**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 25-5418**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

DISTRICT OF COLUMBIA,
*Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, *et al.*,
*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the District of Columbia

---

**EMERGENCY MOTION FOR ADMINISTRATIVE STAY
AND FOR STAY PENDING APPEAL (RELIEF REQUESTED BY
DECEMBER 4, 2025)**

---

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE
J. KAIN DAY
*Attorneys, Appellate Staff
Civil Division, Room 7539
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-514-3511*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties and Amici

Plaintiff-appellee is the District of Columbia. Defendants-appellants are Donald J. Trump, in his official capacity as President of the United States; the United States Department of Defense; Peter B. Hegseth, in his official capacity as Secretary of Defense; the United States Army; Daniel P. Driscoll, in his official capacity as Secretary of the Army; the United States Department of Justice; Pamela J. Bondi, in her official capacity as United States Attorney General; the United States Marshals Service; and Gadyaces S. Seralta, in his official capacity as Director of the United States Marshals Service. The following individuals or entities also noticed appearances and/or filed amicus briefs in the district court: Martin Ackerman, Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals, Law Enforcement Action Partnership, Center for Policing Equity, National Police Accountability Project, Policing Project at New York University School of Law, Washington Lawyers' Committee for Civil Rights and Urban Affairs, NAACP Legal Defense and Educational Fund, Inc., Democracy Forward Foundation, Mia McClain, Allen Chapel AME Church, National African-American Clergy Network, Metropolitan African Methodist Episcopal Church, Christopher Zacharias, Aaron Alexander, Center for Racial Equity and Justice, New Bethel Baptist Church, Barbara Williams-Skinner, Clergy Network, Peace Baptist Church, Emory United

Methodist Church, Religious Nationalism Project, Howard University School of Law Civil Rights Clinic, Shiloh Baptist Church of Washington, D.C., All Souls Church Unitarian, Interfaith Alliance, Sojourners/Sojo Action, Terrance McKinley, America First Legal Foundation, Mike Howell, Constitutional Accountability Center, Steady State, State of Maryland, State of South Carolina, State of West Virginia, State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of Oklahoma, State of South Dakota, State of Tennessee, State of Texas, Commonwealth of Virginia, and Oversight Project.

## B.    Rulings Under Review

The ruling under review (issued by Judge Jia M. Cobb) is an order (and memorandum opinion) granting a preliminary injunction and a section 705 stay.

## C. Related Cases

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

_/s/ Andrew M. Bernie_
ANDREW M. BERNIE

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ..................................................................1

STATEMENT ......................................................................4

ARGUMENT .....................................................................10

    I.     The Government Is Likely to Succeed on Appeal ...................................10

    II.    The Remaining Factors Support a Stay....................................19

    III.   The Court Should Grant an Administrative Stay ....................................22

CONCLUSION .....................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Banner v. United States,*
    428 F.3d 303 (D.C. Cir. 2005) ............................................................ 5

*Dalton v. Specter,*
    511 U.S. 462 (1994) ......................................................................... 19

*Perpich v. Department of Def.,*
    496 U.S. 334 (1990) ........................................................................... 4

*Seegars v. Ashcroft,*
    297 F. Supp. 2d 201 (D.D.C. 2004), *partially reversed on other grounds,*
    396 F.3d 1248 (D.C. Cir. 2005) ........................................................ 12

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) ......................................................................... 19

*Stirling v. Minasian,*
    955 F.3d 795 (9th Cir. 2020) .............................................................. 4

**U.S. Constitution:**

Art. I, § 8, cl. 17 ................................................................................. 5

**Statutes:**

Pub. L. No. 104-321, 110 Stat. 3877 (1996):
    art. I ...............................................................................................17
    art. III(B) ........................................................................................17

32 U.S.C. § 502(f) ............................................................................... 9

32 U.S.C. § 502(f)(1) ....................................................................... 1, 2

32 U.S.C. § 502(f)(2)(A) ........................................................ 1, 2, 10, 16

D.C. Code § 1–201.01 *et seq.* ............................................................. 5

D.C. Code § 1-206.02(b) ...................................................................... 5

D.C. Code § 1-207.40(a) ............................................................ 20

D.C. Code § 5-201 .................................................................... 20

D.C. Code § 7-2332 .................................................................. 18

D.C. Code § 23-501 .................................................................. 20

D.C. Code § 23-581 .................................................................. 20

D.C. Code § 49-102 .............................................................. 2, 11

D.C. Code § 49-103 .................................................................. 15

D.C. Code § 49-301(a) ............................................................... 5

D.C. Code § 49-404 .............................................................. 2, 11

D.C. Code § 49-409 .............................................................. 5, 12

D.C. Code § 49-901 .................................................................. 14

**Executive Materials:**

Exec. Order No. 11485,
    34 Fed. Reg. 15411 (Oct. 3, 1969) ....................................... 5, 14

Exec. Order No. 14333,
    90 Fed. Reg. 39301 (Aug. 11, 2025) ......................................... 6

*Use of the Nat'l Guard to Support Drug Interdiction Efforts in D.C.*,
    13 Op. OLC 91 (1989) ................................................... 11, 14

Presidential Memorandum, *Restoring Law and Order in the District of Columbia*
    (Aug. 11, 2025) ............................................................ 6

U.S. Dep't of Justice, *Re Authority to use the Nat'l Guard*
    *of D.C. to supplement civilian police force activities during*
    *a massive demonstration or parade in D.C.* (July 30, 1963) ............... 11

**Other Authorities:**

Gabe Cohen, *DC sues Trump administration over National Guard
    deployment*, CNN (Sept. 4, 2025), https://www.cnn.com/2025/
    09/04/politics/washington-dc-sues-trump-national-guard. ..................................21

*D.C. Home Rule*, https://dccouncil.gov/dc-home-rule/ ..........................................16

Lawrence Kapp & Barbara Salazar Torreon, Cong. Rsch. Serv.,
    RL30802, *Reserve Component Personnel Issues: Questions
    and Answers* (2021)..................................................................................10

*Martial Law*, Black's Law Dictionary (12th ed. 2024), Westlaw ..........................15

Mayor's Order 2025-090 (Sep. 2, 2025)...................................................................8

Greg Norman, *Bowser pushes police recruitment, says DC needs
    'hundreds more' cops as Trump federal takeover nears end*,
    Fox News (Sept. 3, 2025), https://www.foxnews.com/politics/
    bowser-pushes-police-recruitment-says-dc-needs-hundreds-
    more-cops-trump-federal-takeover-nears-end .......................................................8

## GLOSSARY

| | |
|---|---|
| Emergency Management Assistance Compact | EMAC |
| Joint Task Force District of Columbia | JTF-DC |
| Memorandum of Understanding | MOU |
| DC's Metropolitan Police Department | MPD |
| Office of Legal Counsel | OLC |

## INTRODUCTION

The President is the Commander-in-Chief of the District of Columbia National Guard. The District of Columbia is a federal enclave under the legislative control of Congress. And under federal law, the National Guard may be deployed to provide "[s]upport of operations or missions undertaken … at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(1), (2)(A). A district court has nonetheless issued a sweeping preliminary injunction that blocks the President from deploying a *federal* entity to a *federal* enclave consistent with *federal* law—supposedly because the D.C. Mayor did not request it. This is a wholly unjustified incursion into the territory of both the President and Congress. And in the name of vindicating local interests, it threatens to derail a remarkably successful mission that, with the participation and collaboration of D.C. authorities, including the D.C. Mayor, has reduced crime and improved life in our Nation's capital. This Court should grant a stay pending appeal, or at minimum an administrative stay, by December 4.

President Trump ordered the mobilization of the D.C. National Guard nearly four months ago. The President also directed the Secretary of War to coordinate with States to deploy additional National Guard members to D.C. at federal expense. The results speak for themselves. The deployment has been a part of a broader federal-local effort between federal agencies and the D.C. Mayor's office to safeguard the

public from violent crime. The success of that coordination is undeniable. Even D.C.'s Mayor has acknowledged that "violent crime in the District has noticeably decreased" since August, "due to the cooperative efforts between District and federal officials," thereby returning D.C. to its proper pride of place and allowing Americans from all walks of life the ability to visit Washington, D.C., without fear for their safety.

This deployment is plainly lawful. The D.C. Guard is a federal entity over which the President serves as Commander-in-Chief. Even without express statutory authorization, he may deploy them to a federal enclave for federal purposes without judicial second-guessing. In any event, the President also has express statutory power: Federal law authorizes both the D.C. Guard and Guard members from other States to provide "[s]upport of operations or missions undertaken … at the request of the President or Secretary of Defense," which is exactly what deployed Guard members are doing. 32 U.S.C. § 502(f)(1), (2)(A). If that were not enough, the D.C. Code recognizes the Guard's permissible use "to aid the civil authorities in the execution of the laws," D.C. Code § 49-404, and the Commanding General's power to "order out any portion of the National Guard" for any "duties" he "may deem proper," *id.* § 49-102. It is hard to imagine a decision *less* susceptible to judicial overriding than the Commander-in-Chief's directives that are squarely authorized by multiple federal laws.

2

The district court's contrary analysis does not withstand scrutiny. The court thought that, with narrow exceptions, the President can only deploy the D.C. Guard upon a request from the Mayor or other civil authorities in response to a riot or similar tumult. But the President does not need local consent to deploy a federal entity to a federal enclave consistent with federal law. And the district court's analysis would leave a vacuum whereby *no one* could order the D.C. National Guard to take routine actions traditionally performed by state national guards.

As to other States' Guards, the district court reasoned that Section 502(f) only permits missions that are authorized by the deploying States' laws. But the district court had no basis for concluding (and did not even attempt to demonstrate) that the deployments violate the laws of any deploying State. The district court also appeared to hold that an interstate compact—to which the federal government is not a party, which concerns requests among the States, and which does not purport to be exclusive—divests the President of his express authority to obtain assistance from state National Guards and transfers that power exclusively to the D.C. Mayor. That conclusion is indefensible.

The equitable factors overwhelmingly favor a stay. The injunction impinges on the President's express statutory authority as Commander-in-Chief of the D.C. National Guard and impermissibly second-guesses his successful efforts to address intolerably high crime rates in the Nation's capital. Meanwhile, the only irreparable

harm to D.C. that the district court identified was a supposed "sovereign" injury. But the District is not a sovereign—it is a creation of Congress. And anyway, the federal mission does not detract from D.C.'s limited delegated authority. Guard members are not making arrests, conducting searches and seizures, or deciding whether to arrest, prosecute, or investigate crime; they are merely deterring crime and supporting federal and local law-enforcement as part of the President's Safe and Beautiful Task Force. The District itself, and the public interest, are thus equally victims of this misguided injunction.[1]

## STATEMENT

**1.a.** Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990) (citation omitted). Guard members may serve on (1) federal active duty under Title 10; (2) state control in support of a federal mission under Title 32; or (3) state active duty. Title 32 authorizes "members [to] provide military support as state National Guard members under state control" while "in the service of the federal government and funded by the federal government." *Stirling v. Minasian*, 955 F.3d 795, 798 (9th Cir. 2020). Section

---

[1] In opposing a preliminary injunction, Defendants asked the district court to stay any preliminary injunction pending appeal, Dkt. 34 at 43-44, and Defendants repeated that request at the hearing, but the court granted only a 21-day administrative stay "to permit orderly proceedings on appeal." ADD.60-61.

502(f)(2)(A) of Title 32 provides that Guard members may "be ordered to perform training or other duty," including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense."

**b.** The Constitution provides that "[t]he Congress shall have Power ... [t]o exercise exclusive Legislation in all Cases whatsoever, over such District ... as may … become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17 (first ellipsis in original). The National Guard system thus operates differently in D.C. as compared to the States. The President, rather than a local official, is the D.C. Guard's Commander-in-Chief. D.C. Code § 49-409. And the President appoints and commissions the D.C. Guard's Commanding General. *Id.* § 49-301(a). The President has delegated command of the D.C. Guard in its militia status to the Secretary of War, who has delegated that responsibility to the Secretary of the Army. *See* Exec. Order No. 11485, §§ 1, 4, 34 Fed. Reg. 15411, 15411 (Oct. 3, 1969).

In 1973, Congress passed and President Nixon signed the Home Rule Act (codified as amended at D.C. Code § 1–201.01 *et seq*.). Under the Act, "a mayor and council elected by residents of the District exercise certain executive and legislative powers delegated by Congress." *Banner v. United States*, 428 F.3d 303, 305 (D.C. Cir. 2005) (per curiam). But the Act expressly provides that it does not give the D.C. government any "greater authority over ... the National Guard of the District of Columbia" than it had prior to Home Rule. D.C. Code § 1-206.02(b).

5

**2.a.** On August 11, President Trump issued Executive Order 14333, "Declaring a Crime Emergency in the District of Columbia." As the Order notes, the District has a higher violent crime, murder, and robbery rate than all 50 States, and also has the Nation's highest vehicle theft rate. 90 Fed. Reg. 39301 (Aug. 11, 2025). "Violence and crime hamper the recruitment and retention of essential Federal employees, undermine critical functions of Government and thus the well-being of the entire Nation, and erode confidence in the strength of the United States." *Id.*

**b.** That same day, President Trump directed the Secretary of War to mobilize the D.C. National Guard. *See* Presidential Memorandum, *Restoring Law and Order in the District of Columbia*, § 1 (Aug. 11, 2025). The President further directed the Secretary "to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission." *Id.* § 2.

Implementing the memorandum, the Secretary of the Army approved the D.C. Guard's use to "provide critical support to law enforcement efforts in the District of Columbia." ADD.139. The Commanding General of the Guard then issued Permanent Order 25-223, ordering Guard members to "protect federal property and functions in the District of Columbia and to support federal and District law enforcement." ADD.141.

The D.C. Guard also executed memoranda of understanding (MOUs) with National Guard units from several States. ADD.142-73. The MOUs provide that deployed units will remain under the control of the sending States, ADD.142-43, and direct that the MOUs be interpreted consistent with federal and state law. ADD.150. State Guard members began arriving on August 16 and, at the time of the preliminary injunction briefing, numbered approximately 1,235. ADD.69.

**c.** Since deployment, the National Guards have been organized with a Commanding General overseeing the Joint Task Force District of Columbia (JTF-DC). ADD.67. The JTF-DC's mission is to provide support to D.C.'s Metropolitan Police Department (MPD) as well as federal law enforcement in D.C. ADD.68.

Among other extensive coordination with local authorities, there are daily meetings among JTF-DC, the MPD, the Washington Metro Transit Police Department, the Marshals Service, and the U.S. Park Police. ADD.70. The MPD provides JTF-DC with daily information about suspects to be on the lookout for and any relevant planned MPD operations. ADD.70. The MPD also gives JTF-DC daily updates on the location and frequency of reported crime. ADD.70

National Guard members are not permitted to make arrests, conduct searches or seizures, or engage in similar functions. ADD.68-69. They may make temporary detentions until law enforcement arrives but "[t]he decision of whether to arrest an individual, and any investigation of the underlying incident, are solely the

responsibility of the supported law enforcement agency." ADD.69. When Guard members observe crime, they call 9-1-1, which dispatches MPD forces to the scene. ADD.71. The JTF-DC thus supports the MPD and other law enforcement agencies by acting as a presence to deter crime, reporting crimes they witness, and assisting law enforcement in support missions when requested to do so. ADD.68. Guard members also patrol sites where the Park Police typically patrols, freeing Park Police to partner with MPD off federal property. ADD.82. These additional resources are particularly beneficial given the District's acknowledged shortage of police officers. As recently as August 28, Mayor Bowser repeated that D.C.'s longstanding goal has been a 4,000-officer force; MPD currently has approximately 3,188 officers.[2]

**d.** On September 2, 2025, Mayor Bowser issued Mayor's Order 2025-090. Section I.B.1 of the Order identified "common goals" with the President's Safe and Beautiful Task Force. As Mayor Bowser highlighted, the close cooperation between the District and Federal Governments has yielded significant progress: "[s]ince August 11, 2025, due to the cooperative efforts between District and federal officials, violent crime in the District has noticeably decreased." *Id.* § I.E.

---

[2] Greg Norman, *Bowser pushes police recruitment, says DC needs 'hundreds more' cops as Trump federal takeover nears end*, Fox News (Sept. 3, 2025), https://www.foxnews.com/politics/bowser-pushes-police-recruitment-says-dc-needs-hundreds-more-cops-trump-federal-takeover-nears-end.

**3.a.** Two days after this statement, the D.C. Attorney General filed this action. ADD.87. On September 9, he sought a preliminary injunction that would bar Defendants from deploying National Guard troops "to conduct law enforcement in the District of Columbia without the express consent of the Mayor." ADD.84. Following discovery and supplemental briefing, the district court held a hearing on the preliminary injunction motion (and Defendants' motion to dismiss) on October 24.

**b.**      On November 20, the district court granted a preliminary injunction. The court did not base its decision on any factual findings, but instead concluded that the deployments were contrary to law in two respects. As to the D.C. Guard, the Court held that their deployment must be specifically authorized by Title 49 of the D.C. Code but was not. ADD.21-37. As to the state Guards, the district court concluded that any deployment must be authorized by state law and that there was no state-law basis for the deployments. ADD.42. And the district court appeared to conclude that, notwithstanding 32 U.S.C. § 502(f), any request for assistance from States to deploy National Guard members to D.C. could only be made under the Emergency Management Assistance Compact (EMAC)—a compact to which the federal government is not a party—and only by the District's Mayor. ADD.47-50

## ARGUMENT

## I.    The Government Is Likely to Succeed on Appeal.

**1.** The deployment of the D.C. and state National Guards is lawful.

**a.** The basis for the deployments is straightforward. All the National Guard units are operating in Title 32 status. Title 32 authorizes National Guard members to "be ordered to perform training or other duty," which may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f), (f)(2)(A). Section 502 thus authorizes the President or Secretary to request National Guard units to support a federal mission, which necessarily includes operations in D.C. And nothing in this language limits the type of missions that the President and Secretary of Defense can request.

This provision has been "frequently used." Lawrence Kapp & Barbara Salazar Torreon, Cong. Rsch. Serv., RL30802, *Reserve Component Personnel Issues: Questions and Answers* 20 (2021). National Guard members were deployed to provide airport security after 9/11; assist with the response to Hurricanes Katrina and Rita in 2005; support border security missions in 2006-2008, 2010-2016, and 2018-2020; support COVID-19 response efforts across the country; and respond to civil disturbances in Washington, D.C. in 2020-2021. *Id.*

10

In addition, the D.C. Code recognizes the D.C. Guard's use "to aid the civil authorities in the execution of the laws." D.C. Code § 49-404; *Use of the Nat'l Guard to Support Drug Interdiction Efforts in the D.C.,* 13 Op. OLC 91, 97 (1989) (concluding that Sections 49-404 and 49-102 both authorize the D.C. Guard to engage in law enforcement activity). Section 49-102—which provides that the Commanding General "may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper," D.C. Code § 49-102—likewise confers such authority. The phrase "other duties, as he may deem proper" provides broad authority to order out the Guard.

The Executive Branch, moreover, has so interpreted these provisions for decades. In 1963, OLC concluded that Section 49-102 authorized "the President to request or urge the commanding general to use the National Guard in support of activities of the District of Columbia police whenever he feels that the welfare, safety, or interest of the public would be served thereby." *See Re Authority to use the National Guard of the District of Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of Columbia* 3 (July 30, 1963). OLC has consistently adhered to that analysis, explaining more recently that "[t]he authorization to order out the Guard for 'other duties, as he may deem proper' has long been viewed as broad enough to include law enforcement activities." *Use of the Nat'l Guard*, 13 Op. O.L.C. at 93.

11

**b.** The district court's contrary analysis is wrong.

**i.** As to the D.C. Guard, the district court held that its deployment was not specifically authorized by statute, which the court read as permitting the President to deploy the Guard only for the purposes set forth in D.C. Code § 49-102 (and reading that provision's broad reference to "other duties" not to mean what it says), and for the purposes set forth in section 49-103 only upon request from "the civil authorities" (which the court apparently read as limited to local government officials). ADD.21-37.

Initially, the district court's analysis is untenable on its face. If the district court were right that the President's status as Commander-in-Chief, D.C. Code § 49-409, "is only a designation of command" supplying no freestanding authority, ADD.21, and that the President's only powers to use the Guard are those identified in Sections 49-102 and 49-103 (as narrowly construed by the district court), the D.C. Guard would be unable to perform many of the tasks traditionally performed by National Guards, such as responding to natural disasters like hurricanes, floods, and wildfires. None of these ordinary uses is spelled out in Title 49 of the D.C. Code.

Facial implausibility aside, the district court's analysis is incorrect. For starters, the President does not need express statutory authorization to order the D.C. Guard to undertake the limited mission here. The D.C. Guard is a *federal entity*. *Seegars v. Ashcroft*, 297 F. Supp. 2d 201, 241 (D.D.C. 2004), *partially reversed on*

*other grounds*, 396 F.3d 1248 (D.C. Cir. 2005). The D.C. Code is federal law. And the violent crime problem in D.C. is not simply a local concern, but also endangers federal property and officials. The President, as the Commander in Chief of the D.C. Guard, does not need express statutory authority to utilize those federal forces at his command in support of federal interests.

In concluding otherwise, the district court noted that the President stands in a relation to the D.C. Guard analogous to that of a Governor and a state Guard, and further noted that many state provisions both identify the Governor as Commander-in-Chief and separately spell out the Governor's authority. ADD.22. But to the extent those state provisions are instructive, they underscore that Governors' Commander-in-Chief authorities broadly encompass the power to execute the laws. *See* ADD.25.

Even assuming express statutory authority to deploy the D.C. Guard were needed, moreover, that authority need not be delineated in *Title 49*. As the district court noted, the D.C. National Guard is deployed in a Title 32 status. ADD.20. The D.C. Guard were ordered to duty under Section 502(f)(2)(A). ADD.141. And Section 502(f)(2)(A) clearly authorizes this mission: The D.C. Guard is providing "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense."

13

But Title 49 provides that express authority as well. As to Section 49-102, the district court read "other duties" as limited to exercises similar to drills, inspections, escorts, and parades. ADD.22. Even under that narrow construction, the district court's conclusion was erroneous. The Guard's activities—primarily serving simply *as a presence* at highly trafficked areas, while not making arrests, investigating crimes, or taking similar actions—is not different in kind from, for example, providing escorts.

In any event, the district court's narrow reading is at odds with the plain text of Section 49-102 as well as section 49-404 and the history of Title 49. As OLC explained, reading "other duties" broadly, consistent with its normal meaning, "is especially appropriate in light of section [49-404] of the Code, which makes it clear that the National Guard, acting as militia, may be 'called ... to aid the civil authorities in the execution of the laws.'" *Use of the National Guard*, 13 Op. O.L.C. at 93 (ellipsis in original). Another provision of the Code similarly contemplates the Guard being called in aid of the civil authorities in cases other than riots and related breaches of the peace. D.C. Code § 49-901 ("riot, tumult, breach of the peace, or whenever called in aid of the civil authorities"). In addition, a 1969 Executive Order predating the Home Rule Act provides that the Secretary of Defense may order out the D.C. National Guard "to aid the civil authorities of the District of Columbia." Exec. Order No. 11485 § 1, 34 Fed. Reg. 15411. That underscores that, prior to the

14

Home Rule Act, the President's authority was well understood to encompass ordering out the Guard to aid the civil authorities. And Congress made clear in Section 1-206.02(b) that the Home Rule Act does not displace that preexisting authority.

The district court also reasoned that any power to "aid" the civil authorities under Section 49-404 "is best read as hinging upon a request by a civil authority under section 49-103." ADD.32 (emphasis omitted). But "civil authority" is not synonymous with local D.C. government (as is clear from Section 49-103, which allows for requests by federal, not just local, officials). Civil authority in this context simply means civilian officials (as contrasted with the military). *See Martial Law*, Black's Law Dictionary (12th ed. 2024), Westlaw ("The law by which during wartime the army, instead of civil authority, governs the country."). The President *is himself* part of the District's civil authority.

In any event, Section 49-103 merely provides a procedural mechanism for the Mayor and two specified federal officials to request the D.C. Guard's assistance under specified circumstances—and it provides that, upon such a request, the President is obligated to respond, though the specifics of the response are left to his discretion. D.C. Code § 49-103. It does not impliedly restrict the President's authority under Section 49-404. The reason the Mayor *must make* a request is because the Guard is a federal entity over which D.C. officials have no control.

15

Nothing in this provision divests the President of his authority over the D.C. National Guard and the Home Rule Act expressly directs otherwise.

Finally, in concluding that the Mayor's consent is necessary, the district court also reasoned that, prior to 1975, district commissioners "needed to call upon the President before the DCNG could be deployed for the enforcement of the laws." ADD.34. But the prior statute the district court invoked simply authorized the commissioners to call on the President for assistance; it did not suggest a request was *required*. In any event, any authority held by the D.C. government before 1975 was not authority *independent* of the President (because the President appointed those individuals). *See* D.C. Home Rule, https://dccouncil.gov/dc-home-rule/.

**ii.** The district court's conclusion that the deployment of state National Guards was contrary to law fares no better. The district court reasoned that 32 U.S.C. § 502(f)(2)(A) "is best understood to encompass operations or missions requested by the President that are authorized under state law." ADD.42. By "state law," the district court appears to have meant the law of the deploying state (and the D.C. Code of course is not "state law"). *See* ADD.47-48.

If that is what the district court meant, its analysis is baffling. Defendants never contended that Section 502(f)(2)(A) purports to allow state governors to violate state law. There was thus no briefing on what the relevant state laws permit. The States that agreed to the MOUs presumably determined that the deployments

16

comported with state law (and as noted above, the MOUs direct that they are to be interpreted consistent with state law). And even if the district court were right that deployments violate the law of the deploying State, the remedy, if any, would be a suit against the State and its Governor.

By contrast, if the district court meant that the deployment of out-of-state National Guards is unlawful because the D.C. Guard's activities are unlawful, that claim fails for the reasons stated above.

Relatedly, the district court appeared to suggest that a request for assistance from state Guards could only come in the form of a request by the Mayor under the EMAC. ADD.48-50. But the EMAC plainly has no relevance to the legality of the requests and resulting deployments here. The EMAC is an interstate compact among the 50 States, D.C., Puerto Rico, and all U.S. Territorial possessions. Pub. L. No. 104-321, 110 Stat. 3877 (1996), art. I. Congress approved the compact but the federal government is not a party to it. The EMAC provides a procedure for signatory States to request assistance from other signatory States, *id.* Art. III(B), but those general provisions are not specific to D.C., do not refer to the Mayor, and are not even limited to National Guard assistance.

In any event, the EMAC is general authority given to the several States (as well as the District, Puerto Rico, and U.S. territories) to obtain assistance *from each other*. Title 32 expressly authorizes the President to authorize use of the National

Guard for a federal purpose and at federal expense. Nothing in the EMAC's language suggests that it is the sole mechanism for obtaining assistance from States, and there is no evidence that Congress thought that either its approval of the Compact or its authorization for the Mayor to execute it divested the President of his express statutory authority to request assistance from state National Guards and placed that responsibility solely in the hands of a local official with no Guard-related responsibilities.

Finally, even if the EMAC were the exclusive mechanism for obtaining assistance, the appropriate authority to make that request would be the President, not the D.C. Mayor. Contrary to the district court, federal law does not "give[] the Mayor power to submit requests under the compact." ADD.49 (citing only D.C. Code § 7-2332, which merely gives the Mayor authority to execute the compact).

**c.** Defendants' position does not create "implausible results." ADD.50. The district court emphasized that the President can only federalize the Guard under Title 10 in specified circumstances, "limited by equally strong restraints," ADD.54, and suggested that permitting deployments here pursuant to Title 32 undermines those restraints. But unlike National Guard members federalized under Title 10, Guard members in a Title 32 status remain under the command and control of the deploying State, are subject to the deploying State's laws, and are deployed with the consent of the State.

18

Relatedly, the district court contended that upholding the deployment would mean that States could, at the request of the President, deploy troops to other States without the *receiving State's* consent. ADD.54-55. This is a strawman; Defendants never made any such contention. Nor is that an implication of Defendants' argument. D.C. is not a State, and neither the Home Rule Act nor any other source of law provides the Mayor with any authority to veto the deployment of state Guards in response to the President's request.

## II.    The Remaining Factors Support a Stay.

The remaining equitable factors favor the government.

**1.** D.C. will not suffer harm from a stay. Although D.C. attempted to demonstrate concrete harms from the deployment—such as harm to its economy—its showing was flimsy and not even the district court accepted it. The sole basis for the district court's irreparable-harm analysis was its conclusion that the District suffered a sovereign injury because the Guard's deployment supposedly "usurp[s] the District's rights to home rule." ADD.57. But that analysis simply conflates the merits with irreparable harm. The legal violations the district court found—based on the Home Rule Act and a purported lack of authority—are statutory, not constitutional. *See Dalton v. Specter*, 511 U.S. 462, 473 (1994). And alleged violations of a federal statute do not give rise to any presumption of irreparable harm. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-48 (2024).

19

Nor did the district court identify any concrete sense in which the deployment affects the D.C. government's exercise of delegated powers. The district court contended that "[u]nder D.C. law, the powers to 'preserve the public peace,' 'prevent crime and arrest offenders,' and 'enforce and obey all laws' are reserved to the local elected representatives of the District." ADD.58. But for starters, those powers are at best highly qualified. The D.C. government does not have exclusive law enforcement jurisdiction. The Park Police can make arrests on the same terms as the MPD. D.C. Code § 5-201. The Marshals Service can make arrests for crimes committed in their presence. *Id.* §§ 23-501, 23-581. And if the President determines that emergency conditions require use of the MPD "for federal purposes, he may direct the Mayor to provide him, and the Mayor shall provide, such services of the Metropolitan Police force as the President may deem necessary and appropriate." *Id.* § 1-207.40(a).

In any event, the Guard is not "infring[ing] upon the District's right to govern itself and to make its own decisions on key elements of home rule, including how to best deter crime." ADD.58. As discussed above, Guard members are not making arrests, conducting searches and seizures, or making decisions on whether to arrest, prosecute, or investigate crime. Much of their activities consist of providing a presence in certain areas, thus freeing up the District's undermanned police to conduct law enforcement; and MPD is helping facilitate the Guard's efforts.

20

The district court also framed the injury as undermining the District's supposed right to determine "when to call for emergency assistance from other states." ADD.58. But that is just another way of saying that the D.C. government disagrees (albeit inconsistently[3]) with the deployment decision. That does not constitute irreparable harm and is certainly not a basis for denying a stay.

**2.** On the other side of the ledger, the injunction impinges on the President's authority as Commander in Chief of the D.C. National Guard and enjoins deployments that are expressly authorized by statute. The injunction also impermissibly second-guesses the President's judgments that crime rates in D.C. are unacceptably high and that Guard deployment would improve conditions (a judgment with which the District's Mayor previously agreed). And in practical terms the injunction nullifies agreements carefully negotiated between the Executive Branch and the executive authorities of several States.

## III.   The Court Should Grant An Administrative Stay.

Defendants request an immediate administrative stay. As the district court acknowledged in granting a 21-day administrative stay, ADD.60-61, the injunction

---

[3] Mayor Bowser was informed of this action the morning it was filed and "repeatedly declined to endorse the lawsuit." Gabe Cohen, *DC sues Trump administration over National Guard deployment*, CNN (Sept. 4, 2025), https://www.cnn.com/2025/09/04/politics/washington-dc-sues-trump-national-guard. Mayor Bowser stated only subsequently that she does not support the Guard's continued deployment. Dkt. 70 at 1-2.

would require halting the deployment of over 2,000 members of the National Guard, including more than 1,000 Guard members who have been deployed out-of-state. That relief—in addition to being extraordinarily disruptive—would alter the status quo as it has existed for approximately four months.

In addition, D.C. waited nearly a month to seek a preliminary injunction, and then substantially delayed resolution of its preliminary injunction motion to seek discovery (which proved irrelevant to the district court's decision). These circumstances underscore that a full stay is warranted but, at the very least, D.C. cannot plausibly contend that an injunction must go into effect before this motion is even resolved.

Defendants respectfully request that the Court issue a decision on Defendants' request for an administrative stay by December 4, to allow Defendants to seek relief from the Supreme Court if a stay is denied.

## CONCLUSION

The Court should grant an immediate administrative stay by December 4 and should grant a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY

 */s/ Andrew M. Bernie*
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3411*
  *andrew.bernie@usdoj.gov*

NOVEMBER 2025

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,141 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Times New Roman typeface.

*/s/ Andrew M. Bernie*
Andrew M. Bernie

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/Andrew M. Bernie*
ANDREW M. BERNIE

**ADDENDUM**

# TABLE OF CONTENTS

Memorandum Opinion, Dkt. 88 (Nov. 20, 2025) .................................................... ADD.1

Order Granting Preliminary Injunction, Dkt. 89 (Nov. 20, 2025) ..................... ADD.62

Order Granting in Part and Denying in Part Motion for Expedited Discovery, Dkt. 44 (Sept. 19, 2025) ................................................................ ADD.64

Declaration of Colonel Lawrence M. Doane (with 1 of 2 attachments), Dkt. 34-1 (Sept. 16, 2025) ............................................................. ADD.67

Declaration of Christopher York (without attachments), Dkt. 34-2 (Sept. 16, 2025) .................................................................. ADD.77

Declaration of Donald Snider, Dkt. 34-3 (Sept. 16, 2025) .................................. ADD.80

Plaintiff's Motion for a Preliminary Injunction and Section 705 Stay, Dkt. 3 (Sept 9, 2025) ................................................................... ADD.84

Complaint, Dkt. 1 (Sept. 4, 2025) ........................................................ ADD.87

Letter from Secretary of Army Approving Use of D.C. National Guard, Dkt. 70-1 (letter dated Aug. 11, 2025) .............................................. ADD.139

Permanent Order 25-223, Dkt. 70-1 (order dated Aug. 11, 2025) ................... ADD.140

Memoranda of Understanding, Dkt. 70-1 ........................................... ADD.142

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DISTRICT OF COLUMBIA,

                 Plaintiff,

      v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al*.,

                 Defendants.

Case No. 25-cv-3005 (JMC)

## MEMORANDUM OPINION

Since August 11, 2025, over 2,000 members of the National Guard have been deployed to the District of Columbia. While in the District, these units have provided support to local and federal law enforcement agencies. Guard units have patrolled on the National Mall, in Metro Transit stations, and across D.C. neighborhoods. The Guard's operations in D.C. have been coordinated by the Joint Task Force District of Columbia (JTF-DC), which oversees units from D.C.'s own National Guard (DCNG) and from other states, including South Carolina, West Virginia, Mississippi, Louisiana, Tennessee, Ohio, Georgia, Alabama, and South Dakota. At this point, National Guard units are expected to remain in the District through February 28, 2026.

The District of Columbia (Plaintiff) filed this suit, alleging that the National Guard deployment violated the Administrative Procedure Act (APA), the District of Columbia Home Rule Act, the Emergency Management Assistance Compact (EMAC), the Posse Comitatus Act (PCA), and the Constitution. The complaint named three categories of Defendants: (1) President Donald J. Trump, (2) the United States Department of Defense, Secretary of Defense Peter B. Hegseth, the United States Army, and Secretary of the Army Daniel P. Driscoll (collectively, DOD Defendants), and (3) the Department of Justice, Attorney General Pamela J. Bondi, the U.S.

1

**ADD.001**

Marshals Service, and Director of the Marshals Service Gadyaces S. Serralta (collectively, DOJ Defendants).[1] Plaintiff then moved for a preliminary injunction and to stay agency action, seeking to enjoin or stay the deployment of the National Guard in the District for the duration of this litigation. Defendants oppose the motion and have also moved to dismiss Plaintiff's suit.

The record in this case, including many of the amicus briefs filed, makes clear that there are strong views on both sides about whether these deployments represent good policy. But the Court is only tasked with deciding whether Defendants' actions are lawful. In this opinion, the Court addresses two of the District's statutory arguments under the APA and finds that it is likely to succeed on the merits of both. First, the DOD Defendants have exceeded the bounds of their authority under Title 49 of the D.C. Code, and thus acted contrary to law, in deploying the DCNG for non-military, crime-deterrence missions in the absence of a request from the city's civil authorities. Second, these Defendants lack statutory authority under 32 U.S.C. § 502 to support their request for assistance from out-of-state National Guards and their actions in calling those Guards to the District. The Court finds that the District's exercise of sovereign powers within its jurisdiction is irreparably harmed by Defendants' actions in deploying the Guards, and that the balance of equities and public interest weigh in the District's favor. As such, the Court will **GRANT** the District's motion for preliminary relief and partially **DENY** Defendants' motion to dismiss on those claims. The Court finds, however, that the public interest weighs in favor of an administrative stay in this case, and that a stay is needed to permit orderly proceedings on appeal. Accordingly, the Court will **STAY** its order for 21 days, until December 11, 2025.[2]

---

[1] The individual Defendants are sued in their official capacities.

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

**ADD.002**

## I.       BACKGROUND

The Court begins by providing some background on the legal structures governing the National Guard, the District of Columbia, and the DCNG in particular. The Court then discusses some factual background on the deployment of the National Guard forces in the District since August 2025 and provides a brief overview of the procedural history of this case.

### A. The National Guard

The modern National Guard descends from the state militias of the colonial era recognized and protected by the Constitution. *See* U.S. Const. art. I, § 8, cl. 15 (providing Congress with the power to "call[] forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"); *id*. cl. 16 (giving Congress the power to organize, arm, and discipline the militia, and to govern "such Part of them as may be employed in the service of the United States," while reserving other powers to the states). "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States."[3] *Perpich v. Dep't of Def*., 496 U.S. 334, 345 (1990). National Guard units retain their state character "unless and until ordered to active duty in the Army." *Id*. The President is the Commander in Chief of "the Militia of the several States, when called into the actual Service of the United States"—i.e., when the National Guard is called into federal service. U.S. Const. art. II, § 2, cl. 1.

---

[3] It has been observed that "[i]n many senses, the National Guard is a constitutional anomaly. It simultaneously serves two sovereigns. On the one hand, it serves as an organized version of the militia intended by the framers to be in control of the states in times of peace. As such, it is constantly available to serve state governments in the event of natural disasters (such as floods or tornadoes) or public disturbances (such as riots or strikes), and always ready to be called upon by Congress to serve the federal government in times of war or national emergency. On the other hand, it is the federal reserve of first resort, a very important component of the armed forces of the United States, capable of being ordered onto active duty upon federal command." Peter A. Fish, *The Constitution and the Training of National Guardsmen: Can State Governors Prevent Uncle Sam from Sending the Guard to Central America?*, 4 J.L. & Pol. 597, 636 (1988).

