No. 25-5418

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DISTRICT OF COLUMBIA,
APPELLEE,

V.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,
APPELLANTS.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**OPPOSITION OF APPELLEE THE DISTRICT OF COLUMBIA TO
APPELLANTS' EMERGENCY MOTION FOR ADMINISTRATIVE STAY
AND FOR STAY PENDING APPEAL**

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

STACY L. ANDERSON
Senior Assistant Attorney General

SARAH CARROLL
Assistant Attorney General
Office of the Solicitor General

ALICIA M. LENDON
Chief, Civil Rights and Elder
Justice Section

PAMELA DISNEY
ANDREW MENDRALA
CHARLES SINKS
HANNAH COLE-CHU
Assistant Attorneys General
Public Advocacy Division

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

EMMA SIMSON
ELIZA H. SIMON
MITCHELL P. REICH
Senior Counsels to the Attorney General

BENJAMIN MOSKOWITZ
Assistant Deputy Attorney General
Legal Counsel Division

Office of the Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici.*—Plaintiff-appellee is the District of Columbia. Defendant-appellants are Donald J. Trump, in his official capacity as President of the United States; the United States Department of Defense; Peter B. Hegseth, in his official capacity as Secretary of Defense; the United States Army; Daniel Patrick Driscoll, in his official capacity as Secretary of the Army; the United States Department of Justice; Pamela J. Bondi, in her official capacity as United States Attorney General; the United States Marshals Service; and Gadyaces S. Seralta, in his official capacity as Director of the United States Marshals Service.

The following persons or entities noted their appearance and/or filed amicus briefs in the district court: Martin Ackerman; Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals; Law Enforcement Action Partnership; Center for Policing Equity; National Police Accountability Project; Policing Project at New York University School of Law; Washington Lawyers' Committee for Civil Rights and Urban Affairs; NAACP Legal Defense and Educational Fund, Inc.; Democracy Forward Foundation; Mia McClain; Allen Chapel AME Church; National African-American Clergy Network; Metropolitan African Methodist Episcopal Church; Christopher Zacharias; Aaron Alexander; Center for Racial Equity and Justice; New Bethel Baptist Church; Barbara Williams-Skinner; Clergy Network; Peace Baptist Church; Emory United Methodist Church;

Religious Nationalism Project; Howard University School of Law Civil Rights Clinic; Shiloh Baptist Church of Washington, D.C.; All Souls Church Unitarian; Interfaith Alliance; Sojourners/Sojo Action; Terrance McKinley; America First Legal Foundation; Mike Howell; Constitutional Accountability Center; Steady State; the States of Maryland, South Carolina, West Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas; the Commonwealth of Virginia; and Oversight Project.

As of this filing, America First Legal Foundation and Former Service Secretaries, Retired Senior Military Officers, and Vet Voice Foundation have moved to participate as amici curiae here, and the States of Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, and Utah have filed an amicus brief.

B. *Ruling under review.*—The district court ruling under review is the November 20, 2025 Memorandum Opinion (ECF No. 88) and Order (ECF No. 89) entered by U.S. District Court Judge Jia M. Cobb granting appellee's motion for a preliminary injunction and a section 705 stay, which is available at *District of Columbia v. Trump*, No. 25-CV-3005 (JMC), 2025 WL 3240331 (D.D.C. Nov. 20, 2025).

C. *Related cases*.—This case has not been before this Court previously, and undersigned counsel is unaware of any related case under Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

BACKGROUND .......................................................................................4

    A.    Legal Background. ...............................................................4

    B.    Factual Background............................................................6

    C.    Proceedings Below. ............................................................8

DISCUSSION ........................................................................................10

    I.    Defendants Are Unlikely To Succeed On The Merits. .......................10

        A.    The deployment of DCNG is unlawful.....................................10

        B.    The deployment of out-of-state troops is unlawful...................18

    II.    Defendants Have Not Established Irreparable Injury. ........................21

    III.    The District And The Public Would Suffer Serious Harm If The Injunction Were Stayed. ......................................................22

CONCLUSION ......................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## *Cases*

*Abbott v. Biden*,
    70 F.4th 817 (5th Cir. 2023) ............................................................ 4

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001)........................................................................ 12

*District of Columbia v. John R. Thompson Co.*,
    346 U.S. 100 (1953)........................................................................ 20

*Fed. Educ. Ass'n v. Trump*,
    No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sep. 25, 2025) ...................... 10, 21

*Fuld v. Pal. Liberation Org.*,
    606 U.S. 1 (2025)............................................................................ 19

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024)........................................................ 22

*In re Sealed Case*,
    551 F.3d 1047 (D.C. Cir. 2009)......................................................... 4

*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
    119 F.4th 58 (D.C. Cir. 2024).......................................................... 10

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)........................................................................ 16

*Laird v. Tatum*,
    408 U.S. 1 (1972).......................................................................... 1, 18

*Maryland v. King*,
    567 U.S. 1301 (2012)...................................................................... 22

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................ 10

*Oregon v. Trump*,
    No. 25-6268, 2025 WL 3229986 (9th Cir. Nov. 19, 2025)............................ 23

*Perpich v. Dep't of Defense,*
   496 U.S. 334 (1990) ............................................................... 4

*United States ex rel. Gillett v. Dern,*
   74 F.2d 485 (D.C. Cir. 1934) ................................................. 4

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ............................................................ 18

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ............................................................ 21

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 16 .................................................... 4

U.S. Const. art. I, § 8, cl. 17 ........................................ 1, 16, 20

## Statutes and Regulations

D.C. Code § 1-201.01 ............................................................. 6

D.C. Code § 1-201.02 ............................................................. 6

D.C. Code § 1-207.40 ................................................ 6, 12, 22

D.C. Code § 5-101.03 ..................................................... 3, 22

D.C. Code § 7-2332 ............................................................. 20

D.C. Code § 49-101 ............................................................. 5

D.C. Code § 49-102 .................................... 5, 9, 12, 13, 14, 15

D.C. Code § 49-103 ........................... 2, 5, 11, 13, 14, 15, 17

D.C. Code § 49-404 .................................................... 14, 15

D.C. Code § 49-409 ........................................................ 5, 11

D.C. Code § 49-901 ........................................................ 6, 14

5 U.S.C. § 705 ................................................................... 8

10 U.S.C. § 251 .................................................... 2, 4, 11, 20

10 U.S.C. § 252 .................................................... 2, 4, 11, 20

10 U.S.C. § 253 .................................................... 2, 4, 11, 20

10 U.S.C. § 10106 ......................................................... 4

10 U.S.C. § 12301 .................................................... 2, 17

10 U.S.C. § 12302 .................................................... 2, 18

10 U.S.C. § 12304 .................................................... 2, 17

10 U.S.C. § 12304a ....................................................... 17

10 U.S.C. § 12406 ................................................. 2, 4, 11

18 U.S.C. § 1385 ......................................................... 17

32 U.S.C. § 112 ........................................................... 4

32 U.S.C. § 113 ........................................................... 4

32 U.S.C. § 502 ....................................... 3, 4, 7, 9, 11, 16, 17, 18, 19, 21

32 U.S.C. § 902 ........................................................... 4

42 U.S.C. § 5170a .................................................... 2, 17

42 U.S.C. § 5170b .................................................... 2, 17

Ala. Code § 31-2-52(b) ................................................... 5

Kan. Stat. § 48-242 ....................................................... 5

Act of Mar. 1, 1889, ch. 328, 25 Stat. 772 (1889) .................... 5

District of Columbia Self-Government and Government Reorganization Act,
Pub. L. No. 93-198, 87 Stat. 774 (1973) ............................. 6

Emergency Management Assistance Compact, Pub. L. No. 104-321,
110 Stat. 3877 (1996)......................................................................... 20

*Legislative History*

H.R. Rep. No. 50-809 (1888).................................................................... 5

*Other*

D.C. Homeland Security & Emergency Mgmt. Agency, *District Response
Plan* (Mar. 2017)................................................................................ 17

D.C. Mayor's Office, *Mayor Bowser Participates in Fireside Chat at the
Fortune Most Powerful Women Summit* (Oct. 15, 2025) ................................... 8

*D.C. Police to Begin Patrolling with National Guard After Fatal Attack*,
Wash. Post (Nov. 28, 2025)..................................................................... 8

Frederic J. Stimson, *American Statute Law* (1886) ........................................... 4, 11

Mayor's Order 2025-090, 72 D.C. Reg. 9508 (Sep. 5, 2025) ................................ 22

*Oversight of the District of Columbia: Hearing Before H. Oversight & Gov't
Reform Comm.* (Sep. 18, 2025) ........................................................... 8, 21, 22

# GLOSSARY

DCNG   District of Columbia National Guard

OLC    Office of Legal Counsel

**INTRODUCTION**

The United States has a "traditional and strong resistance . . . to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Yet for nearly four months, more than 2,000 armed National Guard troops have been patrolling the streets of the District of Columbia, detaining and handcuffing suspects, helping to execute warrants, and otherwise enforcing the law as they see fit. Defendants do not claim that this deployment is authorized by any of the statutes expressly permitting the D.C. National Guard (DCNG) to conduct law enforcement—nor could they, because the predicates for invoking those statutes, such as a riot or insurrection, are plainly not satisfied. Instead, they claim that the President may deploy the Guard to engage in law enforcement, or any other function, whenever and wherever he wishes. Pressed below to articulate any limit on that power, Defendants identified none.

The District Court properly rejected this sweeping claim of authority. In 1889, Congress exercised its "exclusive" jurisdiction over the District of Columbia, U.S. Const. art. I, § 8, cl. 17, to enact a detailed militia code for the District. Congress modeled that statute on state militia codes of the time, and it granted the President powers akin to those of a governor with respect to a state National Guard. The D.C. militia code provides that, during a "tumult, riot, mob," or other organized violence, the President may deploy DCNG to aid the District's federal and local authorities in

1

"suppressing such violence and enforcing the laws." D.C. Code § 49-103. It also confirms that the President may call DCNG into "the service of the United States," *id.* §§ 49-104, 4-901, including to "enforce the laws" during an insurrection or other serious exigency, 10 U.S.C. §§ 251-253, 12406. And Congress has separately authorized the President to deploy DCNG to respond to natural disasters, provide emergency relief, and carry out other functions. *See* 42 U.S.C. §§ 5170a-5170b; 10 U.S.C. §§ 12301, 12302, 12304.

It is not plausible that, alongside these specific, carefully enumerated authorities, Congress gave the President a blank check to deploy DCNG however he wishes. None of the vague and ancillary provisions Defendants invoke comes close to conferring such a sweeping power. The President's designation as "Commander-in-Chief" of DCNG is simply a vesting of command; every state militia code in 1889 used the same term, and it did not permit governors to ignore other provisions setting forth the permissible uses of the Guard. The authority to deploy DCNG for "drills, inspections, parades, escort, *or other duties*" is a residual authority to carry out duties similar to the training and military functions that precede it, not fundamentally dissimilar activities like law enforcement addressed elsewhere in the code. The fact that DCNG is a "federal entity" pursuing "federal purposes" does not enable the President, any more than with any federal agency, to use DCNG in excess of the authorities Congress prescribed. And Defendants' late-breaking contention that 32

U.S.C. § 502(f) permits them to deploy DCNG without adhering to the limits in the D.C. militia code does not help them either. Defendants forfeited this argument, and section 502(f) cannot plausibly be read to grant the limitless authority they claim.

Because the present deployment of DCNG is unlawful, Defendants' remaining arguments for a stay fail, as well. Defendants do not dispute that, if the DCNG deployment is unlawful, their orders deploying out-of-state troops to support DCNG and operate under DCNG command are unlawful, too. In any event, those deployments independently exceed the President's authority to "request" state-commanded missions under section 502(f). Defendants' claim of irreparable harm simply repackages their claim on the merits; in notable contrast to other cases, Defendants do not argue the injunction would inflict any real-world harm. And the equities strongly disfavor a stay: the deployment impinges on the District's home rule, requires the diversion of scarce police resources, and exposes both the public and Guard members to substantial public safety risks, as Defendants themselves acknowledged at the outset of the deployment, and as the horrific attack on two National Guard members last week tragically underscored.

The motion for a stay should be denied.

**BACKGROUND**

**A.    Legal Background.**

1.  The National Guard is the modern "Militia" reserved to the states by the Constitution.  U.S. Const. art. I, § 8, cl. 16.  Members of a state Guard unit "must keep three hats in their closets . . . only one of which is worn at any particular time." *Perpich v. Dep't of Defense*, 496 U.S. 334, 348 (1990).  First, a National Guard unit may operate as a state militia wholly under state command.  *United States ex rel. Gillett v. Dern*, 74 F.2d 485, 487 (D.C. Cir. 1934); *Abbott v. Biden*, 70 F.4th 817, 829 (5th Cir. 2023).  Second, a state Guard unit may be called into federal service under Title 10 of the U.S. Code, rendering it a "component of the Army." *In re Sealed Case*, 551 F.3d 1047, 1050 (D.C. Cir. 2009) (quoting 10 U.S.C. § 10106).  Among other things, Title 10 permits the President or the Secretary of Defense to call the Guard into federal service to "enforce the law" during an insurrection or other serious exigency.  10 U.S.C. §§ 251-253, 12406.  Third, a Guard unit may operate in "Title 32 status," in which case it remains a state militia under state command, but may perform certain missions requested and paid for by the federal government.  *See, e.g.*, 32 U.S.C. §§ 112, 113, 502(f), 902.

Since at least 1886, every state has designated its governor "Commander-in-Chief" of its Guard and adopted a detailed militia code delineating the purposes for which the Guard may be deployed.  Frederic J. Stimson, *American Statute Law*

§§ 297-298 (1886); Add. 23-26 & n.17.[1]  Some states permit the governor to deploy the Guard only during riots and other emergencies.  *See, e.g.*, Ala. Code § 31-2-52(b).  Others specify that the governor may deploy the Guard to "preserve the peace" or "execute the laws" upon receiving a "request" from local authorities.  *See, e.g.*, Kan. Stat. § 48-242.

2.  In 1889, Congress enacted a militia code for the District.  *See* Act of Mar. 1, 1889, ch. 328, 25 Stat. 772 (codified as amended at D.C. Code §§ 49-101 *et seq.*).  That code was "patterned after" militia codes of the time.  Add. 33 (citation omitted).  Indeed, the drafters explained that this code "contain[ed] only the usual and necessary provisions that are included in the militia codes of nearly all the States."  H.R. Rep. No. 50-809, at 1-2 (1888).

The D.C. militia code designates the President as "Commander-in-Chief" of DCNG.  D.C. Code § 49-409.  It authorizes the President to deploy DCNG during a "tumult, riot, mob," or similar disturbance when the Mayor, a U.S. Marshal for the District, or the National Capital Service Director "call[s] on" the President to "aid them" in "suppressing such violence and enforcing the laws."  *Id.* § 49-103.  It also provides that the Commanding General may call out DCNG "for such drills, inspections, parades, escort, or other duties, as he may deem proper."  *Id.* § 49-102.

---

[1]  https://babel.hathitrust.org/cgi/pt?id=uiug.30112022927104&seq=123.

And it confirms that DCNG may be "ordered into the service of the United States" under Title 10. *Id.* §§ 49-104, 49-901.

3. In 1973, Congress enacted the Home Rule Act, Pub. L. No. 93-198 (codified as amended at D.C. Code §§ 1-201.01 *et seq.*), to "grant to the inhabitants of the District . . . powers of local self-government," D.C. Code § 1-201.02(a). That Act vests the Mayor with the "executive power of the District," *id.* § 1-204.22, including the responsibility to "prevent crime and arrest offenders" and "preserve the public peace," *id.* § 5-101.03(1), (2). The Act preserves the President's preexisting authority over DCNG. *Id.* § 1-206.02(b). It otherwise assigns him an exceedingly limited role in District affairs. *See id.* §§ 1-204.33, 1-204.34, 1-207.40(a).

## B. Factual Background.

In January, the U.S. Department of Justice declared that violent crime in the District was "the lowest it ha[d] been in over 30 years."[2] And in May, the President acknowledged that "crime is down in Washington, D.C.—street crime, violent crime—by 25%." Add. 104. Nonetheless, following a single well-publicized attempted carjacking, President Trump announced that his administration was "deploying the National Guard to help reestablish law, order, and public safety in Washington, D.C." Add. 105.

---

[2] https://www.justice.gov/usao-dc/pr/violent-crime-dc-hits-30-year-low.

On August 11, the Secretary of the Army deployed DCNG in Title 32 status to provide "support to law enforcement efforts in the District of Columbia." Add. 139-141. The Secretary of Defense later authorized the deployment of several out-of-state National Guard units to support this mission pursuant to 32 U.S.C. § 502(f). Add. 74. Each state entered a memorandum of understanding with DCNG stating that its forces were being deployed to "support" DCNG's operations and would be subject to DCNG's "operational direction." Add. 142-143. Defendants recently extended the deployment until February, Add. 10, and have advised servicemembers to prepare for a "long-term persistent presence" through summer 2026, DCAdd. 46.

Throughout the deployment, DCNG and state Guard personnel have engaged in law-enforcement activities. They conduct daily armed security patrols. Add. 9-10; DCAdd. 42-43, 71-74. They intervene in and break up fights. DCAdd. 38. They handcuff and detain suspects until police arrive. *Id.*; Add. 069. They assist in the execution of warrants. Add. 82; DCAdd. 38, 74. Further, the U.S. Marshals Service has deputized each National Guard member to "confer the law enforcement authority needed to perform th[eir] duties." DCAdd. 34; Add. 069. And the Department of Justice has identified these servicemembers as federal law enforcement officers in charging documents. *See, e.g.*, *United States v. Beidleman*, No. 2025 CMD 012928 (D.C. Super. Ct. filed Oct. 6, 2025).

District officials oppose this deployment. For months, the Mayor has described it as "[u]nAmerican" and not "legal," explained that it is "not working" in reducing crime, and asked the President to end it. DCAdd. 1-2; *Oversight of the District of Columbia: Hearing Before H. Oversight & Gov't Reform Comm.*, at 4:56:43-4:57:22 (Sep. 18, 2025) ("Oversight Hearing")[3]; D.C. Mayor's Office, *Mayor Bowser Participates in Fireside Chat at the Fortune Most Powerful Women Summit*, at 4:50-6:40 (Oct. 15, 2025).[4] At the same time, the District has responsibly assigned police officers to escort, coordinate with, and patrol with the Guard in light of Defendants' own concerns about servicemembers' safety. *See* DCAdd. 50, 66, 70; Add. 70; *D.C. police to begin patrolling with National Guard after fatal attack*, Wash. Post (Nov. 28, 2025).[5]

**C.  Proceedings Below**.

The District filed this suit on September 4. It then moved for a preliminary injunction and a stay under 5 U.S.C. § 705. The District Court granted expedited discovery, which revealed several documents central to this litigation. *See* Add. 139-173; DCAdd. 34-74.

---

[3]     https://oversight.house.gov/hearing/oversight-of-the-district-of-columbia.

[4]     https://tinyurl.com/3wz2d3zz.

[5]     https://www.washingtonpost.com/politics/2025/11/28/national-guard-dc-police.

