No. 25-5418

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

**DISTRICT OF COLUMBIA**,

*Plaintiff-Appellee*,

**v.**

**DONALD J. TRUMP,** *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Columbia
(Jia M. Cobb, District Judge)

**BRIEF OF AMICI CURIAE MARYLAND, 21 OTHER STATES, AND 3 GOVERNOR'S OFFICES IN OPPOSITION TO EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND FOR STAY PENDING APPEAL**

ANTHONY G. BROWN
Attorney General of Maryland

JULIA DOYLE
Solicitor General

VIRGINIA A. WILLIAMSON
ADAM KIRSCHNER
MICHAEL DREZNER
JAMES C. LUH
Assistant Attorneys General
200 Saint Paul Place
Baltimore, Maryland 21202
vwilliamson@oag.maryland.gov
(410) 576-6584

December 2, 2025                        Attorneys for the State of Maryland

[Additional counsel listed on signature page.]

# TABLE OF CONTENTS

Page

INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT ................ 1

ARGUMENT .................................................................................................. 3

I. THE MILITARY SHOULD NOT DISPLACE LOCAL LAW ENFORCEMENT. ............. 3

II. THE DEFENDANTS' ACTIONS VIOLATE FOUNDATIONAL PRINCIPLES OF FEDERALISM. ................................................................. 5

III. STATES AND LOCALITIES SUFFER ADDITIONAL INJURIES FROM THE DEPLOYMENT OF FEDERALIZED SOLDIERS ....................................... 9

CONCLUSION ............................................................................................. 12

# TABLE OF AUTHORITIES

Page

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982).......5

*Bissonette v. Haig*, 776 F.2d 1384 (8th Cir. 1985) ....................................................3

*Illinois v. Trump*, 155 F.4th 929 (7th Cir. 2025) ....................................................5, 8

*Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645
   (N.D. Ill. Oct. 10, 2025)........................................................................ 4, 7, 8, 11

*Laird v. Tatum*, 408 U.S. 1 (1972)............................................................................3

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) .........................5

*New York v. United States*, 505 U.S. 144 (1992).....................................................2

*Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 2817646
   (D. Or. Oct. 4, 2025)......................................................................................... 10, 11

*Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 3126773
   (D. Or. Nov. 7, 2025)..........................................................................................9, 11

**Constitutional Provisions**

U.S. Const. amend. III................................................................................................5

U.S. Const. amend. IV ...............................................................................................5

U.S. Const. amend. V.................................................................................................5

U.S. Const. amend. X.................................................................................................5

U.S. Const. art. I, § 8, cl. 16.......................................................................................5

**Statutes**

32 U.S.C. § 502(f)......................................................................................................6

## Miscellaneous

Army National Guard, *Basic Training Phases*, https://perma.cc/DP63-7SAU.........3

Clara Harter, *National Guard Troops Deployed to L.A. Were Sent to Riverside County Marijuana Farm Raid*, Los Angeles Times (June 24, 2025), https://perma.cc/676E-X5AZ................................................................................7

Clayton D. Laurie & Ronald H. Cole, *The Role of Federal Military Forces in Domestic Disorders 1877-1945* (1997) ..............................................................6

Julie Watson & Christopher Weber, What to Know About the Troops and Federal Agents in LA's MacArthur Park, Associated Press (July 7, 2025), https://perma.cc/Z72Z-WTEU ..........................................................................10

Mary C. Lawton, Memorandum from Antonin Scalia to the Deputy Att'y Gen. re: Law Relating to Civil Disturbances (Jan. 6, 1975), https://perma.cc/B628-5ANM. ............................................................................................6

Police Exec. Res. Forum, *MPD Leaders Should Remain in Charge of Their Police Department* (Aug. 16, 2025), https://perma.cc/89X3-3KCH ..............................4

Remarks to the Department of War in Quantico, Virginia, 2025 Daily Comp. Pres. Doc. 970 (Sept. 30, 2025)....................................................... 2, 3, 11

Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789-1878* (2011) ......................................................................................6

*The Federalist* No. 29 (Alexander Hamilton)............................................................7

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rule 28(a)(1), the undersigned certifies as follows:

A. All parties and amici appearing before the District Court and in this Court are listed in the appellants' Emergency Motion for Administrative Stay and for Stay Pending Appeal and the Opposition of Appellee the District of Columbia to Appellants' Emergency Motion for Administrative Stay and for Stay Pending Appeal.

