No. 25-5418

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

DISTRICT OF COLUMBIA,
    *Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,
    *Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia

# REPLY IN SUPPORT OF EMERGENCY MOTION FOR ADMINISTRATIVE STAY
# AND FOR STAY PENDING APPEAL

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7539*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *202-514-3511*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................2

    A.    The federal government is likely to prevail on the merits .....................2

    B.    The remaining factors support a stay .......................................................8

CONCLUSION ...................................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Case:** **Page(s)**

*Banner v. United States*,
  428 F.3d 303 (D.C. Cir. 2005) ................................................................ 7

**Statutes:**

32 U.S.C. § 502(f) ................................................................................... 4

32 U.S.C. § 502(f)(2)(A) ................................................................... 4,, 6

42 U.S.C. § 5170a-b ................................................................................ 3

D.C. Code § 1-206.02(b) ......................................................................... 6

D.C. Code § 5-129.03 .............................................................................. 4

D.C. Code § 49-101 ................................................................................. 5

D.C. Code § 49-102 ................................................................................. 5

D.C. Code § 49-404 ................................................................................. 5

D.C. Code § 49-901 ................................................................................. 5

**Other Authorities:**

Jeff Abell, *National Guard's Presence Slashes D.C. Crime Rates,
  With Seven Days Homicide-Free* (Aug. 20, 2025),
  https://foxbaltimore.com/news/city-in-crisis/national-guards-
  presence-slashes-dc-crime-rates-with-seven-days-homicide-free ........ 9

CrimeData DC, https://www.crimedatadc.com/todate/homicide
  (last visited Dec. 2, 2025) ...................................................................... 9

# GLOSSARY

| | |
|---|---|
| Emergency Management Assistance Compact | EMAC |
| Metropolitan Police Department | MPD |

## INTRODUCTION

The President, Commander-in-Chief of the D.C. National Guard, deployed the Guard in a federal enclave to further federal interests. That deployment—and deployment of out-of-District Guard members—is expressly authorized by multiple provisions of Titles 32 and 49. The district court's contrary analysis makes the President a functionary who can only call forth the Guard for largely ceremonial purposes, or upon request from the Mayor or subordinate Executive-Branch officials in response to a riot or similar tumult. Those limitations have no textual basis and would leave the D.C. Guard unable to perform most functions historically conducted by state Guards.

As for state Guards, the district court either held that the deploying States lacked authority under their own laws (an unsubstantiated conclusion), or that the deployments are unlawful because the D.C. Guard's deployment was unlawful, which is manifestly incorrect. And Plaintiff barely defends the district court's erroneous reasoning that state National Guard assistance can be sought only by the D.C. Mayor under the Emergency Management Assistant Compact (EMAC).

The balancing of harms overwhelmingly supports a stay. D.C. is suffering from a violent-crime emergency, as made starkly manifest by the recent horrific attack on deployed Guard members. But due to the mission, violent crime has fallen, by some measures dramatically. The Guard has coordinated with local officials,

including the Metropolitan Police Department (MPD). And harm to Plaintiff is nonexistent. Plaintiff does not suffer any "sovereign injury" from the deployment of the Guard (over which it has no control) or its operations (which do not include arrests, prosecutions, or investigations). A stay pending appeal is warranted, and in all events the Court should issue an administrative stay by December 4.

## ARGUMENT

**A.   The federal government is likely to prevail on the merits.**

**1.** The President is Commander-in-Chief of the Guard, a federal force; the D.C. Code is federal law; and violent crime in D.C. is a federal concern. Mot.12-13. The President does not need express statutory authority to deploy a federal force in support of federal interests in a federal enclave, consistent with how state guards in state service may be used.

Plaintiff repeats the district court's observation that state statutes separately note the purposes for which state Guards can be deployed. Op.11. But those provisions are capacious and state Guards routinely execute the laws at the Governor's direction. Add.24-25.[1] In any event, that some States delineate the purposes for which the Guard can be deployed cuts against Plaintiff's reading. Congress took a different approach in Title 49, opting for a general delegation of

---

[1] Plaintiff characterizes "aid to civil authorities" as "more limited" than "execute the laws." Op.14. But the former subsumes the latter: one of the main things civil authorities do is execute the laws.

