# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**No. 25-5418**  **September Term, 2025**

1:25-cv-03005-JMC

**Filed On:** December 17, 2025

District of Columbia,

     Appellee

  v.

Donald J. Trump, in his official capacity as
President of the United States, et al.,

     Appellants

**BEFORE:**   Millett, Katsas, and Rao, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for administrative stay and for stay pending appeal, the response thereto, and the reply; the amicus brief of South Carolina, West Virginia, and 22 additional states, which the court construes as including a motion to participate as amici curiae; the amicus brief of Maryland, 21 other states, and 3 governor's offices, which the court construes as including a motion to participate as amici curiae; the notice of intent to participate as amicus curiae filed by Democracy Forward Foundation, which the court construes as a motion to participate as amicus curiae; the consent motions to participate as amici curiae; and the lodged amicus briefs, it is

**ORDERED** that the motions to participate as amici curiae be granted.  The Clerk is directed to file the lodged amicus briefs.  It is

**FURTHER ORDERED**, on the court's own motion, that the administrative stay entered on December 4, 2025, be dissolved.  It is

**FURTHER ORDERED** that the motion for stay pending appeal be granted for the reasons stated in the attached statement by Circuit Judge Millett, joined by Circuit

Judges Katsas and Rao.  A concurring statement by Circuit Judge Rao, joined by Circuit Judge Katsas, is attached.


**<u>Per Curiam</u>**


**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY:   /s/
Selena R. Gancasz
Deputy Clerk

MILLETT, *Circuit Judge*, joined by KATSAS and RAO, *Circuit Judges*: On August 11, 2025, President Trump issued a memorandum in his capacity "[a]s President of the United States and Commander in Chief of the District of Columbia National Guard" that directed the Secretary of Defense to mobilize the District of Columbia's National Guard to address violent crime and to ensure public safety within the District. Presidential Memorandum, Restoring Law and Order in the District of Columbia (Aug. 11, 2025). The President also directed the Secretary to work with state governors to deploy additional National Guard units from the States to the Nation's Capital. *Id.*

The ensuing deployment has involved over 2,000 guard members that include not only the D.C. National Guard, but also units from South Carolina, West Virgina, Mississippi, Louisiana, Tennessee, Ohio, Georgia, Alabama, and South Dakota (collectively, "State Guards"). Working in close coordination with local and federal law enforcement agencies, guard members have patrolled such areas as the National Mall, Metro stations, the downtown retail district, and residential neighborhoods. The National Guard is set to remain in the District until at least February 28, 2026, unless the district court's ordered relief takes effect.

On September 4, 2025, the District of Columbia filed suit challenging the deployment of National Guard troops in the District, naming as defendants President Donald J. Trump, the U.S. Department of Defense, Secretary of Defense Peter Hegseth, the U.S. Army, Secretary of the Army Daniel P. Driscoll, the U.S. Department of Justice, Attorney General Pamela J. Bondi, the U.S. Marshals Service, and the Director of the U.S. Marshals Service Gadyaces S. Serralta. As relevant to this stay motion, the complaint alleges that the deployment of both the D.C. Guard and State Guards violates the Administrative Procedure Act. Five days after filing the complaint, the District moved for a preliminary injunction and

a stay under the Administrative Procedure Act, 5 U.S.C. § 705. The District also requested discovery, which the district court granted and which was completed on October 10th. The Defendants filed a motion to dismiss, and briefing on that motion was completed on October 17th.

On November 20, 2025, the district court granted the District a preliminary injunction and a Section 705 stay and, in so doing, denied the Defendants' motion to dismiss in part. The court then stayed the effect of its preliminary relief for 21 days to provide the Defendants time to appeal. *District of Columbia v. Trump*, No. 25-cv-3005, 2025 WL 3240331, at *1 (D.D.C. Nov. 20, 2025).

The Defendants promptly appealed and sought an administrative stay and a stay pending appeal of the district court's preliminary relief. This court issued an administrative stay on December 4, 2025, to provide sufficient time for resolution of the Defendants' motion for a stay pending appeal.

We now grant the motion for a stay pending appeal. Because the District of Columbia is a federal district created by Congress, rather than a constitutionally sovereign entity like the fifty States, the Defendants appear on this early record likely to prevail on the merits of their argument that the President possesses a unique power within the District—the seat of the federal government—to mobilize the Guard under 32 U.S.C. § 502(f). It also appears likely that the D.C. Code independently authorizes the deployment of the D.C. Guard.

The remaining stay factors similarly favor the Defendants. Absent a stay, the preliminary relief is likely to result in a profound level of disruption to the lives of thousands of service members who have been deployed for four months already, and the President's order implicates a strong and distinctive interest

in the protection of federal governmental functions and property within the Nation's capital. As for the District's harms, our preliminary determination that the merits favor the Defendants means that the District has not identified any ongoing injury to its statutory interests. The other harms that the District identifies are not supported by the preliminary record before us.

This stay decision is limited in several respects. First, our assessment of the merits is rooted in the preliminary and hurried posture of a stay motion. This decision does not bind the merits panel, which will engage in a fuller assessment of these issues. Second, in granting preliminary relief, the district court declined to address whether the National Guard units are engaged in "law enforcement" activities in violation of the Posse Comitatus Act, 18 U.S.C. § 1385, and whether the Defendants are improperly exercising federal command and control over the State Guards. We do not reach those issues either, resting our decision solely on the district court's preliminary determinations about the source of legal authority for the National Guard deployments in the District that underlay that court's issuance of preliminary relief.

