**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 25-5418**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

DISTRICT OF COLUMBIA,

*Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, *et al.*,

*Defendants-Appellants*.

_____

On Appeal from the United States District Court
for the District of Columbia

_____

**OPENING BRIEF FOR APPELLANTS**

_____

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7539*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *202-514-3511*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiff-appellee is the District of Columbia. Defendants-appellants are Donald J. Trump, in his official capacity as President of the United States; the United States Department of Defense; Peter B. Hegseth, in his official capacity as Secretary of Defense; the United States Army; Daniel P. Driscoll, in his official capacity as Secretary of the Army; the United States Department of Justice; Pamela J. Bondi, in her official capacity as United States Attorney General; the United States Marshals Service; and Gadyaces S. Seralta, in his official capacity as Director of the United States Marshals Service.

The following individuals or entities also noticed appearances and/or filed amicus briefs in the district court and/or this Court: Martin Ackerman, Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals, Law Enforcement Action Partnership, Center for Policing Equity, National Police Accountability Project, Policing Project at New York University School of Law, Washington Lawyers' Committee for Civil Rights and Urban Affairs, NAACP Legal Defense and Educational Fund, Inc., Democracy Forward Foundation, Mia McClain, Allen Chapel AME Church, National African-American Clergy Network, Metropolitan African Methodist Episcopal Church, Christopher Zacharias, Aaron Alexander, Center for Racial Equity and Justice, New Bethel Baptist Church,

Barbara Williams-Skinner, Clergy Network, Peace Baptist Church, Emory United Methodist Church, Religious Nationalism Project, Howard University School of Law Civil Rights Clinic, Shiloh Baptist Church of Washington, D.C., All Souls Church Unitarian, Interfaith Alliance, Sojourners/Sojo Action, Terrance McKinley, America First Legal Foundation, Mike Howell, Constitutional Accountability Center, Steady State, State of Maryland, State of South Carolina, State of West Virginia, State of Alabama, State of Alaska, State of Arizona, State of Arkansas, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Florida, State of Georgia, State of Hawaii, State of Idaho, State of Illinois, State of Indiana, State of Iowa, State of Kansas, State of Kentucky, State of Louisiana, State of Maine, State of Massachusetts, State of Michigan, State of Minnesota, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of North Dakota, State of Ohio, State of Oklahoma, State of Oregon, State of Rhode Island, State of South Dakota, State of Tennessee, State of Texas, State of Utah, State of Vermont, Commonwealth of Virginia, State of Washington, State of Wisconsin, Governor of Kansas, Governor of Kentucky, Governor of Pennsylvania, the Oversight Project, Michael C. Bell, Retired Senior Military Officers, Vet Voice Foundation, and Former Service Secretaries.

ii

**B.    Rulings Under Review**

The ruling under review (issued by Judge Jia M. Cobb) is an order (and memorandum opinion) granting a preliminary injunction and a section 705 stay.

**C.    Related Cases**

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE

# TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF CONTENTS.................................................................................iv

TABLE OF AUTHORITIES ..........................................................................vi

GLOSSARY………........................................................................... vii

INTRODUCTION ...........................................................................................1

STATEMENT OF JURISDICTION................................................................4

STATEMENT OF THE ISSUES.....................................................................4

PERTINENT STATUTES AND REGULATIONS ........................................5

STATEMENT OF THE CASE.........................................................................5

        A.     Legal Background ....................................................................5

        B.     Factual Background...............................................................10

        C.     Prior Proceedings .................................................................14

SUMMARY OF ARGUMENT .....................................................................21

STANDARD OF REVIEW ...........................................................................24

ARGUMENT .................................................................................................25

    I.     The Deployments Are Lawful ...............................................25

        A.     The deployments do not require express federal statutory
             authorization.................................................................25

        B.     Federal law expressly authorizes the deployments ............27

USCA Case #25-5418    Document #2166633    Filed: 04/01/2026    Page 6 of 80

C.  The D.C. Code independently authorizes the D.C. Guard deployment ...................................................................................30

D.  The district court's asserted bases for enjoining the state Guard deployments are incorrect ................................................38

II.  Plaintiff Did Not Establish the Equitable Factors for a Preliminary Injunction ..............................................................................41

CONCLUSION ...........................................................................................48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

v

# TABLE OF AUTHORITIES

**Page**

**U.S. Constitution:**

Art. I, § 8, cl. 17 ................................................................ 6, 43

**Cases:**

*Banner v. United States,*
    428 F.3d 303 (D.C. Cir. 2005) ................................. 6, 7, 8, 44

*Blatchford v. Native Vill. of Noatak & Circle Vill.,*
    501 U.S. 775 (1991) ...................................................................41

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ...............................................47

*Clevinger v. Advocacy Holdings, Inc.,*
    134 F.4th 1230 (D.C. Cir. 2025) ...................................... 42, 45

*Croson v. District of Columbia,*
    2 F.2d 924 (D.C. Cir. 1924) ...................................................43

*Dalton v. Specter,*
    511 U.S. 462 (1994) .................................................................44

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ....................................... 41, 42

*Debs, In re,*
    158 U.S. 564 (1895) .................................................................25

*District of Columbia v. Murphy,*
    314 U.S. 441 (1941) ...................................................................6

*District of Columbia v. Trump,* No. 25-5418,
    2025 WL 3673674 (D.C. Cir. Dec. 17, 2025) ..................... 16, 17, 18, 19, 20, 21,

22, 27, 28, 29, 31, 34, 35, 38,
39, 41, 42, 43, 48

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........................................................ 24, 25

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020) .............................................................................28

*Metropolitan R.R. Co. v. District of Columbia*,
132 U.S. 1 (1889) .................................................................................43

*Mexichem Specialty Resins, Inc. v. Environmental Prot. Agency*,
787 F.3d 544 (D.C. Cir. 2015) ............................................................42

*Neagle, In re*,
135 U.S. 1 (1890) .................................................................................25

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) ...............................................................................27

*Perpich v. Department of Def.*,
496 U.S. 334 (1990) ...............................................................................5

*Seegars v. Ashcroft*,
297 F. Supp. 2d 201 (D.D.C. 2004), *aff'd in part, rev'd in part*,
396 F.3d 1248 (D.C. Cir. 2005) .............................................................7

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ............................................................41

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ...............................................................47

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .............................................................................44

*Stirling v. Minasian*,
955 F.3d 795 (9th Cir. 2020) .................................................................5

*United States v. Sumler*,
  136 F.3d 188 (D.C. Cir. 1998) ...................................................44

*United States ex rel. Polansky v. Executive Health Res., Inc.*,
  599 U.S. 419 (2023) ...................................................29

*Valley Forge Christian Coll. v. Americans United for Separation
  of Church & State, Inc.*,
  454 U.S. 464 (1982) ...................................................46

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................... 25, 42

**Statutes:**

Act of Feb. 27, 1801, ch. 15, 2 Stat. 103, 103-05 ...................................................6

Act of Mar. 1, 1889, ch. 328, 25 Stat. 772, 772 ...................................................7

Pub. L. No. 104-321, 110 Stat. 3877 (1996):
  § 1, 110 Stat. at 3877 ................................................... 9, 39
  § 1, 110 Stat. at 3879 ................................................... 10, 39
  § 1, 110 Stat. at 3879 ...................................................10
  § 2(1), 110 Stat. at 3882 ...................................................40

28 U.S.C. § 1292(a)(1) ...................................................4

28 U.S.C. § 1331 ...................................................4

32 U.S.C. § 112 ...................................................6

32 U.S.C. § 314(b) ...................................................7

32 U.S.C. § 502(f) ................................................... 15, 16

32 U.S.C. § 502(f)(1) ................................................... 2, 6, 16, 22, 28

32 U.S.C. § 502(f)(2) ...................................................28

32 U.S.C. § 502(f)(2)(A) ................................................... 2, 6, 22, 28, 29, 40

32 U.S.C. § 502(f)(2)(B) ................................................................29

32 U.S.C. § 503 ...............................................................................6

D.C. Code § 1-102 ........................................................................43

D.C. Code § 1-201.01 *et seq.* .......................................................8

D.C. Code § 1-203.02 .....................................................................8

D.C. Code § 1-204.33 .....................................................................8

D.C. Code § 1-204.46 .....................................................................8

D.C. Code § 1-206.01 .....................................................................8

D.C. Code § 1-206.02(a)(3) ............................................................9

D.C. Code § 1-206.02(a)(4)-(8) ......................................................8

D.C. Code § 1-206.02(a)(8) ............................................................9

D.C. Code § 1-206.02(b) ............................................................9,19

D.C. Code § 1-206.02(c)(1)-(2) ......................................................8

D.C. Code § 1-207.17(a) ...............................................................44

D.C. Code § 1-207.40(a) ...............................................................45

D.C. Code § 5-201 ..................................................................... 9, 45

D.C. Code § 23-501 .......................................................................45

D.C. Code § 23-581 .......................................................................45

D.C. Code § 49-101 *et seq.* ..........................................................7

D.C. Code § 49-101 .......................................................................36

D.C. Code § 49-102 ............................................................ 23, 32, 35

D.C. Code § 49-103 .................................................................. 19, 34

D.C. Code § 49-301(a) ...................................................................7

D.C. Code § 49-304 .......................................................................7

D.C. Code § 49-314(b) ...................................................................7

D.C. Code § 49-404 ........................................... 2, 19, 22, 31, 32, 36

D.C. Code § 49-405 ...................................................... 18, 31, 32, 36

D.C. Code § 49-409 ...................................................... 7, 31, 37

D.C. Code § 49-901 ...................................................... 31, 36

**Regulatory and Executive Materials:**

Exec. Order No. 14333,
    90 Fed. Reg. 39301 (Aug. 14, 2025) ..................................... 10, 32, 47

Exec. Order No. 11485,
    34 Fed. Reg. 15411 (Oct. 3, 1969)................................................ 8, 37

*Memorandum on Restoring Law and Order in the District
    of Columbia*, 2025 Daily Comp. Pres. Doc. (Aug. 11, 2025)..............................11
        § 1 ...............................................................................11
        §§ 1-2............................................................................28
        § 2 ...............................................................................11

*Use of the National Guard to Support Drug Interdiction Efforts
    in the District of Columbia*, 13 Op. O.L.C. 91 (1989)............................ 32, 33, 36

Memorandum for the Assistant Att'y Gen., Civ. Div., from
    Norbert A. Schlei, Assistant Att'y Gen., Off. of Legal Couns.
    (July 30, 1963) .......................................................................32

**Court Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................................4

**Legislative Material:**

H.R. Rep. No. 109-452 (2006)..................................................................18, 22, 30

**Other Authorities:**

Mayor's Order No. 2025-090, *Creation of the Safe and*
  *Beautiful Emergency Operations Center* (Sep. 2, 2025):
      § I.B.1 ...................................................................................................14
      § I.E .............................................................................................1, 14, 48

Gabe Cohen, *DC Sues Trump Administration over National*
  *Guard Deployment*, CNN (Sep. 4, 2025),
  https://www.cnn.com/2025/09/04/politics/washington-dc-
  sues-trump-national-guard  ...............................................................46

Council of D.C., *D.C. Home Rule*, https://dccouncil.gov/dc-home-rule/................35

Lawrence Kapp & Barbara Salazar Torreon, Cong. Rsch. Serv.,
  RL30802, *Reserve Component Personnel Issues:*
  *Questions and Answers* (2021) .......................................................6, 30

*Martial Law*, Black's Law Dictionary (12th ed. 2024) ...........................................33

Greg Norman-Diamond, *Bowser Pushes Police Recruitment,*
*Says DC Needs 'Hundreds More' Cops as Trump Federal*
*Takeover Nears End*, Fox News (Sep. 3, 2025),
https://perma.cc/MHU3-NCF8 ................................................................13

# GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| District of Columbia | D.C. or District |
| Emergency Management Assistance Compact | EMAC |
| Joint Task Force District of Columbia | JTF-DC |
| Memoranda of Understanding | MOU |
| Metropolitan Police Department | MPD |
| Office of Legal Counsel | OLC |

**INTRODUCTION**

On August 11, 2025, President Trump, as Commander in Chief of the Armed Forces and the District of Columbia (D.C. or District) National Guard, directed the Secretary of War to mobilize the D.C. National Guard to address violent crime and ensure public safety in the District. The President also directed the Secretary to coordinate with cooperating States to deploy additional National Guard members to D.C. at federal expense—approximately 1,235 Guard members were subsequently deployed with the consent of each cooperating State's governor. The Guard has extensively coordinated their activities with the D.C. local government. There are daily meetings among the Joint Task Force overseeing the Guard members, the D.C. Metropolitan Police Department (MPD), the Washington Metro Transit Police Department, the Marshals Service, and the U.S. Park Police; and the MPD provides the task force with daily information about the location and frequency of reported crime, criminal suspects, and planned MPD operations.

