**[ORAL ARGUMENT NOT SCHEDULED]**
**No. 25-5418**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

DISTRICT OF COLUMBIA,
*Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, *et al.*,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia

**JOINT APPENDIX – VOLUME I**

**PUBLIC APPENDIX – SEALED MATERIAL IN SEPARATE
SUPPLEMENT**

BRETT A. SHUMATE
*Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7539*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *202-514-3511*

# TABLE OF CONTENTS

**VOLUME I – PUBLIC APPENDIX**

Docket Sheet ........................................................................................................JA001

Complaint, Dkt. 1 (Sept. 4, 2025)........................................................................JA039

Declaration of Willie Haynes and Exhibits, Dkt. 3-2 (Sept. 9, 2025) .............JA091

Declaration of Jeffrey Buchanan and Exhibits, Dkt. 3-3 (Sept. 9, 2025) ........JA365

Declaration of Renee Hall and Exhibits, Dkt. 3-4 (Sept. 9, 2025) ..................JA378

Declaration of Paul Schwalb and Exhibits, Dkt. 3-5 (Sept. 9, 2025) ..............JA511

Declaration of Laurence Doane and Att. 1, Dkt. 34-1 (Sept. 16, 2025) ..........JA515

Declaration of Christopher York, Dkt. 34-2 (Sept. 16, 2025) .........................JA525

Declaration of Donald Snider, Dkt. 34-3 (Sept. 16, 2025) ..............................JA528

Order, Dkt. 44 (Sept. 19, 2025) .........................................................................JA532

Public Exhibits, Dkt. 70-1 (Oct. 17, 2025) .......................................................JA535

Public Exhibits, Dkt. 83-1 (Oct. 31, 2025) .......................................................JA694

Memorandum Opinion, Dkt. 88 (Nov. 20, 2025)..............................................JA808

Order, Dkt. 89 (Nov. 20, 2025).........................................................................JA869

Public Exhibits, Dkt. 90-1 (Nov. 20, 2025)......................................................JA871

Notice of Appeal Dkt. 92 (Nov. 25, 2025) .......................................................JA908

**VOLUME II – SUPPLEMENT UNDER SEAL**

Sealed Exhibits to Plaintiff's Supp. Brief, Dkt. 78-1 (Oct. 20, 2025)..............JA909

# *1:25cv3005, District Of Columbia V. Trump Et Al*

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 03/31/2026**

## Header

---

**Case Number:** 1:25cv3005
**Date Filed:** 09/04/2025
**Assigned To:** Judge Jia M. Cobb
**Nature of Suit:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** None
**Other Docket:** USCA, 25-05418
**Jurisdiction:** Federal Question

**Class Code:** Open
**Statute:** 05:551
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure
Act/Review or Appeal of Agency Decision

## Participants

---

### Litigants

District of Columbia
**Plaintiff**

### Attorneys

Eliza Simon
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DC OFFICE OF THE ATTORNEY GENERAL
400 6th St. Nw
Washington, DC  20001
USA
202-741-5221 Email:Eliza.Simon@dc.Gov

Emma Simson
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
OFFICE OF THE ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
400 6th Street Nw
Washington, DC  20001
USA
202-257-3056 Email:Emma.Simson@dc.Gov

Mitchell Reich
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DC OFFICE OF THE ATTORNEY GENERAL
400 Sixth Street Nw Suite 10100.047
Washington, DC  20001
USA
202-279-1261 Email:Mitchell.Reich@dc.Gov

Alicia Lendon
ATTORNEY TO BE NOTICED
DC OFFICE OF THE ATTORNEY GENERAL
Public Advocacy Division 400 6th Street Nw 10th Floor
Washington, DC  20001

**JA001**

## Litigants

## Attorneys

USA
615-294-8664 Email:Alicia.Lendon@dc.Gov

Andrew Charles Mendrala
ATTORNEY TO BE NOTICED
OFFICE OF THE ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
Civil Rights Section 400 Sixth Street N.W.
Washington, DC  20001
USA
202-724-9726 Email:Andrew.Mendrala@dc.Gov

Charles Andrew Sinks
ATTORNEY TO BE NOTICED
Office of the Attorney General for the District of Columbia
Public Advocacy Division 400 6th Street N.W. Suite 10100
Washington, DC  20001
USA
202-735-7456 Email:Charles.Sinks@dc.Gov

Hannah Wynne Cole-Chu
ATTORNEY TO BE NOTICED
OFFICE OF THE ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
400 6th Street Nw
Washington, DC  20001
USA
202-724-5079 Email:Hannah.Cole-Chu@dc.Gov

Nicole Suzanne Hill
ATTORNEY TO BE NOTICED
OFFICE OF THE ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
400 6th Street Nw
Washington, DC  20001
USA
202-727-4171 Email:Nicole.Hill@dc.Gov

Pamela A. Disney
ATTORNEY TO BE NOTICED
OFFICE OF THE ATTORNEY GENERAL FOR THE
DISTRICT OF COLUMBIA
400 Sixth Street Nw Suite 10100
Washington, DC  20001
USA
(202) 807-0371 Email:Pamela.Disney@dc.Gov

**Donald J. Trump**
in his official capacity as President of the United States |
**Defendant**

Andrew Marshall Bernie
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
Civil Division, Federal Programs Branch 1100 L Street Nw
Washington, DC  20005
USA
202-353-7203 Email:Andrew.Bernie@usdoj.Gov

Brad P. Rosenberg
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch 1100 L Street, Nw
Washington, DC  20005

**JA002**

District Of Columbia V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| | USA<br>(202) 514-3374 Fax: (202) 616-8460<br>Email:Brad.Rosenberg@usdoj.Gov<br><br>Eric Hamilton<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division 950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-2000 Email:Eric.Hamilton@usdoj.Gov<br><br>John Bailey<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Civil 950 Pennsylvania Ave Nw Ste 3618<br>Washington, DC 20530<br>USA<br>202-514-6993 Email:John.Bailey@usdoj.Gov<br><br>Kian Kevin Azimpoor<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-0860 Email:Kian.K.Azimpoor@usdoj.Gov |
| United States Department of Defense<br>**Defendant** | Andrew Marshall Bernie<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>Civil Division, Federal Programs Branch 1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-353-7203 Email:Andrew.Bernie@usdoj.Gov<br><br>Brad P. Rosenberg<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC 20005<br>USA<br>(202) 514-3374 Fax: (202) 616-8460<br>Email:Brad.Rosenberg@usdoj.Gov<br><br>Eric Hamilton<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division 950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-2000 Email:Eric.Hamilton@usdoj.Gov<br><br>John Bailey<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Civil 950 Pennsylvania Ave Nw Ste 3618<br>Washington, DC 20530<br>USA<br>202-514-6993 Email:John.Bailey@usdoj.Gov |

District Of Columbia V. Trump Et Al

## Litigants

## Attorneys

Kian Kevin Azimpoor
ATTORNEY TO BE NOTICED
DOJ-Civ
1100 L Street Nw
Washington, DC  20005
USA
202-598-0860 Email:Kian.K.Azimpoor@usdoj.Gov

**PETER B. HEGSETH**
in his official capacity as Secretary of Defense |
**Defendant**

Andrew Marshall Bernie
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
Civil Division, Federal Programs Branch 1100 L Street Nw
Washington, DC  20005
USA
202-353-7203 Email:Andrew.Bernie@usdoj.Gov

Brad P. Rosenberg
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch 1100 L Street, Nw
Washington, DC  20005
USA
(202) 514-3374 Fax: (202) 616-8460
Email:Brad.Rosenberg@usdoj.Gov

Eric Hamilton
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
U.S. DEPARTMENT OF JUSTICE
Civil Division 950 Pennsylvania Avenue Nw
Washington, DC  20530
USA
202-514-2000 Email:Eric.Hamilton@usdoj.Gov

John Bailey
ATTORNEY TO BE NOTICED
DOJ-Civ
Civil 950 Pennsylvania Ave Nw Ste 3618
Washington, DC  20530
USA
202-514-6993 Email:John.Bailey@usdoj.Gov

Kian Kevin Azimpoor
ATTORNEY TO BE NOTICED
DOJ-Civ
1100 L Street Nw
Washington, DC  20005
USA
202-598-0860 Email:Kian.K.Azimpoor@usdoj.Gov

United States Army
**Defendant**

Andrew Marshall Bernie
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Enrd
Civil Division, Federal Programs Branch 1100 L Street Nw
Washington, DC  20005
USA
202-353-7203 Email:Andrew.Bernie@usdoj.Gov

Brad P. Rosenberg
LEAD ATTORNEY;ATTORNEY TO BE NOTICED

District Of Columbia V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| | U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC  20005<br>USA<br>(202) 514-3374 Fax: (202) 616-8460<br>Email:Brad.Rosenberg@usdoj.Gov |
| | Eric Hamilton<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division 950 Pennsylvania Avenue Nw<br>Washington, DC  20530<br>USA<br>202-514-2000 Email:Eric.Hamilton@usdoj.Gov |
| | John Bailey<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Civil 950 Pennsylvania Ave Nw Ste 3618<br>Washington, DC  20530<br>USA<br>202-514-6993 Email:John.Bailey@usdoj.Gov |
| | Kian Kevin Azimpoor<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-598-0860 Email:Kian.K.Azimpoor@usdoj.Gov |
| DANIEL P. DRISCOLL<br>in his official capacity as Secretary of the Army \|<br>**Defendant** | Andrew Marshall Bernie<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>Civil Division, Federal Programs Branch 1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-353-7203 Email:Andrew.Bernie@usdoj.Gov |
| | Brad P. Rosenberg<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC  20005<br>USA<br>(202) 514-3374 Fax: (202) 616-8460<br>Email:Brad.Rosenberg@usdoj.Gov |
| | Eric Hamilton<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division 950 Pennsylvania Avenue Nw<br>Washington, DC  20530<br>USA<br>202-514-2000 Email:Eric.Hamilton@usdoj.Gov |
| | John Bailey<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Civil 950 Pennsylvania Ave Nw Ste 3618 |

**JA005**

## Litigants

## Attorneys

| Litigants | Attorneys |
|---|---|
| | Washington, DC  20530<br>USA<br>202-514-6993 Email:John.Bailey@usdoj.Gov |
| | Kian Kevin Azimpoor<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-598-0860 Email:Kian.K.Azimpoor@usdoj.Gov |
| United States Department of Justice<br>**Defendant** | Andrew Marshall Bernie<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>Civil Division, Federal Programs Branch 1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-353-7203 Email:Andrew.Bernie@usdoj.Gov |
| | Brad P. Rosenberg<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC  20005<br>USA<br>(202) 514-3374 Fax: (202) 616-8460<br>Email:Brad.Rosenberg@usdoj.Gov |
| | Eric Hamilton<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division 950 Pennsylvania Avenue Nw<br>Washington, DC  20530<br>USA<br>202-514-2000 Email:Eric.Hamilton@usdoj.Gov |
| | John Bailey<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Civil 950 Pennsylvania Ave Nw Ste 3618<br>Washington, DC  20530<br>USA<br>202-514-6993 Email:John.Bailey@usdoj.Gov |
| | Kian Kevin Azimpoor<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-598-0860 Email:Kian.K.Azimpoor@usdoj.Gov |
| Pamela J. Bondi<br>in her official capacity as United States Attorney General \|<br>**Defendant** | Andrew Marshall Bernie<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>Civil Division, Federal Programs Branch 1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-353-7203 Email:Andrew.Bernie@usdoj.Gov |

**JA006**

| Litigants | Attorneys |
|---|---|
| | Brad P. Rosenberg<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC  20005<br>USA<br>(202) 514-3374 Fax: (202) 616-8460<br>Email:Brad.Rosenberg@usdoj.Gov<br><br>Eric Hamilton<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division 950 Pennsylvania Avenue Nw<br>Washington, DC  20530<br>USA<br>202-514-2000 Email:Eric.Hamilton@usdoj.Gov<br><br>John Bailey<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Civil 950 Pennsylvania Ave Nw Ste 3618<br>Washington, DC  20530<br>USA<br>202-514-6993 Email:John.Bailey@usdoj.Gov<br><br>Kian Kevin Azimpoor<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-598-0860 Email:Kian.K.Azimpoor@usdoj.Gov |
| United States Marshals Service<br>**Defendant** | Andrew Marshall Bernie<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>Civil Division, Federal Programs Branch 1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-353-7203 Email:Andrew.Bernie@usdoj.Gov<br><br>Brad P. Rosenberg<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC  20005<br>USA<br>(202) 514-3374 Fax: (202) 616-8460<br>Email:Brad.Rosenberg@usdoj.Gov<br><br>Eric Hamilton<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division 950 Pennsylvania Avenue Nw<br>Washington, DC  20530<br>USA<br>202-514-2000 Email:Eric.Hamilton@usdoj.Gov |

| Litigants | Attorneys |
|---|---|

**JA007**

District Of Columbia V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| | John Bailey<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Civil 950 Pennsylvania Ave Nw Ste 3618<br>Washington, DC  20530<br>USA<br>202-514-6993 Email:John.Bailey@usdoj.Gov |
| | Kian Kevin Azimpoor<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-598-0860 Email:Kian.K.Azimpoor@usdoj.Gov |
| GADYACES S. SERRALTA<br>in his official capacity as Director of the United States Marshals Service \|<br>**Defendant** | Andrew Marshall Bernie<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-Enrd<br>Civil Division, Federal Programs Branch 1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-353-7203 Email:Andrew.Bernie@usdoj.Gov |
| | Brad P. Rosenberg<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Federal Programs Branch 1100 L Street, Nw<br>Washington, DC  20005<br>USA<br>(202) 514-3374 Fax: (202) 616-8460<br>Email:Brad.Rosenberg@usdoj.Gov |
| | Eric Hamilton<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division 950 Pennsylvania Avenue Nw<br>Washington, DC  20530<br>USA<br>202-514-2000 Email:Eric.Hamilton@usdoj.Gov |
| | John Bailey<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>Civil 950 Pennsylvania Ave Nw Ste 3618<br>Washington, DC  20530<br>USA<br>202-514-6993 Email:John.Bailey@usdoj.Gov |
| | Kian Kevin Azimpoor<br>ATTORNEY TO BE NOTICED<br>DOJ-Civ<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-598-0860 Email:Kian.K.Azimpoor@usdoj.Gov |
| Martin Ackerman<br>**Movant** | MARTIN ACKERMAN<br>PRO SE |

**JA008**

District Of Columbia V. Trump Et Al

## Litigants

## Attorneys

Po Box 100057
Arlington, VA  22210
USA
(202)656-5601

Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals
**Movant**

Eric John Galvez Paredes
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
PROTECT DEMOCRACY PROJECT
82 Nassau Street #601
New York, NY  10038
USA
202-579-4582 Email:Jparedes@dirllp.Com

Jane Petersen Bentrott
LEAD ATTORNEY;ATTORNEY TO BE NOTICED

117 Ringwood Road
Bryn Mawr, PA  19010
USA
267-939-0919 Email:Jane.Bentrott@protectdemocracy.Org

Jeannie Sclafani Rhee
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DUNN ISAACSON RHEE LLP
401 Ninth Street, N.W. Suite 800 20004
Washington, DC  20004
USA
202-240-2900 Email:Jrhee@dirllp.Com

Karen L. Dunn
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street Nw
Washington, DC  20006
USA
202-223-7300 Email:Kdunn@dirllp.Com

Law Enforcement Action Partnership
**Movant**

Joshua Adam Matz
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Hecker Fink LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA
929-294-2537 Fax: 212-564-0883
Email:Jmatz@heckerfink.Com

Trisha Beth Anderson
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
HECKER FINK LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA
202-742-2656 Email:Tanderson@heckerfink.Com

Martin Totaro
PRO HAC VICE;ATTORNEY TO BE NOTICED
HECKER FINK LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA

**JA009**

District Of Columbia V. Trump Et Al

## Litigants

## Attorneys

646-741-5693 Email:Mtotaro@heckerfink.Com

Center for Policing Equity
**Movant**

Joshua Adam Matz
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Hecker Fink LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA
929-294-2537 Fax: 212-564-0883
Email:Jmatz@heckerfink.Com

Trisha Beth Anderson
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
HECKER FINK LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA
202-742-2656 Email:Tanderson@heckerfink.Com

Martin Totaro
PRO HAC VICE;ATTORNEY TO BE NOTICED
HECKER FINK LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA
646-741-5693 Email:Mtotaro@heckerfink.Com

NATIONAL POLICE ACCOUNTABILITY PROJECT
**Movant**

Joshua Adam Matz
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Hecker Fink LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA
929-294-2537 Fax: 212-564-0883
Email:Jmatz@heckerfink.Com

Trisha Beth Anderson
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
HECKER FINK LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA
202-742-2656 Email:Tanderson@heckerfink.Com

Martin Totaro
PRO HAC VICE;ATTORNEY TO BE NOTICED
HECKER FINK LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA
646-741-5693 Email:Mtotaro@heckerfink.Com

POLICING PROJECT AT NEW YORK UNIVERSITY
SCHOOL OF LAW
**Movant**

Joshua Adam Matz
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Hecker Fink LLP
1050 K St Nw Suite 1040
Washington, DC  20001
USA
929-294-2537 Fax: 212-564-0883
Email:Jmatz@heckerfink.Com

**JA010**

District Of Columbia V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| | Trisha Beth Anderson<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>HECKER FINK LLP<br>1050 K St Nw Suite 1040<br>Washington, DC  20001<br>USA<br>202-742-2656 Email:Tanderson@heckerfink.Com |
| | Martin Totaro<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>HECKER FINK LLP<br>1050 K St Nw Suite 1040<br>Washington, DC  20001<br>USA<br>646-741-5693 Email:Mtotaro@heckerfink.Com |
| Washington Lawyers' Committee for Civil Rights and Urban Affairs<br>**Movant** | Madeleine Gates<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>WASHINGTON LAWYERS' COMMITTEE<br>700 14th St. Nw, Ste. 400<br>Washington, DC  20003<br>USA<br>202-319-1044 Email:Madeleine_Gates@washlaw.Org |
| NAACP Legal Defense and Educational Fund, Inc.<br>**Movant** | Jin Hee Lee<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.<br>700 14th Street Nw Suite 600<br>Washington, DC  20005<br>USA<br>202-682-1300 Email:Jlee@naacpldf.Org |
| DEMOCRACY FORWARD FOUNDATION<br>**Movant** | Bradley Girard<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Democracy Forward Foundation<br>P.O. Box 34553<br>Washington, DC  20043<br>USA<br>202-812-3840 Email:Bgirard@democracyforward.Org |
| | Brian D. Netter<br>ATTORNEY TO BE NOTICED<br>DEMOCRACY FORWARD FOUNDATION<br>Po Box 34553<br>Washington, DC  20043<br>USA<br>202-808-1846 Email:Bnetter@democracyforward.Org |
| MIA MCCLAIN<br>Reverend \|<br>**Movant** | John M. Powers<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ADVANCEMENT PROJECT<br>Power & Democracy Program 1220 L Street Nw Ste 850<br>Washington, DC  20005<br>USA<br>202-921-7314 Email:Jpowers@advancementproject.Org |
| | Dariely Rodriguez<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW<br>1500 K Street, Nw Suite 900<br>Washington, DC  20005<br>USA<br>202-662-8340 Fax: 202-783-0857 |

**JA011**

## Litigants

## Attorneys

Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

**Allen Chapel AME Church**
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

**NATIONAL AFRICAN AMERICAN CLERGY NETWORK**
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

Metropolitan African Methodist Episcopal Church

John M. Powers

**JA012**

District Of Columbia V. Trump Et Al

## Litigants

## Attorneys

**Movant**

LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

Christopher Zacharias
Reverend Dr. |
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

RABBI  AARON ALEXANDER
Rabbi |
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900

**JA013**

## Litigants

## Attorneys

Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

**CENTER FOR RACIAL EQUITY AND JUSTICE**
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

New Bethel Baptist Church
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA

**JA014**

District Of Columbia V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| | 202-806-8082 Email:Kristen.Clarke@howard.Edu |
| BARBARA WILLIAMS-SKINNER<br>Reverend Dr. \|<br>**Movant** | John M. Powers<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ADVANCEMENT PROJECT<br>Power & Democracy Program 1220 L Street Nw Ste 850<br>Washington, DC  20005<br>USA<br>202-921-7314 Email:Jpowers@advancementproject.Org |
| | Dariely Rodriguez<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW<br>1500 K Street, Nw Suite 900<br>Washington, DC  20005<br>USA<br>202-662-8340 Fax: 202-783-0857<br>Email:Drodriguez@lawyerscommittee.Org |
| | Kristen M. Clarke<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>HOWARD UNIVERSITY SCHOOL OF LAW<br>2900 Van Ness St Nw<br>Washington, DC  20008<br>USA<br>202-806-8082 Email:Kristen.Clarke@howard.Edu |
| CLERGY NETWORK<br>**Movant** | John M. Powers<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ADVANCEMENT PROJECT<br>Power & Democracy Program 1220 L Street Nw Ste 850<br>Washington, DC  20005<br>USA<br>202-921-7314 Email:Jpowers@advancementproject.Org |
| | Dariely Rodriguez<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW<br>1500 K Street, Nw Suite 900<br>Washington, DC  20005<br>USA<br>202-662-8340 Fax: 202-783-0857<br>Email:Drodriguez@lawyerscommittee.Org |
| | Kristen M. Clarke<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>HOWARD UNIVERSITY SCHOOL OF LAW<br>2900 Van Ness St Nw<br>Washington, DC  20008<br>USA<br>202-806-8082 Email:Kristen.Clarke@howard.Edu |
| PEACE BAPTIST CHURCH<br>**Movant** | John M. Powers<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ADVANCEMENT PROJECT<br>Power & Democracy Program 1220 L Street Nw Ste 850<br>Washington, DC  20005<br>USA<br>202-921-7314 Email:Jpowers@advancementproject.Org |
| | Dariely Rodriguez |

**JA015**

District Of Columbia V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| | PRO HAC VICE;ATTORNEY TO BE NOTICED<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW<br>1500 K Street, Nw Suite 900<br>Washington, DC  20005<br>USA<br>202-662-8340 Fax: 202-783-0857<br>Email:Drodriguez@lawyerscommittee.Org |
| **EMORY UNITED METHODIST CHURCH**<br>**Movant** | Kristen M. Clarke<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>HOWARD UNIVERSITY SCHOOL OF LAW<br>2900 Van Ness St Nw<br>Washington, DC  20008<br>USA<br>202-806-8082 Email:Kristen.Clarke@howard.Edu |
| | John M. Powers<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ADVANCEMENT PROJECT<br>Power & Democracy Program 1220 L Street Nw Ste 850<br>Washington, DC  20005<br>USA<br>202-921-7314 Email:Jpowers@advancementproject.Org |
| | Dariely Rodriguez<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW<br>1500 K Street, Nw Suite 900<br>Washington, DC  20005<br>USA<br>202-662-8340 Fax: 202-783-0857<br>Email:Drodriguez@lawyerscommittee.Org |
| **RELIGIOUS NATIONALISMS PROJECT**<br>**Movant** | Kristen M. Clarke<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>HOWARD UNIVERSITY SCHOOL OF LAW<br>2900 Van Ness St Nw<br>Washington, DC  20008<br>USA<br>202-806-8082 Email:Kristen.Clarke@howard.Edu |
| | John M. Powers<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ADVANCEMENT PROJECT<br>Power & Democracy Program 1220 L Street Nw Ste 850<br>Washington, DC  20005<br>USA<br>202-921-7314 Email:Jpowers@advancementproject.Org |
| | Dariely Rodriguez<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW<br>1500 K Street, Nw Suite 900<br>Washington, DC  20005<br>USA<br>202-662-8340 Fax: 202-783-0857<br>Email:Drodriguez@lawyerscommittee.Org |
| | Kristen M. Clarke<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>HOWARD UNIVERSITY SCHOOL OF LAW |

## Litigants

## Attorneys

2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS
CLINIC
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Edward G. Caspar
ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8390 Email:Ecaspar@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

SHILOH BAPTIST CHURCH OF WASHINGTON DC
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA

**JA017**

## Litigants

## Attorneys

202-806-8082 Email:Kristen.Clarke@howard.Edu

**ALL SOULS CHURCH UNITARIAN**
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

**Interfaith Alliance**
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez
PRO HAC VICE;ATTORNEY TO BE NOTICED
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, Nw Suite 900
Washington, DC  20005
USA
202-662-8340 Fax: 202-783-0857
Email:Drodriguez@lawyerscommittee.Org

Kristen M. Clarke
PRO HAC VICE;ATTORNEY TO BE NOTICED
HOWARD UNIVERSITY SCHOOL OF LAW
2900 Van Ness St Nw
Washington, DC  20008
USA
202-806-8082 Email:Kristen.Clarke@howard.Edu

**SOJOURNERS/SOJO ACTION**
**Movant**

John M. Powers
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
ADVANCEMENT PROJECT
Power & Democracy Program 1220 L Street Nw Ste 850
Washington, DC  20005
USA
202-921-7314 Email:Jpowers@advancementproject.Org

Dariely Rodriguez

District Of Columbia V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| | PRO HAC VICE;ATTORNEY TO BE NOTICED<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW<br>1500 K Street, Nw Suite 900<br>Washington, DC  20005<br>USA<br>202-662-8340 Fax: 202-783-0857<br>Email:Drodriguez@lawyerscommittee.Org |
| | Kristen M. Clarke<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>HOWARD UNIVERSITY SCHOOL OF LAW<br>2900 Van Ness St Nw<br>Washington, DC  20008<br>USA<br>202-806-8082 Email:Kristen.Clarke@howard.Edu |
| REVEREND  TERRANCE MCKINLEY<br>**Movant** | John M. Powers<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ADVANCEMENT PROJECT<br>Power & Democracy Program 1220 L Street Nw Ste 850<br>Washington, DC  20005<br>USA<br>202-921-7314 Email:Jpowers@advancementproject.Org |
| | Dariely Rodriguez<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW<br>1500 K Street, Nw Suite 900<br>Washington, DC  20005<br>USA<br>202-662-8340 Fax: 202-783-0857<br>Email:Drodriguez@lawyerscommittee.Org |
| | Kristen M. Clarke<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>HOWARD UNIVERSITY SCHOOL OF LAW<br>2900 Van Ness St Nw<br>Washington, DC  20008<br>USA<br>202-806-8082 Email:Kristen.Clarke@howard.Edu |
| AMERICA FIRST LEGAL FOUNDATION<br>**Movant** | R. Trent McCotter<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Boyden Gray PLLC<br>800 Connecticut Ave. Nw Suite 900<br>Washington, DC  20006<br>USA<br>202-706-5488 Email:Trent.Mccotter@usdoj.Gov |
| Mike Howell<br>[Terminated: 01/27/2026]<br>**Movant** | Samuel Everett Dewey<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CHAMBERS OF SAMUEL EVERETT DEWEY, LLC<br>2200 12th Court North Apt. 609<br>Arlington, VA  22201<br>USA<br>(703) 261-4194 Email:Samueledewey@sedchambers.Com |
| Constitutional Accountability Center<br>**Movant** | Brianne Jenna Gorod<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CONSTITUTIONAL ACCOUNTABILITY CENTER<br>1730 Rhode Island Ave. Nw Suite 1200<br>Washington, DC  20005<br>USA |

District Of Columbia V. Trump Et Al

## Litigants

## Attorneys

202-296-6889 Email:Brianne@theusconstitution.Org

Brian Rene Frazelle
ATTORNEY TO BE NOTICED
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, Nw Suite 501
Washington, DC  20036
USA
(202) 296-6889 Ext. 308 Email:Brian@theusconstitution.Org

STEADY STATE
**Movant**

Gregory Stuart Smith
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
LAW OFFICES OF GREGORY S. SMITH
913 East Capitol Street, Se
Washington, DC  20003
USA
(202) 460-3381 Fax: (877) 809-9113
Email:Gsmith@dctriallawyers.Com

State of Maryland
et al. |
**Amicus**

Michael Leon Drezner
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
OFFICE OF THE ATTORNEY GENERAL- STATE OF
MARYLAND
Civil Division 200 Saint Paul Place Ste 20th Floor
Baltimore, MD  21202
USA
410-576-6959 Email:Mdrezner@oag.State.Md.Us

State of South Carolina
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of West Virginia
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State  of Alabama
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Alaska
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Arkansas
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA

**JA020**

## Litigants

## Attorneys

202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Florida
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Georgia
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Idaho
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Indiana
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Iowa
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Kansas
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Louisiana
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Mississippi
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Missouri
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED

**JA021**

District Of Columbia V. Trump Et Al

## Litigants

## Attorneys

Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Montana
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Nebraska
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of North Dakota
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Ohio
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Oklahoma
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of South Dakota
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Tennessee
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037
USA
202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com

State of Texas
**Amicus**

Jason Brett Torchinsky
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Holtzman Vogel PLLC
2300 N Street, Nw Suite 643a
Washington, DC  20037

**JA022**

District Of Columbia V. Trump Et Al

## Litigants

## Attorneys

| Litigants | Attorneys |
|---|---|
| | USA |
| | 202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com |
| Commonwealth of Virginia<br>**Amicus** | Jason Brett Torchinsky<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Holtzman Vogel PLLC<br>2300 N Street, Nw Suite 643a<br>Washington, DC  20037<br>USA<br>202-737-8808 Email:Jtorchinsky@holtzmanvogel.Com |
| OVERSIGHT PROJECT<br>**Amicus** | Samuel Everett Dewey<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CHAMBERS OF SAMUEL EVERETT DEWEY, LLC<br>2200 12th Court North Apt. 609<br>Arlington, VA  22201<br>USA<br>(703) 261-4194 Email:Samueledewey@sedchambers.Com |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 09/04/2025 | COMPLAINT  against All Defendants  (Fee Status:Filing Fee Waived) filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons)(Disney, Pamela) (Attachment 1 replaced on 9/4/2025) (zmtm). (Entered: 09/04/2025) | |
| | 09/04/2025 | Case Assigned to Judge Jia M. Cobb. (zmtm) (Entered: 09/04/2025) | |
| 2 | 09/04/2025 | SUMMONS (10) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 09/04/2025) | |
| 11 | 09/04/2025 | MOTION for Leave to File Amicus Brief by MARTIN ACKERMAN. (Attachments: # 1 Exhibit, # 2 Amicus Brief, # 3 Certificate of Service, # 4 Text of Proposed Order)(zjm) (Entered: 09/10/2025) | |
| 3 | 09/09/2025 | MOTION for Preliminary Injunction and Section 705 Stay by DISTRICT OF COLUMBIA. (Attachments: # 1 Memorandum in Support, # 2 Declaration Ex. A - Haynes, # 3 Declaration Ex. B - Buchanan, # 4 Declaration Ex. C - Hall, # 5 Declaration Ex. D - Schwalb, # 6 Text of Proposed Order)(Disney, Pamela). Added MOTION to Stay on 10/29/2025 (znmw). (Entered: 09/09/2025) | |
| 4 | 09/09/2025 | MOTION to Expedite Discovery in Support of Motion for Preliminary Injunction by DISTRICT OF COLUMBIA. (Attachments: # 1 Exhibit A - Discovery Requests)(Disney, Pamela) (Entered: 09/09/2025) | |
| 5 | 09/10/2025 | NOTICE of Appearance by Andrew Charles Mendrala on behalf of DISTRICT OF COLUMBIA (Mendrala, Andrew) (Main Document 5 replaced on 9/11/2025) (znmw). (Entered: 09/10/2025) | |
| 6 | 09/10/2025 | NOTICE of Appearance by Mitchell Reich on behalf of DISTRICT OF COLUMBIA (Reich, Mitchell) (Entered: 09/10/2025) | |
| 7 | 09/10/2025 | NOTICE of Appearance by Brad P. Rosenberg on behalf of All Defendants (Rosenberg, Brad) (Entered: 09/10/2025) | |
| 8 | 09/10/2025 | RESPONSE re 4 MOTION to Expedite Discovery in Support of Motion for Preliminary Injunction (Opposing Request for Expedited Briefing) filed by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. | |

**JA023**

District Of Columbia V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|   |      | TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Rosenberg, Brad) (Entered: 09/10/2025) |   |
| 9 | 09/10/2025 | NOTICE of Appearance by Eliza Simon on behalf of DISTRICT OF COLUMBIA (Simon, Eliza) (Main Document 9 replaced on 9/11/2025) (znmw). (Entered: 09/10/2025) |   |
| 10 | 09/10/2025 | REPLY re 8 Response to motion, in Support of Request for Expedited Briefing in Motion for Expedited Discovery filed by DISTRICT OF COLUMBIA. (Simon, Eliza) (Entered: 09/10/2025) |   |
|   | 09/11/2025 | MINUTE ORDER re 4 Motion to Expedite Discovery: The Parties are ORDERED to appear for a hearing on Plaintiff's 4 Motion to Expedite Discovery on September 18, 2025, at 1:00 PM. This hearing will be on the record before Judge Jia M. Cobb in Courtroom 3. Defendants are hereby ORDERED to file an additional memorandum with the Court by 1:00 PM on September 17, 2025, identifying the specific discovery requests that Defendants object to, as well as the bases for those objections. Signed by Judge Jia M. Cobb on September 11, 2025. (lcjmc2) (Entered: 09/11/2025) |   |
| 12 | 09/11/2025 | NOTICE of Appearance by Charles Andrew Sinks on behalf of DISTRICT OF COLUMBIA (Sinks, Charles) (Main Document 12 replaced on 9/11/2025) (znmw). (Entered: 09/11/2025) |   |
|   | 09/12/2025 | MINUTE ORDER denying 11 Motion for Leave to File Amicus Brief: Upon consideration of non-party Martin Akerman's 11 motion for leave to file an amicus brief in this case, the Court DENIES the motion. It is within the sole discretion of the Court to "determine the fact, extent, and manner of participation by" an amicus.  Hopi Tribe v. Trump , No. 17-cv-2590 (TSC), 2019 WL 2494161, at *3 (D.D.C. Mar. 20, 2019). Local Civil Rule 7(o) requires that a motion for leave to file an amicus brief "shall concisely state the nature of the movant's interest" and "set forth the reasons why an amicus brief is desirable" and "why the matters asserted are relevant to the disposition of the case." The non-party's motion has (1) failed to concisely state his interests in this case and (2) do not establish that his participation as amicus would help the Court better understand matters "relevant to the disposition" of this case. Accordingly, the non-party's Motion for Leave to File an Amicus Brief is hereby DENIED. Signed by Judge Jia M. Cobb on September 12, 2025.(lcjmc2) (Entered: 09/12/2025) |   |
| 13 | 09/15/2025 | NOTICE of Appearance by Jane Petersen Bentrott on behalf of Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals (Bentrott, Jane) (Main Document 13 replaced on 9/15/2025) (znmw). (Entered: 09/15/2025) |   |
| 14 | 09/15/2025 | Unopposed MOTION for Leave to File Amicus Brief by Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals. (Attachments: # 1 Exhibit 1 - Proposed Amicus Brief, # 2 Exhibit 2 - Proposed Order)(Bentrott, Jane) (Entered: 09/15/2025) |   |
| 15 | 09/15/2025 | NOTICE of Appearance by Michael Leon Drezner on behalf of MARYLAND (Drezner, Michael) (Entered: 09/15/2025) |   |
| 16 | 09/15/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Martin Totaro,  Filing fee $ 100, receipt number ADCDC-11958091. Fee Status: Fee Paid. by LAW ENFORCEMENT ACTION PARTNERSHIP, CENTER FOR POLICING EQUITY, NATIONAL POLICE ACCOUNTABILITY PROJECT, POLICING PROJECT AT NEW YORK UNIVERSITY SCHOOL OF LAW. (Attachments: # 1 Declaration of Martin Totaro, # 2 - Certificate of |   |

**JA024**

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Good Standing (DC), # 3 Text of Proposed Order)(Anderson, Trisha) (Entered: 09/15/2025) | |
| 17 | 09/15/2025 | AMICUS BRIEF for States of Maryland, California, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin by MARYLAND. (Drezner, Michael) (Entered: 09/15/2025) | |
| 18 | 09/15/2025 | NOTICE of Appearance by Jeannie Sclafani Rhee on behalf of Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals (Rhee, Jeannie) (Main Document 18 replaced on 9/15/2025) (znmw). (Entered: 09/15/2025) | |
| 19 | 09/15/2025 | MOTION for Leave to File Amicus Brief by CENTER FOR POLICING EQUITY, LAW ENFORCEMENT ACTION PARTNERSHIP, NATIONAL POLICE ACCOUNTABILITY PROJECT, POLICING PROJECT AT NEW YORK UNIVERSITY SCHOOL OF LAW. (Attachments: # 1 Exhibit - Proposed Brief of Amici Curiae in Support of Plaintiff's Motion for Preliminary Injunction and Section 705 Stay, # 2 Text of Proposed Order)(Anderson, Trisha) (Entered: 09/15/2025) | |
| 20 | 09/15/2025 | Unopposed MOTION for Leave to File Amicus Brief by WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS. (Attachments: # 1 Memorandum in Support Brief of Amici Curiae, # 2 Text of Proposed Order Proposed Order)(Gates, Madeleine) (Entered: 09/15/2025) | |
| 21 | 09/15/2025 | NOTICE of Appearance by Jin Hee Lee on behalf of NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC. (Lee, Jin Hee) (Entered: 09/15/2025) | |
| 22 | 09/15/2025 | Consent MOTION for Leave to File Amicus Brief by NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Exhibit Proposed Order)(Lee, Jin Hee) (Entered: 09/15/2025) | |
| 23 | 09/15/2025 | Consent MOTION for Leave to File Amicus Brief by DEMOCRACY FORWARD FOUNDATION. (Attachments: # 1 Proposed amicus brief, # 2 Text of Proposed Order)(Girard, Bradley) (Entered: 09/15/2025) | |
| 24 | 09/15/2025 | MOTION for Leave to File Amicus Brief by MIA MCCLAIN, ALLEN CHAPEL AME CHURCH, NATIONAL AFRICAN AMERICAN CLERGY NETWORK, METROPOLITAN AFRICAN METHODIST EPISCOPAL CHURCH, CHRISTOPHER ZACHARIAS, AARON ALEXANDER, THE CENTER FOR RACIAL EQUITY AND JUSTICE, NEW BETHEL BAPTIST CHURCH, BARBARA WILLIAMS-SKINNER, CLERGY NETWORK, THE PEACE BAPTIST CHURCH, EMORY UNITED METHODIST CHURCH, THE RELIGIOUS NATIONALISMS PROJECT, HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Powers, John) (Entered: 09/15/2025) | |
| 25 | 09/16/2025 | NOTICE of Appearance by Andrew Marshall Bernie on behalf of All Defendants (Bernie, Andrew) (Entered: 09/16/2025) | |
| 26 | 09/16/2025 | NOTICE of Appearance by Karen L. Dunn on behalf of FORMER U.S. ARMY AND NAVY SECRETARIES AND RETIRED FOUR-STAR ADMIRALS AND GENERALS (Dunn, Karen) (Entered: 09/16/2025) | |
| 27 | 09/16/2025 | NOTICE of Appearance by Eric John Galvez Paredes on behalf of FORMER U.S. ARMY AND NAVY SECRETARIES AND RETIRED FOUR-STAR ADMIRALS AND GENERALS (Paredes, Eric John) (Entered: 09/16/2025) | |
| 28 | 09/16/2025 | NOTICE of Appearance by Brian D. Netter on behalf of | |

**JA025**

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | DEMOCRACY FORWARD FOUNDATION (Netter, Brian) (Entered: 09/16/2025) | |
| 29 | 09/16/2025 | NOTICE of Appearance by Trisha Beth Anderson on behalf of CENTER FOR POLICING EQUITY, LAW ENFORCEMENT ACTION PARTNERSHIP, NATIONAL POLICE ACCOUNTABILITY PROJECT, POLICING PROJECT AT NEW YORK UNIVERSITY SCHOOL OF LAW (Anderson, Trisha) (Entered: 09/16/2025) | |
| 30 | 09/16/2025 | NOTICE of Appearance by Joshua Adam Matz on behalf of CENTER FOR POLICING EQUITY, LAW ENFORCEMENT ACTION PARTNERSHIP, NATIONAL POLICE ACCOUNTABILITY PROJECT, POLICING PROJECT AT NEW YORK UNIVERSITY SCHOOL OF LAW (Matz, Joshua) (Entered: 09/16/2025) | |
| 31 | 09/16/2025 | NOTICE of Appearance by John M. Powers on behalf of AARON ALEXANDER, ALLEN CHAPEL AME CHURCH, CENTER FOR RACIAL EQUITY AND JUSTICE, CLERGY NETWORK, EMORY UNITED METHODIST CHURCH, HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC, MIA MCCLAIN, METROPOLITAN AFRICAN METHODIST EPISCOPAL CHURCH, NATIONAL AFRICAN AMERICAN CLERGY NETWORK, NEW BETHEL BAPTIST CHURCH, PEACE BAPTIST CHURCH, RELIGIOUS NATIONALISMS PROJECT, BARBARA WILLIAMS-SKINNER, CHRISTOPHER ZACHARIAS, SHILOH BAPTIST CHURCH OF WASHINGTON DC, ALL SOULS CHURCH UNITARIAN, INTERFAITH ALLIANCE, SOJOURNERS/SOJO ACTION, TERRANCE MCKINLEY (Powers, John) (Entered: 09/16/2025) | |
| 32 | 09/16/2025 | NOTICE of Appearance by R. Trent McCotter on behalf of AMERICA FIRST LEGAL FOUNDATION (McCotter, R. Trent) (Entered: 09/16/2025) | |
| 33 | 09/16/2025 | Consent MOTION for Leave to File Amicus Brief by AMERICA FIRST LEGAL FOUNDATION. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(McCotter, R. Trent) (Entered: 09/16/2025) | |
| 34 | 09/16/2025 | Memorandum in opposition to re 3 MOTION for Preliminary Injunction and Section 705 Stay filed by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Declaration Declaration of Colonel Laurence M. Doane, # 2 Declaration Declaration of Christopher York, # 3 Declaration Declaration of Donald Snider, # 4 Text of Proposed Order)(Bernie, Andrew) (Entered: 09/16/2025) | |
| 35 | 09/16/2025 | MOTION to Dismiss for Lack of Jurisdiction , MOTION to Dismiss and Motion for Relief from Local Rule 7(N)'s Requirements by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Bernie, Andrew) (Entered: 09/16/2025) | |
| 36 | 09/16/2025 | AMICUS BRIEF IN SUPPORT OF DEFENDANTS' OPPOSITON TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION by STATE OF SOUTH CAROLINA, STATE OF WEST VIRGINIA, STATE OF ALABAMA, STATE OF ALASKA, STATE OF ARKANSAS, STATE OF FLORIDA, STATE OF GEORGIA, | |

**JA026**

District Of Columbia V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF NORTH DAKOTA, STATE OF OHIO, STATE OF OKLAHOMA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA. (Torchinsky, Jason) (Entered: 09/16/2025) | |
| 37 | 09/17/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Dariely Rodriguez, Filing fee $ 100, receipt number ADCDC-11963282. Fee Status: Fee Paid. by HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC. (Attachments: # 1 Exhibit D. Rodriguez Certificate of Good Standing, # 2 Declaration D. Rodriguez Declaration for PHV Admission)(Caspar, Edward) (Entered: 09/17/2025) | |
| 38 | 09/17/2025 | Memorandum in opposition to re 4 MOTION to Expedite Discovery in Support of Motion for Preliminary Injunction filed by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Text of Proposed Order)(Rosenberg, Brad) (Entered: 09/17/2025) | |
| 39 | 09/17/2025 | NOTICE of Appearance by Eric Hamilton on behalf of All Defendants (Hamilton, Eric) (Entered: 09/17/2025) | |
| 40 | 09/18/2025 | MOTION for Leave to File Amicus Brief by OVERSIGHT PROJECT, MIKE HOWELL. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order)(Dewey, Samuel) (Entered: 09/18/2025) | |
| 41 | 09/18/2025 | NOTICE of Appearance by Samuel Everett Dewey on behalf of MIKE HOWELL, OVERSIGHT PROJECT (Dewey, Samuel) (Entered: 09/18/2025) | |
| | 09/18/2025 | MINUTE ORDER granting 14 Unopposed Motion for Leave to File Amicus Brief: Having considered the Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals' unopposed motion for leave to file a brief as amicus curiae, the Court GRANTS the motion. It is further ORDERED that the proposed brief accompanying the motion, ECF 14-1, be filed. Signed by Judge Jia M. Cobb on September 18, 2025. (lcjmc2) (Entered: 09/18/2025) | |
| | 09/18/2025 | MINUTE ORDER granting 19 Motion for Leave to File Amicus Brief: A district court "has broad discretion to allow amicus briefs when they provide unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec. , 50 F.4th 164, 193 (D.C. Cir. 2022) (internal quotations and citations omitted). The Law Enforcement Action Partnership, Center for Policing Equity, National Police Accountability Project, and the Policing Project at the New York University School of Law request leave to submit an amicus brief that draws upon their "expert[ise] in law enforcement," ECF 19-1 at 8. The Court GRANTS the motion under Local Civil Rule 7(o). The proposed brief addresses discrete issues that have not been fully explored by the Parties and thus offers "unique information or perspective" that could help the Court. Wash. All. of Tech. Workers, 50 F.4th at 193. It is further ORDERED that the proposed brief accompanying the motion, ECF 19-1, be filed. Signed by Judge Jia M. Cobb on September 18, 2025. (lcjmc2) (Entered: 09/18/2025) | |

**JA027**

District Of Columbia V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
|  | 09/18/2025 | Minute Entry for Discovery Hearing held on 9/18/2025 before Judge Jia M. Cobb. Oral arguments submitted on Plaintiff's Motion 4 to Expedite Discovery in Support of Motion for Preliminary Injunction. Court takes matter under advisement. Forthcoming Order. The parties are to appear for a hearing on Plaintiff's Motion 3 for Preliminary Injunction and Defendants' Motion 35 to Dismiss for Lack of Jurisdiction on 10/24/2025 at 2:00 PM. This hearing will be on the record before Judge Jia M. Cobb in Courtroom 3. Court Reporter: Stacy Johns. (zljn) (Entered: 09/18/2025) |  |
| 42 | 09/18/2025 | NOTICE of Appearance by John Bailey on behalf of All Defendants (Bailey, John) (Entered: 09/18/2025) |  |
| 43 | 09/18/2025 | NOTICE of Revised Discovery Requests by DISTRICT OF COLUMBIA re 4 Motion to Expedite (Simon, Eliza) (Entered: 09/18/2025) |  |
|  | 09/18/2025 | MINUTE ORDER granting 16 Motion for Leave to Appear Pro Hac Vice: Attorney Martin Totaro is hereby admitted pro hac vice to appear in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Jia M. Cobb on September 18, 2025. (lcjmc2) (Entered: 09/18/2025) |  |
|  | 09/18/2025 | MINUTE ORDER granting 37 Motion for Leave to Appear Pro Hac Vice: Attorney Dariely Rodriguez is hereby admitted pro hac vice to appear in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Jia M. Cobb on September 18, 2025. (lcjmc2) (Entered: 09/18/2025) |  |
|  | 09/18/2025 | MINUTE ORDER granting 20 Motion for Leave to File Amicus Brief: Having considered the Local Civil Rights and Legal Services Organizations' unopposed motion for leave to file a brief as amicus curiae, the Court GRANTS the motion. It is further ORDERED that the proposed brief accompanying the motion, ECF 20-1, be filed. Signed by Judge Jia M. Cobb on September 18, 2025. (lcjmc2) (Entered: 09/18/2025) |  |
|  | 09/18/2025 | MINUTE ORDER granting 22 Motion for Leave to File Amicus Brief: Having considered NAACP LDF's consent motion for leave to file a brief as amicus curiae, the Court GRANTS the motion. It is further ORDERED that the proposed brief accompanying the motion, ECF 22-1, be filed. Signed by Judge Jia M. Cobb on September 18, 2025. (lcjmc2) (Entered: 09/18/2025) |  |
|  | 09/18/2025 | MINUTE ORDER granting 23 Motion for Leave to File Amicus Brief: Having considered the Democracy Forward Foundation's consent motion for leave to file a brief as amicus curiae, the Court GRANTS the motion. It is further ORDERED that the proposed brief accompanying the motion, ECF 23-1, be filed. Signed by Judge Jia M. Cobb on September 18, 2025. (lcjmc2) (Entered: 09/18/2025) |  |
|  | 09/18/2025 | MINUTE ORDER granting 24 Motion for Leave to File Amicus Brief: A district court "has broad discretion to allow amicus briefs when they provide unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec., 50 F.4th 164, 193 (D.C. Cir. 2022) (internal quotations and citations omitted). The Civil Rights Clinic and Religious Leaders request leave to submit a brief as amici curiae that demonstrates the effect of the National Guard's deployment on local religious institutions. The Court GRANTS the motion under Local Civil Rule 7(o). The proposed brief addresses discrete issues that have not been fully explored by the Parties and thus offers "unique information or perspective" that could help the |  |

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | | Court. Wash. All. of Tech. Workers, 50 F.4th at 193. It is further ORDERED that the proposed brief accompanying the motion, ECF 24-1, be filed. Signed by Judge Jia M. Cobb on September 18, 2025. (lcjmc2) (Entered: 09/18/2025) | |
| | 09/18/2025 | MINUTE ORDER granting 33 Motion for Leave to File Amicus Brief: Having considered the America First Legal Foundation's consent motion for leave to file a brief as amicus curiae, the Court GRANTS the motion. It is further ORDERED that the proposed brief accompanying the motion, ECF 33-1, be filed. Signed by Judge Jia M. Cobb on September 18, 2025. (lcjmc2) (Entered: 09/18/2025) | |
| 44 | 09/19/2025 | ORDER granting in part and denying in part 4 Motion to Expedite: See document for details. Signed by Judge Jia M. Cobb on September 19, 2025. (lcjmc2) (Entered: 09/19/2025) | |
| 45 | 09/19/2025 | NOTICE of Appearance by Martin Totaro on behalf of CENTER FOR POLICING EQUITY, LAW ENFORCEMENT ACTION PARTNERSHIP, NATIONAL POLICE ACCOUNTABILITY PROJECT, POLICING PROJECT AT NEW YORK UNIVERSITY SCHOOL OF LAW (Totaro, Martin) (Entered: 09/19/2025) | |
| 46 | 09/19/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Kristen Clarke, Filing fee $ 100, receipt number ADCDC-11971082. Fee Status: Fee Paid. by AARON ALEXANDER, ALL SOULS CHURCH UNITARIAN, ALLEN CHAPEL AME CHURCH, CENTER FOR RACIAL EQUITY AND JUSTICE, CLERGY NETWORK, EMORY UNITED METHODIST CHURCH, HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC, INTERFAITH ALLIANCE, MIA MCCLAIN, TERRANCE MCKINLEY, METROPOLITAN AFRICAN METHODIST EPISCOPAL CHURCH, NATIONAL AFRICAN AMERICAN CLERGY NETWORK, NEW BETHEL BAPTIST CHURCH, PEACE BAPTIST CHURCH, RELIGIOUS NATIONALISMS PROJECT, SHILOH BAPTIST CHURCH OF WASHINGTON DC, SOJOURNERS/SOJO ACTION, BARBARA WILLIAMS-SKINNER, CHRISTOPHER ZACHARIAS. (Attachments: # 1 Exhibit Certificate of good standing, # 2 Declaration of Kristen Clarke, # 3 Text of Proposed Order)(Powers, John) (Entered: 09/19/2025) | |
| 47 | 09/19/2025 | Joint MOTION for Briefing Schedule for the Motion for Preliminary Injunction and Motion to Dismiss by DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order)(Disney, Pamela) (Entered: 09/19/2025) | |
| | 09/22/2025 | NOTICE OF ERROR regarding 46 MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Kristen Clarke. The following error(s) need correction: Declaration must have an original, ink signature. Please refile using the event Declaration. (znmw) (Entered: 09/22/2025) | |
| 48 | 09/22/2025 | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Kristen Clarke, Fee Status: No Fee Paid. by AARON ALEXANDER, ALL SOULS CHURCH UNITARIAN, ALLEN CHAPEL AME CHURCH, CENTER FOR RACIAL EQUITY AND JUSTICE, CLERGY NETWORK, EMORY UNITED METHODIST CHURCH, HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC, INTERFAITH ALLIANCE, MIA MCCLAIN, TERRANCE MCKINLEY, METROPOLITAN AFRICAN METHODIST EPISCOPAL CHURCH, NATIONAL AFRICAN AMERICAN CLERGY NETWORK, NEW BETHEL BAPTIST CHURCH, PEACE BAPTIST CHURCH, SHILOH BAPTIST CHURCH OF WASHINGTON DC, SOJOURNERS/SOJO ACTION, BARBARA WILLIAMS-SKINNER, CHRISTOPHER ZACHARIAS. (Attachments: # 1 Exhibit Certificate of good | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | standing, # 2 Declaration of Kristen Clarke, # 3 Text of Proposed Order)(Powers, John) (Entered: 09/22/2025) | |
| 49 | 09/22/2025 | ENTERED IN ERROR.....NOTICE of Appearance by Kian Kevin Azimpoor on behalf of UNITED STATES DEPARTMENT OF JUSTICE (Azimpoor, Kian) Modified on 9/23/2025; refiled as docket entry 50 (znmw). (Entered: 09/22/2025) | |
| | 09/22/2025 | MINUTE ORDER granting 40 Motion for Leave to File Amicus Brief: Having considered the Oversight Project's consent motion for leave to file a brief as amicus curiae, the Court GRANTS the motion. It is further ORDERED that the proposed brief accompanying the motion, ECF 40-1, be filed. Signed by Judge Jia M. Cobb on September 22, 2025. (lcjmc2) (Entered: 09/22/2025) | |
| 50 | 09/22/2025 | NOTICE of Appearance by Kian Kevin Azimpoor on behalf of All Defendants (Azimpoor, Kian) (Entered: 09/22/2025) | |
| 51 | 09/22/2025 | ORDER granting 47 Motion for Briefing Schedule: The Parties' Joint Motion for Briefing Schedule is GRANTED. See document for details. Signed by Judge Jia M. Cobb on September 22, 2025. (lcjmc2) (Entered: 09/22/2025) | |
| | 09/22/2025 | MINUTE ORDER granting 48 Motion for Leave to Appear Pro Hac Vice: Attorney Kristen Clarke is hereby admitted pro hac vice to appear in this matter. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions. Signed by Judge Jia M. Cobb on September 22, 2025. (lcjmc2) (Entered: 09/22/2025) | |
| | 09/22/2025 | MINUTE ORDER denying 46 Motion for Leave to Appear Pro Hac Vice: The Court has granted Attorney Kristen Clarke's 48 Amended Motion for Leave to Appear Pro Hac Vice. Accordingly 46 this Motion is DENIED as moot. Signed by Judge Jia M. Cobb on September 22, 2025. (lcjmc2) (Entered: 09/22/2025) | |
| 53 | 09/22/2025 | AMICUS BRIEF by OVERSIGHT PROJECT. (znmw) (Entered: 09/24/2025) | |
| 52 | 09/23/2025 | NOTICE of Appearance by Dariely Rodriguez on behalf of AARON ALEXANDER, ALL SOULS CHURCH UNITARIAN, ALLEN CHAPEL AME CHURCH, CENTER FOR RACIAL EQUITY AND JUSTICE, CLERGY NETWORK, EMORY UNITED METHODIST CHURCH, HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC, INTERFAITH ALLIANCE, MIA MCCLAIN, TERRANCE MCKINLEY, METROPOLITAN AFRICAN METHODIST EPISCOPAL CHURCH, NATIONAL AFRICAN AMERICAN CLERGY NETWORK, NEW BETHEL BAPTIST CHURCH, PEACE BAPTIST CHURCH, RELIGIOUS NATIONALISMS PROJECT, SHILOH BAPTIST CHURCH OF WASHINGTON DC, SOJOURNERS/SOJO ACTION, BARBARA WILLIAMS-SKINNER, CHRISTOPHER ZACHARIAS (Rodriguez, Dariely) (Entered: 09/23/2025) | |
| 54 | 09/26/2025 | NOTICE of Appearance by Kristen M. Clarke on behalf of AARON ALEXANDER, ALL SOULS CHURCH UNITARIAN, ALLEN CHAPEL AME CHURCH, CENTER FOR RACIAL EQUITY AND JUSTICE, CLERGY NETWORK, EMORY UNITED METHODIST CHURCH, HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC, INTERFAITH ALLIANCE, MIA MCCLAIN, TERRANCE MCKINLEY, METROPOLITAN AFRICAN METHODIST EPISCOPAL CHURCH, NATIONAL AFRICAN AMERICAN CLERGY NETWORK, NEW BETHEL BAPTIST CHURCH, PEACE BAPTIST CHURCH, RELIGIOUS NATIONALISMS PROJECT, SHILOH BAPTIST CHURCH OF WASHINGTON DC, SOJOURNERS/SOJO ACTION, BARBARA WILLIAMS-SKINNER, CHRISTOPHER ZACHARIAS (Clarke, | |

**JA030**

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Kristen) (Entered: 09/26/2025) | |
| 55 | 09/29/2025 | TRANSCRIPT OF PROCEEDINGS before Judge Jia M. Cobb held on September 18, 2025. Page Numbers: 1-59. Date of Issuance: September 29, 2025. Court Reporter: Stacy Johns. Email address: Stacy_Johns@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 10/20/2025. Redacted Transcript Deadline set for 10/30/2025. Release of Transcript Restriction set for 12/28/2025.(Johns, Stacy) (Entered: 09/29/2025) | |
| 56 | 09/29/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Mark Ian Pinkert, Filing fee $ 100, receipt number ADCDC-11991332. Fee Status: Fee Paid. by COMMONWEALTH OF VIRGINIA, STATE OF ALABAMA, STATE OF ALASKA, STATE OF ARKANSAS, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF IDAHO, STATE OF INDIANA, STATE OF IOWA, STATE OF KANSAS, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF NORTH DAKOTA, STATE OF OHIO, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF TENNESSEE, STATE OF TEXAS, STATE OF WEST VIRGINIA. (Attachments: # 1 Declaration, # 2 Good Standing Certificate, # 3 Text of Proposed Order)(Torchinsky, Jason) (Entered: 09/29/2025) | |
| 57 | 09/30/2025 | Memorandum in opposition to re 35 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss and Motion for Relief from Local Rule 7(N)'s Requirements filed by DISTRICT OF COLUMBIA. (Reich, Mitchell) (Entered: 09/30/2025) | |
| 58 | 09/30/2025 | REPLY to opposition to motion re 3 Motion for Preliminary Injunction, filed by DISTRICT OF COLUMBIA. (Reich, Mitchell) (Entered: 09/30/2025) | |
| | 09/30/2025 | MINUTE ORDER denying 56 Motion for Leave to Appear Pro Hac Vice: The motion is DENIED because it does not meet the requirements of Local Rule 83.2(c). The motion includes a certificate of good standing from "the court... in which the applicant regularly practices," LCvR 83.2(c)(2), but that certificate was issued on May 29, 2025, ECF 56-2 at 1. Under the Local Rules, the certificate of good standing must have "been issued within thirty (30) days of filing." LCvR 83.2(c)(2). The motion is therefore DENIED without prejudice. Signed by Judge Jia M. Cobb on September 30, 2025. (lcjmc2) (Entered: 09/30/2025) | |
| 59 | 10/01/2025 | MOTION to Stay Proceedings Due to Lapse of Appropriations by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Text of Proposed Order)(Azimpoor, Kian) (Entered: 10/01/2025) | |

**JA031**

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 60 | 10/01/2025 | Memorandum in opposition to re 59 MOTION to Stay Proceedings Due to Lapse of Appropriations filed by DISTRICT OF COLUMBIA. (Mendrala, Andrew) (Entered: 10/01/2025) | |
| | 10/02/2025 | MINUTE ORDER denying 59 Motion to Stay: The Court DENIES Defendants' 59 Motion for a Stay of Proceedings. As both Parties note in their filings, the Court's order staying certain proceedings in light of the lapse of appropriations does "not extend the United States' deadlines to respond to motions for temporary restraining orders or preliminary injunctions." Standing Order No. 25-55 (Oct. 1, 2025). Plaintiff also opposes Defendants' motion for a stay of the proceedings, citing ongoing irreparable harm to the District. ECF 60 at 2. As such, the Court will not stay the discovery or supplemental briefing deadlines related to the preliminary injunction motion in this case. The Court would normally stay the deadline for Defendants' reply brief in support of its motion to dismiss, which is currently due on October 7, 2025. In this case, however, Defendants have represented to the Court that the motion to dismiss briefing discusses issues intertwined with Plaintiff's motion for a preliminary injunction and asked the Court to decide the motion to dismiss prior to issuing any preliminary relief. Accordingly, the Court declines to stay the reply brief deadline, but GRANTS Defendants an extension of time. Defendants are ORDERED to file their reply by October 17, 2025, in order to provide the Court with sufficient time to consider their arguments in advance of the October 24, 2025 hearing. Signed by Judge Jia M. Cobb on October 2, 2025. (lcjmc2) (Entered: 10/02/2025) | |
| 61 | 10/07/2025 | Consent MOTION for Leave to File Amicus Brief by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 10/07/2025) | |
| 62 | 10/07/2025 | NOTICE of Appearance by Brianne Jenna Gorod on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Gorod, Brianne) (Entered: 10/07/2025) | |
| 63 | 10/08/2025 | Joint MOTION for Protective Order by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Stipulated Protective Order)(Azimpoor, Kian) (Entered: 10/08/2025) | |
| | 10/08/2025 | MINUTE ORDER granting 61 Motion for Leave to File Amicus Brief: Having considered the Constitutional Accountability Center's consent motion for leave to file a brief as amicus curiae, the Court GRANTS the motion. It is further ORDERED that the proposed brief accompanying the motion, ECF 61-1, be filed. Signed by Judge Jia M. Cobb on October 8, 2025. (lcjmc2) (Entered: 10/08/2025) | |
| 64 | 10/09/2025 | ORDER granting 63 Motion for Protective Order: See document for details. Signed by Judge Jia M. Cobb on October 9, 2025. (lcjmc2) (Entered: 10/09/2025) | |
| 65 | 10/10/2025 | Consent MOTION for Leave to File Amicus Briefin Support of the Plaintiff by THE STEADY STATE. (Attachments: # 1 Supplement Brief of Amicus Curiae)(Smith, Gregory) (Entered: 10/10/2025) | |
| | 10/15/2025 | MINUTE ORDER granting 65 Consent Motion for Leave to File Amicus Brief: Having considered the Steady State's 65 consent motion for leave to file a brief as amicus curiae, the Court GRANTS the motion. It is further ORDERED that the proposed brief accompanying the motion, ECF 65-1, be filed. Signed by | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Judge Jia M. Cobb on October 15, 2025. (lcjmc2) (Entered: 10/15/2025) | |
| 66 | 10/15/2025 | NOTICE of Appearance by Hannah Wynne Cole-Chu on behalf of All Plaintiffs (Cole-Chu, Hannah) (Entered: 10/15/2025) | |
| 67 | 10/15/2025 | Consent MOTION for Extension of Time to File Response/Reply In Support of Plaintiff's Motion for Preliminary Injunction by DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order)(Cole-Chu, Hannah) (Entered: 10/15/2025) | |
| | 10/16/2025 | MINUTE ORDER granting 67 Consent MOTION for Extension of Time to File Response/Reply In Support of Plaintiff's Motion for Preliminary Injunction: Upon consideration of Plaintiff's Consent Motion for Extension of Time, the Court hereby finds that good cause exists to extend Plaintiff's deadline to file its supplemental brief from October 16, 2025, to October 17, 2025. It is hereby ORDERED that Plaintiff shall file any supplemental brief to address new information disclosed during expedited discovery by October 17, 2025. Signed by Judge Jia M. Cobb on October 16, 2025. (lcjmc2) (Entered: 10/16/2025) | |
| 68 | 10/17/2025 | REPLY to opposition to motion re 35 Motion to Dismiss/Lack of Jurisdiction,,, filed by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Bernie, Andrew) (Entered: 10/17/2025) | |
| 69 | 10/17/2025 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by DISTRICT OF COLUMBIA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Supplemental Brief, # 2 Exhibits to Supplemental Brief)(Simon, Eliza) (Entered: 10/17/2025) | |
| 70 | 10/17/2025 | SUPPLEMENTAL MEMORANDUM to re 3 MOTION for Preliminary Injunction and Section 705 Stay filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Exhibits (public))(Simon, Eliza) (Entered: 10/17/2025) | |
| 78 | 10/20/2025 | SEALED DOCUMENT (Supplemental Memorandum) filed by DISTRICT OF COLUMBIA. re 3 Motion for Preliminary Injunction, Motion to Stay. (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibits)(znmw) (Entered: 10/29/2025) | |
| 71 | 10/22/2025 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Azimpoor, Kian) (Entered: 10/22/2025) | |
| 72 | 10/22/2025 | SUPPLEMENTAL MEMORANDUM to re 3 MOTION for Preliminary Injunction and Section 705 Stay filed by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Exhibit)(Azimpoor, Kian) (Entered: 10/22/2025) | |
| | 10/23/2025 | MINUTE ORDER: As the Court previously ordered, the Parties are to appear for a hearing on Plaintiff's 3 Motion for Preliminary Injunction and Defendants' 35 Motion to Dismiss on October 24, | |

**JA033**

District Of Columbia V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 2025 at 2:00 PM. Sept. 18, 2025 Min. Entry. The hearing will be on the record before Judge Jia M. Cobb in Courtroom 3. The hearing will be made accessible to the public telephonically via the Courtroom Public Access Line. The Public Access telephone number is 1-833-990-9400, and the meeting ID is 251046985. Signed by Judge Jia M. Cobb on October 23, 2025. (lcjmc2) (Entered: 10/23/2025) | |
| 73 | 10/24/2025 | NOTICE of Appearance by Emma Simson on behalf of DISTRICT OF COLUMBIA (Simson, Emma) (Entered: 10/24/2025) | |
| 74 | 10/24/2025 | NOTICE OF FILING REDACTED DOCUMENT to 3 MOTION for Preliminary Injunction and Section 705 Stay by DISTRICT OF COLUMBIA (Attachments: # 1 Updated Supplemental Brief)(Simon, Eliza) (Entered: 10/24/2025) | |
| 75 | 10/24/2025 | NOTICE of Appearance by Alicia Lendon on behalf of DISTRICT OF COLUMBIA (Lendon, Alicia) (Entered: 10/24/2025) | |
| 76 | 10/24/2025 | NOTICE OF ERRATA by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE re 72 Supplemental Memorandum, (Azimpoor, Kian) (Entered: 10/24/2025) | |
| | 10/24/2025 | Minute Entry for Motion Hearing held before Judge Jia M. Cobb on 10/24/2025. Oral arguments submitted on Plaintiff's Motion 3 for Preliminary Injunction and Defendants' Motion 35 to Dismiss for Lack of Jurisdiction. Court takes matters under advisement. Forthcoming Order. Defendants' oral motion for extension of time to file motion, HEARD AND GRANTED. Defendants' motion deadline extended to 10/28/2025. Court Reporter: Stacy Johns. (zljn) (Entered: 10/24/2025) | |
| 77 | 10/28/2025 | Consent MOTION for Extension of Time to File Motion to Seal Plaintiff's Exhibits by PAMELA BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Text of Proposed Order)(Rosenberg, Brad) (Entered: 10/28/2025) | |
| 79 | 10/29/2025 | Consent MOTION for Extension of Time to File Motion to Seal Plaintiff's Exhibits by PAMELA BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Text of Proposed Order)(Rosenberg, Brad) (Entered: 10/29/2025) | |
| | 10/30/2025 | MINUTE ORDER re 79 Consent Motion for Extension of Time: Defendants have filed a motion for an additional two-day extension of time to file their Motion to Seal Plaintiff's Exhibits. For good cause shown, Defendants' motion is GRANTED. It is ORDERED that Defendants shall have until October 31, 2025 to file their Motion to Seal Plaintiffs Exhibits. Signed by Judge Jia M. Cobb on October 30, 2025. (lcjmc2) (Entered: 10/30/2025) | |
| | 10/30/2025 | MINUTE ORDER denying 77 Motion for Extension of Time as moot: The Court has granted Defendants' 79 Motion for Extension of Time to file their Motion to Seal Plaintiff's Exhibits. Oct. 30 2025 Min. Order. The Court therefore DENIES Defendants' 77 Motion for Extension of Time as moot. Signed by Judge Jia M. Cobb on October 30, 2025. (lcjmc2) (Entered: 10/30/2025) | |

**JA034**

District Of Columbia V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 80 | 10/30/2025 | TRANSCRIPT OF PROCEEDINGS before Judge Jia M. Cobb held on October 24, 2025. Page Numbers: 1-106. Date of Issuance: October 30, 2025. Court Reporter: Stacy Johns. Email address: Stacy_Johns@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 11/20/2025. Redacted Transcript Deadline set for 11/30/2025. Release of Transcript Restriction set for 1/28/2026.(Johns, Stacy) (Entered: 10/30/2025) | |
| 81 | 10/31/2025 | NOTICE REGARDING EXTENSION OF DISTRICT OF COLUMBIA NATIONAL GUARD MISSION by PAMELA BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE (Azimpoor, Kian) (Entered: 10/31/2025) | |
| 82 | 10/31/2025 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAMELA BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Azimpoor, Kian) (Entered: 10/31/2025) | |
| 83 | 10/31/2025 | NOTICE OF FILING OF UNSEALED ExhibitS by PAMELA BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE (Attachments: # 1 Exhibit)(Azimpoor, Kian) (Entered: 10/31/2025) | |
| 84 | 11/05/2025 | ORDER granting 82 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Jia M. Cobb on 11/05/2025. (zljn) (Entered: 11/05/2025) | |
| 85 | 11/13/2025 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by DISTRICT OF COLUMBIA (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Opposition to Motion to Seal)(Simon, Eliza) (Entered: 11/13/2025) | |
| 86 | 11/13/2025 | NOTICE of Appearance by Nicole Suzanne Hill on behalf of DISTRICT OF COLUMBIA (Hill, Nicole) (Entered: 11/13/2025) | |
| 87 | 11/18/2025 | NOTICE OF SUPPLEMENTAL AUTHORITY by DISTRICT OF COLUMBIA (Attachments: # 1 Exhibit 1)(Reich, Mitchell) (Entered: 11/18/2025) | |
| 88 | 11/20/2025 | MEMORANDUM OPINION re 3 Motion for Preliminary Injunction and 705 Stay: See document for details. Signed by Judge Jia M. Cobb on November 20, 2025. (lcjmc2) (Entered: 11/20/2025) | |

**JA035**

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 89 | 11/20/2025 | ORDER granting 3 Motion for Preliminary Injunction and Section 705 Stay; denying in part and deferring in part 35 Motion to Dismiss: See document for details. Signed by Judge Jia M. Cobb on November 20, 2025. (lcjmc2) (Entered: 11/20/2025) | |
| 90 | 11/20/2025 | NOTICE OF FILING OF UNSEALED ExhibitS by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE re 83 Notice (Other), (Attachments: # 1 Exhibit)(Azimpoor, Kian) (Entered: 11/20/2025) | |
| 91 | 11/20/2025 | REPLY to opposition to motion re 82 Sealed Motion for Leave to File Document Under Seal, filed by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Azimpoor, Kian) (Entered: 11/20/2025) | |
| 92 | 11/25/2025 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 88 Memorandum & Opinion, 89 Order on Motion to Dismiss/Lack of Jurisdiction,, Order on Motion for Preliminary Injunction, Order on Motion to Stay by UNITED STATES DEPARTMENT OF JUSTICE, GADYACES S. SERRALTA, DONALD J. TRUMP, DANIEL P. DRISCOLL, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES MARSHALS SERVICE, PAMELA J. BONDI, PETER B. HEGSETH, UNITED STATES ARMY. Fee Status: No Fee Paid. Parties have been notified. (Azimpoor, Kian) (Entered: 11/25/2025) | |
| 93 | 11/25/2025 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 92 Notice of Appeal to DC Circuit Court,. (znmw) (Entered: 11/25/2025) | |
| | 11/25/2025 | USCA Case Number 25-5418 for 92 Notice of Appeal to DC Circuit Court, filed by PETER B. HEGSETH, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DEPARTMENT OF DEFENSE, PAMELA J. BONDI, DANIEL P. DRISCOLL, UNITED STATES MARSHALS SERVICE, GADYACES S. SERRALTA, UNITED STATES ARMY. (mg) (Entered: 12/01/2025) | |
| 94 | 12/01/2025 | ORDER granting 85 Sealed Motion for Leave to File Document Under Seal. Signed by Judge Jia M. Cobb on 12/1/2025. (zed) (Entered: 12/01/2025) | |
| 95 | 12/01/2025 | SEALED OPPOSITION filed by DISTRICT OF COLUMBIA re 82 Sealed Motion for Leave to File Document Under Seal, (znmw) (Entered: 12/02/2025) | |
| 96 | 12/04/2025 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Text of Proposed Order)(Azimpoor, Kian) (Entered: 12/04/2025) | |
| | 12/04/2025 | MINUTE ORDER granting 96 Motion for Extension of Time to Answer: Defendants have filed a motion for an extension of time to file their answer to Plaintiff's complaint. For good cause shown, Defendants' motion is GRANTED. It is ORDERED that Defendants shall have until January 9, 2026, or 14 days after the | |

**JA036**

District Of Columbia V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Court fully resolves the remainder of the motion to dismiss, whichever is later, to file their answer to Plaintiff's complaint. Signed by Judge Jia M. Cobb on December 4, 2025. (lcjmc2) (Entered: 12/04/2025) | |
| 97 | 01/06/2026 | MOTION for Briefing Schedule for Summary Judgment Briefing by DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order)(Simon, Eliza) Modified event on 1/7/2026 (znmw). (Entered: 01/06/2026) | |
| 98 | 01/16/2026 | MOTION to Stay Further District Court Proceedings by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Azimpoor, Kian) (Entered: 01/16/2026) | |
| 99 | 01/16/2026 | RESPONSE re 97 MOTION for Briefing Schedule for Summary Judgment Briefing filed by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Attachments: # 1 Text of Proposed Order)(Azimpoor, Kian) (Entered: 01/16/2026) | |
| 100 | 01/20/2026 | NOTICE of Appearance by Brian Rene Frazelle on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Frazelle, Brian) (Entered: 01/20/2026) | |
| 101 | 01/21/2026 | REPLY to opposition to motion re 97 Motion for Briefing Schedule for Summary Judgment Briefing filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order)(Reich, Mitchell) (Entered: 01/21/2026) | |
| 102 | 01/21/2026 | RESPONSE re 98 MOTION to Stay Further District Court Proceedings filed by DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order)(Reich, Mitchell) (Entered: 01/21/2026) | |
| 103 | 01/27/2026 | MOTION for Leave to File Amicus Brief by MIKE HOWELL, OVERSIGHT PROJECT. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Dewey, Samuel) (Entered: 01/27/2026) | |
| 104 | 01/28/2026 | REPLY to opposition to motion re 98 Motion to Stay, Further District Court Proceedings filed by PAMELA J. BONDI, DANIEL P. DRISCOLL, PETER B. HEGSETH, GADYACES S. SERRALTA, DONALD J. TRUMP, UNITED STATES ARMY, UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES MARSHALS SERVICE. (Azimpoor, Kian) (Entered: 01/28/2026) | |
| 105 | 03/02/2026 | ORDER denying without prejudice 35 Motion to Dismiss; denying 97 Motion for Briefing Schedule; granting 98 Motion to Stay: See document for details. Signed by Judge Jia M. Cobb on March 2, 2026. (lcjmc2) (Entered: 03/02/2026) | |
| | 03/02/2026 | MINUTE ORDER denying 103 Motion for Leave to File Amicus Brief: Upon consideration of non-party the Oversight Project's 103 motion for leave to file an amicus brief, the Court DENIES the motion. Defendants take no position on this motion and Plaintiff has opposed. The motion is DENIED because the Court does not need briefing by amici on routine procedural issues. Signed by Judge Jia M. Cobb on March 2, 2026. (lcjmc2) (Entered: 03/02/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**JA037**

**JA038**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **DISTRICT OF COLUMBIA**, 400 6th Street NW Washington, D.C. 20001 | |
| Plaintiff, | Case No.: 1:25-cv- |
| v. | **COMPLAINT** |
| **DONALD J. TRUMP**, *in his official capacity as President of the United States*, 1600 Pennsylvania Ave. NW Washington, D.C. 20500 | |
| **UNITED STATES DEPARTMENT OF DEFENSE**, 1000 Defense Pentagon Washington, D.C. 20301-1400 | |
| **PETER HEGSETH**, *in his Official Capacity as Secretary of Defense*, 1000 Defense Pentagon Washington, D.C. 20301-1400 | |
| **UNITED STATES ARMY**, 101 Army Pentagon Washington, D.C. 20310-0101 | |
| **DANIEL P. DRISCOLL**, *in his Official Capacity as Secretary of the Army*, 101 Army Pentagon Washington, D.C. 20310-0101 | |
| **UNITED STATES DEPARTMENT OF JUSTICE**, 950 Pennsylvania Avenue NW Washington, D.C. 20530 | |

**JA039**

|  |  |
|---|---|
| **PAMELA J. BONDI**, *in her official capacity as United States Attorney General,*<br>    950 Pennsylvania Avenue NW<br>    Washington, D.C. 20530<br><br>**UNITED STATES MARSHALS SERVICE**,<br>    1215 South Clark Street<br>    Arlington, VA 22202<br><br>**GADYACES S. SERRALTA**, *in his official capacity as Director of the United States Marshals Service,*<br>    1215 South Clark Street<br>    Arlington, VA 22202<br><br>            Defendants. |  |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Over 2,200 National Guard troops from seven states and the District of Columbia are currently patrolling the streets of the District dressed in military fatigues, carrying rifles, and driving armored vehicles. The U.S. Department of Defense has directed these troops to conduct core law enforcement activities, including "presence patrols" and "community patrols." The U.S. Department of Justice has also deputized these troops to engage in additional law enforcement activities, including searches, seizures, and arrests. And despite the fact that these troops are in state militia status—and thus are legally required to be under the sole command of their governors—the President has placed them under the control of the nation's military leadership, which exercises day-to-day supervision over the law enforcement operations they have been designated to conduct.

2.      The residents and leaders of the District of Columbia have not requested any of this. But the President has determined that the District, which he has called a "filthy and crime ridden embarrassment," should be "federalize[d]," so that his Administration can "run it the way

it's supposed to be run." He has therefore disregarded Congress's decision, half a century ago, to afford the residents of the District "the powers of local self-government," including the authority to police the District as they see fit. In so doing, he has run roughshod over a fundamental tenet of American democracy—that the military should not be involved in domestic law enforcement.

3.      None of this is lawful. For one thing, Defendants' deployment of National Guard units to police District streets without the Mayor's consent violates both the Home Rule Act and a congressionally approved compact governing the interstate mobilization of state National Guard troops. More than fifty years ago, Congress exercised its constitutional authority "[t]o exercise exclusive Legislation, in all Cases whatsoever, over [the] District," U.S. Const. Art. I, § 8, cl. 17, to vest the residents of the District with control over "local District matters." Congress gave the President no role in policing the District. What is more, the interstate compact that Congress approved entitles the District alone to determine when to "request" emergency assistance, including "National Guard forces," from other states. Neither the President nor the military he controls may supplant these judgments by deciding for themselves how to police the District or by unilaterally inviting other states to send National Guard forces to "assist" the District.

4.      Furthermore, Defendants' command and control of out-of-state National Guard units when they are in state militia status violates the Constitution and federal law. That is because the Constitution and federal law reserve to the states the authority to command National Guard forces unless and until they have been placed into active federal service. The President has not federalized any of the out-of-state forces he has foisted on the District. The federal government therefore may not lawfully command them or control their day-to-day operations, as it is doing here.

5.      And Defendants' actions flout the Posse Comitatus Act and its counterpart, 10 U.S.C. § 275, which enshrine the nation's foundational prohibition on the participation of military forces in domestic law enforcement absent the most extreme exigencies, such as an invasion or rebellion. Defendants have established a massive, seemingly indefinite law enforcement operation in the District subject to direct military command. The danger that such an operation poses to individual liberty and democratic rule is self-evident.

6.      These unprecedented, unlawful actions have subjected the District to serious and irreparable harm. The deployment of National Guard troops to police District streets without the District's consent infringes on its sovereignty and right to self-governance. The deployment also risks inflaming tensions and fueling distrust toward local law enforcement. And it inflicts economic injuries, depressing business activities and tourism that form the backbone of the local economy and tax base.

7.      No American jurisdiction should be involuntarily subjected to military occupation. The District of Columbia brings this lawsuit to obtain declaratory and injunctive relief that will stop Defendants' violations of law, remedy the harms Defendants are inflicting on the District, and preserve the District's sovereignty.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331.

9.      There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 704-706, and the Court's equitable powers.

10.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The District of

Columbia is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur in the District.

## **PARTIES**

11.    Plaintiff the District of Columbia (the District) is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest. D.C. Code § 1-301.81.

12.    Defendant Donald J. Trump is the President of the United States. He is the Commander-in-Chief of the United States' armed forces, including the District of Columbia National Guard and state National Guard units when under federal control. He is sued in his official capacity.

13.    Defendant United States Department of Defense (DOD) is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f). DOD is responsible for coordinating the activities of the United States' armed forces, including the National Guard when under federal control. DOD also directs the activities of the District of Columbia National Guard pursuant to a delegation from the President. DOD is headquartered in Washington, D.C.

14.    Defendant Peter Hegseth is the Secretary of Defense. As Secretary, Defendant Hegseth is responsible for all actions taken by the agency. He is sued in his official capacity.

15. Defendant United States Army (Army) is the primary land service branch of the United States military. The Army is a component of DOD, which is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

16. Defendant Daniel P. Driscoll is the Secretary of the Army. He is the leader of the Army and is responsible for all actions taken by the Army. He is sued in his official capacity.

17. Defendant United States Department of Justice (DOJ) is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f). DOJ is headquartered in Washington, D.C.

18. Defendant Pamela J. Bondi is the Attorney General of the United States. Attorney General Bondi is responsible for all aspects of the operation and management of DOJ, including implementing and fulfilling DOJ's duties under the Constitution and statutory law. She is sued in her official capacity.

19. Defendant U.S. Marshals Service (USMS) is a federal law enforcement agency within DOJ responsible for enforcing federal laws and providing support for the federal justice system. It operates under the authority and direction of the Attorney General. 28 U.S.C. § 561. The United States Marshals Service is an agency within the meaning of 5 U.S.C. § 552(f).

20. Defendant Gadyaces S. Serralta is the Director of the USMS. He is responsible for all aspects of the operation and management of the U.S. Marshals Service. He is sued in his official capacity.

21. Defendants Department of Defense, Secretary of Defense Peter Hegseth, Department of the Army, and Secretary of the Army Daniel P. Driscoll are collectively referred to in this complaint as "DOD Defendants."

22.    Defendants United States Department of Justice, Attorney General Pamela J. Bondi, U.S. Marshals Service, and USMS Director Gadyaces S. Serralta are collectively referred to in this complaint as "DOJ Defendants."

**LEGAL FRAMEWORK**

**A.    The National Guard**

23.    At the nation's founding, the Framers divided control over state militias in order to protect "individual liberty" and "the sovereignty of the separate States." *Perpich v. Dep't of Defense*, 496 U.S. 334, 340 (1990). The Founding generation "strongly disfavored standing armies" and believed that "adequate defense of country and laws could be secured through the Militia"—a force composed of "civilians primarily, soldiers on occasion." *United States v. Miller*, 307 U.S. 174, 179 (1939). At the same time, the experience of the Revolutionary War and the Articles of Confederation taught the Founding generation that "[t]he steady operations of war" required "a regular and disciplined army" under centralized federal command. The Federalist No. 25 (Alexander Hamilton).

24.    The Constitution therefore reflects a compromise. It "reserv[es] to the States" the principal power over the "Militia," including the authority to appoint its officers, train its members, and "govern[] such Part of them" as are not in federal service. U.S. Const. art. I, § 8, cl. 16. At the same time, the Constitution vests Congress with authority "[t]o raise and support Armies" for terms of no longer than "two years." *Id.* art. I, § 8 cl. 12. It also grants Congress the powers necessary to ensure that the Militia is a professional force available for national emergencies: it states that Congress may provide for "organizing, arming, and disciplining, the Militia," *id.* art. I, § 8, cl. 16,

and for "calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions," *id.* art. I, § 8, cl. 15.

25.     The National Guard is the modern Militia. It is governed by a statutory framework that embodies the careful balance struck in the Constitution. In general, National Guard units are under the command of the states.

26.     A state National Guard unit may be activated by its governor to perform state law duties under state command and control, funded by the state, and with pay and benefits determined by state law. This is known as "state active duty status."

27.     National Guard units are also subject to general rules of organization, training, and discipline set forth in Title 32 of the U.S. Code. At the request of the President or Secretary of Defense, a state National Guard unit may be activated by its state governor to perform training or duty under state command and control, funded by the federal government, with pay and benefits determined by federal law. This is known as "Title 32 status." *See* 32 U.S.C. § 502(f).

28.     In rare circumstances, set forth in Title 10 of the U.S. Code, the President may activate the National Guard, thereby making it part of the federal military subject to his direct control. This is known as "Title 10 status." But these circumstances are limited to the most severe exigencies. They include cases in which a state "request[s]" federal aid to suppress an "insurrection . . . against its government," 10 U.S.C. § 251, or when the United States "is invaded or is in danger of invasion by a foreign nation," *id*. § 12406(1).

29. The District of Columbia National Guard (DCNG) is unique because, regardless of duty status, the President of the United States is always its Commander-in-Chief. D.C. Code § 49-409.

30. The circumstances in which the President may call out the D.C. National Guard in its state-equivalent militia status are circumscribed by statute. For instance, the President may activate the DCNG to "aid the civil authorities in the execution of the laws," D.C. Code § 49-404, only when there is a "tumult, riot, mob," or similar disturbance, and the Mayor, the U.S. Marshal for the District, or the National Capital Service Director requests aid. *Id.* § 49-103.

31. One of the DCNG's elements is the Joint Task Force – District of Columbia (Joint Task Force-DC), a mission-specific entity that typically operates as an organizational umbrella for larger local or federal efforts.[1] The command structure of the Joint Task Force-DC falls completely under the DCNG and, therefore, under the President as Commander-in-Chief of the DCNG.

**B. Home Rule in the District of Columbia**

32. The Constitution vests Congress with the authority "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia]." U.S. Const. art. I, § 8, cl. 17. The Framers granted Congress this "exclusive" authority to make clear that other states—including but not limited to those that ceded land to create the capital—would not interfere with or attempt to regulate the nation's seat of government. *See* The Federalist No. 43 (James Madison).

33. For much of the nation's history, Congress chose to govern the District directly, with little input or control from its residents.

---

[1] DOD, District of Columbia National Guard: Fact Sheet (Aug. 6, 2019), https://media.defense.gov/2019/Aug/06/2002167361/-1/-1/1/DISTRICT%20OF%20COLUMBIA%20NATIONAL%20GUARD%20FACT%20SHEET%2008.06.2019.PDF.

34.     During that period, Congress established a District of Columbia militia, which it later renamed the DC National Guard. *See* Act of Mar. 1, 1889, 25 Stat. 773, ch. 328 (codified as amended at D.C. Code §§ 49-101 *et seq.*).

35.     Congress made the President "Commander-in-Chief" of the DCNG, D.C. Code § 49-404, and gave him control over its operations: he directly appoints and commissions a Commanding General, who prescribes "such drills, inspections, parades, escort, or other duties, as he may deem proper," *id.* §§ 49-102, 49-301; approves "regulations for the government of the militia," *id.* § 49-805; and appoints all of its officers, *id.* § -49-305. During a "tumult, riot, mob," or similar civil disturbance, he may also grant requests by local leadership to "order out so much and such portion of the militia as he may deem necessary to suppress the same." *Id.* § 49-103.

36.     In 1973, after decades of struggle, Congress enacted the District of Columbia Home Rule Act (HRA), Pub. L. No 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code §§ 1-201.01 *et seq.*), which grants the residents of the District "powers of local self-government" and authority over "local District matters," D.C. Code § 1-201.02(a).

37.     To that end, Congress "delegate[d]" to the District government authority over "all rightful subjects of legislation within the District." *Id.* §§ 1-201.02(a), 1-203.02. It authorized the residents to elect a Mayor vested with "[t]he executive power of the District," *id.* § 1-204.22(a), and a Council vested with all of Congress's delegated "legislative power[s]," *id.* § 1-204.04(a).

38.     Pursuant to a statute enacted by Congress, the Mayor's responsibilities include the duty to "preserve the public peace," "prevent crime and arrest offenders," and otherwise "enforce and obey all laws and ordinances in force in the District." D.C. Code § 5-101.03(1), (2), (10). It also includes the power to appoint "all officers and members of [the] Metropolitan Police force," *id.* § 5-105.01, determine the "[c]omposition of [the] force," *id.* § 5-105.05, and to set the rules

governing the Metropolitan Police Department (MPD), subject to any legislation enacted by the Council or by Congress.

39.    Congress reserved for itself control over certain matters it deemed of federal concern—for instance, the authority to enact legislation "that concerns the functions of property of the United States" or that is "not restricted in its application exclusively in or to the District." *Id.* § 1-206.02(a)(3). But it otherwise gave the people of the District the right to govern themselves.

40.    By contrast, Congress gave the President an extremely limited role in District affairs. Under the HRA, the President may nominate a small set of District officials. *E.g.*, *id.* §§ 1-204.33, 1-204.34. In "special conditions of an emergency nature," he also may request that the Mayor provide "the services of the Metropolitan police force" for "federal purposes," for a period of no more than 30 days. *Id.* § 1-207.40(a).

41.    The Home Rule Act also states that the District government may not exercise "any greater authority over . . . the National Guard of the District of Columbia" than it did prior to Home Rule—indicating that the President must retain his command role in that organization. *Id.* § 1-206.02(b). But apart from these limited powers, Congress gave the President essentially no authority to oversee the District or control its governance.

## C.    Emergency Management Assistance Compact

42.    All 50 states, four U.S. territories, and the District of Columbia have entered into an interstate compact, known as the Emergency Management Assistance Compact (Assistance Compact), that governs the deployment of non-federalized National Guard units between jurisdictions. *See* H.J. Res. 193, 104th Cong. (1996).

43.    The Assistance Compact provides that "states"—defined to include the District of Columbia—may deploy emergency assistance to another state upon "request." *Id.* arts. I, III.B.

44. Once sent into another state, "emergency forces" come under "the operational control . . . of the state receiving assistance" and "shall be considered agents of the requesting state." *Id.* arts. IV, VI.

45. The Assistance Compact specifies that "[m]utual assistance in this compact may include the use of states' National Guard forces, either in accordance with" an interstate compact "or by mutual agreement between states." *Id.* art. I.

46. Congress and the President assented to the Assistance Compact in 1996, giving it the status of federal law. Emergency Management Assistance Compact, Pub. L. No. 104-321, 110 Stat. 3877 (1996); *see Cuyler v. Adams*, 449 U.S. 433, 438 (1981).

47. The Council of the District of Columbia subsequently authorized the Mayor to "execute" the compact. D.C. Code § 7-2332. Accordingly, since 2002, the Mayor has been responsible for determining when to "request" the deployment of other states' National Guard forces into the District. *Id.* art. III.B.

**D. The Posse Comitatus Act**

48. Even when the President assumes or exercises control of the National Guard, Congress has sharply limited his authority to use the National Guard for domestic law enforcement purposes.

49. During the nineteenth century, United States Marshals increasingly used the common law power of "posse comitatus"—a Latin phrase that translates roughly to "the power of the county" or "the power of the sheriff"—to deputize citizens, including members of militias and the military, to aid in the enforcement of federal laws. In 1878, Congress rejected this practice and enacted the Posse Comitatus Act (PCA), 18 U.S.C. § 1385, codifying a fundamental principle of

American democracy: military forces are, as a general matter, strictly prohibited from engaging in domestic law enforcement.

50.     The PCA provides that no person may "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws," except where "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

51.     Because the federalization of National Guard troops makes them part of the federal military, this Act applies to any part of the National Guard that is under federal command and control. When National Guard units are brought into federal service, the PCA applies to them, absent an express statutory exception.

52.     Congress has also enacted a statute that extends PCA-like limits to military establishments not initially covered by the PCA.  In 10 U.S.C. § 275, it required the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any activity . . . under this chapter does not include or permit direct participation by any member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity," unless "otherwise authorized by law."  10 U.S.C. § 275.  The Secretary has implemented this requirement by issuing a policy directive that generally bars nearly all "DoD personnel" from providing "direct civilian law enforcement assistance," including but not limited to "a search or seizure," an "arrest" or "apprehension," and "security functions" or "crowd and traffic control." Dep't of Defense Instruction No. 3025.21, at 18-19 (updated Feb. 8, 2019).

## FACTUAL ALLEGATIONS

**A.    The President Has Launched an Unprecedented Assault on the District's Sovereignty.**

53.    Despite more than 50 years of local self-governance in the District, President Trump has repeatedly threatened to infringe on the District's home rule, falsely asserting that the District is lawless and disparaging its appearance.

54.    In March 2023, then-candidate Trump declared that "the federal government should take over control and management of Washington, DC," which he claimed was "littered with trash."[2] Similarly, in August 2023, Trump remarked on social media that he was "calling for a federal takeover of this filthy and crime ridden embarrassment to our nation."[3]

55.    In a November 2023 campaign speech, he promised that the District would "become the most beautiful capital anywhere in the world. We're going to take over the capital and we're going to make it beautiful, we are going to make it safe, we're going to make it great."[4]

56.    In January 2024, then-candidate Trump reiterated, "We're . . . going to federalize Washington DC. It's become hell on earth . . . . . [Y]ou can't even walk through the best areas without being molested or shot, beat up by thugs. We're going to take over Washington DC, and we're going to make it great again."[5]

---

[2] Video posted by Aaron Rupar (@atrupar), X (Mar. 4, 2023, at 6:59 ET) https://x.com/atrupar/status/1632168980130455553?lang=ms.

[3] Shawna Mizelle & Katelyn Polantz, *Trump claims he can't get a fair trial in DC as latest indictment dominates GOP* primary, CNN (Aug. 7, 2023), https://www.cnn.com/2023/08/06/politics/trump-fair-trial-court-case-dc-venue-change/index.html.

[4] Oliver Browning, *Trump vows to 'take over' Washington DC: 'We are going to make it beautiful'*, Independent (Nov. 20, 2023), https://www.the-independent.com/tv/news/trump-iowa-speech-washington-election-b2450354.html.

[5] *Speech: Donald Trump Holds a Campaign Rally in Mason City, Iowa – January 5, 2024*, Factbase, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-mason-city-iowa-january-5-2024/ (01:19:01-01:19:33 timestamp).

57.     Similarly, in July 2024, after making assertions about crime in the District, then-candidate Trump declared, "[W]e're going to take it away from the mayor. . . . [T]hat doesn't make me popular there, but I have to say it."[6]

58.     President Trump's attacks on the District's independence and local autonomy have continued since he re-entered office. On February 19, 2025, President Trump told reporters, "I think that we should govern the District of Columbia . . . I think that we should run it strong, run it with law and order, make it absolutely flawless . . . And I think we should take over Washington, DC . . . We should govern DC. The federal government should take over the governance of DC . . . [T]hey're not doing the job—too much crime, too much graffiti, too many tents on the lawn."[7]

59.     On March 14, 2025, in remarks at DOJ headquarters, President Trump declared, "we're gonna have to take [DC] back and run it through the federal government."[8]

60.     On March 27, 2025, President Trump promulgated Executive Order 14252, "Making the District of Columbia Safe and Beautiful" (the March 27 Executive Order). 90 Fed. Reg. 14559 (Apr. 3, 2025).  The March 27 Executive Order directed federal agencies to coordinate on tasks including "directing maximum enforcement of Federal immigration law and redirecting available Federal, State, or local law enforcement resources to apprehend and deport illegal aliens in the Washington, D.C. metropolitan area" and increasing enforcement of a variety of local criminal laws, including "those prohibiting assault, battery, larceny, graffiti and other vandalism,

---

[6] Mark Segraves, *Here's what a second Trump presidency could mean for DC*, NBCWashington, https://www.nbcwashington.com/news/local/heres-what-a-second-trump-presidency-could-mean-for-dc/3762595/.

[7] Screenshot of White House Press Pool posted by Jake Sherman (@JakeSherman), X (Feb. 19, 2025, at 9:55 ET), https://x.com/JakeSherman/status/1892407773603778589/photo/1.

[8] Julia Mueller, *Trump suggests federal government take over DC if local leaders 'can't do the job'*, The Hill (Mar. 14, 2025), https://thehill.com/homenews/administration/5195711-trump-dc-federal-government-takeover/.

unpermitted disturbances and demonstrations, noise, trespassing, public intoxication, drug possession, sale, and use, and traffic violations." 90 Fed. Reg. at 14560.

61. In early August, President Trump's threats accelerated following a highly publicized incident involving a former staff member of the Department of Government Efficiency (DOGE). Around 3:00 a.m. on August 3, the former DOGE staffer was reportedly assaulted by a group of teenagers. The District's MPD quickly responded to the incident and apprehended two suspects.

62. Two days later, President Trump posted to his social media platform, Truth Social, a photo of a young man—identified by others as the former DOGE staffer—bloodied and with wounds to his face. In this post, the President claimed that "[c]rime in Washington, D.C., is totally out of control," and he renewed threats to "federalize" the District in light of the attack.[9]

63. Over the following days, President Trump continued to threaten to take control of the District, purportedly for the purpose of addressing local crime:

- On August 5, 2025, the President told reporters, "[s]omebody from DOGE was very badly hurt last night. You saw that. A young man that was beat up by a bunch of thugs in D.C. And either they're going to have to straighten out their act in the terms of government and in the terms of protection or we're going to have to federalize it, run it the way it's supposed to be run."[10]

- On August 6, 2025, President Trump stated, "We're considering [taking federal control over law enforcement] because the crime is ridiculous . . . Now we want to

---

[9] Donald J. Trump (@realDonaldTrump), TruthSocial (Aug. 05, 2025, at 4:13 ET), https://truthsocial.com/@realDonaldTrump/posts/114977985620971126.
[10] TIME, *Trump Threatens to Federalize D.C. After Beating of 'Big Balls'*, at 0:05-0:24 (YouTube, Aug. 5, 2025), https://www.youtube.com/watch?v=Fb7yKvOQE_c.

have a great, safe capital, and we're gonna have it, and that includes cleanliness and it includes other things. . . . We're going to do something about it, so whether you call it federalize or what—and that also includes the graffiti that you see, the papers all over the place, the roads that are in bad shape, the medians that are falling down . . . And what a shame—the rate of crimes, the rate of muggings, killings, and everything else. And that includes bringing in the National Guard, maybe, very quickly."[11]

64.    On August 9, 2025, the President announced in a social media post that he would soon hold a press conference that "will, essentially, stop violent crime in Washington, D.C." In the post, he claimed the District is "one of the most dangerous cities anywhere in the World," and that it would "soon be one of the safest!!!"[12]

65.    The President's statements, including his statements that crime in the District is rising, are hyperbolic and inconsistent with the facts. Publicly available data from both federal and local sources demonstrate that violent crime in the District has been and is trending significantly downward.

66.    According to the U.S. Department of Justice, "[t]otal violent crime for 2024 in the District of Columbia [was] down 35% from 2023 and [was] the lowest it [had] been in over 30 years."[13]

---

[11] News18, *Trump Teases Takeover of* DC (Facebook, Aug.7, 2025 at 4:55 a.m.), https://www.facebook.com/cnnnews18/videos/787799723585929/.

[12] Donald J. Trump (@realDonaldTrump), TruthSocial (Aug.9, 2025, at 9:40 a.m.), https://truthsocial.com/@realDonaldTrump/posts/114999087271735961.

[13] Press Release, U.S. Att'y's Off. for D.C., Violent Crime in D.C. Hits 30 Year Low (Jan. 3, 2025), https://www.justice.gov/usao-dc/pr/violent-crime-dc-hits-30-year-low.

67.     That downward trend has continued. In 2025, violent crime is down 26% from this time in 2024, 51% from this time in 2023, and 35% from 2019, prior to the pandemic.

68.     Both President Trump and the U.S. Attorney's Office for the District of Columbia have acknowledged that in 2025, prior to the attempted takeover of MPD or deployment of any National Guard troops in the District, violent crime in D.C. was declining.

69.     In an April 28, 2025 press release, former interim U.S. Attorney Ed Martin, Jr. marked the first 100 days of President Trump's second term "by highlighting a 25 percent drop year-to-date in violent crime across the District, credited in part to the 'Make D.C. Safe Again' initiative and the U.S. Attorney's partnership with the Bureau of Alcohol, Tobacco, Firearms, and Explosives and [the] Metropolitan Police Department."[14]

70.     Shortly thereafter, on May 7, 2025, President Trump praised Mr. Martin, stating that on his watch, "[c]rime is down in Washington, D.C.—street crime, violent crime—by 25%. And it's . . . people have seen . . . they've noticed a big difference."[15]

**B.     The President Ordered the Secretary of Defense to Deploy National Guard Troops.**

71.     On August 11, 2025, flanked by Defendant Hegseth, Defendant Driscoll, Defendant Serralta, Defendant Bondi, and other officials, the President carried through on the threats he had been making for more than two years.[16] In a press conference in the White House briefing room, he "announc[ed] a historic action to rescue our nation's capital from crime, bloodshed, bedlam,

---

[14] Press Release, U.S. Att'y's Off. for D.C., U.S. Attorney Ed Martin, Jr. Credits President Trump's First 100 Days with 25% Drop in D.C. Violent Crime (Apr. 28, 2025), https://www.justice.gov/usao-dc/pr/us-attorney-ed-martin-jr-credits-president-trumps-first-100-days-25-drop-dc-violent.

[15] The White House, *President Trump Swears in the Ambassador to the People's Republic of China*, at 13:24-13:39 (YouTube, May 7, 2025), https://www.youtube.com/watch?v=MydfT0rCkZ8.

[16] Video posted by The White House (@WhiteHouse), X, *President Trump Holds a Press Conference* (Aug. 11, 2025, at 10:36 a.m.), https://x.com/WhiteHouse/status/1954914776527589534.

and squalor, and worse." He continued, "[t]his is liberation day in DC and we're gonna take our capital back. We're taking it back."[17]

72.    In addition to invoking Section 740 of the Home Rule Act to purportedly "place[] the D.C. Metropolitan Police Department under direct federal control,"[18] the President announced that he was "deploying the National Guard to help reestablish law, order, and public safety in Washington, D.C." "[W]e will bring in the military if needed," he added. The President also signaled that his appetite for military intervention extended far beyond his initial deployment of 800 DCNG troops, confirming his administration would deploy "much more, if necessary, much more. You remember, I said I offered 10,000 once."[19]

73.    The same day as the press conference, the President issued a memorandum (the August 11 Memorandum) to the Secretary of Defense titled "Restoring Law and Order in the District of Columbia."[20]

74.    Section One of the August 11 Memorandum repeats the claim that the District is "under siege from violent crime" and asserts that the President has a "solemn duty to protect law-abiding citizens from the destructive forces of criminal activity."

---

[17] *Id.* at 54:52-55:12.

[18] The Administration's efforts to seize direct control of the District's police department were quickly rebuffed in federal court. *See* Zach Montague, *D.C. Police Chief Retains Control of City Police After Court Hearing*, N.Y. Times (Aug. 15, 2025), https://www.nytimes.com/2025/08/15/us/politics/judge-hearing-dc-home-rule.html; *District of Columbia v. Trump*, No. 1:25-cv-02678 (D.D.C. filed Aug. 15, 2025).

[19] Video posted by The White House (@WhiteHouse), X, *President Trump Holds a Press Conference* (Aug. 11, 2025, at 10:36 a.m.), https://x.com/WhiteHouse/status/1954914776527589534.

[20] *Presidential Memoranda: Restoring Law and Order in the District of Columbia*, White House (Aug. 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/.

75.    In Section Two of the August 11 Memorandum, the President directed the Secretary of Defense to deploy the DCNG "in such numbers as [the Secretary of Defense] deems necessary."

76.    In Section Two, the President further directs "the Secretary of Defense to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission."

77.    After the President issued the August 11 Memorandum, Secretary of Defense Hegseth said that the mobilization would be "operationalized" by Secretary of the Army Driscoll and that National Guard members would be deployed in the streets of Washington, D.C. in the coming week.[21]

78.    Two weeks later, on August 25, 2025, President Trump issued an additional Executive Order (the August 25 Executive Order) that required the Secretary of Defense to "immediately create and begin training, manning, hiring, and equipping a specialized unit within the District of Columbia National Guard, subject to activation under Title 32 of the United States Code, that is dedicated to ensuring public safety and order in the Nation's capital." Additional Measures to Address the Crime Emergency in the District of Columbia, 90 Fed. Reg. 42121, 42121 (Aug. 28, 2025). Members of this unit are to be "deputize[d]. . . to enforce Federal law." *Id.*

**C.    Defendants Deployed National Guard Troops from Seven States in the District.**

79.    As directed by the President, Secretary of Defense Hegseth mobilized thousands of troops from across the country into the District.

---

[21] C. Todd Lopez, *National Guard Task Force Mobilizes to Restore Safety in Nation's Capital*, DOD News (Aug. 11, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4271502/national-guard-task-force-mobilizes-to-restore-safety-in-nations-capital/.

80.    In an interview on Fox News on the night of August 11, Defendant Hegseth said he was deploying troops to the District to act as "force multipliers" for local and federal law enforcement.[22]

81.    Comparing the law enforcement actions to come in D.C. with those that had recently taken place in Los Angeles, Defendant Hegseth stated, "[i]n 2025, there was a summer of law enforcement. And we quelled the protests [in Los Angeles] of the attacks on ICE officers. We're going to help get D.C. under control . . . . The D.C. [National] Guard's proud to be a part of it; other states will contribute. . . ."[23]

82.    In defending the President's decision to use the National Guard and the military for domestic law enforcement purposes, Hegseth continued: "He's got the guts to say, 'I'm gonna federalize the police that don't work; I'm gonna bring in the National Guard; I'm gonna bring in federal marshals; I'm gonna bring in the Park Police.'"[24]

83.    "They will be standing right alongside our federal agents, like they were in Los Angeles. They're going to be proactive. If you take an action or a shot at them, there will be a consequence," Hegseth told the host.[25]

84.    When the host then asked what the National Guard would do if law enforcement was not on the scene, Hegseth stated, "I will have their back to make sure they can take the necessary action to protect the citizens of D.C. and protect themselves. . . . You can help somebody, interdict, temporarily detain like we did in Los Angeles, and hand over to law enforcement."[26]

---

[22] Ingraham Angle, *Trump's 'got the guts' to do this: Pete Hegseth*, at 00:26-00:32 (FoxNews Live, Aug. 11, 2025), https://www.foxnews.com/video/6376809414112.
[23] *Id.* at 01:05-01:25.
[24] *Id.* at 2:25-2:37.
[25] *Id.* at 3:35-3:46.
[26] *Id.* at 3:49-4:19.

85.    According to Pentagon Press Secretary Kingsley Wilson, at the time of their original deployment, the DCNG troops were unarmed and following the DCNG rules for the use of force. While claiming that the DCNG troops would not conduct any arrests, Press Secretary Wilson also confirmed that this would be "very similar to the LA mission, where we could temporarily [detain] someone and then turn them over to the proper law enforcement authorities."[27]

86.    Then, between August 16 and August 31, 2025, at the request of the President and Defendant Driscoll, the states of Ohio, South Carolina, West Virginia, Mississippi, Tennessee, Louisiana, and South Dakota sent more than 1,300 National Guard troops from their own states into the District of Columbia.

87.    On August 16, 2025, Ohio Governor Mike DeWine deployed 150 National Guard Military Police Officers to the District.[28] Governor DeWine explained that the deployment request came from Defendant Driscoll and that the troops would "support the District of Columbia National Guard . . . [to] carry out presence patrols and serve as added security" in the District.[29]

88.    On August 16, 2025, South Carolina Governor Henry McMasters deployed 200 members of the South Carolina National Guard to the District, in order to "support federal law enforcement activities under President Donald J. Trump's executive order to Restore Law and

---

[27] C. Todd Lopez, *National Guard Mobilizes 800 Troops in D.C. to Support Federal, Local Law Enforcement,* DOD News (Aug. 14, 2025), https://www.defense.gov/News/News-Stories/Article/Article/4275149/national-guard-mobilizes-800-troops-in-dc-to-support-federal-local-law-enforcem/ (brackets in original).

[28] Press Release, Off. of the Governor of Ohio, Governor DeWine Issues Statement on Ohio National Guard (Aug. 16, 2025), https://governor.ohio.gov/media/news-and-media/governor-dewine-issues-statement-on-ohio-national-guard.

[29] *Id.*

22
**JA060**

Order in the District of Columbia," and "restore law and order to our nation's capital and ensure safety for all who live, work, and visit there." [30]

89.    On August 16, 2025, West Virginia Governor Patrick Morrisey deployed "approximately 300-400" members of the West Virginia National Guard, "to support the President's initiative to restore cleanliness and safety to Washington, D.C. . . . [and] as a show of commitment to public safety and regional cooperation." [31]

90.    On August 18, 2025, Louisiana Governor Jeff Landry deployed 135 members of the Louisiana National Guard "to assist President Donald J. Trump's mission of restoring safety and peace in our nation's capital . . . [and] to return safety and sanity to Washington DC and cities all across our country, including right here in Louisiana."[32] The Louisiana National Guard announced in a press release that, "as directed by the president of the United States," it was "federalizing and activating to Washington, D.C., to support the Metropolitan Police Department, the District of Columbia National Guard and D.C. local law enforcement beginning August 16, 2025."[33]

---

[30] Press Release, Off. of the Governor of South Carolina, Governor Henry McMaster Authorizes Deployment of National Guard to Washington, D.C. (Aug. 16, 2025), https://governor.sc.gov/news/2025-08/gov-henry-mcmaster-authorizes-deployment-national-guard-washington-dc.

[31] Press Release, Off. of the Governor of W. Virginia, West Virginia National Guard to Support President Trump's Initiative to Make D.C. Safe and Beautiful (Aug. 16, 2025) https://governor.wv.gov/article/west-virginia-national-guard-support-president-trumps-initiative-make-dc-safe-and-beautiful.

[32] Governor Jeff Landry (@LAGovJeffLandry), X (Aug. 18, 2025, at 5:04 p.m.), https://x.com/LAGovJeffLandry/status/1957549092562956743.

[33] Press Release, La. Nat'l Guard, La. National Guard Military Police to assist in Washington, D.C. (Aug. 18, 2025), https://geauxguard.la.gov/2025/08/18/la-national-guard-military-police-to-assist-in-washington-d-c/.

91.     On August 18, 2025, Mississippi Governor Tate Reeves deployed 200 members of the Mississippi National Guard to the District.[34] According to Governor Reeves, he approved deployment of the Mississippi National Guard "to support President Trump's effort to return law and order to our nation's capital."

92.     On or about August 18, 2025, Tennessee Governor Bill Lee deployed 160 members of the Tennessee National Guard to the District[35] "to assist with monument security, community safety patrols, protecting federal facilities, and traffic control" for "as long as needed."[36]

93.     On or about August 31, 2025, South Dakota Governor Larry Rhoden announced the deployment of 12 South Dakota National Guard troops to the District "at the request of President Donald J. Trump." The Governor stated that "[w]ith the National Guard's help, President Trump has restored law and order to our nation's capital—and our guardsmen will help keep it that way. We will not sit on the sidelines while crime threatens the safety of our families."[37]

94.     While it is not clear how many other governors received the President's request to deploy National Guard troops to the District, at least one more did. Governor Phil Scott of Vermont publicly declined the request because, "in the absence of an immediate emergency or disaster that

---

[34] Press Release, Off. of Governor of Mississippi, Governor Reeves Statement on Mississippi National Guard Deployment to Washington, D.C. (Aug. 18, 2025), https://governorreeves.ms.gov/governor-reeves-statement-on-mississippi-national-guard-deployment-to-washington-d-c/.

[35] Katie Glueck & Anushka Patil, *Tennessee Becomes Latest Republican-Led State to Send National Guard to D.C.*, N.Y. Times (Aug. 19, 2025), https://www.nytimes.com/2025/08/19/us/politics/tennessee-national-guard-dc-trump.html.

[36] Associated Press, *National Guard troops from Tennessee authorized by governor to patrol D.C.* streets, NewsChannel9 (Aug. 19, 2025), https://newschannel9.com/news/local/national-guard-troops-from-tennessee-authorized-by-governor-to-patrol-dc-streets.

[37] Press Release, Off. of Governor of South Dakota, Gov. Rhoden Mobilizes SDNG to DC at the Request of President Trump (Aug. 31, 2025), https://news.sd.gov/news?id=news_kb_article_view&sys_id=62fdcf1f47e7aa10701588ff336d43ea.

local and regional first responders are unable to handle," he did "not support utilizing the guard for this purpose, and [did] not view the enforcement of domestic law as a proper use of the National Guard."[38]

95.     Notably, most of the states that sent their troops into the District are home to cities presently reporting comparable or higher rates of violent crime than the District, including: Cleveland, Dayton, and Toledo, Ohio; Memphis and Nashville, Tennessee; Shreveport, Louisiana;[39] Jackson, Mississippi;[40] North Charleston, South Carolina;.[41] and Sioux Falls, South Dakota.[42]

**D.     The District Did Not Request Assistance from the Out-of-State National Guard Troops.**

96.     District Mayor Muriel Bowser, who under D.C. Code § 1-204.22 is "responsible for the proper execution of laws relating to the District, and for the proper administration of the affairs of the District," has repeatedly made it clear that she does not support the influx of National Guard troops in the District. Even before the deployment, the Mayor rejected the notion that the

---

[38] Peter Hirschfeld, *Phil Scott rejects second request to deploy Vermont National Guard, this time to Washington, D.C.*, Vermont Public (Aug. 15, 2025), https://www.vermontpublic.org/local-news/2025-08-15/phil-scott-rejects-request-deploy-vermont-national-guard-washington-d-c.

[39] David W. Chen, *Crime Festers in Republican States While Their Troops Patrol Washington*, N.Y. Times (Sept. 1, 2025), https://www.nytimes.com/2025/09/01/us/politics/crime-republican-states.html.

[40] The homicide rate in Jackson, Mississippi is more than four times that in the District. Shamira Muhammad, *Mississippi sent troops to back Trump's D.C. takeover despite its own high crime rates*, NPR (Aug. 20, 2025), https://www.npr.org/2025/08/20/nx-s1-5508089/mississippi-sent-troops-to-back-trumps-d-c-takeover-despite-its-own-high-crime-rates.

[41] *See Crime Statistics (Year-to-Date Comparison)*, City of N. Charleston, https://police.northcharleston.org/services/crime_stats_online_mapping.php.

[42] Cooper Seamer, *Violent crime rates slightly dip, property crime rates steady in Sioux Falls*, DakotaNewsNow (Oct. 1, 2024), https://www.dakotanewsnow.com/2024/10/01/violent-crime-rates-slightly-dip-property-crime-rates-steady-sioux-falls/.

National Guard was a proper tool for law enforcement, correctly noting that National Guard troops are "not law enforcement officials."[43]

97.     On August 11, Mayor Bowser called the deployment of the D.C. National Guard "unsettling and unprecedented."[44] On August 16, following the first announcements that other states were sending their National Guard units to the District, Mayor Bowser posted on social media that "American soldiers and airmen policing American citizens on American soil is #UnAmerican."[45] On August 25, Mayor Bowser reiterated that she "[does not] believe that troops should be policing American cities." [46]

98.     On August 27, as part of a presentation to the public relating to the federal surge of law enforcement in the District, the Mayor noted that "National Guard from other states" was part of "what's not working."[47]

99.     At no time did the Mayor or any other District official request the presence of National Guard troops in the District, under the Emergency Management Assistance Compact or by any other means, and the states that sent out-of-state National Guard troops did not seek the consent of the Mayor prior to sending their National Guard units to the District.

---

[43] Luke Garrett, *D.C. mayor defends capital's crime rates after Trump threatens to take over police*, NPR (Aug. 10, 2025), https://www.npr.org/2025/08/10/g-s1-81933/d-c-mayor-defends-capitals-crime-rates-after-trump-threatens-to-take-over-police.

[44] Aaron Pellish, *Washington mayor calls Trump's police order 'unsettling and unprecedented'*, POLITICO (Aug. 11, 2025), https://www.politico.com/news/2025/08/11/dc-mayor-trump-police-order-unsettling-unprecedented-00504209.

[45] Muriel Bowser (@MurielBowser), X (Aug. 16, 2025, at 9:31 p.m.), https://x.com/MurielBowser/status/1956891644076154962.

[46] Mark Sherman et al., 'Leave Our Kids Alone': *Schools Reopen in DC With Parents on Edge over Trump's Armed Patrols*, Military.com (Aug. 25, 2025), https://www.military.com/daily-news/2025/08/25/leave-our-kids-alone-schools-reopen-dc-parents-edge-over-trumps-armed-patrols.html.

[47] First slide image posted by Mayor Muriel Bowser (@MayorBowser), X (Aug. 27, 2025, at 2:52 pm), https://x.com/MayorBowser/status/1960777484510880111.

100.    The states that sent National Guard troops into the District have also provided virtually no information to the District regarding the deployments.

101.    On or around August 20 and 21, 2025, the Office of the Attorney General for the District of Columbia sent letters to Defendant Driscoll and to the Governors and Attorneys General of Ohio, South Carolina, West Virginia, Mississippi, Tennessee, and Louisiana, requesting information regarding the factual and legal basis for the states' decisions to deploy troops to the District as well as the operational details of their deployment.

102.    Specifically, the District's letters to these states requested information regarding (i) the source of the request for National Guard support, (ii) the legal authority offered by federal officials for the deployment, (iii) their stated mission, (iv) the scope of any law enforcement authority the units would exercise, (v) the command structure the units would follow, (vi) whether the units would be armed, (vii) the rules of force the units would follow, (viii) whether the units had been deputized by any federal law enforcement agencies, and (ix) the length of deployment.

103.    As of the date of this Complaint, only Tennessee has responded to the District's request, and it provided only limited information. On August 22, 2025, Tennessee informed the District that "upon orders from President Trump, Governor Lee granted the Administration's request to provide Tennessee National Guardsmen under Title 32 Status to assist the District of Columbia National Guard on a security mission in our nation's capital." Tennessee stated it had sent "[a]pproximately 160 service members" to "join the D.C. Joint Task Force and work alongside local and federal law enforcement agencies to assist with monument security, community safety patrols, protecting federal facilities, and traffic control." It noted that "the service members are ready to assist as long as needed."

104.    Tennessee did not respond to the District's question about the scope of the Tennessee National Guard's law enforcement authority while in the District, nor did it confirm the nature of their command structure, armed status, rules of force, or deputization status.[48]

**E.    All of the National Guard Units Deployed in the District Are Under Federal Command and Control.**

105.    The National Guard units in the District have purportedly been activated in the District of Columbia in a Title 32 status. Accordingly, the out-of-state National Guard units should be under the command and control of their respective Governors, and not the federal government.

106.    But the reality is that Defendants have seized command and control of the out-of-state National Guard troops. Like the DCNG, they are here at the request of the President and federal military officials, and they have been integrated into the command structure of the Joint Task Force-DC.

107.    Consistent with the President's August 11 Memorandum, the Secretary of Defense activated the Joint Task Force-DC and 800 DCNG troops. The current mission of the troops assigned to the Joint Task Force-DC is "to support local and federal law enforcement efforts aimed at restoring order in the District of Columbia" in accordance with "the President's [March 28 Executive Order] declaring a crime emergency."[49]

---

[48] This Complaint uses the term "deputization" to refer to the process of deputizing or the status of having been deputized. Some DOD and USMS policy documents use the synonymous term "deputation."

[49] *Joint Task Force (JTF)-DC*, D.C. Nat'l Guard, https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/.

108. With the arrival of out-of-state troops, the Secretary of Defense consolidated all National Guard units present in the District under the command of the Joint Task Force-DC.[50] Now, 2,290 Guardsmen are supporting the Joint Task Force-DC, of which 952 troops are from the DCNG and 1,338 troops are from other states' guards.[51]

109. Army Col. Larry Doane of the DCNG is the commander of the Joint Task Force-DC.[52] His chain of command leads through the Army Secretary and Secretary of Defense to the President. Accordingly, any units under the command of Joint Task Force-DC are now also under federal command and control.

110. Demonstrating this federal command structure, the Secretary of Defense, at the behest of the President, has issued crucial orders through Joint Task Force-DC to the out-of-state troops. Most notably, on August 22, 2025, Defendant Hegseth directed Brigadier General Leland D. Blanchard II, the interim Commanding General of the DCNG, to authorize all National Guard members supporting the Joint Task Force-DC to carry their service-issued weapons—M17 pistols or M4 semiautomatic rifles.[53]

---

[50] *See* Jon Soucy, *Guard members from six states, D.C. on duty in Washington in support of local, fed authorities*, D.C. Nat'l Guard (Aug. 29, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4290553/guard-members-from-six-states-dc-on-duty-in-washington-in-support-of-local-fed/ ("More than 2,000 National Guard Soldiers and Airmen from six states and the District of Columbia are on duty in Washington as part of Joint Task Force – District of Columbia").

[51] *Joint Task Force (JTF)-DC*, D.C. Nat'l Guard, https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/.

[52] *Joint Task Force D.C. commander discusses D.C. Safe and Beautiful mission,* Defense Visual Information Distribution Service (Aug. 13, 2025), https://www.dvidshub.net/video/973731/joint-task-force-dc-commander-discusses-dc-safe-and-beautiful-mission.

[53] *National Guard authorized to carry weapons in support of law enforcement*, D.C. Nat'l Guard (Aug. 23, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4284293/national-guard-authorized-to-carry-weapons-in-support-of-law-enforcement/.

111.    That National Guard troops are carrying M17 pistols on District streets is particularly troubling. The M17 is a version of the Sig Sauer P320 handgun, which numerous reports indicate can fire without a trigger pull and cause unintentional injuries. In July 2025, U.S. Immigration and Customs Enforcement (ICE) banned the use of all models of the P320 by agents, and the U.S. Air Force Global Strike Command suspended the use of the pistols pending further investigation.[54]

**F.     The President Has Authorized National Guard Troops Under Federal Command and Control to Engage in Law Enforcement in Violation of the Posse Comitatus Act.**

112.    On August 15, U.S. Marshal Jeryl Isaac, Chief Deputy of the USMS, deputized the leaders of the DCNG that are in command of the Joint Task Force-DC.



*(U.S. Marshal for the District of Columbia Deputizing National Guard Troops in D.C.)*[55]

---

[54] Zita Ballinger Fletcher, *Air Force suspends use of M18 pistols after airman's death*, DefenseNews (Jul. 24, 2025), https://www.defensenews.com/air/2025/07/24/air-force-suspends-use-of-m18-pistols-after-airmans-death/.
[55] U.S. Marshals Service (@USMarshalsHQ), X (Aug. 18, 2025, at 11:33 AM), https://x.com/USMarshalsHQ/status/1957466011742961851.

113.    On August 25, Col. Doane, the commander of the Joint Task Force-DC, addressed the decision to arm National Guard units in the District and stated they would "receive training on the rules of use of force and then be deputized by our partners at the U.S. Marshals Service to work with them as deputy U.S. Marshals."[56]

114.    On information and belief, most or all District of Columbia and out-of-state National Guard units have been deputized as U.S. Marshals.

115.    The USMS is a federal law enforcement agency. Those deputized by the USMS are authorized by the agency to perform federal law enforcement functions. Specifically, they:

> have Title 18 authority . . . to perform any of the following federal law enforcement functions: a. Seek and execute arrest warrants and search warrants; b. Make arrests without a warrant if there are reasonable grounds to believe that the suspect has violated or is violating federal law; c. Serve subpoenas and other legal writs; d. Monitor Title III Intercepts (electronic surveillance); and e. Carry firearms for personal protection or the protection of those covered under the federal assault statutes.

USMS Policy Directive 17.11.D.4 (10/07/2020).

116.    Furthermore, Special USMS Deputies are "appointed, under authority delegated by the Attorney General, to perform the duties of the Office of Special Deputy United States Marshal as directed by an appropriate official of the United States Marshals Service or some other appropriate Federal Official as so designated." Form USM-3B, Special Deputation Oath of Office, Authorization, and Appointment.

---

[56] Master Sgt. Whitney Hughes, *Security Posture Interview with JTF-DC Commander*, 189TH INFANTRY BRIGADE (Aug. 25, 2025), https://www.first.army.mil/Units/Divisions/Division-West/189th-Infantry-Brigade/videoid/974996/, at 0:22.

117.    The USMS also approved the authorization for National Guard units under Joint Task Force-DC to be armed.[57]



*(National Guard Troops Armed With Rifles on the National Mall)[58]*

118.    As a result of these deputizations, the National Guard troops in the District are authorized and expected to detain individuals. On several occasions, Defendants and their representatives have reiterated that they expect National Guard units to "interdict" and "temporarily detain" individuals if they determine that a crime is in progress.[59] And press reports indicate that these detentions are, in fact, occurring.[60]

---

[57] Mosheh Gains & Daniel Arkin, *Hegseth Authorizes National Guard Troops in D.C. to Carry Weapons*, NBC NEWS (Aug. 22, 2025), https://www.nbcnews.com/news/us-news/hegseth-authorizes-national-guard-troops-dc-carry-weapons-rcna226536.

[58] AP Photo, Nikhinson, Julia Demaree (Aug. 26, 2025) https://apnews.com/photo-gallery/trump-national-guard-police-washington-dc-photos-170363ba069f7e52a66f1e7056c24dc5#.

[59] Diana Nerozzi & Steven Nelson, *Trump Takes Control of DC Police, Deploying National Guard in Historica Capital Crime Crackdown – And Warns NYC Could Be Next*, NEW YORK POST (Aug. 11, 2025), https://nypost.com/2025/08/11/us-news/trump-federalizing-dc-police-deploying-national-guard-in-capital-crime-crackdown/.

[60] Eric Schmitt & Campbell Robertson, *National Guard Detained Man Who Assaulted a Park Police Officer, Authorities Say*, THE NEW YORK TIMES (Aug. 16, 2025), https://www.nytimes.com/2025/08/16/us/politics/national-guard-detained-man.html.

119.    In addition, under federal command and control, these units are engaged in armed "presence patrols" across the District. On August 25, 2025, the Commander of the Joint Task Force-DC confirmed that the Task Force had "been ordered by the Secretary of Defense and at the request of the U.S. Marshals Service to go begin armed patrols."[61] These are law enforcement activities.

120.    District residents and visitors have seen this play out in their daily lives. For more than two weeks, members of the National Guard—uniformed, armed, and deputized as law enforcement officers—have been seen carrying out these patrols, bearing handcuffs, across D.C.

 

*(Photos of National Guard Troops Patrolling D.C. Streets)*[62]

---

[61] Master Sgt. Whitney Hughes, *Security Posture Interview with JTF-DC Commander*, 189TH INFANTRY BRIGADE (Aug. 25, 2025), https://www.first.army.mil/Units/Divisions/Division-West/189th-Infantry-Brigade/videoid/974996/ at 0:09.

[62] District of Columbia National Guard (@DCGuard1802), X (Aug. 26, 2025 at 8:40 PM), https://x.com/DCGuard1802/status/1960502754540970464/photo/1; and National Guard (@USNationalGuard), X (Sept. 3, 2025 at 1:00 PM), https://t.co/ekbe76uqGY.

121.    The troops have been regularly seen patrolling in groups, sometimes accompanying MPD or federal law enforcement officers, and sometimes on their own.

122.    Metro stations—which are not federally owned or controlled—have been frequently patrolled and surveilled by the National Guard.

 

*(National Guard Troops Patrolling at a D.C. Metro Station and on a Red Line Train)*[63]

123.    The patrols have extended even further into local District neighborhoods and around routine, local District events, where Defendants have sought to establish a militarized presence.

124.    As recently as August 29, 2025, the National Guard publicized that "[f]uture plans include presence patrols in residential neighborhoods and other locations throughout the District."[64]

---

[63] South Carolina National Guard https://www.flickr.com/photos/thenationalguard/54751381932/in/photostream/; South Carolina National Guard (@TheNationalGuard), Flickr (Aug. 29, 2025), https://www.flickr.com/photos/thenationalguard/54751381932/in/photostream/.

[64] Sgt. 1st Class Jon Soucy, *Guard Members From Six States, D.C. on Duty in Washington in Support of Local, Fed Authorities*, NATIONAL GUARD (Aug. 29, 2025), https://www.nationalguard.mil/News/Article-View/Article/4290072/guard-members-from-six-states-dc-on-duty-in-washington-in-support-of-local-fed/.

**K.**    **The District is Harmed by Defendants' Unlawful Deployment of National Guard Troops to Police the District.**

125.    The District has suffered a severe and irreparable sovereign injury from the deployment of National Guard units to perform law enforcement activities throughout the District. In particular, the deployments have infringed on the District's sovereign authority, granted by the Home Rule Act, to determine how best to police the District and protect public safety. The deployment has also impaired the District's sovereign right to determine when to permit out-of-state National Guard troops to enter the District and furnish assistance to local law enforcement.

126.    The presence of armed military units purporting to exercise law enforcement authority that they are not lawfully permitted to exercise also creates confusion among the public and threatens to undermine the work of the District in combating local crime. These National Guard units are operating without lawful authority and without law enforcement training or expertise, both of which threaten to complicate the District's public safety efforts.

127.    Defendants' unwanted deployment of National Guard troops to conduct law enforcement on District streets also threatens to harm the crucial relationship between police and the communities they serve, eroding trust and inflaming tensions.[65]

128.    Defendants' order that the National Guard troops patrolling District communities carry service weapons only exacerbates the harm to residents. History carries somber reminders of the risks involved when armed National Guardsmen are deployed among civilians. In 1970, for

---

[65] *Opinion: A joint letter from ANCs opposing President Trump's takeover of D.C.*, The 51st (Aug. 29, 2025), https://51st.news/opinion-a-joint-letter-from-ancs-opposing-president-trumps-takeover-of-d-c/.

instance, Ohio National Guard troops opened fire on students protesting at Kent State University, killing four and wounding nine.[66]

129.    The encroachment of National Guard troops in the District has also already caused harm to public safety in the District. On August 20, 2025, a National Guard Member driving a Mine-Resistant Ambush Protected All-Terrain Vehicle (MATV) rammed into the side of an SUV, injuring the civilian driver.[67]



*(Photo of National Guard MATV That Crashed Into Civilian Via Fox5DC)*[68]

130.    MATVs are "military vehicle[s] that weigh[] up to 16 tons and [are] meant to withstand explosive attacks."[69] MATVs are equipped with smaller military-grade windshields that

---

[66] Jennifer Mascia, *With Troops in Los Angeles, Echoes of the Kent State Massacre*, OHIO CAPITAL JOURNAL (June 13, 2025), https://ohiocapitaljournal.com/2025/06/13/with-troops-in-los-angeles-echoes-of-the-kent-state-massacre/.

[67] Luke Garrett, *One Civilian Injured in Crash With D.C. National Guard Military Vehicle*, NPR WAMU (Aug. 20, 2025), https://www.npr.org/2025/08/20/g-s1-83950/national-guard-dc-crash.

[68] Sam Kosmas & Stephanie Ramirez, *1 Injured in Crash Involving National Guard Vehicle*, FOX 5 DC (Aug. 20, 2025), https://www.fox5dc.com/news/1-injured-crash-involving-military-vehicle-dc.

[69] Luke Garrett, *One Civilian Injured in Crash With D.C. National Guard Military Vehicle*, NPR WAMU (Aug. 20, 2025), https://www.npr.org/2025/08/20/g-s1-83950/national-guard-dc-crash.

are suited for bullet-proof windowpanes, but which limit visibility.[70] The guardsman was later ticketed for running the red light in D.C.'s Capitol Hill neighborhood where the crash occurred.[71]

131.    A video circulated on social media shows the sunken angle of the SUV's driver's side door where it collapsed after impact.[72] The civilian driver, reported to live in Capitol Hill, was trapped inside their vehicle until freed by firefighters using the Jaws of Life.[73] The civilian driver suffered lacerations.[74] But the next collision involving these massive armored vehicles on residential streets could lead to worse injury or death.

132.    Concerningly, DCNG officials have not addressed "whether Guard members are receiving training on D.C. traffic, whether leaders issued a risk assessment on pedestrian and driver safety when using these vehicles, or whether Guard members are going to continue to operate [MATVs] in the city."[75] As expressed by D.C. Councilmember and Transportation Committee Chair Charles Allen, "[t]hese are vehicles designed for warfare. They have no business on our city streets."[76]

---

[70] Dan Lamothe, Rachel Weiner & Alex Horton, *Armored National Guard Vehicle Collides With SUV on Capitol Hill*, THE WASHINGTON POST (Aug. 20, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-national-guard-crash-suv/.

[71] District of Columbia National Guard, *D.C. National Guard Activated to Support Law Enforcement in District of Columbia*, DISTRICT OF COLUMBIA NATIONAL GUARD (Aug. 23, 2025), https://dc.ng.mil/Public-Affairs/News-Release/Article/4284259/dc-national-guard-activated-to-support-law-enforcement-in-district-of-columbia/.

[72] Washingtonian Problems (@WashProbs), X (Aug. 20, 2025, at 10:30 AM), https://x.com/WashProbs/status/1958174783041884639.

[73] Mitchell Miller, *National Guard Vehicle Collides With Car, Trapping Driver on Capitol Hill*, WTOP NEWS (Aug. 20, 2025), https://wtop.com/liveblog-today-on-the-hill/2025/08/national-guard-vehicle-collides-with-car-trapping-driver-on-capitol-hill/.

[74] Carla Babb, *DC Driver Trapped, Then Freed From SUV After Crash With Guard Vehicle*, ARMYTIMES (Aug. 21, 2025), https://www.armytimes.com/news/pentagon-congress/2025/08/21/dc-driver-trapped-then-freed-from-suv-after-crash-with-guard-vehicle/.

[75] Dan Lamothe, Rachel Weiner & Alex Horton, *Armored National Guard Vehicle Collides With SUV on Capitol Hill*, THE WASHINGTON POST (Aug. 20, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-national-guard-crash-suv/.

[76] *Id.*

37
**JA075**

133.    Despite these risks, National Guard troops continue driving oversized MATVs that are heavier and wider than District law permits. *See* Chapter 25 of Title 18 of the District of Columbia Municipal Regulations. On information and belief, the MATVs that National Guard troops are driving around the District exceed these limits and no permit has been sought or obtained for their lawful operation. Their continued use within District limits impairs the District's ability to regulate the safe and proper use of its streets and places District residents in harm's way.

134.    The inrush of National Guard troops has also caused financial strain for the District's economy because it has depressed key industries, including tourism, restaurants, and hospitality services. For example, a recent report from the Washington Post indicates that "the week federal forces dispersed across the capital, foot traffic in D.C. dropped 7 percent on average," and that "[r]estaurant reservations saw an even steeper drop."[77] The report continues: "marketing forecasts, street-level foot traffic, [and] hotel occupancy" all demonstrate that "Washington's tourism economy is sliding . . . [and t]he sight of National Guard troops, now authorized to carry weapons, could further chill demand at a time when the industry can least afford it."

135.    Because the majority of transactions at District retail businesses, hotels, and restaurants are subject to gross sales taxes, the reduction in business activity in the District since August 11, 2025, is resulting in the loss of a proportional amount of sales tax revenue to the District government. It is also resulting in a reduction in work hours for some District workers, and a corresponding decline in income tax withholding paid to the District government.

---

[77] Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, THE WASHINGTON POST (Aug. 29, 2025), https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

136.    The continued presence of armed National Guard troops also impinges on the District's right to self-governance by suspending certain District laws. District law criminalizes, among other firearms offenses, the possession of unregistered firearms, D.C. Code § 7-2502.01; the possession of assault weapons, *id.* § 7-2502.02; and the transportation of firearms under certain conditions, *id.* § 22-4504.02. Many National Guard members would be in violation of all of these statutes if they were not lawfully "on duty and duly authorized to carry a firearm." *See, e.g.*, *id.* § 7-2502.01(b)(1)(C). The Secretary of Defense's order authorizing and directing National Guard members to carry these weapons—including semi-automatic M17 pistols and M4 carbine assault rifles—thus purports to relieve these members of criminal liability and exempt them from the District's generally applicable firearms regulations. In addition, if National Guard troops are involved in searches, seizures, and arrests without lawful authority, that could complicate and undermine criminal prosecution efforts and put public safety at risk.

137.    The President has made clear his intention to continue to inflict these harms on the District for an extended period. In the August 25 Executive Order, the President memorialized an intent to continue to use the National Guard to police D.C.'s streets, directing the Secretary of Defense to create a unit within the DCNG in which the members will be deputized to "enforce Federal law." *See* Section 2(d)(i). In doing so, the President memorializes his intent to again violate the PCA and repeat the present injuries to the District's authority.

138.    Defendants claim that their conduct is intended to make D.C. safer; however, recent reporting indicates that "about two-thirds of D.C. residents say Trump's recent actions will not help combat violent crime."[78] News reports confirm that the deployment of National Guard troops

---

[78] Joe Heim, Scott Clement & Emily Guskin, *We Asked 604 D.C. Residents About Trump's Takeover. Here's What They Said*, THE WASHINGTON POST (Aug. 20, 2025),

has given District residents a "palpable sense of fear" and rendered them "afraid to go grocery shopping, show up to work and go about their daily lives." One restaurant owner said that "[i]t's not working. It's an attack on the community. That's the way we're seeing it. We're the ones feeling the effects, everyone, the business owners, the community."[79] At a news conference, Mayor Bowser noted that the National Guard presence has caused some parents to keep their children out of school out of concern for their safety.[80]

## CAUSES OF ACTION

### COUNT I
### Violation of the Administrative Procedure Act
### Contrary to Law
### (DOD and DOJ Defendants)

139.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

140.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority. Under the Administrative Procedure Act (APA) a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

---

https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-poll-trump-crime-police/
https://www.washingtonpost.com/dc-md-va/2025/08/20/dc-poll-trump-crime-police/.
[79] Daniella Silva & Megan Lebowitz, *Trump Vowed to Make Washington Streets Safer. In One Neighborhood, People Feel Less Safe Than Ever*, NBC NEWS (Aug. 26, 2025), https://www.nbcnews.com/news/us-news/national-guard-trump-washington-dc-immigration-fears-ice-deportation-rcna226943.
[80] Konstantin Toropin & Will Weissert, *DC School Year Starts With Parents on Edge Over Trump's Armed Patrols*, PBS NEWS (Aug. 25, 2025), https://www.pbs.org/newshour/education/dc-school-year-starts-with-parents-on-edge-over-trumps-armed-patrols.

141.    Defendants DOD, DOJ, and USMS are all agencies subject to the APA. 5 U.S.C. § 701.

142.    The DOD Defendants took final agency actions that are subject to judicial review when they:

a.    ordered the mobilization of the DCNG for the purpose of supporting local and federal law enforcement in the District;

b.    ordered or requested deployment of out-of-state National Guard units under 32 U.S.C. § 502(f) from Louisiana, Mississippi, Ohio, South Carolina, South Dakota, Tennessee, and West Virginia for the purpose of supporting local and federal law enforcement in the District (the Deployment); and

c.    placed the DCNG and the out-of-state troops under the command and control of the Joint Task Force-DC, which is in turn under the command and control of the Army, DOD, and the President.

143.    The DOJ Defendants took final agency action that is subject to judicial review when they deputized the National Guard units from the District of Columbia, Louisiana, Mississippi, Ohio, South Carolina, Tennessee, and West Virginia as Special Deputy U.S. Marshals to perform law enforcement functions in the District (the Deputization).

144.    The DOD and DOJ Defendants have collectively engaged in final agency action that is subject to judicial review by:

a.    ordering the troops in the DCNG and from the Deployment to be armed with M17 pistols and M4 rifles; and

b.  implementing the President's August 25 Executive Order, including by establishing a unit in the DCNG dedicated to "ensuring public safety and order" in the District and by deputizing the members of that unit to "enforce Federal law."

145.    The DOD and DOJ Defendants' actions are contrary to the Constitution and federal law in numerous respects, including the following.

146.    *First*, the DOD and DOJ Defendants have violated the Home Rule Act and the Assistance Compact by deploying the DCNG and out-of-state National Guard troops to "support" and "assist" District law enforcement without the consent of the Mayor.

147.    In the Home Rule Act, Congress vested the Mayor with "the executive power of the District," which it has elsewhere made clear includes the power to determine how best to police "the boundaries of" the District to "preserve the public peace." By contrast, the Act grants the President no authority to direct or control law enforcement in the District. The President may not supplant the Mayor's authority by directing National Guard units to police the District as he sees fit.

148.    The Assistance Compact further provides that states may send "mutual assistance" to one another upon the "request" of the receiving state. Mutual assistance under this Compact "may include the use of the states' National Guard forces" only pursuant to an interstate compact or "by mutual agreement between states." Congress has designated the District of Columbia a "state" under this Compact, and the Council has authorized the Mayor to "execute[]" it on the District's behalf. The President may not lawfully evade this scheme by authorizing other states to introduce National Guard units into the District without the "request" or "agreement" of the Mayor.

149.    Section 502(f) of Title 32 of the U.S. Code does not alter this framework. It permits National Guard units to perform "training or other duty," including "support of operations or

missions undertaken by the . . . unit at the request of the President or Secretary of Defense." By its terms, this provision only allows the President or the Secretary to "request" support, not to order or authorize the provision of aid over the receiving jurisdiction's objection. And, in context, the provision plainly permits forms of aid similar to "training" or "drills," not a massive, independent power that would gut limits Congress imposed elsewhere in the statute.

150.    *Second*, the DOD and DOJ Defendants have acted contrary to the Constitution and federal law by assuming command and control over out-of-state National Guard units in Title 32 status.

151.    Under the Militia Clauses of the Constitution, the President may only "govern[] such part of [the Militia] as may be employed in the service of the United States." And under the statutes governing the National Guard—the modern-day militia—he may only assume command of National Guard units that have been called into federal service under Title 10. Until then, both the Constitution and statute require that they remain under state command.

152.    The DOD and DOJ Defendants have unlawfully assumed command and control of out-of-state National Guard units in state militia status under Title 32. Through Joint Task Force-DC, the DOD Defendants have exercised pervasive control over the operations of these units in the District, including by issuing "order[s]" and assigning them missions. And the DOJ Defendants have deputized them as U.S. Marshals, subjecting them to the direction and authority of the President and DOJ.

153.    *Third*, the DOD Defendants have violated the Posse Comitatus Act and 10 U.S.C. § 275 by giving DOD and the Army direct command and control of Joint Task Force-DC—a law enforcement operation in the District conducted by National Guard troops vested with the powers to arrest, conduct seizures, and otherwise engage in core law enforcement activities.

154. In the PCA, Congress prohibited the use of "any part of the Army" to engage in "law enforcement." Congress extended the scope of that prohibition in Section 275, which requires the Secretary of Defense to promulgate regulations ensuring that "member[s] of the Army" do not have "direct participation . . . in a search, seizure, arrest, or other similar activity." The DOD has implemented that command by issuing a policy that prohibits most "DoD personnel" from providing "direct civilian law enforcement assistance."

155. The DOD Defendants are subject to the Posse Comitatus Act and Section 275. Nonetheless, they are in direct command of Joint Task Force-DC, an operation expressly designed to engage in law enforcement. The DOD Defendants have asserted pervasive control over and active involvement in the law enforcement work of this Task Force, including by issuing "order[s]" to its members and identifying the forms of law enforcement assistance they should provide, including "community safety patrols," "traffic control," and "presence patrols." And the DOJ Defendants have augmented the law enforcement powers of the Task Force by deputizing its participants as U.S. Marshals—empowering them to conduct searches, seizures, and arrests.

156. Both the Posse Comitatus Act and Section 275 flatly prohibit the establishment of a law enforcement operation in the District that is helmed and controlled by the DOD Defendants.

157. In sum, the DOD and DOJ Defendants have acted contrary to law, in violation of 5 U.S.C. § 706, by deploying the DCNG and out-of-state National Guard units to police the District without the consent of the District's Mayor, assuming command and control of out-of-state National Guard units that are in Title 32 status, and exercising command and control of Joint Task Force-DC, a law enforcement operation.

158.    The District is entitled to vacatur of the final agency actions of the DOJ and DOD Defendants, and a preliminary and permanent injunction prohibiting the DOD and DOJ Defendants from engaging in such actions.

## COUNT II
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious
### (DOD and DOJ Defendants)

159.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

160.    Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

161.    An agency action is arbitrary or capricious where the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

162.    When an agency "rescinds a prior policy," the agency must, at minimum, "consider the alternatives that are within the ambit of the existing policy," "consider [] important aspect[s] of the problem," "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33, 38 (2020) (citations and internal quotation marks omitted).

163.    A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

164.    The DOJ and DOD Defendants' actions are arbitrary and capricious for several reasons, including the following:

a.  The DOD and DOJ Defendants failed to offer any explanation for deviating from longstanding principles and prior practice of not using National Guard units for law enforcement in the District.

b.  The DOD and DOJ Defendants failed to consider the risks associated with deploying National Guard troops to support law enforcement and deputizing them as Special Deputy U.S. Marshals when they lack adequate training and expertise in law enforcement.

c.  The DOD and DOJ Defendants failed to weigh the purported benefits of implementing the Deployment against the costs, including creating confusion among District residents and visitors to the District about what entities are actually policing the District, what powers and duties they may lawfully exercise, and the corresponding threat that the exercise of such powers and duties will cause to public safety in the District. They similarly failed to weigh the risks of authorizing thousands of National Guard troops to carry semi-automatic weapons in the District, including the M17 pistol, a version of the Sig Sauer P320 series pistol that is capable of firing without the trigger being pulled, or the costs and risks of deploying large, armored vehicles on District streets.

d. The DOD and DOJ Defendants also failed to consider other relevant factors, such as the threat to the independence of state National Guard units, the harm their actions would cause to military readiness, and the extent to which the Deployment and the Deputization would render units unable to perform other important state- or District-level functions.

165. For all these reasons, the DOD and DOJ Defendants have acted arbitrarily and capriciously, in violation of 5 U.S.C. § 706.

166. Accordingly, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the District is entitled to a declaration that the DOD and DOJ Defendants' final agency actions are arbitrary and capricious, violate the APA, and are invalid.

167. The District is entitled to vacatur of the DOJ and DOD Defendants' final agency actions, and a preliminary and permanent injunction prohibiting the DOD and DOJ Defendants from continuing such actions.

<div align="center">

**COUNT III**
**Violation of the Constitution**
**Separation of Powers, Take Care Clause, and District Clause**
**(All Defendants)**

</div>

168. The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

169. The Constitution's separation of powers doctrine, Take Care Clause, and District Clause all place limitations on the exercise of executive authority.

170. The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637-38 (2024).

<div align="center">

47
**JA085**

</div>

171. The Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. Art. I, § 8, cl. 15. The Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

172. The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

173. Further, the Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them") (internal quotation marks and citation omitted).

174. The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

175. Finally, the District Clause vests Congress with authority "[t]o exercise exclusive Legislation, in all Cases whatsoever, over such District (not exceeding ten Miles square) as may  .

. . become the Seat of the Government of the United States . . . ."  U.S. Const. art. I, § 8, cl. 17. This Clause affords Congress "plenary power" over the Nation's capital.  *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 434 (1932).  It has exercised that authority by enacting the Home Rule Act, which grants the residents of the District "powers of local self-government" and authority over "local District matters."  D.C. Code § 1-201.02(a). The Executive may not exercise authority over local District governance except to the limited extent authorized by Congress.

176.    Defendants have violated each of these constitutional doctrines.

177.    In violation of the separation of powers, the Take Care Clause, and the District Clause, Defendants have: asserted authority over state Militias that the Constitution and federal law expressly assign to the States; disregarded the limits in the Posse Comitatus Act and 10 U.S.C. § 275 barring the participation of federal military forces in law enforcement; and attempted to supplant the Mayor's authority over law enforcement in the District.

178.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952). The District is entitled to preliminary and permanent injunctive relief barring the actions challenged herein.

179.    Pursuant to 28 U.S.C. § 2201, the District is also entitled to a declaration that the actions challenged herein violate the constitutional separation of powers doctrine, the Take Care Clause, and the District Clause, and impermissibly arrogate to the Executive power that is reserved to Congress, the states, or the District.

## COUNT IV
### Equitable *Ultra Vires*
### (All Defendants)

180.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

181.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional or statutory authority.

182.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

183.    Defendants have taken actions in the absence of any plausible constitutional or statutory authority, and in plain violation of the limits imposed by Congress.  They have impermissibly asserted control over the National Guard units in state militia status, directed DOD to supervise and actively participate in domestic law enforcement activities, and ordered troops to police the District without the Mayor's consent.

184.    The District will continue to suffer irreparable injury if Defendants' actions are not declared unlawful and enjoined, and the District has no adequate remedy at law.

185.    The public interest favors issuance of a judicial declaration that Defendants' actions are unlawful and issuance of an injunction requiring Defendants to cease such actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff District of Columbia respectfully requests that the Court:

186. Declare that Defendants have acted contrary to the Constitution and federal law by:

   a. deploying National Guard troops to conduct law enforcement in the District of Columbia without the express consent of the Mayor;

   b. exercising command and control of out-of-state National Guard troops in Title 32 status in the District of Columbia, including by issuing operational orders to such troops or dictating their day-to-day operations;

   c. deputizing members of National Guard units deployed in or to the District of Columbia as Special Deputy U.S. Marshals;

   d. ordering that National Guard troops in the District of Columbia carry service weapons while conducting operations pursuant to the President's August 11 order; and

   e. placing DOD officials, including the Secretary of the Army, in operational command or control of Joint Task Force-DC, and otherwise permitting DOD officials to directly supervise or participate in law enforcement activities conducted by National Guard Units in the District of Columbia.

187. Permanently and preliminarily enjoin such actions;

188. Stay such actions pursuant to 5 U.S.C. § 705;

189. Vacate such actions pursuant to 5 U.S.C. § 706; and

190. Award such additional relief as the interests of justice may require.

Dated: September 4, 2025

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (D.C. Bar No. 1026153)
ELIZA H. SIMON (D.C. Bar No. 90035651)
MITCHELL P. REICH (D.C. Bar No. 1044671)
Senior Counsels to the Attorney General

BENJAMIN MOSKOWITZ (D.C. Bar No. 1049084)
Assistant Deputy Attorney General
Legal Counsel Division

*/s/ Alicia M. Lendon*
ALICIA M. LENDON (D.C. Bar No. 1765057)
Chief, Civil Rights and Elder Justice Section
Public Advocacy Division

*/s/ Pamela Disney*
PAMELA DISNEY (D.C. Bar No. 1601225)
ANDREW MENDRALA (D.C. Bar No. 1009841)
CHRISTOPHER PEÑA (D.C. Bar No. 888324806)
CHARLES SINKS (D.C. Bar No. 888273315)
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street NW, 10th Floor
Washington, D.C. 20001
Tel: (202) 807-0371
pamela.disney@dc.gov

*Attorneys for the District of Columbia*

# EXHIBIT A

JA091

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA, <br><br> Plaintiff, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Case No.: 1:25-cv-03005 (JMC) <br><br> Judge Jia M. Cobb |

## DECLARATION OF WILLIE HAYNES

I, Willie Haynes, declare under penalty of perjury that the following facts are true and correct to the best of my information and belief:

1.    My name is Willie Haynes. I am over the age of 18 and able to provide true and accurate testimony under oath.

2.    I am an Investigator with the Office of the Attorney General for the District of Columbia ("OAG").

3.    Exhibit 01 attached hereto is a true and accurate copy of Dep't of Defense Instruction No. 3025.21 (updated Feb. 8, 2019).

4.    Exhibit 02 attached hereto is a true and accurate copy of Memorandum from the Secretary of the Defense to the Secretary of the Army and the Secretary of the Air Force, "Supervision and Control of the National Guard of the District of Columbia" (Oct. 10, 1969).

5.    Exhibit 03 attached hereto is a true and accurate copy of Exec. Order No. 14333, titled "Declaring a Crime Emergency in the District of Columbia" (Aug. 11, 2025).

**JA092**

6.    Exhibit 04 attached hereto is a true and accurate copy of Exec. Order No. 14339, titled "Additional Measures To Address the Crime Emergency in the District of Columbia" (Aug. 25, 2025).

7.    Exhibit 05 attached hereto is a true and accurate copy of Attorney General Order No. 6370-2025 (Aug. 14, 2025).

8.    Exhibit 06 attached hereto is a true and accurate copy of Attorney General Order No. 6372-2025 (Aug. 15, 2025).

9.    Exhibit 07 attached hereto is a true and accurate copy of excerpts from the hearing transcript of the motions hearing held on August 15, 2025, in the case *District of Columbia v. Trump*, No. 25-2678 (D.D.C. Aug. 15, 2025).

10.    Exhibit 08 attached hereto is a true and accurate copy of the President's Memorandum for the Secretary of Defense, "Restoring Law and Order in the District of Columbia" (Aug. 11, 2025), captured from https://www.whitehouse.gov/presidential-actions/2025/08/restoring-law-and-order-in-the-district-of-columbia/ on September 5, 2025.

11.    Exhibit 09 attached hereto is a true and accurate copy of D.C. National Guard Permanent Order 25-223 (Aug. 11, 2025).

12.    Exhibit 10 attached hereto is a true and accurate copy of D.C. National Guard press release, "D.C. National Guard Activated to Support Law Enforcement in District of Columbia (Aug. 23, 2025), captured from https://dc.ng.mil/Public-Affairs/News-Release/Article/4284259/dc-national-guard-activated-to-support-law-enforcement-in-district-of-columbia/ on September 5, 2025.

13.    Exhibit 11 attached hereto is a true and accurate copy of a press release from the Office of the Governor of Ohio, Governor DeWine Issues Statement on Ohio National Guard

2

**JA093**

(Aug. 16, 2025), captured from https://governor.ohio.gov/media/news-and-media/governor-dewine-issues-statement-on-ohio-national-guard on September 5, 2025.

14.    Exhibit 12 attached hereto is a true and accurate copy of a press release from the Office of the Governor of South Carolina, Governor Henry McMaster Authorizes Deployment of National Guard to Washington, D.C. (Aug. 16, 2025), captured from https://governor.sc.gov/news/2025-08/gov-henry-mcmaster-authorizes-deployment-national-guard-washington-dc on September 5, 2025.

15.    Exhibit 13 attached hereto is a true and accurate copy of a press release from the Office of the Governor of West Virginia, West Virginia National Guard to Support President Trump's Initiative to Make D.C. Safe and Beautiful (Aug. 16, 2025), captured from https://governor.wv.gov/article/west-virginia-national-guard-support-president-trumps-initiative-make-dc-safe-and-beautiful on September 5, 2025.

16.    Exhibit 14 attached hereto is a true and accurate copy of a post to the X (formerly Twitter) account of Louisiana Governor Jeff Landry (@LAGovJeffLandry) (Aug. 18, 2025), captured from https://x.com/LAGovJeffLandry/status/1957549092562956743 on September 5, 2025.

17.    Exhibit 15 attached hereto is a true and accurate copy of a press release from the Louisiana National Guard, La. National Guard Military Police to assist in Washington, D.C. (Aug. 18, 2025), captured from https://geauxguard.la.gov/2025/08/18/la-national-guard-military-police-to-assist-in-washington-d-c/ on September 5, 2025.

18.    Exhibit 16 attached hereto is a true and accurate copy of a press release from the Office of the Governor of Mississippi, Governor Reeves Statement on Mississippi National Guard Deployment to Washington, D.C. (Aug. 18, 2025), captured from

3

**JA094**

https://governorreeves.ms.gov/governor-reeves-statement-on-mississippi-national-guard-deployment-to-washington-d-c/ on September 5, 2025.

19. Exhibit 17 attached hereto is a true and accurate copy of a press release from the Office of the Governor of Georgia, Gov. Kemp: Georgia Guard to Support D.C. Public Safety Mission (Sep. 5, 2025), captured from https://gov.georgia.gov/press-releases/2025-09-05/gov-kemp-georgia-guard-support-dc-public-safety-mission on September 5, 2025.

20. Exhibit 18 attached hereto is a true and accurate copy of a press release from the Office of the Governor of South Dakota, Gov. Rhoden Mobilizes SDNG to DC at the Request of President Trump (Aug. 31, 2025), captured from https://news.sd.gov/news?id=news_kb_article_view&sys_id=62fdcf1f47e7aa10701588ff336d43ea on September 5, 2025.

21. Exhibit 19 attached hereto is a true and accurate copy of a press release from the D.C. National Guard, Guard Members From Six States, D.C. on Duty in Washington in Support of Local, Fed Authorities (Aug. 29, 2025), captured from https://www.nationalguard.mil/News/Article-View/Article/4290072/guard-members-from-six-states-dc-on-duty-in-washington-in-support-of-local-fed/ on September 5, 2025.

22. Exhibit 20 attached hereto is a true and accurate copy of a press release from the D.C. National Guard, National Guard authorized to carry weapons in support of law enforcement (Aug. 23, 2025), captured from https://dc.ng.mil/Public-Affairs/News-Release/Article/4284293/national-guard-authorized-to-carry-weapons-in-support-of-law-enforcement/ on September 5, 2025.

23. Exhibit 21 attached hereto is a true and accurate copy of a Memorandum from Daniel P. Driscoll, Secretary of the Army, for Interim Commanding General, District of Columbia

4

**JA095**

National Guard, "Extension of 11 August 2025, Mobilization of D.C. National Guard" (Sept. 3, 2025).

24. Exhibit 22 attached hereto is a true and accurate copy of a webpage from the Defense Visual Information Distribution Service including a photograph dated August 15, 2025 with a caption stating, "Jeryl Isaac, Chief Deputy U.S. Marshal, deputizes Brig. Gen. Leland Blanchard II, interim commanding general of the District of Columbia National Guard, Command Sgt. Maj. Ronald L. Smith, senior enlisted leader to the commanding general, and other Guard members at the D.C. Armory, Aug. 15, 2025," captured from https://www.dvidshub.net/image/9260085/dc-national-guard-leaders-deputized-dc-safe-and-beautiful-task-force on September 5, 2025.

25. Exhibit 23 attached hereto is a true and accurate copy of a webpage from the Defense Visual Information Distribution Service including a photograph dated August 19, 2025 with a caption stating, "U.S. Soldiers from the West Virginia National Guard are deputized at the D.C. Armory as part of D.C. Safe and Beautiful Task Force, Washington, D.C., Aug. 19, 2025," captured from https://www.dvidshub.net/image/9266129/dc-safe-and-beautiful-task-force on September 5, 2025.

26. Exhibit 24 attached hereto is a true and accurate copy of a webpage from the Defense Visual Information Distribution Service including a photograph dated August 19, 2025 with a caption stating, "U.S. Army Soldiers from the West Viginia and South Carolina National Guards are deputized at the D.C. Armory in Washington, D.C., Aug. 19, 2025. Guard members were activated under the Joint Task Force–District of Columbia as part of the D.C. Safe and Beautiful Task Force to support District and federal partners in safeguarding property and ensuring

5

**JA096**

the functions of government," captured from https://www.dvidshub.net/image/9268723/dc-safe-and-beautiful-task-force on September 5, 2025.

27.    Exhibit 25 attached hereto is a true and accurate copy of a webpage from the Defense Visual Information Distribution Service including a photograph dated August 19, 2025 with a caption stating, "U.S. Soldiers from the Ohio and Tennessee National Guard are deputized at the D.C. Armory as part of D.C. Safe and Beautiful Task Force, Washington, D.C., Aug. 21, 2025," captured from https://www.dvidshub.net/image/9270341/dc-safe-and-beautiful-task-force on September 5, 2025.

28.    Exhibit 26 attached hereto is a true and accurate copy of a webpage from the Defense Visual Information Distribution Service including a photograph dated August 25, 2025 with a caption stating, "U.S. Soldiers with the Louisiana National Guard recite the oath to become deputized in support of law enforcement partners as part of the Joint Task Force – District of Columbia on Joint Base Anacostia-Bolling Aug. 25 2025," captured from https://www.dvidshub.net/image/9276503/louisiana-national-guard-soldiers-deputized-support-jtf-dc on September 5, 2025.

29.    Exhibit 27 attached hereto is a true and accurate copy of a webpage from the Defense Visual Information Distribution Service including a photograph dated August 25, 2025 with a caption stating, "U.S. assigned to the West Virginia National Guard, recite the oath to become deputized to support to Joint Task Force – District of Columbia at Joint Base Anacostia-Bolling Aug. 25," captured from https://www.dvidshub.net/image/9276236/west-virginia-national-guard-deputized-jtf-dc on September 5, 2025.

30.    Exhibit 28 attached hereto is a true and accurate copy of USMS Policy Directive 17.11 (Oct. 7, 2020).

6

**JA097**

31.     Exhibit 29 attached hereto is a true and accurate copy of Form USM-3B, Special Deputation Oath of Office, Authorization, and Appointment.

32.     Exhibit 30 attached hereto is a true and accurate copy of a Memorandum from Madison D. Sheahan, Deputy Director of U.S. Immigration and Customs Enforcement, "Discontinuation of Approval for ICE Authorized Officers to Carry All Models of SIG Sauer P320 and Direction to Purchase Glock 19s as Replacement Duty Handguns for Affected ICE Authorized Officers and All ICE Aos Moving Forward" (July 9, 2025).

33.     Exhibit 31 attached hereto is a true and accurate copy of a Memorandum from Gen. Thomas A. Bussiere, Commander, Air Force Global Strike Command, "Immediate Pause of M18 Modular Handgun System (MHS) Operations" (July 21, 2025).

34.     Exhibit 32 attached hereto is a true and accurate copy of a webpage by the D.C. National Guard titled "Joint Task Force (JTF)- DC" dated September 3, 2025 captured from https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/           on September 6, 2025.

35.     Exhibit 33 attached hereto is a true and accurate copy of an article by Luke Garrett, *D.C. mayor defends capital's crime rates after Trump threatens to take over police*, NPR (Aug. 10, 2025), captured from https://www.npr.org/2025/08/10/g-s1-81933/d-c-mayor-defends-capitals-crime-rates-after-trump-threatens-to-take-over-police on September 6, 2025.

36.     Exhibit 34 attached hereto is a true and accurate copy of an article by Aaron Pellish, *Washington mayor calls Trump's police order 'unsettling and unprecedented'*, POLITICO (Aug. 11, 2025), captured from https://www.politico.com/news/2025/08/11/dc-mayor-trump-police-order-unsettling-unprecedented-00504209 on September 6, 2025.

**JA098**

37.    Exhibit 35 attached hereto is a true and accurate copy of a post to the X (formerly Twitter) account of Mayor Muriel Bowser (@MurielBowser), X (Aug. 16, 2025), captured from https://x.com/MurielBowser/status/1956891644076154962 on September 6, 2025.

38.    Exhibit 36 attached hereto is a true and accurate copy of an article by Mark Sherman et al., 'Leave Our Kids Alone': *Schools Reopen in DC With Parents on Edge over Trump's Armed Patrols*, Military.com (Aug. 25, 2025), captured from https://www.military.com/daily-news/2025/08/25/leave-our-kids-alone-schools-reopen-dc-parents-edge-over-trumps-armed-patrols.html on September 6, 2025.

39.    Exhibit 37 attached hereto is a true and accurate copy of a post to the X (formerly Twitter) account of Mayor Muriel Bowser (@MurielBowser), X (Aug. 27, 2025), captured from https://x.com/MayorBowser/status/1960777484510880111 on September 6, 2025.

40.    Exhibit 38 attached hereto is a true and accurate copy of a letter from Attorney General Brian Schwalb to Louisiana Governor Jeff Landry dated August 20, 2025.

41.    Exhibit 39 attached hereto is a true and accurate copy of a letter from Attorney General Brian Schwalb to Mississippi Governor Tate Reeves dated August 20, 2025.

42.    Exhibit 40 attached hereto is a true and accurate copy of a letter from Attorney General Brian Schwalb to South Carolina Governor Henry McMaster dated August 20, 2025.

43.    Exhibit 41 attached hereto is a true and accurate copy of a letter from Attorney General Brian Schwalb to Tennessee Governor Bill Lee dated August 20, 2025.

44.    Exhibit 42 attached hereto is a true and accurate copy of a letter from Attorney General Brian Schwalb to West Virginia Governor Patrick Morrissey dated August 20, 2025.

45.    Exhibit 43 attached hereto is a true and accurate copy of a letter from Attorney General Brian Schwalb to Ohio Governor Mike DeWine dated August 20, 2025.

8

**JA099**

46.    Exhibit 44 attached hereto is a true and accurate copy of a letter from Attorney General Brian Schwalb to Secretary of the Army Daniel Driscoll dated August 20, 2025.

47.    Exhibit 45 attached hereto is a true and accurate copy of an email from Chief Deputy Attorney General of Tennessee Lacey E. Mase to Chief Deputy Attorney General of the District of Columbia Seth Rosenthal to Secretary of the Army Daniel Driscoll dated August 22, 2025.

48.    Exhibit 46 attached hereto is a true and accurate copy of an article by the Associated Press, *National Guard troops from Tennessee authorized by governor to patrol D.C.* streets, NewsChannel9 (Aug. 19, 2025), captured from https://newschannel9.com/news/local/national-guard-troops-from-tennessee-authorized-by-governor-to-patrol-dc-streets on September 6, 2025.

49.    Exhibit 47 attached hereto is a true and accurate copy of an article by Peter Hirschfeld, *Phil Scott rejects second request to deploy Vermont National Guard, this time to Washington, D.C.,* Vermont Public (Aug. 15, 2025), captured from https://www.vermontpublic.org/local-news/2025-08-15/phil-scott-rejects-request-deploy-vermont-national-guard-washington-d-c on September 6, 2025.

50.    Exhibit 48 attached hereto is a true and accurate copy of an article by Todd Bookman, S*ig Sauer Guns Hanging on Soldiers' Hips May Be Firing Without Trigger Pull*, NPR (July 24, 2024), captured from https://www.npr.org/2024/07/26/nx-s1-5023043/sig-sauer-guns-military-new-hampshire-investigation on September 6, 2025.

51.    Exhibit 49 attached hereto is a true and accurate copy of a webpage by the D.C. National Guard titled "Joint Task Force (JTF)-DC" dated September 7, 2025 captured from https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/    on September 8, 2025.

9

**JA100**

52.    Exhibit 50 attached hereto is a true and accurate copy of an article by C. Todd Lopez, *National Guard Task Force Mobilizes to Restore Safety in Nation's Capital*, Department of Defense (Aug. 11, 2025), captured from https://www.war.gov/News/News-Stories/Article/Article/4271502/national-guard-task-force-mobilizes-to-restore-safety-in-nations-capital/ on September 8, 2025.

53.    Exhibit 51 attached hereto is a true and accurate copy of a press release by the Air Force Global Strike Command, *AFGSC Completes M18 Handgun Inspection, Returns to Service*, Air Force Global Strike Command (Aug. 24, 2025), captured from https://www.afgsc.af.mil/News/Article-Display/Article/4284351/afgsc-completes-m18-handgun-inspection-returns-to-service/ on September 9, 2025.

54.    Exhibit 52 attached hereto is a true and accurate copy of an article by Sgt. Kalina Hyche, *Tennessee National Guard Sustains DC Safe and Beautiful Mission*, U.S. Army (Sept. 8, 2025), captured from https://www.army.mil/article/288327/tennessee_national_guard_sustains_dc_safe_and_beautiful_mission on September 9, 2025.

55.    Exhibit 53 attached hereto is a true and accurate copy of a post to the X (formerly Twitter) account of the U.S. Army (@USArmy) (Sep. 8, 2025), captured from https://x.com/USArmy/status/1965112966195359126 on September 9, 2025.

56.    Exhibit 54 attached hereto is a true and accurate copy of a post to the X (formerly Twitter) account of the D.C. National Guard (@DCGuard1802) (Sep. 7, 2025), captured from https://x.com/DCGuard1802/status/1964650073528418732 on September 9, 2025.

57.    On September 9, 2025, I reviewed a video posted to Facebook.com by the D.C. National Guard at the following url:  https://www.facebook.com/reel/1282999120241434. The

**JA101**

video includes the following caption, "Spc. Brycen Nelson of the West Virginia National Guard used his American Sign Language skills to help a hearing impaired victim in Washington, D.C. after an attempted robbery. Military skillset expertise paired with unique skills learned from civilian jobs is something our Guard members are using every day to keep #DCSafe. #AlwaysReadyAlwaysThere." In the video, Spc. Nelson states:

> I was able to use the sign language I picked up working at jail back home to get this woman to safety and help her out. We walked up and we saw these two people fighting over a bag, and we got them separated, and the woman came to us, and the female was trying to break down what was going on, but she was deaf. She was mostly using sign language, so I was able to spell out enough to figure out what was going on. I got her to a safe location right there at the police station. It feels good being able to use my real-life skills out here to help the public in D.C.

58.    On September 9, 2025, I reviewed a video posted to a webpage titled "Joint Task Force DC patrols at Union Station" dated August 31, 2025 and posted by the Defense Visual Information Distribution Service at the following url: https://www.dvidshub.net/video/975780/joint-task-force-dc-patrols-union-station. The video depicts a uniformed National Guard Private First Class who states the following:

> It's my first time in D.C. It is a lovely and beautiful city. So our mission here today is to support the D.C. police, and we are patrolling Union Station. So at first we were getting a lot of heckling. They were not very happy to see us here. I can understand how we would come across as threatening. We are wearing firearms and protective armor. We want to defend everyone's freedom of speech. It's great being out here, and it's great seeing people protest in this way. It's not something I

11

**JA102**

get to see a lot of in my hometown. Baton Rouge, Louisiana. The defense of the Constitution is top priority. We're here to make sure that you can do and protest as you please, and that you're protected while you're doing it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 9, 2025.

_____
WILLIE HAYNES

12

**JA103**

JA104

# EXHIBIT
# 01



# Department of Defense
# INSTRUCTION

**NUMBER** 3025.21
February 27, 2013
Incorporating Change 1, Effective February 8, 2019

USD(P)

SUBJECT:    Defense Support of Civilian Law Enforcement Agencies

References:    See Enclosure 1

1. <u>PURPOSE</u>.  In accordance with the authority in DoD Directive (DoDD) 5111.1 and Deputy Secretary of Defense Memorandum (References (a) and (b)), this Instruction:

   a.  Establishes DoD policy, assigns responsibilities, and provides procedures for DoD support to Federal, State, tribal, and local civilian law enforcement agencies, including responses to civil disturbances within the United States, including the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any territory or possession of the United States or any other political subdivision thereof in accordance with DoDD 3025.18 (Reference (c)).

   b.  Prescribes the regulations required by section 275 of title 10, United States Code (U.S.C.) (Reference (d)).

   c.  Incorporates and cancels DoDDs 3025.12, 5525.5, and 5030.46 (References (e), (f), and (g)).

2. <u>APPLICABILITY</u>.  This Instruction:

   a.  Applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff (CJCS) and the Joint Staff, the Combatant Commands, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (hereinafter referred to collectively as the "DoD Components").

   b.  Applies to the Office of the Inspector General of the Department of Defense (IG, DoD) only to the extent that this Instruction does not conflict with any of the duties and responsibilities assigned to the IG, DoD pursuant to section 8(g) of Appendix, title 5, United States Code (U.S.C.) (also known as "The Inspector General Act of 1978, as amended" (Reference (h))).

**JA105**

c.  Governs all DoD Component planning for and participation in Defense support of civilian law enforcement activities, including domestic emergencies and civil disturbance operations (CDO) (formerly referred to as "military assistance for civil disturbances").

d.  Applies to National Guard (NG) personnel in Reference (d) status only.

e.  Applies to civilian employees of the DoD Components and the activities of DoD contractors performed in support of the DoD Components.

f.  Does not apply to:

(1)  Counternarcotics activities.

(2)  Assistance to foreign law enforcement officials.

(3)  The Defense Intelligence and Counterintelligence Components, when providing intelligence assistance to civilian law enforcement activities in accordance with paragraph 2.6. of Executive Order 12333 (Reference (i)) and Procedure 12 of DoD 5240.1-R (Reference (j)).

(4)  Requests for sensitive support, which are governed by DoDD S-5210.36 (Reference (k)).

(5)  NG personnel in State active duty or title 32, U.S.C. (Reference (l)), status.

(6)  Maritime Homeland Security Operations, defined as time-critical requests by the United States Coast Guard for short duration (less than 48 hours) DoD support in countering an immediate maritime security threat, that are governed by the DoD-Department of Homeland Security Memorandum of Agreement for Department of Defense Support to the United States Coast Guard for Maritime Homeland Security (Reference (m)).

(7)  Aircraft piracy operations conducted pursuant to Reference (d).

3.  <u>DEFINITIONS</u>.  See Glossary.

4.  <u>POLICY</u>.  It is DoD policy that:

a.  DoD shall be prepared to support civilian law enforcement agencies consistent with the needs of military preparedness of the United States, while recognizing and conforming to the legal limitations on direct DoD involvement in civilian law enforcement activities.

b.  Support of civilian law enforcement agencies by DoD personnel shall be provided in accordance with sections 112, 351, 831, 1116, 1751, and 1385 (also known and hereinafter referred to as "The Posse Comitatus Act, as amended") of title 18, U.S.C. (Reference (n)); chapter 18 of Reference (d); section 1970 of title 2, U.S.C. (Reference (o)) (for support to the

2

**JA106**

U.S. Capitol Police); and other Federal laws, including those protecting the civil rights and civil liberties of individuals, as applicable.

c.  The restrictions in paragraph 1.c. of Enclosure 3 of this Instruction shall apply to all actions of DoD personnel worldwide.

d.  Exceptions, based on compelling and extraordinary circumstances, may be granted to the restrictions in paragraph 1.c. of Enclosure 3 of this Instruction for assistance to be provided outside the United States; only the Secretary of Defense or Deputy Secretary of Defense may grant such exceptions.

e.  Requests for law enforcement support shall be evaluated using the criteria in Reference (c).

f.  The ASD(HD&GS) may approve requests for DoD support of civilian law enforcement actions in accordance with Paragraph 4.s above the signature of Reference (c).

5.  <u>RESPONSIBILITIES</u>.  See Enclosure 2.

6.  <u>PROCEDURES</u>.  See Enclosures 3 through 9.  See Enclosure 4 for specific guidance for CDO.

7.  <u>RELEASABILITY</u>.  UNLIMITED.  This Instruction is approved for public release and is available on the DoD Issuances Website at https://www.esd.whs.mil/DD/.

8.  <u>SUMMARY OF CHANGE 1</u>.  The changes to this issuance are administrative and:

a.  Update organizational titles and references for accuracy.

b.  Align policy with the existing policy in Reference (c).

c.  Update permissible direct assistance (see Enclosure 3) in accordance with DoD Instruction (DoDI) 5505.03 (Reference (p)).

3

**JA107**

*DoDI 3025.21, February 27, 2013*

9.  <u>EFFECTIVE DATE</u>.  This Instruction is effective February 27, 2013.



James N. Miller
Under Secretary of Defense for Policy

Enclosures
 1.  References
 2.  Responsibilities
 3.  Participation of DoD Personnel in Civilian Law Enforcement Activities
 4.  DoD Support of CDO
 5.  Domestic EOD Support of Civilian Law Enforcement Agencies
 6.  Domestic Terrorism Incident Support
 7.  Use of Information Collected During DoD Operations
 8.  Use of DoD Equipment and Facilities
 9.  Funding
Glossary

4

**JA108**

*DoDI 3025.21, February 27, 2013*

## TABLE OF CONTENTS

ENCLOSURE 1:  REFERENCES ....................................................................................................7

ENCLOSURE 2:  RESPONSIBILITIES ......................................................................................10

    UNDER SECRETARY OF DEFENSE FOR POLICY (USD(P)) ..........................................10
    ASSISTANT SECRETARY OF DEFENSE FOR HOMELAND DEFENSE
        AND GLOBAL SECURITY (ASD(HD&GS)) ...............................................................10
    USD(I) ......................................................................................................................................11
    IG, DoD ..................................................................................................................................11
    UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS
        (USD(P&R)) ........................................................................................................................11
    ASD (M&RA) .........................................................................................................................12
    HEADS OF THE DoD COMPONENTS ...............................................................................12
    SECRETARIES OF THE MILITARY DEPARTMENTS .....................................................12
    CJCS .......................................................................................................................................13
    COMMANDERS OF THE COMBATANT COMMANDS WITH DSCA
        RESPONSIBILITIES .........................................................................................................13
    COMMANDERS OF UNITED STATES NORTHERN COMMAND (USNORTHCOM),
        UNITED STATES INDO-PACIFIC COMMAND (USINDOPACOM), AND UNITED
        STATES SPECIAL OPERATIONS COMMAND (USSOCOM) .................................14
    CHIEF, NGB ...........................................................................................................................14

ENCLOSURE 3:  PARTICIPATION OF DoD PERSONNEL IN CIVILIAN LAW
    ENFORCEMENT ACTIVITIES .............................................................................................16

    GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES .................16
        Statutory Restrictions .......................................................................................................16
        Permissible Direct Assistance ..........................................................................................16
        Restrictions on Direct Assistance ....................................................................................18
        Use of DoD Personnel to Operate or Maintain Equipment ............................................19
        Expert Advice ..................................................................................................................22
        Training ............................................................................................................................22
        Other Permissible Assistance ..........................................................................................23
    EXCEPTIONS BASED ON STATUS ....................................................................................23
    EXCEPTIONS BASED ON MILITARY SERVICE ..............................................................24
    MILITARY READINESS .......................................................................................................24
    APPROVAL AUTHORITY ....................................................................................................24

ENCLOSURE 4:  DoD SUPPORT OF CDO ..............................................................................26

    GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES ...............26
    DoD REQUIREMENTS .........................................................................................................27
    CDO PLANNING ...................................................................................................................27

5

Change 1, 02/08/2019

CONTENTS

**JA109**

ROLE OF THE NG ....................................................................................................28
COOPERATION WITH CIVIL AUTHORITIES.....................................................28
APPROVAL AUTHORITY ......................................................................................29

ENCLOSURE 5:  DOMESTIC EOD SUPPORT OF CIVILIAN LAW ENFORCEMENT
    AGENCIES.................................................................................................................30

GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES..................30
DoD REQUIREMENTS...........................................................................................30
PLANNING AND EXECUTION .............................................................................32
COOPERATION WITH CIVIL AUTHORITIES.....................................................34

ENCLOSURE 6:  DOMESTIC TERRORISM INCIDENT SUPPORT ....................................35

DoD GUIDANCE.....................................................................................................35
REQUIREMENT FOR VOCAL ORDERS TO BE PUBLISHED ........................35

ENCLOSURE 7:  USE OF INFORMATION COLLECTED DURING MILITARY
    OPERATIONS............................................................................................................36

ACQUISITION AND DISSEMINATION.................................................................36
MILITARY READINESS ........................................................................................37

ENCLOSURE 8:  USE OF DoD EQUIPMENT AND FACILITIES ...........................................38

EQUIPMENT AND FACILITIES ...........................................................................38
LIMITATIONS ON THE USE OF PERSONNEL ..................................................38
MILITARY READINESS ........................................................................................38

ENCLOSURE 9:  FUNDING........................................................................................................40

GENERAL.................................................................................................................40
PROCEDURAL REQUIREMENTS ........................................................................40
PERSONNEL DUTY STATUS ...............................................................................41

GLOSSARY ................................................................................................................................42

PART I:  ABBREVIATIONS AND ACRONYMS ................................................42
PART II:  DEFINITIONS........................................................................................43

6

CONTENTS

**JA110**

ENCLOSURE 1

REFERENCES

(a)  DoD Directive 5111.1, "Under Secretary of Defense for Policy (USD(P))," December 8, 1999
(b)  Deputy Secretary of Defense Memorandum, "Delegations of Authority," November 30, 2006
(c)  DoD Directive 3025.18, "Defense Support of Civil Authorities (DSCA)," December 29, 2010, as amended
(d)  Sections 251-254, 271-282 (chapter 15), 2576, 2667, and 9442 and chapters 47[1] and 1011 of title 10, United States Code
(e)  DoD Directive 3025.12, "Military Assistance for Civil Disturbances (MACDIS)," February 4, 1994 (hereby cancelled)
(f)  DoD Directive 5525.5, "DoD Cooperation with Civilian Law Enforcement Officials," January 15, 1986 (hereby cancelled)
(g)  DoD Directive 5030.46, "Assistance to the District of Columbia Government in Combating Crime," March 26, 1971 (hereby cancelled)
(h)  Section 8[2] of Appendix and section 552a[3] to title 5, United States Code
(i)  Executive Order 12333, "United States Intelligence Activities," as amended
(j)  DoD 5240.1-R, "Procedures Governing the Activities of DoD Intelligence Components that Affect United States Persons," December 1982, as amended
(k)  DoD Directive S-5210.36, "Provision of DoD Sensitive Support to DoD Components and Other Departments and Agencies of the U.S. Government (U)," November 6, 2008, as amended
(l)  Section 502 of title 32, United States Code
(m)  Memorandum of Agreement Between the Department of Defense and the Department of Homeland Security for Department of Defense Support to the United States Coast Guard for Maritime Homeland Security, April 5, 2006
(n)  Title 18, United States Code
(o)  Section 1970 of title 2, United States Code
(p)  DoD Instruction 5505.03, "Initiation of Investigations by Defense Criminal Investigative Organizations," February 13, 2017, as amended.
(q)  DoD Directive 5111.13, "Assistant Secretary of Defense for Homeland Defense and Global Security (ASD(HD&GS))," March 23, 2018
(r)  DoD Directive 5106.01, "Inspector General of the Department of Defense (IG DoD)," April 20, 2012, as amended
(s)  DoD Directive 1322.18, "Military Training," January, 13, 2009, as amended
(t)  DoD Directive 5105.77, "National Guard Bureau (NGB)," October 30, 2015, as amended
(u)  DoD Instruction 5525.07, "Implementation of the Memorandum of Understanding (MOU) Between the Departments of Justice (DoJ) and Defense Relating to the Investigation and Prosecution of Certain Crimes," June 18, 2007

---

[1] Also known as "the Uniform Code of Military Justice"
[2] Also known as "the Inspector General Act of 1978, as amended"
[3] Also known as "The Privacy Act of 1974, as amended"

**JA111**

*DoDI 3025.21, February 27, 2013*

(v)  Memorandum of Agreement Between the Attorney General and the Secretary of Defense, "Agreement Governing the Conduct of Defense Department Counterintelligence Activities in Conjunction with the Federal Bureau of Investigation," April 5, 1979, and its supplement, "Coordination of Counterintelligence Matters Between FBI and DoD," June 3 and June 20, 1996

(w)  Sections 23, 78, 593, and 1861(a)[4] of title 16, United States Code

(x)  Public Law 94-524, "The Presidential Protection Assistance Act of 1976," October 17, 1976, as amended

(y)  Sections 408 and 461-462 of title 22, United States Code

(z)  Section 180 of title 25, United States Code

(aa)  Sections 97, 1989, and 5121-5207[5] of title 42, United States Code

(ab)  DoD Instruction 6200.03, "Public Health Emergency Management Within the Department of Defense," March 5, 2010, as amended

(ac)  Section 1065 of title 43, United States Code

(ad)  Sections 1418, 1422, and 1591 of title 48, United States Code

(ae)  Section 220 of title 50, United States Code

(af)  Secretaries of the Departments of Defense, Interior, and Transportation; Administrator of the National Aeronautics and Space Administration; and Chair of the Federal Communications Commission; "National Search and Rescue Plan of the United States," January 2007, as amended

(ag)  DoD Instruction 3003.01, "DoD Support to Civil Search and Rescue (SAR)," September 26, 2011

(ah)  DoD Instruction 5525.13, "Limitation of Authority to Deputize DoD Uniformed Law Enforcement Personnel by State and Local Governments," September 28, 2007

(ai)  DoD Directive 5210.56, "Arming and the Use of Force," November 18, 2016

(aj)  Chairman of the Joint Chiefs of Staff Instruction 3121.01B, "Standing Rules of Engagement/Standing Rules for the Use of Force for U.S. Forces," June 13, 2005

(ak)  DoD Instruction 4515.13, "Air Transportation Eligibility," January 22, 2016, as amended

(al)  Sections 801-904 and 951-971 of title 21, United States Code

(am)  Sections 1324-1328 of title 8, United States Code

(an)  Section 1401 of title 19, United States Code

(ao)  Chapter 705 of title 46, United States Code

(ap)  Deputy Secretary of Defense Memorandum, "DoD Training Support to U.S. Civilian Law Enforcement Agencies," June 29, 1996[6]

(aq)  Deputy Secretary of Defense Memorandum, "Request for Exception to Policy," November 12, 1996[7]

(ar)  DoD Directive 5240.01, "DoD Intelligence Activities," August 27, 2007, as amended

(as)  DoD Directive 5111.10, "Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict (ASD(SO/LIC))," March 22, 1995, as amended

---

[4] Section 1861(a) is part of "The Fishery Conservation and Management Act of 1976, as amended" -- Public Law 94-265, approved April 13, 1976; 16 U.S.C. 1801-1882; 90 Stat. 331; as amended.

[5] Also known as "The Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1988, as amended" ("the Stafford Act")

[6] Available from OASD(HD&GS)/Room 3D247, 2600 Defense Pentagon, Washington, D.C. 20301

[7] Available from OASD(HD&GS)/Room 3D247, 2600 Defense Pentagon, Washington, D.C. 20301

8

**JA112**

*DoDI 3025.21, February 27, 2013*

(at)  Parts 260-270 of title 40, Code of Federal Regulations, Hazardous Waste Management System: General

(au)  DoD Manual 6055.09, Volume 3, "DoD Ammunition and Explosives Safety Standards: General Quantity-Distance Criteria for Accidental Detonations," February 29, 2008, as amended

(av)  DoD Directive 3025.13, "Employment of DoD Capabilities in Support of the U.S. Secret Service (USSS), Department of Homeland Security (DHS)," October 8, 2010, as amended

(aw)  DoD Manual 5100.76, "Physical Security of Sensitive Conventional Arms, Ammunitions, and Explosives (AA&E)," April 17, 2012, as amended

(ax)  National Telecommunications and Information Administration, Manual of Regulations and Procedures for Federal Radio Frequency Management, May 2012 Revision of the January 2008 Edition[8]

(ay)  DoD Instruction 5160.68, Single Manager for Conventional Ammunition (SMCA): Responsibilities of the SMCA, the Military Services, and the United States Special Operations Command (USSOCOM), December 29, 2008, as amended

(az)  DoD Instruction 6055.17, "DoD Emergency Management (EM) Program," February 13, 2017, as amended

(ba)  DoD 5400.11-R, "Department of Defense Privacy Program," May 14, 2007

(bb)  DoD Directive 5200.27, "Acquisition of Information Concerning Persons and Organizations not Affiliated with the Department of Defense," January 7, 1980

(bc)  DoD Directive 5400.11, "DoD Privacy Program," October 29, 2014

(bd)  Sections 1535[9] and 6501-6508[10] of title 31, United States Code

(be)  Title 40, United States Code (also known as "The Federal Property and Administrative Services Act of 1949, as amended")

(bf)  Title 41, United States Code

(bg)  Chapters 21, 25, 29, and 31 of title 44, United States Code

(bh)  DoD Instruction 4165.70, "Real Property Management," April 6, 2005, as amended

(bi)  DoD Directive 5410.12, "Economic Adjustment Assistance to Defense-Impacted Communities," July 5, 2006

(bj)  DoD 7000.14-R, "Department of Defense Financial Management Regulations (FMRs)," Volumes 1-15, date varies per volume

(bk)  Office of the Chairman of the Joint Chiefs of Staff, "DoD Dictionary of Military and Associated Terms," current edition

---

[8] http://www.ntia.doc.gov/page/2011/manual-regulations-and-procedures-federal-radio-frequency-management-redbook

[9] Also known as "The Economy Act of 1932, as amended" ("the Economy Act")

[10] Also known as "The Intergovernmental Cooperation Act of 1968, as amended"

9

*DoDI 3025.21, February 27, 2013*

ENCLOSURE 2

RESPONSIBILITIES

1.  UNDER SECRETARY OF DEFENSE FOR POLICY (USD(P)).  The USD(P) shall establish DoD policy governing defense support of civilian law enforcement agencies and facilitate the coordination of that policy with Federal departments and agencies; State, local, and tribal agencies; and the DoD Components, as appropriate.

2.  ASSISTANT SECRETARY OF DEFENSE FOR HOMELAND DEFENSE AND GLOBAL SECURITY AFFAIRS (ASD(HD&GS)).  The ASD(HD&GS), under the authority, direction, and control of the USD(P) and in accordance with DoDD 5111.13 (Reference (q)), shall develop, coordinate, recommend, and supervise the implementation of policy for defense support of civilian law enforcement agencies and defense support of civil authorities (DSCA), including law enforcement support activities.  In executing this responsibility for DoD law enforcement support activities, the ASD(HD&GS) shall:

   a.  Develop procedures and issue appropriate direction as necessary for defense support of civilian law enforcement agencies in coordination with the General Counsel of the Department of Defense, and in consultation with the Attorney General of the United States (AG), as appropriate, and in accordance with responsibilities assigned in References (c) and (q).  This includes tasking the DoD Components to plan for and to commit DoD resources in response to requests from civil authorities for CDO (such a commitment of DoD resources for CDO must be authorized by the President of the United States and directed by the Secretary of Defense).

   b.  Serve as the principal point of contact between DoD and the Department of Justice for planning and executing CDO.

   c.  Coordinate with civilian law enforcement agencies on policies to further DoD cooperation with civilian law enforcement agencies.

   d.  Provide guidance for the use of Reserve Component personnel in support of civilian law enforcement agencies, in coordination with the Secretaries of the Military Departments and the Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)), and with the Chief, National Guard Bureau (NGB), as appropriate.  This will include guidance for use by approving authorities in evaluating the effect on military preparedness of requests for civilian law enforcement assistance that may involve use of the Reserve Components.

   e.  Assist in the development of policy regulating plans, procedures, and requirements of the DoD Components with authority over defense resources that may be employed to provide law enforcement support.

   f.  Inform the ASD(M&RA) of all requests for assistance by civilian law enforcement agencies that may be met using Reserve Component personnel and resources.

10

**JA114**

(1)  Inform the Chief, NGB of all requests for assistance by civilian law enforcement agencies that may be met using NG personnel.

(2)  Coordinate with the ASD(M&RA) and others as appropriate regarding duty status policies (e.g., performance of duty pursuant to sections 251-254 and 271-282 of Reference (d)).

g.  Coordinate with the CJCS in advance of the commitment of any Federal military forces.

h.  Coordinate with the Under Secretary of Defense (Comptroller)/Chief Financial Officer, Department of Defense, when providing assistance to civilian law enforcement agencies to ensure an appropriate funding approach in accordance with Enclosure 9 of this Instruction.

i.  In coordination with the Under Secretary of Defense for Intelligence (USD(I)), the CJCS, the Commanders of the Combatant Commands with DSCA responsibilities, and the Secretaries of the Military Departments, establish protocols and guidance for ensuring that the needs of civilian law enforcement officials for information are taken into account in the planning and execution of military training and operations.

j.  Ensure, in coordination with the ASD for Special Operations and Low-Intensity Conflict (SO/LIC), the proper use of electronic counter-measures (ECM) by or in support of DoD explosive ordnance disposal (EOD) personnel when supporting civil authorities is addressed in interagency agreements and contingency plans.

k.  Approve requests for DoD support of civilian law enforcement agencies in accordance with Reference (c).

3.  <u>USD(I)</u>.  The USD(I) shall:

a.  Establish DoD processes and procedures to provide support to civilian law enforcement officials with Defense Intelligence Component resources in accordance with appropriate statutory authorities and DoD and Intelligence Community policy.

b.  Facilitate consultation on DoD policy regarding intelligence support of law enforcement officials, with appropriate Federal departments and agencies; State, local, and tribal agencies; and the DoD Components.

4.  <u>IG, DoD</u>.  The IG, DoD, shall issue guidance on cooperation with civilian law enforcement officials with respect to audits and investigations conducted, supervised, monitored, or initiated pursuant to DoDD 5106.01 (Reference (r)).

5.  <u>UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R))</u>.  The USD(P&R) shall monitor and oversee the development of integrated training

*DoDI 3025.21, February 27, 2013*

capabilities related to defense support to civilian law enforcement officials and the integration of these training capabilities into exercises and training to build, sustain, and assess readiness in accordance with DoDD 1322.18 (Reference (s)).

6. <u>ASD(M&RA)</u>.  The ASD(M&RA), under the authority, direction, and control of the USD(P&R), shall assist the ASD(HD&GS*)* in the development of guidance for use by approving authorities in evaluating the effect on military preparedness of requests for civilian law enforcement assistance that may involve use of the Reserve Components.

7. <u>HEADS OF THE DoD COMPONENTS</u>.  The Heads of the DoD Components shall:

    a.  Strictly comply with and disseminate throughout their Components the guidance issued by the ASD(HD&GS) pursuant to section 2 of this enclosure.

    b.  Identify appropriate resources for civilian law enforcement support that are consistent with law and DoD policy to carry out the intent of this Instruction.

    c.  Review training and operational programs to determine how and where assistance can best be provided to civilian law enforcement officials, consistent with the responsibilities established in this enclosure.  This review should include recommendations regarding activities for which reimbursement could be waived in accordance with section 2 of Enclosure 9.

    d.  Issue implementing guidance, in coordination with the ASD(HD&GS), incorporating the procedures in this Instruction, including:

        (1)  Procedures for prompt transfer of relevant information to law enforcement agencies.

        (2)  Procedures for establishing local contact points in subordinate commands for purposes of coordination with Federal, State, tribal, and local civilian law enforcement officials.

        (3)  Guidelines for evaluating requests for assistance in terms of effect on military preparedness of the United States.

    e.  Inform the CJCS of all requests requiring approval of the ASD(HD&GS) or the Secretary of Defense, in accordance with this Instruction.

8. <u>SECRETARIES OF THE MILITARY DEPARTMENTS</u>.  The Secretaries of the Military Departments, in addition to the responsibilities in section 7 of this enclosure, shall:

    a.  Provide resources to the DoD Components, consistent with DoD policies, goals, and objectives, to carry out the purpose of this Instruction.

Change 1, 02/08/2019                                                                                    ENCLOSURE 2

**JA116**

b.  Coordinate with the Commanders of the Combatant Commands with DSCA responsibilities to ensure that the needs of civilian law enforcement officials for information are taken into account in the planning and execution of military training and operations.

9.  <u>CJCS</u>.  The CJCS, in addition to the responsibilities in section 7 of this enclosure, shall:

a.  Assist the ASD(HD&GS) in developing recommendations for responding to requests for CDO and developing interagency policies on CDO.

b.  Develop processes to evaluate the effect of requests for civilian law enforcement assistance on military preparedness of the United States.

c.  Advise the Secretary of Defense, ASD(HD&GS), or Heads of the DoD Components, upon request, on the effect on military preparedness of the United States of any request for defense assistance with respect to CDO.

10.  <u>COMMANDERS OF THE COMBATANT COMMANDS WITH DSCA RESPONSIBILITIES</u>.  The Commanders of the Combatant Commands with DSCA responsibilities, through the CJCS, shall, in addition to the responsibilities in section 7 of this enclosure:

a.  Provide support of civilian law enforcement authorities as directed by the Secretary of Defense.

b.  Implement the provisions of this Instruction in appropriate training and exercises.

c.  When designated as a supported commander, coordinate with supporting DoD Components all reimbursement for assistance provided under the provisions of this Instruction.

d.  When designated as a supported commander, coordinate with the CJCS, the ASD(HD&GS), and the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict (ASD(SO/LIC)) (for the employment of special operations forces) for all military preparations and operations, including the employment of Federal military forces as requested by the AG and approved by the Secretary of Defense, as a result of any domestic emergency, including a terrorist incident, civil disturbance, or a natural disaster.  Commanders shall observe all such law enforcement policies as the AG may determine appropriate.

e.  For a terrorist incident having the potential for a request for military assistance by mutual agreement of DoD and the Federal Bureau of Investigation (FBI), designated Combatant Commanders may dispatch observers to the incident site to evaluate the situation.  Any dispatch of DoD counterterrorism forces must be specifically authorized by the Secretary of Defense through the CJCS.

f.  Coordinate with the Secretaries of the Military Departments to ensure that the needs of civilian law enforcement officials for information are taken into account in the planning and execution of military training and operations.

11.  <u>COMMANDERS OF UNITED STATES NORTHERN COMMAND (USNORTHCOM), UNITED STATES INDO-PACIFIC COMMAND (USINDOPACOM), AND UNITED STATES SPECIAL OPERATIONS COMMAND (USSOCOM)</u>.  The Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM, through the CJCS and in addition to the responsibilities in sections 7 and 10 of this enclosure, shall:

a.  Serve as the DoD planning agents for support of civilian law enforcement activities, including CDO, following the guidance of the ASD(HD&GS) and in coordination with the CJCS.

b.  Lead planning activities for support of civilian law enforcement activities, including CDO, of the DoD Components in accordance with section 3 of Enclosure 4.  Serve as the DoD financial managers for their respective CDO operations in accordance with section 2 of Enclosure 9.

12.  <u>CHIEF, NGB</u>.  The Chief, NGB, shall:

a.  Implement the procedures in this Instruction.

b.  Assist the ASD(HD&GS) in accordance with DoDD 5105.77 (Reference (t)) in developing policy guidance regarding the use of NG personnel for DoD support of civilian law enforcement agencies.

c.  Assist the ASD(HD&GS) in the development of policy guidance for use by approving authorities in evaluating the effect on military preparedness if NG personnel are used to fulfill requests for civilian law enforcement assistance.

d.  Serve as an advisor to the Commanders of the Combatant Commands on NG matters pertaining to Combatant Command responsibilities under this Instruction, and support planning and coordination for such activities as requested by the CJCS or the Commanders of other Combatant Commands.

e.  On all matters pertaining to the NG, serve as the channel of communications between:  the Secretary of Defense, the CJCS, and the DoD Components (other than the Department of the Army and the Department of the Air Force); and the States.  The Chief, NGB, shall keep the Secretaries of the Army and the Air Force informed of all communications unless otherwise directed by the Secretary of Defense.

    f.  Coordinate the sharing of State contingency plans for the use of non-federalized NG forces in CDO roles between the responsible State Adjutants General and the responsible Combatant Commander.

15

**JA119**

*DoDI 3025.21, February 27, 2013*

ENCLOSURE 3

PARTICIPATION OF DoD PERSONNEL IN CIVILIAN LAW ENFORCEMENT
ACTIVITIES

1.  GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES

   a.  Statutory Restrictions

   (1)  The primary restriction on DoD participation in civilian law enforcement activities is the Posse Comitatus Act.  It provides that whoever willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute U.S. laws, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, shall be fined under Reference (n), or imprisoned not more than 2 years, or both.

   (2)  Section 275 of Reference (d) provides that the Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under chapter 15 of Reference (d) does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

   b.  Permissible Direct Assistance.  Categories of active participation in direct law-enforcement-type activities (e.g., search, seizure, and arrest) that are not restricted by law or DoD policy are:

   (1)  Actions taken for the primary purpose of furthering a DoD or foreign affairs function of the United States, regardless of incidental benefits to civil authorities.  This does not include actions taken for the primary purpose of aiding civilian law enforcement officials or otherwise serving as a subterfuge to avoid the restrictions of the Posse Comitatus Act.  Actions under this provision may include (depending on the nature of the DoD interest and the authority governing the specific action in question):

   (a)  Investigations and other actions related to enforcement of chapter 47 of Reference (d) (also known as "the Uniform Code of Military Justice").

   (b)  Investigations and other actions that are likely to result in administrative proceedings by the DoD, regardless of whether there is a related civil or criminal proceeding. (See DoDI 5525.07 (Reference (u)) and Memorandum of Agreement Between the AG and the Secretary of Defense (Reference (v)) with respect to matters in which the DoD and the Department of Justice both have an interest.)

   (c)  Investigations and other actions related to a commander's inherent authority to maintain law and order on a DoD installation or facility.

16

**JA120**

(d)  Protection of classified defense information or equipment or controlled unclassified information (e.g., trade secrets and other proprietary information), the unauthorized disclosure of which is prohibited by law.

(e)  Protection of DoD personnel, equipment, and official guests.

(f)  Such other actions that are undertaken primarily for a military or foreign affairs purpose.

(2)  Audits and investigations conducted by, under the direction of, or at the request of the IG, DoD, pursuant to the Inspector General Act of 1978, as amended.

(3)  When permitted under emergency authority in accordance with Reference (c), Federal military commanders have the authority, in extraordinary emergency circumstances where prior authorization by the President is impossible and duly constituted local authorities are unable to control the situation, to engage temporarily in activities that are necessary to quell large-scale, unexpected civil disturbances because:

(a)  Such activities are necessary to prevent significant loss of life or wanton destruction of property and are necessary to restore governmental function and public order; or,

(b)  When duly constituted Federal, State, or local authorities are unable or decline to provide adequate protection for Federal property or Federal governmental functions.  Federal action, including the use of Federal military forces, is authorized when necessary to protect Federal property or functions.

(4)  DoD actions taken pursuant to sections 251-254 of Reference (d) relating to the use of Federal military forces in specified circumstances with respect to insurrection, domestic violence, or conspiracy that hinders the execution of State or Federal law.

(5)  Actions taken under express statutory authority to assist officials in executing the laws, subject to applicable limitations.  The laws that permit direct DoD participation in civilian law enforcement include:

(a)  Protection of national parks and certain other Federal lands consistent with sections 23, 78, and 593 of title 16, U.S.C. (Reference (w)).

(b)  Enforcement of the Fishery Conservation and Management Act of 1976, as amended, pursuant to section 1861(a) of Reference (w).

(c)  Assistance in the case of crimes against foreign officials, official guests of the United States, and other internationally protected persons pursuant to sections 112 and 1116 of Reference (n).

**JA121**

(d)  Assistance in the case of crimes against Members of Congress, Members-of-Congress-elect, Justices of the Supreme Court and nominees, and certain senior Executive Branch officials and nominees in accordance with section 351 of Reference (n).

(e)  Assistance in the case of crimes involving nuclear materials in accordance with section 831 of Reference (n).

(f)  Protection of the President, Vice President, and other designated dignitaries in accordance with section 1751 of Reference (n) and Public Law 94-524 (Reference (x)).

(g)  Actions taken in support of the neutrality laws in accordance with sections 408 and 461-462 of title 22, U.S.C. (Reference (y)).

(h)  Removal of persons unlawfully present on Indian lands in accordance with section 180 of title 25, U.S.C. (Reference (z)).

(i)  Execution of quarantine and certain health laws in accordance with section 97 of title 42, U.S.C. (Reference (aa)) and DoDI 6200.03 (Reference (ab)).

(j)  Removal of unlawful enclosures from public lands in accordance with section 1065 of title 43, U.S.C. (Reference (ac)).

(k)  Protection of the rights of a discoverer of an island covered by section 1418 of title 48, U.S.C. (Reference (ad)).

(l)  Support of territorial governors if a civil disorder occurs, in accordance with sections 1422 and 1591 of Reference (ad).

(m)  Actions in support of certain customs laws in accordance with section 220 of title 50, U.S.C. (Reference (ae)).

(n)  Actions by Defense Criminal Investigative Organizations in support of internet crimes against children having a DoD nexus in accordance with Reference (p).

(6)  Actions taken to provide search and rescue support domestically under the authorities provided in the National Search and Rescue Plan (Reference (af)) and DoDI 3003.01 (Reference (ag)).

c.  Restrictions on Direct Assistance

(1)  Except as authorized in this Instruction (e.g., in Enclosures 3 and 4), DoD personnel are prohibited from providing the following forms of direct civilian law enforcement assistance:

(a)  Interdiction of a vehicle, vessel, aircraft, or other similar activity.

(b)  A search or seizure.

(c)  An arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity.

(d)  Using force or physical violence, brandishing a weapon, discharging or using a weapon, or threatening to discharge or use a weapon except in self-defense, in defense of other DoD persons in the vicinity, or in defense of non-DoD persons, including civilian law enforcement personnel, in the vicinity when directly related to an assigned activity or mission.

(e)  Evidence collection; security functions; crowd and traffic control; and operating, manning, or staffing checkpoints.

(f)  Surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators.

(g)  Forensic investigations or other testing of evidence obtained from a suspect for use in a civilian law enforcement investigation in the United States unless there is a DoD nexus (e.g., the victim is a member of the Military Services or the crime occurred on an installation under exclusive DoD jurisdiction) or the responsible civilian law enforcement official requesting such testing declares in writing that the evidence to be examined was obtained by consent. Requests for exceptions to this restriction must be made through channels to the ASD(HD&GS), who will evaluate, in coordination with the General Counsel of the Department of Defense, whether to seek Secretary of Defense authorization for an exception to policy.

(2)  The use of deputized State or local law enforcement powers by DoD uniformed law enforcement personnel shall be in accordance with DoDI 5525.13 (Reference (ah)).

(3)  Except as otherwise directed by the Secretary of Defense, the rules for the use of force and authority for the carrying of firearms by DoD personnel providing authorized support under this Instruction shall be in accordance with DoDD 5210.56 (Reference (ai)) and any additional Secretary of Defense-approved rules for the use of force contained in CJCS Instruction 3121.01B (Reference (aj)).

(4)  Exceptions to these restrictions for assistance may be granted when the assistance is to be provided outside the United States. Only the Secretary of Defense or Deputy Secretary of Defense may grant such exceptions, based on compelling and extraordinary circumstances.

d.  <u>Use of DoD Personnel to Operate or Maintain Equipment</u>. The use of DoD personnel to operate or maintain, or to assist in operating or maintaining, equipment shall be limited to situations when the use of non-DoD personnel for operation or maintenance of such equipment would be unfeasible or impractical from a cost or time perspective and would not otherwise compromise military preparedness of the United States. In general, the head of the civilian law enforcement agency may request a DoD Component to provide personnel to operate or maintain, or to assist in operating or maintaining, equipment for the civilian agency. This assistance shall be subject to this guidance:

(1)  Such assistance may not involve DoD personnel directly participating in a law enforcement operation (as described in paragraph 1.c. of this enclosure.)

(2)  The performance of such assistance by DoD personnel shall be at a location where there is not a reasonable likelihood of a confrontation between law enforcement personnel and civilians.

(3)  The use of DoD aircraft to provide transportation for civilian law enforcement agencies may be provided only in accordance with DoD 4515.13-R (Reference (ak)).

(4)  A request for DoD personnel to operate or maintain, or to assist in operating or maintaining, equipment must be made pursuant to section 274 of Reference (d) or other applicable law that permits DoD personnel to provide such assistance to civilian law enforcement officials.  A request that is made pursuant to section 274 of Reference (d) must be made by the head of a civilian agency empowered to enforce any of these laws:

(a)  Sections 801-904 and 951-971 of title 21, U.S.C. (Reference (al)).

(b)  Sections 1324-1328 of title 8, U.S.C. (Reference (am)).

(c)  A law relating to the arrival or departure of merchandise, as defined in section 1401 of title 19, U.S.C. (Reference (an)), into or out of the customs territory of the United States, as defined in Reference (an), or any other territory or possession of the United States.

(d)  Chapter 705 of title 46, U.S.C. (Reference (ao)).

(e)  Any law, foreign or domestic, prohibiting terrorist activities.

(5)  In addition to the assistance authorized by subparagraph 1.b.(1) of this enclosure:

(a)  DoD personnel may be made available to a Federal law enforcement agency to operate or assist in operating equipment, to the extent the equipment is used in a supporting role, with respect to:

1.  A criminal violation of the laws specified in subparagraph 1.d.(4) of this enclosure.

2.  Assistance that the Federal law enforcement agency is authorized to furnish to a State, local, or foreign government that is involved in the enforcement of laws similar to those in subparagraph 1.d.(4) of this enclosure.

3.  A foreign or domestic counter-terrorism operation, including support of FBI Joint Terrorism Task Forces.

4.  Transportation of a suspected terrorist from a foreign country to the United States to stand trial.

20

(b)  DoD personnel made available to a civilian law enforcement agency pursuant to section 274 of Reference (d) may operate equipment for:

<u>1</u>.  Detection, monitoring, and communication of the movement of air and sea traffic.

<u>2</u>.  Detection, monitoring, and communication of the movement of surface traffic outside of the geographic boundary of the United States and, if the initial detection occurred outside of the boundary, within the United States, not to exceed 25 miles of the boundary.

<u>3</u>.  Aerial reconnaissance (does not include satellite reconnaissance).

<u>4</u>.  Interception of vessels or aircraft detected outside the land area of the United States for the purposes of communicating with such vessels and aircraft to direct such vessels and aircraft to go to a location designated by appropriate civilian officials.

<u>5</u>.  Operation of equipment to facilitate communications in connection with the law enforcement programs specified in subparagraph 1.d.(4) of this enclosure.

<u>6</u>.  The following activities that are subject to joint approval by the Secretary of Defense and the AG (and the Secretary of State in the case of a law enforcement operation outside of the land area of the United States):

<u>a</u>.  The transportation of civilian law enforcement personnel along with any other civilian or military personnel who are supporting, or conducting, a joint operation with civilian law enforcement personnel.

<u>b</u>.  The operation of a base of operations for civilian law enforcement and supporting personnel.

<u>c</u>.  The transportation of suspected terrorists from foreign countries to the United States for trial (so long as the requesting Federal law enforcement agency provides all security for such transportation and maintains custody over the suspect through the duration of the transportation).

<u>7</u>.  The detection, monitoring, and tracking of the movement of weapons of mass destruction under the circumstances described above, when outside the United States.

(6)  DoD personnel made available to operate equipment for the purposes in subparagraphs 1.d.(5)(b)<u>1</u> and <u>4</u> of this enclosure may continue to operate such equipment in cases involving the pursuit of vessels or aircraft into the land area of the United States where the detection began outside such land area.

(7)  With the approval of the Secretary of Defense, DoD personnel may be made available to any Federal, State, or local civilian law enforcement agency to operate equipment for purposes other than described in section 2 of this enclosure, only to the extent that such support

21

**JA125**

does not involve direct assistance by such personnel in a civilian law enforcement operation unless such direct participation is otherwise authorized by law and is authorized by the Secretary of Defense.

(8)  Nothing in this Instruction restricts the authority of Federal military commanders to take emergency action to prevent loss of life or wanton destruction of property as provided in subparagraph 1.b.(3) of this enclosure.

(9)  When DoD personnel are otherwise assigned to provide assistance with respect to the laws specified in subparagraph 1.b.(5) of this enclosure, the participation of such personnel shall be consistent with the limitations in such laws, if any, and such restrictions as may be established by policy or the DoD Components concerned.

e.  Expert Advice.  DoD Components may provide, subject to section 5 of this enclosure, expert advice to Federal, State, or local law enforcement officials in accordance with section 273 of Reference (d).  This does not permit direct assistance by DoD personnel in activities that are fundamentally civilian law enforcement operations, except as otherwise authorized in this enclosure.

f.  Training

(1)  The DoD Components may provide, subject to section 5 of this enclosure, training to Federal, State, and local civilian law enforcement officials.  This does not permit large-scale or elaborate DoD training, and does not permit regular or direct involvement of DoD personnel in activities that are fundamentally civilian law enforcement operations, except as otherwise authorized in this enclosure.

(2)  Training of Federal, State, and local civilian law enforcement officials shall be provided according to this guidance:

(a)  Assistance shall be limited to situations when the use of non-DoD personnel would be unfeasible or impractical from a cost or time perspective and would not otherwise compromise military preparedness of the United States.

(b)  Assistance may not involve DoD personnel participating in a law enforcement operation, except as otherwise authorized by this Instruction.

(c)  Assistance of DoD personnel shall be provided at a location where there is not a reasonable likelihood of a confrontation between law enforcement personnel and civilians, except as otherwise authorized by law.

(3)  This paragraph does not apply to advanced military training, which is addressed in Deputy Secretary of Defense memorandums (References (ap) and (aq)).  Additional exceptions to the policy in Reference (ap) may be requested on a case-by-case basis.  Requests for such exceptions shall be forwarded through the ASD(HD&GS).  Advanced military training:

(a)  Includes advanced marksmanship training, including sniper training, military operations in urban terrain (MOUT), advanced MOUT, close quarters battle/close quarters combat, and similar training.

(b)  Does not include basic military skills such as basic marksmanship, patrolling, mission planning, medical, and survival.

g.  <u>Other Permissible Assistance</u>.  These forms of indirect assistance are not prohibited by law or DoD policy:

(1)  Transfer to Federal, State, or local law enforcement officials of information acquired in the normal course of DoD operations that may be relevant to a violation of any Federal or State laws.

(2)  Information obtained through procedures, means, or devices authorized by Federal law exclusively for use in gathering, obtaining, or acquiring national intelligence or military intelligence may be transferred unless specifically prohibited by law.  Information shall not be transferred if it meets any of the following criteria:

(a)  The acquisition of that information violates applicable law protecting the privacy or constitutional rights of any person, including rights protected by section 552a of Reference (h) (also known as "The Privacy Act of 1974, as amended").

(b)  It would have been illegal for those civilian law enforcement officials to have obtained the information or employ the procedures, means, or devices used by the DoD Component to obtain the information.

(3)  Such other actions, approved in accordance with procedures established by the DoD Components concerned, that do not subject civilians to the use of DoD power that is regulatory, prescriptive, proscriptive, or compulsory.

2.  <u>EXCEPTIONS BASED ON STATUS</u>.  The restrictions in section 1 of this enclosure do not apply to:

a.  A member of a Reserve Component when not on active duty, active duty for training, or inactive duty for training.

b.  A member of the NG when not in Federal service.

c.  A civilian employee.  If the civilian employee is under the direct control of a military officer, assistance will not be provided unless it is permitted by section 3 of this enclosure.

d.  A member of a Military Service when off duty and in a private capacity.  A Service member is acting in a private capacity when he or she responds on his or her own volition to

**JA127**

assist law enforcement officials instead of acting under the direction or control of DoD authorities.

    e.  A member of the Civil Air Patrol, except when performing missions pursuant to section 9442(b) of Reference (d).

3.  <u>EXCEPTIONS BASED ON MILITARY SERVICE</u>.  By policy, Posse Comitatus Act restrictions (as well as other restrictions in this Instruction) are applicable to the Department of the Navy (including the Marine Corps) with such exceptions as the Secretary of Defense may authorize in advance on a case-by-case basis.

    a.  Such exceptions shall include requests from the AG for assistance pursuant to section 873(b) of Reference (al).

    b.  Requests for approval of other exceptions should be made by a senior official of the civilian law enforcement agency concerned, who verifies that:

        (1)  The size or scope of the suspected criminal activity poses a serious threat to the interests of the United States and enforcement of a law within the jurisdiction of the civilian agency would be seriously impaired if the assistance were not provided because civilian assets are not available to perform the mission; or

        (2)  Civilian law enforcement assets are not available to perform the mission, and temporary assistance is required on an emergency basis to prevent loss of life or wanton destruction of property.

4.  <u>MILITARY READINESS</u>.  Assistance may not be provided if such assistance could adversely affect military preparedness.  Implementing documents issued by the Heads of the DoD Components shall ensure that approval for the disposition of equipment is vested in officials who can assess the effect of such disposition on military preparedness.

5.  <u>APPROVAL AUTHORITY</u>.  Requests by civilian law enforcement officials for use of DoD personnel to provide assistance to civilian law enforcement agencies shall be forwarded to the appropriate approval authority.

    a.  The Secretary of Defense is the approval authority for requests for direct assistance in support of civilian law enforcement agencies, including those responding with assets with the potential for lethality, except for the use of emergency authority as provided in subparagraph 1.b.(3) of this enclosure and in Reference (c), and except as otherwise provided below.

    b.  Requests that involve Defense Intelligence and Counterintelligence entities are subject to approval by the Secretary of Defense and the guidance in DoDD 5240.01(Reference (ar)) and Reference (j).

*DoDI 3025.21, February 27, 2013*

c.  The Secretaries of the Military Departments and the Directors of the Defense Agencies may, in coordination with the ASD(HD&GS), approve the use of DoD personnel:

(1)  To provide training or expert advice in accordance with paragraphs 1.e. and 1.f. of this enclosure.

(2)  For equipment maintenance in accordance with paragraph 1.d. of this enclosure.

(3)  To monitor and communicate the movement of air and sea traffic in accordance with subparagraphs 1.d.(5)(b) 1 and 4 of this enclosure.

d.  All other requests, including those in which subordinate authorities recommend disapproval, shall be submitted promptly to the ASD(HD&GS) for consideration by the Secretary of Defense, as appropriate.

e.  The views of the CJCS shall be obtained on all requests that are considered by the Secretary of Defense or the ASD(HD&GS), that otherwise involve personnel assigned to a unified or specified command, or that may affect military preparedness.

f.  All requests that are to be considered by the Secretary of Defense or the ASD(HD&GS) that may involve the use of Reserve Component personnel or equipment shall be coordinated with the ASD(M&RA).  All requests that are to be considered by the Secretary of Defense or the ASD(HD&GS) that may involve the use of NG personnel also shall be coordinated with the Chief, NGB.  All requests that are to be considered by the Secretary of Defense or the ASD(HD&GS) that may involve the use of NG equipment also shall be coordinated with the Secretary of the Military Department concerned and the Chief, NGB.

25

*DoDI 3025.21, February 27, 2013*

ENCLOSURE 4

DoD SUPPORT OF CDO

1.  GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES

a.  The President is authorized by the Constitution and laws of the United States to employ the Armed Forces of the United States to suppress insurrections, rebellions, and domestic violence under various conditions and circumstances.  Planning and preparedness by the Federal Government, including DoD, for civil disturbances is important due to the potential severity of the consequences of such events for the Nation and the population.

b.  The primary responsibility for protecting life and property and maintaining law and order in the civilian community is vested in State and local governments.  Supplementary responsibility is vested by statute in specific agencies of the Federal Government other than DoD.  The President has additional powers and responsibilities under the Constitution of the United States to ensure that law and order are maintained.

c.  Any employment of Federal military forces in support of law enforcement operations shall maintain the primacy of civilian authority and unless otherwise directed by the President, responsibility for the management of the Federal response to civil disturbances rests with the Attorney General.  The Attorney General is responsible for receiving State requests for Federal military assistance, coordinating such requests with the Secretary of Defense and other appropriate Federal officials, and presenting such requests to the President who will determine what Federal action will be taken.

d.  The employment of Federal military forces to control civil disturbances shall only occur in a specified civil jurisdiction under specific circumstances as authorized by the President, normally through issuance of an Executive order or other Presidential directive authorizing and directing the Secretary of Defense to provide for the restoration of law and order in a specific State or locality in accordance with sections 251-254 of Reference (d).

e.  Planning by the DoD Components for CDO shall be compatible with contingency plans for national security emergencies, and with planning for DSCA pursuant to Reference (c).  For example:

(1)  Guidelines concerning the use of deputized State or local law enforcement powers by DoD uniformed law enforcement personnel are outlined in Reference (ah).

(2)  Guidelines concerning the use of deadly force and/or the carrying of firearms by DoD personnel while engaged in duties related to security or law and order, criminal investigations, or counterintelligence investigations; protecting personnel; protecting vital Government assets; or guarding Government installations and sites, property, and persons (including prisoners) are outlined in Reference (ai) and any additional Secretary of Defense-approved rules for the use of force contained in Reference (aj).

26

**JA130**

2. <u>DoD REQUIREMENTS</u>

a. Federal military forces shall not be used for CDO unless specifically authorized by the President, except under emergency authority as provided in Reference (c) and subparagraph 1.b.(3) of Enclosure 3.

b. Federal military forces shall be made available for CDO as directed by the President. The Secretary of Defense or other authorized DoD official may, where authorized and consistent with the direction of the President, establish the source and composition of those forces to achieve appropriate balance with other national security or DoD priorities.

c. Federal military forces employed in CDO shall remain under Secretary of Defense command and control at all times.

d. The pre-positioning of Federal military forces for CDO shall not exceed a battalion-sized unit in a single location unless a larger force is authorized by the President.

e. DoD Components shall not take charge of any function of civil government unless absolutely necessary under conditions of extreme emergency (e.g., when using emergency authority as described in Reference (c) and subparagraph1.b.(3) of Enclosure 3). Any commander who is directed, or undertakes, to control such functions shall strictly limit DoD actions to emergency needs and shall facilitate the reestablishment of civil responsibility at the earliest time possible.

3. <u>CDO PLANNING</u>

a. To ensure essential control and sound management of all Federal military forces employed in CDO, centralized direction from the Secretary of Defense, through the ASD(HD&GS), shall guide planning by the DoD Components, whether alone or with civil authorities. Execution of CDO missions shall be decentralized through the Commanders of USNORTHCOM, USINDOPACOM, or USSOCOM, or through joint task force commanders, and only when specifically directed by the Secretary of Defense or as described in subparagraph 1.b.(3) of Enclosure 3.

b. The Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM, as the DoD planning agents for CDO in accordance with section 11 of Enclosure 2, shall lead the CDO planning activities of the DoD Components in these areas:

(1) <u>USNORTHCOM</u>. The 48 contiguous States, Alaska, the District of Columbia, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands.

(2) <u>USINDOPACOM</u>. Hawaii and the U.S. possessions and territories in the Pacific area.

(3)  <u>USSOCOM</u>.  CDO activities involving special operations forces.

c.  CDO plans and readiness measures shall foster efficient employment of Federal equipment controlled by NG forces, whether employed under State or Federal authority, and other resources of the DoD Components.

4.  <u>ROLE OF THE NG</u>

a.  NG forces in a State active duty status have primary responsibility to support State and local Government agencies for disaster responses and in domestic emergencies, including in response to civil disturbances; such activities would be directed by, and under the command and control of, the Governor, in accordance with State or territorial law and in accordance with Federal law.

b.  NG forces may be ordered or called into Federal service to ensure unified command and control of all Federal military forces for CDO when the President determines that action to be necessary in extreme circumstances.

c.  Federal military forces shall conduct CDO in support of the AG or designee (unless otherwise directed by the President) to assist State law enforcement authorities.  Federal military forces will always remain under the command and control of the President and Secretary of Defense.  Federal military forces also could conduct CDO in concert with State NG forces under the command of a dual-status commander, if determined to be appropriate by the Secretary of Defense and the Governor(s) concerned, or in close coordination with State NG forces using direct liaison.

d.  Chief, NGB, will coordinate the sharing of State contingency plans for the use of non-federalized NG forces in CDO roles between the responsible State Adjutants General and the responsible Combatant Commander.

5.  <u>COOPERATION WITH CIVIL AUTHORITIES</u>

a.  The AG shall receive and coordinate preliminary requests for CDO from civil authorities pursuant to sections 251-254 of Reference (d).

(1)  Formal requests for CDO shall be addressed to the President.

(2)  The AG may assign a component law enforcement agency of the Department of Justice, such as the FBI or Bureau of Alcohol, Tobacco, Firearms, and Explosives, to lead the operational response to a civil disturbance incident.

(3)  The President may provide, through the AG or other Federal official, a personal representative to communicate the President's policy guidance to the military commander conducting CDO.  That representative may augment, but shall not replace, the military chain of

*DoDI 3025.21, February 27, 2013*

command.  In addition, an individual may be designated by the AG as the Senior Civilian Representative of the AG.

b.  The ASD(HD&GS) shall represent DoD in coordinating CDO planning and execution with the Department of Justice, and other Federal and State law enforcement agencies, as appropriate.


6.  <u>APPROVAL AUTHORITY</u>

a.  The President is the approval authority for requests for assistance for CDO, except for emergency authority as provided in subparagraph 1.b.(3) of Enclosure 3 and in Reference (c).

b.  If the President directs the use of Federal military forces for CDO, the ASD(HD&GS) and the CJCS shall provide advice to the Secretary of Defense regarding the employment of DoD personnel and resources to implement the direction of the President.  Secretary of Defense approval of such employment shall be communicated to the Combatant Commanders through the CJCS.

c.  The ASD(HD&GS) shall provide any request, contingency plan, directive, or order affecting the employment of special operations forces to the ASD(SO/LIC), who supervises the activities of those forces on behalf of the Secretary of Defense in accordance with DoDD 5111.10 (Reference (as)).

d.  Additionally, the ASD(HD&GS), in coordination with the ASD(SO/LIC) for the employment of special operations forces, shall provide overall policy oversight of the employment of DoD personnel and resources for CDO responding to terrorist incidents and other similar events in coordination with the CJCS.

29

*DoDI 3025.21, February 27, 2013*

ENCLOSURE 5

DOMESTIC EOD SUPPORT OF CIVILIAN LAW ENFORCEMENT AGENCIES

1.  <u>GUIDING STATUTORY REQUIREMENTS AND SUPPORTING POLICIES</u>.  DoD EOD personnel may provide immediate response for EOD support in support of civil authorities, when requested, in accordance with Reference (c) and may provide for disposition of military munitions in accordance with parts 260-270 of title 40, Code of Federal Regulations (Reference (at)).

2.  DoD REQUIREMENTS

    a.  DoD personnel will not participate in search or seizure of ordnance as part of a civilian law enforcement investigation.  DoD personnel may, as described in this enclosure, render safe military munitions and take possession of military munitions for appropriate disposition at the request of civilian law enforcement officials when such military munitions have already been discovered and seized by civilian law enforcement personnel.

    b.  DoD officials, including local military commanders, may provide EOD and explosive detection dog support to local civil authorities to save lives, prevent human suffering, and mitigate great property damage under imminently serious conditions in accordance with Reference (c).  Guidance for planning and execution requirements for Combatant Commanders and the Military Departments in responding to DoD military munitions is found in DoD 6055.09-M-V7 (Reference (au)).

    c.  Such an immediate response may include actions to provide advice and assistance to civil authorities, when requested, in the mitigation, rendering safe, and disposition of suspected or detected presence of unexploded ordnance (UXO), damaged or deteriorated explosives or munitions, an improvised explosive device (IED), other potentially explosive material or device, or other potentially harmful military chemical munitions or device, that creates an actual or potential imminent threat.

    d.  Military munitions, discarded military munitions, and UXO in an unauthorized location under the jurisdiction of public officials potentially present an imminent and substantial danger to public safety and health and to the environment, and may require an immediate EOD response.

        (1)  These conditions include:

            (a)  Items that were illegally removed from military installations.

            (b)  Military munitions that land off range.

**JA134**

(c)  Munitions located on property formerly leased or owned by DoD (including manufacturing areas, pads, pits, basins, ponds, streams, burial sites, and other locations incident to such operations).

(d)  Transportation accidents involving military munitions.

(e)  Unauthorized public possession of military munitions.

(2)  Military munitions found in the conditions in paragraph 2.d. should be considered extremely hazardous and should not be disturbed or moved until technically qualified EOD personnel assess and determine the hazard.

(3)  DoD officials, including local military commanders:

(a)  Will provide EOD support for military munitions, discarded military munitions, and UXO that have (or appear to have) DoD origins.

(b)  May, in accordance with Reference (c), provide EOD support for military munitions or foreign ordnance that do not appear to have DoD origins found in the United States under the conditions in paragraph 2.d.

e.  Rendering safe and disposing of improvised devices, non-military commercial explosives, or similar dangerous articles reported or discovered outside of DoD installations are primarily the responsibility of civil authorities.  However, due to the potential lethality and danger to public safety, DoD EOD personnel may provide assistance upon request in accordance with Reference (c).

f.  When responding to requests for assistance from civil authorities under immediate response authority pursuant to Reference (c), the closest capable EOD unit regardless of Military Service will provide support.

g.  Requests from civil authorities for non-immediate DoD EOD support are subject to approval by the Secretary of Defense.  Examples of non-immediate DoD EOD support include, but are not limited to, post-blast analysis, use of DoD material and equipment, and support of pre-planned events.  Exceptions include those activities in support of the U.S. Secret Service that, in accordance with DoDD 3025.13 (Reference (av)), do not require Secretary of Defense approval and those activities undertaken in response to requests for technical assistance or assessment of military munitions that are performed solely for safety purposes.

h.  DoD EOD forces providing support under immediate response authority under Reference (c) will also comply with Reference (at) and other applicable local, State, and Federal laws and regulations, including environmental laws and regulations.

i.  The National Joint Operations and Intelligence Center (NJOIC) and the FBI's Strategic Information Operations Center shall be advised immediately of the recovery and disposition of military munitions, as well as responses to non-military munitions and explosives.  DoD

31

**JA135**

*DoDI 3025.21, February 27, 2013*

Components also shall ensure that reports are submitted within 72 hours, in accordance with section 846 of Reference (n) and DoD Manual 5100.76 (Reference (aw), to:

Bureau of Alcohol, Tobacco, Firearms, and Explosives
U.S. Bomb Data Center
99 New York Ave., N.E., 8S 295
Washington, DC  20226

3.  PLANNING AND EXECUTION

a.  Combatant Commanders will:

(1)  Maintain situational awareness of all EOD elements in support of civil authorities, consolidate Service EOD incident reports, and provide to the ASD(HD&GS) and the ASD(SO/LIC) a monthly consolidated report highlighting:

(a)  DoD EOD support of civil authorities, resources, and work-hours expended.

(b)  Final determination of the item and the agency supported.

(c)  Final disposition of the hazard and a cost estimate of the support provided.

(d)  A status of reimbursement by the supported entity.  Reimbursement will not be sought for EOD response to military munitions that have (or appear to have) DoD origins.

(2)  Coordinate with the DoD Explosives Safety Board and the Executive Manager for EOD Training and Technology to ensure information sharing.

b.  In situations where DoD EOD personnel are asked to provide support to the Department of Justice (DOJ)/FBI in conducting ECM, such personnel may only employ ECM in the United States if approved by the Secretary of Defense and in accordance with the DOJ program for applying ECM in the United States in response to threats of radio-controlled improvised explosive devices (DOJ Federal ECM Program) approved by the National Telecommunications and Information Administration (NTIA) (see Section 7.25 of the NTIA Manual of Regulations and Procedures for Federal Radio Frequency Management (Reference (ax))).  NTIA has approved the use of DoD military ECM assets in support of the DOJ Federal ECM Program; however, only those DoD military ECM assets/systems that have been approved by NTIA for employment in the United States under the DOJ Federal ECM Program may be used by DoD EOD personnel in providing the requested support to DOJ/FBI.

(1)  DoD officials may provide ECM equipment, and expert advice regarding the FBI's use of the equipment, in accordance with section 2 of this enclosure when the FBI has approved use of ECM and when there is insufficient time to obtain Secretary of Defense approval.

32

(2)  All use of ECM equipment or devices while conducting EOD operations supporting civil authorities will be coordinated with and follow procedures established by the FBI's Strategic Information Operations Center and reported to the NJOIC.

c.  In consideration of the Military Departments' and the Combatant Commanders' planning requirements and in consultation with appropriate local civilian agencies, installation commanders will identify off-installation critical infrastructure and key resources, such as nuclear power stations, power plants, communications hubs, and water treatment plants. Combatant Commanders and other responsible DoD officials will assist in developing priorities for EOD support of civil authorities.  Installations without resident EOD forces will develop plans to seek support from the nearest DoD EOD organization.

d.  Combatant Commanders, as appropriate, will maintain situational awareness of all EOD elements in support of civil authorities, coordinate and de-conflict Military Services' EOD domestic areas of response, and develop consolidated reporting procedures to permit accurate and timely collection of data from the supporting Services.

e.  Service EOD reports shall be used to indicate that DoD is reclaiming accountability of DoD military munitions that were found outside the custody of DoD.  The Military Departments will forward reports of reclaimed military munitions to installations for ammunitions logistics management and submission to the DoD Explosives Safety Board in accordance with References (au) and (aw), and DoDI 5160.68 (Reference (ay)).

f.  Reimbursement is not required for EOD support involving military munitions, discarded military munitions, and UXO that have DoD origins or appear to have DoD origins.  Combatant Commanders will coordinate with the DoD Explosives Safety Board and the Executive Manager for EOD Training and Technology to ensure information sharing.

g.  In accordance with DoDI 6055.17 (Reference (az)) and applicable Military Department issuances, commanders of EOD organizations will:

(1)  Coordinate with installation emergency managers to:

(a)  Establish local processes and procedures to respond to and report military and non-military munitions support requests from civilian law enforcement agencies.

(b)  Determine priorities of EOD support for protecting critical infrastructure and key resources when requested.

(2)  Participate in installation emergency response exercises.

(3)  Determine training requirements for conducting DSCA response missions.

*DoDI 3025.21, February 27, 2013*

4.  <u>COOPERATION WITH CIVIL AUTHORITIES</u>

    a.  DoD EOD forces will maintain relationships with local, State, tribal, and other Federal bomb disposal and other law enforcement agency assets near their geographical locations.  Such relationships may include conferences and training exercises to increase the interoperability and integration with local bomb squad agencies, to improve the response capabilities to civil authorities when requested, and to enhance the consolidated response capabilities.

    b.  DoD EOD personnel may conduct UXO and explosive ordnance awareness and education programs that inform and promote public safety of the hazards associated with military munitions and explosive items.

Change 1, 02/08/2019                                                                                           ENCLOSURE 5

**JA138**

*DoDI 3025.21, February 27, 2013*

ENCLOSURE 6

DOMESTIC TERRORIST INCIDENT SUPPORT

1. <u>DoD GUIDANCE</u>.  Only the Secretary of Defense may authorize the use of DoD personnel in support of civilian law enforcement officials during a domestic terrorism incident, except as described in paragraph 1.b. of this enclosure.  The Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM, in coordination with the CJCS, ASD(HD&GS), and ASD(SO/LIC), have primary responsibility for all military preparations and -- when authorized by the Secretary of Defense -- operations, including the employment of armed Federal military forces at the scene of any domestic terrorist incident.

    a.  In discharging those functions, the Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM shall operate in a manner consistent with law enforcement policies established by the AG.

    b.  When a terrorist incident develops that has a potential for military involvement, the Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM may dispatch military observers to the incident site, with the concurrence of the senior FBI official at the site, to appraise the situation before any decision is made by the Secretary of Defense to commit Federal military forces.  Any dispatch of U.S. counterterrorism forces as observers must be specifically authorized by the Secretary of Defense through the CJCS.

2. <u>REQUIREMENT FOR VOCAL ORDERS TO BE PUBLISHED</u>.  When the Secretary of Defense authorizes U.S. counterterrorism forces to assist with the resolution of a domestic terrorist incident, the CJCS shall issue the appropriate order on behalf of the Secretary of Defense.  That order shall designate the command relationships for the deploying forces.

Change 1, 02/08/2019                                                                        ENCLOSURE 6

*DoDI 3025.21, February 27, 2013*

ENCLOSURE 7

USE OF INFORMATION COLLECTED DURING DoD OPERATIONS

1.  ACQUISITION AND DISSEMINATION.  DoD Components are encouraged to provide to Federal, State, or local civilian law enforcement officials any information collected during the normal course of military operations that may be relevant to a violation of State or Federal law within the jurisdiction of such officials, except as described in subparagraph 1.g.(2) of Enclosure 3 of this Instruction.  The DoD Components shall prescribe procedures for releasing information upon reasonable belief that there has been such a violation.

   a.  The assistance provided shall be in accordance with DoD 5400.11-R (Reference (ba)) and with section 271 of Reference (d) and other applicable laws.

   b.  The acquisition and dissemination of information under this enclosure shall be in accordance with DoDD 5200.27 (Reference (bb)), Reference (ar), and, for DoD intelligence components, Reference (j).

   c.  The DoD Components shall establish procedures for "routine use" disclosures of such information in accordance with Reference (ay) and DoDD 5400.11 (Reference (bc)).

   d.  Under guidance established by the DoD Components concerned, the planning and execution of compatible DoD training and operations shall, to the maximum extent practicable, take into account the needs of civilian law enforcement officials for information when the collection of the information is an incidental aspect of training or operations performed by Federal military forces consistent with section 271 of Reference (d).

   e.  The needs of civilian law enforcement officials shall, to the maximum extent practicable, be considered when scheduling routine training missions, consistent with section 271 of Reference (d).  This does not permit the planning or creation of missions or training for the primary purpose of aiding civilian law enforcement officials, and it does not permit conducting training or missions for the purpose of routinely collecting information about U.S. citizens.

   f.  Civilian law enforcement agents may accompany routinely scheduled training flights as observers for the purpose of collecting law enforcement information.  This provision does not authorize the use of DoD aircraft to provide point-to-point transportation and training flights for civilian law enforcement officials.  Such assistance may be provided only in accordance with Reference (ak).

   g.  Intelligence information held by the DoD Components and relevant to drug interdiction or other civilian law enforcement matters shall be provided promptly to appropriate civilian law enforcement officials, unless sharing that information is determined by the head of that DoD Component to be inconsistent with national security.  Under procedures established by the DoD Components concerned, information concerning illegal drugs that is provided to civilian law

enforcement officials under provisions of Reference (j) shall also be provided to law enforcement officials at the El Paso Intelligence Center.

    h.  Nothing in this section modifies DoD procedures for dissemination of information for foreign intelligence or counterintelligence purposes.

    i.  The DoD Components are encouraged to participate in the Department of Justice law enforcement coordinating committees situated in each Federal judicial district.

    j.  The assistance provided under this enclosure may not include or permit direct participation by DoD personnel in the interdiction of a vessel, aircraft, or land vehicle, or in a search, seizure, arrest, or other similar activity, unless the member's participation in such activity is otherwise authorized by law in accordance with paragraph 1.b. of Enclosure 3 of this Instruction.


2.  <u>MILITARY READINESS</u>.  Information shall not be provided under this enclosure if it could adversely affect military preparedness of the United States.

*DoDI 3025.21, February 27, 2013*

ENCLOSURE 8

USE OF DoD EQUIPMENT AND FACILITIES

1. <u>EQUIPMENT AND FACILITIES</u>.  The DoD Components may make equipment, base facilities, or research facilities available to Federal, State, or local civilian law enforcement officials for law enforcement purposes in accordance with the guidance in this enclosure.

a.  The ASD(HD&GS) shall issue guidance to ensure that the assistance provided under this enclosure is in accordance with applicable provisions of law, including:

(1)  Sections 272, 277, 2576, and 2667 of Reference (d).

(2)  Section 1535 of title 31, U.S.C. (also known and referred to in this Instruction as "The Economy Act, as amended" (Reference (bd))) and sections 6501-6508 of title 31, U.S.C. (also known as "The Intergovernmental Cooperation Act of 1968, as amended" (Reference (bd))).

(3)  Title 40, U.S.C. (Reference (be)).

(4)  Sections 102-103, 105-115, 151-153, 3101, 3105, 3301, 3303-3305, 3509, 3901, 3905-3906, 4501-4506, 4701, and 6101 of title 41, U.S.C. (Reference (bf)).

(5)  Chapters 21, 25, 29, and 31 of title 44, U.S.C. (Reference (bg)).

b.  The ASD(HD&GS) guidance shall also ensure compliance with DoDI 4165.70 and DoDD 5410.12 (References (bh) and (bi)), and other guidance that may be issued by the Under Secretary of Defense (Comptroller)/Chief Financial Officer, Department of Defense.

2. <u>LIMITATIONS ON THE USE OF PERSONNEL</u>.  The DoD Components shall follow the guidance in paragraph 1.d. of Enclosure 3 of this Instruction in considering requests for DoD personnel to operate or maintain, or to assist in operating or maintaining, equipment made available according to section 1 of this enclosure.

3. <u>MILITARY READINESS</u>.  Assistance may not be provided under this enclosure if such assistance could adversely affect military preparedness.  Each request shall be evaluated using the criteria provided in Reference (c) for evaluating legality, lethality, risk, cost, appropriateness, and readiness.  The implementing documents issued by the DoD Components shall ensure that approval for the disposition of equipment is vested in officials who can assess the effect of such disposition on military preparedness.

4. <u>APPROVAL AUTHORITY</u>

38

**JA142**

a.  Requests by civilian law enforcement officials for DoD assistance for the use of DoD equipment and facilities shall be forwarded to the appropriate approval authority under the guidance in this section.  All requests, including those in which subordinate authorities recommend denial, shall be submitted promptly to the approving authority.  Requests will be forwarded and processed according to the urgency of the situation.

    (1)  Requests for the use of equipment or facilities outside the United States, other than for arms, ammunition, combat vehicles, vessels, and aircraft, shall be considered in accordance with procedures established by the applicable DoD Component.

    (2)  Requests from other Federal agencies to purchase equipment (permanent retention) from a DoD Component, that are accompanied by appropriate funding documents, may be submitted directly to the DoD Component concerned.

    (3)  Requests for training, expert advice, or use of personnel to operate or maintain equipment shall be forwarded in accordance with section 5 of Enclosure 3 of this Instruction.

    (4)  For loans pursuant to Reference (bd), which are limited to agencies of the Federal Government, and for leases pursuant to section 2667 of Reference (d), which may be made to entities outside the Federal Government, this guidance applies:

        (a)  Requests for arms, ammunition, combat vehicles, vessels, and aircraft shall be submitted to the Secretary of Defense for approval.

        (b)  Requests for loan or lease or other use of equipment or facilities are subject to approval by the heads of the DoD Components, unless approval by a higher official is required by statute or DoD issuance applicable to the particular disposition.

b.  The Heads of the DoD Components shall issue implementing policy and direction for taking action on requests for loan, lease, or other use of equipment or facilities that are not governed by subparagraphs 4.a.(4)(a) and 4.a.(4)(b) of this enclosure.  Such implementing policy and direction shall ensure compliance with applicable law and DoD issuances, including requiring specific levels of approval with respect to particular dispositions.

*DoDI 3025.21, February 27, 2013*

ENCLOSURE 9

FUNDING

1.  GENERAL.  Reimbursement is required when equipment or services are provided to agencies outside DoD.

a.  The primary sources of reimbursement requirements are the Economy Act, as amended, for provision of equipment or services to Federal departments and agencies and section 2667 of Reference (d).  Section 277 of Reference (d) requires reimbursement unless the Secretary of Defense elects to waive reimbursement using the criteria described in subparagraph 2.c. of this enclosure.

b.  Other statutes may apply to particular types of assistance or may apply to assistance to specific civilian law enforcement agencies.  Payment of fair market value under section 2667 of Reference (d) may only be waived under the provisions of section 2667 of Reference (d).

c.  A requirement for reimbursement does not apply when DoD Components provide information, collected during the normal course of military training or operations, to Federal, State, or local civilian law enforcement officials pursuant to section 271 of Reference (d).

2.  PROCEDURAL REQUIREMENTS

a.  Defense support of civilian law enforcement agencies is normally an unprogrammed requirement for DoD.  DoD 7000.14-R (Reference (bj)) prescribes procedures for financing and reporting costs.  DoD Components shall comply with these procedures and shall consider the factors presented in paragraph 2.c. of this enclosure to determine or recommend whether financing is to be accomplished on a reimbursable or non-reimbursable basis.

b.  The Commanders of USNORTHCOM, USINDOPACOM, and USSOCOM shall serve as the financial managers responsible for DoD oversight of all operations executed in their areas of responsibility in accordance with section 11 of Enclosure 2 of this Instruction.

c.  The Secretary of Defense may waive reimbursement for DoD support to civilian law enforcement agencies provided pursuant to chapter 15 of Reference (d), or support provided by NG personnel performing duty pursuant to section 502(f) of Reference (l), in accordance with section 277 of Reference (d), if such support:

(1)  Is provided in the normal course of DoD training or operations; or

(2)  Results in a benefit to the DoD element or the NG personnel providing the support that is substantially equivalent to that which would otherwise be obtained from military operations or training.

40

**JA144**

*DoDI 3025.21, February 27, 2013*

d.  The ASD(HD&GS) may waive reimbursement of NG in Title 32 status up to $500,000 in accordance with Reference (c).


3.  <u>PERSONNEL DUTY STATUS</u>.  Funding for State active duty of NG personnel is the responsibility of the State involved.

Change 1, 02/08/2019                                                                ENCLOSURE 9

**JA145**

GLOSSARY

PART I.  ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| AG | Attorney General of the United States |
| ASD(HD&GS) | Assistant Secretary of Defense for Homeland Defense and Global Security |
| ASD(SO/LIC) | Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict and Interdependent Capabilities |
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| | |
| CDO | civil disturbance operations |
| CJCS | Chairman of the Joint Chiefs of Staff |
| | |
| DoDI | DoD Instruction |
| DoDD | DoD Directive |
| DOJ | Department of Justice |
| DSCA | defense support of civil authorities |
| | |
| ECM | electronic counter measures |
| EOD | explosive ordnance disposal |
| | |
| FBI | Federal Bureau of Investigation |
| | |
| IED | improvised explosive device |
| IG, DoD | Inspector General of the Department of Defense |
| | |
| MOUT | military operations in urban terrain |
| | |
| NG | National Guard |
| NGB | National Guard Bureau |
| NJOIC | National Joint Operations and Intelligence Center |
| NTIA | National Telecommunications and Information Administration |
| | |
| U.S.C. | United States Code |
| USD(I) | Under Secretary of Defense for Intelligence |

**JA146**

*DoDI 3025.21, February 27, 2013*

| | |
|---|---|
| USD(P) | Under Secretary of Defense for Policy |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness |
| USNORTHCOM | United States Northern Command |
| USINDOPACOM | United States Indo-Pacific Command |
| USSOCOM | United States Special Operations Command |
| UXO | unexploded explosive ordnance |

## PART II.  DEFINITIONS

Unless otherwise noted, these terms and their definitions are for the purpose of this Instruction.

civil authorities.  Defined in the DoD Dictionary of Military and Associated Terms (Reference (bk)).

civil disturbance.  Defined in Reference (bk).

civilian law enforcement official.  An officer or employee of a civilian Federal, State, local, and tribal law enforcement agency with responsibility for enforcement of the laws within the jurisdiction of that agency.  This term and its definition are proposed for inclusion in Reference (bk).

DoD personnel.  Federal military officers and enlisted personnel and civilian employees of the Department of Defense.

domestic emergencies.  Defined in Reference (bk).

emergency authority.  Defined in Reference (c).

explosives or munitions emergency.  A situation involving the suspected or detected presence of UXO, damaged or deteriorated explosives or munitions, an IED, other potentially explosive material or device, or other potentially harmful military chemical munitions or device, that creates an actual or potential imminent threat to human health, including safety, or the environment, including property, as determined by an explosives or munitions emergency response specialist. Such situations may require immediate and expeditious action by an explosives or munitions emergency response specialist to control, mitigate, or eliminate the threat (Reference (at)).

law enforcement agency.  Defined in Reference (bk).

**JA147**

# EXHIBIT

# 02



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

DEC 3 0 2021

MEMORANDUM FOR SECRETARY OF THE ARMY

SUBJECT: Authority to Approve District of Columbia Government Requests for District of
Columbia National Guard Support Assistance

This memorandum modifies the October 10, 1969, Secretary of Defense memorandum,
"Supervision and Control of the National Guard of the District of Columbia," regarding District
of Columbia (DC) Government requests for the DC National Guard (DCNG) to provide law
enforcement support. Effective immediately, the Secretary of Defense is the approval authority
for DC Government requests for the DCNG to provide law enforcement support:

- If DCNG personnel are to be deployed within 48 hours after receipt of the request; or

- If the support requested would involve DCNG personnel in direct participation in
  civilian law enforcement activities (e.g., crowd control, traffic control, search,
  seizure, arrest, or temporary detention).

Effective immediately, the DoD Executive Secretary is the single point of entry for DC
Government requests. You are authorized to approve DC Government requests for assistance for
DCNG support received 48 hours or more in advance of the requested support, if such support
does not involve direct participation in civilian law enforcement activities. You are required to
consult with the Attorney General in accordance with Executive Order 11485, "Supervision and
Control of the National Guard of the District of Columbia."

The October 10, 1969 Secretary of Defense memorandum directs you to command,
through the Commanding General, all operations of the DCNG in a militia status to aid civil
authorities. While this direction to command DCNG operations is still effective, you also are
authorized to coordinate the employment of DCNG forces with any other National Guard forces
employed in DC in a duty status pursuant to 32 U.S.C. § 502(f) to fulfill Department of Defense-
approved Federal department or agency requests for assistance. This includes the authority to
provide tasks to such other National Guard forces through the Commanding General of the
DCNG, as you deem appropriate. This authority may not be further delegated.

cc:
Secretary of the Navy
Secretary of the Air Force
Chairman of the Joint Chiefs of Staff
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness
Chief of the National Guard Bureau
General Counsel of the Department of Defense
Assistant Secretary of Defense for Legislative Affairs
Assistant Secretary of Defense for Homeland Defense and Global Security
Commanding General, District of Columbia National Guard

JA149

**Following this page, please find a copy of the October 10, 1969, memorandum.**

**This memorandum, which has been modified by today's memorandum, is provided for completeness.**

THE SECRETARY OF DEFENSE
WASHINGTON. D. C. 20301

OCT 1 0 1969

MEMORANDUM FOR Secretary of the Army
Secretary of the Air Force

SUBJECT: Supervision and Control of the National Guard of the
District of Columbia

The President, by Executive Order Number 11485, October 1, 1969 (copy attached) authorized and directed me to supervise, administer and control the Army National Guard and the Air National Guard of the District of Columbia (hereinafter "National Guard") while in a militia status except as provided in Section 3 of the Executive Order. The President also directed that I command (through the Commanding General of the National Guard) the military operations, including training, parades and other duty of the National Guard while in militia status and authorized me to delegate to subordinate officials any of the authority conferred upon me by the Executive Order.

I hereby direct the Secretary of the Army to act for me in the above matters pertaining to the Army National Guard and the Secretary of the Air Force to act for me in matters pertaining to the Air National Guard. The Commanding General of the National Guard shall report to the Secretary concerned for their respective elements of the National Guard and the Secretaries will exercise this authority through the Commanding General of the National Guard while the National Guard is in militia status.

As to the use of the National Guard in militia status to aid civil authorities, I hereby direct the Secretary of the Army to command, through the Commanding General of the National Guard, all operations of the Army and Air National Guard elements as an exception to the above. The Secretary of the Army, after consultation with me and subject to the direction of the President as Commander-in-Chief, and

JA151

2

in accordance with the Interdepartmental Action Plan for Civil Disturbance, may order out the National Guard under title 39 of the District of Columbia Code to aid the civil authorities of the District of Columbia.

The Secretary of the Army and the Secretary of the Air Force are authorized to delegate the foregoing authority to the Under Secretary or Assistant Secretary for Manpower and Reserve Affairs of their respective military departments.

Secretary of Defense memorandum subject: District of Columbia National Guard dated 2 February 1949 is rescinded.

JA152

# EXHIBIT

# 03



39301

**Federal Register**

Vol. 90, No. 155

Thursday, August 14, 2025

# Presidential Documents

---

Title 3—

The President

### Executive Order 14333 of August 11, 2025

### Declaring a Crime Emergency in the District of Columbia

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 740 of the District of Columbia Self-Government and Governmental Reorganization Act (Public Law 93–198), as amended (section 740 of the Home Rule Act), and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. Crime is out of control in the District of Columbia. Washington, District of Columbia, is our Nation's capital and home to the central institutions of American governance. Yet rising violence in the capital now urgently endangers public servants, citizens, and tourists, disrupts safe and secure transportation and the proper functioning of the Federal Government, and forces the diversion of critical public resources toward emergency response and security measures. The city government's failure to maintain public order and safety has had a dire impact on the Federal Government's ability to operate efficiently to address the Nation's broader interests without fear of our workers being subjected to rampant violence.

The increase in violent crime in the heart of our Republic has consequences beyond the individual tragedies that have dominated media coverage. Such lawlessness also poses intolerable risks to the vital Federal functions that take place in the District of Columbia. Violence and crime hamper the recruitment and retention of essential Federal employees, undermine critical functions of Government and thus the well-being of the entire Nation, and erode confidence in the strength of the United States. These conditions are disgraceful anywhere, but particularly in the capital of our Nation and the seat of the Federal Government. Citizens, tourists, and Federal workers deserve peace and security, not fear and violence. The smooth functioning of executive departments and agencies, courts, diplomatic missions, and the Federal Government demands an effective law-enforcement mechanism capable of halting the precipitous rise in violent crime, not one that permits Government workers to be violently attacked by mobs or fatally shot close to the Federal buildings where they work.

The magnitude of the violent crime crisis places the District of Columbia among the most violent jurisdictions in the United States. In 2024, the District of Columbia averaged one of the highest robbery and murder rates of large cities nationwide. Indeed, the District of Columbia now has a higher violent crime, murder, and robbery rate than all 50 States, recording a homicide rate in 2024 of 27.54 per 100,000 residents. It also experienced the Nation's highest vehicle theft rate with 842.4 thefts per 100,000 residents—over three times the national average of 250.2 thefts per 100,000 residents. The District of Columbia is, by some measures, among the top 20 percent of the most dangerous cities in the world.

As President, I have a solemn duty to take care that our laws are faithfully executed, and a sacred responsibility to protect the safety and security of United States citizens who live in and visit our Nation's capital, including Federal workers who live or commute into the District of Columbia. These conditions cannot persist. We will make the District of Columbia one of the safest cities in the world, not the most dangerous.

**Sec. 2**. *Services of the Metropolitan Police Department of the District of Columbia.* I determine that special conditions of an emergency nature exist that require the use of the Metropolitan Police Department of the District

of Columbia (Metropolitan Police force) for Federal purposes, including maintaining law and order in the Nation's seat of Government; protecting Federal buildings, national monuments, and other Federal property; and ensuring conditions necessary for the orderly functioning of the Federal Government. Effective immediately, the Mayor of the District of Columbia (Mayor) shall provide the services of the Metropolitan Police force for Federal purposes for the maximum period permitted under section 740 of the Home Rule Act.

**Sec. 3**. *Operational Control of the Metropolitan Police Department of the District of Columbia.* (a) The authority of the President conferred by section 740(a) of the Home Rule Act to direct the Mayor with respect to the current special conditions of an emergency nature is delegated to the Attorney General.

(b) In accordance with section 740(a) of the Home Rule Act, the Mayor shall provide such services of the Metropolitan Police force as the Attorney General may deem necessary and appropriate.

**Sec. 4**. *Monitoring and Recommendations.* (a) The Attorney General shall monitor and regularly consult with any senior official the Attorney General deems appropriate on the special conditions of an emergency nature that exist in the District of Columbia that require the use of the Metropolitan Police force for Federal purposes.

(b) The Attorney General shall regularly update me on the status of the special conditions of an emergency nature that exist in the District of Columbia that require the use of the Metropolitan Police force for Federal purposes.

(c) The Attorney General shall inform me of any circumstances that, in the Attorney General's opinion, might indicate the need for further action by the President or that the action in this order is no longer necessary.

**Sec. 5**. *Severability.* If any provision of this order, or the application of any provision to any individual or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other individuals or circumstances shall not be affected thereby.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this order shall be borne by the Department of Justice.

THE WHITE HOUSE,
*August 11, 2025.*

[FR Doc. 2025–15550

Filed 8–13–25; 11:15 am]

Billing code 4410–CW–P

# EXHIBIT

# 04

# Presidential Documents

Executive Order 14339 of August 25, 2025

## Additional Measures To Address the Crime Emergency in the District of Columbia

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Crime Emergency.* Two weeks ago, I declared a crime emergency in the District of Columbia to address the rampant violence and disorder that have undermined the proper and safe functioning of the Federal Government, and therefore, the Nation, and that have led to disgraceful conditions in our Nation's capital. In furtherance of Executive Order 14333 of August 11, 2025 (Declaring a Crime Emergency in the District of Columbia), I am now ordering further actions to address the conditions described in that Executive Order.

**Sec. 2**. *Operational Actions.* (a) The Director of the National Park Service shall, subject to the availability of appropriations and applicable law, hire additional members of the United States Park Police in the District of Columbia to support the policy goals described in Executive Order 14333. The United States Park Police shall ensure enforcement of all applicable laws within their jurisdiction, including the Code of the District of Columbia, to help maintain public safety and proper order.

(b) The United States Attorney for the District of Columbia shall, subject to the availability of appropriations and applicable law, hire additional prosecutors to focus on prosecuting violent and property crimes.

(c) The D.C. Safe and Beautiful Task Force established in Executive Order 14252 of March 27, 2025 (Making the District of Columbia Safe and Beautiful), shall establish an online portal for Americans with law enforcement or other relevant backgrounds and experience to apply to join Federal law enforcement entities to support the policy goals described in Executive Order 14333. Each law enforcement agency that is a member of the D.C. Safe and Beautiful Task Force, as well as other relevant components of the Department of Justice as the Attorney General determines, shall further, subject to the availability of appropriations and applicable law, immediately create and begin training, manning, hiring, and equipping a specialized unit that is dedicated to ensuring public safety and order in the Nation's capital that can be deployed whenever the circumstances necessitate, and that could be deployed, subject to applicable law, in other cities where public safety and order has been lost.

(d)(i) The Secretary of Defense shall, subject to the availability of appropriations and applicable law, immediately create and begin training, manning, hiring, and equipping a specialized unit within the District of Columbia National Guard, subject to activation under Title 32 of the United States Code, that is dedicated to ensuring public safety and order in the Nation's capital. As appropriate and consistent with applicable law, the Attorney General, the Secretary of the Interior, and the Secretary of Homeland Security, in coordination with the Secretary of Defense, shall each deputize the members of this unit to enforce Federal law.

(ii) The Secretary of Defense shall immediately begin ensuring that each State's Army National Guard and Air National Guard are resourced, trained, organized, and available to assist Federal, State, and local law enforcement in quelling civil disturbances and ensuring the public safety and order

**JA158**

whenever the circumstances necessitate, as appropriate under law. In co-ordination with the respective adjutants general, the Secretary of Defense shall designate an appropriate number of each State's trained National Guard members to be reasonably available for rapid mobilization for such purposes. In addition, the Secretary of Defense shall ensure the availability of a standing National Guard quick reaction force that shall be resourced, trained, and available for rapid nationwide deployment.

(e) The Secretary of Housing and Urban Development (HUD) shall investigate any non-compliance with the crime-prevention and safety requirements of HUD agreements by the District of Columbia Housing Authority or any landlord in the District of Columbia. These investigations shall include consideration of the provisions of such agreements that require housing providers to maintain safe, decent, and sanitary conditions or to restrict tenants who engage in criminal activity that threatens health, safety, and the right to peaceful enjoyment for other tenants, including engaging in drug distribution, violent criminal activity, and domestic violence. The Secretary of HUD shall refer any findings of non-compliance to the Attorney General, Federal law enforcement authorities, the District of Columbia Housing Authority Police Department, and the Metropolitan Police Department, as appropriate.

(f) The Secretary of Transportation shall conduct additional inspections, audits, and examinations to determine whether conditions exist in federally-funded transit services in the District of Columbia that endanger transit workers, and take appropriate remedial action that is within the Department of Transportation's authority.

**Sec. 3**. *Potential Amendments to Metropolitan Police Department General Orders.* (a) The Attorney General shall review the Metropolitan Police Department General Orders and shall request that the Mayor of the District of Columbia make such updates and modifications to such orders as the Attorney General determines are necessary to address the crime emergency and ensure public order and safety.

**Sec. 4**. *Severability.* If any provision of this order, or the application of any provision to any individual or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other individuals or circumstances shall not be affected thereby.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees or agents, or any other person.

**JA159**

(d) The costs for publication of this order shall be borne by the Department of Justice.

THE WHITE HOUSE,
*August 25, 2025.*

[FR Doc. 2025–16614
Filed 8–27–25; 11:15 am]
Billing code 4410–CW–P

**JA160**

# EXHIBIT

# 05

JA161



**Office of the Attorney General**
Washington, D. C. 20530

ORDER NO. 6370-2025

RESTORING SAFETY AND SECURITY TO THE DISTRICT OF COLUMBIA

Residents of the District of Columbia, the thousands of Americans who commute into the

District for work every day, and the millions of tourists from all over the world who visit our

Nation's capital have a right to feel safe and to be free from the scourge of violent crime.

Notwithstanding false media narratives and apparent efforts by some District employees to

manipulate crime statistics, the danger posed by violent crime in the District is plain for all to

see. As Executive Order 14333 of August 11, 2025 (Declaring a Crime Emergency in the

District of Columbia), makes clear, the "rising violence in the capital now urgently endangers

public servants, citizens, and tourists" and is impeding the proper functioning of the Federal

Government. These dangers are multiplied by the District's sanctuary city policies, which

actively shield criminal aliens from the consequences required by federal law. The proliferation

of illegal aliens into our country during the prior Administration, including into our Nation's

capital, presents extreme public safety and national security risks to our country.

Pursuant to section 3 of Executive Order 14333 and section 740(a) of the District of

Columbia Home Rule Act, I hereby order the Mayor of the District of Columbia and the

Metropolitan Police Department ("MPD") to immediately implement the following directives:

(1) Effective immediately, Drug Enforcement Administration Administrator Terrence

  C. Cole shall serve as MPD's Emergency Police Commissioner for the duration of

**JA162**

the emergency declared by the President. Commissioner Cole shall assume all of the powers and duties vested in the District of Columbia Chief of Police. Commissioner Cole shall have the authority to issue any general orders, executive orders, or other written directives that apply to Members of the MPD. Existing MPD leadership, including the current Chief of Police, members of the Executive Office of the Chief of Police, Bureau Heads/Executive Staff, and Commanders must receive approval from Commissioner Cole before issuing any further directives to the MPD.

(2) Executive Order EO-25-005, issued on August 14, 2025, by the Chief of Police, is hereby rescinded.

(3) Section IV, paragraph 22 of General Order GO-PER-201.26 is hereby suspended until further notice.

(4) Section II, paragraphs A.2 and F of General Order GO-PCA-702.01 are hereby suspended until further notice.

(5) The MPD is directed to enforce, to the maximum extent permissible by law, section 22-1307, District of Columbia Code, and all District of Columbia municipal regulations pertaining to the unlawful occupancy of public spaces.

To the extent that provisions in this Order conflict with any existing MPD directives, those directives are hereby rescinded.

_8/14/25_
Date

_Pam Bondi_
Pamela Bondi
Attorney General

**JA163**

JA164

# EXHIBIT

# 06



**Office of the Attorney General**
**Washington, D. C. 20530**

ORDER NO.  6372-2025

RESTORING SAFETY AND SECURITY TO THE DISTRICT OF COLUMBIA

Residents of the District of Columbia, the thousands of Americans who commute into the District for work every day, and the millions of tourists from all over the world who visit our Nation's capital have a right to feel safe and to be free from the scourge of violent crime. Notwithstanding false media narratives and apparent efforts by some District employees to manipulate crime statistics, the danger posed by violent crime in the District is plain for all to see. As Executive Order 14333 of August 11, 2025 (Declaring a Crime Emergency in the District of Columbia), makes clear, the "rising violence in the capital now urgently endangers public servants, citizens, and tourists" and is impeding the proper functioning of the Federal Government. These dangers are multiplied by the District's sanctuary city policies, which actively shield criminal aliens from the consequences required by federal law. The proliferation of illegal aliens into our country during the prior Administration, including into our Nation's capital, presents extreme public safety and national security risks to our country.

Pursuant to section 3 of Executive Order 14333 and section 740(a) of the District of Columbia Home Rule Act, Drug Enforcement Administration Administrator Terrance C. Cole shall serve as the Attorney General's designee for the duration of the emergency declared by the President for the purpose of directing the Mayor of the District of Columbia to provide such services of the Metropolitan Police Department ("MPD") as the Attorney General deems necessary and appropriate.

**JA165**

Pursuant to section 3 of Executive Order 14333 and section 740(a) of the District of Columbia Home Rule Act, I hereby deem the following services to be necessary and appropriate and direct the Mayor to immediately provide for:

1. Assistance with the enforcement of federal immigration law, as deemed necessary and appropriate by Administrator Cole, notwithstanding D.C. Code § 24–211.07 or any other provision of the D.C. Code or MPD policy.

2. Assistance with locating, apprehending, and detaining aliens unlawfully present in the United States, as deemed necessary and appropriate by Administrator Cole, notwithstanding section II, paragraphs A.2 and F of General Order GO-PCA-702.01, D.C. Code § 24–211.07, or any other provision of the D.C. Code or MPD policy.

3. Database inquiries and compliance with requests for information from any federal law enforcement entity, as deemed necessary and appropriate by Administrator Cole, notwithstanding paragraph 22 of General Order GO-PER-201.26 or any other provision of the D.C. Code or MPD policy.

4. Enforcement of section 22-1307 of the D.C. Code and all D.C. municipal regulations pertaining to the unlawful occupancy of public spaces, as deemed necessary and appropriate by Administrator Cole.

Attorney General Order No. 6370-2025 is hereby rescinded.

8/15/25
Date

Pamela Bondi
Attorney General

**JA166**

# EXHIBIT

# 07

Proceedings recorded by machine shorthand;
transcript produced by computer-aided transcription

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,          ) CIVIL NO.:
                               ) 25-2678-ACR
          Plaintiff,           )
     vs.                       )
                               )
DONALD J. TRUMP, et al.,       )
                               ) August 15, 2025
          Defendant.           ) Washington, D.C.
_____) 2:00 p.m.

Transcript of Motions Hearing
Before the Honorable Ana C. Reyes
United States District Judge

APPEARANCES:

For the Plaintiff:

     Mitchell Reich, Esquire
     Benjamin Moskowitz, Esquire
     Caroline Van Zioe, Esquire
     Emma Simson, Esquire
     Pamela A. Disney, Esquire
     Office of the Attorney General
     for the District of Columbia
     400 Sixth Street NW
     Suite 10100
     Washington, DC 20001

For the Defendant:

     Yaakov Roth, Esquire
     Eric Hamilton, Esquire
     Paul Perkins, Esquire
     Andrew Warden, Esquire
     Michael Velchik, Esquire
     U.S. Department of Justice
     1100 L. Street, NW
     Washington, DC 20005

Reported by:   Christine T. Asif, RPR, FCRR
               Federal Official Court Reporter
               333 Constitution Avenue, NW
               Washington, D.C. 20001
               (202) 354-3247

with the Court about section 5, so we didn't -- we didn't really discuss that either.

THE COURT:  Is there anything like emergent about section 5 that we need to address?  I mean, if you guys want to have quick argument on it, I'm happy to do that.

MR. ROTH:  What I've been told is section 5 is happening.  Like this is not an issue that's active right now. MPD has -- is doing it.  And so we don't really understand, but I'm happy to -- if he wants to speak to that.

THE COURT:  I mean, section 5 is just telling the MPD to do what the law is, so I don't see how I can enjoin that, Mr. Reich.

By the way, am I saying your name right?

MR. REICH:  Yes, Your Honor.

THE COURT:  Okay.

MR. REICH:  Your Honor, so this is not just saying what the law.  Is it's setting an enforcement policy that it should be enforced to the maximum extent.  It's requiring the diversion of resources to this function.  In the police chief's declaration, she says this is going to require putting officers on clearing encampments as -- on purely local land who could be doing fighting and policing, much more high-priority criminal activity.  And so this is -- it's unlawful.  It's a -- it's a -- lacks a valid federal purpose. It's setting a policy and -- rather than requesting a service

and.  It is harming the department --

THE COURT:  Well, Mr. Roth, can we just -- if you're going to be reediting this anyway, can't you reedit No. 5 to say, you know, the attorney general and Mr. Cole seeks the services of the MPD to, you know, deal with unlawful occupancy of public spaces or something?

MR. ROTH:  Yes.

THE COURT:  And I think that would address Mr. Reich's concern.

MR. ROTH:  We can do that.

THE COURT:  Okay.  All right.  Here's what we're going to do.  I do think that the section 1 of the order is plainly contrary to statute.  I'm not going to reach the constitutional issue, but I don't want to issue a decision unless I have to, because I think it's better for the parties to work these things out amongst themselves.  It sounds like you all have done so with respect to 2, 3, and 4.  And given Mr. Roth's representation that section 1 is being rewritten, I'm going to hold off issuing a decision on that.

You said it will be like 45 minutes?  All right.

So it's right now it's 4:50.  All right.  If I don't hear from anyone before 6:30, I will enter a TRO enjoining section 1 of the executive order.

If I -- you know, if I hear -- obviously, if we get a new executive order, then if you guys need me, you guys can

come see me.

And if, Mr. Roth, you all need more time, for whatever reason, that's fine.

In the interim, until we get that new order, Mr. Cole is not going to be able to direct police department individuals to do anything. I mean, he's going to have to go through the mayor. All right.

So I'll just -- instead of entering an order, Mr. Roth, since you're nodding your head, I'll just take it that that's what's going to be happening.

Does that give you the direction you need, Mr. Reich?

MR. REICH: I just want to confirm that the agreement is that none of the requirements of section 1 are going to be carried out, that this is not going to be a prohibition on officers issuing any directives until they get Mr. Cole's affirmative approval, that Police Chief Smith is back in full command of the police department, and that Mr. Cole is not acting as the police chief in any capacity.

THE COURT: Yes.

Mr. Roth?

MR. ROTH: That's all coming out, yeah.

THE COURT: Okay. All right. So that's not going to happen before it comes out and once it comes out, it's gone. Right?

# EXHIBIT

# 08

JA172

RESTORING LAW AND ORDER IN THE DISTRICT OF COLUMBIA

Presidential Memoranda

August 11, 2025

Memorandum for THE SECRETARY OF DEFENSE

SUBJECT:      Restoring Law and Order in the District of Columbia

Section 1.  Background.  As President of the United States and Commander in Chief of the District of Columbia National Guard, it is my solemn duty to protect law-abiding citizens from the destructive forces of criminal activity.  That obligation applies with special force in our Nation's capital, where, as Commander in Chief of the District of Columbia National Guard, I must also ensure that all citizens can avail themselves of the right to interact with their elected representatives, and that the Federal Government can properly function, without fear of being subjected to violent, menacing street crime.  The local government of the District of Columbia has lost control of public order and safety in the city, as evidenced by the two embassy staffers who were murdered in May, the Congressional intern who was fatally shot a short distance from the White House in June, and the Administration staffer who was mercilessly beaten by a violent mob days ago.  Citizens, tourists, and staff alike are unable to live peacefully in the Nation's capital, which is under siege from violent crime.  It is a point of national disgrace that Washington, D.C., has a violent crime rate that is higher than some of the most dangerous places in the world.  It is my duty to our citizens and Federal workers to secure

*The* WHITE HOUSE

**JA173**

Sec. 2.  Mobilizing the District of Columbia National Guard.  Pursuant to my authority under the Constitution and laws of the United States and the District of Columbia, I direct the Secretary of Defense to mobilize the District of Columbia National Guard and order members to active service, in such numbers as he deems necessary, to address the epidemic of crime in our Nation's capital.  The mobilization and duration of duty shall remain in effect until I determine that conditions of law and order have been restored in the District of Columbia.  Further, I direct the Secretary of Defense to coordinate with State Governors and authorize the orders of any additional members of the National Guard to active service, as he deems necessary and appropriate, to augment this mission.

Sec. 3.  General Provisions.  This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

 

NEWS

WIRE

ISSUES

CONTACT

VISIT

**JA174**

EOP

ADMINISTRATION

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS



Subscribe to The White House newsletter

| Your email | SIGN UP |

Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

JA175

9/5/25, 12:38 PM
Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 86 of 274
Restoring Law and Order in the District of Columbia – The White House

Copyright

Privacy



# EXHIBIT

# 09

JA177

**DISTRICT OF COLUMBIA NATIONAL GUARD**
OFFICE OF THE COMMANDING GENERAL
2001 EAST CAPITOL STREET, SE
WASHINGTON, DC 20003-1719

PERMANENT ORDERS 25-223                          11 August 2025

DISTRICT OF COLUMBIA NATIONAL GUARD, 2001 EAST CAPITOL STREET S.E.
WASHINGTON, DC 20003-1719

Selected members of the District of Columbia National Guard are hereby encamped pursuant to D.C. Code § 49-101 and involuntarily ordered to duty pursuant to 32 U.S C. § 502(f)(2)(A) until such time as subsequent orders modify or terminate this base encampment order. The purpose of this duty is to respond to short or no-notice direction from the Secretary of Defense or the President of the United States to protect federal property and functions in the District of Columbia and to support federal and District law enforcement.

Authorities: E.O. 11485; Title 32 U.S Code Chapter 5 (Training); and D.C. Code Title 49, Chapter 1 (Active Military Duty).

Duty Station: D.C. Armory or subsequent designated reporting locations
Period: 11 1100R AUG 25 – 25 2359R SEP 25
Reporting time and date: 12 0730R AUG 25, or as otherwise directed

Additional Instructions: Reporting DCNG personnel must not be flagged for investigation or adverse action. Exceptions to these instructions are withheld to the Chief of Staff or first General Officer in the chain of command to include medical MRC 3 & 4 personnel.

Personnel are involuntarily ordered, with pay and allowances, in accordance with 32 U.S. Code § 502 (Required drills and field exercises) and encamped in accordance with D.C. Code §§ 49-101 (Drill parade, encampment or required duty), § 49-102 (Prescribing drills), and § 49-107 (Camp duty).

Additional instructions: An employee of the U.S. Government as defined by 5 U.S. Code 2105 is entitled to leave without loss in pay or time for each day of encampment per 5 U.S Code § 6323(c). An employee of the District of Columbia is entitled to leave without limitation and without loss of pay or time for each day of an encampment per 5 U.S. Code § 6323(c) and D.C. Code § 1-612.03(m-2).

All service members encamped under this order, or any supplemental encampment order will remain encamped within the DC local area, unless released earlier. This order is not valid as proof of being subject to the instant encampment unless presented with an associated annex or unit order listing the individual members encamped by unit, unit identification code, grade/rank, name, and the Service member's DOD ID Number.

Format:  251

DISTRIBUTION:                 ////////////////////////////////////////////////////////
A-E          (1)              //   COMMANDING GENERAL'S OFFICE   //
INDIV INDIC (1)              //        DISTRICT OF COLUMBIA        //
                             ////////////////////////////////////////////////////////

LELAND D. BLANCHARD II, Brigadier General, USA
Commanding General (Interim)

JA178

JA179

# EXHIBIT

# 10

An official website of the United States government    Here's how you know  ⌄

≡    🏛️    DISTRICT OF COLUMBIA NATIONAL GUARD    🔍

Skip to main content (Press Enter).

**NEWS** | Aug. 23, 2025

# D.C. National Guard Activated to Support Law Enforcement in District of Columbia

WASHINGTON – The District of Columbia National Guard was activated Aug. 11 to support local and federal law enforcement efforts aimed at restoring order in the District of Columbia. The activation aligns with the President's executive order declaring a crime emergency.

Currently over 1,900 Guardsmen from the D.C. National Guard, West Virginia, South Carolina, Ohio, Mississippi, Louisiana and Tennessee are assisting the District and federal government agencies. The Guardsmen, who have a dual mission to serve the nation and the District, are providing a visible presence to support law enforcement and deter crime. Their specific tasks vary based on the needs of law enforcement partners. Personnel may be armed, consistent with their training, depending on the mission, operating under civilian law enforcement. The National Guard is prepared to augment its forces if needed.

The Joint Task Force District of Columbia is a scalable and tailored entity supporting mobilizations of the D.C. National Guard. In addition to routine presence patrolling, guardsmen have assisted Amtrak police Aug. 14 and U.S. Park Police at the Smithsonian Metro station August 15 (see story link below).

"The members of the District of Columbia National Guard are highly trained and capable of assisting our interagency partners to keep the District safe," said U.S. Army Brig. Gen. Leland D. Blanchard, commanding general (interim), D.C. National Guard. "Our responsibility is to bring back order and follow the President's mandate."

The National Guard remains capable. The mobilization will continue until law and order is restored, with the duration depending on the situation and the assessment of law enforcement partners. The goal of the DC Safe and Beautiful Task Force is to restore a safe environment. All personnel are operating under applicable laws and regulations.

To further enhance public safety and security for commuters, the task force supports missions at Washington Metropolitan Area Transit Authority metro stations in addition to the exterior. Service members are patrolling Foggy Bottom, Smithsonian, Eastern Market, Stadium Armory, Waterfront, McPherson Sq, Skip to main conte L'Enfant Plaza, Gallery Place, Metro Center and NoMa-Gallaudet U. These efforts

**JA181**

are meant to strengthen safety and support the mission.

"These extraordinary service members are here to serve the task force. Many are traditional Guard members who left behind their civilian careers and families with little notice to come help us in the District. It's the finest tradition of the guard to be able to serve our communities", said U.S. Army Col. Larry Doane, Joint Task Force-DC commander. "We never do this alone so I would like to personally thank the families, employers, and our neighbors for their support. We couldn't do any of this without you."

**Lodging and meals**

Guard members have lodging conveniences at their disposal throughout the District. Such accommodations are necessary for the safeguard of our members while they execute the mission at hand. The National Guard prioritizes the safety of its members and the public.

Local vendors have been contracted to provide three daily meals for guard members, ensuring access to nutritious food while supporting the local economy. This initiative enhances service members' health and performance, while also fostering community engagement and strengthening partnerships with local businesses.

**Vehicle Incident**

Joint Task Force-DC is aware of an incident on Aug. 20, 2025 involving a D.C. National Guard transport vehicle and a civilian vehicle at 8th Street SE and North Carolina Avenue. A five-vehicle convoy and a D.C. police cruiser stopped and helped the civilian, who was taken to a hospital. The driver of the transport vehicle, a National Guardsman, has been ticketed for running a red light. The D.C. The National Guard and JTF-DC are cooperating with local law enforcement.

"We are aware of the incident," said U.S. Army Col. Larry Doane, commander, JTF-DC. "Our priority is ensuring the well-being of all involved. We are grateful for the response of D.C. police and EMS. Safety is our top priority. We will take action based on the investigation. This type of vehicle is authorized, and safety protocols are in place."

**Good News Story Links:**

- Guardsmen Assist Local Police in Apprehending Suspect: https://www.dvidshub.net/news/545799/dc-national-guardsman-stops-assault-national-mall
- Joint Task Force D.C. commander discusses D.C. Safe and Beautiful mission: https://www.dvidshub.net/video/973731/joint-task-force-dc-commander-discusses-dc-safe-and-beautiful-mission
- D.C. National Guard Members alert police to man brandishing knife at

Skip to main content (Press Enter).

Waterfront Metro Station: https://www.dvidshub.net/news/545983/dc-national

## JA182

Waterfront Metro Station: https://www.dvidshub.net/news/543906/dc-national-guard-members-alert-police-man-brandishing-knife-waterfront-metro-station

- VP, SD, WH Dep. COS Meet with Troops at DC Union Station: https://www.dvidshub.net/image/9268016/vp-sd-wh-dep-cos-meet-with-troops-dc-union-station

**Social Media**

- **Facebook:** https://www.facebook.com/DCGuard
- **Instagram:** DCGuard1802
- **X:** DCGuard1802
- **DVIDS:** https://www.dvidshub.net/feature/DCsafeandbeautifultaskforce

- 30 -

  

SHARE        PRINT

**FeedList**

**Feed List**

Skip to main content (Press Enter).

**JA183**

**JA184**

**JA184**
https://dc.ng.mil/Public-Affairs/News-Release/Article/4284259/dc-national-guard-activated-to-support-law-enforcement-in-district-of-columbia/          5/5

# EXHIBIT

# 11

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 96 of 274



# Governor DeWine Issues Statement on Ohio National Guard

*August 16, 2025*

(COLUMBUS, Ohio)— Ohio Governor Mike DeWine released the following statement regarding the Ohio National Guard:

"We have been asked by the Secretary of the Army to send 150 military police from the Ohio National Guard to support the District of Columbia National Guard. These Ohio National Guard members will carry out presence patrols and serve as added security.  None of these military police members are currently serving as law enforcement officers in the state of Ohio."

Ohio National Guard members are expected to arrive in Washington, D.C., in the coming days.

# EXHIBIT
# 12



SC.GOV

JA188

Search Governor.sc.gov

☰ Menu

The Governor          The First Lady          Lieutenant Governor          Newsroom

Executive Branch          Contact

Home  »  Recent News  »  Gov. Henry McMaster Authorizes Deployment of National Guard to Washington, D.C.

# Gov. Henry McMaster Authorizes Deployment of National Guard to Washington, D.C.

August 16, 2025

*Guardsmen Subject to Immediate*

.

**COLUMBIA, S.C. –** Governor Henry McMaster today authorized the deployment of 200 South Carolina National Guardsmen to Washington, D.C. The guardsmen will support federal law

*Recall for Hurricane or Natural Disaster Response*

enforcement activities under President Donald J. Trump's executive order to Restore Law and Order in the District of Columbia.

The guardsmen are subject to immediate recall if a hurricane or other natural disaster requires their return to South Carolina.

"South Carolina is proud to stand with President Trump as he works to restore law and order to our nation's capital and ensure safety for all who live, work, and visit there," said Governor Henry McMaster. "As our National Guard works to support President Trump's mission, should a hurricane or natural disaster threaten our state, these men and women can and will be immediately recalled home to respond."

The governor's order comes at the request of the Pentagon's National Guard Bureau. The deployment will be funded by the federal government under Title 32.

## Executive Orders

Governor McMaster's Executive Orders

**LEARN MORE**

## Boards & Commissions

Information on SC Boards & Commissions

**LEARN MORE**

## Floodwater Commission

SC Floodwater Commission

**LEARN MORE**

**JA189**

**JA190**

The Honorable Henry McMaster

State House

1100 Gervais Street

Columbia, SC 29201

The Governor

The First Lady

Lieutenant Governor

Newsroom

Executive Branch

News Archive

Contact

SC.GOV Home  |  SC.GOV Privacy & Security Policy  |  Help Center  |  Contact SC.GOV  |
Download Adobe Reader

Copyright © 2025 State of South Carolina

# EXHIBIT
# 13



State Agency Directory | Online Services | Phone Directory

Search this site    Search



Home

# WEST VIRGINIA NATIONAL GUARD TO SUPPORT PRESIDENT TRUMP'S INITIATIVE TO MAKE D.C. SAFE AND BEAUTIFUL

*August 16, 2025*

**CHARLESTON, W. Va. –** At the request of the Trump administration, Governor Patrick Morrisey has directed the West Virginia National Guard (WVNG) to support the President's initiative to restore cleanliness and safety to Washington, D.C. Under the command of West Virginia Adjutant General Maj. Gen. Jim Seward, the WVNG will deploy troops to the nation's capital as a show of commitment to public safety and regional cooperation.

WVNG involvement will include providing mission-essential equipment, specialized training, and approximately 300-400 skilled personnel as directed. The mission will be funded at the federal level. The WVNG remains

**JA192**

Case 1:25-cv-03005-JMC       Document 3-2       Filed 09/09/25       Page 103 of 274

steadfast in its commitment to its longstanding National Capital Region partnership.

"West Virginia is proud to stand with President Trump in his effort to restore pride and beauty to our nation's capital," **said Governor Morrisey.** "The men and women of our National Guard represent the best of our state, and this mission reflects our shared commitment to a strong and secure America."

"This initiative aligns with our values of service and dedication to our communities," **said Maj. Gen. Seward.** "We stand ready to support our partners in the National Capital Region and contribute to the collective effort of making our nation's capital a clean and safe environment. The National Guard's unique capabilities and preparedness make it an invaluable partner in this important undertaking."

The WVNG exemplifies the spirit of collaboration that is vital in today's efforts to enhance the safety of our homeland while supporting state and federal missions.

**Office of the Governor**

State Capitol
1900 Kanawha Blvd. E
Charleston, WV  25305

**Ph** 304.558.2000 or 1.888.438.2731
**Fx** 304.558.3588
Write Us a Message
**GET IN TOUCH**



Privacy, Security and Accessibility | WV.gov | USA.gov | © 2025 State of West Virginia

JA193

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 104 of 274

**JA194**

# EXHIBIT
# 14

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 106 of 274

  

← **Post**

**Governor Jeff Landry** ✔
@LAGovJeffLandry                                          •••

I have approved the deployment of approximately 135
@LANationalGuard soldiers to Washington DC to assist in President
@realDonaldTrump's mission of restoring safety and peace in our
nation's capital.

We are a nation of law and order. Our capital is a reflection of our
nation's respect, beauty, and standards. We cannot allow our cities to be
overcome by violence and lawlessness. I am proud to support this
mission to return safety and sanity to Washington DC and cities all
across our country, including right here in Louisiana.

5:04 PM · Aug 18, 2025 · **112.7K** Views

💬 174          ↻ 164          ♡ 692          🔖 24          ⬆

💬 **Read 174 replies**

Log in                                          Sign up

**JA196**

# EXHIBIT
# 15



**Join Now**

# La. National Guard Military Police to assist in Washington, D.C.

/ Featured News, News Releases / By Duncan Foote

**By Sgt. 1st Class Scott D. Longstreet, Louisiana National Guard Public Affairs Office**
**PINEVILLE –** The Louisiana National Guard, as directed by the president of the United States, is federalizing and activating to Washington, D.C., to support the Metropolitan Police Department, the District of Columbia National Guard and D.C. local law enforcement beginning August 16, 2025.

Approximately 135 LANG military police will augment the DCNG in a joint effort to protect federal buildings, national monuments and other federal properties. The National Guard Bureau through its Headquarters, the Department of the Army and the Secretary of the Army, have directed multiple states' National Guard forces to augment DCNG.

"Louisiana Guardsmen are trained and ready to support the District of Columbia. Our Guardsmen mobilized quickly upon order, displaying efficiency, professionalism, and an understanding of what it means to serve in the Guard. Answering the call of our Nation is an honor and a privilege," said Louisiana adjutant general, Maj. Gen. Thomas Friloux.

The Louisiana National Guard and its citizen-Soldiers are always trained and prepared to assist neighborhoods and cities across the country whenever and wherever they are needed; they are 'Always Ready, Always There.'

← Previous Post                                                                                  Next Post →

**JA198**



Search...    🔍

Archives



Select Month ⌄

Recent Posts

La. National Guard mobilizes to support ICE

Louisiana National Guard's 199th Brigade Support Battalion holds change of command
ceremony

La. Guard's Tiger Brigade Marks 20th Anniversary of Redeployment and Hurricane Response

Louisiana Army National Guard commissions 16 new officers

**JA199**

La. National Guard Military Police to assist in Washington, D.C.

## External Links

[U.S. Army A-Z](#)

[Department of Defense](#)

[National Guard Bureau](#)

[U.S. Army](#)

[U.S. Air Force](#)

[Army Knowledge Online](#)

[Guard Knowledge Online](#)

[The White House](#)

[TRICARE](#)

[iSalute](#)

## Useful Links

[Museums](#)

[DA Photo Request](#)

[FOIA Request](#)

[Logistical & Aerial Support](#)

[Office of Family Programs](#)

[Substance Abuse Program](#)

   

**JA200**













**JA201**

# EXHIBIT
# 16

**JA202**

Case 1:25-cv-03095-JMC    Document 3-2    Filed 09/09/25    Page 113 of 274



Flag Status: **Full-Staff**

  



| FOR IMMEDIATE RELEASE | CONTACT: |
|:---:|:---:|
| August 18, 2025 | press@govreeves.ms.gov |

# Governor Reeves Statement On Mississippi National Guard Deployment to Washington, D.C.

**JACKSON, Miss. –** Governor Tate Reeves today released the following statement on approving the deployment of approximately 200 Mississippi National Guard Soldiers to Washington, D.C.:

"I've approved the deployment of approximately 200 Mississippi National Guard Soldiers to Washington, D.C., to support President Trump's effort to return law and order to our nation's capital. Crime is out of control there, and it's clear something must be done to combat it. Americans deserve a safe capital city that we can all be proud of. I know the brave men and women of our National Guard will do an excellent job enhancing public safety and supporting law enforcement."

**JA203**

9/5/25, 3:29 PM

Governor Reeves Statement on Mississippi National Guard Deployment to Washington, D.C.

To contact the Governor's office, please call **601-359-3150** or email **governor@govreeves.ms.gov**.

For all media inquiries, please email **press@govreeves.ms.gov**.

  

**JA204**

© 2025 Office of Governor Tate Reeves. All Rights Reserved.

**JA205**

# EXHIBIT

# 17

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 117 of 274

SEPTEMBER 05, 2025

# Gov. Kemp: Georgia Guard to Support D.C. Public Safety Mission

ATLANTA – Governor Brian P. Kemp announced today that the Georgia National Guard is providing support to the ongoing **Joint Task Force-District of Columbia (https://urldefense.com/v3/__https://officeofgeorgiagovernorbrianpkemp.cmail19.com/t/y-l-qidutlk-hdiulijyhk-y/__;!!HWVSVPY!nCDkJZ6MIxxYpXvYx24HA9t3VunYjBiOz0An1Ry-jzVqNsFQCHLbU2vVR6diewkjbuIc9knPsFNBrr96bl9SMhs$ )** (JTF-DC) operations in Washington, D.C. In total, a contingent of 316 Guardsmen (16 support staff and approximately 300 Soldiers) will mobilize in and around the nation's capital to aid in restoring public safety following the president's executive order declaring a crime emergency in the District of Columbia, dated August 11, 2025. The Georgia Guard has a long history of partnering with federal, state, and local agencies to respond to such emergency situations, both in the state and in other parts of the country, as well as in allied countries around the world without any compromise to the Guard's ability to respond to in-state needs.

"Georgia is proud to stand with the Trump administration in its mission to ensure the security and beauty of our nation's capital," **said Governor Brian Kemp**. "We share a

**JA207**

commitment to upholding public safety and are grateful to these brave Guardsmen and women, for the families that support them, and for their dedication to service above self. As they have demonstrated again and again, our Georgia Guard is well equipped to fulfill both this mission and its obligations to the people of our state."

Following a federal request for the Georgia Guard to provide up to 16 Soldiers as medical, PA, and MP support staff to JTF-DC, these servicemembers were sent earlier this week to Joint Base Anacostia-Boiling within Washington, D.C. where they will work with other military personnel providing support for the broader mission. These Guardsmen are not expected to have any direct interaction with civilians.

Governor Kemp also approved fulfillment of a separate request for up to approximately 300 Georgia Guard Soldiers to relieve service members stationed in D.C. from the start of the mission. These 300 servicemembers are scheduled to mobilize in mid-September and will be on active duty in Washington shortly thereafter, barring any changes to the schedule that may arise beforehand.

Guardsmen have a dual mission to serve their respective state and our country as a whole. As part of the JTF-DC broader mission, the Georgia Guard will join seven other states and over 2,200 Guardsmen from around the nation to provide a visible presence in support of local law enforcement in D.C. Their specific tasks vary based on the

**JA208**

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 119 of 274

needs of those law enforcement partners. Personnel may be armed, consistent with their training, depending on the mission and operating under civilian law enforcement. For more information on JTF-DC, visit:

**https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/** (https://urldefense.com/v3/__https://officeofgeorgiagovernorbrianpkemp.cmail19.com/t/y-l-qidutlk-hdiulijyhk-j/__;!!HWVSVPY!nCDkJZ6MIxxYpXvYx24HA9t3VunYjBiOz0An1Ry-jzVqNsFQCHLbU2vVR6diewkjbulc9knPsFNBrr96glY0mJs$).

**PLEASE NOTE: This request to support the JTF-DC is separate from the request to support Immigration and Customs Enforcement (ICE) Agency operations here in Georgia**. Service members supporting ICE are not armed, nor are they in the field. They perform only administrative and logistical tasks at various ICE facilities in Georgia.

The Georgia Guard is comprised of more than 14,000 Soldiers and Airmen supporting overseas and domestic missions. Its support roles in the various missions noted above will not impact its ability to support the state in the event of an emergency, such as a major hurricane or other weather event. During the response to Hurricane Helene last year, the Georgia National Guard provided support to nearly forty impacted counties while simultaneously participating in operations on six continents.

**JA209**

9/5/25, 3:29 PM
Case 1:25-cv-03005-JMC   Document 3-2   Filed 09/09/25   Page 120 of 274
Gov. Kemp: Georgia Guard to Support DC Public Safety Mission | Governor Brian P. Kemp | Office of the Governor

CONTACT

# Press Secretary: Carter Chapman

[carter.chapman@georgia.gov](mailto:carter.chapman@georgia.gov)

CONTACT

# Deputy Press Secretary and Digital Media Manager: Annalise Morning

[annalise.morning@georgia.gov](mailto:annalise.morning@georgia.gov)

CONTACT

# Media Relations, Georgia Department of Defense: Capt. Dustin Cole

[ng.ga.gaarng.list.pao-staff@army.mil](mailto:ng.ga.gaarng.list.pao-staff@army.mil)

**JA210**

# EXHIBIT

# 18

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 122 of 274

# Gov. Rhoden Mobilizes SDNG to DC at the Request of President Trump



**Today, Governor Larry Rhoden announced the mobilization of 12 South Dakota National Guardsmen to support ongoing operations in Washington D.C. at the request of President Donald J. Trump.**

Date published: 08/31/2025

Copy Permalink

FOR IMMEDIATE RELEASE
August 31, 2025
Contact: Josie Harms

**Gov. Rhoden Mobilizes SDNG to DC at the Request of President Trump**

**PIERRE, S.D. –** Today, Governor Larry Rhoden announced the mobilization of 12 South Dakota National Guardsmen to support ongoing operations in Washington D.C. at the request of President Donald J. Trump.

**JA212**

"South Dakota stands in solidarity with President Trump and his efforts to Make America Safe Again," said **Governor Larry Rhoden**. "With the National Guard's help, President Trump has restored law and order to our nation's capital – and our guardsmen will help keep it that way. We will not sit on the sidelines while crime threatens the safety of our families."

The 12 public affairs guardsmen are from the 129th Mobile Public Affairs Detachment based out of Rapid City. They will serve in a public affairs capacity in the joint information command center.

This mobilization is under the command of the D.C. National Guard and is completely federally funded. The guardsmen will activate on a Title 32 status. The initial deployment is expected to last for 30 days.

For the safety of the guardsmen and their families, the announcement of this mobilization was held until the guardsmen were safely on site.

### 

---

# Other Posts by this Agency

### Results

Growing up on the ranch, you learn that results matter.

Learn More

### Governor Rhoden Celebrates Record-Breaking Build Dakota Awards

Strengthens South Dakota's Future Workforce

Learn More

JA213

**JA214**

# EXHIBIT

# 19

JA215

An official website of the United States government    Here's how you know ⌄



# NATIONAL GUARD

Home : News : Article View



**NEWS** | Aug. 29, 2025

# Guard Members From Six States, D.C. on Duty in Washington in Support of Local, Fed Authorities

By Sgt. 1st Class Jon Soucy, National Guard Bureau

WASHINGTON – More than 2,000 National Guard Soldiers and Airmen from six states and the District of Columbia are on duty in Washington as part of Joint Task Force – District of Columbia in support of local and federal authorities and law enforcement agencies.

**JA216**

"These extraordinary service [members] are here to serve the task force," said U.S. Army Col. Larry Doane, commander of JTF-DC. "Many are traditional Guardsmen who left behind their civilian careers and families with little notice to come help us in the District."

The Guard is unique in the U.S. military with a dual mission that includes serving as the combat arms reserve of the Army and Air Force worldwide, and serving at home in support of local, state, or federal authorities in times of need.

"It's the finest tradition of the Guard to be able to serve our communities," said Doane.

Guard members are providing a visible presence in support of local and federal law enforcement at areas along the National Mall, key federal buildings, the Washington waterfront, Metro subway stations and other areas. Future plans include presence patrols in residential neighborhoods and other locations throughout the District.

"The D.C. National Guard is gathering our Soldiers and Airmen together to partner with our law enforcement partners to provide the safety and security to our neighbors," said Doane.

While Guard members may have a presence in those areas, the U.S. Marshals Service is the lead agency and coordinates with other agencies such as the Washington Metropolitan Police Department, said Doane. Guard members are on duty in support of those elements, and officers from those agencies are brought in on incidents Guard members encounter.

"If there's any concerns, we notify [the Metropolitan Police Department] or the right personnel to make sure that situation is taken care of," said U.S. Air Force Maj. Jay Green, a chaplain with the 113th Wing, District of Columbia Air National Guard.

Since coming on duty, Guard members have responded to several incidents where individuals threatened public safety. One incident involved Guard members responding to a man brandishing a knife in a Metro subway station.

"We showed our presence and then made sure that citizens around that area were safe," said U.S. Army Capt. Giho Yang, with the District of Columbia Army National Guard. "To do that, we had to partner up and communicate with the law enforcement officers that were nearby, making sure that we had eyes and ears on the situation to keep everyone safe."

## JA217

Guard members have also responded to medical emergencies, including an individual found unconscious along a set of railroad tracks.

"He was having what appeared to be a pretty serious episode and looked like he might be dying," said U.S. Army Sgt. Jay Whitehead, a team leader with the 372nd Military Police Battalion, D.C. Army Guard, adding that his team worked alongside Amtrak police officers to revive him, called for an ambulance and kept him safe until medical personnel arrived.

In a separate incident, Soldiers with 4th Battalion, 118th Infantry Regiment, South Carolina Army National Guard responded when a man was struck by a train.

"Everybody was panicking," said U.S. Army Spc. Nicholas Garrison, who responded to the incident, referring to those in the area.

He said he and his team were "able to keep a clear head and make the phone call to 911 to get an ambulance on the way."

Garrison's team aided the individual and secured the scene until emergency personnel arrived.

"Our presence was important for getting him help as quickly as possible," he said.

Others in the task force are taking part in beautification projects throughout Washington.

"Many folks see our troops patrolling the Metro stations and other locations, you know, out there for security," said U.S. Army Chief Warrant Officer 5 Bernard Aguon, the command chief warrant officer of the D.C. Army Guard. "This is the other part of that nested operation – the beautification effort."

Aguon and other Soldiers have been working at federal parks and other areas.

"Today, our project centered on Marvin Gaye Park, to include parts of Marvin Gaye Trail," he said. "We collected approximately 40-plus trash bags with several pieces of debris, some old tires, and crates. Our goal here is really just to help the community by beautifying areas within the District."

Future beautification plans include larger refurbishment projects beyond trash and debris removal. Guard members are coordinating with partner agencies on those projects and ensuring the required permits and equipment are in place, said task force officials.

Supporting those on duty is key, with many of those logistical elements handled at

**JA218**

Logistics Support Area Lincoln, located on Joint Base Anacostia-Bolling in the southeast area of the city.

LSA Lincoln allows for faster coordination and distribution of food, water and other items needed to support the Soldiers and Airmen on duty, said U.S. Air Force Col. Thomas A. Conley, deputy commander for support with JTF-DC, and part of the 113th Wing, D.C. Air Guard.

"This setup makes everything easier," he said. "Workflow makes sense, traffic flow makes sense, you can see every relevant space within one range of vision."

It also streamlines distributing meals to Guard members on duty, said U.S. Army 1st Sgt. David Cochran, with the D.C. Army Guard, whose team oversees the delivery of 9,200 contracted meals daily. That includes 2,300 meals each for breakfast, lunch, dinner and midnight options.

"My team works very hard," he said, adding his team of roughly a dozen Soldiers takes care of meals for the more than 2,000 Service members of the task force. "They are pushing out every meal, every day and I am super proud of them. They do the impossible."

Since Aug. 12, Cochran's team has pushed out more than 75,000 meals, which all meet the Army food program's calorie count and dietary requirements and restrictions, he said. The hot meals are delivered to LSA Lincoln and then distributed to Soldiers and Airmen at their duty locations throughout Washington. Providing hot meals and ensuring Guard members are billeted in safe, comfortable hotels in the area are task force priorities, said officials.

For many Guard members on duty, the mission is important, as the District is home.

"I remember coming here when I was in fifth grade for field trips," said U.S. Air Force Staff Sgt. Hector Amaya, a security forces Airman with the 113th Security Forces Squadron, D.C. Air Guard, who grew up in the greater Washington area. "I care a lot about this city."

---



SHARE      PRINT

🏷 national guard   🏷 Joint Task Force DC   🏷 DC Safe
🏷 DC Safe and Beautiful Task Force

**JA219**

**Related Articles**



### Military Firefighters Hone Skills at Northern Strike

**By Maj. Megan Breen,** | Aug. 20, 2025

CAMP GRAYLING, Mich. — Sirens echoed across the Grayling Army Airfield as firefighters sprinted toward a simulated UH-60 Black Hawk crash site. Smoke drifted through the pine trees as U.S. Army reservists, National Guard...



### A Career of Service: Illinois Army Guard Soldier Reflects on Time in Active Component, Army Guard, and Army Reserve

**By Staff Sgt. Amber Peck,** | July 11, 2025

TORUŃ, Poland — Sgt. 1st Class Hussein Mashal, an Illinois Army National Guard Soldier with nearly two decades of service, has checked a lot of Army boxes – service in all three components – active, Reserve, National Guard –...



### National Guard Supports Army's 250th Birthday Celebration

**By Senior Master Sgt. Jason Melton,** | June 16, 2025

WASHINGTON — More than 800 National Guard members secured the nation's capital June 14 when the U.S. Army celebrated its 250th birthday. Guard members from the District of Columbia, Mississippi, West Virginia and Pennsylvania...

More »

JA220

**Latest News**

Alaska Air Guard Conducts Multiple Hoist Rescues of Stranded Rafters on Kichatna River

Guard News • 3 hours ago

Searcy Leaves Legacy of Advocacy for Warrant Officers in Army Guard

Guard News • 20 hours ago

Georgia Guard Company Leads in Electromagnetic Warfare Modernization

Guard News • 2 days ago

Massachusetts, New York Guard Members Compete in Historic Logan-Duffy Rifle Competition

Guard News • 2 days ago

Alaska Air Guard Rescues Individual With Facial Laceration Near Knik Glacier

Guard News • 2 days ago

**JA221**

**Guard News Archive**

2025 (300)
2024 (423)
2023 (421)
2022 (520)
2021 (688)
2020 (928)
2019 (379)
2018 (318)
2017 (339)
2016 (232)
2015 (343)
2014 (373)
2013 (450)
2012 (540)
2011 (523)
2010 (1046)
2009 (352)
2008 (633)
2007 (288)
2006 (180)

**JA222**

# EXHIBIT

# 20

JA223

An official website of the United States government   Here's how you know  ⌄

☰    DISTRICT OF COLUMBIA NATIONAL GUARD                                    🔍

Skip to main content (Press Enter).

**NEWS** | Aug. 23, 2025

# National Guard authorized to carry weapons in support of law enforcement

WASHINGTON – U.S. Army Brig. Gen. Leland D. Blanchard II, the Commanding General (interim) of the D.C. National Guard, in support of local law enforcement agencies, gave the order for Guard members supporting Joint Task Force-DC to carry their service-issued weapons. The decision comes at the direction of the Secretary of Defense and in  coordination with the Metropolitan Police Department and federal law enforcement partners.

Blanchard made the decision to order Guard members to carry their service-issued weapons after careful consideration of the security environment. "This decision is not something taken lightly," said Blanchard. "We are in coordination with our law enforcement partners and all appropriate review processes are in place."

Guard members on the mission will carry M17 pistols, which are intended for personal protection. Guard members receive initial, regular, ongoing and refresher training, as well as complete annual  weapons qualifications, prior to carrying weapons.

The President of the United States directly commands the D.C. National Guard, the only National Guard force not under a state or territory governor's authority under Title 32 U.S.C. § 110; D.C § 49-409.

The Joint Task Force – District of Columbia mission is conducted under Title 32 U.S. Code § 502(f),  which allows Guard members on Title 32 status—under state command but federally funded— to perform duties in support of law enforcement. Unlike active-duty troops on Title 10 status, National Guard members are not restricted by the Posse Comitatus Act, Title 18 U.S.C. § 1385,  when operating under the governor's authority.

"Our task force members incorporate de-escalation techniques within the D.C. National Guard  rules for the use of force," said COL Larry Doane, JTF-DC Commander. "Incorporating all of these measures ensures they are fully prepared to support law enforcement and safeguard the residents of Washington D.C."

JTF-DC continues to work closely with the District and federal partners to maintain public safety and security.

Skip to main content (Press Enter).

**JA225**

For more information, contact the Joint Information Center at jtf-dcmediadesk@army.mil or 202- 880-4267.

-30-


SHARE


PRINT

**FeedList**

**Feed List**

**JA226**

# EXHIBIT
# 21

03 SEP 2025

MEMORANDUM FOR Interim Commanding General, District of Columbia National Guard, 2001 East Capitol Street, SE. Washington, DC 20003-1719

SUBJECT: Extension of 11 August 2025, Mobilization of D.C. National Guard – JTF-DC

1. On 11 August 2025, the President of the United States, in coordination with the Secretary of Defense, directed the rapid mobilization of the District of Columbia National Guard to support local law enforcement agencies. In alignment with the Presidential memorandum issued on that date, I am extending this mobilization through 30 November 2025, to continue supporting the President's ongoing efforts to restore law and order in the District of Columbia.

2. We will continue to assess conditions on the ground in conjunction with OSD and the White House, to ensure our forces remain appropriately postured.

Dan Driscoll

JA228

# EXHIBIT

# 22

🔍 Search DVIDS...



# DC National Guard Leaders Deputized for DC Safe and Beautiful Task Force [Image 2 of 7]

![DC National Guard members taking oath at the D.C. Armory]

**WASHINGTON, DISTRICT OF COLUMBIA, UNITED STATES**

**08.15.2025**

**Photo by Ayan Sheikh** 🔊

**Joint Task Force DC** 🔍 🔊

Subscribe     5

Jeryl Isaac, Chief Deputy U.S. Marshal, deputizes Brig. Gen. Leland Blanchard II, interim commanding general of the District of Columbia National Guard, Command Sgt. Maj. Ronald L. Smith, senior enlisted leader to the commanding general, and other Guard members at the D.C. Armory, Aug. 15, 2025. The D.C.

National Guard is uniquely commanded by the President of the United States through the Secretary of Defense. Guard members were activated under the Joint Task Force–District of Columbia as part of the DC Safe and Beautiful Task Force to support District and federal partners in safeguarding property and ensuring the functions of government. (U.S. Army National Guard Photo by Ms. Ayan Sheikh, DCNG Public Affairs)

## IMAGE INFO

| | |
|---|---|
| Date Taken: | 08.15.2025 |
| Date Posted: | 08.15.2025 18:01 |
| Photo ID: | 9260085 |
| VIRIN: | 200730-Z-IB405-2003 |
| Resolution: | 6048x4024 |
| Size: | 4.16 MB |
| Location: | WASHINGTON, DISTRICT OF COLUMBIA, US |

| | |
|---|---|
| Web Views: | 55 |
| Downloads: | 3 |

**PUBLIC DOMAIN**

This work, *DC National Guard Leaders Deputized for DC Safe and Beautiful Task Force [Image 7 of 7],* by Ayan Sheikh, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

## GALLERY



## MORE LIKE THIS



**JA231**

 

## CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

## TAGS

National Guard          DCsafe

Safe and Beautiful

## OPTIONS

⬇ Register/Login to Download

DVIDS CONTROL CENTER

404-282-1450

WEB SUPPORT

dvidsservicedesk@dvidshub.net

CUSTOMER SERVICE

1-888-743-4662

dma.enterprise-customer-

services@mail.mil

FEATURES

UNITS

CONTENT

Images

Video

News

Audio

Graphics

Podcasts

Publications

Webcasts

**JA232**

JA233

 



Version: ab5f13e7007ddc668eeb06580813e815f6bd2d8c_2025-09-02T14:42:55

# EXHIBIT

# 23



Search DVIDS...



# D.C. Safe and Beautiful Task Force [Image 4 of 4]



**UNITED STATES**
**08.19.2025**
**Photo by Pfc. Nina Cortez**
**Joint Task Force DC**

Subscribe 5

U.S. Soldiers from the West Virginia National Guard are deputized at the D.C. Armory as part of D.C. Safe and Beautiful Task Force, Washington, D.C., Aug. 19, 2025. Approximately 800 National Guard service members comprise JTF-DC, supporting the D.C. Safe and Beautiful Task Force. These National Guard service members provide critical support, including crowd management, presence patrols, and perimeter control, in support of law enforcement. (U.S. Army photo by Pfc. Nina Cortez)

## IMAGE INFO

| Date Taken: | 08.19.2025 |
| --- | --- |

Date Posted:                    08.19.2025 16:50

Photo ID:                       9266129

VIRIN:                          250819-A-GG554-1083

Resolution:                     7219x3458

Size:                           2.64 MB

Location:                       US

Web Views:                      65

Downloads:                      2

**PUBLIC DOMAIN**

This work, *D.C. Safe and Beautiful Task Force [Image 4 of 4]*, by PFC Nina Cortez, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY

   

# MORE LIKE THIS

 
 

# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

# TAGS

D.C.

**OPTIONS**

⬇ Register/Login to Download

DVIDS CONTROL CENTER

404-282-1450

WEB SUPPORT

dvidsservicedesk@dvidshub.net

CUSTOMER SERVICE

1-888-743-4662
dma.enterprise-customer-
services@mail.mil

FEATURES

UNITS

CONTENT

Images
Video
News
Audio
Graphics
Podcasts
Publications
Webcasts

 



Version: ab5f13e7007ddc668eeb06580813e815f6bd2d8c_2025-09-02T14:42:55

**JA237**

# EXHIBIT

# 24

Search DVIDS...



# D.C. Safe and Beautiful Task Force [Image 3 of 8]

![District of Columbia photo]

**DISTRICT OF COLUMBIA, UNITED STATES**
**08.19.2025**
**Photo by Spc. Giselle Gonzalez** ⤳
**Joint Task Force DC** 🔍 ⤳

Subscribe    5

U.S. Army Soldiers from the West Viginia and South Carolina National Guards are deputized at the D.C. Armory in Washington, D.C., Aug. 19, 2025. Guard members were activated under the Joint Task Force–District of Columbia as part of the D.C. Safe and Beautiful Task Force to support District and federal

partners in safeguarding property and ensuring the functions of government. (U.S. Army Photo by Spc. Giselle Gonzalez)

## IMAGE INFO

| | |
|---|---|
| Date Taken: | 08.19.2025 |
| Date Posted: | 08.20.2025 18:40 |
| Photo ID: | 9268723 |
| VIRIN: | 250819-A-H0992-1014 |
| Resolution: | 6782x4521 |
| Size: | 2.33 MB |
| Location: | DISTRICT OF COLUMBIA, US |

| | |
|---|---|
| Web Views: | 55 |
| Downloads: | 2 |

**PUBLIC DOMAIN**

This work, *D.C. Safe and Beautiful Task Force [Image 8 of 8]*, by SPC Giselle Gonzalez, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

## GALLERY



## MORE LIKE THIS





# CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

# TAGS

DCsafeandbeautifultaskforce    dcsafe

# OPTIONS

⬇ Register/Login to Download

DVIDS CONTROL CENTER

404-282-1450

WEB SUPPORT

dvidsservicedesk@dvidshub.net

CUSTOMER SERVICE

1-888-743-4662

dma.enterprise-customer-services@mail.mil

FEATURES

UNITS

CONTENT

Images

Video

News

Audio

Graphics

Podcasts

Publications

Webcasts

**JA241**

 



Version: ab5f13e7007ddc668eeb06580813e815f6bd2d8c_2025-09-02T14:42:55

# EXHIBIT
# 25



# D.C. Safe and Beautiful Task Force [Image 2 of 11]



**UNITED STATES**

**08.21.2025**

**Photo by Pfc. Nina Cortez** ⟫

**Joint Task Force DC** Q ⟫

Subscribe      5

U.S. Soldiers from the Ohio and Tennessee National Guard are deputized at the D.C. Armory as part of D.C. Safe and Beautiful Task Force, Washington, D.C., Aug. 21, 2025. More than 1,500 National Guard service members comprise JTF-DC, supporting the D.C. Safe and Beautiful Task Force. These National Guard

service members provide critical support, including crowd management, presence patrols, and perimeter control, in support of law enforcement. (U.S. Army photo by Pfc. Nina Cortez)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 08.21.2025 |
| Date Posted: | 08.23.2025 18:02 |
| Photo ID: | 9270341 |
| VIRIN: | 250821-A-GG554-1052 |
| Resolution: | 7801x5187 |
| Size: | 2.81 MB |
| Location: | US |

| | |
|---|---|
| Web Views: | 11 |
| Downloads: | 3 |

**PUBLIC DOMAIN**

This work, *D.C. Safe and Beautiful Task Force [Image 11 of 11]*, by PFC Nina Cortez, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY



# MORE LIKE THIS



**JA245**




## CONTROLLED VOCABULARY KEYWORDS

*No keywords found.*

## TAGS

D.C.

## OPTIONS

⬇ Register/Login to Download

DVIDS CONTROL CENTER

404-282-1450

WEB SUPPORT

dvidsservicedesk@dvidshub.net

CUSTOMER SERVICE

1-888-743-4662

dma.enterprise-customer-services@mail.mil

FEATURES

UNITS

CONTENT

Images

Video

News

Audio

Graphics

Podcasts

Publications

Webcasts

 



Version: ab5f13e7007ddc668eeb06580813e815f6bd2d8c_2025-09-02T14:42:55

# EXHIBIT
# 26

Search DVIDS...



# Louisiana National Guard Soldiers deputized in support of JTF-DC [Image 1 of 2]



**DISTRICT OF COLUMBIA, UNITED STATES**

**08.25.2025**

**Photo by Tech. Sgt. Andrew Enriquez** 🔊

**Joint Task Force DC** 🔍 🔊

Subscribe     5

U.S. Soldiers with the Louisiana National Guard recite the oath to become deputized in support of law enforcement partners as part of the Joint Task Force – District of Columbia on Joint Base Anacostia-Bolling Aug. 25 2025. About 2,000 National Guard members are supporting the D.C. Safe and Beautiful mission

IA249

Task Force providing critical support to the D.C. Metropolitan Police Department in ensuring the safety of all who live, work and visit the District. (U.S. Air National Guard photo by Tech. Sgt. Andrew Enriquez)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 08.25.2025 |
| Date Posted: | 08.28.2025 17:22 |
| Photo ID: | 9276503 |
| VIRIN: | 250825-Z-EZ983-1001 |
| Resolution: | 2048x1363 |
| Size: | 2.19 MB |
| Location: | DISTRICT OF COLUMBIA, US |

| | |
|---|---|
| Web Views: | 24 |
| Downloads: | 0 |

**PUBLIC DOMAIN**

This work, *Louisiana National Guard Soldiers deputized in support of JTF-DC [Image 2 of 2]*, by TSgt Andrew Enriquez, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY

 

# MORE LIKE THIS

 

 

 

**JA250**



## KEYWORDS

*No keywords found.*

## TAGS

National Guard          dcsafe

## OPTIONS

Register/Login to Download

DVIDS CONTROL CENTER

404-282-1450

WEB SUPPORT

dvidsservicedesk@dvidshub.net

CUSTOMER SERVICE

1-888-743-4662
dma.enterprise-customer-
services@mail.mil

FEATURES

UNITS

CONTENT

Images
Video
News
Audio
Graphics
Podcasts
Publications
Webcasts

**JA251**



Version: ab5f13e7007ddc668eeb06580813e815f6bd2d8c_2025-09-02T14:42:55

JA252

# EXHIBIT
# 27

Search DVIDS...



# West Virginia National Guard deputized for JTF-DC [Image 2 of 2]



**DISTRICT OF COLUMBIA, UNITED STATES**

**08.25.2025**

**Photo by Master Sgt. Whitney Hughes** 🔊

**Joint Task Force DC** 🔍 🔊

Subscribe     5

U.S. assigned to the West Virginia National Guard, recite the oath to become deputized to support to Joint Task Force – District of Columbia at Joint Base Anacostia-Bolling Aug. 25. About 2,000 National Guard members are supporting the D.C. Safe and Beautiful mission providing critical support to the D.C.

IA254

Metropolitan Police Department in ensuring the safety of all who live, work, and visit the District. (U.S. Army photo by Master Sgt. Whitney Hughes)

# IMAGE INFO

| | |
|---|---|
| Date Taken: | 08.25.2025 |
| Date Posted: | 08.25.2025 16:24 |
| Photo ID: | 9276236 |
| VIRIN: | 082525-Z-TA175-6602 |
| Resolution: | 6450x4305 |
| Size: | 19.68 MB |
| Location: | DISTRICT OF COLUMBIA, US |

| | |
|---|---|
| Web Views: | 69 |
| Downloads: | 2 |

**PUBLIC DOMAIN**

This work, *West Virginia National Guard deputized for JTF-DC [Image 2 of 2]*, by MSG Whitney Hughes, identified by DVIDS, must comply with the restrictions shown on https://www.dvidshub.net/about/copyright.

# GALLERY

 

# MORE LIKE THIS

 
 
 



# KEYWORDS

*No keywords found.*

# TAGS

National Guard          dcsafe

# OPTIONS

⤓   Register/Login to Download

DVIDS CONTROL CENTER

404-282-1450

WEB SUPPORT

dvidsservicedesk@dvidshub.net

CUSTOMER SERVICE

1-888-743-4662

dma.enterprise-customer-services@mail.mil

FEATURES

UNITS

CONTENT

Images
Video
News
Audio
Graphics
Podcasts
Publications
Webcasts



Version: ab5f13e7007ddc668eeb06580813e815f6bd2d8c_2025-09-02T14:42:55

# EXHIBIT

# 28

JA258

Exhibit # 4

United States Marshals Service POLICY DIRECTIVES

**TACTICAL OPERATIONS**

**17.11   SPECIAL DEPUTATION PROGRAM**

**A.     Proponent:**  Tactical Operations Division (TOD), Special Deputations Branch (SDB).

**B.     Purpose:**  This policy directive establishes the policy and procedures concerning the Special Deputation Program (SDP) for the United States Marshals Service (USMS).

**C.     Authority:**  The authority of the USMS to supervise and administer the SDP is contained in 28 USC 566(c), 561(a), 561(f), 509, 510; 28 CFR, 0.111, 0.112, and 0.113.

**D.     Policy:**

1.      Special Deputations by the USMS are authorized based upon the needs of the USMS or other agencies that can demonstrate a requirement to enforce federal law or carry a concealed weapon.

2.      Special Deputations are not limited to the district of origin and are valid wherever the United States has law enforcement powers.  A Special Deputation may carry restrictions that limit authority to certain duty hours, a specific investigation, a designated location, personal protection, etc.  Limits may also include conditions or restrictions for carrying concealed weapons.

3.      The USMS can deputize federal, state, local, or tribal law enforcement officers to enforce Title 18 criminal offenses only.  Special Deputies are not authorized to participate in federal drug investigations (Title 21) unless they are also deputized by the Drug Enforcement Administration or the Federal Bureau of Investigation.

4.      Deputized individuals have Title 18 authority, as stipulated on Form USM-3B, *Special Deputation Oath of Office*, *Authorization, and Appointment*, to perform any of the following federal law enforcement functions:

   a.      Seek and execute arrest warrants and search warrants;

   b.      Make arrests without a warrant if there are reasonable grounds to believe that the suspect has violated or is violating federal law;

   c.      Serve subpoenas and other legal writs;

   d.      Monitor Title III Intercepts (electronic surveillance); and

   e.      Carry firearms for personal protection or the protection of those covered under the federal assault statutes.

5.      **Special Deputation Eligibility Requirements:**  In order to be qualified for Special Deputation, an applicant must:

   a.      Be a United States citizen;

   b.      Be employed by a federal, state, local, or tribal law enforcement agency, or an agency approved by the Department of Justice (DOJ);

**JA259**

c.    Have successfully completed a basic law enforcement training program. If deputation is requested to participate in a protection detail, proof of protective detail training is also required;

d.    Possess at least 1 year of law enforcement experience with an agency that has general arrest authority;

e.    Have no domestic violence convictions as defined in 18 USC 922(g)(9) (the Lautenberg Amendment);

f.    Have successfully qualified with an authorized firearm on the USMS or employing agency's approved course of fire within 6 months of application date;

g.    Complete Form USM-3A, *Application for Special Deputation/Sponsoring Federal Agency Information;* Form USM-3C, *Application for Group Deputation*; or Form USM-3D, *Agreement Between United States Marshals Service and Physicians/Medical Support Volunteers*. Incomplete applications will not be processed;

h.    Have certified that they have reviewed and agreed to comply with the deadly force policy of their employing agency or the DOJ;

i.    If applicant is a federal employee, applicant must be classified in a law enforcement job series. If an applicant is not employed in a law enforcement job series but has sufficient justification to be deputized, the application and a recommendation from SDB will be submitted to the Office of the Deputy Attorney General (ODAG) for final approval;

j.    Applicants may generally not hold more than one Special Deputation at a time. However, if a scenario arises where it is justifiable for an applicant to be deputized to work under more than one task force/mission, a request for waiver of this limitation can be sent to SDB for review;

k.    Provide written authorization from their employer that they concur with their employee's participation on a task force or mission. This authorization letter must be no older than 2 months of SDB receipt of the application; and

l.    Applicants should not be under internal investigation by their employer. If an applicant is under internal investigation, a written explanation regarding the circumstances of the investigation and what caused it should be sent to SDB for review along with the application.

**6.    Special Deputation Employment Categories:**

a.    **Federal, State, Local, and Tribal Law Enforcement Employees:** These applicants are employed by agencies that have Full-Time Statutory Law Enforcement Authority with general arrest authority. This category also includes Civilian Security Officers employed on military reservations to enforce federal law.

b.    **Security Guards and Personal Protection Employees:** These applicants are employed by the United States Government or private agencies that provide security for a specific place or building; or personal protection for dignitary, government official, or other designated person. They do not have general arrest authority. Applicants must have general law enforcement experience of at least 1 year.

c.    **USMS Employees and Contract Employees:** These are full-time USMS employees, contract Court Security Officers (CSO), and Detention Security Officers. CSOs are deputized by a district United States Marshal (USM) according to Judicial Security Division's (JSD) procedures pursuant to JSD's contracts regarding security officers.

**JA260**

d.    **Physicians:**  These are applicants who are typically employed by hospitals, clinics, etc., but can also have law enforcement authority and work in an emergency medical response capacity in support of task force and/or agency operations as needed and on an uncompensated basis.  Applicants applying as physicians must meet special eligibility requirements to include completion of Form USM-3A and Form USM-3D.  (NOTE: Existing Medical support that currently hold Special Deputations, which predate this policy, will retain their Special Deputations).  Further requirements include:

1)    Maintaining a board certification in Emergency Medicine (American Board of Emergency Medicine).

2)    Maintaining a current/active license to practice medicine, without restriction, in the state of operation.

3)    Maintaining an active clinical practice in a hospital emergency department, ideally in a university medical center or trauma center.

4)    Maintaining a professional practice background without ethics violations, credentialing suspensions or terminations, revocation of privileges (subject to verification through hospital credentialing offices, state licensing boards, National Practitioner's Data Bank and others).

5)    Providing an annual disclosure memorandum to USMS by physician of any proprietary or ownership interests in medical product, device, technology, or services companies, as well as paid teaching/speaking engagements.

6)    Ensuring that their employing agency concurs with their Special Deputation by providing an employer authorization letter to the District/Regional Fugitive Task Force (RFTF).  The Letter of support from physician's employer (or medical institution) indicating support for special deputation and patient care activities in the out-of-hospital setting, specifically the law enforcement tactical environment.

7)    Signing Form USM-3D.

8)    Demonstrating firearms proficiency, if an applicant is not a law enforcement officer with general arrest authority, by providing proof that an approved firearms training course has been completed.  If the deputation expires and a renewal is requested, an updated Form USM-3A and Form USM-3D is required.  No USMS-owned weapons shall be issued.

9)    Carrying the firearm in a concealed manner to the largest extent possible.  The firearm will not be handled or displayed in public unnecessarily.

10)    Submitting notarized statement to the District/RFTF in which he/she will swear/affirm that he/she is not prohibited from possessing a firearm under state or federal law.  This statement must also acknowledge his/her awareness of 18 U.S.C. 1001, describing the prohibition against false statements to federal law enforcement.

11)    Completing Form USM-394, *Personal Identity Verification (PIV) / Building Access Card Request Form*, with identifying information and authorization for the USMS to conduct a suitability review.  A determination of unsuitability will render an existing or future Special Deputation null and void.

12) Demonstrating proficiency with their personally-owned firearm approved by their USMS sponsoring entity at a minimum every 6 months utilizing a USMS Handgun Course of Fire. The personally-owned firearm approved by the USMS sponsoring entity is the only firearm he/she is approved to carry while performing duties for the USMS.

13) Completing a jointly-approved firearms safety program and demonstrating sound judgment to the satisfaction of the Chief or Commander of the District/RFTF, or providing evidence of the completion of a firearms safety program to be signed off and approved by the above.

14) Possessing an approved personally-owned firearm while performing operational medical support of USMS law enforcement operations. Operational medical support requires a degree of on-call responsibility and he/she must be available to respond to District/RFTF operations within a reasonable period of time.

15) Once deputized, the physician will be issued U.S. Government credentials bearing their photograph and signature. This document is accountable property and must be maintained in their possession at all times that he/she is performing services with the District/RFTF. Misuse of the credentials or Special Deputation for personal purpose will result in their revocation.

16) To be eligible for the Special Deputation, the physician must agree to surrender his/her credentials and Special Deputation documents upon the termination of their services with the District/RFTF, or at any time upon the request of the District/RFTF.

17) The District/RFTF will prepare a written justification detailing the operational need for the physician to carry a personally-owned firearm for this purpose. Submission of written justification will take place yearly in advance of a renewal of Special Deputation status or at any time as desired by the Chief or Commander of the District/RFTF or his/her designee.

18) Furthermore, the physician must understand the following:

a) Their Special Deputation does not provide him/her any law enforcement authority on behalf of the USMS or the U.S. Government. If any law enforcement officer requests that he/she perform a law enforcement function, he/she must state that he/she possesses no law enforcement authority and their deputation is only for personal protection.

b) He/she must only draw their firearm during the rarest of circumstances when he/she is forced to defend himself/herself from a threat of bodily injury or death while responding to USMS operations.

c) When not utilized for official purposes, firearms are to be stored in a secure container with appropriate safety devices in place.

d) Physicians do not participate on entry teams or enter residences/structures unless medical attention is necessary, and it has been determined that it is safe to do so.

e) When on-site for an enforcement operation, the physician's role will be to facilitate and provide medical care and advice.

f)      While participating in USMS operations and providing medical support, he/she will not be under the influence of any substance known to affect a person's decision-making ability.

g)      Whether he/she is covered under the Federal Tort Claims Act (FTCA) and workers compensation laws (OWCP) will be determined on a case-by-case basis by the DOJ (for FTCA purposes) and the Department of Labor (for OWCP purposes).

h)      He/she is not eligible for any federal employee benefits.

i)      He/she will use their own liability insurance and medical coverage (minimum of $1 million per occurrence) that specifically covers patient care activities in the "out-of-hospital" setting, specifically within the law enforcement tactical environment for events incident to providing medical support to USMS operations.

j)      Each time the Special Deputation is renewed, the terms of this agreement will continue to apply.

k)      The Special Deputation is not valid while off duty.

l)      Physicians will be instructed on and will comply with all USMS Use of Force guidelines and policies.

e.      **Office of the Director Sponsored Requests:** This applies to officials who may receive Special Deputation due to sponsorship from the Office of the Director. These requests must be coordinated through the Office of the Director and are granted for 2 years.

f.      **United States Military Personnel:** *The Posse Comitatus Act* precludes most military personnel from being deputized. Members of the United States Army, United States Air Force, United States Navy, United States Marine Corps, and their respective reserve components, cannot be deputized. However, United States Coast Guard and National Guard service members are exempt from this restriction.

6.      **Exceptions:** Only the Deputy Attorney General (DAG); Director; Deputy Director; Associate Director for Operations; Associate Director for Administration; and Assistant Director (AD) or the Deputy Assistant Director (DAD), TOD, of the USMS can approve exceptions to this directive.

7.      **Special Consideration Requests that require ODAG approval:**

a.      **Physical Security Specialist (GS-0080):** This category includes a Federal Security Administrator as identified in United States Office of Personnel Management, *Handbook of Occupational Groups and Families, Position Classification Standards*, who has also completed the Federal Law Enforcement Training Center (FLETC) Criminal Investigative Training Program, Basic Protective Investigative Training Program, or FLETC-approved equivalent, if seeking to provide protection to authorized officials or property.

b.      **International Criminal Investigative Training Assistance Program (ICITAP):** Only applications received from the Director, ICITAP, will be processed. Applications must include a request letter stating the requirement for Special Deputation, badge, and credentials. Once the Special Deputation Unit has processed the application, the TOD Office of Security Programs (OSP), Document and Identity Security Office will be notified by email containing the request letter and approved application. Upon receipt of the approved application, TOD OSP will coordinate the issue of Special Deputy badge and credentials through the Director, ICITAP. The process is the same for renewals.

       c.      **United States Attorneys and Assistant United States Attorneys (AUSA):** Only applications received through a representative from the ODAG will be processed.  If the applicant United States Attorney or AUSA requires a firearm qualification, the local USMS district office may provide the qualification upon proof that the firearms training requirement has been met.  An updated firearms qualification is required if an extension to the deputation is needed.  For more information, see section F.5.c.  The following websites list approved firearms training courses:

             1)      National Rifle Association; and/or

             2)      National Shooting Sports Foundation.

**E.**    **Responsibilities:**

    1.    **ODAG:**  Approves several categories of initial requests for Special Deputation except those for USMS personnel, contract employees or law enforcement officers specifically supporting USMS missions (i.e., fugitive task force).

    2.    **Authorized Official:**  Administers the Oath of Office to applicants approved by SDB. The authorized official completes Form USM-3B and obtains the necessary signatures.

    3.    **AD, TOD:**  Oversees the SDP with the assistance of the DAD.

    4.    **Chief, OSP, TOD:**  Oversees the SDP and conducts periodic audits of the program.

    5.    **Chief, SDB:**  Supervises and administers the SDP.  Approves/disapproves all Special Deputation requests supporting USMS and other federal law enforcement missions based upon the needs of the USMS and other federal agencies that can demonstrate a requirement to enforce federal law and carry a concealed weapon under Title 18 authority.

    6.    **SDB:**  Processes all requests for Special Deputation under the direction of the Assistant Chief, SDB.

**F.**    **Procedures:**

    1.    **Procedures for USMS Sponsored Special Deputy United States Marshals:**

       a.      Task Force Officer's (TFO) with an executed agency Memorandum of Understanding (MOU) should be deputized.  Each TFO applicant seeking deputation must follow the deputation procedures below.  Quick reference can be found on the USMS Intranet under the TFO SDB Process Chart.

       b.      Special Deputy state and local officers assigned to a USMS District Fugitive Task Force or a RFTF who require full-time unescorted access to USMS space or systems are required to undergo a background investigation or have had a favorably adjudicated background investigation within the past 5 years to comply with *Homeland Security Presidential Directive-12*.  Please refer to the procedures section of USMS Policy Directive 17.6.2*, Personal Identity Verification*, for instructions on requesting background investigations.

       c.      Officers assigned to a task force on a part-time basis or for a period of less than 1 year may be granted escorted access to USMS space in accordance with existing visitor procedures.  It is the responsibility of the USM, Chief Deputy United States Marshal, RFTF Commander, or Warrant Supervisor to ensure that all Special Deputy United States Marshals without a successfully completed background investigation are escorted at all times while in USMS space.  Special Deputies who do not have a successfully completed background investigation are not authorized access to USMS systems.

d. **Badge and Credentials:** At the discretion of the AD, TOD, or designee, Special Deputy United States Marshals serving on USMS task forces with an executed MOU may be issued unique credentials and/or badges. Except where otherwise noted, the USMS may only issue credentials or badges to deputized USMS employees, TFOs, and contractors. Specific procedures are included in USMS Policy Directive 17.8, *Badges and Credentials*. A badge and credential will only be issued for applicants who:

1) Have a successfully-completed background investigation by the TOD Background Investigations Branch;

2) A Form USM-3A approved by SDB;

3) Committed to a 1-year minimum term as a member of a task force or are sponsored by the Office of the Director;

4) Submits Form USM-287, *Request for Badge/Credential Action,* to the TOD Badge and Credential Program;

5) Full-time TFOs with an executed MOU assigned to a USMS District Fugitive Task Force or RFTF may receive USMS Task Force Credentials; and

6) Special Deputation for TFOs is valid for 3 years from the date of approval. If a Special Deputation is needed for a longer period of time, a request for renewal must be submitted 60 days prior to expiration. Special Deputations cannot be backdated.

7) Upon termination, removal, cancellation, or separation from a task force, the District and Task Force Commander are responsible for completing Form USM-199, *Separation Checklist,* and retrieving Form USM-3B, from the TFO. The collected articles and a copy of Form USM-199 must be sent via FedEx to:

**United States Marshals Service Landover Operations Center**

**Tactical Operations Division, Office of Security Programs 3601 Pennsy Drive**

**Landover, Maryland 20785 Attn: Technical Security Office**

8) All other individuals sponsored by the USMS for Special Deputation should upon expiration, return their badge and credentials to:

**United States Marshals Service Landover Operations Center**

**Tactical Operations Division, Office of Security Programs 3601 Pennsy Drive**

**Landover, Maryland 20785 Attn: Technical Security Office**

2. **Procedures for Other Sponsoring Agencies:**

a. **Sponsoring Agency:** The Chief Administrator of the sponsoring agency has the following responsibilities:

1) Submits the initial and renewal requests for Special Deputation by providing supporting documentation and a completed Form USM-3A for each applicant;

2) Verifies that the applicant meets all qualification requirements;

3) Provides the applicant with a copy of the Deadly Force policy from the

**JA265**

sponsoring agency or the DOJ; and

4) Notifies SDB immediately if a Special Deputy is charged with a criminal offense, abuse of Special Deputation authority, or misuse of a firearm. In addition, when a Special Deputy is no longer employed or assigned, or no longer requires Special Deputation, the Chief Administrator will:

   a) Notify SDB of the individual(s) termination;

   b) If applicable, return the badge and credentials via FedEx to TOD OSP's Technical Security Office; and

   c) Email Form USM-3B to the SDB.

3. **Procedures for International Association of Chief of Police (IACP) applicants:**

   a. IACP Presidents are sponsored by the USM in the district where the applicant is employed and are sworn in for 2-year appointments by the USMS Director during the annual IACP conference. The following are requirements for deputation of the IACP President:

      1) A completed Form USM-3A, Form USM-287, and Operational Signature Sheet (available upon request from the district Administrative Officer or the Badge and Credential Program, TOD);

      2) Photo (business attire required); and

      3) An employer authorization letter.

   b. **Sponsoring District Responsibilities:**

      1) Once the IACP President is deputized, the sponsoring district is responsible for placing credentials on the district property log.

      2) The district is responsible for advising the IACP President of the authorizations and limitations of Special Deputation and the Unique Federal Agency Number for Federal law enforcement officers flying armed.

      3) No Special Deputation extensions or renewals will be granted.

      4) Upon expiration of the 2-year Special Deputation term, the district is responsible for collecting the IACP President's credentials, completing Form USM-199, and returning the credentials via FedEx to TOD OSP's Technical Security Office.

4. **Application Process:**

   a. **Individual Application:** Each applicant seeking Special Deputation must complete a Form USM-3A.

   b. **Supporting Documentation:**

      1) Each applicant must submit an approval letter from their respective law enforcement agency that indicates the applicant's employer supports the Special Deputation. The employer authorization letter must be signed and dated within 2 months of the application submission and on departmental letterhead. The letter must also state that the applicant is not involved in any internal investigation or disciplinary action.

      2) Any other information requested by the SDB (i.e., Firearm Qualification, Certification of Completed Firearm's Course of Instruction, Certification of Protective Investigation Training, Executive Office for the United

**JA266**

States Attorneys (EOUSA) Affidavit, Approval Memorandum from EOUSA AD, Approval Letter from the ODAG, Endorsement Letter from AUSA, Approval Letter from the Special Operations Group Commander, Approval Letter from the AD, TOD).

c.   **Expiration Date:**  The expiration date for Special Deputation is specified on Form USM-3B, and on the credentials.  Special Deputations can be authorized for 1, 2, or 3 years depending on the category of the deputation.  The list below indicates the time period for various deputations.

    1)   **1-year Authorizations:**

        a)   Organized Crime Drug Enforcement Task Force; and

        b)   Physicians and existing medical personnel.

    2)   **2-year Authorizations:**

        a)   International Association of Chief of Police (IACP) President; and

        b)   AUSA.

    3)   **3-year Authorizations:**

        a)   Security Guards and personal protection employees;

        b)   Office of the Inspector General (OIG) Special Agents;

        c)   USMS special employees.

        d)   Federal Task Forces;

        e)   USMS Task Forces; and

        f)   United States Attorney Task Force.

        To avoid disruption of Special Deputation status, renewal requests should be submitted within 60 days of the expiration date.  Special Deputations cannot be backdated.  Each time a Special Deputation is authorized the applicant must renew their Oath of Office.

d.   **Submission:**  The sponsoring agency must submit Form USM-3A and supporting documentation to the SDB.

5.   **Approval Process:**

a.   Chief of SDB, TOD, or designee, must approve all deputations for USMS employees, contract employees, and law enforcement officers, specifically those supporting the USMS mission.

b.   **Other Sponsoring Agencies:**  Requests for Special Deputation to support non-USMS missions require the approval of the ODAG.  The steps of the approval process are:

    1)   SDB reviews the agency's request and applications for Special Deputation.  Incomplete applications are returned;

    2)   The Chief, OSP, submits a recommendation to the ODAG; and

    3)   The ODAG directs the USMS to approve or disapprove the request.

c.   **United States Attorneys and AUSAs:**  Applicants may request Special Deputation only for the purpose of carrying a firearm for personal protection.  Applications are initially submitted to the EOUSA, and not SDB.  When requested

**JA267**

by the EOUSA, the USMS will verify that each applicant has met firearm qualification standards with an approved weapon. After verification, the EOUSA sends the application to the ODAG for approval. Once a decision has been made, the application is sent to the USMS for processing.

1) Each applicant must complete a minimum of 16 hours of firearms training to include Basic Marksmanship and Defensive Pistol training and provide proof of successful completion of this requirement. The following websites list approved firearms training courses:

a) National Rifle Association; and/or

b) National Shooting Sports Foundation.

2) USMS district offices should not make any recommendations regarding the application or provide a threat assessment. JSD provides a threat history to the EOUSA, if requested.

3) The USMS, as a courtesy, may qualify the AUSA on their approved course of fire. The minimum qualification score is 210.

d. **ODAG:** The DAG, in accordance with a December 1999 memorandum signed by Associate Deputy Attorney General Nicholas M. Gess, has complete authority for several categories of deputations. The categories reserved for the DAG's approval are as follows:

1) **Category 2:** Where the deputation is sought for the purpose of providing protective services, (i.e., an OIG Special Agent who is a member of the protective detail of the Cabinet official).

2) **Category 3:** Where the deputation is sought for a law enforcement officer by a United States Attorney. In which case, the application should be submitted with the approval of the EOUSA.

3) **Category 4:** Where the deputation is sought for the purpose of providing extraterritorial law enforcement authority. In which case, the application should be submitted with the approval of the affected agencies and components.

4) **Category 5:** Where the deputation is sought for a federal employee who does not have other federal law enforcement authority, such as an AUSA or an OIG Special Agent.

5) **Category 6:** Where the deputation is sought for the purpose of reviewing tax information under Title 26, in which case the application should be submitted with the concurrence of the Tax Division.

6) **Category 7:** Where the Director of the USMS determines that the request is sufficiently controversial or subject to sufficient policy concerns that it should be reviewed by a higher authority.

6. **Group Deputations:** In cases where a large group of applicants require Special Deputation, such as special operations or high-profile events, it is possible to deputize using Form USM-3C. In some circumstances, group deputations may take place using an abbreviated administrative process. The request letter and individual applications are waived and the applicants are listed on a consolidated log that includes their name; the last four of their social security number; date of birth; firearms qualification date; firearms make, model and caliber; and applicant's signature. After submitting the log, the agency certifies, by signature, that the applicant has met the requirements.

a. **Emergency Support Function-13 (ESF #13):** ESF #13 activations occur pursuant to presidential disaster declarations under 42 USC 5121, the

*Robert T. Stafford Disaster Relief and Emergency Assistance Act*. Per the MOU between the USMS and the Bureau of Alcohol, Tobacco, Firearms and Explosives, SDB will process Special Deputation requests for partner agencies that possess a valid Mission Assignment number and are deploying to a disaster area. These requests will be processed on an expedited basis and do not require that an employer's authorization letter be included with the application at that time. However, the employer's letter will be accepted 5 business days after submission of the applicant log and must include the following items:

1) Agency endorsement of USMS Special Deputation;

2) Wording that applicants are not involved in any internal investigations or facing disciplinary action; and

3) Verification that the applicants possess no Lautenberg Amendment violations.

7. **Special Deputation Appointment/Oath of Office:**

a. **USM-3B:** SDB issues Form USM-3B to the District/RFTF where the swearing-in will occur prior to appointment. Form USM-3B has a dual purpose – it serves as the authorization for USMS District/RFTF to issue the deputation and it serves as the appointment document that identifies that an individual is a Special Deputy.

b. **Oath of Office:** After Form USM-3B is administered by an authorized official, a copy of Form USM-3B must be returned to the SDB for final processing. The district must deputize the applicant within 45 days of receiving the Form USM-3B. Anyone not deputized within 45 days of receiving Form USM-3B must reapply.

c. **Authorized Officials:** Any operational employee with the rank of GS-14, Supervisory Deputy United States Marshal, or above is authorized to administer the Oath of Office. This responsibility may be delegated only in the absence of the aforementioned officials.

d. **Termination/Cancellation:** If an applicant will not be deputized or if a current Special Deputation is no longer required, a copy of Form USM-3B is returned to the SDB with the words "canceled" or "terminated" on it.

e. **Records:** The District/RFTF is responsible for delivering the appointee their deputation appointment. The original Form USM-3B is provided to the appointee. The sponsoring agency/District/RFTF keeps a copy and another copy is emailed to SDB. All copies of Special Deputation records must be kept for no less than 5 years from the date of expiration of the most recent deputation.

**G. Definitions:**

1. **Authorized Official:** A person authorized to administer the Oath of Office.

2. **Special Deputation:** Approved by DOJ and conferred by the USMS, it grants an individual authority to perform federal law enforcement functions to support USMS missions or to achieve law enforcement objectives.

**H. References:**

1. 18 U.S.C. 922, *Unlawful Acts*.

2. 18 U.S.C. 1385, *Posse Comitatus Act*.

3. 28 U.S.C. 509, *Functions of the Attorney General*.

4. 28 U.S.C. 510, *Delegation of Authority*.

5. 28 U.S.C. 561, *United States Marshals Service*.

**JA269**

6.      28 U.S.C. 566, *Powers and Duties*.

7.      42 U.S.C. 5121, *Robert T. Stafford Disaster Relief and Emergency Assistance Act*.

8.      28 C.F.R. 0.111, *General Functions*.

9.      28 C.F.R. 0.112, *Special Deputation*.

10.     28 C.F.R. 0.113, *Redelegation of Authority*.

11.     Title 18, *Crimes and Criminal Procedure*.

12.     Title 21, *Food and Drugs*.

13.     Title 26, *Internal Revenue Code*.

14.     National Rifle Association.

15.     National Shooting Sports Foundation.

16.     Homeland Security Presidential Directive-12, *Policy for a Common Identification Standard for Federal Employees and Contractors*.

17.     USMS Policy Directive 17.6.2, *Personal Identity Verification*.

18.     USMS Policy Directive 17.8, *Badges and Credentials*.

19.     Form USM-3A, *Application for Special Deputation/Sponsoring Federal Agency Information*.

20.     Form USM-3B, *Special Deputation Oath of Office, Authorization, and Appointment*.

21.     Form USM-3C, *Application for Group Special Deputation*.

22.     Form USM-3D, *Agreement Between United States Marshals Service and Physicians/Medical Support Volunteers*.

23.     Form USM-199, *Separation Checklist*.

24.     Form USM-287, *Request for Badge & Credential Action*.

25.     Form USM-394, *Personal Identity Verification (PIV) / Building Access Card Request Form.*

26.     USMS Use of Force Policy and Guidelines.

**I.**     **Cancellation Clause:**  This policy directive supersedes Policy Directive 17.11, *Special Deputation Program*, dated September 6, 2017, and will remain in effect until superseded, updated, or canceled.

**J.**     **Authorization and Date of Approval:**

**By Order of:**                                                **Effective Date:**


_____/s/_____                              ____10/07/2020____
Donald W. Washington
Director
U.S. Marshals Service

# EXHIBIT
# 29

# Exhibit # 2

## Special Deputation Oath of Office, Authorization and Appointment

This form must be completed after an application for Special Deputation (Form USM-3A) has been submitted to, and approved by, the Chief of the Special Deputation Unit, Office of Security Programs, Tactical Operations Division. Return this form to the Special Deputation Unit at spec.dep@usdoj.gov after completion.

## OATH OF OFFICE

I, MICHAEL J. MEADE _____ (*Use name as stated on application*) do solemnly swear (affirm) that I will faithfully execute all lawful orders issued under the authority of the United-States directed to the United States Marshal, the United States Marshals Service, or to an appropriate Federal Official. I will perform the duties of a Special Deputy United States Marshal with integrity, professionalism, and impartiality. I will exercise the authorities as limited by this Special Deputation solely in furtherance of the mission for which I have been specially deputized, and only while this Special Deputation shall be in effect. I agree to abide by the conditions set forth in the appointment. So help me God.

Subscribed and sworn to me this __22nd__ day of __May__, __2019__, at __Columbus__, __Ohio__
City · State

_____
Signature of Appointee

_____
Signature of U.S. Marshal or Officer Administering Oath
Peter C. Tobin

05/30/2021
Expiration Date

S/OH
District or Division

## SPONSORING AGENCY INFORMATION

FRANKLIN COUNTY SHERIFF'S OFFICE
Appointee's Employer

900 N. HAGUE AVE., COLUMBUS, OH 43204
Employer's Address

US MARSHALS SERVICE
Sponsoring Agency

BRADLEY K. STUART - 614-469-5540
Sponsoring Agency Contact Name and Phone No. during Special Deputation (U.S. Marshal or Designated Federal Official)

### TERMS OF SPECIAL DEPUTATION

The individual named herein is appointed, under authority delegated by the Attorney General, to perform the duties of the Office of Special Deputy United States Marshal as directed by an appropriate official of the United States Marshals Service or some other appropriate Federal Official as so designated. This appointment does not constitute employment by the United States Marshals Service, the United States Department of Justice, or the United States Government. The appointee agrees to perform the duties required under this Special Deputation with the knowledge that he or she is neither entering into an employment agreement with the Federal Government or any element thereof, nor being appointed to any position in the Federal Service by virtue of this special deputation. The appointee understands and acknowledges that the authorities vested in him or her by this special deputation can only be exercised in furtherance of the mission for which he or she has been specially deputized and extend only so far as may be necessary to faithfully complete that mission. Moreover, those authorities terminate at the expiration of the term of the Special Deputation.

For verification, contact
United States Marshals Service Comm Center
(202) 307-9100.

USM-3 ID: 175602

### SPECIAL DEPUTATION APPOINTMENT

This certifies that
**MICHAEL J. MEADE**
**S. OHIO FUGITIVE APPREHENSION STRIKE TEAM**

has been specially appointed as a Special Deputy U.S. Marshal to perform the following duties as authorized by law:

* TO SEEK AND EXECUTE ARREST AND SEARCH WARRANTS SUPPORTING A FEDERAL TF UNDER TITLE 18 AUTHORITY

This deputation has the following limitations:

* NOT AUTHORIZED TO PARTICIPATE IN FEDERAL DRUG INVESTIGATIONS UNLESS DEPUTIZED BY DEA OR FBI
* NOT VALID OFF DUTY

_____     05/30/2021
Appointee                              Expiration Date

KAREN BROWN
Chief, Special Deputation Unit

05/16/2019
Authorization Date

_____
U.S. Marshal or Designated Federal Official

Form USM-3B
Est. 06/11
(Previously Form USM-3)

JA272

# EXHIBIT
# 30

JA273

FOR OFFICIAL USE ONLY

*Office of the Deputy Director*

**U.S. Department of Homeland Security**
500 12th Street SW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

July 9, 2025

MEMORANDUM FOR:   Caleb Vitello
Assistant Director
Office of Firearms and Tactical Programs

Marcos D. Charles
Acting Executive Associate Director
Enforcement and Removal Operations

Derek W. Gordon
Acting Executive Associate Director
Homeland Security Investigations

Jennifer M. Fenton
Associate Director
Office of Professional Responsibility

FROM:   Madison D. Sheahan
Deputy Director

SUBJECT:   Discontinuation of Approval for ICE Authorized Officers to Carry
All Models of the SIG Sauer P320 and Direction to Purchase
Glock 19s as Replacement Duty Handguns for Affected ICE
Authorized Officers and All ICE AOs Moving Forward

<u>Purpose</u>

This memorandum directs that U.S. Immigration and Customs Enforcement (ICE) Authorized
Officers (AOs) will no longer be approved to carry all models of the SIG Sauer P320 (P320)
pistols. It also directs the Office of Firearms and Tactical Programs (OFTP) to purchase, as soon
as practicable, replacement duty handguns for currently affected ICE AOs, including those
scheduled to be issued in the near term, and to provide a proposed plan within 10 calendar days
to, among other items, supply an agency-issued Glock 19 MOS pistol and related equipment, to
include a micro red dot sight (MRDS), weapon mounted light, duty holster, and concealed carry
holster, to all ICE AOs moving forward.

FOR OFFICIAL USE ONLY

JA274

# EXHIBIT
# 31



**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS AIR FORCE GLOBAL STRIKE COMMAND**

21 July 2025

MEMORANDUM FOR ALL AIR FORCE GLOBAL STRIKE COMMAND PERSONNEL

FROM: AFGSC/CC
245 Davis Ave E
Barksdale AFB LA 71110

SUBJECT: Immediate Pause of M18 Modular Handgun System (MHS) Operations

1. IMMEDIATE ACTION REQUIRED: Effective immediately, all personnel in AFGSC will pause use of the M18 MHS for all operational and training activities until further notice. This pause will remain in place until completion of ongoing AFOSI and Safety investigations into a recent incident at F.E. Warren AFB. Wing Commanders and DFCs will arm personnel with the M4 rifle in place of the M18.

2. INTERIM PROCEDURES: Until further notice, Wing Commanders and Defense Force Commanders will:
   - Issue the M4 in place of the M18 to required personnel
   - Ensure continuous mission capability during this pause. Contact AFGSC/A3S for supplemental guidance for tasks routinely accomplished with the M18 and for which accomplishment with the M4 is not feasible. Provide feedback to AFGSC/A3S for any operational issues this direction causes.

3. ONGOING COORDINATION: AFGSC staff is actively collaborating with the Air Force Security Forces Center and HAF/A4S to:
   - Conduct a comprehensive review
   - Develop appropriate corrective measures
   - Establish a timeline for resolution

4. INSPECTION REQUIREMENTS: Combat Arms personnel will conduct 100% inspections of all Wing-assigned M18 weapons systems using:
   - Technical Order 11W-3-4-32
   - Additional supplemental inspection guidance in development by AFGSC/A3S

5. REPORTING: Wing Commanders will confirm implementation of immediate action procedures within 24 hours of receipt. Inspection guidance will follow this memorandum. This pause will remain in effect until safety measures are confirmed. Questions should be directed through normal channels.

6. My POC is Lt Col George Hern, AFGSC/A3S, DSN 781-4055.

BUSSIERE.THOM   Digitally signed by
AS.A.1007756255   BUSSIERE.THOMAS.A.1007756
255
Date: 2025.07.21 20.38.36 -05'00'

THOMAS A. BUSSIERE
General, USAF
Commander

# EXHIBIT

# 32

9/6/25, 10:09 AM
District of Columbia National Guard > Domestic Operations > Joint Task Force, Judge District of Columbia (DC)

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 188 of 274

An official website of the United States government    Here's how you know ⌄

☰        DISTRICT OF COLUMBIA NATIONAL GUARD    🔍
(https://dc.ng.mil/)

Skip to main content (Press Enter).

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 189 of 274

**Joint Task Force - District of Columbia (JTF-DC) Operational Overview**

Current as of: September 3, 2025



# <u>Joint Task Force (JTF)- DC</u>

## JTF-DC Mission

The National Guard was activated Aug. 11 to support local and federal law enforcement efforts aimed at restoring order in the District of Columbia. The activation aligns with the President's executive order declaring a crime emergency.

## Personnel Strength

The following represents the number of Guardsmen supporting JTF-DC in the District:

- **JTF-DC:** 2,290
- **DC Guard:** 952
- **Supporting States Guard:** 1,338

## Geographic Representation

- District of Columbia **(** (/)952)
- West Virginia (https://www.wv.ng.mil/) (418)
- South Carolina (https://www.scguard.ng.mil/) (263)
- Ohio (https://www.ong.ohio.gov/) (150)
- Mississippi (https://www.ng.ms.gov/) (182)
- Louisiana (https://geauxguard.la.gov/) (140)
- Tennessee (https://nationalguard.com/tennessee) (175)
- South Dakota (https://nationalguard.com/south-dakota)(12)
- Georgia (https://ga.ng.mil/)(12)

## Press Releases

- National Guard authorized to carry weapons in support of law enforcement (/Public-Affairs/News-Release/Article/4284293/national-guard-authorized-to-carry-weapons-in-support-of-law-enforcement/)
- D.C. National Guard Activated to Support Law Enforcement in District of Columbia (/Public-Affairs/News-Release/Article/4284259/dc-national-guard-activated-to-support-law-enforcement-in-district-of-columbia/)

Skip to main content (Press Enter).

**JA279**

## News Stories

- **D.C. National Guard Members alert police to man brandishing knife at Waterfront Metro Station (https://www.dvidshub.net/news/545983/dc-national-guard-members-alert-police-man-brandishing-knife-waterfront-metro-station)**
- **VP, SD, WH Dep. COS Meet with Troops at DC Union Station (https://www.dvidshub.net/image/9268016/vp-sd-wh-dep-cos-meet-with-troops-dc-union-station)**
- **Week in Review: DC Safe and Beautiful Weekly Roundup 2 (https://www.dvidshub.net/video/974799/week-review-dc-safe-and-beautiful-weekly-roundup-2)**
- **Guard members from six states, D.C. on duty in Washington in support of local, fed authorities** (/Public-Affairs/News-Release/Article/4290553/guard-members-from-six-states-dc-on-duty-in-washington-in-support-of-local-fed/)

**\*\*\*For more stories, please click here (https://www.dvidshub.net/search/?filter%5Btype%5D=news&filter%5Btags%5D%5B%5D=dcsafe&filter%5Bdate%5D=20250808-20270305&sort=date)**

## JTF-DC in Action

  

  

## Social Media

- **Facebook:** https://www.facebook.com/DCGuard (https://www.facebook.com/DCGuard) https://www.facebook.com/TheNationalGuard (https://www.facebook.com/TheNationalGuard)
- **Instagram:** DCGuard1802 (https://l.facebook.com/l.php?u=https%3A%2F%2Fwww.instagram.com%2FDCGuard1802&h=AT0nBHeZspcrG_h_c7Vmo-oydGhVoG-HKbEIfJ2tywksm1niUF3IAQJVPkEzW2XLjWYmYNafZSgZW-iXh1rVwEzNde0hbOhFmAybwK5t-bB3qDFV1_EvlXFsZHhPC53LO7z0r2xOSKH7snoEATwFzhx5pTnFP8FaZBqz)
- **X:** DCGuard1802 (https://l.facebook.com/l.php?u=https%3A%2F%2Fx.com%2FDCGuard1802&h=AT38scIcU0wduYYoXDycvQ67tZET-

Skip to main content (Press Enter)

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 191 of 274

LKKo7SnNMr2W_3AjQHP9Ho56BLXWHSRTHOMJCQaVGE1i0mcMirU8Ne-
Daa1pmyVBHzONTdTMrNSgOgJjekepDYQ-4W6SaRKcggKXlpsZ5mvUT55XGGTdlaLI4xpIwm6CoTbnpII)

- **DVIDS:** https://www.dvidshub.net/feature/DCsafeandbeautifultaskforce
  (https://www.dvidshub.net/feature/DCsafeandbeautifultaskforce)

***For additional information, please contact the Joint Information Center (JIC)

Office Location

D.C. Armory, 2001 E. Capitol Street SE, in Washington, D.C. 20003

JIC Contact information

- Email: jtf-dcmediadesk@army.mil (/News/ng.dc.dcarng.mesg.pao1@army.mil)
- Phone: 202-880-4267

Skip to main content (Press Enter).

JA281

**Leadership**



COL Larry Doane, JTF-DC Commander

Message from COL Larry Doane (https://www.dvidshub.net/video/973731/joint-task-force-dc-commander-discusses-dc-safe-and-beautiful-mission)



CSM Larry McKennon

Skip to main content (Press Enter).

**JA282**

Case 1:25-cv-03005-JMC   Document 3-2   Filed 09/09/25   Page 193 of 274

## DISTRICT OF COLUMBIA NATIONAL GUARD LINKS

Contact Us (/Contact-Us/)

Site Map (/Site_Index)

FOIA (http://www.nationalguard.mil/Resources/FOIA)

USA.gov (http://www.usa.gov)

No FEAR Act (http://prhome.defense.gov/NoFear/)

Accessibility/Section 508 (http://dodcio.defense.gov/DoDSection508/Std_Stmt.aspx)

Privacy Statement (http://www.defense.gov/Resources/Privacy)

Link Disclaimer (http://www.defense.gov/Resources/External-Link-Disclaimer)

Web Policy (http://dodcio.defense.gov/DoD-Web-Policy/)  Guard Careers (https://www.nationalguard.com/careers)

## STAYING CONNECTED

  

Facebook          X          Flickr

(https://www.facebook.com/DCGuard/) (https://twitter.com/DCGuard1802) (https://www.flickr.com/photos/dcng/)

Hosted by Defense Media Activity - WEB.mil (https://www.web.dma.mil/)

 (https://www.veteranscrisisline.net/get-help-now/military-

crisis-line/)

JA283

# EXHIBIT
# 33



HOURLY NEWS

LISTEN LIVE

MY PLAYLIST

  

**DONATE**

## NEWS

# D.C. mayor defends capital's crime rates after Trump threatens to take over police

UPDATED AUGUST 10, 2025 · 2:04 PM ET

 Luke Garrett

District of Columbia Mayor Muriel Bowser listens as President Donald Trump speaks during an event to announce that the 2027 NFL Draft will be held on the National Mall, in the Oval Office of the White House, Monday, May 5, 2025, in Washington.

*Alex Brandon/AP*

Mayor Muriel Bowser of Washington, D.C. broke her silence Sunday in response to President Trump's threats to take federal control of the nation's capital. Bowser defended the District's control of its police department, expressed concern over

JA285

9/6/25, 10:44 AM
Case 1:25-cv-03005-JMC
Document 3-2
Filed 09/09/25
Page 196 of 274
D.C. Mayor defends capital's crime rates after Trump threatens to take over police : NPR

the deployment of the D.C. National Guard, and celebrated a two-year drop in violent crime countering White House claims of out-of-control violence.

Last week, Trump directed federal law enforcement agencies — including the U.S. Park Police, the Drug Enforcement Administration, the Federal Bureau of Investigation, and the U.S. Marshals Service, among others — to increase their presence in D.C. after a former White House staffer was assaulted in an attempted carjacking. A White House official, not authorized to speak publicly on the matter, confirmed nearly 450 federal officers were deployed in the District Saturday night.

On Sunday, the president promised in a social media post to "make our Capital safer" by removing the homeless and jailing criminals, with a plan to be announced at 10 a.m. on Monday.

"I suspect that his announcement is that he is surging federal law enforcement, which he's talked about," Bowser said Sunday during an interview on MSNBC — her first since Trump's federal take over threats. "He may talk about even larger numbers or longer periods of time."

Bowser said she will continue to work with the president on their "shared priorities" of making D.C. a beautiful and safe city. But the mayor said what the city really needs is more federal prosecutors, judges, and repairs to parks and buildings.

She also took issue with recent statements from White House Deputy Chief of Staff Stephen Miller, who called the nation's capital "more violent than Baghdad."

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 197 of 274

"Any comparison to a war-torn country is hyperbolic and false," Bowser said.

They mayor did acknowledge a crime spike in 2023, but said there had been a steep, two-year drop in violence since then. District crime data show violent crime is down 26% when compared to last year.

"We're going to keep talking to the president, working with his people on the issues that are high priority for him," Bowser said. "Now, if the priority is to show force in an American city, we know he can do that here. But it won't be because there's a spike in crime."

Trump has threatened to deploy the National Guard in D.C., but the force told NPR Sunday that it had not yet been activated. Bowser said she's not in favor of their deployment.

"They're not law enforcement officials," Bowser said. "So I'm concerned about that. And I just think that's not the most efficient use of our guard."

Trump deployed the National Guard in D.C. during the 2020 protests over the murder of George Floyd. And two months ago, Trump sent in troops to Los Angeles amid demonstrations against the president's ramped up immigration enforcement.

The president has also toyed with the idea of taking control of the Metropolitan Police Department, telling reporters Wednesday it was an "option on the table." But Bowser denied this was a realistic possibility.

**JA287**

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 198 of 274

"There are very specific things in our law that would allow the president to have more control over our police department," Bowser said. "None of those conditions exist in our city right now."

City law allows the president to take control of D.C. police if "special conditions of an emergency nature exist which require the use of the Metropolitan Police force for Federal purposes."

On Sunday, D.C. Police Chief Pamela Smith ordered a juvenile curfew in the Navy Yard neighborhood — just south of Capitol Hill and home to Nationals Park. In the order, Smith said late-night gatherings in the neighborhood pose "a risk of substantial harm to public safety."

Under the authority of a recently passed law, D.C. police will ban the gathering of nine or more juveniles in the designated area between 8 p.m. and 11 p.m. The curfew begins Sunday evening and runs until Wednesday.

D.C. has a city-wide juvenile curfew in place from 11 p.m. to 6 a.m. lasting through August 31.

In a separate post Sunday, Trump said Bowser "is a good person who has tried, but she has been given many chances, and the Crime Numbers get worse, and the City only gets dirtier and less attractive."

washington, dc

## More Stories From NPR

**JA288**

# EXHIBIT
# 34

9/6/25, 10:53 AM
Washington mayor calls Trump's police order unsettling and unprecedented - POLITICO
Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 290 of 274

# Washington mayor calls Trump's police order 'unsettling and unprecedented'

Mayor Muriel Bowser looked to maintain her role overseeing Washington police despite Trump's promise of a federal takeover.



Washington Mayor Muriel Bowser speaks at a press conference after President Donald Trump announced a federal takeover of the Metropolitan Police Department on Aug. 11, 2025. | Kevin Dietsch/Getty Images

By **AARON PELLISH**
08/11/2025 05:35 PM EDT

   

Washington Mayor Muriel Bowser called President Donald Trump's decision to deploy the National Guard in the nation's capital "unsettling and unprecedented" as she sought to reassert the city government's control over its police department.

Bowser told reporters Monday that the police department's organizational structure hasn't changed, pushing back on the narrative painted by the president at a news conference earlier in the day of a federal takeover of the city.

Advertisement

AD

JA290

Trump, who has frequently disparaged crime rates in Washington, said the city has been "overtaken by violent gangs and bloodthirsty criminals, roving mobs of violent youth, drugged out maniacs and homeless people."

Bowser defended the police department's efforts, citing a downward trend in crime incidents from a 2023 spike, and downplayed the "so-called emergency" that catalyzed Trump's order.

"While this action today is unsettling and unprecedented, I can't say that given some of the rhetoric of the past, that we're totally surprised," Bowser said. "I can say to D.C. residents that we will continue to operate our government in a way that makes you proud."

The mayor said the city will comply with Trump's order and is expected to continue meetings with federal law enforcement officials later Monday to plan coordination. But she made clear that while her office would coordinate with Attorney General Pam Bondi and Terry Cole, who Trump appointed as federal commissioner to Washington police, the city's police officers still reported to her.

"Nothing about our organizational chart has changed, and nothing in the executive order would indicate otherwise. So the chief of police reports through the deputy mayor to the mayor of the District of Columbia, and the two people, I think, that were identified in the presser report to Attorney General Bondi," she said.

A previously unused provision of the District of Columbia Home Rule Act allows Trump to take over Washington's police department for up to 30 days if he notifies certain heads of congressional committees. The act also established broader Congressional oversight of the city's government.

Advertisement

AD

Bowser said the arrangement forces her to comply with federal orders, but noted repeatedly that granting statehood for Washington — an issue city leaders have championed for decades — would likely prevent actions like this.

"If people are concerned about the president being able to move the National Guard into our city, the time to do that would have been when the Congress had a bill that it could have given control of the D.C. National Guard to D.C.," she said. "So there are things that, when a city is not a state, and not fully autonomous, and doesn't have senators, that the federal government can do."

**JA291**

Some of the city's police officers appear to be breaking from Bowser in support of Trump's order. Gregg Pemberton, chair of the Washington police union, called the federal intervention into the city's police "a critical stopgap."

"We stand with the President in recognizing that Washington, DC, cannot continue on this trajectory. Crime is out of control, and our officers are stretched beyond their limits," Pemberton said in a statement.

**FILED UNDER:** DONALD TRUMP, D.C., DISTRICT OF COLUMBIA, CAPITOL POLICE, MURIEL BOWSER, PRESIDENT DONALD TRUMP



## West Wing Playbook: Remaking Government

Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

* All fields must be completed to subscribe

SIGN UP

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service . You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here . This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SPONSORED CONTENT



**Learn relevant skills to help prepare for the…**

capella.edu



**Donald Trump's attack on Fed shifts market…**

Financial Times



**Why Gen X is the real loser generation**

The Economist



**DC National Guard troop deployment…**

Washington Examiner



**Harvard Professor Steven Pinker Says:…**

Cognitive scientist Steven Pinker shares the books tha…

Blinkist: Steven Pinker's Reading List

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

JA292

# EXHIBIT
# 35

JA293

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 204 of 274



# EXHIBIT
# 36

JA295




Military.com

News    Army    Navy    Air Force    Marine Corps    Coast Guard    Space Force

# 'Leave Our Kids Alone': Schools Reopen in DC With Parents on Edge over Trump's Armed Patrols



District of Columbia Mayor Muriel Bowser, center, attends a celebration of the first day of school at Oyster-Adams Bilingual School Monday, Aug. 25, 2025, in Washington. (AP Photo/Manuel Balce Ceneta)

Associated Press | By Mark Sherman , Ashraf Khalil and Sophia Tareen
Published August 25, 2025 at 5:18pm ET

⟳ Share

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 207 of 274




☰        **Military.com**        Login    Sign up

WASHINGTON — Public schools reopened Monday in the nation's tense capital with parents on edge over the presence in their midst of thousands of National Guard troops — some now armed — and large scatterings of federal law enforcement officers carrying out President Donald Trump's orders to make the District of Columbia a safer place.

Even as Trump started talking about other cities and again touted a drop in crime that he attributed to his extraordinary effort to take over policing in Washington, D.C., the district's mayor was lamenting the effect of Trump's actions on children.

"Parents are anxious. We've heard from a lot of them," Mayor Muriel Bowser said at a news conference, noting that some might keep their children out of school because of immigration concerns.

### Don't Miss a Single Military.com Story

To read the full article and get exclusive benefits, sign up today.

**It's FREE**

Sign Up        **Log In**

Why am I seeing this? Visit our **FAQs**

**JA297**

# EXHIBIT

# 37

Case 1:25-cv-03005-JMC    Document 3-2    Filed 09/09/25    Page 209 of 274

JA299











# EXHIBIT
# 38

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Attorney General**

**ATTORNEY GENERAL**
**BRIAN L. SCHWALB**

August 20, 2025

Jeff Landry, Governor
Office of the Governor
PO Box 94004
Baton Rouge, LA 70804
*via email*

Liz Murrill, Attorney General
Louisiana Department of Justice
1885 North Third Street
Baton Rouge, LA 70802
*via email*

Dear Governor Landry and Attorney General Murrill,

I am writing to request information about the current deployment of out-of-state National Guard troops in the District of Columbia, purportedly to address crime. Based on media reports, it is my understanding that Louisiana has sent 135 of its National Guard troops to the District at the request of the federal government. It is also my understanding that these troops may be permitted to carry arms and may be deployed to conduct local law enforcement activities on District streets.

To fully understand the bases for the Louisiana National Guard's presence in the District and its potential ramifications, I request that you respond to the following questions by close of business on Friday, August 22, 2025.

1) If someone contacted Louisiana regarding deployment of the Louisiana National Guard to the District of Columbia, who did so and when did this communication occur?

2) What legal authority, if any, did federal officials cite for the proposition that the Louisiana National Guard could be deployed to the District of Columbia?

3) What is the stated mission for Louisiana National Guard personnel in the District of Columbia and how was that mission communicated to you?

---

August 20, 2025
Page 2

4) What is the scope of authority for Louisiana National Guard troops deployed to the District of Columbia?  Do they have authority to make arrests and, if so, for what offenses and in what geographic boundaries?

5) To whom do the Louisiana National Guard troops report while they are deployed to the District of Columbia?

6) Are any Louisiana National Guard personnel deployed to the District of Columbia armed?

7) What rules governing the use of force, if any, have been provided to the Louisiana National Guard during its deployment in the District, and how and when were those rules conveyed to Louisiana National Guard personnel?

8) Have any Louisiana National Guard troops been deputized by any federal law enforcement agency and, if so, which federal agency deputized them?

9) How long are Louisiana National Guard troops expected to be deployed in the District of Columbia?

If you have any questions, please contact Eliza Simon at eliza.simon@dc.gov or 202-285-0947. Thank you for your prompt attention to this matter.

Sincerely,

Brian L. Schwalb
Attorney General for the District of Columbia

**JA302**

# EXHIBIT
# 39

JA303

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of the Attorney General

★ ★ ★

**ATTORNEY GENERAL**
**BRIAN L. SCHWALB**

August 20, 2025

Tate Reeves, Governor
Governor's Office
550 High St Ste 19
Jackson, MS 39201
(601) 359-3150
*via email*

Lynn Fitch, Attorney General
Office of the Mississippi Attorney General
550 High Street
Jackson MS 39201
*via email*

Dear Governor Reeves and Attorney General Fitch,

I am writing to request information about the current deployment of out-of-state National Guard troops in the District of Columbia, purportedly to address crime. Based on media reports, it is my understanding that Mississippi has sent 200 of its National Guard troops to the District at the request of the federal government. It is also my understanding that these troops may be permitted to carry arms and may be deployed to conduct local law enforcement activities on District streets.

To fully understand the bases for the Mississippi National Guard's presence in the District and its potential ramifications, I request that you respond to the following questions by close of business on Friday, August 22, 2025.

1) If someone contacted Mississippi regarding deployment of the Mississippi National Guard to the District of Columbia, who did so and when did this communication occur?

2) What legal authority, if any, did federal officials cite for the proposition that the Mississippi National Guard could be deployed to the District of Columbia?

3) What is the stated mission for Mississippi National Guard personnel in the District of Columbia and how was that mission communicated to you?

---

400 6th Street, NW, Washington, D.C. 20001, (202) 727-3400, Fax (202) 741-0580
**JA304**

August 20, 2025
Page 2

4) What is the scope of authority for Mississippi National Guard troops deployed to the District of Columbia? Do they have authority to make arrests and, if so, for what offenses and in what geographic boundaries?

5) To whom do the Mississippi National Guard troops report while they are deployed to the District of Columbia?

6) Are any Mississippi National Guard personnel deployed to the District of Columbia armed?

7) What rules governing the use of force, if any, have been provided to the Mississippi National Guard during its deployment in the District, and how and when were those rules conveyed to Mississippi National Guard personnel?

8) Have any Mississippi National Guard troops been deputized by any federal law enforcement agency and, if so, which federal agency deputized them?

9) How long are Mississippi National Guard troops expected to be deployed in the District of Columbia?

If you have any questions, please contact Eliza Simon at eliza.simon@dc.gov or 202-285-0947. Thank you for your prompt attention to this matter.

Sincerely,

Brian L. Schwalb
Attorney General for the District of Columbia

**JA305**

# EXHIBIT

# 40

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of the Attorney General



**ATTORNEY GENERAL**
**BRIAN L. SCHWALB**

August 20, 2025

The Honorable Henry McMaster, Governor
State House
1100 Gervais Street
Columbia, SC 29201
*via email*

Alan Wilson, Attorney General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
*via email*

Dear Governor McMaster and Attorney General Wilson,

I am writing to request information about the current deployment of out-of-state National Guard troops in the District of Columbia, purportedly to address crime. Based on media reports, it is my understanding that South Carolina has sent 200 of its National Guard troops to the District at the request of the federal government. It is also my understanding that these troops may be permitted to carry arms and may be deployed to conduct local law enforcement activities on District streets.

To fully understand the bases for the South Carolina National Guard's presence in the District and its potential ramifications, I request that you respond to the following questions by close of business on Friday, August 22, 2025.

1) If someone contacted South Carolina regarding deployment of the South Carolina National Guard to the District of Columbia, who did so and when did this communication occur?

2) What legal authority, if any, did federal officials cite for the proposition that the South Carolina National Guard could be deployed to the District of Columbia?

3) What is the stated mission for South Carolina National Guard personnel in the District of Columbia and how was that mission communicated to you?

4) What is the scope of authority for South Carolina National Guard troops deployed to the District of Columbia? Do they have authority to make arrests and, if so, for what offenses and in what geographic boundaries?

---

August 20, 2025
Page 2

5) To whom do the South Carolina National Guard troops report while they are deployed to the District of Columbia?

6) Are any South Carolina National Guard personnel deployed to the District of Columbia armed?

7) What rules governing the use of force, if any, have been provided to the South Carolina National Guard during its deployment in the District, and how and when were those rules conveyed to South Carolina National Guard personnel?

8) Have any South Carolina National Guard troops been deputized by any federal law enforcement agency and, if so, which federal agency deputized them?

9) How long are South Carolina National Guard troops expected to be deployed in the District of Columbia?

If you have any questions, please contact Eliza Simon at eliza.simon@dc.gov or 202-285-0947. Thank you for your prompt attention to this matter.

Sincerely,

Brian L. Schwalb
Attorney General for the District of Columbia

**JA308**

# EXHIBIT

# 41

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Attorney General**

**ATTORNEY GENERAL**
**BRIAN L. SCHWALB**

August 20, 2025

Bill Lee, Governor
State Capitol, 1st Floor
600 Dr. Martin L. King, Jr. Blvd.
Nashville, TN 37243
*via email*

Jonathan Skrmetti, Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
*via email*

Dear Governor Lee and Attorney General Skrmetti,

I am writing to request information about the current deployment of out-of-state National Guard troops in the District of Columbia, purportedly to address crime. Based on media reports, it is my understanding that Tennessee has sent 160 of its National Guard troops to the District at the request of the federal government. It is also my understanding that these troops may be permitted to carry arms and may be deployed to conduct local law enforcement activities on District streets.

To fully understand the bases for the Tennessee National Guard's presence in the District and its potential ramifications, I request that you respond to the following questions by close of business on Friday, August 22, 2025.

1) If someone contacted Tennessee regarding deployment of the Tennessee National Guard to the District of Columbia, who did so and when did this communication occur?

2) What legal authority, if any, did federal officials cite for the proposition that the Tennessee National Guard could be deployed to the District of Columbia?

3) What is the stated mission for Tennessee National Guard personnel in the District of Columbia and how was that mission communicated to you?

---

400 6th Street, NW, Washington, D.C. 20001, (202) 727-3400, Fax (202) 741-0580
**JA310**

August 20, 2025
Page 2

4) What is the scope of authority for Tennessee National Guard troops deployed to the District of Columbia?  Do they have authority to make arrests and, if so, for what offenses and in what geographic boundaries?

5) To whom do the Tennessee National Guard troops report while they are deployed to the District of Columbia?

6) Are any Tennessee National Guard personnel deployed to the District of Columbia armed?

7) What rules governing the use of force, if any, have been provided to the Tennessee National Guard during its deployment in the District, and how and when were those rules conveyed to Tennessee National Guard personnel?

8) Have any Tennessee National Guard troops been deputized by any federal law enforcement agency and, if so, which federal agency deputized them?

9) How long are Tennessee National Guard troops expected to be deployed in the District of Columbia?

If you have any questions, please contact Eliza Simon at eliza.simon@dc.gov or 202-285-0947. Thank you for your prompt attention to this matter.

Sincerely,

Brian L. Schwalb
Attorney General for the District of Columbia

**JA311**

# EXHIBIT

# 42

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of the Attorney General

**ATTORNEY GENERAL**
**BRIAN L. SCHWALB**

August 20, 2025

Patrick Morrisey, Governor
Office of the Governor
State Capitol
1900 Kanawha Blvd. E.
Charleston, WV 25305
*via e-mail*

John B. McCuskey, Attorney General
Office of the West Virginia Attorney General
State Capitol Complex, Bldg. 1, Rm. E-26
1900 Kanawha Blvd. E.
Charleston, WV 25305
*via e-mail*

Dear Governor Morrisey and Attorney General McCuskey,

I am writing to request information about the current deployment of out-of-state National Guard troops in the District of Columbia, purportedly to address crime. Based on media reports, it is my understanding that West Virginia has sent 300-400 of its National Guard troops to the District at the request of the federal government. It is also my understanding that these troops may be permitted to carry arms and may be deployed to conduct local law enforcement activities on District streets.

To fully understand the bases for the West Virginia National Guard's presence in the District and its potential ramifications, I request that you respond to the following questions by close of business on Friday, August 22, 2025.

1) If someone contacted West Virginia regarding deployment of the West Virginia National Guard to the District of Columbia, who did so and when did this communication occur?

2) What legal authority, if any, did federal officials cite for the proposition that the West Virginia National Guard could be deployed to the District of Columbia?

3) What is the stated mission for West Virginia National Guard personnel in the District of Columbia and how was that mission communicated to you?

---

400 6th Street, NW, Washington, D.C. 20001, (202) 727-3400, Fax (202) 741-0580
## JA313

August 20, 2025
Page 2

4) What is the scope of authority for West Virginia National Guard troops deployed to the District of Columbia?  Do they have authority to make arrests and, if so, for what offenses and in what geographic boundaries?

5) To whom do the West Virginia National Guard troops report while they are deployed to the District of Columbia?

6) Are any West Virginia National Guard personnel deployed to the District of Columbia armed?

7) What rules governing the use of force, if any, have been provided to the West Virginia National Guard during its deployment in the District, and how and when were those rules conveyed to West Virginia National Guard personnel?

8) Have any West Virginia National Guard troops been deputized by any federal law enforcement agency and, if so, which federal agency deputized them?

9) How long are West Virginia National Guard troops expected to be deployed in the District of Columbia?

If you have any questions, please contact Eliza Simon at eliza.simon@dc.gov or 202-285-0947. Thank you for your prompt attention to this matter.

Sincerely,

Brian L. Schwalb
Attorney General for the District of Columbia

**JA314**

# EXHIBIT

# 43

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of the Attorney General

**ATTORNEY GENERAL**
**BRIAN L. SCHWALB**

August 20, 2025

Mike DeWine, Governor
Office of the Governor
Riffe Center, 30th Floor
77 South High St
Columbus, OH 43215-6117
*via email*

Dave Yost, Attorney General
Office of the Attorney General
Rhodes State Office Tower
30 E Broad St, 14th Floor
Columbus, Ohio 43215
*via email*

Dear Governor DeWine and Attorney General Yost,

I am writing to request information about the current deployment of out-of-state National Guard troops in the District of Columbia, purportedly to address crime. Based on media reports, it is my understanding that Ohio has sent 150 of its National Guard troops to the District at the request of the federal government. It is also my understanding that these troops may be permitted to carry arms and may be deployed to conduct local law enforcement activities on District streets.

To fully understand the bases for the Ohio National Guard's presence in the District and its potential ramifications, I request that you respond to the following questions by close of business on Friday, August 22, 2025.

1) If someone contacted Ohio regarding deployment of the Ohio National Guard to the District of Columbia, who did so and when did this communication occur?

2) What legal authority, if any, did federal officials cite for the proposition that the Ohio National Guard could be deployed to the District of Columbia?

3) What is the stated mission for Ohio National Guard personnel in the District of Columbia and how was that mission communicated to you?

---

400 6th Street, NW, Washington, D.C. 20001, (202) 727-3400, Fax (202) 741-0580
**JA316**

August 20, 2025
Page 2

4) What is the scope of authority for Ohio National Guard troops deployed to the District of Columbia? Do they have authority to make arrests and, if so, for what offenses and in what geographic boundaries?

5) To whom do the Ohio National Guard troops report while they are deployed to the District of Columbia?

6) Are any Ohio National Guard personnel deployed to the District of Columbia armed?

7) What rules governing the use of force, if any, have been provided to the Ohio National Guard during its deployment in the District, and how and when were those rules conveyed to Ohio National Guard personnel?

8) Have any Ohio National Guard troops been deputized by any federal law enforcement agency and, if so, which federal agency deputized them?

9) How long are Ohio National Guard troops expected to be deployed in the District of Columbia?

If you have any questions, please contact Eliza Simon at eliza.simon@dc.gov or 202-285-0947. Thank you for your prompt attention to this matter.

Sincerely,

Brian L. Schwalb
Attorney General for the District of Columbia

**JA317**

# EXHIBIT

# 44

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Attorney General**

★ ★ ★

ATTORNEY GENERAL
BRIAN L. SCHWALB

August 20, 2025

Daniel Driscoll
Secretary of the Army
101 Army Pentagon
Washington, DC 20310-0101
*via e-mail*

Dear Secretary Driscoll,

I am writing to request information about the current deployment of out-of-state National Guard troops in the District of Columbia, purportedly to address crime. This deployment reportedly includes 300-400 troops from West Virginia, 135 from Louisiana, 200 from Mississippi, 200 from South Carolina, 150 from Ohio, and 160 from Tennessee. It is my understanding that these troops may be permitted to carry arms and may be deployed to conduct local law enforcement activities on District streets.

To fully understand the bases for these deployments and their potential ramifications, I request that you respond to the following questions by close of business on Friday, August 22, 2025.

1) If requests to send troops to the District were submitted to these states, who submitted each of the requests, and how was each request communicated to each state?

2) When were the requests made to each state?

3) Under what legal authority are these out-of-state National Guard troops being deployed in the District?

4) What is the stated mission for these out-of-state National Guard troops and how was that mission communicated to each state that is sending troops?

5) What is the scope of authority for the out-of-state National Guard troops deployed to the District? Do out-of-state National Guard troops have authority to make arrests and, if so, for what offenses and in what geographic boundaries?

6) To whom do the out-of-state National Guard troops report while they are deployed in the District?

---

400 6th Street, NW, Washington, D.C. 20001, (202) 727-3400, Fax (202) 741-0580
**JA319**

August 20, 2025
Page 2

7) Are any of the out-of-state National Guard troops armed?

8) What rules governing the use of force, if any, have been provided to the troops during their deployment in the District, and how and when were those rules conveyed to each state National Guard unit?

9) Have any out-of-state National Guard troops been deputized by a federal law enforcement agency and, if so, which federal agency deputized them?

10) How long is the deployment of out-of-state National Guard troops expected to last?

If you have any questions, please contact Eliza Simon at eliza.simon@dc.gov or 202-285-0947. Thank you for your prompt attention to this matter.

Sincerely,

Brian L. Schwalb
Attorney General for the District of Columbia

**JA320**

# EXHIBIT
# 45

| From: | Lacey E. Mase |
|---|---|
| To: | Rosenthal, Seth (OAG) |
| Cc: | Simon, Eliza (OAG) |
| Subject: | Response to August 20, 2025 Letter |
| Date: | Friday, August 22, 2025 6:51:47 PM |
| Attachments: | image001.jpg |

**CAUTION:** This email originated from outside of the DC Government. Do not click on links or open attachments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for additional analysis by OCTO Security Operations Center (SOC).

You don't often get email from lacey.mase@ag.tn.gov. Learn why this is important

Dear Seth,

I am writing in response to General Schwalb's August 20, 2025, letter to Governor Lee and General Skrmetti requesting information about the Tennessee National Guard's deployment to the District of Columbia.

Upon orders from President Trump, Governor Lee granted the Administration's request to provide Tennessee National Guardsmen under Title 32 status to assist the District of Columbia National Guard on a security mission in our nation's capital.

Approximately 160 service members will join the D.C. Joint Task Force and work alongside local and federal law enforcement agencies to assist with monument security, community safety patrols, protecting federal facilities, and traffic control. The service members are ready to assist as long as needed.

Sincerely,

**Lacey E. Mase**
Chief Deputy Attorney General
Office of the Attorney General & Reporter
615-532-5983
lacey.mase@ag.tn.gov



**JA322**

# EXHIBIT

# 46

**National Guard troops from Tennessee authorized by governor to patrol D.C. streets**

by Associated PressTue, August 19th 2025 at 11:00 AM





*Tennessee National Guard Photo by U.S. Army Sgt. Sarah Kirby.*

TOPICS:   **NATIONAL GUARD   TENNESSEE   TRUMP ADMINISTRATION   IMMIGRAT**   ❯

WASHINGTON — Tennessee Governor Bill Lee has authorized National Guard troops from Tennessee to deploy and patrol the streets of our nation's capital.



*File photo: WZTV*

A spokesperson for Tennessee Gov. Bill Lee said that the governor had granted a request from the Trump administration for the state's National Guard members "to assist with monument security, community safety patrols, protecting federal facilities, and traffic control." The troops "are ready to assist as long as needed," the governor's office said.

Gov. Lee is one of 3 Republican governors who made such an announcement on Monday. The others were in Mississippi and Georgia, making the total number of states contributing to President Trump's efforts to crack down on crime and boost immigration enforcement in Washington, D.C. to six.

Governors from the states, including Lee, said they were responding to requests from the Trump administration to join the operation.

Skip Ad

It was not immediately clear why the administration requested additional military support. About 800 troops have already been called up from the Washington, D.C., guard and have had a limited assigned role so far in Trump's 10-day-old attempted takeover of D.C. law enforcement.



*Members of the District of Columbia National Guard stand next to their M-ATV outside Union Station, Sunday, Aug. 17, 2025, in Washington. (AP Photo/Julia Demaree Nikhinson)*

D.C. Mayor Muriel Bowser said the descriptions of the operation needed to be more honest — and acknowledge that they weren't just about curtailing crime but about immigration enforcement, a centerpiece of the second Trump administration that has echoed across the country in recent months. During a news conference, Bowser pushed back on Trump's characterization of the city and voiced skepticism about the administration's intentions.

> *"I think it makes the point that this is not about D.C. crime," Bowser said of the administration and states deploying National Guard members onto the streets of the capital. "The focus should be on violent crime. ... Nobody is against focusing on driving down any level of violence. And so if this is really about immigration enforcement, the administration should make that plain."*

Trump's executive order that launched the federal operation declared a "crime emergency" in the District of Columbia and initiated a takeover of Washington's police department. The administration has ordered local police to cooperate with federal agents on immigration enforcement, orders that would contradict local laws prohibiting such collaboration.

Federal agents have arrested 160 undocumented people in the district since the operation began, including people that White House officials allege are known gang members with prior felony offenses.

**Friction with local government and community continues**

**JA325**



*District of Columbia Army National Guard Staff Sgt. Snowden, left, shows James Maseno of Grandal, Md., how to take a selfie next to an M-ATV infantry mobility vehicle, outside the Union Station in Washington, Monday, Aug. 18, 2025. (AP Photo/Manuel Balce Ceneta)*

The executive order has led to friction with the local government and heightened tensions in the community as a surge of federal agents in the capital garner praise and protest from residents.

The nation's capital can govern itself through powers delegated to it by Congress, though the federal laws that grant that autonomy give wide breadth to the president and Congress to intervene when they see fit. That longstanding tension has led to a legal standoff between local officials and the White House in the current troop deployment and surge of federal officers into the district.

In what could also heighten tensions on the streets, Washington has been informed about the intent for the National Guard to be armed, though it has not received details about when that could happen or where armed Guard members could be deployed in the District, according to a person familiar who was not authorized to disclose the plans and spoke on condition of anonymity.

It would be a departure from what the Pentagon and Army have said about the troops being unarmed. The Army said in a statement last week that "weapons are available if needed but will remain in the armory." Pentagon press secretary Kingsley Wilson also said last week that troops won't be armed.



*A member of the District of Columbia Army National Guard, talks to passerby Truman Horn, right of Nebraska next to an M-ATV infantry mobility vehicle, outside the Union Station in Washington, Monday, Aug. 18, 2025. (AP Photo/Manuel Balce Ceneta)*

In response to questions about whether Guard members in Washington would be armed in the coming days, the District of Columbia National Guard said troops "may be armed consistent with their mission and training." Maj. Melissa Heintz, a spokesperson for the D.C. Guard, didn't provide more details.

In addition to Monday's announcements, West Virginia said it was deploying 300 to 400 troops, South Carolina pledged 200 and Ohio said it will send 150 in the coming days, deployments that built on top of Trump's initial order that 800 National Guard troops deploy as

**JA326**

part of the federal intervention.

National Guard members in the District of Columbia have been assisting law enforcement with tasks including crowd control and patrolling landmarks such as the National Mall and Union Station. Their role has been limited thus far, and it remains unclear why additional troops would be needed, though attention-getting optics have long been a part of Trump's playbook.

## Questions remain about who is actually running the DC police



*Tennessee National Guard Photo by U.S. Army Sgt. Sarah Kirby.*

On Friday, the city's attorney general sued the administration for appointing the head of the Drug Enforcement Administration as the city's "emergency police commissioner." The administration walked back the move but then issued a follow-up order that directed local police to "cooperate fully and completely with federal immigration authorities."

> *"D.C. has been under siege from thugs and killers, but now, D.C. is back under Federal Control where it belongs," Trump wrote on his social media website a day after issuing his order. "The White House is in charge. The Military and our Great Police will liberate this City, scrape away the filth, and make it safe, clean, habitable and beautiful once more!"*

Federal agents from the DEA, Immigration and Customs Enforcement, the Federal Bureau of Investigation, the Secret Service and other agencies have patrolled high-traffic areas around the capital over the last week. ICE officers, who work under the Department of Homeland Security, have made arrests in neighborhoods across the city, dispersed some public gatherings and torn pro-immigrant signs, according to videos published by the administration.

The White House has touted various arrests that local police and federal agents have made across the city since Trump's executive order. Federal agents have made 380 arrests in the week since the start of the operation and in some cases issued charges to detained people. The White House has touted the surge of agents on social media and posted pictures of people arrested by local and federal officers.

> *"Washington, DC is getting safer every night thanks to our law enforcement partners," Attorney General Pam Bondi wrote on social media. "Just this weekend, 137 arrests were made and 21 illegal firearms were seized. In total, there have been nearly 400 arrests—and we are not slowing down."*

**JA327**



*Members of the District of Columbia National Guard, stand next to an M-ATV infantry mobility vehicle, outside the Union Station in Washington, Monday, Aug. 18, 2025. (AP Photo/Manuel Balce Ceneta)*

Amid the crackdown, the administration has received criticism for the conduct of some federal agents, who in several high-profile incidents have arrested people while wearing masks that hide their identity and declined to identify themselves to media or members of the public when questioned. Bowser said Monday that she had asked D.C. Police Chief Pamela Smith to seek answers from the administration about the use of masked police.

> ***"It's very important to us that agents be identified," Bowser said. "There's no reason for a law enforcement official to be masked."***

💬 **READ THE COMMENTS (10)**

On Monday, dozens of protesters gathered in the U Street neighborhood of Washington, where multiple federal agents patrols and arrests had taken place over the weekend, to protest the Trump administration's actions.

**JA328**

# EXHIBIT
# 47

# Phil Scott rejects second request to deploy Vermont National Guard, this time to Washington, D.C.

Vermont Public | By Peter Hirschfeld

Published August 15, 2025 at 1:24 PM EDT

LISTEN • 3:50



*Brian Stevenson / Vermont Public*

Republican Gov. Phil Scott, pictured at his budget address on Jan. 28, 2025, has "politely declined" a federal request to deploy Vermont National Guard soldiers to Washington, D.C. as part of President Donald Trump's controversial directive to tamp down on crime.

Republican Gov. Phil Scott has "politely declined" a federal request to deploy Vermont National Guard soldiers to Washington, D.C. as part of President Donald Trump's controversial directive to tamp down on crime.

At Trump's behest, the federal government has taken control of the capital city's police force and dispatched approximately 800 National Guard troops, as well as roughly 500 federal law enforcement agents, to patrol the streets.

Their numbers could have included a "few dozen" soldiers from Vermont, according to Scott's chief of staff, Jason Gibbs, had the governor not rebuffed a preliminary request from the Pentagon last week.

"While public safety is a legitimate concern in cities across the country and certainly in the nation's capital, in the absence of an immediate emergency or disaster that local and regional first responders are unable to handle, the governor just does not support utilizing the guard for this purpose, and does

**JA330**

not view the enforcement of domestic law as a proper use of the National Guard," Gibbs said Friday.

Gibbs said the governor's calculation might have been different if Washington, D.C. officials were seeking federal assistance with an emergency situation. Instead, the city on Friday filed a legal challenge to the Trump administration's takeover of its police force.

"But in this case, because it is being hyperpoliticized, the governor doesn't feel like — and I believe the vast majority of Vermonters don't feel like — it would be an acceptable and appropriate use of the National Guard," Gibbs said.

It isn't the first time Scott has denied the Trump administration's request to use Vermont National Guard soldiers for a domestic mission. Late last month, the Pentagon asked Scott to mobilize a dozen Guard soldiers to perform administrative duties at detention facilities operated by U.S. Immigration and Customs Enforcement.

Scott rejected the request, saying it was inconsistent with his views of the purpose of the National Guard.

The Republican governor's decision caught the attention of a group of retired four-star admirals and generals, who sent a letter to Scott Thursday praising his actions. The letter, signed by people including retired Adm. Steve Abbott, the former acting homeland security advisor to President Trump, and retired Air Force Gen. Michael Hayden, former director of the Central Intelligence Agency, said Trump's recent requests for Guard troops "represent a troubling blurring of lines between civilian law enforcement and military responsibilities."

**JA331**

**Letter to Gov. Phil Scott from national security leaders**

contributed by
ZoeMcDonald

📄 File ⌄                                                    🔍 Search

p. 1



Vermont Public                                    SIGN IN     ♥ DONATE

"By rejecting the Department of Defense's request to activate the Vermont Army National Guard as an inappropriate use of military resources, you stood up for the security of Vermonters and the healthy civil-military relationship envisioned by our nation's founders," they wrote.

While Scott has thus far into the second Trump administration turned down all federal requests related to potential Guard operations, he has complied with other controversial orders.

Earlier this month, Scott approved the release of the sensitive personal information of about 140,000 low-income Vermonters to the U.S. Department of Agriculture. His decision drew condemnation from food-security advocates and prominent Vermont Democrats.

**JA332**

Scott said an exhaustive legal review by his administration concluded that the Trump administration's demand for the data was a lawful order.

Gibbs said Friday that the governor's pattern of decision-making, when it comes to requests from the federal government over the past seven months, reflects a deliberative process that is "disciplined and clinical."

"He makes a decision that is very detail driven. And it's not politically driven. It's not rhetorically driven. It's not driven by media, and it's not driven by fear or anger or frustration," Gibbs said.

"And that type of protocol we believe serves everyone well … and represents the type of leadership in this particular political environment that is different than what we're seeing on both sides of the political spectrum."

Have questions, comments or tips? Send us a message.

### Congress cut our funding, but you keep us going.

Congress has voted to eliminate all federal funding for public media. This is a devastating decision for the millions of people who rely on public media every day. **We're moving into an uncharted future, but Vermont Public's commitment to you remains unwavering.**

Vermont Public and our national affiliates, NPR and PBS, will fight to continue to bring you rigorous local journalism, stories of our shared humanity, inspired music discovery, and the kind of reporting that democracy depends on —— every day, without fear or favor. That is the promise of a free press in a democracy. It's in the First Amendment. **It's the mission of public media.**

Your donation is more critical now than it has ever been, and every dollar makes a difference. **Donate today to stand with Vermont Public and public media.** Not just for yourself, but for everyone in our region who benefits from a trusted resource, a reliable companion, and a civic cornerstone.



**Vijay Singh**
*CEO, Vermont Public*

**Give Today:**    Monthly    One Time

$5        $10        $25        Other

**JA333**

Tags    Local News    Vermont National Guard    Local News    Government & Politics

President Donald Trump    Phil Scott    New England News Collaborative





## Peter Hirschfeld

The Vermont Statehouse is often called the people's house. I am your eyes and ears there. I keep a close eye on how legislation could affect your life; I also regularly speak to the people who write that legislation.

See stories by Peter Hirschfeld

Enter your email to sign up for *The Frequency*

Vermont Public's daily news update, sent weekday mornings.

Email Address *

Subscribe

See more newsletters

# EXHIBIT

# 48


WAMU 88.5
All Things Considered

MY PLAYLIST

 

DONATE

NATIONAL

# Sig Sauer guns hanging on soldiers' hips may be firing without trigger pull

JULY 27, 2024 · 8:00 AM ET

*nhpr*

HEARD ON WEEKEND EDITION SUNDAY

By Todd Bookman

**4-Minute Listen**                                    PLAYLIST    TRANSCRIPT



A Sig Sauer P320 9mm handgun from the display case at That Hunting Store in Ottawa, Canada.

*Dave Chan/AFP via Getty Images*

A military police sergeant stood chatting with his supervisor inside an office at Fort Eustis in Virginia when another soldier, on his way to the refrigerator, tried to squeeze past him.

That's when their gun holsters made contact.

"All I remember was the clanking" of the two holsters, the sergeant would later tell an Army investigator, according to a military report, "and [the] gun shot."

A bullet from the sergeant's own gun ripped through his ankle, leading to surgery and six months of rehabilitation. Photos included in the Army's report from 2023 appear to show a bloodstained carpet.

"Don't feel safe around those weapons anymore," the sergeant later told investigators.



On Feb. 8, 2023, an Army sergeant was wounded when his holster collided with another soldier's holster, causing his Sig Sauer-made pistol—pictured here—to fire, allegedly without a trigger pull.
*U.S. Army Incident Report*

The gun that wounded the sergeant is a version of one of the country's most popular pistols: Sig Sauer's P320, which is manufactured in New Hampshire. The gun has also been at the center of dozens of lawsuits claiming it has a design or

**JA337**

manufacturing flaw that leaves it susceptible to these types of incidents: people being shot by their own gun, without a trigger pull.

The shooting at Fort Eustis is one of nine separate incidents involving the P320 recorded at U.S. military bases between September 2020 and June 2023 that echo the claims made in many of the lawsuits against Sig Sauer, according to newly released records obtained through a Freedom of Information Act request.

Those records describe instances of guns allegedly firing unintentionally at Army, Marine Corps and Air Force bases stretching from California to Jordan to Japan.

In a statement, Sig Sauer said that "claims that the P320 is capable of firing without a trigger pull are without merit," and that the gun remains trusted by armed forces around the world.

The Army, for its part, denies the guns involved in these incidents displayed any "material flaws." An Army spokesperson said the Sig Sauer guns were extensively tested and function well.

"The pistol remains in service with all the services at this time without restrictions," the spokesperson said.

In 2017, the Army adopted a version of the gun as its new standard–issue sidearm for soldiers. The Marine Corps, Navy and Air Force all followed suit. Today, there are nearly 500,000 of these guns hanging on the hips of soldiers stationed around the globe.

The military initially told New Hampshire Public Radio that it worked with specialists from Sig Sauer to review these incidents, but when asked for details about what role the company played, an Army spokesperson reversed course and said that representatives from Sig Sauer were not, in fact, part of any military review.

### The P320, from civilian to military model

Sig Sauer's P320 model was first released in 2014 and has gone on to become one of the most popular guns in America, with more than 2.5 million units sold. On the gunmaker's website, the company touts a commitment to "safety without compromise."

**JA338**





Following an unintentional discharge on an Air Force base in Oklahoma, a combat arms instructor ran the gun through a battery of tests, and was not able to recreate the unintentional discharge.
*Air Force Incident Report*

In 2017, the Department of Defense selected the P320 as its standard sidearm for soldiers, following a multi-year competition to replace the Beretta M9.

To date, Sig Sauer has delivered nearly half a million pistols across all branches of the U.S. military. The military calls the gun the M17, as well as the M18, a compact version of the pistol.

A year after the Army announced its contract with Sig Sauer, a Department of Defense report was released showing that during testing, the military found the P320 could go off without a trigger pull if dropped at certain angles. Sig Sauer modified the gun's trigger mechanism.

The company then also redesigned the civilian version of the P320, and offered owners of older models the chance to voluntarily return their guns for swapped out components. Sig Sauer maintains that the P320 is safe for use, even with the older trigger system.

But dozens of lawsuits have been filed by individual gun owners and members of law enforcement against Sig Sauer over alleged unintentional shootings involving both the modified and original versions of the P320. That includes an ongoing claim in the federal court in New Hampshire in which 20 victims allege their P320 unintentionally discharged without a trigger pull under a variety of circumstances.

"We're seeing people who are in law enforcement or private citizens, who are responsible gun owners, who ultimately are experiencing life changing injuries when their guns are firing without their intent," said Bob Zimmerman, an attorney involved in dozens of lawsuits involving Sig Sauer.

**JA340**



Sig Sauer is headquartered in Newington, NH
*Dan Tuohy/NHPR*

After initially settling two cases out of court, Sig Sauer has strenuously defended itself in other legal proceedings. In a statement to NHPR, a Sig Sauer spokesperson listed 13 court cases that were dismissed or where a jury sided with the company.

That string of victories ended last month, however, when a jury awarded $2.3 million in damages to a Georgia man who claimed he was injured by a P320.

Zimmerman said he expects more injuries among civilians and police officers who carry the P320.

"This isn't an instance where it's happened once or twice," he said. "It is happening time and time again."

### 'Performed as designed'

According to the newly released military documents, soldiers at bases in Missouri, Virginia, Louisiana and Amman, Jordan were seriously injured when their Sig Sauer gun unintentionally discharged. Though the documents are heavily redacted, in at least two of the six shootings, witnesses stated that the soldier did not have their hand on or near the trigger when the gun discharged.

**JA341**



On June 17, 2023, a Sig Sauer pistol unintentionally fired, wounding an Army soldier inside of a guard shack in Jordan. It isn't clear what caused the gun to fire.

*U.S. Army Incident Report*

In response to questions from NHPR, the Army said it found "no reason to suspect the weapon was the root cause" of the unintentional discharges.

"The Army has full confidence in the quality, performance and safety of the more than 244,000 M17 and M18 pistols issued to our servicemen and women," according to an Army spokesperson. They added that the Sig Sauer pistol is "designed, built, and tested to military standards to endure the rigors of combat."

Greg Rinckey, a former intelligence officer and Army JAG now in private practice, said that when a gun discharges, it can be difficult to determine if the soldier was negligent in their handling of the weapon, or if there was another factor involved.

**JA342**

"Obviously, there are two sides to every story," he said. According to Rinckey, most soldiers facing discipline for an unintentional discharge are going to say "my finger wasn't on the trigger."

Still, he noted that increased attention on the safety record of the newly adopted Sig Sauer weapon is warranted.

"Whenever the military switches to a different firearm, whether it be a pistol or a new AR, there is always going to be heightened scrutiny of that weapon," said Rinckey.

An incident report released by the Marine Corps details an unintentional shooting inside a guard booth in Okinawa, Japan in 2023. Investigators reviewed surveillance footage and determined that the security guard did not mishandle the weapon, and that it fired despite the gun's safety being in place.

The Marine Corps said in a statement that professional armorers and engineers inspected the weapon involved in that incident, and found it was "complete, functional, included all safety equipment, and was operating properly."

A spokesperson added that "the weapon performed as designed, and the conclusion reached was the weapon will not fire unless the safety is off, and the trigger is pulled."

In marketing materials, Sig Sauer describes the P320 pistol as "the chosen one." It supplies the gun to armed forces in Canada, Australia and "many other military units around the world." The company's deal with the U.S. military for the pistol is slated to run through at least 2027.

**More Stories From NPR**

**JA343**

# EXHIBIT

# 49

An official website of the United States government    Here's how you know ⌄

☰  DISTRICT OF COLUMBIA NATIONAL GUARD    🔍
(https://dc.ng.mil/)

Skip to main content (Press Enter).

**JA345**

Current as of: September 7, 2025



# Joint Task Force (JTF)- DC

**JTF-DC Mission**

The National Guard was activated Aug. 11 to support local and federal law enforcement efforts aimed at restoring order in the District of Columbia. The activation aligns with the President's executive order declaring a crime emergency.

**Mission Snapshot**



**JA346**

The following represents the number of Guardsmen supporting JTF-DC in the District:

- **JTF-DC:** 2,330
- **DC Guard:** 952
- **Supporting States Guard:** 1,380

Geographic Representation

- District of Columbia **(** (/)952)
- West Virginia (https://www.wv.ng.mil/) (425)
- South Carolina (https://www.scguard.ng.mil/) (260)
- Ohio (https://www.ong.ohio.gov/) (150)
- Mississippi (https://www.ng.ms.gov/) (180)
- Louisiana (https://geauxguard.la.gov/) (158)
- Tennessee (https://nationalguard.com/tennessee) (170)
- South Dakota (https://nationalguard.com/south-dakota)(12)
- Georgia (https://ga.ng.mil/)(12)

*** The above numbers are approximations.

Press Releases

- National Guard authorized to carry weapons in support of law enforcement (/Public-Affairs/News-Release/Article/4284293/national-guard-authorized-to-carry-weapons-in-support-of-law-enforcement/)
- D.C. National Guard Activated to Support Law Enforcement in District of Columbia (/Public-Affairs/News-Release/Article/4284259/dc-national-guard-activated-to-support-law-enforcement-in-district-of-columbia/)

News Stories

- **D.C. National Guard Members alert police to man brandishing knife at Waterfront Metro Station (https://www.dvidshub.net/news/545983/dc-national-guard-members-alert-police-man-brandishing-knife-waterfront-metro-station)**
- **VP, SD, WH Dep. COS Meet with Troops at DC Union Station (https://www.dvidshub.net/image/9268016/vp-sd-wh-dep-cos-meet-with-troops-dc-union-station)**
- **Week in Review: DC Safe and Beautiful Weekly Roundup 2 (https://www.dvidshub.net/video/974799/week-review-dc-safe-and-beautiful-weekly-roundup-2)**
- **Guard members from six states, D.C. on duty in Washington in support of local, fed authorities** (/Public-Affairs/News-Release/Article/4290553/guard-members-from-six-states-dc-on-duty-in-washington-in-support-of-local-fed/)

***For more stories, please click here (https://www.dvidshub.net/search/?filter%5Btype%5D=news&filter%5Btags%5D%5B%5D=dcsafe&filter%5Bdate%5D=20250808-20270305&sort=date)

JTF-DC in Action

  
  

Social Media

**Facebook:** https://www.facebook.com/DCGuard (https://www.facebook.com/DCGuard) https://www.facebook.com/TheNationalGuard

(https://www.facebook.com/TheNationalGuard)

- **Instagram:** DCGuard1802 (https://l.facebook.com/l.php?
  u=https%3A%2F%2Fwww.instagram.com%2FDCGuard1802&h=AT0nBHeZspcrG_h_c7Vmo-oydGhVoG-
  HKbEIfJ2tywksm1niUF3IAQJVPkEzW2XLjWYmYNafZSgZW-iXh1rVwEzNde0hbOhFmAybwK5t-
  bB3qDFV1_EvlXFsZHhPC53LO7z0r2xOSKH7snoEATwFzhx5pTnFP8FaZBqz)
- **X:** DCGuard1802 (https://l.facebook.com/l.php?u=https%3A%2F%2Fx.com%2FDCGuard1802&h=AT38scIcU0wduYYoXDycvQ67tZET-
  LKKo7SnNMr2W_3AjQHP9Ho56BLXWHSRTHOMJCQaVGE1i0mcMirU8Ne-Daa1pmyVBHzONTdTMrNSgOgJjekepDYQ-
  4W6SaRKcggKXlpsZ5mvUT55XGGTdlaLI4xpIwm6CoTbnplI)

<br>

- **DVIDS:** https://www.dvidshub.net/feature/DCsafeandbeautifultaskforce (https://www.dvidshub.net/feature/DCsafeandbeautifultaskforce)

<br>

**<u>\*\*\*For additional information, please contact the Joint Information Center (JIC)</u>**

<br>

**<u>Office Location</u>**

D.C. Armory, 2001 E. Capitol Street SE, in Washington, D.C. 20003

<br>

**<u>JIC Contact information</u>**

- Email: jtf-dcmediadesk@army.mil (/News/ng.dc.dcarng.mesg.pao1@army.mil)
- Phone: 202-880-4267

Skip to main content (Press Enter).

**Leadership**



COL Larry Doane, JTF-DC Commander

Message from COL Larry Doane (https://www.dvidshub.net/video/973731/joint-task-force-dc-commander-discusses-dc-safe-and-beautiful-mission)



CSM Larry McKennon

DISTRICT OF COLUMBIA NATIONAL GUARD LINKS

Contact Us (/Contact-Us/)                                      USA.gov (http://www.usa.gov)

Site Map (/Site_Index)                              No FEAR Act (http://prhome.defense.gov/NoFear/)

FOIA (http://www.nationalguard.mil/Resources/FOIA)     Accessibility/Section 508 (http://dodcio.defense.gov/DoDSection508/Std_Stmt.aspx)

Privacy Statement (http://www.defense.gov/Resources/Privacy)

Link Disclaimer (http://www.defense.gov/Resources/External-Link-Disclaimer)

Web Policy (http://dodcio.defense.gov/DoD-Web-Policy/)  Guard Careers (https://www.nationalguard.com/careers)

STAYING CONNECTED

  

Facebook          X          Flickr

(https://www.facebook.com/DCGuard1802)  (https://twitter.com/TheDCGuard1802)  (https://www.flickr.com/photos/dcng/)

Hosted by Defense Media Activity - WEB.mil (https://www.web.dma.mil/)

(https://www.veteranscrisisline.net/get-help-now/military-crisis-line/)

**JA350**

# EXHIBIT
# 50

JA351

# National Guard Task Force Mobilizes to Restore Safety in Nation's Capital

Aug. 11, 2025  |  By C. Todd Lopez, DOD News

President Donald J. Trump declared a crime emergency in the nation's capital today and vowed to make its streets safe again for both residents and visitors.



"Washington, D.C., should be one of the safest, cleanest and most beautiful cities anywhere in the world, and we're going to make it that," Trump said during a press conference at the White House. "We're going to make it safe; we're going to make it smart; we're going to

**JA352**

make it beautiful."

The National Guard will play a role in that effort, said Defense Secretary Pete Hegseth after the president issued a memorandum to mobilize the D.C. National Guard.

Hegseth said the mobilization will be operationalized by Secretary of the Army Dan Driscoll, and guard members will be deployed in the streets of Washington in the coming week.

Approximately 800 soldiers were activated today as part of the D.C. Safe and Beautiful Task Force, with about 100-200 of them supporting law enforcement. Duties for those personnel include administrative and logistical roles, as well as providing a physical presence in support of law enforcement.

Hegseth also stated that, beyond the D.C. National Guard, other guard units are ready to participate.

"There are other units we are prepared to bring in; other National Guard units, other specialized units," Hegseth said. "They will be strong, they will be tough, and they will stand with their law enforcement partners."

In recent months, the secretary said the National Guard has played similar roles, both at the border, where troops have worked alongside Immigration and Customs Enforcement and Customs and Border Protection to put a stop to illegal border crossings, and in Los Angeles, where they helped protect ICE and CBP agents from criminal attacks.

Now, the D.C. National Guard will contribute by helping to stop violence on city streets in the nation's capital.

"We will work alongside all D.C. police and federal law enforcement to ensure this city is safe [and] this city is beautiful," Hegseth said, adding, "As I always say about President Trump to the troops, 'He has their back.' And my message to the National Guard and federal law enforcement in Washington is, 'We have your back as well. Be tough. Be strong. We're right behind you.'"

According to a White House fact sheet, two embassy staffers were murdered in Washington this May. A congressional intern was shot and killed near the White House in June, and on Aug. 3, 2025, a federal employee was beaten by a mob.

A White House executive order reports that the 2024 murder rate in the District of Columbia was 27.54 per 100,000 residents, and the vehicle theft rate was at 842.4 thefts per 100,000 residents.

"It's becoming a situation of complete and total lawlessness in Washington," the president said. "Caravans of ... youth rampage through city streets at all times of the day. They're on ATVs, motorbikes — they travel pretty well. Entire neighborhoods are now under emergency curfews."

Trump said that it will soon change.

"We have people that love this country, and they love this ... really beautiful capital," he said. "I flew over it the other day and I said, 'What a beautiful place,' but if there's crime all over the streets when you get there, it doesn't look so beautiful ... We're going to fix [the] crime."

The president also said that he aims to literally clean up the nation's capital in the way of repairs, specifically noting trash, graffiti and broken marble panels.

"We're going to restore the city back to the gleaming capital that everybody wants it to be," Trump said. "It's going to be something very special."

Hosted by Defense Media Activity - WEB.mil

**JA354**

# EXHIBIT
# 51

An official website of the United States government Here's how you know ⌄

  **AIR FORCE GLOBAL STRIKE COMMAND AFSTRAT-AIR**

## AFGSC Completes M18 Handgun Inspection, Returns to Service

🖨 ↪

Published Aug. 24, 2025
By Air Force Global Strike Command
Air Force Global Strike Command

**BARKSDALE AIR FORCE BASE, La. --**  Air Force Global Strike Command has completed a comprehensive inspection of its 7,970 M18 Modular Handgun Systems, following a directed pause on July 21, 2025.

The pause was initiated out of an abundance of caution following a tragic incident at F.E. Warren AFB, Wyoming, and reflects AFGSC's unwavering commitment to the safety and well-being of its Airmen.

"It is paramount that our Airmen trust their weapon systems," said Gen. Thomas Bussiere, AFGSC commander. "This thorough inspection ensures the M18s in our inventory are in optimal working order, providing our Defenders with safe, reliable, and effective systems to accomplish their mission."

The inspection process identified discrepancies with 191 weapons across the command's M18 inventory. The primary discrepancy was related to component wear. The most frequent issues centered on problems with the safety lever, striker assembly and sear. Weapons exhibiting these discrepancies were immediately tagged and are undergoing necessary repairs.

The intent of this command-wide inspection was two-fold: first, to confirm that all weapons in service are in proper working order; and second, to analyze the data regarding any reported discrepancies and usage rates.

A review of weapon discharges in AFGSC showed that none were attributed to weapons malfunction.

"When we see a potential issue, we have a responsibility to our Airmen and the American public to evaluate, find any discrepancies, and act on them," Bussiere said.

As part of its commitment to safety, AFGSC is implementing enhanced inspection procedures for the M18 pistol. The command's bases will include additional inspection criteria for the areas where potential issues were found during the M18 pause.

"By incorporating these added measures, we assess that any issues found with the safety lever, striker assembly and sear will be identified during semi-annual and annual inspections," said Lt. Col. George Hern, AFGSC chief of security forces. "As we execute M18 inspections in the future, we will be taking a particular interest in these components to ensure these methods address the issues we found and make adjustments as needed."

Air Force Global Strike Command Security Forces Defenders are resuming arming with M18s that have successfully passed inspection – deeming them safe and reliable for use – on Aug. 25, 2025.

Further, Security Forces squadron commanders, senior enlisted leaders and combat arms training and maintenance personnel are taking the time to meet with Airmen following this inspection. These leaders are discussing inspection findings, explaining the enhanced inspection procedures, reinforcing muzzle discipline, reviewing reporting procedures for weapons of concern, and providing Airmen the opportunity to ask questions and raise concerns.

The M18 is specifically designed and rigorously tested to meet stringent environmental, endurance, and drop tests unique to the military.

An official website of the United States government Here's how you know ⌄

**JA356**

# EXHIBIT
# 52

 An official website of the United States government Here's how you know

☰ **MENU**  ⭐  **SEARCH** 🔍

# Tennessee National Guard sustains DC Safe and Beautiful mission

By Sgt. Kalina Hyche    September 8, 2025



[https://api.army.mil/e2/c/images/2025/09/08/5ba2dafc/original.jpg]

SHOW CAPTION +                                           1 / 2

WASHINGTON — Soldiers and Airmen from the Tennessee National Guard are delivering essential sustainment support to Task Force Volunteer during the D.C. Safe and Beautiful mission in ensuring Guard members remain equipped, supplied and ready to safeguard the nation's capital.

Operating from a logistics support area on Joint Base Anacostia-Bolling and forward positions across the District, Tennessee sustainment and supply personnel provide the critical resources that enable mission success. From maintaining accountability of sensitive equipment to distributing mission-essential gear, supply professionals ensure every patrol element and command team can remain focused on public safety.

"By equipping our Guardsmen with the tools they need, we're ensuring Task Force Volunteer is a strong, capable force," said U.S. Army Staff Sgt. Cody Ruth, unit supply sergeant of the 269th Military Police Company. "Investment in

**JA358**

preparation today directly translates to mission success tomorrow. Our Soldiers and Airmen are prepared to accomplish their mission."



[https://api.army.mil/e2/c/images/2025/09/08/92d65b8d/original.jpg]

SHOW CAPTION +                                                    1 / 2

Sustainment requires a constant rhythm. Bulk supplies move into staging areas, hand receipts transfer equipment as elements rotate and forward supply teams push essentials directly to patrol sites. Anchored in Army logistics principles, this process ensures resources flow seamlessly from warehouse to warfighter, keeping every element of the mission fully resourced and ready.

For the D.C. Safe and Beautiful mission, sustainment is more than routine, it is decisive. Tennessee supply personnel anticipate mission requirements, adapt schedules to match operational shifts, and pre-position resources ahead of taskings. This approach allows leaders to maintain a presence across the city without interruption.

"Making sure Soldiers and Airmen have what they need; that's what gets me up in the morning," said U.S. Army Spc. Joshua Hodges, senior supply specialist assigned to the 269th Military Police Company. "I take pride knowing that when our team is equipped and ready, I've done my job right. Seeing a unit roll out and knowing they have everything needed to accomplish their mission; it gives me a sense of purpose."

About 2,300 National Guard members are supporting the D.C. Safe and Beautiful mission in providing critical support to the D.C. Metropolitan Police Department in ensuring the safety of all who live, work and visit the District. While medics, military police and security teams provide visible presence, supply professionals ensure they remain sustained, equipped and mission capable.

**JA359**



[https://www.facebook... ][... ][... ]

HOME    CONTACT US    PRIVACY    TERMS OF USE    ACCESSIBILITY    FOIA    NO FEAR ACT    VETERAN'S CRISIS LINE

**JA360**

# EXHIBIT
# 53



← **Post**



**U.S. Army** ✓
@USArmy

Always Ready, Always There.

About 2,300 @USNationalGuard members are supporting the D.C. Safe and Beautiful Task Force providing critical support to the D.C. Metropolitan Police Department in ensuring the safety of all who live, work and visit the District.



ALT

2:00 PM · Sep 8, 2025 · **69.9K** Views

💬 95    ⟲ 368    ♡ 1.9K    🔖 26    ⬆️

💬 Read 95 replies

**New to X?**

Sign up now to get your own personalized timeline!

🔵 Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**What's happening**

Trending in United States
**Khaled Mashal**
4,772 posts

Trending in United States
**SeatGeek**
1,677 posts

Politics · Trending
**Doha**
Trending with Hamas
109K posts

Politics · Trending
**Zaher Jabarin**
3,174 posts

Show more

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ⋯   © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

JA362

# EXHIBIT
# 54



← **Post**



**District of Columbia National Guard** ⋯
@DCGuard1802

Just to clarify, TF #DCSafe Soldiers temporarily restricted movement of the trespassers until the Metropolitan Police Department arrived. Glad we could help!

> **Jon Michael Raasch** ✓ @JMRaasch · Sep 6
>
> Two people broke into my DC condo building and barricaded themselves in our communal laundry room last night.
>
> DC police's response time was significantly delayed.
> …

7:20 AM · Sep 7, 2025 · **654** Views

💬          ⟲1          ♡ 5          🔖          ⬆

**New to X?**

Sign up now to get your own personalized timeline!

[G] **Sign up with Google**

[] **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**What's happening**

Trending in United States
**Khaled Mashal**
4,772 posts

Trending in United States
**SeatGeek**
1,677 posts

Politics · Trending
**Doha**
Trending with  Hamas
109K posts

Politics · Trending
**Zaher Jabarin**
3,174 posts

Show more

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ⋯  © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in      Sign up

JA364

# EXHIBIT B

JA365

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>                 Plaintiff,<br><br>        v.<br><br> DONALD J. TRUMP, *et al.*,<br><br>                 Defendants. | Case No.: 1:25-cv-03005 (JMC)<br><br>Judge Jia M. Cobb |

**DECLARATION OF LIEUTENANT GENERAL JEFFREY S. BUCHANAN, (RETIRED)**

I, Lieutenant General Jeffrey S. Buchanan, (Retired), pursuant to 28 U.S.C. § 1746, declare that the following facts are true and correct to the best of my knowledge, based on my experience described herein:

1.      I am a retired Lieutenant General of the United States Army with extensive experience commanding active component and National Guard troops.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

**BACKGROUND AND QUALIFICATIONS**

3.      As a Lieutenant General of the United States Army, I commanded U.S. Army North (Fifth Army). U.S Army North conducts Multi-Domain Operations in support of U.S. Northern Command in order to detect, deter and defeat threats to the Homeland and conducts defense support of civil authorities and theater security cooperation initiatives to defend the United States and its interests.

1
**JA366**

4.    I was commissioned as a Lieutenant in the Infantry in May 1982 after graduating from the University of Arizona with a Bachelor of Science in Wildlife Ecology. I hold a Master of Arts in Leadership Development from the United States Military Academy.

5.    My duty assignments in the United States Army included command and staff positions within the 82nd Airborne Division, 25th Infantry Division, 101st Airborne Division, and 10th Mountain Division. I served as a Company and Battalion Tactical Officer at the U.S. Military Academy, the Director for Operations (J3) of Joint Task Force Full Accounting, and the Senior Light Infantry Task Force Trainer at the National Training Center.

6.    I served four combat tours in Iraq and one tour in Afghanistan.

7.    I have extensive experience commanding Soldiers in domestic missions. For example, I led the military response in support of FEMA for five major hurricanes (Matthew, Harvey, Irma, Maria, and Florence). I also led more than 6,000 Soldiers and Marines supporting the Department of Homeland Security for security of the southwest border of the United States. Furthermore, I served as commanding general U.S. Army Military District of Washington/Joint Force Headquarters-National Capitol Region from 2013–2015. In that role I led military forces in support of a number of law enforcement agencies, including direct support of the U.S. Capitol Police during National Special Security Events, such as the annual State of the Union Address.

8.    Many of the Soldiers under my command, both abroad and within the United States, were members of the National Guard.

9.    After a 37-year career in the Army, I retired from active duty in September 2019. In my retirement, I serve as a volunteer deputy (and ranch liaison) at the Santa Cruz County Sheriff's Office in Arizona. To serve in this position, I completed over 100 hours of hands-on and classroom training, including firearms and taser qualifications, drug identification, public

assistance, community policing, securing a crime scene, liability, preserving evidence, and more. I also completed more than 100 hours of ride-along (FTO) training with sworn officers before patrolling the remote areas of the county on my own.

10. I have been asked by the Office of the Attorney General for the District of Columbia to provide expert testimony regarding the deployment of the District of Columbia National Guard and National Guard units from other states to the District and the use of the National Guard troops for domestic law enforcement.

## OPINIONS

### I. Federalized National Guard members are generally not authorized to engage in domestic law enforcement tasks.

11. Before members of the National Guard can serve a mission, they must be activated. Typically, there are three active statuses for National Guard forces.

12. First, the National Guard could be activated by the State or Commonwealth in which the National Guard unit is based. This is commonly referred to as "State Active Duty." The governor of the State or Commonwealth activates the guard unit, often in response to an emergency or in anticipation of a particular need. When the members of the National Guard serve in this capacity, they fall under the governor's chain of command. The costs of using the National Guard in State Active Duty are borne by the State or Commonwealth.

13. Second, the National Guard could be activated pursuant to Title 32 of the United States Code. Under Title 32, the governor of a State or Commonwealth makes a request for the federal government to bring troops into active duty for a particular mission. Under this authority, the troops fall under the command of the governor, but the costs of using the National Guard are borne by the federal government.

3
**JA368**

14. Third, the National Guard could be activated pursuant to Title 10 of the United States Code. Under Title 10, the National Guard is considered federal military, subject to the command of the U.S. President. National Guard serving under Title 10 are commonly called "federalized" National Guard troops.

15. The District of Columbia National Guard (DCNG) is unique because the President of the United States is at all times the Commander in Chief of the DCNG. Based on my experience and understanding, the President has delegated command of the DCNG to the Secretary of Defense, who has further delegated command to the Secretary of the Army.

18. In my experience commanding troops serving in post-hurricane emergency response missions, I have also developed extensive understanding of the authority governing out-of-state National Guard troops serving in another State.

19. Under the Emergency Management Assistance Compact (EMAC), States and Commonwealths can share resources from all disciplines, including members of the National Guard.

20. Unless activated under Title 10 (federalized), when National Guard troops from one State serve in another State, they are generally subject to the operational control of the supported State.

21. EMAC provides that States may use other States' National Guard forces pursuant to either EMAC itself or "by mutual agreement between states." I am not familiar with any scenario in which members of the National Guard from one State (in a State Active Duty or Title 32 status) were sent to support a mission in another State without coordination with or request from the supported State.

22. Except for the District, the governors of the States executed EMAC to receive the authority to issue a request for assistance from another State. While the President of the United States is the Commander in Chief of the DCNG, it is the Mayor of the District, to my knowledge, that executed EMAC and can request assistance for the District.

23. Further, based on my experience and understanding, when troops from other States serve in the District, they become subject to the operational control of the DCNG and fall under the same command and control of the Secretary of the Army through to the President of the United States.

24. Regarding the current deployment of out-of-state troops in the District, the DCNG reports that all Guardsmen deployed in the District are supporting the Joint Task Force-District of Columbia. My understanding is that the Joint Task Force-District of Columbia is an element of the DCNG.

25. While National Guard troops serving under State Active Duty or under Title 32 may engage in domestic law enforcement tasks (subject to restrictions under state law), federalized National Guard troops may not engage in domestic law enforcement activities, subject to specific exceptions.

26. By domestic law enforcement activity, I mean the day-to-tasks police officers perform. The tasks include, but are not limited to, patrolling neighborhoods, conducting traffic stops, interviewing witnesses, performing security functions, arresting, apprehending, or detaining individuals, issuing citations, executing search warrants, and conducting criminal investigations.

27. These domestic law enforcement tasks are distinct from the tasks of infantry Soldiers, which include attacking enemy positions, conducting raids, capturing prisoners, and seizing and defending key terrain. Though there are many different occupational specialties in the

5
**JA370**

military (such as infantry, engineers, artillery, and aviation), only military police (or security police in the Air Force) are trained in law enforcement tasks.

28.    While in command of military forces serving in support of civilian law enforcement agencies, I relied on instruction from the Department of Defense regarding what tasks such forces could or could not perform. The most recent version of such instruction is Department of Defense Instruction, Defense Support of Civilian Law Enforcement Agencies 3025.21 (Feb. 27, 2013) (Incorporating Change 1, Eff. Feb. 8, 2019). That guidance document provides that federal troops may not perform direct civilian law enforcement assistance tasks, including: "A search or seizure . . . An arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity . . . Using force or physical violence, brandishing a weapon, discharging or using a weapon [except in self-defense or defense of others] . . . Evidence collection; security functions; crowd and traffic control; and operating, manning, or staffing checkpoints . . . Surveillance or pursuit of individuals, vehicles, items, transactions, or physical locations, or acting as undercover agents, informants, investigators, or interrogators." DODI 3025.21, Enclosure 3 ¶ 1.c.(1). I commanded my troops in accord with the principles described in DODI 3025.21.

29.    As of September 8, 2025, the official website for the Joint Task Force-DC (https://dc.ng.mil/Domestic-Operations/Joint-Task-Force-JTF-District-of-Columbia-DC/) includes a description of the "Duties and Tasks" undertaken by the approximately 2,330 Guardsmen activated in the District. According to this site, the Guardsmen are "directly support[ing] specific federal and civil partners needs, such as *presence patrols*, *crowd control*, and helping *prevent and deter crime* in the District." The site also states that the Guardsmen are patrolling and supporting the Metropolitan Police Department in high-traffic areas and assisting

6

**JA371**

U.S. Park Police with *traffic control*. These are all law enforcement activities that federal military units would be prohibited from performing.

30.    In the District, it is particularly concerning to learn that the United States Marshals Service has deputized National Guard troops as Special Deputy U.S. Marshals. Special USMS Deputies have Title 18 authority to perform law enforcement functions, including executing arrest warrants and search warrants, or making arrests without warrants. These are law enforcement activities.

**II.    For federal troops to support local law enforcement, extensive coordination and training are necessary.**

31.    I have extensive experience commanding troops who have served in a supporting role to law enforcement. For example, I have commanded troops who supported U.S. Capitol Police for major events such as the annual State of the Union address. I have also commanded troops who supported the United States Customs and Border Protection at the southwest border of the United States in 2018 and 2019. In both contexts, the troops I commanded did not engage in domestic law enforcement tasks. They did not perform any of the tasks listed in DODI 3025.21, Enclosure 3 ¶ 1.c.(1). Instead, the troops were engaged in well-defined, discrete military tasks.

32.    Extensive coordination is required for the effective use of active-duty military troops to support local law enforcement. For example, for active-duty military to support U.S. Capitol police to secure the State of the Union address, the military and local law enforcement cooperate at every level. This cooperation includes meetings, rehearsals, and information sharing. The coordination process begins more than six months before the event. Without such coordination, activity duty military would not be able to effectively support local law enforcement.

33.    Similarly, extensive training is required for the effective use of active-duty military troops to support law enforcement. When I commanded active-duty troops who supported federal

law enforcement at the southwest border, those troops received specific scenario-based training based on the specific tasks that were required of them at the border. Without such training, activity duty military would not be able to effectively support law enforcement.

**III.    U.S. military troops, including members of the National Guard, do not receive the training necessary to engage in domestic law enforcement.**

34.    I have had the unique experience of serving as both a member of the military and as a local law enforcement officer.

35.    For me to effectively serve in local law enforcement, I required extensive training regarding skills that I did not need in the military.

36.    First, I needed to learn de-escalation techniques. Infantry members are trained to effectively destroy enemies in combat scenarios. As a result, they do not learn how to take the temperature out of a confrontation. This skill, however, is part of daily life as a local law enforcement officer.

37.    Second, I needed to learn how to make a traffic stop. As a member of the military, I was never trained in making traffic stops, nor was such training necessary to effectively serve. I learned how to manage the many risks involved in making traffic stops, as well as the extensive regulations governing such interactions. None of this was part of my military training.

38.    Third, I needed to learn how to effectively clear a room or a structure. While military members learn to clear rooms, the task is completely different in a domestic civilian context.

39.    Fourth, I needed to learn how to use nonlethal force. Law enforcement officers often carry a taser and/or pepper spray and must be trained on the use of such tools. Both tasers and pepper spray are used by law enforcement as part of a graduated response. Both are intended to incapacitate a subject without having to resort to lethal force such as a firearm. With the

exception of military police, members of the military do not carry tasers nor pepper spray, nor do they receive training regarding those tools.

40.     Fifth, I needed to learn the rules governing the use of force in a domestic scenario. Law enforcement officers are subject to local policies, state law, and federal law governing when the use of force is appropriate against a civilian. None of these policies or laws apply to military officers in combat. As a result, members of the military are not trained on such policies. When I commanded military forces on the Southwest border in 2018 and 2019, I mandated extensive scenario-based training so that our troops (mostly Soldiers and Marines) could apply the Rules for Use of Force (RUF) without consulting a card or asking the opinion of a lawyer. Those rules are intended to enable military forces to accomplish their mission in a domestic context, and protect both our troops and the civilians they encounter. As a result of that training, I am confident that our troops were prepared for the challenges of operating on the southwest border. It is critical to note, however, that they were not performing any of the law enforcement tasks listed in DODI 3025.21, Enclosure 3 ¶ 1.b.(5)

41.     Sixth, I needed to learn how to properly engage in defensive tactics for close quarters combat. In the military, I was trained in the use of mixed martial arts tactics, including the use of chokeholds, to engage with enemy combatants at close range. In the law enforcement context, however, many such tactics are both prohibited and disfavored, as the goal of a close quarters confrontation is to neutralize the potential threat and apply handcuffs.

42.     Seventh, I needed to learn how to properly conduct a criminal investigation. Law enforcement officers must know how to build a case by securing a crime scene, preserving evidence, and conducting witness interviews and interrogations. Generally, members of the military are not required to perform such detective work. Absent specific training regarding the

9
**JA374**

criminal investigation process, a member of the military would be unable to successfully solve crime through investigations and prosecutions.

43. Eighth, I needed to learn how to use discretion appropriately as a law enforcement officer. For example, if a law enforcement officer observes a car driving over 100 miles per hour, an officer must make a series of split-second decisions regarding the appropriateness of vehicle chase. The officer needs to immediately consider factors such as the ongoing risk to life created by the speeding vehicle, the probability of successfully stopping the speeding vehicle through a chase, the capabilities of the officer, and the rules and laws governing such a decision. Officers must make that decision in a matter of seconds, and they cannot do so without extensive training. While military members make countless split-second decisions, weighing the risk and rewards of certain courses of action, I have learned that the context of those decisions is drastically different in the domestic law enforcement context.

44. Finally, and perhaps most importantly, a different mindset is necessary for local law enforcement. The mission of the infantry (which was my branch in the Army) is to close with and destroy the enemy. This tends to produce an aggressive mindset, and that mindset is what we need in our infantry troops in combat. I have learned that it is not the mindset of an effective police officer, who must always try to prevent confrontation and reduce the use of lethal force.

45. I had to receive over a month of training to serve as a local law enforcement officer, notwithstanding my extensive experience in the military.

46. It is my opinion that members of the military are ill-suited to engage in domestic law enforcement tasks unless they receive extensive scenario-based training on the particular tasks required by the mission.

**IV.    The uncoordinated use of untrained U.S. military troops in American cities to engage in civilian law enforcement would result in tremendous harm.**

47.    Policing is a risky activity. It could easily result in harm to both civilians and officers if done incorrectly. Routine activities such as traffic stops, searches, or arrests could turn into tragedies if they are not conducted by trained individuals in coordination with one another. Sending troops untrained in domestic law enforcement into a city, without local coordination, creates a substantial risk that someone innocent will be hurt.

48.    Furthermore, I am gravely concerned that the use of the military for domestic law enforcement would lead to a loss of trust in the military among the American people. The Army is older than our country and for the entirety of our nation's history, the perception of most Americans is that our military is non-partisan. After all, we swear an oath to the Constitution, not a political leader or a political party. To my knowledge, in every poll conducted over the last 40 years (the entirety of my active duty time), the military has been at or near the top of all institutions that people of our country have confidence in. I am concerned about creating the perception among the American people that the military is or will be used for political means. The confidence that our citizens have in our military is based on trust.  Rebuilding trust once it has been lost is a difficult task.

*[Signature on Next Page]*

11

**JA376**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on ___9 SEP 2025___ at ___PATAGONIA, AZ___

_____
Lieutenant General Jeffrey S. Buchanan (Retired)

12

**JA377**

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA,<br><br>Plaintiff,<br><br>v.<br><br>**DONALD J. TRUMP**, *et al.*,<br><br>Defendants. | Case No.: 1:25-cv-03005 (JMC) |

## DECLARATION OF RENEÉ HALL

I, U. Reneé Hall, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct to the best of my knowledge, based on my experience described herein:

1.      My name is U. Reneé Hall. I am over the age of 18 and able to provide true and accurate testimony under oath.

2.      This declaration is based on my own personal knowledge and experience. If I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.      I earned a Bachelor of Science degree in Criminal Justice from Grambling State University, as well as two Masters of Science degrees from the University of Detroit Mercy in Security Administration and Intelligence Analysis, respectively. I am also a graduate of the FBI National Academy (Session 262) and the Major Cities Chiefs Association's Police Executive Leadership Institute. I was a 2022 Harvard Advanced Leadership Initiative Fellow and former Senior Editor of the Harvard Social Impact Review.

1

**JA379**

4.     In my more than twenty-year law enforcement career, I held positions at every level, culminating as the Deputy Chief of Police in Detroit, Michigan from 2014-2017, and as the Chief of Police in Dallas, Texas from 2017-2020.

**(1) Service in Detroit**

5.     I enrolled in the Police Academy in Detroit, Michigan in 1999. I served at the rank of police officer in the Detroit Police Department culminating as the Deputy Chief of Police.

6.     From 1999 through 2017, I advanced through a series of increasingly complex leadership assignments within the Detroit Police Department, acquiring the operational expertise, administrative skill, and community-focused vision that ultimately positioned me to serve as Chief of Police in Dallas. My career began with foundational service as a patrol officer, where I engaged directly with Detroit's neighborhoods, conducted dignitary protection for the mayor and international visitors, and cultivated trust through community affairs initiatives.

7.     Promoted to sergeant in 2006, I assumed supervisory responsibilities across internal affairs, patrol, and tactical operations. My work in internal affairs exemplified my dedication to accountability and integrity, as I investigated allegations of misconduct while ensuring compliance with federal consent decree mandates. Concurrently, I coordinated covert operations targeting violent offenders and narcotics activity, sharpening my command of investigative and tactical protocols. This supervisory stage marked a critical turning point in my development as a leader capable of balancing enforcement with reform and accountability.

8.     My promotion to lieutenant in 2010 expanded my responsibilities to tactical operations at a citywide scale. In this role, I directed incident command for large-scale civil disturbances, special events, and dignitary visits, overseeing logistics for major sporting events and international gatherings. My leadership during the World Series, the Detroit Grand Prix, and

2

**JA380**

presidential visits showcased the capacity to coordinate multi-agency operations under high-pressure conditions. The scope of these assignments required both operational precision and strategic foresight, qualities that became hallmarks of my executive leadership style.

9.      By 2013, I had advanced to the rank of inspector and then commander, taking charge of patrol operations in some of Detroit's most complex precincts, including downtown and entertainment districts. Managing multimillion-dollar budgets and supervising critical infrastructure security, I fostered intergovernmental collaborations with local, state, and federal agencies.

10.      In 2014, I was appointed Deputy Chief of Police, a role in which I oversaw more than one-third of the department, including 12 precincts, specialized divisions, and citywide initiatives. Managing a $137 million budget, I implemented crime reduction strategies that yielded year-end decreases of 20–30 percent in violent crime. I directed Operation Ceasefire, which mobilized law enforcement, clergy, and community leaders to address gang violence, and provided oversight of the department's compliance with use-of-force requirements under federal monitoring. I also spearheaded the pilot implementation of body-worn cameras, establishing policy frameworks that would later serve as national models. My collaborative initiatives, such as Community COMPSTAT and the Spirit of Service program, strengthened police-community relations by engaging residents as partners in crime reduction and cultural understanding.

11.      My experience managing budgets, overseeing specialized units, implementing federal consent decree requirements, and directing large-scale operations established me as a leader uniquely equipped to navigate the complex challenges of urban policing. By the time of my retirement from the Detroit Police Department in 2017, I had amassed nearly two decades of executive-level and operational experience, laying a robust foundation for appointment as Chief

3

**JA381**

of Police in Dallas, where I would continue to advance a vision of accountability, transparency, and community partnership.

**(2) Service in Dallas**

12.    In 2017, I was hired as the Chief of Police in Dallas, Texas. I was the first woman to serve in that role in Dallas.

13.    As Chief, I was the chief executive officer of the Department. In that role, I had full power and authority over the Dallas Police Department, and all functions, resources, officials, and other personnel assigned thereto. I was also responsible for the proper and efficient conduct, control, and discipline of all officers in the Department. I led 4,000 personnel and managed a $500 million budget.

14.    While I was Chief, the Dallas Police Department coordinated extensively with federal partners.

15.    As a Dallas Chief I had operational oversight, MOU authority and executive coordination with several task forces that brought together FBI, ATF, DEA, U.S. Marshals, and Homeland Security resources. These included, for example:

a.    FBI Joint Terrorism Task Force (JTTF) — Oversight of departmental participation in counterterrorism operations, intelligence sharing, and prevention strategies;

b.    FBI Violent Crimes Task Force — Coordination on serial robberies, kidnappings, and multijurisdictional violent offenders;

c.    FBI/DOJ Project Safe Neighborhoods (PSN) — Executive oversight and strategy alignment to reduce gun crime and gang violence;

d.    DEA Task Force — Coordination on large-scale narcotics investigations, including opioids, heroin, and synthetic drugs (like K2 in Dallas);

4

**JA382**

e.      ATF Violent Crime and Firearms Trafficking Task Force — Collaboration on illegal firearms possession, straw purchasing, and trafficking cases;

f.      U.S. Marshals North Texas Fugitive Task Force — Oversight of DPD officers assigned to high-risk fugitive apprehension operations;

g.      Homeland Security Investigations (HSI) Task Force — Coordination on human trafficking, cybercrimes, and transnational organized crime; and

h.      Secret Service Financial Crimes Task Force (where applicable) — Participation in investigations of large-scale fraud, identity theft, and counterfeiting.

16.      I had executive oversight of all departmental participation in these task forces, ensuring that DPD's resources were aligned with federal partners while safeguarding community priorities and constitutional policing.

17.      In my years as Chief, Dallas saw a 5.7 percent reduction in overall crime in 2017, and a 5.97 percent reduction in violent crime in 2018.

18.      As Chief, I prioritized community engagement and outreach. I regularly connected with officers in the field and met often with Dallas community groups, professional leaders, and local organizations. I spearheaded the City of Dallas' restructuring of the Community Police Oversight Board, as well as the police department's first Youth Summer Jobs program, which allowed business leaders and community stakeholders to mentor at-risk youth through workforce development.

19.      In moments of crisis, I also coordinated directly with the Texas National Guard to support local efforts while ensuring that community rights and constitutional freedoms remained protected. These collaborations allowed the Dallas Police Department to leverage federal resources while keeping community trust at the center of every operation.

5

**JA383**

20. The test of leadership came most visibly in 2020 following the murder of George Floyd, when Dallas, like the rest of the nation, was gripped by civil unrest. I worked tirelessly to strike the balance between ensuring public safety and protecting the right to peaceful protest. My leadership approach focused on engagement, transparency, and restraint. We implemented command protocols that limited the use of force to only when absolutely necessary, and I personally met with community leaders, clergy, and activists to listen to concerns and to create space for dialogue. These actions helped Dallas avoid some of the more destructive outcomes seen in other major cities and positioned the Police Department as one willing to face its challenges directly while leaning into reform.

**21.** My efforts in Dallas were always rooted in building trust—bridging the gap between police and community through dialogue, visibility, and accountability. From federal coordination to protest management, my experiences reinforced a principle that guided my leadership: true public safety is only possible when the community believes that their police department exists to serve them with fairness, equity, and respect.

**(3) Current Service**

22. Currently, I serve as President of the National Organization of Black Law Enforcement Executives (NOBLE), an organization of more than 4,800 members with 60 chapters in the United States, Canada, the Caribbean, and Africa. NOBLE's mission is to ensure equity in the administration of justice in the provision of public service to all communities, and to serve as the conscience of law enforcement by being committed to justice by action.

23. I am also currently the Executive Director of the Community Solidarity and Safety Coalition, where I work with nonpartisan leaders and government partners to address public safety challenges.

6

**JA384**

24. Since retiring from the Dallas Police Department in December 2020, I have continued to advance the profession of policing through training, consultation, and leadership development. I have been invited to conduct executive-level trainings for law enforcement agencies across the country, with a focus on 21st Century Policing, organizational change management, crisis leadership, and building community trust. I have consulted with major city police departments, smaller municipal agencies, and community-based organizations seeking to strengthen their partnerships with law enforcement.

25. In addition to direct consultation, I have participated in national conferences, panel discussions, and academic forums where I share insights on modern policing strategies, cultural competency, and police-community relations. I have also partnered with universities, leadership institutes, and professional organizations to design and deliver curriculum for current and aspiring police leaders. These engagements have allowed me to leverage my experiences in Detroit and Dallas while contributing to the next generation of law enforcement leadership.

26. My post-retirement work has been guided by the same principles that shaped my career: a commitment to fairness, accountability, and service. Whether through training, consultation, or public speaking, I continue to advocate for reforms that build trust and ensure that public safety evolves in a way that reflects both community needs and professional standards.

**OPINIONS**

**A.    Community Trust is Essential to Public Safety.**

27. My two-decade-long career in policing has taught me that public safety is built on trust, consistent enforcement, and community-based strategies.

28. Community trust is critical to effective policing. Building trust between law enforcement and the community is a major component of the work of local law enforcement.

7

**JA385**

29. Trust is built in a number of different ways: a transparent command structure, being able to identify individual officers and the law enforcement agencies they work for, systems of accountability, and carefully building community relationships.

30. Policing is not simply about responding to crime; it is about creating an environment where residents feel both safe and respected. That foundation cannot exist without authentic trust between law enforcement and the communities we serve.

31. Community trust is critical to effective policing. Building trust between law enforcement and the community is a major component of the work of local law enforcement, and it requires intentionality. Trust determines whether residents call the police when they need help, whether witnesses are willing to come forward, and whether neighborhoods see officers as guardians or as outsiders.

32. Trust is built in a number of different ways. One way is through a transparent command structure. Communities need to know how decisions are made, who is accountable, and how information flows. By ensuring that our chain of command is clear and that our actions are communicated openly, we reinforce that policing is done with—not to—the community.

33. A second way trust is built is by ensuring that residents can identify individual officers and the agencies they represent. This level of visibility is a safeguard against anonymity, which can erode accountability. When officers wear clearly marked uniforms and nameplates, and when agencies ensure consistent identification, it strengthens both responsibility and professionalism.

34. A third method for ensuring community trust is creating systems of accountability. Oversight mechanisms, internal affairs processes, body-worn cameras, and civilian review boards all serve to ensure that misconduct is addressed transparently and fairly. Accountability is not a

8

punitive measure alone—it is also a way to build credibility by showing the community that law enforcement holds itself to the same standards of justice it enforces.

35. Another essential way trust is built is through carefully cultivated community relationships. These are not achieved through occasional outreach but through sustained engagement. Whether by creating advisory boards, hosting neighborhood dialogues, or involving youth in summer jobs programs, community relationships signal that law enforcement is invested in the success and well-being of residents beyond the moment of crisis.

36. In my experience as Chief in Dallas, one salient example came during the protests of 2020. In the midst of national tension, I met directly with clergy, activists, and community leaders. By listening before acting, by explaining command decisions in real time, and by maintaining open channels of communication, we were able to reduce the temperature of the moment and preserve space for peaceful demonstration. That experience reinforced what I had learned throughout my career: when law enforcement embraces transparency, accountability, and genuine relationship-building, it not only strengthens trust but also enhances public safety in ways enforcement alone never could.

**B.    Law Enforcement Officers, Including in the District of Columbia, Receive Extensive Policing Training.**

37. In my experience in Detroit and Dallas, along with what I have observed in other police departments nationwide, typical training for new recruit police officers, such as those entering service with MPD, includes training on the law relevant to policing. This would typically include law interpreting the Fourth Amendment and standards for lawful stops and arrests; the proper use of force; and the chain of custody and preservation of evidence.

38. I have reviewed MPD training materials that are publicly available.

9

**JA387**

39.     According to these materials, prior to being assigned to police the District, new MPD recruit officers receive approximately 37 weeks of police academy training to prepare them for policing in the District, which includes a full program of classroom, scenario, physical, and tactical training.

40.     This is consistent with the training that officers receive in both the Detroit and Dallas police departments, and it is consistent with my knowledge of other police departments' training procedures across the country.

41.     Based on my review of publicly available training materials, MPD police academy training includes training on District case law interpreting the Fourth Amendment and the standards for lawful stops and arrests. A true and correct copy of the MPD Academy Curriculum Block 4.1 on the Introduction to Criminal Law is attached hereto as Exhibit A.

42.     MPD's police academy training also includes training on the appropriate use of force. A true and correct copy of the MPD Academy Curriculum Block 5.1 on the Use of Force is attached hereto as Exhibit B. MPD's use of force training emphasizes that officers should attempt to defuse any situation by using de-escalation techniques whenever possible and that any use of force should be proportionate to the circumstances. See Ex. B at 6. This training also includes training on MPD's General Order on the Use of Force, which emphasizes that MPD officers must exercise "the utmost restraint" in using force and that "Members shall minimize the force that is used while protecting the lives of members and other persons, and continuously reassess the perceived threat in order to select the reasonable use of force response that is proportional to the threat faced by him, her, or others." A true and correct copy of MPD's General Order on the Use of Force is attached hereto as Exhibit C.

10

**JA388**

43. Finally, MPD's police academy training also includes training on basic investigative techniques, report writing, chain of custody, and the preservation of evidence. A true and correct copy of the MPD Academy Curriculum Blocks 3.2 through 3.4, which cover Basic Investigative Incident Reports, Crime Scene Awareness and Management, and Property, is attached hereto as Exhibit D.

**C.     National Guard Troops Deployed to the District of Columbia Will Undermine Basic Principles of Effective Local Law Enforcement and Risk Public Safety.**

44. Based on public reporting, and my own personal observations as a resident of the greater Metro-Washington area, I understand that the President declared a "crime emergency" in the District of Columbia on or about August 11, 2025.

45. As part of that "emergency," it is my understanding that the President ordered the activation of the D.C. National Guard and deployment of National Guard units from other states to the District. Based on public reporting and public statements I have reviewed from various federal and military officials, it is my understanding that more than 2,300 National Guard troops have been deployed in the District, and been authorized to carry service weapons and engage in law enforcement activities.

46. In my experience, the presence of armed military personnel in an American city is highly unusual. Never in my 20 years as a law enforcement professional have I encountered a deployment of National Guard troops like the one in the District of Columbia right now.

47. In the context of my role as Chief of Police in Dallas, I had the responsibility of working closely with the Texas Department of Public Safety (DPS) in conjunction with the National Guard when their support was requested by the Governor and Mayor during periods of heightened civil unrest (for example, the 2020 George Floyd protests). The National Guard's

11

**JA389**

presence was not initiated unilaterally, but rather came as part of a coordinated, lawful invitation to assist local law enforcement in maintaining order and ensuring community safety.

48.    From the outset, we established a collaborative working relationship that respected both DPS, the Guard's military command structure, and the operational authority of the Dallas Police Department. The National Guard did not act independently; they served in a support capacity under civil authority, reinforcing perimeters, protecting infrastructure, and allowing sworn officers to focus on direct engagement with the public. Importantly, in Dallas their deployment was designed to be non-confrontational and many were unarmed or assigned strictly to static posts, ensuring that their presence communicated stability without escalating tension.

49.    This deliberate approach stands in contrast to what has unfolded in Washington, D.C., where the deployment of federal troops and militarized responses at times blurred the lines between civil law enforcement and military intervention. In Dallas, we were intentional about preserving the distinction, maintaining civilian control, and keeping community trust at the forefront. By doing so, we were able to benefit from the Guard's resources and manpower while ensuring that our policing efforts remained grounded in the principles of accountability, proportionality, and constitutional policing.

50.    In my opinion, based on years of expertise in community-law enforcement relations, the presence of armed National Guard patrols in the District of Columbia poses significant, immediate risks to public safety for three primary reasons: it undermines community trust; it creates confusion and lack of coordination; and it introduces new risks associated with lack of law enforcement training.

12

**JA390**

**(1)    Undermining Community Trust**

51.    The deployment of uniformed and heavily armed military, as well as armored military vehicles, risks destroying carefully-constructed community relationships that, in my experience, local police departments spend decades fostering.

52.    Even when federal law enforcement assists local law enforcement, which in my experience is much more common than a military deployment but still relatively rare, federal law enforcement is not immediately introduced into communities without extensive preparation and coordination at every level. And those federal agents typically come from field offices in or near those communities and are trained law enforcement officers.

53.    The deployment of National Guard troops in the District carries significantly greater risks to public safety.

54.    Deploying uniformed, armed National Guard troops, including more than 1,000 from outside the District who are not familiar with the District's communities, to police the District's neighborhoods risks undermining trust and confidence in law enforcement, generally.

55.    In my experience, if the community does not trust law enforcement, crimes go unreported. If crimes are unreported, communities are less safe.

56.    Additionally, the sight of armed military troops on District streets is intimidating and creates an atmosphere of fear. Americans are not accustomed to armed soldiers in full uniform and armored trucks on city streets. It indicates that residents live in a police state patrolled by an occupying force; it replicates war.

57.    In my extensive law enforcement experience—especially in senior leadership positions in major metropolitan police departments—an atmosphere of fear does not enhance public safety – it undermines it.

13

**JA391**

**(2)    Lack of Coordination**

58.    In addition, effective local policing requires all officers conducting law enforcement activities to have a clear understanding of the command-and-control structures under which they are operating. To the extent that multiple entities or agencies are engaged in law enforcement activities in a single jurisdiction, there must be an infrastructure in place to coordinate the command and control of all law enforcement officers.

59.    Based on my experience leading the police departments in two large, urban cities, it is not possible for thousands of National Guard troops to be integrated or become familiarized with the command structure, deployments, or directives of local law enforcement in a mere matter of days or weeks. Attempting to do so on a short timeframe in the District is highly likely to pose problems for local police officers and other law enforcement entities operating in the District.

60.    The lack of a coordinated command-and-control structure also poses problems for the residents of the District. When a proper command-and-control structure is in place, there is a structure for accountability for officers' conduct. Based on my understanding of the command-and-control structure governing the National Guard troops deployed in the District of Columbia, there does not appear to be a proper framework for accountability for troops' law enforcement activity.

61.    For example, if National Guard troops participate in searches, seizures, arrests, or detentions for crimes in the District, District residents are unlikely to know where to seek accountability for potentially unlawful activity. Moreover, any uncertainty about the lawfulness of troops' involvement in those activities would complicate the prosecution of those crimes, which undermines public safety.

14

**JA392**

**(3)** **Lack of Training**

62.     Finally, it is my understanding that National Guard troops largely do not have experience in policing but instead have other "day jobs" that are unrelated to law enforcement.

63.     Law enforcement training is different than military training. When people act as law enforcement officers without proper training, including untrained National Guard troops, it can create several risks to the public and local governments, including potential violations of the law governing important areas of policing, such as stops, seizures, and arrests; the proper use of force; and the chain of custody and preservation of evidence. Violations of these rules can endanger the public, including by subjecting them to unlawful detentions and excessive or deadly uses of force. And it can lead to negative consequences for local governments, including by exposing them to civil liability and undermining prosecution efforts.

64.     Additionally, it is unclear whether the National Guard units conducting armed patrols have been trained on the safe handling of firearms in a densely populated, domestic urban setting, or on de-escalation techniques required to operate safely in an urban environment within the United States, creating a possibility of accidental discharge or other incident involving harm to the public.

\* \* \*

65.     As a long-time law enforcement officer and retired Chief and Deputy Chief of Police in Dallas and Detroit, respectively, it is my professional opinion that the current deployment of National Guard troops in the District of Columbia risks significantly damaging the District's public safety efforts. Without effective coordination and training, the use of National Guard troops in law enforcement activities poses a danger to the community, as it erodes community trust in law enforcement, sows confusion, and places armed military personnel in positions for which they are ill-trained.

15

JA394

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ____ day of September 2025, in Oxon Hill, MD.

U. Reneé Hall

16

**JA394**

# Exhibit A

# Metropolitan Police Academy



# 4.1 Introduction to Criminal Law

*May 29, 2025*

**JA396**

## Introduction

As a law enforcement officer, you are entrusted with a significant amount of authority, including the legal authority to stop, detain, search, arrest, and ultimately limit or revoke the freedoms of your fellow community members. This authority is not to be taken lightly and must be respected by all police officers. Furthermore, the scope, reach, and limitations of this authority must be thoroughly understood and never abused.

In this lesson, you will learn how serious these rights and freedoms are, how they came to be, and what precedents and standards of proof are in place to guide you in police procedures and functions. You will learn about and discuss historic cases involving decisions made by the Supreme Court that affect how police officers perform their duties and how their actions are weighed in court using standards of proof. You will learn the basics of criminal law needed by police officers, precedent, the categories of crimes, criminal procedures in Washington, DC, and the laws of arrest.

The concepts discussed in this lesson will be used and practiced in the field, and it is imperative that all patrol officers understand them in order to be effective while also respecting the rights of American citizens protected by the US Constitution and the Bill of Rights.

## 4.1.1      Appreciate the limitations on law enforcement placed in the Bill of Rights

**Writ of Assistance**
Limitations on government authority and its associated concepts have been popular topics for political theorists since the ancient Greeks. The American Revolution was inspired by such topics after challenges to powerful court orders enforced upon colonists by the British Empire. These court orders, known as writs of assistance, allowed British officers to conduct searches of premises for contraband without justifiable reason or a description of the contraband being sought. The royal authorities in the thirteen colonies used such writs to enforce massively unpopular taxes imposed by British laws, such as the Stamp Act and Navigation Acts. Unreasonable searches and seizures became a major source of tension in pre-revolutionary America.

In Boston, James Otis represented merchants challenging the writs by arguing that they violated the colonists' natural rights. When legal and political pleadings did not end the unpopular taxes nor the unpopular searches to enforce them, the colonists began to resist by force. There were many incidents where mobs of angry colonists violently resisted the Royal officials as they searched for contraband goods or where the mobs targeted the homes and persons of these officials after particularly unpopular seizures occurred. The cycle of mob violence followed by royal crackdowns to restore order contributed to the outbreak of the American Revolution.

After the American colonists won the Revolutionary War and while they were setting up their new government and legal system, they were determined to prevent the injustices they had suffered under British rule. The abuses associated with the writs of assistance and many of the arguments made by colonists like James Otis figured prominently in the writing of the Constitution and the Bill of Rights. These documents contain several explicit limitations on the powers and authority of law enforcement personnel.

**JA397**

**Fourth Amendment**

As a preventative measure resulting from the writs of assistance, James Madison introduced the Fourth Amendment to the Constitution. It states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

This amendment protects all Americans from unreasonable searches and seizures by the government. Furthermore, any evidence seized in an unreasonable search is inadmissible in court under the **exclusionary rule**, which prohibits the introduction of fruits (unlawfully seized items) of the poisonous tree (the unlawful search). Police officers must understand and strictly adhere to this and all rights granted to Americans while also performing their duties, which will often require conducting reasonable searches and seizures.

The text of the Fourth Amendment also establishes the strong preference for searches and seizures to be conducted with a warrant and what the general requirements for such warrants are.

**Fifth Amendment**

This amendment states, in relevant part, that "...nor shall any person be compelled in any criminal case to be a witness against himself…" Thus, one constitutional right provided by the Fifth Amendment that affects police procedure is that officers cannot compel an individual to engage in self-incrimination, meaning compelling a person to make a statement against him or herself. Invoking this Constitutional protection is commonly called "pleading the Fifth" or "taking the Fifth." More importantly, particularly for the patrol officer, it affects the procedures for questioning, interviewing, and interrogating suspects and arrestees. The well-known requirement to "read suspects their rights" is based on the Fifth Amendment. Doing so ensures that suspects know their right to have an attorney present during questioning, that an attorney can be provided if they cannot afford one, and that anything they say can be used against them in a court of law.

**Sixth Amendment**

The Sixth Amendment states:

> In all criminal prosecutions, the accused shall enjoy the right to a public and speedy trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law; to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

Although much of the protection provided to arrestees by the Sixth Amendment applies to the due process procedures of the court system in the handling of their cases, it is important for police officers to understand much of this system relies upon officers' work and that their actions and inactions can affect the efficiency of the criminal justice system. All procedures for processing an arrest, following through with the collection of evidence, completing all requisite paperwork and court forms in a timely manner, arriving at all scheduled court appearances, and providing all applicable items of evidence to the prosecutor must be diligently observed so as not to deny the defendant's right to due process. Ensuring

that these tasks are all completed prevents Sixth Amendment violations, which would lead to, among other things, the dismissal of a case.

**Eighth Amendment**

This amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." The protections provided by the Eighth Amendment apply both to the procedures of the court system as well as police officers in their handling of prisoners and arrestees.

Cruel and unusual punishment refers not only to court-ordered sentencing or punishment, but to the treatment received while in our custody. Prisoners must be treated and housed humanely. Officers are to use the minimum amount of force necessary to bring an incident under control (GO-RAR-901.07 – Use of Force). Excessive force and abusive/degrading treatment is an Eighth Amendment violation. Prisoners must not be deprived of medical attention, food, or shelter while in your custody. Remember that, regardless of the crime committed, once a person is arrested and, in your custody, you are responsible for their welfare.

## 4.1.2    Define the components of a crime

There are numerous definitions of the term **crime**, nearly all of which involve an act or omission which violates a law of a state and is punishable by that state. The definition used by MPD is "A positive or negative act in violation of penal law; an offense against the state (District of Columbia or United States); Any social harm defined and made punishable by law."

The commission of a crime involves a criminal act along with some level of criminal intent.

**Criminal Act**

For a crime to be committed, a criminal act must occur. The concept of criminal act stems from the Latin phrase "*actus reus,*" meaning "guilty act," in the English common law system, which was adopted and modified by the United States. There are two types of criminal acts:

- **Positive Act:** Positive criminal acts are the most common type encountered by patrol officers. They involve voluntary behavior and physical action which violates the law or laws of the state. An example of a positive act is physically removing merchandise from a store aisle, placing items in one's pocket, passing registers, and exiting the store without paying. In this case, a theft, numerous positive acts were carried out in the commission of the crime.

- **Negative Act:** This type of criminal act is just as much a crime as a positive act; however, it involves a voluntary omission or failure by the offender to physically act. These cases involve situations where, by law, certain actions are required to be taken by the offender. The omission of such action is considered a criminal act despite the fact that no physical action occurred. A simple example of this is the US tax laws. Filing one's taxes is an action which, by law, must be done. Failing to do so (doing nothing) is a criminal act. Police officers, firefighters, medical professionals, and others are required to take action in various situations where the failure or omission of such actions can lead to the injury or death of others. As such, failure to take action in such cases may constitute a criminal act. For example, consider a police officer who witnesses an armed robbery but chooses not to take any form of police action and the armed robber later shoots another

**JA399**

individual at a bus stop. The police officer's failure to act (to include calling 911) is a negative criminal act.

**Criminal Intent**

As described above, the commission of a crime involves a criminal act (positive or negative) accompanied by some form of intent. Without some level of intent, the criminal act does not always constitute a crime. Criminal intent is defined as "an intent to commit an act without any justification, excuse, or other defense."

Just as English common law required the criminal act (*actus reus*), intent must also accompany that act in order to hold someone culpable (guilty). "*Mens rea,*" meaning "the guilty mind," is another Latin phrase used to gauge criminal liability. The English common law system stated, "The act is not culpable unless the mind is guilty." This gauge is in place to ensure that the courts and law enforcement officers take steps to determine if a criminal act was committed purposefully or by accident.

**Tort**

Separate from the types of crime described thus far, a tort refers to a civil matter that MPD defines as "a civil wrong for which a remedy can be obtained in the form of damages." The most important element in the definition of tort is the word "civil", as it refers to the concerns of, or between, private individuals. This is different than a criminal act, which refers to the concerns between individuals and government. Tort law enables the filing of lawsuits, such as suing a person or entity by another, for various reasons including negligence, personal injury, or defamation. Tort cases normally result in some form of relief to the plaintiff (the one bringing the lawsuit), such as a court order that the defendant (the one against whom the lawsuit is brought) must do or cease doing some action or the provision of monetary compensation or reimbursement.

Although patrol officers respond to cases involving criminal law far more often than torts, many calls for service handled by MPD are actually civil in nature and may result in tort cases. MPD does not take direct action in these cases and advises parties to pursue resolution in civil court on their own.

## 4.1.3    Distinguish Principals from Accessories

**Principals**

The principal in a criminal offense is the person or persons participating in the criminal act or actively participating in the commission of a crime.

According to D.C. Code § 22-1805, in prosecutions for any criminal offense:
- All persons advising, inciting, or conniving at the offense
- Or aiding or abetting the principal offender
- Shall be charged as principals and not as accessories

**Examples**:

Suspects A and B plan a bank robbery in which Suspect A enters the bank and demands money from the teller at gunpoint while Suspect B waits outside in a vehicle, acting as a lookout and getaway driver. Both A and B can be charged with the robbery offense even though Suspect A carried out the act inside of the bank alone.

**JA400**

Suspects A and B plan a bank robbery in which Suspect A enters the bank and demands money from the teller at gunpoint. This time, Suspect B helps plan the offense, provides a floor plan of the bank to Suspect A, and lends him the firearm to use in the offense, but stays home instead of assisting in the commission of the act. Again, both are charged with the robbery, even though Suspect B was at home at the time of the offense.

Suspect A plans a bank robbery in which he enters a bank and demands money from the teller at gunpoint without any assistance from Suspect B. After completing the criminal act, Suspect A drives to Suspect B's house, tells him about the offense and asks to stay a few days to avoid being caught. Suspect B allows him to stay and hide. Suspect A is the principal and charged with the Robbery. In this case, Suspect B cannot be charged as a principal with the offense of Robbery but instead as an accessory after the fact.

**Accessory After the Fact**
According to D.C. Code § 22-1806**,** accessory after the fact is a separate and distinct offense in which:

- A felony or misdemeanor occurred
- A particular person, other than the accused, has committed the offense
- The accused must have knowledge that that person committed the offense
- The accused received, relieves, comforts, or assists that person
- And the accused does so with the intent to hinder or prevent that person's apprehension, trial, or punishment

The penalties for Accessory After the Fact depend upon the seriousness of the offense committed by the principal. If that crime has a maximum sentence of life in prison, the accessory faces up to 20 years imprisonment. In all other cases, the accessory offense carries a maximum of one-half the maximum penalty faced by the principal.

## 4.1.4     Categorize the Crimes recognized by the DC Code

**Misdemeanor**: These offenses are punishable by imprisonment for a period of no more than one year.

**Felony**: These are more serious offenses that are punishable by imprisonment for a period of over one year.

**Sentencing**
Felony offenses are described as punishable by a period of imprisonment. The period of imprisonment corresponds to a length of time that varies greatly depending upon the type of offense. Recall that the minimum sentence is 1 year unless otherwise designated in the DC Code. For example:
- When written as "not more than 5 years," it should be taken to mean "at least 1 year in prison or up to and including 5 years in prison."
- When written as "not less than 2 two years nor more than 15 years," a person may be sentenced to at least 2 years or at most 15 years in prison, or some period of years in between.

Always look at maximum sentences first: "not less than 2 years nor more than 15 years" is a less severe penalty than "up to 20 years." In contrast, "not less than 2 years nor more than 15 years" is more severe than "not more than 15 years" because of the minimum requirement involved. "Not more than 15 years"

**JA401**

can result in a sentence of 1 year, whereas "not less than 2 years nor more than 15 years" cannot result in a sentence of less than 2 years.

**While Armed:** As defined in D.C. Code § 22-4502, if, during any felony offense, the defendant uses or is in possession of a weapon, the crime is charged with the addition of "while armed." For example, if a defendant is arrested for burglary II and is found to have a firearm in his waistband, they should be charged with "burglary II while armed." Penalties are enhanced when a crime is committed by an armed suspect, whether the weapon was used in the offense or not

Crimes can also be enhanced due to the nature of the crime or who the crime was made against. For example:

**Department of Parks and Recreation:** A **crime of violence** against person at Department of Parks and Recreation property may be punished by a fine of up to 1 1/2 times the maximum fine otherwise authorized for the offense and may be imprisoned for a term of up to 1 1/2 times the maximum term of imprisonment otherwise authorized by the offense, or both.

**Vulnerable Adults**: A **crime of violence** against vulnerable adults may be punished by a fine of up to 1 1/2 times the maximum fine otherwise authorized for the offense and may be imprisoned for a term of up to 1 1/2 times the maximum term of imprisonment otherwise authorized by the offense, or both.

A **vulnerable adult** is person who is 18 years of age or older and has one or more physical or mental limitations that substantially impairs the person's ability to independently provide for their daily needs or safeguard their person, property, or legal interests.

**Crime of Violence Transportation:** Any person who commits a **crime of violence** against a transportation provider (a private vehicle-for-hire or a public vehicle-for-hire); Metro manager, employee, or passenger, may be punished by a fine of up to 1 1/2 times the maximum fine otherwise authorized for the offense and may be imprisoned for a term of up to 1 1/2 times the maximum term of imprisonment otherwise authorized for the offense, or both.

A **crime of violence** means:
- Aggravated assault;
- Act of terrorism;
- Arson;
- Assault on a police officer (felony);
- Assault with a dangerous weapon;
- Assault with intent to kill, commit first degree sexual abuse, commit second degree sexual abuse, or commit child sexual abuse;
- Assault with significant bodily injury;
- Assault with intent to commit any other offense;
- Burglary;
- Carjacking;
- Armed carjacking;

**JA402**

- Child sexual abuse;
- Cruelty to children in the first degree;
- Extortion or blackmail accompanied by threats of violence;
- Gang recruitment, participation, or retention by the use or threatened use of force, coercion, or intimidation;
- Kidnapping;
- Malicious disfigurement;
- Manslaughter;
- Manufacture or possession of a weapon of mass destruction;
- Mayhem;
- Murder;
- Robbery;
- Sexual abuse in the first, second, or third degrees;
- Use, dissemination, or detonation of a weapon of mass destruction; or
- An attempt, solicitation, or conspiracy to commit any of the foregoing offenses.

## 4.1.5        Distinguish General Intent from Specific Intent

As previously described, all crimes require not just the criminal act but also criminal intent. There are two types of intent that can apply to different offenses based on the terminology used to describe the nature of the particular offense. The types of intent are *general* and *specific*:

**General Intent**
- The person did the act of their own choice or free will
- The person does not need to have the intent to or even be aware of the fact that they are breaking the law
- All crimes must have at least general intent

For example, simple assault is a general intent crime. As such, if John pushes Michael in the chest and then punches Michael in the face, he must only do so willingly to commit the offense of simple assault. The only required level of intent is that John willfully pushes and punches Michael. It is not necessary that John intended to hurt or cause injury to Michael, and Michael does not have to suffer any injuries to constitute the offense.

**Specific Intent**
- The person must have a particular wrongful state of mind
- Not only must the defendant do the act with free will, but the defendant must intend a certain outcome, regardless of whether the act results in that outcome or not.

For Example, malicious disfiguring is a specific intent crime in which an assault occurs with not just a general intent to commit the assault but with a specific intent to cause a certain type of injury which leaves the victim less complete, perfect, or beautiful. If John pushes Michael in the chest, punches Michael to the ground, then holds Michael down and pours sulfuric acid on his face in an effort to

**JA403**

cause permanent chemical burns, which would leave Michael's appearance less perfect and beautiful, John has committed malicious disfiguring. In this case, committing the assault alone does not constitute the offense. Rather, specific intent to cause permanent injury must be articulated.

General intent is always present before specific intent can be developed. For a crime to occur, general intent must be present. Some crimes require that the accused not only had the general intent to commit the act but specific intent as well to produce a certain outcome of that criminal act.

## 4.1.6      Identify the factors that absolve someone of criminal responsibility

**Self-Defense**
Self-defense is defined as "a use of force to protect oneself from an attempted injury by another. If justified, self-defense is a defense to a number of crimes." This defense demonstrates good reason to conduct a thorough preliminary investigation to determine what exactly happened. What may appear to be a crime or assault may be self-defense, and an officer must be able to determine what, if any, action is to be taken. Although self-defense can be determined on the scene of an offense, it is also determined through court proceedings to absolve someone of criminal responsibility when applicable.

**Insanity**
This defense "reflects society's belief that the law should not punish defendants who are mentally incapable of controlling their conduct." This defense is determined through court procedures and does not affect the way MPD enforces the law.

Although these are the only factors that absolve someone of criminal responsibility, officers should thoroughly evaluate situations and circumstances to determine whether criminal intent is present and whether an arrest should be made. For example, it is generally accepted that children under the age of seven are unable to develop criminal intent. When dealing with offenders of this age or younger, officers should consult with an MPD official and an MPD Youth Investigations Branch official to decide what action should be taken.

## 4.1.7      Differentiate the standards of proof

**Mere Suspicion**
Often described as a gut feeling or a hunch, mere suspicion is just that: a feeling which is not articulable by the officer that someone or something is suspicious, out of place, or potentially dangerous. Mere suspicion does not meet the standard of proof required for a stop, search, or arrest but often can lead to a higher level of proof after investigation. Mere suspicion is enough to make an officer take notice of something happening without any objective facts to base the suspicion on.

For example, while walking your beat, a person walking by gives you a very strange look and fails to respond when you say hello. This behavior may be considered out of the ordinary depending on the circumstances, and an officer may become suspicious of that person. In this circumstance, there are no objective facts to prove anything more about the person or what they are doing.

**JA404**

**Reasonable Suspicion**

This is a standard of proof in which the officer can articulate facts about the person or situation that leads the officer to act and is the standard required to conduct a stop and/or a protective pat down. Reasonable suspicion is more than mere suspicion but still does not provide enough information to make an arrest or conduct a search. Reasonable suspicion is a minimal level of justification based on articulable facts. At this level, the officer can explain and justify the action that was taken.

For example, while canvassing your beat for a robbery suspect, in which a detailed lookout (description) for the suspect has been provided, reasonable suspicion can be articulated by an officer who sees someone matching that lookout running from the area or hiding in an alley. Reasonable suspicion justifies the stop of that suspect.

**Probable Cause**

This standard of proof is required for all arrests, searches, seizures, and warrants. It relies upon the objective facts of the situation that an officer can articulate and is defined as a set of facts, circumstances, or reliable information that would lead a reasonable, prudent, and cautious police officer to believe that a crime has been committed, is being committed, or is about to be committed and that a certain person is responsible.

There are no rigid rules for establishing probable cause. You must gather and evaluate all of the information available to you and weigh it against the DC Code definition. Probable cause, meaning it is more likely than not, is one of the most commonly used terms in law enforcement. It has been reviewed and defined by the US Supreme Court in countless decisions interpreting the scope of the Fourth Amendment.

**Beyond a reasonable doubt**

The standard for conviction in a criminal trial is proof beyond a reasonable doubt. Officers in the field do not use this standard of proof; it applies to triers of fact, judges, and juries in court. In other words, a judge or jury must believe beyond a reasonable doubt that the defendant committed the offense.

*NOTE*: These levels of proof do not have to develop in sequence. If probable cause exists, there is no need for an officer to develop some other level of proof to justify an arrest, search, or warrant. If reasonable articulable suspicion exists that the individual is armed and dangerous, there is no need for an officer to develop some other level of proof to justify a stop and pat-down. If an officer witnesses a crime being committed, probable cause exists to make an immediate arrest.

## 4.1.8    Distinguish the standards of proof and understand totality of the circumstances

The different standards of proof described above are required for different procedures used by police officers in the field. Without meeting certain criteria, the actions we take may or may not be legally justified, so we must always be cognizant and respectful of the rights of all people regardless of the severity of circumstances or nature of the offenses involved. The standards required for a field contact, stop, search, and arrest all need to be known and understood for a police officer to be effective in the field. These standards are measured in court and must be viewed in the context of what is reasonable by an objective police officer under the same circumstances.

**JA405**

**Reasonable Suspicion vs. Probable Cause**

The US Supreme Court describes the difference between reasonable suspicion and probable cause as follows:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity and content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Reasonable suspicion must be supported by specific and articulable facts and is considered a minimal level of justification for suspecting a person of engaging in criminal activity.

The specific and articulable facts to support probable cause must be more reliable. It is a set of facts, circumstances, or reliable information that would lead a reasonable, prudent, and cautious police officer to believe a crime has been committed, is being committed, or is about to be committed and that a certain person is responsible. This is a far more demanding standard in which the officer must evaluate the information cautiously, eliminate unreliable information, and reach a determination based on all of the facts, given all of the circumstances. A number of factors surrounding each case's circumstances will strengthen or weaken the level of proof at issue, and understanding and evaluating them constitutes a totality of the circumstances analysis.

**Totality of the Circumstances**

The totality of the circumstances is a legal concept involving the examination of all evidence and information available to the officer to make a decision, to the best of their ability, as to what exactly happened, who is involved, and whether there is enough proof (probable cause) to make an arrest, conduct a search, or obtain a warrant, or enough proof (reasonable suspicion) to conduct a stop or protective pat down. This includes examining and evaluating the sources of the information and the credibility of the sources when acting on a tip. Information should be corroborated as much as possible, especially when you do not have enough information about the source to evaluate its veracity or reliability, such as with the use of an informant. The totality of the circumstances is the product of an analysis of all the information obtained during the preliminary investigation. It involves the credibility of witnesses, complainants, and suspects, and dictates the decisions ultimately made by the officer handling a scene.

**Example:** An officer receives an anonymous call describing that a young black male wearing a plain blue shirt is at a particular bus stop with a handgun in his waistband. The officer arrives and sees a person specifically matching that description. What level of proof exists, and what action should be taken? Since the information in this lookout is general in nature, contains information anyone could discover, and the caller is anonymous, there is not enough information available to establish reasonable suspicion. The officer should look for additional facts that may corroborate the anonymous call and observe the suspect without confronting him to see if he exhibits any indicators of someone who is armed or if he commits any other offense for which the officer can conduct a stop or arrest. This example is based on an actual case where the officer immediately approached the suspect, frisked him, and recovered a handgun without taking any steps to corroborate the tip. The U.S. Supreme Court ruled that the handgun was illegally seized and could not be used as evidence. (Florida v. J.L.)

**Example:** An officer receives an anonymous tip that Vanessa White will, at a certain time, be leaving a certain address and heading towards a certain motel. It is also relayed that she will be driving a brown

Plymouth station wagon and have some cocaine in a brown attaché case. Based on the tip, officers responded to the address and observed Ms. White leaving in the brown Plymouth. She drives a direct route toward the motel described in the call and is stopped a few blocks from the motel. After being informed that she was stopped for suspicion of transporting cocaine, Ms. White consented to a search of her vehicle, and the officers recovered marijuana from it. She is placed under arrest, and a search of her purse uncovers a small quantity of cocaine. Were the officers' actions reasonable based on the anonymous tip? Did the officers establish the standards of proof necessary to justify the vehicle stop, search, and arrest? Yes, although the information came from an anonymous tip, the level of knowledge displayed by the caller was in much greater detail than in the previous scenario. Here, the caller not only knew easily observable facts like the type of car and location but also knew the time of departure and the driver's destination. The U.S. Supreme Court ruled that although it was a close call, based on the totality of the circumstances, the information provided by the caller qualified as reasonable suspicion to justify a stop of Ms. White. (Alabama v. White)

**NOTE**: When relying on anonymous tips, officers must ensure the information is corroborated or based on detailed knowledge about the suspect and incident. Without the additional specific details provided in the second example, the anonymous tip involving information anyone could observe would not be enough to justify the vehicle stop, arrest, and search.

**Evaluating Information**
The main issue in using information from a third party is determining its accuracy and validity. Officers must vet and corroborate the information as much as possible in order to make a practical, common-sense decision, given all the circumstances, including the veracity, reliability, and basis for how the person acquired the information to determine whether it is valid. (Illinois v. Gates) According to the US Supreme Court, the following terms are all highly relevant elements. They are not entirely separate but rather intertwined issues.

- **Veracity** means determining how truthful the person providing the information is.
- **Reliability** is determined by examining how accurate the information provided is.
- **Basis of knowledge:** This is how the person came to acquire the information provided. Did they learn of it while witnessing the offense? Did they hear about it from someone else? Is the information detailed or vague?

Similar to developing standards of proof, determining the validity of the information cannot be done by applying any rigid set of rules or examining any single factor. Rather, the officer must look at the entire situation and all of the information received—the totality of the circumstances—to make a practical, common-sense determination.

There is no single deciding factor in establishing levels of proof, and the totality of the circumstances will dictate your decisions, which is why it is important to conduct thorough preliminary investigations and gather as much information as possible. The following factors comprise the totality of the circumstances analysis that courts take into consideration when determining the legality of an officer's actions:

- **Officer's own knowledge, training, and experience**
  Throughout your career with MPD, you will have opportunities to receive training on several different topics and become familiar with the people and trends in your patrol service area. Experience and expertise give each officer a unique skill set to utilize while policing. Some officers may have training and experience in investigating certain types of offenses and recognizing when

a person's behavior is consistent with that type of offense. For example, an officer may witness people engaging in behavior consistent with that of drug sales or witness a person walking on the sidewalk, pausing at each parked car to look inside, which is consistent with someone who might be planning a theft from automobiles.

An officer's experience with certain individuals and knowledge of their criminal history may also be considered, though their criminal history alone does not justify a stop. For example, an officer observes a person recently convicted of theft from an automobile walking on the sidewalk past vehicles. This alone does not justify a stop, but if the person is observed to be viewing the interior compartments and checking door handles on the vehicles, this behavior, combined with the officer's knowledge, would justify a stop of the person.

- **Person's Appearance**
  A person's appearance alone does not justify a stop, but a stop might be justified when coupled with circumstances surrounding an offense. Examples of this include a person's appearance matching the description of a suspect wanted for an offense, a person appearing to be under the influence of drugs or alcohol, a person suffering from an injury that may have been received in an assault, a person appearing to be winded from running, and a person appearing to be exceptionally nervous.

  For example, if a lookout is broadcast for a white male, 18-25 years of age, wearing blue jeans and a white shirt, you may see numerous individuals fitting the description. As such, an officer should also look for other factors, such as proximity to the offense location, whether the person appears nervous or winded, or whether the person is reasonably involved in some lawful activity. In this case, a stop near the time and place of the offense, could be justified. A stop solely based on the person's clothing an hour later would most likely not be justified.

- **Actions and Demeanor**
  A person may be actively fleeing, hiding, or trying to conceal or destroy evidence. Or, a person may respond to questions with evasive, suspicious, incriminating, or contradictory answers. People may appear exceptionally nervous or display other signs that they may have been involved in unlawful behavior. These actions alone may or may not justify a stop but should always be considered within the totality of the circumstances.

  Remember that, except in specific circumstances, community members are not required to answer any questions posed by a police officer. As such, silence alone does not justify a stop or arrest (remember the protection against self-incrimination and right to remain silent covered above). For example, on the scene of a call involving a drug complaint, you observe a group of men in front of the location of the call that may or may not be dealing drugs. You approach the group, identify yourself, and ask one of the men what they are doing and if they are selling drugs. He looks at you, says nothing, and walks away. Absent some other factor, such as seeing a suspected drug sale or discarding contraband, there is no justification to conduct a stop of the man who walked away. If, instead, the man drops a clear zip-lock bag (potential drugs or paraphernalia) to the ground and begins walking away, a stop would be reasonable because you have articulable facts on which to build the standard of proof and conduct the stop.

**JA408**

- **Time and place**
  The time and place as it relates to a criminal offense is applicable to the justification of police action. A stop of a community member is more reasonable the closer in time and place it occurs to the associated offense. Furthermore, certain types of crimes are more likely to occur at certain times of day or night and in certain locations that officers become familiar with in their respective patrol districts.

  For example, around closing time in the early morning, a higher than usual rate of robberies may be experienced in areas with a high volume of nightclubs. Knowing this trend, you can apply it to the totality of the circumstances when building the standard of proof necessary to conduct stops in that area. If prior early morning robberies involved a group of two or three males 18-25 years old wearing black hooded sweatshirts and blue jeans working together, conducting a stop of one person wearing those items of clothing during the daytime would not be reasonable. However, at closing time, in the vicinity of the night clubs, along with other factors, reasonable suspicion can more easily be developed with this knowledge of the crime trend.

- **Information or information plus corroboration provided by a reliable third party**
  The information used in developing the standards of proof does not have to be gathered by just one officer conducting the investigation or the stop. Information from various sources is also applicable but needs to be measured for accuracy, veracity, and corroborated whenever it is possible. For instance, information from a third party is often used in developing the standards of proof. The third party can be another police officer, officers from other jurisdictions, community members, or paid informants.

  Information from other law enforcement agencies is shared regularly with MPD. MPD officers can make arrests and stops based on this information when valid warrants are issued and thorough lookouts are provided. Lookouts, teletypes, and wanted posters can justify the stop of a community member when a description of the suspect, the underlying offense, and the type of police action requested are included in the message.

  For example, the sergeant conducting roll call distributes wanted posters from the Alexandria Police Department containing a picture of John Smith along with a physical description and indicates that he is wanted on an outstanding warrant for failing to register as a violent sexual offender. If you observe someone who resembles Smith, can you conduct a stop based on the wanted poster? Yes, as long as that person objectively matches the description, the wanted poster indicating the existence of a warrant can justify a stop. Furthermore, if the person is identified during the stop as Smith, he will be arrested after the officer confirms that the warrant is valid and active. A copy of the wanted poster should be attached to the arrest paperwork submitted to the US Attorney's Office.

## 4.1.9      Identify the importance of precedent in criminal law

The Latin legal concept "*stare decisis,*" meaning "to stand by things decided," is the process of looking to prior court decisions to guide present decisions. Issues previously brought to court and the resultant legal decisions that have been made set a precedent for the courts to use in future cases. Precedent is generally adhered to by the courts to provide predictability and consistency. The concept of precedent also ensures equality to all persons under the law, in that persons involved in similar situations will be treated alike.

A great deal of officers' decision-making in the performance of their duties will be dictated by policies in place that limit or restrict an officer's authority in light of precedent, those court decisions that affect how law enforcement officers conduct their investigations. Most MPD policies are a result of court rulings and must be adhered to by members to avoid violating the rights of community members, which have been guaranteed by the US Constitution and determined by courts. A good example of a precedent that affects the everyday thought process of a patrol officer is *Brinegar v. US*, which established the standard of proof needed to establish probable cause for an arrest.

## 4.1.10      Apply the legal brief of court cases to police practices

***Brinegar v. United States*, 338 U.S. 160 (1949)**
In class, we will review and discuss the U.S. Supreme Court ruling in this case. We will discuss how the decision affects the everyday practices of police officers and police policies in terms of the following:
- Did probable cause exist to arrest Brinegar?
- Did probable cause exist to search the vehicle and seize the liquor?
- If so, at what point was the standard of proof for probable cause met?
- What was the Supreme Court's reasoning that supports its ruling about probable cause?
- What does the Supreme Court decision mean for police officers and the need to establish probable cause in the future?

***T.W. v. United States,* 292 A.3d 790, (April 20, 2023) (Review TB 23-08)**
In class, we will review and discuss the court ruling in this case. We will discuss how the decision affects the everyday practices of police officers and police policies in terms of the following:
- Was T.W. seized under the 4th amendment?
- Was there reasonable articulable suspicion (RAS) to stop T.W.?
- What is the difference between a "stop" and a "contact"?

## 4.1.11      Justify different police-community member interactions and the categories of police powers

**Investigative Powers**
Officers in the field conduct investigations into a wide variety of incidents and offenses. As such, their authority, although strictly limited and defined, allows different measures to be taken based on the level of proof that is present. While conducting an investigation, officers often conduct field **contacts, stops, protective pat downs, and questioning** of persons involved.

**Field Contact**
Conduct by a member which places the member in face-to-face communication with an individual under circumstances in which the individual is free not to respond and to leave.

**JA410**

**Conduct during Field Contacts**

- Persons contacted may not be detained in any manner against their will, nor patted down. An officer may not use force or coercion to require a community member to stop or respond.
- Persons cannot be required to answer the officer's questions or to respond in any way to the officer if they choose not to do so. Any information received during the field contact must be voluntarily provided. Officers should avoid asking questions or making a request which could be misunderstood as commands. Requests should be made with language that communicates that the person has an option, such as "may you" or "would you mind," to make it clear that the person is not receiving a lawful order.
- Officers must constantly keep in mind that the distinction between a field contact and a stop depends on whether, under particular circumstances, a community member could reasonably perceive that they are not free to leave the officer's presence. Therefore, since the individual may be, and is presumed to be innocent of wrongdoing of any kind, officers should take special care to act as restrained and courteously as possible.
- The duration of a field contact should be as brief as possible unless such ease and rapport exists that the community member wishes to continue interacting.
- When asked, officers during a field contact must advise community members of their right to refuse the interaction as well as their right to leave. If community members refuse to interact or cease to cooperate during a field contact, they must be permitted to leave. Refusal to cooperate does not justify a stop or arrest.
- Generally, individuals are not required to possess or carry with them any form of identification or be required to account for their presence on public space. No demands for identification should be made.

**Stop**

While conducting investigations, officers have the authority to conduct stops of community members when reasonable suspicion exists to believe that the suspect is involved in criminal activity. Stops are defined as "the temporary detention of a person for the purpose of determining whether probable cause exists to arrest that person." As noted above, an officer must have reasonable suspicion and articulable facts about the suspect and the circumstances to justify the stop, as it does involve the detention of a person for investigative purposes. Unlike a field contact, when a stop is conducted, the suspect is not free to leave, and officers are authorized to use force, when necessary, to conduct the stop.

**Conduct during Stops**

- An individual may be stopped at or near the origination of the stop for a reasonable period of time. When a stop occurs over an extended period of time, officers shall articulate the justification for the length of the stop in a records management system (RMS) report.
- Officers conducting a stop should only detain the person for the length of time necessary to obtain or verify the person's identity, to question the person's presence or conduct, and to determine if the person is to be arrested or not. The length of a stop must be reasonable, and caution dictates that it should not last any longer than necessary to avoid it becoming an arrest.
- Although justified in briefly detaining an individual and compelling them to perform certain actions, officers must act with restraint and courtesy while conducting all stops, and must identify themselves as police officers.
- Officers are required, at some point during every stop, to provide an explanation to the person as to the reason and purpose of the stop. Being the subject of a stop can be very unsettling.

Providing an explanation can potentially de-escalate the situation, gain cooperation, and reinforce the legitimacy of our actions as police officers. However, while all stopped individuals must be provided with a general explanation of the purpose of the stop before they are released, officers are not required to provide specific details, such as detailed lookout information, as that may jeopardize an investigation.

- Officers may question persons during a stop, to include obtaining the person's identity. Persons being detained, however, shall not be compelled to answer questions or produce identification for the officer. Refusal to answer questions and/or identify oneself does not meet the standard of proof for probable cause to arrest. However, such refusal does contribute to the totality of the circumstances and should be taken into consideration by officers conducting the investigation.
- Officers shall use the least coercive means necessary to effect a stop. This includes verbal requests, lawful orders, and the use of physical force when necessary.
- Officers who reasonably believe that a person in the vicinity of a crime of violence has knowledge of value to the investigation, such as an eyewitness, may order the person to stop. The very brief stop is only to obtain identification and information about the current situation. As already noted, however, witnesses shall not be compelled to answer any questions or produce identification for an officer.
- All stops must be documented on an incident report.

**Protective Pat Down**
During a justified and reasonable stop, a protective pat down, also known as a frisk, of the suspect may be conducted if the officer has reasonable articulable suspicion to believe that the subject is armed and dangerous. This is done specifically to detect weapons and other dangerous instruments and to neutralize the threat of physical harm. Pat downs are not meant to discover any other evidence or incriminating material. Reasonable suspicion to conduct a stop does not automatically justify reasonable suspicion to conduct a protective pat down.

Some common factors that are considered in determining if reasonable suspicion exists to conduct a protective pat down include:

- **The individual's physical characteristics**: A stopped person's clothing may bulge in a manner suggesting the presence of a weapon, such as a firearm tucked into a waistband. Physical demeanor, like how a person is standing or slouching, may also suggest that the person may be carrying a weapon.
- **The individual's actions**: A stopped person may have made a movement as if to hide a weapon when approached, may appear nervous, may make threats, or may blade their body in such a way that leads you to believe the person is armed.
- **Prior knowledge about the individual**: The officer may be familiar with an individual and know that the person has been arrested for possessing weapons in the past, is known to carry a weapon, or is known to be violent.

Protective pat downs shall be conducted in the following manner:

- The pat down should begin at the area of a person's body or clothing, which the officer believes is most likely to contain a concealed weapon, such as a waistband or coat pocket.

**JA412**

- Officers should not reach into pockets or clothing. Rather, the officer should touch the outside of pockets or clothing to feel for what may be a weapon concealed beneath or inside. If such an instrument is detected, reaching into the pocket to remove it is then justified.
- Outer clothing such as overcoats and jackets may be opened to allow a pat down of shirts or trousers, when necessary.
- Bags that may contain weapons can be separated from the persons carrying them. In these cases, taking possession of the bag so that it is not accessible to the stopped person is sufficient to eliminate the danger, and a search of its contents is not necessary.
- Other items of property detected during a pat down that are not weapons are not to be removed or seized.
- If, during a pat down, the officer feels an object and believes that it might be a weapon that could be used to harm him or her or others, the officer is authorized to take whatever action is necessary to examine the object and secure it for the duration of the stop.
- If, while retrieving an object that the officer believes might be a weapon, the officer discovers contraband, paraphernalia, or evidence of a crime, the officer may seize it and use it as evidence.

All stops shall be documented in an incident report per the NEAR ACT, as covered later in this lesson. Members shall be mindful of these reporting requirements when conducting stops so they are able to document all required information during the completion of their RMS reports. (GO 304.10 and 3.1 – Report Writing).

The term "stop and frisk" is commonly used to describe a protective pat down encounter. Still, it is important to remember that not all stops involve a frisk (protective pat down). As a reminder, the pat down requires its own justification through articulable facts that give the officer a reason to believe that the suspect may be armed and dangerous. Pat downs of suspects are also called "Terry Stops" after the legal case that defined them. (*Terry v Ohio*).

**_Terry v. Ohio,_ 392 U.S. 1 (1968)**
Language from the US Supreme Court's decision indicates that:

- "When an officer is justified in believing that an individual whose suspicious behavior, he is investigating at close range is armed and presently dangerous to the officer or others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is, in fact, carrying a weapon and to neutralize the threat of physical harm."
- The officer "confined his search to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find.
- "At the time he seized petitioner and searched him for weapons, Officer McFadden had reasonable grounds to believe that petitioner was armed and dangerous, and it was necessary for the protection of himself and others to take swift measures to discover the true facts and neutralize the threat of harm if it materialized.
- "Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing

with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."

An officer must have reasonable articulable suspicion to believe a person has engaged in, is engaged in, or is about to engage in criminal activity, *and* reasonable articulable suspicion to believe the person is armed and potentially dangerous to perform a Terry pat-down.

**Questioning**
While conducting your investigation and handling calls for service, incorporating a thorough line of questioning is very effective. Questioning is a crucial skill for officers in the field. Building rapport with persons during a field contact or stop is valuable for effective questioning, but remember that persons in both forms of interaction do not have to answer your questions. General questioning of everyone present at a crime scene to determine what has happened and who the suspect may be is reasonable. Questioning is conducted for a number of reasons but is primarily done to obtain and corroborate information from people with different forms of involvement in the offense including complainants, witnesses, and suspects.

**Arrest Powers**
As a result of police investigations, when probable cause exists, officers make arrests of suspects and obtain arrest warrants so suspects can be prosecuted in the court system.

**Use of force**
When necessary, officers are authorized to use physical force in affecting the arrest of suspects. The force used is to be the minimal and reasonable amount necessary based on the suspect's level of resistance.

**Search**
Probable cause is the same standard of proof required to conduct a search and apply for a search warrant. Searches differ from pat downs in many ways and are not only conducted to detect weapons. Searches of suspects and their surroundings can be conducted when consent is voluntarily granted to the officer by the suspect. Searches of suspects can also be conducted when it is incident to a lawful arrest. Arrestees are always searched incident to arrest and prior to being transported to an MPD facility for processing. This practice is in place for the safety of officers and prisoners, as arrestees become our responsibility once in our custody. No prisoner is allowed to keep any weapons or illegal devices or substances on their person after being arrested. (More training and information will be provided in Blocks 8 and 10 when case law and searches are discussed.)

**Exercise seizure and restraint**
All arrests involve some level of restraint, whether you are required to use force to take the person into custody or the person submits to the arrest without you having to employ force. Furthermore, an arrest is the seizure and detention of a person. When the person becomes restrained in such a way that they are no longer free to leave, move, or act as one is normally and freely able to do, he or she has been seized by the arresting officer. For example, handcuffing an arrestee and moving the arrestee to a transport vehicle and police facility involves restraint and a seizure of that person. A reasonable person would understand that they are under arrest under these conditions regardless of what the officer does or does not say regarding an arrest.

**JA414**

## 4.1.12    Define Arrest

There are four elements that need to be present for an arrest to occur. Note that these elements do not address the legality of the arrest, just whether an arrest has factually occurred.

1. **Authority to Arrest:** For an arrest to be lawful, the officer must have the legal authority to make an arrest, and the arrest must be based on legal authority, such as a warrant or when an offense is committed in the officer's presence.
2. **Intention to Arrest:** There must be intent on the part of the officer to arrest a person. This element and how that intent is demonstrated is gauged by how a reasonable person would feel based on the totality of the circumstances. Words alone do not constitute an arrest. The officer's intent must be communicated in such a way that a reasonable person under the circumstances would believe that they are not free to go and that they are under arrest.
3. **Seizure and Detention:** The physical taking of someone into custody; a seizing and detention of a person that effectively deprives him or her of their liberty, with or without force, must occur. Words alone do not constitute an arrest, rather the physical restraint and custody convey the officer's intent to arrest.
4. **The Individual Understands:** Persons being arrested must have some understanding that they are under arrest. This can be as simple as saying "You are under arrest," but that does not necessarily have to be the case, and those words are not required to be said for an arrest to occur.

Actions strongly imply that a person is being arrested, with or without an explicit statement to the arrestee about his or her custodial status. For example, if an officer handcuffs a person, conducts a pat down, and places the individual in the back seat of a transport vehicle, a reasonable person would presume that he or she is under arrest with or without being told by an officer. In this situation, the person is not free to leave and has been significantly limited in his or her ordinary freedom. Under other circumstances, the same actions may be taken without an arrest occurring, such as with an overly aggressive or violent person who may be under the influence of drugs. Such a person is handcuffed for safety purposes or placed in a vehicle to keep the person out of extreme cold, heat, or otherwise dangerous weather. These actions would be reasonable without constituting an arrest, but it should always be clearly explained to the person who may otherwise feel that he or she has been arrested.

The element of understanding is not required for arrests involving the following circumstances:
- If the suspect/arrestee is under the influence of drugs or alcohol and is unable to understand what is happening.
- If the suspect/arrestee is mentally unstable.
- If the suspect/arrestee is unconscious.

## 4.1.13    Identify the four elements of a lawful arrest

Once an arrest has been determined to have actually occurred, there are four factors that need to be examined to determine if the arrest was lawful.

1. **Lawful Authority:**  The arrest was made by a sworn police officer with arrest powers, which is the statutory authority to make arrests. The officer should identify him or herself so that the arrestee is aware of this lawful authority, and the officer should display a badge, name tag, ID card, or police uniform.

2. **Lawful Place:**  The arrest must be made in the geographic jurisdiction of the arresting officer. MPD has the authority to make arrests nearly everywhere in the city. The exceptions to this are:
   - Arrests generally should not be made in a courtroom. In the case of an offense occurring in a courtroom, the officer is required to receive advance permission from the judge to make the arrest.
   - Foreign embassies are technically foreign territories where MPD officers lack jurisdiction so officers are not to make arrests on those properties unless such action is requested by an official from the embassy.
   - Officers have no authority to make arrests or continue pursuit onto a military installation. If a pursuit must continue, proper authority to do so should be requested at the entry gate of the military installation. Serving warrants and summons on military bases should be done with the assistance of military police officers from that base.
   - In public buildings and military bases, members should notify the special police officers or military police assigned to the area of any intent to arrest someone on the property, request their assistance as they are familiar with the property and access to different areas of the building/base which minimizes the chance of escape and confrontation.

3. **Lawful Time:**  MPD is authorized to make arrests at any time of the day or night, but officers are prohibited from deliberately serving misdemeanor arrest warrants during early morning or late-night hours. However, if at any time an officer encounters a wanted person, the officer is required to make the arrest. For example, officers shall not respond to the last known addresses of persons wanted for misdemeanor arrest warrants at 2:00 AM for the purpose of serving warrants. On the other hand, if you were dispatched for a radio run at 2:00 AM and one of the involved persons is found to have an outstanding misdemeanor warrant, the arrest shall be made.

4. **Lawful Reason:**  The standard of proof for arrests is probable cause. However, in some cases, even when probable cause exists, an officer is required to apply for and obtain an arrest warrant in lieu of making a field arrest. The Department has clearly defined the circumstances in which arrests can be made without a warrant, and those in which a warrant must be obtained. With knowledge of an outstanding arrest warrant for the suspect, an arrest is always authorized, and officers do not need a physical warrant in their possession to make an arrest based on a warrant.

## 4.1.14    Identify the circumstances when an arrest may be made without a warrant

When probable cause exists, officers shall apply for and obtain an arrest warrant for the suspect in all cases except the following. Under these circumstances, officers may make a field arrest on the scene:

- Any crime which was committed in the officer's presence and witnessed by the officer.

- Any felony case in which probable cause exists to believe the offense occurred and the suspect committed it.
- Any offense in which probable cause exists and a domestic relationship between the victim and suspect is present.
- At the request of any Washington Humane Society Officer who has witnessed a violation of laws for the prevention of animal cruelty.
- Any of the designated **probable cause misdemeanors**.

## 4.1.15      Define probable cause misdemeanors

Probable cause misdemeanors are separated into three different categories and have a set requirement for each. The requirements for each category will be discussed in the following section.

**Category 1 Probable Cause Misdemeanors**

- Assault § 22-404
- Unlawful entry § 22-3302
- Malicious burning, destruction or injury of another's property § 22-303
- Voyeurism § 22-3531
- Theft of property valued less than $1000 §22-3211
- Receiving stolen property §22-3232
- Shoplifting § 22-3213
- Attempt theft of property valued in excess of $1000 § 22-3211
- Attempt unauthorized use of vehicles §22-3215
- Unauthorized Disposal of Solid Waste §8-902
- Illegal construction §113.7

**Category 2 Probable Cause Misdemeanors**

- Aggravated reckless driving §50-2201.04
- Leaving after colliding §50-2201.05c
- Operating or physically controlling a vehicle under the influence of drugs or alcohol §50-2201.05
- Operating a motor vehicle when the operators permit is revoked or suspended §50-1403.01

**Category 3 Probable Cause Misdemeanors**

- Panhandling §22-2301§22-2301
- Defacing public or private property §22-3312.01
- Defacement of certain symbols; displaying of certain emblems §22-3312.02
- Wearing Masks §22-3312.03
- Unlawful entry of a motor vehicle §22-1341
- Tampering with a detection device §22-1211
- Engaging in an unlawful protest targeting a residence as provided §22-2752
- Misdemeanor sexual abuse §22-3006

- Misdemeanor sexual abuse of a child or minor §22-3010.01
- Lewd, indecent, or obscene acts; sexual proposal to a minor §22-1312
- Stalking §22-3133
- Purchase, possession or consumption by persons under 21; misrepresentation of age §25-1002
- Violation of stay away order §23-584

  Intrafamily offense §16-1031

  (see objective 4.1.14 above. An officer can make an arrest of an offense in which probable cause exists and a domestic relationship between the victim and suspect is present).

## 4.1.16    Identify the three criteria required to make an arrest based on a probable cause misdemeanor

An officer can make an arrest without a warrant for any of the offenses falling under the **Category 1** Probable Cause Misdemeanors, as long as the officer has probable cause and reasonable belief that:

1. **Unless immediately arrested, the accused may not be apprehended:** For example, if the suspect is a known flight risk, has no fixed address, uses aliases and other identities, etc., it is possible that he or she may not be apprehended on a warrant and can be arrested in the field upon probable cause, or;

2. **The accused may cause injury to others:** In cases of assault or persons with known violent tendencies, to avoid the possibility of additional assaults or injuries to others, a field arrest can be made upon probable cause. For example, if two intoxicated friends engage in an argument over a sporting event and one attacks the other by punching him in the face and chest, a simple assault has occurred. If probable cause exists to make the arrest and the suspect is still apparently angry and violent, it would be lawful to make a field arrest based upon probable cause. This is because not doing so may result in injuries to others or more injuries to the victim because of the suspect's current state of impairment and demonstrated violence, or;

3. **The accused may dispose of, tamper with, or destroy evidence:** In cases involving circumstances in which evidence may be tampered with or destroyed or circumstances in which evidence cannot be seized or documented, a field arrest based upon probable cause can be made. For example, suppose probable cause exists to make an arrest for DUI or DWI. In that case, the evidence of the offense (suspect's blood alcohol level) will naturally diminish over the course of time. In such a case, a field arrest based on probable cause can be made.

An officer can make an arrest without a warrant for any of the offenses falling under the **Category 2** Probable Cause Misdemeanors, as long as the officer has probable cause and reasonable belief that unless arrested:

1. The accused may dispose of, tamper with, or destroy evidence.
2. The accused may cause injury to others or property.

**JA418**

An officer can make an arrest without a warrant for any offense falling under the **Category 3** Probable Cause Misdemeanor, as long as the officer has probable cause.

## 4.1.17    Define the arrest authority of individuals other than sworn police officers

There are circumstances where people other than sworn law enforcement officers can make arrests in Washington, DC:

1. **Special Police Officers:**  Special police officers (SPOs) have arrest powers while on duty and on the property which they have been hired to patrol. SPOs also have arrest powers while off the property if in fresh pursuit. When off duty or otherwise off the property, SPOs do not have the arrest authority granted to sworn members.
2. **Community Members** do not have arrest powers but can voluntarily detain a person who has committed a felony or probable cause misdemeanor until police arrive. Community members can also legally assist a sworn police officer or SPO in making an arrest when the need arises.


## 4.1.18    Identify the Stop or Field contact Report

D.C. Act 21-356, "Neighborhood Engagement Achieves Results Amendment Act of 2016" (NEAR Act), D.C. Official Code § 5-113, requires information collection specific to police stops and protective pat downs. Members shall be mindful of these reporting requirements when conducting stops in such a way that they are able to document all required information during the completion of their RMS reports. Members shall maintain records of all stops consistent with the rules outlined in this lesson.

A.  For the purposes of NEAR Act data collection and GO-OPS-304.10 (Field Contacts, Stops, and Protective Pat Downs):

1. All arrests are also considered stops.

2. NEAR Act data collection requirements apply to all stopped individuals. Members shall fully document each individual stopped.

3. Required documentation varies by the circumstances of the stop.

    a. Stops that are resolved using a Notice of Infraction (NOI) are referred to as "NOI stops." This also includes stops resulting in notices of violation (NOV).

    b. All other stops shall be referred to as "stops."


B.  All NOI stops shall be documented according to the following procedures.

1. All NOI stops shall be conducted by body-worn camera (BWC)-equipped members. In cases where the serious nature of an offense justifies a member not equipped with a BWC to conduct

**JA419**

the stop, he or she shall request that a BWC-equipped member respond to the scene. In such cases, the member conducting the stop shall also record the details of the stop, including a justification of the circumstances, in RMS.

2. In cases where an official government identification card is presented by the stopped individual, members may use available information (e.g., sex) from the identification card. Alternatively, members may document a person's sex, race, or ethnicity based on the member's observation or, in cases where members are unsure, may select "unknown."

3. All NOI stops resolved with a warning, where no other law enforcement action was taken, shall be documented by issuing a warning NOI or NOV as appropriate.

    a. Verbal warnings shall not be issued. Pursuant to GO-SPT-303.01 (Traffic Enforcement), verbal warnings shall only be given under extreme circumstances (e.g., receipt of a radio assignment requiring immediate response, motorist was en route to a hospital for emergency treatment of a sick or injured passenger). In the occasion that a verbal warning is issued, members shall document the details of the stop, including a justification of the extreme circumstances, in RMS using an "incident" card.

    b. When issuing the warning NOI, members shall indicate the reason for the stop by stating, "You were stopped because (specific violation indicated here)".

4. All NOI stops resulting only in issuance of an NOI, where no other law enforcement action was taken, shall be documented solely through issuance of the NOI.

    a. Members shall indicate the reason for the stop by stating, "You were stopped because (specific violation indicated here)" and document the reason for the stop on the NOI in the "RFS Code" field. Only one RFS Code shall be selected and based upon the initial reason that the stop originated, regardless of any other outcomes of the stop.

    b. Members shall indicate the approximate duration of the stop on the NOI in the "Approx. Duration of stop" field. Stop duration is approximate and measured in minutes; only covering the time in which the actual stop took place (e.g., not time spent on field contacts, arrests, or booking).

5. All stops resulting only in the issuance of an NOV, where no other law enforcement action was taken, shall be documented solely through issuance of the NOV using the "Notes" section as indicated below. Members shall submit a scanned copy of the NOV to the Strategic Change Division Adminbox.

C. All stops shall be documented according to the following procedures.

1. All stops regardless of the outcome of the event require a Central Complaint Number (CCN). For each event, members shall select "Yes" in response to "Was a Stop Involved?" to indicate that a stop occurred. This selection prompts all data collection fields necessary to document stops. RMS fields capture stop data requirements as indicated in this attachment.

**JA420**

2. Members shall be mindful of the time that subjects are no longer considered stopped. The stop ends when the subject is either free to leave or probable cause has been established for an arrest. Stop duration shall be captured for each individual who is stopped and is approximate and measured in minutes; only covering the time in which the actual stop took place (e.g., not time spent on field contacts, arrests, or booking).

3. Reports involving stops shall be properly classified and list the initial reason that the stop originated from the "What was the reason for the stop?" field. The internal narrative of the report shall contain a description of the member's reasonable suspicion justifying the stop, pat down, and any other outcomes of the stop.

4. NEAR Act data collection requirements apply to all stopped individuals. Members shall fully document each individual stopped.

   a. In cases where an official government identification card is presented by the stopped individual, members may use available information (e.g., sex) from the identification card. Alternatively, members may document a person's sex, race, or ethnicity based on the member's observation or, in cases where members are unsure, may select "unknown."

   b. Members may document individuals who were present during the stop but not considered stopped either by adding them as a witness or by adding them to the stop card and selecting "no" under "was this person stopped?"

## 4.1.19    Complete a Stop and Protective Pat Down Report

**Documenting Pat Downs and Searches (GO-OPS-304.10)**

D. Searches occurring during the stop shall be documented by selecting "Yes" in response to one or both of these questions: "Was this PERSON patted down and/or searched as a result of the stop (prior to arrest)?" and/or "Was this person's PROPERTY patted down and/or searched as a result of the stop (prior to arrest)?" Multiple searches can be entered on each type of search by selecting "+ Search Type."

E. Property seized pursuant to a search conducted during a stop shall be documented on the stop card by selecting the category or categories that most closely describe each item seized. To ensure accurate data collection, this step shall be completed in addition to detailing the item(s) in the property card.

F. Post-arrest searches are not subject to NEAR Act requirements and shall be documented in the arrest report.

G. Reviewing officials shall review all RMS reports for conformity with GO-OPS-304.10 (Field Contacts, Stops, and Protective Pat Downs) ensuring that officers are properly classifying stops and documenting the factors that justify members' reasonable suspicion for the stop, and separately for a pat down, if applicable.

**JA421**

JA422

## Summary

As an officer, it is imperative that you become familiar with the Fourth Amendment and its purpose of protecting community members from unreasonable searches and seizures. Understanding legal concepts like the standards of proof for a stop, pat down, and arrest, and the totality of the circumstances for determining when a standard of proof has been met, is vital for operating as an MPD officer. As an officer, knowing and understanding the various criminal laws and concepts covered in this lesson will not only guide you in the field, but will reduce the possibility of civil liability.

## References

| | | |
|---|---|---|
| GO-PER-201.26 | Code of Conduct | 06/12/2024 |
| GO-OPS-304.10 | Field Contacts, Stops, and Protective Pat Downs | 09/01/2023 |
| GO-SPT-304.16 | Electronic Recording of Custodial Interrogations | 02/02/2006 |
| GO-PCA-501.07 | Arrest Procedures by Members of Departments Other than the Metropolitan Police Department | 12/01/1971 |
| GO-PCA-701.01 | Courts and Hearings | 12/31/2008 |
| TB 23-08 | Constitution of the United States of America | 07/20/2023 |
| | Cornell University Law School – Open Access Legal Information Institute | |
| | United States Courts – US Court Records | |
| | California State University – Knowledge Base of Legal Concepts | |
| CIR-24-01 | Secure DC Omnibus Emergency Amendment Act of 2024 | 03/12/2024 |

**JA422**

# Exhibit B

# Metropolitan Police Academy



# 5.1 Use of Force Overview

*May 29, 2025*

## Introduction

The Metropolitan Police Department (MPD) recognizes the value of life. The safety and protection of the public require a measured response that balances an officer's authority to use force and the dignity of human life.

Officers will be required to make split-second decisions regarding the use of force. This training will give the officer the knowledge and skills to make critical decisions about proper force utilization and suspect control. De-escalation techniques will be learned later but will be introduced in this lesson as another tool to use whenever feasible.

## 5.1.1        Identify the source of the authority for using force

**The Authority to Use Force**
As a member of MPD, you are authorized to use force, as necessary, in the accomplishment of your duties. Limitations on officers' authority to use force comes from three sources:

1. **DC Code**
   DC Code § 5-123.02 states that "Any officer who uses unnecessary or wanton severity in arresting or imprisoning any person shall be deemed guilty of assault and battery, and, upon conviction, punished therefore." This means that as a sworn Metropolitan Police Officer, the use of necessary force in performing your duties is authorized. However, using unnecessary or wanton severity in arresting someone could result in criminal sanctions against you.

2. **DC Municipal Regulations**
   DCMR Title 6A Section 207.1 states that, "It is the policy of the Metropolitan Police Department that each member of the department shall in all cases use only the minimum amount of force which is consistent with the accomplishment of their mission and shall exhaust every other reasonable means of apprehension or defense before resorting to the use of firearms."

3. **MPD Policy**
   GO 901.07 (Use of Force) states that, "Members of the Metropolitan Police Department (MPD) shall value and preserve the sanctity of human life at all times, especially when lawfully exercising the use of force. In situations where the use of force is justified, the utmost restraint should be exercised. Members shall minimize the force that is used while protecting the lives of members and other persons, and continuously reassess the perceived threat in order to select the reasonable use of force response that is proportional to the threat faced by him, her, or others." Use of force is authorized to accomplish the following law enforcement objectives:

   - To affect lawful law enforcement objectives (e.g., arrest, detention, search)
   - To overcome resistance directed at the member or others
   - To prevent physical harm to the member or to others (including intervening in a suicide or other attempt to self-inflict injury)
   - To protect the member or a third party from unlawful force

**JA425**

- To prevent property damage or loss

This lesson applies to all sworn and trained professional staff members and establishes procedures for members who use force, whether on- or off-duty.

The MPD's Use of Force Framework is the core of the department's "Use of Force" training. It provides members with an organized way of making decisions about how to proceed in situations involving potential uses of force. While it is not possible to entirely replace judgment and discretion with detailed policy provisions, this lesson is intended to ensure de-escalation techniques are used whenever feasible, force is only used when necessary, and the amount of force used is proportionate to the situation the member encounters.

## 5.1.2        Describe the terminology for use of force

**Asphyxiating Restraints**
The use of any body part or object by a law enforcement officer against a person with the purpose, intent, or effect of controlling or restricting the person's airway or severely restricting the person's breathing, except in cases where the law enforcement officer is acting in good faith to provide medical care or treatment, such as by providing cardiopulmonary resuscitation, or the placement of a person by a law enforcement officer in a position in which that person's airway is restricted.

**Deadly Force**
Any force that is likely or intended to cause serious bodily injury or death.

**Deadly Weapon**
Any object, other than a body part or stationary object, that in the manner of its actual, attempted, or threatened use is likely to cause serious bodily injury or death.

**De-escalation**
Taking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in necessary force. Techniques may include verbal persuasion, warnings, slowing down the pace of an incident, and tactical repositioning.

**Less Lethal Weapon**
Type of weapon deployed with the intent or purpose of nullifying a threat without causing death (e.g., ECD, OC spray, ASP baton).

**Neck Restraint**
The use of any body part or object by a law enforcement officer to apply pressure against a person's neck, including the trachea, carotid artery, or jugular vein, with the purpose, intent, or effect of controlling or restricting the person's airway, blood flow, or breathing, except in cases where the law enforcement officer is acting in good faith to provide medical care or treatment, such as providing cardiopulmonary resuscitation (CPR). Neck restraints are prohibited restraint techniques.

**NOTE: It shall be unlawful for members to apply a neck restraint**, and for any member to observe another member applying a neck restraint and not immediately render first aid or request emergency

**JA426**

medical services. Any member who violates this provision shall be fined up to $25,000 or incarcerated for up to ten (10) years or both.

If a member applies or observes a neck restraint of any kind, they shall immediately render first aid on the person to whom the neck restraint was applied, immediately request emergency medical services, and notify their official. (DC Code § 5-125.03(a)(2)).

**Objective Reasonableness**
This standard requires that the reasonableness of a particular use of force must be judged from the perspective of a reasonable law enforcement officer on the scene in light of the totality of the circumstances confronting the member.

**The Preponderance of Evidence**
As noted previously, this is a standard of proof in administrative investigations, meaning there is evidence that it is more likely than not that an event occurred, and the accused is the one who committed the act.

**Probable Cause**
A set of facts, circumstances, and/or reliable information that would lead a reasonable and prudent police officer to believe that a crime is being committed, has been committed, or is about to be committed by a certain person.

**Serious Bodily Injury**
An extreme physical pain, illness, or impairment of physical condition, including physical injury that involves a substantial risk of death; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member or organ; or protracted loss of consciousness.

**Serious Use of Force**
Actions by members including:
- Firearms discharges (except negligent discharges determined to be misconduct by the Internal Affairs Division (IAD);
- Head strikes with a hard object;
- Those resulting in death or a serious bodily injury;
- Use of asphyxiating restraints or neck restraints;
- MPD canine bites (except bites determined to be misconduct by IAD).

**Use of Force**
Any physical coercion used to affect, influence, or persuade an individual to comply with an order from a member is considered a use of force.

The following actions are designated **Use of Force Investigation Incidents,** and members must complete a Force Incident Report (FIR) <u>immediately</u> following the event:
- Deadly force
- Serious use of force
- Strike
- ASP strike
- Shield deployment resulting in injury or complaint of pain or injury

**JA427**

- Mountain bike strike
- ECD deployment (excluding negligent discharges determined to be misconduct by IAD)
- 40mm extended impact weapon deployment (excluding negligent discharges determined to be misconduct by IAD)
- Firearm discharges (excluding negligent discharges determined to be misconduct by IAD)
- Use of force indicating potential criminal conduct by the member
- Use of force resulting in visible injury
- Use of force resulting in complaint of injury or pain

The following actions are designated **Use of Force Supervisory Review Incidents** as long as the use of force does not result in injury or a complaint of injury or pain. Members <u>must</u> complete an FIR before the end of their shift.
- Takedowns
- Drawing and pointing a firearm at or in the direction of another person
- OC spray deployment
- ASP baton arm extraction
- ASP baton wristlock

**NOTE:** Minor injury or discomfort resulting from the application and general wearing of handcuffs is not, in and of itself, an injury due to use of force.

**Use of Force Framework**
The Use of Force Framework is the decision-making model specifically applicable to situations potentially resulting in the use of force. The Use of Force Framework contains four categories of perceived threats and responses, all of which are fluid, dynamic, and non-sequential. The Use of Force Framework allows officers to determine which action or actions are objectively reasonable and proportional, given the perceived threat.

## 5.1.3        Identify less lethal use of force options

**Less Lethal Weapons**
These are weapons deployed with the intent or purpose of nullifying a threat without causing death. These include but are not limited to:

- **Oleoresin Capsicum (OC Spray)**
  OC spray is a compound that causes swelling and irritates the eyes, causing tears, pain, and even temporary blindness. OC spray may be used in riot control, crowd control, and personal self-defense situations. Members of MPD are currently issued an MK-4 sized dispenser of OC spray to carry on patrol. It is intended to be used as a compliance technique for a subject actively resisting. Two additional sizes are deployed by MPD, the MK-9 and MK-46, which are much larger and used only for crowd control during riotous situations.

- **ASP Friction-Lock Baton**
  The ASP is a friction-locking expandable baton that can be easily carried and readily accessible on an officer's duty belt.

**JA428**

- **40mm Extended Impact Weapon**

  The Extended Impact Weapon is a device capable of firing a 40mm sponge projectile (either marking or non-marking) at a high velocity temporarily incapacitating an aggressive, non-compliant subject.

- **Electronic Control Device (ECD)**
  The ECD is designed primarily to discharge electrical charges into a subject that will cause involuntary muscle contractions and override the subject's voluntary motor responses. ECDs are also called Conducted Energy Devices (CEDs), Energy Conducting Devices (ECDs), Electronic Control Weapons (ECWs), and TASERs®.

When should a member use or request a standoff distance weapon? An officer may confront a situation that may escalate to a point where control of a subject is necessary to accomplish one or more law enforcement objectives. In these cases, approaching within reach of the subject presents a risk of harm to the member(s). One tactical option is the use of a less lethal weapon (OC spray, ECD, 40mm) that allows for compliance and control to be generated from a standoff distance.

Using less than lethal force options can be beneficial in many situations subject to the **Use of Force Factors** (See: pages 5 & 9), especially when a risk of harm to a member or another person exists.

## 5.1.4 Understand the department's policy on use of force

As previously mentioned, members must abide by department policy and guidelines set forth in **GO-RAR-901.07 (Use of Force).** Members are also expected to only use force when necessary and shall never threaten to use force or use force for the following reasons:
- To punish a person or retaliate against a person for past conduct.
- To force compliance with a member's request unless that request is necessary to preserve a member, public safety, or criminal adjudication.
- Based on bias against a person's race, ethnicity, nationality, religion, disability, gender, gender identity, sexual orientation, or any other protected characteristic.

**De-escalation and Generating Voluntary Compliance**
Members should always attempt to diffuse any situation by using de-escalation techniques. This includes giving advice, verbal warnings, and tactical communications. Members should also consider why the subject is not cooperating. Is there an obvious medical condition, mental impairment, physical limitation, developmental disability, language barrier, drug use, or behavior crisis involved? Each situation will require the member to be tactful and determine what, if any, use of force is necessary.

When circumstances permit, using de-escalation techniques and generating voluntary compliance may help to resolve a situation without force. This means members should only use the amount of force proportionate to the circumstance.

**Use of Force Factors** that can determine the amount of force needed include, but are not limited to:
- The risk of harm presented by the subject.
- The risk of harm to the member or innocent subjects by using force.
- The seriousness of the law enforcement objective.

**JA429**

- Whether further de-escalation techniques are feasible, including the time available to a member to decide, and whether additional time could be gained through tactical means.
- Mental or physical disability, medical condition, and other physical and mental characteristics.
- Whether there are other exigent or emergency circumstances.

Members are trained in various force techniques and should use the training technique that is most applicable to the situation. Sound judgment and appropriate exercise of discretion should be the foundation of every member's decision-making process. Members need to constantly reevaluate the situation and circumstances and continue to respond proportionately.

**Proportionate Response**
A proportionate response requires members to:
- Assess the level of threat or resistance presented by the suspect, the imminence of danger, the suspect's mental capacity, their access to weapons, agency policies, and available options (e.g., calling upon other members with specialized training).
- Initiate the proportionate and objectively reasonable force response to overcome resistance.
- Modify their level of force to the amount of resistance the subject offers. As the subject offers less resistance, the member shall lower the amount or type of force used. Conversely, members are authorized to respond objectively and reasonably if resistance escalates.

Members shall not use deadly force against a person unless the member actually and reasonably believes that deadly force is immediately necessary to protect the member or another person (other than the subject of the use of deadly force) from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances.

a. In any grand jury, criminal, delinquency, or civil proceeding where a member's use of deadly force is a material issue, the trier of fact will consider the reasonableness of the member's belief and actions from the perspective of a reasonable law enforcement officer and the totality of the circumstances, which will include:

1) Whether the subject of the use of deadly force possessed or appeared to possess a deadly weapon and refused to comply with the member's lawful order to surrender an object believed to be a deadly weapon before the member used deadly force;

2) Whether the law enforcement officer or another law enforcement officer in close proximity engaged in reasonable de-escalation measures before the use of deadly force, including taking cover, requesting support from available mental health, behavioral health, or social workers, waiting for backup, trying to calm the subject of the use of force, or, if feasible, using non-deadly force before the use of deadly force; and

3) Whether any conduct by the member before using deadly force unreasonably increased the risk of a confrontation, resulting in deadly force being used.

**NOTE:** This does not mean that the officer must go through every level of force before resorting to deadly force. In some situations, the officer may have to use lethal force as a starting point in resolving an incident without using any other force options.

**Displaying a Firearm**
Members shall only display a firearm when certain circumstances occur. Unholstering and/or pointing a firearm are tactics that shall be used with great caution.

Members shall only point a firearm at a subject when circumstances create a reasonable belief that it may be immediately necessary for the member to use deadly force.

When the member no longer reasonably believes that deadly force may be immediately necessary, the member shall, as soon as practicable, secure or holster the firearm.

**Tactical Considerations with Unholstered Firearms**
The presence of a member's firearm, under the right circumstances, can discourage resistance and ensure member safety in potentially dangerous situations without the need to resort to actual force.

Unnecessarily or prematurely drawing a firearm, however, can limit a member's options in controlling a situation, cause the subject to become anxious, and may result in an unwarranted or negligent discharge of the firearm.

**Warning to Subject**
If feasible, the member shall identify themselves as a law enforcement officer and state the intention to shoot before using a firearm.

**Use of Firearm**
To the greatest extent possible, a member shall ensure that using deadly force presents no substantial risk of injury to innocent persons. Members shall not discharge their weapons:
- Into a crowd.
- As a signal for help.
- As a warning shot.

Members shall not discharge their firearms, either at or from a moving vehicle, unless deadly force is being used against the member or another person/s. For the purposes of this lesson, a moving vehicle is not considered deadly force except when it is reasonable to believe the moving vehicle is being used to ram or attempt to ram a crowd of people with the intent to inflict fatal injuries. As a rule, members shall avoid tactics that could place them in a position where a vehicle could be used against them.

**Specific Precautions**

- **Handcuffs**
  You will learn how to apply and use handcuffs later in your training. Members may need to use hand controls (force) to move the person's wrists into a position that allows the subject to be placed in handcuffs.

  Handcuffs are uncomfortable and can pinch or scratch someone even with proper application. This in itself is not a use of force. It should be noted if the subject complains about the use of handcuffs, a member will notify a supervisor who will investigate the complaint.

**JA431**

**NOTE**: Members shall not use force against a subject in handcuffs unless the subject is actively assaulting, attempting to escape police custody, resisting a member's efforts to maintain custody or control over the subject, or actively spitting on a member. In these cases, members shall limit their force response to the minimum amount of force that is consistent with the Use of Force Framework and MPD policy that an objectively reasonable officer would use in light of the circumstances to bring an incident or person under control effectively. Any officer violating this policy's provisions shall be fined no more than the amount set forth in § 22-3571.01 or incarcerated for no more than ten (10) years, or both.

**Prohibited Restraint Techniques – Neck Restraints and Asphyxiating Restraints**

- **Neck Restraints and Asphyxiating Restraints**
  Neck restraints and asphyxiating restraints are not an authorized use of force and are unlawful.

  If a member applies or observes a prohibited restraint technique of any kind, they shall immediately render or cause to be rendered first aid on the person to whom the neck restraint was applied, or immediately request emergency medical services for the person to whom the neck restraint was applied. The member shall also notify their official. (DC Code § 5-125.03(a)(2)).

- **Positional Asphyxia**
  Once the situation is under control, members shall place the subject in a custodial restraint that does not block their ability to breathe. A member shall not place the subject on their stomach for an extended time. Members should watch for signs of difficulty breathing or any other life-threatening symptoms. In such cases, members must seek medical assistance immediately and contact an official to direct another means of custody, if applicable.

- **Spitting**
  Members may use control holds and tactical takedowns to gain control over a subject who is spitting on the member or others. Members may also use limited pressure to turn a subject's face away from the member to prevent the suspect from spitting directly at the member. Members may wish to don their personal protective equipment (PPE) for additional protection. Spit sock hoods may also be used on a subject who is actively spitting or when there is a reasonable belief that the subject will spit on others. Members shall strictly follow **GO-RAR-901.07 (Use of Force)** when gaining control of a spitting subject.

  **NOTE:** The pressure applied to turn a subject's face must not rise to the level of a strike and must be consistent with neck restraint restrictions. No other type of force is authorized to be used in response to spitting.

- **Hair Holds**
  Recent cases brought before the Office of Police Complaints (OPC) have highlighted members' use of "hair holds" on subjects during use of force situations, specifically as a compliance technique on a subject offering active resistance or below. The use of hair holds by members to overcome minimal levels of resistance from a subject has been deemed excessive by OPC.

**JA432**

Certain circumstances may arise where a member's use of a hair hold would be reasonable and proportionate to the threat level presented by a subject, and where other force options are not available or feasible.  In these rare and exigent circumstances, a member may grab or pull a subject's hair when they are struggling to gain control, **and the subject is assaulting the member or others**.

Members are **not** trained to perform hair holds and it is **not** a preferred tactic.

It is important to remember that all uses of force must be objectively reasonable and proportionate to the threat, and members must be able to articulate their actions.

## 5.1.5        Apply the concept of objective reasonableness in use of force as defined by Supreme Court cases

The concept of objective reasonableness was introduced on page 6. To provide further guidance, we now examine the concept in greater detail.

**Standards on Governing the Use of Force** - **The Reasonableness Test**
*Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed. 2d 443 (1989).

**Facts of the case**
Graham was a person with diabetes, who asked his friend to drive him to a local store to purchase some orange juice to counteract an insulin reaction. Upon entering the store and seeing several people ahead of him, Graham hurried out and asked his friend to drive him to another friend's house. Officer Connor, a local police officer, became suspicious after seeing Graham hastily enter and leave the store. The officer followed the car and made an investigative stop, ordering the pair to wait until he found out what happened in the store.

Graham exited the car, ran around it twice, and finally sat down on the curb, where he briefly passed out. Graham's friend told the officer that Graham was suffering from a "sugar reaction." When backup officers arrived on the scene, one rolled Graham over on the sidewalk and handcuffed his hands tightly behind his back, ignoring the friend's pleas to get him some sugar. Another officer on the scene stated, "I've seen a lot of people with sugar diabetes, but they never acted like this. Ain't nothing wrong with … he's drunk. Lock [him] up."

Several officers lifted Graham from behind, carried him over to the friend's car, and placed him face down onto the hood. After regaining consciousness, Graham asked the officers to check his wallet for a diabetic decal that he carried. The officers, however, told him to "shut up" and shoved his face down against the hood of the car. Four officers then grabbed Graham and threw him headfirst into the police car. A friend of Graham's brought some orange juice to the car, but the officers refused to let him have any of it. Finally, Officer Connor received a report that Graham had done nothing wrong at the store; the officers then drove Graham home and released him.

Injuries sustained by Graham during the encounter included a broken foot, cuts on the wrists, a bruised forehead, and an injured shoulder. Graham also claimed to have developed a loud ringing in his right

ear. He filed a federal civil rights action pursuant to 42 U.S.C. 1983 alleging the use of excessive force and making an investigatory stop in violation of the Fourth Amendment.

During the federal civil trial, the defendants moved for a directed verdict (a request that the case be decided in their favor, which would stop the jury trial) at the close of the plaintiff's case in chief. In ruling on the motion, the District Court determined that the amount of force used by the officers was appropriate under the circumstances and granted the defendant's motion for a directed verdict. The Fourth Circuit Court of Appeals affirmed the judgment, ruling that the District Court had applied the correct legal standard in assessing the excessive force claim. However, the US Supreme Court vacated the order and remanded the case for trial, concluding the lower court applied the incorrect legal standard.

**The Supreme Court's Ruling**
The Court specifically rejected the notion that all excessive force claims under Section 1983 are governed by a single standard, stating:

- A court must first identify "the specific constitutional right allegedly infringed by the challenged application of force."
- "Seizure" triggering Fourth Amendment protection occurs when peace officers have "by means of physical force or show of authority in some way restrained the liberty of a citizen."
- "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of `the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake" paying "careful attention to the facts and circumstances of the particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."
- "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

**The Objective Reasonableness Test**
According to the Court, the reasonableness of a particular use of force must be judged from the perspective of *a reasonable officer on the scene*, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation. (490 U. S. 396-9.)

Factors considered by the Court in determining reasonableness:
- The facts and circumstances of a particular case;
- The severity of the crime at issue;
- Whether the suspect poses an immediate threat to the safety of the officers or others; and
- Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

Objective reasonableness includes an allowance for time available to make decisions in as much as officers are often forced to make split-second judgments in tense, uncertain, and rapidly evolving circumstances.

Reasonableness is judged from the perspective of a reasonable officer on the scene without the 20/20 vision of hindsight (meaning the ability to look in the past to see what you've done wrong).

Not every push or shove, even if it may later seem unnecessary while you are in the peace of a judge's chambers, violates the Fourth Amendment.

Evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force, nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

**GO-RAR-901.07 (Use of Force)** adopts this standard: "Objective reasonableness – the standard requiring the reasonableness of a particular use of force must be judged from the perspective of a reasonable member on the scene in light of the facts and circumstances confronting the member."

## 5.1.6    Understand the Use of Force Framework

**The Decision-making Model**
The MPD decision-making model is depicted in detail on the next page.



**The Use of Force Framework**
The Use of Force Framework is a training model that supports a reasonable escalation and de-escalation of applied force. It is a guideline for proportional responses to the action and level of resistance demonstrated by a subject.

**JA435**

The level of response is based on the situation and the subject's actions in response to the member. Responses may progress from the member's physical presence at the scene, to the application of deadly force.

Each time an officer encounters a situation where the possibility of violence or resistance to lawful arrest is present, that officer must, if possible, attempt to de-escalate the situation. This is done through advice, warning, verbal persuasion, tactical communication, and/or other de-escalation techniques. Members must attempt to de-escalate use of force situations whenever feasible.



### 5.1.7      Understand the elements of action and assessment

**Action and Assessment**
The application of force encompasses three main elements of action and assessment:

- **Tools**
  Tools include procedures, behavioral perspectives, and defensive equipment such as OC spray, a baton, and a firearm. Officers may rely upon various tools in response to their perception of the risk.

- **Tactics**
  Tactics incorporate the previously mentioned tools into strategies to accomplish an arrest, such as keeping the subject's hands visible at all times, maintaining cover or concealment during an initial approach, utilizing OC spray to control active resistance, etc. De-escalation through communication, as well as distance, are tactics that should be considered.

**JA436**

- **Timing**
  Timing is the correlation of tools and tactics to effectively apply the appropriate level of force required to establish and maintain lawful control. Effective use of timing is seen when an officer applies handcuffs during an arrest to minimize the potential risk for an assault, quickly exerts their baton to defend against an assault, etc.

**Totality of the Circumstances – (Reference Lesson 4.1 – Criminal Law)**
The totality of the circumstances is a concept involving the examination of all evidence and information available to the officer to make a decision, to the best of their ability, as to what exactly happened, who is involved, and whether there is enough proof (probable cause) to make an arrest, conduct a search, or obtain a warrant, or enough proof (reasonable articulable suspicion) to conduct a stop or a protective pat down. This includes the sources of the information and the credibility of the sources when acting on a tip. Information should be corroborated as much as possible, especially when you do not have enough information about the source to evaluate the veracity or reliability of the source or informant.

The totality of the circumstances is the product of an analysis of all the information obtained during a preliminary investigation. It involves the credibility of witnesses, complainants, and suspects and dictates the decisions the officer makes handling a scene.

Resistance and response are dynamic. The subject's behavior and the use of force to control it may escalate or de-escalate during any altercation. Therefore, it is important to understand that the suspect's behavior may not incrementally escalate or de-escalate in a linear sequence. An officer's use of force may need to start at any option, depending on what is objectively reasonable and according to MPD policy. An officer must use only the minimum amount of force necessary. Remember that an officer's actions amid violent turmoil are often judged long after, in a calm and distant environment.

**Threat Assessment Observations**
What factors help the officer perceive danger? A situational evaluation should include the subject's emotional state, resistive tension, early warning signs, pre-attack postures or gestures, access to weapons, apparent willingness to sustain injury, and non-compliance with a lawful order or request.

## 5.1.8    Identify the significance of officer/subject factors (totality of the circumstances)

**Officer / Subject Factors**
Officers should evaluate the significance of various factors that both the officer and the subject bring to the encounter and how those factors might influence the outcome.

This evaluation should include:
- Size – The officer's size as it relates to the size of the subject.
- Strength – The officer's strength as it relates to the strength of the subject.
- Skill level – The officer's skill as it relates to each of these factors.
- Injury/Exhaustion – Whether the officer or subject has sustained injury or reached exhaustion, and how that may affect the confrontation.
- Number of officers and subjects – The number of officers versus the number of subjects involved.

**JA437**

A law enforcement officer must understand that no set sequence of events applies to the force options available. The force option may escalate or change the situation in seconds.

An officer does not have to attempt every force option before resorting to deadly force. However, the officer must demonstrate that they acted according to MPD policy, used de-escalation techniques whenever feasible, force was used only when necessary, and that the amount of force used was proportionate to the situation the member encountered.

**NOTE:** An officer's application of force must be reasonable at the time it is applied. As a suspect escalates or de-escalates resistance or assault, the officer's force options must escalate or de-escalate appropriately in response.

Officers must be aware of and use effective positioning and cover when approaching or encountering subjects. They must maintain a tactical advantage with respect to their location. Officers in every situation or answering a call for service must recognize and immediately identify those areas that would provide cover from a hostile attack.

**Officer Safety and Control**

The focus of an officer's encounter should be primarily on the perceived actions of the suspect. Can the officer articulate suspicious or possibly confrontational behavior by the suspect? The officer safety and control principles must guide the officer's response to the suspect's perceived behavior.

**NOTE**: Verbal threats of violence alone do not justify the use of physical force; however, when combined with physical actions such as a fighting stance, clenching of fists, stepping towards the officer, or pulling away, verbal threats might indicate a potential use of force situation.

**Goal of Voluntary Compliance**

An officer should clearly and effectively communicate to a suspect regarding what they want the subject to do. Just as verbal communication sends a message to the subject, so too does the use of physical force. When applying force, a subject may go into survival mode and not accurately understand what to do. Simple, clear commands repeated in a clear, authoritative voice throughout the entire application of force will help the subject understand what the officer wants them to do.

**Use of Force Framework Levels**

It is important to understand that this framework is a starting point for discussing a complex issue: the justification for using force. Members must understand that no set order or sequence applies to the Use of Force Framework.

The force options may range from officer presence all the way to lethal force in a matter of seconds. An officer does not have to attempt every force option before resorting to the highest level. However, the officer must demonstrate that they acted according to MPD policy, which ensures that de-escalation techniques are used whenever feasible, that force is only used when necessary, and the amount of force used is proportionate to the situation that the member encounters.

**Passive Resister**

A passive resister denotes a situation where the subject displays a low level of noncompliant behavior by offering no physical or mechanical energy. Generally, this type of subject does not respond to an officer's request or commands and may be argumentative.

In such encounters, the officer at this level perceives an increased risk and must develop a plan and act tactically. The officer can deploy certain low-level tactics in response until control or cooperation is achieved.

Appropriate responses within this level are the following **Control Holds**:
- Soft, empty hand to maintain control
- Leaning on a subject's legs to hold them down
- Firm grip and escorting

**Active Resister**

An active resister signals the need for increased officer alertness due to a recognized danger. At this level, the subject is uncooperative and will not comply with the member's requests or commands. The subject exhibits physical and mechanical defiance or behaves in a way that causes the member to believe that the subject may be armed with a weapon. This includes such actions as bracing, tensing, pushing, verbally signaling an intention not to be taken into or retained in custody, and evasive movement intended to defeat a member's attempt at control.

The officer recognizes the situation is escalating, and the level of noncompliance is increasing in volatility, they can use compliance techniques and physical control tactics to gain control. The officer's actions may cause the subject pain but will not generally cause injury.

Appropriate responses within this level include the following **Compliance Techniques**:
- Control holds (noted above)
- Joint locks
- OC Spray
- Solo and team takedowns
- Wristlocks
- Use of ASP baton to conduct wristlock
- ASP baton arm extractions
- Use of patrol shield to pin down a subject

**Threatening Assailant**

At this level of the framework, there is an assessment of imminent bodily harm to the officer or others, which can include an actual or attempted assault on the officer. The officer may direct energy and tactics toward self-defense in response.

The perception of danger at this level has accelerated for the officer, and there is a more directed focus on officer safety and defense. The subject has gone beyond the level of single non-cooperativeness and is actively and aggressively assaulting (e.g., striking or kicking) the member, his- or herself, or others, or the threat of an aggressive assault is imminent. The subject has demonstrated a lack of concern for the member's safety; however, the subject does not pose an imminent threat of death or serious bodily injury to the member or others.

All force options other than deadly force are available to an officer in response. Although a range of force options are generally available, members shall adhere to policy requirements governing the use of specific force options and less lethal weapons. Defensive tactics can be employed to render the subject into submission forcibly; however, defensive tactics at this level are not likely or designed to cause death or serious bodily injury.

**JA439**

Appropriate responses within this level include the following **Defensive Tactics**:
- ASP baton strikes
- Striking and blocking techniques
- Mountain bike as an impact weapon
- Electronic control devices (ECDs)
- 40mm extended impact weapons

**Active Assailant**
This level of the framework represents a subject who poses an imminent danger of death or serious bodily injury to an officer or others. An officer must maintain the highest level of risk assessment and be prepared to use survival skills and lethal force in this situation.

A subject's action is life-threatening when it reasonably appears necessary for the officer to protect themselves or others, other than the subject from an immediate threat of death or serious bodily injury.

When the officer perceives that the subject poses an imminent danger of death or serious physical injury to the officer or another person, immediate countermeasures must be used to stop the threat.

All force options are available at this level, though deadly force shall only be used if the member reasonably believes that deadly force is immediately necessary to protect the member or another person other than the subject from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances. Examples of force in response by an officer at this level include the use of a firearm or a strike to the head with a hard object.

**NOTE**: When any force response is employed, members shall:
- Conduct a visual and verbal check of the subject to ascertain whether the subject needs medical care.
- Summon medical assistance immediately if a person is injured, complains of pain, or demonstrates life-threatening symptoms as established in **GO-PCA-502.07 (Medical Treatment and Hospitalization of Prisoners)**.
- Render first aid as soon as the scene is safe.
- Request for an official to respond.

## 5.1.9　　Apply the concept of bystander liability (ABLE)

**Bystander Liability and Culpability**
Civil or criminal law enforcement officers may be concerned about liability issues throughout their careers. One type of liability is called bystander liability.

An officer may be held civilly or criminally liable for standing by and failing to intervene while violating a suspect's established constitutional rights. MPD policy requires officers to report any use of force incident in which they observe another member utilizing excessive force or engaging in any type of misconduct. Failure to intervene and/or report may lead to administrative sanctions, fines, or jail time.

Types of **Constitutional Rights Violations:**
- **Compelled Confession** – the use of force to extract a confession.
- **Warrantless Search** – when the officer knows or should have known that a warrant is required.
- **Unlawful Arrest** – when there is no probable cause to justify taking a subject into custody.
- **Excessive Use of Force** – when an officer knows or should have known that there is no necessity for the level of force used.

Any of the above examples may result in civil or criminal liability, even if you did not physically participate but merely stood by and did not intervene to stop the clear violation of the subject's constitutional rights.

**Legal Theory**

The main legal theory of bystander liability is conspiracy combined with duty, including the duty to keep a person in custody free from harm.
- **Conspiracy -** Courts have ruled that acquiescence can amount to a conspiracy agreement between all officers present when the bystander officer watches as an open breach of the law occurs and does not intervene to seek its prevention.
- **Duty -** There is a duty borne by police officers associated with protecting the constitutional rights of community members.

**Court Decisions**

- Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972)

  A police officer who fails to intervene to prevent a constitutional violation by other police officers may also be personally liable for civil damages. The Seventh Circuit Court of Appeals held that both supervisory and non-supervisory officers present during an unconstitutional act can be held liable.

- U.S. v. Reese, 2 F.3d 870 (9th Cir. 1993)

  The Ninth Circuit Court of Appeals held that a police sergeant who stood by and failed to prevent other officers from beating suspects may also be convicted of federal criminal civil rights violations.

- U.S. v. Koon 34 F.3d 1416 (9th Cir. 1994)

  As a result of the Rodney King beating by Lost Angeles officers, the Ninth Circuit Court of Appeals ruled that "...a person in official custody has a right to be free from harm inflicted by third persons, and … an official who willfully subjects a custodial subject to a deprivation of that right is subject to criminal liability."

In light of the above court decisions, police officers have a duty to intercede when their fellow officers violate a suspect's or other citizen's constitutional rights. Mere inaction may not protect the bystander officer.

Courts have recognized that intervening to stop a constitutional violation may be a defense to both civil and criminal liability if a realistic opportunity to prevent the violation existed at the time of the intervention.

**JA441**

## 5.1.10    Explain the Department's use of force reporting requirements (Force Incident Report – FIR)

**Notifications and On-Scene Responses**
Once members have used any use of force tactic, they need to notify an official, and supervisors will immediately respond to the scene. Supervisors and the watch commander will take the necessary steps to report and document the use of force by members.

**Reporting Requirements**
A **Force Incident Report** (FIR) shall be filled out for all Use of Force Supervisory Review Incidents and Use of Force Investigation Incidents. The FIR is a single document that replaces the Use of Force Incident Report (UFIR) and Reportable Incident Form (RIF). Charging information will be automatically uploaded into the FIR, provided the Mark43 arrest report is complete. Once completed, the watch commander will review the FIR.

Before the end of the member's shift, an FIR must be completed for **Use of Force Supervisory Review Incidents** involving:
- Takedowns
- Drawing and pointing a firearm at or in the direction of another person
- OC spray deployment
- ASP baton arm extraction
- ASP baton wristlock

An FIR must be completed immediately after the event for the following **Use of Force Investigation Incidents:**
- Strike
- ASP strike
- Shield deployment resulting in injury or complaint of pain or injury
- Mountain bike strike
- ECD deployment (excluding negligent discharges determined to be misconduct by IAD)
- 40mm extended impact weapon deployment (excluding negligent discharges determined to be misconduct by IAD)
- Firearm discharge (excluding negligent discharges determined to be misconduct by IAD)
- Deadly force
- Serious use of force
- Use of force indicating potential criminal conduct
- Use of force resulting in visible injury
- Use of force resulting in complaint of injury or pain

**Exception:**  When control holds are used, and there is no injury or complaint of pain or injury.

When completing an FIR, members should articulate the events as accurately and coherently as possible. Members should also articulate when they used de-escalation tactics and why they didn't implement techniques to help keep the situation calm (e.g., that a particular force option was not feasible at the time). Members need to document as much detail as possible in their narratives to help officials understand what happened on the scene. In the event that a member declines to complete a FIR, or declines to make a statement, the members supervisor will need to notify the watch commander.

**JA442**

Members cannot be compelled to complete reports or makes statements, but they must get approval from either the United States Attorney's Officer (USAO) or IAD to issue a reverse-Garrity warning.

**Body Worn Cameras (BWC)**
The BWC is one of the department's most important tools to help document a member's patrol activities. This tool is particularly useful in use of force investigations. After a use of force, one of the first questions asked by the department, the media, and activist groups is, "Was the officer wearing a body camera?"

A body camera program helps promote and ensure department transparency. When officers activate their body cameras, they are less likely to be perceived as concealing their actions. However, if that same officer is equipped with a camera and does not activate it, they will likely be viewed as having something to hide. That officer could even be accused of deliberately trying to cover up their actions.

Body cameras are a powerful tool and are here to stay. While interacting with the public, it is especially important to remember to activate your camera immediately when you receive a service call or whenever you self-initiate any field activities. This will not only protect you and your fellow officers and provide a valuable resource if your actions are questioned.

Officers may review BWC footage before writing initial reports except for serious uses of force and an incident involving an officer involved death. For any other incident, officers may review BWC footage prior to writing a report, but officers shall indicate whether the officer viewed body-worn camera footage prior to writing the report and specify what body-worn camera was viewed.

When releasing body-worn camera recordings, the likenesses of law enforcement officers acting in their professional capacities, other than those acting undercover, shall not be redacted or otherwise obscured.

**Note:** Officers are no longer required to notify contact subjects they are being recorded.
**Note**: The above is the information that General Counsel provides to officials during legal training.

## Summary

The Use of Force Framework is a tool designed to give members a path to follow to determine a proportional application of force appropriate to a subject's actions. With a complete understanding of the Use of Force Framework components and the circumstances of an arrest, members can apply the principles associated with applying force. Members have the option of escalating, de-escalating, disengaging, or maintaining a level of appropriate force until complete control of the subject is gained. Members, however, must consider what an objectively reasonable law enforcement officer would do under similar circumstances.

**JA443**

## References

| | | |
|---|---|---|
| GO-SPT-302.13 | Body Worn Cameras | 03/12/2024 |
| GO-PCA-502.07 | Medical Treatment and Hospitalization of Prisoners | 04/01/2014 |
| GO-RAR-901.04 | Less Lethal Weapons | 03/28/2024 |
| GO-RAR-901.07 | Use of Force | 03/28/2024 |
| CIR-24-01 | Secure DC Omnibus Emergency Amendment Act of 2024 | 03/12/2024 |

**JA444**

# Exhibit C

# GENERAL ORDER



## DISTRICT OF COLUMBIA

| Title | | |
|---|---|---|
| **Use of Force** | | |
| Topic | Series | Number |
| **RAR** | **901** | **07** |
| **Effective Date** | | |
| **March 28, 2024** | | |
| **Replaces:** GO-RAR -901.07 (Use of Force), Effective Date March 12, 2024 **Related to:** GO-RAR-901.01 (Handling of Service Weapons) GO-RAR-901.04 (Less Lethal Weapons) | | |

| I. | Purpose | Page | 1 |
|---|---|---|---|
| II. | Procedures | Page | 2 |
| II.A | Use of Force Principles | Page | 2 |
| II.B | Specific Precautions | Page | 7 |
| II.C | Notifications and On-Scene Response | Page | 8 |
| II.D | Documentation and Reporting | Page | 9 |
| II.E | Investigative Responsibility | Page | 11 |
| II.F | Chain of Command Investigations | Page | 15 |
| II.G | Internal Affairs Division Investigations | Page | 16 |
| II.H | Investigative Conclusions | Page | 17 |
| II.I | Force-Related Duty Status Determination | Page | 18 |
| II.J | Use of Force Review Board | Page | 18 |
| II.K | Mandated Use of Force Training | Page | 22 |
| III. | Definitions | Page | 22 |

## I.    PURPOSE

Members of the Metropolitan Police Department (MPD) shall value and preserve the sanctity of human life at all times, especially when lawfully exercising the use of force. In situations where the use of force is justified, the utmost restraint should be exercised. Members shall minimize the force that is used while protecting the lives of members and other persons, and continuously reassess the perceived threat in order to select the reasonable use of force response that is proportional to the threat faced by him, her, or others.

Regulations pertaining to the use of force by law enforcement officers are outlined in chapter six of the District of Columbia Municipal Regulations (DCMR), the Fourth Amendment of the United States Constitution, and various sections of District of Columbia (DC) Official Code. DCMR provides guidance regarding a law enforcement officer's use of force including, but not limited to, outlining the circumstances permitting appropriate levels of force and imposing restrictions on firearm discharges. The Fourth Amendment of the US Constitution guarantees people "the right to be secure in their persons" and provides a framework in which the courts can evaluate the use of force by law enforcement officers, including the "objective reasonableness" standard established in *Graham v. Connor* 490 U.S. 386 (1989). The "objective reasonableness" standard acknowledges the difficult decisions that members are forced to make under rapidly evolving and unpredictable circumstances.

**JA446**

This general order applies to all sworn and civilian department members and establishes procedures for members who use force, whether on or off duty. The MPD use of force framework is the core of the department's use of force training and provides members with an organized way of making decisions about how they shall act in situations that may involve potential uses of force. While it is not possible to entirely replace judgment and discretion with detailed policy provisions, this general order is intended to ensure that de-escalation techniques are used whenever feasible, that force is only used when necessary, and that the amount of force used is proportionate to the situation that the member encounters. The purpose of this general order is to outline when members may use force and provide procedures to follow when force is used to ensure that all incidents receive a thorough and impartial investigation.

## II.    PROCEDURES

A.    Use of Force Principles

1.    Any physical coercion used to affect, influence, or persuade an individual to comply with an order from a member is considered a use of force. Members shall only use force that is objectively reasonable. Members **may** use force only to accomplish the following specific law enforcement objectives:

| Law Enforcement Objectives |
| --- |
| a.  To affect lawful law enforcement objectives (e.g., arrest, detention, search). |
| b.  To overcome resistance directed at the member or others. |
| c.  To prevent physical harm to the member or to another person (including intervening in a suicide or other attempt to self-inflict injury). |
| d.  To protect the member or a third party from unlawful force. |
| e.  To prevent property damage or loss. |

2.    Members **shall not** use or threaten to use force for the following reasons:

| Prohibitions |
| --- |
| a.  To punish a person or retaliate against a person for past conduct. |
| b.  To force compliance with a member's request, unless that request is necessary to preserve member or public safety or criminal adjudication. |
| c.   Based on bias against a person's race, ethnicity, nationality, religion, disability, gender, gender identity, sexual orientation, or any other protected characteristic. |

3.    Members shall attempt to defuse use of force situations with de-escalation techniques whenever feasible.

a.    All members who encounter a situation where the possibility of violence or resistance to lawful arrest is present, shall, if possible, first attempt to defuse the situation through advice, warning, verbal persuasion, tactical communication, or other de-escalation techniques.

b.    When feasible, members shall consider whether a subject's failure to comply with a member's command is due to a medical condition, mental impairment, physical limitation, developmental disability,

**JA447**

language barrier, drug interaction, behavioral crisis, or other factors beyond the subject's control. In these situations, members shall consider whether specific techniques or resources would help to resolve the situation without force.

c.    When using force, members must be able to articulate the facts and circumstances surrounding their tactics, decision making, and the extent of force used in any given situation.

4.    Members shall only use the amount of force that is proportionate to the circumstances. If de-escalation tactics are not effective or feasible, the member may use an increasing level of force to overcome the level of resistance, as long as the force response remains proportionate to the perceived threat. In general, the greater the threat and the more likely the threat will result in injury or death, the greater the level of force may be immediately necessary to overcome it. Some of the factors that members should consider when determining how much force to use include:

| Use of Force Factors |
| --- |
| (a)   The risk of harm presented by the subject. |
| (b)   The risk of harm to the member or innocent subjects by using force. |
| (c)   The seriousness of the law enforcement objective. |
| (d)   Whether further de-escalation techniques are feasible, including the time available to a member to decide, and whether additional time could be gained through tactical means. |
| (e)   Mental or physical disability, medical condition, and other physical and mental characteristics. |
| (f)   Whether there are other exigent or emergency circumstances. |

5.    Members are trained on a range of force options. It is not possible to determine ahead of time the proportionate level of force for every possible situation. Sound judgment and the appropriate exercise of discretion shall be the foundation of decision-making. The use of force framework contains four categories of perceived threats and force responses, all of which are fluid, dynamic, and non-sequential. The appropriate force response shall be based upon the member's perception of the threat depicted here and in accordance with department training and standards.

NOTE: The department recognizes and acknowledges that the level of resistance encountered by a member cannot always be accurately discerned from the video recordings or body worn camera (BWC) footage of an interaction.

**JA448**

## USE OF FORCE FRAMEWORK

| Category of Perceived Threat | | Force Response |
|---|---|---|
| **Passive Resister** | Subject displays a low level of noncompliant, passive resistance. Subject does not respond to the member's lawful requests or commands and may be argumentative. Noncompliance offers no physical (i.e., caused by the body) or mechanical (i.e., produced by tools or machines) energy. | **Control Holds** Low-level physical tactics to gain control and cooperation (examples include soft empty hand controls, leaning on a subject's legs to hold them down, and firm grip). |
| **Active Resister** | Subject is uncooperative and will not comply with member's requests or commands. Subject exhibits physical and mechanical defiance or behaves in such a way that causes the member to believe that subject may be armed with a weapon, including evasive movements to defeat member's attempt at control, including bracing, tensing, pushing, or verbally signaling an intention not to be held in custody, provided that the intent to resist has been clearly manifested. | **Compliance Techniques** Actions that may induce pain or cause discomfort to the subject who is actively resisting until control is achieved, but will not generally cause an injury when used in accordance with department training and standards. Examples include oleoresin capsicum (OC) spray, wrist locks, takedowns, ASP baton arm extractions, use of an ASP baton to conduct a wrist lock, and use of a patrol shield to pin a subject down. |
| **Threatening Assailant** | Subject has gone beyond the level of simple non-cooperativeness, and is actively and aggressively assaulting (e.g., striking, kicking) the member, themselves, or others, or the threat of an aggressive assault is imminent. Subject has demonstrated a lack of concern for the member's safety; however, subject does not pose an imminent threat of death or serious bodily injury to member or others. | **Defensive Tactics** All force options other than deadly force. Although a range of force options are generally available, members shall adhere to policy requirements governing the use of specific force options and less lethal weapons outlined in GO-RAR-901.04 (Less Lethal Weapons). Defensive tactics are employed to forcibly render the subject into submission; however, these actions are not likely nor designed to cause death or serious bodily injury. Defensive tactics are primarily used to ensure the safety of the member and others [examples include strikes, ASP baton strikes, use of a police mountain bike as an impact weapon, electronic control devices (ECDs), and 40mm extended impact weapons]. |
| **Active Assailant** | Subject poses an imminent danger of death or serious bodily injury to member or another person (other than the subject). Subject's actions demonstrate subject's intent to inflict imminent death or serious bodily injury upon member or another person. | **Deadly Force** All force options. Deadly force shall only be used if the member actually and reasonably believes that deadly force is immediately necessary to protect the member or another person (other than the subject of the use of deadly force) from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances (examples include the use of a firearm or a strike to the head with a hard object). |

6.      As situations change, members shall reevaluate the circumstances and continue to respond proportionately. This approach requires members to:

| Proportionate Response |
|---|
| a.   Assess the level of threat or resistance presented by the suspect, the imminence of danger, the suspect's mental capacity, his or her access to |

**JA449**

| | weapons, agency policies, available options (e.g., calling upon other members with specialized training). |
|---|---|
| b. | Initiate the proportionate and objectively reasonable force response to overcome resistance. |
| c. | Modify their level of force in relation to the amount of resistance offered by the subject. As the subject offers less resistance, the member shall lower the amount or type of force used. Conversely, if resistance escalates, members are authorized to respond in an objectively reasonable manner. |

7. Members shall not use techniques or defensive weapons to apply force unless they have received the requisite training and the technique or weapon has been approved for use by the department. However, members may employ force as necessary to protect the life of a member or other individual subject to the imminent threat of death or serious bodily injury, when no other options are feasible, and the force is objectively reasonable and proportionate to the perceived threat.

8. Deadly Force

Members shall not use deadly force against a person unless the member actually and reasonably believes that deadly force is immediately necessary to protect the member or another person (other than the subject of the use of deadly force) from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances.

a. In any grand jury, criminal, delinquency, or civil proceeding where a member's use of deadly force is a material issue, the trier of fact will consider the reasonableness of the member's belief and actions from the perspective of a reasonable law enforcement officer and the totality of the circumstances, which will include:

(1) Whether the subject of the use of deadly force possessed or appeared to possess a deadly weapon and refused to comply with the member's lawful order to surrender an object believed to be a deadly weapon prior to the member using deadly force;

(2) Whether the member, or another law enforcement officer in close proximity, engaged in reasonable de-escalation measures prior to the use of force, or, if feasible, using non-deadly force prior to the use of deadly force; and

(3) Whether any conduct by the member prior to the use of deadly force unreasonably increased the risk of a confrontation resulting in deadly force being used.

b. Threatening deadly force does not necessarily constitute deadly force so long as the member's purpose is limited to indicating that deadly force will be used if necessary.

**JA450**

    c.      If feasible, the member shall identify him or herself as a law enforcement officer and state his or her intention to shoot before using a firearm.

    d.      Members shall not discharge a firearm either at or from a moving vehicle unless deadly force is being used against the member or another person. For purposes of this order, a moving vehicle is not considered deadly force except when it is reasonable to believe that the moving vehicle is being used to ram, or attempt to ram, a crowd of people with the intent to inflict fatal injuries. Members shall avoid tactics that could place them in a position where a vehicle could be used against them

    e.      To the greatest extent possible, members shall ensure that the use of deadly force presents no substantial risk of injury to innocent persons. Members shall not discharge their weapon into a crowd, as a signal for help, or as a warning shot.

    f.      Members shall only display a firearm when certain circumstances occur. Unholstering or pointing a firearm are tactics that shall be used with great caution. The presence of a member's firearm, under the right circumstances, can discourage resistance and ensure member safety in potentially dangerous situations without the need to resort to actual force. However, unnecessarily or prematurely drawing a firearm can limit a member's options in controlling a situation, create great anxiety on the part of subjects, and may result in an unwarranted or negligent discharge of the firearm. Members shall only point a firearm at a subject when circumstances create a reasonable belief that it may be immediately necessary for the member to use deadly force. When the member no longer reasonably believes that deadly force may be immediately necessary, the member shall, as soon as practicable, secure or holster the firearm.

9.    When force is used, members shall promptly conduct a visual and verbal check of the subject, to include checking vital signs when appropriate, to determine the need for medical care.

    a.      When a subject is injured, complains of pain, or demonstrates life-threatening symptoms, members shall immediately summon medical assistance and render first aid consistent with the member's training as soon as safe and practical. Injured subjects shall be treated with dignity and respect and shall be properly cared for while awaiting the arrival of emergency medical personnel. Members may use discretion in handcuffing subjects who are suffering from life-threatening injuries and are clearly incapacitated. Whenever possible, un-cuffed subjects should be guarded by two members.

    b.      Members shall closely monitor subjects against whom force was used for signs that they require medical assistance, including but

not limited to, subjects that are believed to be pregnant, children, elderly, or physically frail.

10. Members shall take steps to prevent or stop illegal or inappropriate uses of force by other members and report illegal and inappropriate uses of force by other members that they observe or of which they are made aware.

B. Specific Precautions

1. Handcuffs

   a. Proper application and general wearing of handcuffs may lead to complaints of minor pain or injury (e.g., pinching of skin or scratches) but is **not**, in and of itself, a use of force.

   b. When a subject complains of pain or injury that is associated with the application or wearing of handcuffs, members shall notify an official who shall investigate the complaint or injury in accordance with GO-PCA-502.07 (Medical Treatment and Hospitalization of Prisoners). If the investigating official determines the subject's injury or complaint of pain is not exclusively the result of the application and wearing of handcuffs or force was required to apply the handcuffs, he or she shall initiate a use of force investigation.

   c. When subjects resist being handcuffed, members may need to use hand controls in order to forcibly move the person's wrists or arms, or to physically maneuver the person's body so that the handcuffs can be applied.

   d. Members shall not use force against a subject in handcuffs **unless** the subject is actively assaulting, attempting to escape police custody, resisting members' efforts to maintain custody or control over the subject, or actively spitting on a member as authorized in this order. In these cases, members shall limit their force response to the minimum amount of force, consistent with the use of force framework, that the objectively reasonable officer would use in light of the circumstances to effectively bring an incident or person under control.

2. Prohibited Restraint Techniques

   a. Asphyxiating restraints and neck restraints are prohibited restraint techniques pursuant to DC Official Code § 5-125.03.

   b. Any member who uses a prohibited restraint technique or observes the application of a prohibited restraint technique shall immediately render, or cause to be rendered, first aid on the person on whom the prohibited restraint technique was used or immediately request emergency medical services for the person on whom the prohibited

**JA452**

restraint technique was used. Failure to do so shall be in violation of DC Official Code § 5-125.03.

3.  Positional Asphyxia

a.  Members shall position individuals in a manner to allow free breathing once the subject has been controlled and placed under custodial restraint using handcuffs or other authorized methods. Members shall seek medical assistance immediately if a person appears to be having difficulty breathing or is otherwise demonstrating life-threatening symptoms. An official shall direct alternative means to maintain custody, if appropriate.

b.  After gaining control of a subject, members shall position the subject in a manner to allow the subject to breathe unobstructed. Whenever feasible, members shall not force the subject to lie on his or her stomach for an extended period of time. Prisoners shall be carefully monitored for signs and symptoms of suffocation.

c.  Members shall not employ unauthorized use of custodial restraints while detaining or transporting a subject.

4.  Spitting

a.  Members may use control holds and tactical takedowns in order to gain control over a subject who is spitting on a member or others. Members may also use limited pressure to turn a suspect's face away from the member to prevent the suspect from spitting directly at a member, provided that the pressure does not rise to the level of a strike and is consistent with the restrictions on prohibited restraint techniques outlined in this order.

b.  No other types of force are authorized in response to spitting. Members may also don personal protective equipment (PPE) for additional protection against subjects who are spitting.

C.  Notifications and On-Scene Response

1.  Members shall immediately notify an official following all events requiring a force incident report (FIR), allegations of excessive force (even when the member has not used force on the subject), and negligent discharges of ECDs, 40mm extended impact weapons, and firearms. Upon notification, supervisors shall immediately respond to the scene and notify the watch commander.

2.  Supervisors shall immediately notify IAD of all incidents involving serious uses of force through the Real Time Crime Center (RTCC).

3.  Supervisors shall obtain incident summary (IS) tracking numbers before the end of the supervisor's shift.

**JA453**

4.      Upon notification by the supervisory official, watch commanders shall respond to the scene of all serious uses of force, all uses of force indicating potential criminal conduct, and all ECD and 40mm extended impact weapon deployments. If the watch commander is unavailable, he or she shall designate a lieutenant or above to respond to the scene.

5.      The watch commander shall make notification to the appropriate element if the investigation will be conducted by a unit outside of the member's organizational element.

6.      Responding officials shall ensure the scene is maintained and preserved, that witness canvasses are conducted, and that assistance of district personnel is provided to IAD, as necessary.

7.      Fraternal Order of Police (FOP) representatives shall be permitted access to their members at all times at the scene of serious use of force incidents to advise involved or witness FOP members of their right to be represented by legal counsel.

8.      Any statement that an FOP member is required to provide to an assigned investigator regarding a use of force will either be covered by a "Reverse Garrity" warning or will not be compelled until after the FOP member has been provided an opportunity to speak with an FOP representative and invoke the right to counsel. For any FOP member who invokes their right to legal counsel, the department shall coordinate with the member's counsel to schedule an interview with the FOP member and shall make all reasonable efforts for the interview to occur within two business days, where practicable, for witnesses to the use of force incident and three calendar days, where practicable, for target(s) of the use of force investigation. Extensions beyond these timelines may occur with the agreement of the chief of police and the chairman of the FOP or their respective designees.

9.      The watch commander on the scene of a deadly force incident shall ensure all members involved in the events leading up to the use of force, as well as in its use, deactivate their BWC as soon as the scene is secure, or at the direction of the responding IAD member. All members' BWCs and department-issued cell phones shall be submitted to the IAD member as soon as he or she arrives on the scene. All BWC deactivations must be in accordance with GO-SPT-302.13 (Body-Worn Camera Program). If a member is injured and must leave the scene to seek medical care, the member's BWC and department-issued cell phone shall be retrieved as soon as possible.

10.     In incidents where a member uses force outside of the District, whether on or off duty, the member shall immediately notify the watch commander through the RTCC.

        a.      In the case of deadly force, serious use force, and use of force indicating potential criminal conduct, the watch commander shall notify the RTCC to page the on-call IAD agent. An IAD agent shall

respond to the scene immediately. While the jurisdiction of occurrence will maintain primary responsibility for the criminal investigation, IAD shall initiate a concurrent administrative investigation and work closely with their investigators.

b.      In incidents where a member uses force other than deadly force, serious force, or force indicating potential criminal conduct, the member shall notify an official from the member's organizational element who shall obtain IS numbers before the end of his or her shift. In such cases, the appropriate law enforcement authority of the jurisdiction of occurrence will handle all criminal investigations and IAD shall only conduct a policy review.

D.      Use of Force Reporting Requirements

1.      The following actions require completion of a FIR **prior to the end of the member's shift** according to the procedures set forth in this order. Provided there is no visible injury or complaint of injury, the following actions require a documented supervisory review of the report and associated BWC footage. Supervisors and IAD shall review the BWC footage of the member completing the report and any additional BWC footage as reasonably necessary to ensure consistency between the BWC footage and the report and to confirm that the incident does not require a full use of force investigation.

| Use of Force Supervisory Review Incidents |
|---|
| Takedowns |
| Drawing and pointing a firearm at or in the direction of another person |
| OC spray deployment |
| ASP baton arm extraction |
| ASP baton wrist lock |

2.      The following actions require completion of a FIR **immediately following the event** according to the procedures set forth in this order. These actions require a full use of force investigation pursuant to the investigative procedures set forth in this order.

| Use of Force Investigation Incidents |
|---|
| Strike |
| ASP strike |
| Shield deployment resulting in injury or complaint of pain or injury |
| Mountain bike strike |
| ECD deployment (excluding negligent discharges determined to be misconduct by IAD) |
| 40mm extended impact weapon deployment (excluding negligent discharges determined to be misconduct by IAD) |
| Firearm discharges (excluding negligent discharges determined to be misconduct by IAD) |
| Deadly force |
| Serious use of force |
| Use of force indicating potential criminal conduct |
| Use of force resulting in visible injury |
| Use of force resulting in complaint of injury or pain |

**JA455**

3.    Members shall complete a FIR following all events involving use of force except control holds where there is no injury or complaint of injury.

4.    Members shall complete the FIR accurately and completely describing the facts and circumstances concerning the event, including articulating the specific facts to explain the member's actions and all de-escalation efforts. Pursuant to GO-SPT-302.13, members shall not review any BWC recordings to assist in initial report writing for any incident involving an officer-involved death or serious use of force. Upon completion, members shall submit the completed report.

5.    The supervisor shall review the relevant BWC footage and ensure that the report is completed properly prior to the end of the supervisor's shift. All properly completed reports shall be approved by the supervisor.

6.    The watch commander shall ensure that the report is completed properly prior to the end of the watch commander's shift. All properly completed reports shall be approved by the watch commander.

7.    If a member who was involved in a use of force incident or who was a witness to the use of force incident declines to complete the FIR, or declines to make a statement, the supervisor shall notify the watch commander. In these cases, members shall not be compelled to complete the report or make a statement (including interviews that are recorded by video or audio) until either the United States Attorney's Office (USAO) has issued a written declination or the element watch commander receives approval from IAD to issue a reverse-Garrity warning.

a.    If IAD **authorizes** the issuance of a reverse-Garrity warning, the supervisor shall issue the warning to the member.

| Sample Reverse-Garrity Warning Language |
|---|
| "This form concerns administrative matters relating to the official business of the MPD. This form is not intended for the purpose of instituting a criminal prosecution against you. During the course of completing the form, even if you disclose criminal conduct, neither self-incriminating statements nor the fruits of any self-incriminating statements will be used against you in any criminal proceeding.<br>    Since this is an administrative matter and any self-incriminating information you disclose will not be used against you in a court of law, you are required to fill out the form fully and truthfully. GO-PER-201.26 (Duties, Responsibilities and Conduct of Members of the Department) states in part, 'members shall respond truthfully when questioned by supervisory officers about matters relating to official business of the police department...' Failure to fill out the form will result in disciplinary action." |

b.    If IAD **does not authorize** the issuance of a reverse-Garrity warning, the supervisor shall complete the Use of Force Preliminary Investigation Template prior to the end of the supervisor's shift.

8.    Members may consult with their own attorney at any time, for any reason.

**JA456**

E.      Investigative Responsibility

1.      The Force Investigations Team (FIT) shall investigate **all** incidents involving the following actions. IAB has the authority to assume control of any force-related incident investigation.

| IAD Investigations |
|---|
| a.   MPD use of force involving deadly force, serious use of force, or the use of force indicating potential criminal conduct. |
| b.   MPD vehicular pursuits resulting in death. |
| c.   All deaths while the deceased was in the custody or under the control of any member of MPD, or while the deceased was housed in any facility under the exclusive command of MPD. |
| d.   Any use of an MPD canine resulting in a bite, to include any allegations of a canine bite (except bites determined to be misconduct by IAD). |
| e.   MPD confirmed head strikes with a hard object, excluding allegations with no corroborative evidence or resulting injury. |
| f.   Final investigations of MPD ECD deployments (including negligent discharges resulting in contact with a person or result in injury or complaint of pain). |
| g.   Final investigations of MPD 40mm extended impact weapon deployments (including negligent discharges resulting in contact with a person or result in injury or complaint of pain). |
| h.    Any discharge of a service pistol; authorized off-duty pistol; duty shotgun; or duty rifle, regardless of location, by a sworn member of the (1) MPD; (2) District of Columbia Housing Authority Police; (3) authorized, armed members of the District of Columbia Fire, and Emergency Medical Services Department's Arson Investigation Unit; and (4) authorized, armed members of the District of Columbia Office of the Inspector General. |
| i.   Any use of force resulting in the death of a subject by any police officer employed by a bona-fide police agency legally empowered to operate or function within the District of Columbia. |
| j.   Fatal and non-fatal shootings within the District of Columbia resulting from the discharge of a firearm involving any on-duty sworn active law enforcement member from an outside law enforcement agency, acting under the color of law. |

2.      The Security Officers Management Branch (SOMB) shall investigate use of force incidents involving security officers (SO) and special police officers (SPO) who fall under their purview when the incident does not involve deadly force or serious use of force. Responding on-scene officials shall collect SO, SPO, subject, and witness statements, video, photographs, and any other relevant evidence. Deadly force and serious use of force incidents involving an SPO shall be investigated by IAD. SOMB does not regulate or investigate private security working as a contractor for the federal government on federal property or armored car guards.

3.      The Criminal Investigations Division (CID) shall investigate the following types of incidents that occur in the District of Columbia:

a.      With the exception of the incidents investigated by FIT, all firearm discharges by retired MPD members or outside law enforcement members (active or retired) authorized to carry a concealed weapon under H.R. 218 [Law Enforcement Officers Safety Act

**JA457**

(Title 18 U.S. Code, Section 926)];

b.      MPD member suicides, regardless of the means; and

c.      Any discharge of a privately owned firearm not authorized for off-duty use unless used under the color of law within the District of Columbia by a sworn member of the MPD; the District of Columbia Housing Authority Police; authorized, armed members of the District of Columbia Fire and Emergency Medical Services Department's Arson Investigation Unit; or authorized, armed members of the District of Columbia Office of the Inspector General.

4.      With the exception of incidents involving evidence of serious misconduct, the member's chain of command shall investigate use of force incidents involving injury or complaint of pain or injury that is exclusively the result of the application and wearing of handcuffs, preliminary investigations of all ECDs and 40 mm extended impact weapon deployments, intentional and unintentional OC spray deployments, and any other use of force not investigated by IAD, SOMB, or CID.

a.      In chain of command investigations, the commanding official may delegate responsibility for conducting the investigation to another official the rank of lieutenant or above and of a higher rank than the member who used force.

b.      No supervisor shall investigate a use of force in which he or she was involved.

c.      IAD shall conduct the final investigation of all use of force incidents involving ECDs and 40mm extended impact weapons, other than discharges at animals and training incidents, unless there is evidence of serious misconduct. IAD investigators are not required to respond to the scene of ECD and 40mm deployments unless there is a serious bodily injury.

5.      ECD Deployments

a.      If evidence is discovered during the preliminary investigation of an ECD deployment that raises the possibility of disciplinary or criminal action, the member's ability to carry an ECD may be suspended and his or her ECD returned to the Metropolitan Police Academy (MPA) armorer pending completion of the final investigation.

b.      In ECD deployments, the ranking official on-scene shall designate non-involved members to photograph the contact area after the probe has been removed (e.g., using AXON Capture) and collect the cartridge, wire leads, probes, and confetti tags as evidence. The ranking official shall also ensure, prior to the end of the shift,

that data from the BWC and ECD is downloaded, labeled, and categorized in accordance with GO-SPT-302.13.

c.    Members who used force are prohibited from collecting cartridges, wire leads, probes, and confetti tags unless exigent circumstances exist (e.g., failure to collect the items would result in the destruction of evidence).

6.    Negligent Discharges of a Less Lethal Weapon

After a negligent discharge of an ECD or 40mm extended impact weapon, whether on or off duty, the notified watch commander shall complete a PD Form 901b (Preliminary Report Form – Use of Force Incidents) and submit the completed PD Form 901b to iad.adminbox@dc.gov (copying the member's chain of command), prior to the end of the watch commander's shift. A copy shall also be attached to the watch commander's report. IAD shall review the incident and determine if the discharge appears to be negligent and whether the incident will be investigated as misconduct or a use of force.

a.    Negligent discharges of an ECD or 40mm extended impact weapon that **do not** result in contact with a person or injury or complaint of pain may be considered a misconduct violation based on the circumstances surrounding the discharge and may be assigned as a chain of command investigation.

b.    Negligent discharges of an ECD or 40mm extended impact weapon that result in contact with a person or result in an injury or complaint of pain shall be considered a use of force investigated by IAD.

7.    Negligent Discharges of a Firearm

a.    Members shall not display their firearms unnecessarily and shall handle and store their firearms in a safe manner at all times.

b.    Negligent discharges of a department firearm that **are not** at or in the direction of a person (e.g., firearms discharges occurring during range and training incidents, cleaning, or evidence recovery) may be considered a misconduct violation based on the circumstances surrounding the discharge.

c.    After a negligent discharge of a firearm, the notified watch commander shall immediately notify IAD through the RTCC and complete and submit a PD Form 901b to iad.adminbox@dc.gov (copying the member's chain of command), prior to the end of the watch commander's shift. A copy shall also be attached to the watch commander's report. IAD shall review the incident to confirm that the discharge appears to be negligent and whether the incident will be investigated as misconduct or a use of force.

**JA459**

       d.     All negligent discharge cases that are classified as misconduct rather than use of force shall not be subject to review by the Use of Force Review Board (UFRB).

   8.    Negligent Canine Bites

       a.     Negligent canine bites that are not the result of canine deployments or that do not result in an injury to a member of the public (e.g., training incidents) may be considered a misconduct violation by IAD based on the circumstances surrounding the bite.

       b.     All canine bites shall be handled according to the procedures set forth in GO-RAR-306.01 (Canine Program).

   9.    The Risk Management Division (RMD) shall conduct periodic audits of supervisory reviews and investigations at least annually to ensure that they are consistently reviewed and investigated pursuant to this order.

F.    Investigative Requirements

During use of force investigations, investigating members shall, as applicable:

1.    Notify the supervisors of any involved members.

2.    Review relevant BWC and ECD recordings and document findings. Ensure that the investigative findings are consistent with recordings and note any discrepancies.

3.    Photograph any person on whom force was used. Photograph injuries of all involved members and subjects.

4.    Interview all subjects on whom force was used and all appropriate MPD members, including supervisors.

       a.     Ensure that members involved in use of force incidents are sequestered until they are interviewed. Members who are sequestered shall have access to and be permitted to confer with their union representative and/or an attorney prior to any interviews.

       b.     Interview all complainants and witnesses, including MPD members and supervisors. Avoid leading questions. Whenever practicable, interview complainants and witnesses at sites and times convenient to them.

       c.     Avoid group interviews by conducting interviews separately, whenever possible. If a group interview is unavoidable, attempt to supplement the interview with subsequent individual interviews, whenever possible. Document any inconsistencies in member, complainant, and witness interview statements.

**JA460**

       d.       Whenever practicable, interview complainants and witnesses at sites and times convenient to them.

    5       Ensure that evidence is collected, preserved, documented and analyzed, (including canvassing the scene to locate witnesses and obtaining complainant medical records), pursuant to GO-SPT-304.08 (Crime Scene Response and Evidence Collection).

    6.      In chain of command investigations, notify IAD of any evidence of criminal misconduct discovered during the use of force investigation.

    7.      Complete and submit investigations by assigned deadlines. IAD shall conduct a quality control review of all chain of command investigations and may recommend to the IAB assistant chief that a case be reviewed by UFRB.

G.     Internal Affairs Division Investigations

    1.      The scope of serious use of force and deadly force investigations shall be broader than the actions of the member(s) at the point that serious or deadly force is used. The actions, tactics, and decisions of all MPD participants in the event shall be assessed against MPD policy requirements to inform training and identify opportunities for improvement.

    2.      Only IAD investigators specially trained in use of force investigations shall be assigned to lead use of force investigations involving deadly force or serious use of force.

    3.      When conducting use of force investigations, IAD investigators shall, as applicable:

         a.       Respond to the scene of the incident and assume responsibility for the investigation.

         b.       Ensure BWCs and department-issued cell phones from all members involved in the use of force, as well as those involved in the events leading up to the use of force, are collected and ensure that the related recordings are immediately uploaded, labeled, and categorized in accordance with GO-SPT-302.13. BWCs and department-issued cell phones shall be transferred to an official in the members' unit for return prior to their next shift.

         c.       Interview all members directly involved in the use of force, as well as those involved in the events leading up to the use of force, once immediately after the incident and at least once after all the relevant evidence has been collected and analyzed when necessary.

         d.       Record by audio or video (in conformance with applicable laws and MPD orders) the interviews of subjects, members, and material witnesses. If a subject or non-member witness refuses to be

**JA461**

recorded, then a written narrative of the statement shall be prepared to be signed by the witness. Ensure that all recorded statements are transcribed and included in the investigative file for fatal uses of force, cases where identified misconduct will likely result in an adverse action hearing, in-custody deaths, vehicle pursuits resulting in a fatality, serious uses of force, and any other cases as determined by the IAD commanding official.

e.    In every investigation and in every interview of a member engaged in a serious use of force or deadly force, document the possibilities for de-escalation or whether no reasonable opportunity for de-escalation is apparent.

f.    Conduct a documented analysis of the events leading up to and following the incident.

g.    Involve the defensive tactics instructors when conducting a tactical review of the member(s)' actions. In high-risk entry incidents, involve Emergency Response Team officials in the tactical review Document these findings.

h.    Notify and consult with the USAO within 24 hours or the next business day about incidents of serious use of force, deadly force, use of force indicating potential criminal conduct, vehicle pursuits involving a fatality, and in-custody deaths involving a member. The USAO or relevant prosecuting authority will make the determination as to whether criminal wrongdoing is present.

i.    When evidence of potential criminal wrongdoing is determined, coordinate prosecutorial needs between the USAO or other appropriate prosecuting entity and the affected element or investigative unit and liaise with other applicable law enforcement agencies. Handle all arrests of police officers related to use of force investigations.

j.    Continue to pursue any investigative leads and collaborate with the USAO or prosecuting authority while the matter is under review.

k.    After receiving a letter of declination from the USAO or upon the conclusion of a criminal prosecution (absent special circumstances that must be documented), complete a final investigative report with conclusions and recommendations by the assigned deadline.

4.    The IAB assistant chief shall, in instances of a negligent or performance of duty firearm discharge, serious use of force, or any use of force indicating potential criminal conduct by a member, forward the preliminary report to the chief of police, within 24 hours of occurrence.

5.    IAD supervisors shall provide oversight of use of force investigations by periodically (i.e., bi-weekly at a minimum) reviewing investigative files and

**JA462**

documenting each review in writing to be included as part of the completed investigative file.

6.     All use of force investigations shall be submitted by the assigned deadline. IAD supervisors shall carefully scrutinize the recommendations and conclusions of IAD investigators, and if necessary, return investigations to IAD investigators for additional work.

H.     Investigative Conclusions

For all use of force investigations, the investigating member shall submit a final report with a description of the incident, any other uses of force or allegations of misconduct identified during the investigation, a summary and analysis of all relevant evidence gathered during the investigation, and proposed findings for each allegation of misconduct [pursuant to GO-PER-120.20 (Administrative Investigations)] and each use of force as outlined below:

| Required Findings for Use of Force |
|---|
| 1.  Document whether each use of force was **Justified** or **Not Justified** (i.e., whether the actions of the member were objectively reasonable in the circumstances); |
| 2.  Document whether each use of force (and events surrounding the use of force) was consistent with policy; |
| 3.  Document whether the member requires tactical improvement endeavors or formal re-training; and |
| 4.  Document any additional areas for policy and training improvements, risk management issues, equipment concerns, and areas for improvement that do not require formal re-training. |

I.     Force-Related Duty Status Determination

1.     The department has the sole authority and complete discretion to determine the duty status of a member. The duty-status decision will consider recommendations made by the Medical Services Division, IAB, and any department-recognized support professional. The department's duty-status decision shall not be subject to the contractual grievance procedure (or any other appeal).

2.     When a member is involved in a serious use of force incident, an incident where a person dies in police custody, or where the actions of the member results in, or is alleged to have resulted in, serious bodily injury or death, the member shall be placed on administrative leave with pay for three business days during which time the department shall designate a duty status pursuant to GO-OMA-120.24 (Revocation/Restoration of Police Powers).

3.     The IAB assistant chief may change the duty status of any member involved in a serious use of force incident as the investigation progresses and new information is revealed.

4.     Duty-status decisions do not preclude the Medical Services Division from placing a member in a sick leave status as a result of a serious use of force incident.

J.      Use of Force Review Board

1.      UFRB shall review all IAD use of force investigations of MPD members, chain of command investigations forwarded to UFRB by the IAB assistant chief, and vehicle pursuits resulting in a fatality.

2.      UFRB shall consist of the following 13 voting members and may also include non-voting members at the mayor's discretion. The chief of police or his or her designee shall determine the rotation schedule for the chairperson and Patrol Services representative who shall serve at least one year.

| UFRB Voting Members |
| --- |
| MPD assistant chief appointed by the chief of police (chairperson) |
| Six MPD members appointed by the chief of police who hold the rank of inspector or above or the civilian equivalent |
| Office of Police Complaints executive director |
| Civilian member appointed by the mayor with no current or prior affiliation with law enforcement who has personally experienced the use of force by a law enforcement officer |
| Civilian member appointed by the mayor with no current or prior affiliation with law enforcement who is a member of the DC Bar in good standing |
| Civilian member appointed by the mayor with no current or prior affiliation with law enforcement who is a District resident |
| Civilian member appointed by DC Council with no current law enforcement affiliation who has subject matter expertise in criminal justice policy |
| Civilian member appointed by DC Council with no current law enforcement affiliation who has subject matter expertise in law enforcement oversight and the use of force |
| **UFRB Non-Voting Members** |
| One member selected by the Fraternal Order of Police (consistent with the current Collective Bargaining Agreement) |
| Policy and Standards Branch director |
| MPA commanding official |

3.      IAB shall administer UFRB. The IAB assistant chief shall designate an IAB member to serve as the UFRB administrator who shall:

| UFRB Administrator Responsibilities | |
| --- | --- |
| a. | Coordinate with IAB to identify investigations for review. |
| b. | Track the progress of investigations and notify IAB of cases that are at risk of missing the 90-day deadline. |
| c. | Prepare proposed agendas for review and approval by the chairperson. |
| d. | Handle scheduling, notifications, and administrative tasks. |
| e. | Provide all pertinent reports, records, directives, lesson plans, statistical information, and evidence to be considered. |
| f. | Ensure that relevant and appropriate historical information about members and supervisors are available for consideration. |
| g. | Prepare a summary of proceedings including member attendance and conclusions that outline findings and recommendations |
| h. | Prepare memoranda to transmit findings and recommendations. |
| i. | Notify members and their chain of command of UFRB decisions. |
| j. | Maintain UFRB records reflecting adverse and corrective actions. |

**JA464**

| k. | Assist with the preparation of annual reports. |
| l. | Maintain complete historical records including agendas, correspondence, annual reports, decision point matrix analyses, and meeting summaries with detailed deliberation notes and actions taken in each case (i.e., issues discussed, actions taken, and specific findings). |

4. The UFRB chairperson shall be responsible for conducting an orientation for newly appointed UFRB members at their first board meeting. The orientation shall consist of topics including, but not limited to, a review of related MPD policies, UFRB roles and responsibilities, and a general overview of operations. The Fraternal Order of Police non-voting UFRB member shall be notified of and permitted to attend all orientation sessions.

5. Absent special circumstances, UFRB shall meet twice monthly to review use of force incidents.

6. The quorum for each UFRB proceeding shall be the majority of seated members. MPD UFRB members shall not be permitted to send a representative in their place. MPD UFRB members shall be excused from a proceeding only by the UFRB chairperson.

7. Review Process

   a. UFRB shall review the actions of all members involved in the events leading up to the use of force, as well as in its use (not just the actions of the member who used force). The actions of the members leading up to and following the use of force shall be reviewed to identify commendable actions or conduct warranting corrective intervention or training.

   b. UFRB shall use the decision point analysis matrix to provide a meaningful independent analysis of the decision points faced by all MPD participants of the event. UFRB shall review use of force incidents and consider: compliance with official MPD guidance (i.e. policy, procedure, and training), whether proper tactics were used, risk management issues, adequacy of training, analysis of the events leading up to and following the incident, and whether the level of force used was appropriate for the incident. The analysis shall carefully scrutinize the various decision points of the member who used force as well as those of any member that is relevant to the use of force. Where appropriate, the analysis shall identify any policy, training, equipment, or tactical concerns raised by the actions of the participants.

   c. If, at any time during the review process UFRB determines an IAD use of force investigation to be inadequate or lacking in quality or timeliness, the chairperson shall notify the IAD commanding official and IAB assistant chief.

   d. When UFRB has additional questions or determines that an investigation is incomplete, UFRB may compel witnesses, reassign

**JA465**

the case to IAD for investigation, return the case to IAD for follow up, or return the case to the investigating unit for appropriate action. Any case returned to IAD or an investigative unit for completion or correction of an investigation shall be returned to the UFRB chairperson within five business days of receipt for a re-evaluation.

e.      UFRB may recommend to the chief of police use of force investigative protocols, standards for use of force investigations, training enhancements, and policy and procedure amendments.

8.      Referral of Findings and Recommendations

After evaluating each case, UFRB shall provide its conclusions pursuant to the following investigative review findings, which shall either affirm or reject the investigative recommendation. Dissenting or non-concurring members of a UFRB finding or recommendation may submit a minority report.

| Required Findings for Use of Force |
| --- |
| 1. Document whether each use of force was **Justified** or **Not Justified** (i.e., whether the actions of the member were objectively reasonable in the circumstances); |
| 2. Document whether each use of force (and events surrounding the use of force) was consistent with policy and training; |
| 3. Document whether the member requires tactical improvement endeavors or formal re-training; and |
| 4. Document any additional areas for policy and training improvements, risk management issues, equipment concerns, and areas for improvement that do not require formal re-training. |

a.      When UFRB determines that a policy violation has occurred, UFRB shall forward the case to the Disciplinary Review Division (DRD) to determine the appropriate level of discipline.

b.      DRD shall implement education-based development or disciplinary action, when applicable. Upon resolution of the sanctions associated with the incident, DRD shall update the digital tracking system and electronically forward the information to the respective command and UFRB.

c.      In cases where there is no clear violation of policy or training, UFRB may request MPA and other applicable elements to research best practices and training recommendations, where warranted, to instruct involved individuals of potential areas of improvement.

d.      When UFRB determines that there has been an act that merits recognition, appropriate commendation recommendations shall be forwarded to the applicable element's commanding official or the MPD awards committee.

**JA466**

9. UFRB shall complete, to the extent practicable, its review of each incident within 90 business days of the date that IS numbers were issued. This time period may be tolled due to criminal investigations and investigations conducted by the Office of the Inspector General, Office of the DC Auditor, or Office of Police Complaints. RMD shall conduct periodic audits to review the timeliness of cases pending submission to the UFRB.

10. Notwithstanding any other provision of law, the UFRB shall publish the findings of fact and merits determination for all UFRB investigations on the MPD website.

11. UFRB and IAB shall conduct an annual analysis of all use of force incidents to detect existing patterns, problems, and issues for submission to the Executive Office of the Chief of Police by February 15.

K. Mandated Training

1. The MPA commanding official shall ensure that all sworn members receive use of force training prior to completion of initial training and refresher training semiannually and that all civilian cell block technicians receive pre-service and annual in-service use of force training.

2. The MPA commanding official shall provide copies of all recruit and in-service use of force lesson plans and training materials through the chain of command to the general counsel and the Policy and Standards Branch director on an annual basis for a documented legal sufficiency and policy review.

3. The IAB assistant chief shall ensure that all IAD investigators assigned to lead serious use of force and deadly force investigations receive initial and refresher specialized investigative training on conducting a thorough tactical analysis, reviewing the decisions that led to the use of force and analyzing policy, training, and equipment issues.

III. DEFINITIONS

When used in this directive, the following terms shall have the meanings designated.

| | Term | Definition |
|---|---|---|
| 1. | Asphyxiating restraint | Use of any body part or object by a law enforcement officer against a person with the purpose, intent, or effect of controlling or restricting the person's airway or severely restricting the person's breathing, except in cases where the law enforcement officer is acting in good faith to provide medical care or treatment, such as by providing cardiopulmonary resuscitation, or the placement of a person by a law enforcement officer in a position in which that person's airway is restricted. Asphyxiating restraints are prohibited restraint techniques. |
| 2. | Deadly force | Any force that is likely or intended to cause serious bodily injury or death. |
| 3. | Deadly weapon | Any object, other than a body part or stationary object, that in the manner of its actual, attempted, or threatened use is likely to cause serious bodily injury or death. |

**JA467**

| 4. | De-escalation | Taking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in necessary force. Techniques may include verbal persuasion, warnings, slowing down the pace of an incident, and tactical repositioning. |
|---|---|---|
| 5. | Less lethal weapon | Weapon deployed with the intent or purpose of nullifying a threat without causing death (e.g., ECD, OC spray, ASP baton). |
| 6. | Neck restraint | Use of any body part or object by a law enforcement officer to apply pressure against a person's neck, including the trachea, carotid artery, or jugular vein, with the purpose, intent, or effect of controlling or restricting the person's airway, blood flow, or breathing, except in cases where the law enforcement officer is acting in good faith to provide medical care or treatment, such as by providing cardiopulmonary resuscitation. Neck restraints are prohibited restraint techniques. Pursuant to the Secure DC Omnibus Emergency Amendment Act of 2024, this definition is administratively retroactive to July 22, 2020. |
| 7. | Objective reasonableness | Standard requiring the reasonableness of a particular use of force must be judged from the perspective of a reasonable law enforcement officer on the scene in light of the totality of the circumstances confronting the member. |
| 8. | Preponderance of the evidence | Standard of proof in administrative investigations in which it is more likely than not that the event occurred. |
| 9. | Probable cause | Set of facts, circumstances, or reliable information that would lead a reasonable and prudent police officer to believe that a crime has been committed, or is about to be committed, and that a certain person committed it. |
| 10. | Serious bodily injury | Extreme physical pain, illness, or impairment of physical condition including physical injury that involves a substantial risk of death; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member or organ; or protracted loss of consciousness. |
| 11. | Serious use of force | Actions by members including:<br>a. Firearms discharges (except negligent discharges determined to be misconduct by IAD);<br>b. Head strikes with a hard object;<br>c. Those resulting in death or serious bodily injury;<br>d. Use of asphyxiating restraints or neck restraints; and<br>e. MPD canine bites (except bites determined to be misconduct by IAD). |
| 12. | Use of force | Any physical coercion used to affect, influence, or persuade an individual to comply with an order from a member is considered a use of force. |
| 13. | Use of force indicating potential criminal conduct | Includes, but is not limited to, all strikes, blows, kicks or other similar uses of force against a handcuffed subject and all accusations or complaints of excessive force made against the member where there is objective, corroborating evidence indicating potential criminal conduct or other serious misconduct. This includes any use of force that clearly goes beyond that which an objectively reasonable officer would use in light of the circumstances under which the force was used, or any use of force which may rise to the level of a criminal act. |

**JA468**

Pamela A. Smith
Chief of Police

| Amendment # | Page # | Description of Change | Effective Date of Change | Name and Title of Authorizing Member |
|---|---|---|---|---|
| 1 | 11 | Revised Part II.D.4 to amend the prohibition for reviewing BWCs for initial report writing consistent with the *Secure DC Omnibus Emergency Amendment Act of 2024.* | 3/29/2024 | Maureen O'Connell, Director, Policy and Standards Branch |

**JA469**

# Exhibit D

**JA470**

# Metropolitan Police Academy



# 3.2 Basic Investigative Incident Reports

## Introduction

As a police officer, not every report taken will be for an offense and subsequent arrest. Many reports will be incident reports. Incident reports are just as critical as those taken for an offense and must be given the same due diligence and care during a preliminary investigation. Officers must not be lulled into a false sense of security simply because they have been dispatched to a scene of an incident and not an offense. Situational awareness is still critical and the ability to keep track of what is going on around you in a complex and dynamic environment will ensure your safety. Remember that regardless of how a dispatcher voices an assignment over the air, it is incumbent upon the officer to not only make the final determination, but to respond to the scene using the same level of caution as he or she would when responding to the scene of an offense report or an offense in progress.

By the conclusion of this lesson, you will have a clear understanding of how to conduct an investigation for an *Injured Person to the Hospital*, including how to handle the incident when the identity of the person is unknown. You will also gain full competency in understanding *Check on the Welfare* and *Missing Person* investigations.

## 3.2.1        Describe an *Injured Person to the Hospital* investigation

**General Order 401.01 - Field Reporting System**
This General Order states that: "Members shall complete an incident report for all injured persons on public space, and injured persons transported to the hospital regardless of the type of location."

When responding to the scene of an injured person, remember to treat this as seriously and with as much caution as you would when responding to the scene of an offense. Just because it is dispatched to you one way does not mean that is actually the nature of the call to which you are responding. Situational awareness is vitally important. It is not unheard of for officers to receive a call for a seemingly innocuous incident and because of the nature of the call let down their guard, only to discover too late that the call was a set-up for an ambush in which they are injured or killed.

Follow these steps:
- As you approach the scene of a call in which you were advised there is a potentially injured community member on scene, be sure to scan your environment before exiting your vehicle.
- After marking on the scene, your first priority is to locate the injured citizen and request medical help. You are then to deliver as much aid as you are able to provide until an ambulance arrives.
- Provide an update for the dispatcher so that he or she may relay that information to necessary parties. This does not mean that you tie up the air with superfluous transmissions, Rather, inform the dispatcher of the community member's condition and, if the person instead appears to be the victim of a crime, inform the dispatcher of that as well.
- You must voice to the dispatcher whether the injured community member is an adult or child, whether the person is conscious and breathing, and if there are any visible injuries.  If there is no visible injury, inform the dispatcher where the community member states their is pain emanating from. It is important that you do so as informing the dispatcher of the injuries determines whether a DCFEMS Ambulance or Medic arrives on your scene, as one is equipped to handle higher levels of trauma than the other.
  ***NOTE:*** Do not voice the race of the community members over the air.

*3.2 Basic Investigative Incident Reports*

**JA472**

- You must then conduct a preliminary investigation in order to gain a grasp of the scene and situation in its entirety. Ask what happened leading up to the incident and allow the community member to tell you what occurred in his or her own words. It is your job to paraphrase what you are told for the report. Do not forget to capture the "who," "what," "when," "where," "how," and "why". The community member may be emotional as a result of injury or how it was sustained, and you should give the person the space for this, all the while exhibiting empathy and compassion.
- Do not forget to introduce and identify yourself when it is feasible to do so and does not jeopardize your safety or that of the community member whom you have been called upon to assist.

The following complainant / victim / witness information must be captured within the report:
- **Name** - Full name; Ask for an identification card from which you can copy down the information. If the community member does not have one, verbal identification will suffice.
- **Address** - Home and Work.
- **School Information** - Name and Address, if applicable.
- **Phone number** - Cell phone, Home, Work (Ask: "Which is easiest to get ahold of you?") In the case of theft, robbery, or lost property, make sure you obtain both the number of the stolen phone and a number that you can use to reach the complainant.
- **Email addresses** – Home and Work.

Many of the people you will help during the course of your career may have social media accounts that could assist in your investigation. These accounts will be on such sites as Facebook, LinkedIn, Twitter, Instagram, and countless other sites that allow constant contact between users. Being able to view the social media of a victim, for example, may provide crucial clues or information with regards to a potential suspect or in finding a missing person. Due to the sensitive nature of social media, because of the sheer amount of personal information posted by individuals on their accounts, it is important that you exercise tact when requesting social media information. Stress that the information will be used for no other purpose than assisting in the investigation and be mindful of how you phrase your requests. Some phrases that may be helpful to preface your request are:
- "May I…."
- "Would you mind…."
- "If it is all right with you…."
- "Would it be possible…."

Remember, the community member is under no obligation to provide his or her social media information to you, and you cannot attempt to coerce the person into doing so.

When gathering information from witnesses, your notebook will serve as a powerful documentary tool. So, whenever possible, make an attempt to get witnesses and victims to write down their statements. As noted in an earlier lesson, you should carry *Witness Statement* forms (PD119) in your patrol gear. These forms serve as official government documents and allow witnesses and community members who have been victims of an offense or find themselves at the center of an incident the ability to write what occurred in their own words.

In addition,
- Locate any and all witnesses to the incident in question and capture their information for your

*3.2 Basic Investigative Incident Reports*

**JA473**

report.

- Take note of any potential evidence that could have contributed to the citizen's injury, and if any is found place it on the property book at your element (See **General Order 601.1 - Recording, Handling and Disposition of Property Coming into the Custody of the Department**).
- If a defect on public space led to or directly contributed to the injury of a community member, request *District Crime Scene* to have photographs taken of the defect. You must take this step as the defect that caused the injury could lead to future litigation against the city, and as such, must be documented. In the event that no crime scene certified officer can respond, you must utilize your MPD issued phone and BWC to take photographs.
- If a defect is found, you also must raise the dispatcher and inform him or her of the defect and its location so the proper notification can be made. If you fail to do this, there is a risk that another citizen may suffer an injury.
- Be mindful of the fluidity of scenes and be sure to note the condition and state of the community member's clothing. Is it torn or does it appear to have been damaged during the commission of a crime? If so, seize the clothing as needed. This means that you must take care not to fall prey to a "tunnel vision" mindset. If your preliminary investigation reveals that an offense has occurred and it is no longer an incident, then you must take the appropriate police action.

You must request that an official respond to your scene for an *Injured Person to the Hospital,* per **General Order 401.01 - Field Reporting System**, when one of the following three criteria are met:

- The injured person is found to be suffering from injuries of an unknown nature - This means you arrived on the scene, conducted your preliminary investigation, and were unable to discover how the injuries to the community member were obtained.
- The injured community member cannot coherently describe how his or her injuries were obtained. The person may be flustered or disoriented and cannot give you a clear and concise reason behind the injuries, and your preliminary investigation is unable to elucidate further.
- The injured citizen is unconscious.

When an injured citizen is transported to the hospital, and your investigation did not reveal that he or she was the victim of a crime, then you must classify it as an *Injured Person to the Hospital* and complete an incident report.

When you are unable to ascertain the identity of the injured party, you must do an *Injured Person to the Hospital* report. Some examples of when this report is required include, but are not limited to when a community member is:

- semi-conscious, unconscious, intoxicated, and/or incoherent, and
- unaccompanied by anyone who knows the identity of the community member, and

You learned about teletypes in lesson 2.1 on *Roll Call***.** There is a Teletype Unit that not only issues teletypes to the entire department, but continuously compiles information on stolen autos, missing persons, and injured persons who are transported to the hospital, amongst other duties. **You must notify the Teletype Unit by calling (202) 727-4225** when a citizen is transported to the hospital, and there is *any* indication, regardless of how slight, that they may be admitted, and no next of kin has been

*3.2 Basic Investigative Incident Reports*

**JA474**

notified.  Also, be sure to document in your notebook the name and number of the member whom you spoke with at Teletype.

Upon notifying Teletype, you will provide them with:
- the identity of the citizen, when known
- a description of the citizen (clothing, height, weight, etc.)
- a brief synopsis of how the citizen became injured, when known
- who transported the community member (medic or ambulance number)
- what location the community member was transported from
- what hospital the community member was taken to

## 3.2.2        Describe a *Check on the Welfare* investigation

During your time as a police officer, you will respond to many calls for service that are dispatched as *Check on the Welfare*. Welfare checks are conducted by MPD when a member is asked to respond to a location to determine the well-being or safety of one or more persons.  Some examples of this are:
- a therapist seeks police assistance in determining the welfare of a patient who may be struggling with mental health issues
- a community member is worried about an elderly neighbor he or she has not seen in a few days
- a teacher is concerned that a student with exemplary attendance is suddenly  absent from school
- the Child and Family Services Agency (CFSA) requests assistance in helping to verify the potential abuse of a child within a home

When you arrive on the scene in order to ascertain the welfare of the subject, you must remain cognizant of your surroundings as this directly impacts your safety. Maintaining situational awareness is a skill that you must continually hone and utilize. Do not disregard it, or think it unnecessary simply because of the nature of the call to which you are responding. You must always be ready for a multitude of different possibilities when arriving on a scene.

Whenever you are dispatched to a call for *Check on the Welfare*, you must complete an incident report. This report will be classified as either "*Check on Welfare of an Adult*" or "*Check on Welfare of a Juvenile*," depending on whether the subject is at least eighteen (18) years of age (for an adult) or younger (for a juvenile). If you determine that a crime has occurred, take a report for that offense instead.

If you make contact with the subject of your welfare check, be sure to capture the following information in your field notebook:
- **Name** - Full name; Ask for an identification card from which you can copy down the information. If the community member does not have one, verbal identification will suffice.
- **Address** - Home and Work.
- **School Information** - Name and Address, if applicable.
- **Phone number** - Cell phone, Home, Work (Ask: "Which is easiest to get ahold of you?") In the case of theft, robbery, or lost property, make sure you obtain both the number of the stolen phone and a number that you can use to reach the complainant.
- **Email addresses** – Home and Work.
- **Social Media** – Personal and Work.

Your report must include:

*3.2 Basic Investigative Incident Reports*

**JA475**

- the identity of the person requesting the check listed as the Reporting Person and the person being checked on as the Subject Person
- if the subject is a juvenile or otherwise vulnerable
- how the identity of the subject was obtained
- the state in which you found the subject
- how the welfare of the subject in question was determined. How were you able to verify their safety? Did you see the person yourself?
- a detailed description of all investigative steps you took

If you are unable to verify the welfare of a subject, there are some additional steps you need to take and record in the report, while being mindful of the Internal and External Narrative distinction:
- An official at your element must be notified. This official will review the situation and may order additional actions. If you cannot verify the welfare of a juvenile, you must additionally notify YFSD and CFSA.  CFSA can be reached at (**202) 671-SAFE**. (**GO 304.02 Welfare Checks**).
- You must leave your contact information and the CCN of the report either with the reporting person or at the location of the welfare check. If for some reason that is not possible, you must describe why in your report.

There will be times when your *Check on the Welfare* call will reveal that an adult at the location has been neglected, abused, or is incapable of caring for themselves. During the times when you encounter a community member who is the victim of neglect or abuse, or is seen to be incapable of caring for himself or herself, you must:
- summon an official to the scene
- contact Adult Protective Services (APS) on their 24-hour hotline at **(202) 541-3950**. They are located at 645 H St. NE on the 3rd floor, operating from 0815-1645.

It should be noted that, per **Special Order 11-02 – Adult Protective Services,** "an adult shall *not* be considered to be committing self-neglect for the sole reason that he/she seeks treatment by spiritual means through prayer alone in accordance with a religious method of healing, in lieu of medical treatment." *However*, if you come into contact with a community member who is in desperate need of medical attention, yet they are refusing medical assistance, you *must* request that an ambulance respond to your scene. If the person is still refusing medical assistance and the religious request is honored by the EMTs that arrive on the scene, then contact your Watch Commander as he or she will make the determination whether the community member should be involuntarily taken to the Comprehensive Psychiatric Emergency Program (CPEP) for psychological evaluation.

This is yet another moment where the thoroughness of your investigation and your report will directly impact the type of assistance the community member receives and the urgency with which it is received. It is incumbent upon you, as the responding officer, to ensure that you document with as much detail as possible what you see, hear, and smell while on the scene of potential abuse or neglect. Remember, agencies that could assist the community member cannot respond to anything of which they have not been notified. Your report must include:
- the name, age, and a physical description of the adult in need of Protective Services
- the name of the possible abuser and all of his or her relevant information. Remember, capture as much data on this person as possible. Your initial report may be the basis upon which a later criminal investigation is launched.
- the type of abuse or neglect to which you are witness

*3.2 Basic Investigative Incident Reports*

**JA476**

- the basis and source of your knowledge of the abuse or neglect. What facts surrounding the situation lead you to believe that the adult in question is in need of Protective Services?
- any additional information you deem relevant. The more detail, the better. Paint the picture for those who are not able to be on the scene with you.
- the date and time notification to APS was made
- who you spoke with when you made the notification to APS

There will be times when the Child and Family Services Agency (CFSA) will seek your assistance checking the welfare of a juvenile. When you are able to locate the child, you must notify CFSA through the dispatcher or by calling **(202) 671-SAFE**. A CFSA agent will come out to speak with the juvenile, but if the agent is unable to give you an estimated time of arrival, then contact and be guided by your official. You must also contact your official when you are unable to locate a juvenile when attempting to check on their welfare.

*NOTE:* You are a mandatory reporter as a police officer. This means that you are required by law, DC Code § 7-1903, to report any cases of abuse or potential abuse.

## 3.2.3 Define key terms related to a *Missing Person* investigation (General Order 304.03)

### *Missing Person*
If you are approached by a community member who wishes to file a *Missing Person* report, you must first find out from where the individual is missing.
- A missing person is an adult or juvenile community member who is **missing from the person's lawful home within the District of Columbia** for a period of time that is regarded as suspicious or unusual when considering the behaviors, patterns, plans, or routines of the citizen. For example: A father calls 911 and requests police assistance because his son typically returns home after school, every day, no later than 1630 hours but today it is approaching 1900 hours and his son has yet to arrive. Based on his son's usually consistent behavior, the fact that he has not returned home from school is unusual and breaks with his normal pattern of behavior.
- A community member, regardless of their place of residence, who is missing for a period of time that is regarded as suspicious or unusual when considering his or her typical behaviors, patterns, plans, or routines **and** for whom there is **credible information to believe he or she was last seen within the District of Columbia** will also be classified as a missing person.
- If the missing individual is not a resident of the District or they went missing in another jurisdiction, then the community member wishing to file a *Missing Person* report must contact the police department of the jurisdiction in which the person lives or went missing. Although this is outside DC jurisdiction you could still provide guidance and assistance to ensure the reporting person finds the correct police phone number.

A missing person investigation must be conducted, and a report taken whether the individual went missing within the District of Columbia or the individual is a resident of the District of Columbia.

### *Critical Missing Person*
A *Critical Missing Person* is a community member who fits the formerly given criteria of a *Missing Person* and the person in question also meets one or more additional conditions. It is up to you, the primary

*3.2 Basic Investigative Incident Reports*

**JA477**

responding officer, to ascertain whether the individual in question will be considered to be a *Critically Missing Person*. Then, it is the responsibility of the Watch Commander to classify it as such.

A community member will be classified as critically missing if he or she is:
- an elderly citizen over the age of sixty-five (65)
- a juvenile under the age of fifteen (15)
  **NOTE: Juveniles fifteen (15) years of age and over shall be deemed critical when the circumstances of the incident meet the criteria outlined in Part III.3.c of G.O. 304.03.**
- mentally ill or a mental health consumer. It is important to determine whether the individual is currently suicidal. *Additionally, are they drug dependent and the dependency leads to a life-threatening situation? For example, the person requires insulin every four hours and he or she has been missing for five hours without their medication. Are they missing from a hospital or institution while presenting an imminent danger to him or herself or others?*

There may be additional factors that cause the Watch Commander to reach the conclusion that the *Missing Person* is at-risk and should be considered critically missing. For example, the community member is currently in the company of another person who could endanger his or her welfare or the community member is in real or suspected danger of foul play.

***Attempt to Locate***
During your time as a patrol officer, there will come a time when you respond to the scene of an incident that is dispatched to you as a *Missing Person* because a community member has called in requesting assistance in locating an adult. Upon conducting a preliminary investigation, you may conclude that the missing adult in question does not meet any of the criteria of a *Missing Person*. In that instance, the classification for the report is *Attempt to Locate* and information must be entered into the Washington Area Law Enforcement System (WALES).

***Silver Alert* (Special Order 13-10)**
The elderly community members whom you will serve and protect are a segment of the population that at times are in need of extra care. Some of the elderly suffer from dementia or similar cognitive disabilities, and at times they may become disoriented and unable to recall how they have reached a destination or how to return home. In order to assist in the safe return of an elderly community member over the age of sixty-five (65) who has been reported missing by family members, caretakers, or friends, a *Silver Alert*, which is similar to an *AMBER Alert*, can be implemented when the following criteria have been met:

- it is believed that the missing community member is in imminent danger or grave risk of bodily harm
- a thorough preliminary investigation has occurred, to include a canvass for the missing individual in order to eliminate alternative explanations for the person's absence
- the CCN is provided to the Silver Alert Coordinator

Once you believe you have enough information to initiate a *Silver Alert*, contact your Watch Commander. Your Watch Commander will in turn contact the CIC Watch Commander who will bring the information to the attention of the Silver Alert Coordinator.

**Placement Violation**

*3.2 Basic Investigative Incident Reports*

**JA478**

A person twenty-one (21) years of age or under who is reported missing and who was placed by court order into a group home operated or contracted by the Department of Youth Rehabilitation Services (DYRS) or Court Social Services (CSS) shall **not** be classified as a *Missing Person*. The incident shall be classified as a *Placement Violation* by the Telephone Reporting Unit, Office of Unified Communications.

## 3.2.4        Describe a *Missing Person* Investigation

There is **no** minimum time requirement that an individual must be missing prior to a *Missing Person* report being filed. When you arrive on the scene for a missing person remember that the community member calling in to report another person missing may be distraught. While you should always show empathy and compassion while on scenes with worried individuals and victims, remain cognizant of the fact that the faster you are able to obtain accurate information, the faster you can issue a **Flash Look-Out** so that your fellow officers in the field can begin canvassing for the missing individual.

During the canvass, broadcast the last place the missing person was seen, as this is the first place your fellow officers will search if it differs from the location from which the person is reported missing. If he or she has been reported missing on prior occasions, ensure that those locations are thoroughly searched as well. If the location(s) are in another district, contact the dispatcher and request a district appropriate unit to canvass and search that location on your behalf. Remember not to become a victim of tunnel vision or linear thinking; utilize all the resources available to you. When a potential location of the *Missing Person* is in another jurisdiction, contact your Watch Commander as he or she will take the steps to notify and request assistance from the appropriate agency.

When you are on the scene of a *Missing Person* that involves a juvenile under the age of twelve (12) and you have actually responded to the home, you must thoroughly search the premises. Any place a child could potentially hide must be searched. This means you must look in the garage, closets, attics, and crawl spaces and beneath the bed regardless of whether the reporting person states that he or she has already searched and cleared the residence.

When canvassing for juveniles, make sure that you find out if they are currently participating in any extracurricular activities. For example, are they on a sports or debate team? In an afterschool program? In summer school? Do they attend a summer camp? All of this will provide you with critical information that can help you find the child. If the juvenile is involved in school activities, contact school security along with the School Resource Officer (a police officer assigned to a particular school or set of schools) through the dispatcher and request that the location is searched for the child.

You must gather the following information while interviewing the reporting person as it has a direct impact on the course of the investigation. In addition, it could provide much needed information regarding safety that you can relay to your fellow officers who will assist during the canvass for the missing person and for your report.

- How the reporting person is related to the missing person. What is the nature of the relationship? For example, are they siblings or in a romantic relationship? Is the missing person the child of the reporting person or simply a friend?
- The name, age, date of birth, and social security number of the missing person.
- The mental, physical, and health habits and history of the missing person. Include physical features such as tattoos and scars and a clothing description from when the missing person was last seen.

*3.2 Basic Investigative Incident Reports*

**JA479**

- You must obtain the information on any relevant **caution codes** that can be added to your *Missing Person* report and passed along to relevant parties. Note if the individual is:
  - armed and dangerous
  - prone to violent tendencies
  - a martial arts expert
  - an explosives expert
  - an escape risk
  - a sexually violent predator
- In addition to the caution codes that are relevant to safety concerns, it is also necessary to obtain information on any relevant **medical codes**, such as:
  - Does the missing person have a heart condition?
  - Is he or she prone to epileptic seizures?
  - Does the missing person have any known allergies?
  - Is the missing person an alcoholic?
  - Is he or she a hemophiliac?
  - Is the missing person diabetic?
  - Does he or she require any medication and currently in possession of that medication? How often is the person required to take the medication?
- Ascertain whether the missing person has any dependency on drugs (illegal or prescribed), and if they are prescribed drugs, are they on their person.
- Obtain names and addresses of friends and relatives where the missing person may be located. *These will be used to assist in canvassing for the missing person as these locations will also be checked.*
- Determine whether the person has been missing before and if so, where he or she was located. It is smart and necessary to check these areas during the canvas. *Check **Mark43** to see what previous reports say.*
- Find out whether the missing person has access to computers and social media.
- Obtain the cell phone number of the missing person, if applicable.
- Obtain a vehicle description, if applicable.
- Learn the maiden name of the missing person's mother.
- Obtain a photograph of the missing person if one is available, making sure to note within the incident report (PD 251) if no photograph was able to be provided.

It is your responsibility as the primary responding officer to gather as much information about the missing person as possible. The more you are able to learn about habits and behaviors, the greater the probability that you and your fellow officers will be able to locate the missing person before he or she comes to possible harm.

If during the course of your investigation you realize that the missing person in question can be classified as a *Critically Missing Person*, or the person meets the criteria for a *Silver Alert*, or you suspect foul play of any sort, notify your official immediately and be guided by his or her directives.

While you may have enough to know a citizen can be classified as a *Critical Missing Person*, **it is the Watch Commander that makes the final determination in that regard**. It is also the responsibility of the Watch Commander to set up a Command Post for missing persons under age 12, which is essentially the base of operations, at the location from which this type of community member was reported missing. Beyond age 12, it is at the discretion of the Watch Commander for critical cases. If it is determined by the Watch

*3.2 Basic Investigative Incident Reports*

**JA480**

Commander that it is indeed a *Critical Missing Person* investigation, the Youth and Family Services Division (YFSD) must be notified at **(202) 576-6768**. YFSD must also be immediately contacted if an adult is missing with a juvenile in his or her custody**.**

As noted, one of the first things you will do is quickly get a description of the missing person and issue a flash lookout so other officers can begin to canvass. After gathering as much information about the missing person as possible, members shall  call the Teletype Unit as it may have information regarding the whereabouts of the individual being reported missing. If Teletype does not have the information an officer is seeking, an officer must then begin calling all of the hospitals within the District of Columbia. The hospital staff can tell officers whether anyone currently admitted is the missing person or perhaps matches a description given of the missing person.

There will be times when the staff of a particular hospital may not be willing to give that information to you over the phone, as they have no proof of your identity. In those instances, utilize your resources. Contact the dispatcher, request a unit that works within the appropriate district or PSA be sent to the hospital and have that officer make the inquiry in person. While you hope for the best, you should always be prepared for the worst and in doing so, know that anything could have happened to the citizen during the time he or she actually went missing, before the point that someone noticed. For this reason, you must also call the **Medical Examiner's Office (202) 698-9000**.

Just as you document the names of witnesses when you are able to speak with them in person on the scene, you must also note the names of every individual you speak with over the phone during the course of your investigation. For someone who works at a hospital, document a name along with the hospital he or she works for, the number you dialed, and the time that you spoke so it becomes part of your finished report.

If you are unable to get through to Teletype, then the **CCN Reconciliation System** is a useful tool. On the MPD homepage, you can find the CCN Reconciliation System by clicking on the **CCN Checkoff Link**. This is where you will go to search all of the reports that were submitted for an *Injured Citizen to the Hospital*. Searching the time frame between when the citizen was last seen and when he or she was reported missing can also aid you in ascertaining whether the person is truly missing or has been taken and admitted to the hospital for medical treatment.

Sometimes, the missing person has been placed under arrest or is currently in police custody. When you are searching for a missing adult, call the district stations and Central Cell Block. When trying to locate a juvenile, contact the Youth and Family Services Division and the Juvenile Processing Center to rule out that possibility. Also, check the Washington Area Law Enforcement System (WALES) in order to determine if there is any additional information that can be provided that may assist with your investigation.

If the person that you are attempting to find is under twenty-one (21) years of age, then the reporting person must be given a *Reporting Your Child Missing* form (PD899A). Be prepared for emotions to potentially run high on the side of the reporting person as this form directs them to http://mpdc.dc.gov/missing where the child's dentist will be able to add information concerning the dental records of the child. This form will be returned to the Missing Person Section at YFSD. If the child has never visited the dentist, document this information in your field notebook as it must be added to the incident report.

*3.2 Basic Investigative Incident Reports*

**JA481**

You must check all of the mentioned locations and sources, because you want to be able to definitively say that the community member in question is indeed missing to the best of your knowledge. This allows you to rule out as many explanations as possible that could explain the disappearance.

Your report must contain all of the information you obtained from the reporting person. You must also include any and all notifications you made and hospitals that were called, along with the names of the persons to whom you spoke and the date and time on which each conversation occurred. If a Command Post was established, ensure that this fact is included within the public narrative. Also, include the areas that were canvassed during the search.

If the missing person is located or returns on his or her own, complete a report for *Missing Person/Returned.* Include in the report where the community member was located, where he or she was during the time he or she could not be located, and the person's condition when he or she returned or was found.

**Court Ordered Violators and Group Homes**
There will be times when you come into contact with a youth who is twenty-one (21) years old or younger who has violated his or her court-ordered placement in a group home, not to include the Child and Family Services Agency group homes. These youth are **not** classified as *Missing Persons*, but as *Placement Violations*. When you come into contact with them, absent any offense for which an arrest must be made:
- The youth must be transported immediately to the Department of Youth Rehabilitation Services (DYRS) Youth Services Center (YSC) at 1000 Mt. Olivet Rd. NE.
- You must then contact Teletype in order to have the status of the youth in question updated throughout the system.
- You must note whom you spoke to at Teletype in your Field Notebook.
- No additional reports are to be completed outside of the aforementioned documentation.

In contrast, any youth twenty-one (21) years old or younger who are missing from any CFSA group home or who have not been committed to a group home via court order will be classified as *Missing Person* and the investigation shall be handled using the same standards as any other *Missing Person* investigation. If you locate the youth during the performance of your patrol duties, do **not** place the youth under arrest unless an arrestable offense has occurred. Instead:
- Transport the youth to CFSA, 400 6th ST SW, and turn the youth over to the custody of CFSA.
- Complete a supplemental report.
If you have any questions regarding how to transfer the custody of the youth to CFSA, contact your Watch Commander.

When you make contact with or locate a juvenile from another jurisdiction for whom a *Missing Person* report has been filed, the youth must be transported to the Juvenile Processing Center (JPC) and a delinquency report must be completed and submitted.

Adults who do not return to penal institutions from holiday leave or rehabilitative programs are *not* considered to be missing persons. Instead, these adults must be handled in accordance with **General Order PCA-501.08 - Arrests of Escapees from the D.C. Department of Corrections.**

**Locating Competent Out-of-State, Adult Missing Persons**

*3.2 Basic Investigative Incident Reports*

**JA482**

Competent adults can leave their homes for a myriad of reasons, some of which may be safety-related, and they cannot be forced to return against their will. When you locate such an individual:

- advise the individual that he or she is the subject of a *Missing Person* report as he or she may be unaware.
- inquire as to whether the individual wishes to have his or her whereabouts disclosed to the person who initially reported him or her missing.
- if after affirming the person's safety and well-being, the individual states that he or she does not want the reporting person to know of his or her location, inform the reporting person that the individual that was formerly missing has been located and is well, but does not wish to have his or her location disclosed.
- if the reporting person demands to know the location of the formerly missing person, inform him or her that such disclosure would constitute a violation and invasion of privacy.
- if the located adult was reported missing in another jurisdiction, contact Teletype so the unit can update the necessary party in the appropriate jurisdiction.

Close the case by preparing an incident report with the classification *Missing Person Found (Interstate)* and include the OCA number within the narrative.

## 3.2.5    Complete an Event Report for any of the incidents encountered in this instructional block

In your time at the academy, you will learn how to complete *Basic Investigative Incident Reports*. Please take special note of the following information:

Officers and/or their superiors are required to notify the CIC of the following situations:

- Crimes of violence
- Critical missing persons (AMBER and Silver alerts)
- Hospital details
- Injured officers
- Gun recoveries
- License plate reader arrests
- Suspicious packages
- Burglaries (excluding attempts)
- Vehicle pursuits
- Large vehicle disruptions
- Any other unusual occurrences
- Sounds of gunshots with property damage
- Sounds of gunshots with ballistic evidence recovered at the scene
- ADW gun where shots were fired
- Any other significant event involving gunfire

When you have filled out your narrative and made the proper contact, please indicate the name of the CIC staff member that was notified. The CIC can be reached by phone **(202) 727–9099** or by email at **CIC.adminbox@dc.gov.**

**Summary**

*3.2 Basic Investigative Incident Reports*

**JA483**

As you have learned, not every report you take will be for an offense, but this does not lessen their importance in any way and proper documentation on your part must occur. Every scene and call to which you respond requires empathy and compassion. When you respond to the scene of an injured person, he or she will look to you for support. You are the stabilizing influence for *Check on the Welfare* investigations, the person that is called when community members are worried and seeking reassurance. The same goes for receiving a call about a missing person, as you must take control of your scene while showing the compassion necessary for the reporting person to know you care about the safe return of his or her loved one nearly as much as they do.

Understanding how to handle your scene for the incidents about which you have just learned will ensure that you are policing to the best of your ability. It will also ensure that you are providing the type of protection and service that the citizens within the District of Columbia depend upon you to deliver.

*3.2 Basic Investigative Incident Reports*

**JA484**

# Metropolitan Police Academy



# 3.3 Crime Scene Awareness and Management

November 6, 2023

## 3.3.1        Explain the key considerations for officers when they arrive on a crime scene

Patrol officers encounter crime scenes on a daily basis. The scenes vary in size, complexity, and severity. Regardless of these variations, the first consideration on every scene must be safety. Scene safety is a phrase that you will hear repeatedly throughout your time in the academy and career, but what does it mean? **Safety** is defined as "the condition of being protected from danger, risk, or injury."

As a police officer, it will be your job to protect yourself and others from danger, risk, and injury. When you approach a crime scene, you must immediately assess any potential safety concerns.

Things to consider:
- The suspect's location.
- The location of weapons on the scene and if they are accessible to the victim or suspect.
- Hazardous scene conditions (e.g., condemned buildings, gas leaks, open manholes, stairwells, and doorways).
- Potential biohazards that may be present (e.g., blood, bodily fluids, drugs that can be absorbed through the skin like PCP).
- Potentially aggressive animals (e.g., dogs).
- Pests such as roaches, bedbugs, or even pets that could be infested with lice. (This is a serious issue. Many insects are easily transmitted through simple contact, and you do not want to bring these insects home with you.)

Remember that the assessment of safety never stops. Threats to safety can change with little or no warning. Protect yourself and your partner by taking control of the scene during an investigation. If a suspect is on the scene, an officer should be in control of the suspect at all times. If a weapon is on the scene, separate the victim and suspect from it, or secure the weapon if separation is not possible.

Always be mindful of your surroundings. Unsafe structures and buildings increase the chances of you or someone else being injured. While you are on the scene, be aware of what you are touching and where you are stepping. Always wear personal protective equipment (PPE), such as rubber gloves, when on crime scenes. If you are in a location that may be infested with pests and/or insects, limit your contact with that environment as much as possible.

Once scene safety concerns have been addressed, your next consideration is **securing the scene**. Securing the scene can help to minimize new safety risks from developing while providing the first step in preserving evidence. This is accomplished by **establishing scene boundaries** that encompass all areas known or suspected to contain evidence. You should always make your scene is large enough to encompass areas like flight paths/escape routes. It is far easier to decrease the size of a scene later than to increase the size of a scene as potential evidence may be destroyed.

> **For example:** You are on the scene of a homicide along a busy road. You have established scene boundaries around the area containing the body but chose not to block the street to keep traffic flowing. A crowd gathers at the boundaries while new information is uncovered that the suspect may have shot the victim from across the street. The area

**JA486**

across the street is not included within your scene so you must expand your scene boundaries. The first hurdle is to move the crowd, and this can prove very difficult when it includes potential family members and friends of the victim. Once you have moved the crowd, you now need to reestablish your scene boundaries. Expanding a scene often takes more police officers and resources than making the scene larger at the beginning.

When establishing scene boundaries, the preservation of evidence and the safety of emergency workers must take precedence over traffic concerns and pedestrian convenience. Showing respect and compassion to individuals inconvenienced by a crime scene is imperative, but MPD officers cannot sacrifice the integrity of the scene for the convenience of these individuals.

We have talked about where you should place the scene boundaries, but how do you physically establish scene boundaries? The first and most common way is for an officer to advise approaching individuals. Other methods of securing a scene are to use physical barriers such as crime scene tape, barricades, fences, walls, buildings, and anything else that physically blocks a person's passage into the scene. Once the boundaries are physically established, officers must be positioned to ensure that the boundaries are respected.

Once the boundaries are secure, an access point to the scene should be established. The primary responsibility of the officer assigned to the access point is to establish a crime scene log using their police notebook. A crime scene log is used to record the names of anyone who enters or is already inside the scene.

Crime scenes can occur in indoor or outdoor settings and all environmental conditions. Each type of location has unique challenges and requires a somewhat different response.

> **Outdoor scenes** have more potential access points. Every access point needs to be secured and monitored. Outdoor scenes generally require more officers to secure due to the increased number of access points and the fact that they can cover a much larger area. They also have the potential to be compromised by weather, such as rain, which can wash away possible evidence. In situations like this, it is important that officers be guided by the official on the scene and do what they can to preserve evidence without disturbing or contaminating it. It also is important to make sure you request the appropriate crime scene unit to respond in a timely fashion to facilitate the scene being processed in the fastest manner possible. This will help preserve as much evidence as possible during inclement weather or adverse conditions.
> **Indoor scenes** are often smaller and generally have limited entrance points, which can reduce the number of officers required to secure the scene. An indoor scene also creates a natural access point and allows a crime scene log to be more easily kept. The challenge with indoor scenes is that there are often many more hiding places for people and evidence to be concealed.

## 3.3.1-2    Crime scene communication

Police departments have traditionally tried to tightly control the flow of information regarding ongoing incidents and investigations. Generally, the release of information is centralized in the hands of senior commanders and designated spokespeople. There are good reasons for doing so. It ensures consistency

**JA487**

in the message that is provided to the public—with only a handful of officials speaking to the media, it is much less likely that multiple, conflicting messages will be disseminated.

There are also serious risks associated with releasing information:

- If a suspect is alerted that the police are specifically looking for certain pieces of evidence, it is possible that he or she will attempt to destroy or hide that evidence to prevent the police from finding it.
- If a suspect is alerted to the fact that the police are looking for him or her, he or she may flee. This could also create the potential for violence if the suspect has time to prepare, whereas the police may have been able to make an arrest without violence if the suspect was surprised.
- Sometimes initial information or reports are wrong. Investigators are trained to keep this possibility in mind and to seek out as much corroborating evidence as possible, but the media often reports whatever the initial account is as unquestioned fact. This has led to false narratives of events becoming widely believed by the public and to the misidentification of suspects.
- Individuals speaking to the media may not stick strictly to information that they know for certain to be true. Individuals may give in to the temptation to speculate or report information that they merely believe to be true but is inaccurate.
- Defense attorneys will attempt to claim that particularly widespread or sensational coverage is so prejudicial that it prevents their clients from getting a fair trial. If successful in court, these claims can endanger successful prosecutions.

Given these risks, it is understandable why many police agencies choose to tightly control the flow of information from within the agency to the public. When communication was limited to daily newspapers and nightly news broadcasts, such a system of controlling public statements worked fairly well. As we are all aware, however, information moves much, much faster today.

With access to the internet and social media literally in the palm of everyone's hands, information and misinformation can spread like wildfire. This has a number of implications for police communications:

- Trying to prevent *basic* information from being released, except on our timetable, is often futile and counterproductive. Witnesses, journalists, activists, and everyday people are often already talking about what they have seen or heard on platforms that have a global reach.
- Many departments have established presences on social media and use these to inform the public about serious crimes and other notable incidents. Often, officers have not received any additional training on communications and operate under the old mindset concerning print and broadcast media. This has led to situations where officers refuse to provide any sort of information about why they are present at a location, while their agency's official social media account has already released the nature of the incident for public consumption.
- When means of communication moved much more slowly, the measured, centralized release of information did not seem unusual and did not impact the general perception of law enforcement authority. Today, in contrast, people are generally used to receiving information within minutes (at the most) of a request or incident. The inclination of some agencies to wait hours, or even days, before releasing any information seems more and more unusual to people. This can have the effect of undermining trust in the agency.

**JA488**

Police agencies must adapt with changing technology, while not letting go of the solid fundamentals of good law enforcement communications strategy. The principles of the Marine Corps Command and Staff College related by Dr. Garcia provide a good guideline for police officers when it comes to communicating about crime scenes or ongoing investigations:

- **Engage:** Speak with the members of the community who are on scene. Simply refusing to speak is becoming less and less of an option, and your refusal to speak sends a message in itself.
- **Tell the truth**: Don't lie, but also don't reveal confidential or sensitive information. You are responsible for whatever you say so you will have to balance giving out information against potentially compromising an investigation. <u>If you are in doubt, err on the side of releasing less information.</u> However, just because you decide to avoid releasing specific information does not mean that you cannot engage and converse with community members.
- **Stay in your lane:** Talk only about things that are your direct responsibility. Adhering to this maxim will help you avoid compromising an investigation. In general, only talk about what you are immediately doing; if you're holding a crime scene, limit your remarks to holding the perimeter of the scene. Don't talk about what other officers or detectives are doing, as this increases the chances of inadvertently compromising the investigation. Once information has been released, we cannot recall it.

When speaking with members of the community on scenes, use plain English and not jargon or technical terms which can be confusing to people who are not professional law enforcement officers. You cannot assume that your audience is familiar with police procedures and terms. Also, the use of technical language can make officers seem disengaged, remote, or uncaring to the public.

Be mindful of your interactions with other officers. Laughing and joking on scenes can very easily send the wrong message and be misinterpreted. You will be judged by others on your bearing and manner. While jovial behavior is often innocent in nature (such as coworkers expressing comradery, expressing happiness upon seeing an old classmate from the Academy), to the public it appears that the officers have an inappropriate bearing and manner while handling the trauma experienced by a community member.

While engaging with members of the community, you must never lose sight of the fact that you are investigating a crime. The primary purpose of your engagement is to reassure community members regarding their safety, provide basic information about why the police are at a particular location (without compromising the investigation), and potentially gather additional information that would be beneficial to the case itself. Ensuring trust in law enforcement and reassuring the public of its safety are fundamental parts of the job of police officers. Each opportunity to engage allows MPD to positively build trust with our community. Of course, we are talking about times when a situation is under control, and it is safe and prudent to speak with bystanders.

With an active hazard or unsecured scene, or when other pressing tasks are to be accomplished, those will generally take priority over speaking with uninvolved parties. <u>For example</u>**:**

- You arrive on a scene and are told that it's a homicide, however the sergeant hands you a roll of crime scene tape and tells you, "Go secure the front of the building." As you secure the scene, you will be looking for potential evidence and, if found, you will keep it from being lost, destroyed, moved, tampered with, or missed by another officer. Once a detective or crime scene technician arrives on the scene, you should notify them of what you have found.

**JA489**

- You are maintaining the crime scene perimeter when you are approached by a member of the community who wants to know what happened. **Engage***:* Introduce yourself and ask who he or she is. **Explain**: Tell the truth while staying in your lane by providing basic information which would not compromise any investigation. Saying to a member of the public that the police were called to the house and that officers are currently investigating what happened is acceptable. Even if there are pressing tasks, you should at least acknowledge the community member and tell him or her that an officer will come back to talk when possible.
- If a concerned community member asks if anyone is deceased, you may not disclose this information without consulting with an official or the lead detective on the case. A next of kin notification may not have been made and it should not come to the family through street rumors. If the member of the community is asking because they are a relative, friend, or other concerned party, acknowledge and respect the question. Identify and locate, when the timing is appropriate, a detective and/or official to speak with the community member.
- If a witness is known, this is something that may not be released, as it may imperil the investigation or the witness and his or her family. You should neither acknowledge if a witness has survived the attack nor to which hospital he or she was transported.
- Similarly, you should not disclose specifics about the crime, such as the type of weapon used, or statements made by a witness or suspect. You can reassure the community if the police are still looking for subjects or if there is no concern for continued public alarm. Encourage members of the community to call **(202) 727-9099** if they hear any details, and hand out a tip card if possible.
- If a lookout has been placed for a specific individual or vehicle, ascertain from a detective or supervisor if this information is for the general public or is being kept under wraps so as not to alert the suspects they are known and being sought. As deemed appropriate by the official, you may communicate this to the inquiring community member.
- Members of the media that arrive on the scene and are looking to conduct an interview or gather additional information for reporting purposes should be directed to an official on scene. It is not the role of a patrol officer to serve as the official spokesperson for the department, nor to make declarative statements to the media.

Officers are responsible for being engaged and providing good customer service through every interaction. Consider the following scenario:

> You are an officer assigned to scout/cruiser 5031. You receive a radio assignment for the sound of gunshots at 1234 Main Street NE. Upon arrival on the scene, you and your partner find the front door of the home ajar. As you proceed to the door, you see that it has been "kicked in" and the locking mechanism destroyed.
>
> You call out to the interior of the house and receive no answer. Carefully entering the home, you find an individual inside suffering from multiple gunshot wounds. The victim has been bound and possibly assaulted. You immediately call for assistance, give aid to the injured victim where possible, and check the house for any suspects or additional injured victims or complainants/witnesses.
>
> A short time later, the EMS board has come and gone, and the house is filled with officials, detectives, and crime scene personnel. You and your partner are told to put up crime scene tape. As you begin laying out the crime scene tape and establishing the boundaries of the crime scene, you realize a small crowd of concerned community members have

**JA490**

gathered on the sidewalk directly in front of the residence. They begin calling out questions asking about the well-being of the occupants of the home. How do you respond?

In the past, officers would respond with little to no information. In fact, some officers have been rude and demanded the crowd disperse. However, you cannot and should not respond in this fashion. So, how should you respond? Depending on your knowledge and responsibilities, here are a few suggestions:

- When you are among the first responding officers, you are going to have more information than others when asked questions. At the same time, however, the department may be releasing information as the scene is being investigated (example Twitter feed: "MPD is investigating the sounds of gunshots at 1234 Main Street, NE, more information to be released later.") The community is not naive. So, how should you answer their questions about the well-being of the occupants? First, while you should not lie to them, you should keep in consideration that next of kin notifications have most likely not been made, even if the victim's body has been identified. You might answer in this manner, "The detectives are currently investigating a shooting that occurred inside the residence and will be getting in touch with the families of those persons involved."
- This may naturally be followed up by a community member asking, "Was anybody killed?" Here again, keep in mind the feelings of the family members who have not yet been notified and what the public actually needs to know at this moment. Consider answering in this manner: "I don't know much about the scene. I know that members of the District of Columbia Fire and Emergency Medical Services Department have come and done what they could, and the department is currently attempting to reach out to family members."
- Saying "Next of Kin" is a giveaway that someone is deceased inside. If the transport vehicle from the Office of the Chief Medical Examiner is on the scene, you can acknowledge that a death has occurred (if known), but you should refrain from disclosing the identity of the deceased. If members of the community want more information, this is an appropriate time to request an official to speak with members of the public. Let the community know you have requested an official or detective to come to speak with them.
- If someone in the crowd offers to call a family member, quickly contact one of the detectives and have them come out and talk with that individual.

Patrol officers do not have to carry the burden of public communications solely on their shoulders. They should confer with the detectives and/or officials on the scene as to how much they should say.

**Information that should be withheld**

Since we are discussing the responsibilities of the first officers on the scene, they should refrain from giving out specific information such as, "A female was criminally assaulted." In addition, this type of information should not be mentioned over the radio.

Other information that should be withheld at the crime scene is:
- The fact that a particular type of weapon was used (e.g., "They used a shotgun." "They used a machete." "She was raped at knifepoint." "She was strangled with a nylon hose.") This type of

**JA491**

specific information should be guarded and not shared as the detectives may use it during an interrogation to determine if someone is lying or not.

- Information that the residence was entered by kicking in the front door. Again, you should refrain from sharing this as it may cause concern among the local residents that their residences may be next, when in fact, this could very well have been a targeted location. Officers should attempt to ease the concerns of the community members for their own safety by assuring them that this appears to be an isolated incident if this is true.

Officers should ask those community members on the scene if they have any information that they would like to share that may assist the detectives in their investigation. Officers should keep in mind that the community members feel invested in the well-being of their neighbors and the neighborhood in general. When an incident occurs, it is normal for people to ask questions and want to know what happened. If it occurred in your neighborhood, you would want to know too.

Per **GO-SPT-302.13 (Body-Worn Camera Program)**, members shall activate their BWCs for all dispatched and self-initiated calls for service.

Each potential scenario is different, dynamic, and variable based upon the circumstances of that scene. Officers need to acknowledge and engage with members of the community. Lack of engagement, rude, or discourteous behavior undermines the fundamental principles of our agency and makes the work of each of our officers that much harder.

As noted, there will be times that officers are engaged in a law enforcement operation and the timing and release of information could be detrimental to the operation; however, officers should return and communicate on such scenes as soon as it is practicable to do so. Sufficient officers should be called to any scene to ensure MPD addresses and positively interacts with community members, where possible.

Every encounter with a member of the public is critical to building trust in our department and assuring the community we are here to help them. Your actions as a police officer will reflect on the MPD brand and are critical. Communicating appropriately is not just the responsibility of the Public Information Officer, district officials, or the Commander; it is a fundamental duty of each police officer in our department.

Appropriate communication with members of the community not only reflects the needs of the department but also the needs of the community. Every interaction a community member has with a member of the department should leave him or her feeling as if concerns have been acknowledged and addressed in some way. Consciously acting and communicating professionally reassures the public that MPD is engaged in their communities, cares about their well-being, and is working to keep them safe.

## 3.3.2  Identify the five basic search patterns

Once a crime scene is safe and secure, the search for and recovery of evidence can be particularly challenging. The only way officers can ensure that every area of a crime scene is searched for evidence is to use a systematic approach. This approach consists of five different search patterns:

**JA492**

**Spiral Search -** A search method in which the officers move in an inward spiral from the boundary of the scene to the center of the scene, or in an outward spiral from the center to the boundary. A spiral search is commonly used when looking for an object that is suspected to be a specific distance from another. For example: A cartridge casing from a gun or an object thrown by hand from a specific location but thrown in an unknown direction.



**Line search –** A search method used by multiple officers who stand in a long line and walk in straight lines going the same direction across the crime scene. Stakes and string can be used to create "lanes" for which each officer is responsible. A line search is commonly used when searching a large area looking for a large object.



**Zone search -** A search method in which the crime scene is divided into smaller sections and officers are assigned to search each section. Each of these sections can be subdivided into smaller sections for smaller teams to search thoroughly. A zone search is commonly used for recording the location and shapes of suspected blood patterns, projectile trajectories, and other types of evidence where the interrelationship of each piece of evidence is of the highest concern.

**Grid search -** A search method employed by one or more people overlapping separate line searches, thereby forming a grid. A grid search is commonly used for searching large areas such as a field or open lands.



**JA493**



**Wheel search pattern -** A search method employed by several people moving from the boundary of the scene straight toward the center of the scene (inward) or from the center straight to the boundary (outward). A wheel search pattern is commonly used for searching large open areas. Each section of the wheel is searched using a variation of the line or grid search.

### 3.3.3        Identify the types of evidence that may be found at a crime scene

Police officers have a responsibility to identify, document, and preserve evidence at any crime scene they encounter, but what is evidence? **Evidence** is defined as "information given personally, drawn from a document, or in the form of material objects, tending or used to establish facts in a legal investigation."

Evidence can either support or disprove an officer's theory of the events on a crime scene. It is the responsibility of every police officer investigating a crime to consider all relevant evidence in making their decisions and preserve it for analysis and judicial proceedings. There are several broad types of evidence.

**General Evidence**
General evidence is any physical item that provides a clue or leads to relevant facts in a criminal investigation. General evidence can be a physical item that provides insight into a case through its presence, position, or condition, or through the information it contains.

**Blood Stain Evidence:**
Blood Stain Evidence is present at a crime scene and the blood stain was deposited during or after and as a result of what occurred on the scene. When you observe what you believe to be a blood stain, but you were not present to witness its origin, it should be referred to as *suspected blood*. Analysis of blood stain evidence can assist investigators in answering a number of things, such as:

- Where did the blood come from?
- What caused the wounds?
- From what direction was the victim or suspect wounded?
- How were the victim and suspect positioned?
- What movements were made after the bloodshed?
- How many potential perpetrators were present?
- Does the blood stain evidence support or refute witness statements?

**DNA Evidence**
DNA or deoxyribonucleic acid is the building block for the human body. DNA is found in blood, saliva, skin, hair, and bone. DNA from an individual is the same no matter what type of cell it comes from. For example, the DNA from John's blood will be identical to the DNA from John's saliva.

DNA is a powerful investigative tool, and it can be recovered from a variety of surfaces (e.g., countertops, door handles, weapons, and other surfaces). If recovered, DNA has the potential to positively link a known suspect to a scene or to another piece of evidence. With the exception of identical twins, no two individuals have the same DNA.

If you are working on a case with no known suspects, DNA can be compared to an FBI database known as CODIS (the Combined DNA Index System). CODIS contains DNA profiles contributed by federal, state, and local participating forensic laboratories from all 50 states, the District of Columbia, the federal government, the U.S. Army Criminal Investigation Laboratory, and Puerto Rico.

**Trace Evidence**

Trace evidence refers to a very small piece of evidence left at or taken from a crime scene that may be used to identify or link a suspect to a crime. Trace evidence can consist of many things, including human hair, animal hair, textile fibers, rope, feathers, soil, glass, and building materials. Physical contact between a suspect and victim or a crime scene can result in the transfer of trace materials. The identification and comparison of these materials can often associate a suspect to a crime scene or another individual. Here is a description of some types of trace evidence:

- **Hair -** Examination can determine if a hair is animal or human. If animal, the species and possibly breed of the animal can also be determined. If human, the racial characteristics, body area, length, root type (whether it naturally shed or was forcibly removed), and any artificial treatment or damage can be determined.
- **Fibers -** Examination can determine if a fiber is natural or manmade. Questioned fibers can be compared to fibers from a known source to determine if they are consistent with the questioned fiber from that source. Questioned fibers can also be compared to other questioned fibers to determine if they are consistent, though the source is not known.
- **Fabric -** Examination can determine if a questioned piece of fabric and a known piece of fabric are consistent in color, construction, and composition. Torn pieces of fabric can be physically matched to a damaged garment.
- **Feathers -** Examination can determine the species of bird that a feather came from, and questioned and known samples of feathers can be compared.

**Fingerprints**

Fingerprint evidence plays a crucial role in criminal investigations. Since a person's fingerprints are unique and do not naturally change during their life, they can be used to quickly and effectively confirm or disprove a person's identity. Fingerprints collected at a crime scene have the potential to link a series of crimes together or to place a suspect at the crime scene.

**Footwear and Tire Impressions**

The basic theory behind footwear and tire track analysis is that, much like fingerprints, shoes and tires may leave behind either prints (referred to as "imprints") or impressions that can be examined by investigators. The type of evidence left behind depends largely on the type of surface traveled. Often criminals take steps to cover their face and hands but rarely take steps to cover their footwear.

Footwear and tire impressions are evaluated on the following characteristics:

- **Individual characteristics** are unique aspects of a particular shoe or tire that result from use, not the manufacturing process. These could be from damage such as a cut, gouge or crack, or a temporary alteration like a stone or twig stuck in the tread.
- **Wear characteristics** result from the natural erosion of the shoe or tread caused by use. Specific wear characteristics include the wear pattern and the basic position of tread wear, the wear

condition and the amount or depth of the wear, and, where extreme, the damage to or destruction of the tread. For instance, the location and amount of tread loss on a particular brand and style of shoe will be different for each person wearing the shoe based on how and where they walk, and the length of time they have owned the shoe.

### 3.3.4        Explain ways to minimize contamination of a crime scene

**Contamination** is the introduction of something to a scene that was not previously there. Each time you interact with a crime scene, you will leave something behind or take something away. It is very important that you minimize this interaction.

Only trained members shall process scenes and collect evidence. All evidence shall be collected in accordance with Attachment A (Responsibilities for Processing Incidents and Crime Scenes) from GO-OPS-304.08 (Crime Scene Response and Evidence Collection).

Preventing crime scene contamination begins with each officer. Officers must refrain from eating, drinking, using tobacco products, or engaging in any other behavior that could cause them to deposit trace evidence at a crime scene. Wearing personal protective equipment (PPE) like rubber gloves can help to prevent you from adding your fingerprints to the scene or depositing other trace evidence that could cloud an investigation.

*NOTE:* Rubber gloves do **not** prevent you from picking up trace evidence from a surface onto the glove or from destroying fingerprints that may have been left on a surface you are touching.

Every action you take and everything you touch on a crime scene should have a valid and justifiable reason. As a general rule, you should never touch or move evidence. If you are forced to move evidence in order to provide a safe crime scene, it should be done so sparingly and with care and caution.

> For example: You arrive at the scene of a shooting where the victim and suspect are still on the scene. The firearm is also still present on the scene. While securing the suspect and rendering aid to the victim, you may need to move or secure the firearm to protect yourself or others from continued violence.

*NOTE:* Officers should not disturb evidence unless it is to protect life or prevent injury.

Officers may also move evidence in situations where if the evidence was not moved, it could be lost or destroyed. Anytime you move evidence, you should always do what you can to first document its original location and condition through either photographing it or making notes when it is safe to do so.

With all that in mind here are some ways to minimize crime scene contamination:

- If your presence is not required on a scene, do not enter it. Every person's presence on the scene should be explainable and necessary.
- If you are on a scene and your presence is no longer required, you should leave the scene.
- When arriving on a scene, be careful where you park. Otherwise, you could easily drive over evidence and destroy a chance at solving a crime.

**JA496**

- Always be cautious where you step on a crime scene. You should use the same path to enter and exit the scene.
- No matter how many times a scene has been searched, you should always scan for evidence as you move about a scene.  It is not uncommon to find new evidence as you move around.
- Wear gloves and do not touch anything that is not absolutely necessary. Each time you touch something you leave something behind or take something with you.
- Do not use chalk to mark the location of cartridge casings or place anything over the top of the casings.

**It is critical that members do not do anything that may unintentionally contaminate forensic processing of the evidence.**

## 3.3.5        Explain the importance of documentation of crime scenes

**Crime scene photography** is very important because it begins the documentation process of a scene. A photograph captures and preserves an image of evidence in the state it is in at the time the photograph is taken.

MPD issues every officer both a body-worn camera (BWC) and a cellular telephone. Both of these devices are linked to an official evidence archive maintained by the department at **Evidence.com**. The primary use of the cell phone is to classify BWC videos in the field, so officers do not have to return to the station and use a desktop computer to tag their videos.

The cell phone also comes pre-loaded with **the AXON Capture app**. This app uses the cell phone's camera to take photographs and upload them to Evidence.com. Photographs taken with AXON Capture become official crime scene photos and must be categorized and retained appropriately.

Patrol officers are to use AXON Capture to take crime scene photographs when that is the **only** form of evidence processing necessary at a crime scene. This will generally be most misdemeanor offenses, assaults, robberies where only minor injury occurs, and other scenes requiring an investigation (like an MPD-involved traffic crash with minor damage only). Patrol officers are to take crime scene photos with their department cell phones *only* when it is the only kind of evidence processing necessary. For example, if there was a break-in where both photographs and fingerprinting were necessary, the officer would call for a crime scene trained unit, and the trained officer would then both fingerprint and take crime scene photos.

Keep in mind that taking pictures or videos of a crime scene creates evidence. Therefore, photos should only be taken with your department-issued cell phone. You should never share photographs of a crime scene on social media. You should never take pictures using your own cell phone as doing so could allow a defense attorney to obtain a court order to examine everything on your personal phone as well as any devices or social media accounts to which it is linked.

**Crime scene diagrams** are an important tool that crime scene technicians use to capture the overall layout of a scene. They also document the location evidence is discovered on the scene. A crime scene diagram

**JA497**

includes measurements of the distance between evidence and a permanent object or structure. A diagram allows for the reconstruction of a crime scene at a later date to assist an investigation or prosecution of a case.

Once evidence has been documented through photography and diagramming, it must be removed from the scene and stored for presentation at court. Packaging and storage of evidence from scenes processed by the Department of Forensic Science (DFS) is generally done by the technician handling the scene. Evidence recovered on crime scenes processed by trained MPD members is packaged and stored by the officers at their respective element.

## 3.3.6 Differentiate between the roles of MPD members trained in evidence collection and evidence technicians assigned to the Department of Forensic Sciences

When more evidence must be processed than just crime scene photographs, you will need to call for an MPD member trained in evidence collection or a Department of Forensic Sciences (DFS) crime scene technician, depending on the type of crime scene (**GO-OPS304.08 [Crime Scene Response and Evidence Collection]**).

**MPD Members Trained in Evidence Collection**
Each district has a number of sworn officers who have been trained to process crime scenes when fingerprints, cartridge casings, or buccal swabs are the only form of forensic documentation required. These officers are assigned to each district and perform crime scene processing in addition to patrol duties. Generally, they handle non-violent burglaries and vehicle-related crimes (excluding carjackings), random gunfire calls for service, or when directed by a watch commander.

**Department of Forensic Sciences Evidence Technicians**
DFS Evidence Technicians work out of the Consolidated Forensics Lab. DFS is an independent city agency that provides integrated forensic, scientific, and crime scene services to the various DC government agencies tasked with investigating and enforcing laws, codes, and regulations. DFS technicians respond for the most serious criminal offenses and incidents that have the potential to develop into serious offenses (e.g., missing persons reports where kidnapping or other foul play is suspected or an unconscious injured individual where a violent assault is suspected). DFS handles all potential DNA evidence collection, firearms cases, cases involving other weapons, violent crimes that result in serious bodily injury or death, carjackings, and traffic-related fatalities. More information about the types of crime scenes that require a DFS response can be found in Attachment A (Responsibilities for Processing Incidents and Crime Scenes) from GO-OPS-304.08 (Crime Scene Response and Evidence Collection).

## Summary

Patrol officers encounter crime scenes daily. The first consideration at every scene, regardless of its size, complexity, or severity, must be safety and then its integrity. Officers have a responsibility to identify, document, and preserve evidence at any crime scene they encounter. Evidence is information given personally, drawn from a document, or in the form of material objects, tending or used to establish facts

in a legal investigation.  Officers at crime scenes should take great care to prevent or eliminate the possibility of crime scene contamination. Only trained members shall process scenes and collect evidence.

## References

| GO 304.8 | Crime Scene Response and Evidence Collection | 08/28/2023 |
| SO 13-13 | Photographs, Video Recordings and Audio Recordings of Crime Scenes | 11/27/2013 |

Oxford Dictionaries. Oxford University Press Dictionaries. 1 January 2000. 7 May 2015 <http://www.oxforddictionaries.com/us/definition/american_english/evidence>.

National Criminal Justice Reference Service. Understanding DNA Evidence. April 2001 <https://www.ncjrs.gov/app/publications/abstract.aspx?id=264320>

Federal Bureau of Investigation.  Combined DNA Index System. 1 September 2011 < http://www.fbi.gov/about-us/lab/biometric-analysis/codis>

Forensic Magazine, On the scene and in the LAB. Crime Scene Integrity. 10 October 2011 < http://www.forensicmag.com/articles/2011/10/crime-scene-integrity>

# Metropolitan Police Academy



# 3.4 Property

*3.4 Property*

## Introduction

In their duties, patrol officers will be required on occasion to take possession of various items of property. Such property may be needed as evidence for a trial, held for an arrestee until he or she is released, safeguarded for a citizen who lost something, or for a multitude of other reasons. Due to the sheer volume of property that MPD encounters, MPD has created an entire system for its collection and processing. The system spans the path of items, from the district all the way to the Evidence Control Division. Such a system would not be effective without a classification process that properly tracks the thousands of pieces of property that the department encounters on a yearly basis.

MPD officers must be adept at classifying property correctly in addition to being able to properly collect and safeguard it. There are few more important tasks MPD officers encounter than taking property into the custody of the department. Personal property, evidence, and other items are of the utmost importance to those connected with them. Consequently, the Department has instituted strict policies and procedures that allow MPD to take property into custody. Such tasks are made easier by specialized paperwork that matches each property task with its proper form. This lesson is an introduction to MPD property rules and procedures.

## 3.4.1 Identify Property Officer, Evidence Control Division, Evidence on Q Database, Station Clerk, and Property Clerk

MPD officers must be adept at handling property from its recovery out in the field to its actual processing at a MPD district station. It is important that MPD officers know each step of the property control process as well as the different jobs performed by those within MPD who are tasked with taking custody of the property after the officer is finished with it.

Per G.O. 601.01, "in all cases of property which comes into the possession of the Department, it is the responsibility of the member who first handles the property to ensure that the property is properly recorded and processed." The officer who completes the **Property Record** must also either tag (PD285) or secure the property in a **Property Bag** (PD14). The recovering officer must also make a record entry into the **Property Book** (PD82).

All property recovered by MPD officers must be reported on an Incident Report (PD251) in addition to the Property Record. All related reports, to include arrest paperwork, must denote the same Property Book (PD82) information throughout the handling of the arrest and incident.

There are several property books in a station and members shall complete each book based on the corresponding type of property they are documenting. Examples include prisoners, money, vehicle, and drugs. If drugs have been collected, they must be documented in the Drugs Property Books as well as placed in the **Narcotics Evidence Locker**.

The recovering officer is responsible for ensuring that all property is properly documented and safeguarded until he or she is relieved of the responsibility by the element **Property Officer**. After the recovering officer is finished with the Property Record, he or she will then bring it to a lieutenant or above for approval. The property is then ready to be taken to the element Property Officer.

*3.4 Property*

**JA501**

The element Property Officer inspects the forms for accuracy and ensures that all information is entered into the **Evidence on Q database**, a database that is used by MPD for the tracking of all evidence. The element Property Officer also makes sure the description in the property book and property record match the actual item of property. Then, the Property Record is given a **Property Control Number**. This prepares the recovered property for transmittal to the **Property Control Branch**. Before forwarding an item, the element Property Officer must ensure that all property is securely wrapped, tied, marked, and/or tagged.

The element Property Officer is responsible for the security and safekeeping of property held at the element until its proper transfer to the **Evidence Control Division**. A transfer must be accompanied by the Property Record (PD81). Element Property Officers also make attempts to notify owners or their families of any property being held by MPD at their respective element. The Evidence Control Division controls the inventory of all types of property that comes into the possession of MPD.

In addition, the element Property Officer is responsible for:
- maintaining custody and control over all property held at the element
- safeguarding all evidence so as to maintain a proper chain of custody for court
- reviewing all property records (PD81s) and property listed thereon for accuracy and completeness;
- ensuring that miscellaneous property such as clothing, tools, and other loose items are securely wrapped or boxed with a property tag attached
- ensuring that all serial numbers and identification numbers are correctly entered on the property record
- continually reviewing the Property Book (PD82) to ensure that all items are listed accurately, and that the property control numbers are listed for all items.

When the element Property Officer is not available, the primary contact for all property issues becomes the element **Station Clerk**. Station Clerks review each entry made on the Property Book during their respective shifts. This is to ensure that personnel are adhering to MPD directives when taking possession of property. When the element Property Officer is not present, the Station Clerk makes certain the property destined for the element's property office is properly secured. When authorized, the Station Clerk also returns property to claimants.

The MPD **Property Clerk** is responsible for all property in the possession of the Evidence Control Division. Any disputes regarding property are resolved by the MPD Property Clerk. The MPD Property Clerk is a lieutenant or higher assigned to the Evidence Control Division.

## 3.4.2    Classify property that comes into departmental custody

**Found Property**
This is any property that the department comes into contact with that has no other obvious classification. This property has no current use as evidence and is found by an officer or a citizen who presented the property to an officer. Every attempt is made to contact the owner for all found property. Further description of how to handle and process Found Property is contained at the end of this lesson.

*NOTE:* For bicycles, you must check the National Bicycle registry for ownership of found bicycles.

*NOTE:* Property found at Metro facilities or on conveyances is turned over to WMATA employees who will

*3.4 Property*

provide the MPD member with a receipt.

**Abandoned Property**
Abandoned property is found property that is specifically known to have been abandoned by someone. This type of property is processed in the same manner as Found Property. The primary difference between Found Property and Abandoned Property is the likelihood of finding an owner willing to accept the property.

*NOTE:* Abandoned Vehicles are discussed in the Traffic training block.

**Evidence**
Evidence is physical proof that supports an assertion of alleged fact. In most MPD applications, evidence supports a criminal charge. Evidence is recorded on a MPD Property Record (PD81) in a Property Book (PD82). Narcotics are recorded on a DEA 7. Evidence is kept separate from all other types of property.

**Impounded Vehicles**
These are vehicles that MPD took possession of in order to take the vehicle off a public highway or street. There are many reasons why MPD will want to do this. Reasons can be criminal or non-criminal in nature. For example, there is a drunk driver who will be released in a few hours who cannot turn his vehicle over to a licensed, sober driver in the meantime.  Another possible reason for MPD to impound a vehicle is if it is unregistered for over thirty (30) days. An Incident Report (PD251), Property Record (PD81), and Property Book entry (PD82) are required for impounded vehicles.

In the case of abandoned/junk cars that are not creating a safety hazard or need for immediate removal, officers should give a ticket to the owner/claimant, be sure to list the VIN on NOI if there is no tag, and notify the Department of Public Works (DPW) for removal. This can be done via the 311 App on your MPD issued phone.

**Property Removed from Impounded Vehicles**
Per G.O. 602.01, all impounded vehicles must be safeguarded by MPD.  If a vehicle remains impounded for over twenty-four (24) hours, MPD will take possession of all property in the vehicle. The property is classified as *Removed from Impounded Vehicle*. All property is put on a Property Record (PD81) and in a Property Book (PD82).

**Safekeeping**
Occasionally, members take unattended property into custody so that it may be safeguarded until the owner is located. Such property shall be classified as *Safekeeping* and handled in the same manner as Found Property described above. A property record (PD81) and Property Book (PD82) are required for Safekeeping items. An Incident Report is also required. Attempts must be made at locating the owner while still on the original scene. Further attempts must be made prior to the end of the officer's tour of duty.

If a vehicle is encountered by MPD that has been reported stolen, MPD must take possession of the vehicle. It is then either released to the owner or an owner representative on the scene or it is taken to a private tow lot. Either way, an entry into the Property Book (PD82) is made and an Incident Report (PD 251) is completed. If the vehicle is released to the owner or an owner's representative on the scene, a Property Released on Scene (PD81A) form is required with no Property Record (PD81). However, if the vehicle cannot be released on scene and is towed, then only the Incident Report (PD251) and Property

*3.4 Property*

Record (PD81) are utilized.

**Suspected Proceeds of a Crime**

This property is kept separate from prisoner property. Proceeds are usually taken from a person at the time of arrest. As its classification suggests, proceeds of a crime are suspected of having been acquired through the commission of a crime. For example, a person arrested for robbery may have a large amount of money in his or her possession that is suspected to have been taken during the crime. This money can be taken from the arrestee and classified as *Suspected Proceeds of a Crime*.

All seized money, regardless of classification, must have an accompanying Property Record (PD81) and must be photographed by an evidence technician. The money shall be separated by denominations when photographed. In the event that the money recovered is over $3,000, then a continuation report (PD202A) is used to record the exact denominations of the bills. The money shall also be placed in individual property bags by denominations. In addition, a minimum of two sworn members shall be present during the counting of the money. The money is required to be counted twice before it is turned over to the element Property Officer or Station Clerk.

*NOTE: Suspected Proceeds of a Crime* is only a temporary classification. The element Property Officer is responsible for notifying the recovering member and their official if the suspected proceeds have not been reclassified after ten (10) days. The recovering officer must reclassify or release the property within five (5) days of being notified by the element Property Officer or Property Clerk of the reclassification requirement.

Ultimately, Suspected Proceeds of a Crime shall either be released (via PD81C) or reclassified (via PD81D) as Found Property, Safekeeping, Prisoner Property, etc. The member papering the case is responsible for completing the PD81C in case the case has not already been papered and an AUSA or AAG subsequently releases any evidence hold on the property.

**Turned over to Police for Destruction**

This type of property has been given to the police department specifically in order for it to be destroyed. *Turned over to Police for Destruction* is written on the Property Record (PD81) and in the Property Book (PD82). Fireworks are the most common example and they will be discussed in an ACADIS module.

*NOTE:* Remember from a previous lesson that there are notifications that must be made to the Teletype Unit whenever a member is recovering, safekeeping, and impounding vehicles or license plates and any recovered, lost, or stolen weapons. Notifying Teletype is an integral part of the process in order to keep track of certain items that come into possession of the department.

## 3.4.3    Identify the PD forms related to handling property

In all cases where property comes into the possession of the department, it is the responsibility of the member who first handles the property to ensure that the property is accurately recorded and processed in accordance with the General Orders, taking special care to note timeliness, make a Violent Crime Suppression Division (VCSD) notification, the related crimes, and when $1,000.00 or more is involved. There are at least nine types of MPD forms that allow sworn members to process and safeguard property. These forms are utilized until the Property Record is signed and the property is finally turned over to the

*3.4 Property*

element Property Officer. Members need to understand each type of form in order to properly take possession of the various types of recovered property.

**Property Bags/Envelopes (PD14)**
All property taken into custody in any MPD facility needs to be securely wrapped, tied, boxed, marked, and/or tagged before it can be delivered to the Property Control Branch. Small articles and items which can reasonably fit inside should be placed inside a PD14 envelope/bag. This is the most commonly used PD form when taking property into custody. A good way to remember what goes into a PD14 is by referring to it as the "Property Bag." Property Bags/Envelopes, which are used to contain Prisoner Property, Found Property, etc., and Evidence Bags/Envelope, which are used to contain evidence shall be filled out the same way, except for the classification that is listed on the top of the bag.

Property Bags/Envelopes (PD14) can be found in the station. It is a good idea for Officers to also carry Property Bags with them on the street to handle situation when they take items from someone who has been placed under arrest. The items should be placed directly in the Property Bag to avoid loss.

Certain items are prohibited from being placed in a Property Bag and should be discarded. This includes:
- opened, perishable items
- food or beverages
- flammable items such as lighters or matches
- hazardous items

In addition to storing items of evidence at MPD facilities, the Property Bag/Envelope can be used to package items to submit for forensic testing at the Department of Forensic Sciences. When packaging items to be sent to DFS for testing, members will fill out and seal the Property Bag/Envelope normally. They will then sign, date, and place their CAD on the reverse side of the bag under the red *Tamper Evident* seal.

**Property Tags (PD285)**
A Property Tag (PD285) follows the same guidelines as the Property Bag/Envelope (PD14). It is used for any item that does not fit into the Property Bag/Envelope or Evidence Bag/Envelope. All of the same information from the Property Bag should be transferred to the Property Tag. When a Property Tag is placed on an item, it should still be secured and nothing hazardous or dangerous should be tagged.

**Property Book (PD82)**
A Property Book (PD82) is located in each station area. Officers are required to input information regarding any and all property taken into the custody of the department onto a page of the Property Book. This should be all of the same information from the Property Bag or Property Tag. The Property Book page and book number should then be recorded onto the Property Bag and Property Tag.

The left side of the property book is for the recording officer when the officer comes into possession of the property. The right side of the property book is for station personnel and is used when returning property to the owner.

Any corrections made to the Property Book must be made in red ink. The initials of the person making the correction along with his/her badge number must be written on the corrected entry. When corrections are made to the Property Book, a line in red shall be drawn through the incorrect entry. The

*3.4 Property*

**JA505**

person who made the correction shall affix his or her initials and badge number at either end of the red line.

### Property Record (PD81)

The PD81 is the Property Record form. This is used when all property other than prison property is turned over to the Property Division. All property taken into custody should be given to the Station Clerk or the element Property Officer with a completed PD81. There are paper copies of the PD81 available in each station. Members can also download and type the information into the PD81, which is located on the MPD intranet in the MPD Online Forms. It is also helpful to save a copy to your personal N drive.

*NOTE:* This form must be approved by a Lieutenant or above.

### Continuation Report (PD202A)

This report is used whenever the narrative portion of the Property Record extends past the available space. It is useful when there is an excessive amount of property involved, or the circumstances require further articulation.

### Property Released on Scene / District (PD 81A)

As noted above, it is incumbent upon the MPD member to find the lawful owner upon coming into possession of property. In cases where the owner is found and the property is not needed by MPD, the property can be expeditiously released on scene. The *Property Released on Scene* form (PD81A) allows the officer to do so without having to take the property to his/her element. An entry into the Property Book (PD82), however, is still required. The *Property Released on Scene* (PD81A) is attached to this entry.

### Property Release (PD81C)

It is a common occurrence for MPD to take into possession property that is initially thought to be useful as evidence. Sometimes, however, it is determined that this property has no evidentiary value in a criminal case or investigation. In other instances, a disposition for a criminal case has been received and the property will no longer be needed as evidence. In such cases, the initial investigating officer must file a *Property Release* form (PD81C) and forward it to the Property Control Branch. The property will then either be released to its lawful owner or destroyed (example: narcotics). Note that for Suspected Proceeds of a Crime, any requested Property Release form to the investigating member must be completed within five (5) days of notification by an element Property Officer.

### Property Ownership / Classification Information Card (PD81D)

Sometimes it becomes apparent that the original classification of property taken by MPD is no longer appropriate. For example, a purse found on a crime scene and taken as Suspected Proceeds of a Crime is discovered to have no evidentiary value. MPD must then change the classification from Suspected Proceeds of a Crime to another, more applicable, one. Sometimes it is reclassified to be Found Property, Abandoned Property, etc. The form that is utilized for such instances is called the *Property Ownership / Classification Information Card* (PD 81D).

In other instances, a recovering officer may discover the identity of the owner/claimant of previously unclaimed Found Property. A *Property Ownership / Classification Information Card* form is completed in this circumstance as well, and the form is forwarded to Property Control Branch via the element Property Officer.

### Property Receipt (PD 82A)

*3.4 Property*

There are occasions when a citizen will turn unclaimed property that he or she found over to MPD. This type of property shall be classified as Found Property. Upon taking possession of unclaimed property, it is MPD policy that the citizen be given a *Property Receipt* (PD82A). A copy of the Property Receipt is  placed in a special file at the MPD member's element. This receipt is, of course, in addition to Property Record (PD 81) and Property Book (PD82) entry that is made for the item.

## 3.4.4    Describe the procedures for taking property into departmental custody

The property record is the centerpiece of the process of taking property into departmental custody. As already noted, with the exception of prisoner's property  a Property Record must be completed whenever property is taken into departmental custody. This is in addition to the entry that is must be made in the Property Book as well as any Property Tag or Property Bag/Envelope information that needs to be completed.

When an MPD officer comes into possession of recovered property, he or she should first inspect it. For example, if the officer encounters a wallet, the officer should go through the wallet to look for any identification, money, credit cards, etc. All such contents shall be accounted for when the property is put on the Property Record and the Property Book. Another example can be a backpack or a purse. The same procedure holds true and the bag should be examined for recoverable items. Any weapons, drugs, or other contraband must be dealt with according to departmental procedures.

The officer shall then canvass and otherwise try to notify the owner of any recovered property. Hopefully, identification or other personal effects of the claimant will be found and assist in this effort. If the officer is unable to find the owner of the property, the property must be taken to an MPD district. Depending on the size of the property, it must either be bagged in a Property Bag/Envelope or tagged with a Property Tag.

**NOTE:** Be sure to include the CCN#, owner information (if available), and a thorough listing of the property on the Property Bag and in the Property Book.

The Property Record (PD81) consists of numerous spaces that describe the property and where it was found. Different sections are to be filled out by different MPD personnel.

A.    Recording Officer Information
1.    N/A (Filled out by District/Element Property Officer, not recording officer)
2.    Receiving Element - 1D, 2D, 3D…, NSID, etc.)
3.    Property Book & Page Number
4.     CCN - 15-123456Page 1 of 2, or 3,4,5 for page number
5.    No. of Items listed below - How many items are going to the property division that are listed on this PD81.
6.    No of Associates - How many people involved? Owner, Finder etc…
7.    N/A (Filled out by District/Element Property Officer at a later date)
8.    N/A (Filled in by Property Clerk)
9.    Name of member recovering Property (Your name and badge number) may be different from box 10

*3.4 Property*

**JA507**

10. N/A at time of submission

B.    Part 1 - Description of Property
   1. Date recovered - The date the officer is putting the information in the Property Book and submitting the PD81. The date the officer comes into contact with the property.
   2. Where was property found? - Location the property was recovered

Classification section:
   1. Abandoned
   2. Turned Over to Police for Destruction
   3. Suspected Proceeds of Crime
   4. Estate of Deceased
   5. Evidence
   6. Found
   7. Safekeeping - Recovered Stolen Auto
   8. Held for Civil Forfeiture
   9. Impounded
   10. Removed from Impounded Vehicle
   11. Set Out for Eviction
   12. Prisoner's Property
   13. Alleged Mentally Ill
        a. Item No - Given to each individual item entered on the PD81 (1-5, continue onto another PD81 if more than 5, 6-10, etc.) Indicate page numbers in box between boxes 4 and 5. Ie. 1of 2 or 2 of 2.
        b. Description of Item: Give a brief description of the property. Do not give value when value is unknown (i.e. say yellow bracelet instead of gold, or shiny grey instead of silver), and note if broken before taken into police custody (I.e. Apple iPhone with cracked screen)
        c. Color
        d. Serial Number
        e. Classification - Choose from the above list and mark with the appropriate letter
        f. Quantity: How many? Do not use this if they are different (i.e. two cell phones should be recorded separately with different serial numbers, however 25 clear zip should be listed once with a quantity of 25).

The Following sections are to be completed by the reporting officer:
1. Part II - Motor Vehicles Impounded or in Custody: Self - explanatory, fill in fields where appropriate
2. Part III - Description of Firearms - Self - explanatory, fill in fields where appropriate
   Special Notes for filling out a Property Record Form (PD 81)
        1: Model # of weapon can be found on the slide of newer semi-automatic handguns and on the frame of most revolvers.
        2: Number of shots should indicate magazine capacity of semi-automatic or cylinder capacity of revolvers NOT the actual amount of cartridges in the firearm at the time of recovery.
        3: The officer turning over the property to either Station Clerk or the District/Element Property Officer should ensure the property has been signed for on the Property Book (PD82) by the station clerk or property before turning it over to them.
3. Part IV - Court Disposition: Completed by attorney
4. Part V - Property Ownership/Claim Information
   *3.4 Property*

**JA508**

    a.   Item Nos - This corresponds with the item in question listed in Part 1, Section A, Item #
    b.   Type of Associate: Owner (O), Claimant (C), Dependent (D), Lienholder (L), and Finder (F), displayed at the top. This corresponds with the item number
    c.   Name of Associate - Last, First
    d.   Address: #, Street, City, State, Zip
    e.   Social Security Number (if necessary)
    f.   Telephone Number
    g.   Charge (If applicable)
    h.   Arrest No. (If applicable)
    i.   Disposition (If applicable)

5.   Part VI - Statement of Facts
    a.   The narrative of the PD81 should include the circumstances by which MPD has come into possession of the listed property.  The chain-of-custody for the property must also be included here.

The Property Book must also be completed with the requisite CCN#, Officer Name, the classification of the property, etc.  A good description of the property being taken should also be written.  Be sure to note the space where the element Property Officer or Station Clerk signs to acknowledge receipt of the property from the recovering member. Once complete, the Property Record (PD81) is ready for the lieutenant's signature. All Property Records must be approved by a lieutenant or above prior to listing items in the Property Book and giving them to the Property Clerk.

## 3.4.5          Describe a found property investigation

A common situation that MPD members will encounter is a Found Property investigation. Although not one of the more involved of MPD member tasks, its importance is readily apparent. As covered earlier in this lesson, the safeguarding of property is one of the most important functions of the Metropolitan Police Department. Suppose a community member presents an MPD member with property that has been found on the sidewalk. What steps must be taken? First, the MPD member must be diligent to safeguard the property. Then, the MPD member must investigate the circumstances that led to the property being found. Is it possible evidence of a crime? Was the property damaged? These are all part of a Found Property investigation. This type of investigation is recorded in the member's notebook before any departmental paperwork is initiated.

Upon being presented with Found Property, it is required that the MPD member give the citizen who found it the original of a Property Receipt (PD82A), described above. The MPD officer will turn over the form copy to his or her respective element. MPD officers should always have *Found Property* forms available for such scenarios. Please note that the Property Receipt does not infer any right to the property to the finder.
The MPD officer must then complete an Incident Report and Property Record and record an entry in the Property Book. Note that in most instances, the Property Receipt will have its Property Book entry information updated at the element. All of these tasks must be completed prior to the conclusion of the member's tour of duty.

It is however, required of the member to attempt to locate the owner of the recovered property. If this can be conveniently accomplished on the original scene, the MPD officer will obtain a signature on the *Property Released on Scene* form (PD81A). A lieutenant or above must approve of any property released

*3.4 Property*

**JA509**

on the original scene. Satisfactory proof of ownership is required in order to release any property. If property is released on the scene, such a scenario must be articulated in the Incident Report (PD251). The MPD officer must still respond to the element complete the Property Record and Incident Report and to the property into the Property Book,.

The *Property Released on Scene* form is stapled to the Property Book entry. MPD requires that officers write "**RETURNED ON SCENE**" in bold red lettering across the *Property Released on Scene* form when doing. If the property was not returned on the scene, MPD officers must continue to reasonably attempt to find the owner of the property. If the owner is not found by the end of his or her tour of duty, the member must inform the Station Clerk who will then attempt to notify the owner. If there is still no owner found, the responsibility for the item ultimately falls upon the element Property Officer.

Remember that Found Property scenarios typically require Property Receipts and Property Released on Scene forms. This is in addition to the mandatory Property Record, Property Book entry, and Incident Report.

There are exceptions to the above procedure when encountering Found Property. For example, if the property is found inside a DC Taxicab Commission-licensed vehicle, the MPD officer must first follow the above procedures with the addition of making a notification to the DC Taxicab Commission. The notification must detail the property found. Additionally, the Incident Report must include the notification details, including the name of the person notified as well as when the notification was made.

If the Found Property was encountered on a Metrorail train or parking lot, the property must be turned over to a WMATA employee. The WMATA employee will then give the MPD officer a receipt. If the property is found on a WMATA bus, the bus driver will be given the property. Again, MPD officer will be given a receipt. Both types of property receipts must be given to the officer's element Station Clerk. An Incident Report, Property Book entry, and Property Record is still required. The narratives on these forms will indicate that the property was turned over to Metro-Transit.

*NOTE:* Whenever taking property into the possession of the department, the recovering member must complete a Property Record, Incident Report and Property Book entry <u>every time</u>. When the Property Record is complete, it must be approved by a lieutenant or above. The Property Record will have a corresponding log in the Property Book. Every MPD member must be able to execute such tasks flawlessly. As has been mentioned earlier, there are few more important tasks that an MPD member will handling than the safeguarding of property.

**Summary**
By the end of this lesson, recruits should become adept at taking possession of different types of property and properly completing the corresponding paperwork and processing tasks. This lesson builds on the good notebook habits, basic investigative skills, and report writing abilities learned in prior lessons. It is imperative that an MPD member be able to safeguard and properly classify and process property.

*3.4 Property*