**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 25-5418**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**DISTRICT OF COLUMBIA,**

*Plaintiff-Appellee,*

**v.**

**DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,**

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

**BRIEF FOR AMERICA FIRST LEGAL FOUNDATION AS
*AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-
APPELLANTS AND REVERSAL**

_____

GENE HAMILTON
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave SE #231
Washington, DC 20003

JENNIFER K. HARDY
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave NW
  Suite 900
Washington, DC 20006
(202) 955-0620
jhardy@boydengray.com

*Counsel for Amicus Curiae
America First Legal Foundation*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *Amicus* hereby submits this certificate.

### A. Parties and *Amici*

The parties and *amici* who have appeared before the Court are listed in Defendants-Appellants' D.C. Circuit Rule 28(a)(1) certificate, filed on April 1, 2026. As of April 8, 2026, the date on which this brief was filed, *Amicus* was not aware of any other parties, intervenors, or *amici* who have entered an appearance.

### B. Rulings Under Review

The ruling under review (issued by Judge Jia M. Cobb) is an order and memorandum opinion granting a preliminary injunction and a section 705 stay. The opinion and order are included in the Joint Appendix filed on April 1, 2026, Dkt. 2166644. *See* JA808; JA869.

### C. Related Cases

There are no related cases.

April 8, 2026
/s/ Jennifer K. Hardy
Jennifer K. Hardy

*Counsel for Amicus Curiae*
*America First Legal Foundation*

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a), and D.C. Circuit Rules 26.1 and 28(a)(1)(A), *Amicus* America First Legal Foundation states that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock. America First Legal is a 501(c)(3) non-profit organization headquartered in Washington, D.C. America First Legal is dedicated to promoting the rule of law in the United States and defending individual rights guaranteed under the Constitution and federal statutes.

April 8, 2026

*/s/ Jennifer K. Hardy*
Jennifer K. Hardy

*Counsel for Amicus Curiae*
*America First Legal Foundation*

ii

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), the parties have consented to the filing of this *amicus* brief.

Pursuant to D.C. Circuit Rule 29(d), counsel submits that a separate brief for America First Legal Foundation as *Amicus* is necessary. Counsel is not aware of any other *amicus* brief addressing the subject of this brief, namely, the significant positive shift in the atmosphere and safety in Washington, D.C., since the President deployed the National Guard here. As a 501(c)(3) non-profit organization headquartered in Washington, D.C., America First Legal is well-suited to offer its perspective on that issue. Additionally, America First Legal routinely files briefs in cases involving questions of executive power and the separation of powers, and has submitted *amicus* briefs in other litigation concerning the deployment of the National Guard. *See Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 7, 2025), Dkt. 23.2; *Illinois v. Trump*, No. 1:25-cv-12174 (N.D. Ill. Oct. 8, 2025), Dkt. 51-1.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................................ i

CORPORATE DISCLOSURE STATEMENT ............................................ ii

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING ........................................................................ iii

TABLE OF AUTHORITIES ....................................................................... v

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 2

ARGUMENT .............................................................................................. 5

I.     The District Lacks Standing Because It Is Not a Sovereign and Thus Has No Injury in Fact. .................................................... 5

II.    The Federal Government Lawfully Deployed the National Guard. .............................................................................................. 7

III.   The Equitable Factors Overwhelmingly Favor the President's Deployment of the National Guard. ............................................. 11

       A.   People in the District Feel Safer and Are Cooperating with Law Enforcement. ........................................................ 12

       B.   Violent Crime Is Dramatically Down. .................................. 17

       C.   Even the Mayor Agrees: The Federal Government's Actions Have Dramatically Reduced Crime. .......................... 22

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Branzburg v. Hayes,*
    408 U.S. 665 (1972)..................................................................22

*District of Columbia v. John R. Thompson Co.,*
    346 U.S. 100 (1953)....................................................................6

*District of Columbia v. Trump,*
    810 F. Supp. 3d 19 (D.D.C. 2025) ............................................. 6, 8, 10

*District of Columbia v. Trump,*
    No. 25-5418, 2025 WL 3673674 (D.C. Cir. Dec.
    17, 2025).................................................... 5, 7, 8, 9, 10, 11

*Metro. R. Co. v. District of Columbia,*
    132 U.S. 1 (1889)...................................................................5, 6

