No. 25-5418

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

DISTRICT OF COLUMBIA,
*Plaintiffs-Appellee*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,
*Defendants-Appellants*

## BRIEF OF *AMICI CURIAE* SOUTH CAROLINA, WEST VIRGINIA, AND TWENTY-ONE ADDITIONAL STATES IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL

Appeal from the U.S. District Court for the
District of Columbia District Court
Case No. 1:25-cv-03005-JMC

ALAN WILSON
ATTORNEY GENERAL
STATE OF SOUTH CAROLINA

Thomas T. Hydrick
Solicitor General
P.O. Box 11549
Columbia, South Carolina 29201
(803) 734-3765
thomashydrick@scag.gov

JOHN B. MCCUSKEY
ATTORNEY GENERAL
STATE OF WEST VIRGINIA

Michael R. Williams
Solicitor General
State Capitol, Bldg 1
Room E-26
Charleston, WV 25305
(681) 313-4550
Michael.R.Williams@wvago.gov

Mark Pinkert
David Johnson
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
2333 Ponce de Leon Blvd.
Suite 600
Coral Gables, FL 33134
(203) 415-6665
mpinkert@holtzmanvogel.com

*Additional counsel listed in signature block*

**TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE ................................................................... 1

INTRODUCTION ....................................................................................... 1

ARGUMENT............................................................................................... 4

I.   The President Is Likely to Succeed on The Merits Because the Federal Government Has Sovereign and Constitutional Authority over the Nation's Capital ..................................................................................... 4

    A.   The District of Columbia Cannot Sue the Federal Government ....... 6

    B.   The President Is Properly Exercising Article II Power to Ensure the Faithful Execution of Federal Law in the Nation's Capital ............. 9

    C.   The President Is Exercising Statutory Power Because Congress Made the President Commander-in-Chief of the D.C. Guard .........15

II.  The Equities Weigh Heavily in Favor of a Stay, as the Injunction Usurps Presidential Power and Endangers D.C. Citizens and the Government 21

    A.   Because of the Ineffective and Often Counterproductive Responses of D.C. Officials, Crime Has Exploded in Our Capital, Hurting Residents and Hindering the Federal Government ....................... 21

    B.   In the Months Since the Executive Orders, President Trump and the National Guard Troops Have Made the Capital Safer for Government Officials and Citizens Alike...................................... 25

CONCLUSION...........................................................................................30

i

# TABLE OF AUTHORITIES

**Cases**                                                    **Pages**

*Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023) .................. 14

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001) ........................... 13

*Clayton v. District of Columbia*, 931 F. Supp. 2d 192 (D.D.C. 2013) .......... 12

*Coleman v. Miller*, 307 U.S. 433 (1939) ................................................... 6

*Croson v. District of Columbia*, 2 F.2d 924 (D.C. Cir. 1924) ...................... 5

*CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005) .................... 7

*Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11 (D.D.C. 2020) . 10

*Cunningham v. Neagle,* 135 U.S. 1 (1890) ................................................. 9

*Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230 (2019) ........................... 5

*Goode v. Markley*, 603 F.2d 973 (D.C. Cir. 1979) ...................................... 5

*In re Debs*, 158 U.S. 564 (1895) .............................................................. 9

*Lane v. Peña*, 518 U.S. 187 (1996) .......................................................... 6

*Lin v. United States*, 539 F. Supp. 2d 173 (D.D.C. 2008) .......................... 10

*Luther v. Borden*, 48 U.S. 1 (1849) ......................................................... 11

*Mackey v. United States*, 47 Ct. Cl. 121 (1911) .......................................... 5

*Martin v. Mott*, 25 U.S. 19 (1827) .......................................................... 10

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ............................................ 6

*Metro. R.R. Co. v. D.C.*, 132 U.S. 1 (1889) ............................................ 2, 5

*Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723 (D.C. Cir. 2021) .................. 6

*Mueller v. City of Joliet*, 943 F.3d 834 (7th Cir. 2019) ............................... 14

*Myerson v. United States*, 98 A.3d 192 (D.C. Ct. App. 2014) ..................... 16

*O'Donoghue v. United States*, 289 U.S. 516 (1933) ...................................... 3

*Sabin v. Butz*, 515 F.2d 1061 (10th Cir. 1975) .......................................... 13

*Sanchez v. Off. of the State Superintendent of Educ.*, 45 F.4th 388 (D.C. Cir. 2022) ....................................................................................4

*Seegars v. Ashcroft*, 297 F. Supp. 2d 201 (D.D.C. 2004), *rev'd in part on other grounds sub nom. Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005) ...................................................................................... 12

*Sterling v. Constantin*, 287 U.S. 378 (1932) ......................................... 9, 10

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .....................................5

*United States v. Miller*, 604 U.S. 518 (2025).............................................6

*United States v. Mitchell*, 463 U.S. 206 (1983)..........................................6

*Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36 (1933)...........6

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .............. 2, 11

**Statutes**

1st Cong., sess. II, ch. XXVIII, 1 Stat. 130 (1790) .......................................3

2 U.S.C. § 25a ...........................................................................................4

An act for the government of the District of Columbia, and for other purposes, 43d Cong., sess. I, ch. 337, 18 Stat. 116 (1874).........................4

An Act to provide a Government for the District of Columbia, 41st Cong., sess. III, ch. LXII, 16 Stat. 419 (1871).......................................................4

An act to provide for the organization of the militia of the District of Columbia, 50th Cong., sess. II, ch. 328, 25 Stat. 772 (1889) ...................11

D.C. Code § 1-102 ......................................................................................6

D.C. Code § 1-201.02 ...............................................................................4, 6

D.C. Code § 1-206.01 ...............................................................................4, 6

D.C. Code § 1-206.02..................................................................................12

D.C. Code § 1-207.40..................................................................................12

D.C. Code § 49-102....................................................................................13

iii

D.C. Code § 49-103 ................................................................ 13

D.C. Code § 49-409 ........................................................7, 11, 12

District of Columbia Elected Board of Education Act, Pub. L. 90-292, 82
Stat. 101 (1968) ................................................................... 4

Reorganization Plan No. 3 of 1967, 81 Stat. 948 (1967) ................................ 4

**Constitutional Provisions**

U.S. CONST. amend. I ............................................................... 1

U.S. CONST. art. I, § 8, cl. 17 ...............................................1, 3, 4

U.S. CONST. art. II, § 1, cl. 1 ................................................. 7, 8

U.S. CONST. art. II, § 2, cl. 1 .................................................... 7

