NOT YET SCHEDULED FOR ORAL ARGUMENT

---

No. 25-5418

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

DISTRICT OF COLUMBIA,
APPELLEE,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,
APPELLANTS.

---

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

**BRIEF FOR APPELLEE THE DISTRICT OF COLUMBIA**

---

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

SARAH CARROLL
Assistant Attorney General
Office of the Solicitor General

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

EMMA SIMSON
ELIZA H. SIMON
MITCHELL P. REICH
Senior Counsels to the Attorney
General

KARTHIK P. REDDY
Special Assistant Attorney General

Office of the Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici.*—Plaintiff-appellee is the District of Columbia. Defendant-appellants are Donald J. Trump, in his official capacity as President of the United States; the United States Department of Defense; Peter B. Hegseth, in his official capacity as Secretary of Defense; the United States Army; Daniel Patrick Driscoll, in his official capacity as Secretary of the Army; the United States Department of Justice; Todd Blanche, in his official capacity as Acting United States Attorney General;[1] the United States Marshals Service; and Gadyaces S. Serralta, in his official capacity as Director of the United States Marshals Service.

The following persons or entities noted their appearance and/or filed amicus briefs in the district court: Martin Ackerman; Former U.S. Army and Navy Secretaries and Retired Four-Star Admirals and Generals; Law Enforcement Action Partnership; Center for Policing Equity; National Police Accountability Project; Policing Project at New York University School of Law; Washington Lawyers' Committee for Civil Rights and Urban Affairs; NAACP Legal Defense and Educational Fund, Inc.; Democracy Forward Foundation; Mia McClain; Allen Chapel AME Church; National African-American Clergy Network; Metropolitan African Methodist Episcopal Church; Christopher Zacharias; Aaron Alexander;

---

[1]    Todd Blanche has been automatically substituted for Pamela J. Bondi under Federal Rule of Appellate Procedure 43(c)(2).

i

Center for Racial Equity and Justice; New Bethel Baptist Church; Barbara Williams-Skinner; Clergy Network; Peace Baptist Church; Emory United Methodist Church; Religious Nationalism Project; Howard University School of Law Civil Rights Clinic; Shiloh Baptist Church of Washington, D.C.; All Souls Church Unitarian; Interfaith Alliance; Sojourners/Sojo Action; Terrance McKinley; America First Legal Foundation; Mike Howell; Constitutional Accountability Center; Steady State; the States of Maryland, South Carolina, West Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas; the Commonwealth of Virginia; and Oversight Project.

As of this filing, the following persons or entities have filed amicus briefs in this Court: the America First Legal Foundation; Former Service Secretaries, Retired Senior Military Officers and Vet Voice Foundation; Democracy Forward Foundation; the States of Maryland, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin and the Governors of Kansas, Kentucky, and Pennsylvania; the Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; All Souls Church Unitarian, Allen Chapel AME Church, Howard University School of Law Civil Rights Clinic, Interfaith Alliance, Mia M.

McClain, Metropolitan African Methodist Episcopal Church, National African American Clergy Network, New Bethel Baptist Church, Sojourners/Sojo Action, The Religious Nationalisms Project, Barbara Williams-Skinner, Christopher Zacharias, Michael C. Bell, Aaron Alexander, Center for Racial Equity and Justice, and Terrance McKinley; the Oversight Project; and the States of Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia, and the Commonwealth of Pennsylvania. Washington Lawyers' Committee, ACLU-DC, Amica Center, Bread for the City, Children's Law Center, DC Appleseed, Disability Rights DC, League of Women Voters DC, Legal Aid DC, School Justice Project, Tzedek DC, Washington Legal Clinic for the Homeless, and Democracy Forward Foundation have filed notices of intention to participate as amicus curiae.

B. *Ruling under review.*—The district court ruling under review is the November 20, 2025 Memorandum Opinion (ECF No. 88) and Order (ECF No. 89) entered by U.S. District Court Judge Jia M. Cobb granting appellee's motion for a preliminary injunction and a Section 705 stay, which is published at 810 F. Supp. 3d 19.

C. *Related cases*.—This case has not been before this Court previously, and undersigned counsel is unaware of any related case within the meaning of Circuit Rule 28(a)(1)(C).

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................1

STATEMENT OF ISSUES ................................................................................3

STATEMENT OF THE CASE...........................................................................4

    A.    Legal Background ........................................................................4

    B.    Factual Background......................................................................10

    C.    Procedural History.......................................................................13

SUMMARY OF ARGUMENT ...........................................................................15

ARGUMENT .......................................................................................................19

    I.    The District Has Standing ..........................................................19

    II.    The District Is Likely To Succeed On The Merits.............................24

        A.    The deployment of the D.C. Guard is unlawful........................24

            1.    The D.C. militia code does not authorize the D.C. Guard deployment ..........................................................24

            2.    Section 502(f) does not authorize the D.C. Guard deployment .................................................................39

        B.    The deployment of state Guard troops is unlawful...................48

            1.    The state Guard deployment cannot continue if the D.C. Guard deployment is unlawful..............................48

            2.    The state Guard deployment violates the Militia Clauses ...............................................................48

            3.    The state Guard deployment lacks statutory authorization .............................................................50

III.    The Equities Favor Preliminary Relief ..................................................53

    A.    The District is suffering irreparable injury ..............................53

    B.    An injunction is in the public interest.......................................54

CONCLUSION ..........................................................................................................56

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES*

## *Cases*

*Abbott v. Biden*,
  70 F.4th 817 (5th Cir. 2023) ................................................................ 4, 41, 48

*Amador County v. Salazar*,
  640 F.3d 373 (D.C. Cir. 2011) ................................................................ 20, 21

*Ass'n of Civilian Technicians v. United States*,
  603 F.3d 989 (D.C. Cir. 2010) ................................................................ 48, 49

*Bond v. United States*,
  564 U.S. 211 (2011) ................................................................................. 50

*Bond v. United States*,
  572 U.S. 844 (2014) ................................................................................. 47

*Chapin v. Ferry*,
  28 P. 754 (Wash. 1891) ............................................................................. 5

*Circuit City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001) ................................................................................. 26

*City of Olmsted Falls v. FAA*,
  292 F.3d 261 (D.C. Cir. 2002) ................................................................... 19

*Clark v. Martinez*,
  543 U.S. 371 (2005) ................................................................................. 42

*Clean Wisc. v. EPA*,
  964 F.3d 1145 (D.C. Cir. 2020) ............................................................... 19, 21

*Comm. on the Judiciary v. McGahn*,
  968 F.3d 755 (D.C. Cir. 2020) ................................................................... 23

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*Commonwealth ex rel. Tyler v. Small*,
    26 Pa. 31 (1856) ................................................................................ 36

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    144 F.4th 296 (D.C. Cir. 2025) ......................................................... 20

*District of Columbia v. John R. Thompson Co.*,
    346 U.S. 100 (1953) .......................................................................... 50

*District of Columbia v. Trump*,
    No. 25-5418, 2025 WL 3673674
    (D.C. Cir. Dec. 17, 2025) .......................... 14, 15, 22, 30, 31, 33, 35, 39, 53, 55

*Ela v. Smith*,
    71 Mass. 121 (1855) ............................................................................ 5

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) .......................................................................... 28

*Fuld v. Pal. Liberation Org.*,
    606 U.S. 1 (2025) .............................................................................. 50

*Guam v. United States*,
    593 U.S. 310 (2021) .......................................................................... 22

*Hanson v. District of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024) ......................................................... 53

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024) .......................................................................... 28

*In re Debs*,
    158 U.S. 564 (1895) .......................................................................... 38

*In re Neagle*,
    135 U.S. 1 (1890) .............................................................................. 38

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) .......................................................................... 24

viii

*Laird v. Tatum,*
  408 U.S. 1 (1972) ............................................................. 1, 55

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................. 54, 55

*Learning Resources, Inc. v. Trump,*
  146 S. Ct. 628 (2026) ...................................................... 28, 47

*Maryland ex rel. Levin v. United States,*
  381 U.S. 41 (1965) .................................................................. 4

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) .............................................................. 50

*Mauran v. Smith,*
  8 R.I. 192 (1865) ................................................................... 36

*Metro. Gov't of Nashville v. Tenn. Dep't of Educ.,*
  645 S.W.3d 141 (Tenn. 2022) .............................................. 22

*Metro. R.R. Co. v. District of Columbia,*
  132 U.S. 1 (1889) .................................................................. 22

*Medellín v. Texas,*
  552 U.S. 491 (2008) .............................................................. 38

*New Prime Inc. v. Oliveira,*
  586 U.S. 105 (2019) .............................................................. 24

*Northcross v. Bd. of Educ.,*
  412 U.S. 427 (1973) .............................................................. 30

*People ex rel. Boatright v. Newlon,*
  238 P. 44 (Colo. 1925) .......................................................... 37

*Perpich v. Dep't of Defense,*
  496 U.S. 334 (1990) .............................................................. 39

*Puerto Rico v. United States,*
  490 F.3d 50 (1st Cir. 2007) ................................................... 22

*Sanchez v. Off. of State Superintendent of Educ.*,
  45 F.4th 388 (D.C. Cir. 2022) ............................................................ 9, 37

*Sec'y of Lab. v. KC Transp., Inc.*,
  173 F.4th 294 (D.C. Cir. 2026) .............................................................. 23

*State ex rel. Milton v. Dickenson*,
  33 So. 514 (Fla. 1902) ....................................................................... 5, 37

*State v. Josephson*,
  45 So. 381 (La. 1908) .............................................................................. 37

*State v. Wagener*,
  77 N.W. 424 (Minn. 1898) .................................................................. 5, 37

*Stirling v. Minasian*,
  955 F.3d 795 (9th Cir. 2020) ............................................................ 41, 42

*Susman Godfrey LLP v. Exec. Off. of President*,
  789 F. Supp. 3d 15 (D.D.C. 2025) ......................................................... 53

*Taggart v. Lorenzen*,
  587 U.S. 554 (2019) .......................................................................... 24, 45

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .................................................................. 21

*Trump v. Illinois*,
  146 S. Ct. 432 (2025) ...................................................... 3, 25, 38, 51

*United States ex rel. Gillett v. Dern*,
  74 F.2d 485 (D.C. Cir. 1934) .................................................. 3, 4, 41, 48

*United States v. Nixon*,
  418 U.S. 683 (1974) ............................................................................... 23

*United States v. Rauscher*,
  119 U.S. 407 (1886) ............................................................................... 37

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ............................................................................... 47

x

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 15 .................................................................. 4

U.S. Const. art. I, § 8, cl. 16 ............................................................... 4, 41

U.S. Const. art. I, § 8, cl. 17 ........................................................ 6, 9, 38

## Statutes and Regulations

10 U.S.C. § 251 ............................................................................... 51

10 U.S.C. § 252 ............................................................................... 51

10 U.S.C. § 683 (1964) .................................................................... 45

10 U.S.C. § 12315 ........................................................................... 45

10 U.S.C. § 12406 ............................................................. 7, 25, 28, 51

16 Rev. Stat. § 1642 (2d ed. 1878) ..................................................... 7

16 U.S.C. § 1456 ............................................................................. 31

19 U.S.C. § 1862 ............................................................................. 31

19 U.S.C. § 3203 ............................................................................. 31

22 U.S.C. § 1978 ............................................................................. 31

32 U.S.C. § 101 ............................................................. 40, 41, 42, 45

32 U.S.C. § 112 ............................................................................ 8, 44

32 U.S.C. § 328 ............................................................................... 41

*32 U.S.C. § 502 .......................... 2, 8, 18, 24, 39, 40, 41, 42, 43, 44, 45, 46, 47, 51

33 U.S.C. § 1362 ............................................................................. 23

33 U.S.C. § 1365 ............................................................................. 23

42 U.S.C. § 7602 ............................................................................... 23

42 U.S.C. § 7604 ............................................................................... 23

50 U.S.C. § 3803 ............................................................................... 31

Act of July 14, 1868, No. XVIII, 1868 Ark. Acts of Gen. Assembly .................... 27

Act of Mar. 1, 1889, ch. 328, 25 Stat. 772 .................................................... 6

Act of Mar. 9, 1869, 1869 N.J. Laws 251 .................................................... 30

Act of Feb. 18, 1909, ch. 146, 35 Stat. 629 ................................................ 34

Act of Oct. 3, 1964, Pub. L. No. 88-621, 78 Stat. 999 ................................ 8

Act of Oct. 13, 1885, No. 355, Ga. Acts & Resolutions 74 .............................. 30

Ark. Code Ann. § 12-61-111 ................................................................... 7

D.C. Code § 1-204.01 ............................................................................. 9

D.C. Code § 1-204.21 ............................................................................. 9

D.C. Code § 1-204.22 ........................................................................ 9, 21

D.C. Code § 1-206.02 ........................................................................ 9, 31

D.C. Code § 1-207.40 ............................................................................. 9

D.C. Code § 5-101.03 .................................................................... 9, 21, 54

D.C. Code § 5-105.01 ............................................................................. 9

D.C. Code § 5-105.05 ........................................................................... 21

D.C. Code § 7-2332 ............................................................................... 52

D.C. Code § 49-101 ......................................................................... 6, 28

*D.C. Code § 49-102 .............................. 1, 6, 13, 16, 26, 27, 28, 29, 30, 32, 33, 34

\*D.C. Code § 49-103 ........................................................ 7, 25, 28, 29, 30, 31, 32

D.C. Code § 49-104 ............................................................................ 7, 25, 28

D.C. Code § 49-106 ....................................................................................... 28

D.C. Code § 49-107 ................................................................................. 28, 34

D.C. Code § 49-301 ....................................................................................... 49

D.C. Code § 49-401 .................................................................................... 6, 33

D.C. Code § 49-402 .................................................................................... 6, 33

D.C. Code § 49-403 .................................................................................... 6, 33

\*D.C. Code § 49-404 ......................................... 2, 7, 14, 16, 25, 29, 30, 33, 34, 35

\*D.C. Code § 49-405 .......................................................... 2, 6, 14, 16, 33, 34, 45

D.C. Code § 49-406 ......................................................................... 2, 6, 33, 34

D.C. Code § 49-409 .................................................................................... 6, 49

D.C. Code § 49-901 ......................................................................... 7, 25, 29, 30

Emergency Management Assistance Compact, Pub. L. No. 104-321, 110
  Stat. 3877 (1996)........................................................................................ 52, 53

Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) ...................................... 9

La. Rev. Stat., Militia, § 1467 (1896) ................................................................. 27

Mass. Gen. Laws Ann. ch. 33, § 41 ................................................................... 7

Nev. Gen. Stat. ch. V, § 667 (1885)................................................................... 27

N.H. Gen. Laws, tit. 12, ch. 95, §§ 6-7 (1878) ................................................... 35

Pa. Digest Laws, National Guard, § 16 (1883)................................................... 35

S.C. Gen. Stat., tit. IV, ch. XII, § 325 (1882)...................................................... 35

*Legislative History*

19 Cong. Rec. 2072 (Mar. 14, 1888) ........................................................ 29

20 Cong. Rec. 240 (Dec. 13, 1888).......................................................... 29

H.R. Rep. No. 50-809 (1888)......................................................... 6, 29, 34

H.R. Rep. No. 50-2869 (1888)................................................................. 6

H.R. Rep. No. 60-1068 (1908)................................................................ 35

H.R. Rep. No. 88-886 (1963)................................................................. 46

H.R. Rep. No. 109-452 (2006)................................................................ 47

S. Rep. No. 88-1584 (1964) ............................................................. 45, 46

*Other Authorities*

David J. Barron & Martin S. Lederman, *The Commander in Chief at the
    Lowest Ebb*,
    121 Harv. L. Rev. 689 (2008)........................................................ 36

Black's Law Dictionary (12th ed. 2024) ................................................. 36

Major Christopher R. Brown, *Been There, Doing That in a Title 32 Status*,
    Army Law., May 2008................................................................ 8, 47

Chief National Guard Bureau Instruction 1302.01 (2012) ...................... 42

Cong. Research Serv., RL30802, *Reserve Component Personnel Issues:
    Questions and Answers* (2020) ................................................ 39, 45

Ctr. for Law & Military Operations, Judge Advocate General's Legal Ctr. &
    Sch., U.S. Army, Domestic Operational Law: 2024 Handbook for Legal
    Personnel............................................................................... 43

Dep't of Defense Directive 3025.18 (2010) ........................................... 43

Exec. Order No. 11,485, 34 Fed. Reg. 15,411 (Oct. 3, 1969) .......................... 32, 49

The Federalist No. 43 (James Madison) .................................................... 50

The Federalist No. 69 (Alexander Hamilton) ............................................36

*Member of the National Guard—Government Clerk Absent on Parade*,
20 Op. Att'y Gen. 437 (1892)................................................................. 27

Nat'l Guard Bureau, NGR 500-5, Nat'l Guard Domestic Law Enforcement
Support & Mission Assurance Operations (Aug. 18, 2010)......................... 8, 42

Off. of the Gen. Counsel, Nat'l Guard Bureau, Dep't of Defense, *Domestic
Operations Law and Policy* (3d ed. 2024)......................................... 52

OLC Mem., *Re: Authority to use the National Guard of the District of
Columbia to supplement civilian police force activities during a massive
demonstration or parade in the District of Columbia* (July 30, 1963)............. 32

OLC Mem., *Re: Amenability of members of the National Guard of the
District of Columbia to courts-martial or other disciplinary action for
failure to participate in formations ordered pursuant to Section 44 of the
Act of March 1, 1889* (Aug. 9, 1963) ................................................32

G.E. Voyle, A Military Dictionary (3d ed. 1876)...............................26, 27

## INTRODUCTION

The United States has a "traditional and strong resistance . . . to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972).  Yet for nine months, more than 2,000 armed National Guard troops have been patrolling the District of Columbia, detaining suspects, assisting in the execution of warrants, and otherwise enforcing the law.  The District's leaders have repeatedly said they do not want these troops here.  But the Administration has made clear they will remain at least until the end of the President's term in January 2029.

One would expect rock-solid legal foundations for such an unprecedented deployment of military power on American streets.  Yet defendants' brief confirms that this deployment rests on the most attenuated legal grounds, each of which crumbles on close scrutiny.

In the district court, defendants contended that the deployment is authorized by the D.C. militia code—the organic statute for the D.C. National Guard.  That statute was enacted in 1889 and has hardly changed since.  Like most state militia codes from that time, it allows the militia's commander-in-chief—here, the President—to deploy the militia during specific exigencies: invasions, insurrection, riots, and other organized violence.  But rather than invoke any of those express grants of authority, defendants have relied mainly on D.C. Code § 49-102, an ancillary provision authorizing the Guard's commanding general to order it to

1

perform "drills, inspections, parades, escort, or other duties, as he may deem proper." Text, context, and structure make clear that this authorization to order military exercises does not license the President to deploy the D.C. Guard whenever he wishes.

The stay panel, for its part, believed that D.C. Code §§ 49-404 and 49-405 could support the deployment. With respect, that was serious error. Both of those provisions pertain exclusively to "the *enrolled* militia," a body distinct from the D.C. Guard that consists of nearly every able-bodied man in the District between 18 and 45. The D.C. Guard, by contrast, is "[t]he *organized* militia." D.C. Code § 49-406. And as common sense would suggest, these provisions do not give the President *carte blanche* to order nearly every man in the District between 18 and 45 to patrol the streets.

Perhaps recognizing the weakness of their reliance on the D.C. militia code, defendants now argue principally that the D.C. Guard's deployment is authorized by 32 U.S.C. § 502(f). Defendants never made this argument below, so it is forfeited. And it too lacks merit. Section 502(f) authorizes federal *funding* for Guard troops operating in state militia status. As defendants' own regulations recognize, this statute does not permit troops to undertake missions that state or District law does not separately authorize. Indeed, reading Section 502(f) to grant such authorization would render it unconstitutional, as the Constitution vests the "whole government"

2

of state militias in the states alone. *United States ex rel. Gillett v. Dern*, 74 F.2d 485, 487 (D.C. Cir. 1934).

Because the deployment of the D.C. Guard is unlawful, the deployment of state troops into the District is unlawful, as well. Those troops were sent to aid the D.C. Guard, and their orders place them under the D.C. Guard's command. Their deployments therefore cannot continue if the D.C. Guard deployment is enjoined. And they are independently unlawful because they unconstitutionally place state troops under federal command and are themselves unauthorized by statute.

Not long after the stay panel issued its decision in this case, the Supreme Court halted the deployment of Guard troops in Chicago, rejecting the statutory basis the President relied on for that deployment and similar ones in Portland and Los Angeles. *Trump v. Illinois*, 146 S. Ct. 432 (2025). Yet, months later, the Guard deployment in the District continues based on what is, if anything, a more strained and historically inapt reading of statutory text. Each day, this unlawful deployment instills fear in District residents, burdens the District government, and marks an unprecedented breach of the wall between military and civil power. The district court properly halted that deployment, and its judgment should be affirmed.

## STATEMENT OF ISSUES

1. Whether defendants lacked statutory authority to deploy the D.C. Guard to engage in law-enforcement activities in the District.

3

2. Whether defendants unlawfully authorized state Guard units to support the D.C. Guard's law-enforcement activities.

3. Whether the district court properly held that the equities favor injunctive relief.

## STATEMENT OF THE CASE

**A.    Legal Background.**

1. The National Guard is the modern version of "the Militia" recognized by the Constitution. *Maryland ex rel. Levin v. United States*, 381 U.S. 41, 46, *vacated on other grounds*, 382 U.S. 159 (1965). The Constitution's Militia Clauses generally give each state "exclusive" authority to govern its militia. *Abbott v. Biden*, 70 F.4th 817, 829 (5th Cir. 2023); *see Dern*, 74 F.2d at 487. The federal government, by contrast, may exert power over state militias in only two ways. First, Congress may "provide for calling forth the Militia" into federal service "to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Second, Congress may "provide for organizing, arming, and disciplining, the Militia." *Id.* art. I, § 8, cl. 16.

As of 1889, every state had exercised its exclusive authority to enact a detailed militia code. Those codes shared several features. Each state designated its governor "Commander-in-Chief" of its militia. *See, e.g.*, Add. 28-29. Nearly every state divided its militia into two bodies: a principal organization composed of volunteers

4

(typically designated the "organized" or "active" militia) and a reserve organization consisting of nearly every able-bodied man between 18 and 45 (typically designated the "enrolled" or "reserve" militia). *See, e.g.*, Add. 30-39. Further, virtually every state authorized its commanders to order military exercises such as "drills," "inspections," "parades," and "escorts." *See, e.g.*, Add. 40-50.

Each state also delineated the specific circumstances in which its governor could deploy the militia. *See* Add. 51-75. Most states permitted their governors to deploy the militia only during exigencies such as invasions, insurrections, and riots. *See* Add. 51-64; *see also, e.g.*, *State v. Wagener*, 77 N.W. 424, 425 (Minn. 1898) (militia may not be deployed "except in times of insurrection, invasion, and riot"); *State ex rel. Milton v. Dickenson*, 33 So. 514, 516-517 (Fla. 1902) (militia may be called only during "the extraordinary contingencies" specified by statute). Some states also authorized their governors to deploy the militia to "execute the laws" or "aid the civil authorities in the execution of the laws," but they often limited that power to circumstances in which civil authorities requested aid during riots or other breaches of the peace. *See* Add. 65-75; *see also, e.g.*, *Chapin v. Ferry*, 28 P. 754, 757 (Wash. 1891) ("in each instance" where states codes authorize militias "to assist [civil authorities] . . . the authority thus conferred is expressed in precise and unequivocal language" and "hedged about with . . . formal safeguards"); *Ela v. Smith*, 71 Mass. 121, 140 (1855) ("the words . . . 'to aid the civil authority'" confer

"no power . . . to act independently of the civil authority"). No state gave its governor open-ended authority to deploy the militia for any purpose he wished.

2. In 1889, Congress exercised its "exclusive" jurisdiction over the District, U.S. Const. art. I, § 8, cl. 17, to enact the D.C. militia code. *See* Act of Mar. 1, 1889, 25 Stat. 772, ch. 328 (codified as amended at D.C. Code §§ 49-101 *et seq.*). The drafters stated that this code "contain[ed] only the usual and necessary provisions that are included in the militia codes of nearly all the States" and "place[d] the militia of the District of Columbia on the same footing as those of the several States." H.R. Rep. No. 50-809, at 1-2 (1888); *see* H.R. Rep. No. 50-2869, at 1 (1888) (same). Consistent with that characterization, Congress borrowed heavily—often verbatim—from the language of contemporaneous state militia codes.

