No. 25-5418

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**DISTRICT OF COLUMBIA**,

*Plaintiff-Appellee,*

**v.**

**DONALD J. TRUMP,** *et al.*,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court for the District of Columbia
(Jia M. Cobb, District Judge)

_____

**BRIEF OF AMICI CURIAE MARYLAND, 22 OTHER STATES,
AND 3 GOVERNOR'S OFFICES IN SUPPORT OF APPELLEE**

_____

ANTHONY G. BROWN
Attorney General of Maryland

JULIA DOYLE
Solicitor General

VIRGINIA A. WILLIAMSON
ADAM KIRSCHNER
MICHAEL DREZNER
JAMES C. LUH
Assistant Attorneys General
200 Saint Paul Place
Baltimore, Maryland 21202
vwilliamson@oag.maryland.gov
(410) 576-6584

May 26, 2026                    Attorneys for the State of Maryland

[Additional counsel listed on signature page.]

**TABLE OF CONTENTS**

Page

INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT................1

ARGUMENT ........................................................................................................3

I.     THE MILITARY SHOULD NOT DISPLACE LOCAL LAW ENFORCEMENT. .............3

II.    THE DEFENDANTS' ACTIONS ARE UNLAWFUL AND VIOLATE FOUNDATIONAL PRINCIPLES OF FEDERALISM. ...................................................5

III.   STATES AND LOCALITIES SUFFER ADDITIONAL INJURIES FROM THE DEPLOYMENT OF FEDERALIZED SOLDIERS.......................................................11

CONCLUSION .................................................................................................13

## TABLE OF AUTHORITIES

Page

### Cases

*Abbott v. Biden*, 70 F.4th 817 (5th Cir. 2023) ........................................................9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982).......5

*Bissonette v. Haig*, 776 F.2d 1384 (8th Cir. 1985) ....................................................3

*District of Columbia v. Trump*, 810 F. Supp. 3d 19, (D.D.C. 2025) .............. 1, 9, 11

*District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674
   (D.C. Cir. Dec. 17, 2025) ......................................................................................11

*Illinois v. Trump*, 155 F.4th 929 (7th Cir. 2025) .................................................5, 10

*Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645
   (N.D. Ill. Oct. 10, 2025) ............................................................................. 4, 10, 13

*Laird v. Tatum*, 408 U.S. 1 (1972) .............................................................................3

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) .........................5

*New York v. United States*, 505 U.S. 144 (1992) ......................................................2

*Newsom v. Trump*, No. 3:25-cv-04870-CRB (N.D. Cal. Sept. 2, 2025) ...... 4, 11, 12

*Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 2817646
   (D. Or. Oct. 4, 2025) ................................................................................... 12, 13

*Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 3126773
   (D. Or. Nov. 7, 2025) ................................................................................... 10, 13

*Trump v. Illinois*, 146 S. Ct. 432 (2025) ...................................................................2

### Constitutional Provisions

Cal. Const. art. V, § 7...................................................................................................7

U.S. Const. amend. III..................................................................................................5

U.S. Const. amend. IV .................................................................................5

U.S. Const. amend. V ..................................................................................5

U.S. Const. amend. X ..................................................................................5

U.S. Const. art. I, § 8, cl. 16.......................................................................5

**Statutes**

32 U.S.C. § 502(f)......................................................................... 6, 8, 9, 11

Cal. Mil. & Vet. Code § 146 .......................................................................7

Cal. Mil. & Vet. Code § 143 .......................................................................7

Md. Code Ann., Pub. Safety § 13-702 (LexisNexis 2022).........................7

Wash. Rev. Code § 38.08.040......................................................................8

**Miscellaneous**

1868 Md. Laws, ch. 414...............................................................................7

1916 Md. Laws, ch. 311...............................................................................7

1968 Md. Laws, ch. 71.................................................................................7

Army National Guard, *Basic Training Phases*, https://perma.cc/DP63-7SAU.........3

Clayton D. Laurie & Ronald H. Cole, *The Role of Federal Military Forces in Domestic Disorders 1877-1945* (1997) .................................................6

