**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

## No. 25-5418

DISTRICT OF COLUMBIA,

*Plaintiff-Appellee,*

*v.*

DONALD J. TRUMP, in his official capacity as President
of the United States, *et al.*,

*Defendants-Appellants.*

_____

*On Appeal from an Order the United States District Court
for the District of Columbia*

# BRIEF OF FORMER LAW-ENFORCEMENT OFFICIALS AND POLICING ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE

TRISHA ANDERSON
   *Counsel of Record*
MARTIN TOTARO
JARED M. HIRSCHFIELD
HECKER FINK LLP
1050 K Street, NW, 10th Floor
Washington, DC 20001
(212) 763-0883
tanderson@heckerfink.com

*Counsel for Amici Curiae*

May 26, 2026

COUNSEL PRESS
A Proceed Service
The Appellate Experts®    (800) 4-APPEAL • (393381)

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

All parties, intervenors, and *amici* appearing before the district court and in this Court are listed in Plaintiff-Appellee's briefing. References to rulings at issue and related cases also appear in Plaintiff-Appellee's briefing.

May 26, 2026

/s/ Trisha Anderson
Trisha Anderson

*Counsel for Amici Curiae*

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* state as follows: Both the Law Enforcement Action Partnership and the Policing Project at New York University School of Law are nonpartisan, nonprofit organizations. Neither has a parent corporation, and neither is owned by a publicly held entity.

## D.C. CIRCUIT RULE 29(d) STATEMENT

Pursuant to D.C. Circuit Rule 29(d), *amici* state that this separate brief is necessary to provide *amici*'s unique perspective on the importance of law-enforcement accountability, transparency, and training in how to best engage with communities on a day-to-day basis in the District of Columbia. *Amici* bring hundreds of years of combined experience and significant expertise directly relevant to the issues presented by this case.

May 26, 2026

/s/ Trisha Anderson
Trisha Anderson

*Counsel for Amici Curiae*

ii

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES......................i

CORPORATE DISCLOSURE STATEMENT ......................................................... ii

D.C. CIRCUIT RULE 29(d) STATEMENT ............................................................ ii

TABLE OF AUTHORITIES .................................................................................iv

IDENTITY AND INTEREST OF *AMICI CURIAE*.....................................................1

INTRODUCTION & SUMMARY OF ARGUMENT................................................3

ARGUMENT ...........................................................................................................5

    I.     National Guard Troops Lack the Training, Experience, and Guidance Necessary To Engage in the Kind of Law-Enforcement Functions Performed by Local Police ..............................6

         A.     Any law-enforcement training that National Guard troops patrolling D.C. may have received is inadequate to safely and effectively perform day-to-day policing ...............6

         B.     National Guard troops are focused on a military mission and typically do not train for or engage in law-enforcement functions...........................................................10

    II.    The Deployment of National Guard Troops To Perform Everyday Law-Enforcement Functions Threatens To Undermine Public Trust in Law Enforcement and Public Safety ........................................................................................15

         A.     The deployment of National Guard troops in D.C. threatens to undermine public trust in law enforcement...........16

         B.     The deployment of National Guard troops in D.C. threatens to undermine public safety by increasing the risk that interactions with the community will result in harmful escalations .................................................23

CONCLUSION .....................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bissonette v. Haig*,
 776 F.2d 1384 (8th Cir. 1985) ...................................................................25

*Illinois v. Trump*,
 155 F.4th 929 (7th Cir. 2025) ...................................................................15

*Illinois v. Trump*,
 25 Civ. 12174, 2025 WL 2886645 (N.D. Ill. Oct. 10, 2025) ..............................26

*Laird v. Tatum*,
 408 U.S. 1 (1972)........................................................................ 3, 8, 9, 12

*Oregon v. Trump*,
 802 F. Supp. 3d 1277 (D. Or. 2025) ............................................. 13, 26

*Pappas v. Giuliani*,
 290 F.3d 143 (2d Cir. 2002) ........................................................................17

**Statutes & Other Authorities:**

32 U.S.C. § 10 .........................................................................................10

32 U.S.C. § 502(a) ....................................................................................14

Adam Trahan & Douglas N. Evans, *Perceptions of Legal System Legitimacy Among Family Members of Individuals Incarcerated for Sex Offenses*,
 30 Psych. Pub. Pol'y & L. 80 (2024)......................................................21

Ash Gautam, *Balancing Interests in Public Access to Police Disciplinary Records*, 100 Tex. L. Rev. 1405 (2022)..............................................20

Barry Friedman & Maria Ponomarenko, *Democratic Policing*,
 90 N.Y.U. L. Rev. 1827 (2015) ............................................................20

Debo P. Adegbile, *Policing Through an American Prism*,
 126 Yale L.J. 2222 (2017) ...................................................................17

Monica C. Bell, *Police Reform and the Dismantling of Legal Estrangement*,
 126 Yale L.J. 2054 (2017) ....................................................................21

iv

Robin S. Engel et al., *Assessing the Impact of De-Escalation Training on Police Behavior: Reducing Police Use of Force in the Louisville, KY Metro Police Department*, 21 Criminology & Pub. Pol'y 199 (2022) .......................................25

Rachel Abanonu, *De-Escalating Police-Citizen Encounters*, 27 S. Cal. Rev. L. & Soc. Just. 240 (2018).........................................................25

Rachel Moran, *Police Privacy*, 10 U.C. Irvine L. Rev. 153 (2019) .................. 16-17

Rick Trinkner, Jonathan Jackson & Tom R. Tyler*, Bounded Authority: Expanding "Appropriate" Police Behavior Beyond Procedural Justice*, 42 Law & Hum. Behav. 280 (2018) ............................................................. 22, 23