**ADD.003**

The National Guard can operate in three statuses: state active duty, federal active duty under Title 10 of the U.S. Code, and full-time National Guard duty under Title 32 of the U.S. Code. When a member of the National Guard is operating under state active duty, they act "under state control for state purposes" and "at state expense." *Stirling v. Minasian*, 955 F.3d 795, 798 (9th Cir. 2020). In contrast, federal active duty pursuant to Title 10 refers to duty that the National Guard undertakes "in the active military service of the United States." 10 U.S.C. § 101(d)(1). The President can call up the National Guard for federal active duty—known as federalizing the Guard—under limited circumstances, including when there is an insurrection, invasion, or rebellion, or if the President is unable to execute the laws of the United States with regular forces. *See* 10 U.S.C. §§ 251–53; *id.* § 12406. When federalized, the National Guard is subject to the restrictions of the Posse Comitatus Act, barring it from conducting domestic law enforcement. 18 U.S.C. § 1385 (prohibiting the Army and the Air Force from being used "as a posse comitatus or otherwise to execute the laws"); *see also Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019) ("Federal service for purposes of the Posse Comitatus Act refers to standing active duty forces organized under Title 10 of the U.S. Code.").

In this case, all of the National Guard units at issue, from D.C. and out of state, are operating pursuant to the third status—a hybrid state/federal status under Title 32 also referred to as "[f]ull-time National Guard duty." 32 U.S.C. § 101(19). Title 32 authorizes "members [to] provide military support as state National Guard members under state control" while also being "in the service of the federal government and funded by the federal government." *Stirling*, 955 F.3d at 798. In other words, Title 32 covers those activities performed by state National Guard units when they remain under the control of their own state governors and generals but receive federal funding to assist with a federal mission. Duties under Title 32 are defined as "training or

**ADD.004**

other duty" performed by a member of the National Guard under sections 316, 502, 503, 504, or 505 of Title 32 "for which the member is entitled to pay from the United States." 32 U.S.C. § 101(19). Relevant here, section 502(f) authorizes a member of the state National Guard to "be ordered to perform training or other duty," including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f).

When Title 10's predicates are satisfied—such as in the case of a rebellion—the President can order federalized National Guard units into any state across the country, regardless of which states the troops originate from. *See* 10 U.S.C. § 12406 (allowing the President to call into federal service the National Guard units of "any State" and to deploy those units "as he considers necessary"). Accordingly, in commanding the federalized National Guard, the President does not need the permission of the sending or receiving state governors to act. But under both state active duty and Title 32 statuses, the states can deploy their National Guards to assist each other only by mutual agreement or through the Emergency Management Assistance Compact (EMAC). Pub. L. No. 104–321, § 1, 110 Stat. 3877 (1996). The EMAC provides for "[m]utual assistance between the states" in managing any "emergency disaster" declared by the receiving state governor, including assistance through "use of the states' National Guard forces." *Id.* As explained on the EMAC website, state active duty and Title 32 are two forms of "duty statuses," but "[d]uty statuses are not a mechanism for a deployment outside of the home state." *Duty Status*, EMAC, https://perma.cc/J6F7-D5CW. Instead, the EMAC "serves as th[e] mechanism" for those out-of-state-deployments and "provides [legal] protections . . . for the deploying forces." *Id*.

5

**ADD.005**

### B. The District of Columbia and its National Guard

This case also implicates the unique constitutional position of the District of Columbia. Pursuant to the District Clause of the Constitution, Congress has the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may . . . become the Seat of the Government of the United States." U.S. Const. art. I § 8, cl. 17. In 1889, Congress passed an act establishing the governance of the D.C. militia, which is retained in substantial form by Title 49 of the D.C. Code. The statute provides that "[t]he President of the United States shall be the Commander-in-Chief of the militia of the District of Columbia." D.C. Code § 49-409. Title 49 also explicitly states that the President can call out the DCNG as he deems necessary (1) when there is a "tumult, riot, mob," or other coordinated criminal or violent activity in the District, and (2) the Mayor, the U.S. Marshal, or the National Capital Service Director "call[s] on the [President] to aid them in suppressing such violence and enforcing the laws." *Id*. § 49-103. In 1969, the President delegated this authority over the DCNG to the Secretary of Defense. *Supervision and Control of the National Guard of the District of Columbia*, Exec. Order No. 11485, § 1, 34 Fed. Reg. 15411 (Oct. 1, 1969) (establishing that the Secretary of Defense is authorized to "supervise, administer[,] and control" the DCNG "while in militia status" and that the Commanding General of the DCNG "shall report" to the Secretary of Defense). The Secretary of Defense is empowered to "command the military operations, including training, parades and other duty" of the DCNG and, "subject to the direction of the President," can deploy the DCNG "to aid the civil authorities of the District." *Id*.

In 1973, in response to "calls for local self-government," Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act, more commonly known as the Home Rule Act. *Marijuana Pol'y Proj. v. United States*, 304 F.3d 82, 83 (D.C. Cir. 2002) (citing

**ADD.006**

Pub. L. No. 93-198, 87 Stat. 774 (1973)); *see* D.C. Code § 1-201.02(a) (stating that Congress's intent was to "grant to the inhabitants of the District . . . powers of local self-government"). In doing so, Congress delegated its police powers over the District to the local District government, headed by a mayor. Under D.C. law, "[i]t shall be the duty of the Mayor" to "preserve the public peace," "prevent crime and arrest offenders," and "enforce and obey all laws."[4] D.C. Code § 5-101.03(1), (2), (10); *see id.* § 1-204.22 ("The Mayor shall be responsible for the proper execution of all laws relating to the District."). The Home Rule Act specified, however, that "[n]othing in this chapter shall be construed as vesting in the District government any greater authority over . . . the National Guard of the District of Columbia . . . than was vested in the Commissioner prior to January 2, 1975."[5] *Id.* § 1-206.02(b).

In 2002, in the aftermath of the terrorist attacks on September 11th, 2001, the District of Columbia passed legislation joining the EMAC and authorizing the Mayor to "execute, on behalf of the District of Columbia," the provisions of the compact. D.C. Law 14-194, § 603, 49 D.C. Reg. 5306 (codified at D.C. Code § 7-2332). As adopted by the District, the EMAC can be utilized to seek assistance from other states only after "the Mayor of the District of Columbia" makes "a declaration of a state of emergency or disaster." *Id.* (Article IV of the EMAC).

---

[4] In some instances, the District's power may be shared with federal power. For example, Defendants have noted that some federal entities—including the U.S. Marshals and the U.S. Park Police—play key roles in law enforcement in the District. ECF 35-1 at 18; D.C. Code § 5-201 (addressing the powers and duties of the Park Police); *id.* §§ 23-501, 23-581 (providing certain federal law enforcement officers with the powers to make arrests in the District).

[5] From 1874 to 1967, D.C.'s government was comprised of a three-member commission appointed by the President. Joseph V. Jaroscak & Ben Leubsdorf, Cong. Rsch. Serv., IF12577, Governing the District of Columbia: Overview and Timeline 2 (2024). In 1967, President Lyndon B. Johnson reorganized the District government and established a nine-member council and a mayor-commissioner appointed by the President. *Id.* Since the enactment of the Home Rule Act in 1973, D.C. has been led by an elected mayor and council. *Id.* Section § 1-206.02 of the D.C. Code thus establishes that the elected Mayor, after the passage of the Home Rule Act, does not wield any greater authority over the National Guard than that exercised by the appointed mayor-commissioner prior to 1975.

**ADD.007**

### C. August 2025 Mobilization of National Guard in the District

On August 11, President Trump issued a Presidential Memorandum ordering the deployment of the DCNG and out-of-state National Guards to combat crime in the District:

> Mobilizing the District of Columbia National Guard. Pursuant to my authority under the Constitution and laws of the United States and the District of Columbia, I direct the Secretary of Defense to mobilize the District of Columbia National Guard and order members to active service, in such numbers as he deems necessary, to address the epidemic of crime in our Nation's capital. The mobilization and duration of duty shall remain in effect until I determine that conditions of law and order have been restored in the District of Columbia. Further, I direct the Secretary of Defense to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission.

Presidential Memorandum, *Restoring Law and Order in the District of Columbia*, § 2 (Aug. 11, 2025) [hereinafter August 11 Presidential Memorandum], https://perma.cc/WM9U-RHTE.

The Secretary of the Army and the Commanding General of the DCNG implemented the President's directive. First, the Secretary of the Army approved the DCNG to "provide critical support to law enforcement efforts in the District of Columbia." ECF 70-1 at 135. The Commanding General then issued DCNG Permanent Order 25-223. Under that Order, members of the DCNG were ordered to "protect federal property and functions in the District of Columbia and to support federal and District law enforcement." *Id.* at 137. The Order cites 32 U.S.C. § 502 and D.C. Code §§ 49-101, 49-102, and 49-107 as support for the Commanding General's authority to direct such actions.

Defendants also executed Memorandums of Understanding (MOUs) between the DCNG and various "Supporting States," establishing the terms under which those states would send their National Guard units to the District. According to documents produced by Defendants in discovery, the DCNG executed MOUs with state National Guard units from Louisiana,

**ADD.008**

Mississippi, Ohio, Tennessee, West Virginia, Georgia, Alabama, and South Dakota.[6] ECF 70-1 at

13–16, 17–20, 21–24, 25–28, 29–32, 33–36, 37–40, 41–44. The MOUs' stated purpose is to

"support . . . Operation Make DC Safe and Beautiful," including by facilitating "cooperation and

unity of effort" between the DCNG, U.S. Marshals Service, U.S. Park Police, and Metropolitan

Police Department (MPD). *Id*. at 13. Under the agreements, each governor "retain[s] the authority

to decline missions that will compromise his or her ability to respond to emergency requirements."

*Id*. The MOUs also provide that "[s]ending units will remain under the command and control of

the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving

State will retain tactical control providing operational direction for mission accomplishment," and

that the parties to the MOUs "will perform duties under 32 U.S.C. § 502(f)." *Id*. at 13–14. The

MOUs also list the activities the out-of-state National Guard units may assist in, including

"national monument security, area beautification, traffic control points, and law enforcement

patrols." *Id*. at 13.

The Parties broadly agree that, since being deployed in August, the National Guard has

been operating throughout the District as part of "presence patrol[s]" and "high visibility missions"

to deter crime.[7] ECF 83-1 at 10–11; ECF 35-1 at 23 (National Guard units in the District support

---

[6] Defendants represent in their briefing that JTF-DC consists of personnel from "South Carolina, West Virginia, Mississippi, Louisiana, Tennessee, and Ohio." ECF 35-1 at 22. Defendants have subsequently produced documents, however, referencing the involvement of National Guard units from Georgia, Alabama, and South Dakota. *See, e.g.*, ECF 83-1 at 84–85 (referencing the "TF Bulldawg (GANG)" and "TF Yellow Hammer (ALNG)"); ECF 70-1 at 41–44 (MOU between the DCNG and South Dakota). And it does not appear that Defendants have produced a MOU for South Carolina. The Court understands that operational changes may have occurred since the initial briefing was filed in this case and that the states whose units are deployed within the District at any given moment may continue to shift. The Court's opinion and order applies to all out-of-state National Guard units operating in the District pursuant to 32 U.S.C. § 502(f).

[7] In their briefing, the Parties extensively dispute whether the activities the National Guard units are undertaking in the District qualify as "law enforcement" activities. *See* ECF 35-1 at 34 (Defendants denying that the DCNG or out-of-state National Guard are "making arrests or engaging in direct law enforcement activity"); ECF 3-1 at 45 (Plaintiff arguing that the National Guard troops have been deputized as U.S. Marshals and given the authority to conduct law enforcement). Defendants characterize the missions as crime deterrence and passive patrolling, while Plaintiff argues

**ADD.009**

the MPD and federal law enforcement by "acting as a presence to deter crime, report crimes they witness, and assist law enforcement in support missions"). For example, the National Guard has patrolled Metro stations and busy public spaces like the H Street Corridor, Gallery Place, and Dupont Circle. *See, e.g.*, ECF 83-1 at 10–11. The Guard has also taken over patrolling some parks, freeing up the Park Police to assist the MPD in other activities. ECF 35-1 at 23–24.

And these deployments will continue for a while. On September 3, the Secretary of the Army initially extended the mobilizations of both out-of-state National Guard units and the DCNG through November 30. Secretary of the Army Daniel Driscoll, *Memorandum for Interim Commanding General, DCNG, Re: Extension of 11 August 2025, Mobilization of D.C. National Guard – JTF-DC* (Sept. 3, 2025), ECF 3-2 at 138, ("In alignment with the Presidential memorandum issued [on August 11, 2025], I am extending this mobilization through 30 November 2025, to continue supporting the President's ongoing efforts to restore law and order in the District of Columbia."). On October 31, Defendants filed a notice informing the Court that the DCNG's mission has again been extended through February 28, 2026, and that the Commanding General of the DCNG will implement guidance to effectuate this directive. ECF 81 at 1. Indeed, shortly after the August 11 Presidential Memorandum, the President issued Executive Order No. 14339 concerning "Additional Measures to Address the Crime Emergency in the District of Columbia." 90 Fed. Reg. 42121 (Aug. 25, 2025). That Order directed the Secretary of Defense to "begin training, manning, hiring, and equipping a specialized unit within the District of Columbia National Guard, subject to activation under Title 32 . . . , that is dedicated to ensuring public safety and order in the Nation's capital," *id.* § 2(d)(i), which could be read to suggest that the use of the

---

that the National Guard units are displacing local law enforcement in everyday policing. Whether these activities constitute "law enforcement" is not relevant to the claims that the Court addresses in this opinion. The Court will address any legal questions about the scope of the Guard's activities in the District as necessary in future decisions.

**ADD.010**

DCNG for crime deterrence and public safety missions in the District may become longstanding, if not permanent.

### D. Procedural History

The District filed its complaint on September 4, 2025, alleging four causes of action. ECF 1. The complaint challenges (1) the National Guard's deployment as contrary to law under the APA, citing violations of the Home Rule Act, the EMAC, Title 32 of the U.S. Code, the Posse Comitatus Act, and the Constitution. *Id*. ¶¶ 139–58. Plaintiff also alleges that Defendants' actions are (2) arbitrary and capricious under the APA, (3) violate the Separation of Powers, the Take Care Clause, and the District Clause of the Constitution, and (4) are ultra vires. *Id*. ¶¶ 159–85. A few days later, on September 9, Plaintiff filed its motion for a preliminary injunction and a section 705 stay, asking this Court to enjoin the deployment of National Guard troops and stay agency action pending the resolution of this litigation. ECF 3.

On the same day, Plaintiff filed a motion to expedite discovery in support of the preliminary relief motion, seeking information about the extent of federal command and control over the National Guard troops and the scope of activities in which they were engaged. ECF 4. On September 16, Defendants moved to dismiss the case. ECF 35. After holding a hearing on the District's motion for expedited discovery, the Court authorized the District to serve revised, limited discovery requests on September 19. Sept. 18, 2025 Min. Entry; ECF 43; ECF 44. The Parties completed initial discovery and supplemental briefing based on those discovery productions on October 22. ECF 51. On October 24, the Parties appeared for a hearing before the Court on the District's motion for preliminary relief and Defendants' motion to dismiss.

In this opinion, the Court addresses only Plaintiff's APA contrary to law claims regarding the Home Rule Act, the EMAC, and Title 32 against the DOD Defendants, granting Plaintiff's

**ADD.011**

motion for preliminary relief and denying Defendants' motion to dismiss as to these claims. The Court makes no ruling as to whether the District would also be entitled to preliminary relief on any of its remaining claims, and will resolve Defendants' motion to dismiss those claims separately.

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party moving for a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without preliminary injunctive relief, (3) that the balance of equities tips in its favor, and (4) that an injunction serves the public interest. *Id.* at 20; *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The third and fourth prongs—the balance of equities and the public interest—merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"Under the [APA], a court may set aside an agency's final decision only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ams. for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)). In APA cases, the Court can grant a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 or "issue all necessary and appropriate process to . . . preserve status or rights pending conclusion of the review proceedings" when doing so is "necessary to prevent irreparable injury." 5 U.S.C. § 705. The same factors governing the issuance of a preliminary injunction govern the issuance of relief under section 705. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

ADD.012

### III.    ANALYSIS

Plaintiff seeks to enjoin the DCNG and out-of-state National Guards' deployments in the District as authorized by the DOD Defendants. The Court grants Plaintiff's motion because the DOD Defendants' actions are likely contrary to law under the APA. First, the Court finds that the District has standing to bring its statutory claims and can challenge the DOD Defendants' actions under the APA. Turning to the merits, the Court finds that Defendants lack authority under D.C. law to support their deployment of the DCNG and have exceeded the bounds of their statutory authority under 32 U.S.C. § 502(f) in requesting the deployment of out-of-state National Guards. Finally, the Court concludes that Plaintiff is suffering an irreparable harm to its sovereign powers under the Home Rule Act, which are being usurped by Defendants' unlawful actions. Because the balance of the equities and the public interest also weigh in Plaintiff's favor, the Court grants Plaintiff's motion in relevant part.[8]

### A.    Likelihood of Success on the Merits

#### 1.    Standing

To start, the Court must assure itself of its jurisdiction and confirm that the District has standing to bring its challenges. As noted above, the Court evaluates only two of Plaintiff's claims here: that the DOD Defendants have exceeded their authority (1) under Title 49 of the D.C. Code

---

[8] Defendants also ask the Court to waive the requirement under Local Civil Rule 7(n) to file a certified list of an administrative record simultaneously with the filing of their motion to dismiss. ECF 35-1 at 26 n.10. The administrative record is not necessary for the Court to resolve Plaintiff's preliminary relief motion or Defendants' motion to dismiss on the claims analyzed in this opinion. The issues analyzed here only concern issues of statutory interpretation and the Court is not passing on Plaintiff's arbitrary and capricious claims. Accordingly, the Court will waive Local Civil Rule 7(n) pending the resolution of any appeal of this opinion and order. *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018) (granting Defendants' motion to waive compliance with Local Civil Rule 7(n) because "the Court need not consider the administrative record in evaluating the motions before it"). The Court finds that waiver is additionally justified by the fact that the District does not oppose and instead stated that it views expedited discovery as an alternative to the production of the administrative record in this case. ECF 4 at 9; *see also AAR Airlift Grp., Inc. v. U.S. Transp. Command*, 161 F. Supp. 3d 37, 41 n.1 (D.D.C. 2015) (finding that an administrative record is not necessary when the "documents that would comprise" a substantial portion of the record were already produced as exhibits).

**ADD.013**

in deploying the DCNG and (2) under 32 U.S.C. § 502(f) in requesting the assistance of the out-of-state National Guard units. The Court finds that the District has standing to bring both claims.

The "'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Relevant to the claims the Court resolves in this opinion, the Parties dispute whether the District has suffered any injury from the National Guard units' presence in the District. The District contends that Defendants' deployment of the DCNG and out-of-state National Guard units has caused it many injuries, including the sovereign injury of being "depriv[ed] . . . of the core rights of self-government afforded in the Home Rule Act" and being "divested . . . of its authority under the Assistance Compact."[9] ECF 3-1 at 50. For their part, Defendants question whether the District can establish an injury to its sovereignty when the District is not a state, but a "statutory creation [of Congress] with a set of delegated authorities."[10] ECF 35-1 at 47. But Defendants acknowledge that the District may have standing to sue based upon injuries to "statutory right[s] Congress has granted to the District Government specifically." ECF 35-1 at 47 ("Plaintiff perhaps has standing to

---

[9] Plaintiff also argues that Defendants are "undermining the District's own law enforcement work," creating the risk of "serious public safety harms," and causing the District to lose out on substantial tax revenues from tourism and entertainment. ECF 3-1 at 51–53. Defendants respond that the District's asserted law enforcement harms are self-inflicted, based on actions voluntarily taken by the MPD, and that its public safety and economic harms are hypothetical. ECF 35-1 at 50–52. The Court finds that the injuries to the District's self-rule are sufficient to establish standing in this case and declines to address the other potential asserted bases for standing in this opinion. The Court notes, however, that another district court has found that such harms may be too speculative to establish a concrete injury. *See Newsom v. Trump*, No. 25-cv-4870, 2025 WL 2501619, at *15 (N.D. Cal. Sept. 2, 2025) ("Plaintiffs' generalized references to 'tensions,' 'chaos,' and 'fear' are intangible harms that are not concrete enough to establish Article III standing."); *see id.* at *14 ("[I]t is not apparent on this factual record which of these economic harms are traceable to . . . the presence of . . . troops.").

[10] Defendants argue that Plaintiff has no standing to challenge the out-of-state deployment "on the grounds that the federal government is unlawfully commanding the day-to-day operations of state National Guard members," accusing the District of seeking to vindicate rights belonging to the sending states' governors. ECF 68 at 18 (arguing that the District lacks standing to "assert an injury on behalf of another State or its Governor"). The Court is not addressing the District's claim about federal command and control under section 502(f) in this opinion so leaves that question for another day.

**ADD.014**

vindicate the specific rights that they say (incorrectly) the Mayor has under D.C. law and the EMAC.").

The Court finds that the District can establish standing based on injuries to its sovereign power to govern itself and to the statutory rights afforded to it under the D.C. Code and the EMAC for two reasons. First, the District is injured by Defendants' deployment of the DCNG and out-of-state National Guards because Defendants' actions usurp the District's rights to self-governance. Under the District Clause of the Constitution, "Congress may . . . exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes." *Banner v. United States*, 428 F.3d 303, 309 (D.C. Cir. 2005). Under the Home Rule Act, Congress delegated its exclusive authority over the District to the District government and its local elected representatives. *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953) (noting that "there is no constitutional barrier to the delegation by Congress to the District of Columbia of full legislative power," subject to constitutional limits and Congress's power to revoke the authority granted). The District may not be a sovereign like a state is, but it can nevertheless exercise delegated sovereign *powers* and is therefore injured by being unlawfully deprived of those powers. *Compare Sovereign*, Black's Law Dictionary (12th ed. 2024) (a "state vested with independent and supreme authority"), *with Sovereign Power*, Black's Law Dictionary (12th ed. 2024) ("The power to make and enforce laws."); *see New Jersey v. EPA*, 989 F.3d 1038, 1047 (D.C. Cir. 2021) (finding that New Jersey could establish standing based on harm to an authority delegated to it by the EPA).

Under D.C. law, the District has a right to govern itself and to determine how to enforce laws in the District. D.C. Code § 1-204.22 ("The Mayor shall be responsible for the proper execution of all laws relating to the District."); *see id*. § 5-101.03(1), (2), (10) (noting that "[i]t

**ADD.015**

shall be the duty of the Mayor" to "preserve the public peace," "prevent crime and arrest offenders," and "enforce and obey all laws"). The District has asserted an injury sufficient for standing purposes by alleging that Defendants have, without statutory authority, reallocated decisions about preventing and deterring crime from the District's local government authorities to other actors, including DCNG and out-of-state commanders.[11] *See Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 268 (4th Cir. 2011) (finding that a federal action that "hinders a state's exercise of th[e] sovereign power . . . arguably inflicts an injury sufficient to provide . . . standing to challenge" that action). The District is also harmed when Defendants undermine its right to determine when to call for out-of-state assistance under the EMAC, including when Defendants call for the deployment of out-of-state units to the District without a declaration of emergency by the Mayor. *See* D.C. Code § 7-2332.

Second, the District suffers a distinct injury from the presence of out-of-state National Guard units—an injury to its constitutional status as a federal district free from state interference. The Constitution placed the District exclusively under Congress's authority to prevent individual states from exerting any influence over the nation's capital. *See* U.S. Const. art. I § 8, cl. 17 (providing Congress with "exclusive" power to govern "such District . . . as may . . . become the Seat of the Government of the United States"); *Thompson*, 346 U.S. at 109 (finding that the word "exclusive" in the District Clause was used to "eliminate any possibility" that Congress's power over the District had "to be concurrent with that of the ceding states"); *see also* The Federalist No. 43 (recognizing that the District was designed to be "protect[ed]" from the "awe or influence" of

---

[11] At the hearing on the preliminary relief motion, Defendants raised an additional theory that the District does not have standing to challenge the Guard's actions on federal property. Hr'g Tr. 83:1–3. Defendants have never argued that the deployment of the DCNG or out-of-state National Guards has been limited to federal property and the record suggests otherwise. *See, e.g.*, ECF 83-1 at 10–11 (describing National Guards' operational locations around the District, including Gallery Place, 14th Street, and various "designated Metro Stations"). The District's self-rule injury is based on Defendants' asserted and exercised powers of deployment—i.e., the underlying *orders*—not the day-to-day locations to which the forces are deployed, which, in any case, include municipal property throughout the District.

**ADD.016**

other states). When improperly deployed in the District, out-of-state National Guard units violate the District's right to be free from state influence by forcing the D.C. government to share power with state governors commanding Guard units. *See id.* Further, the District's right to be free from out-of-state influence is also intertwined with its right to self-rule. The District's home rule rights would be meaningless if, for example, Virginia's National Guard could patrol the District at will and the District could not seek any remedy to prevent that from happening. *See* D.C. Code § 1-201.02(a) (stating that Congress's intent is to "grant to the inhabitants of the District . . . powers of local self-government"); 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 433 (Jonathan Elliot ed., 2d ed., Philadelphia, J.B. Lippincott 1901) (recognizing the need for "the general government [to] be guarded from the undue influence of particular states").

At its core, Congress has given the District rights to govern itself. Those rights are infringed upon when Defendants approve, in excess of their statutory authority, the deployment of National Guard troops to the District. Any incursion on the District's exercise of its sovereign power would cause Article III injury, but the Court observes that the scope of the infringement here is no small matter. The deployments at issue entail the day-to-day presence of more than 2,000 National Guard troops, about two-thirds the size of the MPD, on the streets of the District. Hr'g Tr. 33:5–10. And there is also the risk that this incursion may become permanent, or at least enduring, given the creation of a DCNG unit specifically established to conduct law enforcement in the District. Exec. Order No. 14339, § 2(d)(i) (ordering the establishment of a specialized unit "that is dedicated to ensuring public safety and order in the Nation's capital"). Faced with these major intrusions into local governance, the Court finds that the District has standing to challenge Defendants' actions.

**ADD.017**

*See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (permitting states to sue when they have "suffered injury to their sovereign power to enforce state law").[12]

### 2. APA Review

Addressing another threshold inquiry, the Court determines that it can review the DOD Defendants' challenged actions under the APA. It is well established that this Court cannot review the President's actions under the APA because the President is not an "agency." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). In this case, the President issued the initial directive asking the Secretary of Defense to mobilize the DCNG and to coordinate with state governors on soliciting the support of the out-of-state National Guard. August 11 Presidential Memorandum. While the District cannot seek APA review of the President's memorandum, it can seek APA review of the agency orders implementing the presidential directive.[13] *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (holding "that the Secretary's regulations . . . based on the President's Executive Order" were subject to "judicial review under the APA, even if the validity of the Order were thereby drawn into question").

In this case, the DOD Defendants, including the Secretary of Defense and other subordinate actors, carried out and completed the decisionmaking process that brought the DCNG and out-of-state National Guard units to D.C. and those actions are reviewable. *See Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (observing that "*Franklin* is limited to those cases

---

[12] Defendants also make passing arguments that the District is not injured because the Mayor has cooperated with the National Guard deployment and has not joined this suit. The District disputes that argument, but in any event, it is not relevant to any of the legal questions before the Court. It is well-established that the D.C. Attorney General can sue on the District's behalf, which it has done here. D.C. Code § 1-301.81 (describing the Attorney General's litigating powers on behalf of the District).

[13] Plaintiff also challenges other agency actions implementing the deployment of the National Guard in the District, such as their deputation by the U.S. Marshals Service. Because those actions are not relevant to the claims that the Court addresses in this opinion, the Court does not analyze them at this time. As a result, the Court need not enjoin the DOJ Defendants at this time because their challenged actions are not relevant to the statutory interpretation questions addressed in this opinion.

in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties"). For the DCNG, both the Secretary of the Army and the Commanding General of the DCNG took action to implement the presidential directive. *See* ECF 70-1 at 135 (the Secretary of the Army "approv[ing] the use of the DCNG to provide critical support to law enforcement efforts in the District"); DCNG Permanent Order 25-223 (Aug. 11, 2025), *id*. at 137 (ordering members of the DCNG to "protect federal property and functions in the District of Columbia and to support federal and District law enforcement"). The Secretary of the Army issued the memorandum extending the DCNG's mobilization through November 30, 2025, *id*. at 99, and the Commanding General of the DCNG was charged with implementing the further extension of the deployment through February 28, 2026, ECF 81 at 1. And for the out-of-state National Guards, the District can challenge the MOUs executed and signed between the DCNG and the states under the APA. *See, e.g.*, ECF 70-1 at 13–16 (MOU between the DCNG and Louisiana for Operation Make D.C. Safe and Beautiful).[14]

As such, the Court concludes that it can review the DOD Defendants' actions under the APA and assess whether they are contrary to law. In the following analysis, the Court nevertheless often refers to the President's actions or legal authorities as a shorthand for the legal bases for the DOD Defendants' actions. In deploying the DCNG and requesting the assistance of out-of-state National Guard units, the DOD Defendants rely on the President's authorities and are limited by the bounds of the President's powers. Accordingly, the Court turns to assessing the scope of

---

[14] Defendants only argue that other agency actions—the deputations of the Guard members and the memorandum authorizing them to carry service weapons—are not final within the meaning of the APA. ECF 35-1 at 43. Defendants have not argued that any of the orders or memoranda executed to authorize the DCNG's or out-of-state Guards' deployments are not final agency action. Any such argument would now be forfeited. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief."). Additionally, the orders and memoranda discussed in this paragraph are clearly agency actions that impose "legal consequences" and determine "rights or obligations" because they determine whether the National Guard members have legal authorization to operate in the District. *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

**ADD.019**

Defendants' asserted authority to deploy the DCNG under Title 49 of the D.C. Code and Article II of the Constitution. Next, the Court evaluates whether Defendants have exceeded the scope of their authority under 32 U.S.C. § 502(f) by requesting that out-of-state National Guards undertake missions in the District.

### 3. The D.C. National Guard

The President can exercise command over the DCNG in two distinct capacities. Pursuant to an act of Congress, the President is the commander in chief of the DCNG when it is operating in militia status. D.C. Code § 49-409. The President can also federalize the DCNG under Title 10 of the U.S. Code and act in his capacity as commander in chief of the armed forces. The Parties agree that the DCNG is currently operating under Title 32 status—in a state-commanded, federally funded mission with the President acting in a position analogous to a state governor. *See* ECF 3-1 at 38; ECF 35-1 at 12. In his role as state commander in chief, the President has mobilized the DCNG to "address the epidemic of crime in our Nation's capital." August 11 Presidential Memorandum.

Defendants identify three sources of authority for the President to wield the DCNG in this manner. First, Defendants argue that because the President is commander in chief of the DCNG, he does not need separate statutory authority to deploy it. *See* ECF 35-1 at 28. Next, they rely on D.C. Code § 49-102, which states that the Commanding General "may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties" as he deems necessary. They argue that that the phrase "other duties" encompasses supporting law enforcement and deterring crime when read in the context of section 49-404, which they say allows the DCNG to "aid the civil authorities in the execution of the laws." D.C. Code § 49-404. Finally, Defendants

**ADD.020**

suggest that the President has inherent Article II authority "to use troops for the protection of federal property and federal functions" and to enforce federal law. ECF 35-1 at 40.

The Court finds no authority in Title 49 of the D.C. Code that supports the President's ability to call out the DCNG to patrol the District under these circumstances. Section 49-409, which states that the President is the commander in chief of the DCNG, is only a designation of command; separate provisions of the D.C. Code define when and how that command can be exercised. Section 49-102, in turn, is best read as a limited authority over drills, inspections, escorts, parades, and other similar duties related to discrete military exercises. And the President's ability to order the DCNG to "aid the civil authorities in the execution of the laws" is limited precisely to those instances in which the relevant civil authorities *request* the President's aid. D.C. Code §§ 49-103, 49-404. Additionally, while Defendants mention in passing that the President can rely on his Article II powers in the absence of statutory authorization, his command over the DCNG in militia status is bounded by Congress's power to govern the District and its military forces. As such, the Court finds that the President has no free-floating Article II power to deploy the DCNG for the deterrence of crime. Historical practice confirms this understanding of the President's authority. The Court concludes that the District has shown a likelihood of success on the merits of its claim against the deployment of the DCNG.

### a. Title 49 of the D.C. Code Does Not Allow the President to Deploy the DCNG in the Circumstances Present Here.

The District Clause of the Constitution endows Congress with sole authority to legislate over the District. U.S. Const. art. I, § 8, cl. 17 (granting Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District"). In 1889, Congress first passed the statute that forms the basis for Title 49 of the D.C. Code—the statutory provisions that govern the DCNG. Act of March 1, 1889, ch. 328, § 45, 25 Stat. 772, 778. The Parties agree that, under Title 49, "the

**ADD.021**

President stands in a relation to the D.C. National Guard that is similar to the relation obtaining between the Governors of the several States and their respective State National Guard units." ECF 35-1 at 27 (quoting *Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia*, 13 Op. O.L.C. 91, 94 (1989) [hereinafter 1989 OLC Opinion]); ECF 57 at 17 (discussing how the D.C. militia code was "patterned after" state statutes delineating governors' powers over their state militias). Notably, state statutes do not simply provide that the governor is the commander in chief of the state militia and leave other powers—such as the power to enforce the laws—implicit within that authority. Instead, such statutes spell out the specific instances in which the governor can call up the National Guard for state active duty. *See infra* Section III.A.3.a.i. The Parties point to two provisions of the D.C. Code that set forth the President's authority to call upon the DCNG: the "other duties" language in section 49-102 and the power "to aid" civil authorities in section 49-103. D.C. Code §§ 49-102, 49-103.

These two provisions of Title 49—sections 102 and 103—reflect well-established categories of powers in state law governing militias. Section 49-102 embodies one type of authority regarding the state commander's power to order the militia to engage in discrete military exercises. As discussed below, the Court finds that the phrase "other duties" in that section refers to other military duties that are similar in nature to drills, inspections, parades, or escorts and excludes activities outside of military exercises, such as patrolling a city to deter crime. Section 49-103 exemplifies another category of statutory authority that enables state governors to use the National Guard in the event of riots, insurrections, or similar crises. In the case of the DCNG, such authority is only available to the President when the relevant civil authorities request aid. D.C. Code. §§ 49-404, 49-103; *OLC Memorandum concerning the amenability of members of the National Guard of the District of Columbia to courts-martial or other disciplinary action for*

**ADD.022**

*failure to participate in formations ordered pursuant to Section 44 of the Act of March 1, 1889* at

2–3 (Aug. 9, 1963) [hereinafter August 1963 OLC Opinion], *available at* https://perma.cc/CEY4-

TY8J (contrasting the "drill- and training-type activities" of section 49-102 with "aid-to-civil-

authorities-type activities expressly covered by" section 49-103). Finding no support for

Defendants' actions in Title 49, the Court concludes that the DOD Defendants have likely

exceeded the bounds of their statutory authority.

### i.  "Commander in Chief" in Section 49-409

First, Defendants argue that, because the President is commander in chief of the DCNG,

"he does not need specific statutory authority to deploy it." ECF 35-1 at 28; *see* D.C. Code § 49-

409 ("The President of the United States shall be the Commander-in-Chief of the militia of the

District of Columbia."). Defendants ask the Court to read section 49-409 as an affirmative grant

of commander in chief power, permitting the President to deploy the DCNG at will. The Parties

agree, however, that the D.C. Code's provisions governing the DCNG are broadly modeled after

state militia codes and the President is "functionally serving in the role of a Governor of a state."

ECF 35-1 at 29; ECF 57 at 17. And a state statute's identification of a governor as commander in

chief of a state national guard does not, merely by that designation, describe the contours of the

governor's power. A brief survey of state law demonstrates that state constitutions and statutes

often have separate provisions (1) designating the governor as commander in chief and (2) listing

the situations in which the governor can deploy the state militia. The designation provision in these

statutes does not independently confer authority to call up the National Guard for whatever reason

a governor sees fit. Similarly, the President, like state governors, is only permitted to call up the

DCNG through the exercise of a specific power outlined in state law.

**ADD.023**

Other state code provisions can provide a helpful comparison to the relevant D.C. statutes here. Consider, for example, the structure of Alabama's state laws governing its National Guard. First, Alabama Code § 31-2-51 designates the governor of Alabama as the "Commander in Chief" of the state's military forces. Another section—section § 31-2-52—then lists the powers and duties the governor shall have as commander in chief:

> (b) The Governor, as Commander in Chief, shall have the power in case of war, invasion, insurrection, riot, tumult, breach of peace, natural disaster, or imminent danger thereof, to call or order all or any portion or class of the armed forces of the state into the active military or naval service[.]
> . . .
> (c) The Governor may authorize all or any part of the National Guard or Naval Militia to participate in any drill, parade, review, or other public exercise, or to engage in service for escort duty . . . of the state.
> . . .
> (e) The Governor, as Commander in Chief, is authorized to call out all or any such portion of the National Guard as he may deem advisable, upon his determination that a state of emergency exists.