On November 20, the District Court granted the District's motion for preliminary relief. The court found the District likely to succeed on its claims that the deployment of both DCNG and out-of-state National Guard forces is unlawful. Add. 2. As to DCNG, the court examined the "three sources of authority" Defendants identified and found that none permitted the current deployment. Add. 20-21. First, the court explained that the President's designation as "Commander-in-Chief" vests him with authority to command DCNG but does not establish the parameters for its use; instead, Congress set forth those parameters in other provisions. Add. 23-26. Second, the court held that section 49-102's authorization to call out DCNG "for such drills, inspections, parades, escort, or other duties, as he may deem proper," permits activities similar to the listed functions, not law enforcement activities, which the militia code separately authorizes and limits. Add. 26-28. Third, the court rejected Defendants' suggestion that the deployment is authorized by "inherent Article II powers." Add. 37-40.

As to the out-of-state forces, the court explained that Defendants cannot deploy state Guard units to support DCNG in performing activities for which DCNG itself lacks authority. Add. 48. And it held that 32 U.S.C. § 502(f) does not authorize the federal government to deploy state troops to the District without its consent. Add. 48-57.

The court also found the equities favored injunctive relief. It concluded that the deployment inflicts irreparable harm by usurping the District's home rule authority over law enforcement. Add. 57-59. By contrast, it found that the federal government has no valid interest in continuing an unlawful deployment. Add. 59-60. The court granted a 21-day administrative stay. Add. 60.

## DISCUSSION

"Stays pending appeal are a rare form of emergency relief reserved for true emergencies." *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *3 (D.C. Cir. Sep. 25, 2025). To obtain such "exceptional relief," the stay applicant "must (1) make a 'strong showing that it is likely to succeed on the merits'; (2) demonstrate that it will be 'irreparably injured' before the appeal concludes; (3) show that issuing a stay will not 'substantially injure the other parties interested in the proceeding'; and (4) establish that 'the public interest' favors a stay." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 63 (D.C. Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)) (brackets omitted). Defendants cannot satisfy any of these stringent requirements.

## I.     Defendants Are Unlikely To Succeed On The Merits.

### A.     The deployment of DCNG is unlawful.

Defendants have not invoked any statutory authority that permits the present DCNG deployment. Congress has specifically delineated the circumstances in which the President may deploy DCNG to conduct law-enforcement work. The D.C.

militia code provides that, during a "tumult, riot, mob," or other organized violence, the President may deploy DCNG to "aid" the civil authorities "in suppressing such violence and enforcing the laws." D.C. Code § 49-103. Title 10 authorizes the President to call DCNG into federal service to "enforce the laws" during an insurrection or other serious exigency. 10 U.S.C. §§ 251-253, 12406. But Defendants invoked none of these statutory authorities to justify the DCNG deployment—nor could they, because their prerequisites plainly are not met.

Below, Defendants advanced three alternative legal bases for the deployment. Add. 20, 40. The District Court properly rejected those arguments, as each would defy the statutory text and swallow Congress's enumeration of specific authorities. And Defendants' new argument on appeal—that 32 U.S.C. § 502(f) authorizes the deployment of DCNG—is both forfeited and meritless.

1. Defendants' principal contention (Mot. 12-13) is that the President may deploy DCNG for any purpose he wishes because he is its "Commander-in-Chief." D.C. Code §§ 49-409. As the District Court explained, this argument is irreconcilable with the established public meaning of the term "Commander-in-Chief" at the time of the statute's enactment. Add. 23-26. In 1889, as now, every state designated its governor as "Commander-in-Chief" of its National Guard. Stimson, *supra*, § 297. At the same time, states separately delineated—typically at great length—the specific purposes for which the governor could deploy the Guard.

*Id.* §§ 298-299; *see* Add. 23-26 & n.17 (surveying provisions). Those detailed enumerations would be meaningless if the "Commander-in-Chief" designation included the power to deploy the Guard for any purpose. Congress modeled the D.C. militia code on these statutes, *see supra* p. 5, and provided a similarly detailed enumeration of duties. The term "Commander-in-Chief" should not be construed in a way vastly broader than comparable enactments, particularly given that such a reading would allow the President to exceed the limited role Congress assigned him in District affairs, *see, e.g.*, D.C. Code § 1-207.40(a), and swallow the limits in the D.C. militia code itself.

2. Defendants also argue (Mot. 14-15) that D.C. Code § 49-102 confers authority to use DCNG for any purpose the President wishes, including law enforcement. As the District Court explained, that reading is not plausible. Add. 23-37. Section 49-102 authorizes the Commanding General to call out DCNG "for such drills, inspections, parades, escort, or other duties, as he may deem proper," and permits the commander of any regiment to "assemble his command . . . in the evening for drill, instruction, or other business, as he may deem expedient." *Id.* Under ordinary principles of statutory construction, the phrases "other duties" and "other business" should be construed to confer powers "similar" to those in the preceding lists. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001). Every item in both lists concerns training or military exercises. Add. 26-27. It

follows that "other duties" and "other business" refer to similarly limited functions. They do not allow the President to use DCNG for law enforcement, which is entirely unlike the listed functions and which Congress authorized and carefully limited elsewhere in the statute. Add. 31.

Numerous textual clues reinforce this reading. The title of section 49-102 is "Prescribing drills." Every other clause concerns "drills" and "parades." D.C. Code § 49-102. And the final clause specifies that "no parade shall be performed . . . without the permission of the Commanding General." *Id.* Had Congress understood the residual clauses in section 49-102 to confer power to deploy DCNG for any purpose—including law enforcement—it surely would not have specified that the Commanding General's permission was required only for "parade[s]."

Defendants' reading would also render section 49-103 superfluous. Add. 31-37. That provision specifically authorizes the President to deploy DCNG to "aid" the civil authorities in "enforcing the laws" if certain conditions are satisfied. D.C. Code § 49-103. Defendants' reading of section 49-102 would enable the President to ignore those conditions and leave section 49-103 with no meaningful work to do. Defendants suggest (Mot. 15) that, under their reading, section 49-103 would still serve to clarify that the Mayor or the U.S. Marshal may request the President's aid. But Congress did not need to grant such permission and it did not plausibly enact this detailed provision for such a trivial purpose.

Furthermore, Defendants have not identified any militia code in 1889 that conferred law-enforcement authority in the obscure way they propose. When Congress enacted the D.C. militia code, states authorized their militias to engage in law enforcement either by forthrightly stating that they could "execute the laws," or by enacting a more limited "aid to civil authorities" provision like section 49-103. *See* Add. 33-34. Congress chose the latter model in the D.C. militia code. Section 49-102, by contrast, closely tracks contemporaneous provisions that conferred ancillary authority to conduct training and similar activities. *See* Add. 24-25 & n.16.

Section 49-404 (Mot. 14) does not help Defendants either. Add. 32-33. This provision is a limit, not a source of additional power: it states that "[t]he enrolled militia shall not be subject to any duty except when called into the service of the United States, or to aid the civil authorities in the execution of the laws or the suppression of riots." D.C. Code § 49-404. The latter clause plainly refers to the authority granted by section 49-103. It uses almost precisely the same words as section 49-103. And section 49-103 imposes several conditions before the President may deploy personnel to render such "aid"; Congress would not have spelled out those detailed criteria in section 49-103 only to negate them in section 49-404.[6]

_____

[6] Similarly, section 49-901 sets pay for DCNG personnel when they are "ordered to duty in case of riot, tumult, breach of the peace, or whenever called in aid of civil authorities." D.C. Code § 49-901. The first three items in this list are

Indeed, to the extent that DCNG is the "enrolled militia" referenced in section 49-404 at all—a questionable proposition, *compare id.* § 49-401, *with id.* § 49-406—this provision refutes Defendants' claim to unenumerated powers by stating that the enrolled militia "shall not be subject to any duty" except for those specifically listed.

Defendants' appeal to executive-branch interpretations and post-enactment practice (Mot. 11, 14-15) is unavailing. There is no record of any President invoking section 49-102 to deploy DCNG for law-enforcement purposes. Add. 35-37. As recently as 2020, the Trump Administration arranged to have the U.S. Marshal request DCNG's aid under section 49-103—a wholly unnecessary effort if section 49-102 conferred such authority. Add. 36-37. Indeed, in 1963, OLC cautioned against relying on an expansive interpretation of section 49-102, explaining that courts could construe "the term 'other duties' . . . *in pari materia* with the other terms used in that section which relate primarily to drill- and training-type activities." Add. 30 (citation modified).

3. Defendants also claim (Mot. 12-13) that the President does not need express statutory authority to deploy DCNG because it is a "federal entity" and he

___

expressly drawn from section 49-103. And the residual clause is most naturally read to refer not to some independent authority to aid the civil authorities outside of section 49-103, *contra* Mot. 14, but to the residual language in section 49-103 itself. *See* D.C. Code § 49-103 (authorizing DCNG to "aid" civil authorities during a "tumult, riot, mob, *or a body of men acting together by force with attempt to commit a felony or to offer violence to persons or property, or by force or violence to break and resist the laws*" (emphasis added)).

seeks to enforce "federal law" and promote "federal interests." Defendants offer no authority for this sweeping theory, and it cannot be correct. All federal entities implement federal law and promote federal interests, yet such entities "ha[ve] no power to act . . . unless and until Congress confers power upon [them]." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). That is especially true in the District, where any authority must be conferred by Congress, whose jurisdiction over the District is "exclusive." U.S. Const. art. I, § 8, cl. 17. To the extent Defendants are gesturing toward some inherent Article II power, the District Court comprehensively explained why any such power would not support the deployment here. Add. 37-40.

4. Finally, Defendants argue for the first time on appeal (Mot. 13) that 32 U.S.C. § 502(f)(2)(A) authorizes the DCNG deployment. Defendants never made this argument below, so it is forfeited. Add. 20, 40 (identifying the "three sources of authority" Defendants invoked). It is also wrong. Section 502(f)(2)(A) merely allows "the President or Secretary of Defense" to "request" that state National Guard units conduct federally funded operations and missions. 32 U.S.C. § 502(f)(2)(A). As Defendants appear to concede, state National Guards may not grant those requests if their governing laws bar the requested deployment. *See* Mot. 16-17. By the same token, DCNG may not grant the President's request under Section 502(f) in violation of the D.C. militia code. Further, it is exceptionally unlikely that section

502(f)(2)(A) would have *sub silentio* authorized the President to deploy DCNG for any purpose, given the provision's text, structure, and history. *See infra* Part I.B.

5. The District Court's interpretation does not have the "implausibl[e]" policy consequences (Mot. 12) Defendants claim. Defendants retain full authority to deploy DCNG to respond to disasters or emergencies under the Stafford Act and Title 10. *See* 42 U.S.C. §§ 5170a–5170b; 10 U.S.C. §§ 12304, 12304a; D.C. Homeland Security & Emergency Mgmt. Agency, *District Response Plan* 24-26 (Mar. 2017) (describing prior DCNG deployments under the Stafford Act).[7] Defendants may also deploy DCNG to engage in law enforcement when the conditions in section 49-103 or Title 10 are satisfied—authorities that do not depend (*contra* Mot. 15-16) on "the Mayor's consent." *See* Add. 35-36 & n.24. And Defendants may call DCNG into federal service to perform any of the other functions the U.S. military may lawfully perform. *See* 10 U.S.C. §§ 12301(b), 12302, 12304.

It is Defendants' interpretation, rather, that would have intolerable consequences. It would grant the President command of a domestic military force that could be deployed to enforce the laws—or engage in any other activity— whenever and wherever he wished, free of the strictures (in Defendants' view) of both the Posse Comitatus Act, 18 U.S.C. § 1385, and the limits that every other

---

[7] https://hsema.dc.gov/sites/default/files/dc/sites/hsema/page_content/ attachments/District%20Response%20Plan.pdf.

Guard's "Commander-in-Chief" must obey. Nothing suggests that Congress sought to depart so dramatically from our Nation's historic resistance to "any military intrusion into civilian affairs." *Laird*, 408 U.S. at 15. And Defendants' labored effort to breathe such limitless authority into vague and ancillary provisions confirms that the District Court properly found their arguments without merit. *See West Virginia v. EPA*, 597 U.S. 697, 724-725 (2022).

## B. The deployment of out-of-state troops is unlawful.

1. Defendants do not dispute that if the deployment of DCNG is unlawful, the deployment of out-of-state troops is unlawful, as well. *See* Mot. 17. For good reason: state forces have been deployed to "support" DCNG's law-enforcement mission under its "operational direction." Add. 142-143. Because the DCNG deployment is unlawful, Defendants cannot lawfully deploy out-of-state troops to support DCNG's deployment under DCNG command. Add. 48-50. That alone defeats Defendants' request for a stay of this portion of the injunction.

2. The deployment of out-of-state forces is independently unlawful because section 502(f)(2)(A) does not authorize it. Add. 41-56. As noted, that section simply allows the President to "request" services authorized elsewhere, either by state or federal law, and permits the use of Title 32 funding for those missions. 32 U.S.C. § 502(f)(2)(A). It is not (*contra* Mot. 10-11) an independent source of unlimited

presidential authority that permits the President to authorize troops to police another jurisdiction without its consent.

Numerous textual indicia confirm that straightforward reading. Section 502 is located in a chapter on "Training," is titled "Required drills and field exercises," and generally details the frequency with which units must train. 32 U.S.C. § 502(a)-(e). The last subsection, labeled (f), provides that troops may be "ordered to perform training or other duty in addition to that prescribed under subsection (a)," and that such training or other duty may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." *Id*. § 502(f)(1), (2)(A). A battery of interpretive canons—the title canon, *noscitur a sociis*, *ejusdem generis*—dictate that the residual term "other duty" should be construed to convey an ancillary authority analogous to "drills" or "training," not a substantial and independent power unlike anything in the surrounding statute.

The Constitution and multiple other statutes confirm that section 502(f)(2)(A) does not grant limitless authority to deploy forces into another jurisdiction without its consent. Under the Constitution, a state may not exert its sovereign will in another jurisdiction—let alone deploy military forces into that jurisdiction—without consent. *See, e.g.*, *Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 14 (2025) ("State sovereign authority is bounded by the States' respective borders."). That principle applies with particular force to the District, which the Framers placed in Congress's

"exclusive" jurisdiction, U.S. Const. art. I, § 8, cl. 17, precisely to "eliminate any possibility" that its powers would be "concurrent with that of the . . . states." *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109-110 (1953).

Further, the Emergency Management Assistance Compact, which all fifty states and the District executed and Congress ratified, provides that "states"—which the Compact defines to include "the District of Columbia"—may deploy National Guard units into another state "by mutual agreement." Pub. L. No. 104-321, § 1, art. I (1996). As Defendants' own National Guard Bureau has explained (*contra* Mot. 18), the Mayor is the sole person authorized to agree to out-of-state National Guard assistance under this Compact. Off. of the Gen. Counsel, Nat'l Guard Bureau, Dep't of Defense, Domestic Operations Law and Policy 75 (3d ed. 2024); *see* D.C. Code § 7-2332.

Finally, Title 10 imposes "strong restraints" on the President's authority to deploy National Guard forces from one jurisdiction into another over the receiving jurisdiction's objection. Add. 54; *see* 10 U.S.C. §§ 251-253. Defendants' reading— under which the President may deploy troops into a jurisdiction with "no[] . . . limits" other than a deploying governor's consent, Mot. 10—would gut those restraints, giving the President *carte blanche* to deploy troops into an unwilling jurisdiction under the "operational direction" of the federal government. Add. 143. It is implausible that Congress altered the "fundamental details" of the Title 10 and

Title 32 schemes and vastly augmented presidential authority in this manner through the "vague terms" of Section 502(f)(2)(A). *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

## II. Defendants Have Not Established Irreparable Injury.

Defendants "ha[ve] not made a meaningful attempt" to demonstrate that they will suffer irreparable injury absent a stay. *Fed. Educ. Ass'n*, 2025 WL 2738626, at *1. They summarily assert (Mot. 21) that the injunction interferes with the President's authority as Commander-in-Chief of DCNG and "second-guesses the President's judgments." That simply repackages Defendants' claims on the merits, which fail for the reasons discussed above.

Defendants' feeble showing of harm is particularly notable compared to their other recent motions to stay injunctions against National Guard deployments. In each of those cases, Defendants vociferously argued that the injunctions threatened public safety. *See* Stay Appl. 35-38, *Trump v. Illinois*, No. 25A443 (U.S. Oct. 17, 2025); Stay Mot. 22, *Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 5, 2025); Stay Mot. 20-21, *Newsom v. Trump*, No. 25-3727 (9th Cir. June 12, 2025). Although those contentions lacked merit, Defendants do not even attempt to argue that ending the National Guard deployment in the District poses such real-world harm. And the injunction would not affect the surge of federal *civilian* law enforcement that the Mayor has actually credited (*contra* Mot. 8, 20) with reducing crime. *Oversight*

*Hearing* at 4:56:43-4:57:17; Mayor's Order 2025-090, 72 D.C. Reg. 9508, §§ I.E, II (Sep. 5, 2025).

## III. The District And The Public Would Suffer Serious Harm If The Injunction Were Stayed.

The remaining equitable factors also weigh against a stay. Defendants have severely intruded on the District's home rule by assuming local law-enforcement functions that (with narrow exceptions) Congress vested exclusively in the District government. Add. 57-59; *see* D.C. Code §§ 5-101.03, 1-207.40. That Defendants have encroached on powers conferred by statute rather than the Constitution (Mot. 19) does not negate that injury. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Indeed, Defendants' own claimed injury (Mot. 21) is purely statutory.

The deployment also poses "concrete harm to the District's law enforcement and public safety interests." *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (citation modified). Defendants have acknowledged since the outset of the deployment that it exposes the public and the Guard itself to threats of targeted violence. DCAdd. 50, 66, 70. To minimize those threats, the District has been forced to deploy scarce police resources to coordinate with and escort the Guard, DCAdd. 70; Add. 70—efforts it has redoubled in light of last week's heinous attack on two servicemembers, *see supra* p. 8.

Finally, the public has a strong interest in ensuring that the Guard is only deployed lawfully. Add. 59-60. The Guard's experienced personnel should be available to perform the critical functions that Congress assigned them. And the Nation has an enduring interest in preserving the lawful separation of military and civilian power.

## CONCLUSION

The motion for a stay pending appeal should be denied.[8]

---

[8] Given Defendants' low likelihood of success and minimal showing of harm, their request for an indefinite administrative stay should also be denied. To minimize disruption, the District does not oppose a partial administrative stay allowing troops to remain in the District in Title 32 status pending resolution of this appeal but not conduct presence patrols, temporary detentions, or other law-enforcement activities. *Cf. Oregon v. Trump*, 2025 WL 3229986, at *1 (9th Cir. Nov. 19, 2025).