B. References to the rulings under review appear in the appellants' Emergency Motion for Administrative Stay and for Stay Pending Appeal and the Opposition of Appellee the District of Columbia to Appellants' Emergency Motion for Administrative Stay and for Stay Pending Appeal.

C. Related cases are listed in the appellants' Emergency Motion for Administrative Stay and for Stay Pending Appeal and the Opposition of Appellee the District of Columbia to Appellants' Emergency Motion for Administrative Stay and for Stay Pending Appeal.

            /s/ Virginia A. Williamson
            _____
            Virginia A. Williamson

## INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT

The Amici States fully support and depend upon the brave men and women of the National Guard and have strong interests in preventing their unlawful deployment.[1] The Amici States also condemn in the strongest terms the heinous attack last week on two West Virginia National Guard members in the District of Columbia.

In the stay motion, the President has asserted a sweeping power far out of step with our Nation's laws and tradition: the power to deploy unlimited numbers of National Guard troops for seemingly any reason and without any judicial review. As the district court explained, under the defendants' view, "the President could send a non-federalized National Guard unit to another state, against the receiving state's will, to conduct any operation or mission the President directs." (Add. 56.)[2] Such a power strikes at the foundations of state sovereignty, and this Court should not endorse it.

---

[1] The Amici States are the States of Maryland, Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin and the Governors of Kansas, Kentucky, and Pennsylvania.

[2] Citations to "Add. XX" are to the addendum submitted with the defendants' motion.

In recent months, the Trump Administration has sent or attempted to send National Guard members into one community after another: in California, Oregon, Illinois, and the District of Columbia. Those Amici States whose sovereignty, authority, and communities have not already been threatened fear they will be next. Indeed, on September 30, 2025, President Trump made plain his desire to "use some of these dangerous cities" (namely, "the ones that are run by the radical-left Democrats") as "training grounds for our military—National Guard."[3] In the same speech, President Trump declared, "[W]e're going to straighten them out one by one."[4]

The threat posed to the sovereignty of the Amici States and our structure of federalism is significant. The President's desire to transform American cities into military "training grounds" does not permit him to use troops to address "crime" or quash protests. The Constitution "divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." *New York v. United States*, 505 U.S. 144, 187 (1992).

The motion for stay should be denied.

---

[3] Remarks to the Department of War in Quantico, Virginia, 2025 Daily Comp. Pres. Doc. 970, at 12 (Sept. 30, 2025).

[4] *Id.*

# ARGUMENT

**I.    THE MILITARY SHOULD NOT DISPLACE LOCAL LAW ENFORCEMENT.**

"Civilian rule is basic to our system of government." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985), *on reh'g*, 800 F.2d 812 (8th Cir. 1986), *aff'd*, 485 U.S. 264 (1988). Civilian authority is necessary to uphold our liberties because the "use of military forces to seize civilians can expose civilian government to the threat of military rule and the suspension of constitutional liberties." *Id.* Accordingly, "a traditional and strong resistance of Americans to any military intrusion into civilian affairs . . . has deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Yet President Trump has deployed or sought to deploy the National Guard as domestic law enforcement at least four times in as many months and describes this as part of how he will "handle" what he calls "the enemy from within."[5] This deployment of federalized National Guard troops threatens our constitutional tradition and the freedoms it protects.

Moreover, National Guard units are a poor fit for local law enforcement. National Guard basic training is geared toward preparing a fighting force. *See* Army National Guard, *Basic Training Phases*, https://perma.cc/DP63-7SAU (basic training for Army National Guard). "Local agencies are responsive to their local

---

[5] Remarks to the Department of War in Quantico, Virginia, 2025 Daily Comp. Pres. Doc. 970, at 13 (Sept. 30, 2025).