2

authority to the President as Commander-in-Chief. Apart from Section 49-103—which is a *command* to the President—there is no provision directly addressing the President's authority to call up the D.C. Guard. There is no reason to think that Congress gave the President substantially less ability to use the D.C. Guard than *any* state governor.

Relatedly, Plaintiff advances an implausibly narrow view of the Guard's permissible use. Plaintiff contends the President is limited to using the D.C. Guard for "military" or "training" exercises, Op.12, and otherwise may deploy the Guard only upon a request under Section 49-103 in response to a riot or similar tumult. That would mean that the D.C. Guard could not perform many tasks traditionally performed by state Guards, including responding to natural disasters and border control. Mot.12.

Plaintiff contends that Defendants "retain full authority to deploy DCNG to respond to disasters or emergencies under the Stafford Act." Op.17. But regardless, it is implausible to read *Title 49 itself* so narrowly. And neither of the provisions Plaintiff cites mentions the Guard; they refer to a "Federal agency." 42 U.S.C. § 5170a-b. If Plaintiff contends that Defendants may deploy the Guard for whatever purpose other federal components may be used—absent a specific legal prohibition—that supports Defendants' position.

3

Additionally, while the district court noted the use of the D.C. Guard for law-enforcement functions in connection with inaugurations, Add.49, that too would be illegal under Plaintiff's reading. That use is not described in Section 49-103, and does not fall within Section 49-102 as Plaintiff reads it (limited to military/training exercises). And while the district court cited D.C. Code § 5-129.03, that just authorizes the Mayor to designate special police officers; it does not refer to the Guard.

If specific statutory authority is required, the President has authority to order Guard members "to perform training or other duty," including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense," 32 U.S.C. § 502(f), (f)(2)(A). Defendants did not "forfeit[]" this argument. Op.16. They relied on the President's role as Commander-in-Chief of the D.C. Guard. Through that authority, the Guard was placed in a Section 502(f) mission. Dist.Ct.Dkt.22-23,29. Defendants also reiterated at the hearing that Section 502(f) provided authority for the D.C. Guard deployment. Oct.24 Tr.53-54, 57. And as the district court acknowledged, Add.8, Section 502(f)(2)(A) was invoked in calling the Guard into duty. Add.141. Plaintiff similarly acknowledges that "the Secretary of the Army deployed DCNG in Title 32 status." Op. 7. On the merits, Plaintiff contends that the D.C. Guard "may not grant the President's request under Section 502(f) in violation of the D.C. militia code,"

4

Op.16; but even if Section 502(f) could not override a *specific prohibition* in the D.C. Code, it is plainly a *source of authority* that can authorize deployments.

Regardless, Title 49 authorizes the Commanding General to deploy the Guard "for such drills, inspections, parades, escort, *or* other duties, as he may deem proper," D.C. Code § 49-102. Plaintiff contends that "other duties" should be read as similar to the items that precede it. Op.12. But that interpretive presumption is overridden here for multiple reasons: (1) the preceding section puts "duty" at the end of a similar list in a provision that encompasses aiding civil authorities in executing the laws, D.C. Code § 49-101; (2) other provisions (*id.* §§ 49-404, 49-901[2]) contemplate aid to civil authorities in situations not covered by Section 49-103; and (3) Plaintiff's reading would result in a Guard that could do almost nothing. In any event, the Guard's limited mission—focused on providing a presence to deter crime—is not fundamentally dissimilar to the other listed items. Mot.14.

Plaintiff also argues that the Guard cannot aid civil authorities absent a request under Section 49-103 from the Mayor or two specified federal officials. But the President's use of the Guard obviously is not limited to the restrictive conditions described in Section 49-103. Nothing in Section 49-103 suggests that it is exclusive.

---

[2] As to Section 49-901, Plaintiff's response is unpersuasive. The residual language it emphasizes from Section 49-103, Op.14, is covered by Section 49-901's "breach of the peace," so "whenever called in aid of civil authorities" must go beyond that to have independent meaning.

5

Reading the provision to require a request from the Mayor to the President would be contrary to the Home Rule Act. *See* D.C. Code § 1-206.02(b).[3] It would also be anomalous for Congress to condition the President's authority to use the Guard on a request from a *subordinate federal official*. *See* Add.36.