# I

## A

The National Guard traces its roots to the founding-era state militias. *See Perpich v. Department of Defense*, 496 U.S. 334, 340–342 (1990). In broad strokes, the National Guard comprises "two overlapping but distinct organizations"—the National Guards of the various States and the District and the

National Guard of the United States.[1]  *Id.* at 345 (quotation marks omitted).  When a guard member enlists in a State's or the District's National Guard, that guard member simultaneously enlists in the National Guard of the United States.  *Id.*  In the former capacity, the guard member serves the State or the District under a command structure prescribed and administered by State or District law.  In the latter, the guard member becomes a "reserve component[] of the armed forces" of the United States, 10 U.S.C. § 10101, and may be called into "the service of the United States" under the command structure of the United States Army or the United States Air Force, *id.* §§ 10106, 10112.

The National Guard's dual-enlistment structure yields three different active operational statuses for guard members:  state active duty, federal active duty under Title 10 of the U.S. Code, and full-time duty under Title 32 of the U.S. Code.

As a general matter, when operating in state active duty, the National Guard "is a state agency, under state authority and control."  *Knutson v. Wisconsin Air Nat'l Guard*, 995 F.2d 765, 767 (7th Cir. 1993).  National Guard operations in state active-duty status are undertaken "at state expense."  *Stirling v. Minasian*, 955 F.3d 795, 798 (9th Cir. 2020) (quoting National Guard Regulation No. 500-5 § 10-2(a)).

Federal active duty under Title 10 places the guard members "in the active military service of the United States[.]"  10 U.S.C. § 101(d)(1).  Title 10 prescribes the limited and extraordinary circumstances under which the President can call

---

[1]  There are other territories of the United States that also have their own National Guard units.  *See* 32 U.S.C. § 328.  The discussion in this Statement is focused on the States and the District, which is all this case involves.

the National Guard into active duty for the United States. *See* 10 U.S.C. §§ 251–253, 12406. That process has been termed "federalizing" the National Guard. *Abbott v. Biden*, 70 F.4th 817, 822 (5th Cir. 2023). Once federalized, a National Guard unit is integrated into the United States military command structure and ceases during that time period to be a state entity. *See* 32 U.S.C. § 325(a)(1) (A guard member "who is ordered to active duty is relieved from duty in the National Guard of his State * * * from the effective date of his order to active duty until he is relieved from that duty.").

Full-time National Guard duty under Title 32 is a "hybrid" between state active duty and federal active duty. *See Stirling*, 955 F.3d at 798. Guard members in Title 32 status act in "service of the federal government and [are] funded by the federal government[,]" but they remain "state National Guard members under state control[.]" *Id.* In other words, National Guard units in Title 32 status undertake a federal mission but remain in their respective State's chain of command. Title 32 authorizes specific federal missions, like drug interdiction (32 U.S.C. § 112) and field exercises (32 U.S.C. § 503). But it also provides more broadly that a member of the National Guard may "be ordered to perform training or other duty[,]" including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(1), (f)(2)(A). Guard members in Title 32 status have performed missions such as disaster relief, border security operations, airport security after the September 11th attacks, and Covid-19 response efforts. *See* Lawrence Kapp & Barbara Salazar Torreon, Cong. Rsch. Serv., RL30802, *Reserve Component Personnel Issues: Questions and Answers* 20 (2021), https://perma.cc/HM3S-ALVY.

**B**

The District Clause of the Constitution empowers Congress "[t]o exercise exclusive legislation in all Cases whatsoever, over such District * * * as may * * * become the Seat of the Government of the United States." U.S. CONST. Art. I, § 8, Cl. 17. The District of Columbia Organic Act of 1801 created the District of Columbia as the Nation's Capital. *See* An Act concerning the District of Columbia, ch. 15, 2 Stat. 103, 103–105 (1801). In 1889, Congress created the District of Columbia National Guard. *See* An Act to Provide for the Operation of the Militia of the District of Columbia, ch. 328, 25 Stat. 772, 772 (1889). That 1889 statute has been codified in Title 49 of the D.C. Code, and its content has been largely unchanged over the ensuing decades. *See* D.C. Code § 49-101 *et seq.*

In Title 49, Congress directed that the "President of the United States shall be the Commander-in-Chief of the militia of the District of Columbia." D.C. Code § 49-409. In that role, the President "appoint[s] and commission[s]" the Commanding General of the D.C. Guard, *id.* § 49-301(a), who is responsible for organizing and directing members of the D.C. Guard, *see id.* § 49-405. The President has delegated his command of the D.C. Guard to the Secretary of Defense, who, in turn, has delegated that responsibility to the Secretary of the Army (for the D.C. Army National Guard) and the Secretary of the Air Force (for the D.C. Air National Guard). *See* Exec. Order No. 11,485, §§ 1, 4, 34 Fed. Reg. 15,411, 15,411 (Oct. 3, 1969); Memorandum from the Secretary of Defense to the Secretary of the Army and the Secretary of the Air Force (Oct. 10, 1969).

In 1973, Congress enacted the District of Columbia Self-Government and Governmental Re-organization Act, Pub. L. No. 93-198, 87 Stat. 774 (codified as amended at D.C. Code

§ 1-201.01 *et seq.*), to "grant to the inhabitants of the District * * * powers of local self-government[,]" D.C. Code § 1-201.02(a). Under that statute, commonly known as the Home Rule Act, "a mayor and council elected by residents of the District exercise certain executive and legislative powers delegated by Congress." *Banner v. United States*, 428 F.3d 303, 305 (D.C. Cir. 2005) (per curiam). The Home Rule Act grants the Mayor the "executive power of the District[,]" D.C. Code § 1-204.22, including the responsibility to "prevent crime and arrest offenders" and to "preserve the public peace[,]" *id.* § 5-101.03(1), (2). But nothing in the Home Rule Act "vest[s] in the District government any greater authority over * * * the National Guard of the District of Columbia * * * than was vested" prior to Home Rule. *Id.* § 1-206.02(b). As a result, the D.C. Guard remains under the authority of the federal government.