The success of that coordination is undeniable. Even D.C.'s Mayor has acknowledged that "violent crime in the District has noticeably decreased" since August, "due to the cooperative efforts between District and federal officials," Mayor's Order No. 2025-090, *Creation of the Safe and Beautiful Emergency Operations Center* § I.E (Sep. 2, 2025) (Order), thereby returning D.C. to its proper pride of place and allowing Americans from all walks of life the ability to visit

Washington, D.C., without fear for their safety. And although the District is not a sovereign, the federal mission does not detract from the local government's limited delegated authority. Guard members are not making arrests; conducting searches and seizures; or deciding whether to arrest, prosecute, or investigate crime. Indeed, much of their work consists of acting as a presence to deter crime, reporting crimes they witness, and assisting law enforcement in support of missions when requested to do so.

The deployments are plainly lawful. Federal law authorizes both the D.C. Guard and Guard members from other States to provide "[s]upport of operations or missions undertaken . . . at the request of the President or Secretary of Defense," which is exactly what deployed Guard members are doing. 32 U.S.C. § 502(f)(1), (2)(A). If that were not enough, the D.C. Code recognizes the Guard's permissible use "to aid the civil authorities in the execution of the laws," D.C. Code § 49-404, and the Commanding General's power to "order out any portion of the National Guard" for any "duties" he "may deem proper," *id.* § 49-102.

The district court nonetheless issued a preliminary injunction against the deployment of both the D.C. Guard and Guard from other States. That order was flawed in multiple respects, as a unanimous panel of this Court recognized when it, in a meticulous and well-reasoned opinion, granted the federal government's request for a stay of that injunction pending appeal.

As the stay panel noted, the text of § 502(f) expressly authorizes both deployments. The district court did not engage with that text and instead reasoned that § 502(f) only permits missions that are authorized by the deploying States' laws. But even if that were true, the court had no basis for concluding (and did not even attempt to demonstrate) that the deployments violate the laws of any deploying State. Although no further authorization is needed, the D.C. Code also independently authorizes the deployment of the D.C. Guard.

The district court further concluded that any deployment of a State Guard could only be made under the Emergency Management Assistance Compact (EMAC)—a compact to which the federal government is not a party—and only at the request of the District's Mayor. That is plainly incorrect. As the stay panel noted, the EMAC provides a source of authority for States and D.C. to request assistance from each other; it does not purport to foreclose or restrict deployments separately authorized by federal law.

Because the District has no likelihood of success on the merits, that alone requires reversal. But the remaining requirements do not support the preliminary injunction either. The only irreparable harm the district court identified was a supposed "sovereign" injury. But the D.C. government is not a sovereign and the district court's irreparable harm conclusion is entirely derivative of its (incorrect) merits analysis. And in any event, the federal mission does not detract from D.C.'s

3

limited delegated authority. On the other side of the ledger, the injunction impinges on the President's express statutory authority as Commander-in-Chief of the D.C. National Guard and impermissibly second-guesses his successful efforts to address high crime rates in the Nation's capital. This Court should vacate the injunction.

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331.[1] JA42. The district court granted a preliminary injunction on November 20, 2025, JA869-70, and the federal government timely appealed on November 25, 2025. *See* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the President's decision to deploy the D.C. National Guard was lawful.

2. Whether the deployment of Guard members from other States in the District with the consent of their Governors and at the Secretary of War's request was lawful.

---

[1] In granting a stay of the preliminary injunction, Judge Rao wrote a concurring opinion, which Judge Katsas joined, arguing that the District may lack an independent sovereignty that can give rise to an Article III injury from actions of the federal government. *See infra* p. 21. As discussed further below, defendants agree with Judge Rao, but even if plaintiff had standing, these same considerations at the very least mean plaintiff cannot demonstrate any irreparable harm justifying the district court's erroneous injunction.

3.     Whether plaintiff failed to establish the equitable requirements for a preliminary injunction.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Legal Background

**1.** Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990) (quotation marks omitted). When a Guard member enlists in a State or district National Guard, that Guard member also enlists in the National Guard of the United States. This dual-enlistment structure results in three possible statuses for active service operations. At any given time, Guard members may serve on (1) federal active duty under Title 10 of the U.S. Code; (2) state control in support of a federal mission under Title 32 of the U.S. Code; or (3) state active duty under applicable provisions of state law.

Service in Title 32 status is a "hybrid" between state and federal active duty. *E.g.*, *Stirling v. Minasian*, 955 F.3d 795, 798 (9th Cir. 2020). The Guard members remain "state National Guard members under state control," but those members work "in the service of" and are "funded by the federal government." *Id.* Title 32 authorizes the President to order and the federal government to fund specific federal

5

missions, like drug interdiction (32 U.S.C. § 112) and field exercises (32 U.S.C. § 503). But it also provides the President with broader authority. Members of a state or district Guard may "be ordered to perform training or other duty," including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(1), (2)(A). Over the last several decades, Guard members in Title 32 status have, pursuant to this provision, engaged in a variety of missions, including assisting with disaster relief, border security operations, airport security after the September 11th attacks, and COVID-19 response efforts. *See* Lawrence Kapp & Barbara Salazar Torreon, Cong. Rsch. Serv., RL30802, *Reserve Component Personnel Issues: Questions and Answers* 20 (2021).

**2.** The District is "an exceptional community . . . established under the Constitution as the seat of the National Government." *District of Columbia v. Murphy*, 314 U.S. 441, 452 (1941). The District Clause of the Constitution empowers Congress to "exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may . . . become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17. Pursuant to that authority, Congress created the District of Columbia in 1801. *See* Act of Feb. 27, 1801, ch. 15, 2 Stat. 103, 103-05. "In the 1870s, Congress unified the District government under a three-person commission appointed by the President . . . ." *Banner v. United States*, 428 F.3d 303,

6

305 (D.C. Cir. 2005) (per curiam). Later, in 1967, the commission "was replaced with a commissioner and council, also presidentially appointed." *Id.*

In 1889, Congress created the D.C. National Guard. *See* Act of Mar. 1, 1889, ch. 328, 25 Stat. 772, 772. That 1889 statute has been codified in Title 49 of the D.C. Code, and its text remains largely unchanged to this day. *See* D.C. Code § 49-101 *et seq.*

Because of the District's unique status, the D.C. National Guard functions differently as compared to the state Guards. "[T]he organized militia of the District of Columbia, which is organized, armed, and controlled by the President of the United States, is essentially a component of the federal government." *Seegars v. Ashcroft*, 297 F. Supp. 2d 201, 241 (D.D.C. 2004), *aff'd in part, rev'd in part*, 396 F.3d 1248 (D.C. Cir. 2005). The President, rather than a local official, is the D.C. Guard's Commander-in-Chief. D.C. Code § 49-409. And the President appoints and commissions the D.C. Guard's Commanding General. *Id.* § 49-301(a). He also chooses the Guard's Adjutant General. *Id.* § 49-304; *see also* 32 U.S.C. § 314(b). By Presidential delegation, the Secretary of War supervises, administers, and controls the D.C. Guard, and subject to direction from the President, and consultation with the Attorney General of the United States, is authorized to command D.C. Guard military operations (e.g., Make D.C. Safe and Beautiful) through the

7

Commanding General. *See* Exec. Order No. 11485, §§ 1, 4, 34 Fed. Reg. 15411, 15411 (Oct. 3, 1969).

In 1973, Congress passed and President Nixon signed legislation that is commonly referred to as the Home Rule Act (codified as amended at D.C. Code § 1-201.01 *et seq.*). Under the Act, "a mayor and council elected by residents of the District exercise certain executive and legislative powers delegated by Congress." *Banner*, 428 F.3d at 305. The powers typically residing in a State's governor are divided between the President and Mayor in the District.

The powers ceded to the District's local government under the Home Rule Act are important but come with substantial limitations. For example, in addition to serving as Commander in Chief of the D.C. National Guard, the President appoints D.C.'s local government judges. D.C. Code § 1-204.33. The District Council's authority is limited to "rightful subjects of legislation," and the Home Rule Act lists certain matters that are not rightful subjects. *Id.* §§ 1-203.02, 1-206.02(a)(4)-(8). Any Council enactment becomes law only if Congress declines to pass a joint resolution of disapproval within 30 days (60 days for criminal laws). *See id.* § 1-206.02(c)(1)-(2). Congress can enact legislation concerning the District on any subject and repeal Council enactments at any time. *Id.* § 1-206.01. The Act also prohibits District officers and employees from expending funds unless authorized to do so by Congress. *Id.* § 1-204.46.

8

In addition, the District Council has no power over the courts, federal property, or any federal agency. *See* D.C. Code § 1-206.02 (a)(8), (3), (b). Nor does the District government have exclusive law-enforcement jurisdiction in the city. Among other federal law-enforcement agencies operating in the District, Congress has vested in the United States Park Police "the same powers and duties as the Metropolitan Police of the District." *Id.* § 5-201.

And as relevant here, the Act makes clear that the District Government may not exercise any "greater authority over . . . the National Guard of the District of Columbia" than it did prior to Home Rule. D.C. Code § 1-206.02(b). The D.C. Guard thus remains under the sole authority of the federal government.

**3.** The EMAC is an interstate compact between all 50 States, the Commonwealth of Puerto Rico, the District, and all U.S. territorial possessions; Congress subsequently approved the EMAC in 1996. Pub. L. No. 104-321, § 1, 110 Stat. 3877, 3877 (1996) (EMAC art. I).

The EMAC provides "for mutual cooperation in emergency-related exercises," including "the giving and receiving of aid by party states or subdivisions of party states during emergencies." Pub. L. No. 104-321, § 1, 110 Stat. at 3877 (EMAC art. I). "Mutual assistance in this compact may include the use of the states' National Guard forces, either in accordance with the National Guard Mutual Assistance Compact or by mutual agreement between states." *Id.* Any "party state

may request assistance to another party state." *Id.*, 110 Stat. at 3879 (EMAC art. III.B). A party state requested to provide aid "shall take such action as is necessary to provide and make available the resources covered by this compact in accordance with the terms hereof; provided that it is understood that the state rendering aid may withhold resources to the extent necessary to provide reasonable protection for such state." *Id.*, 110 Stat. at 3879 (EMAC art. IV).