*Palmore v. United States,*
    411 U.S. 389 (1973)...................................................................6

*United States v. Budd,*
    23 F.3d 442 (D.C. Cir. 1994)........................................................6

*Washington, Alexandria, & Mt. Vernon Ry. Co. v. Downey,*
    236 U.S. 190 (1915)...................................................................6

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 17 ...........................................................5

**Statutes**

32 U.S.C. § 502 ......................................................................3, 8

D.C. Code § 1-201.02 ..................................................................7

D.C. Code § 1-206.01 ..................................................................7

D.C. Code § 1-207.17 ....................................................................... 7

D.C. Code § 49-103 ........................................................................ 10

D.C. Code § 49-404 .......................................................................... 9

D.C. Code § 49-405 ....................................................................... 3, 9

D.C. Code § 49-409 ....................................................................... 3, 9

Pub. L. No. 104-321, 110 Stat. 3877 (1996) ........................................ 8, 9

**Other Authorities**

*August 26, 2025, Cover Page*, N.Y. Post (Aug. 26, 2025) ........................ 16

*Carjacking: MPD Carjacking Dashboard*, Metro. Police Dep't,
    Washington, D.C., https://mpdc.dc.gov/page/carjacking
    (last visited Apr. 6, 2026) .................................................................. 18

Courtney Anderson, *Trump Claims Memphis Crime Down 77%,
    City Presents Different Data*, ABC24 (Jan. 5, 2026),
    https://perma.cc/DU64-QG89 .......................................................... 21

Cuneyt Dil, *Scoop: D.C. Mayor Urged AG Against Raising
    Tensions With Trump, Suing Over National Guard*, Axios D.C.
    (Sept. 4, 2025), https://www.axios.com/local/washington-dc/
    2025/09/04/dc-mayor-attorney-general-tension-over-trump-
    crackdown-strategy .......................................................................... 23

DC Police Union (@DCPoliceUnion), X (Sept. 1, 2025, 1:13 PM),
    https://perma.cc/5NHC-YVW3 ........................................................ 18

DC Police Union (@DCPoliceUnion), X (Sept. 1, 2025, 1:13 PM),
    https://perma.cc/KDN9-VUFP ......................................................... 18

*District Crime Data*, Metro. Police Dep't, Washington, D.C.,
    https://perma.cc/2WT4-L6ZX (updated Apr. 8, 2026) ........................ 21

Eliana Block, *VERIFY: Does DC Have More Police Per Capita
    Than Any Other US City?* (July 15, 2020), https://perma.cc/
    MWA2-F9E2 ................................................................................... 15

Emma Huber & Peter Hermann, *D.C. Went Three Weeks in 2026 Without a Homicide as Violent Crime Drops*, Wash. Post (Feb. 1, 2026), https://www.washingtonpost.com/dc-md-va/2026/02/01/crime-dc-homicides-january/.............................................................. 21

Gary Fields, *4 Takeaways from Trump's Federal Law Enforcement Surge in D.C. as His Emergency Order Expires*, PBS News (Sept. 10, 2025), https://perma.cc/T5EY-G4MM ................................ 17

John Kelly et al., *CBS News Analyzed D.C. Crime Data Amid National Guard Deployments. Here's What the Numbers Show*, CBS News (Aug. 27, 2025), https://perma.cc/37UQ-58VT ........... 19, 20

Max Rego, *Bowser Says Federal Police Surge Has Reduced Crime in DC, But 'North Star' Is Protecting City's Autonomy*, CNN (Aug. 28, 2025), https://www.cnn.com/2025/08/28/politics/bowser-dc-police-crime.................................................................... 23

Mayor's Order No. 2025-090, *Creation of the Safe and Beautiful Emergency Operations Center* (Sept. 2, 2025), https://perma.cc/5S6B-9GTN ........................................................................ 23

Olivia George & Rachel Siegel, *D.C. Mayor Praises Federal Surge, Angering Residents and Pleasing Trump*, Wash. Post (Sept. 15, 2025) ....................................................................... 14

*Orleans Parish Crime Trends: As of April 5, 2022-2026*, Metro. Crime Comm'n, https://perma.cc/J3D6-NNWS (last visited Apr. 8, 2026)............................................................ 21

Rich Schapiro, *Carjacked in the Capital: The 'Crime of the Pandemic' Is Still Roiling D.C.*, NBC News (Aug. 24, 2025), https://perma.cc/F88S-Y4BN?type=image ........................................ 17