U.S. CONST. art. II, § 3, cl. 1 .................................................... 9

U.S. CONST. art. VI, cl. 2 ......................................................... 6

**Founding Era Materials**

1 W. Blackstone, Commentaries on the Laws of England 235 (1765) ........... 5

Letter from George Washington to Alexander Hamilton (Sep. 7, 1792) ....... 8

The Federalist No. 43 (James Madison) (Project Gutenberg ed. 2021) ........ 7

**Executive materials**

Exec. Order No. 14,333, 90 Fed. Reg. 39301, § 1 (Aug. 11, 2025) .............. 10

Presidential Memoranda, *Restoring Law and Order in the District of
Columbia*, § 1 (Aug. 11, 2025) .................................................. 10

Use of the National Guard to Support Drug Interdiction Efforts in the
District of Columbia, 13 Op. O.L.C. 91, 94 (1989) ............................. 12, 13

**Other sources**

*2026 Year-to-Date Crime Comparison*, WASH D.C. METRO. POLICE (last
accessed Mar. 27, 2026) ....................................................... 19

Andrea Swalec, *Congressional Staffer Assaulted in Dc Gunpoint Robbery Attempt: Police*, 4NBC WASH. (June 17, 2023) .......................................... 18

Christopher Harris, *Congressmen Condemn DC Crime After Staffers Targeted in Navy Yard Robbery Spree*, FOX5 (June 11, 2024) ............... 18

Doc Louallen, *Congressional Intern Killed in Washington, DC Shooting: Officials*, ABC NEWS (July 3, 2025) ........................................................17

Edgar Sandoval & Campbell Robertson, *Congressman Becomes Latest Carjacking Victim as D.C. Crime Continues to Rise*, N.Y. TIMES (Oct. 3, 2023) ............................................................................................................ 18

*Federal Troops Guarded the U.S. Capitol Following the Assassination Dr. Martin Luther King Jr.*, U.S. HOUSE OF REPS. HISTORY, ART & ARCHIVES (last accessed Mar. 27, 2025) ..................................................................... 8

Fenit Nirappil & Peter Hermann, *D.C. Activists and Lawmakers Confront Challenges of 'Defund Police' Movement* WASH. POST (June 25, 2020) .. 16

Gary Fields, *4 Takeaways From Trump's Federal Law Enforcement Surge in D.C. as His Emergency Order Expires*, PBS NEWS (Sep. 10, 2025) ....20

Helene Cooper & Eric Schmitt, *For National Guard Troops in D.C., It's Trash Pickup and Metro Patrols*, N.Y. TIMES (Sept. 11, 2025,) ............... 21

Holmes Lybrand, *Man Who Attacked Rep. Angie Craig in DC Apartment Building Sentenced to 27 Months in Prison*, CNN (Nov. 16, 2023)......... 18

*Homicide Falls Sharply in Major U.S. Cities Amid Continuing Decline in Overall Crime*, COUNCIL ON CRIM. JUST. (Jan. 22, 2026).......................... 19

Isabel van Brugen, *Photos Show POI Over Attack on DOGE Worker 'Big Balls'*, NEWSWEEK (Aug. 11, 2025) .......................................................... 18

Jeff Abell, *National Guard's Presence Slashes D.C. Crime Rates, With Seven Days Homicide-Free*, FOX45 NEWS (Aug. 20, 2025)............... 19, 20

John Kelly et al., *CBS News Analyzed D.C. Crime Data Amid National Guard Deployments. Here's What the Numbers Show*, CBS NEWS (Aug. 27, 2026) ................................................................................ 19

Konner McIntire & Janae Bowens, *Fact Check Team: Cities That Called to 'Defund Police' Grappling with Crime Surge Boost Police Funding Amid Staffing Shortfalls*, ABC 33/40 NEWS (Aug. 15, 2023) ..................16, 17, 19

Konstantin Toropin, *DC National Guard Deployment in the Nation's Capital is Extended to Feb. 28*, ASSOC. PRESS (Nov., 5, 2025) ................. 21

Mayor's Order 2025-090, "Creation of the Safe and Beautiful Emergency Operations Center" (Sept. 2, 2025)........................................................ 21

*Past and Post War*, D.C. NAT'L GUARD (last accessed Mar. 27, 2026). .........8

Paul Wagner, *What's Driving DC's Crime Drop? MPD Points to Federal Surge, Weather*, 4NBC WASH. (Feb. 10, 2026).......................................20

Peter Hermann, *Congressional Staffer Among Victims Targeted in Spate of D.C. Robberies,* WASH. POST (Dec. 5, 2024)........................................ 18

Pierre Thomas et al., *2 Israeli Embassy Staffers Killed in 'Act of Terror' in Washington, DC*, ABC NEWS (May 22, 2025) ...........................................17

Rebecca Shabad, *Mayor Muriel Bowser Says Trump's Surge of Federal Law Enforcement Has Lowered Crime in D.C.*, NBC NEWS (Aug. 27, 2025) ..................................................................................................20

*Reducing Urban Blight as Crime Prevention Strategy*, UNIV. MICH. YOUTH VIOLENCE PREVENTION CTR. (last accessed November 28, 2025).............. 21

Spencer S. Hsu, *D.C. Officer's Murder Case Stokes Debate over U.S. Police Prosecutions*, WASH. POST (Sep. 9, 2024) ............................................... 16

Steven Allen Adams, *Judge Rules Against Preliminary Injunction, West Virginia National Guard D.C. Deployment Legal*, PARKERSBURG NEWS & SENTINEL (Nov. 11, 2025).......................................................................15

*The Executive Branch*, THE WHITE HOUSE (last accessed Sep. 11, 2025) ......8

*The Great War*, D.C. NAT'L GUARD (last accessed Mar. 27, 2026) ...............8

## INTEREST OF AMICI CURIAE

*Amici* are 23 States who support President Trump's lawful efforts to make the District of Columbia safer. *Amici* send Senators, Representatives, and officials to the District. Their Citizens often travel there to visit the sights and petition the Government. And some of the *amici* States have sent their own National Guard troops to the District to advance President Trump's mission of making the District safer. *Amici* have a profound interest in the outcome of this case and in the safety and security of our Nation's capital.

## INTRODUCTION

The District of Columbia is the "Seat of Government of the United States" and the house of all three of its branches. U.S. CONST. art. I, § 8, cl. 17. Safety, security, and domestic tranquility in D.C. are critical, not only to the good people of the District, but to the functioning of the United States. The American People rely on the effective operation of their Government, which in turn depends on the safety of elected representatives and officials who carry out the popular will. The American People travel from all over the country to Washington, D.C. every day to visit its historic sites and exercise their First Amendment right to petition the Government. *See* U.S. CONST. amend. I. The District belongs to "the People" as a whole, and its safety is critical to our constitutional republic.