Like other codes, the D.C. militia code designates the President "Commander-in-Chief." D.C. Code § 49-409. It divides the militia into two bodies: an "organized" or "active" militia, referred to as the D.C. National Guard, *id.* § 49-406, and an "enrolled" militia, consisting of nearly all able-bodied men between 18 and 45, *id.* §§ 49-401 to 49-403; *see id.* § 49-405 (distinguishing the "enrolled militia" from the "active militia"). It also authorizes the commanding general to order out the D.C. Guard "for such drills, inspections, parades, escort, or other duties, as he may deem proper." *Id.* § 49-102.

Following most contemporaneous codes, Congress authorized the President to deploy the militia only in specified exigencies. Section 49-103 provides that, during a "tumult, riot, mob," or organized "violence," the Mayor, the U.S. Marshal, or the National Capital Service Director may "call on the Commander-in-Chief to aid them in suppressing such violence and enforcing the laws," and "the Commander-in-Chief shall thereupon order out so much and such portion of the militia as he may deem necessary to suppress the same." *Id.* § 49-103. Other provisions of the code recognize that the President may call the militia into the "service of the United States," *id.* §§ 49-104, 49-404, 49-901—a reference to federal statutes authorizing the President to call militias, including the D.C. Guard, into "Federal service" during invasions, insurrections, and other emergencies, 10 U.S.C. § 12406; *see* 16 Rev. Stat. § 1642 (2d ed. 1878). The Code contains no provision authorizing the President to deploy the D.C. Guard outside these circumstances.

In the 137 years since Congress enacted the D.C. militia code, all 50 states have substantially updated their militia codes. Every state, for instance, now permits its governor to deploy its militia to respond to natural disasters.[1] But as defendants

---

[1]    *See, e.g.*, Ark. Code Ann. § 12-61-111(a)(1)(A) (authorizing deployment during "disaster"); Mass. Gen. Laws Ann. ch. 33, § 41(a) ("public catastrophe or natural disaster").

acknowledge (Br. 7), Congress has not substantively revised the D.C. militia code since 1889.

3. In addition to delineating the narrow circumstances in which the President may call state militias into Federal service, Congress has authorized the federal military to *fund* National Guard missions commanded by the states. *See* Major Christopher R. Brown, *Been There, Doing That in a Title 32 Status*, Army Law., May 2008, at 23, 30-32 ("*Title 32 Status*"). In 1964, Congress enacted 32 U.S.C. § 502(f)(1), which authorizes Guard members to receive federal pay and benefits when performing "training or other duty" approved by the Army or Air Force. Pub. L. No. 88-621, § 1, 78 Stat. 999 (1964). In 1989, Congress clarified that this "training or other duty" could include drug interdiction responsibilities. 32 U.S.C. § 112. And in 2006, Congress specified that it may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(2)(A).

As regulations issued by the National Guard Bureau explain, Section 502(f) and these follow-on statutes merely authorize federal pay and benefits for state-commanded missions. *See* Nat'l Guard Bureau, NGR 500-5, Nat'l Guard Domestic Law Enforcement Support & Mission Assurance Operations, § 10-3(a) (Aug. 18, 2010), https://tinyurl.com/mwbm2ev8. Guard units perform these so-called "Title 32" missions in their traditional status as a state militia, under state command, and

may perform those missions only "if authorized by state law." *Id.* § 8-7(c); *see id.* §§ 3-1(b), 3-2.

4.    Congress has "plenary power" under the Constitution to determine the form of the District's government and to delegate governing authority to entities "of its choosing." *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 400-01 (D.C. Cir. 2022); *see* U.S. Const. art. I, § 8, cl. 17. Since the nineteenth century, Congress has given local District officials principal authority over law enforcement. In 1878, it assigned the appointed Mayor the "duty" to "preserve the public peace," "prevent crime," and supervise the District police. D.C. Code §§ 5-101.03, 5-105.01. When Congress later enacted the Home Rule Act, Pub. L. No. 93-198 (1973), which permitted District residents to elect the Mayor and Council, D.C. Code §§ 1-204.01(a), 1-204.21(a), it transferred this longstanding authority over law enforcement to the locally accountable Mayor. *Id.* § 1-204.22.

By contrast, the Home Rule Act gave the President carefully circumscribed authority over law enforcement in the District. It authorized him to require the services of the Metropolitan Police Department in emergencies for up to 30 days, *id.* § 1-207.40, retained his authority over the Park Police, *id.* § 5-201, and preserved his authority over the D.C. Guard as it existed at the time, *id.* § 1-206.02(b).

9

**B.      Factual Background.**

President Trump has long stated that he wishes to "take over" the District and "run it the way it's supposed to be run."  JA052-54.  He has often premised these threats on claims that the District is "one of the most dangerous cities anywhere in the World."  JA055.  To the contrary, the Department of Justice stated in January 2025 that violent crime in the District had reached a 30-year low.  JA055.  And President Trump acknowledged in May 2025 that "street crime" and "violent crime" in the District had fallen "by 25%."  JA056.

Nonetheless, on August 11, 2025, the President declared a "crime emergency" in the District, JA154-55, and instructed the Secretary of Defense to mobilize the D.C. Guard "to address the epidemic of crime in our Nation's capital," JA174.  The D.C. Guard's commanding general then deployed the Guard to "support federal and District law enforcement" and "deter crime."  JA671, JA181; *see* JA669.  The Deputy Attorney General subsequently authorized those troops to be deputized as U.S. Marshals to "confer the law enforcement authority needed to perform th[eir] duties."  JA536, JA640; *see* JA517 (explaining that all Guard members are deputized).  And the Secretary of Defense ordered them to be armed.  JA225, JA523.

The D.C. Guard executed memoranda of understanding with several states purporting to authorize them to deploy their own Guard forces into the District.  JA547-78.  Each memorandum provided that the state units would perform their

10

duties "in support" of the D.C. Guard and follow its "operational direction." JA547-48. Consistent with those memoranda, Defendants placed all state forces under the supervision of the D.C. Guard, JA544, JA874, and reiterated daily that "all" Guard personnel were subject to the D.C. Guard's "command and control," *e.g.*, JA878, JA884.

By early September, the Guard deployment included over 2,300 troops from eight states. JA346-47. These troops conduct "presence patrols" to "prevent and deter crime." JA346; *see* JA516, JA620-21, JA816-17. They intervene in physical altercations. JA541. They "temporarily detain" suspects. JA517. They assist in the execution of warrants. JA530. And they provide perimeter security to "prevent disruption of law enforcement ops." JA628.

The day before the President announced this deployment, the Mayor explained that she was "not in favor of" it because Guard members are "not law enforcement officials." JA287. Since then, she has repeatedly reiterated that the deployment is not "legal," *Mayor Bowser Participates in Fireside Chat* at 4:50-6:40 (Oct. 15, 2025), https://tinyurl.com/3wz2d3zz, that the use of state Guard troops is "[n]ot working," JA299, and that she has "asked [the President] to remove" the Guard, *Oversight of the District of Columbia: Hearing Before H. Oversight & Gov't Reform Comm.*, at 4:57:20-4:57:45 (Sept. 18, 2025), https://tinyurl.com/pedv87pn. The Mayor has expressly distinguished Guard members from federal civilian law

11

enforcement and credited only the latter with helping reduce crime. *Id.* at 4:57:00-4:57:08; *see* JA299; Mayor's Order No. 2025-090 §§ I.E, II.

The deployment has substantially burdened the District and its residents. It has required the District government to coordinate daily with the Guard and provide it "police escort[s]." *See* JA518-19. It has instilled fear in D.C. residents, deterring them from day-to-day activities. JA297, JA513. And, as defendants themselves have acknowledged, it has created a "heightened threat environment" that risks harm to the public and the Guard itself. JA743, JA794, JA799.

Defendants have nonetheless made clear they intend this deployment to last indefinitely. JA817-18. The President has ordered the creation of a "unit within the" D.C. Guard "deputize[d] . . . to enforce Federal law." JA158. Defendants have announced they will enlarge the deployment to 5,000 personnel this summer as part of a "crackdown on crime." Perry Stein et al., *Parents of Teens Who Break Curfew in D.C. Will Be Prosecuted, DOJ Says*, Wash. Post (May 15, 2026), https://tinyurl.com/3pdjz84t. And defendants have confirmed the deployment will continue until at least January 2029. Ellen Mitchell, *Pentagon Plans to Keep National Guard in DC into 2029*, The Hill (Mar. 20, 2026), https://tinyurl.com/ycy5vaux.

**C.    Procedural History.**

1. The District filed this suit in September 2025 and promptly sought a preliminary injunction and 5 U.S.C. § 705 stay.  On November 20, 2025, after extensive briefing and argument, the district court held that the deployment exceeded the President's statutory authority and granted the injunction and Section 705 stay. JA809.

The district court began by examining defendants' three claimed "sources of authority" for the D.C. Guard's deployment.  JA827.  First, the court held that the President's designation as "Commander-in-Chief" does not authorize him to deploy the Guard "as he sees fit." JA832.  Rather, both the D.C. militia code and state codes on which it was "modeled" contained "separate language" that "empowered and restrained" the commander-in-chief.  JA830-33.

Second, the court held that D.C. Code § 49-102 does not authorize the deployment.  Applying the *ejusdem generis* canon, the court concluded that the phrase "other duties" in this provision encompasses only duties similar to the list of "military exercises" that precede it.  JA834-35.  "To read the statute otherwise," the court explained, would grant the commanding general authority dramatically at odds with the statute as a whole.  JA835, JA837-44.

Third, the court held that the President's "inherent Article II powers" could not justify the deployment.  JA844.  That position, the court explained, "would erase

Congress's [constitutional] role in governing the District and its National Guard." JA844.

The court found the deployment of state units unlawful, as well. JA848. The D.C. Guard cannot "invite other states to assist it in . . . actions" that it cannot lawfully perform. JA857. Further, no statute authorizes defendants to consent to state deployments into the District. JA855-56. Given these defects, the district court found it unnecessary to address the District's claims that the deployment violates the Militia Clauses and the Posse Comitatus Act. JA818-19, JA849 n.29.

Finally, the court found that the equities favored injunctive relief. It explained that the deployment irreparably harms the District by infringing on its statutory authority over law enforcement, and that the federal government has no valid interest in continuing an unlawful deployment. JA864-67.

2. Defendants appealed and sought a stay from this Court. After "hurried" briefing, the motions panel granted a stay. *District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *2 (D.C. Cir. Dec. 17, 2025) ("*Stay Decision*"). The panel relied heavily on D.C. Code § 49-405—a provision defendants never cited—which states that the President may sometimes "order out" a portion of "the enrolled militia." *Id.* at *8. Reading "the enrolled militia" as equivalent to "the D.C. Guard," the panel suggested that this provision and Section 49-404—which also concerns only "the enrolled militia"—together permit the President to deploy the D.C. Guard

14

"'to aid the civil authorities.'" *Id.* The panel also reasoned that the President had lawfully authorized the use of state forces in his capacity as Commander-in-Chief. *Id.* at *11.

The panel emphasized, however, that its "assessment of the merits [wa]s rooted in the preliminary and hurried posture of a stay motion." *Id.* at *2. It cautioned that its "decision does not bind the merits panel, which will engage in a fuller assessment of these issues." *Id.*

## SUMMARY OF ARGUMENT

The district court correctly concluded that defendants lack authority to deploy the D.C. Guard or state Guard units to conduct law-enforcement activities in the District. Its decision should be affirmed.

I. The District has standing to challenge the deployment. As defendants acknowledge, the District must expend resources every day to coordinate with the Guard. The deployment also infringes on the District's statutory authority, deters residents from daily activities, threatens public safety, and undermines the District's tax base. Contrary to the stay concurrence's suggestion, the District is not claiming injury to any inherent "sovereignty." It is alleging statutory and practical harms, as municipalities regularly do in challenging federal actions.

II. The District is likely to succeed in establishing that the deployment of both the D.C. Guard and state Guard troops is unlawful.

15

A. 1. Congress set forth the authorities of the D.C. Guard in the D.C. militia code of 1889. Congress modeled that code on contemporaneous state militia codes, and its drafters expressly sought to place the D.C. Guard on the same footing as other militias. Like most militia codes of that time, the D.C. militia code authorizes the Commander-in-Chief to deploy the militia only during exigencies such as invasions, insurrections, and riots.

Defendants do not—and cannot—rely on any of those express grants of authority here. Instead, they claim that several ancillary provisions authorize the President to deploy the D.C. Guard for whatever purpose he wishes. None can bear that reading.

First, defendants invoke D.C. Code § 49-102, which permits the commanding general to order out the D.C. Guard for "such drills, inspections, parades, escort, or other duties, as he may deem proper." Under the *ejusdem generis* canon, the phrase "other duties" most naturally refers to military exercises similar to the preceding items. That conclusion is reinforced by the fact that, where Congress authorized the use of the Guard for law enforcement, it did so expressly and with careful limits. And reading this provision as an open-ended grant would render it dramatically broader than any militia code of the era.

Second, defendants (echoing the stay panel) claim that D.C. Code §§ 49-404 and 49-405 authorize the D.C. Guard deployment. Those provisions, however, do

16

not pertain to the D.C. Guard. They concern "the enrolled militia," a distinct body consisting of nearly every able-bodied man in the District between 18 and 45. The D.C. Guard, by contrast, is "the organized militia." The distinction between these bodies was well-established in 1889, and Congress itself differentiated between them. Further, as common sense would suggest, these provisions do not allow the President to order nearly every adult man under 45 to engage in law enforcement at will.

Third, defendants claim that the President need not identify any express grant of statutory authority because the D.C. militia code designates him "Commander-in-Chief" and the District is a "federal enclave." Contemporaneous militia codes, however, invariably designated their governors "commander-in-chief," and statutes and case law made clear this title did not confer authorities beyond those granted by statute. That the District is a "federal enclave" does not justify imbuing this standard term with a novel meaning. Nor does the President's "inherent authority" empower him to override Congress's judgment as to how to delegate law enforcement power in a jurisdiction subject to its "exclusive" control.

Properly construed, the D.C. militia code gives the President authority like most governors had over their militias in 1889. Although every state has since amended its militia code, Congress has not done the same, and it is emphatically not the courts' role to update the code themselves.

2. Defendants alternatively claim that 32 U.S.C. § 502(f) provides independent authorization to deploy the D.C. Guard. Defendants never made this argument below, so it is forfeited. Regardless, it lacks merit. Section 502(f) authorizes federal *funding* for state militias to undertake actions authorized by their governing law; it is not an independent source of substantive authority.

Several textual features make this clear. Section 502(f) applies to "member[s] of the National Guard" operating in state militia status. Under the Militia Clauses, the federal government may not dictate when state militias may be deployed; only states can govern the militia. Section 502(f) would thus be unconstitutional if it authorized the deployment of Guard units whenever the President wished.

Furthermore, Section 502(f) states that any duties approved under that section must be "[u]nder regulations . . . prescribed by" the Army and the Air Force. Those regulations repeatedly state that any actions taken under Section 502(f) must be "authorized by state law," which the regulations define to include the law of the District. And the statute's structure and history make clear that Congress enacted Section 502(f) simply to authorize funding for missions not already covered by Section 502(a), not to confer a vast new authority at odds with the surrounding statute and the historic balance between state and federal authority.

B. Because the deployment of the D.C. Guard is unlawful, the state Guard deployments are unlawful, as well. Those deployments are premised on the

18

existence and lawfulness of the D.C. Guard deployment, and so cannot continue independently. And the state deployments are themselves unlawful: defendants have placed state militia units under federal command in violation of the Militia Clauses, and defendants lack statutory authority to deploy them into the District.

III. The equities favor the district's court's injunction. The District is irreparably harmed each day that thousands of armed Guard troops unlawfully patrol its streets. Defendants, by contrast, will suffer no cognizable injury if this unlawful deployment is halted and the proper balance between military and civil power is restored.

## ARGUMENT

### I.    The District Has Standing.

The District has standing to challenge the deployment of thousands of armed National Guard troops onto its streets. Like other litigants, government entities can demonstrate standing in various ways, including by showing "direct harm to [their] economic, environmental, or administrative interests." *Clean Wisc. v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020) (per curiam). Indeed, this Court has routinely "found standing for a city suing an arm of the federal government when a harm to the city itself has been alleged." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) (emphasis omitted).

The deployment inflicts numerous concrete harms on the District.   As defendants acknowledge, the deployment has required "extensive coordination" with District entities, necessitating the ongoing expenditure of District resources. Br. 1, 12.   District personnel attend "daily meetings" with Guard personnel, "coordinat[e]" law-enforcement operations with them, and "provide[] a police escort" to Guard forces "when they are transported." Br. 12; JA518-19.   The Metropolitan Police Department has "increase[d]" its "patrols" around Guard lodgings due to heightened safety threats, JA799, and the District's emergency responders have received special training to prevent harm from military vehicles, JA691-92.  Forgoing these expenditures would undermine public safety and threaten grave harm.  JA372-76, JA392.  The deployment has thus "increase[d] . . . costs" to the District, inflicting a quintessential injury.  *Amador County v. Salazar*, 640 F.3d 373, 378 (D.C. Cir. 2011); *see Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (a plaintiff suffers injury where it makes "programmatic expenditures" in response to actions that "directly affect[]" it (citation modified)).

Further, as defendants' documents acknowledge, the Guard deployments have created a "heightened threat environment," JA794, risking harm to the public and the Guard itself that District law enforcement has expended resources to mitigate, JA743, JA799; *see* JA373-76, JA393, JA666.  District residents are more afraid to

20

send their children to school, patronize businesses, and go about their daily lives. JA297, JA513; *see Amador County*, 640 F.3d at 378 (county was injured by action that would "impact the character of the community"). And the deployment has caused "direct harm" to the District's "economic . . . interests," *Clean Wisc.*, 964 F.3d at 1158, by reducing tourism, restaurant and hotel revenue, and, consequently, local tax revenue. JA512-14; *see* Tracy Hadden Loh & Glencora Haskins, *Consumer spending and visitor demand in the Washington, DC region are dropping*, Brookings (Dec. 12, 2025), https://tinyurl.com/4bkzx5mj (linking the deployment to a "large drop in regional resident spending"); DowntownDC BID, *State of Downtown 2025*, at 36 (May 2026), https://tinyurl.com/3affakjs (finding the deployment "reduced both regional and out-of-market visitation").

The deployment also intrudes on the District's statutory authority. Congress has given the Mayor authority over law enforcement in the District and the power to consent to the deployment of state Guard forces in the District. *See* D.C. Code §§ 1-204.22, 5-101.03, 5-105.05; *see infra* pp. 50-53. Defendants have intruded on those authorities by assuming a significant portion of the District's law-enforcement responsibilities and purporting to authorize the deployment of out-of-state troops themselves. That "federal assertion[] of authority to regulate matters" that the District "believe[s] [it] control[s]" is a cognizable injury. *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

21

Contrary to the stay concurrence's suggestion, this theory of injury does not depend on a claim that the District is "sovereign" in the constitutional sense. *Stay Decision* at *13 (Rao, J., concurring). The District contends simply that Congress delegated it statutory authority and the deployment encroaches on that authority. That is a cognizable injury akin to ones that municipalities routinely raise. *See, e.g.*, *Metro. Gov't of Nashville v. Tenn. Dep't of Educ.*, 645 S.W.3d 141, 150 (Tenn. 2022) (municipality had standing to challenge an action injuring "the legal interest the Home Rule Amendment was enacted to protect—local control of local affairs"). Moreover, the District has suffered additional concrete harms that the stay concurrence did not question. *See supra* pp. 19-21.

Various amici, for their part, assert that the District *never* has standing to sue the federal government because it is purportedly part of the federal government. That argument is meritless. Even when the District was governed by presidential appointees, the Supreme Court rejected the "conten[tion] that the government of the District of Columbia is a department of the United States government." *Metro. R.R. Co. v. District of Columbia*, 132 U.S. 1, 7 (1889). Litigation between the federal government and the District is therefore commonplace, as is litigation between the federal government and territories. *See, e.g.*, *Guam v. United States*, 593 U.S. 310 (2021); *Puerto Rico v. United States*, 490 F.3d 50 (1st Cir. 2007); *United States v. District of Columbia*, 571 F.2d 651 (D.C. Cir. 1977). Indeed, the United States has

filed four lawsuits against the District in the last five months.  *See United States v. Fox*, No. 26-cv-1658 (D.D.C. filed May 13, 2026); *United States v. D.C. Water & Sewer Auth.*, No. 26-cv-1346 (D.D.C. filed Apr. 20, 2026); *United States v. District of Columbia*, No. 25-cv-4458 (D.D.C. filed Dec. 22, 2025); *United States v. D.C. Bd. of Elections*, No. 25-cv-4403 (D.D.C. Dec. 18, 2025).  And Congress itself has long authorized the District to sue the federal government.  *See, e.g.*, 33 U.S.C. §§ 1362(3), 1365(h) (Clean Water Act); 42 U.S.C. §§ 7602(d)-(e), 7604(a) (Clean Air Act).

Further, even if the District were part of the federal government, it is unquestionably not part of *the Executive Branch*, and this Court has repeatedly held that disputes between different branches of the federal government are justiciable. *See, e.g.*, *Comm. on the Judiciary v. McGahn*, 968 F.3d 755, 760 (D.C. Cir. 2020) (en banc).  And even within the Executive Branch, the question for Article III purposes is merely whether "the[] issues are of a type which are traditionally justiciable" and the dispute presents the "concrete adverseness which sharpens the presentation of issues."  *United States v. Nixon*, 418 U.S. 683, 697 (1974) (citation omitted); *see Sec'y of Lab. v. KC Transp., Inc.*, 173 F.4th 294, 303-08 (D.C. Cir. 2026).  This case is plainly justiciable even under that framework.

**II.    The District Is Likely To Succeed On The Merits.**

**A.    The deployment of the D.C. Guard is unlawful.**

Like every federal entity established by Congress, the D.C. Guard "literally has no power to act . . . unless and until Congress confers powers upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Defendants cannot identify any statute that authorizes the present deployment of the D.C. Guard.  The D.C. militia code permits the President to deploy the D.C. Guard only in specified exigencies, none of which defendants claim is present.  And Section 502(f) merely authorizes the federal government to *fund* Guard troops; it does not grant independent substantive authority to deploy the Guard whenever the President wishes.

> 1.    The D.C. militia code does not authorize the D.C. Guard deployment.

Congress enacted the D.C. militia code in 1889 and has not meaningfully updated it since.  It is a "fundamental canon of statutory construction" that words must be given "their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (citation modified). Moreover, where "a statutory term is obviously transplanted from another legal source, it brings the old soil with it."  *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (citation modified).  Thus, in construing the D.C. militia code, the Court must give its words the meaning they had in 1889, interpreted in light of the state militia codes from which they were drawn.

24

The D.C. militia code, like most state codes of its era, authorizes the President to deploy the D.C. Guard only in response to specific exigencies: invasions, insurrections, riots, and similar disturbances. *See* Add. 51-64. In particular, Section 49-103 permits the President to deploy the militia during a "tumult, riot, mob," or organized "violence," to "aid" the civil authorities in "suppressing such violence and enforcing the laws." D.C. Code § 49-103. The code also makes clear that the President may call the militia into the "service of the United States," *id.* §§ 49-104, 49-404, 49-901—a reference to federal statutes allowing the President to call up militias during invasions, rebellions, or when the federal military has legal authority to enforce federal law but cannot do so. *See* 10 U.S.C. § 12406; *Trump*, 146 S. Ct. at 434.

Defendants have not invoked any of these express grants of authority here. Nor could they. There is no "riot" or similar disturbance in the District, and the years-long deployment of the Guard is not limited to "suppress[ing] the same." D.C. Code § 49-103. Nor is there any invasion, rebellion, or "source of authority that would allow the military to execute the laws in [the District]." *Trump*, 146 S. Ct. at 434.

Instead of relying on these express authorities, defendants invoke ancillary provisions that they claim authorize the President to deploy the D.C. Guard for any purpose he wishes. It is implausible that Congress buried such open-ended authority

25

alongside the narrowly tailored grants just described.  And none of the provisions defendants cite confers such a power.

a. Defendants contend that Section 49-102 authorizes the President to assign the D.C. Guard any duties he deems "proper," including law enforcement.  Br. 32, 35-36.  The first sentence of that provision reads:

> The Commanding General shall prescribe such stated drills and parades as he may deem necessary for the instruction of the National Guard, and may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper.

D.C. Code § 49-102.

Ordinary principles of statutory construction make clear that the phrase "other duties" in this provision authorizes duties similar to the list of military exercises that precedes it.  Its wording—a list of nouns followed by the phrase "other duties"— "calls for the application of the maxim *ejusdem generis*," under which a residual phrase should be construed as limited to "objects similar in nature" to the preceding items in the list.  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001).