Julie Watson & Christopher Weber, What to Know About the Troops and Federal Agents in LA's MacArthur Park, Associated Press (July 7, 2025), https://perma.cc/Z72Z-WTEU .......................................................12

Mary C. Lawton, Memorandum from Antonin Scalia to the Deputy Att'y Gen. re: Law Relating to Civil Disturbances (Jan. 6, 1975), https://perma.cc/B628-5ANM. .......................................................................6

Police Exec. Res. Forum, *MPD Leaders Should Remain in Charge of Their Police Department* (Aug. 16, 2025), https://perma.cc/89X3-3KCH .............................4

Remarks to the Department of War in Quantico, Virginia, 2025 Daily Comp. Pres. Doc. 970 (Sept. 30, 2025) .......................................................................... 2, 3, 13

Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789-1878* (2011) ...............................................................................................6

*The Federalist* No. 29 (Alexander Hamilton)...............................................................9

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rule 28(a)(1), the undersigned certifies as follows:

A.     All parties and amici appearing before the district court and in this Court are listed in the appellants' opening brief and the brief of Appellee the District of Columbia.

B.     References to the rulings under review appear in the appellants' opening brief and the brief of Appellee the District of Columbia.

C.     All related cases are listed in the appellants' opening brief and the brief of Appellee the District of Columbia.

/s/ Virginia A. Williamson

_____

Virginia A. Williamson

v

## INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT

The defendants' brief asserts a sweeping Presidential power far out of step with our Nation's laws and tradition: the power to deploy unlimited numbers of National Guard troops for seemingly any reason and without any judicial review. As the district court explained, under the defendants' view, "the President could send a non-federalized National Guard unit to another state, against the receiving state's will, to conduct any operation or mission the President directs." *District of Columbia v. Trump*, 810 F. Supp. 3d 19, 62 (D.D.C. 2025). Such a power strikes at the foundations of state sovereignty, and this Court should not endorse it.

In the last year, the Trump Administration has sent or attempted to send National Guard members into one community after another: in California, Oregon, Illinois, and the District of Columbia. Those Amici States[1] whose sovereignty, authority, and communities have not already been threatened fear they may be next. Indeed, on September 30, 2025, President Trump made plain his desire to "use some of these dangerous cities" (namely, "the ones that are run by the radical-left

---

[1] The Amici States are the States of Maryland, Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, Washington, and Wisconsin and the Governors of Kansas, Kentucky, and Pennsylvania.

Democrats") as "training grounds for our military—National Guard."[2]  In the same speech, President Trump declared, "we're going to straighten them out one by one."[3]

Multiple courts, including the Supreme Court, have held the recent National Guard deployments to be unlawful, *see, e.g.*, *Trump v. Illinois*, 146 S. Ct. 432 (2025), but these losses have not dissuaded the President from continuing the National Guard deployment in Washington, D.C.  That continued deployment threatens the sovereignty of the Amici States and our structure of federalism.  The President's desire to transform American cities into military "training grounds" does not permit him to use troops to address "crime" or quash protests.  The Constitution "divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day."  *New York v. United States*, 505 U.S. 144, 187 (1992).

The district court's decision should be affirmed.

---

[2] Remarks to the Department of War in Quantico, Virginia, 2025 Daily Comp. Pres. Doc. 970, at 12 (Sept. 30, 2025) ("Sept. 30, 2025 Remarks").

[3] *Id.*

**ARGUMENT**

**I.    THE MILITARY SHOULD NOT DISPLACE LOCAL LAW ENFORCEMENT.**

"Civilian rule is basic to our system of government." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985), *on reh'g*, 800 F.2d 812 (8th Cir. 1986), *aff'd*, 485 U.S. 264 (1988).  Civilian authority is necessary to uphold our liberties because the "use of military forces to seize civilians can expose civilian government to the threat of military rule and the suspension of constitutional liberties." *Id.*  Accordingly, "a traditional and strong resistance of Americans to any military intrusion into civilian affairs . . . has deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Yet President Trump has deployed or sought to deploy the National Guard as domestic law enforcement at least four times and describes this as part of how he will "handle" what he calls "the enemy from within."[4]  This deployment of National Guard troops threatens our constitutional tradition and the freedoms it protects.