Tom Tyler, *Police Discretion in the 21st Century Surveillance State*, 2016 U. Chi. Legal F. 579 (2016)................................................................ 21, 23

Tom R. Tyler, *Why People Obey the Law* (1990) ....................................................17

Tracey L. Meares, *Trust & Models of Policing*, 151 Dædalus 161 (2022)........................................................................ 16, 17, 22

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

With hundreds of years of combined law-enforcement experience, former law-enforcement officials—Art Acevedo, Brandon del Pozo, Dr. Kysha Fedd, Neill Franklin, Diane Goldstein, Renee Hall, Wayne P. Harris, Corey Pegues, Sonia Pruitt, Sue Rahr, Howard Rahtz, Rob Reyes, Sean Smoot, Darrel W. Stephens, Trevor Velinor, Robert Wasserman, and Charles P. Wilson—and the following law-enforcement organizations submit this brief in support of Plaintiff-Appellee District of Columbia.[2]

The **Law Enforcement Action Partnership (LEAP)** is a nonprofit organization whose members include police, prosecutors, judges, corrections officials, and other law-enforcement officials advocating for criminal justice and drug policy reforms that will make our communities safer and more just. Founded by five police officers in 2002 with a sole focus on drug policy, today LEAP's speakers bureau numbers more than 275 criminal justice professionals advising on police-community relations, incarceration, harm reduction, drug policy, and global issues. Through speaking engagements, media appearances, testimony, and support

---

[1] Appellants and Appellee consent to *amici*'s filing of this brief. No counsel for a party to this case authored this brief in whole or in part; no party or counsel for a party contributed monetarily to the preparation or submission of any portion of this brief; and no person other than counsel for *amici curiae* contributed money that was intended to fund preparing or submitting the brief.

[2] Brief biographies for each individual *amicus* are contained in the Appendix.

of allied efforts, LEAP reaches audiences across a wide spectrum of affiliations and beliefs, calling for more practical and ethical policies from a public safety perspective.

**The Policing Project at New York University School of Law** is dedicated to ensuring that policing is effective, equitable, and democratically accountable.[3] The Policing Project facilitates public engagement on policing policies and practices, with the twin aims of giving communities a voice in how they are policed and developing greater mutual trust between the police and the communities they serve. The Policing Project believes in "front-end accountability"—that policing should operate according to laws and regulations in place before police act, rather than simply trying to correct the situation when something goes wrong. The Policing Project pursues this mission through a variety of strategies, including drafting and promoting legislation regarding policing and litigating when these principles are not respected. It works regularly with policing agencies and jurisdictions that share its goals. Recognizing that police officers are not always trained to deal with the raft of reasons that people call 911 for assistance, the Policing Project also is a national leader in the field of alternative first response.

---

[3] The Policing Project is affiliated with New York University School of Law, but this brief does not purport to represent the School's official views.

*Amici* share a longstanding commitment to promoting the public's trust and confidence in effective, equitable law enforcement, with the goal of making our communities safer. As former law-enforcement officials and national experts on policing, *amici* offer a unique perspective grounded in their personal experience as to how that critical trust is undermined by the deployment of National Guard troops to the streets of D.C. to conduct ordinary law-enforcement activities.

## INTRODUCTION & SUMMARY OF ARGUMENT

The "traditional and strong resistance of Americans to any military intrusion into civilian affairs" has "deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). *Amici*, all experts with many years of experience working directly in law enforcement, submit this brief to illuminate the fuller context and adverse consequences of the federal government's decision to send thousands of National Guard troops to patrol the streets of the District of Columbia despite the general legal prohibition against military forces providing domestic law enforcement.

*Amici* focus on the irreparable injuries and public harm that will occur if Appellants' actions are allowed to stand. Appellants' decision to deploy National Guard troops to perform routine law-enforcement functions in the District undermines local trust in law enforcement and weakens public safety. National Guard troops are, understandably, focused on a military mission or responding to emergencies such as fires or other natural disasters, and receive training in the tactics

3

and skills necessary to perform those functions. They are not trained to be ordinary police officers, nor do they have the necessary experience and knowledge of the local community that can help local police perform their jobs safely and effectively.

Against that background, deploying armed National Guard troops into a civilian law-enforcement setting invites deleterious and even disastrous results. The deployment of these troops to conduct ordinary law enforcement in D.C. communities threatens to erode the public's trust in law enforcement that local authorities work hard to develop and maintain. Local officials rely on that trust day in and day out to safely and effectively protect local communities and enforce the laws. Any erosion of such trust will decrease the likelihood that D.C. residents will report crime or cooperate with investigations, and increase the risk of tension and violence between residents and police. Once eroded, trust built over years cannot be easily restored even after the National Guard troops have left the District.

The troop deployment also endangers public safety, creating the potential for harm to D.C. residents, local law enforcement, and the troops themselves. Their presence risks escalating situations that ordinary police are better equipped to defuse because those troops lack the experience and training of local police officers. It also risks errors of judgment in sensitive situations that could result in unnecessary shows of force or other law-enforcement power.

4

In this Court's review of the equities guiding the district court's entry of a preliminary injunction, it should assign these considerations substantial weight, as they strike at the heart of public trust, order, and safety.

## ARGUMENT

Local law-enforcement officers are trained on how to be effective in conducting day-to-day policing. That training is refined through years of on-the-job experience. This training and experience helps them hone the judgment needed to make on-the-spot decisions that will best promote public safety while maintaining strong relationships with the community. Exercising prudent judgment includes knowing when and how to use the unique powers of law enforcement and when other, less intrusive measures will suffice. Local law-enforcement officers are also trained to recognize the importance of developing relationships of trust with the communities that they serve.