*Id*. Subsection (b) provides the Alabama Governor with power to act in cases of war, invasion, insurrection, riot, and other circumstances broadly corresponding with D.C. Code § 49-103.[15]

---

[15] While the Alabama statute does not reference "civil authorities," many other state law provisions addressing such exigent situations reference a request from a civil authority or the governor's ability to "aid" civil authorities. *See* S.C. Code Ann. § 25-1-1840 ("In the event of (a) war, insurrection, rebellion, invasion, tumult, riot or a mob, (b) a body of men acting together by force with intent to commit a felony, to offer violence to persons or property or by force and violence to break and resist the laws of this State or of the United States, (c) in case of the imminent danger of the occurrence of any of such events or (d) in the event of public disaster the Governor may order the National Guard of South Carolina or any part thereof into the active service of the State and cause them to perform such duty as he shall deem proper. The Governor may also upon the written request of the mayor of a city or the sheriff of a county within which a large public assemblage is to occur order out the National Guard or any part thereof to preserve order and keep people within bounds at such assemblage."); Miss. Code Ann. § 33-7-301 ("Whenever any circuit judge of a county, sheriff, or mayor of a municipality . . . shall apprehend the outbreak of insurrection, riot, breach of the peace, or combination to oppose the enforcement of the law by force or violence . . . or in the event of disaster or other grave emergency, it shall forthwith become the duty of the circuit judge, sheriff or mayor, when it appears that such unlawful combination or disaster has progressed beyond the control of the civil authorities, to notify the Governor, and the Governor may then, in his discretion, if he deems the apprehension well-founded or the disaster or emergency of sufficient magnitude, order into the active service of the state, for such period, to such extent, and in such manner as he may deem necessary, all or any part of the organized militia."); 20 Ill. Comp. Stat. Ann. 1805/83 ("Whenever there is a tumult, riot, mob or body of persons acting together by force with attempt to commit a felony, or to offer violence to persons or property, or by force or violence to break or resist the laws of the State, or when such tumult, riot or mob is threatened it shall be deemed that a time of public disorder and danger then exists, and it shall be the duty of the Governor thereupon to order such military force as he may deem necessary to aid the civil authorities in suppressing

**ADD.024**

Subsection (c) gives the Governor authority over "any drill, parade, review, or other public exercise," with language that parallels D.C. Code § 49-102.[16] The Alabama statute identifies the governor as the "Commander in Chief" of the state National Guard in three separate instances across two sections. But that designation as commander in chief does not confer boundless discretion—instead, the statute goes on to list specific enumerated powers that the governor can wield. State constitutional provisions dating to the 1800s operate through a similar structure. *See, e.g.*, Ill. Const. art. XII, § 4 ("The Governor is commander-in-chief of the organized militia . . . . He may call them out to enforce the laws, suppress insurrection or repel invasion."); Mich. Const. art. V, § 12 ("The governor shall be commander-in-chief of the armed forces and may call them out to execute the laws, suppress insurrection and repel invasion.").[17]

Defendants read section 49-409 as providing a grant of authority to the President to deploy the DCNG as he sees fit. ECF 35-1 at 29 ("[T]he President, as Commander in Chief and

---

such violence and executing the law."); Kan. Stat. Ann. § 48-238 ("It shall be the duty of the governor, and the governor is hereby authorized and required, in case of war, invasion, insurrection, or breaches of the peace, or imminent danger thereof, or any forcible obstruction to the execution of the laws, or reasonable apprehension thereof, to call upon the national guard to defend the state or aid the civil authorities to enforce the laws thereof."); Mich. Comp. Laws § 32.551 (noting that the governor "may order to active state service any members of the Michigan National Guard in case of riot, tumult, breach of the peace, or resistance of process, or for service in aid of civil authority, whether state or federal, or in time of actual or imminent public danger, disaster, crisis, catastrophe, or other public emergency within this state or to respond to acts or threats of terrorism or to safeguard military or other vital resources of this state or of the United States").

[16] *See also* Neb. Rev. Stat. § 55-113 ("Each organization shall assemble for drill and instruction, and participate in encampments, maneuvers and other exercises at such periods as may be prescribed by the Governor."); Colo. Rev. Stat. Ann. § 28-3-902 ("The governor may, in his or her discretion, order such organizations as he or she may deem proper to parade for purposes of drill, review, or escort duty and prescribe all regulations and requirements therefor.").

[17] These state constitutional provisions are examples of language in effect at the time of Congress's passage of the 1889 D.C. militia act. *See* Frederic J. Stimson, American Statute Law § 298 (1886) (identifying provisions among state constitutions that empowered the governor to "call out the militia . . . to execute the laws"). In Michigan and Illinois, this language has been part of the state constitutions since 1850 and 1870 respectively. *Michigan Constitution, Art V § 12*, Michigan Constitutional Archive, Makinac Center Legal Foundation, https://perma.cc/MFF5-4SQ9 (noting that the Michigan Constitution of 1850 included a provision stating that "[t]he Governor shall be Commander-in-Chief of the military and naval forces, and may call out such forces to execute the laws, to suppress insurrections and to repel invasions"); Ill. Const. 1870, art. V, § 14 ("The Governor shall be commander-in-chief of the military and naval forces of the State . . . and may call out the same to execute the laws, suppress insurrection, and repel invasion.").

**ADD.025**

functionally serving in the role of a Governor of a state, [can] independently determine that mobilization of the [DCNG] is necessary."). But the Court cannot accept that interpretation. State governors do not derive their authority to call out state National Guards from their status as commanders in chief alone—they are empowered and restrained by separate language in their states' legal frameworks.[18] *See supra* notes 15–17 (listing the specific powers that state governors have to aid civil authorities or order drills). D.C. law is no different. And under D.C. law, the relevant powers are identified in sections 49-102 and 49-103, allowing the President and his subordinates to prescribe drills or aid the civil authorities in the execution of the laws. The Court next evaluates those statutory provisions and, finding that those statutes do not authorize the DCNG's activities, concludes that the DCNG is likely operating contrary to law.

### ii.   "Prescribing Drills" in Section 49-102

First, the Court interprets the scope of two words that Defendants rely on—the phrase "other duties" in D.C. Code § 49-102. Section 49-102 is entitled "Prescribing drills" and states, in relevant part:

> The Commanding General shall prescribe such stated drills and parades as he may deem necessary for the instruction of the National Guard, and may order out any portion of the National Guard for such drills, inspections, parades, escort, *or other duties*, as he may deem proper.

*Id.* (emphasis added).

Applying the principle of *noscitur a sociis*—"a word is known by the company it keeps"— the Court examines the phrase "other duties" in light of the terms that precede it. *Yates v. United States*, 574 U.S. 528, 543–44 (2015). A "drill" is the "act or exercise of training soldiers in the

---

[18] A Tennessee state court recently reached the same conclusion, finding that the Tennessee governor's status as commander in chief did not authorize his deployment of the Tennessee National Guard to address "law enforcement concern[s]." *See Harris v. Lee*, No. 25-1461-I, slip op. at 28–31 (Tenn. Ch. Ct. Nov. 17, 2025) (finding that the Tennessee governor's exercise of power over the Tennessee National Guard likely exceeded his powers under Tenn. Code Ann. § 58-1-106).

**ADD.026**

military art." *Drill*, Webster's Complete Dictionary of the English Language 413 (1886); *Drill*, Dictionary of the English Language 447 (1888) ("The instruction of officers and soldiers in the exercise of the firelock, and in the first principles of field movements."). An "inspection" refers to the "act of inspecting," which means "view[ing] and examin[ing] officially" of "troops, arms, goods offered for sale, [or] work performed." *Inspection*, Webster's Complete Dictionary 699; *Inspect*, Webster's Complete Dictionary 699. An "escort" is a "body of persons, giving attendance for the sake of affording safety" or "a guard." *Escort*, Webster's Complete Dictionary 464; *Escort*, Dictionary of the English Language 501 ("A convoy; a guard from place to place; a company of armed men attending on a person as a guard or a distinction."). Finally, to "parade" means to "assemble and be marshaled in military order" or "to go about in military procession." *Parade*, Webster's Complete Dictionary 946.

Under the canon of *ejusdem generis*, the Supreme Court has repeatedly counseled that "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to those specific items that precede it." *Fischer v. United States*, 603 U.S. 480, 487 (2024). As the preceding definitions make clear, drills, inspections, escorts, and parades are all types of military exercises. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (citing founding-era sources which indicate that the militias were "able bodied men . . . required by law to attend military exercises on certain days"); *Presser v. People of State of Ill.*, 116 U.S. 252, 253, 262 (1886) (evaluating a provision of the Illinois Military Code that forbade unauthorized bodies of men other than the regular volunteer militia from engaging in military duties including "drill[ing] or parad[ing] with arms"); *id.* at 263 (noting duties of the Illinois militia which included engaging in "inspections, parades, and encampments"); *id.* at 267 (referencing the "organization, drilling, and parading of military bodies and associations"). The "other duties" permitted by

27

**ADD.027**

statute, then, must encompass only those duties that relate to discrete military exercises ordered by the commanders of the DCNG. To read the statute otherwise would lead to improbable results—Congress is unlikely to have listed a set of activities within the sphere of military exercises if "other duties" was meant to sweep in all law enforcement-related activities in the District. *See Yates*, 574 U.S. at 543 (applying *noscitur a sociis* to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress"); *Fischer*, 603 U.S. at 487 ("Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it."). The second sentence of section 49-102 confirms the necessity of applying the *noscitur a sociis* and *ejusdem generis* canons here. Section 49-102 also allows "[t]he commanding officer of any regiment, battalion or company" to "assemble his command, or any part thereof, in the evening for drill, instruction, *or other business*, as he may deem expedient." D.C. Code § 49-102 (emphasis added). Such a provision cannot plausibly be read to allow the subordinate military officials of the DCNG to conduct any business they would like, including general policing in the District. Reading the two sentences together, section 49-102 naturally refers to orders from DCNG commanders to their units for duties related to military exercises—an inspection of the troops, for example, or a training drill.

Defendants respond that the terms "escorts" and "inspections" include "core police and law enforcement duties." ECF 35-1 at 40. While claiming that the National Guard units in the District are not engaged in law enforcement activities (a position that Plaintiff hotly contests), Defendants argue that if section 49-102 includes law enforcement powers, it must also provide sufficient authority to authorize the DCNG's passive, crime-deterrence activities. Hr'g Tr. 54:3–13 ("These Guardsmen are not doing law enforcement, but surely the lesser is included in the greater here."). In the alternative, Defendants argue that, even if section 49-102 cannot be read to include law

**ADD.028**

enforcement powers and is only "read by reference to the items that precede it," "the Guard's duties—principally acting as a deterrence force—are not different in kind from the preceding items." ECF 68 at 13.

The Court first turns to Defendants' argument that section 49-102 includes a general law enforcement power over the District and rejects it. Even if the plain meaning of the terms "escorts" and "inspections" could encompass such duties—a position for which Defendants have provided no authority—Defendants have not demonstrated that the best reading of those terms in the context of a militia statute for "[p]rescribing drills" includes such activities.[19] Defendants hinge their reading of section 49-102 not on the statutory text, but on opinions from the Department of Justice's Office of Legal Counsel (OLC), which have interpreted section 49-102 to be "broad enough to include law enforcement activities." 1989 OLC Opinion at 93. In July 1963, the OLC opined that the language of section 49-102 can "be construed as authorizing the commanding general to use the National Guard to support activities of the civilian police force during any massive demonstration or parade in the District." *Memorandum for the Assistant Attorney General, Civil Division, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, Re: Authority to use the National Guard of the District of Columbia to supplement civilian police force activities during a massive demonstration or parade in the District of Columbia* at 1–2 (July 30, 1963) [hereinafter July 1963 OLC Opinion], *available at* https://perma.cc/2VWF-BA8F. The opinion adopts an expansive view of the President's powers under section 49-102, stating:

---

[19] In modern parlance, the term "escort" is often used in the context of convoys of vehicles "traveling together for safety" or for safe passage. *See Convoy*, Black's Law Dictionary (12th ed. 2024) (a "group of vehicles or vessels traveling together for safety, esp. with armed escorts"); *Safe Conduct*, Black's Law Dictionary (12th ed. 2024) (referencing "safe conduct[] . . . with or without an escort"). In the context of the statute, the term is best read to encompass only military escorts or convoys. Defendants offer no reason to think that the term should be read out of alignment with the statute to encompass all police escorts in the District. Similarly, while the term "inspection" can refer to a wide range of activities—home inspections, for example—the context of the statute dictates that it refers to military activities such as inspections of the troops.

**ADD.029**

> Since the President performs the same function with respect to the District of
> Columbia National Guard as the Governors of the several States serve with respect
> to their respective State organizations, and since the Congress has vested the
> President with comparable authority in the appointment and removal of the
> commanding general of the District of Columbia organization, it would certainly
> not seem inappropriate for the President to request or urge the commanding general
> to use the National Guard in support of activities of the District of Columbia police
> whenever he feels that the welfare, safety, or interest of the public would be served
> thereby.

*Id*. at 3.

The Court recognizes the Executive Branch's interpretation of section 49-102, but the OLC

Opinions do not bear the weight Defendants place on them.[20] First, OLC's position on this issue

is far from definitive. The July 1963 OLC Opinion states that "*it would certainly not seem*

*inappropriate* for the President to *request or urge* the commanding general to use the National

Guard" to undertake these activities. *Id*. (emphasis added). The Opinion itself appears to express

hesitance about whether the President could mandate the Commanding General of the DCNG to

take such actions and does not cite any authority for the President's power to do so. For example,

it does not explain how a general power to call out the DCNG to protect the "welfare, safety, or

interest of the public" is rooted in the text of section 49-102. Absent such an analysis, the Opinion's

interpretation of "other duties" has no clear limiting principle. The Department of Justice appeared

to recognize this issue and equivocated on their view of the statute two weeks later. In an August

1963 opinion, the OLC recognized that the term "other duties" could "be construed by courts *in*

*pari materia* with the other terms used in that section which relate primarily to drill- and training-

type activities." August 1963 OLC Opinion at 2–3.

Second, as discussed previously, the July 1963 OLC Opinion appears to overread the extent

to which state governors have the authority to use their National Guard units to support the public

---

[20] As the D.C. Circuit has noted, "OLC's views are not binding" but courts may "look to them for their persuasive value." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp*., 77 F.4th 679, 689 (D.C. Cir. 2023).

**ADD.030**

welfare. *See supra* Section III.A.3.a.i. As discussed above, state governors are often limited in the situations that they can call upon their National Guards. The July 1963 OLC Opinion conflates two, separate categories of state governors' powers over their National Guard units—(1) the authority to order drills, parades, and other similar military duties, and (2) the authority to quell insurrections, riots, and mobs, or otherwise intervene in emergencies for the public welfare. The Opinion reads the latter power—an exigency-based authority—into section 49-102. But section 49-102 covers only the former—orders by commanding officials relating to military exercises.

Finally, Defendants argue that, even if the phrase "other duties" in section 49-102 is "read by reference to the items that precede it," the DCNG's current activities in the District "are not different in kind from the preceding items." ECF 68 at 13. But Defendants' reading ignores that the plain meaning of the terms "drill," "inspection," "escort," and "parade" all refer to discrete military exercises. *See supra* 26–27 (defining those terms). While the Guard's conduct may be superficially similar when acting in different capacities—the Guard can walk through Union Station in a military procession or as part of a crime-deterring force—the nature of the activity authorized is distinct. Section 49-102 confers authority on the Commanding General to issue orders related to activities performed by the DCNG in its capacity as a military unit. The partial delegation of that authority to subordinate officials demonstrates that section 49-102 only covers conduct that can be authorized within that command structure. Defendants seek to use section 49-102 as a basis for the DCNG to interact with members of the public outside of any military exercise to patrol and to deter crime. Such an authority lies outside of the best reading of the statute.

### iii. "To Aid the Civil Authorities" in Sections 49-103 and 49-404

Defendants also argue that section 49-102 must be understood in the context of section 49-404 and thus the "other duties" permissibly ordered by the Commanding General can include

ADD.031

activities "to aid the civil authorities in the execution of the laws," which is what Defendants contend the DCNG is doing here by supporting local law enforcement. ECF 68 at 14 (arguing that section 49-102 "does not stand alone"); D.C. Code § 49-404 ("The enrolled militia shall not be subject to any duty except when called into the service of the United States, or to aid the civil authorities in the execution of the laws or suppression of riots.").

The Court finds no such expansive power in section 49-404 permitting Defendants to unilaterally call upon the DCNG to assist the District with crime control. First, section 49-404 is a prohibition, not a grant of power. It provides that the DCNG "*shall not* be subject to any duty except" when federalized or in aid of the civil authorities in the execution of the laws or suppressing riots.[21] *Id.* (emphasis added). Even if that language could be read as a grant of authority to "aid" the civil authorities in execution of the laws, such language is best read as hinging upon a *request* by a civil authority under section 49-103. Section 49-103 states, in relevant part:

> When there is in the District of Columbia a tumult, riot, mob, or a body of men acting together by force with attempt to commit a felony or to offer violence to persons or property, or by force or violence to break and resist the laws, or when such tumult, riot, or mob is threatened, it shall be lawful for the Mayor of the District of Columbia, or for the United States Marshal for the District of Columbia, or for the National Capital Service Director, *to call on the Commander-in-Chief to aid them in suppressing such violence and enforcing the laws*; the Commander-in-Chief shall thereupon order out so much and such portion of the militia as he may deem necessary to suppress the same.

D.C. Code § 49-103 (emphasis added). Sections 49-103 and 49-404 mirror each other in referencing when the DCNG is called on "to aid" civil authorities in "enforcing the laws." *Id.*; *id.* § 49-404 ("to aid the civil authorities in the execution of the laws"). The phrase "to aid" is best

---

[21] A similar provision in South Carolina state law is also clearly a prohibition, not a grant of affirmative authority. *See* S.C. Code Ann. § 25-1-1820 ("The National Guard shall not be subject to active duty other than training duty, except (a) in case of war, (b) in event or danger of invasion by a foreign nation, (c) there is a rebellion or danger of rebellion against the authority of the government of the United States, (d) the President issues orders to execute the laws of the United States, (e) for preventing, repelling or suppressing invasion, insurrection or riot, (f) for aiding civil officers in the execution of the laws.").

**ADD.032**

read as "to help," "to assist," or "[t]o support, either by furnishing strength or means to effect a purpose." *Aid*, Webster's Complete Dictionary 32. Section 49-404 prohibits the imposition of any "duty" on the DCNG except for in certain circumstances, one of which is when they are called on "to aid" the civil authorities, and section 49-103 delineates when and how the DCNG can be called on to give such "aid." Neither section 49-103 nor 49-404 endow the President or the Commanding General with additional authority of their own to execute the laws.

That structure reflects the choice Congress made when it enacted the first version of Title 49. At the time of the 1889 act, nearly two dozen state constitutions allowed governors to call out the National Guard "to execute the laws," but Congress chose instead to only allow the President "to aid the civil authorities." Frederic J. Stimson, American Statute Law § 298 (1886); *see supra* Section III.A.3.a.i (describing state constitutions that allow governors to call upon the National Guard "to enforce" or "execute" the laws); *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) ("It is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law."). Congress was aware of the other state laws in place at the time of its passage of the 1889 act, yet intentionally adopted a narrower phrase. *See* July 1963 OLC Opinion at 2 ("[T]he legislative history of [the 1889] Act indicates that it was patterned after a number of State statutes in effect at the time of its enactment."); H.R. Rep. No. 50-809, at 1–2 (1888) (stating that the 1889 act "contains only the usual and necessary provisions that are included in the militia codes of nearly all the States").[22] The Court must give meaning to the words Congress chose, which limit the DCNG's duties to "aid[ing]" the civil authorities in the execution of the

---

[22] Because the legislative history demonstrates that Congress was aware of contemporary state militia statutes, the Court finds it a reasonable inference that Congress was also aware of contemporary state constitution provisions governing the militia. *See* Stimson, American Statute Law § 298. Congress was thus likely aware that it had the option to adopt phrases such as to "execute" or "enforce" the laws but chose a different formulation.

**ADD.033**

laws. D.C. Code § 49-404.[23] This understanding of "aid" to civil authorities is also reflected in other state laws today, which use the phrase to refer to more limited instances in which a county or municipality can no longer enforce the laws and requests the governor's aid. *See, e.g.*, Ariz. Rev. Stat. § 26-172(C) ("The civil authorities of a county or municipality requiring aid of the national guard to quell any riot, insurrection or other civil disturbance shall submit to the governor a written request for aid."); *see supra* note 15 (collecting state statutes referencing aid to civil authorities).

Defendants also argue that because the District government now has no greater authority over the DCNG than was vested in the District commissioners prior to 1975, the Mayor cannot veto the President's use of the DCNG. *See* D.C. Code § 1-206.02(b). But section 45 of the 1889 act stated that "it shall be lawful for the commissioners of the District of Columbia . . . to call on the commander-in-chief to aid them in suppressing such violence and enforcing the laws." Act of March 1, 1889, ch. 328, § 45, 25 Stat. at 778. The Mayor and the commissioners, then, both needed to call upon the President before the DCNG could be deployed for the enforcement of the laws and the Mayor is allocated no greater authority than was available to the commissioners prior to 1975.

Finally, Defendants suggest that section 49-103 is merely a mechanism by which the Mayor can "request" assistance from the President, but "does not divest the President of his authority to call out the D.C. National Guard." ECF 35-1 at 28. Relatedly, they argue that the use of the DCNG as a "federal entity" cannot be "condition[ed]" on the "consent of a local official." *Id.* at 29. But, as the Court has already recognized, it is more accurate to say that the D.C. Code

---

[23] Defendants also cite Executive Order 11485 to argue that the President has affirmative power to engage in law enforcement, which he delegated to the Secretary of Defense. ECF 35-1 at 29. But the Executive Order merely states that the Secretary may order out the National Guard to "aid the civil authorities of the District," which is entirely consistent with the Court's reading of section 49-103. Exec. Order No. 11485, § 1, 34 Fed. Reg. at 15411. The Executive Order also cannot give the Secretary of Defense authority that the President does not have by statute.

**ADD.034**

does not provide authority for the President to call out the DCNG at will. Rather, section 49-103

provides a limited exception to that general lack of authority, giving the President power to

mobilize the DCNG only when specific predicates are met.[24] Historical practice, in fact,

demonstrates that Presidents have relied on a request by a civil authority before deploying the

DCNG, as outlined by section 49-103. During the Know-Nothing Riots of 1857, for example,

President James Buchanan ordered a Marine detachment into the District to restore peace at the

request of the mayor. Lawrence Kapp et al., Cong. Rsch. Serv., R46886, Use of Militia, National

Guard, or Federal Armed Forces within the District of Columbia Prior to 2020 at 5 (2021)

[hereinafter Kapp et al., Use of Militia]. In 1932, the then-board of commissioners of the District

"requested military support from President Herbert Hoover" in response to a march of 10,000 to

20,000 World War I veterans on the District. *Id*. at 9. President Hoover explicitly declined to

"proclaim a state of insurrection or to declare martial law" but approved "the use of federal armed

forces to assist the police operations in a supporting role." *Id*. On April 5, 1968, the day after

Reverend Dr. Martin Luther King., Jr.'s assassination, the mayor-commissioner at the time

"requested federal troops to assist civil authorities in their response to riots in the district." *Id*. at

13. That same day, President Lyndon B. Johnson issued Executive Order 11403 ordering the

Secretary of Defense to assume authority over the DCNG, giving the Secretary the power to

federalize the DCNG and to take control over the DCNG in its militia status. *Id*. at 13–14. Soon

thereafter, the Secretary federalized the DCNG, without using the delegated state militia authority.

*Id*. at 14.

---

[24] In the absence of a request by the civil authorities, the President remains free to federalize the DCNG and to exercise his power as commander in chief of the armed forces. Lawrence Kapp et al., Cong. Rsch. Serv., IF11768, National Guard Civil Support in the District of Columbia 2 (2021) [hereinafter Kapp et al., National Guard Civil Support] (noting that Title 10 "authorize[s] the President to deploy the military to address significant civil unrest under certain conditions").

**ADD.035**

More recently, during the 2020 Black Lives Matter protests, the two U.S. Marshals in D.C. requested that the President activate DCNG troops.[25] U.S. Dep't of Just., Office of the Inspector Gen., *A Review of the Department of Justice's Response to Protest Activity and Civil Unrest in Washington, D.C. in Late May and Early June 2020*, No. 24-085 at 73–74 (July 2024) [hereinafter OIG Report]. After being activated, members of the DCNG assisted with the clearing of protests, including in and around Lafayette Park. *Id*. at 6, 95, 98. And on December 31, 2020, in advance of planned demonstrations at the U.S. Capitol on January 5 and 6, 2021, D.C. Mayor Muriel Bowser sent a letter to the Commanding General of the DCNG requesting support. Letter from Mayor Muriel Bowser, to Major General William J. Walker, Commanding General of the D.C. National Guard (Dec. 31, 2020), https://perma.cc/WS9T-G5GQ. In the midst of exigent circumstances, both local civil authorities and the Executive Branch have appeared to operate under the assumption that the President can call out the DCNG after receiving a request from the Mayor or the U.S. Marshals. *See* OIG Report at 74 (noting that "OLC, in consultation with DOD, continued to examine the use of § 49-103 to request assistance from the DCNG on June 1" and "OLC attorneys debated internally the practical mechanics of making such a request"); *id*. at 73 n.92 (noting that the D.C. government had requested DCNG assistance before June 1 but asked for a "limited number of DCNG troops to help the MPD with traffic control" and "explicitly stated that troops would not be involved in law enforcement-related activities").[26] The history of such

---

[25] There are two U.S. Marshals in the District—one for the federal district court and one for the Superior Court—and they are both appointed by the President. 28 U.S.C. § 561(c) ("The President shall appoint, by and with the advice and consent of the Senate, a United States marshal for each judicial district of the United States and for the Superior Court of the District of Columbia.").

[26] In other historical instances, the President did not rely on a request by the Mayor or the U.S. Marshals, but it is unclear whether the DCNG was federalized or deployed in state militia status at the time. Kapp et al., Use of Militia at 8–9, 11–13 (describing the deployment of civil and military personnel to address 1919 and 1967 riots and demonstrations in the District).

**ADD.036**

requests in the midst of active emergencies suggests that the relevant players have understood that section 49-103 imposes requirements for the deployment of the DCNG, consistent with the Court's interpretation of the statute.

      **b.**  **The President's Article II Powers Must Be Exercised in Conformity with Congress's Power to Govern the District.**

On a single page of their opening brief, Defendants also contend that, separate from any statutory powers, the President has inherent Article II powers to utilize the DCNG (1) to enforce the D.C. Code as federal law and (2) to "use troops for the protection of federal property and federal functions." ECF 35-1 at 40; *see also* ECF 68 at 13 ("The D.C. Code is itself federal law and the President is Commander in Chief of the D.C. National Guard, a federal entity. The President does not need express statutory authority to enforce federal law using federal forces at his command."). The Court rejects Defendants' fly-by assertion of constitutional power, finding that such a broad reading of the President's Article II authority would erase Congress's role in governing the District and its National Guard.

First, Defendants rely on a footnote in the 1989 OLC Opinion to argue that the President has inherent constitutional authority to use the DCNG to carry out federal law in the District. 1989 OLC Opinion at 93 n.6.[27] The 1989 Opinion analyzed the question of whether the DCNG, in its militia status, could be used to support local drug enforcement efforts. The Opinion suggested, without deciding, that such activities could be permitted, not only under section 49-102, but alternatively "on the basis of the President's inherent constitutional authority to use any forces at

---

[27] The footnote reads in full:

    Although there is adequate statutory authority in this case, and we therefore need not reach the question, since the President is Commander-in-Chief of the District of Columbia National Guard in its militia status (D.C. Code § [4]9-[4]09), and since the D.C. Code is federal law, this use of the National Guard might also be supported on the basis of the President's inherent constitutional authority to use any forces at his command to carry out the laws. *See In Re Neagle*, 135 U.S 1 (1890).

**ADD.037**

his command to carry out the laws." *Id*. Defendants also cite the OLC Opinion that considered whether the President could deploy the DCNG in the face of the Mayday Demonstrations, which threatened to block traffic in the District and prevent federal employees from reaching their workplaces. *Authority to Use Troops to Prevent Interference with Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions,* 1 Op. O.L.C. Supp. 343, 343–44 (1971) [hereinafter Mayday OLC Opinion] (noting that "this authority rests on inherent power, rather than specific statutes"). Because it is the President's "constitutional duty to protect this functioning," the Opinion reasoned, the President could call upon the DCNG as part of his "inherent powers to use troops to protect federal property and functions as a necessary adjunct of his constitutional duties under Article II, Section 3 of the Constitution."[28] *Id*. at 344. In the current case, the August 11 Presidential Memorandum draws on the logic of the Mayday OLC Opinion when it states that the DCNG's deployment serves to ensure that "the Federal Government can properly function, without fear of being subjected to violent, menacing street crime." August 11 Presidential Memorandum § 1. Additionally, the memorandum provides that it is the President's duty to "Federal workers to secure the safety and the peaceful functioning of our Nation, the Federal Government, and our city." *Id*.

---

[28] Both OLC opinions rely on *In re Neagle*, in which the Supreme Court determined that the use of troops would be permissible in the protection of essential public functions like the flow of interstate mail and the safeguarding of public land. 135 U.S. 1, 65 (1890). The Mayday OLC Opinion also cites *In re Debs*, which reiterates the power to "use . . . force on the part of the executive authorities" if there is an obstruction to interstate commerce. 158 U.S. 564, 582 (1895) ("The strong arm of the national government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails. If the emergency arises, the army of the nation, and all its militia, are at the service of the nation, to compel obedience to its laws."). As another district court addressing similar issues recently noted, *Neagle* and *Debs* must be read in their context—the first arose from "well-documented threats against a sitting Supreme Court Justice," and the second "involved a massive strike that effectively halted mail delivery across the country." *Newsom*, 2025 WL 2501619, at *23. The Court similarly declines to stretch those cases, "made in response to historic threats," to now "grant the President a perpetual, atextual right to defy Congress if he determines it necessary to protect federal property, personnel, or functions." *Id*.

**ADD.038**

While the President certainly may have some Article II powers to protect federal functioning and property, including in the District, such powers cannot justify the deployment of the DCNG in this case. As Commander in Chief of the DCNG, the President must exercise his powers in a manner that is consistent with Congress's power over the governance of the District. When the DCNG is in state militia status, the President is exercising delegated authority from Congress's exclusive constitutional power over the District. *See* U.S. Const. art. I, § 8, cl. 17 (granting Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District"). Congress, too, has authority to legislate for the protection and regulation of federal property. *Id.* art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting . . . Property belonging to the United States."). The D.C. Code states that the D.C. Council has no authority to pass laws that "concern[] the functions or property of the United States." D.C. Code § 1-206.02(a)(3). That reserved power, carved out from the Home Rule Act, remains with Congress. Pub. L. No. 93-198, § 602(A), 87 Stat. 774.

In passing Title 49, Congress has specified the instances in which the President is allowed to deploy the DCNG to protect federal functioning in the District. In section 49-103, for example, Congress has recognized that there are instances in which federal property or functioning may need to be protected by forces stronger than those the civil authorities can call upon and carved out limited instances for the President to intervene. *See* D.C. Code § 49-103. The President cannot now assert an Article II power that operates as if in an "open field"; instead, he must wield any Article II powers he has in a manner that co-exists with the statutory scheme set up by Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 639 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional

**ADD.039**

powers minus any constitutional powers of Congress over the matter."). Like in *Youngstown*, Defendants' assertion of executive power here would leave Congress powerless to exercise its authority under the District Clause. Stretched to an extreme, a freestanding Article II power to protect the functioning of the federal government or enforce the D.C. Code would allow the President day-to-day control over the functioning of the entire District. But such power would run headlong into the Constitution's allocation of the governance of the District to Congress. Here, Congress has drawn a line between what remains in the President's power and what is carved out for D.C.'s home rule. For the DCNG's state militia operations, that line is embodied in Title 49.

Finally, in examining the historical record, the Court finds that, even when faced with mass protests or demonstrations, the President has either federalized the National Guard or responded to a call from a civil authority, drawing upon powers based in statute. Just over five years ago, the President did not invoke any inherent Article II power over federal property to clear Lafayette Park—a park operated by the National Park Service directly in front of the White House. Instead, the President waited for requests made by the U.S. Marshals before deploying the DCNG, pursuant to D.C. Code § 49-103. *See* OIG Report at 73–74. The Court finds the historical practice of Presidents—the Lafayette Park example and others cited above—to be persuasive evidence of the Executive Branch's historical understanding of its Article II powers over the DCNG: as powers that must be exercised consistent with Congress's direction in Title 49.

*   *   *

In sum, the DOD Defendants rely on three separate provisions of the D.C. Code to support the deployment of the DCNG in this case: (1) the "other duties" language in section 49-102, (2) the "aid" to civil authorities language in sections 49-404 and 49-103, and (3) the President's status as the Commander in Chief of the DCNG under section 49-409. None of these statutory bases

40

**ADD.040**

support the deployment of the DCNG in the District for crime deterrence purposes. Nor does the President have an Article II power that can override Congress's statutory scheme governing the District. Accordingly, the Court finds no statutory authority supporting the DOD Defendants' actions and that the District is likely to succeed on the merits of its claim.

### 4. Out-of-State National Guard Units

The DCNG only forms part of the current National Guard deployment in the District. Over 1,000 out-of-state National Guard members are also deployed in the District in reliance on the President's authority under 32 U.S.C. § 502(f). ECF 3-1 at 38 ("The out-of-state National Guard units called into the District are all in state militia status under Title 32."); ECF 35-1 at 35 ("The parties all agree that out-of-District National Guard units are all operating in Title 32 status."). Within the context and structure of Title 32, the Court finds that section 502(f) cannot bear the expansive interpretation that Defendants attribute to it and that Plaintiff is also likely to succeed on the merits of this claim.

Title 32 of the U.S. Code outlines a hybrid federal-state status for the National Guard. Under Title 32, guard members "fall under the command and control of their state or territory governor, but their duty is federally funded and regulated." *National Guard Duty Statuses*, National Guard Bureau, https://perma.cc/V9C4-GMTA. Under section 502(f), a member of the National Guard may "be ordered to perform training or other duty" in "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(2)(A). Defendants adopt a reading of section 502 that allows state National Guard units to support any "operation[] or mission[]" requested by the President and consented to by the state governor. Hr'g Tr. 63:14–16 ("Congress has used broad language, but it has to be . . . support of operations or missions undertaken by the member's unit at the request of the President

**ADD.041**

or Secretary of Defense."). The District, on the other hand, argues that Title 32 contains no authority to justify what Defendants have done here—entering Memorandums of Understanding with the states and calling those out-of-state units to D.C. The District reads section 502(f) to empower the federal government to fund and support activities that state National Guard units have authority to undertake under state law, but does not provide authorization for state National Guard units to fulfill any and all federally requested missions. *See* Hr'g Tr. 20:18–22.

The Court concludes that section 502(f)(2)(A) is best understood to encompass operations or missions requested by the President that are authorized under state law. Accordingly, the Court finds that section 502 cannot support the out-of-state National Guards' operations in the District because there is no state-law basis for those Guards to travel to the District and the EMAC has not been invoked as the mechanism for their deployment. As a result, the Court finds that the DOD Defendants' actions are likely to have exceeded the scope of section 502.[29]

---

[29] The Parties also dispute the extent to which the federal government is improperly exercising "command and control" over the out-of-state units in Title 32 status. ECF 3-1 at 36; ECF 35-1 at 35. The District argues that both the Constitution and federal law bar the federal government from exercising day-to-day control over state National Guard units in state militia status. ECF 3-1 at 37. Discovery has shown that the out-of-state units are operating under the day-to-day instructions of the DCNG and the JTF-DC. It is unclear in this situation, given the DCNG's unique structure, whether the out-of-state units are operating under *federal* command and control or under the DCNG's operational control pursuant to its authority as a receiving jurisdiction. If the out-of-state units were properly operating in D.C. under Title 32 and the EMAC, the DCNG would be in the position of the state receiving assistance. Under Article IV of the EMAC, "[e]mergency forces will continue under the command and control of their regular leaders, but the organizational units will come under the operational control of the emergency services authorities of the state receiving assistance." Pub. L. No. 104-321, 110 Stat. at 3879. Under the EMAC, sending states have signed up to delegate, by default, a portion of their day-to-day operational control to the receiving state in service of the efficiency of emergency management. If the out-of-state units were properly in the District pursuant to state mutual assistance authority under the EMAC, it would not be improper for the DCNG to issue day-to-day operational orders to the out-of-state National Guards and such orders would not violate prohibitions that the out-of-state National Guards remain under state command. Given the lack of briefing on this unique jurisdictional line in the context of the District—where state command is federal command—the Court declines to address this question in this opinion. This separate question is not necessary to decide whether the out-of-state units are properly in the District pursuant to Title 32.

**ADD.042**

### a. Section 502(f) is Best Read as a Limited Grant of Authority for Federal Requests for Missions That are Permitted Under State Law.

Under section 502(f), state National Guard units can "perform training or other duty" in "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f). Defendants argue that the plain text of section 502(f) lends itself to capacious interpretation, authorizing support of any "operations" or "missions" requested by the President. *See, e.g.*, *Operation*, Webster's II Dictionary 499 (3rd ed. 2005) (defining "operation" as a "military action or campaign"); *Operation*, Merriam-Webster's Collegiate Dictionary 869 (11th ed. 2003) (a "military action, mission, or maneuver including its planning and execution"). Defendants argue, in essence, that Title 32 allows the President to call up the state National Guards for any federal mission, at any time, for any purpose. ECF 35-1 at 33 ("[N]othing in Section 502(f) limits the types of missions that the President and Secretary of Defense can request."). The only check, in their view, is that the President must receive the consent of the state governor whose National Guard unit is being deployed. *See* Hr'g Tr. 63:18–24. Section 502(f)'s intended scope, however, is narrower and focused on providing federal support for operational missions that the relevant National Guard unit already had authority to undertake under state law. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute."); *Maracich v. Spears*, 570 U.S. 48, 65 (2013) ("It is necessary and required that an interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning.").

To start, consider the historical backdrop of Title 32. In 1903, Congress created what has now become Title 32 by providing for a federally funded, state-controlled training status for the

**ADD.043**

National Guard. *See* An Act to Promote the Efficiency of the Militia, and for Other Purposes, ch. 196, § 14, 32 Stat. 775, 777 (1903) (providing federal funds for "field or camp service for instruction" of the organized militia). Section 502 sits within Chapter 5 of Title 32, which is entitled "Training." Title 32 establishes the scope of permitted activities under "full-time National Guard duty," which is defined as "training or other duty . . . performed by a member of the [National Guard] . . . in the member's status as a member of the National Guard of a State or territory, the Commonwealth of Puerto Rico, or the District of Columbia under section 316, 502, 503, 504, or 505 of this Title." 32 U.S.C. § 101(19); *see also* 10 U.S.C. § 101(d)(5). Section 316 allows the President to detail officers of the Army National Guard "to duty as instructors at rifle ranges." 32 U.S.C. § 316. Sections 503, 504, and 505 permit the National Guard to, with authorization of the Secretary of the Army or of the Air Force, (1) participate in "encampments, maneuvers, outdoor target practice, or other exercises for field or coast-defense instruction," *id*. § 503(a)(1); (2) "attend schools conducted by the Army or the Air Force," *id*. § 504(a)(1); or (3) be attached to a branch of the Army or Air Force for "routine practical instruction." *Id*. § 505. Subsections 502(a)–(e), too, discuss training; 502(a), for example, permits the federal government to order state National Guard units to conduct a certain number of days of training per year. *Id*. § 502(a). The theme is clear: Chapter 5 of Title 32 provides authorities for state National Guard activities related to training and interoperability between the National Guard, the Army, and the Air Force. Christopher R. Brown, *Been There, Doing That in a Title 32 Status: The National Guard Now Authorized to Perform Its 400-Year-Old Domestic Mission in Title 32 Status*, 2008-MAY Army Law 23, 29 (2008) ("It is in Title 32 status that the National Guard generally 'trains' rather than 'operates' because training to perform the dual mission . . . is the primary task of Army National Guard units in peacetime.").