Respectfully submitted,

CAROLINE S. VAN ZILE
Solicitor General

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

ASHWIN P. PHATAK
Principal Deputy Solicitor General

EMMA SIMSON
ELIZA H. SIMON
Senior Counsels to the Attorney General

STACY L. ANDERSON
Senior Assistant Attorney General

/s/ Mitchell P. Reich
MITCHELL P. REICH
Senior Counsel to the Attorney General
Bar Number 1044671

SARAH CARROLL
Assistant Attorney General
Office of the Solicitor General

ALICIA M. LENDON
Chief, Civil Rights and Elder
Justice Section

BENJAMIN MOSKOWITZ
Assistant Deputy Attorney General
Legal Counsel Division

PAMELA DISNEY
ANDREW MENDRALA
CHARLES SINKS
HANNAH COLE-CHU
Assistant Attorneys General
Public Advocacy Division

Office of the Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

December 2025

**CERTIFICATE OF COMPLIANCE**

I certify that this opposition complies with the type-volume limitation in Federal Rule of Appellate Procedure 27(d)(1) because the opposition contains 5,173 words, excluding exempted parts. This opposition complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Mitchell P. Reich
MITCHELL P. REICH

# ADDENDUM

Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction and Section 705 Stay [ECF No. 3-2 (Sep. 9, 2025)]

Exhibit A:  Declaration of Willie Haynes

Exhibit 35 [ECF No. 3-2]................................................................. 1

Exhibit 37 [ECF No. 3-2]................................................................. 2

Exhibit B: Declaration of Lt. General Jeffrey S. Buchanan, (Retired) [ECF No. 3-3] ......................................................................................... 3

Exhibit C:  Declaration of Reneé Hall [ECF No. 3-4]....................................... 15

Exhibit D:  Declaration of Paul Schwalb [ECF No. 3-5] ................................... 31

Supplemental Brief in Support of Plaintiff's Motion for a Preliminary Injunction and Section 705 Stay [ECF No. 70 (Oct. 17, 2025)]

Exhibit 1 [ECF No. 70-1].................................................................... 34

Exhibit 2 [ECF No. 70-1].................................................................... 37

Exhibit 16 [ECF No. 70-1].................................................................. 39

Exhibit 19 [ECF No. 70-1].................................................................. 45

Notice of Filing of Unsealed Exhibits [ECF No. 83 (Oct. 31, 2025)]

Plaintiff's Exhibit 23 [ECF No. 83-1] ................................................... 47

Plaintiff's Exhibit 42 [ECF No. 83-1] ................................................... 64

Plaintiff's Exhibit 43 [ECF No. 83-1] ................................................... 70

Notice of Filing of Unsealed Exhibits [ECF No. 90 (Nov. 20, 2025)]

Plaintiff's Exhibit 9 [ECF No. 90-1] .................................................... 71

Plaintiff's Exhibit 10 [ECF No. 90-1] .................................................. 72

Plaintiff's Exhibit 27 [ECF No. 90-1] .................................................. 73

Plaintiff's Exhibit 31 [ECF No. 90-1] .................................................. 74

9/6/25, 10:54 AM
Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 204 of 274
Muriel Bowser on X: "American soldiers and airmen policing American citizens on American soil is #UnAmerican." / X



← Post

**Muriel Bowser**
@MurielBowser

American soldiers and airmen policing American citizens on American soil is #UnAmerican.

9:31 PM · Aug 16, 2025 · **334.8K** Views

💬 1.1K    ⇄ 949    ♡ 2.7K    🔖 47    ⬆

💬 Read 1.1K replies

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

Retry

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ··· © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

DCAdd. 001



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>    Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, *et al*.,<br><br>    Defendants. | Case No.: 1:25-cv-03005 (JMC)<br><br>Judge Jia M. Cobb |

### DECLARATION OF LIEUTENANT GENERAL JEFFREY S. BUCHANAN, (RETIRED)

I, Lieutenant General Jeffrey S. Buchanan, (Retired), pursuant to 28 U.S.C. § 1746, declare that the following facts are true and correct to the best of my knowledge, based on my experience described herein:

1.      I am a retired Lieutenant General of the United States Army with extensive experience commanding active component and National Guard troops.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

3.      As a Lieutenant General of the United States Army, I commanded U.S. Army North (Fifth Army). U.S Army North conducts Multi-Domain Operations in support of U.S. Northern Command in order to detect, deter and defeat threats to the Homeland and conducts defense support of civil authorities and theater security cooperation initiatives to defend the United States and its interests.

1

DCAdd. 003

4.     I was commissioned as a Lieutenant in the Infantry in May 1982 after graduating from the University of Arizona with a Bachelor of Science in Wildlife Ecology. I hold a Master of Arts in Leadership Development from the United States Military Academy.

5.     My duty assignments in the United States Army included command and staff positions within the 82nd Airborne Division, 25th Infantry Division, 101st Airborne Division, and 10th Mountain Division. I served as a Company and Battalion Tactical Officer at the U.S. Military Academy, the Director for Operations (J3) of Joint Task Force Full Accounting, and the Senior Light Infantry Task Force Trainer at the National Training Center.

6.     I served four combat tours in Iraq and one tour in Afghanistan.

7.     I have extensive experience commanding Soldiers in domestic missions. For example, I led the military response in support of FEMA for five major hurricanes (Matthew, Harvey, Irma, Maria, and Florence). I also led more than 6,000 Soldiers and Marines supporting the Department of Homeland Security for security of the southwest border of the United States. Furthermore, I served as commanding general U.S. Army Military District of Washington/Joint Force Headquarters-National Capitol Region from 2013–2015. In that role I led military forces in support of a number of law enforcement agencies, including direct support of the U.S. Capitol Police during National Special Security Events, such as the annual State of the Union Address.

8.     Many of the Soldiers under my command, both abroad and within the United States, were members of the National Guard.

9.     After a 37-year career in the Army, I retired from active duty in September 2019. In my retirement, I serve as a volunteer deputy (and ranch liaison) at the Santa Cruz County Sheriff's Office in Arizona. To serve in this position, I completed over 100 hours of hands-on and classroom training, including firearms and taser qualifications, drug identification, public

assistance, community policing, securing a crime scene, liability, preserving evidence, and more. I also completed more than 100 hours of ride-along (FTO) training with sworn officers before patrolling the remote areas of the county on my own.

10.    I have been asked by the Office of the Attorney General for the District of Columbia to provide expert testimony regarding the deployment of the District of Columbia National Guard and National Guard units from other states to the District and the use of the National Guard troops for domestic law enforcement.

## OPINIONS

### I.    Federalized National Guard members are generally not authorized to engage in domestic law enforcement tasks.

11.    Before members of the National Guard can serve a mission, they must be activated. Typically, there are three active statuses for National Guard forces.

12.    First, the National Guard could be activated by the State or Commonwealth in which the National Guard unit is based. This is commonly referred to as "State Active Duty." The governor of the State or Commonwealth activates the guard unit, often in response to an emergency or in anticipation of a particular need. When the members of the National Guard serve in this capacity, they fall under the governor's chain of command. The costs of using the National Guard in State Active Duty are borne by the State or Commonwealth.

13.    Second, the National Guard could be activated pursuant to Title 32 of the United States Code. Under Title 32, the governor of a State or Commonwealth makes a request for the federal government to bring troops into active duty for a particular mission. Under this authority, the troops fall under the command of the governor, but the costs of using the National Guard are borne by the federal government.

DCAdd. 005

14. Third, the National Guard could be activated pursuant to Title 10 of the United States Code. Under Title 10, the National Guard is considered federal military, subject to the command of the U.S. President. National Guard serving under Title 10 are commonly called "federalized" National Guard troops.

15. The District of Columbia National Guard (DCNG) is unique because the President of the United States is at all times the Commander in Chief of the DCNG. Based on my experience and understanding, the President has delegated command of the DCNG to the Secretary of Defense, who has further delegated command to the Secretary of the Army.

18. In my experience commanding troops serving in post-hurricane emergency response missions, I have also developed extensive understanding of the authority governing out-of-state National Guard troops serving in another State.

19. Under the Emergency Management Assistance Compact (EMAC), States and Commonwealths can share resources from all disciplines, including members of the National Guard.

20. Unless activated under Title 10 (federalized), when National Guard troops from one State serve in another State, they are generally subject to the operational control of the supported State.

21. EMAC provides that States may use other States' National Guard forces pursuant to either EMAC itself or "by mutual agreement between states." I am not familiar with any scenario in which members of the National Guard from one State (in a State Active Duty or Title 32 status) were sent to support a mission in another State without coordination with or request from the supported State.

22.     Except for the District, the governors of the States executed EMAC to receive the authority to issue a request for assistance from another State. While the President of the United States is the Commander in Chief of the DCNG, it is the Mayor of the District, to my knowledge, that executed EMAC and can request assistance for the District.

23.     Further, based on my experience and understanding, when troops from other States serve in the District, they become subject to the operational control of the DCNG and fall under the same command and control of the Secretary of the Army through to the President of the United States.

24.     Regarding the current deployment of out-of-state troops in the District, the DCNG reports that all Guardsmen deployed in the District are supporting the Joint Task Force-District of Columbia. My understanding is that the Joint Task Force-District of Columbia is an element of the DCNG.

25.     While National Guard troops serving under State Active Duty or under Title 32 may engage in domestic law enforcement tasks (subject to restrictions under state law), federalized National Guard troops may not engage in domestic law enforcement activities, subject to specific exceptions.

26.     By domestic law enforcement activity, I mean the day-to-tasks police officers perform. The tasks include, but are not limited to, patrolling neighborhoods, conducting traffic stops, interviewing witnesses, performing security functions, arresting, apprehending, or detaining individuals, issuing citations, executing search warrants, and conducting criminal investigations.

27.     These domestic law enforcement tasks are distinct from the tasks of infantry Soldiers, which include attacking enemy positions, conducting raids, capturing prisoners, and seizing and defending key terrain. Though there are many different occupational specialties in the

5

military (such as infantry, engineers, artillery, and aviation), only military police (or security police in the Air Force) are trained in law enforcement tasks.

28.    While in command of military forces serving in support of civilian law enforcement agencies, I relied on instruction from the Department of Defense regarding what tasks such forces could or could not perform. The most recent version of such instruction is Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies 3025.21 (Feb. 27, 2013) (Incorporating Change 1, Eff. Feb. 8, 2019). That guidance document provides that federal troops may not perform direct civilian law enforcement assistance tasks, including: "A search or seizure . . . An arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity . . . Using force or physical violence, brandishing a weapon, discharging or using a weapon [except in self-defense or defense of others] . . . Evidence collection; security functions; crowd and traffic control; and operating, manning, or staffing checkpoints . . . Surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators." DODI 3025.21, Enclosure 3 ¶ 1.c.(1). I commanded my troops in accord with the principles described in DODI 3025.21.

29.    As of September 8, 2025, the official website for the Joint Task Force-DC (https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/) includes a description of the "Duties and Tasks" undertaken by the approximately 2,330 Guardsmen activated in the District. According to this site, the Guardsmen are "directly support[ing] specific federal and civil partners needs, such as *presence patrols*, *crowd control*, and helping *prevent and deter crime* in the District." The site also states that the Guardsmen are patrolling and supporting the Metropolitan Police Department in high-traffic areas and assisting

U.S. Park Police with *traffic control*.  These are all law enforcement activities that federal military units  would be prohibited from performing.

30.     In the District, it is particularly concerning to learn that the United States Marshals Service has deputized National Guard troops as Special Deputy U.S. Marshals. Special USMS Deputies have Title 18 authority to perform law enforcement functions, including executing arrest warrants and search warrants, or making arrests without warrants. These are law enforcement activities.

**II.     For federal troops to support local law enforcement, extensive coordination and training are necessary.**

31.     I have extensive experience commanding troops who have served in a supporting role to law enforcement. For example, I have commanded troops who supported U.S. Capitol Police for major events such as the annual State of the Union address. I have also commanded troops who supported the United States Customs and Border Protection at the southwest border of the United States in 2018 and 2019. In both contexts, the troops I commanded did not engage in domestic law enforcement tasks. They did not perform any of the tasks listed in DODI 3025.21, Enclosure 3 ¶ 1.c.(1). Instead, the troops were engaged in well-defined, discrete military tasks.

32.     Extensive coordination is required for the effective use of active-duty military troops to support local law enforcement. For example, for active-duty military to support U.S. Capitol police to secure the State of the Union address, the military and local law enforcement cooperate at every level. This cooperation includes meetings, rehearsals, and information sharing. The coordination process begins more than six months before the event. Without such coordination, activity duty military would not be able to effectively support local law enforcement.

33.     Similarly, extensive training is required for the effective use of active-duty military troops to support law enforcement. When I commanded active-duty troops who supported federal

law enforcement at the southwest border, those troops received specific scenario-based training based on the specific tasks that were required of them at the border. Without such training, activity duty military would not be able to effectively support law enforcement.

## III. U.S. military troops, including members of the National Guard, do not receive the training necessary to engage in domestic law enforcement.

34.    I have had the unique experience of serving as both a member of the military and as a local law enforcement officer.

35.    For me to effectively serve in local law enforcement, I required extensive training regarding skills that I did not need in the military.

36.    First, I needed to learn de-escalation techniques. Infantry members are trained to effectively destroy enemies in combat scenarios. As a result, they do not learn how to take the temperature out of a confrontation. This skill, however, is part of daily life as a local law enforcement officer.

37.    Second, I needed to learn how to make a traffic stop. As a member of the military, I was never trained in making traffic stops, nor was such training necessary to effectively serve. I learned how to manage the many risks involved in making traffic stops, as well as the extensive regulations governing such interactions. None of this was part of my military training.

38.    Third, I needed to learn how to effectively clear a room or a structure. While military members learn to clear rooms, the task is completely different in a domestic civilian context.

39.    Fourth, I needed to learn how to use nonlethal force. Law enforcement officers often carry a taser and/or pepper spray and must be trained on the use of such tools. Both tasers and pepper spray are used by law enforcement as part of a graduated response. Both are intended to incapacitate a subject without having to resort to lethal force such as a firearm. With the

DCAdd. 010

exception of military police, members of the military do not carry tasers nor pepper spray, nor do they receive training regarding those tools.

40.    Fifth, I needed to learn the rules governing the use of force in a domestic scenario. Law enforcement officers are subject to local policies, state law, and federal law governing when the use of force is appropriate against a civilian. None of these policies or laws apply to military officers in combat. As a result, members of the military are not trained on such policies. When I commanded military forces on the Southwest border in 2018 and 2019, I mandated extensive scenario-based training so that our troops (mostly Soldiers and Marines) could apply the Rules for Use of Force (RUF) without consulting a card or asking the opinion of a lawyer. Those rules are intended to enable military forces to accomplish their mission in a domestic context, and protect both our troops and the civilians they encounter. As a result of that training, I am confident that our troops were prepared for the challenges of operating on the southwest border. It is critical to note, however, that they were not performing any of the law enforcement tasks listed in DODI 3025.21, Enclosure 3 ¶ 1.b.(5)

41.    Sixth, I needed to learn how to properly engage in defensive tactics for close quarters combat. In the military, I was trained in the use of mixed martial arts tactics, including the use of chokeholds, to engage with enemy combatants at close range. In the law enforcement context, however, many such tactics are both prohibited and disfavored, as the goal of a close quarters confrontation is to neutralize the potential threat and apply handcuffs.

42.    Seventh, I needed to learn how to properly conduct a criminal investigation. Law enforcement officers must know how to build a case by securing a crime scene, preserving evidence, and conducting witness interviews and interrogations. Generally, members of the military are not required to perform such detective work. Absent specific training regarding the

criminal investigation process, a member of the military would be unable to successfully solve crime through investigations and prosecutions.

43.    Eighth, I needed to learn how to use discretion appropriately as a law enforcement officer. For example, if a law enforcement officer observes a car driving over 100 miles per hour, an officer must make a series of split-second decisions regarding the appropriateness of vehicle chase. The officer needs to immediately consider factors such as the ongoing risk to life created by the speeding vehicle, the probability of successfully stopping the speeding vehicle through a chase, the capabilities of the officer, and the rules and laws governing such a decision. Officers must make that decision in a matter of seconds, and they cannot do so without extensive training. While military members make countless split-second decisions, weighing the risk and rewards of certain courses of action, I have learned that the context of those decisions is drastically different in the domestic law enforcement context.

44.    Finally, and perhaps most importantly, a different mindset is necessary for local law enforcement. The mission of the infantry (which was my branch in the Army) is to close with and destroy the enemy. This tends to produce an aggressive mindset, and that mindset is what we need in our infantry troops in combat. I have learned that it is not the mindset of an effective police officer, who must always try to prevent confrontation and reduce the use of lethal force.

45.    I had to receive over a month of training to serve as a local law enforcement officer, notwithstanding my extensive experience in the military.

46.    It is my opinion that members of the military are ill-suited to engage in domestic law enforcement tasks unless they receive extensive scenario-based training on the particular tasks required by the mission.

DCAdd. 012

**IV.    The uncoordinated use of untrained U.S. military troops in American cities to engage in civilian law enforcement would result in tremendous harm.**

47.    Policing is a risky activity. It could easily result in harm to both civilians and officers if done incorrectly. Routine activities such as traffic stops, searches, or arrests could turn into tragedies if they are not conducted by trained individuals in coordination with one another. Sending troops untrained in domestic law enforcement into a city, without local coordination, creates a substantial risk that someone innocent will be hurt.

48.    Furthermore, I am gravely concerned that the use of the military for domestic law enforcement would lead to a loss of trust in the military among the American people. The Army is older than our country and for the entirety of our nation's history, the perception of most Americans is that our military is non-partisan. After all, we swear an oath to the Constitution, not a political leader or a political party. To my knowledge, in every poll conducted over the last 40 years (the entirety of my active duty time), the military has been at or near the top of all institutions that people of our country have confidence in. I am concerned about creating the perception among the American people that the military is or will be used for political means. The confidence that our citizens have in our military is based on trust.  Rebuilding trust once it has been lost is a difficult task.

*[Signature on Next Page]*

11

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on ___9 SEP 2025___ at ___PATAGONIA, AZ___

Lieutenant General Jeffrey S. Buchanan (Retired)

13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DISTRICT OF COLUMBIA,** | |
| Plaintiff, | |
| v. | Case No.: 1:25-cv-03005 (JMC) |
| **DONALD J. TRUMP,** *et al.*, | |
| Defendants. | |

## DECLARATION OF RENEÉ HALL

I, U. Reneé Hall, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct to the best of my knowledge, based on my experience described herein:

1.     My name is U. Reneé Hall. I am over the age of 18 and able to provide true and accurate testimony under oath.

2.     This declaration is based on my own personal knowledge and experience. If I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.     I earned a Bachelor of Science degree in Criminal Justice from Grambling State University, as well as two Masters of Science degrees from the University of Detroit Mercy in Security Administration and Intelligence Analysis, respectively. I am also a graduate of the FBI National Academy (Session 262) and the Major Cities Chiefs Association's Police Executive Leadership Institute. I was a 2022 Harvard Advanced Leadership Initiative Fellow and former Senior Editor of the Harvard Social Impact Review.

1

4.      In my more than twenty-year law enforcement career, I held positions at every level, culminating as the Deputy Chief of Police in Detroit, Michigan from 2014-2017, and as the Chief of Police in Dallas, Texas from 2017-2020.

**(1) Service in Detroit**

5.      I enrolled in the Police Academy in Detroit, Michigan in 1999. I served at the rank of police officer in the Detroit Police Department culminating as the Deputy Chief of Police.