3

communities in a way that federal agencies," and certainly soldiers from other States, "are not."[6] State and local law enforcement are more familiar with the laws they are enforcing. Their training and practices, such as rules of engagement and policies on use of force, are often tailored to local needs. *See* Decl. of German Hurtado ¶ 17 (ECF 183-5), *Newsom v. Trump*, No. 3:25-cv-04870-CRB (N.D. Cal. Sept. 2, 2025) ("LAPD relentlessly trains its personnel on the tenets of constitutional policing, use of force, and crowd management and control, as well as historical perspective of the local communities and police relations."). Local police officers have built relationships with community members, understand relevant interests, and have greater knowledge of the geography, conditions, and people. *See id.* ¶ 9 (explaining that LAPD "implemented an initiative to protect Los Angeles by . . . engaging the public to help inform best practices").

By contrast, the defendants act as if National Guard members, from anywhere in the country, may be deployed as federal law enforcement with minimal notice and training. As the Seventh Circuit recognized, this view conflicts with the public's "significant interest in having only well-trained law enforcement officers deployed

---

[6] Police Exec. Res. Forum, *MPD Leaders Should Remain in Charge of Their Police Department* (Aug. 16, 2025), https://perma.cc/89X3-3KCH; *see also Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *24 (N.D. Ill. Oct. 10, 2025) (explaining that deploying "militarized actors unfamiliar with local history and context whose goal is 'vigorous enforcement' of the law is not in the community's interest" (citation omitted)).

4

in their communities and avoiding unnecessary shows of military force in their neighborhoods, except when absolutely necessary and justified by law." *Illinois v. Trump*, 155 F.4th 929, 940 (7th Cir. 2025).

## II. THE DEFENDANTS' ACTIONS VIOLATE FOUNDATIONAL PRINCIPLES OF FEDERALISM.

The Constitution establishes a federal government of limited, enumerated powers, and a general police power is not among them. Rather, it is the States and local jurisdictions that enjoy "great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (citation omitted). The District of Columbia similarly enjoys autonomy guaranteed by Congress under the Home Rule Act, so that the defendants' deployment of National Guard soldiers infringes on the District's authority and its ability to enforce its own legal code. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982) (explaining that States have a sovereign interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction" and that "this involves the power to create and enforce a legal code, both civil and criminal"). Many of the protections the Founders enshrined in the Constitution were intended to ensure that the abuses of British rule would not be repeated. *See, e.g.*, U.S. Const. art. I, § 8, cl. 16 & amends. III, IV, V, X.

Consistent with the inherently state and local character of the police power and limitations established by Congress, the President has used militia members in domestic law enforcement only as "a last resort." Mary C. Lawton, Memorandum from Antonin Scalia to the Deputy Att'y Gen. re: Law Relating to Civil Disturbances at 9 (Jan. 6, 1975), https://perma.cc/B628-5ANM; *see also, e.g.*, Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789-1878*, at 347 (2011) (presidents rarely used militia to address domestic emergencies); Clayton D. Laurie & Ronald H. Cole, *The Role of Federal Military Forces in Domestic Disorders 1877-1945*, at 187 n.18 (1997) ("After 1865, no president federalized the National Guard for use in a domestic disorder for nearly a century."). Yet in August, President Trump ordered the National Guard into the District of Columbia to address "crime" in the city, purportedly under the authority of 32 U.S.C. § 502(f). (Add. 8.) The decision to deploy armed soldiers into the Nation's capital and entangle them in everyday civilian law enforcement—over the objections of local elected leaders—is a major break from precedent and runs counter to constitutional limitations. Section 502(f) authorizes Guard members only to "perform training or other duty" at the request of the President, yet the defendants have asserted that "*nothing* [therein] limits the type of missions that the President and Secretary of Defense can request." Mot. for Stay at 10 (emphasis added). Such an assertion of Presidential authority would have shocked the Framers and is not supported by the statutory text upon

6

which the defendants rely. In fact, when debating the Constitution, Alexander Hamilton thought it "preposterous" that militia could ever be deployed to another jurisdiction to impose a President's will. *The Federalist* No. 29 (Alexander Hamilton) (rejecting the "exaggerated and improbable suggestions" that federally controlled militia "of Virginia are to be dragged from their homes five or six hundred miles, to tame the republican contumacy of Massachusetts").[7]