Defendants' position does not render Section 49-103 "superfluous." Op.13. Section 49-103 describes circumstances under which designated officials may make a request for Guard assistance *to which the President is obligated to respond*. Mot.15. Properly construed, the provision does independent work.

2. As to out-of-District Guard deployments, little further need be said about the district court's conclusion that 32 U.S.C. § 502(f)(2)(A) "is best understood to encompass operations or missions requested by the President that are authorized under state law." Add.42. If the district court meant the *deploying* state's laws, Plaintiff does not defend that conclusion. Op.21-22. If the court meant out-of-District deployments are unlawful because the D.C. Guard's deployment was unlawful, it identified no textual basis in Section 502(f) for imposing on out-of-District Guard members any particular limitations imposed on the D.C. Guard, and its analysis is simply derivative of its incorrect conclusions as to the D.C. Guard. Mot.17.

---

[3] Plaintiff does not defend the district court's contention that, before 1975, the President could only deploy the Guard upon a District government request. Add.34.

6

Plaintiff's additional arguments lack merit. Not even the district court accepted Plaintiff's argument that the provision is limited to activities similar to "drills" or "training," Op.19; the statute provides for operational missions, and the Guards have "frequently" conducted operations going well beyond drills or training. Mot.10. Plaintiff, echoing the district court, contends that Section 502(f)(2)(A) does not allow a State to deploy in another jurisdiction without its consent. Op.19. We have never claimed otherwise. But unlike States, D.C. is not a sovereign. *Banner v. United States*, 428 F.3d 303, 309 (D.C. Cir. 2005) (per curiam) ("Congress *is* the District's government…"). Nothing in the Home Rule Act suggests that Congress authorized District officials to veto the deployment of state Guards in response to the President's request.

Finally, Plaintiff half-heartedly defends the district court's reliance on the EMAC, contending that it allows States (defined to include the District) to deploy into other States by mutual agreement. Op.20. But as Defendants previously explained, it is absurd to read the EMAC to constrain the *President's* express authority under Title 32 to request assistance from state Guards. Mot.17. Nothing in the EMAC provides that it is the sole mechanism by which a state Guard can be sent to another jurisdiction. And the obvious party to make a request under the compact would be the President. It would be bizarre to provide the Mayor exclusive authority to request out-of-District Guard assistance since the Mayor has no authority over the

7

D.C. Guard and no ability to reciprocate such assistance. Add.49. Plaintiff identifies no statute authorizing the Mayor to *make requests* under the EMAC, let alone one providing that such authority is exclusive to the Mayor.

**3.** Defendant's position does not grant the President overbroad authority. The Guard remain subject to statutory and constitutional constraints. Plaintiff emphasizes restraints on the President's deployment and use of *federalized* Guard members. Op.20. But Title 32 imposes different restraints; the deploying State must consent, and the Guard deploys under the deploying State's control and subject to its laws. Mot.18. Plaintiff's contention that Defendant's reading would allow deployment "into an unwilling jurisdiction," Op.20, ignores that deployment of state Guards in a federal enclave is different from deploying non-federalized Guard members to a State without that State's consent. Mot.19. And Plaintiff's emphasis on "resistance to any military intrusion into civilian affairs," Op.18 (quotation marks omitted), ignores the many state laws that authorize governors to use the Guard to execute the laws or to aid the civil authorities. Defendant's reading just puts the President on par with those governors, consistent with the President's authority as Commander-in-Chief of the D.C. Guard.

**B.    The remaining factors support a stay.**

In addition to impinging on the President's authority, the injunction would negatively affect public safety in the District and end a mission that has improved

8

life in our Nation's capital. Plaintiff's contention that Defendants did not make this argument, Op.21, is wishful thinking. Defendants stated that the deployment "has reduced crime and improved life in our Nation's capital," Mot.1, explained how the deployment has freed up federal forces to assist with law enforcement, Mot.8, and noted the Mayor's acknowledgment of improved conditions, Mot.8. The irreparable-harm section was not required to repeat all of that analysis, but it reiterated that D.C.'s crime rate is unacceptably high and that the deployment has improved conditions. Mot.21.