## C

Four months ago, President Trump "direct[ed] the Secretary of Defense to mobilize the District of Columbia National Guard and order members to active service, in such numbers as he deems necessary, to address the epidemic of crime in our Nation's capital." Presidential Memorandum, Restoring Law and Order in the District of Columbia, § 2 (Aug. 11, 2025), https://perma.cc/2ANB-5Y75 ("Presidential Memorandum"). The President further "direct[ed] the Secretary of Defense to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service * * * to augment this mission." *Id.*

In response to the Presidential Memorandum, four actions ensued. First, the Secretary of the Army, exercising his delegated authority as Commander in Chief of the D.C. Guard, "approve[d] the use of the [D.C. Guard] to provide critical

support to law enforcement efforts in the District of Columbia." Letter from Secretary of the Army Dan Driscoll Approving Use of D.C. National Guard (Aug. 11, 2025), ECF No. 70-1, at 135.

Second, the Commanding General "ordered" the D.C. Guard into duty in Title 32 status "in accordance with 32 U.S. Code § 502" and "encamped" the D.C. Guard under D.C. Code Sections 49-101, 49-102, and 49-107. Commanding General's Office of the District of Columbia, Permanent Orders 25-223 (Aug. 11, 2025), ECF No. 70-1, at 137.[2]

Third, the Secretary of Defense authorized the deployment of National Guard units from several States to support the D.C. Guard's mission "pursuant to 32 U.S.C. § 502(f)[.]" Memorandum for Secretary of the Army on Employment Guidance for the D.C. National Guard and Out-of-District National Guard Service Members (Aug. 20, 2025), ECF No. 34-1, at 8.

Fourth, the D.C. Guard entered memoranda of understanding with several States. *See* Memoranda of Understanding Between the D.C. National Guard and the Supporting States, ECF No. 70-1, at 13–44. Those memoranda provide that State Guard units may be deployed to the District in Title 32 status to "perform duties under 32 U.S.C. § 502(f)[.]" *Id.* at 14, 18, 22, 26, 30, 34, 38, 42.

---

[2] Section 49-101 of the D.C. Code designates "[a]ny * * * duty * * * ordered * * * under the provisions of this title" a military duty. D.C. Code § 49-101. Section 49-102 authorizes the Commanding General to "order out any portion of the National Guard for such * * * other duties, as he may deem proper." *Id.* § 49-102. And Section 49-107 requires the Quartermaster General of the militia to provide "a suitable camp-ground for the annual encampment of the militia[.]" *Id.* § 49-107.

Since August, both the D.C. Guard and the State Guards have operated in the District under Title 32. The Guard units work in tandem through "Joint Task Force District of Columbia" to support the Metropolitan Police Department and federal law enforcement agencies in the District. *See* Decl. of Colonel Lawrence M. Doane, ECF No. 34-1 ¶¶ 3–4. Guard members "act as a presence to deter crime, report any crime they witness to law enforcement, and assist law enforcement in other support missions when requested." *Id.* ¶ 6.

## D

In September, the District of Columbia filed this suit and moved for both a preliminary injunction and a stay under the Administrative Procedure Act, 5 U.S.C. § 705. *See District of Columbia*, 2025 WL 3240331, at *6. As relevant here, the District argued that, in deploying both the D.C. Guard and the State Guards, the Department of Defense, the Secretary of Defense, the United States Army, and the Secretary of the Army acted contrary to law in violation of the Administrative Procedure Act, the District of Columbia Home Rule Act, the Emergency Management Assistance Compact, the Posse Comitatus Act, and the United States Constitution. *See id.* at *1, *6. The district court ordered expedited discovery and subsequently held a hearing on the District's motion for preliminary relief as well as the Defendants' motion to dismiss. *Id.* at *6.

On November 20th, the district court granted the District's motion for preliminary relief. *District of Columbia*, 2025 WL 3240331, at *1. The district court concluded that the Secretaries of Defense and of the Army "lack authority under D.C. law to support their deployment of the [D.C. Guard] and have exceeded the bounds of their statutory authority under 32 U.S.C. § 502(f) in requesting the deployment of out-of-state

National Guards." *Id.* at *7. The district court further concluded that the District had "demonstrated irreparable harm * * * [to] its ability to exercise sovereign powers within its jurisdiction," and that "[t]he balance of the equities and the public interest * * * tip[ped] in the District's favor." *Id.* at *28–29.

In so ruling, the district court did not reach the issues of (1) whether the National Guard units are engaged in "law enforcement" activities that implicate the Posse Comitatus Act, 18 U.S.C. § 1385, or (2) whether "the federal government is improperly exercising 'command and control'" over the State Guards given their Title 32 status. *District of Columbia*, 2025 WL 3240331, at *5 n.7, *21 n.29. The district court then denied in part the Defendants' motion to dismiss to the extent they argued that the deployments are lawfully authorized under Title 32 of the U.S. Code and Title 49 of the D.C. Code.