### B.    Factual Background

**1.** On August 11, 2025, President Trump issued Executive Order 14333, "Declaring a Crime Emergency in the District of Columbia." As the Order notes, "[c]rime is out of control in the District of Columbia." Exec. Order No. 14333, § 1, 90 Fed. Reg. 39301, 39301 (Aug. 14, 2025). The District has a higher violent crime, murder, and robbery rate than all 50 States and also has the Nation's highest vehicle theft rate. *Id.* Rising violence in our Nation's capital "urgently endangers public servants, citizens, and tourists, disrupts safe and secure transportation and the proper functioning of the Federal Government, and forces the diversion of critical public resources toward emergency response and security measures." *Id.* Indeed, the situation in the District continues to "hamper the recruitment and retention of essential Federal employees, undermine critical functions of Government and thus the well-being of the entire Nation, and erode confidence in the strength of the United States." *Id.*

10

That same day, President Trump directed the Secretary of War to mobilize the D.C. National Guard and "to coordinate with State Governors" regarding the deployment of state National Guard members to the District. *See Memorandum on Restoring Law and Order in the District of Columbia*, 2025 Daily Comp. Pres. Doc. (Aug. 11, 2025). In doing so, the President explained that ongoing violence impacted the "public order and safety" in the District, as "evidenced by the two embassy staffers who were murdered in May, the Congressional intern who was fatally shot a short distance from the White House in June, and the Administration staffer who was mercilessly beaten by a violent mob days [before]." *Id.* § 1. And the President authorized an ongoing mission "until [he] determine[s] that conditions of law and order have been restored in the District of Columbia." *Id.* § 2.

Implementing the memorandum, the Secretary of the Army approved the D.C. Guard's use to "provide critical support to law enforcement efforts in the District of Columbia." JA669. The Commanding General of the D.C. Guard then issued Permanent Orders 25-223, ordering Guard members to "protect federal property and functions in the District of Columbia and to support federal and District law enforcement." JA671.

The D.C. Guard also executed memoranda of understanding (MOUs) with National Guard units from several States. JA547-78. The MOUs provide that deployed units will remain under the control of the sending States, JA548, and direct

11

that the MOUs be interpreted consistent with federal and state law, JA547. State Guard members began arriving on August 16, 2025 and, at the time of the preliminary injunction briefing in district court, numbered approximately 1,235 (in addition to deployed members of the D.C. National Guard). JA517.

**2.** Since deployment, the National Guard units have been organized with a Commanding General overseeing the Joint Task Force District of Columbia (JTF-DC). JA515. The JTF-DC's mission is to provide support to D.C.'s MPD as well as federal law enforcement in the District. JA516. While the Commanding General has "direct command and control over" members of the D.C. National Guard, he has only "coordinating and tasking authority over" out-of-district forces—subject to restrictions imposed by, and the ultimate control held by, individual State governors. JA517.

Among other extensive coordination with local authorities, there are daily meetings among JTF-DC, the MPD, the Washington Metro Transit Police Department, the Marshals Service, and the U.S. Park Police. JA518. The MPD provides JTF-DC with daily information about suspects to be on the lookout for and any relevant planned MPD operations. JA518. The MPD gives JTF-DC daily updates on the location and frequency of reported crime. JA518. The MPD also provides a police escort to JTF-DC forces when they are transported from their staging area to their operating area. JA518.

12

Under current orders, National Guard members are not permitted to make arrests, conduct searches or seizures, or engage in other similar direct law-enforcement activity. JA516-17. They may make temporary detentions until law enforcement arrives but "[t]he decision of whether to arrest an individual, and any investigation of the underlying incident, are solely the responsibility of the supported law enforcement agency." JA517. When Guard members observe crime, they call 9-1-1, which dispatches MPD forces to the scene. JA519. The JTF-DC thus supports the MPD and other law-enforcement agencies by acting as a presence to deter crime, reporting crimes they witness, and assisting law enforcement in support missions when requested to do so. JA516. Guard members also patrol sites where the Park Police typically patrols, freeing Park Police to partner with the MPD off federal property. JA530. These additional resources are particularly beneficial given the District's acknowledged shortage of police officers. As recently as August 28, 2025, Mayor Bowser repeated that D.C.'s longstanding goal has been a 4,000-officer force; MPD currently has approximately 3,188 officers.[2]

Consistent with Title 32, "[a]ll out-of-district forces are participating in this mission with the consent of their state Governors and remain under the administrative command and control of their sending state Adjutants General and

---

[2] Greg Norman-Diamond, *Bowser Pushes Police Recruitment, Says DC Needs 'Hundreds More' Cops as Trump Federal Takeover Nears End*, Fox News (Sep. 3, 2025), https://perma.cc/MHU3-NCF8.

ultimately their State Governors." JA517. These forces may be withdrawn by their State Governors at any time. JA517. Any out of District force can also "refuse any task assigned to them should their Governor or Adjutant General object to the assignment." JA517.

**3.** On September 2, 2025, Mayor Bowser issued Mayor's Order 2025-090. Section I.B.1 of the Order identified "common goals" with the President's Safe and Beautiful Task Force. Order § I.B.1. As Mayor Bowser highlighted, the close cooperation between the District and Federal Government has yielded significant progress: "[s]ince August 11, 2025, due to the cooperative efforts between District and federal officials, violent crime in the District has noticeably decreased." Order § I.E.

### C.    Prior Proceedings

**1.** Two days after the Mayor's statement of support, the D.C. Attorney General filed this action on behalf of the District of Columbia. JA39. In that complaint, plaintiff attempted to plead four different counts. It argued that deployment of the National Guard in the District was (i) contrary to law in violation of the Administrative Procedure Act (APA), (ii) arbitrary and capricious in violation of the APA, (iii) inconsistent with the Take Care Clause, District Clause, and constitutional separation of powers, and (iv) *ultra vires* conduct in excess of defendants' constitutional and statutory authority. Shortly thereafter, plaintiff sought a

14

preliminary injunction barring defendants from deploying National Guard troops to conduct law enforcement without the Mayor's consent. Defendants opposed and also moved to dismiss the complaint.

On November 20, 2025, the district court granted a preliminary injunction and denied, in part, defendants' motion to dismiss. The court did not base its decision on any factual findings, but instead concluded that the deployments were contrary to law in two respects. JA809. As to the D.C. Guard, the Court held that their deployment must be but was not specifically authorized by Title 49 of the D.C. Code. JA828-44. As to the state Guards, the district court concluded that any deployment must be authorized by state law and that there was no state-law basis for the deployments. JA849. And the court appeared to conclude that, notwithstanding 32 U.S.C. § 502(f), any request for assistance from States to deploy National Guard members to the District could only be made under the EMAC—a compact to which the federal government is not a party—and only by the District's Mayor. JA854-57. Based on these conclusions, the court also denied defendants' motion to dismiss insofar as it argued that the President lawfully deployed the National Guard members under Title 32 of the U.S. Code and Title 49 of the D.C. Code. Otherwise, the court reserved judgment on plaintiff's claims and defendants' motion to dismiss. The court has since stayed further proceedings (and denied the remainder of defendants'

15

motion to dismiss without prejudice) pending this Court's resolution of this appeal. Dkt. No. 105.

**2.** A unanimous panel of this Court granted a stay pending appeal. *District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *1 (D.C. Cir. Dec. 17, 2025) (per curiam) (*Stay Decision*). In doing so, the panel concluded that each of the stay factors favored defendants.

**a.** On the merits, the panel first held that the "President" likely "possesses a unique power within the District—the seat of the federal government—to mobilize the Guard under 32 U.S.C. § 502(f)." *Stay Decision*, at *2. That statute, first enacted in 1964, allows the President to deploy Guard members to "perform training or other duty in addition to" certain specified duties. *Id.* at *6 (quoting 32 U.S.C. § 502(f)(1)). And since 2006, § 502(f) has made it clear that the phrase "training or other duty" may include, among other things, "support of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." *Id.* (citation modified). "On its face," this statute "appears likely to authorize the deployment of the D.C. Guard and the State Guards in this instance." *Id.* While use of the word "request" implies that State governors and the Commanding General of the D.C. Guard must agree to any deployment, the panel noted (and plaintiff does not dispute) that this requirement was satisfied here. *Id.* at *7.

16

Moreover, the panel rejected plaintiff's argument that "training or other duty" in subsection (f)(2) must be limited to activities that are "analogous to drills or training." *Stay Decision*, at *7 (citation modified). The statutory structure and legislative history, the panel reasoned, likely forecloses that argument. First, as the panel explained, the phrase "other duty" in § 502(f)(2) cannot be so limited. *Id.* The statute defines "training or other duty" to include "support of operations or missions . . . at the request of the President." *Id.* at *6 (citation modified). And as the panel reasoned, the phrase "operations or missions" must be broader than the "*training* operations and *training* missions" referenced elsewhere in the text. *Id.* at *7. Moreover, the panel relied on the statute's "repeated disjunctive use of the phrase 'training or other duty,'" which "indicates that 'duty' encompasses more than training." *Id.*

This interpretation also "makes structural sense," the panel reasoned. *Stay Decision*, at *7. "Subsection (f)(2)(A) allows requests for deployments only by the President or Secretary of Defense—two individuals whose high-level positions within the Executive Branch often require responses to emergencies that exceed training issues, and who would likely leave training to military officers who have expertise in such matters." *Id.* Finally, the panel explained how "[S]ubsection 502(f)(2)(A)" was added "in the wake of Hurricane Katrina to allow the deployment of guard troops to address the 'full range of diverse 21st century missions.'" *Id.* at

17

*8 (quoting H.R. Rep. No. 109-452, at 12 (2006)). According to the panel, this legislative history undermined plaintiff's interpretation. *Id.*

The panel thus held that defendants "are likely to show that Section 502(f)(2)(A) authorized the President and the Secretary of Defense to request that both the D.C. Guard and the State Guards undertake a federal mission in the District." *Stay Decision*, at *8.

**b.** Next, the panel accepted (for purposes of argument) the district court's conclusion that "Section 502(f)(2)(A) is best understood to encompass operations or missions requested by the President that are authorized under state law." *Stay Decision*, at *8 (quotation marks omitted). Then, the panel held that deployment of the D.C. and state National Guard members was likely authorized even on that assumption.

With respect to the D.C. Guard, the panel held that "the D.C. Code independently authorizes the deployment" of those Guard members. *Stay Decision*, at *2; *see also id.* at *8-9. As "Commander in Chief of the D.C. Guard," the panel explained, the President "may deploy the Guard only within the bounds of the law." *Id.* at *8. But the law provides the President express authority to "'order out' the D.C. Guard '[w]henever it shall be necessary[.]'" *Id.* (alterations in original) (quoting D.C. Code § 49-405). And the panel identified "multiple provisions" that allow the "D.C. Guard [to] be ordered to 'aid the civil authorities in the execution of

18

the laws[.]'" *Id.* (second alteration in original) (quoting D.C. Code § 49-404). The President need not await a request from a subordinate official before calling forth the D.C. Guard, the panel reasoned, based on the language of the statutory text and past practice—which Congress has not seen fit to upset. *Id.* at *8-9. Although another statute authorizes the D.C. Mayor and two presidential subordinates to request deployment of the Guard, *see* D.C. Code § 49-103, that provision merely expands the list of officials who may identify the need for Guard deployment; but it does not cabin the President's authority. *Stay Decision*, at *9. And Congress made it clear that "the Executive Branch retain[ed] independent control over the D.C. Guard" when it enacted the Home Rule Act. *Id.* (discussing D.C. Code § 1-206.02(b)).

With respect to state National Guard members, the panel rejected plaintiff's argument that deployment of those troops violated applicable state law. *Stay Decision*, at *9-11. Plaintiff's sole argument on that score centered on the EMAC. As the panel explained, the EMAC "simply provides its signatories, including all States and the District, an avenue for independently seeking assistance from other Guard units wholly apart from any federal-law-based activation." *Id.* at *10. "It does not purport to foreclose or restrict deployments separately authorized by federal law." *Id.* And even if the deployment of state National Guard members violated the laws of the *sending State*, the panel concluded that "the remedy for such a violation

19

would be a suit against that governor for violating state law, not the Administrative Procedure Act lawsuit against the federal governmental Defendants on which the district court's preliminary relief rests." *Id.*

The panel also rejected plaintiff's argument that deployment of the out-of-district Guard members raised serious constitutional questions. It recognized that deployment of Guard members to a non-consenting *State* might raise such issues, but deployment to the District—a federal enclave—at the President's request did not. *Stay Decision*, at *10-11. And nothing about the Home Rule Act changed that conclusion, the panel reasoned. *Id.* at *11. Ultimately, the panel held that the President's "consent is dispositive in this unique context." *Id.*

**3.** Finally, the panel held that "[a] balancing of the relevant equitable considerations also weighs heavily in favor of granting a stay." *Stay Decision*, at *11. It explained that the federal government has a "strong . . . interest in the protection of federal functions and property within the Nation's Capital." *Id.* Moreover, the panel noted how deployment of Guard members had become the status quo: "[f]or over four months" deployment of federal resources had been conditioned on the presence of the National Guard troops. *Id.* "On the other side of the scale," the panel found that plaintiff failed to establish its purported "sovereign injury" because it was not likely to succeed on the merits. *Id.* at *12.