Testimony of Forlesia Cook before the S. Comm. on the Judiciary (Sept. 30, 2025), https://perma.cc/5LXC-ZG2P ................................ 12

*Washington, DC: Crime Rates*, Neighborhood Scout, https://perma.cc/BN4S-L4GZ (last visited Mar. 25, 2026)................. 12

The White House, *President Trump Participates in a Black History Month Reception*, YouTube, at 38:28-41:00 (Feb. 18, 2026), https://www.youtube.com/watch?v=NS1xNWqJazY..................... 13, 24

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus Curiae* America First Legal Foundation is a 501(c)(3) non-profit organization headquartered in Washington, D.C. America First Legal is dedicated to promoting the rule of law in the United States and defending individual rights guaranteed under the Constitution and federal statutes. None of these rights can be enjoyed, however, where citizens lack the basic guarantees of public safety. *Amicus* therefore seeks to provide the Court with helpful information regarding improvements in the sense of safety in the District of Columbia over the last few months, *stemming* from actions like those challenged in this suit.

No person other than *Amicus Curiae* and its counsel assisted with or made a monetary contribution for preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This suit is a legally flawed, misguided effort to stop the Federal Government[1]—the only sovereign in the District of Columbia ("D.C." or "District")—from using its express statutory authority to make a real difference to the safety of those who live in, work in, and visit our Nation's Capital. In granting a preliminary injunction against the deployment of the National Guard, the district court erred in three ways: It wrongly concluded the District had standing; it wrongly concluded the District had shown a likelihood of success on the merits; and it wrongly concluded that the equities favored the District.

The district court should have rejected the District's challenge from the very start. As a panel of this Court recognized in staying the district court's preliminary injunction, the District is entirely a creature of Congress and enjoys no independent sovereign status. With no sovereignty, the District has no sovereign injury and no standing. That

---

[1] Defendant-Appellants Donald J. Trump, the United States Department of War, Peter B. Hegseth, the United States Army, Daniel Patrick Driscoll, the United States Department of Justice, Pamela J. Bondi, the United States Marshals Service, and Gadyaces S. Serralta are collectively referred to throughout this brief as "the Federal Government."

alone warrants reversal, vacatur, and remand to the district court with instructions to dismiss.

But the errors don't stop there. The district court was also wrong on the merits. The law authorizes the President to deploy the National Guard. *First*, federal law authorizes the President to deploy the National Guard for public safety support missions, including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(2). The district court's contrary conclusions rest on a tortured statutory interpretation and a misunderstanding of the Emergency Management Assistance Compact. *Second*, the President's deployment of the D.C National Guard is lawful for another reason: The D.C. Code expressly recognizes the President as the Commander in Chief of the D.C. National Guard, D.C. Code § 49-409, and authorizes him to order out the D.C. National Guard "[w]henever it shall be necessary," *id*. § 49-405.

Not only was the district court wrong on the merits, but it was also wrong on the equities. Far from the public interest and balance of the harms favoring the District, as the district court found, they weigh strongly in favor of the President's deployment of the National Guard.

Over the past few months, the sense of safety in the District has improved in a way that can be seen and felt by all. For the first time in years, law-abiding citizens feel like they can go for a walk at night without constantly looking over their shoulders or being accosted. And citizens feel that way for good reason: crime has dropped significantly. Even the Mayor has candidly and repeatedly acknowledged the benefits of the Federal Government's actions in the District. Common sense, reality, and statistics all show the positive impact the National Guard's presence has had on the people who live and work in the District.

This litigation—brought by the D.C. Attorney General over the Mayor's objection—has needlessly cast a cloud of legal suspicion over the President's lawful deployment of the National Guard to the District. This Court can and should remove that cloud of suspicion so that members of the National Guard can continue their important work of making the District safer for all. This Court should accordingly reverse and vacate the district court's order granting the preliminary injunction.

## ARGUMENT

### I.    The District Lacks Standing Because It Is Not a Sovereign and Thus Has No Injury in Fact.

The district court should have dismissed the District's suit for lack of jurisdiction because the District has no standing. And it has no standing for one simple reason: It is not a sovereign, and without sovereignty, it has no injury in fact.