1

In the years preceding President Trump's second term, however, crime in D.C. surged, putting that safety in jeopardy. Rampant carjackings, robberies, murders, and overall violence impeded the operations of government and endangered the lives of civilians and government employees alike. Several months ago, President Trump acted swiftly and effectively. Using his Article II and statutory authority, President Trump deployed the National Guard to safeguard the District. This mission has already produced strong results, but more work must be done, and the danger still lingers.

Despite the necessity and legality of President Trump's actions in the District, the district court below issued a sweeping preliminary injunction that usurps the President's constitutional power as Commander-in-Chief and imperils our Nation's capital at a critical time. This Court correctly stayed the injunction and now it should vacate it.

***First***, the President is likely to succeed on the merits. The District cannot sue the United States, for one, because it not a sovereign entity but rather a creature of the federal government itself. *See, e.g.*, *Metro. R.R. Co. v. District of Columbia*, 132 U.S. 1, 9 (1889). While Congress has delegated some legislative authority to the District, the District remains its subordinate, and Congress has not waived sovereign immunity to authorize this suit. The District has no standing or statutory power to sue the President

2

of the United States, and a federal court has no jurisdiction to entertain this suit.

Even if the District could sue, the President is still acting under his constitutional authority to protect our capital. Moreover, his Article II duty to ensure the laws be faithfully enforced requires him to protect the seat of government, which is home to hundreds of agencies and tens of thousands of officials who cannot carry out their duties if they are not safe. President Trump is also acting under clear statutory authority, U.S. Code Title 32 and D.C. Code Title 49, meaning his authority is at its highest point. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The district court's injunction infringes on both the President's constitutional authority and congressional mandate.

***Second***, the equities weigh heavily in favor of vacating the injunction. For years, but especially since 2020, the District has been mired in crime and tumult, which impedes the Government's operations. Several victims of the crime waves have been members of Congress and their staffers, as well as administration officials, all of whom must be safe to carry out their constitutionally assigned duties. Although the D.C. Attorney General filed this lawsuit in the District's name, the Mayor of D.C. and other officials have recognized the benefits of National Guard deployment. And residents,

3

unsurprisingly, have welcomed it. This lawsuit is based on political expediency, not the interests of our nation nor those of the District. If the injunction goes into effect, it will impede the operations of the federal government and usurp presidential power. Most of all, it will harm the American People and D.C. residents.

## ARGUMENT

**I.    THE PRESIDENT IS LIKELY TO SUCCEED ON THE MERITS BECAUSE THE FEDERAL GOVERNMENT HAS SOVEREIGN AND CONSTITUTIONAL AUTHORITY OVER THE NATION'S CAPITAL**

The Founders recognized the need to designate a special District as "the Seat of the Government of the United States." U.S. CONST. art. I, § 8, cl. 17. In July 1790, Congress passed "An Act for establishing the temporary and permanent seat of the Government of the United States," 1st Cong., sess. II, ch. XXVIII, 1 Stat. 130 (1790), setting the "permanent seat" of the Nation's government "on the river Potomac at some place between the mouths of the Eastern Branch and Conocochegue." *Id.* § 1. Washington, D.C. is now not only our Nation's capital, but the "very heart … of the Union itself," *O'Donoghue v. United States*, 289 U.S. 516, 539 (1933), and the abiding home of all three branches of our federal government. Without a safe and secure capital, our elected officials, congressional staff, administration staff, and judicial officers and staff are put at risk, imperiling the government's

ability to function. The District's safety and well-being is not only a practical necessity for good governance but also a symbol of our Nation's strength.

For those reasons, the Constitution places authority over the District, not into the hands of a small group of residents, but with the federal government, which represents all the American People. Congress "exercise[s] exclusive Legislation in all Cases whatsoever, over such District." U.S. CONST. art. I, § 8, cl. 17. For over two hundred years following the Founding, all legislative and executive control over Washington, D.C. remained in the hands of the federal government. Although the details changed, legislation related to D.C. recognized congressional and presidential control over the District.[1]

Not until 1973 did Congress cede a small portion of its legislative authority over to the District. In the District of Columbia Home Rule Act ("Home Rule Act"), Pub. L. No 93-198, 87 Stat. 774 (1973) (codified, as amended, at D.C. Code §§ 1-201.01 *et seq.*), Congress "delegate[d] certain legislative powers to the government of the District of Columbia" but

---

[1] *See, e.g.*, An Act to provide a Government for the District of Columbia, 41st Cong., sess. III, ch. LXII, 16 Stat. 419 (1871); An act for the government of the District of Columbia, and for other purposes, 43d Cong., sess. I, ch. 337, 18 Stat. 116 (1874); Reorganization Plan No. 3 of 1967, 81 Stat. 948 (1967); District of Columbia Elected Board of Education Act, Pub. L. 90-292, 82 Stat. 101 (1968); District of Columbia Delegate Act, Pub. L. 91–405, § 202, 84 Stat. 848 (1970), codified at 2 U.S.C. § 25a (1988).

retained "the ultimate legislative authority over the nation's capital granted by article I, § 8, of the Constitution." D.C. Code § 1-201.02; *see also id.* § 1-206.01 ("Notwithstanding any other provision of this chapter, the Congress of the United States reserves the right, at any time, to exercise its constitutional authority as legislature for the District."). The delegation in the Home Rule Act was limited, and Congress continued to "wield[] plenary power over the nation's capital." *Sanchez v. Off. of the State Superintendent of Educ.*, 45 F.4th 388, 400 (D.C. Cir. 2022) (citation omitted).

## A.    The District of Columbia Cannot Sue the Federal Government

Although the District has some legislative authority delegated by Congress, it is not a distinct sovereign entity: "The sovereign power of this qualified state is not lodged in the corporation of the District of Columbia, but in the government of the United States." *Metro. R.R.*, 132 U.S. at 9; *see also Goode v. Markley*, 603 F.2d 973, 976 (D.C. Cir. 1979) ("Violations of the District of Columbia Code and violations of the United States Code are all crimes against a single sovereign, namely, the United States."); *Croson v. District of Columbia*, 2 F.2d 924, 924 (D.C. Cir. 1924) (D.C. "possesses no sovereign power"); *Mackey v. United States*, 47 Ct. Cl. 121, 123 (1911) ("The United States Government is the sovereign and the District government merely one of the agencies of the sovereign power.").