The items preceding "other duties" all concern military exercises that were standard fare for militias in 1889.  A "drill" was "[t]he instruction given to all officers and soldiers of the army to fit them for their respective duties."  G.E. Voyle, A Military Dictionary 115 (1876), https://tinyurl.com/3n3mvaja.  An "inspection" was the "examination" of "men, cattle, books, ordnance, [and] everything attached to the *personnel* and *matériel* of their command."  *Id.* at 200.  A "parade" was the

"place where troops assemble for muster, inspection, drill, &c." *Id.* at 286. And an "escort" was "[a] guard of troops attending an officer or person of distinction while travelling" or "a guard placed over prisoners on a march, or over military stores in transit." *Id.* at 131.

Context makes clear that Section 49-102 employs these words in their standard military sense. *See Member of the National Guard—Government Clerk Absent on Parade*, 20 Op. Att'y Gen. 437, 438 (1892) (explaining that section 49-102 uses the word "parade" as a "military term" connoting the "arrangement of troops . . . for inspection or evolutions before some superior officer"); *contra* Br. 36. Other militia codes of the time pervasively used the same words to describe military exercises. *See, e.g.*, Nev. Gen. Stat. ch. V, § 667 (1885) (requiring an "inspection of . . . the arms, accoutrements, and dress of each soldier"); La. Rev. Stat., Militia, § 1467 (1896) (authorizing troops to meet "for the purpose of drill, funeral, or other escort"); Act of July 14, 1868, No. XVIII, § 6, 1868 Ark. Acts of Gen. Assembly 44, 46 (commander-in-chief may provide for "inspections, musters, instructions, reviews, or other duties"); Add. 40-50. So do other provisions of the D.C. militia code, including the surrounding clauses of Section 49-102 itself. *See, e.g.*, D.C. Code § 49-102 (authorizing "drills and parades . . . for the instruction of the National Guard"); *id.* § 49-215 (requiring "[a]n annual inspection . . . of the National Guard"). It follows that the phrase "other duties" refers to military exercises "similar in

nature" to the ones preceding it, not a "'radically different' power" to conduct law enforcement or any other operation the commanding general sees fit. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512-13 (2018)).[2]

That conclusion is reinforced by that fact that, when Congress wished to assign law enforcement authority to the D.C. Guard, it did so expressly and subject to significant constraints. D.C. Code § 49-103 and 10 U.S.C. § 12406 permit the President to deploy the Guard to "enforc[e]" or "execute the laws" in response to specific exigencies, such as "riot[s]" and "invasions," and only after following specific processes. D.C. Code § 49-103; 10 U.S.C. § 12406. "Against this backdrop of clear and limited delegations" to the President, it is implausible that Congress would have granted "unbounded" power to the commanding general—the President's subordinate—to "unilaterally" deploy the Guard for law enforcement whenever he wishes. *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 640 (2026).

---

[2]    Defendants are incorrect that the duties encompassed by Section 49-102 are coterminous with those in Section 49-101. Br. 36. Section 49-101 refers to "any drill, parade, encampment, or duty *that is required, ordered, or authorized to be performed under the provisions of this title*." Section 49-102 is a single provision, not the entire title, and does not include the same expansive language. Further, Section 49-101 encompasses both "encampment[s]," which are authorized and restricted separately from Section 49-102, *see* D.C. Code §§ 49-106, 49-107, and duties performed in "the service of the United States," which may be ordered only by the President, not the commanding general, *see id.* § 49-104; 10 U.S.C. § 12406.

28

The government's reading would also render the D.C. militia code unlike every state militia code in 1889. Those codes permitted the "Commander-in-Chief" to deploy the militia only in carefully drawn circumstances, usually limited to exigencies. *See supra* pp. 5-6. Defendants' contention that the commanding general may deploy the D.C. Guard for any purpose he deems "proper," Br. 32, would place the D.C. militia code in a class of one. Had Congress intended to confer such an unusual power, it surely would have used clearer language. Instead, members of Congress repeatedly asserted that the militia code merely placed the D.C. Guard on "the same footing" as other militias, H.R. Rep. No. 50-809, at 1, and made the Guard available during "emergenc[ies]" such as a "rebellion, or war, or revolution, or riot," 20 Cong. Rec. 240 (Dec. 13, 1888) (statement of Rep. McAdoo); *see* 19 Cong. Rec. 2072 (Mar. 14, 1888) (statement of Rep. Blount) (noting that the militia was designed for "emergencies" such as "the suppression of riots" and "popular disorder").

Defendants' contrary arguments are unpersuasive. Defendants contend that Section 49-102 must allow the D.C. Guard to engage in law enforcement because Sections 49-404 and 49-901 recognize that the Guard may be deployed to provide "aid to civil authorities." Br. 36 (citing D.C. Code §§ 49-404, 49-901). This phrase, however, plainly refers to the authority granted by Section 49-103, which authorizes the President to deploy the Guard to "aid" the civil authorities in "suppressing . . .

29

violence and enforcing the laws" in terms that are repeated, nearly verbatim, by the provisions defendants cite. *Compare* D.C. Code § 49-103 (authorizing the President to deploy the militia during a "tumult, riot, mob," or organized "violence" to "aid" the civil authorities in "suppressing such violence and enforcing the laws"); *with id.* § 49-404 (barring the enrolled militia from performing "any duty except when called . . . to aid the civil authorities in the execution of the laws or suppression of riots"), *and id.* § 49-901 (authorizing pay whenever the Guard "shall be ordered to duty in case of riot, tumult, breach of the peace, or whenever called in aid of civil authorities"); *see Northcross v. Bd. of Educ.*, 412 U.S. 427, 428 (1973) (per curiam) ("similarity of language" between two provisions is "a strong indication that [they] should be interpreted *pari passu*"). It is not plausible that this phrase refers to Section 49-102, which does not mention "aid," the "suppression of riots," or civil authorities at all.

Nor is it anomalous that the President must receive a request from one of the three civil officials named in Section 49-103 before deploying the Guard to "aid the civil authorities." Br. 35; *see Stay Decision* at *9. Many state militia codes in 1889 similarly required the governor to receive a request from a local official before sending the Guard to break up a riot and likewise made it the governor's "duty" to grant such a request. *See, e.g.*, Act of Oct. 13, 1885, No. 355, § IX, Ga. Acts & Resolutions 74, 78-79; Act of Mar. 9, 1869, § 77, 1869 N.J. Laws 251, 275-76; *see*

*generally* Add. 51-75.  Even today, federal law is replete with provisions that make a request from another executive official a trigger for the President's power, including in the areas of military affairs and national security.  *See, e.g.*, 16 U.S.C. § 1456(c)(1)(B);  19  U.S.C.  §§ 1862(c)(1)(A),  3203(d)(2)-(3);  22  U.S.C. § 1978(a)(5); 50 U.S.C. § 3803(k)(1).

The fact that the President must receive such a request to deploy the Guard under Section 49-103 does not "imbue" the requesting officials with "more power . . . than the President." *Stay Decision* at \*9.  Two of the civil authorities named in that provision are subordinates of the President subject to his control.  The President may therefore "order" those officials to request the deployment of the D.C. Guard if that statute's predicates are satisfied.  *Id.*  Indeed, the President did just that in 2020, when his administration instructed the U.S. Marshal to request aid under Section 49-103 during unrest following the killing of George Floyd.  *See* Office of Inspector General, Dep't of Justice, *A Review of the Department of Justice's Response to Protest Activity and Civil Unrest in Washington, D.C.*, at 73-74 (July 2024), https://tinyurl.com/4syb3t6h.[3]

---

[3]    Contrary to defendants' suggestion (Br. 35), the Mayor has the same authority under Section 49-103 as was "vested in the Commissioner [of the District] prior to January 2, 1975," D.C. Code § 1-206.02(b): she is one three officials who can request the President's aid under that provision.

31

Finally, past practice does not support defendants' interpretation of Section 49-102. Br. 32-33. The Office of Legal Counsel ("OLC") first advanced defendants' interpretation in an unpublished memorandum 74 years after the statute's enactment. *See* OLC Mem., *Re: Authority to use the National Guard of the District of Columbia* 2-3 (July 30, 1963), https://tinyurl.com/zjtw9cf7. Less than two weeks later, OLC advised against reliance on that tentative interpretation, explaining that the "term 'other duties' . . . might be construed by the courts *in pari materia* with the other terms used in that section[,] which relate primarily to drill- and training-type activities[,] as distinguished from the aid-to-civil authorities-type activities expressly covered by [Section 49-103]." OLC Mem., *Re: Amenability of members of the National Guard of the District of Columbia to courts-martial* 3 (Aug. 9, 1963), https://tinyurl.com/yee6yzfd. Indeed, President Nixon appeared to draw that very distinction in his 1969 executive order, which authorized the commanding general to deploy the Guard for "training, parades, *and other duty*," but separately reserved to the Secretary of Defense and the President the authority to "order out the National Guard . . . to aid the civil authorities." Exec. Order No. 11,485, § 1, 34 Fed. Reg. 15,411 (Oct. 3, 1969) (emphasis added). There is no evidence that any administration ever relied on Section 49-102 to conduct law enforcement in the decades since. JA842-43.

32

b. The stay panel did not accept defendants' interpretation of Section 49-102. Instead, it rested its "preliminary and hurried" analysis on Sections 49-404 and 49-405, which it thought independently authorized the President to deploy the D.C. Guard to engage in law enforcement. *Stay Decision* at \*2, \*8. Defendants never made this argument: they affirmatively disclaimed below that they were "independently relying on 49-404 as a separate base for authority," Oct. 24, 2025, Tr. 57:3-4 (ECF No. 80), and they never invoked Section 49-405 at all.

That was for good reason: Sections 49-404 and 49-405 do not pertain to the D.C. Guard. Instead, both provisions address the President's authority over "the *enrolled* militia." *See* D.C. Code § 49-404 (stating that "[t]he enrolled militia shall not be subject to any duty except" two); *id.* § 49-405 (authorizing the President to "order out" draftees or volunteers "[w]henever it shall be necessary to call out any portion of the enrolled militia"). The D.C. Guard, however, is expressly defined by statute as "[t]he *organized* militia." *Id.* § 49-406 (emphasis added). The "enrolled militia" is a distinct entity consisting of nearly every able-bodied man in the District between 18 and 45. *See id.* § 49-401 (stating that nearly "[e]very able-bodied male resident" between 18 and 45 "shall be enrolled in the militia"); *id.* §§ 49-402 to 49-404 (defining exemptions and process for compulsory "enrollment in the militia").

The distinction between the "organized militia" and the "enrolled militia" was well-established in 1889. Nearly every state code drew the same distinction between

the regular, volunteer branch of the militia (typically designated the "organized" or "active" militia) and a compulsory reserve body consisting of nearly every able-bodied man between 18 and 45 (typically designated the "enrolled" or "reserve" militia). *See, e.g.*, Add. 30-39. Tracking this distinction, the drafters of the D.C. militia code stated that they sought to decrease reliance on "the enrolled militia, which included every citizen between eighteen and forty-five years of age," and to instead "recogniz[e] and provid[e] for volunteer militia." H.R. Rep. No. 50-809, at 1. Indeed, Section 49-405 itself distinguishes between these two bodies. It states that the commanding general may assign "[t]he portion of the *enrolled militia* ordered out . . . to existing organizations *of the active militia*."[4]

What is more, Sections 49-405 and Section 49-404 both establish rules for the enrolled militia that cannot logically apply to the D.C. Guard. For instance, Section 49-404 states that "[t]he enrolled militia shall not be subject to any duty except" two, yet Sections 49-102 and 49-107 assign the D.C. Guard numerous "duties"—such as "drills" and "encampments"—not listed in those provisions. Similarly, Section 49-405 states that the President may order out the enrolled militia "by draft," but Section 49-406 says that the D.C. Guard "shall be composed of volunteers." Accordingly,

---

[4]   The D.C. militia code initially designated the D.C. Guard "the active militia." 25 Stat. at 774. In 1909, Congress changed that designation to "[t]he organized militia" but left some preexisting references to the "active militia" unchanged. Act of Feb. 18, 1909, ch. 146, 35 Stat. 629, 629.

34

when Congress considered technical amendments to the D.C. militia code in 1908, the War Department explained that Section 49-404 applies to "the enrolled militia, as distinguished from the organized militia." H.R. Rep. No. 60-1068, at 2 (1908).

That suffices to refute the stay panel's (and, belatedly, defendants') reliance on these provisions, but it bears noting that their construction of Sections 49-404 and 49-405 is also incorrect on its own terms. The stay panel read Section 49-405 as authorizing the President to deploy the enrolled militia "[w]henever it shall be necessary." *Stay Decision* at *8. But Section 49-404 expressly says that "[t]he enrolled militia shall not be subject to any duty except" the two it expressly lists. As explained above, those two duties merely reference authorities granted elsewhere in the code. *See supra* pp. 25, 29-30. Like parallel provisions of state codes, these provisions thus *limit* the use of the enrolled militia and specify how draftees may be called into service. *See, e.g.*, N.H. Gen. Laws, tit. 12, ch. 95, §§ 6-7 (1878); Pa. Digest Laws, National Guard, § 16 (1883); S.C. Gen. Stat., tit. IV, ch. XII, § 325 (1882). As common sense would suggest, they do not grant the President open-ended authority to order nearly every adult man in the District under 45 to police the streets whenever he wishes.

c. As a last-ditch effort, defendants argue that the President need not identify any "express federal statutory authorization" to deploy the D.C. Guard because the

D.C. militia code designates him "Commander-in-Chief" and the District is a "federal enclave." Br. 25. That cannot be correct.

In the nineteenth century, as now, the term "Commander-in-Chief" simply meant the person holding "supreme command and direction" in a military organization. The Federalist No. 69 (Alexander Hamilton); *see* Black's Law Dictionary (12th ed. 2024). Since the founding era, every state similarly designated its governor as "Commander-in-Chief," and these states shared a "common understanding" that the "title itself did not define the actual powers of the office." David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb*, 121 Harv. L. Rev. 689, 781 (2008). Instead, each state separately enumerated the governor's powers. Add. 51-75. Those enumerations would have made little sense if the title "Commander-in-Chief" vested the governor with authority to act "without express statutory authorization." Br. 25.

Courts also rejected defendants' view. In 1856, the Pennsylvania Supreme Court held that the title "Commander-in-Chief" did not confer any "implied authority," but merely authorized the governor to carry out "the duties imposed upon him." *Commonwealth ex rel. Tyler v. Small*, 26 Pa. 31, 39 (1856). Likewise, in 1865, the Rhode Island Supreme Court explained that "[w]ere it not for the [state's] militia law, the Commander-in-Chief would have no power of any kind." *Mauran*

*v. Smith*, 8 R.I. 192, 214 (1865); *accord People ex rel. Boatright v. Newlon*, 238 P. 44, 45 (Colo. 1925).

Defendants contend that states' enumeration of governors' powers "underscore[s] that Governors' Commander-in-Chief authorities broadly encompass the power to execute the laws." Br. 26. That is a perplexing inference. Usually "the specific enumeration of" certain powers "implies the exclusion of all others." *United States v. Rauscher*, 119 U.S. 407, 420 (1886). And, in practice, courts regularly construed the enumerated authorities in their state militia codes as exclusive. *See State v. Josephson*, 45 So. 381, 381 (La. 1908); *Wagener*, 77 N.W. at 425; *Dickenson*, 33 So. at 516-17. More often than not, those enumerated powers did *not* include a general authority to deploy the militia to "execute the laws." *See supra* p. 5-6; *contra* Br. 26.

The fact that the District is a "federal enclave" (Br. 25) does not justify giving the term "Commander-in-Chief" a radically different meaning in the D.C. militia code than it had in any of its models. To the contrary, because the Constitution places the District "under the legislative control of Congress," Br. 25, Congress has "plenary power" to determine which powers it will delegate to the President and which to local officials. *Sanchez*, 45 F.4th at 400-01. The Court respects that constitutional design by holding the President to the limits of his delegation, not by imbuing him with a novel authority unmoored from the text Congress enacted.

37

Nor does the President's "inherent authority" support defendants' claim of a boundless authority over the D.C. Guard.  Br. 25.  Because Congress has "exclusive" jurisdiction over the District, U.S. Const. art. I, § 8, cl. 17, and has precisely prescribed the conditions for the Guard's deployment, the President's power is "at its lowest ebb." *Medellín v. Texas*, 552 U.S. 491, 525 (2008).  Neither *In re Neagle*, 135 U.S. 1 (1890), nor *In re Debs*, 158 U.S. 564 (1895), suggests the President has any inherent authority that overrides Congress's will in an area within its exclusive control.  In addition, even the Executive Branch has taken the position that the President's inherent authority simply confers authority to "protect federal personnel and property" and does not encompass "executing the laws."  *Trump*, 146 S. Ct. at 434.  It therefore cannot justify the years-long, city-wide deployment of troops at issue here.

d. Defendants repeatedly assert that the District's reading of the D.C. militia code would give the President "substantially less ability to use the D.C. Guard than any State's governor." Br. 26.  Just the opposite is true.  Reading the D.C. militia code according to its terms would give the President power closely analogous to that possessed by most governors in 1889.  *See supra* pp. 5-7.  It is defendants' reading, rather, that would vest the President with an authority wholly unlike that conferred by any contemporaneous state militia code.  As the role of the Guard has evolved over the past 137 years, all 50 states have substantially amended their militia codes,

38

including to allow deployment during "natural disasters."  Br. 37; *see supra* p. 7 &

n.1.  Congress, however, has not meaningfully amended the D.C. militia code, and

it is emphatically not the role of the courts to update it themselves.[5]

> 2.     Section 502(f) does not authorize the D.C. Guard deployment.

In addition to relying on the D.C. militia code, Defendants argue that 32

U.S.C. § 502(f) constitutes "an *independent* source of authority" for the President to

deploy the D.C. Guard for whatever purpose he wishes.  Br. 27-28, 39.  Defendants

did not make this argument below.  Although they cited Section 502(f) as a basis for

the President to request and fund state troops, they never suggested that this statute

authorized him to deploy the D.C. Guard.  *See* Opp'n to Prelim. Inj. 22-23 (ECF No.

34).  For that reason, the district court never addressed this argument, and neither

did the stay panel.  *See* JA827-28 (identifying the "three sources of authority"

defendants invoked for the D.C. Guard deployment); *Stay Decision* at *8 (declining

to address whether Section 502(f) provides independent authorization).  Defendants

have accordingly forfeited it.

---

[5]     In any event, defendants' concern that the D.C. Guard cannot be used for disaster relief is overstated.  Every member of the Guard is part of the federal military reserves, and in that capacity the federal government can assign them various functions the federal military can perform.  *See Perpich v. Dep't of Defense*, 496 U.S. 334, 345-346 (1990).  As defendants' source explains, that can include domestic relief operations in appropriate circumstances.  *See* Cong. Research Serv., RL30802, *Reserve Component Personnel Issues: Questions and Answers* 14-16 (2020) ("*Reserve Component Issues*") (describing use of reserves for COVID relief efforts).

39

This late-breaking argument is also incorrect. Section 502(f) enables the federal government to *fund* Guard units to perform duties they are otherwise authorized to perform. It does not grant substantive power to *authorize* Guard units to engage in any duties the President wishes.

Start with the text. Section 502(f) appears in a chapter entitled "Training" and a section entitled "Required drills and field exercises." 32 U.S.C. ch. 5, § 502. Subsection (a) delineates how often Guard troops must assemble for drills and other exercises. Subsections (b) through (e) specify when Guard members may receive "credit" for those exercises, thereby triggering the availability of federal pay and benefits. *See id.* § 101(19). Subsection (f) then provides, as relevant:

> (1) Under regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may—
>
>> (A) without his consent, but with the pay and allowances provided by law; or
>>
>> (B) with his consent, either with or without pay and allowances;
>
> be ordered to perform training or other duty in addition to that prescribed under subsection (a).
>
> (2) The training or duty ordered to be performed under paragraph (1) may include the following:
>
>> (A) Support of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense.

32 U.S.C. § 502(f).

40

As an initial matter, reading this provision to grant independent substantive authority for states to deploy Guard troops would raise fatal constitutional problems. State Guard personnel perform missions under Section 502(f) in their capacity as members of the state militia, where they "operate under state control." *Stirling v. Minasian*, 955 F.3d 795, 799 (9th Cir. 2020); *see* 32 U.S.C. §§ 502(f)(1), 101(4); Br. 5, 41 n.4. Any orders to such troops must be issued by the governor, *see, e.g.*, 32 U.S.C. § 328(a), and the states have "exclusive" authority to authorize their deployment. *Abbott*, 70 F.4th at 829; *see Dern*, 74 F.2d at 487. Accordingly, Section 502(f) would violate the Militia Clauses if it authorized governors to deploy troops in circumstances that state law does *not* authorize—if, for instance, it allowed a governor to deploy the Guard to conduct law enforcement when state law only allows him to deploy it during exigencies. *See Abbott*, 70 F.4th at 835 (the federal government may not "usurp" a state's "exclusive constitutional authority to 'govern' the non-federalized [state] militia"); U.S. Const. art. I, § 8, cl. 16 (Congress may provide for "governing" only "such Part of [the militia] as may be employed in the Service of the United States").

Although defendants suggest that Section 502(f) might uniquely create substantive authority over the D.C. Guard—while leaving state deployment to state law—statutes are not "chameleon[s]" whose meanings are "subject to change depending on the presence or absence of constitutional concerns in each individual

41

case." *Clark v. Martinez*, 543 U.S. 371, 382 (2005). Section 502(f) refers in a single phrase to all "member[s] of the National Guard," which encompasses both state and District units. 32 U.S.C. §§ 502(f)(1), 101(4). Whatever authority Section 502(f) grants, it must apply to the D.C. Guard and state Guards alike.

Numerous features of the text, history, and context confirm that Section 502(f) does not grant independent authority to deploy Guard units. First, the opening words of Section 502(f)(1) state that any duties must be performed "[u]nder regulations to be prescribed by" the Army or the Air Force. The National Guard Bureau—an entity jointly managed by the Army and the Air Force—has promulgated "[t]he key regulation" as National Guard Regulation 500-5. *Stirling*, 955 F.3d at 799. That regulation repeatedly states that any operations conducted pursuant to Section 502(f) must be "authorized by state law" and "governed by state laws." *See, e.g.*, Nat'l Guard Reg. 500-5 § 8-7(c) ("National Guard members may be called to duty under Title 32 if authorized by state law to perform" the requested duties); *id.* § 3-2 ("State laws and policies govern the use of National Guard Soldiers and Airmen . . . while serving in . . . Title 32 status[]."); *id.* § 3-1(b) ("Unless ordered into federal status, members of the National Guard serve under a state chain of command, and are governed by state laws"). That regulation expressly defines "states" to include "the District of Columbia." *Id.* at i, 54. And numerous other regulations and guidance documents contain the same requirement. *See, e.g.*, Chief Nat'l Guard Bureau

42

Instruction 1302.01, § 4(e) (2012), https://tinyurl.com/5n83cxzm; Dep't of Defense Directive 3025.18, § 4(h) (2010), https://tinyurl.com/2mwctfk9; Ctr. for Law & Military Operations, Judge Advocate General's Legal Ctr. & Sch., U.S. Army, Domestic Operational Law: 2024 Handbook for Legal Personnel at 72, 234-35, https://tinyurl.com/u6b3u7wm. Because Section 502(f) requires Guard units to act "under"—that is, consistent with—these regulations, it bars them from performing duties under Section 502(f) that are not separately authorized by law.

Second, the authorizing language of Section 502(f) merely permits members to receive federal pay and benefits for duties not separately prescribed by Section 502(a). It states (simplified somewhat) that "a member of the National Guard may . . . *with the pay and allowances provided by law* . . . be ordered to perform training or other duty in addition to that prescribed under subsection (a)." 32 U.S.C. § 502(f)(1) (emphasis added). This language thus provides, in the passive voice, that a member may receive pay and benefits for duties not elsewhere prescribed in Section 502(a). It does not say *who* may order such duties, *when* they may do so, or *which* duties troops may be ordered to perform. The answers to those questions necessarily depend on independent bodies of law. If, by analogy, a statute said that "a resident may, with or without paying tuition, be enrolled in the state university," it would plainly mean only that a resident may be enrolled with or without paying tuition; it would not allow a resident to be enrolled regardless of whether she satisfies

43

any separate requirements for admission, such as having a high school diploma or submitting an application.  Similarly, Section 502(f)(1) does not allow troops to be "ordered" to perform duty without satisfying the substantive requirements elsewhere established by law.