Moreover, National Guard units are a poor fit for local law enforcement. National Guard basic training is geared toward preparing a fighting force.  *See* Army National Guard, *Basic Training Phases*, https://perma.cc/DP63-7SAU (basic training for Army National Guard).  "Local agencies are responsive to their local communities in a way that federal agencies," and certainly soldiers from other States,

---

[4] Sept. 30, 2025 Remarks at 13.

"are not."[5]  State and local law enforcement are more familiar with the laws they are enforcing.  Their training and practices, such as rules of engagement and policies on use of force, are often tailored to local needs.  *See* Decl. of German Hurtado ¶ 17 (ECF 183-5), *Newsom v. Trump*, No. 3:25-cv-04870-CRB (N.D. Cal. Sept. 2, 2025) ("LAPD relentlessly trains its personnel on the tenets of constitutional policing, use of force, and crowd management and control, as well as historical perspective of the local communities and police relations.").  Local police officers have built relationships with community members, understand relevant interests, and have greater knowledge of the geography, conditions, and people.  *See id.* ¶ 9 (explaining that LAPD "implemented an initiative to protect Los Angeles by . . . engaging the public to help inform best practices").

By contrast, the defendants have acted as if National Guard members, from anywhere in the country, may be deployed as federal law enforcement with minimal notice and training.  As the Seventh Circuit recognized, this view conflicts with the public's "significant interest in having only well-trained law enforcement officers deployed in their communities and avoiding unnecessary shows of military force in

---

[5] Police Exec. Res. Forum, *MPD Leaders Should Remain in Charge of Their Police Department* (Aug. 16, 2025), https://perma.cc/89X3-3KCH; *see also Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *24 (N.D. Ill. Oct. 10, 2025) (explaining that deploying "militarized actors unfamiliar with local history and context whose goal is 'vigorous enforcement' of the law is not in the community's interest" (citation omitted)).

4

their neighborhoods, except when absolutely necessary and justified by law."
*Illinois v. Trump*, 155 F.4th 929, 940 (7th Cir. 2025).

## II.     THE DEFENDANTS' ACTIONS ARE UNLAWFUL AND VIOLATE FOUNDATIONAL PRINCIPLES OF FEDERALISM.

The Constitution establishes a federal government of limited, enumerated powers, and a general police power is not among them.  Rather, it is the States and local jurisdictions that enjoy "great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (citation omitted).  The District of Columbia similarly enjoys autonomy guaranteed by Congress under the Home Rule Act, so that the defendants' deployment of National Guard soldiers infringes on the District's authority and its ability to enforce its own legal code.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982) (explaining that States have a sovereign interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction" and that "this involves the power to create and enforce a legal code, both civil and criminal").  Many of the protections the Founders enshrined in the Constitution were intended to ensure that the abuses of British rule, including the deployment of soldiers on American streets, would not be repeated.  *See, e.g.*, U.S. Const. art. I, § 8, cl. 16; *id.* amends. III, IV, V, X.

Consistent with the inherently state and local character of the police power and limitations established by Congress, the President historically has used militia members in domestic law enforcement only as "a last resort."  Mary C. Lawton, Memorandum from Antonin Scalia to the Deputy Att'y Gen. re: Law Relating to Civil Disturbances at 9 (Jan. 6, 1975), https://perma.cc/B628-5ANM; *see also, e.g.*, Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders 1789-1878*, at 347 (2011) (presidents rarely used militia to address domestic emergencies); Clayton D. Laurie & Ronald H. Cole, *The Role of Federal Military Forces in Domestic Disorders 1877-1945*, at 187 n.18 (1997) ("After 1865, no president federalized the National Guard for use in a domestic disorder for nearly a century.").  Yet in August 2025, President Trump ordered the National Guard into the District of Columbia to address "crime" in the city, purportedly under the authority of 32 U.S.C. § 502(f).  The decision to deploy armed soldiers into the Nation's capital and entangle them in everyday civilian law enforcement—over the objections of local elected leaders—is a major break from precedent and runs counter to statutory and constitutional limitations.