Members of the National Guard do not have the same mission, training, and experience, and often lack connection to local communities. The National Guard routinely assists other parts of the military in missions abroad and, domestically, performs functions other than law enforcement, such as responding to natural disasters or providing security for discrete purposes, such as special events. Focused on a military mission and lacking the training and experience of local law-enforcement officers, National Guard troops are not well-suited to conduct ordinary

policing. The performance of everyday police responsibilities by the National Guard in the District threatens to undermine public trust in law enforcement, and puts public safety at risk. Among other reasons, having National Guard troops perform routine law enforcement increases the likelihood that their interactions will lead to dangerous escalations, rather than de-escalations, when troops engage with community members. Further, the presence of military officials risks undermining public trust and escalating police-community interactions. All of this irreparably harms Plaintiff and shows that the equities strongly favor affirming the district court's preliminary injunction.

## I.    National Guard Troops Lack the Training, Experience, and Guidance Necessary To Engage in the Kind of Law-Enforcement Functions Performed by Local Police.

### A.    Any law-enforcement training that National Guard troops patrolling D.C. may have received is inadequate to safely and effectively perform day-to-day policing.

The federal government has deployed National Guard troops to engage in ordinary law-enforcement functions such as "patroll[ing] Metro stations and busy public spaces like the H Street Corridor, Gallery Place, and Dupont Circle," as well as "some parks." JA817. All of these troops carry weapons while patrolling the

District. *See* Joseph Gedeon, *Pentagon Says Every National Guard Soldier Deployed in Washington DC 'Is Now Armed,'* Guardian (Dec. 2, 2025).[4]

Yet critical questions remain unanswered about precisely what law-enforcement training or guidance the National Guard troops have received. For example, what types of training have armed National Guard troops received on uses of force in a law-enforcement context? What use-of-force rules govern the National Guard troops deployed in the District? What are the accountability mechanisms for inappropriate uses of force or other law-enforcement powers? And do the same rules apply to troops regardless of where their unit is based? *See* Gedeon, *supra* ("[T]he rapid arming of all reservists in DC for street-level policing brings up questions regarding training and readiness to engage in civil law enforcement."); Mark Nevitt, *Trump, the National Guard, and the District of Columbia: What You Need to Know*, Just Sec. (Aug. 18, 2025) ("Relevant state laws governing National Guard usage vary widely by state.").[5] The federal government's failure to adequately answer these questions is itself telling. These issues are of paramount importance because military forces, including the National Guard, "are less familiar than police with the nuances of citizens' rights and the conditions under which force is permissible" and "are taught to treat civilians as potential threats and to always be ready to respond." Mark

---

[4] https://www.theguardian.com/us-news/2025/dec/02/national-guard-washington-dc-armed.

[5] https://www.justsecurity.org/119178/trump-national-guard-dc/.

F. Cancian & Chris H. Park, *Sending the National Guard Into D.C. Is the Wrong Solution to a Crime Problem*, Ctr. for Strategic and Int'l Stud. (Aug. 12, 2025).[6] Decisive answers to these questions are critical because the federal government may seek to use troops for "crime deterrence and public safety missions in the District" on a "longstanding, if not permanent" basis. JA818.

Even if National Guard troops receive some law-enforcement training before their deployment in the District, any such training is not as comprehensive as what local police receive, nor could it include the kind of training that years of experience provides. Training for police officers focuses on the nuts and bolts of on-the-ground policing. Police academy training for the D.C. Metropolitan Police lasts thirty-seven weeks, during which time recruits "complete a full program of classroom, scenario, physical, and tactical training to prepare them for the challenges of being a police officer." *MPD Academy Curriculum*, Metro. Police Dep't.[7] Training subjects "include laws of arrest, search and seizure, criminal law, traffic regulations, human relations, community policing, and ethics." *Id.* Recruit officers also "receive skills training in operation of emergency police vehicles, self-defense, advanced first aid, and much more." *Id.* And the police department posts the curriculum on a public website and expressly invites scrutiny, so that "members of the public [can] provide

---

[6] https://www.csis.org/analysis/sending-national-guard-dc-wrong-solution-crime-problem.

[7] https://mpdc.dc.gov/page/mpd-academy-curriculum.

comments and feedback for consideration in future updates." *Id*. Moreover, the D.C. Metropolitan Police instructs officers to use de-escalation tactics, such as "verbal persuasion, warnings, slowing down the pace of an incident, and tactical repositioning." *See Metropolitan Police Academy: 5.3 Four Pillars of Communication* 7, Metro. Police Dep't.[8] These de-escalation tactics are designed to "stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in necessary force." *Id.*

By contrast, the extent and focus of training National Guard troops for deployment in the District is distinct from that received by local police officers. One day or a few days of pre-deployment training does not compare to the months-long trainings and, often, years-long experience of local police. *See* Austin Goss, *National Guard Soldiers Strengthen Skills Through De-Escalation Training*, U.S. Army (Sep. 12, 2025) (explaining that some National Guard troops "supporting the D.C. Safe and Beautiful Task Force" participated in a one-day "de-escalation course" on September 8, 2025).[9] Further, where National Guard troops do receive more extensive law-enforcement training—for example, in the case of troops training to

---

[8]  https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/5.3 %20Four%20Pillars%20of%20Communication%20FINAL.pdf.
[9]  https://www.army.mil/article/288448/national_guard_soldiers_strengthen_skills _through_de_escalation_training.

be military police—the focus of that training is not the same as general police training. Military police "control traffic, prevent crime and respond to . . . emergencies," but their primary duty is to "protect the lives and property on Army National Guard installations by enforcing military laws and regulations." *Military Police*, Nat'l Guard.[10]

**B.      National Guard troops are focused on a military mission and typically do not train for or engage in law-enforcement functions.**

The difference in levels of law-enforcement training between National Guard troops and local police officers results from the way in which National Guard troops have been trained and deployed. The National Guard dates back almost 400 years, when the first militia regiments in North America were organized in Massachusetts based on an order of the Massachusetts Bay Colony's General Court. *About the Guard: How We Began*, Nat'l Guard.[11] Over the past several centuries, the National Guard has maintained its focus on a military mission. By statute, and "[i]n accordance with the traditional military policy of the United States," the "strength and organization of the Army National Guard and the Air National Guard as an integral part of the first line defenses of the United States [must] be maintained and assured at all times." 32 U.S.C. § 102.