**ADD.044**

Although Section 502 was originally narrowly focused on training, it has been expanded over the years to cover federal support of state operational missions. In 1964, Congress amended section 502 by adding subsection (f), creating section 502(f)'s "other duty" status:

> (f) Under regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may—
>> (1) without his consent, but with the pay and allowances provided by law; or
>> (2) with his consent, either with or without pay and allowances;
> be ordered to perform *training or other duty* in addition to that prescribed under subsection (a). Duty without pay shall be considered for all purposes as if it were duty with pay.

Act of Oct. 3, 1964, Pub. L. No. 88-621, § 1(1), 78 Stat. 999 (emphasis added). Relying on the grant of authority that permitted "other dut[ies]" in addition to training, the federal government could now ask state National Guard units to perform "specific, statutorily authorized operational missions . . . under state control." Brown, *supra*, at 30. Section 502(f)'s "other duty" status was invoked to "provide federal pay and benefits to the National Guard personnel who provided security at many of the nation's airports after September 11, 2001, and who participated in disaster relief operations in response to hurricanes Katrina and Rita in 2005." Jennifer K. Elsea, Cong. Rsch. Serv., LSB10121, The President's Authority to Use the National Guard or the Armed Forces to Secure the Border 2 (June 15, 2023).

Also in the aftermath of the September 11th attacks, Congress "significantly increased the authority for the Federal Government to fund these National Guard domestic operations in Title 32 status." Brown, *supra*, at 23. First, in 2002, Congress provided authority for National Guard units serving under section 502(f) to perform "duties in support of emergency preparedness" or to "respond to any emergency" involving weapons of mass destruction or terrorist attacks. *See* Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, § 514, 116 Stat. 2458, 2539 (2002) (amending 10 U.S.C. § 12310(c)(1)(A) & (B)). Second, in 2004, Congress

**ADD.045**

passed Chapter 9 of Title 32, authorizing the Secretary of Defense to provide funds to state

governors to employ state National Guard units to "conduct homeland defense activities that the

Secretary determines to be necessary and appropriate for participation by the National Guard units

or members." 32 U.S.C. § 902; *id*. § 904(a) (providing that "[a]ll duty performed under this chapter

shall be considered to be full-time National Guard duty under section 502(f) of this title"). Under

such a scheme, "the states benefit from . . . cost sharing" and "are not required to reimburse the

federal government for the use of federal equipment." Brown, *supra*, at 34.

After the passage of Chapter 9, various state governors unsuccessfully attempted to use the

new homeland defense authorities but were stymied by the cumbersome requirements for receiving

federal assistance. Brown, *supra*, at 31–32. In response to "confusion and frustration regarding the

apparent nonuse of" Chapter 9, *id*. at 32, Congress amended section 502 in 2006 by adding section

502(f)(2), further expanding state National Guards' ability to undertake operations with federal

support. John Warner National Defense Authorization Act for Fiscal Year 2007, Pub. L. No. 109-

364, § 525(c), 120 Stat. 2083, 2195 (2006). The newly added section reads:

> (2) The training or duty ordered to be performed under paragraph (1) may include the following:
>
> > (A) *Support of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense.*
> >
> > (B) Support of training operations and training missions assigned in whole or in part to the National Guard by the Secretary concerned, but only to the extent that such training missions and training operations--
> >
> > > (i) are performed in the United States or the Commonwealth of Puerto Rico or possessions of the United States; and
> > >
> > > (ii) are only to instruct active duty military, foreign military (under the same authorities and restrictions applicable to active duty troops), Department of Defense contractor personnel, or Department of Defense civilian employees.

32 U.S.C. § 502(f)(2) (emphasis added).

**ADD.046**

In light of the amendment history of section 502, section 502(f)(2)(A) is best read to permit federal support of federally-requested state National Guard missions. In other words, the President or Secretary of Defense can request—and use federal funds to support—state-authorized National Guard activities that the President or Secretary believes would serve a national purpose. Such a reading conforms with the prior understanding of section 502(f)'s "other duty" status, which was not seen as an independent grant of authority for new federal missions. Instead, missions undertaken in section 502(f)'s "other duty" status referred to missions authorized by state governors that were eligible for federal support. *See* 32 U.S.C. § 112(a) ("The Secretary of Defense may provide funds to the Governor of a State who submits to the Secretary a State drug interdiction and counter-drug activities plan."); *id*. § 112(c)(5) (allowing state National Guard units in Title 32 status to participate in drug interdiction activities when "the use of the National Guard of the State for the activities proposed under the plan is authorized by, and is consistent with, State law"); *id*. § 902 ("The Secretary of Defense may provide funds to a Governor to employ National Guard units or members to conduct homeland defense activities that the Secretary determines to be necessary and appropriate."). Section 902, for example, does not provide that the Secretary of Defense can call up the state National Guard units for "homeland defense activities" directly ordered by the Secretary. *Id*. § 902. Instead, the section states that the Secretary of Defense "may provide funds to a Governor to employ National Guard units" to conduct homeland defense activities. *Id.* The power to deploy the National Guard comes from the governor's authorities under state law; the Secretary can then decide which activities are necessary and appropriate to fund for homeland defense purposes under Title 32. As is the case here, the state governor retains control and can accept or decline the mission. But to accept the mission, the state governor must exercise

47

**ADD.047**

authorities *that already exist* under state law. The governor is granted no new authority under section 502(f).

Looking to state law, the out-of-state National Guard units would only have authorization to operate in the District if (1) the District had statutory authority to undertake the requested activities, and (2) had properly requested other states' assistance under the EMAC. D.C. Code § 7-2332; Pub. L. No. 104-321, § 1, 110 Stat. at 3877. First, under the EMAC, the sending states' emergency forces are afforded "the same powers, . . . duties, rights, and privileges as are afforded forces of the state in which they are performing emergency services." D.C. Code § 7-2332 (Article IV, Limitations). If the DCNG does not have the authority to conduct general crime deterrence in the District itself, it also cannot invite out-of-state National Guard units to do so. Second, as previously explained, "[d]uty statuses" like Title 32 "are not a mechanism for a deployment outside of the home state." *Duty Status*, EMAC, https://perma.cc/J6F7-D5CW. Instead, the EMAC "serves as th[e] mechanism" for those out-of-state-deployments and "provides [legal] protections . . . for the deploying forces." *Id.* ("[T]he EMAC mission is needed as the deployment mechanism."). The District has not made any requests to other states for assistance through the EMAC and has not invoked a deployment mechanism for those out-of-state units to come to the District.

Defendants argue that the EMAC can never be used to accept National Guard members into the District from other states, and that D.C. Code § 7-2332 only codifies the "terms of the EMAC that *apply* to D.C.," excluding the "National Guard terms." ECF 35-1 at 30. Defendants also argue that even if such authority did exist, the President, not the Mayor, would exercise it on the District's behalf. *Id.* at 31. But Defendants' reading finds no support in the text of D.C. Code § 7-2332, which does not carve out the National Guard in any provision. Instead, the statute codifies the EMAC and states that emergency forces will only be activated "subsequent to a

48

declaration of a state of emergency or disaster by . . . the Mayor of the District of Columbia." D.C. Code § 7-2332 (Article IV of the EMAC).[30] And while Defendants correctly observe that the Mayor cannot deploy the DCNG to other states, the District government is permitted to "receive other State[s'] resources" under the compact, including their National Guard units operating under state control. Off. of the Gen. Counsel, Nat'l Guard Bureau, Dep't of Defense, Domestic Operations Law and Policy 75 (3d ed. 2024) [hereinafter Domestic Operations Law and Policy Manual]. In other words, a civilian official in the District government, "acting on behalf of the Mayor," can "request[] other [state active duty] forces to augment DCNG." *Id.*

The historical practice surrounding inaugurations supports the reading that interstate deployments rely upon authority otherwise granted under state law and contradicts Defendants' view of the District's role in the compact. When the DCNG is called upon to support law enforcement at inaugurations and "anticipates the exercise of [law enforcement]-like functions," the Mayor designates members of the DCNG as special police officers under D.C. Code § 5-129.03. Domestic Operations Law and Policy Manual at 74 (noting that D.C. Code § 5-129.03 permits the Mayor to appoint "special privates without pay" for days of "public election, ceremony, or celebration"). Title 32 orders issued to the DCNG and to out-of-state National Guard units then permit those forces to exercise "authority to act under . . . Title 5 of the D.C. Code." *Id.* This practice confirms an understanding that D.C. law—authority provided by the Mayor under Title 5—forms the legal basis for out-of-state National Guards to support D.C. law enforcement.

---

[30] Defendants again rely on D.C. Code § 1-206.02(b) to argue that the Mayor does not have the authority to obtain out-of-District assistance under the EMAC because the District does not have any greater authority over the National Guard under Home Rule than it did before 1975. ECF 35-1 at 31. Such an argument is not persuasive, however, when a separate provision of the D.C. Code gives the Mayor power to submit requests under the compact. D.C. Code § 7-2332 ("The Mayor is hereby authorized to execute, on behalf of the District of Columbia, the Emergency Management Assistance Compact."). In submitting requests through the EMAC, the Mayor is not commanding or controlling the DCNG—i.e., not directly exercising authority "over" the DCNG—but exercising a different authority to call for out-of-state assistance.

**ADD.049**

In short, Title 32 is a collection of federal statutes that define the federal government's involvement with state National Guard units, but its provisions do not change the scope of state command. As discussed in Section III.A.3, the DCNG has no state-law authority for the activities it is currently conducting and could not invite other states to assist it in those actions under the EMAC. Additionally, the District made no request through the EMAC here. As a result, no authority exists for the out-of-state National Guard units to operate in the District and Plaintiff is likely to succeed on the merits of its APA contrary to law claim.

**b. Defendants' Counter-Arguments Lead to Implausible Results, Upending the Fundamental Division of Power Between State and Federal Control over the National Guard.**

Defendants, on the other hand, read section 502(f)(2)(A) as allowing the President to request any mission or operation from state National Guard units, including missions for which the President cannot utilize the federalized National Guard. Such a reading cannot be right. First, Defendants do not explain why Congress would bury such an expansive authority—in their view, a more flexible version of Title 10—in a subsection of a statute in a chapter focused on training. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (describing the principle that Congress does not "hide elephants in mouseholes"). Second, Defendants cannot articulate why this single amendment to Title 32 should be read to create operational authorization for the underlying activities, when other Title 32 provisions are structurally designed to rely on governors' powers under state law. *See* 32 U.S.C. § 112(c)(5) (allowing state National Guard units in Title 32 status to participate in drug interdiction activities when "the use of the National Guard of the State for the activities proposed under the plan is authorized by . . . State law"); *id*. § 906 ("A Governor of a State may request funding assistance for the homeland defense activities of the National Guard of that State from the Secretary of Defense."). Another amendment passed in the same package as

**ADD.050**

the updated section 502(f) demonstrates that Congress did not view the addition of section 502(f)(2)(A) as altering the fundamental scheme of Title 32. The bill also added to an existing statute to permit members "serving on full-time National Guard duty under section 502(f)" to assist in emergency preparedness or help respond to emergencies involving a "natural or manmade disaster in the United States." Pub. L. No. 109-364, § 527, 120 Stat. at 2196 (modifying 10 U.S.C. § 12310(c)). Defendants offer no explanation as to why Congress would establish such a specific emergency provision if it thought that section 502(f)(2)(A) already empowered the National Guard to undertake any mission the President requested.

At argument, Defendants cited past instances of the deployment of the National Guard under Title 32 as support for its broad interpretation of the statute, noting that Presidents have previously utilized the provision to undertake border patrol missions. Hr'g Tr. 53:2–22 (citing other 502(f) missions as "helpful data points"). But those historical examples confirm, rather than undermine, the principle that missions under section 502(f)(2)(A) must be authorized by state law, rather than presidential request. Defendants cite two border-control missions—Operation Jump Start and Operation Phalanx—performed by state National Guard units beginning in 2006 and 2010 respectively. Under Operation Jump Start, more than 6,000 Guardsmen from states across the country were called to the border, while Operation Phalanx involved about 1,200 Guardsmen from the border states. Luis Martinez, *Pentagon Has Few Details About Guard Deployment to Border*, ABC News (April 5, 2018), https://perma.cc/A5TB-N5FD. For Operation Jump Start, the governors of Arizona, California, New Mexico, and Texas "officially requested" federal support in managing the crisis at the border and executed a memorandum of agreement to request out-of-state assistance. Major Jonathan E. Marang, *Operation Jump Start*, Marine Corps Gazette 80 (Nov. 2018), https://perma.cc/64MN-TPJZ. In these operations, "National Guard personnel involved in

**ADD.051**

activities on the border [were] under the command and control of the governors of the southwest border states and . . . received federal funding in Title 32 status." U.S. Gov't Accountability Off., GAO-12-657T, Border Security: Observations on Costs, Benefits, and Challenges of a Department of Defense Role in Helping to Secure the Southwest Land Border 7 (2012).

The authority for these operations, then, came not from the President's request that such operations take place, but from the requesting states. Arizona, California, New Mexico, and Texas asserted their authority to deploy their own National Guards to assist with emergencies at the border.[31] *See, e.g.*, Ariz. Rev. Stat. § 26-172(A) ("When the governor proclaims an emergency . . . the governor may mobilize all or any part of the national guard or the unorganized militia into service of the state."); Cal. Mil. & Vet. Code § 146(a) (noting that the governor can call the California National Guard into state active service in case of "emergency, or imminent danger thereof, or resistance to the laws of this state or the United States"). Title 32 was invoked to support, not authorize, such operations. In fact, one Congressional Research Service report describing those operations noted that "[a]lthough National Guard members did not engage in direct law enforcement activities during these two border security operations, it is possible that *states* might consider giving them that authority in future operations." Elsea, *supra*, at 2 (emphasis added). The reliance on state authority is also consistent with the National Guard's own interpretations of Title 32. Nat'l Guard Bureau, Nat'l Guard Reg. 500-5, Nat'l Guard Domestic Law Enforcement Support & Mission Assurance Operations § 4–2(a) (Aug. 18, 2010) ("The National Guard normally serves on state active duty or Title 32 status when providing support during these operations, and is under the command of the state's Governor, in accordance with

---

[31] It is also notable that the National Guard units were not serving in a "direct law enforcement role" by enforcing federal law at the border, but instead assisting with engineering, aviation, entry identification teams, and other forms of logistical and administrative support. Elsea, *supra,* at 1–2.

**ADD.052**

state law."); *id*. § 4-2(b) ("Governors may authorize the use of the National Guard to assist civil authorities and support law enforcement activities according to state law or the state constitution.").

Finally, since the Founding, governing law has recognized that the militia operates as both a federal and state organization, but that different rules apply to its different statuses. The Militia Clause mandates that Congress shall have the power to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States." U.S. Const. art. I, § 8, cl. 16. In other words, when the militia is in state status, Congress can provide resources for "organizing, arming, and disciplining" them, but can only "govern[] such Part of them as may be employed" in federalized service. *Id*. And the Constitution reserves to the states the powers to appoint officers and "the Authority of training the Militia according to the discipline prescribed by Congress." *Id*.

This bedrock division between two separate statuses for operating the National Guard— under state active duty or as part of the federal armed forces—has not been erased by section 502(f) of Title 32. Congress and the states have crafted an intricate framework governing the National Guard in its different roles, with specific checks imposed, and the Court will not read section 502(f) to render these checks superfluous. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."); *Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("When there are two acts upon the same subject, the rule is to give effect to both if possible.").

And these checks on federal power have endured for good reason. The President wields a powerful tool under Title 10 and the Insurrection Act. *See* 10 U.S.C. §§ 251–53, 12406. Under those statutes, the President can call up the National Guard of any state, without its governor's

**ADD.053**

consent, and deploy it to any other state. *See id*. That expansive Title 10 authority, however, is limited by equally strong restraints. The President is only allowed to federalize the National Guard during an insurrection, invasion, rebellion, or when regular forces cannot suffice to execute the laws. *Id*. Courts have recently upheld limits on the President's power to federalize the National Guard when those conditions are not met. *See Illinois v. Trump*, 155 F.4th 929, 938–39 (7th Cir. 2025) (concluding that the federal government was unlikely to succeed on its argument that it had met the prerequisites for federalizing the National Guard under 10 U.S.C. § 12406). Additionally, the federalized National Guard is considered part of the federal armed forces and subject to the Posse Comitatus Act's prohibition on the use of armed forces in domestic law enforcement. *See* 18 U.S.C. § 1385 (barring "any part of the Army" or the Air Force from being used to "execute the laws"). Defendants' reading of section 502(f) would obviate the need to satisfy the predicates found in Title 10 and the Insurrection Act and provide an escape hatch from the PCA, allocating power to the President without any corresponding checks.[32]

State active duty status, on the other hand, has traditionally come with its own benefits and limitations. The National Guard is not subject to the PCA when operating under state active duty, permitting those units to engage in a wider array of activities. *Mueller*, 943 F.3d at 837 (holding that the PCA "only bars the Army and Air Force from domestic law enforcement"). In fact, many states explicitly allow their governors to call on the Guard to "execute the laws." *See, e.g.*, Miss. Code § 33-3-1 ("The Governor shall be Commander in Chief of the militia . . . and shall have

---

[32] Defendants argue that deployments of the state National Guard under section 502(f) are still constrained by the need to receive the sending state governor's consent. Hr'g Tr. 63:25–64:4 (arguing that "while 502(f) is written broadly," any missions authorized under the statute would need approval from "high-level" state and federal authorities, who "have to come to some agreement on the necessity of th[e] project"). Such an argument, however, does not respond to two of the key issues raised by their interpretation: (1) that reading section 502(f) broadly would allow the President to avoid the strictures of the Posse Comitatus Act, and (2) that permitting such missions would risk trampling on the sovereignty of the receiving states, who are not required to consent to the section 502(f) missions under Defendants' interpretation.

**ADD.054**

power to call forth the militia to execute the laws."). But state governors are not generally authorized to act outside of their own state's borders or to respond to crises outside of their jurisdictions. Congress and the states have developed the EMAC as a mechanism that permits states to send their National Guards to assist other states in times of crisis. *See* Pub. L. No. 104-321, 110 Stat. at 3878–79 (Articles II and III of the EMAC, describing general implementation and party state responsibilities); *id.* at 3877 (stating that the purpose of the compact is to "provide for mutual assistance between the states . . . in managing any emergency disaster," including "community disorders"). The EMAC, however, requires the consent of both the sending and receiving states, while Defendants' interpretation of section 502(f) would allow the President to ignore the receiving states' voices entirely.

As currently designed, Title 10, the EMAC, and the PCA function as interlocking pieces of a comprehensive scheme, placing limits on the use of the National Guard under both its federal and state statuses. For example, the EMAC carefully carves out the President's activities under Title 10 from its scope. Pub. L. No. 104-321, 110 Stat. at 3882 (Article XIII of the EMAC, stating that nothing in the compact "shall authorize or permit the use of military force by the National Guard of a state at any place outside that state in any emergency for which the President is authorized by law" to federalize the National Guard). The compact also does not permit the use of the state National Guards for law enforcement in the absence of express authorization. *Id.* (prohibiting the use of National Guard units under the EMAC "for any purpose for which the use of the Army or the Air Force would in the absence of express statutory authorization be prohibited under" the PCA). Defendants, on the other hand, read 32 U.S.C. § 502(f) to erase all boundaries between the state and federal National Guards and the respective limits on their use. *Contra Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) (stating that courts' construction of terms "must,

**ADD.055**

to the extent possible, ensure that the statutory scheme is coherent and consistent"). Under their interpretation of Title 32, the President could send a non-federalized National Guard unit to another state, against the receiving state's will, to conduct any operation or mission the President directs. As the Seventh Circuit has recently noted, such an interpretation would raise serious constitutional questions implicating the Tenth Amendment's protections of state sovereignty. *See Illinois*, 155 F.4th at 940 (finding "an incursion on Illinois's sovereignty" when National Guard members from Texas are deployed to Illinois "over the state's objection"). The Court declines to adopt an interpretation of section 502(f) that would raise such serious constitutional questions.[33] *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (noting that when "choosing between competing plausible interpretations of a statutory text," courts can "rest[] on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

After delineating the specific powers and statutory schemes governing the state and federal National Guards in Title 10, the PCA, and the EMAC, Congress has not eviscerated those limits by amending section 502. As a result, the Court rejects Defendants' interpretation and finds that the out-of-state National Guards are likely operating in the District in a manner contrary to law. Under section 502(f), state law defines the permissible use of the National Guard under state control—i.e., which missions the governors can order their units to conduct. Here, the state governors whose units are currently operating in the District lack authority to order these missions because the District has not properly sought their aid under D.C. law and the EMAC.

---

[33] Defendants argue that the Court cannot consider any state sovereignty issues raised by their interpretation because the Plaintiff in this case is not a state. But Defendants have not articulated how their interpretation of section 502(f) would apply differently to states, as opposed to the District. *See Clark*, 543 U.S. at 382 (declining to adopt an interpretative approach in which a statute's meaning would be "subject to change depending on the presence or absence of constitutional concerns in each individual case").

**ADD.056**

*    *    *

In sum, the Court concludes that the District is likely to succeed on the merits of its statutory arguments against Defendants' deployments of both the DCNG and the out-of-state National Guards. The Court now moves to analyzing the remaining preliminary injunction and stay factors: irreparable harm, balance of the equities, and the public interest.

## B.  Remaining Preliminary Injunction and Stay Factors

The Court finds that the District has demonstrated irreparable harm from Defendants' infringements on its ability to exercise sovereign powers within its jurisdiction. The balance of the equities and the public interest also favor preliminary relief here.

### 1.  Irreparable Harm

To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The Court finds that the District has demonstrated irreparable harm from the DOD Defendants' actions deploying the National Guard and usurping the District's rights to home rule.

Defendants do not contest that sovereign injuries to states constitute irreparable harm. *See Kentucky v. EPA*, Nos. 23-3126, 23-3225, 2023 WL 11871967, at *4 (6th Cir. July 25, 2023) ("[I]nvasions of state sovereignty likely cannot be economically quantified, and thus cannot be monetarily redressed, and as such constitute irreparable harm."); *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) ("[A] stay is necessary to prevent the irreparable harm to state sovereignty."). Instead, Defendants argue that the District cannot assert a sovereign injury because

**ADD.057**

the District government is a "statutory creation," exercising "a limited set of delegated authorities." ECF 35-1 at 48–49.

As discussed above in Section III.A.1, however, the Court finds that the District can assert injuries to the exercise of the sovereign powers that Congress has delegated to it. Under D.C. law, the powers to "preserve the public peace," "prevent crime and arrest offenders," and "enforce and obey all laws" are reserved to the local elected representatives of the District. D.C. Code § 5-101.03(1), (2), (10); *see id*. § 1-204.22 ("The Mayor shall be responsible for the proper execution of all laws relating to the District."). The deployments of the DCNG and the out-of-state National Guards have infringed upon the District's right to govern itself and to make its own decisions on key elements of home rule, including how to best deter crime and when to call for emergency assistance from other states. *See supra* Section III.A.1; *Harris v. Lee*, No. 25-1461-I, slip op. at 32 (Tenn. Ch. Ct. Nov. 17, 2025) (finding irreparable harm where Memphis mayor and county officials were "deprived . . . of the ability to exercise their authority, rights, and duties as current elected public officials under Tennessee law"). Those injuries are concrete, immediate, and irreparable. Defendants have not suggested, for example, how after-the-fact relief could rectify these intrusions, and the Court can think of none. *Cf. Ctr. for Biological Diversity v. Regan*, No. 21-cv-119, 2024 WL 1740078, at *5 (D.D.C. Apr. 23, 2024) (refusing to find irreparable harm because Florida "remain[ed] free to enforce state law and to exercise its traditional sovereign authority").[34] Defendants have improperly reallocated the exercise of the District's sovereign

---

[34] Defendants' arguments that the National Guard is helping the District by supporting law enforcement agencies is not responsive to the self-government injury the District has asserted. ECF 35-1 at 48. Additionally, while it is true that Congress has given some law enforcement powers in the District to other actors, including the President's emergency powers over the MPD, those limited powers are carved out from the District's sphere of home rule. *See* D.C. Code § 1-207.40. Defendants' exercise of their powers over the DCNG would similarly not injure the District if Defendants were exercising their powers within the bounds authorized by D.C. law.

    Defendants have also suggested that the District's delay in filing this lawsuit undermines its claim of irreparable harm. ECF 35-1 at 53 (noting that the District "waited nearly a month to even seek an injunction"). But

powers to the commanders of the DCNG and the out-of-state Guard units and such harm, if it proceeds during the course of this litigation, could not be remediated. The Court finds that the irreparable harm factor supports the granting of preliminary relief in this case.

### 2. Balance of the Equities and Public Interest

The balance of the equities and the public interest also tip in the District's favor. These factors "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022). Defendants argue that granting an injunction in this case would impinge on the President's "longstanding and express authority as Commander in Chief" of the DCNG and "second guess" the President's judgment on crime rates in the District. ECF 35-1 at 52. Defendants also ask the Court to weigh the benefits they say the deployment is delivering to "residents, federal employees, and visitors," such as a reduction in violent crime. *Id.* at 53. The Court recognizes, as the Ninth and Seventh Circuits have, that the federal government has a strong interest in the protection of federal functions and property—in this case, through the deterrence of crime in the District. *See Illinois*, 155 F.4th at 940; *Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025). But the District and the public have countervailing interests to not be subject to the presence of National Guard units who have exceeded the bounds of their lawful authority. That is because "[t]here is generally no public interest in the perpetuation of unlawful agency action," but "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) ("[T]he government cannot suffer harm from an injunction that merely ends an unlawful practice or reads

---

the District's sovereign powers injury is ongoing for the duration of the improper deployments. The Court also finds that the District's delay is explained by uncertainty over the factual circumstances surrounding the initial deployment, including its need for discovery from Defendants. *Cf. Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (finding that an "unexcused delay" in seeking injunctive relief may imply a lack of irreparable harm).

**ADD.059**

a statute as required."). Because of the District's strong public interest in enforcing "its duly enacted law," *Hansen v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024), and its "high likelihood of success on the merits," *Newby*, 838 F.3d at 12, the Court concludes that a "preliminary injunction would serve the public interest." *Id*.

### C. Stay Pending Appeal

Based on the analysis above, the Court finds that all four preliminary injunction factors weigh in the District's favor and will grant the District's motion for preliminary relief. The Court now considers Defendants' final argument, requesting that the Court administratively stay its order pending appeal. Hr'g Tr. 86:24–87:3. The Court finds that, under these circumstances, an administrative stay is necessary to permit orderly proceedings on appeal. Accordingly, the Court will stay its order granting preliminary relief for 21 days, until December 11, 2025.

"A stay pending appeal is an extraordinary remedy." *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020) (citing *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985)). The Court must consider four factors before granting a stay motion: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434. While the Court again finds Defendants' arguments unpersuasive on the merits, the Court concludes that the public interest weighs in favor of granting Defendants a brief administrative stay. *See Marin Audubon Soc'y v. Fed. Aviation Admin.*, 129 F.4th 869, 871–72 (D.C. Cir. 2025) (as part of the consideration of the equities and the public interest, courts can evaluate "the practical effects" on the parties, including the need to avoid "substantial disruption"). As discussed throughout this opinion, over 2,000 members of the National Guard are currently deployed in the

**ADD.060**

District, including over 1,000 members from states outside the District. To prevent potential disruption to the functioning of the District and the National Guard during the appeals process, the Court will administratively stay its decision, "freez[ing] legal proceedings" to provide the D.C. Circuit time to rule on Defendants' request for relief. *See United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of applications to vacate stay) (describing courts' practice of issuing administrative stays "to permit time for briefing and deliberation"). The District has also indicated that it "does not oppose" a "time-limited administrative stay to permit orderly resolution of any request for emergency relief." ECF 57 at 51 n.22. The Court will thus stay its order for 21 days in order to "build in a grace period" and avoid "disruptive consequences" to the public. *Marin Audubon Soc'y*, 129 F.4th at 872.

\* \* \*

For the foregoing reasons, Plaintiff's motion for preliminary relief, ECF 3, is **GRANTED** against the DOD Defendants. Defendants' motion to dismiss, ECF 35, is **DENIED in part** on those same claims. A separate order accompanies this memorandum opinion. The Court's order is administratively **STAYED** for 21 days, until December 11, 2025.

       **SO ORDERED.**

_____

JIA M. COBB
United States District Judge

Date: November 20, 2025

**ADD.061**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>             Plaintiff,<br><br>       v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>             Defendants. | Case No. 25-cv-3005 (JMC) |

**ORDER**

For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that Plaintiff's motion for a preliminary injunction and a section 705 stay, ECF 3, is **GRANTED**. Defendants' motion to dismiss, ECF 35, is **DENIED in part and DEFERRED in part**.

It is hereby **ORDERED** that the DOD Defendants are **ENJOINED** from deploying or requesting the deployment of any members of the National Guard in the District of Columbia pursuant to the following:

- Letter from Secretary of the Army Daniel Driscoll to Brigadier General Leland Blanchard, Commanding General, District of Columbia National Guard (DCNG) (Aug. 11, 2025);

- DCNG Permanent Order 25-223;

- Memorandum for Interim Commanding General, DCNG, Re: Extension of 11 August 2025, Mobilization of D.C. National Guard – JTF-DC (Sept. 3, 2025);

- Any guidance, regulations, or orders that effectuate the extension of the DCNG's deployment through February 28, 2026;

**ADD.062**

- Any Memorandum of Understanding executed between the DCNG and another state in support of Operation Make DC Safe and Beautiful;

- Any extensions, modifications, or other actions implementing these orders, regulations, or memoranda; and it is further

**ORDERED** that these orders, regulations, and memoranda are **STAYED** pursuant to 5 U.S.C. § 705; and it is further

**ORDERED** that this Order shall apply to the maximum extent provided for by Federal Rule of Civil Procedure 65(d)(2) and 5 U.S.C. §§ 705 and 706.

Defendants' motion for relief from Local Civil Rule 7(n)(1)'s requirement to file a certified list of the contents of the administrative record, ECF 35-1 at 26 n.10, is **GRANTED**.

Defendants' request to administratively stay preliminary relief, ECF 35-1 at 53, is **GRANTED**. This Order is **STAYED** for 21 days until December 11, 2025.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: November 20, 2025

2

**ADD.063**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,

                Plaintiff,

     v.

DONALD J. TRUMP, *et al*.,

                Defendants.

Case No. 25-cv-3005 (JMC)

## ORDER

Plaintiff District of Columbia challenges the deployment of over 2,300 National Guard troops in the District. It brought this suit against President Donald J. Trump; against the Department of Defense, Secretary of Defense Peter B. Hegseth, the U.S. Army, and Secretary of the Army Daniel P. Driscoll (collectively, "DOD Defendants"); and against the Department of Justice, Attorney General Pamela J. Bondi, the U.S. Marshals Service, and its Director Gadyaces S. Serralta (collectively, "DOJ Defendants").[1] On September 9, 2025, Plaintiff filed a motion for a preliminary injunction, seeking, among other relief, to enjoin Defendants from "deploying National Guard troops to conduct law enforcement in the District of Columbia" and from "exercising command and control of out-of-state National Guard troops." ECF 3-6 at 1.[2] On the same day, Plaintiff also filed a motion for expedited discovery in support of its motion for a preliminary injunction. ECF 4.

On September 18, 2025, the Court held a hearing on Plaintiff's expedited discovery motion.

---

[1] The individual Defendants are sued in their official capacities.

[2] All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

**ADD.064**

Sept. 18, 2025 Min. Entry. The Court found that Plaintiff's initial discovery requests, ECF 4-1, were overly broad and burdensome on Defendants. After the hearing, Plaintiff filed a notice of revised discovery requests. ECF 43.

Based on the record before it and the issues raised at the hearing, the Court finds that limited expedited discovery is appropriate in this case. *See* Fed. R. Civ. P. 26(d) (Advisory Committee's note to 1993 amendment) (Discovery can be expedited in cases as appropriate, including "those involving requests for a preliminary injunction."). As the Parties discussed at the hearing, there are significant factual disputes relevant to deciding Plaintiff's preliminary injunction motion, including the extent of Defendants' command and control over out-of-state National Guard units and the instructions and training that National Guard units have been given. As a result, the Court will order DOD and DOJ Defendants to respond to Plaintiff's narrowed Requests for Production of documents. ECF 43 at 9–10 (listing Requests for Production No. 1–6). DOD and DOJ Defendants are also required to respond to Plaintiff's Interrogatory No. 1. *Id*. at 18.

The Court finds that this limited expedited discovery is reasonable and proportional in light of the circumstances of this case, particularly in aiding the Court's efficient resolution of Plaintiff's preliminary injunction motion. *See Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014). While normally the Court would not order discovery while a motion to dismiss is pending, given the expedited timeline and overlap of issues, the Court plans to resolve the motion to dismiss and preliminary injunction motion simultaneously. ECF 3, 35. As discussed above, limited discovery on key factual issues will aid the Court in doing so. Additionally, the Court has narrowed the scope of discovery to minimize the burden on Defendants. *See Guttenberg*, 26 F. Supp. 3d at 98. First, at the hearing, Plaintiff voluntarily withdrew its request to seek any discovery from the President or the White House. Second, the Court ruled that no depositions would be permitted at this time.

**ADD.065**

Finally, the Court has cabined the discovery primarily to the production of documents. Even for the one interrogatory that Defendants are ordered to respond to, Defendants are free to answer by specifying the responsive records. *See* Fed. R. Civ. P. 33(d). The Court finds that limiting discovery to document production is appropriate because Plaintiff has not shown that any of the orders or instructions it seeks have failed to be memorialized in writing. If Plaintiff reviews Defendants' document production and finds there to be significant gaps or holes in the record, the Court will consider further discovery requests at that time.

For the reasons stated, it is hereby **ORDERED** that Plaintiff's Motion for Expedited Discovery, ECF 4, is **GRANTED** in part and **DENIED** in part.

DOD and DOJ Defendants are **ORDERED** to respond to Requests for Production No. 1, 2, 3, 4, 5, and 6 and Interrogatory No. 1 in Plaintiff's Notice of Revised Discovery Requests, ECF 43. DOD and DOJ Defendants may answer the Interrogatory by "specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." Fed. R. Civ. P. 33(d). DOD and DOJ Defendants' responses are due by **October 10, 2025**.

SO ORDERED.

_____
JIA M. COBB
United States District Judge

Date: September 19, 2025

3

**ADD.066**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,

Plaintiff,

v.

DONALD J. TRUMP, *et al.*,

Defendants.

Civil Action No. 1:25-cv-03005-JMC

## DECLARATION OF COLONEL LAWRENCE M. DOANE

I, Colonel Lawrence M. Doane, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a member of the District of Columbia Army National Guard (DCARNG).

2.      I submit this declaration in support of Defendants' opposition to Plaintiff's motion for a preliminary injunction. I base this declaration upon my personal knowledge, as well as knowledge made available to me in the course of my official duties.

### The Current Task Force District of Columbia Mission

3.      On August 11, 2025, by order of Brigadier General Leland Blanchard, II, Commanding General, DCNG, I was assigned as Commander, Joint Task Force District of Columbia (JTF-DC), as part of Operation "Make DC Safe and Beautiful." All individuals working under JTF-DC are members of the DCNG (either Air and Army) or a State National Guard. During the first few days of command my immediate commander was Brigadier General Craig Maceri, DCNG Land Component Commander, with Brigadier General Blanchard in overall command of the operation. Currently, I report directly to Brigadier General Blanchard who remains in overall command of the operation.

**ADD.067**

4.    The JTF-DC mission is to provide support to law enforcement agencies including but not limited to the United States Marshals Service (USMS), the United States Park Police (Park Police), and the District of Columbia Metropolitan Police Department (DC-MPD) as part of Operation "Make DC Safe and Beautiful." JTF-DC conducts operations in accordance with employment guidance issued in the August 20, 2025 Secretary of Defense Memorandum. *See* Attachment 1. This guidance states that National Guard Service Members who are participating in this mission are not authorized:

- To effect arrests or engage in other similar direct law enforcement activity.

- To share equipment with law enforcement agencies.

- To use intelligence, surveillance, and reconnaissance (ISR) assets or to conduct ISR or incident, awareness, and assessment activities.

- To employ helicopters or any other air assets.

5.    The employment guidance also provides that DCNG personnel and out-of-district forces supporting law enforcement agencies will be armed with their service-issued weapon(s).

6.    National Guard forces supporting law enforcement within the District of Columbia as part of Operation Make DC Safe and Beautiful act as a presence to deter crime, report any crime they witness to law enforcement, and assist law enforcement in other support missions when requested. JTF-DC personnel acting as a presence free up law enforcement officers who would normally be used to ensure a presence in these areas to do other missions. For example, JTF-DC forces provide a presence to observe and report events on the National Mall which allows the National Park Police to send officers to patrol other locations. DCNG personnel also provide a presence in and around Metro stations freeing Metro Transit Police to patrol other areas and do other duties.

**ADD.068**

7.    All members of JTF-DC are sworn in as Special Deputies by USMS before participating in any operation. The USMS special deputation appointment authorizes service members to carry their service-issued weapon, and states that service members are not authorized to conduct searches, seizures, arrests, or other similar functions. JTF-DC personnel, if they witness a crime, may temporarily detain an individual until law enforcement arrives. The decision of whether to arrest an individual, and any investigation of the underlying incident, are solely the responsibility of the supported law enforcement agency.

8.    JTF-DC initially was composed of DCNG service members only. On 16 August 2025, out-of-district forces began to be assigned to JTF-DC. Currently, JTF-DC consists of personnel from the DCNG and the following states in the following numbers: South Carolina – 256, West Virginia - 339, Mississippi – 178, Louisiana – 139, Tennessee – 173, Ohio – 150.

9.    As JTF-DC Commander, I have direct command and control over DCNG personnel. I exercise coordinating and tasking authority over the out of district forces participating in this mission. All out-of-district forces are participating in this mission with the consent of their state Governors and remain under the administrative command and control of their sending state Adjutants General and ultimately their State Governors. All tasks assigned to out-of-district forces are within parameters set by their State Governors. For example, I cannot assign Ohio National Guard Forces crowd control tasks, and no out of district forces can be assigned beautification missions. All out of district forces are assigned tasks by JTF-DC and only participate in law enforcement support tasks. Out of district forces may be withdrawn, or their operations further limited by their State Governors at any time. DCNG has no disciplinary or administrative authority over these forces. Any out of state force can refuse any task assigned to them should their Governor or Adjutant General object to the assignment.