6.      From 1999 through 2017, I advanced through a series of increasingly complex leadership assignments within the Detroit Police Department, acquiring the operational expertise, administrative skill, and community-focused vision that ultimately positioned me to serve as Chief of Police in Dallas. My career began with foundational service as a patrol officer, where I engaged directly with Detroit's neighborhoods, conducted dignitary protection for the mayor and international visitors, and cultivated trust through community affairs initiatives.

7.      Promoted to sergeant in 2006, I assumed supervisory responsibilities across internal affairs, patrol, and tactical operations. My work in internal affairs exemplified my dedication to accountability and integrity, as I investigated allegations of misconduct while ensuring compliance with federal consent decree mandates. Concurrently, I coordinated covert operations targeting violent offenders and narcotics activity, sharpening my command of investigative and tactical protocols. This supervisory stage marked a critical turning point in my development as a leader capable of balancing enforcement with reform and accountability.

8.      My promotion to lieutenant in 2010 expanded my responsibilities to tactical operations at a citywide scale. In this role, I directed incident command for large-scale civil disturbances, special events, and dignitary visits, overseeing logistics for major sporting events and international gatherings. My leadership during the World Series, the Detroit Grand Prix, and

2

presidential visits showcased the capacity to coordinate multi-agency operations under high-pressure conditions. The scope of these assignments required both operational precision and strategic foresight, qualities that became hallmarks of my executive leadership style.

9.    By 2013, I had advanced to the rank of inspector and then commander, taking charge of patrol operations in some of Detroit's most complex precincts, including downtown and entertainment districts. Managing multimillion-dollar budgets and supervising critical infrastructure security, I fostered intergovernmental collaborations with local, state, and federal agencies.

10.    In 2014, I was appointed Deputy Chief of Police, a role in which I oversaw more than one-third of the department, including 12 precincts, specialized divisions, and citywide initiatives. Managing a $137 million budget, I implemented crime reduction strategies that yielded year-end decreases of 20–30 percent in violent crime. I directed Operation Ceasefire, which mobilized law enforcement, clergy, and community leaders to address gang violence, and provided oversight of the department's compliance with use-of-force requirements under federal monitoring. I also spearheaded the pilot implementation of body-worn cameras, establishing policy frameworks that would later serve as national models. My collaborative initiatives, such as Community COMPSTAT and the Spirit of Service program, strengthened police-community relations by engaging residents as partners in crime reduction and cultural understanding.

11.    My experience managing budgets, overseeing specialized units, implementing federal consent decree requirements, and directing large-scale operations established me as a leader uniquely equipped to navigate the complex challenges of urban policing. By the time of my retirement from the Detroit Police Department in 2017, I had amassed nearly two decades of executive-level and operational experience, laying a robust foundation for appointment as Chief

3

of Police in Dallas, where I would continue to advance a vision of accountability, transparency, and community partnership.

**(2) Service in Dallas**

12.    In 2017, I was hired as the Chief of Police in Dallas, Texas. I was the first woman to serve in that role in Dallas.

13.    As Chief, I was the chief executive officer of the Department. In that role, I had full power and authority over the Dallas Police Department, and all functions, resources, officials, and other personnel assigned thereto. I was also responsible for the proper and efficient conduct, control, and discipline of all officers in the Department. I led 4,000 personnel and managed a $500 million budget.

14.    While I was Chief, the Dallas Police Department coordinated extensively with federal partners.

15.    As a Dallas Chief I had operational oversight, MOU authority and executive coordination with several task forces that brought together FBI, ATF, DEA, U.S. Marshals, and Homeland Security resources. These included, for example:

a.    FBI Joint Terrorism Task Force (JTTF) — Oversight of departmental participation in counterterrorism operations, intelligence sharing, and prevention strategies;

b.    FBI Violent Crimes Task Force — Coordination on serial robberies, kidnappings, and multijurisdictional violent offenders;

c.    FBI/DOJ Project Safe Neighborhoods (PSN) — Executive oversight and strategy alignment to reduce gun crime and gang violence;

d.    DEA Task Force — Coordination on large-scale narcotics investigations, including opioids, heroin, and synthetic drugs (like K2 in Dallas);

4

  e.  ATF Violent Crime and Firearms Trafficking Task Force — Collaboration on illegal firearms possession, straw purchasing, and trafficking cases;

  f.  U.S. Marshals North Texas Fugitive Task Force — Oversight of DPD officers assigned to high-risk fugitive apprehension operations;

  g.  Homeland Security Investigations (HSI) Task Force — Coordination on human trafficking, cybercrimes, and transnational organized crime; and

  h.  Secret Service Financial Crimes Task Force (where applicable) — Participation in investigations of large-scale fraud, identity theft, and counterfeiting.

  16.  I had executive oversight of all departmental participation in these task forces, ensuring that DPD's resources were aligned with federal partners while safeguarding community priorities and constitutional policing.

  17.  In my years as Chief, Dallas saw a 5.7 percent reduction in overall crime in 2017, and a 5.97 percent reduction in violent crime in 2018.

  18.  As Chief, I prioritized community engagement and outreach. I regularly connected with officers in the field and met often with Dallas community groups, professional leaders, and local organizations. I spearheaded the City of Dallas' restructuring of the Community Police Oversight Board, as well as the police department's first Youth Summer Jobs program, which allowed business leaders and community stakeholders to mentor at-risk youth through workforce development.

  19.  In moments of crisis, I also coordinated directly with the Texas National Guard to support local efforts while ensuring that community rights and constitutional freedoms remained protected. These collaborations allowed the Dallas Police Department to leverage federal resources while keeping community trust at the center of every operation.

20.     The test of leadership came most visibly in 2020 following the murder of George Floyd, when Dallas, like the rest of the nation, was gripped by civil unrest. I worked tirelessly to strike the balance between ensuring public safety and protecting the right to peaceful protest. My leadership approach focused on engagement, transparency, and restraint. We implemented command protocols that limited the use of force to only when absolutely necessary, and I personally met with community leaders, clergy, and activists to listen to concerns and to create space for dialogue. These actions helped Dallas avoid some of the more destructive outcomes seen in other major cities and positioned the Police Department as one willing to face its challenges directly while leaning into reform.

21.     My efforts in Dallas were always rooted in building trust—bridging the gap between police and community through dialogue, visibility, and accountability. From federal coordination to protest management, my experiences reinforced a principle that guided my leadership: true public safety is only possible when the community believes that their police department exists to serve them with fairness, equity, and respect.

**(3) Current Service**

22.     Currently, I serve as President of the National Organization of Black Law Enforcement Executives (NOBLE), an organization of more than 4,800 members with 60 chapters in the United States, Canada, the Caribbean, and Africa. NOBLE's mission is to ensure equity in the administration of justice in the provision of public service to all communities, and to serve as the conscience of law enforcement by being committed to justice by action.

23.     I am also currently the Executive Director of the Community Solidarity and Safety Coalition, where I work with nonpartisan leaders and government partners to address public safety challenges.

6

24.    Since retiring from the Dallas Police Department in December 2020, I have continued to advance the profession of policing through training, consultation, and leadership development. I have been invited to conduct executive-level trainings for law enforcement agencies across the country, with a focus on 21st Century Policing, organizational change management, crisis leadership, and building community trust. I have consulted with major city police departments, smaller municipal agencies, and community-based organizations seeking to strengthen their partnerships with law enforcement.

25.    In addition to direct consultation, I have participated in national conferences, panel discussions, and academic forums where I share insights on modern policing strategies, cultural competency, and police-community relations. I have also partnered with universities, leadership institutes, and professional organizations to design and deliver curriculum for current and aspiring police leaders. These engagements have allowed me to leverage my experiences in Detroit and Dallas while contributing to the next generation of law enforcement leadership.

26.    My post-retirement work has been guided by the same principles that shaped my career: a commitment to fairness, accountability, and service. Whether through training, consultation, or public speaking, I continue to advocate for reforms that build trust and ensure that public safety evolves in a way that reflects both community needs and professional standards.

## OPINIONS

### A.    Community Trust is Essential to Public Safety.

27.    My two-decade-long career in policing has taught me that public safety is built on trust, consistent enforcement, and community-based strategies.

28.    Community trust is critical to effective policing. Building trust between law enforcement and the community is a major component of the work of local law enforcement.

7

29.     Trust is built in a number of different ways: a transparent command structure, being able to identify individual officers and the law enforcement agencies they work for, systems of accountability, and carefully building community relationships.

30.     Policing is not simply about responding to crime; it is about creating an environment where residents feel both safe and respected. That foundation cannot exist without authentic trust between law enforcement and the communities we serve.

31.     Community trust is critical to effective policing. Building trust between law enforcement and the community is a major component of the work of local law enforcement, and it requires intentionality. Trust determines whether residents call the police when they need help, whether witnesses are willing to come forward, and whether neighborhoods see officers as guardians or as outsiders.

32.     Trust is built in a number of different ways. One way is through a transparent command structure. Communities need to know how decisions are made, who is accountable, and how information flows. By ensuring that our chain of command is clear and that our actions are communicated openly, we reinforce that policing is done with—not to—the community.

33.     A second way trust is built is by ensuring that residents can identify individual officers and the agencies they represent. This level of visibility is a safeguard against anonymity, which can erode accountability. When officers wear clearly marked uniforms and nameplates, and when agencies ensure consistent identification, it strengthens both responsibility and professionalism.

34.     A third method for ensuring community trust is creating systems of accountability. Oversight mechanisms, internal affairs processes, body-worn cameras, and civilian review boards all serve to ensure that misconduct is addressed transparently and fairly. Accountability is not a

8

punitive measure alone—it is also a way to build credibility by showing the community that law enforcement holds itself to the same standards of justice it enforces.

35.     Another essential way trust is built is through carefully cultivated community relationships. These are not achieved through occasional outreach but through sustained engagement. Whether by creating advisory boards, hosting neighborhood dialogues, or involving youth in summer jobs programs, community relationships signal that law enforcement is invested in the success and well-being of residents beyond the moment of crisis.

36.     In my experience as Chief in Dallas, one salient example came during the protests of 2020. In the midst of national tension, I met directly with clergy, activists, and community leaders. By listening before acting, by explaining command decisions in real time, and by maintaining open channels of communication, we were able to reduce the temperature of the moment and preserve space for peaceful demonstration. That experience reinforced what I had learned throughout my career: when law enforcement embraces transparency, accountability, and genuine relationship-building, it not only strengthens trust but also enhances public safety in ways enforcement alone never could.

**B.     Law Enforcement Officers, Including in the District of Columbia, Receive Extensive Policing Training.**

37.     In my experience in Detroit and Dallas, along with what I have observed in other police departments nationwide, typical training for new recruit police officers, such as those entering service with MPD, includes training on the law relevant to policing. This would typically include law interpreting the Fourth Amendment and standards for lawful stops and arrests; the proper use of force; and the chain of custody and preservation of evidence.

38.     I have reviewed MPD training materials that are publicly available.

9

39.    According to these materials, prior to being assigned to police the District, new MPD recruit officers receive approximately 37 weeks of police academy training to prepare them for policing in the District, which includes a full program of classroom, scenario, physical, and tactical training.

40.    This is consistent with the training that officers receive in both the Detroit and Dallas police departments, and it is consistent with my knowledge of other police departments' training procedures across the country.

41.    Based on my review of publicly available training materials, MPD police academy training includes training on District case law interpreting the Fourth Amendment and the standards for lawful stops and arrests. A true and correct copy of the MPD Academy Curriculum Block 4.1 on the Introduction to Criminal Law is attached hereto as Exhibit A.

42.    MPD's police academy training also includes training on the appropriate use of force. A true and correct copy of the MPD Academy Curriculum Block 5.1 on the Use of Force is attached hereto as Exhibit B. MPD's use of force training emphasizes that officers should attempt to defuse any situation by using de-escalation techniques whenever possible and that any use of force should be proportionate to the circumstances. See Ex. B at 6. This training also includes training on MPD's General Order on the Use of Force, which emphasizes that MPD officers must exercise "the utmost restraint" in using force and that "Members shall minimize the force that is used while protecting the lives of members and other persons, and continuously reassess the perceived threat in order to select the reasonable use of force response that is proportional to the threat faced by him, her, or others." A true and correct copy of MPD's General Order on the Use of Force is attached hereto as Exhibit C.

10

DCAdd. 024

43. Finally, MPD's police academy training also includes training on basic investigative techniques, report writing, chain of custody, and the preservation of evidence. A true and correct copy of the MPD Academy Curriculum Blocks 3.2 through 3.4, which cover Basic Investigative Incident Reports, Crime Scene Awareness and Management, and Property, is attached hereto as Exhibit D.

**C.     National Guard Troops Deployed to the District of Columbia Will Undermine Basic Principles of Effective Local Law Enforcement and Risk Public Safety.**

44. Based on public reporting, and my own personal observations as a resident of the greater Metro-Washington area, I understand that the President declared a "crime emergency" in the District of Columbia on or about August 11, 2025.

45. As part of that "emergency," it is my understanding that the President ordered the activation of the D.C. National Guard and deployment of National Guard units from other states to the District. Based on public reporting and public statements I have reviewed from various federal and military officials, it is my understanding that more than 2,300 National Guard troops have been deployed in the District, and been authorized to carry service weapons and engage in law enforcement activities.

46. In my experience, the presence of armed military personnel in an American city is highly unusual. Never in my 20 years as a law enforcement professional have I encountered a deployment of National Guard troops like the one in the District of Columbia right now.

47. In the context of my role as Chief of Police in Dallas, I had the responsibility of working closely with the Texas Department of Public Safety (DPS) in conjunction with the National Guard when their support was requested by the Governor and Mayor during periods of heightened civil unrest (for example, the 2020 George Floyd protests). The National Guard's

11

presence was not initiated unilaterally, but rather came as part of a coordinated, lawful invitation to assist local law enforcement in maintaining order and ensuring community safety.

48.    From the outset, we established a collaborative working relationship that respected both DPS, the Guard's military command structure, and the operational authority of the Dallas Police Department. The National Guard did not act independently; they served in a support capacity under civil authority, reinforcing perimeters, protecting infrastructure, and allowing sworn officers to focus on direct engagement with the public. Importantly, in Dallas their deployment was designed to be non-confrontational and many were unarmed or assigned strictly to static posts, ensuring that their presence communicated stability without escalating tension.

49.    This deliberate approach stands in contrast to what has unfolded in Washington, D.C., where the deployment of federal troops and militarized responses at times blurred the lines between civil law enforcement and military intervention. In Dallas, we were intentional about preserving the distinction, maintaining civilian control, and keeping community trust at the forefront. By doing so, we were able to benefit from the Guard's resources and manpower while ensuring that our policing efforts remained grounded in the principles of accountability, proportionality, and constitutional policing.

50.    In my opinion, based on years of expertise in community-law enforcement relations, the presence of armed National Guard patrols in the District of Columbia poses significant, immediate risks to public safety for three primary reasons: it undermines community trust; it creates confusion and lack of coordination; and it introduces new risks associated with lack of law enforcement training.

12

**(1)     Undermining Community Trust**

51.     The deployment of uniformed and heavily armed military, as well as armored military vehicles, risks destroying carefully-constructed community relationships that, in my experience, local police departments spend decades fostering.

52.     Even when federal law enforcement assists local law enforcement, which in my experience is much more common than a military deployment but still relatively rare, federal law enforcement is not immediately introduced into communities without extensive preparation and coordination at every level. And those federal agents typically come from field offices in or near those communities and are trained law enforcement officers.

53.     The deployment of National Guard troops in the District carries significantly greater risks to public safety.

54.     Deploying uniformed, armed National Guard troops, including more than 1,000 from outside the District who are not familiar with the District's communities, to police the District's neighborhoods risks undermining trust and confidence in law enforcement, generally.

55.     In my experience, if the community does not trust law enforcement, crimes go unreported. If crimes are unreported, communities are less safe.

56.     Additionally, the sight of armed military troops on District streets is intimidating and creates an atmosphere of fear. Americans are not accustomed to armed soldiers in full uniform and armored trucks on city streets. It indicates that residents live in a police state patrolled by an occupying force; it replicates war.

57.     In my extensive law enforcement experience—especially in senior leadership positions in major metropolitan police departments—an atmosphere of fear does not enhance public safety – it undermines it.

13

### (2)    Lack of Coordination

58.    In addition, effective local policing requires all officers conducting law enforcement activities to have a clear understanding of the command-and-control structures under which they are operating. To the extent that multiple entities or agencies are engaged in law enforcement activities in a single jurisdiction, there must be an infrastructure in place to coordinate the command and control of all law enforcement officers.

59.    Based on my experience leading the police departments in two large, urban cities, it is not possible for thousands of National Guard troops to be integrated or become familiarized with the command structure, deployments, or directives of local law enforcement in a mere matter of days or weeks.  Attempting to do so on a short timeframe in the District is highly likely to pose problems for local police officers and other law enforcement entities operating in the District.

60.    The lack of a coordinated command-and-control structure also poses problems for the residents of the District. When a proper command-and-control structure is in place, there is a structure for accountability for officers' conduct. Based on my understanding of the command-and-control structure governing the National Guard troops deployed in the District of Columbia, there does not appear to be a proper framework for accountability for troops' law enforcement activity.

61.    For example, if National Guard troops participate in searches, seizures, arrests, or detentions for crimes in the District, District residents are unlikely to know where to seek accountability for potentially unlawful activity. Moreover, any uncertainty about the lawfulness of troops' involvement in those activities would complicate the prosecution of those crimes, which undermines public safety.

14

**(3)    Lack of Training**

62.    Finally, it is my understanding that National Guard troops largely do not have experience in policing but instead have other "day jobs" that are unrelated to law enforcement.

63.    Law enforcement training is different than military training. When people act as law enforcement officers without proper training, including untrained National Guard troops, it can create several risks to the public and local governments, including potential violations of the law governing important areas of policing, such as stops, seizures, and arrests; the proper use of force; and the chain of custody and preservation of evidence. Violations of these rules can endanger the public, including by subjecting them to unlawful detentions and excessive or deadly uses of force. And it can lead to negative consequences for local governments, including by exposing them to civil liability and undermining prosecution efforts.

64.    Additionally, it is unclear whether the National Guard units conducting armed patrols have been trained on the safe handling of firearms in a densely populated, domestic urban setting, or on de-escalation techniques required to operate safely in an urban environment within the United States, creating a possibility of accidental discharge or other incident involving harm to the public.

* * *

65.    As a long-time law enforcement officer and retired Chief and Deputy Chief of Police in Dallas and Detroit, respectively, it is my professional opinion that the current deployment of National Guard troops in the District of Columbia risks significantly damaging the District's public safety efforts. Without effective coordination and training, the use of National Guard troops in law enforcement activities poses a danger to the community, as it erodes community trust in law enforcement, sows confusion, and places armed military personnel in positions for which they are ill-trained.

15

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9 day of September 2025, in Oxon Hill, MD.

U. Reneé Hall

16

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**DISTRICT OF COLUMBIA**, *et al.*,

        *Plaintiffs,*

    v.