The recent experiences of some Amici States, though, exemplify the very use of military force that the Founders feared. For example, the Administration initially attempted to justify its federalization of California National Guard elements as a response to protests in Los Angeles in June. But federalized California National Guard members were soon deployed to assist drug enforcement raids more than 140 miles away. *See* Clara Harter, *National Guard Troops Deployed to L.A. Were Sent to Riverside County Marijuana Farm Raid*, L.A. Times (June 24, 2025), https://perma.cc/676E-X5AZ. Months later, even the United States had acknowledged that any justification for their deployment had faded. *See* Application to Stay the Order Issued by the U.S. District Court for the Northern District of Illinois and Request for an Immediate Administrative Stay at 7, *Trump v. Illinois*, No. 25A443 (U.S. Oct. 17,

---

[7] *See Illinois*, 2025 WL 2886645, at *18 ("[T]he assurances of our Founders make[] clear that the power to call forth the militia to execute the laws was not to be employed merely in cases of the need for law enforcement . . . .").

2025). Yet the Administration sent many California Guard members to support broad operations in Oregon or to conduct training in Illinois. *See* Plaintiffs' Supplement in Further Support of Their Motion for a Temporary Restraining Order and Preliminary Injunction at 8 (ECF 63), *Illinois v. Trump*, No. 1:25-cv-12174 (N.D. Ill. Oct. 9, 2025). Illinois and Oregon, in turn, had to rush to court to prevent the unlawful deployment of federalized troops into their jurisdictions. *E.g.*, *Illinois*, 2025 WL 2886645. Even today, California National Guard members remain in federalized status.

In granting or upholding temporary injunctive relief, courts have underscored the harm to state authority and sovereignty if these deployments are allowed to go forward. In Illinois, for example, the Seventh Circuit held that the deployment of federalized "Guard troops in the state over the state's objection" was "proof of an irreparable harm." *Illinois*, 155 F.4th at 940 (citation omitted). Moreover, the Seventh Circuit held, "the deployment of National Guard members from Texas—an incursion on Illinois's sovereignty—makes the constitutional injury especially significant." *Id*. Similarly, in Oregon, the district court agreed that the President had unlawfully commandeered state National Guardsmen and that the non-consensual deployment of federalized California and Texas National Guard members in Portland constituted a clear "violation of Oregon's 'sovereignty under

the Constitution.'" *Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 3126773, at *48 (D. Or. Nov. 7, 2025) (citation omitted).

Permitting a military deployment into the District, using the National Guard of other States under Title 32, threatens the security and autonomy of all States and local jurisdictions. (*See* Add. 56 n.33 ("Defendants have not articulated how their interpretation of section 502(f) would apply differently to states, as opposed to the District.").) This Court should decline the defendants' invitation to take such an unprecedented and drastic step.

### III. STATES AND LOCALITIES SUFFER ADDITIONAL INJURIES FROM THE DEPLOYMENT OF FEDERALIZED SOLDIERS.

The deployment of soldiers in the District of Columbia is just part of an ongoing pattern in which the President deploys the military to States and cities and thereby inflicts myriad injuries on those jurisdictions.

The ongoing deployment of federalized National Guard troops has harmed California in multiple ways. First, the presence of federalized troops sows confusion and necessitates additional state and local law enforcement resources to respond to ensuing protests. *See, e.g.*, Decl. of Joseph Zizi ¶¶ 12, 15 (ECF 77-3), *Newsom v. Trump* (N.D. Cal. June 16, 2025). Second, deployment of federalized National Guard alongside law enforcement hampers clear communications and unified command because Guard members are "not familiar with the rules of engagement, the laws of arrest, or rules and policy regarding the use of force in policing and

domestic law enforcement." Decl. of Daniel Randolph ¶ 20 (ECF 87-4), *Newsom v. Trump* (N.D. Cal. June 19, 2025). Third, the militarized presence of the National Guard chills consumer and community activities by stoking fear, causing people to stay home and avoid areas where the military is deployed. Decl. of Carlos A. Singer ¶¶ 7-10 (ECF 183-3), *Newsom v. Trump* (N.D. Cal. Sept. 2, 2025); Decl. of Oliver Alpuche ¶ 10 (ECF 183-6), *Newsom v. Trump* (N.D. Cal. Sept. 2, 2025) (noting a 40% drop in business for a downtown Los Angeles business owner since the federalization began). During the widely publicized Department of Homeland Security operation dubbed Operation Excalibur, for instance, approximately 80 federalized National Guard troops accompanied dozens of federal officers and tactical vehicles to a park in a densely populated Los Angeles neighborhood, causing the closure of at least one nearby business. *See* Trial Tr. 35:19-23, 37:15-18 (ECF 162), *Newsom v. Trump* (N.D. Cal. Aug. 11, 2025); Julie Watson & Christopher Weber, *What to Know About the Troops and Federal Agents in LA's MacArthur Park*, Associated Press (July 7, 2025), https://perma.cc/Z72Z-WTEU.