And the Guard's deployment *has* improved conditions. As the amicus brief from 24 States notes (Dkt. #2148180 at 10), following the deployment in mid-August, violent crime dropped dramatically. *See* CrimeData DC, https://www.crimedatadc.com/todate/homicide (last visited Dec. 2, 2025); *see also* Jeff Abell, *National Guard's Presence Slashes D.C. Crime Rates, With Seven Days Homicide-Free* (Aug. 20, 2025)[4] ("Carjackings have decreased by 83%, robberies by 46%, car thefts by 21%, and overall violent crime is down 22%.").

Plaintiff does not deny that crime has dropped significantly since August 11. It just contends that the Guard's arrival had nothing to do with that simultaneous decrease, and portrays the Mayor's praise for the federal assistance as limited to

---

[4] https://foxbaltimore.com/news/city-in-crisis/national-guards-presence-slashes-dc-crime-rates-with-seven-days-homicide-free.

9

federal civilian law-enforcement assistance. Op.21. Of course, that overlooks that this surge is substantially *enabled* by the Guard's presence, which frees up federal forces to partner with the MPD. Add.82.

The injunction is also highly disruptive. It would require halting the Guard's deployment, including more than 1,000 out-of-District Guard members who have been deployed pursuant to agreements negotiated between the federal government and States. Mot.21-22. And because Plaintiff waited nearly a month to seek an injunction and subsequently sought discovery rather than timely resolution of its motion, the injunction would upend the status quo as it has existed for four months. Mot.22. Plaintiff does not meaningfully address any of this.

Plaintiff, by contrast, identifies no concrete harm from a stay. The district court found irreparable harm solely in a supposed "sovereign injury," which Plaintiff repeats. But Plaintiff does not deny that its claimed legal violations are purely statutory, and thus do not carry any presumption of irreparable harm. Mot.19. And again, the Guard's presence does not encroach upon Plaintiff's asserted authority to police the District. Plaintiff complains that the Guard "handcuff and detain suspects until police arrive," and "intervene in and break up fights." Op.7. But the idea that these activities are *harmful* is fatuous; and they do not undermine Plaintiff's authority to make arrest, investigation, and charging decisions, which the Guard is not doing. Plaintiff also asserts that Guard members are "helping to execute

10

warrants." Op.1. But the Guard is not independently executing warrants, instead providing assistance and support when requested. *See, e.g.*, D.C.Add.38. Again, how this is harmful to Plaintiff or its residents is left unexplained.

Plaintiff's additional harm allegations are insubstantial. Contra Plaintiff, Defendants have never suggested that the Guard's deployment risks harm *to the public*, as opposed to a risk of targeted violence towards the Guard members themselves. D.C.Add.50,66,70. As to Plaintiff's discussion of last week's shooting, Op.3,22, an assassin's veto is a wholly inappropriate basis to enjoin the President's lawful acts, and that despicable act of violence does not undermine the public-safety benefits the Guard's presence has brought.

As for Plaintiff's contention that it "has been forced to deploy scarce police resources to coordinate with and escort the Guard," Op.22, it just cites documents submitted *by Defendants* indicating that the MPD has provided escorts, Add.70, and patrolled Guard members' lodgings, DC.Add.70. Plaintiff offers no evidence that this appreciably diminishes MPD resources, which in any event are offset by assistance the Guard's presence at highly trafficked area provides. And although Defendants appreciate the coordination the MPD has provided, these voluntary actions are not a basis for denying a stay.

Indeed, Plaintiff's concession that the deployment can temporarily continue so long as the Guard does not conduct "patrols" or briefly detain anyone until the

11

MPD arrive, Op.23, underscores that it is suffering from no irreparable harm; the former is not dissimilar from the parades Plaintiff admits are lawful, and the latter is unremarkable (and indeed, analogous to citizens-arrest authority). If this is all Plaintiff objects to, it's hard to understand why it brought this lawsuit, let alone opposes a stay pending appeal.

## CONCLUSION

The Court should stay the district court's order pending appeal and should grant an immediate administrative stay by December 4.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7539*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-3411*
  *andrew.bernie@usdoj.gov*

DECEMBER 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,595 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font.

　　　　　　　　　　　　　　　　　　*/s/ Andrew M. Bernie*
　　　　　　　　　　　　　　　　　　Andrew M. Bernie

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

          */s/Andrew M. Bernie*
          Andrew M. Bernie