The district court preliminarily enjoined the Department of Defense, the U.S. Army, and their respective Secretaries "from deploying or requesting the deployment of the National Guard in the District of Columbia pursuant to" the Commanding General's order, the memoranda of understanding executed thereunder, and any related guidance, regulations, or orders. Order granting Motion for Preliminary Injunction and 705 Stay, ECF No. 89 ("Order"), at 1. The district court also stayed those orders, regulations, and memoranda under 5 U.S.C. § 705. Order at 2. But "[t]o prevent potential disruption to the functioning of the District and the National Guard during the appeals process," *District of Columbia*, 2025 WL 3240331, at *30, the district court administratively stayed its grant of preliminary relief for 21 days, *see* Order at 2.

The Defendants noticed their appeal and moved this court for a stay pending appeal.

**II**

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). To obtain such exceptional relief, the stay applicant must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) demonstrate that it will be "irreparably injured" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see Make the Road N.Y. v. Noem*, No. 25-5320, slip op. at 15–16 (D.C. Cir. Nov. 22, 2025) (per curiam) (applying *Nken* standard to partially grant stay pending appeal of a Section 705 stay order).

We conclude, at this preliminary juncture, that the Defendants have satisfied their burden on each of these factors.

**A**

With respect to the likelihood of success on the merits prong, the Defendants have demonstrated on this preliminary record that they will likely succeed in showing that the guard deployments are lawful under 32 U.S.C. § 502(f) and D.C. law.

**1**

The Defendants have deployed the D.C. Guard and the State Guards in the District in a hybrid state/federal status under Section 502 of Title 32. While portions of Section 502 trace their roots back to 1916, Pub. L. No. 64-85, § 92, 39 Stat.

166, 206 (1916), Congress enacted Sections 502(a) through (e) (and Title 32 itself) into positive law in 1956, Pub. L. No. 84-1028, tit. 32, 70A Stat. 1, 596–617 (1956).

Section 502(a) generally prescribes mandatory training requirements for guard members. *See* 32 U.S.C. § 502(a)(1) (requiring that guard members "assemble for drill and instruction, including indoor target practice, at least 48 times each year"). Sections 502(b) to 502(e) then dictate when and how National Guard units may receive credit towards fulfilling their training requirements under subsection (a). *Id.* § 502(b)–(e).

Added to the statute in 1964, Subsection (f) addresses the activities for which guard members may be deployed in a Title 32 status, stating that "a member of the National Guard may * * * be ordered to perform training or other duty in addition to that prescribed under subsection (a)." 32 U.S.C. § 502(f)(1); *see also* Pub. L. No. 88-621, § 1, 78 Stat. 999, 999 (1964).

Subsection (f)(2), which was added to Section 502 in 2006, provides that the "training or duty ordered to be performed * * * may include[,]" among other things, "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(2)(A); *see also* Pub. L. No. 109-364, § 525, 120 Stat. 2083, 2195 (2006).

On its face, Section 502(f)(2) appears likely to authorize the deployment of the D.C. Guard and the State Guards in this instance. There is no dispute that the guard members presently operating in the District of Columbia are supporting a mission undertaken at the request of the President and the Secretary of Defense. And the text of Section 502(f)(2)(A) likely leaves

room for operational missions such as the type of public-safety-support mission within the Nation's Capital at issue here.

Of course, by authorizing missions only at the "request" of the President or Secretary of Defense, Section 502(f)(2)(A) imposes a corresponding procedural limitation: The commander in chief of each Guard, or the Commanding General of the D.C. Guard, must first agree to the request. 32 U.S.C. § 502(f)(2)(A); *see also id.* § 328(a) ("The Governor of a State * * * or the commanding general of the District of Columbia National Guard * * * *may* order a member of the National Guard to perform * * * [duties] pursuant to section 502(f) of this title.") (emphasis added). This textual requirement that Title 32 deployments be consented to by the governors of the mobilized State Guards stands in contrast to a federalization of the National Guard by a President under Title 10, which does not always require such consent. *See* 10 U.S.C. §§ 252–253, 12406; *see also Newsom v. Trump*, 141 F.4th 1032, 1053 (9th Cir. 2025) (per curiam) ("The omission of an express consent requirement [in 10 U.S.C. § 12406] is telling, as Congress provided governors with veto power in [10 U.S.C. § 12301(d)].").

At this stage, there is no dispute that every guard member's Governor or the District's Commanding General has authorized his or her deployment to the District.

**2**

The District contends that Section 502(f)(2)(A) "should be construed to convey" only "an ancillary authority analogous to 'drills' or 'training,' not a substantial and independent power" on the part of the President or Secretary of Defense to authorize operational missions. Opp'n Br. 19. The District points out that Section 502 is located in a chapter on training and that

Sections 502(a) to 502(e) expressly discuss training requirements. *Id.*

For purposes of this stay motion, that argument is unlikely to succeed for three reasons.

First, Section 502(f) textually distinguishes the "training or other duty" authorized by that subsection, 32 U.S.C. § 502(f)(1), from all those "drill and instruction" duties, *id.* § 502(a)(1), that are "prescribed under subsection (a)," and discussed further in subsections (b) through (e), *id.* § 502(f)(1); *see id.* § 502(b)–(e).

The statutory text corroborates that subsection (f) goes beyond just training and instruction. Subsection (f)(2)(A) authorizes "operations or missions" requested by the President or Secretary of Defense without qualifying language limited to training. That contrasts sharply with the immediately succeeding subsection (f)(2)(B) that authorizes only "*training* operations and *training* missions" ordered by the Secretaries of the Army or Air Force. 32 U.S.C. § 502(f)(2)(B) (emphases added). Congress's selective, and presumably intentional, omission of the "training" qualifier in Section 502(f)(2)(A) must be given effect. *See Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

That distinction also makes structural sense. Subsection (f)(2)(A) allows requests for deployments only by the President or Secretary of Defense—two individuals whose high-level positions within the Executive Branch often require responses to emergencies that exceed training issues, and who would

likely leave training to military officers who have expertise in such matters. That presumably is why any need for training deployments is separately addressed by the power of the Secretaries of the Army and Air Force to request support for "training" operations and missions. 32 U.S.C. § 502(f)(2)(B).