**4.** In addition to joining the unanimous panel opinion, Judge Rao wrote a concurring opinion, which Judge Katsas joined. Judge Rao explained that plaintiff "may lack Article III standing to challenge the deployment of National Guard troops in the District." *Stay Decision*, at *13 (Rao, J., concurring). This Court has "never recognized that the District possesses an independent sovereignty that can give rise to an Article III injury from actions of the federal government." *Id.* And according to Judges Rao and Katsas, "[s]uch an injury is likely untenable as a matter of first principles and finds no support in our precedent or historical practice." *Id.*

## SUMMARY OF ARGUMENT

The district court erred in granting a preliminary injunction.

**I.**      Plaintiff has no possibility, let alone a likelihood, of prevailing on the merits because the deployments are lawful.

**A.**      Contrary to the district court's premise, the deployments of the D.C. and state Guards do not require express federal statutory authorization. The President does not need express statutory authority to deploy a federal force in support of federal interests in a federal enclave, consistent with how state guards in state service may be used. And absent any constitutional concerns of the sort that would apply to deployment within another State, a State does not need express federal statutory authority to deploy its Guard in the District at the federal executive's request.

21

**B.**    In any event, federal law expressly authorizes both deployments. Title 32 authorizes members to "be ordered to perform training or other duty," which may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(1), (2)(A). That is precisely what the Guards are doing here. Plaintiff's contrary argument that "other duty" should be limited to duties similar to training—which not even the district court embraced—has no textual basis. It also makes no sense in light of the statutory structure, which, in a separate subsection wholly distinct from training exercises, carves out a category of operations and missions so important that only the President and Secretary of Defense can request them. The relevant statutory language was added in 2006 in the aftermath of Hurricane Katrina, specifically for the purpose of "address[ing] the 'full range of diverse 21st century missions[.]'" *Stay Decision*, at *8 (second alteration in original) (quoting H.R. Rep. No. 109-452, at 12). And the statute has been frequently used for missions that are not at all similar to training exercises.

**C.** Though § 502(f) is dispositive, the D.C. Code independently authorizes the D.C. Guard's deployment. Among other provisions, the D.C. Code contemplates in multiple provisions that the D.C. Guard may be ordered to "aid the civil authorities in the execution of the laws." D.C. Code § 49-404. And it also allows the Commanding General to "order out any portion of the National Guard for such drills,

inspections, parades, escort, or other duties, as he may deem proper." *Id.* § 49-102. The district court read these and other provisions as extraordinarily narrow, and it interpreted a different provision to mean that, with narrow exceptions, the President can only deploy the D.C. Guard upon a request from the Mayor or two designated federal officials in response to a riot or similar tumult. But as the stay panel recognized, that reading is wrong. It is contrary to the plain meaning of the relevant provisions. It would mean that two subordinates of the President would have more power to protect the Nation's capital than the President himself. It would provide the District government with authority over the D.C. Guard notwithstanding an express statutory directive to the contrary in the Home Rule Act. It would leave a vacuum where *no one* could order the D.C. Guard to take routine actions traditionally performed by state national guards. And it is belied by the history surrounding the Home Rule Act.

**D.** The district court's conclusion that the state deployments should be enjoined as violative of state law plainly fails. The court did not even attempt to establish—and no party argued below—that the deployments violated the state law of any deploying State (and any such contention would not be a basis for an injunction here anyway). As to the EMAC, that compact is merely an agreement among the States and the District to provide assistance to each other and plainly does not restrict—let alone divest—the federal executive's authority to obtain assistance.

**II.**    Though unnecessary to address here, the remaining preliminary-injunction factors overwhelmingly favor the United States. The district court found irreparable harm to the District solely based on an alleged sovereign injury, but that theory fails because the District does not have standing to assert it, because it would be a purely statutory injury that would give rise to no presumption of irreparable harm, and because it is in any event wholly derivative of the court's incorrect merits conclusion. All that aside, plaintiff failed to identify any concrete sense in which the deployment affects the D.C. government's exercise of delegated powers. On the other side of the ledger, the injunction impinges on the President's authority as Commander in Chief of the D.C. National Guard and enjoins deployments that are expressly authorized by statute. In practical terms the injunction nullifies agreements carefully negotiated between the Executive Branch and the executive authorities of several States. And it would end a mission to address rates of crime in the District that everyone agrees are unacceptably high—efforts that, as the District's Mayor has acknowledged, have been successful. The injunction should be vacated.

## STANDARD OF REVIEW

This Court reviews the district court's grant of an injunction for abuse of discretion, but questions of law are reviewed de novo. *Global Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025). To secure a preliminary injunction, plaintiff was required to show that it (1) was "likely to succeed on the merits," (2) was "likely

24

to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tip[ped] in [its] favor," and (4) that "an injunction [wa]s in the public interest." *Id.* (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

**ARGUMENT**

### I.    The Deployments Are Lawful.

#### A.    The deployments do not require express federal statutory authorization.

As a threshold matter, the district court proceeded from the assumption that express statutory authority is required for both deployments. But that assumption is wrong. As discussed, the President is the Commander-in-Chief of the D.C. National Guard; the District of Columbia is a federal enclave under the legislative control of Congress; and although Congress in the 1973 Home Rule Act delegated limited authority to D.C.'s local government, the Home Rule Act expressly provides that it does not give the local government any "greater authority over . . . the National Guard of the District of Columbia" than it had prior to Home Rule. *See supra* p. 9. Even without express statutory authorization then, the President may deploy the D.C. National Guard to a federal enclave for federal purposes. Indeed, the President has inherent authority to ensure safety in the District, a uniquely federal entity. *See In re Neagle*, 135 U.S. 1, 65, 69 (1890); *In re Debs*, 158 U.S. 564, 582 (1895). The President does not need express statutory authority to deploy a federal force in

25

support of federal interests in a federal enclave, consistent with how state guards in state service may be used.

Insisting otherwise, the district court noted "that state constitutions and statutes often have separate provisions (1) designating the governor as commander in chief and (2) listing the situations in which the governor can deploy the state militia." JA830. But to the extent those state-law provisions are instructive, they underscore that Governors' Commander-in-Chief authorities broadly encompass the power to execute the laws. The provisions cited by the district court are capacious and show that state guards routinely execute the laws at their Governor's direction. JA831-32.

In any event, that some States delineate the purposes for which the Guard can be deployed cuts against plaintiff's reading. Congress took a different approach in Title 49, opting for a general delegation of authority to the President as Commander-in-Chief. Apart from Section 49-103—which is a *command* to the President, and which we discuss further below—there is *no* provision directly addressing the President's authority to call up the D.C. Guard. There is no reason to think that Congress gave the President substantially less ability to use the D.C. Guard than any State's governor. Rather, the logical inference is that the President may broadly deploy the Guard unless a federal statute or the Constitution specifically prohibits a particular use.

The same is true of the state deployments. The Constitution would likely prohibit a State from deploying its Guard into another *State* without the receiving State's consent. But as the stay panel noted, *see Stay Decision*, at *10-11, that constitutional concern is not present here, since the District is not a sovereign, and the President, as Commander in Chief of the D.C. Guard, nevertheless consented to the state deployments. And presumably a State could not deploy its Guard in a manner that violates state law. But as the panel noted, that is a state law issue and the remedy for such a violation would be a suit against the governor for violating state law (and the Eleventh Amendment would likely bar such a suit in federal court, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103 (1984)). But even without express statutory authorization, there is no *federal bar* on a State deploying its own Guard members to the District at the President's request and with his consent.

**B.    Federal law expressly authorizes the deployments.**

But even if express authority were required, the President has such authority, as the stay panel recognized. Federal law provides the President with authority that, "[o]n its face," allows for "the deployment of the D.C. Guard and the State Guards in this instance." *Stay Decision*, at *6. The district court reached a contrary conclusion only by misreading the federal statutory language and misunderstanding the import of state and District law.

27

Title 32 authorizes National Guard members to "be ordered to perform training or other duty," which may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(1), (2)(A). The plain meaning of this provision encompasses the deployments here. *Stay Decision*, at *6-7; *see also Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184 (2020) (holding that courts "must enforce plain and unambiguous statutory language" (quotation marks omitted)). After all, this is an "operation[] or mission[]" that has been performed "at the request of the President," 32 U.S.C. § 502(f)(2)(A); *see Memorandum on Restoring Law and Order in the District of Columbia*, 2025 Daily Comp. Pres. Doc. §§ 1-2, and with the consent of the relevant state Governors, *see Stay Decision*, at *7.

The phrase "training or other duty" cannot, as plaintiff argued during stay briefing, be read narrowly to include only drills and similar activities. *See Stay Decision*, at *7-8. By definition, "training or other duty" must be capacious enough to include "operations or missions" performed at the request of the President. *See* 32 U.S.C. § 502(f)(2) (defining "training or duty" to include such operations). And reading those "operations or missions," *id.* § 502(f)(2)(A), as limited to those like training duties would render superfluous neighboring language in the statute. The statute expressly distinguishes, in separate subsections, between "[s]upport of *training* operations and *training* missions assigned in whole or in part to the National

28

Guard by the Secretary," *see id.* § 502(f)(2)(B) (emphases added), and "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense," *id.* § 502(f)(2)(A). If "other duty" were limited to training activities, Congress would not have needed to mention it separately from the statutory authority to order "training." After all, it is a basic tenet of statutory interpretation that "every clause and word of a statute should have meaning." *See United States ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 432 (2023) (quotation marks omitted).

In addition, and as the stay panel also noted, that conclusion is the only one that makes sense of the statutory structure. Subsection (f)(2)(A), unlike subsection (f)(2)(B), "allows requests for deployments only by the President or Secretary of Defense—two individuals whose high-level positions within the Executive Branch often require responses to emergencies that exceed training issues." *Stay Decision*, at *7. It would make little sense for Congress to carve out a category of operations and missions so important that only the President and Secretary of Defense can request them, but limit those operations and missions to those similar to "training"— particularly when the neighboring provision already authorizes support for training operations and missions requested by these officials' subordinates.

Although resort to legislative history is unnecessary here, that history confirms the point. As the stay panel explained, § 502(f)(2)—the provision that

29

allows deployment of the Guard for "operations and missions" at the President's request—was added in 2006. This came on the heels of Hurricane Katrina, and Congress expressly added the provision to "address the 'full range of diverse 21st century missions[.]'" *Stay Decision*, at \*8 (alteration in original) (quoting H.R. Rep. No. 109-452, at 12). Consistent with this history, § 502(f) has been "frequently used" in circumstances that differ greatly from training duties. Kapp & Salazar, *supra*, at 20. National Guard members were deployed to support border security missions in 2006-2008, 2010-2016, and 2018-2020; support COVID-19 response efforts across the country; and respond to civil disturbances in Washington, D.C. in 2020-2021. *Id.* None of these examples would have been permissible under plaintiff's narrow understanding of the statutory text. Indeed, although the district court concluded that the state Guard deployments were unlawful because they were unauthorized by state law—a puzzling and incorrect conclusion we address further below—not even the court embraced plaintiff's atextual reading of § 502(f) as authorizing only missions sufficiently similar to training.