It is beyond question that the District has no sovereignty. The panel staying the preliminary injunction correctly recognized that "the District of Columbia is a federal district created by Congress, rather than a constitutionally sovereign entity like the fifty States," and thus it possesses no independent sovereign power. *District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *2 (D.C. Cir. Dec. 17, 2025) (per curiam) ("*Stay Decision*"). As the Supreme Court has explained, "the sovereign power" of the District of Columbia is "in the government of the United States." *Metro. R. Co. v. District of Columbia*, 132 U.S. 1, 9 (1889); *see* U.S. Const. art. I, § 8, cl. 17. Indeed, that the Federal Government, not the District, is the sovereign can be seen in the fact that "violations of the District of Columbia Code and of the United States Code are both crimes against a single sovereign, namely the United States." *United*

5

*States v. Budd*, 23 F.3d 442, 447 (D.C. Cir. 1994) (cleaned up). Even the district court conceded as much in finding that the District is "not [] a sovereign like a state is." *District of Columbia v. Trump*, 810 F. Supp. 3d 19, 37 (D.D.C. 2025). That should have ended the matter.

Nonetheless, the district court erroneously found standing "based on injuries to [the District's] sovereign power to govern itself and to the statutory rights afforded to it under the D.C. Code and the [Emergency Management Assistance Compact]." *Id.* In other words, according to the district court, because the District can "exercise delegated sovereign powers," it "is therefore injured by being unlawfully deprived of those powers." *Id.* (emphasis omitted). This flawed logic cannot withstand even the most glancing scrutiny.

As the Supreme Court explained long ago, the District's "subordinate legislative powers" are "of a municipal character" and "do not make" it "sovereign." *Metro. R. Co.*, 132 U.S. at 9; *see District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 107–08 (1953) (same). Instead, Congress retains "plenary authority" over the District. *Washington, Alexandria, & Mt. Vernon Ry. Co. v. Downey*, 236 U.S. 190, 192 (1915); *see Palmore v. United States*, 411 U.S. 389, 397 (1973) (same).

6

The 1973 Home Rule Act reflects this principle: It expressly provides that Congress retains "the ultimate legislative authority over the nation's capital granted by article I, § 8, of the Constitution," and that the District "shall remain and continue a body corporate." D.C. Code §§ 1-201.02(a), 1-207.17(a); *see also id.* § 1-206.01.

At bottom, the D.C. Circuit has "never recognized that the District has standing to sue the President and federal officers for sovereignty-based injuries." *Stay Decision* at *13 (Rao, J., concurring). And it shouldn't start now. This Court should therefore reverse and vacate the injunction, and instruct the district court to dismiss the case.

## II. The Federal Government Lawfully Deployed the National Guard.

Even if this Court concludes that the District has standing, this Court should still reverse because the President acted lawfully in deploying the National Guard. The President acted well within the plain text of 32 U.S.C. § 502(f) in deploying both the D.C. National Guard and the National Guard from several States. The D.C. Code supplies him with additional authority to deploy the D.C. National Guard. The district court's contrary conclusion rests on a convoluted misreading of the law.

7

*First*, the President lawfully deployed the National Guard in the District under 32 U.S.C. § 502(f). Section 502(f) expressly provides that a member of the National Guard may "be ordered to perform training or other duty," including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." As the stay panel observed, the statute "leaves room for operational missions such as the type of public-safety-support mission" the National Guard is engaging in right now in the District. *Stay Decision* at *6. This provision alone authorizes the President's deployment of the National Guard to D.C.

In concluding otherwise, the district court reasoned that § 502(f) "is best understood to encompass operations or missions requested by the President that are authorized under state law." *Trump*, 810 F. Supp. 3d at 53. The district court did not find (and the District made no showing) "that any deployment to the District violated any deploying State's law," *see Stay Decision* at *9, but instead concluded that their deployment to D.C. was illegal because the District did not request any States' assistance under the Emergency Management Assistance Compact. *Trump*, 810 F. Supp. 3d at 56–57; *see* Pub. L. No. 104-321, 110 Stat. 3877,

8

3877–83 (1996). But, again, as the stay panel observed, the Emergency Management Assistance Compact merely provides an "*additional* authority under state law for out-of-state deployments of state guard units." *Stay Decision* at *10 (emphasis added); *see also* Pub. L. No. 104-321, § 2(1), 110 Stat. at 3882 (stating that consenting to the Emergency Management Assistance Compact "shall … not be construed as impairing or in any manner affecting any right or jurisdiction of the United States in and over the subject of the compact"). It does not restrict or limit the Federal Government's authorization of the National Guard under § 502(f). *Id.* This Court should reaffirm that conclusion and hold that the deployment of the National Guard was lawful.