As Judge Rao explained in her stay concurrence, this Court has "never recognized that the District possesses an independent sovereignty." Stay Order 30 (Rao, J., concurring). And, for that reason, this Court has "never recognized that the District has standing to sue the President and federal officers for sovereignty-based injuries," such as those alleged here. *Id.* at 31. "This lack of historical support weighs heavily against the District's standing." *Id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)).

Not only is there a lack of historical support for the District's Article III standing, but the historical record counsels *against* standing and in favor of sovereign immunity. At the Founding, the well-established rule was that "no suit or action can be brought against the king"—i.e., the sovereign—"even in civil matters, because no court can have jurisdiction over him." *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 238–39 (2019) (quoting 1 W. Blackstone, Commentaries on the Laws of England 235 (1765)). While most Founding-era discussions of sovereign immunity addressed the States, "the immunity of the United States was understood even more clearly." *Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 741 (D.C. Cir. 2021) (Katsas, J., concurring). Congress may waive sovereign immunity, but waiver "must be unequivocally expressed in statutory text." *Lane v. Peña*, 518 U.S. 187, 192 (1996). If there is no clear waiver, there is no jurisdiction to sue the federal

government. *See United States v. Miller*, 604 U.S. 518, 527 (2025) ("Sovereign immunity is jurisdictional in nature" and "deprive[s] courts of the power to hear suits against the United States absent Congress's express consent") (citation omitted); *accord United States v. Mitchell*, 463 U.S. 206, 212 (1983).[2]

In passing the Home Rule Act and other statutes related to the District's limited authority, Congress never waived sovereign immunity to give the District ability to bring this suit. To the contrary, the Home Rule Act provides that the District can "exercise all other powers of *a municipal corporation* not inconsistent with the Constitution and laws of the United States." D.C. Code § 1-102 (emphasis added); *see also id.* § 1-201.02 (Congress retains ultimate legislative authority over District); *id.* § 1-206.01 (same). The Supreme Court has long held that municipal corporations cannot sue their own State. *See Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will

---

[2] Because States have a unique "stake in protecting [their] quasi-sovereign interests, they may be "entitled to special solicitude in [Article III] standing analysis." *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007). As a municipal corporation created by federal statute, however, the District can make no such claim. *See* Stay Order at 32 (Rao, J., concurring).

of its creator."); *see also Coleman v. Miller*, 307 U.S. 433, 441 (1939). That rule applies with even greater force with the federal government, which operates under the Supremacy clause. *See* U.S. CONST. art. VI, cl. 2.

In short, the District has neither inherent nor express statutory power to sue its sovereign, the United States, or the President of the United States in his official capacity. Thus, this Court lacks jurisdiction to entertain this suit.

**B.    The President Is Properly Exercising Article II Power to Ensure the Faithful Execution of Federal Law in the Nation's Capital**

Even if the District had standing to sue, the President is properly exercising his Article II authority to protect the seat of our national government, as our commander-in-chief, and to faithfully execute the laws as the Nation's chief executive. Accordingly, the deployment of the National Guard is constitutional, and the District is likely to lose on the merits.

Article II makes the President the commander-in-chief. *See* U.S. CONST. art. II, § 1, cl. 1; § 2, cl. 1. And, in D.C. Code Title 49, Congress directed that the "President of the United States shall be the Commander-in-Chief of the militia of the District of Columbia." D.C. Code § 49-409. One of the chief responsibilities as commander-in-chief is to protect and defend the nation's capital. As James Madison explained in *The Federalist No. 43*, the

9

responsibility for the safety of the District was "too great a public pledge to be left in the hands of a single State." The Federalist No. 43 (James Madison) (Project Gutenberg ed. 2021). Because it is the place on which "the security of the entire Union may depend," it is not proper for its defense to "depend[] on a particular" State. *Id.*; *cf. CSX Transp., Inc. v. Williams*, 406 F.3d 667, 672 (D.C. Cir. 2005) ("The need to protect the United States Capitol and its environs from terrorist attack is and could hardly be a more quintessentially national concern.").

On several occasions, presidents have called up the D.C. National Guard to protect the District. Shortly before the U.S. officially entered World War I, for example, the Guard was called up to protect critical sites around D.C. from espionage or attack.[3] But this has happened not only in wartime but also in peacetime. The D.C. National Guard, for example, was activated during Vietnam War and Civil Rights demonstrations.[4] When Martin Luther King, Jr. was assassinated in 1968, more than 1,800 D.C. National Guardsmen were called up to secure the District from riots.[5]

---

[3] *The Great War*, D.C. NAT'L GUARD, https://tinyurl.com/4654bp7y (last accessed Mar. 27, 2026)

[4] *Past and Post War*, D.C. NAT'L GUARD, https://dc.ng.mil/About-Us/Heritage/History/Past-and-post-war/ (last accessed Mar. 27, 2026).

[5] *Federal Troops Guarded the U.S. Capitol Following the Assassination Dr. Martin Luther King Jr.*, U.S. HOUSE OF REPS. HISTORY, ART & ARCHIVES

In addition to making the President the commander in chief, the Constitution also vests the Executive power in the President and requires him to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 1, cl. 1. Because the Executive branch and its fifteen Cabinet departments, fifty independent federal commissions, numerous agencies,[6] and over 150,000 of its officers are located in D.C., the President cannot carry out his constitutional obligations if his officials are imperiled or are scared away from serving in the federal government in the first place. As President George Washington observed in 1792, "it is my duty to see the Laws executed: to permit them to be trampled upon with impunity would be repugnant to" that duty. Letter from George Washington to Alexander Hamilton (Sep. 7, 1792).[7]

The Supreme Court has recognized that the President has sole authority and solemn duty to faithfully execute federal law under the Constitution, so the "executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen." *Sterling v. Constantin*, 287 U.S. 378, 399 (1932). Indeed, the

---

https://history.house.gov/HistoricalHighlight/Detail/25769818158 (last accessed Mar. 27, 2025).

[6] *The Executive Branch*, THE WHITE HOUSE, https://tinyurl.com/mr3uymwe (last accessed Sep. 11, 2025).

[7] https://founders.archives.gov/documents/Washington/05-11-02-0040 (last accessed Sept. 11, 2025).