Third, Section 502(f)(2)(A) makes clear that the federal government merely requests and funds, but does not authorize, missions performed under Section 502(f). It provides that the training or duties ordered under Section 502(f) "may include . . . [s]upport of operations or missions *undertaken by the member's unit* at the *request* of the President or Secretary of Defense."  It is therefore "the member's unit" that must choose to "undertak[e]" tasks under this provision—a decision that necessarily depends on what that unit may lawfully do under its governing law.  And the President's role is to "request" such missions, not to "authorize" them himself. *Contra* Br. 40.

Context confirms that Section 502(f) does not provide independent authority. 32 U.S.C. § 112 provides that, to perform "drug interdiction" missions "under section 502(f)," a state or the District must certify that "the use of the National Guard of the State for the activities proposed . . . is *authorized by, and is consistent with, State law*."  *Id.* § 112(b), (c)(5) (emphasis added); *see id.* § 112(h)(3) (defining "state" to include the District).  Congress would not have required that missions

44

under Section 502(f) be "authorized by" state law if Section 502(f) provided independent legal authority.

Further, Congress borrowed the authorizing language of Section 502(f) almost verbatim from 10 U.S.C. § 683, a longstanding provision (now codified at 10 U.S.C. § 12315) that authorizes federal pay and benefits for members of the military reserves. *See* 10 U.S.C. § 683 (1964) ("Subject to other provisions of this title, any Reserve may be ordered to active duty or other duty—(1) with the pay and allowances provided by law; or (2) with his consent, without pay."); H.R. Rep. No. 88-1584, at 2 (explaining that the drafters "conform[ed] [Section 502(f)(1)] as nearly as practicable to the text of" this provision). Section 683 does not provide independent authorization to deploy the military reserves; rather, such authority must come from other provisions, which limit deployments to specified emergencies. *See Reserve Component Issues* at 14-18 (listing the legal bases to mobilize the reserves). It follows that Section 502(f), which borrowed the same language, does not provide independent authorization to deploy Guard personnel, either. *See Taggart*, 587 U.S. at 560.

Section 502(f)'s place in the statutory scheme confirms its limited remit. Section 502(f) appears at the end of a long list of provisions that specify the training and drills that Guard units must perform to receive "credit" and thereby obtain federal pay and benefits. 32 U.S.C. §§ 502(a)-(e), 101(19). Congress textually

45

linked Section 502(f) to the preceding sections by stating that it allows troops to receive federal "pay and allowances" for duties "in addition to that prescribed in subsection (a)." *Id.* § 502(f)(1). In context, it is therefore most natural to read Section 502(f) as authorizing Guard troops to receive federal pay and benefits for duties not specified in the preceding subsections, rather than granting a major authority wholly unlike what precedes it.

Indeed, the statute's history confirms that was Congress's aim. Congress enacted Section 502(f)(1) in 1964 as a narrow amendment to fill a gap in the then-existing statute. At the time, Guard members frequently performed training and other duties "in addition to" the drills specified in Section 502(a), but could not receive federal "medical care, hospitalization, pay and allowances, or physical disability" benefits when doing so. S. Rep. No. 88-1584, at 2 (1964); *see* H.R. Rep. No. 88-886, at 2 (1963) (same). Congress therefore amended Section 502(f) to "extend to members of the National Guard ordered to perform such duties the coverage of" the federal statutes authorizing such pay and benefits. S. Rep. No. 88-1584, at 2. No member of Congress or the military—which commented extensively on the legislation, *see id.* at 5-7—suggested that this provision authorized Guard units to perform duties not otherwise permitted by the governing law. Likewise, when Congress added Section 502(f)(2) in 2006 as part of an omnibus defense bill, its aim was to "simplif[y]" the statute by making it easier for troops to receive

46

"federal funding" when performing "domestic operational mission[s] under state control" following Hurricane Katrina. *Title 32 Status* at 31-32, 35. This minor amendment was not intended to work a sea change in Section 502(f); it was designed simply "to better reflect the nation's continuing reliance on the national guard" for purposes not expressly listed elsewhere in Title 32. H.R. Rep. No. 109-452, at 311 (2006).

Finally, "common sense" suggests defendants cannot be right. *Learning Resources*, 146 S. Ct. at 639 (citation omitted). If their interpretation were correct, Section 502(f) would grant a power of "extraordinary" significance and scope. *Id.* at 640. It would permit the President to override statutory limits on the use of the Guard in every state and territory and authorize governors to deploy those forces to perform whatever tasks he wished, including local policing. That would mark a "transformative expansion" of the President's power over one of the most jealously guarded areas of state authority. *Id.* And it would defy centuries of tradition—including the decades during which Section 502(f) has been in effect—when "no President" has claimed or exercised such power. *Id.* The Court should hesitate before reading this ancillary provision to confer such a novel power at odds with the normal balance of state and federal authority and the Constitution itself. *See West Virginia v. EPA*, 597 U.S. 697, 725 (2022); *Bond v. United States*, 572 U.S. 844, 858 (2014).

47

### B.   The deployment of state Guard troops is unlawful.

1.   The state Guard deployment cannot continue if the D.C. Guard deployment is unlawful.

Because the deployment of the D.C. Guard is unlawful, the state Guard deployment is unlawful, as well.  The memoranda of understanding that govern the state deployments provide that state troops will "support" the D.C. Guard and follow its "operational direction."  JA547-48.  Defendants have in turn placed those units under the "command and control" of the D.C. Guard.  *See, e.g.*, JA544, JA874, JA878, JA884.  As a result, if the D.C. Guard deployment is unlawful, the state troops would have no lawful mission to "support," no leadership to "direct[]" them, and no validly constituted operation to participate in.  Defendants have never suggested otherwise.  The Court need go no further to hold the state Guard deployment unlawful.

2.   The state Guard deployment violates the Militia Clauses.

The deployment of state troops is independently unlawful because it violates the Militia Clauses.  Those Clauses entrust state Guard forces to the "exclusive" command of the states and bar the federal government from assuming command itself.  *Abbott*, 70 F.4th at 829, 835; *Dern*, 74 F.2d at 487.  As defendants have previously argued, that means that state forces must remain "under the command of the state Governor" and subject to her "day-to-day" control.  *Ass'n of Civilian Technicians v. United States*, 603 F.3d 989, 992-93 (D.C. Cir. 2010).

Defendants are flouting that constraint. They admit that the state troops are in state militia status and that the D.C. Guard is "essentially a component of the federal government" that is "control[led]" and "command[ed]" by the Secretary of Defense. Br. 7-8; *see* D.C. Code §§ 49-409, 49-301, Exec. Order No. 11,485, § 1. Yet, as noted, defendants have placed command of the state units in the hands of the D.C. Guard. The memoranda explicitly provide that state troops must take "operational direction" from the D.C. Guard. JA548. The organizational charts governing the deployment show that all Guard personnel report to the D.C. Guard and the Defense Department. JA544, JA874. And defendants have repeatedly stated that "all" Guard units are under the "command and control" of the D.C. Guard. JA878, JA884.

Defendants' claim that the sending states retain exclusive day-to-day control (Br. 11-12) is belied by the record. Under the memoranda, a sending state governor retains only the power to "decline missions that will compromise his or her ability to respond to emergency requirements." JA547. Apart from that narrow exception, "operational direction" rests with the D.C. Guard. JA548. And, in practice, the D.C. Guard commander regularly issues formal orders jointly to both the D.C. and state Guards, dictating in detail what tasks each unit must perform each day, with the state commanders often updated only after-the-fact. *See, e.g.*, JA590-615, JA627-31, JA635-39. The Constitution bars the federal government from "control[ling] . . . the

49

day-to-day operations" of state Guard units in this way. *Ass'n of Civilian Technicians*, 603 F.3d at 992. And the District, like any party injured by a violation of the Constitution's federalism protections, has standing to raise those protections in court. *Bond v. United States*, 564 U.S. 211, 223-24 (2011).

3.     The state Guard deployment lacks statutory authorization.

The state deployment is also unauthorized by statute. It is a bedrock precept of our federal system that one jurisdiction cannot deploy its military forces into another without the receiving jurisdiction's authorization. *See Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 14 (2025) ("State sovereign authority is bounded by the States' respective borders."); *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) ("Massachusetts cannot invade Rhode Island"). That principle applies with particular force to the District, which the framers placed within Congress's exclusive jurisdiction to prevent states from exerting sovereign power over it. *See District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953) (the District Clause "eliminate[s] any possibility" that Congress's powers are "concurrent with that of the . . . states"); The Federalist No. 43 (James Madison) (Congress has "complete authority" over the District to preclude "dependence" on any "state"). Accordingly, a state cannot send its Guard forces into the District without the authorization of Congress or its delegee.

Defendants identify no statute permitting them to authorize the deployment of state Guard troops into the District. Defendants suggest that Section 502(f) confers such authority. But, as discussed above, that statute simply authorizes federal funding for Guard troops acting under state command; it does not grant independent authorization for any deployment. *See supra* pp. 39-47. And nothing in that provision even mentions the deployment of forces into another jurisdiction, let alone suggests that Congress sought to enlarge the President's authority over the District.

Nor does the D.C. militia code grant such authority. No provision of that code allows the President or his subordinates to authorize the deployment of state forces into the District. And, as noted, the President's designation as "Commander-in-Chief" is simply a designation of command over the D.C. Guard. *See supra* pp. 35-38. It does not empower the President to authorize the deployment of state forces—which he does not command—in circumstances where he cannot deploy the D.C. Guard itself.

The broader statutory context confirms that Congress did not delegate the President this authority. In both Section 12406 and the Insurrection Act, Congress established specific, circumscribed criteria for when the President may authorize the Guard of one jurisdiction to conduct law enforcement in another. *See* 10 U.S.C. §§ 251-252, 12406; *Trump*, 146 S. Ct. at 434. If defendants were correct that Section 502(f) or the D.C. militia code allows the President to authorize the deployment of

51

state Guard forces into the District whenever he wishes, he could evade the limits of these vital provisions at will.

Further, Congress specifically delegated the authority to request out-of-state troops to a different entity—the District—in the Emergency Management Assistance Compact.  That interstate compact, which Congress assented to in 1996, provides that "states"—expressly defined to include "the District of Columbia"—may deploy emergency assistance to another state upon "request."  Pub. L. No. 104-321, § 1, arts. I, III.B.  It further states that "[m]utual assistance in this compact may include the use of the states' National Guard forces . . . by mutual agreement between states." *Id.* art. I.  The D.C. Council has ratified this compact and given the Mayor the responsibility to "execute" it.  D.C. Code § 7-2332.  Accordingly, as the Department of Defense has recognized, the Mayor and her delegees are the sole officials authorized to request and obtain the assistance of another state's Guard under the Compact.  Off. of the Gen. Counsel, Nat'l Guard Bureau, Dep't of Defense, *Domestic Operations Law and Policy* 75 (3d ed. 2024), https://tinyurl.com/bdhz3s37.

Had Congress wished to ensure that the President, too, could authorize state Guard entries into the District, it could easily have done so.  Indeed, Congress clarified when it assented to the Compact that it did not affect "the authority of the President over the National Guard provided by article I of the Constitution and title

52

10 of the United States Codes." Pub. L. No. 104-321, § 2(6). But Congress said nothing to suggest it intended the President to have power to authorize deployments of the Guard outside of the circumstances permitted by Title 10. Accordingly, that power resides with Congress and the District alone.

## III. The Equities Favor Preliminary Relief.

### A. The District is suffering irreparable injury.

The District is irreparably harmed by the indefinite presence of armed military patrols on its streets. The deployment has forced the District to divert resources to coordinate with and protect the Guard. JA518-19, 691-92, 799; *see* JA372-73, JA376, JA392. It has infringed on the District's congressionally delegated authority over law enforcement. *See supra* p. 21. It has undermined the District's law enforcement work and threatened public safety. JA743, JA794, JA799. And it has instilled fear in the community, harming local businesses and reducing tax revenue. JA297, JA512-14. None of these injuries can be redressed at final judgment. *See, e.g., Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (harm to District's "law enforcement and public safety interests" constitutes "irreparable harm"); *Susman Godfrey LLP v. Exec. Off. of President*, 789 F. Supp. 3d 15, 56 (D.D.C. 2025) (financial losses that are unrecoverable because of sovereign immunity may "constitute irreparable harm").

The stay panel discounted the District's harms because it concluded the deployment was likely authorized by statute. *Stay Decision* at *12. As explained above, however, the stay panel's view of the merits was erroneous. And contrary to defendants' suggestion (Br. 42-44), the District's concrete harms do not depend on whether it is "sovereign" in the constitutional sense. Indeed, in district court, the federal government acknowledged the District's interest in "vindicat[ing] the *specific* rights that they say . . . the Mayor has under D.C. law." Opp'n to Prelim. Inj. at 37 (ECF No. 34).

Nor is the harm to the District mitigated by the fact that Congress gave the President other, carefully delimited means to protect public safety in the District. Br. 45. The very fact that defendants have disregarded those limits, and instead deployed a military force larger than the Metropolitan Police Department to police the District for years on end, highlights the severity of their intrusion on the Mayor's statutory authority to "preserve the public peace" and "prevent crime." D.C. Code § 5-101.03(1)-(2).

## B.    An injunction is in the public interest.

The balance of harms and the public interest likewise favor the District. The District's "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). That is particularly true

54

given the nature of the District's claims. The unlawful deployment of the military in an American city strikes at the core of our Nation's values. *See Laird*, 408 U.S. at 15. And it has inflicted myriad concrete harms, including chilling people from attending religious services, Amicus Br. of Religious Leaders, *et al.* Opposing Stay 1-2, making residents, particularly the most vulnerable, "feel less safe," Amicus Br. of NAACP Legal Defense and Educational Fund Opposing Stay 3, and pulling Guard forces away from their critical missions, thereby "undermining morale, harming effectiveness, and compromising public safety and national security," Amicus Br. of Former Service Secretaries, *et al.* Opposing Stay 5.

On the other side of the ledger, the federal government has no valid interest in continuing an unlawful military deployment. *See League of Women Voters*, 838 F.3d at 12. The stay panel noted the public interest in "protecting federal governmental functions." *Stay Decision* at *12. But as defendants highlight, the preliminary injunction does not restrict the many lawful means defendants possess to protect federal interests in the District. Br. 45. And contrary to defendants' misstatements (Br. 1, 24, 47-48), the Mayor has repeatedly said she opposes the Guard deployment and does not credit it with reducing crime. *See supra* pp. 11-12.

Nor does affirmance "risk[] the back-and-forth withdrawal and redeployment of guard members." *Stay Decision* at *12. The parties have agreed no further evidence is necessary for the district court to reach summary judgment, so this

Court's decision on the merits will be effectively conclusive as to the claims before it. *See* ECF No. 98-1, at 2. And it is palpably in the public interest to bring an end to defendants' grave breach of our Nation's historic commitment to the separation of civil and military power.[6]

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

SARAH CARROLL
Assistant Attorney General
Office of the Solicitor General

BRIAN L. SCHWALB
Attorney General for the
District of Columbia

EMMA SIMSON
ELIZA H. SIMON
Senior Counsels to the Attorney
General

/s/ Mitchell P. Reich
MITCHELL P. REICH
Senior Counsel to the Attorney
General

KARTHIK P. REDDY
Special Assistant Attorney General

Office of the Attorney General
400 6th Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

May 2026

---

[6] The District would not oppose a narrow, time-limited administrative stay of this Court's judgment to permit a brief wind-down of the deployment and orderly resolution of any further proceedings. *See* JA867-68.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,986 words, excluding exempted parts.  This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Mitchell P. Reich
MITCHELL P. REICH

## ADDENDUM

## TABLE OF CONTENTS

Constitutional Provisions ...............................................................................1

U.S. Code Provisions ....................................................................................2

D.C. Code Provisions...................................................................................19

State Militia Code Provisions .....................................................................28

    1.    Examples of provisions designating the governor as "commander-in-chief" ...............................................................................28

    2.    Examples of provisions dividing the militia into two bodies...............30

    3.    Examples of provisions authorizing drills, inspections, parades, escort, and other military exercises ......................................................40

    4.    Provisions authorizing commanders-in-chief to deploy the militia during exigencies such as insurrections, invasions, and riots .............51

    5.    Provisions authorizing the commander-in-chief to deploy the militia to execute the laws.............................................................................65

**Constitutional Provisions**

**U.S. Const. art. I, § 8**

The Congress shall have Power

* * *

Cl. 15. To provide for the calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

Cl. 16. To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

Cl. 17. To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

* * *

Add. 1

## U.S. Code Provisions

### 10 U.S.C. § 251

**Federal aid for State governments**—Whenever there is an insurrection in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States, in the number requested by that State, and use such of the armed forces, as he considers necessary to suppress the insurrection.

### 10 U.S.C. § 252

**Use of militia and armed forces to enforce Federal authority**—Whenever the President considers that unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings, he may call into Federal service such of the militia of any State, and use such of the armed forces, as he considers necessary to enforce those laws or to suppress the rebellion.

### 10 U.S.C. § 683 (1964)

**Reserves: duty with or without pay—**

**(a)** Subject to other provisions of this title, any Reserve may be ordered to active duty or other duty—

**(1)** with the pay and allowances provided by law; or

**(2)** with his consent, without pay.

Duty without pay shall be considered for all purposes as if it were duty with pay.

\* \* \*

Add. 2

**10 U.S.C. § 12315**

**Reserves: duty with or without pay—**

**(a)** Subject to other provisions of this title, any Reserve may be ordered to active duty or other duty—

**(1)** with the pay and allowances provided by law; or

**(2)** with his consent, without pay.

Duty without pay shall be considered for all purposes as if it were duty with pay.

\* \* \*

**10 U.S.C. § 12406**

**National Guard in Federal service: call—**Whenever—

**(1)** the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;

**(2)** there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or

**(3)** the President is unable with the regular forces to execute the laws of the United States;

the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

**16 Rev. Stat. § 1642 (2d ed 1878)**

**Orders of President in case of invasion—**Whenever the United States are invaded, or are in imminent danger of invasion from any foreign nation or Indian tribe, or of rebellion against the authority of the Government of the United States, it shall be lawful for the President to call forth such number of

Add. 3

the militia of the State or States, most convenient to the place of danger, or scene of action, as he may deem necessary to repel such invasion, or to suppress such rebellion, and to issue his orders for that purpose to such officers of the militia as he may think proper.

## 16 U.S.C. § 1456

**Coordination and cooperation—**

* * *

**(c) Consistency of Federal activities with State management programs; Presidential exemption; certification**

* * *

**(1)(B)** After any final judgment, decree, or order of any Federal court that is appealable under section 1291 or 1292 of Title 28, or under any other applicable provision of Federal law, that a specific Federal agency activity is not in compliance with subparagraph (A), and certification by the Secretary that mediation under subsection (h) is not likely to result in such compliance, the President may, upon written request from the Secretary, exempt from compliance those elements of the Federal agency activity that are found by the Federal court to be inconsistent with an approved State program, if the President determines that the activity is in the paramount interest of the United States. No such exemption shall be granted on the basis of a lack of appropriations unless the President has specifically requested such appropriations as part of the budgetary process, and the Congress has failed to make available the requested appropriations.

* * *

## 19 U.S.C. § 1862

**Safeguarding national security—**

* * *

**(c) Adjustment of imports; determination by President; report to Congress; additional actions; publication in Federal Register—**

Add. 4

**(1)(A)** Within 90 days after receiving a report submitted under subsection (b)(3)(A) in which the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President shall--

> **(i)** determine whether the President concurs with the finding of the Secretary, and

> **(ii)** if the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security.

**(B)** If the President determines under subparagraph (A) to take action to adjust imports of an article and its derivatives, the President shall implement that action by no later than the date that is 15 days after the day on which the President determines to take action under subparagraph (A).

\* \* \*

**19 U.S.C. § 3203**

> **Eligible Articles—**

> \* \* \*

> **(d) Emergency relief with respect to perishable products—**

> **(1)** If a petition is filed with the United States International Trade Commission pursuant to the provisions of section 201 of the Trade Act of 1974 regarding a perishable product and alleging injury from imports from beneficiary countries, then the petition may also be filed with the Secretary of Agriculture with a request that emergency relief be granted pursuant to paragraph (3) of this subsection with respect to such article.

> **(2)** Within 14 days after the filing of a petition under paragraph (1) of this subsection--

Add. 5

(A) if the Secretary of Agriculture has reason to believe that a perishable product from a beneficiary country is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing a perishable product like or directly competitive with the imported product and that emergency action is warranted, he shall advise the President and recommend that the President take emergency action; or

(B) the Secretary of Agriculture shall publish a notice of his determination not to recommend the imposition of emergency action and so advise the petitioner.

(3) Within 7 days after the President receives a recommendation from the Secretary of Agriculture to take emergency action pursuant to paragraph (2) of this subsection, he shall issue a proclamation withdrawing the duty-free treatment provided by this chapter or publish a notice of his determination not to take emergency action.

\* \* \*

## 22 U.S.C. § 1978

**Restriction on importation of fishery or wildlife products from countries which violate international fishery or endangered or threatened species programs—**

**(a) Certification to President—**

**(1)** When the Secretary of Commerce, in consultation with the Secretary of State, determines that nationals of a foreign country, directly or indirectly, are conducting fishing operations in a manner or under circumstances which diminish the effectiveness of an international fishery conservation program, the Secretary of Commerce shall certify such fact to the President.

**(2)** When the Secretary of Commerce or the Secretary of the Interior, in consultation with the Secretary of State, finds that nationals of a foreign country, directly or indirectly, are engaging in trade or taking which

Add. 6

diminishes the effectiveness of any international program for endangered or threatened species, the Secretary making such finding shall certify such fact to the President.

**(3)** In administering this subsection, the Secretary of Commerce or the Secretary of the Interior, as appropriate, in consultation with the Secretary of State, shall--

> **(A)** periodically monitor the activities of foreign nationals that may affect the international programs referred to in paragraphs (1) and (2);

> **(B)** promptly investigate any activity by foreign nationals that, in the opinion of the Secretary, may be cause for certification under paragraph (1) or (2); and

> **(C)** promptly conclude; and reach a decision with respect to; any investigation commenced under subparagraph (B).

**(4)** The Secretary of Commerce and the Secretary of the Interior shall each report to Congress each certification to the President made by such Secretary under this subsection, within 15 days after making such certification.

**(5)** Upon receipt of any certification made under paragraph (1) or (2), the President may direct the Secretary of the Treasury to prohibit the bringing or the importation into the United States of any products from the offending country for any duration as the President determines appropriate and to the extent that such prohibition is sanctioned by the World Trade Organization (as defined in section 3501(8) of Title 19) or the multilateral trade agreements (as defined in section 3501(4) of Title 19).

* * *

Add. 7

**32 U.S.C. § 101**

**Definitions—**

\* \* \*

**(4)** "Army National Guard" means that part of the organized militia of the several States and Territories, Puerto Rico, and the District of Columbia, active and inactive, that--

(A) is a land force;

(B) is trained, and has its officers appointed, under the sixteenth clause of section 8, article I, of the Constitution;

(C) is organized, armed, and equipped wholly or partly at Federal expense; and

(D) is federally recognized.

\* \* \*

**(19)** "Full-time National Guard duty" means training or other duty, other than inactive duty, performed by a member of the Army National Guard of the United States or the Air National Guard of the United States in the member's status as a member of the National Guard of a State or territory, the Commonwealth of Puerto Rico, or the District of Columbia under section 316, 502, 503, 504, or 505 of this title for which the member is entitled to pay from the United States or for which the member has waived pay from the United States.

\* \* \*

**32 U.S.C. § 112**

**Drug interdiction and counter-drug activities—**

**(a) Funding assistance.**—The Secretary of Defense may provide funds to the Governor of a State who submits to the Secretary a State drug interdiction and counter-drug activities plan satisfying the requirements of subsection (c). Such funds shall be used for the following:

Add. 8

**(1)** The pay, allowances, clothing, subsistence, gratuities, travel, and related expenses, as authorized by State law, of personnel of the National Guard of that State used, while not in Federal service, for the purpose of drug interdiction and counter-drug activities.

**(2)** The operation and maintenance of the equipment and facilities of the National Guard of that State used for the purpose of drug interdiction and counter-drug activities.

**(3)** The procurement of services and equipment, and the leasing of equipment, for the National Guard of that State used for the purpose of drug interdiction and counter-drug activities. However, the use of such funds for the procurement of equipment may not exceed $15,000 per item, unless approval for procurement of equipment in excess of that amount is granted in advance by the Secretary of Defense

**(b) Use of personnel performing full-time National Guard duty.—**

**(1)** Under regulations prescribed by the Secretary of Defense, personnel of the National Guard of a State may, in accordance with the State drug interdiction and counter-drug activities plan referred to in subsection (c), be ordered to perform full-time National Guard duty under section 502(f) of this title for the purpose of carrying out drug interdiction and counter-drug activities.