Still, the defendants insist that the President holds "broad[]" and "inherent" authority under Title 32 to command the D.C. National Guard, and order out-of-state units into the city, as he sees fit.  Appellants' Br. 25-26.  This assertion contravenes both guarantees of federalism and the principle of an Executive constrained by

6

limited, enumerated powers.  Moreover, the defendants are wrong to suggest that the President has "inherent" authority to command the D.C. Guard without express statutory authorization, or that such asserted "inherent" authority alone is akin to the authority of state governors over their state guard units.  *Id*. at 26.  To the contrary, state laws carefully delineate the authority of their respective Governors over the National Guard, and these laws have evolved over time to provide additional powers where state legislatures deemed it appropriate.

In Maryland, for instance, when the relevant state militia law was first enacted, it authorized the Governor to deploy the militia only during "war, rebellion, insurrection or threatened invasion."  *See* 1868 Md. Laws, ch. 414.  In 1916, the law was amended to permit deployment to "enforce the laws" of Maryland as well. *See* 1916 Md. Laws, ch. 311.  Finally, in 1968, the law was further broadened to permit the Governor to deploy the Guard in instances of "public crisis [or] disaster" or to fulfill "any of the functions of the militia of this State," such as training.  1968 Md. Laws, ch. 71; *see* Md. Code Ann., Pub. Safety § 13-702 (LexisNexis 2022). This history, like the history of many other States' National Guard laws, underscores that state Guard authority is carefully delineated by state statutes and constitutions and is not some plenary, inherent executive power.  *See, e.g.,* Cal. Const. art. V, § 7; Cal. Mil. & Vet. Code §§ 143, 146 (authorizing Governor to deploy militia in certain circumstances, including during times of war, insurrection, rebellion, emergencies,

7

or upon the call of federal or municipal officers); Wash. Rev. Code § 38.08.040 (authorizing the Governor to order "the organized militia of Washington, or any part thereof, into active service of the state to execute the laws, and to perform such duty as the governor shall deem proper").

Such state laws also refute the defendants' claim that Section 502(f) operates as "an *independent* source of authority" to control "both the D.C. Guard and state Guards." Appellants' Br. 39. That provision merely describes when state Guard units may be supported with federal funds in furtherance of certain federally requested activities. Units in Title 32 status remain under state control and thus must be deployed consistent with state law. Yet the defendants assert that § 502(f) enables the President to deploy D.C. and State National Guard units to undertake seemingly any "operation[] or mission[]," without regard to whether the state or local laws that govern those units authorize such deployment. Appellants' Br. 28. Amici States have never understood § 502(f) to confer this authority on the President, and to their knowledge no prior President has ever asserted such authority. Further, reading § 502(f) as the defendants propose would likely render it unconstitutional, since the Militia Clauses of the Constitution give States the "exclusive" authority to govern non-federalized state militia. *Abbott v. Biden*, 70 F.4th 817, 829 (5th Cir. 2023).

This claim, if adopted, also poses a grave threat to the sovereignty of States and local jurisdictions, as the President could seemingly ignore state laws dictating

when and how state Guard units can be deployed by the Governor when they are under state control.  As the defendants acknowledge, "a State could not deploy its Guard in a manner that violates state law," Appellants' Br. 27, and the President cannot circumvent this bar simply by requesting a deployment under § 502(f).  In sum, under Title 32, "[t]he power to deploy the National Guard comes from the governor's authorities under state law," and neither the President nor state governors hold any "new authority under Section 502(f)" to deploy Guard units.  *See District of Columbia*, 810 F. Supp. 3d at 57.