---

[10] https://nationalguard.com/31b-military-police.
[11] https://www.nationalguard.mil/About-the-Guard/How-We-Began.

Consistent with that statutory mandate, and in contrast to local law enforcement, the National Guard has been used extensively in overseas military operations. It "is the primary combat reserve of the Army and Air Force, seamlessly providing enduring, rotational, surge and follow-on forces to the Joint Force to fight and win the nation's wars and defend the homeland." *About the Guard*, Nat'l Guard.[12] For example, "[i]n early 2005, more than half the combat power in Iraq came from the National Guard." Jim Greenhill, *"Surge" Extends Minnesota Guard Unit's Iraq Tour Up to 125 Days*, Nat'l Guard (Jan. 11, 2007).[13] In 2016, the Army National Guard accounted for "roughly 40 percent of the Army's combat capability." Jon Soucy, *National Guard Remains a Vital Component of the War Fight*, U.S. Army (Mar. 22, 2016).[14] The D.C. National Guard has assisted in those efforts, deploying overseas more than 1,200 soldiers and completing over 90 whole-unit deployments in support of the War on Terror. *Past and Post War*, D.C. Nat'l Guard.[15]

The D.C. National Guard has, on occasion, been deployed domestically. However, before 2020, there were only "10 instances in which the militia, National

---

[12] https://www.nationalguard.mil/About-the-Guard/.

[13] https://www.nationalguard.mil/News/Article-View/Article/572868/surge-extends -minnesota-guard-units-iraq-tour-up-to-125-days/.

[14] https://www.army.mil/article/164663/national_guard_remains_a_vital_ component_of_the_war_fight.

[15] https://dc.ng.mil/About-Us/Heritage/History/Past-and-post-war/.

Guard, or federal armed forces were used for operations within the geographic boundaries of Washington, DC, due to violence or anticipated violence." Lawrence Kapp, Alan Ott & David A. Blum, Cong. Rsch. Serv., R46886, *Use of Militia, National Guard, or Federal Armed Forces Within the District of Columbia Prior to 2020*, at 1 (2021). In these instances—some of the most significant moments in American history—the D.C. National Guard deployed to defend the nation's capital or to perform critical security functions:

- The D.C. Militia attempted to defend the city during the War of 1812, when British military forces captured the District after "rout[ing] a U.S. force of approximately 5,000 soldiers";

- Federal armed forces, including federalized militia, "mann[ed] a series of forts and artillery batteries surrounding the capital" throughout the Civil War;

- The D.C. National Guard "protect[ed] reservoirs and power plants around [D.C.]" from espionage attacks shortly before the United States entered World War I;

- The D.C. National Guard "provid[ed] security for the U.S. Capitol" in the wake of Martin Luther King, Jr.'s assassination and the ensuing riots;

- The D.C. National Guard "mobilized . . . for security duty throughout [D.C.] and "provid[ed] perimeter security at the U.S. Capitol Complex" in the days following the September 11, 2001 terrorist attacks.

*Id.* at 3, 7, 8, 13, 16. While there have been additional deployments in the District for other purposes, "such as natural disaster response, counterdrug operations, . . . [and] general crowd and traffic control support," *id.* at 1, none of

12

these deployments involved using the National Guard for the kinds of routine law-enforcement purposes that the Guard is engaged in now.

Given the National Guard's traditional deployment overseas and, when necessary, for discrete disaster response and security functions domestically, "[m]embers of the National Guard generally do not receive training to perform local law enforcement tasks, such as learning de-escalation techniques, the use of non-lethal force, or how to properly conduct criminal investigations." *Oregon v. Trump*, 802 F. Supp. 3d 1277, 1283 (D. Or. 2025), *appeal dismissed*, 171 F.4th 1144 (9th Cir. 2026). Among the D.C. National Guard's stated priorities are "grow[ing] combat-ready Soldiers and Airmen," "focus[ing] on wartime mission and build[ing] lethal formations," and "evolv[ing] [the Guard's] formations to be ready for the next fight." *Mission & Vision*, D.C. Nat'l Guard.[16] This combat-centered training differs significantly from that of D.C. Metropolitan Police Officers, whose primary responsibility is local law enforcement and whose mission is to "protect [the District's] residents and visitors with the highest regard for the sanctity of human life." *MPDC: Mission and Value Statement*, Metro. Police Dep't.[17]

While police train to maintain peace in local communities, National Guard troops train primarily for war. *See* Cancian & Park, *supra*; Luke William Hunt,

---

[16] https://dc.ng.mil/About-Us/Mission-Vision/.

[17] https://mpdc.dc.gov/page/mpdc-mission-and-value-statement.