**ADD.069**

10.     JTF-DC began operations on August 11, 2025. Initially JTF-DC's operations were conducted in support of the Park Police and USMS. Operations were conducted unarmed and were in and around National Park Service controlled property, specifically the National Mall and Washington, D.C. Union Station. On 24 August 2025, JTF-DC's operations became armed and were expanded to include providing a presence at large public gatherings, specific sporting events, and in high foot traffic and retail areas around and near the National Mall, Union Station, and downtown Washington, DC.

**Task Force District of Columbia's Integration with the District**

11.     On 25 August 2025, I started attending a daily multiagency coordination meeting with the USMS, Park Police, DC-MPD, and the Washington Metro Transit Police Department. As result of these meetings, I have been in daily contact with Commander Jason Bagshaw, of DC-MPD's Special Operations Division to coordinate JTF-DC operations in support of DC-MPD. These meetings are held daily at the United States Park Police Headquarters located at 1901 Anacostia Drive, Washington DC.  In addition, two DC-MPD liaisons are assigned to the JTF-DC Operations Center located at the DCNG Armory to ensure coordination and cooperation between the DC-MPD and JTF-DC.

12.     In furtherance of JTF-DC's cooperation with DC-MPD, DC-MPD provides JTF-DC an Officer Awareness Packet each day. These packets include "Be on the Look Out" notices for suspects as well as any planned DC-MPD operations that may affect JTF-DC. In addition, DC-MPD provides daily updates on the location and frequency of reported crime within the District of Columbia. DC-MPD also provides a police escort to JTF-DC forces when they are transported from their staging area to their operating area.

**ADD.070**

13.     JTF-DC conducts operations such as area security in direct support of the USMS and Park Police. Outside of these preplanned operations, JTF-DC has maintained an enduring partnership with DC-MPD for many years. This enduring partnership enhances interoperability for National Special Security Events and other civil support missions the DCNG conducts at the request of DC-MPD.  These operations have included support to the District for the annual 4th of July celebrations, Presidential Inaugurations, and the civil disturbances in the summer of 2020, among others.

14.     For the ongoing mission and from a tactical standpoint, JTF-DC personnel are instructed to call 9-1-1 whenever they witness a crime, a person in distress, or other emergency that requires a police response. The 9-1-1 operator then dispatches DC-MPD officers to the scene. DC-MPD then contacts the JTF-DC Operations Center to coordinate their response and to connect the responding DC-MPD officers with the JTF-DC personnel on site. At all times, JTF-DC works in coordination with and with the full support of DC-MPD. All JTF-DC operations are vetted and approved by supported law enforcement partners.

**Joint Publication 3-28**

15.     Attached as Attachment 2 is Joint Publication 3-28, Defense Support to Civil Authorities, dated 31 July, 2013. This document outlines the principles and doctrine that DOD forces follow when conducting defense support to civil authorities within the United States.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 16th day of September 2025.

Digitally signed by
DOANE.LAWRENCE.MICHAEL.12
37174387
Date: 2025.09.16 19:11:41 -04'00'

LAWRENCE M. DOANE, Colonel, DCARNG
Commander

**ADD.071**

Attachments:

1.  SECDEF Employment Guidance Memorandum, dated 20 August 2025

2.  Joint Publication 3-28, Defense Support to Civil Authorities, dated 31 July 2013

**ADD.072**

# ATTACHMENT 1



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

AUG 2 0 2025

MEMORANDUM FOR SECRETARY OF THE ARMY
        UNDER SECRETARY OF DEFENSE (COMPTROLLER)
        CHIEF NATIONAL GUARD BUREAU

SUBJECT:  Employment Guidance for the District of Columbia National Guard and Out-of-
      District National Guard Service Members

    I authorized D.C. National Guard (DCNG) Service members (SMs) to support the D.C.
Metropolitan Police Department (MPD) as it coordinates with law enforcement agencies (LEAs)
to help lower the crime rate in Washington, D.C.  DCNG SMs will conduct this mission in a duty
status pursuant to 32 U.S.C. § 502(f) and subject to the conditions in this memorandum.  I also
authorized the activation of up to 1,400 National Guard SMs from Louisiana, Mississippi, Ohio,
South Carolina, Tennessee, and West Virginia to provide support to the Department of Justice
(DOJ).

    In addition to DCNG support of MPD, the Secretary of the Army may approve the use of
DCNG SMs to support Federal law enforcement agencies within the District of Columbia upon
the written request of the Federal law enforcement agency.  The Secretary of the Army also may
waive the requirement for reimbursement under 10 U.S.C. § 277(b) if he determines the standard
in 10 U.S.C. § 277(c) for such a waiver is met.  The Secretary of the Army will provide the
Under Secretary of Defense for Policy with copies of such requests and approvals.  If the
Secretary of the Army approves support to the Department of Homeland Security (DHS) or a
DHS component, he will ensure that he complies with section 1707 of the National Defense
Authorization Act for Fiscal Year 2020.

    The Under Secretary of Defense (Comptroller) will facilitate and prioritize funding
through existing procedures, including a reprogramming action to cover the costs of deployment,
to include lodging, per diem, pay, and allowances, for the activation of United States Army
personnel assigned to the DCNG in support of MPD and, if the Secretary of the Army waives the
requirement for reimbursement in accordance with 10 U.S.C. § 277(c), in support of Federal law
enforcement agencies.

    Given that the President has exercised his power under section 740(a) of the D.C. Home
Rule Act (section 1-207.40 of the D.C. Code) and the MPD is now in support of the Attorney
General of the United States, the Secretary of the Army will determine DCNG missions in
support of MPD based on information from the Attorney General of the United States.

    I direct and authorize the Chief of the National Guard Bureau (CNGB) to work with
appropriate officials from the States and territories to identify NG units to provide such support.
To the maximum extent possible, supporting States and territories should identify coherent units

**ADD.074**

with a sufficient number of commissioned and noncommissioned officers to coordinate support activities. Upon appropriate authorization for support to Federal law enforcement agencies in D.C., the CNGB will convey my request to appropriate Governors, through their respective Adjutants General that they order their respective NG service members to duty under 32 U.S.C. § 502(f) to assist the Department of Defense in providing support requested by a Federal law enforcement agency.

At all times, any supporting out-of-district NG personnel will remain under the administrative command and control of their State Governor. The Secretary of the Army, through the Interim Commanding General of the DCNG, will coordinate the employment of DCNG and any other NG forces employed in the District of Columbia in a duty status pursuant to 32 U.S.C. § 502(f) by assigning tasks for supporting NG service members, consistent with the guidance of the supported law enforcement agency.

Unless provided written authorization from the Secretary of Defense, NG service members activated under 32 U.S.C. § 502(f) are not authorized to:

- To effect arrests or engage in other similar direct law enforcement activity. This restriction does not preclude the Secretary of the Army from authorizing the use of NG personnel to conduct the full range of civil disturbance operations, short of arrest.

- To share equipment with law enforcement agencies.

- To use intelligence, surveillance, and reconnaissance (ISR) assets or to conduct ISR or incident, awareness, and assessment activities.

- To employ helicopters or any other air assets.

DCNG personnel and out-of-district SMs supporting LEAs will be armed with their service-issued weapon(s).

Supporting Governors or other appropriate officials directing supporting NG SMs will adhere to the DCNG Rules for the Use of Force (RUF) subject to my authorization of out-of-district NG SMs to conduct this mission in a 32 U.S.C. § 502(f) duty status.

When employed, NG SMs will be in their military uniforms and clearly marked and/or distinguished from civilian law enforcement personnel.

At all times, DCNG SMs will remain under the operational and administrative command and control of the Interim Commanding General of the DCNG, who reports to the Secretary of Defense through the Secretary of the Army and will adhere to DCNG RUF.

If the CNGB believes support under this activation will, now or in the future, adversely affect military preparedness of the United States, the CNGB is directed to notify the Chairman of the Joint Chiefs of Staff (CJCS), who will make an appropriate assessment consistent with 10 U.S.C. § 153. This is an ongoing notification requirement for the duration of the mission.

**ADD.075**

Upon completion of this mission, please work with the Interim Commanding General, DCNG, to prepare and submit an after-action report to the Under Secretary of Defense for Policy.

cc:
United States Attorney General
Secretary of the Air Force
Chairman of the Joint Chiefs of Staff
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness
General Counsel of the Department of Defense
Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs
Interim Commanding General, DCNG

**ADD.076**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,

                    Plaintiff,

          v.                                              Civil Action No. 1:25-cv-03005-JMC

DONALD J. TRUMP, *et al.*,

                    Defendants.

## DECLARATION OF CHRISTOPHER YORK

I, Colonel Christopher York, do hereby state and declare as follows:

1.        I currently serve as the Commander of Task Force Beautification, the beautification element of Operation Make D.C. Safe and Beautiful.  I am a Colonel in the District of Columbia Army National Guard (DCARNG).  Over the course of my career, I have served as a platoon leader where I deployed to Iraq in support of Operation Iraqi Freedom, commander of Joint Force Headquarters, DCARNG, deputy commander 74th Troop Command, DCARNG and am currently the commander of the Multi-Agency Augmentation Command (MAC), DCARNG.

2.        I submit this declaration in support of Defendants' opposition to Plaintiff's motion for a preliminary injunction.  I base this declaration upon my personal knowledge, as well as knowledge made available to me in the course of my official duties.

### The Current Task Force Beautification Mission

3.        The overall civil support mission currently being performed by the District of Columbia National Guard (DCNG) within the District of Columbia (the District) was directed by the Secretary of Defense by verbal order on or about 8 August 2025 and later in writing by memorandum dated 20 August 2025.  Specific tasks in furtherance of the mission were approved by the Secretary of the Army by memorandum dated 11 August 2025, with a mission end-date of 25 September 2025, and extended through 30 November 2025, by memorandum dated 3 September 2025.  The underlying directives of Task Force Beautification's mission are further derived in part from Presidential Executive Order, dated 28 March 2025, entitled "Making The District of Columbia Safe and Beautiful."

**ADD.077**

4.    On or about 20 August 2025, I was verbally designated the Commander of Task Force Beautification.  In this role, I report directly to the Task Force Support Commander, Brigadier General Craig M. Maceri, who in turn reports to the Commander of the DCNG, Brigadier General Leland D. Blanchard II.  My responsibilities include coordinating with federal and local partners, to include the National Park Service (NPS), the D.C. Office of Community Relations, the D.C. Homeland Security Emergency Management Agency (HSEMA), and the D.C. Department of Public Works (DPW).  Task Force Beautification servicemembers include approximately 63 members from both the Air and Army components of the DCNG.  Out of District (OOD) servicemembers do not currently support and have never supported Task Force Beautification; all servicemembers supporting Task Force Beautification, under my command, are DCNG members on Title 32 orders.

5.    As further discussed below, Task Force Beautification has from its inception coordinated closely with City officials from HSEMA and DPW to accomplish beautification efforts within the District, many of which were proposed by the District itself.  Throughout the course of its ongoing mission, the DCNG has, through its liaison officers with the District, collaborated on various beautification tasks on Federal and District land.

**Task Force Beautification's Integration with the District**

6.    On or about 22 August 2025, shortly after taking command, my task force engaged in communications with a D.C. City representative for the District, which resulted in a list of locations to begin beautification efforts.  See Attachment 1.  This coordination was followed by a meeting with a representative from the D.C. Office of Community Relations and Services to further discuss beautification efforts.

7.    On or about 25 August 2025, my task force engaged in a telephone call with a representative from HSEMA to initiate our collaboration on the beautification mission.  During the week of 25 August 2025, my staff attended multiple joint meetings with representatives from NPS, HSEMA, and DPW to discuss the beautification mission.  During one of those meetings, HSEMA provided an updated list of proposed beautification projects for the DCNG to perform.  See Attachment 2.  The list was drafted as a memorandum which HSEMA had provided to the U.S. Martial Service on or about 20 August 2025 entitled "DC Guard Federal Surge Tasking," which stated that the District had "identified initial locations and tasks for beautification missions in the District of Columbia."  See Attachment 2.  The memorandum further stated that support from the DCNG "could significantly accelerate [the District's] existing beautification plans and ensure timely progress."  See Attachment 2.  The memorandum identified dozens of potential projects on "both local and Federal land" within the District.  See Attachment 2.  Task

**ADD.078**

Force Beautification proceeded to support these District-requested projects, in addition to other projects requested by NPS (see Attachment 3) or independently identified by the DCNG.

8.      HSEMA representatives further coordinated with Task Force Beautification members to create a personnel roster for enhanced communication.  See Attachment 4.

9.      Additionally, DPW coordinates daily with Task Force Beautification for bulk pickup of trash collected at various beautification project locations.  Upon completing a trash collection project, Task Force Beautification members provide location details directly to DPW, which dispatches a collection vehicle to the site.  This coordination has been occurring for weeks and remains in effect as of the date of this memorandum.

10.     Since the start of this mission, I am unaware of any representative from the District objecting to any actions proposed or performed by Task Force Beautification members.  My command has, however, rejected several beautification projects proposed by the District due to safety concerns (such as cleanup along busy highways where sufficient traffic controls would not be present).

### Current Assessment of Task Force Beautification Mission Impact

11.     Since the onset of Task Force Beautification's mission, DCNG servicemembers have completed 58 beautification projects, of which 40 were directly requested by the District.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this _13_th day of September 2025.

YORK.CHRISTO  Digitally signed by
PHER.1240030  YORK.CHRISTOPHER.1240
221           030221
              Date: 2025.09.16 17:42:17
              -04'00'

CHRISTOPHER YORK, Colonel, DCARNG
Commander

Attachments:
1.      District of Columbia List of Proposed Beautification Projects
2.      HSEMA Memorandum to U.S. Martial Service, dated 20 August 2025
3.      NPS Proposed Projects for DCNG
4.      Task Force Beautification/HSEMA Personnel Roster

**ADD.079**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,

    Plaintiff,

    v.

DONALD J. TRUMP, *et al.*,

    Defendants.

Civil Action No.:  1:25-CV-03005 (JMC)

## DECLARATION OF DONALD SNIDER

    I, Donald F. Snider Jr., under the penalty of perjury, declare as follows:

    1.  My name is Donald F. Snider Jr., and I am currently employed as a Chief Inspector with the United States Marshals Service (USMS).  I have served with USMS since January 2008 and was previously employed by U.S Immigration and Customs Enforcement (ICE) from 2006 until 2008.  Since February of 2020, I have served as the Commander of the Capital Area Regional Fugitive Task Force (CARFTF).  As the Commander of CARFTF, I am responsible for leading a multi-agency fugitive task force that consists of over 300 investigators from over 100 partner agencies across Maryland, Virginia, and Washington D.C.

    2.  The USMS is a bureau within the Department of Justice and serves under the direction and authority of the Attorney General.  28 U.S.C. § 561(a).  The USMS mission includes executing and enforcing all orders of the federal courts, as well as all lawful writs, process, and orders issued under the authority of the United States.  28 U.S.C. § 566(a) and (c).  "The mission of the U.S. Marshals is to enforce federal laws and provide support to virtually all elements of the federal justice system..."  See https://www.usmarshals.gov/who-we-are.  The USMS, "as a bureau within the Department of Justice[,] receives direction from the Attorney General."  *Id.* USMS leads 56 local fugitive task forces and eight regional fugitive task forces, consisting of federal, state, and local officers, across the nation.  34 U.S.C. 41503; *See* https://usmarshals.gov/what-we-do/fugitive-investigations.

    3.  Since August 11, 2025, I have served as the tactical commander, under the leadership of the Federal Surge Commander, Director Gadyaces Serralta, for the federal law enforcement surge[1] associated with the Crime Emergency in the District of Columbia Executive Order issued by President Donald J. Trump.  *See* E.O. 14333.

---

[1] On August 7, 2025, the D.C. Safe and Beautiful Task Force was ordered to surge federal agency resources into the district.  Executive Order 14333 was a follow-on order to this initial surge with additional direction and coordination with District agencies.

**ADD.080**

4.  My role as the tactical commander is to coordinate interagency law enforcement resources, to include USMS, the United States Park Police (USPP), the Metropolitan Police Department (MPD), ICE, the Bureau of Alcohol Tobacco and Firearms (ATF), the Federal Bureau of Investigation (FBI), the as well as other agencies, in order to eliminate crime in Washington DC.

5.  An additional primary role as tactical commander is to coordinate resources to address other aspects of the recently issued executive orders, such as the homelessness crisis impacting Washington D.C.[2] and the cleanliness and beautification of the District's streets, parks and monuments.[3]

6.  These efforts involve regular collaboration with the District of Columbia Executive Office of the Mayor (EOM), specifically Wayne Turnage,[4] as well as the U.S. Health and Human Services and the United States Public Health Service, to deploy additional providers to augment city resources to address the needs of homeless individuals. Coordination to address the cleanliness and beautification of the District's streets, parks and monuments is done primarily with EOM, the National Park Service, the National Park Service Police, MPD, and the National Guard.

7.  The federal surge command post operates out of Metropolitan Police Department's Headquarters, Joint Operations Command Center (JOCC), where over 20 agencies and National Guard personnel liaise 24 hours a day, seven days a week, including members of the MPD and EOM staff. The JOCC is regularly activated for special security events that affect the District, which is a regular occurrence. Likewise, there is regular coordination across multiple executive agencies with MPD, the Mayor's office and other Federal District agencies as various situations and events occur within the District.

8.  The Mayor's office provides support to law enforcement and other District efforts related to the federal surge by keeping and publishing a daily federal crime surge data report.[5] The purpose of this report is to detail the results of the efforts of the surge and measure its effectiveness to better coordinate further efforts.[6]

9.  One line of effort is the D.C. National Guard, augmented by National Guard units from various states, serving as a high visibility deterrence force across Washington D.C. They primarily deploy to parks, monuments, the National Mall, metro stations, and Union Station. Their role is strictly to be visible and act as a deterrence. If any member of the National Guard witnesses a crime, they are under orders issued by their leadership to call 911. The National Guard is armed strictly for personal protection and preservation of life.

---

[2] *See* Executive Order 14321, Ending Crime and Disorder on America's Streets, dated July 24, 2025.
[3] *See* Executive Order 14252, Making the District of Columbia Safe and Beautiful, dated March 28, 2025.
[4] Wayne Turnage is the Deputy Mayor for the District of Columbia Health and Human Services (DMHHS). Coordination is done either directly with Deputy Mayor Turnage or a member of his staff.
[5] *See* link to Federal Surge Data Reports: https://mpdc.dc.gov/publication/federal-surge-data-reports.
[6] Coordination is done with Deputy Mayor Lindsey Appiah who is the Deputy Mayor for Public Safety and Justice in the District of Columbia.

**ADD.081**

10. National Guard personnel have augmented, and continue to augment, United States Park Police as a presence at various parks and monuments to free-up and surge more law enforcement personnel into the city streets to conduct law enforcement actions. USPP officers have the same arrest authority as MPD officers. Having National Guard personnel augment the USPP allows for a larger police presence in the communities most in need. The additional police presence in the community has contributed to the overall drop in violent crime across the city. The National Guard provides daily situational awareness briefings to law enforcement leadership to coordinate surge efforts.

11. National Guard personnel have also served, and continue to serve, as a presence and deterrence by conducting high visibility operations at metro stations, Union Station, the National Mall, and across the city, but they do not conduct direct law enforcement actions.[7] On at least two occasions  warrant teams were surrounded and reportedly threatened by disruptive crowds. National Guard personnel later provided crowd and traffic control at intersections near addresses that were subject to investigation. National Guard personnel did not conduct direct law enforcement action but provided outer cordon support.

12. The D.C. National Guard is the lead National Guard unit that is augmented by National Guard units from several states. To the best of my knowledge, National Guard units conduct high visibility operations, carry out beautification efforts, and serve as a quick response force. I do not direct National Guard units in performing these mission sets nor am I aware of which National Guard units are assigned to perform which mission set.

13. The National Guard's presence in parks and at monuments and other District landmarks and sites has allowed for a substantial surge of additional law enforcement personnel on the streets, which has resulted in a reduction in crime as reported in the Mayor's federal crime surge data report.[8]

14. To the best of my knowledge and belief, as the tactical commander for the federal surge, I have not directed nor coordinated any National Guard personnel to conduct any direct law enforcement actions in support of the federal surge of personnel into the district as ordered in Executive Order 14333 and subsequent orders from the President of the United States.

15. To the best of my knowledge and belief, I have not witnessed, nor do I have any knowledge of Director Serralta, or any other law enforcement personnel, directing or coordinating any National Guard personnel to conduct any direct law enforcement actions in support of the federal surge of personnel into the district as ordered in Executive Order 14333 and subsequent orders from the President of the United States.

16. To the best of my knowledge and belief, I have not witnessed, nor do I have any knowledge of National Guard personnel conducting any direct law enforcement actions in support of the federal surge of personnel into the District as ordered in Executive Order 14333 and subsequent orders from the President of the United States.  Brigadier General Leland

---

[7] The Special Deputation Appointment for National Guard members specifically does not authorize them to conduct searches, seizures, arrests, or other similar functions.
[8] *See* https://mpdc.dc.gov/publication/federal-surge-data-reports.

**ADD.082**

Blanchard is the commanding General of the D.C. National Guard, and I do not have direct involvement in the decision-making process or command structure of the D.C. National Guard.

17. To the best of my knowledge and belief, National Guard personnel conduct area beautification across the district, and as I previously stated, provide a deterrent presence.

I declare under the penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Dated at Washington, D.C., this 16th day of September 2025.


_____
Donald F. Snider Jr.,
Chief Inspector
United States Marshals Service
Commander, Capital Area Regional Fugitive Task Force

**ADD.083**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DISTRICT OF COLUMBIA, | |
| Plaintiff, | Case No.: 1:25-cv-03005 (JMC) |
| v. | Judge Jia M. Cobb |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND SECTION 705 STAY

Pursuant to Local Civil Rule 65.1(c), Plaintiff District of Columbia moves for a preliminary injunction enjoining the Defendants from:

1.     Deploying National Guard troops to conduct law enforcement in the District of Columbia without the express consent of the Mayor;

2.     Exercising command and control of out-of-state National Guard troops in Title 32 status pursuant to 32 U.S.C. § 502(f) in the District of Columbia, including by issuing operational orders to such troops or dictating their day-to-day operations;

3.     Deputizing members of National Guard units deployed in or to the District of Columbia as Special Deputy U.S. Marshals;

4.     Ordering that National Guard troops in the District of Columbia carry service weapons while conducting operations pursuant to the President's August 11 order; and

5.     Placing Department of Defense (DOD) officials, including the Secretary of the Army, in operational command or control of Joint Task Force – District of Columbia, and otherwise permitting DOD officials to directly supervise or participate in law enforcement activities

**ADD.084**

conducted by National Guard units in the District of Columbia, until the Court can further consider the merits.

The District also moves for a stay of such actions pursuant to 5 U.S.C. § 705.

As set forth in more detail in the accompanying brief, Defendants' actions violate the Administrative Procedure Act, 5 U.S.C. § 500, *et seq.*, because they are contrary to law and arbitrary and capricious. Defendants' actions also violate the U.S. Constitution, including the Militia Clauses, the District Clause, the Take Care Clause, and separation of powers. And Defendants' actions exceed the scope of their authority and are *ultra vires*. The District will continue to suffer devastating and irreparable harms unless Defendants' unlawful actions are promptly enjoined. The public interest and balance of equities favor granting an injunction.

Pursuant to Local Civil Rule 7(m), the undersigned discussed the motion with opposing counsel, who stated that Defendants do not consent to the relief requested herein.

Dated: September 9, 2025              Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

*/s/ Mitchell P. Reich*_____
EMMA SIMSON (D.C. Bar No. 1026153)
ELIZA H. SIMON (D.C. Bar No. 90035651)
MITCHELL P. REICH (D.C. Bar No. 1044671)
Senior Counsels to the Attorney General

BENJAMIN MOSKOWITZ (D.C. Bar No. 1049084)
Assistant Deputy Attorney General
Legal Counsel Division

ALICIA M. LENDON (D.C. Bar No. 1765057)
Chief, Civil Rights and Elder Justice Section
Public Advocacy Division

PAMELA DISNEY (D.C. Bar No. 1601225)
ANDREW MENDRALA (D.C. Bar No. 1009841)

**ADD.085**

CHRISTOPHER PEÑA (D.C. Bar No. 888324806)
CHARLES SINKS (D.C. Bar No. 888273315)
HANNAH COLE-CHU (D.C. Bar No. 1613497)
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street NW, 10th Floor
Washington, D.C. 20001
Tel: (202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*

**ADD.086**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DISTRICT OF COLUMBIA**, <br> 400 6th Street NW <br> Washington, D.C. 20001 <br><br>     Plaintiff, <br><br>   v. <br><br> **DONALD J. TRUMP**, *in his official capacity as President of the United States*, <br>   1600 Pennsylvania Ave. NW <br>   Washington, D.C. 20500 <br><br> **UNITED STATES DEPARTMENT OF DEFENSE**, <br>   1000 Defense Pentagon <br>   Washington, D.C. 20301-1400 <br><br> **PETER HEGSETH**, *in his Official Capacity as Secretary of Defense*, <br>   1000 Defense Pentagon <br>   Washington, D.C. 20301-1400 <br><br> **UNITED STATES ARMY**, <br>   101 Army Pentagon <br>   Washington, D.C. 20310-0101 <br><br> **DANIEL P. DRISCOLL**, *in his Official Capacity as Secretary of the Army*, <br>   101 Army Pentagon <br>   Washington, D.C. 20310-0101 <br><br> **UNITED STATES DEPARTMENT OF JUSTICE**, <br>   950 Pennsylvania Avenue NW <br>   Washington, D.C. 20530 | Case No.: 1:25-cv- <br><br><br> **COMPLAINT** |

**ADD.087**

| | |
|---|---|
| **PAMELA J. BONDI**, *in her official capacity as United States Attorney General,*<br>    950 Pennsylvania Avenue NW<br>    Washington, D.C. 20530<br><br>**UNITED STATES MARSHALS SERVICE,**<br>    1215 South Clark Street<br>    Arlington, VA 22202<br><br>**GADYACES S. SERRALTA**, *in his official capacity as Director of the United States Marshals Service,*<br>    1215 South Clark Street<br>    Arlington, VA 22202<br><br>                    Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Over 2,200 National Guard troops from seven states and the District of Columbia are currently patrolling the streets of the District dressed in military fatigues, carrying rifles, and driving armored vehicles. The U.S. Department of Defense has directed these troops to conduct core law enforcement activities, including "presence patrols" and "community patrols." The U.S. Department of Justice has also deputized these troops to engage in additional law enforcement activities, including searches, seizures, and arrests. And despite the fact that these troops are in state militia status—and thus are legally required to be under the sole command of their governors—the President has placed them under the control of the nation's military leadership, which exercises day-to-day supervision over the law enforcement operations they have been designated to conduct.

2.      The residents and leaders of the District of Columbia have not requested any of this. But the President has determined that the District, which he has called a "filthy and crime ridden embarrassment," should be "federalize[d]," so that his Administration can "run it the way

2

**ADD.088**

it's supposed to be run." He has therefore disregarded Congress's decision, half a century ago, to afford the residents of the District "the powers of local self-government," including the authority to police the District as they see fit. In so doing, he has run roughshod over a fundamental tenet of American democracy—that the military should not be involved in domestic law enforcement.

3.        None of this is lawful. For one thing, Defendants' deployment of National Guard units to police District streets without the Mayor's consent violates both the Home Rule Act and a congressionally approved compact governing the interstate mobilization of state National Guard troops. More than fifty years ago, Congress exercised its constitutional authority "[t]o exercise exclusive Legislation, in all Cases whatsoever, over [the] District," U.S. Const. Art. I, § 8, cl. 17, to vest the residents of the District with control over "local District matters." Congress gave the President no role in policing the District. What is more, the interstate compact that Congress approved entitles the District alone to determine when to "request" emergency assistance, including "National Guard forces," from other states. Neither the President nor the military he controls may supplant these judgments by deciding for themselves how to police the District or by unilaterally inviting other states to send National Guard forces to "assist" the District.

4.        Furthermore, Defendants' command and control of out-of-state National Guard units when they are in state militia status violates the Constitution and federal law. That is because the Constitution and federal law reserve to the states the authority to command National Guard forces unless and until they have been placed into active federal service. The President has not federalized any of the out-of-state forces he has foisted on the District. The federal government therefore may not lawfully command them or control their day-to-day operations, as it is doing here.

**ADD.089**

5.      And Defendants' actions flout the Posse Comitatus Act and its counterpart, 10 U.S.C. § 275, which enshrine the nation's foundational prohibition on the participation of military forces in domestic law enforcement absent the most extreme exigencies, such as an invasion or rebellion. Defendants have established a massive, seemingly indefinite law enforcement operation in the District subject to direct military command. The danger that such an operation poses to individual liberty and democratic rule is self-evident.

6.      These unprecedented, unlawful actions have subjected the District to serious and irreparable harm. The deployment of National Guard troops to police District streets without the District's consent infringes on its sovereignty and right to self-governance. The deployment also risks inflaming tensions and fueling distrust toward local law enforcement. And it inflicts economic injuries, depressing business activities and tourism that form the backbone of the local economy and tax base.

7.      No American jurisdiction should be involuntarily subjected to military occupation. The District of Columbia brings this lawsuit to obtain declaratory and injunctive relief that will stop Defendants' violations of law, remedy the harms Defendants are inflicting on the District, and preserve the District's sovereignty.

### JURISDICTION AND VENUE

8.      This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331.

9.      There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 704-706, and the Court's equitable powers.

10.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The District of

**ADD.090**

Columbia is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur in the District.

## **PARTIES**

11.    Plaintiff the District of Columbia (the District) is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest. D.C. Code § 1-301.81.

12.    Defendant Donald J. Trump is the President of the United States. He is the Commander-in-Chief of the United States' armed forces, including the District of Columbia National Guard and state National Guard units when under federal control. He is sued in his official capacity.

13.    Defendant United States Department of Defense (DOD) is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f). DOD is responsible for coordinating the activities of the United States' armed forces, including the National Guard when under federal control. DOD also directs the activities of the District of Columbia National Guard pursuant to a delegation from the President. DOD is headquartered in Washington, D.C.

14.    Defendant Peter Hegseth is the Secretary of Defense. As Secretary, Defendant Hegseth is responsible for all actions taken by the agency. He is sued in his official capacity.

**ADD.091**

15.     Defendant United States Army (Army) is the primary land service branch of the United States military. The Army is a component of DOD, which is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

16.     Defendant Daniel P. Driscoll is the Secretary of the Army. He is the leader of the Army and is responsible for all actions taken by the Army. He is sued in his official capacity.

17.     Defendant United States Department of Justice (DOJ) is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f). DOJ is headquartered in Washington, D.C.

18.     Defendant Pamela J. Bondi is the Attorney General of the United States. Attorney General Bondi is responsible for all aspects of the operation and management of DOJ, including implementing and fulfilling DOJ's duties under the Constitution and statutory law. She is sued in her official capacity.

19.     Defendant U.S. Marshals Service (USMS) is a federal law enforcement agency within DOJ responsible for enforcing federal laws and providing support for the federal justice system. It operates under the authority and direction of the Attorney General. 28 U.S.C. § 561. The United States Marshals Service is an agency within the meaning of 5 U.S.C. § 552(f).

20.     Defendant Gadyaces S. Serralta is the Director of the USMS. He is responsible for all aspects of the operation and management of the U.S. Marshals Service. He is sued in his official capacity.

21.     Defendants Department of Defense, Secretary of Defense Peter Hegseth, Department of the Army, and Secretary of the Army Daniel P. Driscoll are collectively referred to in this complaint as "DOD Defendants."

**ADD.092**

22.     Defendants United States Department of Justice, Attorney General Pamela J. Bondi, U.S. Marshals Service, and USMS Director Gadyaces S. Serralta are collectively referred to in this complaint as "DOJ Defendants."

## LEGAL FRAMEWORK

### A.    The National Guard

23.     At the nation's founding, the Framers divided control over state militias in order to protect "individual liberty" and "the sovereignty of the separate States." *Perpich v. Dep't of Defense*, 496 U.S. 334, 340 (1990). The Founding generation "strongly disfavored standing armies" and believed that "adequate defense of country and laws could be secured through the Militia"—a force composed of "civilians primarily, soldiers on occasion." *United States v. Miller*, 307 U.S. 174, 179 (1939). At the same time, the experience of the Revolutionary War and the Articles of Confederation taught the Founding generation that "[t]he steady operations of war" required "a regular and disciplined army" under centralized federal command. The Federalist No. 25 (Alexander Hamilton).

24.     The Constitution therefore reflects a compromise. It "reserv[es] to the States" the principal power over the "Militia," including the authority to appoint its officers, train its members, and "govern[] such Part of them" as are not in federal service. U.S. Const. art. I, § 8, cl. 16. At the same time, the Constitution vests Congress with authority "[t]o raise and support Armies" for terms of no longer than "two years." *Id.* art. I, § 8 cl. 12. It also grants Congress the powers necessary to ensure that the Militia is a professional force available for national emergencies: it states that Congress may provide for "organizing, arming, and disciplining, the Militia," *id.* art. I, § 8, cl. 16,

**ADD.093**

and for "calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions," *id.* art. I, § 8, cl. 15.

25.    The National Guard is the modern Militia. It is governed by a statutory framework that embodies the careful balance struck in the Constitution. In general, National Guard units are under the command of the states.

26.    A state National Guard unit may be activated by its governor to perform state law duties under state command and control, funded by the state, and with pay and benefits determined by state law. This is known as "state active duty status."

27.    National Guard units are also subject to general rules of organization, training, and discipline set forth in Title 32 of the U.S. Code. At the request of the President or Secretary of Defense, a state National Guard unit may be activated by its state governor to perform training or duty under state command and control, funded by the federal government, with pay and benefits determined by federal law. This is known as "Title 32 status." *See* 32 U.S.C. § 502(f).

28.    In rare circumstances, set forth in Title 10 of the U.S. Code, the President may activate the National Guard, thereby making it part of the federal military subject to his direct control. This is known as "Title 10 status." But these circumstances are limited to the most severe exigencies. They include cases in which a state "request[s]" federal aid to suppress an "insurrection . . . against its government," 10 U.S.C. § 251, or when the United States "is invaded or is in danger of invasion by a foreign nation," *id*. § 12406(1).

**ADD.094**

29.     The District of Columbia National Guard (DCNG) is unique because, regardless of duty status, the President of the United States is always its Commander-in-Chief. D.C. Code § 49-409.

30.     The circumstances in which the President may call out the D.C. National Guard in its state-equivalent militia status are circumscribed by statute.  For instance, the President may activate the DCNG to "aid the civil authorities in the execution of the laws," D.C. Code § 49-404, only when there is a "tumult, riot, mob," or similar disturbance, and the Mayor, the U.S. Marshal for the District, or the National Capital Service Director requests aid. *Id.* § 49-103.

31.     One of the DCNG's elements is the Joint Task Force – District of Columbia (Joint Task Force-DC), a mission-specific entity that typically operates as an organizational umbrella for larger local or federal efforts.[1] The command structure of the Joint Task Force-DC falls completely under the DCNG and, therefore, under the President as Commander-in-Chief of the DCNG.

**B.     Home Rule in the District of Columbia**

32.     The Constitution vests Congress with the authority "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia]." U.S. Const. art. I, § 8, cl. 17. The Framers granted Congress this "exclusive" authority to make clear that other states—including but not limited to those that ceded land to create the capital—would not interfere with or attempt to regulate the nation's seat of government. *See* The Federalist No. 43 (James Madison).

33.     For much of the nation's history, Congress chose to govern the District directly, with little input or control from its residents.

---

[1] DOD, District of Columbia National Guard: Fact Sheet (Aug. 6, 2019), https://media.defense.gov/2019/Aug/06/2002167361/-1/-1/1/DISTRICT%20OF%20COLUMBIA%20NATIONAL%20GUARD%20FACT%20SHEET%2008.06.2019.PDF.

**ADD.095**

34.     During that period, Congress established a District of Columbia militia, which it later renamed the DC National Guard. *See* Act of Mar. 1, 1889, 25 Stat. 773, ch. 328 (codified as amended at D.C. Code §§ 49-101 *et seq.*).

35.     Congress made the President "Commander-in-Chief" of the DCNG, D.C. Code § 49-404, and gave him control over its operations: he directly appoints and commissions a Commanding General, who prescribes "such drills, inspections, parades, escort, or other duties, as he may deem proper," *id.* §§ 49-102, 49-301; approves "regulations for the government of the militia," *id.* § 49-805; and appoints all of its officers, *id.* § -49-305. During a "tumult, riot, mob," or similar civil disturbance, he may also grant requests by local leadership to "order out so much and such portion of the militia as he may deem necessary to suppress the same." *Id.* § 49-103.

36.     In 1973, after decades of struggle, Congress enacted the District of Columbia Home Rule Act (HRA), Pub. L. No 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code §§ 1-201.01 *et seq.*), which grants the residents of the District "powers of local self-government" and authority over "local District matters," D.C. Code § 1-201.02(a).

37.     To that end, Congress "delegate[d]" to the District government authority over "all rightful subjects of legislation within the District." *Id.* §§ 1-201.02(a), 1-203.02. It authorized the residents to elect a Mayor vested with "[t]he executive power of the District," *id.* § 1-204.22(a), and a Council vested with all of Congress's delegated "legislative power[s]," *id.* § 1-204.04(a).

38.     Pursuant to a statute enacted by Congress, the Mayor's responsibilities include the duty to "preserve the public peace," "prevent crime and arrest offenders," and otherwise "enforce and obey all laws and ordinances in force in the District." D.C. Code § 5-101.03(1), (2), (10).  It also includes the power to appoint "all officers and members of [the] Metropolitan Police force," *id.* § 5-105.01, determine the "[c]omposition of [the] force," *id.* § 5-105.05, and to set the rules

10

**ADD.096**

governing the Metropolitan Police Department (MPD), subject to any legislation enacted by the Council or by Congress.

39.    Congress reserved for itself control over certain matters it deemed of federal concern—for instance, the authority to enact legislation "that concerns the functions of property of the United States" or that is "not restricted in its application exclusively in or to the District." *Id.* § 1-206.02(a)(3). But it otherwise gave the people of the District the right to govern themselves.