**DONALD J. TRUMP**, *et al.*,

        *Defendants.*

**DECLARATION OF PAUL SCHWALB**

I, Paul Schwalb, declare under penalty of perjury that the following statements are true and correct:

1.      My name is Paul Schwalb. I am over the age of 18 and able to provide true and accurate testimony under oath.

2.      I give this declaration based upon my personal knowledge of the facts recited.

3.      I am the Executive Secretary-Treasurer for UNITE HERE Local 25. UNITE HERE is a labor union that represents hotel, restaurant, and casino workers in the Washington, D.C. metro region. Our union represents over 7,500 non-managerial employees working in all hotel and casino departments, including: housekeeping, public space, dining room, banquet, room service, kitchen, stewarding, bar, mini-bar, front desk, PBX, bell and door services, concierge, night auditing, laundry, valet, maintenance, night cleaning, purchasing and receiving, and storeroom. More than 40 hotels and other related businesses employ our members and are under contract to our union. This accounts for many of the major properties in the hotel industry within Washington, D.C. and its suburbs.

4.      Following the President's announcement on August 11, 2025 that he would be deploying federal law enforcement agencies and the National Guard in the District of Columbia, the hotel

and restaurant industry in Washington, D.C. has suffered profound economic effects. Since that announcement, hotels and restaurants in the District have reported declines in business.

5.      While the law enforcement surge has surely had an impact on local businesses, the effects specifically attributable to the National Guard deployments in the District are particularly profound. Our members have reported that the unfamiliar presence of armed military patrols has frightened away customers and led to a significant reduction in tourism, foot traffic, and associated revenue at restaurants and hotels throughout the District.

6.      In addition, we have heard from African American members and staff that to see armed National Guard patrols in the District has been deeply disturbing to them and has caused them to feel unsafe. For example, one staff member stated that she tells her Black teenage son to go straight home after school and minimize time outside for fear of possible harassment or other negative interactions.

7.      Moreover, hotels have seen reduced occupancy rates, and hotels have cut the number of employees on a given shift or reduced employees' overall scheduled hours. Comparing housekeeping room attendant scheduled hours during the workweek ending August 29, 2025 to the corresponding week in 2024, we observe a 3.9% reduction in workers' scheduled hours this year as compared to the corresponding period in 2024. Similarly, workers have reported reduced hours at District restaurants because of reduced customer traffic. While 2025 daily hotel occupancy year over year has been 1.9% lower compared to 2024, according to CoStar data, daily occupancy has been 3.9% lower year over year from August 11, 2025 to August 30, 2025, the most recent date available.

8.      Employee wages are subject to District income tax withholding, and reductions in hotel and restaurant workers' hours and corresponding reductions in employees' wages have therefore directly resulted in proportional reductions to the amount of income tax that District hotels have

paid to the District government.

I declare under penalty of perjury that the foregoing is true and correct.

Executed September 4, 2025 in Washington, D.C..

_____
Paul Schwalb



**U.S. Department of Justice**

United States Marshals Service

*Operations Support Division*

*Washington, DC  20530-0001*

August 21, 2025

MEMORANDUM FOR THE DEPUTY ATTORNEY GENERAL

FROM:        FLORIANO WHITWELL        FLORIANO    Digitally signed by
             ACTING ASSISTANT DIRECTOR   WHITWELL   FLORIANO WHITWELL
                                                    Date: 2025.08.21
                                                    14:47:40 -04'00'

SUBJECT:     Special Deputation Request

PURPOSE:     To obtain the Deputy Attorney General's approval or disapproval for
             the Special Deputation of National Guard Service Members.

**DAG DECISION REQUESTED BY:**  August 21, 2025; Date requested to ensure adequate
time for recipients to be deputized and execute required duties.

**REQUIRED DUE DATE:** August 21, 2025.

**EXECUTIVE SUMMARY:** A decision regarding Special Deputation is requested by the
United States Marshals Service (USMS) to grant federal law enforcement authority to United
States National Guard (USNG) Service Members (SM) who have been mobilized by the U.S.
Secretary of Defense to support the Metropolitan Police Department (MPD) and other Federal
law enforcement agencies to help lower the crime rate in Washington, DC.

This is a Category 7 request for Special Deputation.

**DISCUSSION**: A Special Deputation request has been submitted for the USNG to assist MPD
and other Federal law enforcement agencies in the Make D.C. Safe and Beautiful Again Surge
Operation.

The duties the National Guard (NG) SMs are expected to perform require law enforcement
authority which they currently lack. Special Deputation would confer the law enforcement
authority needed to perform those duties.

Given that the President has exercised his power under section 740(a) of the D.C. Home Rule
Act (Section 1-207.40 of the D.C. Code), and MPD is now in support of the Attorney General of
the United States, the Secretary of the Army will determine DCNG missions in support of MPD
based on information from the Attorney General of the United States.

DCNG personnel and out-of-district SMs supporting Federal law enforcement agencies in
Washington, DC, will be armed with their service issued weapons while on duty as directed in
the accompanying memorandum issued by the Secretary of Defense. NG SMs are not authorized

~~Confidential — Subject to Protective Order~~   DCNG_DEF_00003337

Memorandum for the Deputy Attorney General                                    Page 2
Subject: Special Deputation Request

to effect arrests or engage in other similar direct law enforcement activity. This restriction does not preclude the Secretary of the Army from authorizing the use of NG personnel to conduct the full range of civil disturbance operations, short of arrest. All NG SMs are required to adhere to the DCNG Rules for the Use of Force (RUF).

Due to the exigency of the NG's mobilization in support of this operation, the USMS cannot provide a roster of NG SMs applicants seeking Special Deputation. The USMS will rely on certification from the NG that all personnel who have and will receive a special deputation through the USMS are in good standing with the USNG and are not currently the subject of a misconduct investigation.

The deputations will be active from August 21, 2025, through September 25, 2025.

Pursuant to the Deputy Attorney General's (DAG) memorandum dated December 9, 1999, the DAG retains authority in seven categories of Special Deputations. This request falls within Category 7, where the deputation sought is sufficiently controversial or subject to sufficient policy concerns that it should be reviewed by a higher authority.

**CONSULTATION:** None.

**OTHER STAKEHOLDERS:** None.

**RECOMMENDATION:** The USMS recommends that the DAG approve this request for Special Deputation of NG SMs to authorize them to assist MPD and the other Federal law enforcement agencies in support of the Make D.C. Safe and Beautiful Again Surge Operation. Any approved deputation shall limit the authority as follows: To protect federal property and functions in the District of Columbia and to support other Federal law enforcement agencies; Not authorized to searches, seizures, arrests, or other similar functions; Not valid off duty.

        Confidential—Subject to Protective Order   DCNG_DEF_00003338

Memorandum for the Deputy Attorney General                                   Page 3
Subject: Special Deputation Request

APPROVE: _____ 8/22/25          <u>Concurring Component(s)</u>:
                                           None


DISAPPROVE: _____               <u>Non-concurring Component</u>:
                                           None


OTHER: _____

Attachments
- Employment Guidance for the DCNG and Out-of-District NG SMs
- DCNG Mobilization Order

        Confidential—Subject to Protective Order    DCNG_DEF_00003339

 Outlook

## Fwd: DCNG TF Update (30 AUG 25)

**From** Seward, James D BG USARMY NG WVARNG (USA) ███████████████

**Date** Sun 8/31/2025 10:58 AM

**To** Kincaid, Robert J Jr COL USARMY NG WVARNG (USA) ███████████ Reese, James D COL USARMY NG WVARNG (USA) ███████████████; Justice, Anthony T COL USARMY NG WVARNG (USA)

**Cc** Chard, Patrick D Brig Gen USAF NG WVANG (USA) ███████████ Sloan, Robert A (Hooch) II Col USAF 130 AW (USA) ███████████ Blanchard, Leland D II BG USARMY NG DCARNG (USA) ███████████ Holt, Murray E II BG USARMY NG WVARNG (USA) ███████████ Cleek, Siobhan O'Flaherty CW4 USARMY NG WVARNG (USA)

Update re incident in DC

---

**From:** "Blanchard, Leland D II BG USARMY NG DCARNG (USA)" ████████████████

**Date:** Saturday, August 30, 2025 at 12:09:55 PM

**To:** "Woodruff, Matthew S BG USARMY NG OHARNG (USA)" ███████████ "Friloux, Thomas C MG USARMY NG LAARNG (USA)" ███████████████"Seward, James D BG USARMY NG WVARNG (USA)" ███████████ "Ross, Warner A II MG USARMY NG TNARNG (USA)" ███████████ "Stilwell, Robin B MG USARMY NG SCARNG (USA)" ███████████ "Ginn, Bobby M Jr BG USARMY NG MSARNG (USA)" █████████████████

**Cc:** "Nordhaus, Steven S Gen USAF NG OCNGB (USA)" ███████████ "Rieger, Timothy L MG USARMY NG OCNGB (USA)" ███████████"Burkett, Ronald Winfield (Win) II MG USARMY NG NGB (USA)" ███████████"Stubbs, Jonathan Matthew (Jon) LTG USARMY NG NGB ARNG (USA)" ███████████"Pirak, Duke A Maj Gen USAF NGB CF (USA)" ███████████ "Smith, Ronald L Jr CSM USARMY NG DCARNG (USA)" ███████████ "Raines, John T III SEA USARMY NG OCNGB (USA)"

**Subject:** DCNG TF Update (30 AUG 25)

Team,

A quick update on the outstanding work the Soldiers and Airmen are doing as part of the DC Safe and Beautiful Task Force.

The team continues to do some amazing things. They are representing your organizations with great pride and contributing to some amazing results across the District. They are enabling law enforcement (LE) to step up in ways that have not been seen in a long time.

As of very early this morning, more than 150 firearms have been seized and over 1,400 arrests made across the district by LE. The Safe & Beautiful TF is doing some incredible work and making great strides in the city.

Confidential - Subject to Protective Order

Yesterday we had an incident where Soldiers were breaking up a fight in the Metro Station (on a stopped train) and when escorting them off the train one Soldier was struck in the face and another bad actor attempted to seize the weapon of a Soldier.  Long story short- our guys did everything right.  They secured the assailants and police support was immediately on-site.  The assailants are facing federal charges (reminder, our Soldiers are Deputized Federal Law Enforcement) and potentially minimum sentencing of 20 years based on the initial charges.

Today we are supporting an operation in which we will conduct post-incident support by establishing a cordon and security while the USMS serves high risk warrants on some bad characters known for gun violence and resisting arrest.

The point is that they are making a difference and, in every circumstance, they have excelled.  But, as we saw yesterday in the Metro, we must remain diligent.

As we move into an extended operational period, we are doing a few things here.  First, we are working with the team to look at ways to get the team out and experience some of the things they are protecting.  We are also looking at moving hotel locations over the next week or so to reduce the commute and shorten the shifts a bit.  That will be a deliberate decision that I approve based on security, unity of command, and again, the conditions we will ask them to stay in.  If we cannot meet the standard of "would you feel comfortable with your spouse and kids staying there", we will not move to different locations.

While it causes some turbulence with schedules, we will continue to rotate forces to varying mission locations.  Nobody will stay in the same sector or assignment for the duration.  Each location has different challenges and opportunities.  We are deliberate in the missioning but keeping them fresh is important to us.

As we approach 30 days, I know there may be some of you with changing conditions as well.  I am tracking at least one state that will have to look at a relief in place or transition.  I ask that we stay ahead of this and please let me know so we can ensure that there is no gap for your inbound or outbound Soldiers.  We will support a PDSS, ADVON, etc so that your Soldiers are well taken care of and understand the OE.

As always, I am here as needed.  Appreciate the amazing work the team is doing.

Leland

Leland D. Blanchard II
BG, USA
Commanding General (Interim)

District of Columbia National Guard
2001 East Capitol St SE
Washington, DC 2003-1719



DCAdd. 038

Confidential - Subject to Protective Order

 Outlook

**Re: DCNG Update, 12 SEP 25**

**From** Pritchett, David K MG USARMY NG ALARNG (USA) ███████████████

**Date** Sat 9/13/2025 12:41 PM

**To** Nordhaus, Steven S Gen USAF NG OCNGB (USA) ████████████████████Blanchard, Leland D II BG
USARMY NG DCARNG (USA) ██████████████████; Burkett, Ronald Winfield (Win) II MG
USARMY NG NGB (USA)

**Cc** George, Randy A GEN USARMY HQDA CSA (USA)████████████████Stubbs, Jonathan Matthew
(Jon) LTG USARMY NG NGB ARNG (USA)██████████████████ Rieger, Timothy L MG USARMY
NG OCNGB (USA████████████████ Davis, Robert B MG USARMY NG NGB (USA)
███████████████████; Smith, Jeffery M (Jeff) BG USARMY NG ALARNG (USA)
██████████████il>


WILCO, Sir!

David K. Pritchett
Major General
The Adjutant General

Alabama National Guard
1720 Congressman W.L. Dickinson Drive
Montgomery, AL. 36109-0711

███████████████████████████████

**From:** "Nordhaus, Steven S Gen USAF NG OCNGB (USA)" ████████████████████
**Date:** Saturday, September 13, 2025 at 10:11:26 AM
**To:** "Pritchett, David K MG USARMY NG ALARNG (USA)"████████████████████"Blanchard,
Leland D II BG USARMY NG DCARNG (USA)"██████████████████"Burkett, Ronald
Winfield (Win) II MG USARMY NG NGB (USA)█████████████████
**Cc:** "George, Randy A GEN USARMY HQDA CSA (USA)"████████████████████"Stubbs,
Jonathan Matthew (Jon) LTG USARMY NG NGB ARNG (USA)"██████████████████
"Rieger, Timothy L MG USARMY NG OCNGB (USA)"█████████████████"Davis, Robert B
MG USARMY NG NGB (USA)"████████████████████"Smith, Jeffery M (Jeff) BG USARMY NG
ALARNG (USA██████████████████
**Subject:** Re: DCNG Update, 12 SEP 25

Thanks David!  Please call me if you need anything!

VR,

Steve

DCAdd. 039

Confidential - Subject to Protective Order

Gen Steve Nordhaus
Chief, National Guard Bureau

Offic ██████████████
DSN ██████████████

**From:** "Pritchett, David K MG USARMY NG ALARNG (USA)" ████████████████████
**Date:** Saturday, September 13, 2025 at 10:54:40
**To:** "Nordhaus, Steven S Gen USAF NG OCNGB (USA)" ██████████████████ "Blanchard,
Leland D II BG USARMY NG DCARNG (USA)" ████████████████████ 'Burkett, Ronald
Winfield (Win) II MG USARMY NG NGB (USA)" ████████████
**Cc:** "George, Randy A GEN USARMY HQDA CSA (USA)" ██████████████████, "Stubbs,
Jonathan Matthew (Jon) LTG USARMY NG NGB ARNG (USA)" ████████████████████
"Rieger, Timothy L MG USARMY NG OCNGB (USA)" █████████████████ "Davis, Robert B
MG USARMY NG NGB (USA)" ████████████████ 'Smith, Jeffery M (Jeff) BG USARMY NG
ALARNG (USA)" ████████████████████
**Subject:** Re: DCNG Update, 12 SEP 25

+ BG Jeff Smith and CSM Bailey

Sir,

Gov Ivey approves AL backfilling TN.  We have begun prep' for the mission.

V/r

David K. Pritchett
Major General
The Adjutant General

Alabama National Guard
1720 Congressman W.L. Dickinson Drive
Montgomery, AL. 36109-0711

████████████████████████████████
████████████████████████████████
████████████████████████████████

**From:** "Nordhaus, Steven S Gen USAF NG OCNGB (USA)"
████████████████████
**Date:** Saturday, September 13, 2025 at 5:49:47 AM
**To:** "Pritchett, David K MG USARMY NG ALARNG (USA)" ████████████████████
"Blanchard, Leland D II BG USARMY NG DCARNG (USA)"
████████████████ "Burkett, Ronald Winfield (Win) II MG USARMY NG
NGB (USA)" ████████████████
**Cc:** "George, Randy A GEN USARMY HQDA CSA (USA)" ████████████████████
"Stubbs, Jonathan Matthew (Jon) LTG USARMY NG NGB ARNG (USA)"
████████████████ "Rieger, Timothy L MG USARMY NG OCNGB (USA)"

DCAdd. 040

Confidential - Subject to Protective Order

██████████████████████████ "Davis, Robert B MG USARMY NG NGB (USA)"

**Subject:** Fwd: DCNG Update, 12 SEP 25

David,

As a follow up to our call last night.  Here is last night's evening roll up from the DC mission discussing TN departure on or about 24 September for your SA.  Please let me know once your Gov has approved AL to backfill.

Win and Leland,

SecWar provided VOCO to replace TN with AL on the DC mission if their Gov approved. Please coordinate with MG Pritchett for a smooth RIPTOA if he's given the approval by his Gov.

Thanks for all the support!

VR,

Steve

Gen Steve Nordhaus
Chief, National Guard Bureau

Offic ██████████████
DSN ██████████████

**From:** "Riley, Eric James BG USARMY HQDA DCS G-3-5-7 (USA)"
██████████████████████
**Date:** Friday, September 12, 2025 at 17:19:28
**To:** "Driscoll, Daniel P HON (USA)" ████████████████ "Fitzgerald, David R SES (USA)" ████████████ "George, Randy A GEN USARMY HQDA CSA (USA)" ████████████████ "Mingus, James J GEN USARMY HQDA VCSA (USA)"
**Cc:** "Bechtel, Peter B SES USARMY HQDA DCS G-3-5-7 (USA)"
██████████████████ "Blanchard, Leland D II BG USARMY NG DCARNG (USA)"
████████████>, "Burkett, Ronald Winfield (Win) II MG USARMY NG NGB (USA)" ██████████████████, "Butler, David M COL USARMY HQDA OCPA (USA)" ████████████ "Carlisle, Karen H SES USARMY HQDA OTJAG (USA)" ████████████ "Choquette, Sean M Maj Gen USAF JS J3 (USA)" ████████████████ "'COL Anthony Fuscellaro'"
██████████████████████ Dennis, Kirby Robert (Bo) COL USARMY HQDA (USA)"
████████████ "Evans, Marcus S LTG USARMY HQDA DAS (USA)"
██>, "Gilliam, John B COL USARMY HQDA DAS (USA)"
██, "Isenhower, James P III MG USARMY HQDA (USA)"
██████████ Johnson, Eric M BG USARMY HQDA DCS G-3-5-7
██████████>, "Kupratty, Alexander CSM USARMY HQDA (USA)"
████████ "McElwain, Rebecca B BG USARMY HQDA ASA FM

Confidential - Subject to Protective Order



(USA)" ████████████████, "Morgan, Shane P BG USARMY JS J3 (USA)"
████████, "Morris, Jason L MajGen USMC HQMC (USA)"
"Nordhaus, Steven S Gen USAF NG OCNGB (USA)"
██.mil>, "Riley, Eric James BG USARMY HQDA DCS G-3-5-7
(USA)" ████████████, "Ryan, Joseph A LTG USARMY HQDA DCS G-3-5-7
(USA)" ███████████ .mil>, "SanNicolas, Gina Diego COL USARMY HQDA
SECARMY (USA)" █████████████████, "Schuck, G Patrick COL USARMY
HQDA (USA)"██████████████"Shaw, Robert M (Rob) COL USARMY
HQDA DCS G-3-5-7 (USA)" <r████████████████"Spedero, Paul C Jr RADM
USN JS ODJS (USA)" ██████████████████"Stubbs, Jonathan Matthew (Jon) LTG
USARMY NG NGB ARNG (USA)" <████████████, "Stultz, James C COL
USARMY HQDA (USA)"███████████████"Sylvia, Brett G MG USARMY
HQDA DAS (USA)" ████████████, "Weimer, Michael R SMA USARMY
HQDA (USA)"██████████████████"White, Graham R COL USARMY HQDA
(USA)"███████████████

**Subject:** DCNG Update, 12 SEP 25

**CLASSIFICATION:** CUI

Secretary Driscoll and GEN George,

Gentlemen, your DCNG operational highlights for Friday, 12 September:

- *Total DCNG Strength: **2312** Total Servicemembers (**+2** from yesterday). **2099** ARNG / **213** ANG*

- ***837** Servicemembers on mission conducting operations over the last 24 hours*

- ***75** Servicemembers supporting area beautification over the last 24 hours*

- ***1436** Servicemembers complete with armed deputation*

- *RIPTOA with SC & GA began 11 SEP and will conclude on 20 SEP*

- *TNNG force departure O/A 24 SEP*

**Operations Summary. Last 24 Hours:**

- Provided support to LE at 18x designated Metro Stations
- Conducted beautification mission at 2 locations within the JOA
- Conducted presence patrol Seward Park, Garfield Park & Fields at RFK
- Continued TCP at USPP
- Provided support to LE at Union Station

DCAdd. 042

- Conducted high visibility missions in National Mall Zone
- Conducted presence patrol NOMA-Gallaudet Gov't Offices, H St. Corridor, Eastern Market, Lincoln Park
- Conducted presence patrol at City Center, Gallery Place, 14th Street & Dupont Circle
- Conducted presence patrol in Georgetown

**Planned Operations. Next 24 Hours:**

- Provide support to LE at 18x designated Metro Stations
- Conduct beautification mission at 1 location within the JOA
- Continue TCP at USPP
- Provide support to LE at Union Station
- Provide immediate response force
- Conduct presence patrol at Seward Park, Garfield Park (4-Parks), Lincoln Park and Fields at RFK
- Conduct presence patrol at City Center, Gallery Place, 14th Street & Dupont Circle
- Conduct presence patrol NOMA-Gallaudet Gov't Offices, H St. Corridor & Eastern Market
- Conduct presence patrol in Georgetown

Pending your questions.