Moreover, as the district court in Oregon concluded in blocking the attempted deployment of the National Guard in Portland, "[f]ederalizing Oregon National Guard members diverts them from their state responsibilities, which impairs the State's ability to call on the Guard to respond to emergencies." *Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 2817646, at *14 (D. Or. Oct. 4, 2025). The

10

National Guard deployment to Portland also was counterproductive to its purported aim of calming protests. *See Oregon*, 2025 WL 3126773, at *25. The district court credited evidence suggesting that, had the deployments not been blocked, the protests would have only grown. *See Oregon*, 2025 WL 2817646, at *14.

Similarly, in Illinois, the district court recognized that "deployment of National Guard members is likely to lead to civil unrest, requiring deployment of state and local resources to maintain order." *Illinois*, 2025 WL 2886645, at *23. Indeed, the court observed, deployment of the federalized National Guard at the site of protests "or anywhere else in Illinois will only add fuel to the fire that Defendants themselves started." *Id*.

Unless the defendants are checked by the rule of law, the President will, in his own words, send the military to yet more cities in the Amici States, "one by one," to "straighten them out."[8] The Amici States accordingly urge this Court to deny the defendants' motion, and thereby protect the sovereignty of the States and the civil liberties of all Americans.

---

[8] Remarks to the Department of War in Quantico, Virginia, 2025 Daily Comp. Pres. Doc. 970, at 12 (Sept. 30, 2025).

# CONCLUSION

The motion for stay should be denied.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

JULIA DOYLE
Solicitor General

/s/ Virginia A. Williamson

_____
VIRGINIA A. WILLIAMSON
ADAM KIRSCHNER
MICHAEL DREZNER
JAMES C. LUH
Assistant Attorneys General
200 Saint Paul Place
Baltimore, Maryland 21202
vwilliamson@oag.maryland.gov
(410) 576-6584

December 2, 2025            Attorneys for the State of Maryland

| | |
|---|---|
| KRISTIN K. MAYES<br>Attorney General of Arizona | ROB BONTA<br>Attorney General of California |
| PHILIP J. WEISER<br>Attorney General of Colorado | WILLIAM TONG<br>Attorney General of Connecticut |
| KATHLEEN JENNINGS<br>Attorney General of Delaware | ANNE E. LOPEZ<br>Attorney General of Hawaiʻi |
| KWAME RAOUL<br>Attorney General of Illinois | AARON M. FREY<br>Attorney General of Maine |

| | |
|---|---|
| JUSTIN WHITTEN<br>Attorney for Governor Kelly<br>Office of the Governor of Kansas | S. TRAVIS MAYO<br>Attorney for Governor Andy Beshear<br>Office of the Governor of Kentucky |
| ANDREA JOY CAMPBELL<br>Attorney General of Massachusetts | DANA NESSEL<br>Attorney General of Michigan |
| KEITH ELLISON<br>Attorney General of Minnesota | AARON D. FORD<br>Attorney General of Nevada |
| MATTHEW J. PLATKIN<br>Attorney General of New Jersey | RAÚL TORREZ<br>Attorney General of New Mexico |
| LETITIA JAMES<br>Attorney General of New York | JEFF JACKSON<br>Attorney General of North Carolina |
| DAN RAYFIELD<br>Attorney General of Oregon | JOSH SHAPIRO<br>Governor of Pennsylvania |
| PETER F. NERONHA<br>Attorney General of Rhode Island | CHARITY R. CLARK<br>Attorney General of Vermont |
| NICHOLAS W. BROWN<br>Attorney General of Washington | JOSHUA L. KAUL<br>Attorney General of Wisconsin |

## CERTIFICATE OF SERVICE

I certify that on December 2, 2025, this brief was electronically filed with the Clerk of the Court using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

/s/ Virginia A. Williamson
Virginia A. Williamson

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a) because the brief contains 2,546 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Virginia A. Williamson
Virginia A. Williamson