Second, Title 32's repeated disjunctive use of the phrase "training or other duty" likewise indicates that "duty" encompasses more than training. *See, e.g.*, 32 U.S.C. § 502(f)(1) (Guard members may be "ordered to perform training or other duty[.]"); *id.* § 101(19) ("'Full-time National Guard duty' means training or other duty * * * performed by a member of the [National Guard] in the member's status as a member of the National Guard of a State * * * or the District of Columbia[.]"); *id.* § 715(a)(3) (dealing with claims against the United States for "personal injury or death" caused by a member of the National Guard "while engaged in training or duty"). To read "duty" as redundant of training would leave that word with no work to do, which is something courts strive to avoid in statutory interpretation. *See, e.g.*, *Center for Biological Diversity v. United States Int'l Dev. Finance Corp.*, 77 F.4th 679, 688 (D.C. Cir. 2023) (It is a "fundamental rule of statutory interpretation that in construing statutes courts should give effect, if possible, to every word used by Congress.") (formatting modified).

Third, the legislative history provides structural background that supports this reading of the text. Congress added Section 502(f)(2)(A) in 2006 in the wake of Hurricane Katrina to allow the deployment of guard troops to address the "full range of diverse 21st century missions[.]" *Report of the H.R. Comm. on Armed Services on the National Defense Authorization Act for Fiscal Year 2007*, H.R. REP. NO. 109-452, at 12 (2006) (identifying the "Rationale for the Committee Bill" as, after Hurricane Katrina, "[t]he committee considers it

critical that the capabilities and capacity of the armed forces continue to improve so they can accomplish the full range of diverse 21st century missions[.]"); *see id*. at 371 ("The committee applauds the national guard's response to Hurricane Katrina, and believes that the command and control arrangements for national guard units during this multi-state emergency worked well and should serve as a model for future multi-state responses."); Keith Bea, Cong. Rsch. Serv., RL33729, *Federal Emergency Management Policy Changes After Hurricane Katrina: A Summary of Statutory Provisions* at Summary, 1–2, 54–55 (2006), https://perma.cc/Q4ZM-4JA2 (listing the law adding subsection 502(f)(2)(A) as one of the statutes enacted post-Katrina to assist "future federal emergency management actions" and describing additional authority given to the President over the National Guard).

In sum, the Defendants are likely to show that Section 502(f)(2)(A) authorized the President and the Secretary of Defense to request that both the D.C. Guard and the State Guards undertake a federal mission in the District.

**3**

The district court reasoned that Section 502(f)(2)(A) "is best understood to encompass operations or missions requested by the President that are authorized under state law." *District of Columbia*, 2025 WL 3240331, at *21. Discerning no D.C. Code authorization for the D.C. Guard's deployment and no state-law authorizations for the State Guards' deployments, the district court concluded that "no authority exists" for the operation at issue. *Id.* at *25.

Even were we to accept the district court's reading of Section 502(f)(2)(A), the Defendants have still shown that they are likely to succeed on appeal.

**a**

Start with the D.C. Guard. Congress made the President the Commander in Chief of the D.C. Guard. D.C. Code § 49-409. The parties agree that, as Commander in Chief, the President "functionally serve[s] in the role of a Governor of a state." *District of Columbia*, 2025 WL 3240331, at *12; *see* Opp'n Br. 1. And like a governor, the President may deploy the Guard only within the bounds of the law. Given the special security needs of the District as the seat of federal government and the Nation's Capital, Defendants have likely shown that the D.C. Code affords the President authority for this deployment.

To begin, the D.C. Code provides that the President, as Commander in Chief of the D.C. Guard, "shall order out" the D.C. Guard "[w]henever it shall be necessary[.]" D.C Code § 49-405; *see id*. § 49-409. And it is the President who "appoint[s] and commission[s]" (and may "remove[] at any time") the Commanding General of the D.C. Guard, *id.* § 49-301(a). Further, the D.C. Code contemplates the possibility that the Commanding General may be "[a]ny officer of the armed forces of the United States" who is "detailed to serve as Commanding General" of the D.C. Guard, which indicates a uniquely close connection between the federal government and the D.C. Guard. *Id.* § 49-301(c). Recognizing this relationship, the D.C. Code states that the Commanding General is "an employee of the Department of Defense, and of the United States," not of the District. *Id.* § 49-301(b).

More to the point, the D.C. Code contemplates in multiple provisions that the D.C. Guard may be ordered to "aid the civil authorities in the execution of the laws[.]" D.C. Code § 49-404; *see id.* § 49-901 (similar). And Section 49-103 allows two

Executive Branch subordinates of the President—the United States Marshal for the District of Columbia and the National Capital Services Director—as well as the District of Columbia Mayor, to request that the President order out the D.C. National Guard to address violence in the Nation's Capital. *See id.* § 49-103.

Neither the district court nor the District disputed that Section 49-103 allows the D.C. Guard to be called up in such circumstances, given its distinctive role in helping to protect the Nation's Capital and the functioning of the federal government. Instead, the district court concluded that the President can mobilize the D.C. National Guard *only* when one of the three enumerated officials first submits a request to the President. *See District of Columbia*, 2025 WL 3240331, at *17–18. But the provision speaks in permissive, not limiting, language that serves to expand the list of who may identify a need for the D.C. Guard's activation. *See* D.C. Code § 49-103 ("it shall be lawful"). So Section 49-103's text does not displace or limit the President's statutory authority over the D.C. Guard and its Commanding General.