###### C. The D.C. Code independently authorizes the D.C. Guard deployment.

The district court also concluded that the D.C. Code does not allow the President to deploy the D.C. Guard here. JA828-44. But if § 502(f) authorizes the deployments, the court's analysis of the D.C. Code is beside the point. The D.C. Code obviously does not govern or address the conduct of state Guard members.

And as to the D.C. Guard, plaintiff does not contend that the D.C. Code *expressly prohibits* the deployment here; plaintiff simply contends that the Code does not encompass this deployment. But § 502(f) is an independent source of authority. Another source of power is not required (again even assuming that express federal statutory authorization is required at all). Thus, the Court can vacate the preliminary injunction without addressing state or District law. But even were the Court to reach the issue, the D.C. Code plainly authorizes the D.C. Guard's deployment here. *See Stay Decision*, at *8 (not endorsing the district court's conclusion that the D.C. Code must authorize the deployments but stating that "[e]ven were we to accept the district court's reading of Section 502(f)(2)(A), the Defendants have still shown that they are likely to succeed on appeal").

**1.** District law expressly authorizes the President's deployment of the D.C. Guard to support policing efforts. The D.C. Code provides that the President, as Commander in Chief of the D.C. Guard, "shall order out" the D.C. Guard "[w]henever it shall be necessary." D.C Code § 49-405; *see also id.* § 49-409 ("The President of the United States shall be the Commander-in-Chief of the militia of the District of Columbia."). The D.C. Code further recognizes the D.C. Guard may be used "to aid the civil authorities in the execution of the laws." *Id.* § 49-404; *see also id.* § 49-901 ("Whenever the National Guard of the District of Columbia shall be ordered to duty in case of riot, tumult, breach of the peace, *or whenever called in aid*

31

*of the civil authorities . . . .*" (emphasis added)). And it also allows the Commanding General to "order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper." *Id.* § 49-102.

Together, these provisions provide broad authority to order out the D.C. Guard, and the deployments in this case fall comfortably within the plain meaning of these provisions. The President has deemed it "proper" and "necessary" to mobilize the D.C. National Guard to "aid the civil authorities in the execution of the laws" given the crime epidemic in our Nation's Capital. *See* D.C. Code §§ 49-405, 49-102, 49-404; Exec. Order No. 14333, 90 Fed. Reg. at 39301 (Executive Order on crime in the District).

Confirming the plain statutory text, the Executive Branch has long understood these provisions to allow exactly what occurred here. In 1963, for example, Office of Legal Counsel (OLC) concluded that Section 49-102 authorized "the President to request or urge the commanding general to use the National Guard in support of activities of the District of Columbia police whenever he feels that the welfare, safety, or interest of the public would be served thereby." *See* Memorandum for the Assistant Att'y Gen., Civ. Div., from Norbert A. Schlei, Assistant Att'y Gen., Off. of Legal Couns. 3 (July 30, 1963). In 1989, the Office repeated that "[t]he authorization to order out the Guard for 'other duties, as he may deem proper' has long been viewed as broad enough to include law enforcement activities." *Use of the*

32

*National Guard to Support Drug Interdiction Efforts in the District of Columbia*, 13 Op. O.L.C. 91, 93 (1989). Consistent with these statements, the D.C. Guard has been used "in the course of presidential inaugurations and in the case of large demonstrations." *Id.* This tradition provides additional support for what the plain text of the statutes already makes clear—the President's and state Governor's deployments in this case were well within their respective authority.

**2.** Breaking from this clear text and tradition, the district court held that deployment of the D.C. Guard was not specifically authorized by the D.C. Code. JA828-44. It read that Code as permitting the President to deploy the Guard only for the purposes and under the constraints set forth in D.C. Code Sections 49-102 and 49-103. JA828-44. And at the same time, it gave Sections 49-102 and 49-103 a strained reading that would sharply cabin the President's authority. Neither provision supports the district court's conclusion.

**a.** As to Section 49-103, the district court reasoned that any power to "aid" the civil authorities under Section 49-404 "is best read as hinging upon a request by a civil authority under section 49-103." JA839 (emphasis omitted). But "civil authority" is not synonymous with local D.C. government (as is clear from Section 49-103, which allows for requests by federal, not just local, officials). Civil authority in this context simply means civilian officials (as contrasted with the military). *See Martial Law*, Black's Law Dictionary (12th ed. 2024) ("The law by which during

33

wartime the army, instead of civil authority, governs the country . . . .”). The President *is himself* part of the District’s civil authority.

And Section 49-103 simply does not support the district court’s interpretation. It provides that, under certain circumstances, “it shall be lawful for the Mayor of the District of Columbia, or for the United States Marshal for the District of Columbia, or for the National Capital Service Director, to call on the Commander-in-Chief to aid them in suppressing such violence and enforcing the laws.” D.C. Code § 49-103. When such a request is made, “the Commander-in-Chief shall thereupon order out so much and such portion of the militia as he may deem necessary to suppress the same.” *Id.*

Section 49-103 thus merely provides a procedural mechanism for the Mayor and two specified federal officials to request the D.C. Guard’s assistance under specified circumstances—and it provides that, upon such a request, the President is obligated to respond, though the specifics of the response are left to his discretion. It does not impliedly restrict the President’s authority under other provisions of the Code. The reason the Mayor must make a request is because the D.C. Guard is a federal entity over which D.C. officials have no control. As the stay panel noted, “Section 49-103’s text does not displace or limit the President’s statutory authority over the D.C. Guard and its Commanding General.” *Stay Decision*, at *9.

34

Even if the text were unclear on this point, the district court's contrary reading would be untenable. The two officials listed alongside the Mayor in this provision are federal officials, so "the district court's reading would imbue two presidential subordinates with more power to protect the seat of the federal government than the President—a highly untenable reading of statutory text." *Stay Decision*, at *9. And insofar as it would require Mayoral consent, such a reading would be contrary to the Home Rule Act, since it would give the District government more authority over the D.C. National Guard than it had prior to Home Rule.[3]

**b.** The district court's reading of Section 49-102 fares no better. As noted, that provision empowers the Commanding General to "order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper." D.C. Code § 49-102. The court read "other duties" as limited to exercises similar to drills, inspections, escorts, and parades, applying the *noscitur a sociis* and *ejusdem generis* interpretive presumptions. JA833-35. Even if correct,

---

[3] The district court also reasoned that, prior to 1975, the District commissioners "needed to call upon the President before the [D.C. National Guard] could be deployed for the enforcement of the laws." JA841. But the prior statute the court invoked simply authorized the commissioners to call on the President for assistance and does not suggest a request was *required*. In any event, any authority held by the D.C. government before 1975 was not authority *independent* of the President (because the President appointed those individuals). *See* Council of D.C., *D.C. Home Rule*, https://dccouncil.gov/dc-home-rule/. Notably, in prior stay briefing, not even plaintiff defended the district court's apparent contention that, before 1975, the President could only deploy the Guard upon a District government request.

35

that argument does not impact the President's authority under the other provisions discussed above. Regardless, the argument fails on its own terms. The list of duties in Section 49-102 covers core policing duties—like "inspections" and "escort[s]." And the efforts undertaken by the National Guard members here—largely patrolling areas that would otherwise require police presence, while not making arrests or charging decisions—are if anything *less intrusive* than those expressly listed in the statutory text.

But even assuming those interpretive presumptions would otherwise militate against defendants' position, that presumption is rebutted here for multiple reasons. For one, the preceding section puts "duty" at the end of a similar list in a provision that encompasses aiding civil authorities in executing the laws, D.C. Code § 49-101. Second, as just discussed, other provisions (*id.* §§ 49-404, 49-405, 49-901) contemplate aid to civil authorities in a much broader range of situations. As OLC explained, reading "other duties" broadly, consistent with its normal meaning, "is especially appropriate in light of section [49-404] of the Code, which makes it clear that the National Guard, acting as militia, may be 'called . . . to aid the civil authorities in the execution of the laws,'" *Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia*, 13 Op. O.L.C. at 93 (second alteration in original).

**c.** More fundamentally, the district court's reading is untenable both logically and as a matter of history. Logically, if the court were right that the President's status as Commander-in-Chief, D.C. Code § 49-409, "is only a designation of command" supplying no freestanding authority, JA828, and that the President's only powers to use the Guard are those identified in Sections 49-102 and 49-103 (as narrowly construed by the court), the D.C. Guard would be unable to perform many of the tasks traditionally performed by National Guards, such as responding to natural disasters like hurricanes, floods, and wildfires. None of these ordinary uses is spelled out in Title 49 of the D.C. Code.

And as with § 502(f), although the text of the D.C. Code is clear on its face, the history surrounding the Home Rule Act only further underscores that the district court's analysis is incorrect. In 1969, just four years prior to passage of the Home Rule Act, President Nixon issued an Executive Order providing that the Secretary of Defense may order out the D.C. National Guard "to aid [the] civil authorities of the District of Columbia." Exec. Order No. 11485, § 1, 34 Fed. Reg. at 15411. That underscores that, prior to the Home Rule Act, the President's authority was well understood to encompass ordering out the Guard to aid the civil authorities. And Congress made clear in Section 1-206.02(b) that the Home Rule Act does not displace that preexisting authority. As the stay panel noted, "when Congress was given the opportunity just four years later in enacting the Home Rule Act to direct

37

such power going forward to the Mayor or City Council, Congress did the opposite."

*Stay Decision*, at \*9.

### D. The district court's asserted bases for enjoining the state Guard deployments are incorrect.

Finally, the district court's injunction against the state deployments must also be vacated. As noted above, § 502(f) expressly authorizes deployment of the state Guards. And the court, for its part, did not embrace plaintiff's atextual reading of § 502(f) as authorizing only missions sufficiently similar to training. But it concluded that § 502(f) is limited to missions "authorized under state law." JA849. By "state law," the court appears to have meant the law of the deploying State (and the D.C. Code of course is not "state law"). *See* JA854-55.

If that is what the district court meant, its analysis is baffling. Defendants never contended that § 502(f)(2)(A) purports to allow state governors to violate state law. There was thus no briefing on what the relevant state laws permit. The States that agreed to the MOUs presumably determined that the deployments comported with their respective state law (and as noted above, the MOUs direct that they are to be interpreted consistent with state law, *see* JA547). And even if the court were right that deployments violate the law of the deploying State, the remedy, if any, would be a suit against the State and its Governor—as the stay panel noted. *See supra* p. 19. As the stay panel also noted, "the District has made no showing and the district court made no finding that any deployment to the District violated any deploying

38

State's law." *Stay Decision*, at \*9. But to the extent the court was referring to the D.C. Code, the D.C. Code obviously does not govern or address the conduct of state Guard members. And again, as to both the D.C. Guard and state Guards, § 502(f) is an *independent* source of authority.

The district court's "state law" conclusion here thus appears to amount to a holding that a request for assistance from state Guards could only come in the form of a request by the Mayor under the EMAC. JA855-57. But the EMAC plainly has no relevance to the legality of the requests and resulting deployments here. The EMAC is an interstate compact among the 50 States, D.C., Puerto Rico, and all U.S. territorial possessions. Pub. L. No. 104-321, § 1, 110 Stat. at 3877 (EMAC art. I). Congress approved the compact but the federal government is not a party to it. The EMAC provides a procedure for signatory States to request assistance from other signatory States, *id.*, 110 Stat. at 3879 (EMAC art. III.B). As the stay panel noted, "the EMAC—an interstate compact—simply provides its signatories, including all States and the District, an avenue for independently seeking assistance from other Guard units wholly apart from any federal-law-based activation." *Stay Decision*, at \*10. "It does not purport to foreclose or restrict deployments separately authorized by federal law." *Id.* Indeed, the EMAC expressly provides that it "shall . . . not be construed as impairing or in any manner affecting any right or jurisdiction of the

United States in and over the subject of the compact." Pub. L. No. 104-321, § 2(1), 110 Stat. 3882 (EMAC art. XIII).