*Second*, although no additional authority is necessary, the D.C. Code independently authorizes the deployment of the D.C. National Guard in the District. The D.C. Code recognizes that the President is the "Commander-in-Chief" of the D.C. National Guard and that the President "shall order out" the D.C. National Guard "[w]henever it shall be necessary." D.C. Code §§ 49-405, 49-409. Still another section of the D.C. Code provides that the D.C. National Guard may be ordered "to aid the civil authorities in the execution of the laws[.]" *Id.* § 49-404. These

provisions on their face authorize the President's deployment of the D.C. National Guard.

But the district court found that these provisions just don't mean what they say. According to the district court, they don't "provide authority for the President to call out the [D.C. National Guard] at will." 810 F. Supp. 3d at 49. Instead, the district court reasoned, the only provision that authorizes the President to call out the D.C. National Guard requires that he do so at the request of the Mayor, the U.S. Marshal for the District of Columbia, or the National Capital Service Director. *Id.* at 47–50; D.C. Code § 49-103. That reading of the statute is "highly untenable." *Stay Decision* at \*9.

On its face, D.C. Code § 49-103 simply "*expand*[*s*] the list of who may identify a need for the D.C. Guard's activation" to two Executive Branch subordinates of the President and the Mayor. *Id.* (emphasis added). It says nothing that diminishes the authority provided to the President elsewhere. Wholly apart from the district court's distortion of the plain meaning of the D.C. Code, its reading of these provisions creates a bizarre result. It would "imbue two presidential subordinates with more power to protect the seat of the federal government than the President."

10

*Id.* This Court should, as the stay panel did, reject this implausible interpretation and hold that the D.C. Code permits the President to deploy the D.C. National Guard.

### III. The Equitable Factors Overwhelmingly Favor the President's Deployment of the National Guard.

Having fundamentally misread the relevant statutes, the district court then erred in weighing the equities. It did not dispute that crime has decreased. *Trump*, 801 F. Supp. 3d at 64. But that renewed safety for people in the District was trivial to the district court. Instead, the district court found the equities favored a preliminary injunction because of the "countervailing interests to not be subject to the presence of National Guard units who have exceeded the bounds of their lawful authority." *Id.* As explained below, those who live in, work in, and visit our Nation's Capital, feel safer while here because of the National Guard. That sense of safety isn't just a feeling. It reflects the reality that the National Guard deployment has helped reduce crime. That reality ought to have tipped the balance of the equities decidedly in favor of the Federal Government and its deployment of the National Guard.

11

### A.    People in the District Feel Safer and Are Cooperating with Law Enforcement.

The National Guard deployment has tangibly changed the District's atmosphere. For far too long, those who live and work in the District have dealt with rampant crime. According to one analysis based on crime data from 2024, D.C. residents had a 1 in 99 chance of being a victim of a violent crime.[2]

Just ask District Resident Forlesia Cook. She is all too familiar with the District's longstanding crime problem. Last September, she testified before the Senate Committee on the Judiciary at a hearing addressing soft-on-crime policies afflicting places like the District. She recounted how her grandson had "fought through his challenges," but his life was on the right path, and he had a "bright future" as an electrician.[3] That bright future was cut short when he was murdered in cold blood in 2017, shot seven times.[4] The pain she feels at his loss is written on her face and

---

[2]    *See Washington, DC: Crime Rates*, Neighborhood Scout, https://perma.cc/BN4S-L4GZ (last visited Mar. 25, 2026).

[3] Testimony of Forlesia Cook before the S. Comm. on the Judiciary (Sept. 30, 2025), https://perma.cc/5LXC-ZG2P.

[4] *See id.*

12

can be heard in her voice even now in 2026.[5] The District's crime problem comes at a real cost to real people.

But it doesn't have to be like this. Indeed, it isn't like this in places just outside the District, and it hasn't been like this in the District itself during the National Guard deployment. As Ms. Cook said about the deployment: "[W]e need National Guard. Wish we did years ago."[6] The presence of the National Guard has increased the sense of safety in the District.