11

Supreme Court has recognized the President's inherent ability to use troops to protect federal functions. In *Cunningham v. Neagle*, the Court explained:

> [I]f the president or the postmaster general is advised that the mails of the United States, possibly carrying treasure, are liable to be robbed, and the mail carriers assaulted and murdered, in any particular region of country, who can doubt the authority of the president, or of one of the executive departments under him, to make an order for the protection of the mail, and of the persons and lives of its carriers, by … providing a sufficient guard, whether it be by soldiers of the army or by marshals of the United States.

135 U.S. 1, 65 (1890). During a railway strike obstructing the mail, President Cleveland ordered out troops, which action the Supreme Court upheld: "If [an] emergency arises, the army of the nation, and all its militia, are at the service of the nation to compel obedience to its laws." *In re Debs*, 158 U.S. 564, 582 (1895).

Beyond broadly enforcing federal law by supervising subordinate officials, the President has other specific constitutional duties in the Nation's capital that depend on a safe and secure D.C. For example, the President must provide information on the "State of the Union" from "time to time," U.S. CONST. art. II, § 3, cl. 1, which has traditionally been done by traveling down Pennsylvania Avenue to the United States Capitol Building to address Congress. The President also "shall receive Ambassadors and other public Ministers" within the District to carry out his critical power over foreign

12

policy and military affairs. *Id.* Both of those textual and historical powers would be hindered if the President could not ensure a safe and secure capital.

Because of the rising violent crime in D.C., the President made the executive decision and finding that the functioning of the federal government was at risk. In August 2025, he issued a Presidential Memoranda and two Executive Orders, setting forth the problems and predicates for his exercise of Article II power. *See* Presidential Memoranda, *Restoring Law and Order in the District of Columbia*, § 1 (Aug. 11, 2025). Specifically, President Trump concluded that the "rising violence in the capital now urgently endangers public servants, citizens, and tourists, disrupts safe and secure transportation and the proper functioning of the Federal Government, and forces the diversion of critical public resources toward emergency response and security measures." Exec. Order No. 14,333, 90 Fed. Reg. 39301, § 1 (Aug. 11, 2025). In his view, "the city government's failure to maintain public order and safety has had a dire impact on the Federal Government's ability to operate efficiently to address the Nation's broader interests without fear of our workers being subjected to rampant violence." *Id.* President Trump specifically concluded that the increase in crime has interfered with his ability to carry out his Article II Take Care obligations. *Id.* § 1.

This decision under Article II and the factual predicate upon which it is based are not justiciable—they are "conclusive." *Sterling*, 287 U.S. at 399; *see also, e.g.*, *Martin v. Mott*, 25 U.S. 19, 28 (1827) (President's decision is "exclusive[]"); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020) ("Although presidential declarations of emergencies … have been at issue in many cases, *no* court has ever reviewed the merits of such a declaration." (emphasis in original)). After all, "[j]udges are not soldiers or diplomats." *Lin v. United States*, 539 F. Supp. 2d 173, 180 (D.D.C. 2008). Federal courts lack both the constitutional authority and institutional competence to evaluate President Trump's well-supported findings. Judicial meddling in matters like these would be "a guarantee of anarchy, and not of order." *Luther v. Borden*, 48 U.S. 1, 43 (1849).

The President as both commander-in-chief and chief executive has determined that the only way to defend the capital and take care that the laws are faithfully executed is to call up the National Guard to support the D.C. police in quelling the crime wave. That decision is squarely within the Article II power.

**C.    The President Is Exercising Statutory Power Because Congress Made the President Commander-in-Chief of the D.C. Guard**

In addition to exercising core Article II power, the President is acting under express statutory authority under both Title 32 and D.C. law.

"When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Given the federal government's constitutional power over D.C., the President's Article II power to take care that the laws are faithfully executed, and the President's statutory authority over D.C. and its National Guard, President Trump's actions fall squarely within the first *Youngstown* category.

In support of the Founders' goal of ensuring domestic tranquility in the Nation's capital, Congress created a standing militia in the District and designated the President as Commander-in-Chief of that militia in Title 49 of the D.C. Code. *See* An act to provide for the organization of the militia of the District of Columbia, 50th Cong., sess. II, ch. 328, 25 Stat. 772 (1889); D.C. Code § 49-409. "[F]rom ... District of Columbia Code provisions, it is apparent that the organized militia of the District of Columbia, which is organized, armed, and controlled by the President of the United States, is

15

essentially a component of the federal government." *Seegars v. Ashcroft*, 297 F. Supp. 2d 201, 241 (D.D.C. 2004), *rev'd in part on other grounds sub nom. Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005). Indeed, "[i]n light of the degree of supervision and control exercised over the District Guard [even] in peacetime by federal authorities, the [Guard] is a federal entity during [both] times of peace and times of war." *Clayton v. District of Columbia*, 931 F. Supp. 2d 192, 200 (D.D.C. 2013) (cleaned up). That broad delegation of authority permits the President to deploy the troops at his discretion, including to execute federal law. *See* Use of the National Guard to Support Drug Interdiction Efforts in the District of Columbia, 13 Op. O.L.C. 91, 94 (1989).

The Home Rule Act explicitly empowers the President to make "use of the Metropolitan Police force for federal purposes ... as the President may deem necessary and appropriate." D.C. Code § 1-207.40(a). And Congress made the President commander-in-chief of the District of Columbia Guard. D.C. Code § 49-409; *see also* D.C. Code § 1-206.02(b) (stressing that nothing in the Home Rule Act was to be "construed as vesting in the District government any greater authority over . . . the National Guard of the District of Columbia" than the limited powers held by the District Commissioner before January 2, 1975).

16

Despite the broad grant of statutory authority, and Article II backdrop, the district court read Title 49 narrowly to require the D.C. Mayor to request the assistance of the President and only in the case of a "tumult, riot, mob, or similar disturbance" before calling the D.C. Guard. But Title 49 provides a procedural mechanism for the Mayor to request the assistance of the D.C. National Guard:

> When there is in the District of Columbia a tumult, riot, mob, or a body of men acting together by force with attempt to commit a felony or to offer violence to persons or property, or by force or violence to break and resist the laws, or when such tumult, riot, or mob is threatened, *it shall be lawful for* the Mayor of the District of Columbia, or for the United States Marshal for the District of Columbia, or for the National Capital Service Director, *to call on the* Commander-in-Chief to aid them in suppressing such violence and enforcing the laws.

D.C. Code § 49-103 (emphases added). That provision does not set a condition precedent on the President's act of constitutional and statutory authority as Commander-in-Chief. If it did, then that "would imbue two presidential subordinates"—i.e., the U.S. Marshal or National Capital Service Director—"with more power to protect the seat of the federal government than the President—a highly untenable reading of statutory text." Stay Order at 18.