**(2)(A)** A member of the National Guard serving on full-time National Guard duty under orders authorized under paragraph (1) shall participate in the training required under section 502(a) of this title in addition to the duty performed for the purpose authorized under that paragraph. The pay, allowances, and other benefits of the member while participating in the training shall be the same as those to which the member is entitled while performing duty for the purpose of carrying out drug interdiction and counter-drug activities. The member is not entitled to additional pay, allowances, or other benefits for participation in training required under section 502(a)(1) of this title.

**(B)** Appropriations available for the Department of Defense for drug interdiction and counter-drug activities may be used for paying costs

Add. 9

associated with a member's participation in training described in subparagraph (A). The appropriation shall be reimbursed in full, out of appropriations available for paying those costs, for the amounts paid. Appropriations available for paying those costs shall be available for making the reimbursements.

\* \* \*

**(c) Plan requirements.**—A State drug interdiction and counter-drug activities plan shall—

\* \* \*

**(5)** include a certification by the Attorney General of the State (or, in the case of a State with no position of Attorney General, a civilian official of the State equivalent to a State attorney general) that the use of the National Guard of the State for the activities proposed under the plan is authorized by, and is consistent with, State law; and

\* \* \*

**(g) Statutory construction.**—Nothing in this section shall be construed as a limitation on the authority of any unit of the National Guard of a State, when such unit is not in Federal service, to perform law enforcement functions authorized to be performed by the National Guard by the laws of the State concerned.

**(h) Definitions.**—For purposes of this section:

**(1)** The term "drug interdiction and counter-drug activities", with respect to the National Guard of a State, means the use of National Guard personnel in drug interdiction and counter-drug law enforcement activities, including drug demand reduction activities, authorized by the law of the State and requested by the Governor of the State.

**(2)** The term "Governor of a State" means, in the case of the District of Columbia, the Commanding General of the National Guard of the District of Columbia.

Add. 10

**(3)** The term "State" means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States.

## 32 U.S.C. § 328

### Active Guard and Reserve duty: Governor's authority—

**(a) Authority.**—The Governor of a State or the Commonwealth of Puerto Rico, Guam, or the Virgin Islands, or the commanding general of the District of Columbia National Guard, as the case may be, with the consent of the Secretary concerned, may order a member of the National Guard to perform Active Guard and Reserve duty, as defined by section 101(d)(6) of title 10, pursuant to section 502(f) of this title.

\* \* \*

## 32 U.S.C. § 502

### Required drills and field exercises—

**(a)** Under regulations to be prescribed by the Secretary of the Army or the Secretary of the Air Force, as the case may be, each company, battery, squadron, and detachment of the National Guard, unless excused by the Secretary concerned, shall--

**(1)** assemble for drill and instruction, including indoor target practice, at least 48 times each year; and

**(2)** participate in training at encampments, maneuvers, outdoor target practice, or other exercises, at least 15 days each year.

However, no member of such unit who has served on active duty for one year or longer shall be required to participate in such training if the first day of such training period falls during the last one hundred and twenty days of his required membership in the National Guard.

**(b)** An assembly for drill and instruction may consist of a single ordered formation of a company, battery, squadron, or detachment, or, when authorized by the Secretary concerned, a series of ordered formations of parts of those organizations. However, to have a series of formations credited as an

Add. 11

assembly for drill and instruction, all parts of the unit must be included in the series within 90 consecutive days.

**(c)** The total attendance at the series of formations constituting an assembly shall be counted as the attendance at that assembly for the required period. No member may be counted more than once or receive credit for more than one required period of attendance, regardless of the number of formations that he attends during the series constituting the assembly for the required period.

**(d)** No organization may receive credit for an assembly for drill or indoor target practice unless--

**(1)** the number of members present equals or exceeds the minimum number prescribed by the President;

**(2)** the period of military duty or instruction for which a member is credited is at least one and one-half hours; and

**(3)** the training is of the type prescribed by the Secretary concerned.

**(e)** An appropriately rated member of the National Guard who performs an aerial flight under competent orders may receive credit for attending drill for the purposes of this section, if the flight prevented him from attending a regularly scheduled drill.

**(f)(1)** Under regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may--

**(A)** without his consent, but with the pay and allowances provided by law; or

**(B)** with his consent, either with or without pay and allowances;

be ordered to perform training or other duty in addition to that prescribed under subsection (a).

**(2)** The training or duty ordered to be performed under paragraph (1) may include the following:

Add. 12

**(A)** Support of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense.

**(B)** Support of training operations and training missions assigned in whole or in part to the National Guard by the Secretary concerned, but only to the extent that such training missions and training operations--

> **(i)** are performed in the United States or the Commonwealth of Puerto Rico or possessions of the United States; and

> **(ii)** are only to instruct active duty military, foreign military (under the same authorities and restrictions applicable to active duty troops), Department of Defense contractor personnel, or Department of Defense civilian employees.

**(3)** Duty without pay shall be considered for all purposes as if it were duty with pay.

**33 U.S.C. § 1362**

**Definitions—**

Except as otherwise specifically provided, when used in this chapter:

\* \* \*

(3) The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands.

**33 U.S.C. § 1365**

>**Citizen Suits—**
>
>\* \* \*
>
>**(h) Civil action by State Governors—**A Governor of a State may commence a civil action under subsection (a), without regard to the limitations of subsection (b) of this section, against the Administrator where there is alleged a failure of the Administrator to enforce an effluent standard or limitation under this chapter the violation of which is occurring in another State and is causing an adverse effect on the public health or welfare in his State, or is causing a violation of any water quality requirement in his State.

**42 U.S.C. § 7602**

>**Definitions—**
>
>When used in this chapter—
>
>\* \* \*
>
>**(d)** The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.
>
>**(e)** The term "person" includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.
>
>\* \* \*

**42 U.S.C. § 7604**

>**(a) Authority to bring civil action; jurisdiction—**Except as provided in subsection (b), any person may commence a civil action on his own behalf—
>
>>**(1)** against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have

Add. 14

violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,

**(2)** against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or

**(3)** against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I (relating to significant deterioration of air quality) or part D of subchapter I (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties (except for actions under paragraph (2)). The district courts of the United States shall have jurisdiction to compel (consistent with paragraph (2) of this subsection) agency action unreasonably delayed, except that an action to compel agency action referred to in section 7607(b) of this title which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under section 7607(b) of this title. In any such action for unreasonable delay, notice to the entities referred to in subsection (b)(1)(A) shall be provided 180 days before commencing such action.

\* \* \*

Add. 15

**50 U.S.C. § 3803**

**Persons liable for training and service—**

**\* \* \***

**(k) Reduction of periods of service; establishment of National Security Training Corps; composition; service; pay—**

**(1)** Upon a finding by him that such action is justified by the strength of the Armed Forces in the light of international conditions, the President, upon recommendation of the Secretary of Defense, is authorized, by Executive order, which shall be uniform in its application to all persons inducted under this chapter but which may vary as to age groups, to provide for (A) decreasing periods of service under this chapter but in no case to a lesser period of time than can be economically utilized, or (B) eliminating periods of service required under this chapter.

**Emergency Management Assistance Compact, Pub. L. No. 104-321**

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. CONGRESSIONAL CONSENT.

The Congress consents to the Emergency Management Assistance Compact entered into by Delaware, Florida, Georgia, Louisiana, Maryland, Mississippi, Missouri, Oklahoma, South Carolina, South Dakota, Tennessee, Virginia, and West Virginia. The compact reads substantially as follows:

"Emergency Management Assistance Compact

"ARTICLE I.

"PURPOSE AND AUTHORITIES.

"This compact is made and entered into by and between the participating member states which enact this compact, hereinafter called party states. For the purposes of this compact, the term 'states' is taken to mean the several states, the Commonwealth of Puerto Rico, the District of Columbia, and all U.S. territorial possessions.

Add. 16

"The purpose of this compact is to provide for mutual assistance between the states entering into this compact in managing any emergency disaster that is duly declared by the Governor of the affected state, whether arising from natural disaster, technological hazard, man-made disaster, civil emergency aspects of resources shortages, community disorders, insurgency, or enemy attack.

"This compact shall also provide for mutual cooperation in emergency-related exercises, testing, or other training activities using equipment and personnel simulating performance of any aspect of the giving and receiving of aid by party states or subdivisions of party states during emergencies, such actions occurring outside actual declared emergency periods. Mutual assistance in this compact may include the use of the states' National Guard forces, either in accordance with the National Guard Mutual Assistance Compact or by mutual agreement between states.

* * *

"ARTICLE XIII.

"ADDITIONAL PROVISIONS.

"Nothing in this compact shall authorize or permit the use of military force by the National Guard of a state at any place outside that state in any emergency for which the President is authorized by law to call into federal service the militia, or for any purpose for which the use of the Army or the Air Force would in the absence of express statutory authorization be prohibited under § 1385 of Title 18 of the United States Code.".

SEC. 2. RIGHT TO ALTER, AMEND, OR REPEAL.

The right to alter, amend, or repeal this joint resolution is hereby expressly reserved. The consent granted by this joint resolution shall—

* * *

Add. 17

(6) be construed as understanding that Article XIII does not affect the authority of the President over the National Guard provided by article I of the Constitution and title 10 of the United States Code.

\* \* \*

**D.C. Code Provisions**

## D.C. Code § 1-204.01

### Creation and Membership.—

(a) There is established a Council of the District of Columbia; and the members of the Council shall be elected by the registered qualified electors of the District. * * *

## D.C. Code § 1-204.04

### Powers of the Council.—

(a) Subject to the limitations specified in §§ 1-206.01 to 1-206.04, the legislative power granted to the District by this chapter is vested in and shall be exercised by the Council in accordance with this chapter. In addition, except as otherwise provided in this chapter, all functions granted to or imposed upon, or vested in or transferred to the District of Columbia Council, as established by Reorganization Plan No. 3 of 1967, shall be carried out by the Council in accordance with the provisions of this chapter.

* * *

## D.C. Code § 1-204.22

**Powers and duties.**—The executive power of the District shall be vested in the Mayor who shall be the chief executive officer of the District government.  In addition, except as otherwise provided in this chapter, all functions granted to or vested in the Commissioner of the District of Columbia, as established under Reorganization Plan No. 3 of 1967, shall be carried out by the Mayor in accordance with this chapter.  The Mayor shall be responsible for the proper execution of all laws relating to the District, and for the proper administration of the affairs of the District coming under his jurisdiction or control, including but not limited to the following powers, duties, and functions:

* * *

Add. 19

**D.C. Code § 1-206.02**

**Limitations on the Council.—**

* * *

**(b)** Nothing in this chapter shall be construed as vesting in the District government any greater authority over the National Zoological Park, the National Guard of the District of Columbia, the Washington Aqueduct, the National Capital Planning Commission, or, except as otherwise specifically provided in this chapter, over any federal agency, than was vested in the Commissioner prior to January 2, 1975.

* * *

**D.C. Code § 1-207.40**

**Emergency control of police.—**

(a) Notwithstanding any other provision of law, whenever the President of the United States determines that special conditions of an emergency nature exist which require the use of the Metropolitan Police force for federal purposes, he may direct the Mayor to provide him, and the Mayor shall provide, such services of the Metropolitan Police force as the President may deem necessary and appropriate. In no case, however, shall such services made available pursuant to any such direction under this subsection extend for a period in excess of 48 hours unless the President has, prior to the expiration of such period, notified the Chairmen and ranking minority members of the Committees on the District of Columbia of the Senate and the House of Representatives, in writing, as to the reason for such direction and the period of time during which the need for such services is likely to continue.

(b) Subject to the provisions of subsection (c) of this section, such services made available in accordance with subsection (a) of this section shall terminate upon the end of such emergency, the expiration of a period of 30 days following the date on which such services are first made available, or the enactment into law of a joint resolution by the Congress providing for such termination, whichever first occurs.

Add. 20

(c) Notwithstanding the foregoing provisions of this section, in any case in which such services are made available in accordance with the provisions of subsection (a) of this section during any period of an adjournment of the Congress sine die, such services shall terminate upon the end of the emergency, the expiration of the 30-day period following the date on which Congress first convenes following such adjournment, or the enactment into law of a joint resolution by the Congress providing for such termination, whichever first occurs.

(d) Except to the extent provided for in subsection (c) of this section, no such services made available pursuant to the direction of the President pursuant to subsection (a) of this section shall extend for any period in excess of 30 days, unless the Senate and the House of Representatives enact into law a joint resolution authorizing such an extension.

## D.C. Code § 5-101.03

**General duties of Mayor.**—It shall be the duty of the Mayor of the District of Columbia at all times of the day and night within the boundaries of said Police District:

(1) To preserve the public peace;

(2) To prevent crime and arrest offenders;

(3) To protect the rights of persons and of property;

(4) To guard the public health;

(5) To preserve order at every public election;

(6) To remove nuisances existing in the public streets, roads, alleys, highways, and other places;

(7) To provide a proper police force at every fire, in order that thereby the firemen and property may be protected;

(8) To protect strangers and travelers at steamboat and ship landings and railway stations;

Add. 21

(9) To see that all laws relating to the observance of Sunday, and regarding pawnbrokers, mock auctions, elections, gambling, intemperance, lottery dealers, vagrants, disorderly persons, and the public health, are promptly enforced; and (10) To enforce and obey all laws and ordinances in force in the District, or any part thereof, which are properly applicable to police or health, and not inconsistent with the provisions of this title. The police shall, as far as practicable, aid in the enforcement of garbage regulations.

## D.C. Code § 5-105.01

**Appointments; assignments; promotions; applicable civil service provisions; vacancies.—**

**(a)** The Mayor of said District shall appoint to office, assign to such duty or duties as he may prescribe, and promote all officers and members of said Metropolitan Police force; * * *

* * *

## D.C. Code § 5-105.05

**Composition of force; duties of positions.—**The said Metropolitan Police force shall consist of 1 Chief of Police, who shall continue to be invested with such powers and charged with such duties as is provided by existing law; * * * and such others as said Mayor may deem necessary within the appropriations made by Congress; * * *

## D.C. Code § 7-2332

**Authority to execute Compact.—**The Mayor is hereby authorized to execute, on behalf of the District of Columbia, the Emergency Management Assistance Compact * * *

## D.C. Code § 49-101

**Drill, parade, encampment or required duty.—**Any drill, parade, encampment or duty that is required, ordered, or authorized to be performed under the provisions of this title, shall be deemed to be a military duty, and while on such duty every officer and enlisted man of the National Guard shall

Add. 22

be subject to the lawful orders of his superior officers, and for any military offense may be put and kept under arrest or under guard for a time not extending beyond the term of service for which he is then ordered.

## D.C. Code § 49-102

**Prescribing drills.**—The Commanding General shall prescribe such stated drills and parades as he may deem necessary for the instruction of the National Guard, and may order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper. The commanding officer of any regiment, battalion or company may also assemble his command, or any part thereof, in the evening for drill, instruction, or other business, as he may deem expedient; but no parade shall be performed by any regiment, battalion, company, or part thereof, without the permission of the Commanding General.

## D.C. Code § 49-103

**Suppression of riots.**—When there is in the District of Columbia a tumult, riot, mob, or a body of men acting together by force with attempt to commit a felony or to offer violence to persons or property, or by force or violence to break and resist the laws, or when such tumult, riot, or mob is threatened, it shall be lawful for the Mayor of the District of Columbia, or for the United States Marshal for the District of Columbia, or for the National Capital Service Director, to call on the Commander-in-Chief to aid them in suppressing such violence and enforcing the laws; the Commander-in-Chief shall thereupon order out so much and such portion of the militia as he may deem necessary to suppress the same, and no member thereof who shall be thus ordered out by proper authority for any such duty shall be liable to civil or criminal prosecution for any act done in the discharge of his military duty.

## D.C. Code § 49-104

**Excuse for physical disability; penalty for absence.**—No officer or soldier of the National Guard, when ordered on duty to aid the civil authorities, or when ordered into the service of the United States in obedience to the call or order of the President, shall be excused from such duty except upon the certificate of the surgeon of his command of physical disability, such

Add. 23

certificate to be presented to the Commanding General in case of an officer, or to his company commander in case of a soldier. If such officer or soldier fail to furnish such excuse he shall be tried and punished by a court-martial. For absence from any other military duty required or ordered under the provisions of this chapter the penalty shall be such as may be prescribed by the Commanding General, or the bylaws of the organization to which the officer or soldier belongs.

## D.C. Code § 49-106

**Rules for parades and encampments.—** Every commanding officer, when on duty, may ascertain and fix necessary bounds and limits to his parade or encampment. Whoever intrudes within the limits of the parade or encampment after being forbidden, or whoever shall interrupt, molest, or obstruct any officer or soldier while on duty, may be put and kept under guard until the parade, encampment, or duty be concluded; and the commanding officer may turn over such person to any police officer, and said police officer is required to detain him in custody for examination or trial before the Superior Court of the District of Columbia, and the judge thereof may punish such offense by a fine not exceeding $25.

## D.C. Code § 49-107

**Camp Duty.—**The National Guard shall perform not less than 6 consecutive days of camp duty in each year, at such time as may be ordered by the Commanding General, and the Quartermaster General of the militia, subject to the approval of the Commanding General, shall provide, by rental or otherwise, a suitable camp-ground for the annual encampment of the militia, make the necessary provisions thereon for the encampment, and provide necessary transportation to and from the same for baggage and supplies.

## D.C. Code § 49-301

**Commanding General.—**

(a) There shall be appointed and commissioned by the President of the United States a Commanding General of the militia of the District of

Columbia with the rank of brigadier general, or major general, who shall hold office until his successor is appointed and qualified, but may be removed at any time by the President.

(b) Except as provided in subsection (c) of this section, any person serving as the Commanding General of the militia of the District of Columbia shall be considered to be an employee of the Department of Defense, and of the United States, within the meaning of § 2105 of Title 5, United States Code.

(c) Any officer of the armed forces of the United States who, while serving on active duty, is detailed to serve as Commanding General of the militia of the District of Columbia shall, while so detailed, be entitled to receive only the pay and allowances to which he is entitled as an officer of the armed forces.

## D.C. Code § 49-401

**Militia; persons to be enrolled.**—Every able-bodied male citizen resident within the District of Columbia, of the age of 18 years and under the age of 45 years, excepting persons exempted by § 49-402, and idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia. Persons so convicted after enrollment shall forthwith be disenrolled; and in all cases of doubt respecting the age of a person enrolled, the burden of proof shall be upon him.

## D.C. Code § 49-402

**Exemptions from service.**—In addition to the persons exempted from enrollment in the militia by the general laws of the United States, the following persons shall also be exempt from enrollment in the militia of the District of Columbia, namely: Officers of the government of the District of Columbia; judges and officers of the courts of the District of Columbia; officers who have held commissions in the regular or volunteer Army, Navy, or Air Force of the United States; officers who have served for a period of 5 years in the militia of the District of Columbia or of any state of the United States; ministers of the gospel; practicing physicians; and conductors and engine-drivers of railroad trains.

**D.C. Code § 49-403**

      **Assessors to make list of persons liable to enrollment.**—The Mayor of the District of Columbia shall provide for the enrollment of the militia, and for this purpose may require the assessors of taxes, at the same time they are engaged in taking the assessment of valuation of real and personal property, to make a list of persons liable to enrollment, and such record shall be deemed a sufficient notification to all persons whose names are thus recorded that they have been enrolled in the militia.  Immediately after the completion of each enrollment they shall furnish the Commanding General of the militia with a copy of the same.

**D.C. Code § 49-404**

      **Duty of enrolled militia; police and fire department personnel.**— The enrolled militia shall not be subject to any duty except when called into the service of the United States, or to aid the civil authorities in the execution of the laws or suppression of riots.  However, if the enrolled militia is called to aid the civil authorities, who already have activated, or will concomitantly activate, the police and fire departments, no member of these departments shall be subject to duty in the militia.  Also, if the enrolled militia is called into service of the United States, the chief of the police department and the chief of the fire department shall be entitled to have exempted from call in the militia minimum personnel considered necessary to ensure continued, reasonable police and fire services to the citizens of the District of Columbia.

**D.C. Code § 49-405**

      **Ordering enrolled militia into service.**—Whenever it shall be necessary to call out any portion of the enrolled militia the Commander-in-Chief shall order out, by draft or otherwise, or accept as volunteers as many as required.  Every member of the enrolled militia who volunteers, or who is ordered out or drafted under the provisions of this chapter, who does not appear at the time and place designated, may be arrested by order of the Commanding General and be tried and punished by a court-martial.  The portion of the enrolled militia ordered out or accepted shall be mustered into service for such period as may be required, and the Commanding General may

assign them to existing organizations of the active militia, or may organize them as the exigencies of the occasion may require.

### D.C. Code § 49-406

**Organized militia; volunteer service; designation.**—The organized militia shall be composed of volunteers, and shall be designated the National Guard of the District of Columbia.

### D.C. Code § 49-409

**President to be Commander-in-Chief.**—The President of the United States shall be the Commander-in-Chief of the militia of the District of Columbia.

### D.C. Code § 49-901

**Active service.**—Whenever the National Guard of the District of Columbia shall be ordered to duty in case of riot, tumult, breach of the peace, or whenever called in aid of the civil authorities, all enlisted men who do duty shall be paid at the rate equivalent to 2 times the pay of enlisted men of the regular Army of like grade. Commissioned officers who do duty shall be entitled to and shall receive the same pay and allowances as commissioned officers of like grade of the regular Army. Each mounted officer and enlisted man shall be paid a reasonable per diem compensation for each horse actually furnished and used by him; provided, that when the National Guard of the District of Columbia is called into actual service of the United States the officers and enlisted men shall, during their time of service, be entitled to the same pay and allowances as are or may be provided by law for the regular Army.

**State Militia Code Provisions**

**1. Examples of provisions designating the governor as "commander-in-chief."**

**Ala. Code § 156 (1887)**

> **The governor commander-in-chief of Alabama state troops.**—The volunteer military forces of the state shall be known and designated as the Alabama State Troops, and the governor is the commander-in-chief thereof.

**Act of July 14, 1868, No. XVIII, § 2, 1868 Ark. Acts of Gen. Assembly 44, 45**

> The Governor of the State shall be Commander-in- Chief of all the Militia forces of this State, which shall consist of two classes, namely: The State Guard of Arkansas, and of the Reserve Militia.

**Cal. Pol. Code § 1916 (1886)**

> **Governor commander-in-chief.**—The governor is commander-in-chief of the national guard.

**Colo. Gen. Stat. ch. LXXIII, § 2282 (1883)**

> **Governor commander-in-chief—Appoint general and other officers.**—The governor shall be commander-in-chief of the militia, except when turned over into the service of the United States * * *

**Conn. Gen. Stat. § 3146 (1887)**

> **Governor to be commander-in-chief.**—The Governor shall be Commander-in-chief of the militia, except when turned over into the service of the United States * * *

**Fla. Code § 499 (1892)**

> **Commander-in-chief.**—The governor as commander-in-chief of the militia of the State, and by virtue of the power conferred on him by the Constitution, shall appoint all commissioned officers of the militia, and present their names to the senate for confirmation, and when they are so confirmed shall issue their commissions. * * *

Add. 28

**Act of Oct. 13, 1885, No. 355, § III, Ga. Acts & Resolutions 74, 75 (1885)**

> **Commander-in-chief.**— * * * The Governor is Commander-in-chief of the volunteer forces of this State. * * *

**Minn. Gen. Stat., ch. 12, § 3 (1889)**

> **Active militia, how constituted—commander-in-chief—companies, etc.**— * * * The governor is commander-in-chief of the militia of the state * * *

**Mo. Rev. Stat., ch. 112, § 6933 (1889)**

> **Governor shall be commander-in-chief—staff, officers of.**—The governor shall be commander-in-chief * * *

**Nev. Gen Stat., ch. V, § 1 (1885)**

> **To issue commissions.**—The Governor, as Commander-in-Chief of the militia of the state * * *

**Act of Apr. 23, 1883, § 9, 1883 N.Y. Laws 417, 419**

> **Governor to appoint officers in the first instance.**—The Governor, as Commander-in-Chief of the National Guard and of the Militia * * *

**Tenn. Comp. Stat. § 553 (1884)**

> **Governor commander-in-chief.**—The Governor shall be commander-in-chief of the army and navy of this State and of the militia, except when they shall be called into the service of the United States.

Add. 29

**2. Examples of provisions dividing the militia into two bodies.**

**Act of July 14, 1868, No. XVIII, §§ 2-3, 5, 1868 Ark. Acts of Gen. Assembly 44, 45-46**

SEC. 2. The Governor of the State shall be Commander-in- Chief of all the Militia forces of this State, which shall consist of two classes, namely: The State Guard of Arkansas, and of the Reserve Militia.