The defendants' sweeping assertion of Presidential authority would have shocked the Framers.  In fact, when debating the Constitution, Alexander Hamilton thought it "preposterous" that militia could ever be deployed to another jurisdiction to impose a President's will.  *The Federalist* No. 29 (Alexander Hamilton) (rejecting the "exaggerated and improbable suggestions" that federally controlled militia "of Virginia are to be dragged from their homes five or six hundred miles, to tame the republican contumacy of Massachusetts").[6]

In granting or upholding temporary injunctive relief, courts have underscored the harm to state authority and sovereignty if unauthorized deployments are allowed

---

[6] *See Illinois*, 2025 WL 2886645, at *18 ("[T]he assurances of our Founders make[] clear that the power to call forth the militia to execute the laws was not to be employed merely in cases of the need for law enforcement . . . .").

to go forward.  In Illinois, for example, the Seventh Circuit held that the deployment of federalized "Guard troops in the state over the state's objection" was "proof of an irreparable harm."  *Illinois*, 155 F.4th at 940 (citation omitted).  Moreover, the Seventh Circuit stressed, "the deployment of National Guard members from Texas—an incursion on Illinois's sovereignty—makes the constitutional injury especially significant."  *Id*.  Similarly, in Oregon, the district court agreed that the President had unlawfully commandeered state National Guardsmen and that the non-consensual deployment of federalized California and Texas National Guard members in Portland constituted a clear "violation of Oregon's 'sovereignty under the Constitution.'"  *Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 3126773, at *48 (D. Or. Nov. 7, 2025) (citation omitted).

As the stay panel in this Court recognized, "[d]eploying an out-of-state Guard to a non-consenting State to conduct law enforcement would be constitutionally troubling to our federal system of government."  *District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *10 (D.C. Cir. Dec. 17, 2025).  Permitting a military deployment into the District, using the National Guard of other States under Title 32, threatens the security and autonomy of all States and local jurisdictions.  *See District of Columbia*, 810 F. Supp. 3d at 62 n. 33 ("Defendants have not articulated how their interpretation of section 502(f) would apply differently to states, as

10

opposed to the District.").  This Court should decline the defendants' invitation to take such an unprecedented and drastic step.

### III.    STATES AND LOCALITIES SUFFER ADDITIONAL INJURIES FROM THE DEPLOYMENT OF FEDERALIZED SOLDIERS.

The deployment of soldiers in the District of Columbia is part of a pattern in which the President deploys the military to States and cities and thereby inflicts myriad injuries on those jurisdictions.

The deployment of federalized National Guard troops harmed California in multiple ways.  First, the presence of federalized troops sowed confusion and necessitated additional state and local law enforcement resources to respond to ensuing protests.  *See, e.g.*, Decl. of Joseph Zizi ¶¶ 12, 15 (ECF 77-3), *Newsom v. Trump* (N.D. Cal. June 16, 2025).  Second, deployment of federalized National Guard soldiers alongside law enforcement hampered clear communications and unified command because Guard members are "not familiar with the rules of engagement, the laws of arrest, or rules and policy regarding the use of force in policing and domestic law enforcement."  Decl. of Daniel Randolph ¶ 20 (ECF 87-4), *Newsom v. Trump* (N.D. Cal. June 19, 2025).  Third, the militarized presence of the National Guard chilled consumer and community activities by stoking fear and causing people to stay home and avoid areas where the military was deployed.  Decl. of Carlos A. Singer ¶¶ 7-10 (ECF 183-3), *Newsom v. Trump* (N.D. Cal. Sept. 2, 2025); Decl. of Oliver Alpuche ¶ 10 (ECF 183-6), *Newsom v. Trump* (N.D. Cal.

11

Sept. 2, 2025) (noting a 40% drop in business for a downtown Los Angeles business owner since the federalization began). During the widely publicized Department of Homeland Security operation dubbed Operation Excalibur, for instance, approximately 80 federalized National Guard troops accompanied dozens of federal officers and tactical vehicles to a park in a densely populated Los Angeles neighborhood, causing the closure of at least one nearby business. *See* Trial Tr. 35:19-23, 37:15-18 (ECF 162), *Newsom v. Trump* (N.D. Cal. Aug. 11, 2025); Julie Watson & Christopher Weber, *What to Know About the Troops and Federal Agents in LA's MacArthur Park*, Associated Press (July 7, 2025), https://perma.cc/Z72Z -WTEU.