*Trump's Deployment of the National Guard to Fight Crime Blurs the Legal Distinction Between the Police and the Military*, Conversation (Sep. 5, 2025) (distinguishing between "state and local police training," which "focus[es] on law enforcement and maintaining order," and National Guard training, which focuses on "the skills it takes to become a Soldier").[18] Indeed, the Guard's statutory training requirements do not include any law-enforcement functions: "[E]ach company, battery, squadron, and detachment of the National Guard" is required to focus on "drill and instruction, including indoor target practice" and "training at encampments, maneuvers, outdoor target practice, or other exercises." 32 U.S.C. § 502(a). Basic training for National Guard troops is geared toward the "fundamentals of soldiering," including "hand-to-hand combat and guerrilla exercises," "convoy operations," "defeating improvised explosive devices," and "tactical foot marches." *Basic Training Phases*, Nat'l Guard.[19] And troops typically receive additional, continuing training "one drill weekend each month and one two-week annual training period each year." *Frequently Asked Questions*, Army Nat'l Guard;[20] Anshu Siripurapu et al., *What Does the U.S. National Guard Do?*, Council on Foreign Rels. (Jan. 29, 2026) (explaining that many National Guard troops "serve

---

[18]    https://theconversation.com/trumps-deployment-of-the-national-guard-to-fight-crime-blurs-thelegal-distinction-between-the-police-and-the-military-264548.

[19] https://nationalguard.com/basic-combat-training/basic-training-phases.

[20] https://www.nationalguard.mil/About-the-Guard/Army-National-Guard/FAQ/.

14

part-time while holding civilian jobs or attending school").[21] Deploying National Guard troops for routine law enforcement is thus "beyond what they're trained" to do. Jonathan Shorman, *Governors Split Over Mobilizing National Guard as Trump Seeks More Troops*, Stateline (Sep. 4, 2025) (describing statement by a former Air Force Reserve major general).[22]

Given that "the public has a significant interest in having only well-trained law enforcement officers deployed in their communities," *Illinois v. Trump*, 155 F.4th 929, 940 (7th Cir.), *stay denied*, 146 S. Ct. 432 (2025), the federal government's deployment of National Guard troops to patrol the streets of D.C.—troops who lack the training and experience that law-enforcement officers require to safely and effectively perform their duties—poses severe and irreparable harm to D.C. and its residents. This deployment undermines public safety and community trust in law enforcement, as described below.

## II.     The Deployment of National Guard Troops To Perform Everyday Law-Enforcement Functions Threatens To Undermine Public Trust in Law Enforcement and Public Safety.

The deployment of National Guard troops to patrol the streets of D.C. in support of a crime-fighting mission "infringe[s] upon the District's right to . . . make its own decisions on . . . how to best deter crime." JA865. Appellants attempt to

---

[21] https://www.cfr.org/backgrounder/what-does-us-national-guard-do.
[22] https://stateline.org/2025/09/04/governors-split-over-mobilizing-national-guard-as-trump-seeks-more-troops/.

refute this by asserting that National Guard troops are "not making arrests, conducting searches and seizures, or making decisions on whether to arrest, prosecute, or investigate crime" and are primarily focused on "providing a presence" in the District. Appellant Br. 45-46. But it is precisely this "presence" that threatens to undermine the trust between law enforcement and community members that takes years to develop. Any erosion of that trust will have a detrimental impact on public safety, including by reducing cooperation and crime reporting by the public and increasing the likelihood that ordinary interactions between law enforcement and community members will escalate into dangerous situations. That harm is irreparable because trust, once breached, is difficult to regain.

> **A.    The deployment of National Guard troops in D.C. threatens to undermine public trust in law enforcement.**

"No single factor has been more crucial to reducing crime levels than the partnership between law enforcement agencies and the communities they serve." *Community-Police Engagement*, Int'l Ass'n of Chiefs of Police.[23] That partnership is based largely on trust. "Building trust between legal authorities and members of the public is a cornerstone of strategies that promote safe communities . . . ." Tracey L. Meares, *Trust & Models of Policing*, 151 Dædalus 161, 172 (2022); *see also, e.g.*, Rachel Moran, *Police Privacy*, 10 U.C. Irvine L. Rev. 153, 185-86 (2019) ("Mistrust

---

[23] https://www.theiacp.org/resources/critical-issues-community-police-relations.

of the police undermines the legitimacy of both law enforcement and the rule of law more generally.”). As the Second Circuit explained over two decades ago, “[t]he effectiveness of a city’s police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias.” *Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002) (citing Tom R. Tyler, *Why People Obey the Law* 22-23, 67 (1990)). And “[t]he most important aspect of promoting trust-based approaches is the training of agency personnel.” Meares, *supra*, at 166; *see* Int’l Ass’n of Chiefs of Police, *Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practices Guide for Local Law Enforcement* 10-11 (2009) (outlining training and education as strategies for building community trust);[24] Debo P. Adegbile, *Policing Through an American Prism*, 126 Yale L.J. 2222, 2256 (2017) (recounting how “[m]ore trainings, new de-escalation policies, and the release of police data led to a decrease in both crime rates and excessive force complaints” in the Dallas police department).

The federal government’s ongoing deployment of National Guard troops in the District will erode the trust of D.C. residents and visitors, who are being policed by individuals largely unfamiliar with the local community and whose training

---

[24] https://portal.cops.usdoj.gov/resourcecenter/RIC/Publications/cops-w0724-pub.pdf.

emphasizes military tactics, not community-oriented policing. Common sense dictates that a National Guard member with less experience in, for example, de-escalation will not perform in the same manner as a police officer who has been trained to handle such situations and has confronted similar situations many times before. The lack of local familiarity and connection is also damaging. "[L]aw enforcement cannot build community trust if it is seen as an occupying force coming in from outside to impose control on the community." President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing* 1 (2015).[25]

As a practical matter, the National Guard troops' lack of training and guidance creates a greater risk of mistakes while performing law-enforcement functions, including in sensitive situations regarding appropriate uses of force. Errors attributable to the lack of training or guidance for National Guard members are likely to harm the public's trust in law enforcement in general. Here, that risk is especially acute where there are numerous agencies deployed in a law-enforcement capacity and where the line between military and law-enforcement agents is blurry. *See* Minority Staff of S. Comm. on Homeland Sec. & Governmental Affs., 119th Cong., *At What Cost?: Trump's Indefinite Deployment of the National Guard in D.C. on*

---

[25] https://www.govinfo.gov/content/pkg/GOVPUB-J36-PURL-gpo64136/pdf /GOVPUB-J36-PURL-gpo64136.pdf.