40.    By contrast, Congress gave the President an extremely limited role in District affairs. Under the HRA, the President may nominate a small set of District officials. *E.g.*, *id.* §§ 1-204.33, 1-204.34. In "special conditions of an emergency nature," he also may request that the Mayor provide "the services of the Metropolitan police force" for "federal purposes," for a period of no more than 30 days. *Id.* § 1-207.40(a).

41.    The Home Rule Act also states that the District government may not exercise "any greater authority over . . . the National Guard of the District of Columbia" than it did prior to Home Rule—indicating that the President must retain his command role in that organization. *Id.* § 1-206.02(b). But apart from these limited powers, Congress gave the President essentially no authority to oversee the District or control its governance.

**C.    Emergency Management Assistance Compact**

42.    All 50 states, four U.S. territories, and the District of Columbia have entered into an interstate compact, known as the Emergency Management Assistance Compact (Assistance Compact), that governs the deployment of non-federalized National Guard units between jurisdictions. *See* H.J. Res. 193, 104th Cong. (1996).

43.    The Assistance Compact provides that "states"—defined to include the District of Columbia—may deploy emergency assistance to another state upon "request." *Id.* arts. I, III.B.

**ADD.097**

44.    Once sent into another state, "emergency forces" come under "the operational control . . . of the state receiving assistance" and "shall be considered agents of the requesting state." *Id.* arts. IV, VI.

45.    The Assistance Compact specifies that "[m]utual assistance in this compact may include the use of states' National Guard forces, either in accordance with" an interstate compact "or by mutual agreement between states." *Id.* art. I.

46.    Congress and the President assented to the Assistance Compact in 1996, giving it the status of federal law. Emergency Management Assistance Compact, Pub. L. No. 104-321, 110 Stat. 3877 (1996); *see Cuyler v. Adams*, 449 U.S. 433, 438 (1981).

47.    The Council of the District of Columbia subsequently authorized the Mayor to "execute" the compact. D.C. Code § 7-2332. Accordingly, since 2002, the Mayor has been responsible for determining when to "request" the deployment of other states' National Guard forces into the District. *Id.* art. III.B.

**D.    The Posse Comitatus Act**

48.    Even when the President assumes or exercises control of the National Guard, Congress has sharply limited his authority to use the National Guard for domestic law enforcement purposes.

49.    During the nineteenth century, United States Marshals increasingly used the common law power of "posse comitatus"—a Latin phrase that translates roughly to "the power of the county" or "the power of the sheriff"—to deputize citizens, including members of militias and the military, to aid in the enforcement of federal laws. In 1878, Congress rejected this practice and enacted the Posse Comitatus Act (PCA), 18 U.S.C. § 1385, codifying a fundamental principle of

**ADD.098**

American democracy: military forces are, as a general matter, strictly prohibited from engaging in domestic law enforcement.

50.      The PCA provides that no person may "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except where "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

51.      Because the federalization of National Guard troops makes them part of the federal military, this Act applies to any part of the National Guard that is under federal command and control. When National Guard units are brought into federal service, the PCA applies to them, absent an express statutory exception.

52.      Congress has also enacted a statute that extends PCA-like limits to military establishments not initially covered by the PCA.  In 10 U.S.C. § 275, it required the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any activity . . . under this chapter does not include or permit direct participation by any member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity," unless "otherwise authorized by law."  10 U.S.C. § 275.  The Secretary has implemented this requirement by issuing a policy directive that generally bars nearly all "DoD personnel" from providing "direct civilian law enforcement assistance," including but not limited to "a search or seizure," an "arrest" or "apprehension," and "security functions" or "crowd and traffic control." Dep't of Defense Instruction No. 3025.21, at 18-19 (updated Feb. 8, 2019).

**ADD.099**

## FACTUAL ALLEGATIONS

**A.    The President Has Launched an Unprecedented Assault on the District's Sovereignty.**

53.    Despite more than 50 years of local self-governance in the District, President Trump has repeatedly threatened to infringe on the District's home rule, falsely asserting that the District is lawless and disparaging its appearance.

54.    In March 2023, then-candidate Trump declared that "the federal government should take over control and management of Washington, DC," which he claimed was "littered with trash."[2] Similarly, in August 2023, Trump remarked on social media that he was "calling for a federal takeover of this filthy and crime ridden embarrassment to our nation."[3]

55.    In a November 2023 campaign speech, he promised that the District would "become the most beautiful capital anywhere in the world. We're going to take over the capital and we're going to make it beautiful, we are going to make it safe, we're going to make it great."[4]

56.    In January 2024, then-candidate Trump reiterated, "We're . . . going to federalize Washington DC. It's become hell on earth . . . . . [Y]ou can't even walk through the best areas without being molested or shot, beat up by thugs. We're going to take over Washington DC, and we're going to make it great again."[5]

---

[2] Video posted by Aaron Rupar (@atrupar), X (Mar. 4, 2023, at 6:59 ET) https://x.com/atrupar/status/1632168980130455553?lang=ms.

[3] Shawna Mizelle & Katelyn Polantz, *Trump claims he can't get a fair trial in DC as latest indictment dominates GOP* primary, CNN (Aug. 7, 2023), https://www.cnn.com/2023/08/06/politics/trump-fair-trial-court-case-dc-venue-change/index.html.

[4] Oliver Browning, *Trump vows to 'take over' Washington DC: 'We are going to make it beautiful'*, Independent (Nov. 20, 2023), https://www.the-independent.com/tv/news/trump-iowa-speech-washington-election-b2450354.html.

[5] *Speech: Donald Trump Holds a Campaign Rally in Mason City, Iowa – January 5, 2024*, Factbase, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-mason-city-iowa-january-5-2024/ (01:19:01-01:19:33 timestamp).

**ADD.100**

57.    Similarly, in July 2024, after making assertions about crime in the District, then-candidate Trump declared, "[W]e're going to take it away from the mayor. . . . [T]hat doesn't make me popular there, but I have to say it."[6]

58.    President Trump's attacks on the District's independence and local autonomy have continued since he re-entered office. On February 19, 2025, President Trump told reporters, "I think that we should govern the District of Columbia . . . I think that we should run it strong, run it with law and order, make it absolutely flawless . . . And I think we should take over Washington, DC . . . We should govern DC. The federal government should take over the governance of DC . . . [T]hey're not doing the job—too much crime, too much graffiti, too many tents on the lawn."[7]

59.    On March 14, 2025, in remarks at DOJ headquarters, President Trump declared, "we're gonna have to take [DC] back and run it through the federal government."[8]

60.    On March 27, 2025, President Trump promulgated Executive Order 14252, "Making the District of Columbia Safe and Beautiful" (the March 27 Executive Order). 90 Fed. Reg. 14559 (Apr. 3, 2025).  The March 27 Executive Order directed federal agencies to coordinate on tasks including "directing maximum enforcement of Federal immigration law and redirecting available Federal, State, or local law enforcement resources to apprehend and deport illegal aliens in the Washington, D.C. metropolitan area" and increasing enforcement of a variety of local criminal laws, including "those prohibiting assault, battery, larceny, graffiti and other vandalism,

---

[6] Mark Segraves, *Here's what a second Trump presidency could mean for DC*, NBCWashington, https://www.nbcwashington.com/news/local/heres-what-a-second-trump-presidency-could-mean-for-dc/3762595/.

[7] Screenshot of White House Press Pool posted by Jake Sherman (@JakeSherman), X (Feb. 19, 2025, at 9:55 ET), https://x.com/JakeSherman/status/1892407773603778589/photo/1.

[8] Julia Mueller, *Trump suggests federal government take over DC if local leaders 'can't do the job'*, The Hill (Mar. 14, 2025), https://thehill.com/homenews/administration/5195711-trump-dc-federal-government-takeover/.

**ADD.101**

unpermitted disturbances and demonstrations, noise, trespassing, public intoxication, drug possession, sale, and use, and traffic violations." 90 Fed. Reg. at 14560.

61.    In early August, President Trump's threats accelerated following a highly publicized incident involving a former staff member of the Department of Government Efficiency (DOGE). Around 3:00 a.m. on August 3, the former DOGE staffer was reportedly assaulted by a group of teenagers. The District's MPD quickly responded to the incident and apprehended two suspects.

62.    Two days later, President Trump posted to his social media platform, Truth Social, a photo of a young man—identified by others as the former DOGE staffer—bloodied and with wounds to his face. In this post, the President claimed that "[c]rime in Washington, D.C., is totally out of control," and he renewed threats to "federalize" the District in light of the attack.[9]

63.    Over the following days, President Trump continued to threaten to take control of the District, purportedly for the purpose of addressing local crime:

- On August 5, 2025, the President told reporters, "[s]omebody from DOGE was very badly hurt last night. You saw that. A young man that was beat up by a bunch of thugs in D.C. And either they're going to have to straighten out their act in the terms of government and in the terms of protection or we're going to have to federalize it, run it the way it's supposed to be run."[10]

- On August 6, 2025, President Trump stated, "We're considering [taking federal control over law enforcement] because the crime is ridiculous . . . Now we want to

---

[9] Donald J. Trump (@realDonaldTrump), TruthSocial (Aug. 05, 2025, at 4:13 ET), https://truthsocial.com/@realDonaldTrump/posts/114977985620971126.

[10] TIME, *Trump Threatens to Federalize D.C. After Beating of 'Big Balls'*, at 0:05-0:24 (YouTube, Aug. 5, 2025), https://www.youtube.com/watch?v=Fb7yKvOQE_c.

**ADD.102**

have a great, safe capital, and we're gonna have it, and that includes cleanliness and it includes other things. . . . We're going to do something about it, so whether you call it federalize or what—and that also includes the graffiti that you see, the papers all over the place, the roads that are in bad shape, the medians that are falling down . . . And what a shame—the rate of crimes, the rate of muggings, killings, and everything else. And that includes bringing in the National Guard, maybe, very quickly."[11]

64.    On August 9, 2025, the President announced in a social media post that he would soon hold a press conference that "will, essentially, stop violent crime in Washington, D.C." In the post, he claimed the District is "one of the most dangerous cities anywhere in the World," and that it would "soon be one of the safest!!!"[12]

65.    The President's statements, including his statements that crime in the District is rising, are hyperbolic and inconsistent with the facts. Publicly available data from both federal and local sources demonstrate that violent crime in the District has been and is trending significantly downward.

66.    According to the U.S. Department of Justice, "[t]otal violent crime for 2024 in the District of Columbia [was] down 35% from 2023 and [was] the lowest it [had] been in over 30 years."[13]

---

[11] News18, *Trump Teases Takeover of* DC (Facebook, Aug.7, 2025 at 4:55 a.m.), https://www.facebook.com/cnnnews18/videos/787799723585929/.
[12] Donald J. Trump (@realDonaldTrump), TruthSocial (Aug.9, 2025, at 9:40 a.m.), https://truthsocial.com/@realDonaldTrump/posts/114999087271735961.
[13] Press Release, U.S. Att'y's Off. for D.C., Violent Crime in D.C. Hits 30 Year Low (Jan. 3, 2025), https://www.justice.gov/usao-dc/pr/violent-crime-dc-hits-30-year-low.

**ADD.103**

67.     That downward trend has continued. In 2025, violent crime is down 26% from this time in 2024, 51% from this time in 2023, and 35% from 2019, prior to the pandemic.

68.     Both President Trump and the U.S. Attorney's Office for the District of Columbia have acknowledged that in 2025, prior to the attempted takeover of MPD or deployment of any National Guard troops in the District, violent crime in D.C. was declining.

69.     In an April 28, 2025 press release, former interim U.S. Attorney Ed Martin, Jr. marked the first 100 days of President Trump's second term "by highlighting a 25 percent drop year-to-date in violent crime across the District, credited in part to the 'Make D.C. Safe Again' initiative and the U.S. Attorney's partnership with the Bureau of Alcohol, Tobacco, Firearms, and Explosives and [the] Metropolitan Police Department."[14]

70.     Shortly thereafter, on May 7, 2025, President Trump praised Mr. Martin, stating that on his watch, "[c]rime is down in Washington, D.C.—street crime, violent crime—by 25%. And it's . . . people have seen . . . they've noticed a big difference."[15]

**B.     The President Ordered the Secretary of Defense to Deploy National Guard Troops.**

71.     On August 11, 2025, flanked by Defendant Hegseth, Defendant Driscoll, Defendant Serralta, Defendant Bondi, and other officials, the President carried through on the threats he had been making for more than two years.[16] In a press conference in the White House briefing room, he "announc[ed] a historic action to rescue our nation's capital from crime, bloodshed, bedlam,

---

[14] Press Release, U.S. Att'y's Off. for D.C., U.S. Attorney Ed Martin, Jr. Credits President Trump's First 100 Days with 25% Drop in D.C. Violent Crime (Apr. 28, 2025), https://www.justice.gov/usao-dc/pr/us-attorney-ed-martin-jr-credits-president-trumps-first-100-days-25-drop-dc-violent.

[15] The White House, *President Trump Swears in the Ambassador to the People's Republic of China*, at 13:24-13:39 (YouTube, May 7, 2025), https://www.youtube.com/watch?v=MydfT0rCkZ8.

[16] Video posted by The White House (@WhiteHouse), X, *President Trump Holds a Press Conference* (Aug. 11, 2025, at 10:36 a.m.), https://x.com/WhiteHouse/status/1954914776527589534.

**ADD.104**

and squalor, and worse." He continued, "[t]his is liberation day in DC and we're gonna take our capital back. We're taking it back."[17]

72.    In addition to invoking Section 740 of the Home Rule Act to purportedly "place[] the D.C. Metropolitan Police Department under direct federal control,"[18] the President announced that he was "deploying the National Guard to help reestablish law, order, and public safety in Washington, D.C." "[W]e will bring in the military if needed," he added. The President also signaled that his appetite for military intervention extended far beyond his initial deployment of 800 DCNG troops, confirming his administration would deploy "much more, if necessary, much more. You remember, I said I offered 10,000 once."[19]

73.    The same day as the press conference, the President issued a memorandum (the August 11 Memorandum) to the Secretary of Defense titled "Restoring Law and Order in the District of Columbia."[20]

74.    Section One of the August 11 Memorandum repeats the claim that the District is "under siege from violent crime" and asserts that the President has a "solemn duty to protect law-abiding citizens from the destructive forces of criminal activity."

---

[17] *Id.* at 54:52-55:12.

[18] The Administration's efforts to seize direct control of the District's police department were quickly rebuffed in federal court. *See* Zach Montague, *D.C. Police Chief Retains Control of City Police After Court Hearing*, N.Y. Times (Aug. 15, 2025), https://www.nytimes.com/2025/08/15/us/politics/judge-hearing-dc-home-rule.html; *District of Columbia v. Trump*, No. 1:25-cv-02678 (D.D.C. filed Aug. 15, 2025).

[19] Video posted by The White House (@WhiteHouse), X, *President Trump Holds a Press Conference* (Aug. 11, 2025, at 10:36 a.m.), https://x.com/WhiteHouse/status/1954914776527589534.

[20] *Presidential Memoranda: Restoring Law and Order in the District of Columbia*, White House (Aug. 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/.

**ADD.105**

75.    In Section Two of the August 11 Memorandum, the President directed the Secretary of Defense to deploy the DCNG "in such numbers as [the Secretary of Defense] deems necessary."

76.    In Section Two, the President further directs "the Secretary of Defense to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission."

77.    After the President issued the August 11 Memorandum, Secretary of Defense Hegseth said that the mobilization would be "operationalized" by Secretary of the Army Driscoll and that National Guard members would be deployed in the streets of Washington, D.C. in the coming week.[21]

78.    Two weeks later, on August 25, 2025, President Trump issued an additional Executive Order (the August 25 Executive Order) that required the Secretary of Defense to "immediately create and begin training, manning, hiring, and equipping a specialized unit within the District of Columbia National Guard, subject to activation under Title 32 of the United States Code, that is dedicated to ensuring public safety and order in the Nation's capital." Additional Measures to Address the Crime Emergency in the District of Columbia, 90 Fed. Reg. 42121, 42121 (Aug. 28, 2025). Members of this unit are to be "deputize[d]. . . to enforce Federal law." *Id.*

**C.    Defendants Deployed National Guard Troops from Seven States in the District.**

79.    As directed by the President, Secretary of Defense Hegseth mobilized thousands of troops from across the country into the District.

---

[21] C. Todd Lopez, *National Guard Task Force Mobilizes to Restore Safety in Nation's Capital*, DOD News (Aug. 11, 2025),  https://www.defense.gov/News/News-Stories/Article/Article/4271502/national-guard-task-force-mobilizes-to-restore-safety-in-nations-capital/.

**ADD.106**

80.    In an interview on Fox News on the night of August 11, Defendant Hegseth said he was deploying troops to the District to act as "force multipliers" for local and federal law enforcement.[22]

81.    Comparing the law enforcement actions to come in D.C. with those that had recently taken place in Los Angeles, Defendant Hegseth stated, "[i]n 2025, there was a summer of law enforcement. And we quelled the protests [in Los Angeles] of the attacks on ICE officers. We're going to help get D.C. under control . . . . The D.C. [National] Guard's proud to be a part of it; other states will contribute. . . ."[23]

82.    In defending the President's decision to use the National Guard and the military for domestic law enforcement purposes, Hegseth continued: "He's got the guts to say, 'I'm gonna federalize the police that don't work; I'm gonna bring in the National Guard; I'm gonna bring in federal marshals; I'm gonna bring in the Park Police.'"[24]

83.    "They will be standing right alongside our federal agents, like they were in Los Angeles. They're going to be proactive. If you take an action or a shot at them, there will be a consequence," Hegseth told the host.[25]

84.    When the host then asked what the National Guard would do if law enforcement was not on the scene, Hegseth stated, "I will have their back to make sure they can take the necessary action to protect the citizens of D.C. and protect themselves. . . . You can help somebody, interdict, temporarily detain like we did in Los Angeles, and hand over to law enforcement."[26]

---

[22] Ingraham Angle, *Trump's 'got the guts' to do this: Pete Hegseth*, at 00:26-00:32 (FoxNews Live, Aug. 11, 2025), https://www.foxnews.com/video/6376809414112.
[23] *Id.* at 01:05-01:25.
[24] *Id.* at 2:25-2:37.
[25] *Id.* at 3:35-3:46.
[26] *Id.* at 3:49-4:19.

**ADD.107**

85.     According to Pentagon Press Secretary Kingsley Wilson, at the time of their original deployment, the DCNG troops were unarmed and following the DCNG rules for the use of force. While claiming that the DCNG troops would not conduct any arrests, Press Secretary Wilson also confirmed that this would be "very similar to the LA mission, where we could temporarily [detain] someone and then turn them over to the proper law enforcement authorities."[27]

86.     Then, between August 16 and August 31, 2025, at the request of the President and Defendant Driscoll, the states of Ohio, South Carolina, West Virginia, Mississippi, Tennessee, Louisiana, and South Dakota sent more than 1,300 National Guard troops from their own states into the District of Columbia.

87.     On August 16, 2025, Ohio Governor Mike DeWine deployed 150 National Guard Military Police Officers to the District.[28] Governor DeWine explained that the deployment request came from Defendant Driscoll and that the troops would "support the District of Columbia National Guard . . . [to] carry out presence patrols and serve as added security" in the District.[29]

88.     On August 16, 2025, South Carolina Governor Henry McMasters deployed 200 members of the South Carolina National Guard to the District, in order to "support federal law enforcement activities under President Donald J. Trump's executive order to Restore Law and

---

[27] C. Todd Lopez, *National Guard Mobilizes 800 Troops in D.C. to Support Federal, Local Law Enforcement,* DOD News (Aug. 14, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4275149/national-guard-mobilizes-800-troops-in-dc-to-support-federal-local-law-enforcem/ (brackets in original).
[28] Press Release, Off. of the Governor of Ohio, Governor DeWine Issues Statement on Ohio National Guard (Aug. 16, 2025), https://governor.ohio.gov/media/news-and-media/governor-dewine-issues-statement-on-ohio-national-guard.
[29] *Id.*

**ADD.108**

Order in the District of Columbia," and "restore law and order to our nation's capital and ensure safety for all who live, work, and visit there." [30]

89.    On August 16, 2025, West Virginia Governor Patrick Morrisey deployed "approximately 300-400" members of the West Virginia National Guard, "to support the President's initiative to restore cleanliness and safety to Washington, D.C. . . . [and] as a show of commitment to public safety and regional cooperation." [31]

90.    On August 18, 2025, Louisiana Governor Jeff Landry deployed 135 members of the Louisiana National Guard "to assist President Donald J. Trump's mission of restoring safety and peace in our nation's capital . . . [and] to return safety and sanity to Washington DC and cities all across our country, including right here in Louisiana."[32] The Louisiana National Guard announced in a press release that, "as directed by the president of the United States," it was "federalizing and activating to Washington, D.C., to support the Metropolitan Police Department, the District of Columbia National Guard and D.C. local law enforcement beginning August 16, 2025."[33]

---

[30] Press Release, Off. of the Governor of South Carolina, Governor Henry McMaster Authorizes Deployment of National Guard to Washington, D.C. (Aug. 16, 2025), https://governor.sc.gov/news/2025-08/gov-henry-mcmaster-authorizes-deployment-national-guard-washington-dc.

[31] Press Release, Off. of the Governor of W. Virginia, West Virginia National Guard to Support President Trump's Initiative to Make D.C. Safe and Beautiful (Aug. 16, 2025) https://governor.wv.gov/article/west-virginia-national-guard-support-president-trumps-initiative-make-dc-safe-and-beautiful.

[32] Governor Jeff Landry (@LAGovJeffLandry), X (Aug. 18, 2025, at 5:04 p.m.), https://x.com/LAGovJeffLandry/status/1957549092562956743.

[33] Press Release, La. Nat'l Guard, La. National Guard Military Police to assist in Washington, D.C. (Aug. 18, 2025), https://geauxguard.la.gov/2025/08/18/la-national-guard-military-police-to-assist-in-washington-d-c/.

**ADD.109**

91.     On August 18, 2025, Mississippi Governor Tate Reeves deployed 200 members of the Mississippi National Guard to the District.[34] According to Governor Reeves, he approved deployment of the Mississippi National Guard "to support President Trump's effort to return law and order to our nation's capital."

92.     On or about August 18, 2025, Tennessee Governor Bill Lee deployed 160 members of the Tennessee National Guard to the District[35] "to assist with monument security, community safety patrols, protecting federal facilities, and traffic control" for "as long as needed."[36]

93.     On or about August 31, 2025, South Dakota Governor Larry Rhoden announced the deployment of 12 South Dakota National Guard troops to the District "at the request of President Donald J. Trump." The Governor stated that "[w]ith the National Guard's help, President Trump has restored law and order to our nation's capital—and our guardsmen will help keep it that way. We will not sit on the sidelines while crime threatens the safety of our families."[37]

94.     While it is not clear how many other governors received the President's request to deploy National Guard troops to the District, at least one more did. Governor Phil Scott of Vermont publicly declined the request because, "in the absence of an immediate emergency or disaster that

---

[34] Press Release, Off. of Governor of Mississippi, Governor Reeves Statement on Mississippi National Guard Deployment to Washington, D.C. (Aug. 18, 2025), https://governorreeves.ms.gov/governor-reeves-statement-on-mississippi-national-guard-deployment-to-washington-d-c/.

[35] Katie Glueck & Anushka Patil, *Tennessee Becomes Latest Republican-Led State to Send National Guard to D.C.*, N.Y. Times (Aug. 19, 2025), https://www.nytimes.com/2025/08/19/us/politics/tennessee-national-guard-dc-trump.html.

[36] Associated Press, *National Guard troops from Tennessee authorized by governor to patrol D.C. streets*, NewsChannel9 (Aug. 19, 2025), https://newschannel9.com/news/local/national-guard-troops-from-tennessee-authorized-by-governor-to-patrol-dc-streets.

[37] Press Release, Off. of Governor of South Dakota, Gov. Rhoden Mobilizes SDNG to DC at the Request of President Trump (Aug. 31, 2025), https://news.sd.gov/news?id=news_kb_article_view&sys_id=62fdcf1f47e7aa10701588ff336d43ea.

**ADD.110**

local and regional first responders are unable to handle," he did "not support utilizing the guard for this purpose, and [did] not view the enforcement of domestic law as a proper use of the National Guard."[38]

95.    Notably, most of the states that sent their troops into the District are home to cities presently reporting comparable or higher rates of violent crime than the District, including: Cleveland, Dayton, and Toledo, Ohio; Memphis and Nashville, Tennessee; Shreveport, Louisiana;[39] Jackson, Mississippi;[40] North Charleston, South Carolina;.[41] and Sioux Falls, South Dakota.[42]

**D.    The District Did Not Request Assistance from the Out-of-State National Guard Troops.**

96.    District Mayor Muriel Bowser, who under D.C. Code § 1-204.22 is "responsible for the proper execution of laws relating to the District, and for the proper administration of the affairs of the District," has repeatedly made it clear that she does not support the influx of National Guard troops in the District. Even before the deployment, the Mayor rejected the notion that the

---

[38] Peter Hirschfeld, *Phil Scott rejects second request to deploy Vermont National Guard, this time to Washington, D.C.*, Vermont Public (Aug. 15, 2025), https://www.vermontpublic.org/local-news/2025-08-15/phil-scott-rejects-request-deploy-vermont-national-guard-washington-d-c.

[39] David W. Chen, *Crime Festers in Republican States While Their Troops Patrol Washington*, N.Y. Times (Sept. 1, 2025), https://www.nytimes.com/2025/09/01/us/politics/crime-republican-states.html.

[40] The homicide rate in Jackson, Mississippi is more than four times that in the District. Shamira Muhammad, *Mississippi sent troops to back Trump's D.C. takeover despite its own high crime rates*, NPR (Aug. 20, 2025), https://www.npr.org/2025/08/20/nx-s1-5508089/mississippi-sent-troops-to-back-trumps-d-c-takeover-despite-its-own-high-crime-rates.

[41] *See Crime Statistics (Year-to-Date Comparison)*, City of N. Charleston, https://police.northcharleston.org/services/crime_stats_online_mapping.php.

[42] Cooper Seamer, *Violent crime rates slightly dip, property crime rates steady in Sioux Falls*, DakotaNewsNow (Oct. 1, 2024), https://www.dakotanewsnow.com/2024/10/01/violent-crime-rates-slightly-dip-property-crime-rates-steady-sioux-falls/.

**ADD.111**

National Guard was a proper tool for law enforcement, correctly noting that National Guard troops are "not law enforcement officials."[43]

97.    On August 11, Mayor Bowser called the deployment of the D.C. National Guard "unsettling and unprecedented."[44] On August 16, following the first announcements that other states were sending their National Guard units to the District, Mayor Bowser posted on social media that "American soldiers and airmen policing American citizens on American soil is #UnAmerican."[45] On August 25, Mayor Bowser reiterated that she "[does not] believe that troops should be policing American cities." [46]

98.    On August 27, as part of a presentation to the public relating to the federal surge of law enforcement in the District, the Mayor noted that "National Guard from other states" was part of "what's not working."[47]

99.    At no time did the Mayor or any other District official request the presence of National Guard troops in the District, under the Emergency Management Assistance Compact or by any other means, and the states that sent out-of-state National Guard troops did not seek the consent of the Mayor prior to sending their National Guard units to the District.

---

[43] Luke Garrett, *D.C. mayor defends capital's crime rates after Trump threatens to take over police*, NPR (Aug. 10, 2025), https://www.npr.org/2025/08/10/g-s1-81933/d-c-mayor-defends-capitals-crime-rates-after-trump-threatens-to-take-over-police.

[44] Aaron Pellish, *Washington mayor calls Trump's police order 'unsettling and unprecedented'*, POLITICO (Aug. 11, 2025), https://www.politico.com/news/2025/08/11/dc-mayor-trump-police-order-unsettling-unprecedented-00504209.

[45] Muriel Bowser (@MurielBowser), X (Aug. 16, 2025, at 9:31 p.m.), https://x.com/MurielBowser/status/1956891644076154962.

[46] Mark Sherman et al., 'Leave Our Kids Alone': *Schools Reopen in DC With Parents on Edge over Trump's Armed Patrols*, Military.com (Aug. 25, 2025), https://www.military.com/daily-news/2025/08/25/leave-our-kids-alone-schools-reopen-dc-parents-edge-over-trumps-armed-patrols.html.

[47] First slide image posted by Mayor Muriel Bowser (@MayorBowser), X (Aug. 27, 2025, at 2:52 pm), https://x.com/MayorBowser/status/1960777484510880111.

**ADD.112**

100.    The states that sent National Guard troops into the District have also provided virtually no information to the District regarding the deployments.

101.    On or around August 20 and 21, 2025, the Office of the Attorney General for the District of Columbia sent letters to Defendant Driscoll and to the Governors and Attorneys General of Ohio, South Carolina, West Virginia, Mississippi, Tennessee, and Louisiana, requesting information regarding the factual and legal basis for the states' decisions to deploy troops to the District as well as the operational details of their deployment.

102.    Specifically, the District's letters to these states requested information regarding (i) the source of the request for National Guard support, (ii) the legal authority offered by federal officials for the deployment, (iii) their stated mission, (iv) the scope of any law enforcement authority the units would exercise, (v) the command structure the units would follow, (vi) whether the units would be armed, (vii) the rules of force the units would follow, (viii) whether the units had been deputized by any federal law enforcement agencies, and (ix) the length of deployment.

103.    As of the date of this Complaint, only Tennessee has responded to the District's request, and it provided only limited information. On August 22, 2025, Tennessee informed the District that "upon orders from President Trump, Governor Lee granted the Administration's request to provide Tennessee National Guardsmen under Title 32 Status to assist the District of Columbia National Guard on a security mission in our nation's capital." Tennessee stated it had sent "[a]pproximately 160 service members" to "join the D.C. Joint Task Force and work alongside local and federal law enforcement agencies to assist with monument security, community safety patrols, protecting federal facilities, and traffic control." It noted that "the service members are ready to assist as long as needed."

**ADD.113**

104.    Tennessee did not respond to the District's question about the scope of the Tennessee National Guard's law enforcement authority while in the District, nor did it confirm the nature of their command structure, armed status, rules of force, or deputization status.[48]

**E.    All of the National Guard Units Deployed in the District Are Under Federal Command and Control.**

105.    The National Guard units in the District have purportedly been activated in the District of Columbia in a Title 32 status. Accordingly, the out-of-state National Guard units should be under the command and control of their respective Governors, and not the federal government.

106.    But the reality is that Defendants have seized command and control of the out-of-state National Guard troops. Like the DCNG, they are here at the request of the President and federal military officials, and they have been integrated into the command structure of the Joint Task Force-DC.

107.    Consistent with the President's August 11 Memorandum, the Secretary of Defense activated the Joint Task Force-DC and 800 DCNG troops. The current mission of the troops assigned to the Joint Task Force-DC is "to support local and federal law enforcement efforts aimed at restoring order in the District of Columbia" in accordance with "the President's [March 28 Executive Order] declaring a crime emergency."[49]

---

[48] This Complaint uses the term "deputization" to refer to the process of deputizing or the status of having been deputized. Some DOD and USMS policy documents use the synonymous term "deputation."

[49] *Joint Task Force (JTF)-DC*, D.C. Nat'l Guard, https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/.

**ADD.114**

108.    With the arrival of out-of-state troops, the Secretary of Defense consolidated all National Guard units present in the District under the command of the Joint Task Force-DC.[50] Now, 2,290 Guardsmen are supporting the Joint Task Force-DC, of which 952 troops are from the DCNG and 1,338 troops are from other states' guards.[51]

109.    Army Col. Larry Doane of the DCNG is the commander of the Joint Task Force-DC.[52] His chain of command leads through the Army Secretary and Secretary of Defense to the President. Accordingly, any units under the command of Joint Task Force-DC are now also under federal command and control.

110.    Demonstrating this federal command structure, the Secretary of Defense, at the behest of the President, has issued crucial orders through Joint Task Force-DC to the out-of-state troops. Most notably, on August 22, 2025, Defendant Hegseth directed Brigadier General Leland D. Blanchard II, the interim Commanding General of the DCNG, to authorize all National Guard members supporting the Joint Task Force-DC to carry their service-issued weapons—M17 pistols or M4 semiautomatic rifles.[53]

---

[50] *See* Jon Soucy, *Guard members from six states, D.C. on duty in Washington in support of local, fed authorities*, D.C. Nat'l Guard (Aug. 29, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4290553/guard-members-from-six-states-dc-on-duty-in-washington-in-support-of-local-fed/ ("More than 2,000 National Guard Soldiers and Airmen from six states and the District of Columbia are on duty in Washington as part of Joint Task Force – District of Columbia").

[51] *Joint Task Force (JTF)-DC*, D.C. Nat'l Guard, https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/.

[52] *Joint Task Force D.C. commander discusses D.C. Safe and Beautiful mission,* Defense Visual Information Distribution Service (Aug. 13, 2025), https://www.dvidshub.net/video/973731/joint-task-force-dc-commander-discusses-dc-safe-and-beautiful-mission.

[53] *National Guard authorized to carry weapons in support of law enforcement*, D.C. Nat'l Guard (Aug. 23, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4284293/national-guard-authorized-to-carry-weapons-in-support-of-law-enforcement/.

**ADD.115**

111.    That National Guard troops are carrying M17 pistols on District streets is particularly troubling. The M17 is a version of the Sig Sauer P320 handgun, which numerous reports indicate can fire without a trigger pull and cause unintentional injuries. In July 2025, U.S. Immigration and Customs Enforcement (ICE) banned the use of all models of the P320 by agents, and the U.S. Air Force Global Strike Command suspended the use of the pistols pending further investigation.[54]

**F.    The President Has Authorized National Guard Troops Under Federal Command and Control to Engage in Law Enforcement in Violation of the Posse Comitatus Act.**

112.    On August 15, U.S. Marshal Jeryl Isaac, Chief Deputy of the USMS, deputized the leaders of the DCNG that are in command of the Joint Task Force-DC.



*(U.S. Marshal for the District of Columbia Deputizing National Guard Troops in D.C.)*[55]

---

[54] Zita Ballinger Fletcher, *Air Force suspends use of M18 pistols after airman's death*, DefenseNews (Jul. 24, 2025), https://www.defensenews.com/air/2025/07/24/air-force-suspends-use-of-m18-pistols-after-airmans-death/.
[55] U.S. Marshals Service (@USMarshalsHQ), X (Aug. 18, 2025, at 11:33 AM), https://x.com/USMarshalsHQ/status/1957466011742961851.

**ADD.116**

113.    On August 25, Col. Doane, the commander of the Joint Task Force-DC, addressed the decision to arm National Guard units in the District and stated they would "receive training on the rules of use of force and then be deputized by our partners at the U.S. Marshals Service to work with them as deputy U.S. Marshals."[56]

114.    On information and belief, most or all District of Columbia and out-of-state National Guard units have been deputized as U.S. Marshals.

115.    The USMS is a federal law enforcement agency. Those deputized by the USMS are authorized by the agency to perform federal law enforcement functions. Specifically, they:

> have Title 18 authority . . . to perform any of the following federal law enforcement functions: a. Seek and execute arrest warrants and search warrants; b. Make arrests without a warrant if there are reasonable grounds to believe that the suspect has violated or is violating federal law; c. Serve subpoenas and other legal writs; d. Monitor Title III Intercepts (electronic surveillance); and e. Carry firearms for personal protection or the protection of those covered under the federal assault statutes.

USMS Policy Directive 17.11.D.4 (10/07/2020).

116.    Furthermore, Special USMS Deputies are "appointed, under authority delegated by the Attorney General, to perform the duties of the Office of Special Deputy United States Marshal as directed by an appropriate official of the United States Marshals Service or some other appropriate Federal Official as so designated." Form USM-3B, Special Deputation Oath of Office, Authorization, and Appointment.

---

[56] Master Sgt. Whitney Hughes, *Security Posture Interview with JTF-DC Commander*, 189TH INFANTRY BRIGADE (Aug. 25, 2025), https://www.first.army.mil/Units/Divisions/Division-West/189th-Infantry-Brigade/videoid/974996/, at 0:22.

**ADD.117**

117.    The USMS also approved the authorization for National Guard units under Joint Task Force-DC to be armed.[57]



*(National Guard Troops Armed With Rifles on the National Mall)[58]*

118.    As a result of these deputizations, the National Guard troops in the District are authorized and expected to detain individuals. On several occasions, Defendants and their representatives have reiterated that they expect National Guard units to "interdict" and "temporarily detain" individuals if they determine that a crime is in progress.[59] And press reports indicate that these detentions are, in fact, occurring.[60]

---

[57] Mosheh Gains & Daniel Arkin, *Hegseth Authorizes National Guard Troops in D.C. to Carry Weapons*, NBC NEWS (Aug. 22, 2025), https://www.nbcnews.com/news/us-news/hegseth-authorizes-national-guard-troops-dc-carry-weapons-rcna226536.

[58] AP Photo, Nikhinson, Julia Demaree (Aug. 26, 2025) https://apnews.com/photo-gallery/trump-national-guard-police-washington-dc-photos-170363ba069f7e52a66f1e7056c24dc5#.

[59] Diana Nerozzi & Steven Nelson, *Trump Takes Control of DC Police, Deploying National Guard in Historica Capital Crime Crackdown – And Warns NYC Could Be Next*, NEW YORK POST (Aug. 11, 2025), https://nypost.com/2025/08/11/us-news/trump-federalizing-dc-police-deploying-national-guard-in-capital-crime-crackdown/.

[60] Eric Schmitt & Campbell Robertson, *National Guard Detained Man Who Assaulted a Park Police Officer, Authorities Say*, THE NEW YORK TIMES (Aug. 16, 2025), https://www.nytimes.com/2025/08/16/us/politics/national-guard-detained-man.html.

**ADD.118**

119.    In addition, under federal command and control, these units are engaged in armed "presence patrols" across the District. On August 25, 2025, the Commander of the Joint Task Force-DC confirmed that the Task Force had "been ordered by the Secretary of Defense and at the request of the U.S. Marshals Service to go begin armed patrols."[61] These are law enforcement activities.

120.    District residents and visitors have seen this play out in their daily lives. For more than two weeks, members of the National Guard—uniformed, armed, and deputized as law enforcement officers—have been seen carrying out these patrols, bearing handcuffs, across D.C.

 

*(Photos of National Guard Troops Patrolling D.C. Streets)[62]*

---

[61] Master Sgt. Whitney Hughes, *Security Posture Interview with JTF-DC Commander*, 189TH INFANTRY BRIGADE (Aug. 25, 2025), https://www.first.army.mil/Units/Divisions/Division-West/189th-Infantry-Brigade/videoid/974996/ at 0:09.