Respectfully,

Eric

ERIC J. RILEY

Brigadier General, U.S. Army

Deputy Director of Operations, Readiness, and Mobilization (DAMO-OD)

HQDA, G-3/5/7



DCAdd. 043

Confidential - Subject to Protective Order



DCAdd. 044

Confidential - Subject to Protective Order

 Outlook

**Re: DCNG TF Update (17 SEP 25)**

**From** Seward, James D BG USARMY NG WVARNG (USA) ███████████████

**Date** Fri 9/19/2025 2:09 PM

**To**     Blanchard, Leland D II BG USARMY NG DCARNG (USA) ████████████ Woodruff, Matthew
S BG USARMY NG OHARNG (USA) ██████████████ Friloux, Thomas C MG USARMY NG
LAARNG (USA) ████████████ Ross, Warner A II MG USARMY NG TNARNG (USA)
█████████████ Stilwell, Robin B MG USARMY NG SCARNG (USA)
█████████████; Ginn, Bobby M Jr BG USARMY NG MSARNG (USA)
█████████████; Pritchett, David K MG USARMY NG ALARNG (USA)
█████████████>; Morrell, Mark R Brig Gen USAF (USA) - ████████████
Wilson, Richard D MG USARMY NG GAARNG (USA) ██████████████

**Cc**     Nordhaus, Steven S Gen USAF NG OCNGB (USA) ████████████ Rieger, Timothy L MG
USARMY NG OCNGB (USA) ████████████████ Burkett, Ronald Winfield (Win) II MG USARMY
NG NGB (USA) █████████████; Stubbs, Jonathan Matthew (Jon) LTG USARMY NG NGB
ARNG (USA) ████████████; Pirak, Duke A Maj Gen USAF NGB CF (USA)
████████████ Smith, Ronald L Jr CSM USARMY NG DCARNG (USA)
████████████; Raines, John T III SEA USARMY NG OCNGB (USA)

---

Thank you. Love all the great stories of our troops helping the citizens and visitors.  Great stuff. Jim

---

**From:** "Blanchard, Leland D II BG USARMY NG DCARNG (USA)" ████████████████
**Date:** Wednesday, September 17, 2025 at 9:38:57 PM
**To:** "Woodruff, Matthew S BG USARMY NG OHARNG (USA)" ████████████████
"Friloux, Thomas C MG USARMY NG LAARNG (USA)" ████████████ "Seward,
James D BG USARMY NG WVARNG (USA)" ████████████████ "Ross, Warner A II MG
USARMY NG TNARNG (USA)" ████████████ "Stilwell, Robin B MG USARMY NG
SCARNG (USA)" ████████████ 'Ginn, Bobby M Jr BG USARMY NG MSARNG (USA)"
████████████████ Pritchett, David K MG USARMY NG ALARNG (USA)"
████████████████, "Morrell, Mark R Brig Gen USAF (USA)"
████████████████ Wilson, Richard D MG USARMY NG GAARNG (USA)"

**Cc:** "Nordhaus, Steven S Gen USAF NG OCNGB (USA)" ████████████████ "Rieger,
Timothy L MG USARMY NG OCNGB (USA)" ████████████ "Burkett, Ronald
Winfield (Win) II MG USARMY NG NGB (USA)" ████████████, "Stubbs, Jonathan
Matthew (Jon) LTG USARMY NG NGB ARNG (USA)"████████████ 'Pirak, Duke A
Maj Gen USAF NGB CF (USA)" ████████████ Smith, Ronald L Jr CSM USARMY NG DCARNG
(USA)" ████████████ Raines, John T III SEA USARMY NG OCNGB (USA)"

**Subject:** DCNG TF Update (17 SEP 25)

Gentlemen,

Confidential - Subject to Protective Order

Your Soldiers and Airmen continue to impress. Professional, disciplined, and amazing ambassadors for your respective state, the National Guard, the Army, and our Nation.

I have asked the team to work quickly towards "winterizing" our formation. Ranging from heating spaces in the AO to personal gear that will ensure comfort and safety during shifts, we want to get ahead of the issues. We know that everybody will run out and purchase winter gear once the first cold snap hits. We aim to be ahead of that so we do not run into a shortage/unavailable issue.

The latest on the length of the mission remains a commitment through 30 NOV although my guidance to the team is to plan and prepare for a long-term persistent presence. We know that America 250 occurs this summer, and that will be a factor in determining the future of the mission.

The success of the mission continues to drive requests to expand our reach. We are doing so deliberately and in close coordination with our LE partners. Some of these requests come in with little warning as "pop-up" events require flexibility. As I tell your Soldiers, every issue comes to the Nation's Capital and part of our job is to ensure groups can exercise their 1A rights safely. Safety is the number one consideration as we take on these requests.

We are working to ensure that those forces who are returning are getting through the Reverse JRSOI process quickly. We want to ensure that they clear all the ammo, have accountability, and of course, get CAC'd out so we can report to the WH accurate numbers as well as provide the US Marshal's Service the information they require daily. Closing out is quick, but critical. Please bear with us as we work that with your teams as they depart.

Operationally, we remain in a surge status and that will not change. We are providing coverage to all our assignments while we also are looking to balance Soldier care and give them a predictable refit opportunity. We are also incorporating training into the schedule. This includes refresher on first aid tasks, weapons retention, weapons training, etc. Not looking to take 10-12 hours for training events, but we are ensuring that Soldiers are ready for the issues they are encountering in the AO.

If there is anything we can do for your Soldiers/Airmen, please let me know. As always- feel free to reach out to me 24/7.

Thank you for all that you do!

Leland

Leland D. Blanchard II
BG, USA
Commanding General (Interim)

District of Columbia National Guard
2001 East Capitol St SE
Washington, DC 2003-1719

Confidential - Subject to Protective Order

CUI//LEI

Joint Force Headquarters
District of Columbia National Guard
Washington, DC 20003
12AUG2025

## OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission

**(U) References:**

a. Map Series V734S, Sheet: Washington, D.C. Edition: 2-DMA, Washington, D.C. 1:50000

b. Executive Order 11485, Supervision and Control of the National Guard of the District of Columbia, 1969

c. Executive Order 12656, Assignment of emergency preparedness responsibilities, 1988

d. DoD Directive 3025.18, DSCA, 19 March 2018

e. DoD Instruction 3025.21, Defense Support of Civilian Law Enforcement Agencies, 08 February 2019

f. DoD Directive 5105.83, JFHQ-State, 31 March 2020

g. DoD Directive 3160.01, Homeland Defense Activities Conducted by the National Guard, 06 June 2017

h. DoD Instruction 3025.20, Defense Support of Special Events, 24 May 2017

i. DoD Instruction 3025.21, Defense Support of Civilian Law Enforcement Agencies, 08 February 2019

j. DoD Instruction 3025.22, The Use of the National Guard for Defense Support of Civil Authorities, 15 May 2017

k. Joint Publication 3-0, Joint Operations

l. Joint Publication 5-0, Joint Planning

m. Joint Publication 3-28, Defense Support of Civil Authorities, 29 October 2018

n. Joint Publication 3-33, Joint Force Headquarters, 19 September 2022

o. CNGBI 3000.04, National Guard Bureau Domestic Operations, 24 January 2019

p. 10 USC § 12310, Reserves: For Organizing, Administering, etc., Reserve Component

Controlled by: DCNG
Controlled by: NGDC-JFHQ-J3
CUI Category: OPSEC
Limited Dissemination Control: FEDCON          1
POC: COL James Davis,
CUI//LEI

Confidential: Subject to Protective Order

CUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

q. 32 USC § 502, Required Drills and Field Exercises

r. D.C. Official Code § 49-101, 102, 103

s. E.O. Declaring a Crime Emergency in the District of Columbia, 11 August 2025

t. POTUS memo for SecDef, Restoring Law and Order in D.C., 11 August 2025

u. Secretary of the Army Action Memorandum 11 August 2025

v. HQDA EXORD 290-25 D.C. National Guard in support of Local Law, 11 August 2025

**(U) Time Zone Used Throughout the OPORD:** Local

**(U) Task Organization:**

JFHQ-DC

a. (U) Land Component Command (LCC)

    (1) (U) 74th Troop Command

    (2) (U) Medical Detachment Command

    (3) (U) Multi-Agency Augmentation Command

    (4) (U) 260th Regional Training Institute (RTI), Command

    (5) (U) Legal Support Office

    (6) (U) Aviation Command

    (7) (U) Recruiting and Retention Battalion

    (8) (U) Headquarters and Headquarters Detachment, Joint Forces Headquarters, D.C.

b. (U) Joint Force Headquarters – Air (JFHQ-Air)

    (1) (U) 113th Wing

        (a) (U) 113th Operations Group

        (b) (U) 113th Maintenance Group

        (c) (U) 113th Mission Support Group

CUI//LEI

DCAdd. 048

Confidential - Subject to Protective Order

DCNG_DEF_00000158

~~OUWLEI~~

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE
Make D.C. Safe and Beautiful Mission**

      (d) (U) 113th Medical Group

      (e) (U) Wing Staff Agency

  c. (U) USPFO-DC

  d. (U) 33rd Weapons of Mass Destruction-Civil Support Team (WMD-CST)
  e.

## 1. SITUATION.

  a. **(U) General.** The President of the United States (POTUS) announced on 11 August 2025 his plan to restore the law and order in the District of Columbia (D.C.) due to recent violent criminal activity. POTUS directed the Secretary of Defense (SecDef) to mobilize the DCNG in such numbers as he deems necessary, to address the epidemic of crime in our Nation's capital. The mobilization and duration of duty shall remain in effect until POTUS determines that conditions of law and order have been restored in D.C. On 11 August 2025, DCNG service members (SM) were officially encamped pursuant to Title 32 U.S.C. § 502(f)(2)(A) and tasked to provide National Monument security, area beautification, traffic control points (TCP), and roving patrols.

  b. **Area of Concern.**

    (1) **(U) Area of Interest.** The area of interest is Washington, D.C.

    (2) **(U) Joint Operational Area.** Washington D.C. is the Joint Operational Area (JOA) and is divided into four quadrants of unequal area: Northwest (NW), Northeast (NE), Southeast (SE), and Southwest (SW). Personnel and equipment shall remain within D.C. unless mission parameters dictate otherwise. Operations outside of D.C. will be limited to support activities for the executable mission.

    (3) **(U) Assessment of Terrain.** This terrain is characterized as urban and is punctuated by national monuments, memorials, and federal buildings particularly in the cultural city center in the vicinity of the National Mall. The areas outside of the National Mall consist of businesses, high density and single-family residences, universities, embassies, and other infrastructure and life support systems. The District of Columbia is comprised of 8 Wards, each with a population of between eighty and ninety thousand citizens. The White House and National Mall are within Ward 2, the US Capitol building is in Ward 6. The Anacostia River splits the district within Ward 7 and Ward 8 along the southeast and eastern border. The Potomac River creates the divisional line between D.C. and Virginia along the southwest and western border. Maryland encompasses a land border to D.C. which wraps from the northwest, north, northeast, east, and southeast. Major roadways and throughfares can be found within the city, primarily Interstate 295 which traverses Ward 8 from the south through the northern edge of Ward 7, Interstate 395 and 695 which spans from west to east in Ward 6, and the

3

DCNG_DEF_00000159

CUI//LEI

## OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission

George Washington Memorial Parkway which follows the eastern edge of the Potomac River from Ward 2 through Ward 3. Interstate 495, also referred to as the Beltway, circles D.C. and provides access to the city from all avenues of approach. Major thoroughfares become congested during the working week particularly between 0630–0900 HRS and 1530-1900 HRS. Local roadways within the wards are narrow and may be encumbered by local street parking.

c. (CUI) **Risk.** The Make D.C. Safe and Beautiful Mission presents an opportunity for criminals, violent extremists, issue motivated groups and lone actors to advance their interests, given the prominence of locality, and expected media coverage for the mission. Threat assessments will be constantly updated by interagency partners and transmitted to NG forces via the Threat Working Group (TWG).



(3) (U) Illness/Injury. The risk of personnel illness/injury is low and will most likely be limited to hot weather-related incidents. The severity of loss is low.



CUI//LEI

4

DCAdd. 050

Confidential - Subject to Protective Order

CUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**



e. **Friendly Forces.**

(1) (CUI) **Operational Center of Gravity.** The DCNGs ability to provide a sufficient number of trained and ready personnel available to support law enforcement requirements, ability to receive and integrate those forces, and the ability to provide adequate Command, Control, and Communications of those forces.

(2) **(U) Operations of Forces.** Joint Force Head Quarters District of Columbia (JFHQ-DC) is tasked to support civilian authorities for the Make D.C. Safe and Beautiful mission.

(3) **Federal Agencies.**

a. United States Marshal Service (USMS)

b. United States Park Police (USPP)

c. Metropolitan Police Department (MPD)

(4) **Department of Defense Entities.**

a. Office of the Secretary of Defense (OSD)

b. Office of the Secretary of the Army

c. Department of the Army (DA)

d. National Guard Bureau (NGB)

**2. (U) MISSION.** The DCNG will provide national monument security, area beautification, traffic control points, and roving patrol support to the United States Marshal Service (US Marshalls), USPP, and MPD in Washington, D.C., from 11 August 25 until mission complete IOT restore law and order.

**3. EXECUTION.**

CUI//LEI

5

Confidential - Subject to Protective Order

DCNG_DEF_00000161

CUI//LEI

## OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission

  a. **Commander's Intent.**

    (1) **(U) Purpose.** Assist and support law enforcement entities in the District of Columbia in order to enable restoration of law and order across the District.

    (2) **(U) Key Tasks.** This operation will focus on supporting District law enforcement agencies to increase the capacity for public safety and the protection of life and property.

      a. (U) Provide support to law enforcement and deter criminal activity IAW HQDA EXORD 290-25 National Guard in support of Local Law.

      b. (U) Conduct JRSOI and subsequent redeployment operations for mission personnel and assets.

      c. (U) Provide presence in high visibility areas through static observation points, vehicle patrols, and dismounted patrols.

      d. (U) Conduct all logistical operations, including lodging, movement control, and sustainment operations.

    (3) **(U) End State.** The DCNG enhances law enforcement efforts to ensure public safety. Following the support missions, D.C. returns to normal operational levels that no longer require active support from National Guard forces. DCNG resources and supporting states (if required) are returned to home stations and appropriately demobilized.

  b. **(U) Concept of the Operation.** This operation will be conducted in three phases.

    a. (U) Phase 1: Notification and Identification. Begins on 11AUG25 and ends TBD. Key tasks during this phase includes notification; identification of capability and capacity requirements and gaps; and capability build.

    b. (CUI) Phase 2: JRSOI. Phase 2 begins on 12AUG25 upon receipt of initial forces to the JOA. This phase ends o/a 13AUG25.

    c. (CUI) Phase 3: Execution. Phase 3 begins on 11AUG25 upon employment of initial forces to support D.C. law enforcement and federal partners. This phase begins following Phase 1 and ends upon receipt of mission termination, TBD.

    d. (CUI) Phase 4: Reconstitution/Redeployment. Phase 4 begins when TF operations and any emergent requirements have concluded. During this phase all elements will conduct redeployment operations. Phase 4 concludes when all DCNG SMs have returned to home station and begun reconsolidation for future follow-on requirements.

6

CUI//LEI

DCAdd. 052

Confidential - Subject to Protective Order

DCNG_DEF_00000162

CUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

c. **Tasks.**

(1) **Land Component Commander**

a. (CUI) Provide O6 level command team and staff for JTF-DC to provide C3 for DCNG SMs supporting the mission and potential out-of-district (OOD) NG SMs, NLT 13AUG25.

b. (CUI) Establish JTF-DC NLT 13AUG2025.

c. (U) Provide sustainment for all JTF-DC forces.

d. (CUI) Provide 12x SMs in the grade of E7-E9 or O3-O5 to serve as Joint Staff LNO's to partner agencies. Provide names to J3 NLT 13AUG25.

e. (CUI) Provide 2x qualified personnel in the grades of O4-O5 and E8-E9 to serve as Joint Staff J1 and J1 SNCO. Tasked personnel will serve as OIC and NCOIC for Joint Staff J1 and are responsible for daily PERSTAT submissions. Provide names to the J3 NLT 13AUG25.

f. (CUI) Provide 2x NCOs to support Joint Staff J1 to conduct JRSOI CAC-in scans. Provide names to J3 NLT 13AUG25.



h. (CUI) Provide 1x qualified SMs in the grade of E7-E9 to serve as SNCO for JRSOI under the Joint Staff J3. Provide names to the J3 NLT 13AUG25.

i. (CUI) Provide 2x SMs with operational experience in the grades of O3-O4 so support the Joint Staff J33. Provide names to the J3 NLT 13AUG25.

j. (CUI) Provide 1x qualified SM in the grade of O3-O4 or E7-E8 to serve as a J4 representative for JRSOI. Provide name to the J3 NLT 13AUG25.

k. (CUI) Provide 1x qualified SM in the grade of O4-O5 to serve as the JTF-DC and Joint Staff J4 (this is a dual-hatted position). Provide name to the J3 NLT 13AUG25.

l. (CUI) Provide 2x qualified personnel in the grades of O4-O5 and E6-E8 to serve as Joint Staff J5 and J5 NCO. Provide names to the J3 NLT 13AUG25.