Indeed, the district court's reading would imbue two presidential subordinates with more power to protect the seat of the federal government than the President—a highly untenable reading of statutory text. After all, the President could order either of his two subordinates to make such a request.

Finally, past practice and corresponding congressional inaction suggest that Congress, in passing the Home Rule Act, envisioned the Executive Branch retaining independent control over the D.C. Guard. In 1969, President Nixon issued Executive Order 11485, delegating the authority to "administer and control the Army National Guard and the Air National

Guard of the District of Columbia" to the Secretary of Defense. Exec. Order No. 11,485, § 1, 34 Fed. Reg. at 15,411. Yet when Congress was given the opportunity just four years later in enacting the Home Rule Act to direct such power going forward to the Mayor or City Council, Congress did the opposite, providing: "Nothing in this chapter shall be construed as vesting in the District government any greater authority over * * * the National Guard of the District of Columbia * * * than was vested in the Commissioner prior to January 2, 1975." D.C. Code § 1-206.02(b); *see* Pub. L. No. 93-198, § 602(b), 87 Stat. at 814.

In sum, considering the many provisions of the D.C. Code that identify the President's status as Commander in Chief of the D.C. Guard alongside those that enable the D.C. Guard to assist civil authorities in preserving the operations of the seat of federal government and protecting the Nation's Capital, the Defendants are likely correct that the President acted consistently with District law in directing the deployment of the D.C. Guard.

**b**

As for deployment of the State Guards, the Defendants are also likely to succeed in showing that they acted within the bounds of Title 32.

To perform a mission under Section 502(f)(2)(A), a state Guard's commander in chief—the governor—must receive a request from the President or Secretary of Defense, evaluate the scope of the requested mission and the availability of the State's guard resources, and then determine whether the duties to be performed are authorized under state law. As the district court put it, "to accept the mission, the state governor must

exercise authorities *that already exist* under state law." *District of Columbia*, 2025 WL 3240331, at *24.

On the record before us, the District has made no showing and the district court made no finding that any deployment to the District violated any deploying State's law. So that argument seems unlikely to succeed on this record.

The district court concluded that *any* deployment of a state Guard to the District would be unlawful unless it complied with the Emergency Management Assistance Compact ("EMAC"), Pub. L. No. 104-321, § 1, 110 Stat. 3877, 3877–3883 (1996). *See District of Columbia*, 2025 WL 3240331, at *24 ("[T]he out-of-state National Guard units would only have authorization to operate in the District if * * * [the District] requested other states' assistance under the EMAC.").

The short answer is that the EMAC—an interstate compact—simply provides its signatories, including all States and the District, an avenue for independently seeking assistance from other Guard units wholly apart from any federal-law-based activation. *See* D.C. Code § 7-2332, art. I(c) ("Mutual assistance in this compact may include the use of the states' National Guard forces[.]"). The EMAC, in other words, simply creates an additional authority under state law for out-of-state deployments of state guard units. It does not purport to foreclose or restrict deployments separately authorized by federal law. Indeed, in "consent[ing]" to the EMAC, Congress expressly stated that its approval "shall * * * not be construed as impairing or in any manner affecting any right or jurisdiction of the United States in and over the subject of the compact." Pub. L. No. 104-321, § 2(1), 110 Stat. at 3877, 3882.

Anyhow, even if a governor had authorized a deployment to the District in violation of state law, the remedy for such a

violation would be a suit against that governor for violating state law, not the Administrative Procedure Act lawsuit against the federal governmental Defendants on which the district court's preliminary relief rests.

The district court also reasoned that the Defendants' reading of Section 502(f)(2)(A) would raise serious constitutional questions because "the President could send a non-federalized National Guard unit to another state, against the receiving state's will, to conduct any operation or mission the President directs." *District of Columbia*, 2025 WL 3240331, at *28.

Deploying an out-of-state Guard to a non-consenting State to conduct law enforcement would be constitutionally troubling to our federal system of government, and courts no doubt have a duty to construe ambiguous text in statutes to avoid serious constitutional questions. *See United States v. Hansen*, 143 S. Ct. 1932, 1946 (2023); *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring).

But the only issue that was before the district court and is now before this court is whether the President could request such deployments to the *District of Columbia*, which is not a sovereign State, but instead is a unique federal district that serves as the Capital of the United States and the seat of the federal government. In that specific context, the Defendants are correct that staying the preliminary relief ordered here would not require reading Section 502 to permit a president to call on governors to deploy their Guards into non-consenting States. *See* Emergency Mot. 19; Reply Br. 8.

As Defendants correctly noted, "Plaintiff's contention that Defendant's reading would allow deployment 'into an

unwilling jurisdiction' ignores that deployment of state Guards in a federal enclave is different from deploying non-federalized Guard members to a State without that State's consent." Reply Br. 8 (citation omitted).[3]  After all, "the States entered the federal system with their sovereignty intact[.]" *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 779 (1991); *Alden v. Maine*, 527 U.S. 706, 713 (1999).  As a result, the States' right to self-governance, without the unwelcome presence of another State's militia, is inherent to their sovereign status.  *See Alden*, 527 U.S. at 714; *see also* THE FEDERALIST NO. 29 (Alexander Hamilton) (rejecting as an "absurdit[y]" the idea that one State could, at the direction of the federal government, deploy its militia to a non-consenting State to provide law enforcement).