Even putting aside that basic point, nothing in the EMAC's language suggests that it is the sole mechanism for obtaining assistance from States. And if Congress in approving the EMAC intended the district court's apparent interpretation—that it placed the responsibility for requesting assistance from state Guards solely in the hands of a local official with no Guard-related responsibilities, all in a document to which the federal government was not a party—it surely would have made that intention clear. To the contrary, Title 32 *specifically* authorizes the President to authorize use of the National Guard for a federal purpose and at federal expense. By contrast, the EMAC's general provisions are not specific to D.C., do not refer to the Mayor, and are not even limited to National Guard assistance. Indeed, the provisions of the EMAC do not even authorize the Mayor (as opposed to the President) to make a request under the Compact; the Mayor has no authority over the D.C. Guard so she would be unable to reciprocate any such assistance (as even the district court acknowledged, *see* JA856). And in all events, the provision authorizing operations or missions at the President or Secretary of War's request—32 U.S.C. § 502(f)(2)(A)—was enacted in 2006, *after* Congress authorized the D.C. Mayor to execute the EMAC. So even if the EMAC was, prior to 2006, the exclusive mechanism for obtaining assistance from state Guards (it was not), Congress

40

provided the President and Secretary additional express statutory authority in 2006

and nothing in the EMAC disturbs (or purports to disturb) that authority. Plaintiff

has no possibility of prevailing on the merits.[4]

## II.    Plaintiff Did Not Establish the Equitable Factors for a Preliminary Injunction.

Because plaintiff has no possibility of success on the purely legal questions at

issue in this appeal, the remaining preliminary injunction factors are beside the point.

*See, e.g.*, *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (suggesting that

"a likelihood of success" and "a likelihood of irreparable harm" are "independent,

free-standing requirement[s] for a preliminary injunction" (quoting *Davis v. Pension*

---

[4] Contrary to the district court, defendants' position does not create "implausible results." JA857. The court emphasized that the President can only federalize the Guard under Title 10 in specified circumstances, "limited by equally strong restraints," JA861, and suggested that permitting deployments here pursuant to Title 32 undermines those restraints. But unlike National Guard members federalized under Title 10, Guard members in a Title 32 status remain under the command and control of the deploying State, are subject to the deploying State's laws, and are deployed with the consent of the State. Relatedly, the court contended that upholding the deployment would mean that States could, at the request of the President, deploy troops to other States without the receiving State's consent. JA861-63. But defendants never made any such contention, and that is not an implication of defendants' argument. This case does not implicate that principle because D.C. is not a State, and neither the Home Rule Act nor any other source of law provides the Mayor with any authority to veto the deployment of state Guards in response to the President's request. Unlike the states, which "entered the federal system with their sovereignty intact," *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 779 (1991), "[t]he District of Columbia, in contrast, is a federal district, not a sovereign State," *Stay Decision*, at *11.

41

*Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring))). In any event, those factors do not support the injunction either.

**1.** As to irreparable harm, to be irreparable, an injury must be "certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. Environmental Prot. Agency*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation marks omitted). Irreparable injury is a distinct requirement, which must be established in addition to likelihood of success on the merits before any preliminary injunction may issue. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1235-36 (D.C. Cir. 2025). Here, the district court found irreparable injury based solely on plaintiff's "exercise of the sovereign powers that Congress has delegated to it." JA865. That was error.

For starters, as the stay panel noted, "any such sovereign injury depends entirely on the District prevailing on the merits." *Stay Decision*, at *12. Simply put, if the deployment is lawful, that is dispositive.

But that aside, plaintiff lacks any sovereign rights as against the federal government. As Judge Rao explained in her concurrence at the stay stage, this Court has "never recognized that the District possesses an independent sovereignty that can give rise to an Article III injury from actions of the federal government." *Stay*

*Decision*, at \*13 (Rao, J., concurring). And there are good reasons for rejecting such an injury based on first principles. The District "enjoys no sovereign [immunity] separate from the federal government," *id.* (citing *Croson v. District of Columbia*, 2 F.2d 924, 924 (D.C. Cir. 1924)), which renders the District fundamentally different from the sovereign States, *see id.* at \*14. And the Constitution unequivocally subordinates the District to congressional control. *See* U.S. Const. art. I, § 8, cl. 17.

The fact that Congress has delegated plaintiff some independent authority does not render plaintiff's actions an exercise of sovereign powers. The Supreme Court recognized as much more than 100 years ago in *Metropolitan Railroad Co. v. District of Columbia*, 132 U.S. 1 (1889). In that decision, the Court held that the District had "a right to sue and be sued," but it also carefully set out the bounds of the District's delegated authority. *Id.* at 9. While the District might be called a State "in a very qualified sense," its sovereign power "is not lodged in the corporation of the District of Columbia, but in the government of the United States." *Id.* And the District's "subordinate legislative powers . . . do not make [it] sovereign." *Id.*

Nothing about more recent developments, including the Home Rule Act, alters this conclusion. When *Metropolitan Railroad* was decided, the District was constituted as a body corporate for municipal purposes. The same is true today. *See* D.C. Code § 1-102 (codifying the 1878 Act). The Home Rule Act only reaffirms this principle, providing that the District "shall remain and continue a body corporate"

43

notwithstanding other changes in its governmental structure. *Id.* § 1-207.17(a). Decisions from this Court are in accord. *See, e.g.*, *Banner v. United States*, 428 F.3d 303, 309 (D.C. Cir. 2005) (per curiam) ("Congress is the District's government . . . ." (citation modified)); *United States v. Sumler*, 136 F.3d 188, 191 (D.C. Cir. 1998) (explaining that "District residents live under only one sovereign while most Americans live under two").

In the end, the District is not a sovereign entity, at least as compared to the federal government, so it cannot claim any sovereign injuries based on the federal government's actions. The district court thus erred when it characterized plaintiff as asserting "injuries to the exercise of [its] sovereign powers"—both for purposes of standing (*e.g.*, JA822) and for purposes of irreparable injury (JA864-65).

Plaintiff accordingly lacks Article III standing even to assert these injuries, which a fortiori cannot support an assertion of irreparable harm (which of course requires a far greater showing of injury than that needed for Article III standing). But even if the District had standing, the asserted injuries are at most statutory, arising from the District's delegated authority, and those allegations cannot give rise to a presumption of irreparable injury. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-48 (2024); *cf. Dalton v. Specter*, 511 U.S. 462, 473 (1994) (holding that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims").

44

Even putting aside these threshold defects, any injury plaintiff might suffer falls well short of the irreparable injury needed to justify an injunction. *See Clevinger*, 134 F.4th at 1236. In particular, plaintiff failed to identify any concrete sense in which the deployment affects the D.C. government's exercise of delegated powers, and the district court erred in suggesting otherwise. The court contended that "[u]nder D.C. law, the powers to 'preserve the public peace,' 'prevent crime and arrest offenders,' and 'enforce and obey all laws' are reserved to the local elected representatives of the District." JA865. But for starters, those powers are at best highly qualified. The D.C. government does not have exclusive law-enforcement jurisdiction. The Park Police can make arrests on the same terms as the MPD. D.C. Code § 5-201. The Marshals Service can make arrests for crimes committed in their presence. *Id.* §§ 23-501, 23-581. And if the President determines that emergency conditions require use of the MPD "for federal purposes, he may direct the Mayor to provide him, and the Mayor shall provide, such services of the Metropolitan Police force as the President may deem necessary and appropriate." *Id.* § 1-207.40(a).

In any event, the Guard is not "infring[ing] upon the District's right to govern itself and to make its own decisions on key elements of home rule, including how to best deter crime and when to call for emergency assistance from other states." JA865. As discussed above, Guard members are not making arrests, conducting

45

searches and seizures, or making decisions on whether to arrest, prosecute, or investigate crime. Most of their activities consist of providing a presence in certain areas, thus freeing up the District's undermanned police to conduct law enforcement; and MPD is helping facilitate the Guard's efforts. Moreover, the district court's reference to "emergency assistance from other states," JA865, is nothing more than disagreement with the President's (and state Governors') deployment decisions. That disagreement does not even appear to have been uniform among the D.C. government (at least at the time the lawsuit was filed),[5] and it certainly does not amount to irreparable harm. *Cf. Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (noting mere "observation of conduct with which one disagrees" is not an injury sufficient to confer Article III standing.).

In district court, plaintiff also attempted to establish a number of other harms—such as harm to its economy. But the court did not accept these harms, at least for purposes of its present injunction. Indeed, the court suggested that the District's other asserted harms, such as economic and public safety harms from the

---

[5] Mayor Bowser was informed of this action the morning it was filed and "repeatedly declined to endorse the lawsuit." Gabe Cohen, *DC Sues Trump Administration over National Guard Deployment*, CNN (Sep. 4, 2025), https://www.cnn.com/2025/09/04/politics/washington-dc-sues-trump-national-guard. Mayor Bowser stated only subsequently that she does not support the Guard's continued deployment.

46

deployment might be too speculative to even support Article III standing, let alone for irreparable harm, *see* JA821 n.9. There is no basis for this Court accepting them for the first time on appeal. Plaintiff's assertions are "far too speculative to warrant preliminary injunctive relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 298 (D.C. Cir. 2006); *see* JA821 n.9 (recognizing that other courts have "found that such harms may be too speculative to establish a concrete injury" that could support standing).

**2.** Separate from irreparable injury, the public interest and balance of the equities cut strongly against any injunction here. *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (holding that these two factors merge when the federal government opposes an injunction). It is beyond dispute that the federal government has "a strong interest in the protection of federal functions and property." JA866.

For example, the National Guard has deterred crime and relieved the burdens on other officials, who have been better able to police crime as a result. When the National Guard deployed, "[c]rime [wa]s out of control in the District of Columbia." Exec. Order No. 14333, § 1, 90 Fed. Reg. at 39301. And this had served to "hamper the recruitment and retention of essential Federal employees, undermine critical functions of Government and thus the well-being of the entire Nation, and erode confidence in the strength of the United States." *Id.* But as the D.C. Mayor noted, "due to the cooperative efforts between District and federal officials, violent crime

47

in the District has noticeably decreased." Order § I.E. The deployment of the National Guard has been an important part of that cooperation, and thus, that deployment serves an important government interest. Enjoining the National Guard deployment, and pulling National Guard members from the area, would only undermine the progress that has been achieved to date.

In addition, as the stay panel noted, the injunction "threatens severe disruption," including requiring "over 1,000 troops from States as far away as South Dakota" to "to pack up and leave the District, only to be ordered to return if this court were to find on the merits of the appeal that they were lawfully deployed, and only to be ordered out again if further review found the deployments unlawful." *Stay Decision*, at *12. It would also effectively unwind memoranda of understanding carefully negotiated between the highest levels of the federal government and the governments of the States who agreed to provide assistance. JA547-78. The balance of equities thus strongly favors vacatur of the preliminary injunction.

## CONCLUSION

The Court should vacate the district court's preliminary injunction.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY

 */s/ Andrew M. Bernie*

ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*
  *andrew.bernie@usdoj.gov*

APRIL 2026

49

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 11,719 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Times New Roman typeface.

*/s/ Andrew M. Bernie*
Andrew M. Bernie

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Andrew M. Bernie
ANDREW M. BERNIE

**ADDENDUM**

## ADDENDUM OF STATUTES AND REGULATIONS TABLE OF CONTENTS

32 U.S.C. § 502 (excerpts)...................................................................................A1

D.C. Code § 1-102 .............................................................................................A2

D.C. Code § 1-206.01 ........................................................................................A2

D.C. Code § 1-206.02 ........................................................................................A2

D.C. Code § 1-207.17 ........................................................................................A4

D.C. Code § 5-201 .............................................................................................A5

D.C. Code § 49-101 ...........................................................................................A5

D.C. Code § 49-102 ...........................................................................................A5

D.C. Code § 49-103 ...........................................................................................A6

D.C. Code § 49-404 ...........................................................................................A6

D.C. Code § 49-405 ...........................................................................................A6

D.C. Code § 49-409 ...........................................................................................A7

D.C. Code § 49-901 ...........................................................................................A7

Emergency Management Assistance Compact......................................................A8

**32 U.S.C. § 502**

**§ 502. Required drills and field exercises**

\*\*\*

**(f)(1)** Under regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may--

> **(A)** without his consent, but with the pay and allowances provided by law; or

> **(B)** with his consent, either with or without pay and allowances;

be ordered to perform training or other duty in addition to that prescribed under subsection (a).