The D.C. Attorney General claimed below that the Federal Government's actions "pose[] a high risk of undermining the District's own law enforcement work" and are "likely to undermine trust in District law enforcement generally." Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. & Section 705 Stay at 42–43, *Trump*, No. 1:25-cv-3005 (Sept. 9, 2025) ("D.C.'s Mem. in Supp. of PI Mot."), Dkt. 3-1. The D.C. Attorney General likewise claimed that the challenged actions "have given District residents a 'palpable sense of fear' and rendered them 'afraid to go

---

[5] *See* The White House, *President Trump Participates in a Black History Month Reception*, YouTube, at 38:28–41:00 (Feb. 18, 2026), https://www.youtube.com/watch?v=NS1xNWqJazY.

[6] *Id.* at 40:31–36.

grocery shopping, show up to work and go about their daily lives.'" *Id.* at 43.

These claims are all false. Trust in law enforcement is increasing. Before the deployment of the National Guard, residents often declined to call police because they felt helpless or feared retaliation. But now people feel they can call to report problems. "[C]ity officials noted that calls for service have increased by 18 percent amid the time of heightened federal law enforcement presence, compared to the same 20-day period last year."[7] Mayor Bowser approvingly said, "We don't know who's not calling but we do know that a lot of people are calling."[8] Far from "undermining the District's own law enforcement work" or "undermin[ing] trust in District law enforcement," D.C.'s Mem. in Supp. of PI Mot., *supra*, at 42–43, the Federal Government's actions have been encouraging cooperation between residents and law enforcement.

---

[7] Olivia George & Rachel Siegel, *D.C. Mayor Praises Federal Surge, Angering Residents and Pleasing Trump*, Wash. Post (Sept. 15, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/28/federal-police-surge-mayor-bowser-crime-decrease/.

[8] *Id.*

The D.C. Attorney General also claimed that National Guard personnel lack "appropriate training or coordination with MPD, [and thus] they are likely to engage in conduct that 'could easily result in harm to both civilians and officers.'" *Id.* at 42. But there is no evidence to back up this claim, perhaps because the National Guard routinely works with local law enforcement and government agencies.

The D.C. Attorney General also asserted that people have been "frightened away" by "[t]he unfamiliar presence of armed military patrols." *Id.* at 43. But the District has long had the largest presence of law enforcement of any major city in the country.[9] Military vehicles, federal agents, street closures, motorcades, lockdowns for days or even weeks at a time during major events are routine occurrences in the District. Indeed, the National Guard's presence is such a non-issue that it has largely dropped from the local headlines.

Tourists likewise welcome the presence of those who seek to ensure their safety. The photo below was featured on the front page of the

---

[9] *E.g.*, Eliana Block, *VERIFY: Does DC Have More Police Per Capita Than Any Other US City?*, WUSA9 (July 15, 2020), https://perma.cc/MWA2-F9E2.

country's third-largest print circulation newspaper, captioned "*Tourists pose with National Guard troops stationed in Washington, DC.*"[10]



But the D.C. Attorney General insists tourists are terrified.

Further, as explained below, violent crime is dramatically down, and people have noticed. That has a compounding effect. As Mayor Bowser explained, "We know that when carjackings go down, when use

---

[10] *August 26, 2025, Cover Page*, N.Y. Post (Aug. 26, 2025), https://perma.cc/NN9N-9APN.

of guns goes down, when homicide or robbery go down, neighborhoods feel safer and are safer. So, this surge has been important to us for that reason."[11] Again, it is the District, not the Federal Government, who is seeking to disrupt the public's peace of mind.

### B.    Violent Crime Is Dramatically Down.

The D.C. Attorney General asserted below that the challenged actions here "pose an immediate risk of serious public safety harms." D.C.'s Mem. in Supp. of PI Mot., *supra*, at 43. That is also demonstrably incorrect.

NBC News produced a special report on the number of carjackings in the District, "a particularly brutal crime" that "often causes lasting psychological damage."[12] As the report explained, this crime is disproportionately committed by juveniles who are often released quickly and reoffend, leaving a trail of victims in their wake.[13] But in the month of August 2025, there were only 10 carjackings in the District, and 6 of

---

[11] Gary Fields, *4 Takeaways from Trump's Federal Law Enforcement Surge in D.C. as His Emergency Order Expires*, PBS News (Sept. 10, 2025), https://perma.cc/T5EY-G4MM.