Even if Section 49-103 could be read that narrowly, the D.C. Code separately authorizes the Commanding General of the D.C. National Guard—who in turn reports to the President—to "order out any portion of the

National Guard for … other duties, as he may deem proper." D.C. Code § 49-102. This provision is "broad enough to include law enforcement activities." *Id.* Use of the National Guard, 13 Op. O.L.C. at 93. The district court tried to limit this broad "other duties" language by employing a couple canons of statutory construction (*noscitur a sociis* and *ejusdem generis*). But in doing so, it erased express language of the statute directing that these "other duties" are *whatever* duties that Commanding General "may deem proper." D.C. Code § 49-102; *see, e.g.*, *Sabin v. Butz*, 515 F.2d 1061, 1066 (10th Cir. 1975) (explaining how a statute giving the Secretary of Agriculture the right to issue permits "upon such terms and conditions as he may deem proper" gives the Secretary "[b]road authority"). The district court's preferred "canons of construction are not mandatory rules," and they must yield when a different congressional intent is "embodied in the statute Congress wrote." *Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001).

The President also acted within his authority when he requested assistance from the States' National Guard units. In the Complaint, Plaintiff tries to confound the legality of the President's (and Governors') actions by questioning whether the National Guard troops from the States were deployed under so-called Title 10 status or Title 32 status. National Guard troops from States can be activated under two different statutory authorities,

Title 10 of the U.S. Code ("Title 10 status")[8] or Title 32 of the U.S. Code ("Title 32 status").[9] When troops are called up under Title 10, the Posse Comitatus Act applies and limits the presidential authority and the ability to deploy troops for law enforcement purposes. *E.g.*, *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 41 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). But when National Guard troops are deployed under Title 32 status, those troops can be deployed to support domestic law enforcement activities. *Id.* ("The Posse Comitatus Act … only bars the Army and Air Force [and Navy, Marine Corps, and Space Force] from domestic law enforcement, but does not apply to Title 32 National Guard duty.") (quoting *Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019)).

The National Guard troops deployed to the District from the States are deployed under Title 32 status, meaning the Posse Comitatus Act and its limitations do not apply. The President requested assistance from the States

---

[8] "Whenever there is an insurrection in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States, in the number requested by that State, and use such of the armed forces, as he considers necessary to suppress the insurrection." 10 U.S.C. § 251.

[9] State National Guard troops can also be activated under a third "State Active Duty status," but that status is not at issue here.

19

to protect the capital—a request that the Governors of the States did not have to comply with—meaning they are Title 32 status; some *Amici* are among those States who responded and whose Governors willingly and voluntarily deployed their State's National Guard troops under Title 32. The Plaintiff does not and cannot directly claim otherwise. *Compare* ECF No. 1 ¶ 103 ("Governor Lee granted the Administration's request to provide Tennessee National Guardsmen *under Title 32 Status* to assist the District of Columbia National Guard on a security mission in our nation's capital") (emphasis added), *with id.* ¶ 79–95 (arguing to the contrary).

In any event, *Amici* States—particularly those who deployed their National Guard troops—are in the best position to speak to the actions and intentions behind the deployment. And here, the troops were deployed pursuant to their Governors' orders under Title 32 status, as one sending State's courts have already held in direct disagreement with the district court's holding here. *See* Steven Allen Adams, *Judge Rules Against Preliminary Injunction, West Virginia National Guard D.C. Deployment Legal*, Parkersburg News & Sentinel (Nov. 11, 2025), https://tinyurl.com/mwasvtkr (describing dismissal of a challenge to West Virginia's deployment of National Guard troops to D.C.). The National Guard

troops are acting lawfully and helping the President secure and protect our Nation's capital.

## II.   THE EQUITIES WEIGH HEAVILY IN FAVOR OF A STAY, AS THE INJUNCTION USURPS PRESIDENTIAL POWER AND ENDANGERS D.C. CITIZENS AND THE GOVERNMENT

### A.   Because of the Ineffective and Often Counterproductive Responses of D.C. Officials, Crime Has Exploded in Our Capital, Hurting Residents and Hindering the Federal Government

For decades, but especially in the last few years, politicians in Washington, D.C. have disregarded their duty to the District's residents and to the American People. Rather than help the federal government strengthen and secure our Nation's capital, they have preferred soft-on-crime politics. In the face of growing and dangerous crime waves, they have not only stood by idly but have also exacerbated the problem. They have enacted policies that fail to protect D.C. residents and the Nation. Indeed, this lawsuit does not serve the safety or interests of any Americans but is instead part of an aggressive, misguided political opposition to President Trump's administration. *See Myerson v. United States*, 98 A.3d 192, 197 (D.C. 2014) (D.C. Code § 1-206.02(a)(3) prevents District from implementing policies that "impact the federal government's ability to operate").

Although Washington, D.C. has had substantial crime waves in the past, the recent problems can be traced to the recent defund-the-police

movement. In 2020, notwithstanding high crime and murder rates, the District's Council "sanctioned a $15 million cut in police funding."[10] Indeed, the District's Deputy Mayor for Public Safety and Justice, Kevin Donahue, strongly advised against that policy, making clear that those budget cuts would "not make D.C. safer or stronger."[11] The Council cut the police budget anyway. Moreover, the D.C. U.S. Attorney's office—with support of some segments of the local government—prosecuted more police officers during Biden's presidency than it had for the prior thirty years combined, often under novel legal theories.[12] Predictably, the budget cuts and prosecutions deflated police morale and dissuaded them from doing their jobs.

The painful results of these policies were inevitable. Crime immediately surged in the District: by 2023, violent crime had risen 37

---

[10] Konner McIntire & Janae Bowens, *Fact Check Team: Cities That Called to 'Defund Police' Grappling with Crime Surge Boost Police Funding Amid Staffing Shortfalls*, ABC 33/40 NEWS (Aug. 15, 2023), https://tinyurl.com/bdfs22cd.

[11] Fenit Nirappil & Peter Hermann, *D.C. Activists and Lawmakers Confront Challenges of 'Defund Police' Movement* WASH. POST (June 25, 2020), https://www.washingtonpost.com/local/dc-politics/dc-police-cuts/2020/06/25/dacff0e2-b6f2-11ea-a510-55bf26485c93_story.html.