SEC. 3. The State Guard of Arkansas shall consist of such electors and all such other male persons between the ages of eighteen and twenty-one who shall voluntarily enroll and uniform themselves for service therein * * *

* * *

SEC. 5. The Reserve Militia shall consist of all such persons liable to military duty as have not enrolled in the State Guard * * *

**Cal. Pol. Code §§ 1895, 1912 (1886)**

CHAPTER I.

ENROLLED MILITIA

SEC. 1895. **Who are subject to military duty.**—Every able-bodied male inhabitant of this state * * * between the ages of eighteen and forty-five years, not exempt by law, is subject to military duty. * * *

* * *

CHAPTER II.

THE NATIONAL GUARD

SEC. 1912. **National guard, of what it consists.**—The organized uniformed militia of the state of California are known as the national guard of California. * * *

**Colo. Gen. Stat. ch. LXXIII, §§ 2284, 2294 (1883)**

SEC. 2284. **Who subject to being enrolled.**—Every able-bodied male citizen of Colorado, and those who have declared their intention to become citizens of the United States, between the ages of eighteen and forty-five

Add. 30

years, except persons exempt by law, shall be enrolled in the militia, and perform military duty in the manner hereinafter prescribed.

\* \* \*

SEC. 2294. **Of what troops the militia shall consist—Number—Apportionment.**—The organized militia shall be designated the "Colorado National Guard," and, in time of peace, shall consist of not more than three regiments of infantry, one- regiment bf cavalry and three batteries of artillery, with a total membership of not over five thousand (5,000) persons. They may be ordered into active service, by the governor, to aid the civil officers to suppress, or prevent riot, or insurrection, or to repel, or prevent invasion, and they shall in all cases be called into service before the unorganized militia.

**Conn. Gen. Stat. §§ 3133-3134 (1887)**

SEC. 3133. **Who liable.**—All male citizens of this State between the ages of eighteen and forty-five years, not expressly exempted by law, shall be subject to military duty, and designated as the militia.

SEC. 3134. **Active militia.**—The active militia shall be organized as hereinafter mentioned, and designated as the Connecticut National Guard \* \* \*

**Fla. Code §§ 491, 553 (1892)**

SEC. 491. **Qualifications and exemptions.**—Every able-bodied male citizen of this State between the ages of eighteen and forty-five years, not exempt by law, and not a member of the volunteer militia, shall be a member of the enrolled militia. \* \* \*

\* \* \*

SEC. 553.  **Designation of.**—There shall be organized in this State a body of militia, composed of volunteer companies, known as Florida State troops \* \* \*

**Ill. Rev. Stat. ch. 129 §§ 1, 3 (1887)**

SEC. 1. **Who subject to military duty.**—That all able bodied male citizens of this State, between the ages of eighteen and forty-five years, except

such as are expressly exempted by the laws of the United States, or are State or county officers, or on account of their profession or employment are exempted by the commander in chief, shall be subject to military duty and designated as "The Illinois State Militia."

* * *

SEC. 3. **Illinois National Guard—how enlisted—brigades, etc.—** The active militia shall be designated as the Illinois National Guard" * * *

**Kan. Comp. Laws ch. 64, § 1 (1885)**

**Subject to.**—All persons subject to military duty under the constitution of this state, and not exempt therefrom by the provisions of this act, and such other male persons as shall voluntarily enroll themselves, shall be divided into two classes, to-wit: One consisting of those who enlist in the active militia of the state under the provisions of this act, which shall be known as the Kansas national guard; the other to consist of all those subject to military duty, but not included in the above active or enlisted militia-the latter class to be known as the Kansas reserve militia.

**Ky. Gen. Stat., ch. 76, §§ 1-2 (1887)**

SEC. 1. The militia of this State shall be divided into two classes:

1. The volunteer militia, to be known as the Kentucky State Guard.

2. The militia of the reserve.

SEC. 2. **Reserve militia composed of all persons betwe'n 18 and 45 years of age.**—The militia of the reserve shall consist of all able-bodied male persons, resident in this State, between the ages eighteen and forty-five years, except such persons as now are, or hereafter may be, exempted by the laws of the United States or of this State; and those who belong to religious societies whose tenets forbid them to carry arms; and those who become bona fide members of the State Guard, during their term of service, and forever after, if they serve two terms.

**1880 Me. Laws, ch. 225, §§ 1-2, 15**

SEC. 1. **Enrollment lists, what to contain, by whom made, when filed, etc.—**The names of all male citizens of this state between the ages of eighteen and forty-five, shall, biennially, in April, be enrolled alphabetically by the assessors of the several cities, towns and plantations in which they respectively reside. * * *

SEC. 2. **Enrolled militia.—**All able bodied male citizens enrolled in this state, not exempt by law, and not belonging to the volunteer or reserve militia, shall be known as the enrolled militia of Maine.

* * *

SEC. 15. **Designation of active militia, strength of force, term and manner of enlistment.—**The active militia shall be known and designated as the Maine volunteer militia * * *

**Md. Code, Pub. Gen. Laws, art. LXV, §§ 1, 26 (1888)**

SEC. 1. The militia of this State shall consist of all able-bodied white male citizens, between the ages of eighteen and forty-five years, and not exempt by the laws of the United States, except the comptroller, the treasurer, the secretary of State, judges and clerks of the courts of record, registers of wills, sheriffs, and ministers of any religious denomination. ***

***

SEC. 26. Out of the volunteer uniformed organizations already existing and those hereby created, there shall be formed a body of active militia, to consist of not more than thirty-eight companies, and to contain not more than twenty-two hundred and eighty enlisted men, to be enlisted, organized and maintained as hereinafter provided, to be known as the "Maryland National Guard" * * *

**Mass. Gen. Laws. ch. 411, §§ 1, 21 (1887)**

SEC. 1. **Enrolment of the militia.—**Every able-bodied male citizen, resident within this state, of the age of eighteen years and under the age of forty-five years, excepting persons exempted by sections two, three and five,

Add. 33

and idiots, lunatics, common drunkards, vagabonds, paupers and persons convicted of any infamous crime, shall be enrolled in the militia.

* * *

SEC. 21. **Designation.**—The active militia shall be composed of volunteers, and shall be designated the Massachusetts Volunteer Militia * * *

## Mich. Gen. Stat. tit. VII, §§ 868, 873 (1882)

SEC. 868. **Persons subject to military duty.**—That all able bodied, white male citizens, between the ages of eighteen and forty-five years, and not exempted by the laws of the United States, or of this state, shall be subject to military duty. The enrolled militia shall not be subject to active military duty except in case of war, rebellion, invasion, the prevention of invasion, the suppression of riots, tumults, and breaches of the peace, and to aid civil officers in the execution of the laws, and the service of process; in which case they may be ordered out for actual service, by draft or otherwise, or so many of them as the necessity demands. * * *

SEC. 873. **Active militia to be known as state troops.**—The active militia shall be composed of volunteers between the ages of eighteen and forty-five years, and shall be known as state troops, and in case of war, rebellion, invasion, the prevention of invasion, the suppression of riots, to aid civil officers in the execution of admitted, the laws of this state, shall first be ordered into service. Minors over the age of eighteen years may be admitted into any company of state troops, with the consent, in writing, of their parents or guardians, or if they have none, with the consent, in writing of a justice of the peace of the township or city in which they reside.

## Act of Mar. 3, 1888, §§ 1, 3, 1888 Miss. Laws. 57, 57

SEC. 1. The militia of the State shall be divided into two classes, viz: the active and the reserve militia.

* * *

SEC. 3. **Active militia.**—The active militia of the State shall consist of the organized and uniformed militia of the State, and shall be designated "The Mississippi National Guard." It shall form an entirely distinct

Add. 34

organization from that of the reserve militia, having its own brigade, regimental, battalion, and company organizations and officers. * * *

**Mo. Rev. Stat. ch. 112, §§ 6923-6925 (1889)**

SEC. 6923. **Who subject to military duty.**—All able-bodied males, inhabitants of this state, between the ages of eighteen and forty-five years, who are citizens of the United States, or have declared their intention to become such citizens, shall be liable to military duty in the militia of this state: * * *

SEC. 6924. **Volunteer militia may be organized.**—In time of peace there may be organized a volunteer militia.

SEC. 6925. **Style of "The National Guard of Missouri."**—The volunteer militia shall be styled "The National Guard of Missouri."

**Neb. Comp. Stat. ch. 56, §§ 1, 3 (1887)**

SEC. 1. **Who liable to duty.**—Every able-bodied male citizen of this state, between the ages of eighteen and forty-five years, not expressly exempted by law, shall be subject to military duty and be designated as the militia.

* * *

SEC. 3. **Number—Enlistment.**—The active militia shall be designated as the "Nebraska National Guard"; shall be recruited by volunteer enlistment; shall consist of not more than two thousand men, and shall be assigned to regiments and brigades by the commander-in-chief. * * *

**N.H. Gen. Laws, tit. 12, ch. 95, §§ 1-2, ch. 96, § 1 (1878)**

**Ch. 95**

SEC. 1. **Enrollment lists, what to contain, by whom made, when filed, etc.**—The names of all male citizens of this State, between the ages of eighteen and forty-five, shall, annually, in April, be enrolled alphabetically by

the selectmen of the towns and places and assessors of the cities in which they respectively reside. * * *

SEC. 2. **Reserved militia.**—All able-bodied male citizens enrolled in this State, not exempt by law and not belonging to the New Hampshire National guard, shall be known as the Reserved Militia of New Hampshire.

* * *

**Ch. 96**

SEC. 1. **Composition of active forces.**—The active militia shall be designated as the New Hampshire National Guard. * * *

**Act of Apr. 6, 1865, § 1, 1865 N.J. Laws 856, 856**

**Militia divided into two classes.**— * * * That the militia of the state shall be divided into two classes, the active and the reserve; in case of draft upon the reserve militia for state service, the contingent supplied thereby may be first applied to fill up any active corps deficient in the maximum number of recruits required to complete such corps.

**Act of Apr. 23, 1883, §§ 1, 7, 1883 N.Y. Laws 417, 417, 419**

SEC. 1. **Persons subject to military duty.**—All able-bodied male citizens and males of foreign birth who shall have declared their intention to become citizens, between the ages of eighteen and forty-five years, residing in this State, and not exempted by the laws of the United States, shall be subject to military duty, excepting: * * *

* * *

SEC. 7. **National guard how composed.**—The uniformed Militia of the State shall constitute and be known as the National Guard of the State of New York, and shall consist of the present uniformed force, and such persons as shall enlist therein; * * *

**N.C. Code §§ 3157, 3258 (1883)**

SEC. 3157. **Of whom composed; exemptions.**—The militia of North Carolina shall consist of those liable to military duty, and every person liable

shall be required to serve in the same unless he shall pay to the county treasurer a yearly contribution of two dollars, or be exempted under the certificate of some practicing physician on account of bodily infirmity.

* * *

SEC. 3258.  **State guard to be composed of volunteers; enlistments for five years.**—The active militia shall be designated The State Guard, and consist of volunteers, and shall be subject at all times to the orders of the officers. * * *

**Ohio Rev. Stat. tit. XV, §§ 3023, 3033-3034 (1890)**

SEC. 3023.  **Who shall be enrolled.**—All male citizens of this state who are eighteen and under forty-five years of age, except persons exempt by law, shall be enrolled in the militia, and perform military duty, in the manner hereinafter prescribed.

* * *

SEC. 3033.  **Active militia: how constituted and apportioned.**—In time of peace, the active militia shall consist of not more than eighty-two companies of infantry, eight batteries of light artillery, and two troops of cavalry, to be allotted and apportioned in such localities of the State as the necessity of the service, in the discretion of the commander-in-chief, may require.

SEC. 3034. **"Ohio National Guard;" active service.**—The active militia shall be known the "Ohio national guard" and may be ordered into active service by the governor to aid the civil officers to suppress or prevent riot or insurrection, or to repel or prevent invasion; and they shall, in all cases, be called into service before the unorganized militia.

**Ore. Codes & Gen. Laws § 3741 (1887)**

**Division of persons subject to military duty into classes.**—All persons subject to military duty under the constitution of this state, and not exempt therefrom by the provisions of this act, and such other male persons as shall voluntarily enroll themselves, shall be divided into two classes, to wit: one consisting of those who enlist in the active militia of the state under the

Add. 37

provisions of this act, which shall be known as the Oregon National Guard; the other to consist of all those subject to military duty, but not included in the above active or enlisted militia,-the latter class to be known as the Oregon Reserve Militia.

**S.C. Gen. Stat., tit. IV, ch. XII, §§ 321-322 (1882)**

SEC. 321. **Who subject to military duty. Who exempt.**—All able-bodied male citizens between the ages of eighteen and forty-five years, residing in this State, and not exempted by the laws of the United States, shall be subject to military duty, and shall constitute the militia of the State, excepting * * *

SEC. 322. **Of what the organized militia shall consist.**—The organized militia of this State shall consist of the Volunteer Troops * * * and the National Guard * * *

**2 Tex. Rev. Stat., tit. 64, ch. 1, §§ 3242-3244 (2d. ed. 1889)**

ART. 3242. **Division of the militia.**—The militia shall be divided into two classes, to be known and designated as—

1. The reserve militia.

2. The volunteer guards

ART. 3243. **Reserve militia.**—The reserve militia shall consist of all persons liable to military duty, who have not attached themselves by enlistment to the volunteer guards.

ART. 3244. **Volunteer guards.**—The volunteer guards shall consist of such persons as by voluntary enlistment have organized themselves into uniformed companies, and have been accepted as such by the commander-in-chief in accordance with the provisions of this title.

**Vt. Rev. Laws, tit. 29, ch. 168, § 3746, 3750 (1880)**

SEC. 3746. **Who to be enrolled. Enrollment how made.**—Able bodied male citizens of this state, between the ages of eighteen and forty-five

years, except as hereinafter provided, shall be liable to perform military duty and shall be enrolled in the militia. * * *

* * *

SEC. 3750.   **Organized militia, how constituted, officered and drilled.**—The organized militia shall consist of one regiment of volunteer infantry of ten companies of fifty-one officers and men each and a battery of light artillery, consisting of not more than eighty officers and men, which shall be armed, drilled and disciplined under such regulations as the commander-in-chief prescribes. * * *

**3. Examples of provisions authorizing drills, inspections, parades, escort, and other military exercises.**

**Ala. Code § 190 (1887)**

      **Monthly drills, etc.**—The commanding officer of any company may, and on the direction of the regimental commander must, and by him shall order at least one drill a month; and officers and members failing, without good excuse, to attend such drill, shall be subject to a fine, in the discretion of a court martial, not exceeding twenty dollars. The commanding officer of a regiment may, when two or more companies are stationed at the same place, order a battalion drill or dress parade once in each month, and on memorial clay, and on the occasion of the funeral of any officer or member of the state troops; and any officer or member of the state troops failing, without good excuse, to obey such order, shall be fined, in the discretion of a court-martial, not exceeding thirty dollars. Any officer failing, without good excuse, to attend any such drill or parade, so ordered, may, with the approval of the governor, be dishonorably dismissed.

**Act of July 14, 1868, No. XVIII, § 6, 1868 Ark. Acts of Gen. Assembly 44, 46**

      The State Guard and the Reserve Militia may be organized into companies, batteries, regiments, brigades and divisions, in the same manner as the army of the United States, and the Commander-in-Chief may, by general and special orders, provide for the organization of the same, detail officers to command the brigades and divisions, and such staff officers as shall be required for that duty; and he may, from time to time, as he shall deem necessary, provide by general and special orders for inspections, musters, instructions, reviews or other duties. * * *

**Colo. Gen. Stat. ch. LXXIII, §§ 2345-2346 (1883)**

      SEC. 2345.    **Drills-Company-Battallon-Regiment-When.**—There shall be a company, troop, and battery drill at least once every month, and a battery [battalion] drill of each battalion or regiment at least once in each year, at the time and place most convenient.

Add. 40

SEC. 2346. **Inspection twice a year.**—The inspector-general, or an officer acting under his authority, shall publicly inspect each company, troop and battery twice in each year, once in and including its armory, and once during the encampment, or at some other suitable time.

### Conn. Gen. Stat. § 3136 (1887)

**Governor alone to call out the militia.**—No person except the Commander-in-chief shall call out the militia or national guard of this State for any duty whatever. But the Commander-in-chief may make such regulations for calling out the national guard for drill, parades, and inspections as seems to him proper in conformity with law, and the said guard may be called out by the proper officers for these purposes, and no other.

### Fla. Code § 561 (1892)

**Inspection at.**—The adjutant-general shall inspect the troops at each encampment, and shall report to the governor in writing on their drill, discipline, the condition of their arms, accoutrements, and whether any company or battery has not present the minimum number of enlisted men, properly uniformed and equipped.

### Act of Oct. 13, 1885, No. 355, § VIII, Ga. Acts & Resolutions 74, 78 (1885)

**Parades and inspection.**—Every company of volunteers shall parade at least four times in every year, and every battalion at least once every year, the times to be appointed by the rules adopted by such company or battalion, or in the absence of such rules, by its commanding officer. The Governor may order such other parades, not exceeding one in any year, of any company or battalion, as he may think proper, for inspection or review by the adjutant and inspector general, or such officer of volunteers as he may designate for that duty.

### Ill. Rev. Stat. ch. 129, §§ 17, 19, 23 (1887)

SEC. 17. **Drills.**—The commanding officer of each regiment, battalion, company, troop or battery may order weekly evening drills.

\* \* \*

Add. 41

SEC. 19. **Powers of commander of encampment or parade.**—The commanding officer of any encampment or parade may cause those under his command to perform any field or camp duty he shall require * * *

* * *

SEC. 23. **Annual inspection—expenses, how paid.**—The entire Illinois National Guard, and all armories. ordnance stores and camp equipage belonging to the State, shall be inspected at least once in each year, under such rules and regulations as may be provided by the inspector general with the approval of the commander in chief, and all the necessary traveling expenses incurred therein shall be paid on requisition in the same manner as hereinafter provided for.

### Ind. Rev. Stat. ch. 84, § 5391 (1881)

**Parade and drill.**—Commanders of companies shall cause their companies to parade not less than four times in each year. They shall, in addition thereto, order such company drills as may be proper; which shall not be less than twelve drills per annum.

### Iowa Code tit. VII, ch. 1, §§ 20-21, 25 (1888)

SEC. 20. **Drill by companies.**—The commandant of each regiment shall order monthly or semi-monthly, day or evening drills, by the companies of his command, and the members thereof shall receive no compensation for their services while attending such drills.

SEC. 21. **Parade for drill each year.**—The Iowa national guard may parade for drill not less than three nor more than five days annually, by company, regiment, or brigade, as ordered by the commander-in-chief. * * *

* * *

Sec. 25. **Inspection.**—Such inspection of the Iowa national guard shall be made as the commander-in-chief may from time to time direct.

### Kan. Comp. Laws ch. 64, § 15 (1885)

**Annual muster.**—There shall be an annual muster and-camp of instruction of the Kansas national guard, at such time and place, or places, as

Add. 42

the commander-in-chief may designate, at which time the companies shall be drilled, inspected, and reviewed, by battalions, regiments, and brigade. * * *

**La. Rev. Stat, Militia, §§ 1466-1467 (1896)**

SEC. 1466. **Militia may be ordered for escort or other duties.**—The commander-in-chief may order out any portion of the militia for escort or other duties. The commanders of companies or corps so ordered out shall present their accounts for necessary music to the quartermaster-general, who shall pay them out of the money of the State in his hands.

SEC. 1467. **Companies authorized to meet for purpose of drill, funeral or other escort or voluntary service.**—Nothing herein contained shall be construed to prevent any company from meeting for the purpose of drill, funeral or other escort, or a voluntary service, nor to impair the obligations arising under constitutional articles of agreement adopted by the company, so far as regards the members who have signed the same, unless they are repugnant to law. * * *

**1880 Me. Laws 222, § 85 (ch. 225)**

**Company parade and drills.**—The volunteer militia shall parade by companies on the first Tuesday in May for inspection, company drill and manoeuvre. They shall also be assembled for drill not less than three hours in each month.

**Mass. Gen. Laws. ch. 411, §§ 106, 114-115 (June 14, 1887)**

SEC. 106. **Annual parade for drill and inspection.**—Each regiment, separate battalion, corps of cadets and unattached company of the volunteer militia shall parade for drill one day in each year, at such time and place as the commander-in-chief may designate. The inspector general, his assistants or such other officers as the commander-in-chief shall indicate, shall attend such drills and report upon the proficiency of the troops; such report to be made to the commander-in-chief, in writing, within thirty days from the date of such drill.

* * *

Add. 43

SEC. 114. **Escort duty.**—The commander-in-chief may order out any portion of the militia for escort and other duties, and may authorize the use of mounted bands.

SEC. 115. **Companies or officers may be assembled for evening drill or instruction, etc.**—The commander of any regiment, battalion or corps of cadets, whose companies are located within a radius of three miles, may at any time assemble the companies, or the officers of his command, for evening drill, instruction or other business; and commanders of brigades, regiments, battalions and corps of cadets may order company inspections in the evening at the several company armories, whenever the good of the service may demand.

## Minn. Gen. Stat. ch. 12, §§ 35, 38 (1889)

SEC. 35. **Annual inspection.**—There shall be an annual inspection of the National Guard by the inspector general, at such time and place as may be directed by the commander in chief.

* * *

SEC. 38. **Drills.**—Every company or battery of the National Guard of this state shall make at least thirty company drills or parades in each year, exclusive of camp and actual service.

## Neb. Comp. Stat. ch. 56, §§ 30, 41 (1887)

SEC. 30. **Inspection of arms, armories, etc.**—The commander-in-chief may from time to time require the inspector general, or an officer detailed for the purpose, to examine any armory, or arms, equipments, etc., provided as aforesaid, and to report to him the condition thereof, and of the arms, etc., therein deposited.

* * *

SEC. 41. **Same—Parades.**—The place of encampment shall be designated by the proper commanding officer, subject to approval by the commander-in-chief. Orders for encampment shall be given at least twenty days prior thereto, and for parade at least five days prior thereto, by depositing the same in the mail, properly addressed to the person to be notified by leaving

Add. 44

the same at his usual place of abode, or by reading the same to his respective commands. Each battery of artillery shall parade one day in September for drill in its own town, and the commander-in-chief, may at his discretion, order any battery of artillery to attend the regimental or brigade encampment. No member of the Nebraska National Guard shall be exempt or relieved from military duty by membership or service in any fire company.

### Nev. Gen. Stat. ch. V, § 667 (1885)

**Duties of Commander-in-Chief.**—The Commander-in-Chief may, in his discretion, order a public parade of all the organized militia of the state, on two days of each year, such parades to be held within the limits of the brigade to which such troops respectively belong, and such public parades shall be reviewed by the Commander-in-Chief, or in his absence, by the Major-General of Division, or by the officer of the brigade of the highest rank present. Immediately after such troops have been reviewed, they shall be inspected by the Inspector-General, or, in his absence, by the Division or Brigade Inspector; and such inspecting officer, after a minute inspection of the dress and military bearing of the field officers and commissioned staff, and the officers of companies, and the arms, accoutrements, and dress of each soldier, will report the result of such inspection to his commanding officer * * *

### N.H. Gen. Laws tit. 12, ch. 100, §§ 1-2 (1878)

SEC. 1. **Annual company parade.**—The commanding officer of every troop, platoon, battery, or company shall, on the second Tuesday in May, annually, at one o'clock in the afternoon, parade his command, at which parade he shall inspect the arms and equipments of his men.

SEC. 2. **Other company parade.**—He shall also parade his troop, platoon, battery, or company one other half-day previous to the annual encampment, and may parade them at such other times as the company may authorize by a vote of two-thirds of the company present at any parade duly warned; and, at all parades, he shall drill and instruct his company in military exercises and evolutions.

Add. 45

**N.J. Pub. L. No. 1869 § 43 (Mar. 9, 1869)**

**Written or printed notices of parades to be given.**—That the orderly sergeant or acting orderly sergeant of each company shall notify every member thereof of any parade ordered in pursuance of this act, by a written or printed notice to be left at the residence or place of business of such member, or sent by mail, at least two days before the time specified for such parade; at the time and place of meeting named in said orders, the orderly sergeant shall call the roll of the company, and shall make a true list of all present or absent at each roll call; if the company be part of any battalion, regiment or brigade, then the commandant of the company shall make copies of the return of' the sergeant, and certify and forward the same to the commandant of the battalion, regiment or brigade; adjutants and assistant adjutant generals shall in like manner, by service of written or printed notice or by mail, three days prior to the day fixed for parade, notify commissioned officers, call the roll of officers, and make return to the commanding officers in cases of battalion, regimental or brigade parade.