Moreover, as the district court in Oregon concluded in blocking the attempted deployment of the National Guard in Portland, "[f]ederalizing Oregon National Guard members diverts them from their state responsibilities, which impairs the State's ability to call on the Guard to respond to emergencies." *Oregon v. Trump*, No. 3:25-CV-1756-IM, 2025 WL 2817646, at \*14 (D. Or. Oct. 4, 2025). The National Guard deployment to Portland also was counterproductive to its purported aim of calming protests. *See Oregon*, 2025 WL 3126773, at \*25. The district court credited evidence suggesting that, had the Court not halted the deployment of the Guard, the protests would have only grown. *See Oregon*, 2025 WL 2817646, at \*14.

Similarly, in Illinois, the district court recognized that "deployment of National Guard members is likely to lead to civil unrest, requiring deployment of state and local resources to maintain order." *Illinois*, 2025 WL 2886645, at *23. Indeed, the court observed, deployment of the federalized National Guard at the site of protests "or anywhere else in Illinois will only add fuel to the fire that Defendants themselves started." *Id*.

Unless the defendants are checked by the rule of law, the President may, in his own words, send the military to yet more cities in the Amici States, "one by one," to "straighten them out."[7] The Amici States accordingly urge this Court to affirm the district court's decision, and thereby protect the sovereignty of the States and the civil liberties of their residents.

## CONCLUSION

The order of the United States District Court for the District of Columbia should be affirmed.

---

[7] Sept. 30, 2025 Remarks at 12.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

JULIA DOYLE
Solicitor General

/s/ Virginia A. Williamson

VIRGINIA A. WILLIAMSON
ADAM KIRSCHNER
MICHAEL DREZNER
JAMES C. LUH
Assistant Attorneys General
200 Saint Paul Place
Baltimore, Maryland 21202
vwilliamson@oag.maryland.gov
(410) 576-6584

May 26, 2026    Attorneys for the State of Maryland

KRISTIN K. MAYES    ROB BONTA
Attorney General of Arizona    Attorney General of California

PHILIP J. WEISER    WILLIAM TONG
Attorney General of Colorado    Attorney General of Connecticut

KATHLEEN JENNINGS    ANNE E. LOPEZ
Attorney General of Delaware    Attorney General of Hawaiʻi

KWAME RAOUL    AARON M. FREY
Attorney General of Illinois    Attorney General of Maine

JUSTIN WHITTEN    S. TRAVIS MAYO
Attorney for Governor Kelly    Attorney for Governor Andy Beshear
Office of the Governor of Kansas    Office of the Governor of Kentucky

ANDREA JOY CAMPBELL    DANA NESSEL
Attorney General of Massachusetts    Attorney General of Michigan

14

KEITH ELLISON
Attorney General of Minnesota

JENNIFER DAVENPORT
Attorney General of New Jersey

LETITIA JAMES
Attorney General of New York

DAN RAYFIELD
Attorney General of Oregon

PETER F. NERONHA
Attorney General of Rhode Island

JAY JONES
Attorney General of Virginia

JOSHUA L. KAUL
Attorney General of Wisconsin

AARON D. FORD
Attorney General of Nevada

RAÚL TORREZ
Attorney General of New Mexico

JEFF JACKSON
Attorney General of North Carolina

JOSH SHAPIRO
Governor of Pennsylvania

CHARITY R. CLARK
Attorney General of Vermont

NICHOLAS W. BROWN
Attorney General of Washington

15

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a) because the brief contains 2,965 words, excluding exempted parts.  This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

<u>/s/ Virginia A. Williamson</u>

Virginia A. Williamson

2

**CERTIFICATE OF SERVICE**

I certify that on May 26, 2026, this brief was electronically filed with the Clerk of the Court using the CM/ECF system.  I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

/s/ Virginia A. Williamson

Virginia A. Williamson