*Track to Cost Taxpayers $600 Million a Year* 11-12 (Feb. 2026).[26] If law-enforcement personnel make mistakes, the public's confidence in policing diminishes. And if the public is not always aware of which type of officer—local or federal—is making the mistake, the community's trust and confidence in local law enforcement will not be restored when federal officers leave. D.C. Mayor Muriel Bowser has described a "break in trust" between law enforcement and the community resulting from National Guard troops and other federal agents engaging in law enforcement. Nicole Markus, *Bowser Continues to Walk the Trump Tightrope,* Politico (Aug. 27, 2025).[27]

Trust in law enforcement is further eroded by National Guard troops' lack of accountability to the communities they are patrolling. *See* Donell Harvin, *How to Truly Keep Washington, DC Safe: President Trump's Militarized Approach Undercuts What's Been Working*, Just Sec. (Aug. 15, 2025) (explaining that the D.C. Metropolitan Police Department is accountable to D.C. residents and elected officials, whereas the National Guard is not).[28] An important part of building trust between the local community and the police who serve that community is the ability to hold the police department and individual officers accountable. *See* Barry

---

[26] https://www.hsgac.senate.gov/wp-content/uploads/NationalGuardReport.pdf.
[27] https://www.politico.com/news/2025/08/27/bowser-trump-tightrope-washington-police-00531535.
[28] https://www.justsecurity.org/119047/trump-federalization-takeover-dc/.

Friedman & Maria Ponomarenko, *Democratic Policing*, 90 N.Y.U. L. Rev. 1827, 1880-81 (2015); *see also* Ash Gautam, *Balancing Interests in Public Access to Police Disciplinary Records*, 100 Tex. L. Rev. 1405, 1415 (2022) ("A number of scholars, journalists, activists, lawmakers, and even police chiefs and other police advocates argue that transparency is an important solution to the police's continuing public trust problem." (quotation marks omitted)). The District has established accountability mechanisms for law enforcement that foster such trust. For example, the police's "training, policies and procedures are reviewed by elected officials and oversight bodies." Harvin, *supra*. And the statutorily created and independent Office of Police Complaints "increase[s] community trust in the District of Columbia police forces by providing a fair, thorough, and independent system of civilian oversight of law enforcement." *Office of Police Complaints*, DC.gov ("The agency's functions are to conduct fair and thorough investigations of citizen complaints, provide a reliable system of civilian oversight of law enforcement policies, procedures, and training, and promote positive community-police interactions.").[29] By contrast, National Guard troops operate with little community oversight because "their missions are governed by military regulations, not municipal codes, and their actions are rarely subject to public complaint processes or civilian[] courts." Harvin, *supra*.

---

[29] https://policecomplaints.dc.gov/page/about-office-police-complaints.

An erosion of trust between law enforcement and the community makes the work of law enforcement more difficult and ultimately diminishes public safety. Community members with "low levels of perceived legitimacy and trust in criminal justice systems, particularly police, are less likely to report crimes to police and cooperate with subsequent investigations." Adam Trahan & Douglas N. Evans, *Perceptions of Legal System Legitimacy Among Family Members of Individuals Incarcerated for Sex Offenses*, 30 Psych. Pub. Pol'y & L. 80, 87 (2024); *see* Michael Friedman, *What Happens When We Don't Trust Law Enforcement?*, Psych. Today (Sep. 9, 2014) ("Trust in law enforcement is essential for the belief in the legitimacy of law enforcement, or feeling an obligation to obey the law and defer to decisions made by legal authorities.").[30] This lack of community participation hinders the effectiveness of law enforcement. *See, e.g.*, Tom Tyler, *Police Discretion in the 21st Century Surveillance State*, 2016 U. Chi. Legal F. 579, 584 (2016) ("Many of the problems that the police identify as making policing more difficult," "such as widespread disregard of police authority and a broad unwillingness to work with the police, are linked to a lack of trust and confidence in the police."); Monica C. Bell, *Police Reform and the Dismantling of Legal Estrangement*, 126 Yale L.J. 2054, 2059 (2017) ("Empirical evidence suggests that feelings of distrust manifest themselves

---

[30] https://www.psychologytoday.com/us/blog/brick-brick/201409/what-happens-when-we-dont-trust-law-enforcement.

in a reduced likelihood among African Americans to accept law enforcement officers' directives and cooperate with their crime-fighting efforts."); Desmond Ang et al., *Police Violence Reduces Civilian Cooperation and Engagement with Law Enforcement* 3 (Harv. Kennedy Sch., Working Paper No. 21-022, 2021) (finding evidence that "high-profile acts of police violence may severely impair civilian trust and crime-reporting"). That, in turn, irreparably harms public safety as crimes go unreported and unaddressed.

By contrast, "when people perceive that legal authorities are treating them fairly, they say they are more likely to comply, cooperate, and engage with the law and authorities' directives." Meares, *supra*, at 165; *see* Richard Brown, *Do We Trust the Police?*, Psych. Today (Apr. 28, 2023) ("Police forces that are trusted by their communities can perform their duties more effectively, which, in turn, helps to foster positive relationships between the police and the communities they serve.").[31] That brings its own set of benefits. When law-enforcement authorities "hold up their end of the relationship by wielding their power in appropriate ways, citizens in turn feel a sense of responsibility as members of society to comply with the law, cooperate with law enforcement, and participate in the legal system." Rick Trinkner, Jonathan Jackson & Tom R. Tyler, *Bounded Authority: Expanding "Appropriate" Police*

---

[31] https://www.psychologytoday.com/us/blog/understanding-health-behaviors/202303/do-we-trust-the-police.