[62] District of Columbia National Guard (@DCGuard1802), X (Aug. 26, 2025 at 8:40 PM), https://x.com/DCGuard1802/status/1960502754540970464/photo/1; and National Guard (@USNationalGuard), X (Sept. 3, 2025 at 1:00 PM), https://t.co/ekbe76uqGY.

**ADD.119**

121.    The troops have been regularly seen patrolling in groups, sometimes accompanying MPD or federal law enforcement officers, and sometimes on their own.

122.    Metro stations—which are not federally owned or controlled—have been frequently patrolled and surveilled by the National Guard.

 

*(National Guard Troops Patrolling at a D.C. Metro Station and on a Red Line Train)*[63]

123.    The patrols have extended even further into local District neighborhoods and around routine, local District events, where Defendants have sought to establish a militarized presence.

124.    As recently as August 29, 2025, the National Guard publicized that "[f]uture plans include presence patrols in residential neighborhoods and other locations throughout the District."[64]

---

[63] South Carolina National Guard https://www.flickr.com/photos/thenationalguard/54751381932/in/photostream/; South Carolina National Guard (@TheNationalGuard), Flickr (Aug. 29, 2025), https://www.flickr.com/photos/thenationalguard/54751381932/in/photostream/.
[64] Sgt. 1st Class Jon Soucy, *Guard Members From Six States, D.C. on Duty in Washington in Support of Local, Fed Authorities*, NATIONAL GUARD (Aug. 29, 2025), https://www.nationalguard.mil/News/Article-View/Article/4290072/guard-members-from-six-states-dc-on-duty-in-washington-in-support-of-local-fed/.

**ADD.120**

**K.   The District is Harmed by Defendants' Unlawful Deployment of National Guard Troops to Police the District.**

125.    The District has suffered a severe and irreparable sovereign injury from the deployment of National Guard units to perform law enforcement activities throughout the District. In particular, the deployments have infringed on the District's sovereign authority, granted by the Home Rule Act, to determine how best to police the District and protect public safety. The deployment has also impaired the District's sovereign right to determine when to permit out-of-state National Guard troops to enter the District and furnish assistance to local law enforcement.

126.    The presence of armed military units purporting to exercise law enforcement authority that they are not lawfully permitted to exercise also creates confusion among the public and threatens to undermine the work of the District in combating local crime. These National Guard units are operating without lawful authority and without law enforcement training or expertise, both of which threaten to complicate the District's public safety efforts.

127.    Defendants' unwanted deployment of National Guard troops to conduct law enforcement on District streets also threatens to harm the crucial relationship between police and the communities they serve, eroding trust and inflaming tensions.[65]

128.    Defendants' order that the National Guard troops patrolling District communities carry service weapons only exacerbates the harm to residents. History carries somber reminders of the risks involved when armed National Guardsmen are deployed among civilians. In 1970, for

---

[65] *Opinion: A joint letter from ANCs opposing President Trump's takeover of D.C.*, The 51st (Aug. 29, 2025), https://51st.news/opinion-a-joint-letter-from-ancs-opposing-president-trumps-takeover-of-d-c/.

**ADD.121**

instance, Ohio National Guard troops opened fire on students protesting at Kent State University,

killing four and wounding nine.[66]

129.    The encroachment of National Guard troops in the District has also already caused

harm to public safety in the District. On August 20, 2025, a National Guard Member driving a

Mine-Resistant Ambush Protected All-Terrain Vehicle (MATV) rammed into the side of an SUV,

injuring the civilian driver.[67]



*(Photo of National Guard MATV That Crashed Into Civilian Via Fox5DC)*[68]

130.    MATVs are "military vehicle[s] that weigh[] up to 16 tons and [are] meant to

withstand explosive attacks."[69] MATVs are equipped with smaller military-grade windshields that

---

[66] Jennifer Mascia, *With Troops in Los Angeles, Echoes of the Kent State Massacre*, OHIO CAPITAL JOURNAL (June 13, 2025), https://ohiocapitaljournal.com/2025/06/13/with-troops-in-los-angeles-echoes-of-the-kent-state-massacre/.

[67] Luke Garrett, *One Civilian Injured in Crash With D.C. National Guard Military Vehicle*, NPR WAMU (Aug. 20, 2025), https://www.npr.org/2025/08/20/g-s1-83950/national-guard-dc-crash.

[68] Sam Kosmas & Stephanie Ramirez, *1 Injured in Crash Involving National Guard Vehicle*, FOX 5 DC (Aug. 20, 2025), https://www.fox5dc.com/news/1-injured-in-crash-involving-military-vehicle-dc.

[69] Luke Garrett, *One Civilian Injured in Crash With D.C. National Guard Military Vehicle*, NPR WAMU (Aug. 20, 2025), https://www.npr.org/2025/08/20/g-s1-83950/national-guard-dc-crash.

**ADD.122**

are suited for bullet-proof windowpanes, but which limit visibility.[70] The guardsman was later ticketed for running the red light in D.C.'s Capitol Hill neighborhood where the crash occurred.[71]

131.    A video circulated on social media shows the sunken angle of the SUV's driver's side door where it collapsed after impact.[72] The civilian driver, reported to live in Capitol Hill, was trapped inside their vehicle until freed by firefighters using the Jaws of Life.[73] The civilian driver suffered lacerations.[74] But the next collision involving these massive armored vehicles on residential streets could lead to worse injury or death.

132.    Concerningly, DCNG officials have not addressed "whether Guard members are receiving training on D.C. traffic, whether leaders issued a risk assessment on pedestrian and driver safety when using these vehicles, or whether Guard members are going to continue to operate [MATVs] in the city."[75] As expressed by D.C. Councilmember and Transportation Committee Chair Charles Allen, "[t]hese are vehicles designed for warfare. They have no business on our city streets."[76]

---

[70] Dan Lamothe, Rachel Weiner & Alex Horton, *Armored National Guard Vehicle Collides With SUV on Capitol Hill*, THE WASHINGTON POST (Aug. 20, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-national-guard-crash-suv/.

[71] District of Columbia National Guard, *D.C. National Guard Activated to Support Law Enforcement in District of Columbia*, DISTRICT OF COLUMBIA NATIONAL GUARD (Aug. 23, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4284259/dc-national-guard-activated-to-support-law-enforcement-in-district-of-columbia/.

[72] Washingtonian Problems (@WashProbs), X (Aug. 20, 2025, at 10:30 AM), https://x.com/WashProbs/status/1958174783041884639.

[73] Mitchell Miller, *National Guard Vehicle Collides With Car, Trapping Driver on Capitol Hill*, WTOP NEWS (Aug. 20, 2025), https://wtop.com/liveblog-today-on-the-hill/2025/08/national-guard-vehicle-collides-with-car-trapping-driver-on-capitol-hill/.

[74] Carla Babb, *DC Driver Trapped, Then Freed From SUV After Crash With Guard Vehicle*, ARMYTIMES (Aug. 21, 2025), https://www.armytimes.com/news/pentagon-congress/2025/08/21/dc-driver-trapped-then-freed-from-suv-after-crash-with-guard-vehicle/.

[75] Dan Lamothe, Rachel Weiner & Alex Horton*, Armored National Guard Vehicle Collides With SUV on Capitol Hill*, THE WASHINGTON POST (Aug. 20, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-national-guard-crash-suv/.

[76] *Id*.

**ADD.123**

133.    Despite these risks, National Guard troops continue driving oversized MATVs that are heavier and wider than District law permits. *See* Chapter 25 of Title 18 of the District of Columbia Municipal Regulations. On information and belief, the MATVs that National Guard troops are driving around the District exceed these limits and no permit has been sought or obtained for their lawful operation. Their continued use within District limits impairs the District's ability to regulate the safe and proper use of its streets and places District residents in harm's way.

134.    The inrush of National Guard troops has also caused financial strain for the District's economy because it has depressed key industries, including tourism, restaurants, and hospitality services. For example, a recent report from the Washington Post indicates that "the week federal forces dispersed across the capital, foot traffic in D.C. dropped 7 percent on average," and that "[r]estaurant reservations saw an even steeper drop."[77] The report continues: "marketing forecasts, street-level foot traffic, [and] hotel occupancy" all demonstrate that "Washington's tourism economy is sliding . . . [and t]he sight of National Guard troops, now authorized to carry weapons, could further chill demand at a time when the industry can least afford it."

135.    Because the majority of transactions at District retail businesses, hotels, and restaurants are subject to gross sales taxes, the reduction in business activity in the District since August 11, 2025, is resulting in the loss of a proportional amount of sales tax revenue to the District government. It is also resulting in a reduction in work hours for some District workers, and a corresponding decline in income tax withholding paid to the District government.

---

[77] Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, THE WASHINGTON POST (Aug. 29, 2025), https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

**ADD.124**

136.   The continued presence of armed National Guard troops also impinges on the District's right to self-governance by suspending certain District laws. District law criminalizes, among other firearms offenses, the possession of unregistered firearms, D.C. Code § 7-2502.01; the possession of assault weapons, *id.* § 7-2502.02; and the transportation of firearms under certain conditions, *id.* § 22-4504.02. Many National Guard members would be in violation of all of these statutes if they were not lawfully "on duty and duly authorized to carry a firearm." *See, e.g.*, *id.* § 7-2502.01(b)(1)(C). The Secretary of Defense's order authorizing and directing National Guard members to carry these weapons—including semi-automatic M17 pistols and M4 carbine assault rifles—thus purports to relieve these members of criminal liability and exempt them from the District's generally applicable firearms regulations. In addition, if National Guard troops are involved in searches, seizures, and arrests without lawful authority, that could complicate and undermine criminal prosecution efforts and put public safety at risk.

137.   The President has made clear his intention to continue to inflict these harms on the District for an extended period. In the August 25 Executive Order, the President memorialized an intent to continue to use the National Guard to police D.C.'s streets, directing the Secretary of Defense to create a unit within the DCNG in which the members will be deputized to "enforce Federal law." *See* Section 2(d)(i). In doing so, the President memorializes his intent to again violate the PCA and repeat the present injuries to the District's authority.

138.   Defendants claim that their conduct is intended to make D.C. safer; however, recent reporting indicates that "about two-thirds of D.C. residents say Trump's recent actions will not help combat violent crime."[78] News reports confirm that the deployment of National Guard troops

---

[78] Joe Heim, Scott Clement & Emily Guskin, *We Asked 604 D.C. Residents About Trump's Takeover. Here's What They Said*, The Washington Post (Aug. 20, 2025),

**ADD.125**

has given District residents a "palpable sense of fear" and rendered them "afraid to go grocery shopping, show up to work and go about their daily lives." One restaurant owner said that "[i]t's not working. It's an attack on the community. That's the way we're seeing it. We're the ones feeling the effects, everyone, the business owners, the community."[79] At a news conference, Mayor Bowser noted that the National Guard presence has caused some parents to keep their children out of school out of concern for their safety.[80]

### CAUSES OF ACTION

#### COUNT I
#### Violation of the Administrative Procedure Act
#### Contrary to Law
#### (DOD and DOJ Defendants)

139.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

140.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority. Under the Administrative Procedure Act (APA) a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

---

https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-poll-trump-crime-police/
https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-poll-trump-crime-police/.
[79] Daniella Silva & Megan Lebowitz, *Trump Vowed to Make Washington Streets Safer. In One Neighborhood, People Feel Less Safe Than Ever*, NBC NEWS (Aug. 26, 2025), https://www.nbcnews.com/news/us-news/national-guard-trump-washington-dc-immigration-fears-ice-deportation-rcna226943.
[80] Konstantin Toropin & Will Weissert, *DC School Year Starts With Parents on Edge Over Trump's Armed Patrols*, PBS NEWS (Aug. 25, 2025), https://www.pbs.org/newshour/education/dc-school-year-starts-with-parents-on-edge-over-trumps-armed-patrols.

**ADD.126**

141.    Defendants DOD, DOJ, and USMS are all agencies subject to the APA. 5 U.S.C. § 701.

142.    The DOD Defendants took final agency actions that are subject to judicial review when they:

    a.    ordered the mobilization of the DCNG for the purpose of supporting local and federal law enforcement in the District;

    b.    ordered or requested deployment of out-of-state National Guard units under 32 U.S.C. § 502(f) from Louisiana, Mississippi, Ohio, South Carolina, South Dakota, Tennessee, and West Virginia for the purpose of supporting local and federal law enforcement in the District (the Deployment); and

    c.    placed the DCNG and the out-of-state troops under the command and control of the Joint Task Force-DC, which is in turn under the command and control of the Army, DOD, and the President.

143.    The DOJ Defendants took final agency action that is subject to judicial review when they deputized the National Guard units from the District of Columbia, Louisiana, Mississippi, Ohio, South Carolina, Tennessee, and West Virginia as Special Deputy U.S. Marshals to perform law enforcement functions in the District (the Deputization).

144.    The DOD and DOJ Defendants have collectively engaged in final agency action that is subject to judicial review by:

    a.    ordering the troops in the DCNG and from the Deployment to be armed with M17 pistols and M4 rifles; and

**ADD.127**

b.  implementing the President's August 25 Executive Order, including by establishing a unit in the DCNG dedicated to "ensuring public safety and order" in the District and by deputizing the members of that unit to "enforce Federal law."

145.    The DOD and DOJ Defendants' actions are contrary to the Constitution and federal law in numerous respects, including the following.

146.    *First*, the DOD and DOJ Defendants have violated the Home Rule Act and the Assistance Compact by deploying the DCNG and out-of-state National Guard troops to "support" and "assist" District law enforcement without the consent of the Mayor.

147.    In the Home Rule Act, Congress vested the Mayor with "the executive power of the District," which it has elsewhere made clear includes the power to determine how best to police "the boundaries of" the District to "preserve the public peace." By contrast, the Act grants the President no authority to direct or control law enforcement in the District. The President may not supplant the Mayor's authority by directing National Guard units to police the District as he sees fit.

148.    The Assistance Compact further provides that states may send "mutual assistance" to one another upon the "request" of the receiving state. Mutual assistance under this Compact "may include the use of the states' National Guard forces" only pursuant to an interstate compact or "by mutual agreement between states." Congress has designated the District of Columbia a "state" under this Compact, and the Council has authorized the Mayor to "execute[]" it on the District's behalf. The President may not lawfully evade this scheme by authorizing other states to introduce National Guard units into the District without the "request" or "agreement" of the Mayor.

149.    Section 502(f) of Title 32 of the U.S. Code does not alter this framework. It permits National Guard units to perform "training or other duty," including "support of operations or

**ADD.128**

missions undertaken by the . . . unit at the request of the President or Secretary of Defense." By its terms, this provision only allows the President or the Secretary to "request" support, not to order or authorize the provision of aid over the receiving jurisdiction's objection. And, in context, the provision plainly permits forms of aid similar to "training" or "drills," not a massive, independent power that would gut limits Congress imposed elsewhere in the statute.

150.    *Second*, the DOD and DOJ Defendants have acted contrary to the Constitution and federal law by assuming command and control over out-of-state National Guard units in Title 32 status.

151.    Under the Militia Clauses of the Constitution, the President may only "govern[] such part of [the Militia] as may be employed in the service of the United States." And under the statutes governing the National Guard—the modern-day militia—he may only assume command of National Guard units that have been called into federal service under Title 10. Until then, both the Constitution and statute require that they remain under state command.

152.    The DOD and DOJ Defendants have unlawfully assumed command and control of out-of-state National Guard units in state militia status under Title 32. Through Joint Task Force-DC, the DOD Defendants have exercised pervasive control over the operations of these units in the District, including by issuing "order[s]" and assigning them missions. And the DOJ Defendants have deputized them as U.S. Marshals, subjecting them to the direction and authority of the President and DOJ.

153.    *Third*, the DOD Defendants have violated the Posse Comitatus Act and 10 U.S.C. § 275 by giving DOD and the Army direct command and control of Joint Task Force-DC—a law enforcement operation in the District conducted by National Guard troops vested with the powers to arrest, conduct seizures, and otherwise engage in core law enforcement activities.

**ADD.129**

154.    In the PCA, Congress prohibited the use of "any part of the Army" to engage in "law enforcement." Congress extended the scope of that prohibition in Section 275, which requires the Secretary of Defense to promulgate regulations ensuring that "member[s] of the Army" do not have "direct participation . . . in a search, seizure, arrest, or other similar activity." The DOD has implemented that command by issuing a policy that prohibits most "DoD personnel" from providing "direct civilian law enforcement assistance."

155.    The DOD Defendants are subject to the Posse Comitatus Act and Section 275. Nonetheless, they are in direct command of Joint Task Force-DC, an operation expressly designed to engage in law enforcement. The DOD Defendants have asserted pervasive control over and active involvement in the law enforcement work of this Task Force, including by issuing "order[s]" to its members and identifying the forms of law enforcement assistance they should provide, including "community safety patrols," "traffic control," and "presence patrols." And the DOJ Defendants have augmented the law enforcement powers of the Task Force by deputizing its participants as U.S. Marshals—empowering them to conduct searches, seizures, and arrests.

156.    Both the Posse Comitatus Act and Section 275 flatly prohibit the establishment of a law enforcement operation in the District that is helmed and controlled by the DOD Defendants.

157.    In sum, the DOD and DOJ Defendants have acted contrary to law, in violation of 5 U.S.C. § 706, by deploying the DCNG and out-of-state National Guard units to police the District without the consent of the District's Mayor, assuming command and control of out-of-state National Guard units that are in Title 32 status, and exercising command and control of Joint Task Force-DC, a law enforcement operation.

**ADD.130**

158.    The District is entitled to vacatur of the final agency actions of the DOJ and DOD

Defendants, and a preliminary and permanent injunction prohibiting the DOD and DOJ Defendants

from engaging in such actions.

**COUNT II**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious**
**(DOD and DOJ Defendants)**

159.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set

forth herein.

160.    Under the Administrative Procedure Act, a court shall "hold unlawful and set aside

agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," that is "contrary to constitutional right [or] power," or that is "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-

(C).

161.    An agency action is arbitrary or capricious where the agency fails to "articulate a

satisfactory explanation for its action including a 'rational connection between the facts found and

the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

162.    When an agency "rescinds a prior policy," the agency must, at minimum, "consider

the alternatives that are within the ambit of the existing policy," "consider [] important aspect[s]

of the problem," "assess whether there were reliance interests," and "weigh any such interests

against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591

U.S. 1, 30, 33, 38 (2020) (citations and internal quotation marks omitted).

**ADD.131**

163.    A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

164.    The DOJ and DOD Defendants' actions are arbitrary and capricious for several reasons, including the following:

   a.    The DOD and DOJ Defendants failed to offer any explanation for deviating from longstanding principles and prior practice of not using National Guard units for law enforcement in the District.

   b.    The DOD and DOJ Defendants failed to consider the risks associated with deploying National Guard troops to support law enforcement and deputizing them as Special Deputy U.S. Marshals when they lack adequate training and expertise in law enforcement.

   c.    The DOD and DOJ Defendants failed to weigh the purported benefits of implementing the Deployment against the costs, including creating confusion among District residents and visitors to the District about what entities are actually policing the District, what powers and duties they may lawfully exercise, and the corresponding threat that the exercise of such powers and duties will cause to public safety in the District. They similarly failed to weigh the risks of authorizing thousands of National Guard troops to carry semi-automatic weapons in the District, including the M17 pistol, a version of the Sig Sauer P320 series pistol that is capable of firing without the trigger being pulled, or the costs and risks of deploying large, armored vehicles on District streets.

**ADD.132**

    d.   The DOD and DOJ Defendants also failed to consider other relevant factors, such as the threat to the independence of state National Guard units, the harm their actions would cause to military readiness, and the extent to which the Deployment and the Deputization would render units unable to perform other important state- or District-level functions.

165.    For all these reasons, the DOD and DOJ Defendants have acted arbitrarily and capriciously, in violation of 5 U.S.C. § 706.

166.    Accordingly, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the District is entitled to a declaration that the DOD and DOJ Defendants' final agency actions are arbitrary and capricious, violate the APA, and are invalid.

167.    The District is entitled to vacatur of the DOJ and DOD Defendants' final agency actions, and a preliminary and permanent injunction prohibiting the DOD and DOJ Defendants from continuing such actions.

## COUNT III
### Violation of the Constitution
### Separation of Powers, Take Care Clause, and District Clause
### (All Defendants)

168.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

169.    The Constitution's separation of powers doctrine, Take Care Clause, and District Clause all place limitations on the exercise of executive authority.

170.    The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637-38 (2024).

**ADD.133**

171.    The Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. Art. I, § 8, cl. 15. The Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

172.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

173.    Further, the Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them") (internal quotation marks and citation omitted).

174.    The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

175.    Finally, the District Clause vests Congress with authority "[t]o exercise exclusive Legislation, in all Cases whatsoever, over such District (not exceeding ten Miles square) as may  .

. . become the Seat of the Government of the United States . . . ."  U.S. Const. art. I, § 8, cl. 17. This Clause affords Congress "plenary power" over the Nation's capital.  *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 434 (1932).  It has exercised that authority by enacting the Home Rule Act, which grants the residents of the District "powers of local self-government" and authority over "local District matters."  D.C. Code § 1-201.02(a). The Executive may not exercise authority over local District governance except to the limited extent authorized by Congress.

176.     Defendants have violated each of these constitutional doctrines.

177.     In violation of the separation of powers, the Take Care Clause, and the District Clause, Defendants have: asserted authority over state Militias that the Constitution and federal law expressly assign to the States; disregarded the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement; and attempted to supplant the Mayor's authority over law enforcement in the District.

178.     This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952). The District is entitled to preliminary and permanent injunctive relief barring the actions challenged herein.

179.     Pursuant to 28 U.S.C. § 2201, the District is also entitled to a declaration that the actions challenged herein violate the constitutional separation of powers doctrine, the Take Care Clause, and the District Clause, and impermissibly arrogate to the Executive power that is reserved to Congress, the states, or the District.

**ADD.135**

**COUNT IV**
**Equitable *Ultra Vires***
**(All Defendants)**

180.   The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

181.   Neither the President nor an agency can take any action that exceeds the scope of their constitutional or statutory authority.

182.   Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

183.   Defendants have taken actions in the absence of any plausible constitutional or statutory authority, and in plain violation of the limits imposed by Congress.  They have impermissibly asserted control over the National Guard units in state militia status, directed DOD to supervise and actively participate in domestic law enforcement activities, and ordered troops to police the District without the Mayor's consent.

184.   The District will continue to suffer irreparable injury if Defendants' actions are not declared unlawful and enjoined, and the District has no adequate remedy at law.

185.   The public interest favors issuance of a judicial declaration that Defendants' actions are unlawful and issuance of an injunction requiring Defendants to cease such actions.

**ADD.136**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff District of Columbia respectfully requests that the Court:

186.    Declare that Defendants have acted contrary to the Constitution and federal law by:

 a. deploying National Guard troops to conduct law enforcement in the District of Columbia without the express consent of the Mayor;

 b. exercising command and control of out-of-state National Guard troops in Title 32 status in the District of Columbia, including by issuing operational orders to such troops or dictating their day-to-day operations;

 c. deputizing members of National Guard units deployed in or to the District of Columbia as Special Deputy U.S. Marshals;

 d. ordering that National Guard troops in the District of Columbia carry service weapons while conducting operations pursuant to the President's August 11 order; and

 e. placing DOD officials, including the Secretary of the Army, in operational command or control of Joint Task Force-DC, and otherwise permitting DOD officials to directly supervise or participate in law enforcement activities conducted by National Guard Units in the District of Columbia.

187.    Permanently and preliminarily enjoin such actions;

188.    Stay such actions pursuant to 5 U.S.C. § 705;

189.    Vacate such actions pursuant to 5 U.S.C. § 706; and

190.    Award such additional relief as the interests of justice may require.

**ADD.137**

Dated: September 4, 2025   Respectfully submitted,

          BRIAN L. SCHWALB
          Attorney General for the District of Columbia

          EMMA SIMSON (D.C. Bar No. 1026153)
          ELIZA H. SIMON (D.C. Bar No. 90035651)
          MITCHELL P. REICH (D.C. Bar No. 1044671)
          Senior Counsels to the Attorney General

          BENJAMIN MOSKOWITZ (D.C. Bar No. 1049084)
          Assistant Deputy Attorney General
          Legal Counsel Division

          */s/ Alicia M. Lendon*
          ALICIA M. LENDON (D.C. Bar No. 1765057)
          Chief, Civil Rights and Elder Justice Section
          Public Advocacy Division

          */s/ Pamela Disney*
          PAMELA DISNEY (D.C. Bar No. 1601225)
          ANDREW MENDRALA (D.C. Bar No. 1009841)
          CHRISTOPHER PEÑA (D.C. Bar No. 888324806)
          CHARLES SINKS (D.C. Bar No. 888273315)
          Assistant Attorneys General
          Office of the Attorney General for
          the District of Columbia
          400 6th Street NW, 10th Floor
          Washington, D.C. 20001
          Tel: (202) 807-0371
          pamela.disney@dc.gov

          *Attorneys for the District of Columbia*

**ADD.138**

SECRETARY OF THE ARMY
WASHINGTON

1 1 AUG 2025

Brigadier General Leland Blanchard
Commanding General
District of Columbia National Guard
2001 East Capitol Street SE
Washington, DC 20003-1719

Dear General Blanchard:

On August 11, 2025, the President of the United States directed the rapid mobilization of the
District of Columbia's National Guard to support law enforcement organization. This
mobilization will support restoring Law and Order in the District of Columbia as directed in the
Presidential memoranda dated August 11, 2025.

<u>Approval</u>

I approve the use of the DCNG to provide critical support to law enforcement efforts in the
District of Columbia.

Dan Driscoll
Secretary of the Army

**ADD.139**

Confidential - Subject to Protective Order          DCNG_DEF_00002234

# Exhibit 38

2001 EAST CAPITOL STREET, SE
WASHINGTON, DC 20003-1719

PERMANENT ORDERS 25-223                               11 August 2025

DISTRICT OF COLUMBIA NATIONAL GUARD, 2001 EAST CAPITOL STREET S.E.
WASHINGTON, DC 20003-1719

Selected members of the District of Columbia National Guard are hereby encamped pursuant
to D.C. Code § 49-101 and involuntarily ordered to duty pursuant to 32 U.S.C. § 502(f)(2)(A)
until such time as subsequent orders modify or terminate this base encampment order. The
purpose of this duty is to respond to short or no-notice direction from the Secretary of
Defense or the President of the United States to protect federal property and functions in the
District of Columbia and to support federal and District law enforcement.

Authorities: E.O. 11485; Title 32 U.S Code Chapter 5 (Training); and D.C. Code Title
49, Chapter 1 (Active Military Duty).

Duty Station: D.C. Armory or subsequent designated reporting locations
Period: 11 1100R AUG 25 -- 25 2359R SEP 25
Reporting time and date: 12 0730R AUG 25, or as otherwise directed

Additional Instructions: Reporting DCNG personnel must not be flagged for
investigation or adverse action. Exceptions to these instructions are withheld to the
Chief of Staff or first General Officer in the chain of command to include medical
MRC 3 & 4 personnel.

Personnel are involuntarily ordered, with pay and allowances, in accordance with 32
U.S. Code § 502 (Required drills and field exercises) and encamped in accordance
with D.C. Code §§ 49-101 (Drill parade, encampment or required duty), § 49-102
(Prescribing drills), and § 49-107 (Camp duty).

Additional instructions: An employee of the U.S. Government as defined by 5 U.S. Code 2105
is entitled to leave without loss in pay or time for each day of encampment per 5 U.S Code §
6323(c). An employee of the District of Columbia is entitled to leave without limitation and
without loss of pay or time for each day of an encampment per 5 U.S. Code § 6323(c) and
D.C. Code § 1-612.03(m-2).

All service members encamped under this order, or any supplemental encampment order will
remain encamped within the DC local area, unless released earlier. This order is not valid as
proof of being subject to the instant encampment unless presented with an associated annex
or unit order listing the individual members encamped by unit, unit identification code,
grade/rank, name, and the Service member's DOD ID Number.

Format: 251

DISTRIBUTION:          ////////////////////////////////////////////////
A-E          (1)       //    COMMANDING GENERAL'S OFFICE    //
INDIV INDIC (1)        //         DISTRICT OF COLUMBIA         //
                       ////////////////////////////////////////////////

                       LELAND D. BLANCHARD II, Brigadier General, USA
                       Commanding General (Interim)

**ADD.141**

Confidential - Subject to Protective Order                    DCNG_DEF_00001940

## MEMORANDUM OF UNDERSTANDING
BETWEEN
THE DISTRICT OF COLUMBIA NATIONAL GUARD (DCNG)
AND
THE SUPPORTING STATES, COMMONWEALTHS, AND TERRITORIES FOR OPERATION
MAKE D.C. SAFE AND BEAUTIFUL
MOU-DCNG-SSCT

This is a new memorandum of understanding (MOU) between the District of Columbia National Guard (DCNG) and the Supporting States, Commonwealths, and Territories. When referred to collectively, the DCNG and the Supporting States, Commonwealths, and Territories are referred to as the "Parties."

1. AUTHORITIES:

   1.1.    The Federal Tort Claims Act, 28 United States Code (USC) §§ 1346, 2671-2679.

   1.2.    32 U.S.C. § 502(f).

   1.3.    DC Code § 5-129.03.

   1.4.    DC Code § 5-205.

   1.5.    HQDA EXORD 290-25, District of Columbia National Guard in Support of Local Law.

2. PURPOSE: This memorandum of understanding (MOU) is executed in support of Operation Make DC Safe and Beautiful HQDA EXORD 290-25 District of Columbia National Guard in Support of Federal Law Enforcement.  This MOU is executed to facilitate cooperation and unity of effort between the District of Columbia National Guard (DCNG) and the parties with respect to assisting the United States Marshall Service, United States Park Police (USPP) and Metropolitan Police Department (MPD) with national monument security, area beautification, traffic control points, and law enforcement patrols.  No term or provision in this MOU shall not be interpreted in a manner that conflicts with Federal law, regulation, or policy or State law.

3. UNDERSTANDINGS OF THE PARTIES:

   3.1.    The Parties agree to accept forces from other jurisdictions to perform duties in support of Make DC Safe and Beautiful. The Chief, National Guard Bureau, will coordinate the provision of resources to the Parties in furtherance of the mission. Each Governor, and the Commanding General of the DCNG, shall retain the authority to decline missions that will compromise his or her ability to respond to emergency requirements.

   3.2.    The Commanding General of the District of Columbia National Guard will

1

**ADD.142**

assume the lead role in coordinating the JRSOI and tasking units from a supporting State, Commonwealth, or the District of Columbia. Sending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment.

3.3.   The Parties will perform duties under 32 U.S.C. § 502(f) in accordance with all applicable laws and Department of Defense (DoD) and Military Department regulations, policies, and authorities. These duties may include law enforcement and require personnel performing them to be sworn in as law enforcement agents and may require personnel to be armed. All operations will be conducted consistently with any relevant Secretary of Defense utilization memorandum should be issued.

3.4.   Requests for forces will be handled according to the procedures specified in the applicable operations and execution orders; however, all Parties agree that validation of requirements by the National Guard Bureau is a necessary precondition to the deployment of National Guard forces and the disbursement of funds.

3.5.   All National Guard forces participating in activities supporting Make DC Safe and Beautiful will receive operational direction for tasks from the Commanding General, DCNG, comply with the DCNG Rules for the Use of Force and Rules of Conduct, and will support Arming decisions made by the Commanding General, DCNG as authorized by the Secretary of Defense.

3.6.   All National Guard members participating in Make DC Safe and Beautiful missions under Title 32, U.S.C., are performing missions in support of the Federal Government or to the benefit of the Federal Government and are federal employees within the meaning of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671- 2679.

3.7.   Other States and Territories may participate in the Agreement by adopting the terms and conditions of this MOU.

4. GENERAL PROVISIONS:

4.1. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds between the Parties, nor does it make any commitment of funds or resources.  No provision in this MOU will be interpreted to require obligation or payment of funds.

4.2. MODIFICATION OF MOU.  This MOU may only be modified by the written agreement of the Parties, duly signed by their authorized representatives.  This MOU will be reviewed as needed based on the duration of operations.

2

**ADD.143**

4.3. DISPUTES.  Any disputes relating to this MOU will, subject to any applicable law, Executive order, or DoD issuances, be resolved by consultation between the parties.

4.4. TERMINATION OF UNDERSTANDING.  This MOU will terminate upon the completion of Operation Make D.C. Safe and Beautiful and may be terminated by either party at any time.

4.5. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

4.6. ENTIRE UNDERSTANDING.  It is expressly understood and agreed that this MOU embodies the entire understanding between the Parties regarding the MOU's subject matter, thereby superseding all prior understandings of the Parties with respect to such subject matter.

4.7. EFFECTIVE DATE.  This MOU takes effect beginning on the day after the last Party signs.

4.8. EXPIRATION DATE.  This MOU terminates upon completion of operations and redeployment of personnel back to their home State.

4.9. NO THIRD-PARTY BENEFICIARIES.  Nothing in this MOU, express or implied, is intended to give to, or will be construed to confer upon, any person not a party any remedy or claim under or by reason of this MOU and this MOU will be for the sole and exclusive benefit of the Parties.


APPROVED:


LELAND D. BLANCHARD II
Brigadier General, USA
Commanding (Interim)

JAMES O. ROBINSON
Colonel, USA
USPFO  for DC


JAMES SEWARD
Major General, USA
Adjutant General

JAMES W. DEAN
Colonel, USA
USPFO  for WV


ROBIN B. STILWELL
Major General, USA
Adjutant General

KELVIN L. BROWN
Colonel, USA
USPFO for SC

3

**ADD.144**

BOBBY M. GINN JR
Major General, USA
Adjutant General

MILTON L. GRIFFITH
Colonel, USA
USPFO for MS

THOMAS C. FRILOUX
Major General, USA
Adjutant General

DANIEL H. FRITTS
Colonel, USA
USPFO for LA

MATHEW S. WOODRUFF
Brigadier General, USA
Adjutant General

JOSEPH A. SCHWADE
Colonel, USA
USPFO for  OH

WARNER A. ROSS II
Major General, USA
Adjutant General

JONATHAN T. PINKARD
Colonel, USAF
USPFO for TN

**ADD.145**

Confidential - Subject to Protective Order

DCNG_DEF_00000617

## MEMORANDUM OF UNDERSTANDING
BETWEEN
THE DISTRICT OF COLUMBIA NATIONAL GUARD (DCNG)
AND
THE SUPPORTING STATES, COMMONWEALTHS, AND TERRITORIES FOR OPERATION
MAKE D.C. SAFE AND BEAUTIFUL
MOU-DCNG-SSCT

This is a new memorandum of understanding (MOU) between the District of Columbia National Guard (DCNG) and the Supporting States, Commonwealths, and Territories. When referred to collectively, the DCNG and the Supporting States, Commonwealths, and Territories are referred to as the "Parties."

1. AUTHORITIES:

    1.1.    The Federal Tort Claims Act, 28 United States Code (USC) §§ 1346, 2671-2679.

    1.2.    32 U.S.C. § 502(f).

    1.3.    DC Code § 5-129.03.

    1.4.    DC Code § 5-205.

    1.5.    HQDA EXORD 290-25, District of Columbia National Guard in Support of Local Law.

2. PURPOSE: This memorandum of understanding (MOU) is executed in support of Operation Make DC Safe and Beautiful HQDA EXORD 290-25 District of Columbia National Guard in Support of Federal Law Enforcement.  This MOU is executed to facilitate cooperation and unity of effort between the District of Columbia National Guard (DCNG) and the parties with respect to assisting the United States Marshall Service, United States Park Police (USPP) and Metropolitan Police Department (MPD) with national monument security, area beautification, traffic control points, and law enforcement patrols.  No term or provision in this MOU shall not be interpreted in a manner that conflicts with Federal law, regulation, or policy or State law.

3. UNDERSTANDINGS OF THE PARTIES:

    3.1.    The Parties agree to accept forces from other jurisdictions to perform duties in support of Make DC Safe and Beautiful. The Chief, National Guard Bureau, will coordinate the provision of resources to the Parties in furtherance of the mission. Each Governor, and the Commanding General of the DCNG, shall retain the authority to decline missions that will compromise his or her ability to respond to emergency requirements.

    3.2.    The Commanding General of the District of Columbia National Guard will

1

**ADD.146**

Confidential - Subject to Protective Order

assume the lead role in coordinating the JRSOI and tasking units from a supporting State, Commonwealth, or the District of Columbia. Sending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment.

3.3.    The Parties will perform duties under 32 U.S.C. § 502(f) in accordance with all applicable laws and Department of Defense (DoD) and Military Department regulations, policies, and authorities. These duties may include law enforcement and require personnel performing them to be sworn in as law enforcement agents and may require personnel to be armed. All operations will be conducted consistently with any relevant Secretary of Defense utilization memorandum should be issued.

3.4.    Requests for forces will be handled according to the procedures specified in the applicable operations and execution orders; however, all Parties agree that validation of requirements by the National Guard Bureau is a necessary precondition to the deployment of National Guard forces and the disbursement of funds.

3.5.    All National Guard forces participating in activities supporting Make DC Safe and Beautiful will receive operational direction for tasks from the Commanding General, DCNG, comply with the DCNG Rules for the Use of Force and Rules of Conduct, and will support Arming decisions made by the Commanding General, DCNG as authorized by the Secretary of Defense.

3.6.    All National Guard members participating in Make DC Safe and Beautiful missions under Title 32, U.S.C., are performing missions in support of the Federal Government or to the benefit of the Federal Government and are federal employees within the meaning of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671- 2679.

3.7.    Other States and Territories may participate in the Agreement by adopting the terms and conditions of this MOU.

4. GENERAL PROVISIONS:

4.1. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds between the Parties, nor does it make any commitment of funds or resources.  No provision in this MOU will be interpreted to require obligation or payment of funds.

4.2. MODIFICATION OF MOU.  This MOU may only be modified by the written agreement of the Parties, duly signed by their authorized representatives.  This MOU will be reviewed as needed based on the duration of operations.

**ADD.147**

Confidential - Subject to Protective Order

4.3. DISPUTES.  Any disputes relating to this MOU will, subject to any applicable law, Executive order, or DoD issuances, be resolved by consultation between the parties.

4.4. TERMINATION OF UNDERSTANDING.  This MOU will terminate upon the completion of Operation Make D.C. Safe and Beautiful and may be terminated by either party at any time.