7

CUI//LEI

DCAdd. 053

Confidential - Subject to Protective Order

CUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

m. (CUI) Provide 1x qualified SM in the grade of O4-O5 to serve as the JTF and Joint Staff J6 (this is a dual-hatted position). Provide name to the J3 NLT 13AUG25.

n. (CUI) Provide 1x qualified SM in the grade of O3-O4 or E5-E7 to support the Joint Staff J6 and provide JRSOI technical support. Provide name to the J3 NLT 13AUG25.

p. (CUI) Provide 1x qualified personnel to serve as the Joint Staff Deputy J8. Provide name to J3 NLT 13AUG25.

q. (CUI) Provide 6x personnel from public affairs to serve in the Joint Information Center (JIC). Provide names to ███████████ at ████████████████████ or ████████████ NLT 13AUG25.

r. (CUI) Provide 10x qualified SMs in the grades of E3-E6, 1x qualified personnel in the grades of O2-O3, 1x qualified personnel in the grades of E7-E8 to serve under the Joint Staff Joint Operations Center (JOC) as operators. Provide names the JOC Battle Captain, ████████ at ████████████████████████ NLT 13AUG25.

s. (CUI) Provide 1x JAG to support the Joint Staff. Provide name to the J3 NLT 13AUG25.

t. (CUI) Provide 2x medical personnel to support JRSOI and medical team. Provide names to the J3 NLT 13AUG25.

u. (CUI) Provide 5x SMs in the grade of O3-O4 or E7-E9 to support the Joint Visitor Bureau (JVB). Provide names the Deputy JVB OIC, ████████ at ████████████████████ NLT 13AUG25.

v. (CUI) Provide 2x qualified SMs in the grade of O3-O4 to provide SAPR support. Provide name to the J9 (Resiliency Director), ████████████████ at ████████████████ NLT 13AUG25.

w. (CUI) Provide 1x SM in the grade of E1-E4 to provide support to military and family readiness. Provide name to the J9 (Resiliency Director), ████████████ at ████████████████████ NLT 13AUG25.

x. (U) Provide 5x SMs in the grade of E8-O6, to support the Religious Support Team. Provide name to the J9 (Resiliency Director), ████████████████ at ████████████████ NLT 13AUG25.

8

CUI//LEI

Confidential - Subject to Protective Order

DCNG_DEF_00000164

OUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

   y. (OUI) Provide 3x SMs in the minimum grade of E4 to serve as drivers for the mission. Provide name to the CG XO, ███████████ at ███████████████████ NLT 13AUG25.

   z. (OUI) Provide 3x SUVs or 7 PAX vehicles to support the Joint Visitors Bureau (JVB), NLT 13AUG25. POC is Deputy JVB OIC, ███████████ at ███████████████

   aa. (OUI) Publish Annex E (Personnel) to JFHQ-DC OPORD.

   bb. (U) DIRLAUTH with the 113th Wing and JTF-DC

  **(2) 113th Wing Commander**

   a. (OUI) Provide 100x SMs to support JTF-DC. Provide names to the J3 NLT 13AUG25.

   b. (OUI) Provide 1x officer in the grade of O3-O4 to serve as the JRSOI OIC. Provide name to J3 NLT 13AUG25.

   c. (OUI) Provide 4x qualified personnel in the grades of O3-O4 and E5-E7 to serve as Joint Staff Deputy J1 and J1 NCOs. Provide names to J3 NLT 13AUG25.

   d. (OUI) Provide 2x NCOs to support Joint Staff J1 to conduct JRSOI CAC scan. Provide names to J3 NLT 13AUG25.

   e. (OUI) Provide 1x SM at the minimum grade of E7 to serve as Joint Staff Deputy J4. Provide name to J3 NLT 13AUG25.

██████████████████████████████████████████
██████████████████████████████████████████

   g. (OUI) Provide 2x trained personnel in the grade of E4-E6 to support the JOC. Provide names the JOC Battle Captain, ███████████ at ███████████████████ NLT 13AUG25.

   h. (OUI) Provide 1x officer to serve as the Joint Staff J8. Provide name to J3 NLT 13AUG25.

   i. (OUI) Provide 1x JAG to support JRSOI. Provide name to J3 NLT 13AUG25.

   j. (OUI) Provide 1x SM in the grade of O3-O4 or E7-E9 to support the JVB. Provide name to the J3 NLT 13AUG25.

9

OUI//LEI

DCAdd. 055

Confidential - Subject to Protective Order

CUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

k. (CUI) Provide 8x personnel from public affairs to serve in the Joint Information Center (JIC). Provide names to ████████ at ██████████████████████████, NLT 13AUG25.

l. (CUI) Provide 1x qualified SM in the grade of E6-E7 to provide SAPR support. Provide name to the J9 (Resiliency Director), ████████ at ██████████████████, NLT 13AUG25.

m. (CUI) Provide 1x SM in the grade of E1-E4 to provide support to military and family readiness. Provide name to the J9 (Resiliency Director), ████████ at ██████████████████ NLT 13AUG25.

n. (CUI) Provide 1x SM in the grade of O2-O4 to serve as Deputy J9. Provide name to the J9 (Resiliency Director), ████████████ at ████████████████ NLT 13AUG25.

o. (CUI) Provide 4x SMs in the grade of O4-O5 to support the Religious Support Team. Provide name to the J9 (Resiliency Director) ████████████ at ████████████████ NLT 13AUG25.

p. (CUI) Provide 2x medical personnel to support JRSOI and medical team. Provide name to J3 NLT 13AUG25.

q. (U) DIRLAUTH with the LCC, JTF-DC and OOD Force Commands and Staffs authorized.

**(3) JTF-DC Commander**

a. (CUI) NLT 13AUG25 establish the JTF with an O6 level command team and staff.

b. (CUI) NLT 13AUG25, task organize the JTF to execute DCNG lines of efforts IAW the approved RFA.

c. (CUI) NLT 13AUG25, provide CONOPS back brief to the DCNG Commanding General and the Adjutant General for situational awareness.

d. (CUI) Establish Liaison Officer representation with the following entities to maintain lines of communication and to conduct operational coordination for the duration of operation with the USPP, MPD, and DCNG JOC.

████████████████████████████████████

10

CUI//LEI

DCAdd. 056

Confidential - Subject to Protective Order

CUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**



### (4) JFHQ-DC

#### (a) J-1

1. (U) Support TF-JRSOI operations during all phases of the operation.

2. (U) Ensure NGB PERSTAT reporting is accomplished daily via NGB COP.

3. (U) Participate in CUB as required.

4. (U) DIRLAUTH with NGB, Federal and District partners, and supporting NG States authorized.

#### (b) J-2

1. (U) Support TF-JRSOI operations during all phases of the mission.

2. (U) Provide intelligence oversight guidance during all phases of the mission.

4. (U) Supervise total force compliance of Personnel Security (PERSEC) requirements during the mission.

5. (U) Review CG's CCIRs in conjunction with the J3 and recommend revision as necessary to support mission requirements.

6. (U) Publish Annex B to JFHQ-DC OPORD.

7. (U) DIRLAUTH with NGB, Federal and District partners.

#### (c) J-3

1. (CUI) Coordinate with MPD, USPP, USMS and other agencies as missions emerge. J3-DOMS is primary staff member responsible for the coordinating with all supporting agencies.

11

CUI//LEI

DCAdd. 057

Confidential - Subject to Protective Order

OUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

2. (COU) Submit RFA mission analysis and CG memo to the Department of the Army G3/5/7 NLT 48 hours after receipt of the RFA.

3. (U) Coordinate Deputization of forces at JRSOI with the U.S. Marshal Service.

4. (

5. (U) Collect all relevant TWG summaries during all phases of the operation; provide timely TWG updates to all forces as required.

6. Coordinate and oversee JRSOI in conjunction with personnel from 113th Air Wing. Coordinate redeployment operations.

7. (U) Receive and integrate external organizational LNOs into the JFHQ Staff.

8. (U) Provide situational awareness to CG and outside agencies as required.

9. (U) Respond to all request for information (RFIs) and requests for forces (RFF) in a timely fashion.

10. (U) Publish battle rhythm for JOC and CG update briefing during Phase 2.

11. (COU) Publish Annex C and R to JFHQ-DC OPORD.

12. (U) DIRLAUTH with NGB, Federal and District partners, and supporting NG States authorized.

**(d) J-4**

1. (U) Identify and validate sustainment requirements for all phases of the operation.

2. (U) Coordinate with NGB, DCNG USPFO, and 113th Wing for all contracting requirements to include but not exclusive to lodging, sustenance, transportation, and associated MOU/MOAs.

3. (COU) Publish Annex D. Publish Sustainment Support Plan as Appendices to Annex D (Logistics) to JFHQ-DC OPORD.

12

OUI//LEI

DCAdd. 058

DCNG_DEF_00000168

CUI//LEI

## OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission

4. (U) DIRLAUTH with NGB, JTF-NCR, Federal and District partners, and supporting NG States (if authorized through NGB).

### (e) J-6

1. (U) Develop communications plan to provide support to maintain lines of communication between the JFHQ-DC JOC and JTF-DC forces.

2. (U) Establish Frequency / Communication card.

3. (U) Conduct communications training / radio ROE for all JTF personnel.

4. (U) DIRLAUTH with NGB, Federal and District partners, and supporting NG States authorized.

5. (CUI) Publish phone directory of all key JFHQ-DC and JTF-DC personnel by location as part of Annex K (Communications) to JFHQ-DC OPORD.

### (f) Public Affairs / JIC

1. (U) Establish and maintain liaison with DCHSEMA JIC.

2. (U) Provide 1x SM to support JRSOI activities.

3. (U) Market news and feature stories to external media outlets.

4. (U) Prepare for and conduct news conferences and interviews when directed.

5. (U) Train senior leaders E-7 and above to properly conduct news conferences and interviews.

6. (U) Ensure all media information and activities are cleared by the J-3 for security purposes before release.

7. (U) Publish JFHQ-DC Communications Plan.

8. (CUI) Coordinate and execute Media Training with CG DCNG, TAG, and JTF-DC Commander in coordination with NGB/PA.

9. (U) Participate in CAT as required.

10. (CUI) Prepare Annex F to JFHQ-DC OPORD.

CUI//LEI

DCAdd. 059

Confidential - Subject to Protective Order

DCNG_DEF_00000169

OUO//LEI

## OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission

11. (U) DIRLAUTH with DA, NGB, Federal and District partners, and supporting NG States authorized.

### (g) Staff Judge Advocate

1. (U) Provide required legal training and familiarization to all JTF personnel and support TF-JRSOI operations during all phases of the operation.

2. (U) Participate in CAT as required.

3. (U) FOIA – disseminate required information to ensure appropriate records are kept for any FOIA request, coordinate and action FOIA requests as needed.

4. Publish Annex G to JFHQ-DC OPORD.

5. (U) DIRLAUTH with DA, NGB, Federal and District partners, and supporting NG States if authorized.

### (h) USPFO

1. (U) Oversee spending of all federal funds for the mission.
2. (U) Coordinate with J4 to establish contracts for logistical support.

3. (U) Participate in CAT as required.

4. (U) Provide contracting POC IAW J3 instructions.

5. (U) Provide guidance for and assist with capturing reimbursable costs as part of AAR.

### d. Coordinating Instructions

(1) (U) This OPORD is effective upon receipt.

(C

(2) (U) Uniform: Directed to wear OCP, patrol pap, Protective Vest. Face mask/coverings will not be worn. Weapons will not be carried but will be available. No riot gear (No Batons, etc.).

(3) The JIC is the sole approval and release authority for all Make D.C. Safe and Beautiful imagery. JTF-DC and subordinate task force public affairs (PA) elements must submit all imagery for review, approval and release by the JIC, and shall not agree to or conduct any media engagements without prior review and approval from the JIC.

OUO//LEI

DCAdd. 060

Confidential - Subject to Protective Order

CUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

(4) ████ NSSE Transportation / Traffic subcommittee requests that all vehicle blocking positions, all vehicles required to have properly licensed driver and assistant driver. Soldiers to remain at vehicle for duration of mission. Soldiers required to have NBC Pro mask in vehicle.

(5) Submit AAR comments to JFHQ-DC J5/7 NLT End of Mission, TBD (48 hours following mission redeployment)

(6) ████ Deputization within the boundaries of Washington D.C. requires verification of US Citizenship status.

(7) ████ Commander's Critical Information Requirements (CCIRs). Standing CCIRs are in effect and applicable to all NG forces assigned to DCNG in support of The Make D.C. Safe and Beautiful Mission.

(8) (U) Priority Information Requirements (PIR).

a. (U) Specific and credible threats to the Make D.C. Safe and Beautiful Mission.

b. (U) Indications of significant threats that impact the Make D.C. Safe and Beautiful Mission.

c. (U) Indications of reports of civil unrest within the JOA.

(9) (U) Friendly Forces Information Requirements (FFIRs).

a. (U) Any use of force by NG SMs.

b. (U) All breaches of RUF or ROC by NG SMs.

c. (U) Loss of any COMSEC device or COMSEC security comprise.

d. (U) RFAs from supported agencies.

e. **(U) Rules for the Use of Force (RUF) and Rules of Conduct (ROC).** Reference RUF/ROC briefing provided during JRSOI and published to MS Teams.

f. **(U) Risk Reduction Control Measures.**

(1) (U) All vehicle operators will maintain a valid license on the vehicles they operate. All personnel in a moving tactical vehicle will wear helmets.

(2) (U) Personnel assigned to JTF-DC must have completed annual hot weather training and force protection training.

15

CUI//LEI

DCAdd. 061

Confidential - Subject to Protective Order

CUI//LEI

**OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

g. **(U) Environmental Considerations.** Leaders will identify hazards to NG elements and the local population. Units will not conduct operations in an area of known danger to the health of NG elements without the approval of the JTF-DC Commander.

h. **Reporting Requirements**

(1) (U) Reference Annex R for reporting requirements - TBP.

i. **Key Locations**

**4. ADMINISTRATION AND LOGISTICS**

a. **Sustainment.** Refer to Annex D.

b. **Logistics.** Refer to Annex D.

c. **Public Affairs.** Refer to Annex F.

d. **Health Services Support.** Refer to Annex Q.

**5. COMMAND AND CONTROL**

a. **Command.**

(1) **Command Relationships.** Refer to Annex A

(2) **Command Posts**

a. (U) JFHQ-DCNG will be located at the D.C. National Guard Armory, 2001 East Capitol Street, S.E., Washington, D.C.

(3) **(U) Succession of Command for this Operation.**

a. Commanding General
b. The Adjutant General – Vacant, TBD
c. The Director of the Joint Staff
d. CDR JTF-DC
e. 113th Wing Commander

16

DCAdd. 062

Confidential - Subject to Protective Order

DCNG_DEF_00000172

OPORD 11-2025 DISTRICT OF COLUMBIA NATIONAL GUARD SUPPORT TO THE
Make D.C. Safe and Beautiful Mission

  b.  **(U) Command, Control, Communications, and Computer (C4) Systems.**
      Refer to Annex K.


  ACKNOWLEDGE:


                                        //SIGNED//
                                        JOHN C. CAMPO
                                        BRIGADIER GENERAL, USAF
                                        DIRECTOR, JOINT STAFF



  OFFICIAL:
  ██████████

  COL, DCNG
  J-3

  Annex A TASK ORG - TBP
  Annex C OPERATIONS – TBP
  Annex D LOGISTICS - TBP
  Annex E PERSONNEL- TBP
  Annex F PUBLIC AFFAIRS- TBP
  Annex G CIVIL/MILITARY OPERATIONS (JAG/LEGAL) - TBP
  Annex K COMMAND, CONTROL, COMMUNICATIONS, AND COMPUTER (C4)
  SYSTEMS- TBP
  Annex Q – HEALTH SERVICES- TBP
  Annex R - REPORTS

17

DCNG_DEF_00000173

Copy __ of __ copies
DCNG Armory,
Washington, DC
291700AUG25

**FRAGO 15 to OPORD 04-2025 - JTF-DC SUPPORT TO Make D.C. Safe and Beautiful Mission**

(U) **References: (NO CHANGE)**

(U) **Time zone used throughout**: Romeo (Local).

(U) **Task organization:** (NO CHANGE)

1. (COT) **Situation.** (NO CHANGE)

2. (U) **Mission.** (NO CHANGE)

3. (U) **Execution.**

    a. (NO CHANGE)

    b. (U) Concept of the Operation. (NO CHANGE)

    c. (U) <u>Tasks to Subordinate Units and Directorates</u>.

        (1) (U) Subordinate headquarters.

            (a) (U) TF Red Hand (372$^d$ Military Police Battalion) (NO CHANGE)

            (b) (████) TF Iron Horse (SCNG).

                1. Coordinate with TF Volunteer for tasking of 1 x ████████

            (c) TF Mountaineer (WVNG). (NO CHANGE)

            (d) TF Magnolia (MSNG) (NO CHANGE)

            (e) TF Volunteer (TNNG)

Controlled by: DCNG
Controlled by: JTF-DC-J3
CUI Category: OPSEC
    Limited Dissemination Control: FEDCON
    POC: ████████

1

████████

CUI//LEI

**FRAGO 16 to OPORD 04-2025 JTF-DC SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

1. Provide 1 x ▮▮▮▮▮▮▮▮ during next ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ Coordinate with TF Iron Horse for PLT tasks.

(2) (U) Direct Reporting Units.

(f) (U) HHC, 74th Troop Command. (NO CHANGE)

(g) (U) 715th Public Affairs Detachment. (NO CHANGE)

(2) (U) Tasks to Staff. (NO CHANGE)

(a) J-1. (NO CHANGE)

(b) J-2. (NO CHANGE)

(c) J-3. (NO CHANGE)

(d) J-4. (NO CHANGE)

(e) J-6. (NO CHANGE)

d. (U) Coordinating Instructions.

(1-9) Timeline: (NO CHANGE)

(10) ▮▮▮▮ Other Coordinating Instructions:

(a) (CHANGE) All units input data into attachment 1 to FRAGO 16
▮▮▮▮▮▮ for the following 48 hours operational period for ongoing operational
taskings.

(b-r) (NO CHANGE)

(s) (CHANGE) Battle Rhythm:



CUI//LEI

2

Confidential - Subject to Protective Order

CUI//LEI

FRAGO 16 to OPORD 04-2025 JTF-DC SUPPORT TO THE Make D.C. Safe and Beautiful Mission



(t-iii) (NO CHANGE)

(jjj) (U) See Attachment 2, DC Safe and Beautiful Force Protection Advisory Message, dated ▮▮▮▮ with guidance for a heightened threat environment. Service members may expect a heightened threat environment within the NCR and increased probability of nefarious threat actors engaging in grievance-based violence, and individuals inspired by foreign terrorist organizations, who view the MDCSB mission as a target of opportunity. Additionally, civilian populations with varying political views, may attempt to engage with JTF-DC SMs.