The District of Columbia, in contrast, is a federal district, not a sovereign State.  From its inception, the District has been a creation of Congress.  *See* U.S. CONST. Art. I, § 8, cl. 17 (vesting Congress with the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District * * * as may * * * become the Seat of Government of the United States").  And not just a federal district, but also the Nation's Capital—a jurisdiction in which Congress has distinctive power to provide for the defense of the operations and property of the federal government.

To be sure, Congress has also granted the District substantial self-governance rights under the Home Rule Act.

---

[3]  *See* Emergency Mot. 19 ("[T]he district court contended that upholding the deployment would mean that States could, at the request of the President, deploy troops to other States without the *receiving State's* consent.  This is a strawman; Defendants never made any such contention.  Nor is that an implication of Defendants' argument.") (citation omitted); *id*. at 5 ("The National Guard system thus operates differently in D.C. as compared to the States.").

*See generally* Pub. L. No. 93-198, 87 Stat. 774. But that has not changed the District's "unique status" as a federal enclave existing as "the very heart of the Union itself." *District of Columbia v. Carter*, 409 U.S. 418, 432 (1973) (formatting modified); *Banner*, 428 F.3d at 309 ("Congress is not a foreign sovereign government in relation to the District * * *; Congress *is* the District's government[.]"). And even in granting home rule, Congress preserved for the President, as the D.C. Guard's Commander in Chief, exclusive control over guard operations within the District. D.C. Code § 1-206.02(b); Pub. L. No. 93-198, § 602(b), 87 Stat. at 814; D.C. Code § 49-409.

In addition, the President consented to—indeed, asked for—the deployment of out-of-state Guards to the District to assist with maintaining public safety. Presidential Memorandum, § 2 ("I direct the Secretary of Defense to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission."). Given the President's position as Commander in Chief of the D.C. Guard, D.C. Code § 49-409, the Defendants are likely to succeed in showing that the President's consent is dispositive in this unique context.

In short, because of the District's unique constitutional status as a federal territory, the Nation's Capital, and the seat of federal government, as well as the President's consent to receive these forces, the Defendants have demonstrated that the district court likely erred in concluding that the deployment of out-of-state guard members to the District raised a serious federalism question under the Constitution.

**B**

A balancing of the relevant equitable considerations also weighs heavily in favor of granting a stay.

On the Defendants' side of the scale, the preliminary relief implicates the strong federal interest in the protection of federal functions and property within the Nation's Capital and would inflict an extraordinary level of disruption to the lives of thousands of service members who, we have determined, likely were lawfully deployed and have already been in the District for four months without concrete signs of having caused irreparable harm to the District.

Any withdrawal and redeployment of the National Guard would disrupt important operations related to federal law enforcement in the District. For over four months now, the deployment of law enforcement units such as the United States Park Police has been organized in light of the availability of National Guard patrols. *District of Columbia*, 2025 WL 3240331, at *5. For example, because the National Guard has taken over patrolling some parks, members of the United States Park Police have been freed up and reassigned to other missions. *Id.* Similarly, the National Guard has worked in regular coordination with and "provide[d] support to law enforcement agencies including * * * the United States Marshals Service[.]" Doane Decl., ECF No. 34-1 ¶ 4; *see* Decl. of Chief Inspector Donald F. Snider, Jr., ECF No. 34-3 ¶ 4.

These operations implicate the federal government's strong interest in protecting federal governmental functions within the seat of government. *Cf. Illinois v. Trump*, 155 F.4th 929, 940 (7th Cir. 2025) ("We recognize, as the Ninth Circuit did, that the federal government has a strong interest in the protection of its agents and property.") (per curiam); *Newsom*, 141 F.4th at

1054 (noting the federal government's "significant" "interest in the protection of federal agents and property and the faithful execution of law"; and collecting cases).

Absent a stay pending appeal, the district court's order also risks the back-and-forth withdrawal and redeployment of guard members pending the completion of litigation. The Supreme Court has explained, in the context of the removal of principal officers, that a stay is justified "to avoid the disruptive effect of the repeated removal and reinstatement of officers during the pendency of * * * litigation." *Trump v. Wilcox*, 145 S. Ct. 1415, 1417 (2025) (mem.); *see also Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (mem.) (staying preliminary injunctions preventing removal of officers).

Yet here, the district court's order threatens severe disruption. There are currently over 2,000 National Guard members deployed within the District, including over 1,000 troops from States as far away as South Dakota. *District of Columbia*, 2025 WL 3240331, at *1, *21. Those Guard members will be directly affected by the ordered preliminary relief. The district court's order would require them to pack up and leave the District, only to be ordered to return if this court were to find on the merits of the appeal that they were lawfully deployed, and only to be ordered out again if further review found the deployments unlawful. That would severely disrupt the lives of the affected service members, their families who would have to endure the difficulties of on-again and off-again separations, and the guard members' employers who would have to accommodate their unpredictable absences from and returns to the workplace.

Such serious burdens provide strong support for a stay. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 27 (2008) ("The policy against the imposition of judicial restraints prior

to an adjudication of the merits becomes more significant when there is reason to believe that the decree will be burdensome.") (quoting 11A *Wright & Miller's Federal Practice & Procedure* § 2948.2 (2d ed. 1995)).

On the other side of the scale, the District argues that the deployment severely impinges on its "exclusive[]" local law-enforcement powers. Opp'n Br. 22. The district court relied on this sovereign injury in granting preliminary relief. *See District of Columbia*, 2025 WL 3240331, at *28–29.