**(2)** The training or duty ordered to be performed under paragraph (1) may include the following:

> **(A)** Support of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense.

> **(B)** Support of training operations and training missions assigned in whole or in part to the National Guard by the Secretary concerned, but only to the extent that such training missions and training operations--

> > **(i)** are performed in the United States or the Commonwealth of Puerto Rico or possessions of the United States; and

> > **(ii)** are only to instruct active duty military, foreign military (under the same authorities and restrictions applicable to active duty troops), Department of Defense contractor personnel, or Department of Defense civilian employees.

> \*\*\*

A1

**D.C. Code § 1-102**

## § 1-102. District created body corporate for municipal purposes.

The District is created a government by the name of the "District of Columbia," by which name it is constituted a body corporate for municipal purposes, and may contract and be contracted with, sue and be sued, plead and be impleaded, have a seal, and exercise all other powers of a municipal corporation not inconsistent with the Constitution and laws of the United States and the provisions of this Code.

**D.C. Code § 1-206.01**

## § 1-206.01. Retention of constitutional authority.

Notwithstanding any other provision of this chapter, the Congress of the United States reserves the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council by this chapter, including legislation to amend or repeal any law in force in the District prior to or after enactment of this chapter and any act passed by the Council.

**D.C. Code § 1-206.02**

## § 1-206.02. Limitations on the Council.

(a) The Council shall have no authority to pass any act contrary to the provisions of this chapter except as specifically provided in this chapter, or to:

(1) Impose any tax on property of the United States or any of the several states;

(2) Lend the public credit for support of any private undertaking;

(3) Enact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District;

(4) Enact any act, resolution, or rule with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts);

(5) Impose any tax on the whole or any portion of the personal income, either directly or at the source thereof, of any individual not a resident of the District (the terms "individual" and "resident" to be understood for the purposes of this paragraph as they are defined in § 47-1801.04);

(6) Enact any act, resolution, or rule which permits the building of any structure within the District of Columbia in excess of the height limitations contained in § 6-601.05, and in effect on December 24, 1973;

A2

(7) Enact any act, resolution, or regulation with respect to the Commission on Mental Health;

(8) Enact any act or regulation relating to the United States District Court for the District of Columbia or any other court of the United States in the District other than the District courts, or relating to the duties or powers of the United States Attorney or the United States Marshal for the District of Columbia;

(9) Enact any act, resolution, or rule with respect to any provision of Title 23 (relating to criminal procedure), or with respect to any provision of any law codified in Title 22 or 24 (relating to crimes and treatment of prisoners), or with respect to any criminal offense pertaining to articles subject to regulation under Chapter 45 of Title 22 during the 48 full calendar months immediately following the day on which the members of the Council first elected pursuant to this chapter take office; or

(10) Enact any act, resolution, or rule with respect to the District of Columbia Financial Responsibility and Management Assistance Authority established under § 47-391.01(a).

(b) Nothing in this chapter shall be construed as vesting in the District government any greater authority over the National Zoological Park, the National Guard of the District of Columbia, the Washington Aqueduct, the National Capital Planning Commission, or, except as otherwise specifically provided in this chapter, over any federal agency, than was vested in the Commissioner prior to January 2, 1975.

(c)(1) Except acts of the Council which are submitted to the President in accordance with Chapter 11 of Title 31, United States Code, any act which the Council determines, according to § 1-204.12(a), should take effect immediately because of emergency circumstances, and acts proposing amendments to subchapter IV of this chapter and except as provided in § 1-204.62(c) and § 1-204.72(d)(1) the Chairman of the Council shall transmit to the Speaker of the House of Representatives, and the President of the Senate, a copy of each act passed by the Council and signed by the Mayor, or vetoed by the Mayor and repassed by two-thirds of the Council present and voting, each act passed by the Council and allowed to become effective by the Mayor without his signature, and each initiated act and act subject to referendum which has been ratified by a majority of the registered qualified electors voting on the initiative or referendum. Except as provided in paragraph (2) of this subsection, such act shall take effect upon the expiration of the 30-calendar-day period (excluding Saturdays, Sundays, and holidays, and any day on which neither House is in session because of an adjournment sine die, a recess of more than 3 days, or an adjournment of more than 3 days) beginning on the day such act is transmitted by the Chairman to

A3

the Speaker of the House of Representatives and the President of the Senate, or upon the date prescribed by such act, whichever is later, unless during such 30-day period, there has been enacted into law a joint resolution disapproving such act. In any case in which any such joint resolution disapproving such an act has, within such 30-day period, passed both Houses of Congress and has been transmitted to the President, such resolution, upon becoming law, subsequent to the expiration of such 30-day period, shall be deemed to have repealed such act, as of the date such resolution becomes law. The provisions of § 1-206.04, except subsections (d), (e), and (f) of such section, shall apply with respect to any joint resolution disapproving any act pursuant to this paragraph.

(2) In the case of any such act transmitted by the Chairman with respect to any act codified in Title 22, 23, or 24 of the District of Columbia Code, such act shall take effect at the end of the 60-day period beginning on the day such act is transmitted by the Chairman to the Speaker of the House of Representatives and the President of the Senate unless, during such 60-day period, there has been enacted into law a joint resolution disapproving such act. In any case in which any such joint resolution disapproving such an act has, within such 60-day period, passed both Houses of Congress and has been transmitted to the President, such resolution, upon becoming law subsequent to the expiration of such 60-day period shall be deemed to have repealed such act, as of the date such resolution becomes law. The provisions of § 1-206.04, relating to an expedited procedure for consideration of joint resolutions, shall apply to a joint resolution disapproving such act as specified in this paragraph.

(3) The Council shall submit with each Act transmitted under this subsection an estimate of the costs which will be incurred by the District of Columbia as a result of the enactment of the act in each of the first 4 fiscal years for which the act is in effect, together with a statement of the basis for such estimate.

## D.C. Code § 1-207.17

### § 1-207.17. Status of the District.

(a) All of the territory constituting the permanent seat of the Government of the United States shall continue to be designated as the District of Columbia. The District of Columbia shall remain and continue a body corporate, as provided in § 1-102. Said Corporation shall continue to be charged with all the duties, obligations, responsibilities, and liabilities, and to be vested with all of the powers, rights, privileges, immunities, and assets, respectively, imposed upon and vested in said Corporation or the Commissioner.

A4

(b) No law or regulation which is in force on January 2, 1975 shall be deemed amended or repealed by this chapter except to the extent specifically provided herein or to the extent that such law or regulation is inconsistent with this chapter, but any such law or regulation may be amended or repealed by act or resolution as authorized in this chapter, or by Act of Congress, except that, notwithstanding the provisions of § 1-207.52, such authority to repeal shall not be construed as authorizing the Council to repeal or otherwise alter, by amendment or otherwise, any provision of subchapter III of chapter 73 of title 5, United States Code in whole or in part.

(c) Nothing contained in this section shall affect the boundary line between the District of Columbia and the Commonwealth of Virginia as the same was established or may be subsequently established under the provisions of title I of the Act of October 31, 1945 (59 Stat. 552).

## D.C. Code § 5-201

### § 5-201. United States watchmen to be known as United States Park Police; powers and duties.

The watchmen provided by the United States government for service in any of the public squares and reservations in the District of Columbia shall, after August 5, 1882, be known as the "United States Park Police." They shall have and perform the same powers and duties as the Metropolitan Police of the District.

## D.C. Code § 49-101

### § 49-101. Drill, parade, encampment or required duty.

Any drill, parade, encampment or duty that is required, ordered, or authorized to be performed under the provisions of this title, shall be deemed to be a military duty, and while on such duty every officer and enlisted man of the National Guard shall be subject to the lawful orders of his superior officers, and for any military offense may be put and kept under arrest or under guard for a time not extending beyond the term of service for which he is then ordered.

## D.C. Code § 49-102

### § 49-102. Prescribing drills.

The Commanding General shall prescribe such stated drills and parades as he may deem necessary for the instruction of the National Guard, and may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper. The commanding officer of any regiment, battalion or company may also assemble his command, or any part thereof, in the evening

for drill, instruction, or other business, as he may deem expedient; but no parade shall be performed by any regiment, battalion, company, or part thereof, without the permission of the Commanding General.

## D.C. Code § 49-103

### § 49-103. Suppression of riots.

When there is in the District of Columbia a tumult, riot, mob, or a body of men acting together by force with attempt to commit a felony or to offer violence to persons or property, or by force or violence to break and resist the laws, or when such tumult, riot, or mob is threatened, it shall be lawful for the Mayor of the District of Columbia, or for the United States Marshal for the District of Columbia, or for the National Capital Service Director, to call on the Commander-in-Chief to aid them in suppressing such violence and enforcing the laws; the Commander-in-Chief shall thereupon order out so much and such portion of the militia as he may deem necessary to suppress the same, and no member thereof who shall be thus ordered out by proper authority for any such duty shall be liable to civil or criminal prosecution for any act done in the discharge of his military duty.

## D.C. Code § 49-404

### § 49-404. Duty of enrolled militia; police and fire department personnel.

The enrolled militia shall not be subject to any duty except when called into the service of the United States, or to aid the civil authorities in the execution of the laws or suppression of riots. However, if the enrolled militia is called to aid the civil authorities, who already have activated, or will concomitantly activate, the police and fire departments, no member of these departments shall be subject to duty in the militia. Also, if the enrolled militia is called into service of the United States, the chief of the police department and the chief of the fire department shall be entitled to have exempted from call in the militia minimum personnel considered necessary to ensure continued, reasonable police and fire services to the citizens of the District of Columbia.

## D.C. Code § 49-405

### § 49-405. Ordering enrolled militia into service.

Whenever it shall be necessary to call out any portion of the enrolled militia the Commander-in-Chief shall order out, by draft or otherwise, or accept as volunteers as many as required. Every member of the enrolled militia who volunteers, or who is ordered out or drafted under the provisions of this chapter, who does not appear at the time and place designated, may be arrested by order of the Commanding General and be tried and punished by a court-martial. The portion of the enrolled

A6

militia ordered out or accepted shall be mustered into service for such period as may be required, and the Commanding General may assign them to existing organizations of the active militia, or may organize them as the exigencies of the occasion may require.

**D.C. Code § 49-409**

**§ 49-409. President to be Commander-in-Chief.**

The President of the United States shall be the Commander-in-Chief of the militia of the District of Columbia.

**D.C. Code § 49-901**

**§ 49-901. Active service.**

Whenever the National Guard of the District of Columbia shall be ordered to duty in case of riot, tumult, breach of the peace, or whenever called in aid of the civil authorities, all enlisted men who do duty shall be paid at the rate equivalent to 2 times the pay of enlisted men of the regular Army of like grade. Commissioned officers who do duty shall be entitled to and shall receive the same pay and allowances as commissioned officers of like grade of the regular Army. Each mounted officer and enlisted man shall be paid a reasonable per diem compensation for each horse actually furnished and used by him; provided, that when the National Guard of the District of Columbia is called into actual service of the United States the officers and enlisted men shall, during their time of service, be entitled to the same pay and allowances as are or may be provided by law for the regular Army.

A7

**Emergency Management Assistance Compact**

**Pub. L. No. 104–321, October 19, 1996, 110 Stat 3877**

SECTION 1. CONGRESSIONAL CONSENT.