[12] Rich Schapiro, *Carjacked in the Capital: The 'Crime of the Pandemic' Is Still Roiling D.C.*, NBC News (Aug. 24, 2025), https://perma.cc/F88S-Y4BN?type=image.

[13] *See id.*

those were before federal control.[14] The last time the District had 10 or fewer carjackings in a month was March of 2020—the last month before COVID-19 and summer protests led to a massive surge in certain crimes. To put that in perspective, here are the carjacking numbers from the month of August back to 2020:

August 2020:　　43 carjackings
August 2021:　　49 carjackings
August 2022:　　40 carjackings
August 2023:　　88 carjackings
August 2024:　　39 carjackings
**August 2025:　　10 carjackings**[15]

This improvement has only continued. In the first three months of 2026, there have been only 35 carjackings, almost 50% fewer carjackings than in the same period in 2025.[16]

But carjackings tell only one part of the story here. CBS News undertook an extensive review and concluded that "[i]n the nearly three weeks since President Trump deployed federal troops and law

---

[14] DC Police Union (@DCPoliceUnion), X (Sept. 1, 2025, 1:13 PM), https://perma.cc/5NHC-YVW3.

[15] DC Police Union (@DCPoliceUnion), X (Sept. 1, 2025, 1:13 PM) (emphasis added), https://perma.cc/KDN9-VUFP.

[16] *Carjacking: MPD Carjacking Dashboard*, Metro. Police Dep't, Washington, D.C., https://mpdc.dc.gov/page/carjacking (last visited Apr. 6, 2026).

enforcement agents throughout Washington, D.C., a CBS News analysis of crime data shows *violent crime is down in Washington by almost half* when compared to the same 19 days in 2024."[17] That same analysis also shows "violent crime *is down in comparison to the five-year average for the same dates.* Beyond violent crime, reported burglaries also are down 48% and car thefts have fallen 36%."[18]

Contrary to pundits' false accusations, CBS News reported that federal law enforcement agents were primarily deployed to "areas with higher—and often much higher—rates of crime, violent crime and gun crime than the average neighborhood across the city."[19] And the statistics prove what happens when federal officials make their presence known in

---

[17] John Kelly et al., *CBS News Analyzed D.C. Crime Data Amid National Guard Deployments. Here's What the Numbers Show*, CBS News (Aug. 27, 2025), https://perma.cc/37UQ-58VT (emphasis added).

[18] *Id.* (emphasis added).

[19] *Id.*

high-crime areas. *Every* major category of crime went down, often

dramatically so:



From Aug. 7 through Aug. 25, most major crime categories in Washington fell compared with the same period in 2024. Combined violent crime dropped 49%, from 180 to 92 incidents, while other categories such as robbery and burglary also saw significant declines, according to CBS News analysis of MPD data.

[20]

That positive trend has continued unabated into 2026. Compared

to the approximately first three months of 2025, robberies are down 24%,

burglaries are down 26%, motor vehicle theft is down 57%, and, most

---

[20] *Id.*

remarkably, homicides are down 68%.[21] In fact, the District went three weeks in 2026 without a homicide *for the first time in nearly 30 years*.[22]

The District isn't alone in experiencing a massive reduction in crime following deployment of the National Guard. Similar phenomena (unsurprisingly) have been observed in New Orleans and Memphis, where President Trump recently deployed National Guard members. In New Orleans, compared to 2025, the murder rate has dropped 28%.[23] And since the deployment of the National Guard in Memphis in October 2025, murder is down 44%, car theft is down nearly 70%, and the overall crime rate is down 44%.[24]

Every one of these statistics represents real people and real victims, and the numbers should still be lower. All of this confirms that the D.C.

---

[21] *See District Crime Data*, Metro. Police Dep't, Washington, D.C., https://perma.cc/2WT4-L6ZX (updated Apr. 8, 2026).

[22] *See* Emma Huber & Peter Hermann, *D.C. Went Three Weeks in 2026 Without a Homicide as Violent Crime Drops*, Wash. Post (Feb. 1, 2026), https://www.washingtonpost.com/dc-md-va/2026/02/01/crime-dc-homicides-january/.

[23] *Orleans Parish Crime Trends: As of April 5, 2022–2026*, Metro. Crime Comm'n, https://perma.cc/J3D6-NNWS (last visited Apr. 8, 2026).