[12] Spencer S. Hsu, *D.C. Officer's Murder Case Stokes Debate over U.S. Police Prosecutions*, WASH. POST (Sep. 9, 2024), https://www.washingtonpost.com/dc-md-va/2024/09/09/dc-police-prosecutions-us-attorney/.

percent over the previous year, while homicides had risen 25 percent.[13] This crime wave not only harmed residents of the District, but also government officials, congresspeople, staffers, foreign embassy workers and visitors, who endured assault, robberies at gunpoint, battery, and even murder. Every violent attack against those individuals is not only a tragedy for them and their families but also for the functioning of the federal government.

Crime against government officials has occurred regularly. Last fall, two Guardsmen were attacked and shot in northwest D.C. One, Army Spc. Sarah Beckstrom, succumbed to her injuries, while the other, Air Force Staff Sgt. Andrew Wolfe, was critically injured.[14] In March of last year, a pro-Hamas and anti-Israel protestor murdered an innocent Israeli embassy staffer and his bride-to-be right outside the Capital Jewish Museum.[15] In July of last year, a 21-year-old congressional intern named Eric Tarpinian-

---

[13] *See* McIntire & Bowens, *supra* note 10.

[14] Kerry Breen et al, *D.C. National Guard Shooting Live Updates as Murder Investigation Probes Suspect's Backgroundd,* CBS NEWS (Nov. 28, 2025). https://www.cbsnews.com/live-updates/dc-national-guard-shooting-investigation-murder/.

[15] Pierre Thomas et al., *2 Israeli Embassy Staffers Killed in 'Act of Terror' in Washington, DC*, ABC NEWS (May 22, 2025), https://abcnews.go.com/US/2-shot-fbi-field-office-washington-dc/story?id=122059162.

Jachym was murdered near the intersection of 7th and M Street NW.[16] In August of last year, a well-known Trump administration staffer named Edward Coristine was assaulted and severely beaten during a carjacking less than one mile from the White House.[17] In 2024, a congressional legislative director was robbed at gunpoint during a spate of robberies, as were eleven others in the Capitol Hill area, and several others were targeted in a Naval Yard robbery spree.[18] In 2023, a man attacked Representative Angie Craig in her D.C. apartment, after he followed her into an elevator and trapped her. [19] After the attack, Craig received death threats and was forced to move to

---

[16] Doc Louallen, *Congressional Intern Killed in Washington, DC Shooting: Officials*, ABC NEWS (July 3, 2025), https://abcnews.go.com/US/umass-student-house-intern-dies-washington-dc-shooting/story?id=123429541.

[17] Isabel van Brugen, *Photos Show POI Over Attack on DOGE Worker 'Big Balls'*, NEWSWEEK (Aug. 11, 2025), https://www.newsweek.com/photos-show-poi-big-balls-attack-doge-worker-dc-police-2111587.

[18] Peter Hermann, *Congressional Staffer Among Victims Targeted in Spate of D.C. Robberies,* WASH. POST (Dec. 5, 2024), https://www.washingtonpost.com/dc-md-va/2024/12/04/robberies-dc-capitol-hill/; Christopher Harris, *Congressmen Condemn DC Crime After Staffers Targeted in Navy Yard Robbery Spree*, FOX5 (June 11, 2024), https://www.fox5dc.com/news/congressmen-condemn-dc-crime-after-staffers-targeted-navy-yard-robbery-spree.

[19] Holmes Lybrand, *Man Who Attacked Rep. Angie Craig in DC Apartment Building Sentenced to 27 Months in Prison*, CNN (Nov. 16, 2023), https://www.cnn.com/2023/11/16/politics/angie-craig-attacker-sentenced.

protect her safety.[20] Craig's attacker was sentenced to only 27 months in prison.[21] Representative Henry Cuellar was also carjacked that year,[22] and another staffer was robbed at gunpoint.[23]

The crime had gotten so bad that as of 2023, the District's Democratic Mayor, Muriel Bowser, had "advocated for increased police presence."[24] District Councilmember Trayon White, also a Democrat, "even called for National Guard assistance."[25]

### B. In the Months Since the Executive Orders, President Trump and the National Guard Troops Have Made the Capital Safer for Government Officials and Citizens Alike

"[D]espite initial skepticism" from some D.C. residents, President Trump's deployment of National Guard troops in the District has caused

---

[20] *Id.*

[21] *Id.*

[22] Edgar Sandoval & Campbell Robertson, *Congressman Becomes Latest Carjacking Victim as D.C. Crime Continues to Rise*, N.Y. TIMES (Oct. 3, 2023), https://www.nytimes.com/2023/10/03/us/politics/cuellar-car-theft.html.

[23] Andrea Swalec, *Congressional Staffer Assaulted in Dc Gunpoint Robbery Attempt: Police*, 4NBC WASH. (June 17, 2023), https://www.nbcwashington.com/news/local/congressional-staffer-assaulted-in-dc-gunpoint-robbery-attempt-police/3368812/.

[24] McIntire & Bowens, *supra* note 10.

[25] McIntire & Bowens, *supra* note 10.

crime rates to drop substantially.[26] As of this writing, the drop in crime rates this year as compared to a year ago have been staggering and even historic. Overall, crime is down 27 percent, with homicides down 63 percent, robberies down 30 percent, carjacking down 55 percent, and almost every other crime metric down substantially.[27] Other sources confirm this steep decline in crime in the District.[28]

These historic lows in crime are directly attributable to President Trump's deployment. Murder rates in the first weeks of deployment dropped significantly compared to the comparable period in 2024.[29] As of August 20, 2025, only nine days after National Guard troops were first deployed, D.C. went seven days without a homicide, for the first time "in a long time."[30]

---

[26] Jeff Abell, *National Guard's Presence Slashes D.C. Crime Rates, With Seven Days Homicide-Free*, FOX45 NEWS (Aug. 20, 2025), https://foxbaltimore.com/newsletter-daily/national-guards-presence-slashes-dc-crime-rates-with-seven-days-homicide-free.

[27] *2026 Year-to-Date Crime Comparison*, WASH D.C. METRO. POLICE, https://mpdc.dc.gov/dailycrime (last accessed Mar. 27, 2026).

[28] *Homicide Falls Sharply in Major U.S. Cities Amid Continuing Decline in Overall Crime*, COUNCIL ON CRIM. JUST. (Jan. 22, 2026), https://counciloncj.org/homicide-falls-sharply-in-major-u-s-cities-amid-continuing-decline-in-overall-crime/

[29] John Kelly et al., *CBS News Analyzed D.C. Crime Data Amid National Guard Deployments. Here's What the Numbers Show*, CBS NEWS (Aug. 27, 2026), https://www.cbsnews.com/news/dc-crime-data-national-guard-deployments-analysis/.