**Act of Apr. 23, 1883, §§ 67-69, 1883 N.Y. Laws 417, 436-37**

SEC. 67. **Annual inspection and muster, etc.**—An annual inspection and muster of all organizations of the National Guard shall be made by the Inspector-General or his assistants, at such time and place as the Commander-in-Chief shall order. No person shall be mustered at the annual muster and inspection, or be permitted in the ranks on any parade or drill required by this act, who does not appear uniformed, armed and equipped, according to the provisions of this act; and all members of the National Guard, who shall appear without such uniform, arms and equipments, at any parade or drill required by this act, to shall be returned as absent and fined accordingly. * * *

SEC. 68. **At least five compulsory drills and parades during the year.**—Officers—other than General and staff officers—and enlisted men, shall be obliged to perform, during the year, not less than five compulsory drills and parades, including inspection and muster and camp duty. * * *

SEC. 69. **Sale of liquors, gambling and huckster sales, etc. prohibited.**—The Commanding Officer at any parade or drill may cause

Add. 46

those under his command to perform any military duty he shall require; and may place in arrest for the time of such parade any officer or enlisted man who shall disobey the orders of his superior officer, or in any way interrupt the exercises; and also any other person or persons who shall trespass on the parade ground or armory, or in any way or manner interrupt or molest the orderly discharge of duty of those under arms; and also may prohibit and prevent the sale or use of all spirituous liquors, wine, ale or beer, within the limits of such parade or encampment, such limits to be prescribed in orders by the officer ordering the parade or encampment, and, also, in his discretion, all huckster or auction sales, or gambling, may be abated as nuisances. * * *

* * *

SEC. 75.  **Any body of men, except national guard, etc., to associate as a military company and to parade, to be a misdemeanor.**—It shall not be lawful, but it shall be a misdemeanor, for any body of men whatsoever, other than the regular organized corps of the National Guard and Militia and the troops of the United States, except such independent military organizations as are now in to existence, to associate themselves together as a military company or organization, or to parade in public with fire-arms in any city or town of this State; nor shall it be lawful for any city or town to raise or appropriate any money toward arming, equipping, uniforming, or in any other way supporting, sustaining, or providing drill rooms or armories for any such body of men; *provided*, that associations wholly composed of soldiers honorably discharged from the service of the United States may parade in public with fire-arms on Decoration Day or upon the reception of any Regiments or Companies of soldiers returning from said service, and for the purpose of escort duty toward at the burial of deceased soldiers; * * *

**Ohio Rev. Stat., tit. XV, §§ 3076-3077 (1890)**

SEC. 3076.  **Company, battalion and regimental drills; instruction in tactics, etc.**—Each company of the national guard shall assemble for drill and instruction at least twice in each month from October to April, inclusive, once and in each month from May to September, inclusive, and the commanding officer of each regiment and battalion shall inspect at least one

Add. 47

drill of each company of his command during the semi-monthly drill season, or detail a field officer for such inspection. * * *

SEC. 3077. **Public inspection.**—The adjutant-general, or an officer acting under his authority, shall publicly inspect each company, troop, and battery twice in each year—once in and including its armory, and once during the encampment, or at some other suitable time.

## Ore. Codes & Gen. Laws § 3756 (1887)

**Annual muster and camp.**—There shall be an annual muster and camp of instruction of the Oregon National Guard at such time and place or places as the commander-in-chief may designate, at which time the companies shall be drilled, inspected, and reviewed by battalions, regiments, and brigade; * * *

## Pa. Digest Laws, National Guard § 101 (1883)

**Parade for inspection and drill by regiments and companies.**—It shall be the duty of the commander-in-chief to cause all the enrolled militia of the commonwealth to be organized and officered, in like organizations as is provided in the act to which this act is a supplement, relative to volunteer militia, and shall by general orders, require said militia to parade for inspection and drill, by companies, at least three times in each year, and by regiments, at least twice a year; and on failure to perform such military duty, each commissioned officer shall be subject to a fine of five dollars, and each non-commissioned officer and private to a fine of three dollars per day, for each day on which they shall fail to attend said parade.

## S.C. Gen. Stat., tit. IV, ch. XII, §§ 372, 374 (1882)

**Parades, Drills, etc.—**

SEC. 372. Commanders of companies shall cause their companies to parade not less than once in each year; in addition to such parades, they shall order company drills not less than two times each year. Regimental, brigade, and division commanders, may order out their respective commands, or any part of them, for parade, drill, review, or inspection, at such times and places as they may deem most convenient. The Commander-in-Chief may order

Add. 48

reviews or encampments of such portions of the militia at such times and places as he shall deem proper.

* * *

SEC. 374. The commanding officer at any parade or drill may cause those under his command to perform any field or camp duty he shall require; and, also, may put under guard, for the day or time of continuing such parade or drill, any officer, non-commissioned officer, or private, who shall disobey the order of his superior officer, or in any way or manner interrupt the exercises of the day. * * *

**Vt. Rev. Laws, tit. 29, ch. 168, §§ 3769-3770 (1880)**

SEC. 3769.  **Annual company drill.**—There shall be, in each year, in the month of June, one day designated by the commander-in-chief for each company for drill and inspection, at such place near the headquarters of said company as the commanding officer directs, and the first sergeant of each company shall give notice of the time and place of parade of such company, by posting up the order for that purpose two weeks previously at four public places near the headquarters of the company, which shall be sufficient notice to every member to appear at such time and place under the penalties herein provided.

SEC. 3770.  **Annual regimental parade.  Additional parades.**— There shall be annually, between the first day of August and the fifteenth day of October, a parade of the organized militia, for drill, discipline, inspection and review, at such times and places as the commander-in-chief directs, which parade shall continue not less than three days, and not more than five days. And the commander-in-chief may order additional parades each year by company, regiment or battery, as he deems advisable, not exceeding three days in each year, at such time and place as he directs and subject to such regulations as he prescribes. Notices of parades shall be given at such time and in such manner as the commander-in-chief prescribes.

**Va. Code, tit. 11, § 361 (1887)**

SEC. 361. **Commanding officer may require any camp or field duty of his command; may fix bounds to his parade.**—The commanding officer at any parade my cause those under his command to perform any field or camp duty he shall require; and also may put under guard or arrest, for the day or time of continuing such parade, any officer or soldier who shall disobey the orders of his superior officer, or in any way interrupt the exercises of the day. * * *

**Wis. Stat. Ann., tit. VIII, § 633 (1889)**

**When companies to assemble.**—All companies of the organized Wisconsin national guard of this state shall assemble at least once in two months for instruction; and all members who absent themselves from such meetings for instruction during three consecutive meetings, unless properly excused by the commanding officer of such company, or through absence from the county, or bodily disability, shall, in addition to all other prescribed penalties, be debarred from the exemption of jury duty and poll tax, and subject to exclusion from their company. The governor may order any company or battery or all the Wisconsin national guard to assemble for instruction, parade, review or exercise, at such other times and places, and for such length of time, as he shall think proper, or make any other orders relating thereto.

**W. Va. Code ch. XXII, § 1 (1887)**

The governor may order such musters, (which word shall be deemed to include parades, reviews, trainings, inspections, and encampments) in time of war, insurrection, invasion, or great public danger, in the several divisions, brigades, regiments and company districts, or any of them, and such returns, as he shall deem necessary or proper. * * *

Add. 50

**4. Provisions authorizing commanders-in-chief to deploy the militia during exigencies such as insurrections, invasions, and riots.**

**Act of July 14, 1868, No. XVIII, §§ 13-14, 1868 Ark. Acts of Gen. Assembly 44, 49-50**

SEC. 13.  In time of war, rebellion, insurrection, invasion, resistance of civil process, breach of the peace, or imminent danger thereof, the Governor shall have full power to order into active service the military force of this State.

SEC. 14. It shall be the duty of the Commander-in-Chief, when he is advised or believes that the enforcement of the civil or criminal law is or may be so obstructed that it would be dangerous or impossible for the Sheriff to enforce the same without a posse, to authorize the Sheriff of such county, or his deputy, to call upon the commander of the State Guard or Reserve Militia to render such aid as is necessary to execute the law in such cases. * * *

**Cal. Pol. Code § 2039 (1886); Cal. Crim. Code § 728 (1886)**

**Cal. Pol. Code**

SEC. 2039. **Militia, when and by whom called into actual service.**— In case of war, insurrection, or rebellion, or of resistance to the execution of the laws of this state, or upon the call or requisition of the president of the United States, or upon the call of any officer of the United States army commanding a division, department, or district in California, or upon the call of any United States marshal in California, or of the chief executive officer of any city, or of any sheriff, the commander-in-chief is authorized to call into active service any portion of the national guard or enrolled militia.

**Cal. Crim. Code**

SEC. 728.  **Officers who may order out the military.**—When there is an unlawful or riotous assembly with the intent to commit a felony, or to offer violence to person or property, or to resist by force the laws of the state or of the United States, and the fact is made known to the governor, or to any justice of the supreme court, or to the district judge of that judicial district, or to the county judge or sheriff of the county, or to the mayor of a city, or to the

Add. 51

president of the board of supervisors of the cities and counties of Sacramento and San Francisco, either of those officers may issue an order directed to the commanding officer of a division or brigade of the organized national guard or enrolled militia of the state, to order his command, or such part thereof as may be necessary, into active service, and to appear at a time and place therein specified to aid the civil authorities in suppressing violence and enforcing the laws.

**Colo. Gen. Stat. ch. LXXIII, §§ 2294, 2359 (1883)**

SEC. 2294. **Of what troops the militia shall consist—Number—Apportionment.**—The organized militia * * * may be ordered into active service, by the governor, to aid the civil officers to suppress, or prevent riot, or insurrection, or to repel, or prevent invasion, and they shall in all cases be called into service before the unorganized militia.

SEC. 2359. **Mob—Riot—Duty of sheriff—Of commander.**—Whenever, in any county, there is a tumult, riot, mob, or any body of men acting together with intent to commit a felony, or to do or offer violence to person or property, or by force and violence to break or resist the laws of the State, and the civil authorities are unable to suppress the same, or there is reasonable apprehension thereof, the commander-in-chief, or the sheriff of the county during the absence of the commander-in chief from such county, may issue his call to the commanding officer of any regiment, battalion, company, troop or battery, to order his command, or any part thereof, describing the same, to be and appear at a time and place therein specified, to act in aid of the civil authority.

**Conn. Gen. Stat. §§ 3134, 3137, 3146 (1887)**

SEC. 3134. **Active militia.**—The active militia shall be organized as hereinafter mentioned, and designated as the Connecticut National Guard, and said guard shall be liable at all times to be ordered into active service, and shall first be called out by the Commander-in-chief on all occasions for military service, and may be by him turned over into the service of the United States, on requisition by the President, for service without the State, not exceeding three months in any one year. In time of war, invasion, rebellion,

Add. 52

or riot, or reasonable apprehension thereof, or upon requisition by the President of the United States, the Commander-in-chief may order out, for active service, such further portion of the militia as he may deem necessary, designating the same by draft, if a sufficient number shall not volunteer, and may organize the same and appoint and commission officers therefor; and when so ordered out for service, the militia shall be subject to like regulations and receive from the State like compensation, as that prescribed for the army of the United States.

\* \* \*

SEC. 3137.  **In case of riot or civil commotion.**—In case of riot or civil commotion at any place in the this State, any officer whose duty it is to enforce the civil authority at such place, shall, if he considers that the force at his disposal is not sufficient, inform the Commander-in-chief, who may order out such portion of the national guard as he thinks proper, and may direct the proper commanding officer of such force to communicate with the person making the application and to assist such person in preserving the peace, and to use such portion of his force as may be necessary therefor. But before using this force against any body of men, such preliminary warning shall be given and precautions taken as are provided by law.

\* \* \*

Sec. 3146.  **Governor to be Commander-in-Chief.**—The Governor shall be Commander-in-chief of the militia, except when turned over into the service of the United States, and may employ it, or any part of it, for the defense or relief of the State or any part of its inhabitants or territory; may make and publish regulations for the government of the national guard, in accordance with the laws of this State, and shall have all the powers necessary to carry into full effect the provisions of this title.

**Del. Laws, ch. 25, § 14 (1883)**

When it may be necessary to use any military force for public defense against foreign or domestic violence, the Governor shall have power, according to the emergency, to call out any volunteer companies or troops, or any part thereof, for that purpose; and the sheriff of any county, or any two

magistrates thereof, may by a written order, addressed to the captain or commanding officer of any company, or troop, or the major of any battalion, or colonel of any regiment, within the county, require the aid of such company, troop, battalion, or regiment for the suppression of a riot and the protection of the peace of the county. * * *

**Fla. Code §§ 525-526 (1892)**

SEC. 525. **Calling into active service, in case of war, rebellion, etc.**—In case of war, insurrection or rebellion, or of resistance to the execution of the laws of this State, or upon the call of any officer of the United States army in command of troops within the State, or upon the call of any United States marshal in the State, or of any mayor of any city, or of any county judge, the commander-in-chief is authorized to call into active service any portion of the volunteer militia of the State. * * *

Sec. 526. **In case of riot, etc.**—First. In any case of insurrection, riot, mob, unlawful assembly or resistance to the execution of the laws of this State, and the civil authorities are unable to suppress such insurrection, riot, mob, unlawful assemblage, or resistance to the execution of the laws, it shall be the duty of the governor of the State, if present, and in case the governor is not present, it shall be the duty of the county judge of the county where such insurrection, riot, unlawful assembly, or resistance to the execution of the laws occurs, or if the county judge is not present it shall be the duty of the sheriff of the county, or the mayor of any incorporated city or town within whose limits such insurrection, mob, riot, unlawful assembly, or resistance to the execution of the laws may occur, to issue his order in writing to the officer in command of the nearest body of volunteer militia of this State, commanding such officer to call out the troops under his command, and to proceed with all promptness to suppress such insurrection, mob, riot, unlawful assembly, or resistance to the execution of the laws. * * *

**Act of Oct. 13, 1885, No. 355, § IX, Ga. Acts & Resolutions 74, 75 (1885)**

In case of any invasion, rebellion, insurrection or probable prospect thereof, the Governor shall have authority to order into the service of the State such portion of the volunteer forces as in his judgment the occasion shall

Add. 54

require * * * Whenever any judge of the superior court, city-court judge, sheriff, or mayor of any incorporated city, town or village in this State shall have reasonable cause to apprehend the outbreak of any riot, rout, tumult, insurrection, mob, or combination to oppose the enforcement of the laws by force or violence, within the jurisdiction in which such officer is by law a conservator of the peace, which cannot be speedily suppressed or effectually prevented by the ordinary *posse comitatus* and peace-officers, it shall forthwith become the duty of such judge, sheriff, or mayor to report the facts and circumstances, in writing, to the Governor, and request him to order out such portion of the volunteer forces of this State as may be necessary to enforce the laws and preserve the peace; and it thereupon shall be the duty of the Governor, if he deem such apprehension well founded, to order out, or direct to be held in readiness, such portion of the volunteer forces of the State as he may deem advisable for the proper enforcement of the law, and he may direct the officer in command of the troops to report to the officer making such application, or any one or more of them, and to obey the orders of such civil officer, or if the Governor deem it advisable, may specially instruct the officer in command of such troops as to the duties required of them, and direct their execution under the immediate control of the Governor. * * *

## Ind. Rev. Stat. ch. 84, §§ 5387, 5400 (1881)

SEC. 5387. **Articles of war.**—Whenever any portion of the active militia shall be ordered to assemble for the purposes of military instruction, under the authority of the Governor; or whenever any part of the State forces shall be ordered to assemble under his authority in time of war, invasion, insurrection or public danger,—the rules and articles of war and the general regulations for the government of the army of the United States, with such modifications as the Governor may prescribe, shall be considered in force, and regarded as part of this Act during the continuance of such instructions and to the close of such state of war, invasion, insurrection or public danger; but no punishment under such rules and articles which shall extend to the taking of life shall, in any case, be inflicted, except in time of actual war, invasion, or insurrection, declared by proclamation of the Governor to exist or to be threatened or anticipated.

Add. 55

* * *

SEC. 5400. **Calling out troops.**—Whenever there shall be, in any city, town, or county, any tumult, riot, mob, or any body of men acting together by force, with intent to commit any felony or misdemeanor, or to offer violence to any persons or property, or by force and violence to break and resist the laws of this State, or the laws or authorities of the United States; or any such tumult, riot, or mob, shall be threatened, and the fact be made to appear to the Governor, to the Mayor of any city, or to any Court of record sitting in said city or county, or any Judge thereof, or to the Sheriff of said county, or, in his absence, to his lawful deputy, the Governor may issue his order, or such Mayor, Court, Judge, Sheriff, or Deputy Sheriff may, in writing, direct the senior or other military officers convenient to the scene of disturbance, to turn out such portion of his or their command as may be necessary to quell, suppress, or prevent such tumult or threatened tumult. Any officer or member of the military who shall fail promptly to obey such orders and directions of said civil officers shall be cashiered.

## Iowa Code tit. VIII, ch. 1, §§ 4-5 (1888)

SEC. 4. **In case of insurrection, etc., may be ordered out.**—The commander-in-chief shall have power, in case of insurrection, invasion, or breaches of the peace, or imminent danger thereof, to order into the service of the state such of its military force as he may deem proper, and under the command of such officers as he shall designate.

SEC. 5. **Sheriff can call on any commandant: when.**—In case of any breach of the peace, tumult, riot, or resistance to process of this state, or imminent danger thereof, it shall be lawful for the sheriff of any county to call for aid upon the commandant of any military force within his county, immediately notifying the governor of such action; and it shall be the duty of the commandant upon whom such call is made, to order out in aid of the civil authorities the military force, or any part thereof, under his command.

## Kan. Comp. Laws ch. 64, §§ 18, 27, 29 (1885)

SEC. 18. **War.**—In case of war, insurrection, invasion, or imminent danger thereof, or any forcible obstruction to the execution of the laws, or

Add. 56

reasonable apprehension thereof, the governor, if he deems the organized national guard insufficient to defend the state, or to aid the civil authorities to enforce the laws, may, in his discretion, either call for volunteer recruits to temporarily fill companies and batteries of the national guard to the maximum strength, or authorize the temporary organization of volunteer companies or batteries, or he may do both. Such temporary volunteers shall be discharged when directed by the commander-in-chief, or as soon as the emergency for which they were required has passed; and while in such service they shall be the subject to the same discipline and penalties, and receive the same pay, as the regular national guard.

\* \* \*

SEC. 27. **Commander-in-chief.**—The commander-in-chief shall have power, in case of invasion, insurrection, or breaches of the peace, or imminent danger thereof, to order into the service of the state any of the companies, batteries, battalions, regiments or brigades of the Kansas national guard or of the militia force of the state that he may deem proper, and under the command of such officers as he shall designate \* \* \*

\* \* \*

SEC. 29.  **Breach of Peace.**—In case of any breach of the peace, tumult, riot, or resistance to process in this state, or imminent danger thereof, it shall be lawful for the sheriff of any county, or the mayor of any city, to call for aid upon the commanding officer of any regiment, battalion or company; and it shall be the duty of the said commanding officer upon whom such call is made, to order out in aid of the civil authorities the military force, or any part thereof, under his command, reporting immediately what he has done, and all the circumstances attending the same, to his immediate commanding officer, and also to the commander-in-chief.

## Ky. Gen Stat. ch. 76, § 36 (1887)

**Governor may call out State Guard in case of public danger.**— Whenever, in the judgment of the Governor of this Commonwealth, any actual or threatened invasion, domestic violence, or other great public danger, makes it necessary to render military aid to the civil power of the government for the

enforcement of law, the preservation of peace, and the security of the rights, lives, or property of citizens, he may order into active service so much of the State Guard as he may deem necessary, and may employ them anywhere in of this Commonwealth. * * *

**La. Rev. Stat. §§ 1468, 1470 (1884)**

SEC. 1468. **Duty of the commander in chief in relation to invasion of or insurrection in the State.**—When an invasion of or insurrection in the State is made or threatened, the commander-in-chief shall call upon the militia to repel or repress the same, and may order out divisions, brigades, regiments, battalions or companies, or may order to be detached parts of companies thereof, or any number of men to be drafted therefrom, and may cause officers to be detailed sufficient with those attached to the troops to organize the forces.

* * *

SEC. 1470. **Duty of the commander-in-chief with regard to mob, tumult, etc.**—When there is in any parish a tumult, riot, mob, or body of men acting together by force, with intent to commit a felony or to offer violence to persons or property, or by force and violence to break and resist the laws of the State, or when such tumult, riot or mob is threatened, and the fact is made to appear to the commander-in-chief, he may issue his order to any commander of a division, brigade, regiment, battalion or corps, directing him to order his corps or a part thereof (describing the kind and number of troops) to appear at a time and place therein specified, to aid the civil authority in suppression such violence and supporting the laws.

**Md. Code, Pub. Gen. Laws, art. LXV, §§ 2, 29 (1888)**

SEC. 2. In case of war, rebellion, insurrection or threatened invasion of this or any neighboring State, the governor, as commander-in-chief, is hereby authorized to order out for actual service, either by calling for volunteers, by draft or otherwise, as many of the militia as the exigency may, in his judgment, require; and in such case he is hereby vested with the full power and authority to make all needful rules and regulations therefor, which rules and regulations shall have the force of law.

\* \* \*

SEC. 29. The force thus composed and organized shall be considered in the actual military service of this State, and liable to be called into actual service at any time for the repression of disorder and for the protection of property in aid of the civil authorities and the police of the State \* \* \*

**Nev. Gen. Stat. ch. V, §§ 660, 681 (1885)**

SEC. 660. **May be called into active service. Who may call out troops.**—In case of war, insurrection, or rebellion, or of resistance to the execution of the laws of this state, or upon the call of any officer of the United States army, commanding a division, department, or district in Nevada, or upon the call of any United States Marshal in Nevada, or of any Mayor of any city, or Chairman of the Board of Commissioners of any county, or of any Sheriff, the Commander- in-Chief is authorized to call into active service any portion of the organized or enrolled militia of this state. \* \* \*

\* \* \*

SEC. 681. **Civil officers in certain cases may control troops.**—Whenever any portion of the organized or enrolled militia shall have been called into active service to suppress an insurrection or rebellion, to disperse a mob, or to enforce the execution of the laws of this state, or of the United States, it shall be competent for the Commander-in-Chief, or the General acting in his place, as provided in section thirty-nine, to place such troops under the temporary direction of the Mayor of any city, or Chairman of the Board of County Commissioners of any county, or of any Sheriff of any county, or of any Marshal of the United States \* \* \*

**Act of Mar. 9, 1869, §§ 76-77, 1869 N.J. Laws 251, 275-76**

SEC. 76. **In case of invasion term of service not to exceed three months.**—That the commander in chief may, in case of invasion or other emergency, order out any company, battalion, regiment, brigade or division of the national guard, to march to any part of the state and continue in service so long as he may think necessary, not exceeding three months.

Add. 59

SEC. 77.  **Powers of sheriffs, &c. in case of riot.**—That in case of any breach of the peace, tumult, riot, or resistance to process of this state, or apprehension of immediate danger of the same, in any city or county of the state, it shall be lawful for the mayor of such city or the sheriff of such county to call for aid from any brigade, regiment, battalion or company of such city or county, by application to the proper authority, and it shall be the duty of the commanding officer of such brigade, regiment,. battalion or company to whom such application is made in writing, to order out verbally or otherwise in aid of the civil authorities, the military force, or any part thereof under his command, and to provide the force so ordered out, with the requisite ammunition for the service; and he shall be reimbursed therefor out of the treasury of the state, on proof to the comptroller of his disbursement so made.

**Act of Apr. 23, 1883, §§ 77, 79, 1883 N.Y. Laws 417, 440**

SEC. 77.  **Power of commander-in-chief in case of invasion, etc. to order into service.**—The Commander-in-Chief shall have power, in case of insurrection, invasion or breaches of the peace, or imminent danger thereof, to order into the active service any and all of the Troops, Batteries, Companies, Battalions, Regiments, Brigades or Divisions of the National Guard, or of other Militia or military organizations of the State, that he may deem proper * * * .

SEC. 79.  **Sheriffs or mayors may call on commander of nat. guard in case of any breach of peace, etc.**—In case of any breach of the peace, tumult, riot, or resistance to process of this State, or imminent danger thereof, it shall be lawful for any sheriff of any county, or the mayor of any city, to call for aid upon the Commandant of the National Guard stationed therein or adjacent thereto; and it shall be the duty of such Commanding Officer upon whom the call is made to order out, in aid of the civil authorities, the military force or any part thereof, under his command, and he shall immediately report what he has done and all the circumstances of the case to the Commander-in-Chief, and in such case it shall not be necessary for Commanders of Troops, Batteries or Companies to issue written orders or notices for calling out their men, but verbal orders and notices shall be sufficient.