*Behavior Beyond Procedural Justice*, 42 Law & Hum. Behav. 280, 289 (2018). And

"[i]f people in the community have greater trust in the police," conflicts in the

aftermath of high-visibility police shootings "are less likely to begin and escalate

into resistance and physical violence." Tyler, *Police Discretion*, *supra*, at 583. The

community's trust in its law enforcement accordingly benefits the public and law

enforcement alike.

**B.      The deployment of National Guard troops in D.C. threatens to undermine public safety by increasing the risk that interactions with the community will result in harmful escalations.**

In addition to undermining the carefully built trust of D.C. residents in law

enforcement, dispatching National Guard troops to patrol D.C. neighborhoods also

threatens to irreparably harm public safety. While National Guard troops focus their

training on fulfilling military objectives or responding to domestic emergencies, the

vast majority of our nation's largest police departments train and expect their officers

to use de-escalation tactics. Campaign Zero, *8 Can't Wait* (as of May 2021, at least

77 of the nation's top 100 cities require de-escalation training);[32] *see* Fraternal Ord.

of Police et al., *National Consensus Policy and Discussion Paper on Use of Force*

2-3 (2020) (national consensus policy, published by eleven of the most prominent

police leadership and labor organizations in the United States, providing that "[a]n

officer shall use de-escalation techniques and other alternatives to higher levels of

---

[32] https://8cantwait.org.

23

force consistent with his or her training whenever possible and appropriate before resorting to force and to reduce the need for force");[33] Police Exec. Rsch. F., *Guiding Principles on Use of Force* 54 (2016) ("De-escalation can be used in a range of situations, especially when confronting subjects who are combative and/or suffering a crisis because of mental illness, substance abuse, developmental disabilities, or other conditions that can cause them to behave erratically and dangerously.").[34] Those tactics include "verbal persuasion, warnings, slowing down the pace of an incident, and tactical repositioning." *Metropolitan Police Academy: 5.1 Use of Force Overview*, Metro. Police Dep't.[35] This "cornerstone of modern policing" has altered the way in which local police interact with the public. *De-Escalation in Law Enforcement*, National Policing Institute.[36] As the Department of Justice has explained, "de-escalation training can dramatically reduce injuries among civilians and law enforcement officers alike." Off. of Just. Programs, U.S. Dep't of Just., *De-*

---

[33] https://www.theiacp.org/sites/default/files/2020-07/National_Consensus_Policy_On_Use_Of_Force%2007102020%20v3.pdf.

[34] https://www.policeforum.org/assets/30%20guiding%20principles.pdf.

[35] https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/5.1%20Use%20of%20Force%20Overview%20FINAL.pdf; *see also* Albuquerque Police Dep't, *Use of Force: De-escalation, SOP 2-55-4*, at 1-2 (2024), https://tinyurl.com/vyeu53u3; Columbus Police Dep't, *Columbus Police Division Directive: Use of Force* 2 (2025), https://tinyurl.com/yewwuhxt.

[36] https://www.policinginstitute.org/de-escalation/#learn-more.

*Escalation Training: Safer Communities and Safer Law Enforcement Officers* (Sep. 6, 2022).[37]

For example, one jurisdiction that implemented de-escalation training saw a 28% decline in use-of-force incidents; a 36% decline in injuries to officers; and a 26% decline in injuries to the public. *See* Robin S. Engel et al., *Assessing the Impact of De-Escalation Training on Police Behavior: Reducing Police Use of Force in the Louisville, KY Metro Police Department*, 21 Criminology & Pub. Pol'y 199, 201 (2022). Other jurisdictions incorporating de-escalation into officer training have likewise seen sharp declines in excessive force complaints. *See* Rachel Abanonu, *De-Escalating Police-Citizen Encounters*, 27 S. Cal. Rev. L. & Soc. Just. 240, 249-50 (2018) (noting 64% reduction in Dallas). These examples reflect the basic premise that local law enforcement trained in de-escalation who know and understand their communities are better prepared to minimize conflicts when interactions do occur.

Without meaningful, sustained de-escalation training, however, National Guard troops' presence may "create the atmosphere of fear and hostility which exists in territories occupied by enemy forces." *Bissonette v. Haig*, 776 F.2d 1384, 1387 (8th Cir. 1985). And tasking National Guard troops with "roles far outside their

---

[37] https://www.ojp.gov/news/ojp-blogs/de-escalation-training-safer-communities-and-safer-law-enforcement-officers.

intended purpose" creates the risk that they will "escalate tensions in the very neighborhoods they're meant to protect." Christopher Purdy, *What We Lose by Distorting the Mission of the National Guard*, Atlantic (Aug. 31, 2025).[38] The deployment of troops to local neighborhoods thus inherently risks escalating, rather than de-escalating, any situation that requires law-enforcement intervention.

This escalatory risk poses a grave threat to the safety not only of the public, but also of the local police that the National Guard are deployed ostensibly to assist. To the extent tensions rise or situations get out of hand, local law enforcement may be required to respond to defuse tension or come to the aid of Guard members. *See Oregon*, 802 F. Supp. 3d at 1295-96 ("[S]tate and local law enforcement will need to . . . quell increased civil unrest that is likely to result from the Guard's mobilization."); *Illinois v. Trump*, 25 Civ. 12174, 2025 WL 2886645, at *23 (N.D. Ill. Oct. 10, 2025) ("[D]eployment of National Guard members is likely to lead to civil unrest, requiring deployment of state and local resources to maintain order."). Police officers who may have successfully avoided escalation in the first place would now be placed in harm's way. Since late November, D.C. police have begun patrolling alongside the National Guard after two National Guard troops were shot (one fatally) while on duty. Jenny Gathright, Emily Davies & Olivia George, *D.C.*

---

[38] https://www.theatlantic.com/politics/archive/2025/08/what-we-lose-misusing-national-guard/684070/.