4.5. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

4.6. ENTIRE UNDERSTANDING.  It is expressly understood and agreed that this MOU embodies the entire understanding between the Parties regarding the MOU's subject matter, thereby superseding all prior understandings of the Parties with respect to such subject matter.

4.7. EFFECTIVE DATE.  This MOU takes effect beginning on the day after the last Party signs.

4.8. EXPIRATION DATE.  This MOU terminates upon completion of operations and redeployment of personnel back to their home State.

4.9. NO THIRD-PARTY BENEFICIARIES.  Nothing in this MOU, express or implied, is intended to give to, or will be construed to confer upon, any person not a party any remedy or claim under or by reason of this MOU and this MOU will be for the sole and exclusive benefit of the Parties.


APPROVED:




LELAND D. BLANCHARD II                    JAMES O. ROBINSON
Brigadier General, USA                    Colonel, USA
Commanding (Interim)                      USPFO  for DC



JAMES SEWARD                              JAMES W. DEAN
Major General, USA                        Colonel, USA
Adjutant General                          USPFO  for WV



ROBIN B. STILWELL                         KELVIN L. BROWN
Major General, USA                        Colonel, USA
Adjutant General                          USPFO for SC

3

**ADD.148**

Confidential - Subject to Protective Order



BOBBY M. GINN JR
Major General, USA
Adjutant General

MILTON L. GRIFFITH
Colonel, USA
USPFO for MS

THOMAS C. FRILOUX
Major General, USA
Adjutant General

DANIEL H. FRITTS
Colonel, USA
USPFO for LA

MATHEW S. WOODRUFF
Brigadier General, USA
Adjutant General

JOSEPH A. SCHWADE
Colonel, USA
USPFO for  OH

WARNER A. ROSS II
Major General, USA
Adjutant General

JONATHAN T. PINKARD
Colonel, USAF
USPFO for TN

4

**ADD.149**

DCNG_DEF_00000621

# MEMORANDUM OF UNDERSTANDING

BETWEEN

THE DISTRICT OF COLUMBIA NATIONAL GUARD (DCNG)

AND

THE SUPPORTING STATES, COMMONWEALTHS, AND TERRITORIES FOR OPERATION MAKE D.C. SAFE AND BEAUTIFUL

MOU-DCNG-SSCT

This is a new memorandum of understanding (MOU) between the District of Columbia National Guard (DCNG) and the Supporting States, Commonwealths, and Territories. When referred to collectively, the DCNG and the Supporting States, Commonwealths, and Territories are referred to as the "Parties."

1. AUTHORITIES:

   1.1.   The Federal Tort Claims Act, 28 United States Code (USC) §§ 1346, 2671-2679.

   1.2.   32 U.S.C. § 502(f).

   1.3.   DC Code § 5-129.03.

   1.4.   DC Code § 5-205.

   1.5.   HQDA EXORD 290-25, District of Columbia National Guard in Support of Local Law.

2. PURPOSE: This memorandum of understanding (MOU) is executed in support of Operation Make D.C. Safe and Beautiful HQDA EXORD 290-25 District of Columbia National Guard in Support of Federal Law Enforcement. This MOU is executed to facilitate cooperation and unity of effort between the District of Columbia National Guard (DCNG) and the parties with respect to assisting the United States Marshal Service, United States Park Police (USPP) and Metropolitan Police Department (MPD) with national monument security, area beautification, traffic control points, and law enforcement patrols. No term or provision in this MOU shall be interpreted in a manner that conflicts with Federal law, regulation, or policy or State law.

3. UNDERSTANDINGS OF THE PARTIES:

3.1.   The Parties agree to accept forces from other jurisdictions to perform duties in support of Operation Make D.C. Safe and Beautiful. The Chief, National Guard Bureau, will coordinate the provision of resources to the parties in furtherance of the mission. Each Governor, and the Commanding General of the DCNG, shall retain the authority to decline missions that will compromise his or her ability to respond to emergency requirements.

3.2.   The Commanding General of the DCNG will

1

**ADD.150**

Confidential - Subject to Protective Order

assume the lead role in coordinating the Joint Reception Staging Onward Movement and Integration and tasking units from a supporting State, Commonwealth, or the District of Columbia. Sending units will remain under the command and control of the Adjutant General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment.

3.3.    The Parties will perform duties under 32 U.S.C. § 502(f) in accordance with all applicable laws and Department of Defense (DoD) and Military Department regulations, policies, and authorities. These duties may include law enforcement and require personnel performing them to be sworn in as law enforcement agents and may require personnel to be armed. All operations will be conducted consistently with any relevant Secretary of Defense utilization memorandum should one be issued.

3.4.    Requests for forces will be handled according to the procedures specified in the applicable operations and execution orders; however, all Parties agree that validation of requirements by the National Guard Bureau is a necessary precondition to the deployment of National Guard forces and the disbursement of funds.

3.5.    All National Guard forces participating in activities supporting Operation Make D.C. Safe and Beautiful will receive operational direction for tasks from the Commanding General, DCNG, comply with the DCNG Rules for the Use of Force and Rules of Conduct, and will support Arming decisions made by the Commanding General, DCNG as authorized by the Secretary of Defense.

3.6.    All National Guard members participating in Operation Make D.C. Safe and Beautiful missions under Title 32, U.S.C., are performing missions in support of the Federal Government or to the benefit of the Federal Government and are federal employees within the meaning of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671- 2679.

3.7.    Other States and Territories may participate in the Agreement by adopting the terms and conditions of this MOU.

4. GENERAL PROVISIONS:

4.1. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds between the Parties, nor does it make any commitment of funds or resources. No provision in this MOU will be interpreted to require obligation or payment of funds.

4.2. MODIFICATION OF MOU. This MOU may only be modified by the written agreement of the Parties, duly signed by their authorized representatives. This MOU will be reviewed as needed based on the duration of operations.

2

**ADD.151**

Confidential - Subject to Protective Order

4.3. DISPUTES. Any disputes relating to this MOU will, subject to any applicable law, Executive order, or DoD issuances, be resolved by consultation between the parties.

4.4. TERMINATION OF UNDERSTANDING. This MOU will terminate upon the completion of Operation Make D.C. Safe and Beautiful and may be terminated by either party at any time.

4.5. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

4.6. ENTIRE UNDERSTANDING. It is expressly understood and agreed that this MOU embodies the entire understanding between the Parties regarding the MOU's subject matter, thereby superseding all prior understandings of the Parties with respect to such subject matter.

4.7. EFFECTIVE DATE. This MOU takes effect beginning on the day after the last Party signs.

4.8. EXPIRATION DATE. This MOU terminates upon completion of operations and redeployment of personnel to their home State.

4.9. NO THIRD-PARTY BENEFICIARIES. Nothing in this MOU, express or implied, is intended to give to, or will be construed to confer upon, any person not a party any remedy or claim under or by reason of this MOU and this MOU will be for the sole and exclusive benefit of the Parties.


APPROVED:


LELAND D. BLANCHARD II
Brigadier General, USA
Commanding (Interim)

JAMES O. ROBINSON
Colonel, USA
USPFO for DC


JAMES SEWARD
Major General, USA
Adjutant General

JAMES W. DEAN
Colonel, USA
USPFO for WV


ROBIN B. STILWELL
Major General, USA
Adjutant General

KELVIN L. BROWN
Colonel, USA
USPFO for SC

3

**ADD.152**

Confidential - Subject to Protective Order

BOBBY M. GINN JR
Major General, USA
Adjutant General

MILTON L. GRIFFITH
Colonel, USA
USPFO for MS

THOMAS C. FRILOUX
Major General, USA
Adjutant General

DANIEL H. FRITTS
Colonel, USA
USPFO for LA

MATTHEW S. WOODRUFF
Brigadier General, USA
Adjutant General

JOSEPH A. SCHWADE
Colonel, USA
USPFO for OH

WARNER A. ROSS II
Major General, USA
Adjutant General

JONATHAN T. PINKARD
Colonel, USAF
USPFO for TN

4

**ADD.153**

Confidential - Subject to Protective Order

## MEMORANDUM OF UNDERSTANDING
### BETWEEN
### THE DISTRICT OF COLUMBIA NATIONAL GUARD (DCNG)
### AND
### THE SUPPORTING STATES, COMMONWEALTHS, AND TERRITORIES FOR OPERATION
### MAKE D.C. SAFE AND BEAUTIFUL
### MOU-DCNG-SSCT

This is a new memorandum of understanding (MOU) between the District of Columbia National Guard (DCNG) and the Supporting States, Commonwealths, and Territories. When referred to collectively, the DCNG and the Supporting States, Commonwealths, and Territories are referred to as the "Parties."

1.  AUTHORITIES:

    1.1.    The Federal Tort Claims Act, 28 United States Code (USC) §§ 1346, 2671-2679.

    1.2.    32 U.S.C. § 502(f).

    1.3.    DC Code § 5-129.03.

    1.4.    DC Code § 5-205.

    1.5.    HQDA EXORD 290-25, District of Columbia National Guard in Support of Local Law.

2.  PURPOSE: This memorandum of understanding (MOU) is executed in support of Operation Make DC Safe and Beautiful HQDA EXORD 290-25 District of Columbia National Guard in Support of Federal Law Enforcement.  This MOU is executed to facilitate cooperation and unity of effort between the District of Columbia National Guard (DCNG) and the parties with respect to assisting the United States Marshall Service, United States Park Police (USPP) and Metropolitan Police Department (MPD) with national monument security, area beautification, traffic control points, and law enforcement patrols.  No term or provision in this MOU shall not be interpreted in a manner that conflicts with Federal law, regulation, or policy or State law.

3.  UNDERSTANDINGS OF THE PARTIES:

    3.1.    The Parties agree to accept forces from other jurisdictions to perform duties in support of Make DC Safe and Beautiful. The Chief, National Guard Bureau, will coordinate the provision of resources to the Parties in furtherance of the mission. Each Governor, and the Commanding General of the DCNG, shall retain the authority to decline missions that will compromise his or her ability to respond to emergency requirements.

    3.2.    The Commanding General of the District of Columbia National Guard will

1

**ADD.154**

Confidential - Subject to Protective Order

assume the lead role in coordinating the JRSOI and tasking units from a supporting State, Commonwealth, or the District of Columbia. Sending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment.

3.3.   The Parties will perform duties under 32 U.S.C. § 502(f) in accordance with all applicable laws and Department of Defense (DoD) and Military Department regulations, policies, and authorities. These duties may include law enforcement and require personnel performing them to be sworn in as law enforcement agents and may require personnel to be armed. All operations will be conducted consistently with any relevant Secretary of Defense utilization memorandum should be issued.

3.4.   Requests for forces will be handled according to the procedures specified in the applicable operations and execution orders; however, all Parties agree that validation of requirements by the National Guard Bureau is a necessary precondition to the deployment of National Guard forces and the disbursement of funds.

3.5.   All National Guard forces participating in activities supporting Make DC Safe and Beautiful will receive operational direction for tasks from the Commanding General, DCNG, comply with the DCNG Rules for the Use of Force and Rules of Conduct, and will support Arming decisions made by the Commanding General, DCNG as authorized by the Secretary of Defense.

3.6.   All National Guard members participating in Make DC Safe and Beautiful missions under Title 32, U.S.C., are performing missions in support of the Federal Government or to the benefit of the Federal Government and are federal employees within the meaning of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671- 2679.

3.7.   Other States and Territories may participate in the Agreement by adopting the terms and conditions of this MOU.

4. GENERAL PROVISIONS:

4.1. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds between the Parties, nor does it make any commitment of funds or resources.  No provision in this MOU will be interpreted to require obligation or payment of funds.

4.2. MODIFICATION OF MOU.  This MOU may only be modified by the written agreement of the Parties, duly signed by their authorized representatives.  This MOU will be reviewed as needed based on the duration of operations.

2

**ADD.155**

Confidential - Subject to Protective Order

4.3. DISPUTES. Any disputes relating to this MOU will, subject to any applicable law, Executive order, or DoD issuances, be resolved by consultation between the parties.

4.4. TERMINATION OF UNDERSTANDING. This MOU will terminate upon the completion of Operation Make D.C. Safe and Beautiful and may be terminated by either party at any time.

4.5. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

4.6. ENTIRE UNDERSTANDING. It is expressly understood and agreed that this MOU embodies the entire understanding between the Parties regarding the MOU's subject matter, thereby superseding all prior understandings of the Parties with respect to such subject matter.

4.7. EFFECTIVE DATE. This MOU takes effect beginning on the day after the last Party signs.

4.8. EXPIRATION DATE. This MOU terminates upon completion of operations and redeployment of personnel back to their home State.

4.9. NO THIRD-PARTY BENEFICIARIES. Nothing in this MOU, express or implied, is intended to give to, or will be construed to confer upon, any person not a party any remedy or claim under or by reason of this MOU and this MOU will be for the sole and exclusive benefit of the Parties.


APPROVED:


LELAND D. BLANCHARD II
Brigadier General, USA
Commanding (Interim)

JAMES O. ROBINSON
Colonel, USA
USPFO for DC


JAMES SEWARD
Major General, USA
Adjutant General

JAMES W. DEAN
Colonel, USA
USPFO for WV


ROBIN B. STILWELL
Major General, USA
Adjutant General

KELVIN L. BROWN
Colonel, USA
USPFO for SC

3

**ADD.156**

Confidential - Subject to Protective Order

BOBBY M. GINN JR
Major General, USA
Adjutant General

MILTON L. GRIFFITH
Colonel, USA
USPFO for MS

THOMAS C. FRILOUX
Major General, USA
Adjutant General

DANIEL H. FRITTS
Colonel, USA
USPFO for LA

MATHEW S. WOODRUFF
Brigadier General, USA
Adjutant General

JOSEPH A. SCHWADE
Colonel, USA
USPFO for  OH





WARNER A. ROSS II
Major General, USA
Adjutant General

JONATHAN T. PINKARD
Colonel, USAF
USPFO for TN

4

**ADD.157**

DCNG_DEF_00000629

## MEMORANDUM OF UNDERSTANDING
### BETWEEN
### THE DISTRICT OF COLUMBIA NATIONAL GUARD (DCNG)
### AND
### THE SUPPORTING STATES, COMMONWEALTHS, AND TERRITORIES FOR OPERATION MAKE D.C. SAFE AND BEAUTIFUL
### MOU-DCNG-SSCT

This is a new memorandum of understanding (MOU) between the District of Columbia National Guard (DCNG) and the Supporting States, Commonwealths, and Territories. When referred to collectively, the DCNG and the Supporting States, Commonwealths, and Territories are referred to as the "Parties."

1. AUTHORITIES:

    1.1.    The Federal Tort Claims Act, 28 United States Code (USC) §§ 1346, 2671-2679.

    1.2.    32 U.S.C. § 502(f).

    1.3.    DC Code § 5-129.03.

    1.4.    DC Code § 5-205.

    1.5.    HQDA EXORD 290-25, District of Columbia National Guard in Support of Local Law.

2. PURPOSE: This memorandum of understanding (MOU) is executed in support of Operation Make DC Safe and Beautiful HQDA EXORD 290-25 District of Columbia National Guard in Support of Federal Law Enforcement.  This MOU is executed to facilitate cooperation and unity of effort between the District of Columbia National Guard (DCNG) and the parties with respect to assisting the United States Marshall Service, United States Park Police (USPP) and Metropolitan Police Department (MPD) with national monument security, area beautification, traffic control points, and law enforcement patrols.  No term or provision in this MOU shall not be interpreted in a manner that conflicts with Federal law, regulation, or policy or State law.

3. UNDERSTANDINGS OF THE PARTIES:

    3.1.    The Parties agree to accept forces from other jurisdictions to perform duties in support of Make DC Safe and Beautiful. The Chief, National Guard Bureau, will coordinate the provision of resources to the Parties in furtherance of the mission. Each Governor, and the Commanding General of the DCNG, shall retain the authority to decline missions that will compromise his or her ability to respond to emergency requirements.

    3.2.    The Commanding General of the District of Columbia National Guard will

1

**ADD.158**

assume the lead role in coordinating the JRSOI and tasking units from a supporting State, Commonwealth, or the District of Columbia. Sending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment.

3.3.   The Parties will perform duties under 32 U.S.C. § 502(f) in accordance with all applicable laws and Department of Defense (DoD) and Military Department regulations, policies, and authorities. These duties may include law enforcement and require personnel performing them to be sworn in as law enforcement agents and may require personnel to be armed. All operations will be conducted consistently with any relevant Secretary of Defense utilization memorandum should be issued.

3.4.   Requests for forces will be handled according to the procedures specified in the applicable operations and execution orders; however, all Parties agree that validation of requirements by the National Guard Bureau is a necessary precondition to the deployment of National Guard forces and the disbursement of funds.

3.5.   All National Guard forces participating in activities supporting Make DC Safe and Beautiful will receive operational direction for tasks from the Commanding General, DCNG, comply with the DCNG Rules for the Use of Force and Rules of Conduct, and will support Arming decisions made by the Commanding General, DCNG as authorized by the Secretary of Defense.

3.6.   All National Guard members participating in Make DC Safe and Beautiful missions under Title 32, U.S.C., are performing missions in support of the Federal Government or to the benefit of the Federal Government and are federal employees within the meaning of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671- 2679.

3.7.   Other States and Territories may participate in the Agreement by adopting the terms and conditions of this MOU.

4. GENERAL PROVISIONS:

4.1. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds between the Parties, nor does it make any commitment of funds or resources.  No provision in this MOU will be interpreted to require obligation or payment of funds.

4.2. MODIFICATION OF MOU.  This MOU may only be modified by the written agreement of the Parties, duly signed by their authorized representatives.  This MOU will be reviewed as needed based on the duration of operations.

**ADD.159**

Confidential - Subject to Protective Order

4.3. DISPUTES.  Any disputes relating to this MOU will, subject to any applicable law, Executive order, or DoD issuances, be resolved by consultation between the parties.

4.4. TERMINATION OF UNDERSTANDING.  This MOU will terminate upon the completion of Operation Make D.C. Safe and Beautiful and may be terminated by either party at any time.

4.5. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

4.6. ENTIRE UNDERSTANDING.  It is expressly understood and agreed that this MOU embodies the entire understanding between the Parties regarding the MOU's subject matter, thereby superseding all prior understandings of the Parties with respect to such subject matter.

4.7. EFFECTIVE DATE.  This MOU takes effect beginning on the day after the last Party signs.

4.8. EXPIRATION DATE.  This MOU terminates upon completion of operations and redeployment of personnel back to their home State.

4.9. NO THIRD-PARTY BENEFICIARIES.  Nothing in this MOU, express or implied, is intended to give to, or will be construed to confer upon, any person not a party any remedy or claim under or by reason of this MOU and this MOU will be for the sole and exclusive benefit of the Parties.


APPROVED:


LELAND D. BLANCHARD II
Brigadier General, USA
Commanding (Interim)

JAMES O. ROBINSON
Colonel, USA
USPFO  for DC


JAMES SEWARD
Major General, USA
Adjutant General

JAMES W. DEAN
Colonel, USA
USPFO  for WV


ROBIN B. STILWELL
Major General, USA
Adjutant General

KELVIN L. BROWN
Colonel, USA
USPFO for SC

3

**ADD.160**

Confidential - Subject to Protective Order

BOBBY M. GINN JR
Major General, USA
Adjutant General

MILTON L. GRIFFITH
Colonel, USA
USPFO for MS


THOMAS C. FRILOUX
Major General, USA
Adjutant General

DANIEL H. FRITTS
Colonel, USA
USPFO for LA


MATHEW S. WOODRUFF
Brigadier General, USA
Adjutant General

JOSEPH A. SCHWADE
Colonel, USA
USPFO for  OH


WARNER A. ROSS II
Major General, USA
Adjutant General

JONATHAN T. PINKARD
Colonel, USAF
USPFO for TN

4

**ADD.161**

Confidential - Subject to Protective Order

## MEMORANDUM OF UNDERSTANDING
BETWEEN
THE DISTRICT OF COLUMBIA NATIONAL GUARD (DCNG)
AND
THE SUPPORTING STATES, COMMONWEALTHS, AND TERRITORIES FOR OPERATION
MAKE D.C. SAFE AND BEAUTIFUL
MOU-DCNG-SSCT

This is a new memorandum of understanding (MOU) between the District of Columbia National Guard (DCNG) and the Supporting States, Commonwealths, and Territories. When referred to collectively, the DCNG and the Supporting States, Commonwealths, and Territories are referred to as the "Parties."

1. AUTHORITIES:

    1.1.    The Federal Tort Claims Act, 28 United States Code (USC) §§ 1346, 2671-2679.

    1.2.    32 U.S.C. § 502(f).

    1.3.    DC Code § 5-129.03.

    1.4.    DC Code § 5-205.

    1.5.    HQDA EXORD 290-25, District of Columbia National Guard in Support of Local Law.

2. PURPOSE: This memorandum of understanding (MOU) is executed in support of Operation Make DC Safe and Beautiful HQDA EXORD 290-25 District of Columbia National Guard in Support of Federal Law Enforcement. This MOU is executed to facilitate cooperation and unity of effort between the District of Columbia National Guard (DCNG) and the parties with respect to assisting the United States Marshall Service, United States Park Police (USPP) and Metropolitan Police Department (MPD) with national monument security, area beautification, traffic control points, and law enforcement patrols. No term or provision in this MOU shall not be interpreted in a manner that conflicts with Federal law, regulation, or policy or State law.

3. UNDERSTANDINGS OF THE PARTIES:

    3.1.  The Parties agree to accept forces from other jurisdictions to perform duties in support of Make DC Safe and Beautiful. The Chief, National Guard Bureau, will coordinate the provision of resources to the Parties in furtherance of the mission. Each Governor, and the Commanding General of the DCNG, shall retain the authority to decline missions that will compromise his or her ability to respond to emergency requirements.

    3.2.  The Commanding General of the District of Columbia National Guard will

1

**ADD.162**

DCNG_DEF_00000634

assume the lead role in coordinating the JRSOI and tasking units from a supporting State, Commonwealth, or the District of Columbia. Sending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment.

3.3.  The Parties will perform duties under 32 U.S.C. § 502(f) in accordance with all applicable laws and Department of Defense (DoD) and Military Department regulations, policies, and authorities. These duties may include law enforcement and require personnel performing them to be sworn in as law enforcement agents and may require personnel to be armed. All operations will be conducted consistently with any relevant Secretary of Defense utilization memorandum should be issued.

3.4.  Requests for forces will be handled according to the procedures specified in the applicable operations and execution orders; however, all Parties agree that validation of requirements by the National Guard Bureau is a necessary precondition to the deployment of National Guard forces and the disbursement of funds.

3.5.  All National Guard forces participating in activities supporting Make DC Safe and Beautiful will receive operational direction for tasks from the Commanding General, DCNG, comply with the DCNG Rules for the Use of Force and Rules of Conduct, and will support Arming decisions made by the Commanding General, DCNG as authorized by the Secretary of Defense.

3.6.  All National Guard members participating in Make DC Safe and Beautiful missions under Title 32, U.S.C., are performing missions in support of the Federal Government or to the benefit of the Federal Government and are federal employees within the meaning of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671- 2679.

3.7.  Other States and Territories may participate in the Agreement by adopting the terms and conditions of this MOU.

4. GENERAL PROVISIONS:

4.1. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds between the Parties, nor does it make any commitment of funds or resources.  No provision in this MOU will be interpreted to require obligation or payment of funds.

4.2. MODIFICATION OF MOU.  This MOU may only be modified by the written agreement of the Parties, duly signed by their authorized representatives.  This MOU will be reviewed as needed based on the duration of operations.

2

**ADD.163**

Confidential - Subject to Protective Order

4.3. DISPUTES. Any disputes relating to this MOU will, subject to any applicable law, Executive order, or DoD issuances, be resolved by consultation between the parties.

4.4. TERMINATION OF UNDERSTANDING. This MOU will terminate upon the completion of Operation Make D.C. Safe and Beautiful and may be terminated by either party at any time.

4.5. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

4.6. ENTIRE UNDERSTANDING. It is expressly understood and agreed that this MOU embodies the entire understanding between the Parties regarding the MOU's subject matter, thereby superseding all prior understandings of the Parties with respect to such subject matter.

4.7. EFFECTIVE DATE. This MOU takes effect beginning on the day after the last Party signs.

4.8. EXPIRATION DATE. This MOU terminates upon completion of operations and redeployment of personnel back to their home State.

4.9. NO THIRD-PARTY BENEFICIARIES. Nothing in this MOU, express or implied, is intended to give to, or will be construed to confer upon, any person not a party any remedy or claim under or by reason of this MOU and this MOU will be for the sole and exclusive benefit of the Parties.


APPROVED:


LELAND D. BLANCHARD II
Brigadier General, USA
Commanding (Interim)

JAMES O. ROBINSON
Colonel, USA
USPFO for DC


JAMES SEWARD
Major General, USA
Adjutant General

JAMES W. DEAN
Colonel, USA
USPFO for WV


ROBIN B. STILWELL
Major General, USA
Adjutant General

KELVIN L. BROWN
Colonel, USA
USPFO for SC

3

**ADD.164**

Confidential - Subject to Protective Order

BOBBY M. GINN JR
Major General, USA
Adjutant General

MILTON L. GRIFFITH
Colonel, USA
USPFO for MS

THOMAS C. FRILOUX
Major General, USA
Adjutant General

DANIEL H. FRITTS
Colonel, USA
USPFO for LA

MATHEW S. WOODRUFF
Brigadier General, USA
Adjutant General

JOSEPH A. SCHWADE
Colonel, USA
USPFO for OH

WARNER A. ROSS II
Major General, USA
Adjutant General

JONATHAN T. PINKARD
Colonel, USAF
USPFO for TN

RICHARD D. WILSON
Major General, USA
Adjutant General

ALEXANDER V. McLEMORE
Colonel, USA
USPFO for GA

MARK R. MORRELL
Major General, USAF
Adjutant General

JOSEPH V. JACOBSON
Colonel, USA
USPFO for SD

4

**ADD.165**

Confidential - Subject to Protective Order

## MEMORANDUM OF UNDERSTANDING
BETWEEN
THE DISTRICT OF COLUMBIA NATIONAL GUARD (DCNG)
AND
THE SUPPORTING STATES, COMMONWEALTHS, AND TERRITORIES FOR OPERATION
MAKE D.C. SAFE AND BEAUTIFUL
MOU-DCNG-SSCT

This is a new memorandum of understanding (MOU) between the District of Columbia National Guard (DCNG) and the Supporting States, Commonwealths, and Territories. When referred to collectively, the DCNG and the Supporting States, Commonwealths, and Territories are referred to as the "Parties."

1. AUTHORITIES:

    1.1.    The Federal Tort Claims Act, 28 United States Code (USC) §§ 1346, 2671-2679.

    1.2.    32 U.S.C. § 502(f).

    1.3.    DC Code § 5-129.03.

    1.4.    DC Code § 5-205.

    1.5.    HQDA EXORD 290-25, District of Columbia National Guard in Support of Local Law.

2. PURPOSE: This memorandum of understanding (MOU) is executed in support of Operation Make DC Safe and Beautiful HQDA EXORD 290-25 District of Columbia National Guard in Support of Federal Law Enforcement. This MOU is executed to facilitate cooperation and unity of effort between the District of Columbia National Guard (DCNG) and the parties with respect to assisting the United States Marshall Service, United States Park Police (USPP) and Metropolitan Police Department (MPD) with national monument security, area beautification, traffic control points, and law enforcement patrols. No term or provision in this MOU shall not be interpreted in a manner that conflicts with Federal law, regulation, or policy or State law.

3. UNDERSTANDINGS OF THE PARTIES:

    3.1.    The Parties agree to accept forces from other jurisdictions to perform duties in support of Make DC Safe and Beautiful. The Chief, National Guard Bureau, will coordinate the provision of resources to the Parties in furtherance of the mission. Each Governor, and the Commanding General of the DCNG, shall retain the authority to decline missions that will compromise his or her ability to respond to emergency requirements.

    3.2.    The Commanding General of the District of Columbia National Guard will

1

**ADD.166**

    DCNG_DEF_00003691

assume the lead role in coordinating the JRSOI and tasking units from a supporting State, Commonwealth, or the District of Columbia. Sending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment.

3.3.  The Parties will perform duties under 32 U.S.C. § 502(f) in accordance with all applicable laws and Department of Defense (DoD) and Military Department regulations, policies, and authorities. These duties may include law enforcement and require personnel performing them to be sworn in as law enforcement agents and may require personnel to be armed. All operations will be conducted consistently with any relevant Secretary of Defense utilization memorandum should be issued.

3.4.  Requests for forces will be handled according to the procedures specified in the applicable operations and execution orders; however, all Parties agree that validation of requirements by the National Guard Bureau is a necessary precondition to the deployment of National Guard forces and the disbursement of funds.

3.5.  All National Guard forces participating in activities supporting Make DC Safe and Beautiful will receive operational direction for tasks from the Commanding General, DCNG, comply with the DCNG Rules for the Use of Force and Rules of Conduct, and will support Arming decisions made by the Commanding General, DCNG as authorized by the Secretary of Defense.

3.6.  All National Guard members participating in Make DC Safe and Beautiful missions under Title 32, U.S.C., are performing missions in support of the Federal Government or to the benefit of the Federal Government and are federal employees within the meaning of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671- 2679.

3.7.  Other States and Territories may participate in the Agreement by adopting the terms and conditions of this MOU.

4. GENERAL PROVISIONS:

4.1. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds between the Parties, nor does it make any commitment of funds or resources.  No provision in this MOU will be interpreted to require obligation or payment of funds.

4.2. MODIFICATION OF MOU.  This MOU may only be modified by the written agreement of the Parties, duly signed by their authorized representatives.  This MOU will be reviewed as needed based on the duration of operations.

**ADD.167**

Confidential - Subject to Protective Order

4.3. DISPUTES.  Any disputes relating to this MOU will, subject to any applicable law, Executive order, or DoD issuances, be resolved by consultation between the parties.

4.4. TERMINATION OF UNDERSTANDING.  This MOU will terminate upon the completion of Operation Make D.C. Safe and Beautiful and may be terminated by either party at any time.

4.5. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

4.6. ENTIRE UNDERSTANDING.  It is expressly understood and agreed that this MOU embodies the entire understanding between the Parties regarding the MOU's subject matter, thereby superseding all prior understandings of the Parties with respect to such subject matter.

4.7. EFFECTIVE DATE.  This MOU takes effect beginning on the day after the last Party signs.

4.8. EXPIRATION DATE.  This MOU terminates upon completion of operations and redeployment of personnel back to their home State.

4.9. NO THIRD-PARTY BENEFICIARIES.  Nothing in this MOU, express or implied, is intended to give to, or will be construed to confer upon, any person not a party any remedy or claim under or by reason of this MOU and this MOU will be for the sole and exclusive benefit of the Parties.


APPROVED:


LELAND D. BLANCHARD II
Brigadier General, USA
Commanding (Interim)

JAMES O. ROBINSON
Colonel, USA
USPFO  for DC


JAMES SEWARD
Major General, USA
Adjutant General

JAMES W. DEAN
Colonel, USA
USPFO  for WV


ROBIN B. STILWELL
Major General, USA
Adjutant General

KELVIN L. BROWN
Colonel, USA
USPFO for SC

3

**ADD.168**

BOBBY M. GINN JR
Major General, USA
Adjutant General

MILTON L. GRIFFITH
Colonel, USA
USPFO for MS

THOMAS C. FRILOUX
Major General, USA
Adjutant General

DANIEL H. FRITTS
Colonel, USA
USPFO for LA

MATHEW S. WOODRUFF
Brigadier General, USA
Adjutant General

JOSEPH A. SCHWADE
Colonel, USA
USPFO for OH

WARNER A. ROSS II
Major General, USA
Adjutant General

JONATHAN T. PINKARD
Colonel, USAF
USPFO for TN

RICHARD D. WILSON
Major General, USA
Adjutant General

ALEXANDE V. McLEMORE
Colonel, USA
USPFO for GA

MARK R. MORRELL
Major General, USAF
Adjutant General

JOSEPH V. JACOBSON
Colonel, USA
USPFO for SD

DAVID K. PRITCHETT
Major General, USA
Adjutant General

RAYMOND J. BARNES
Colonel, USA
USPFO for AL

4

**ADD.169**

## MEMORANDUM OF UNDERSTANDING
BETWEEN
THE DISTRICT OF COLUMBIA NATIONAL GUARD (DCNG)
AND
THE SUPPORTING STATES, COMMONWEALTHS, AND TERRITORIES FOR OPERATION
MAKE D.C. SAFE AND BEAUTIFUL
MOU-DCNG-SSCT

This is a new memorandum of understanding (MOU) between the District of Columbia National Guard (DCNG) and the Supporting States, Commonwealths, and Territories. When referred to collectively, the DCNG and the Supporting States, Commonwealths, and Territories are referred to as the "Parties."

1. AUTHORITIES:

    1.1.    The Federal Tort Claims Act, 28 United States Code (USC) §§ 1346, 2671-2679.

    1.2.    32 U.S.C. § 502(f).

    1.3.    DC Code § 5-129.03.

    1.4.    DC Code § 5-205.

    1.5.    HQDA EXORD 290-25, District of Columbia National Guard in Support of Local Law.

2. PURPOSE: This memorandum of understanding (MOU) is executed in support of Operation Make DC Safe and Beautiful HQDA EXORD 290-25 District of Columbia National Guard in Support of Federal Law Enforcement. This MOU is executed to facilitate cooperation and unity of effort between the District of Columbia National Guard (DCNG) and the parties with respect to assisting the United States Marshall Service, United States Park Police (USPP) and Metropolitan Police Department (MPD) with national monument security, area beautification, traffic control points, and law enforcement patrols. No term or provision in this MOU shall not be interpreted in a manner that conflicts with Federal law, regulation, or policy or State law.

3. UNDERSTANDINGS OF THE PARTIES:

    3.1.  The Parties agree to accept forces from other jurisdictions to perform duties in support of Make DC Safe and Beautiful. The Chief, National Guard Bureau, will coordinate the provision of resources to the Parties in furtherance of the mission. Each Governor, and the Commanding General of the DCNG, shall retain the authority to decline missions that will compromise his or her ability to respond to emergency requirements.

    3.2.  The Commanding General of the District of Columbia National Guard will

1

**ADD.170**

assume the lead role in coordinating the JRSOI and tasking units from a supporting State, Commonwealth, or the District of Columbia. Sending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction, and the receiving State will retain tactical control providing operational direction for mission accomplishment.

3.3.  The Parties will perform duties under 32 U.S.C. § 502(f) in accordance with all applicable laws and Department of Defense (DoD) and Military Department regulations, policies, and authorities. These duties may include law enforcement and require personnel performing them to be sworn in as law enforcement agents and may require personnel to be armed. All operations will be conducted consistently with any relevant Secretary of Defense utilization memorandum should be issued.

3.4.  Requests for forces will be handled according to the procedures specified in the applicable operations and execution orders; however, all Parties agree that validation of requirements by the National Guard Bureau is a necessary precondition to the deployment of National Guard forces and the disbursement of funds.

3.5.  All National Guard forces participating in activities supporting Make DC Safe and Beautiful will receive operational direction for tasks from the Commanding General, DCNG, comply with the DCNG Rules for the Use of Force and Rules of Conduct, and will support Arming decisions made by the Commanding General, DCNG as authorized by the Secretary of Defense.

3.6.  All National Guard members participating in Make DC Safe and Beautiful missions under Title 32, U.S.C., are performing missions in support of the Federal Government or to the benefit of the Federal Government and are federal employees within the meaning of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671- 2679.

3.7.  Other States and Territories may participate in the Agreement by adopting the terms and conditions of this MOU.

4. GENERAL PROVISIONS:

4.1. FUNDS AND MANPOWER. This MOU neither documents nor provides for the exchange of funds between the Parties, nor does it make any commitment of funds or resources. No provision in this MOU will be interpreted to require obligation or payment of funds.

4.2. MODIFICATION OF MOU. This MOU may only be modified by the written agreement of the Parties, duly signed by their authorized representatives. This MOU will be reviewed as needed based on the duration of operations.

2

**ADD.171**

Confidential - Subject to Protective Order

4.3. DISPUTES. Any disputes relating to this MOU will, subject to any applicable law, Executive order, or DoD issuances, be resolved by consultation between the parties.

4.4. TERMINATION OF UNDERSTANDING. This MOU will terminate upon the completion of Operation Make D.C. Safe and Beautiful and may be terminated by either party at any time.

4.5. TRANSFERABILITY. This MOU is not transferable except with the written consent of the Parties.

4.6. ENTIRE UNDERSTANDING. It is expressly understood and agreed that this MOU embodies the entire understanding between the Parties regarding the MOU's subject matter, thereby superseding all prior understandings of the Parties with respect to such subject matter.

4.7. EFFECTIVE DATE. This MOU takes effect beginning on the day after the last Party signs.

4.8. EXPIRATION DATE. This MOU terminates upon completion of operations and redeployment of personnel back to their home State.

4.9. NO THIRD-PARTY BENEFICIARIES. Nothing in this MOU, express or implied, is intended to give to, or will be construed to confer upon, any person not a party any remedy or claim under or by reason of this MOU and this MOU will be for the sole and exclusive benefit of the Parties.

APPROVED:

LELAND D. BLANCHARD II
Brigadier General, USA
Commanding (Interim)

JAMES O. ROBINSON
Colonel, USA
USPFO for DC

JAMES SEWARD
Major General, USA
Adjutant General

JAMES W. DEAN
Colonel, USA
USPFO for WV

ROBIN B. STILWELL
Major General, USA
Adjutant General

KELVIN L. BROWN
Colonel, USA
USPFO for SC

3

**ADD.172**

Confidential - Subject to Protective Order

DCNG_DEF_00003697

BOBBY M. GINN JR
Major General, USA
Adjutant General

MILTON L. GRIFFITH
Colonel, USA
USPFO for MS

THOMAS C. FRILOUX
Major General, USA
Adjutant General

DANIEL H. FRITTS
Colonel, USA
USPFO for LA

MATHEW S. WOODRUFF
Brigadier General, USA
Adjutant General

JOSEPH A. SCHWADE
Colonel, USA
USPFO for OH

WARNER A. ROSS II
Major General, USA
Adjutant General

JONATHAN T. PINKARD
Colonel, USAF
USPFO for TN

RICHARD D. WILSON
Major General, USA
Adjutant General

ALEXANDER V. McLEMORE
Colonel, USA
USPFO for GA

MARK R. MORRELL
Major General, USAF
Adjutant General

JOSEPH V. JACOBSON
Colonel, USA
USPFO for SD

**ADD.173**

Confidential - Subject to Protective Order

DCNG_DEF_00003698