(kkk) (U) Effective immediately SMs are not allowed to leave the hotels alone, they are to be in buddy teams for force protection.

(lll) ▮▮▮▮All SMs involved with physical contact (pushing, shoving, etc) in sector report to sick call to ensure medical personnel properly document the circumstance and assess for any injuries.

(mmm) All Task Force movements to mission must include a "Line 7 – POC Name, ATAK or Cell #" in every movement reported to the JTF-DC TOC in OPS Chat.

(nnn) (U) See Attachment 4, vehicle route guide/map for ▮▮▮▮ with locations of designated parking and restricted parking areas. POC for this product is JTF Support, ▮▮▮▮ at, ▮▮▮▮

(ooo) (U) See Attachment 3, Media Engagement Quick Reference Guide, from the Joint Information Center (JIC), regarding media engagements throughout OPN MDCSB. POC for this product is the JIC Director, ▮▮▮▮ ▮▮▮▮

4. (U) **Sustainment.**

(a-e) (NO CHANGE).

3

CUI//LEI

DCAdd. 066

Confidential - Subject to Protective Order

DCNG_DEF_00003478

CUI//LEI

**FRAGO 16 to OPORD 04-2025 JTF-DC SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

    f. All GSA vehicles must utilize a driver's log. The log must be completed every time a new driver utilizes the vehicle and must be kept in the vehicle at all times. See attachment 2 for driver's Log form. POC is JTF J-4 ███████ at ███████████████

    g. All TFs provide input and validate the "JTF Meal Forecast Tracker" ███████████ for the next week ███████████ NLT ███████████ for submission to JTF Support for meal allocation. Task Forces will use the third tab only to roll-up their task force only. POC is JTF J-4 ███████ at ███████████

    h. Water is available in bottles and in the water buffalo at ███████████ The primary water source is the camelback hydration system. All TFs provide the number of camelback's needed for roll-up to NGB for issuance (Camelback roll-up). POC is JTF J-4 ███████████ at ███████████

    i. Laundry services start ███████████ Ensure all SM have a laundry bag and contact hotel laundry POC for each TF for laundry drop off/pick up process per your laundry POCs. See ███████████ for POC at each hotel. POC is JTF J-4 ███████████ at ███████████

    j. Effective ███████████ TFs provide logistics requests to the JTF J4 through the JTF J4 request form, attachment 3. ███████████ TF's complete form and ensure document is named with the following format ███████████ and email to ███████████ Purchase requests must include a quote for GPC purchases. The QR code is now obsolete. POC is JTF J-4 ███████████ at ███████████

    k. All vehicles must carry accident reporting documentation, see attachment 2 "Ground Vehicle Mishap Report Documents". The POC for this action is ███████████ at ███████████

    l. TF Leaders will select one (1) Senior Medic per state to submit Class VIII and M3W requests; upon submission, the POC will be contacted within two (2) business days to confirm the request and coordinate pickup based on location. Request can be made via ███████████

███████████████████████████████████

4

CUI//LEI

Confidential - Subject to Protective Order

CUI//LEI

**FRAGO 16 to OPORD 04-2025 JTF-DC SUPPORT TO THE Make D.C. Safe and Beautiful Mission**



    m. All TF (State) Level Commands, provide a memorandum for record NLT ████████ from each State, identifying the quantity of M-17s needed to support OPN MDCSB to the JTF J4. The memorandums will be used to determine the number of weapons and/or weapons holsters required to issue, for each supporting States. Any property provided to supporting States will be laterally transferred in accordance with the **Property transfer guidance.** Any State/Territory receiving weapons and/or weapon holsters from DCNG JFHQ will have those items laterally transferred via GCSS-Army IAW AR-735-5, AR 710-4 and DoDI 1200.18. The POCs JTF J-4 ████████ at ████████████

5. (U) **Command and Signal.**

   a. Please find revised Attachment 4 to FRAGO 10 ████████████████ ████████████

   b. All TFs provide ████████ report ████████ (attachment 1), at ████ and ████████ in the ████████ on the ████████ hannel ████ ████████ POC is JTF J-4 ████████████ at ████████ and ████████████ at ████████

    **ACKNOWLEDGE:**

                                            DOANE
                                            COL

OFFICIAL:
████████████

CUI//LEI

DCAdd. 068

Confidential - Subject to Protective Order

DCNG_DEF_00003480

CUI//LEI

**FRAGO 16 to OPORD 04-2025 JTF-DC SUPPORT TO THE Make D.C. Safe and Beautiful Mission**

 DCARNG
J3

**Annexes:**

Annex A–Task Organization. Omitted.
Annex B–Intelligence. Omitted.
Annex C–Operations.
Annex D–Fires. Omitted.
Annex E–Protection. Omitted.
Annex F–Sustainment. Omitted.
Annex G–Engineer. Omitted.
Annex H–Signal. Omitted.
Annex I–Announcements.
Annex J–Public Affairs. Omitted.
Annex K–Civil Affairs Operations. Omitted.
Annex L–Information Collection. Omitted.
Annex M–Assessment. Omitted.
Annex N–Spare. Omitted.
Annex O–Spare. Omitted.
Annex P–Host-Nation Support. Omitted.
Annex Q–Knowledge Management. Omitted
Annex R–Reports. Omitted.
Annex S–Special Technical Operations. Omitted.
Annex T–Spare. Omitted.
Annex U–Inspector General. Omitted.
Annex V–Interagency Coordination. Omitted.
Annex W–Operational Contract Support. Omitted.
Annex X–Spare. Omitted.
Annex Z–Distribution. Omitted.

CUI//LEI

DCAdd. 069

Confidential - Subject to Protective Order

DCNG_DEF_00003481

UNCLASSIFIED





# DC Safe and Beautiful
# Force Protection Advisory Message
### *28 AUG 2025*

**Current FPCON BRAVO**                                        **Tracking #2025-002**

(U) **SUMMARY:** JTF-DC Servicemembers may expect a heightened threat environment while supporting the "Make DC Safe and Beautiful" (MDCSB) mission within the NCR. Threat/nefarious actors engaging in grievance-based violence, and those inspired by foreign terrorist organizations, may view the MDCSB mission as a target of opportunity. Additionally, civilian populations with varying political views may attempt to engage with JTF-DC SMs.

(U) **RECOMMENDED ACTIONS:** Local law enforcement agreed to increase patrols in the vicinity of JTF lodging. JTF members should also implement the following Force Protection measures:

> (U) Always use the buddy system.

> (U) Change into civilian clothing when off mission or off lodging premises.

> (U) Report all incidents of verbal or written threats towards JTF members.

> (U) Provide the 5Ws for all suspicious activity witnessed by JTF members.

including any context, details, or descriptions.

## (U) REPORTING CHANNELS:

> (U) Local Law Enforcement partners

> (U) Chain of Command

> (U) DCNG JOC: ▓▓▓▓▓▓▓▓ or ▓▓▓▓▓▓▓▓▓▓▓▓

(U) **LOCATIONS:** The National Capital Region (NCR) and TF Hotel locations.

(U) Distribute to the maximum extent possible.

UNCLASSIFIED

Confidential - Subject to Protective Order



# MAKE DC SAFE AND BEAUTIFUL

HQDA | DCS | G-3/5/7





**MISSION:** Effective immediately, D.C. National Guard (DCNG) supports law enforcement entities in the District of Columbia to restore law and order across the District.

**INTENT**

To provide a highly visible crime deterrent and increase safety across all eight wards of the District.

**KEY TASKS**
- Monument Security / Presence Patrols
- Blocking Positions / Entry Control Management
- Area Beautification

**AREA BEAUTIFICATION**

Current Projects: Fletchers Cove & Lincoln Memorial

Cumulative Statistics: 63 Projects completed: (54 Federal | 8 District | Community Support 1)
1,015 bags of trash collected (791 Federal | 224 District); 1,045 cubic yards of mulch spread; 5 truck loads of plant waste; 6.7 miles of roadway cleaned; 1.5 miles of road vegetation cleared; 270 feet of fence painted; 5,030 pounds of food packaged; over 4,220 service member hours

Personnel:
75 Personnel

**JTF-DC: PERSTAT (2316)**
**CAO 16 1200 SEP 25**

| STATE/UNIT | Infill / Exfil | JRSOI Complete ARNG / ANG | Armed Deputation | JTF-DC Conducting Ops | JTF-DC Supporting Ops |
|---|---|---|---|---|---|
| DC | +5 / 0 | 847 / 112 | 299 | 259 | 700 |
| WV | 0 / -2 | 350 / 61 | 347 | 342 | 69 |
| SC | 0 / 0 | 262 / 1 | 223 | 257 | 6 |
| OH | 0 / 0 | 150 / 0 | 144 | 150 | 0 |
| TN | 0 / -5 | 154 / 13 | 146 | 167 | 0 |
| MS | 0 / 0 | 179 / 7 | 154 | 186 | 0 |
| LA | 0 / 0 | 139 / 2 | 135 | 134 | 7 |
| SD | 0 / 0 | 12 / 0 | 0 | 0 | 12 |
| GA | 0 / 0 | 27 / 0 | 2 | 20 | 7 |
| TOTAL | +5 / -7 | 2120 / 196 | 1450 | 1515 | 801 |

| | TF Red Hand (DC and OH) Armed | TF Magnolia (MS and LA) Armed | TF Mountaineers (WV) Armed | TF Iron Horse (SC) Armed | TF Volunteer (TN) Armed | JTF-DC (DC) |
|---|---|---|---|---|---|---|
| | T1: Provide support to USPP in Sectors | T1: Provide support to LE at designated | T1: Provide LE support to | T1: Provide LE support to | T1: Provide a (24) pax immediate response force. | T1: Maintain C2 of all JTF-DC personnel assigned. |
| | | | T2: Provide roving patrols in the areas of: | T2: Conduct PP IVO | T2: Conduct PP IVO | T2: Conduct PP |
| | T2: Provide LE support to | | | T3: Conduct PP IVO | T3: Provide LE support at | |
| | T3: Provide 24/7 | | | T4: Conduct PP IVO | T4: AO East internal Response PP I 1600-2400. | |

**Special Considerations**
- AO is divided into sectors (Mall, North, South, East)
- SMs will be armed with their unit issued weapon IAW
- 807 Personnel on mission conducting operations during the 16 SEP duty period
- 75 Personnel supporting beautification mission during the 16 SEP duty period

**Last 24**
- Conducted beautification mission at Independence Ave & Hains Point
- Conducted presence patrol at
- Provided support to LE at
- Continued support to USPP at the National Mall, MLK Memorial, Jefferson Memorial
- Conducted presence patrol at Pennsylvania Ave, Washingto
- Conducted roving patrols in the areas of

**Next 24**
- Conduct beautification mission at Fletchers Cove & Lincoln Memorial
- Provide support to LE at
- Conduct presence patrol at
- Conduct roving patrols in the areas of

Current as of 161200SEP25

BE ALL YOU CAN BE

Confidential - Subject to Protective Order



# MAKE DC SAFE AND BEAUTIFUL

HQDA | DCS | G-3/5/7



**MISSION:** Effective immediately, D.C. National Guard (DCNG) supports law enforcement entities in the District of Columbia to restore law and order across the District.

| INTENT | |
|---|---|
| To provide a highly visible crime deterrent and increase safety across all eight wards of the District. | |

**Current Projects:** Conduct mission analysis for future community action projects and range support

**Cumulative Statistics:** 109 Projects completed: (93 Federal | 15 District) 1,155 bags of trash collected (895 Federal | 260 District); 1,045 cubic yards of mulch spread; 56 truck loads of plant waste; 7.9 miles of roadway cleaned; 400+ trees pruned; 270 feet of fence painted; 6,030 pounds of food packaged; over 6,117 service member hours; 1,710 cubic yards of building cleared

**Personnel:** 40 Personnel

### KEY TASKS
- Monument Security / Presence Patrols
- Blocking Positions / Entry Control Management
- Area Beautification

**JTF-DC PERSTAT (2439)**
**CAO 04 1200 OCT 25**

| STATE/UNIT | Infil / Exfil | JRSOI Complete ARNG / ANG | Armed Deputation | JTF-DC Conducting Ops | JTF-DC Supporting Ops |
|---|---|---|---|---|---|
| DC | +3 / -1 | 835 / 133 | 335 | 225 | 743 |
| WV | +56 / -46 | 343 / 61 | 329 | 334 | 70 |
| SC | 0 / 0 | 41 / 0 | 37 | 39 | 2 |
| OH | 0 / 0 | 153 / 0 | 151 | 153 | 0 |
| MS | 0 / 0 | 181 / 21 | 173 | 182 | 20 |
| AL | +89 / 0 | 197 / 4 | 0 | 0 | 201 |
| LA | 0 / 0 | 138 / 2 | 131 | 140 | 0 |
| SD | 0 / 0 | 10 / 0 | 0 | 0 | 10 |
| GA | +26 / 0 | 320 / 0 | 274 | 286 | 34 |
| TOTAL | +174 / -47 | 2218 / 221 | 1430 | 1359 | 1080 |



| TF Red Hand (DC and OH) Armed | TF Magnolia (MS and LA) Armed | TF Mountaineers (WV) Armed | TF Bulldawg (GA) Armed | JTF-DC (DC) |
|---|---|---|---|---|
| T1: Provide LE support at | T1: Provide LE support at | T1: Provide LE support at | T1: Provide LE support at | T1: Maintain C2 of all JTF-DC personnel assigned. |
| T2: Provide PP IVO | T2: Provide PP IVO | T2: Conduct PP IVO | T2: Conduct PP IVO | |
| T3: Provide LE support | T3: Conduct PP IVO | T3: Conduct PP IVO | T3: Conduct PP IVO | |
| T4: Conduct | T4: Conduct PP | T4: Conduct PP | T4: Conduct PP IVO | |
| T5: Conduct PP IVO | T5: Conduct PP IVO | | T5: Conduct Roving Patrol IVO | |
| T6: Conduct PP IVO | T6: Conduct PP IVO | | T6: Provide internal sector relief | 0700-2200. |
| | T7: Conduct PP IVO | | | |
| | T8: Conduct PP IVO | | | |

**Special Considerations**

| Last 24 | Next 24 |
|---|---|
| • Provided support to LE at | • Provide support to LE at |
| • Conducted support Special Olympic Torch Run | • Conducting mission analysis for future community action projects and range support |
| • Provided support to LE at | • Provide support to LE at |
| • Conducted presence patrol at | • Conduct presence patrol |
| • Conducted roving patrol at | • Conduct roving patrol at |
| • Provided | • Provide |

- AC is divided into sectors (Main, North, South, East)
- SMs will be armed with their unit issued weapon IAW
- 675 Personnel on mission conducting operations during the 04 OCT duty period
- 37 Personnel conducting operations on leave/medical during the 04 OCT duty period
- 40 Personnel supporting beautification mission during the 04 OCT duty period
- Armed Deputation reflects new deputation ending on 30 NOV
- IRF is based out of TF Bulldog T6: Provide internal sector relief

Current as of 041200OCT25

BE ALL YOU CAN BE
DCNG_DEF_00003804

DCAdd. 072





 **U.S. ARMY** HQDA | DCS | G-3/5/7

# MAKE DC SAFE AND BEAUTIFUL



**MISSION:** Effective immediately, D.C. National Guard (DCNG) supports law enforcement entities in the District of Columbia to restore law and order across the District.

| INTENT | AREA BEAUTIFICATION |
|---|---|
| To provide a highly visible crime deterrent and increase safety across all eight wards of the District. | **Current Projects:** Washington Monument & Constitution Ave NW |
| **KEY TASKS** | **Cumulative Statistics: 50** Projects completed: **44** Federal | **6** District **934** bags of trash collected (**724** Federal | **210** District); **744** cubic yards of mulch spread; **5** truckloads of plant waste; **5.2** miles of roadway cleaned; **270** feet of fence painted; over **3,180** service member hours |
| • Monument Security / Presence Patrols <br> • Blocking Positions / Entry Control Management <br> • Area Beautification | |
| | **Personnel:** **100 PAX** |

JTF-DC: PERSTAT (2310)
CAO 08 1200 SEP 25

| STATE/UNIT | Infill / Exfil | JRSOI Complete ARNG / ANG | Armed Deputation | JTF-DC Conducting Ops | JTF-DC Supporting Ops |
|---|---|---|---|---|---|
| DC | +4 / -4 | 832 / 123 | 296 | 259 | 696 |
| WV | 0 / 0 | 356 / 62 | 334 | 342 | 76 |
| SC | 0 / 0 | 262 / 1 | 222 | 257 | 6 |
| OH | 0 / 0 | 150 / 0 | 143 | 150 | 0 |
| TN | 0 / 0 | 155 / 18 | 149 | 171 | 2 |
| MS | 0 / 0 | 177 / 7 | 143 | 184 | 0 |
| LA | 0 / -2 | 139 / 2 | 134 | 134 | 7 |
| SD | 0 / 0 | 12 / 0 | 0 | 0 | 12 |
| GA | +1 / 0 | 14 / 0 | 2 | 13 | 1 |
| **TOTAL** | **+5 / -6** | **2097 / 213** | **1423** | **1510** | **800** |



Approximate Shift Schedule (08SEP25)

TF Red Hand (DC and OH) Armed | TF Magnolia (MS and LA) Armed | TF Mountaineers (WV) Armed | TF Iron Horse (SC) Armed | TF Volunteer (TN) Armed | JTF-DC (DC)

T1: Maintain C2 of all JTF-DC personnel assigned.

| Special Considerations | Last 24 | Next 24 |
|---|---|---|
| • Unit coverage areas for security/presence patrols are on a ▮▮▮▮ <br> • SMs will be armed with their unit-issued weapon ▮▮▮▮ <br> • 100 Personnel on mission supporting beautification operations during the 08 SEP duty period | • Provided support to LE at ▮▮▮▮ <br> • Conducted beautification mission at 2 locations with the JOA ▮▮▮▮ <br> • Conducted presence patrol ▮▮▮▮ <br> • Established outer cordon ISO USMS warrant at ▮▮▮▮ <br> • Conducted presence patrol at ▮▮▮▮ <br> • Provided support to LE at ▮▮▮▮ <br> • Conducted presence patrol at ▮▮▮▮ <br> • Conducted high visibility missions in ▮▮▮▮ <br> • Conducted high visibility presence a ▮▮▮▮ <br> • Conducted high visibility presence a ▮▮▮▮ <br> • Conducted high visibility presence a ▮▮▮▮ <br> • Conducted high visibility presence a ▮▮▮▮ | • Provide support to LE at ▮▮▮▮ <br> • Conduct beautification mission at 2 locations with the JOA ▮▮▮▮ <br> • Conduct presence patrol ▮▮▮▮ <br> • Provide support to LE at ▮▮▮▮ <br> • Conduct high visibility missions in ▮▮▮▮ <br> • Conduct presence patrol ▮▮▮▮ <br> • Conduct presence patrol ▮▮▮▮ <br> • Conduct presence patrol ▮▮▮▮ <br> • Conduct presence patrol ▮▮▮▮ <br> • Conduct presence patrol ▮▮▮▮ <br> • Conduct presence patrol ▮▮▮▮ |

Current as of 081200SEP25

**BE ALL YOU CAN BE**

DCNG_DEF_00003752

DCAdd. 074