But any such sovereign injury depends entirely on the District prevailing on the merits. The District's sovereignty is a creature of congressional legislation; Congress has retained "the ultimate legislative authority over the nation's capital," D.C. Code § 1-201.02(a); and Congress withheld from the District's Home Rule authority control over deployments of the D.C. Guard within the District, *id.* § 1-206.02(b). Because we have found, at this preliminary posture, that the District is not likely to succeed on the merits of the legal issues underlying the district court's preliminary relief, its asserted sovereign injury has not been established at this stage. *See District of Columbia*, 2025 WL 3240331, at *29 n.34 ("Defendants' exercise of their powers over the [D.C. Guard] would similarly not injure the District if Defendants were exercising their powers within the bounds authorized by D.C. law.").[4]

_____

[4] The District separately argues that the Guard deployments have "expose[d] the public and the Guard itself to threats of targeted violence[,]" and that the District has been "forced to deploy scarce police resources to coordinate with and escort the Guard." Opp'n Br. 22. But the district court did not make any findings that support these entirely factual and disputed claims.

### III

For the foregoing reasons, the Defendants' motion for a stay pending appeal is granted. If the parties wish to have the appeal expedited, the parties should consult and propose a schedule to the court.

RAO, *Circuit Judge*, joined by KATSAS, *Circuit Judge*, concurring: I write separately to highlight an additional reason the President and other federal officials are likely to succeed on the merits of their appeal: the District of Columbia may lack Article III standing to challenge the deployment of National Guard troops in the District.

The district court held that the National Guard deployment injured the District's "sovereign power" and "usurp[ed] the District's rights to self-governance." *District of Columbia v. Trump*, No. 25-cv-3005, 2025 WL 3240331, at *8 (D.D.C. Nov. 20, 2025). It concluded that "[a]ny incursion on the District's exercise of its sovereign power would cause Article III injury." *Id.* at *9.

We have never recognized that the District possesses an independent sovereignty that can give rise to an Article III injury from actions of the federal government. Such an injury is likely untenable as a matter of first principles and finds no support in our precedent or historical practice.

To begin with, a theory of sovereign injury is inconsistent with the District's legal status. The District is a federal district and congressionally created municipal corporation. *See* U.S. Const., art. I, § 8, cl. 17 (enabling Congress to "exercise exclusive Legislation in all Cases whatsoever, over such District" that "become[s] the Seat of Government of the United States"); D.C. Code § 1-102 ("The District … [may] exercise all other powers of a municipal corporation not inconsistent with the Constitution and laws of the United States."). We have long recognized that the District enjoys no sovereign status separate from the federal government. *See Croson v. District of Columbia*, 2 F.2d 924, 924 (D.C. Cir. 1924) ("The District of Columbia, as a municipal corporation, has the right to sue and be sued, but it possesses no sovereign power."). And the Supreme Court has explained that the District's "sovereign power … is not lodged in the corporation of the District of

Columbia, but in the government of the United States." *Metro. R.R. Co. v. District of Columbia*, 132 U.S. 1, 9 (1889). This comports with the District's status as the seat of the national government. Statement of Millett, J. at 21–23.

Even after the 1973 Home Rule Act, on which the district court places primary reliance, we have continued to recognize the unique status of the District in relation to the federal government, explaining that "Congress is not a foreign sovereign government in relation to the District, … Congress *is* the District's government." *Banner v. United States*, 428 F.3d 303, 309 (D.C. Cir. 2005). In fact, the Home Rule Act expressly confirms the District's lack of sovereignty, providing that "[t]he District of Columbia shall remain and continue a body corporate." D.C. Code § 1–207.17(a).

While Congress has provided the District with a certain degree of self-governance, we have never recognized that the District has standing to sue the President and federal officers for sovereignty-based injuries. This lack of historical support weighs heavily against the District's standing. The Supreme Court has repeatedly emphasized that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (cleaned up); *see Raines v. Byrd*, 521 U.S. 811, 826 (1997) ("Not only do appellees lack support from precedent, but historical practice appears to cut against them as well."). Even in the state standing context, where the Supreme Court has occasionally recognized sovereignty-based injuries, "the lack of historical precedent" is a "telling indication of [a] severe constitutional problem." *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023) (cleaned up). That reasoning applies perforce to the District, which, unlike a State, enjoys no constitutional or statutory sovereignty separate from the federal government.

In finding standing, the district court relied exclusively on cases involving state standing to sue federal entities, but no one suggests that the District has the same sovereignty as a State. States, unlike the District, "retain 'a residuary and inviolable sovereignty.'" *Alden v. Maine*, 527 U.S. 706, 715 (1999) (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)). Nor can the District benefit from the "special solicitude" occasionally afforded to States in determining standing. *See New Jersey v. EPA*, 989 F.3d 1038, 1045 (D.C. Cir. 2021) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)). "Special solicitude" purportedly traces to the territorial sovereignty of States. *See Massachusetts*, 549 U.S. at 518–20. *But cf. Texas*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (observing that "special solicitude" has not "played a meaningful role" in recent Supreme Court decisions). But as already explained, the District is a federal enclave, the metes, bounds, and powers of which are set by Congress. Nothing in the Constitution or the Home Rule Act suggests that the District enjoys the sovereignty of a State.

In their motion for a stay, the Defendants did not object to the District's standing. Article III courts, of course, have an independent obligation to verify their jurisdiction. Permitting the District to sue the President and other federal officials based on a sovereign injury is unprecedented and likely at odds with the unique legal status of the District. In subsequent proceedings, this important jurisdictional question should be given further consideration.