The Congress consents to the Emergency Management Assistance Compact entered into by Delaware, Florida, Georgia, Louisiana, Maryland, Mississippi, Missouri, Oklahoma, South Carolina, South Dakota, Tennessee, Virginia, and West Virginia. The compact reads substantially as follows:

"Emergency Management Assistance Compact

"ARTICLE I.

"PURPOSE AND AUTHORITIES.

"This compact is made and entered into by and between the participating member states which enact this compact, hereinafter called party states. For the purposes of this compact, the term 'states' is taken to mean the several states, the Commonwealth of Puerto Rico, the District of Columbia, and all U.S. territorial possessions.

"The purpose of this compact is to provide for mutual assistance between the states entering into this compact in managing any emergency disaster that is duly declared by the Governor of the affected state, whether arising from natural disaster, technological hazard, man-made disaster, civil emergency aspects of resources shortages, community disorders, insurgency, or enemy attack.

"This compact shall also provide for mutual cooperation in emergency-related exercises, testing, or other training activities using equipment and personnel simulating performance of any aspect of the giving and receiving of aid by party states or subdivisions of party states during emergencies, such actions occurring outside actual declared emergency periods. Mutual assistance in this compact may include the use of the states' National Guard forces, either in accordance with the National Guard Mutual Assistance Compact or by mutual agreement between states.

"ARTICLE II.

"GENERAL IMPLEMENTATION.

"Each party state entering into this compact recognizes that many emergencies transcend political jurisdictional boundaries and that intergovernmental coordination is essential in managing these and other emergencies under this

A8

compact. Each state further recognizes that there will be emergencies which require immediate access and present procedures to apply outside resources to make a prompt and effective response to such an emergency. This is because few, if any, individual states have all the resources they may need in all types of emergencies or the capability of delivering resources to areas where emergencies exist.

"The prompt, full, and effective utilization of resources of the participating states, including any resources on hand or available from the federal government or any other source, that are essential to the safety, care, and welfare of the people in the event of any emergency or disaster declared by a party state, shall be the underlying principle on which all articles of this compact shall be understood.

"On behalf of the Governor of each state participating in the compact, the legally designated state official who is assigned responsibility for emergency management will be responsible for formulation of the appropriate interstate mutual aid plans and procedures necessary to implement this compact.

"ARTICLE III.

"PARTY STATE RESPONSIBILITIES.

"A. It shall be the responsibility of each party state to formulate procedural plans and programs for interstate cooperation in the performance of the responsibilities listed in this article. In formulating such plans, and in carrying them out, the party states, insofar as practical, shall:

"1. Review individual state hazards analyses and, to the extent reasonably possible, determine all those potential emergencies the party states might jointly suffer, whether due to natural disaster, technological hazard, man-made disaster, emergency aspects of resources shortages, civil disorders, insurgency, or enemy attack;

"2. Review party states' individual emergency plans and develop a plan which will determine the mechanism for the interstate management and provision of assistance concerning any potential emergency;

"3. Develop interstate procedures to fill any identified gaps and to resolve any identified inconsistencies or overlaps in existing or developed plans;

"4. Assist in warning communities adjacent to or crossing the state boundaries;

"5. Protect and assure uninterrupted delivery of services, medicines, water, food, energy and fuel, search and rescue, and critical lifeline equipment, services, and resources, both human and material;

A9

"6. Inventory and set procedures for the interstate loan and delivery of human and material resources, together with procedures for reimbursement or forgiveness; and

"7. Provide, to the extent authorized by law, for temporary suspension of any statutes or ordinances that restrict the implementation of the above responsibilities.

"B. The authorized representative of a party state may request assistance to another party state by contacting the authorized representative of that state. The provisions of this compact shall only apply to requests for assistance made by and to authorized representatives. Requests may be verbal or in writing. If verbal, the request shall be confirmed in writing within thirty days of the verbal request. Requests shall provide the following information:

"1. A description of the emergency service function for which assistance is needed, including, but not limited to, fire services, law enforcement, emergency medical, transportation, communications, public works and engineering, building, inspection, planning and information assistance, mass care, resource support, health and medical services, and search and rescue;

"2. The amount and type of personnel, equipment, materials and supplies needed, and a reasonable estimate of the length of time they will be needed; and

"3. The specific place and time for staging of the assisting party's response and a point of contact at that location.

"C. There shall be frequent consultation between state officials who have assigned emergency management responsibilities and other appropriate representatives of the party states with affected jurisdictions and the United States Government, with free exchange of information, plans, and resource records relating to emergency capabilities.

"ARTICLE IV.

"LIMITATIONS.

"Any party state requested to render mutual aid or conduct exercises and training for mutual aid shall take such action as is necessary to provide and make available the resources covered by this compact in accordance with the terms hereof; provided that it is understood that the state rendering aid may withhold resources to the extent necessary to provide reasonable protection for such state.

"Each party state shall afford to the emergency forces of any party state, while operating within its state limits under the terms and conditions of this compact, the same powers, except that of arrest unless specifically authorized by the receiving state, duties, rights, and privileges as are afforded forces of the state in which they

A10

are performing emergency services. Emergency forces will continue under the command and control of their regular leaders, but the organizational units will come under the operational control of the emergency services authorities of the state receiving assistance. These conditions may be activated, as needed, only subsequent to a declaration of a state emergency or disaster by the governor of the party state that is to receive assistance or upon commencement of exercises or training for mutual aid and shall continue so long as the exercises or training for mutual aid are in progress, the state of emergency or disaster remains in effect, or loaned resources remain in the receiving state, whichever is longer.

"ARTICLE V.

"LICENSES AND PERMITS.

"Whenever any person holds a license, certificate, or other permit issued by any state party to the compact evidencing the meeting of qualifications for professional, mechanical, or other skills, and when such assistance is requested by the receiving party state, such person shall be deemed licensed, certified, or permitted by the state requesting assistance to render aid involving such skill to meet a declared emergency or disaster, subject to such limitations and conditions as the Governor of the requesting state may prescribe by executive order or otherwise.

"ARTICLE VI.

"LIABILITY.

"Officers or employees of a party state rendering aid in another state pursuant to this compact shall be considered agents of the requesting state for tort liability and immunity purposes. No party state or its officers or employees rendering aid in another state pursuant to this compact shall be liable on account of any act or omission in good faith on the part of such forces while so engaged or on account of the maintenance or use of any equipment or supplies in connection therewith. Good faith in this article shall not include willful misconduct, gross negligence, or recklessness.

"ARTICLE VII.

"SUPPLEMENTARY AGREEMENTS.

"Inasmuch as it is probable that the pattern and detail of the machinery for mutual aid among two or more states may differ from that among the states that are party hereto, this compact contains elements of a broad base common to all states, and nothing herein shall preclude any state entering into supplementary agreements with another state or affect any other agreements already in force between states.

A11

Supplementary agreements may comprehend, but shall not be limited to, provisions for evacuation and reception of injured and other persons and the exchange of medical, fire, police, public utility, reconnaissance, welfare, transportation and communications personnel, and equipment and supplies.

"ARTICLE VIII.

"COMPENSATION.

"Each party state shall provide for the payment of compensation and death benefits to injured members of the emergency forces of that state and representatives of deceased members of such forces in case such members sustain injuries or are killed while rendering aid pursuant to this compact, in the same manner and on the same terms as if the injury or death were sustained within their own state.

"ARTICLE IX.

"REIMBURSEMENT.

"Any party state rendering aid in another state pursuant to this compact shall be reimbursed by the party state receiving such aid for any loss or damage to or expense incurred in the operation of any equipment and the provision of any service in answering a request for aid and for the costs incurred in connection with such requests; provided, that any aiding party state may assume in whole or in part such loss, damage, expense, or other cost, or may loan such equipment or donate such services to the receiving party state without charge or cost; and provided further, that any two or more party states may enter into supplementary agreements establishing a different allocation of costs among those states. Article VIII expenses shall not be reimbursable under this article.

"ARTICLE X.

"EVACUATION.

"Plans for the orderly evacuation and interstate reception of portions of the civilian population as the result of any emergency or disaster of sufficient proportions to so warrant, shall be worked out and maintained between the party states and the emergency management/services directors of the various jurisdictions where any type of incident requiring evacuations might occur. Such plans shall be put into effect by request of the state from which evacuees come and shall include the manner of transporting such evacuees, the number of evacuees to be received in different areas, the manner in which food, clothing, housing, and medical care will be provided, the registration of the evacuees, the providing of facilities for the notification of relatives or friends, and the forwarding of such evacuees to other areas or the bringing in of additional materials, supplies, and all

A12

other relevant factors. Such plans shall provide that the party state receiving evacuees and the party state from which the evacuees come shall mutually agree as to reimbursement of out-of-pocket expenses incurred in receiving and caring for such evacuees, for expenditures for transportation, food, clothing, medicines, and medical care, and like items. Such expenditures shall be reimbursed as agreed by the party state from which the evacuees come. After the termination of the emergency or disaster, the party state from which the evacuees come shall assume the responsibility for the ultimate support of repatriation of such evacuees.

"ARTICLE XI.

"IMPLEMENTATION.

"A. This compact shall become effective immediately upon its enactment into law by any two states. Thereafter, this compact shall become effective as to any other state upon enactment by such state.

"B. Any party state may withdraw from this compact by enacting a statute repealing the same, but no such withdrawal shall take effect until thirty days after the Governor of the withdrawing state has given notice in writing of such withdrawal to the Governors of all other party states. Such action shall not relieve the withdrawing state from obligations assumed hereunder prior to the effective date of withdrawal.

"C. Duly authenticated copies of this compact and of such supplementary agreements as may be entered into shall, at the time of their approval, be deposited with each of the party states and with the Federal Emergency Management Agency and other appropriate agencies of the United States Government.

"ARTICLE XII.

"VALIDITY.

"This compact shall be construed to effectuate the purposes stated in Article I. If any provision of this compact is declared unconstitutional, or the applicability thereof to any person or circumstances is held invalid, the constitutionality of the remainder of this compact and the applicability thereof to other persons and circumstances shall not be affected.

"ARTICLE XIII.

"ADDITIONAL PROVISIONS.

"Nothing in this compact shall authorize or permit the use of military force by the National Guard of a state at any place outside that state in any emergency for which the President is authorized by law to call into federal service the militia, or

A13

for any purpose for which the use of the Army or the Air Force would in the absence of express statutory authorization be prohibited under § 1385 of Title 18 of the United States Code.".

SEC. 2. RIGHT TO ALTER, AMEND, OR REPEAL.

The right to alter, amend, or repeal this joint resolution is hereby expressly reserved. The consent granted by this joint resolution shall—

(1) not be construed as impairing or in any manner affecting any right or jurisdiction of the United States in and over the subject of the compact;

(2) not be construed as consent to the National Guard Mutual Assistance Compact;

(3) be construed as understanding that the first paragraph of Article II of the compact provides that emergencies will require procedures to provide immediate access to existing resources to make a prompt and effective response;

(4) not be construed as providing authority in Article III A. 7. that does not otherwise exist for the suspension of statutes or ordinances;

(5) be construed as understanding that Article III C. does not impose any affirmative obligation to exchange information, plans, and resource records on the United States or any party which has not entered into the compact; and

(6) be construed as understanding that Article XIII does not affect the authority of the President over the National Guard provided by article I of the Constitution and title 10 of the United States Code.

SEC. 3. CONSTRUCTION AND SEVERABILITY.

It is intended that the provisions of this compact shall be reasonably and liberally construed to effectuate the purposes thereof. If any part or application of this compact, or legislation enabling the compact, is held invalid, the remainder of the compact or its application to other situations or persons shall not be affected.

SEC. 4. INCONSISTENCY OF LANGUAGE.

The validity of this compact shall not be affected by any insubstantial difference in its form or language as adopted by the States.

A14