[24] Courtney Anderson, *Trump Claims Memphis Crime Down 77%, City Presents Different Data*, ABC24 (Jan. 5, 2026), https://perma.cc/DU64-QG89.

21

Attorney General is flat wrong to claim the Federal Government's actions are undermining safety, and the district court was similarly wrong to ignore the reduction of crime in weighing the equities. How many people owe their lives and sense of safety to the presence of the National Guard in just the last few months?

There is the strongest possible public interest in "preventing the community from being disrupted by violent disorders endangering both persons and property." *Branzburg v. Hayes*, 408 U.S. 665, 701 (1972). It is the D.C. Attorney General's actions—not the Federal Government's— that threaten to upend this extraordinary public interest in safety.

C.    **Even the Mayor Agrees: The Federal Government's Actions Have Dramatically Reduced Crime.**

This Court should not lose sight of the fact that despite bringing suit in the name of "The District of Columbia," the claims here do not reflect those of the entire city, including the Mayor herself. She has acknowledged that "the increase in federal law enforcement contributed to 'an extreme reduction in carjackings' and a decrease in gun crimes and homicides," adding that because of the Federal Government's actions, she "think[s] that there's more accountability in the system, or at least

22

perceived accountability in the system, that is driving down illegal behavior."[25]

The Mayor even signed an executive order to ensure cooperation between the District and federal officials.[26] Indeed, in this order, the Mayor once again acknowledged that "due to the cooperative efforts between District and federal officials, violent crime in the District has noticeably decreased."[27] This order shows that the Mayor is willing and capable of working with the Federal Government, and those efforts should not be undermined because the D.C. Attorney General decided to bring this suit, especially given the reports that the Mayor tried to persuade him not to sue.[28] The D.C. Attorney General does not represent

---

[25] Max Rego, *Bowser Says Federal Police Surge Has Reduced Crime in DC, But 'North Star' Is Protecting City's Autonomy*, CNN (Aug. 28, 2025), https://www.cnn.com/2025/08/28/politics/bowser-dc-police-crime.

[26] Mayor's Order No. 2025-090, *Creation of the Safe and Beautiful Emergency Operations Center* (Sept. 2, 2025), https://perma.cc/5S6B-9GTN.

[27] *Id.* at 2.

[28] Cuneyt Dil, *Scoop: D.C. Mayor Urged AG Against Raising Tensions With Trump, Suing Over National Guard*, Axios D.C. (Sept. 4, 2025), https://www.axios.com/local/washington-dc/2025/09/04/dc-mayor-attorney-general-tension-over-trump-crackdown-strategy.

the District's best interests or reflect its residents' concerns when he cannot convince even the long-sitting Mayor to join his demands.

Respectfully, this dispute is best handled through the political process, not through judicial action sought by a local politician against the wishes of the District's Mayor.

\* \* \*

The District has been strongly trending in the right direction during the deployment of the National Guard. The President's actions are lawful. As Ms. Cook, who knows the permanent pain D.C. crime brings, said, "Let [the President] do his job. He's doing the right thing."[29]

---

[29] The White House, *President Trump Participates in a Black History Month Reception, supra,* at 38:28–41:00.

24

## CONCLUSION

The Court should reverse, vacate the preliminary injunction, and remand to the district court with instructions to dismiss the case.

April 8, 2026                                   Respectfully submitted,

                                                */s/ Jennifer K. Hardy*
                                                JENNIFER K. HARDY
                                                  *Counsel of Record*
                                                BOYDEN GRAY PLLC
                                                800 Connecticut Ave NW
                                                  Suite 900
                                                Washington, DC 20006
                                                (202) 955-0620
                                                jhardy@boydengray.com

                                                GENE HAMILTON
                                                AMERICA FIRST LEGAL FOUNDATION
                                                611 Pennsylvania Ave SE #231
                                                Washington, DC 20003

                                                *Counsel for Amicus Curiae*
                                                *America First Legal Foundation*

## CERTIFICATE OF COMPLIANCE AND SERVICE

This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14- point font. The word limit for *amicus* briefs is 6,500 words. This brief contains 4,425 words, excluding the exempt portions.

I hereby certify that on April 8, 2026, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

April 8, 2026

*/s/ Jennifer K. Hardy*
JENNIFER K. HARDY
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave NW
  Suite 900
Washington, DC 20006
(202) 955-0620
jhardy@boydengray.com