[30] *See* Abell, *supra* note 26.

Carjackings decreased by 83 percent, robberies by 46 percent, car thefts by 21 percent, and overall violent crime by 22 percent.[31] Federal law enforcement in the District quickly resulted in the arrest of twenty suspected gang members, including members of the notably dangerous gangs MS-13 and Tren De Aragua.[32] In addition, hundreds of illegal firearms have been taken off the streets. *Id.* There is no doubt, then, that deployment has caused the steep drop in overall crime, rather than some other exogenous factors. As Metropolitan Police Department Commander Kevin Kentish explained, the "federal surge" of law enforcement in the District has played a critical part.[33]

Indeed, shortly after troops were deployed, on August 27th, even Mayor Bowser acknowledged the sharp decline in crime since the deployment of National Guard troops in the District and expressed her appreciation for "the surge of officers that enhance what [the Metropolitan

---

[31] *See id.*

[32] Gary Fields, *4 Takeaways From Trump's Federal Law Enforcement Surge in D.C. as His Emergency Order Expires*, PBS NEWS (Sep. 10, 2025), https://www.pbs.org/newshour/politics/takeaways-from-trumps-federal-law-enforcement-surge-in-dc-as-his-emergency-order-is-set-to-expire.

[33] Paul Wagner, *What's Driving DC's Crime Drop? MPD Points to Federal Surge, Weather*, 4NBC WASH. (Feb. 10, 2026), https://www.nbcwashington.com/news/local/whats-driving-dcs-crime-drop-mpd-points-to-federal-surge-weather/4058128/.

27

Police Department] has been able to do in this city."[34] According to Mayor Bowser's order, "violent crime in the District has noticeably decreased." Mayor's Order 2025-090, "Creation of the Safe and Beautiful Emergency Operations Center" (Sept. 2, 2025), at 2. Mayor Bowser's comments and mayoral order refute the Plaintiff's claim that the National Guard troops are undermining local law enforcement. *See* ECF No. 1 ¶ 126. The President's policy does not supplant but instead *supports* the existing law enforcement framework. As the Plaintiff concedes, when Louisiana announced that it was deploying National Guard troops to the District, it stated that the deployment was only meant "to support the Metropolitan Police Department." *Id.* ¶ 90.

National Guard troops have made the District safer in other ways as well; troops have stopped at least one fight near the metro, helped provide first aid to elderly residents of the district, and aided in the successful search for a missing child.[35] As part of supporting law enforcement, troops have worked on beautification projects to clean up neighborhoods. In October, the

---

[34] Rebecca Shabad, *Mayor Muriel Bowser Says Trump's Surge of Federal Law Enforcement Has Lowered Crime in D.C.*, NBC NEWS (Aug. 27, 2025), https://www.nbcnews.com/politics/politics-news/bowser-trump-police-takeover-lower-dc-crime-national-guard-ice-rcna227582.

[35] Helene Cooper & Eric Schmitt, *For National Guard Troops in D.C., It's Trash Pickup and Metro Patrols*, N.Y. TIMES (Sept. 11, 2025,), https://www.nytimes.com/2025/09/11/us/politics/trump-national-guard-troops-dc.html.

National Guard reported clearing trash, spreading mulch, and removing plant waste.[36] This type of work supports the efforts to prevent crime by ensuring that those neighborhoods are not "recognized as invitations to violent and property crimes."[37]

The results of the temporary deployment of National Guard troops in support of the Metropolitan Police Department will be long-lasting. On September 2, 2025, two days before the District filed this lawsuit, Mayor Bowser formally acknowledged that after the deployment, "violent crime in the District has noticeably decreased." Mayor's Order 2025-090 at 2. The Order also establishes a Safe and Beautiful Emergency Operations Center "to manage the District's response to the Task Force, the Presidential declaration of emergency and on a continuing basis." *Id.* Thanks to the President's decision-making during exigent circumstances to get the acute crime problem in the District under control, the National Guard troops have

---

[36] Konstantin Toropin, *DC National Guard Deployment in the Nation's Capital is Extended to Feb. 28*, ASSOC. PRESS (Nov., 5, 2025), https://apnews.com/article/national-guard-trump-deployment-washington-cbae3a840cec29b0d361413fbe162e14 (last accessed Nov. 28, 2025).

[37] *Reducing Urban Blight as Crime Prevention Strategy*, UNIV. MICH. YOUTH VIOLENCE PREVENTION CTR., https://yvpc.sph.umich.edu/reducing-urban-blight-crime-prevention-strategy/ (last accessed November 28, 2025).

created a sustainable situation that can be turned over to the District to manage in the long-term.

**CONCLUSION**

For these reasons, the Court should vacate the Injunction.

Dated: April 8, 2026

ALAN WILSON
ATTORNEY GENERAL
STATE OF SOUTH CAROLINA

/s/ Thomas T. Hydrick
Thomas T. Hydrick
Solicitor General
P.O. Box 11549
Columbia, South Carolina 29201
(803) 734-3765
thomashydrick@scag.gov

JOHN B. MCCUSKEY
ATTORNEY GENERAL
STATE OF WEST VIRGINIA

/s/ Michael R. Williams
Michael R. Williams
Solicitor General
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Michael.R.Williams@wvago.gov

/s/ Mark Pinkert
Mark Pinkert
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2333 Ponce de Leon Blvd.
Suite 600
Coral Gables, FL 33134
(203) 415-6665
mpinkert@holtzmanvogel.com

Jason Torchinsky
Kellen Dwyer
David P. Johnson
Brandon Smith
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643
Washington, DC 20037
(202) 737-8808
jtorchinsky@holtzmanvogel.com

*Counsel for Amici Curiae*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

STEPHEN J. COX
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

RAÚL LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
State of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General and Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

31

## CERTIFICATE OF COMPLIANCE AND SERVICE

This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia and 12-point font. The word limit for amicus briefs is 6,500 words. This brief contains 6,500 words, excluding the exempt portions.

I hereby certify that on April 8, 2026, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

April 8, 2026

> /s/ Mark Pinkert
> Mark Pinkert
> HOLTZMAN VOGEL BARAN
> TORCHINSKY & JOSEFIAK PLLC
> 2333 Ponce de Leon Blvd.
> Suite 600
> Coral Gables, FL 33134
> (203) 415-6665
> mpinkert@holtzmanvogel.com

32