**N.C. Code ch. 35, § 3257 (1883)**

**State guard liable to active service.**—The state guard hereinafter mentioned shall be liable at all times to be ordered into active service, and shall first be called on by the commander-in-chief on all occasions for military service. In time of war, invasion, rebellion, insurrection or riot, or reasonable apprehension thereof, the commander-in-chief may order out for active service such further portion of the militia as he may deem necessary, designating the same by draft if a sufficient number shall not volunteer, and may organize the same and appoint and commission officers therefor, and when so ordered out for service the militia shall be subject to like regulations and receive from the state like compensation as that prescribed for the army of the United States; and the governor may, whenever the exigences of the public service require it, detail for special duty any officer of the state guard, and his expenses and compensation therefor shall be paid upon the approval of the governor and warrant of the auditor. * * * *

**Ohio Rev. Stat. tit. XV, §§ 3034, 3096-3097 (1891)**

SEC. 3034.  **"Ohio National Guard;" active service.**—The active militia shall be known the "Ohio national guard," and may be ordered into active service by the governor to aid the civil officers to suppress or prevent riot or insurrection, or to repel or prevent invasion; and they shall, in all cases, be called into service before the unorganized militia.

* * *

SEC. 3096.  **When militia required to aid civil authority.**— Whenever, in any county, there is a tumult, riot, mob, any body of men acting together with intent to commit a felony, or do or offer violence to person or property, or by force and violence to civil authority. break or resist the laws of the state, or there is reasonable apprehension thereof, the commander-in-chief, the sheriff of the county, the mayor of any municipal corporation therein, or a judge of any court of the state or the United States, may issue his call to the commanding officer of any regiment, battalion, company, troop, or battery, to order his command, or any part thereof, describing the same, to be and appear, at a time and place therein specified, to act in aid of the civil authority.

Add. 61

SEC. 3097.  **Must obey call of the civil authority**—The officer to whom the call is directed shall forthwith order the troops therein mentioned to parade at the time and place appointed; and if he neglect or refuse to obey, or if any officer refuse authority or neglect to obey any order issued in pursuance of such call, he shall be cashiered, and be further punished by fine, and imprisonment not exceeding six months, as a court-martial may adjudge; and an enlisted man who neglects or refuses to appear at the place of parade, or to obey any order issued in such case; or a person who advises or endeavors to persuade an officer or soldier to refuse or neglect to appear at such place, or to obey such order, shall be imprisoned not exceeding six months, or fined not exceeding one thousand dollars, or both.

### Ore. Code & Gen. Laws ch. LVIII, § 3759, 3768 (1887)

SEC. 3759.  **Power of governor to call out militia.**—In case of war, insurrection, invasion, or imminent danger thereof, or any forcible obstruction to the execution of the laws, or reasonable apprehension thereof, the governor, if he deems the organized National Guard insufficient to defend the state or to aid the civil authorities to enforce the laws, may, in his discretion, either call for volunteer recruits to temporarily fill companies and batteries of the National Guard to the maximum strength, or authorize the temporary organization of volunteer companies or batteries, or he may do both; such temporary volunteers shall be discharged when directed by the commander-in-chief, or as soon as the emergency for which they were required has passed; and while in such service they shall be subject to the same discipline and penalties, and receive the same pay, as the regular National Guard

\* \* \*

SEC. 3768.  **When commander-in-chief may order militia into service.**—The commander-in-chief shall have power, in case of invasion, insurrection, or breaches of the peace, or imminent danger thereof, to order into the service of the state any of the companies, batteries, battalions, regiments, or brigades of the Oregon National Guard, or of the militia force of the state, that he may deem proper, and under the command of such officers as he shall designate; and in such case, the forces so called into service shall receive the same pay and rations as troops in the service of the United States.

**Tenn. Comp. Stat. § 554 (1884)**

**When militia called into service.**—The militia shall not be called into service except in case of rebellion or invasion, and then only when the General Assembly shall declare by law that the public safety requires it.

**Vt. Rev. Laws tit. 29, ch. 168, § 3771 (1880)**

**By whom and when.  May be ordered into camp.**—The commander-in-chief, or in his absence the lieutenant-governor, or in the absence of both the adjutant and inspector-general, may, in case of riot, rebellion or insurrection, within this state, or in case of great opposition to the service of legal process whether civil or criminal, or in case of invasion or imminent danger thereof, call out the organized militia, or such parts thereof as he deems necessary * * *

**W. Va. Code ch. XXIII, § 27, ch. XXV, §§ 1-2 (1887)**

**Ch. XXIII**

* * *

**Volunteers ordered into service.**—

SEC. 17. When volunteers are called out by the governor to repel invasion, suppress insurrection, or enforce the execution of the laws, they shall be called out by regiments and battalions where such organizations exist, and by companies where they do not, unless a smaller number be deemed sufficient for the occasion. When called out by separate companies, such companies shall be under the command of their respective officers, but the governor may organize them for the service into regiments and battalions, and appoint the necessary field officers therefor.

* * *

**Ch. XXV**

**Calling militia and volunteers into service.**—

SEC. 1. If a sudden invasion or insurrection happen in any county, or there be imminent danger thereof; or if, in any part of the State, the peace and

Add. 63

safety of the people be endangered, or the execution of the laws be obstructed by a combination too powerful to be suppressed by the ordinary course of judicial proceedings, it shall be the duty of the commandant of the division, brigade, regiment, battalion, or company where it occurs, to order out the militia or volunteers under his command, or such part thereof as shall be sufficient, and therewith defend the State, maintain the public peace, and enforce the laws. He shall also, if he deem it necessary, call upon the commandants for additional force.  But in every case the officer ordering out any military force shall immediately report to the governor the measures he has taken, and the cause thereof.

SEC. 2. Upon the warrant of a judge, sheriff, or mayor of a city, requiring him so to do, the commandant of a company, regiment or separate battalion of militia or volunteers shall order out the same, (or such detachment thereof as shall be sufficient for the occasion) to preserve the public peace, suppress riots, and enforce the execution of the laws.

## Wis. Stat. Ann., tit. VIII, § 641 (1889)

**How called into.**—In case of war, insurrection, rebellion, riot or invasion, or of resistance to the execution of the laws of the state, or of the United States, or upon application of any marshal of the United States, or of any mayor of a city, or of a sheriff, the governor may call into active service all or any portion of the organized Wisconsin national guard. * * *

Add. 64

**5. Provisions authorizing the commander-in-chief to deploy the militia to execute the laws.**

**Ala. Code §§ 4701-4703, 4714 (1887)**

SEC. 4701. **When governor may call out military.**—The governor may call out all or such portion of the militia and volunteer forces of the state, as he may deem advisable, to execute the laws, suppress insurrection, and repel invasion.

SEC. 4702. **Use of military prohibited, except as hereinafter provided.**—No portion of the Alabama State Troops shall be called into service, or be used in the enforcement of the laws of this state, without the authority of the governor, except in cases hereinafter provided in this article.

SEC. 4703. **Civil officers may call on governor for troops when posse comitatus insufficient.**—Whenever any circuit judge, chancellor, city court judge, sheriff; mayor, or intendant of any incorporated city, town, or village, shall have reasonable cause to apprehend the outbreak of any riot, rout, tumult, insurrection, mob, or combination to oppose the enforcement of the laws by force or violence, within the jurisdiction in which such officer is by law a conservator of the peace, which cannot be speedily suppressed or effectually prevented by the ordinary posse comitatus and peace officers, it shall forthwith become the duty of such judge, chancellor, sheriff, mayor, or intendant, to report the facts and circumstances in writing to the governor, and request him to order out such portion of the militia or volunteer forces of this state as may be necessary to enforce the laws and preserve the peace; and it shall thereupon be the duty of the governor, if he deems such apprehension well founded, to order out, or direct to be held in readiness, such portion of the militia or volunteer forces of the state as he may deem advisable for the proper enforcement of the law; and he may direct the officer in command of the troops to report to the officer making such application, or to any other officer named in this section, to obey the orders of such civil officer; or, if the governor deem it advisable, may specially instruct the officer in command of such troops as to the duties required of them, and direct their execution under the immediate control of the governor.

Add. 65

SEC. 4714. **Authority of governor to order out military forces in aid of civil authorities; regulations.**—Whenever there is any insurrection or outbreak of a formidable character, which has overawed, or threatens to overawe, the ordinary civil authorities, and the authorities in such county, town, or city have attempted and failed to quell the same by the use of the posse comitatus, or it is apparent that such attempt would be useless, the governor, on a certificate of such facts from any four conservators of the peace in such county, city, or town, or from any circuit judge, chancellor, probate judge, sheriff, or justice of the supreme court, shall immediately order out such portion of the state troops or militia as he may deem necessary to enforce the laws and preserve the peace; and the governor may, when the urgency is great, order out such troops without any certificate from either of the officers mentioned in this section; but in no case shall the governor keep in service, in any county, city, or town of the state, for more than ten days, any troops or militia, other than those raised in such county, except in time of invasion or actual insurrection, unless some justice of the supreme court, or circuit judge, or chancellor of the circuit or division of which such county forms a part, or four justices of the peace in such county, or the sheriff thereof, shall certify to him that the longer presence of such militia or troops is requisite to the proper enforcement of the law, or the preservation of the peace therein.

## Ill. Rev. Stat. ch. 129, §§ 2, 39 (1887)

SEC. 2. **Enrollment.**—When it is necessary to execute the laws, suppress insurrection or repel invasion, or to quell riots, or when a requisition shall be made by the president of the United States for troops, the governor, as commander in chief, may, by his proclamation, require the enrollment of the militia of the State, or of such portion thereof as may be necessary, and he shall appoint necessary enrolling officers and prescribe their duties, issuing all proper orders that may be required in the premises. He may designate the place of rendezvous, provide for the organization of the militia into companies, battalions, regiments and brigades, and their equipments, as the case may require. The militia, when called into active service, shall receive the same pay and subsistence as is provided for like troops in the service of the United States.

* * *

SEC. 39. **Regulations in case of riot, etc.—extent of punishment for violation.**—Whenever any portion of the military forces of this State shall be ordered by the commander in chief to assemble for the purpose of suppressing any riot, insurrection, invasion, or in the time of public danger, the rules and articles of war and general regulations for the government of the army of the United States, so far as they are applicable, and with such modifications as the commander in chief may prescribe, shall be considered in force and regarded as part of this act during the continuance of such service. * * *

**1880 Me. Laws 222, 225, §§ 15, 125 (ch.225)**

SEC. 15. **Liability to active service. Proceedings in case of invasion, etc.**—* * * The Maine volunteer militia, herein mentioned, shall be liable at all times to be ordered into active service for the purpose of repelling, preventing, or suppressing invasion, insurrection, or riot, or for aiding civil officers in the execution of the law; and shall first be called out by the commander-in-chief on all occasions for military service. If such invasion, insurrection or riot, or imminent danger thereof, in any part of the state be so sudden that the commander-in-chief cannot be informed and his orders received and executed in season to resist or suppress the same, any commander of division in such part of the state may order out his division, or any part thereof, as the commander-in-chief might do.

* * *

SEC. 125. **Proceedings in case of riot, mob, etc.**—When there is, in any county, a tumult, riot, mob, or a body of men acting together by force with intent etc. to commit a felony, or to offer violence to persons or property, or by force and violence to break and resist the laws of the state, or of the United States, or when such tumult, riot or mob is threatened, and the fact is made to appear to the commander-in-chief, or the mayor of a city, or to a court of record sitting in said county, or, if no such court be sitting therein, then to a justice of such court, or, if no justice is within the county, then to the sheriff thereof, the commander-in-chief may issue his order, or such mayor, court, justice or sheriff, may issue a precept, directed to any commander of division,

Add. 67

brigade, regiment or corps, directing him to order his command, or a part thereof, describing the kind and number of troops, to appear at a time and place therein specified, to aid the civil authorities in suppressing such violence and supporting the laws * * *

**Mass. Gen. Laws. ch. 411, §§ 21, 98-99 (June 14, 1887)**

SEC. 21.  **Designation.**—The active militia shall be composed of volunteers, and shall be designated the Massachusetts Volunteer Militia, and shall first be ordered into service to resist invasion, quell insurrection, aid in the suppression of riots, to aid civil officers in the execution of the laws of the Commonwealth, or in time of public danger.

* * *

SEC. 98.  **Volunteer militia to be called upon in case of invasion or insurrection.**—When an invasion of, or insurrection in, the state is made or threatened, the commander-in-chief shall call upon the volunteer militia to repel or suppress the same. * * *

SEC. 99.  **Troops may be ordered out in case of riot or tumult.**—When there is in any city or town a tumult, riot, mob or a body of men acting together by force, with attempt to commit a felony, or to offer violence to persons or property, or by force and violence to break and resist the laws of the Commonwealth; or when such tumult, riot or mob is threatened, and the fact is made to appear to the commander-in-chief, the sheriff of the county, the mayor of the city or the selectmen of the town, the commander-in-chief may issue his order, or such sheriff, mayor or selectmen may issue a precept, directed to any commander of a brigade, regiment, battalion, corps of cadets or company, within the limits of their jurisdiction, directing him to order his command, or a part thereof, to appear at a time and place therein specified, to aid the civil authority in suppressing such violence and supporting the laws * * *

**Mich. Gen. Stat. tit. VII, §§ 868, 870, 911 (1882)**

SEC. 868.  **When subject to active duty.**—* * * The enrolled militia shall not be subject to active military duty except in case of war, rebellion,

Add. 68

invasion, the prevention of invasion, the suppression of riots, tumults, and breaches of the peace, and to aid civil officers in the execution of the laws, and the service of process; in which case they may be ordered out for actual service, by draft or otherwise, or so many of them as the necessity demands.

* * *

SEC. 870. **Commander-in-chief may order out the militia.**—In case of actual or threatened war against, insurrection in, or invasion of, the state, or in case of actual rebellion in, or war against, the United States, or in case the president of the United States shall make a requisition on the governor of this state, the commander-in-chief may order out, by draft, voluntary enlistment, or otherwise, the whole, or so much of the militia of this state as the public necessity demands; and he may also, in like manner, order out any portion of the militia for the service of the state, to suppress riots, and to aid civil officers in the execution of the laws of this state, or of the United States; * * *

* * *

SEC. 911. **State troops may be called out to quiet riots, etc.**—In case of any breach of the peace, tumults, riot, or violent resistance of any process of this state, or apprehension, of immediate danger thereof, it shall be lawful for the sheriff of any county, or the mayor or recorder of any city, to call for aid from any portion of the state troops; and it shall be the duty of the commanding officer to whom such order is given to order out, in aid of the civil authorities, the military force under his command, or any part thereof. * * *

**Minn. Gen. Stat. ch. 12, §§ 1, 3 (1889)**

SEC. 1. **Who are liable to military duty.** All able-bodied male persons residing in the state of Minnesota, between the ages of eighteen and forty-five years, shall constitute the militia of this state, and be liable to perform military duty in case of war, invasion, rebellion, or to maintain the public peace and enforce the laws * * *

* * *

Add. 69

SEC. 3. **Active militia, how constituted—commander-in-chief—companies, etc.** The active militia shall be composed of volunteers, and in case of war, invasion, the prevention of invasion, the suppression of riots, and to aid civil officers in the execution of the laws of the commonwealth, shall be first ordered into service, and shall be known and designated as the National Guard of the state of Minnesota. * * *

## Miss. Rev. Code, ch. 11, § 617 (1880)

**Militia may be ordered to active service.**—The governor may order into active service the militia of the state, or any part of it, and to any part of the state to execute the laws, repel invasions, and suppress riots or insurrections.

## Mo. Rev. Stat. ch. 112, §§ 6943, 6974 (1889)

SEC. 6943. **Who may call out troops in case of riot, etc.**—When an invasion of or insurrection in this state is made or threatened, or there is in any city or county a tumult, riot, mob, or a body of men acting together by force, with intent to commit a felony, or to offer violence to persons or property, or by force and violence to break and resist the laws of the state, or when such tumult, riot or mob is threatened and there is not time to inform the commander-in-chief and receive his orders, any senior commander of any unattached company or battalion, or any regiment or brigade or division of the national guard of Missouri, upon written request from the mayor or other chief officer of any city or town, or the sheriff of any county, where any such disturbance may exist, shall call out his command, in the same manner as the commander-in-chief might do.

* * *

SEC. 6974. **All persons of military age may be enrolled, when.**—Whenever the national guard of Missouri shall prove inadequate to enable the executive department of state to execute the laws, suppress, insurrections or repel invasion, the commander-in-chief shall, by proclamation, require the enrollment of all persons subject to military duty, or any portion thereof, other than members of the national guard of Missouri, and shall issue all orders

Add. 70

needful and necessary in the premises, and provide penalties for any violation thereof.

**Neb. Comp. Stat. ch. 56, §§ 2, 22 (1887)**

SEC. 2.　**When enrolled.**—When it is necessary to execute the law, suppress insurrection or repel invasion, or when a requisition is made by the president of the United States for troops, the governor, as commander-in-chief, shall, by his proclamation, require the enrollment of the militia of the state, or such portion thereof as may be necessary, in a manner herein provided.

SEC. 22.　**When liable to duty.**—The Nebraska National Guard, heretofore mentioned, shall be liable at all times to be ordered into active service, and shall be first called out by the commander-in-chief on all occasions for military service within the state, in time of war, invasion, riot, rebellion or reasonable apprehension thereof; or upon the requisition of the president of the United States, the commander-in-chief may order out for active service such further portion of the militia as he may deem necessary, or to comply with the requisition of the president of the United States, designating the same by draft, if a sufficient number shall not volunteer, and may organize the same in the manner therein provided for organizing the Nebraska National Guard and commissioned officers therefor, and when so ordered out for service the militia shall be subject to like regulations an services from the state, and the same compensation as that prescribed for the army for the United States * * *

**N.H. Gen Laws, tit. 12, ch. 95, §§ 6-7, ch. 96, §§ 1, 6-7 (1878)**

**Ch. 95**

SEC. 6.　**Reserved militia subject to active duty, when.**—The reserved militia so enrolled shall not be subject to active duty, except in case of war, or for the purpose of preventing, repelling, or suppressing invasion, insurrection, or riot, or of aiding civil officers in the execution of the law, and then only when the active force shall be insufficient for that purpose.

Add. 71

SEC. 7. **How called out.**—When it is necessary for said purposes, the commander-in-chief may order into actual service as many of the reserved militia as may be required, by draft or otherwise, and if a draft is to be made, shall issue his orders to the selectmen to return from their towns the number required; and they shall notify the persons enrolled to appear at a time and place of parade appointed by them, and then and there, by draft or voluntary enlistment, procure the required number, and forthwith return their names to the commander-in-chief.

### Ch. 96

SEC. 1. **Composition of active forces; enlistments; minors; surgeon's certificate; active force to be called and liable at all times.**— * * * The New Hampshire National Guard, herein mentioned, shall be liable at all times to be ordered into active service for the purpose of repelling, preventing, or suppressing invasion, insurrection, or riot, or for aiding civil officers in the execution of the law; and shall first be called out by the commander-in-chief on all occasions for military service.

* * *

## Pa. Digest Laws, National Guard, §§ 16, 19, 109 (1883)

SEC. 16. **When enrolled militia to be liable for active service.**—The enrolled militia shall be subject to no active duty, except in case of war, invasion, the prevention of invasion, the suppression of riots, and to aid civil officers in the execution of the laws of the commonwealth; in which cases the commander-in-chief shall order out for actual service, by draft or otherwise, as many of the militia as necessity demands.

* * *

SEC. 19. **Volunteers to be first ordered into service.**—The active militia shall be composed of volunteers, and in case of war, invasion, the prevention of invasion, the suppression of riots, and to aid civil officers in the execution of the laws of the commonwealth, shall first be ordered first ordered into service.

* * *

Add. 72

SEC. 109.  **When militia to be called out.**—When an invasion of, or insurrection in, the state is made or threatened, or a tumult, riot or mob shall exist, the commander-in-chief shall call upon the militia to repel or suppress the same, and may order out divisions, brigades, regiments, battalions or companies, or may order to be detached, parts or companies thereof, or any number of men to be drafted therefrom, and may cause officers to be detailed, sufficient with those attached to the troops, to organize the forces.

**R.I. Pub. Laws, tit. XXXIV, ch. 258, §§ 10, 102-103 (1882)**

SEC. 10.  **Active militia, liability to service.**—The active militia shall, in all cases, first be ordered into service in case of war or invasion or to prevent invasion, or suppress insurrection, riot or tumult, or to aid civil officers in the execution of the laws of the state.

* * *

SEC. 102.  **Power of commander-in-chief and brigadier general to order out militia in case of invasion, etc.**—Whenever any invasion of the state or any insurrection, riot or tumult shall be made in any part of the state, the commander-in-chief shall call out the militia or any part thereof, as he may deem expedient or necessary to suppress or repel the same * * *

SEC. 103. **Power to order out militia in time of tumult, riot, etc., by whom and how to be exercised.**—Whenever in any county in this state there shall be any tumult, riot, mob or any body of men acting together, with intent to commit felony, to offer violence to persons or property, or in any other way to resist the laws of the state by force of arms or by violence, or whenever any of said acts shall be threatened, and the fact made to appear to the commander-in-chief or the sheriff of said county, or to either of the justices of the supreme court, or to the president of the town council, or if in any city, then to the mayor of such city in the first instance, or in his absence, to the president of the board of aldermen, that the services of the militia are required, the commander- in-chief shall issue his order, or such justice, sheriff, mayor, or president shall issue his or their precept to that effect, properly signed, directed to the commander-in-chief, and in case he cannot be informed, a copy thereof to the commanding officer of the brigade, regiment, battalion or company,

Add. 73

making requisition for troops upon either of them, as the case may be, who shall order out his command, or any part of the same, and by such precept or order empowering them to suppress such riot, tumult or mob, and to prevent the perpetration of any such felony, or act of unlawful violence.

**S.C. Gen. Stat., tit. IV, ch. XII, § 325 (1882)**

SEC. 325.  **The ordinary militia not subject to active duty, except when called into active service on emergency.**—The militia shall not be subject to active duty except in case of war, or for the preventing, repelling, or suppressing invasion, insurrection, or riot, or of aiding civil officers in the execution of the laws, in which cases the Commander-in-Chief shall order out for active service, by draft or otherwise, as many of the militia as necessity demands.

**2 Tex. Rev. Stat., tit. 64, ch. 2, §§ 3246, 3330, 3331 (2d ed. 1889)**

ART. 3246. **May Call forth militia for what.—**[The Governor] shall have power to call forth the militia to execute the laws, to suppress insurrections, repel invasions and protect the frontier from hostile incursions by Indians or other predatory bands.

ART. 3330. **Duty in case of invasion or insurrection.**—When an invasion of or insurrection in the state is made or threatened, the commander-in-chief shall call upon the volunteer guards to repel or suppress the same, and it is made their duty to respond immediately to such call.

ART. 3331. **In case of riot or resistance to the laws.**—When there is in any county, city or town a tumult, riot, mob or a body of men acting together by force with intent to commit a felony or breach of the peace, or to do violence to persons or property, or by force and violence to break or resist the laws, or when such tumult, riot, mob, or other unlawful act or violence is threatened, and that fact is made to appear to the commander-in-chief, or to the sheriff of such county, or the mayor of such city or town, the cmmander-in-chief may issue his order, or such sheriff or mayor may issue a writ directed to any commander of a brigade, regiment, battalion or company of volunteer guards, directing him to order his command, or part thereof, to appear at a

Add. 74

time and place therein specified, to aid the civil authority in suppressing such violence and in executing the laws.

**Va. Code tit. 11, §§ 300, 368 (1887)**

SEC. 300. **Virginia Volunteers to compose active militia.**—The active militia shall be composed of volunteers, who shall be styled Virginia volunteers, and in case of war, invasion, the prevention of invasion, the suppression of invasion, the suppression of riots, and to aid civil officers in the execution of the laws of the commonwealth, they shall first be ordered into service.

\* \* \*

SEC. 368. **How troops called out in time of danger**—In case of any breach of the peace, tumult, riot, or resistance of law, or imminent danger thereof, it shall be lawful for the sheriff of any county, or the mayor of any city, to call upon the Governor for aid, and, in cases where the emergency is such as not to admit of this delay, upon the commandant of any division, brigade, regiment, or company; and, it shall be the duty of the commanding officer of the division, brigade, regiment, or company, upon whom such call is made, to order out, in aid of the civil authorities, the military force, or any part thereof, under his command. \* \* \*