*Police to Begin Patrolling with National Guard After Fatal Attack*, Wash. Post (Nov. 28, 2025).[39] This may decrease the risk of escalation, but the presence of troops with less training in de-escalation still puts police officers at risk. The deployment of armed National Guard troops to patrol the streets of D.C. thus strikes at the heart of public safety—but it points against, rather than for, their deployment. Their deployment irreparably injures the public trust, order, and safety. National Guard troops should play no role in conducting ordinary law-enforcement functions in the District.

---

[39] https://www.washingtonpost.com/politics/2025/11/28/national-guard-dc-police/.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order.

May 26, 2026

Respectfully Submitted,

*/s/ Trisha Anderson*
Trisha Anderson
    *Counsel of Record*
Martin Totaro
Jared M. Hirschfield
HECKER FINK LLP
1050 K Street NW, 10th Floor
Washington, DC 20001
(212) 763-0883
tanderson@heckerfink.com

*Counsel for Amici Curiae*

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,685 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced type face using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.


May 26, 2026


*/s/ Trisha Anderson*
Trisha Anderson

*Counsel for Amici Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2026, I electronically filed the foregoing *amicus curiae* brief with the Clerk for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

May 26, 2026

*/s/ Trisha Anderson*
Trisha Anderson

*Counsel for Amici Curiae*

**APPENDIX: BIOGRAPHIES OF INDIVIDUAL *AMICI CURIAE***

**Art Acevedo** served as Chief of Police in Austin, Texas; Houston, Texas; Miami, Florida; and Aurora, Colorado. He is also a former president of the Major Cities Chiefs Association and the National Latino Peace Officers Association.

**Brandon del Pozo** served for eight years as an infantry rifle platoon leader, executive officer, and company commander in the New Hampshire, New York, and Vermont Army National Guards. He also served as a police officer for 23 years: 19 in the New York Police Department, where he commanded two patrol precincts, and four as the Chief of Police of Burlington, Vermont. He is currently an assistant professor of medicine and health policy at Brown University. His book, *The Police and the State*, examines the principles of effectively policing a democracy.

**Dr. Kysha Fedd** started her career at the Gadsden County Sheriff's Office and advanced through the ranks, retiring as a Captain. She served as Chief Strategy Officer for the U.S. Virgin Islands Police from 2020 to 2021.

**Neill Franklin** spent 34 years in the Maryland State Police and the Baltimore Police Department, during which he led the Baltimore Police Department's Bureau of Drug and Criminal Enforcement and the Education and Training Division.

**Diane Goldstein** served as a police officer for over 21 years in the Redondo Beach Police Department. She advanced through the ranks and retired as a lieutenant in command of three operational divisions.

**Renee Hall** served as Chief of the Dallas Police Department. She began her career with the Detroit Police Department and has spent more than 20 years in public service.

**Wayne P. Harris** served in law enforcement for 30 years. He became Deputy Chief of the Rochester Police Department following a lengthy career as an officer, lieutenant, captain, and commander.

**Corey Pegues** served for 21 years in the New York Police Department and advanced through the ranks as a sergeant, lieutenant, and captain. In 2008, he was promoted to Deputy Inspector of the 67th Precinct.

**Sonia Pruitt** is a former Chairperson of the National Black Police Association. She is a Professor of Criminal Justice at Howard University and Montgomery College in Maryland, and previously served as a captain with the Montgomery County, Maryland Police Department.

**Sue Rahr** has spent more than 40 years in law enforcement, including as Sheriff of King County, Washington, and Interim Chief of the Seattle Police Department.

**Howard Rahtz** retired as Captain of the Cincinnati Police Department after a career in community policing, training, and drug enforcement. He is the author of four books on police and use-of-force issues.

**Rob Reyes** is the former Chief of Police for the U.S. Department of Veterans Affairs in Erie, PA, where he was responsible for 500 employees.

**Sean Smoot** is an Honorably Discharged veteran of the United States Army and the Illinois National Guard. Mr. Smoot was an elected alderman for 12 years and the Commissioner of Police in Leland Grove, Illinois for over 10 years. He is a nationally recognized expert on police and public safety and currently serves as the Chairman of the Illinois Law Enforcement Training & Standards Board.

**Darrel W. Stephens** has over forty years of law-enforcement experience, including as Chief of Police in cities such as Charlotte-Mecklenburg, North Carolina; St. Petersburg, Florida; Newport News, Virginia; and Largo, Florida. He has also served as Executive Director of the Major Cities Chiefs Association and has held roles with the National Academy of Public Administration, the Police Executive Research Forum, the Harvard University Executive Sessions for Policing, and other law-enforcement associations.

**Trevor Velinor** is the former Commissioner of the U.S. Virgin Islands Police Department and former Deputy Assistant Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

**Robert Wasserman** has served as a senior executive in several large American police agencies, including Dayton, Ohio; Boston, Massachusetts; and Houston, Texas. He previously served as Senior Advisor on International Law

Enforcement for the Bureau of International Narcotics and Law Enforcement at the U.S. Department of State and as Chief of Staff of the White House Office of National Drug Control Policy.

**Charles P. Wilson** served 23 years with the Rhode Island College Campus Police Department as a patrol shift supervisor. He was also Chief of the Woodmere Village, Ohio Police Department and has served a historic nine terms as National Chairman of the National Association of Black Law Enforcement Officers.