[NOT YET SCHEDULED FOR ORAL ARGUMENT]

No. 25-5418

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

DISTRICT OF COLUMBIA,

*Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

*Defendants-Appellants*.

---

*On Appeal from the United States District Court
for the District of Columbia*

---

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF APPELLEE AND AFFIRMANCE

---

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1730 Rhode Island Ave NW
  Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**STATEMENT REGARDING
CONSENT TO FILE AND SEPARATE BRIEFING**

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae* represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amicus* certifies that a separate brief is necessary.  *Amicus* is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees. In furtherance of those goals, CAC frequently files *amicus* briefs in the federal courts addressing questions of constitutional and statutory interpretation, including recent briefs concerning National Guard deployments filed in the Supreme Court and in the Seventh and Ninth Circuits.  CAC accordingly has an interest in this case and is well situated to aid the Court in resolving the appeal.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

**CERTIFICATE AS TO PARTIES,
RULINGS, AND RELATED CASES**

**I.    PARTIES AND *AMICI CURIAE***

Except for any *amici* who had not yet entered an appearance in this case as of the filing of Appellants' opening brief, all parties, intervenors, and *amici* appearing in this Court are listed in Appellants' opening brief.

**II.    RULINGS UNDER REVIEW**

Reference to the ruling under review appears in Appellants' opening brief.

**III.    RELATED CASES**

Reference to any related cases pending before this Court appears in Appellants' opening brief.

Dated: May 26, 2026                     */s/ Brianne J. Gorod*
                                        Brianne J. Gorod

                                        *Counsel for Amicus Curiae*

iii

## TABLE OF CONTENTS

                            **Page**

TABLE OF AUTHORITIES ................................................................................ v

GLOSSARY ...................................................................................................... ix

INTEREST OF *AMICUS CURIAE* ................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ..................................................................................................... 5

I.     The D.C. Code Does Not Allow President Trump to Use the National Guard for Crime Reduction ..................................................... 5

     A.    Congress patterned the D.C. Guard on state laws that expressly defined and carefully limited the commander-in-chief's powers ................................................................... 5

     B.    Section 49-103 is the only mechanism for presidential deployment of the D.C. Guard .................................................. 10

     C.    No other D.C. Code provision supports President Trump's deployment .................................................................................. 15

II.    Title 32 Does Not Allow President Trump to Use the National Guard for Crime Reduction ................................................................. 20

     A.    Section 502(f)(2) allows state National Guards to receive federal pay and benefits only for activities independently authorized by other laws ........................................................... 20

     B.    Section 502(f)(2) cannot plausibly be read as allowing presidents to use the military for domestic law enforcement whenever a governor lends troops ............................................. 24

CONCLUSION ................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Abramski v. United States*,
573 U.S. 169 (2014).................................................................. 26

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008).................................................................. 15

*Kendall v. United States ex rel. Stokes*,
37 U.S. 524 (1838).................................................................. 13

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026)........................................... 4, 15, 21, 25-27

*Martin v. Mott*,
25 U.S. 19 (1827).................................................................. 13

*Myers v. United States*,
272 U.S. 52 (1926).................................................................. 13

*Trump v. Illinois*,
146 S. Ct. 432 (2025)......................................... 4, 11, 25, 26

*Worth v. Craven Cnty. Comm'rs*,
118 N.C. 112 (1896) .................................................................. 7

<u>FEDERAL STATUTES AND LEGISLATIVE MATERIALS</u>

10 U.S.C. § 251.................................................................. 25

10 U.S.C. § 252.................................................................. 25

10 U.S.C. § 253.................................................................. 25

10 U.S.C. § 275.................................................................. 26, 27

10 U.S.C. § 283.................................................................. 26

10 U.S.C. § 284.................................................................. 26

v

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

10 U.S.C. § 12301 .............................................................................. 15

10 U.S.C. § 12310 .............................................................................. 15, 21

10 U.S.C. § 12406 .............................................................................. 26

18 U.S.C. § 1385 ................................................................................ 25

19 U.S.C. § 1862 ................................................................................ 13

32 U.S.C. § 112 .................................................................................. 21

32 U.S.C. § 502 .................................................................. 3, 20, 21, 27

32 U.S.C. § 902 .................................................................................. 22

Act of July 29, 1861, ch. 25, 12 Stat. 281 ..................................... 10, 11

Act of Mar. 1, 1889, ch. 328, 25 Stat. 772 ..................................... 5, 6, 12

D.C. Code § 49-101 ........................................................................... 18

D.C. Code § 49-102 ........................................................................... 15, 16

D.C. Code § 49-103 ........................................................................... 19

D.C. Code § 49-404 ........................................................................... 18

D.C. Code § 49-405 ........................................................................... 19

D.C. Code § 49-406 ........................................................................... 18

D.C. Code § 49-901 ........................................................................... 19

H.R. Rep. No. 50-809 (1888) ............................................................ 6

## EXECUTIVE BRANCH MATERIALS

1 Op. Att'y Gen. 624 (1823) ............................................................. 13

13 Op. O.L.C. 91 (1989) ................................................................... 18

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Exec. Order No. 11403 (Apr. 5, 1968) ....................................................... 11

Memorandum from Norbert A. Schlei, Assistant Attorney General,
    OLC (Aug. 9, 1963) .................................................................. 17, 18

Memorandum from Norbert A. Schlei, Assistant Attorney General,
    OLC (July 30, 1963) ....................................................................... 17

## STATE CONSTITUTIONAL PROVISIONS

Minn. Const. art. V (1857).......................................................................... 7

Mont. Const. art. VI (1972) ...................................................................... 15

Mont. Const. art. VII (1889) ..................................................................... 14

N.Y. Const. art. IV (1846) .......................................................................... 8

N.Y. Const. art. XI (1846) .......................................................................... 8

Pa. Const. art. IV (1873) ............................................................................. 7

Pa. Const. art. XI (1873) ............................................................................. 7

Wis. Const. art. V (1848) ............................................................................ 8

## STATE STATUTES

*Annotated Statutes of Wisconsin* (1889) ................................................... 8

*Digest of the Military Laws of Pennsylvania* (1882) ................................. 8

*Laws of Kansas* (1889).............................................................................. 10

*Military Code of the State of New York* (1889) .............................. 8-10, 14

*Public Statutes of the Commonwealth of Mass.* (1882)............................. 9

*Revised Statutes of the State of Ohio* (1891)............................................. 9

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

BOOKS, ARTICLES, AND OTHER AUTHORITIES

Christopher R. Brown, *Been There, Doing That in a Title 32 Status: The National Guard Now Authorized to Perform Its 400-Year-Old Domestic Mission in Title 32 Status*, 2008 Army Lawyer 23 (2008) .................................................................................. 20

Thomas Cooley, *Treatise on Constitutional Limitations* (1878)............ 7

Jerry Cooper, *The Wisconsin National Guard in the Milwaukee Riots of 1886*, Wis. Mag. Hist. 31 (1971) ...................................................... 8

*The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies* (Francis Newton Thorpe, ed., 1909) .................................................................. 7

Lawrence Kapp et al., Cong. Rsch. Serv., No. R46886, *Use of Militia, National Guard, or Federal Armed Forces within the District of Columbia Prior to 2020* (Aug. 25, 2021) ............................................ 11

William H. Riker, *Soldiers of the States: The Role of the National Guard in American Democracy* (1957) ................................................ 6

Antonin Scalia & Bryan A. Garner, *Readling Law: The Interpretation of Legal Texts* (2012) ........................................................................ 15

Paul Sonne et al., *Pentagon Disarms National Guard Activated in D.C., Sends Active-Duty Forces Home*, Wash. Post (June 5, 2020) ............ 28

Kevin Stack, *The President's Statutory Powers to Administer the Laws*, 106 Colum. L. Rev. 263 (2006) ........................................................... 13

Frederic J. Stimson, *American Statute Law* (1886) ................................ 6, 14

Peter Strauss, *Overseer, or "The Decider"? The President in Administrative Law*, 75 Geo. Wash. L. Rev. 696 (2007)..................... 14

# GLOSSARY

CAC          Constitutional Accountability Center

EMAC        Emergency Management Assistance Compact

MOU         Memorandum of Understanding

OLC          Office of Legal Counsel

## INTEREST OF *AMICUS CURIAE*

Constitutional Accountability Center is a think tank and public interest law firm that works to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees.  Accordingly, CAC has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

If the Trump administration wants to end lawlessness in the District of Columbia, it should start with its own actions.  No statute sanctions its use of the D.C. National Guard as a roving crime-reduction squad.  Nor does any statute allow it to bring in military units from other jurisdictions to police the District's residents, evading the constraints Congress has long imposed on using military power for domestic law enforcement.  Because there is no legal basis for this unprecedented deployment of armed soldiers into the neighborhoods of Washington, D.C., this Court should affirm.

**1.**  Nothing in the D.C. Code allows presidents to unilaterally deploy the D.C. Guard for law enforcement.  Congress drafted the legislation creating the D.C. Guard by selectively borrowing from contemporary state militia laws. Consistent with those laws, the President's status as the Guard's commander-in-chief is a tactical designation only, not a license to choose the purposes for which the Guard may be deployed.  Moreover, Congress followed the states that restrained their commander-in-chief's authority to execute the laws with the

1

militia. While some states broadly allowed governors to use the militia for this purpose, others more narrowly confined that authority. Some governors could not deploy the militia for law execution absent a riot, tumult, or similar exigency. Other states conditioned gubernatorial action on a request for aid from mayors or other local officials. In some instances, local officials could cause the militia to be deployed even in circumstances where the governor could not.

Drawing on these examples, Congress authorized presidents to activate the D.C. Guard only under the conditions specified in D.C. Code § 49-103. That choice was understandable. Presidents already had the power under other statutes to use the entire nation's militia—as well as its army and navy—to ensure the execution of the law in the District during a crisis. In Section 49-103, Congress expanded the situations allowing presidents to employ military force, accounting for smaller and more local disturbances. But Congress reasonably conditioned this additional authority on the participation of other officials with local jurisdiction.

Neither that provision, nor anything else in the D.C. Code, supports President Trump's deployment of the National Guard to lower the crime rate. The President's reliance on the words "other duties" in D.C. Code § 49-102 is irreconcilable with the surrounding text and basic rules of statutory interpretation, which demonstrate that this term refers only to training and ceremonial duties. Finally, an examination of Sections 49-404 and 49-405, which the stay panel cited,

2

only confirms that the exclusive mechanism for presidential activation of the Guard is a request for aid under Section 49-103.

**2.**  Title 32 does not authorize this operation either.  According to President Trump, 32 U.S.C. § 502(f)(2) allows him to use unfederalized National Guard forces for any purpose not expressly prohibited by law.  But the little-noticed enactment of this provision two decades ago did not radically transform the President's relationship with the nation's militia.  As the district court explained, and the stay panel did not dispute, Section 502(f)(2) simply enables state Guards to obtain federal funding and benefits for operations independently authorized by other laws.  It does not delegate to the President the power to establish new purposes for which state troops may be deployed in their unfederalized status.

Section 502(f)(2), therefore, does not authorize either the D.C. Guard's deployment or the importation of state troops to support it.  The D.C. Guard deployment lacks independent legal authorization for the reasons described above.  And that conclusion also dooms the legality of the state-troop deployments.  These state forces have been brought in by the D.C. Guard exclusively to support its own operation.  Because that operation is illegal, so is the participation of other Guard units in it.  Moreover, the Trump administration (and the participating states) have not shown that any state's deployment is authorized by their own state laws— which means that one of Section 502's prerequisites is not satisfied.

3

Even if Section 502(f)(2) could be construed as permitting operations not elsewhere authorized by law, it cannot possibly allow presidents to use military forces for domestic law enforcement, "unconstrained by the significant procedural limitations in other … statutes," *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 640 (2026), whenever a governor supplies troops.  That would allow easy circumvention of laws that have long constrained the domestic use of the armed forces and the militia.  Instead of federalizing the National Guard, invoking the Insurrection Act, or employing similar statutes on the terms Congress has set, presidents could simply rely on ideologically aligned governors to deploy military force domestically at will.  Congress did not sanction that result by adding the "operations or missions" clause to the tail end of a statute devoted to "drills and field exercises."

In a crisis, President Trump has ample legal authority to maintain order, defend federal property, and execute the law in the District of Columbia.  But he must stay within the bounds of that authority.  *See Trump v. Illinois*, 146 S. Ct. 432, 434 (2025).  The absence of any legal basis for his current actions reflects Congress's choice to deny presidents unlimited discretion over the domestic use of the military.

**I.    The D.C. Code Does Not Allow President Trump to Use the National Guard for Crime Reduction.**

In 1889, Congress reorganized the District of Columbia's militia and established its National Guard.  *See* Act of Mar. 1, 1889, ch. 328, 25 Stat. 772 (hereinafter "D.C. Militia Act").  Now codified in the D.C. Code, that legislation remains largely unchanged.  While it makes the President the commander-in-chief of the District's militia, it does not give him unfettered discretion to call the militia into service.  Rather, like the state laws that Congress emulated in passing it, it allows him to deploy the militia only under specific conditions.

Nothing in this legislation allows the President to deploy the National Guard for general crime reduction.  In an emergency threatening the District's safety or the execution of federal law, presidents already had ample legal authority to respond using the nation's militia and its regular armed forces.  The D.C. Militia Act expanded presidential authority to maintain order in the District in response to lesser calamities.  But it conditioned that authority on riot-like conditions and the participation of officials with local jurisdiction.  Nowhere did Congress authorize using the National Guard as a perpetual, supplemental police force.

**A.    Congress patterned the D.C. Guard on state laws that expressly defined and carefully limited the commander-in-chief's powers.**

In the late nineteenth century, a wave of state laws attempted to revive the nation's militia, deemphasizing the ailing system of the "enrolled" militia—which

5

included all male citizens of fighting age—in reliance on smaller volunteer forces, typically called the "active" or "organized" militia and designated as the National Guard. *See* William H. Riker, *Soldiers of the States: The Role of the National Guard in American Democracy* 41-42 (1957). Congress patterned the D.C. Militia Act on these laws. *See* H.R. Rep. No. 50-809, at 1-2 (1888). The Act focuses on equipping and training these volunteer forces, with primary emphasis on annually required inspections and encampments. D.C. Militia Act §§ 10, 40-44, 25 Stat. at 774, 778. In crafting this bill, Congress borrowed selectively from contemporary state models while adapting them to the federal District.

State constitutions invariably made their governor the commander-in-chief of the militia. *See* Frederic J. Stimson, *American Statute Law* § 297 (1886). Because the District had no governor—being managed instead by a commission— Congress assigned this role to the President. *See* D.C. Militia Act, § 6, 25 Stat. at 773. But commander-in-chief status was a tactical designation only. It placed governors atop the chain of command but did not authorize them to decide the purposes for which the militia could be deployed. Instead, states expressly enumerated those purposes in their constitutions, their laws, or both.

Different states allowed their commanders-in-chief to deploy the militia for different reasons—in some cases, requiring a request for aid from local officials. Those legislative choices were conclusive. As Thomas Cooley observed, "where

6

the governor is made commander-in-chief of the military forces of the State, it is obvious that his authority must be exercised under such proper rules as the legislature may prescribe, because the military forces are themselves under the control of the legislature." *Treatise on Constitutional Limitations* 140 (1878).

Some states opted for broad delegations, allowing their governors to use the militia "to execute the laws," as well as to "suppress insurrection and repel invasion." Minn. Const. art. V, § 4 (1857). Even in these states, lawmakers could specify the circumstances in which the militia could be deployed to execute the laws. *See Worth v. Craven Cnty. Comm'rs*, 118 N.C. 112, 112 (1896) ("This constitutional power may be regulated by legislation, by providing what shall amount to sufficient evidence of the existence of the causes mentioned in the constitution."). And other states restricted the commander-in-chief's power even further.[2]

Notably, some states withheld the authority to use the militia for law execution outside of riot-like conditions. In Pennsylvania, for instance, the constitution designated the governor as commander-in-chief without enumerating additional powers. *See* Pa. Const. art. IV, § 7 (1873); *id.* art. XI, § 1. By statute,

---

[2] The state constitutions cited herein can be found in *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies* (Francis Newton Thorpe ed., 1909), *available at* https://catalog.hathitrust.org/Record/001140815.

7

the governor could activate the militia only "[w]hen an invasion of or insurrection in the State is made or threatened, or a tumult, riot, or mob shall exist." *Digest of the Military Laws of Pennsylvania* § 72 (1882). New York employed the same model. Its constitution simply designated the governor as commander-in-chief and allowed him to appoint military officers. *See* N.Y. Const. art. IV, § 4 (1846); *id.* art. XI. By statute, governors could deploy the militia only "in case of insurrection, invasion or breaches of the peace, or imminent danger thereof." *Military Code of the State of New York* § 77 (1889).

State law sometimes conditioned the authority to deploy the militia on requests for assistance from local officials. In Wisconsin, where the constitution did not specify permissible uses of the militia, *see* Wis. Const. art. V, § 4 (1848), state law allowed governors to activate the militia under extreme conditions: "war, insurrection, rebellion, riot or invasion, or … resistance to the execution of the laws." *Annotated Statutes of Wisconsin*, ch. 84, § 641 (1889). Absent one of those conditions, governors could deploy the militia only "upon application of any marshal of the United States, or of any mayor of a city, or of a sheriff." *Id.* So when a governor in 1886 confronted labor unrest that did not yet meet the statute's factual predicates, he understood that he could not deploy the militia without a request from one of those officials. *See* Jerry Cooper, *The Wisconsin National Guard in the Milwaukee Riots of 1886*, Wis. Mag. Hist. 31, 39 (1971) (in response

8

to disruptive railroad strikes, the governor "could do little, for he needed an official request from either [the] Mayor … or [the] Sheriff … before he could order out the Guard").

Still other states empowered local officials to order militia support themselves in response to local disturbances. In Massachusetts, whenever there was a "tumult, riot, mob, or a body of men acting together by force … to break and resist the laws," a sheriff, mayor, or town selectmen could order local militia commanders "to aid the civil authority in suppressing such violence, and supporting the laws." *Public Statutes of the Commonwealth of Mass.*, ch. 14, § 101 (1882); *see id.* §§ 102-103 (obligating commander to obey). Alternatively, these officials could apprise the governor of the facts, who could then issue an order. *Id.* § 101. Ohio law was similar, allowing sheriffs, mayors, and judges to issue mandatory orders to local militia officers "to act in aid of the civil authority" in response to tumults, riots, or violent resistance to the laws. *See Revised Statutes of the State of Ohio*, ch. 5, §§ 3096-3097 (1891).

Local officials in some states could order the militia to be deployed even when the governor could not. In New York, where gubernatorial authority to activate the militia was limited to "insurrection, invasion or breaches of the peace," *Military Code of the State of New York* § 77 (1889), mayors and sheriffs could demand obligatory assistance from local militia commanders in a wider array of

9

circumstances: "any breach of the peace, *tumult, riot, or resistance to process of this state*," *id.* § 79 (emphasis added).  In Kansas, mayors and sheriffs—but not the governor—were also statutorily authorized to demand the militia's aid in response to "tumult, riot, or resistance to process in this state."  *Laws of Kansas*, ch. 64, §§ 27, 29-31 (1889).

### B.    Section 49-103 is the only mechanism for presidential deployment of the D.C. Guard.

Selectively borrowing from state models, Congress designed a system for the District in which presidential activation of the D.C. Guard is contingent on the conditions specified in D.C. Code § 49-103.

That approach made sense.  The President already had the authority to use all of the nation's militia forces—not to mention its army and navy—to ensure the execution of the law in the District.  Under legislation tracing to the Founding, the President could call forth any part of the militia, or the federal armed forces, "as he may deem necessary to enforce the faithful execution of the laws of the United States … within any State or Territory" where federal law was being "forcibly opposed, or the execution thereof forcibly obstructed."  Act of July 29, 1861, ch. 25, § 1, 12 Stat. 281, 281.  In case of any "rebellion against the authority of the Government of the United States" in any state or territory, the President could direct the same forces "to suppress such rebellion."  *Id.*

10

To be sure, presidents did not have a blank check under this legislation. But they had ample power to uphold the law and protect the District in a crisis. Deploying military force was permitted upon a presidential finding that, "by reason of unlawful obstructions, combinations, or assemblages of persons, or rebellion against the authority of the Government," it was "impracticable, in the judgment of the President of the United States, to enforce, by the ordinary course of judicial proceedings, the laws of the United States." 12 Stat. at 281; *cf. Illinois*, 146 S. Ct. at 434 (construing modern version of this requirement).

Illustrating the potency of this authority, President Lyndon Johnson utilized it when the District experienced riots following Martin Luther King Jr.'s assassination. Ordering the Secretary of Defense to respond, the President called upon both his D.C. Code authority and his power to federalize the National Guard. *See* Exec. Order No. 11403 (Apr. 5, 1968). Ultimately, the D.C. Code authority "went unused as the Secretary exercised the order's primary delegation to federalize the [D.C. Guard]." Lawrence Kapp et al., Cong. Rsch. Serv., No. R46886, *Use of Militia, National Guard, or Federal Armed Forces within the District of Columbia Prior to 2020*, at 13 (Aug. 25, 2021).

By enacting what is now D.C. Code § 49-103, Congress expanded presidential authority to maintain order in the District—though still within limits. Presidents could now act whenever there was "a tumult, riot, mob, or a body of

11

men acting together by force with attempt to commit a felony or to offer violence to persons or property, or by force and violence to break and resist the laws." D.C. Militia Act, § 45, 25 Stat. at 778. So too when those conditions were "threatened." *Id.*

Congress reasonably conditioned this additional authority on the involvement of officials with local jurisdiction over the District. If the prescribed conditions arose, the District's Commissioners or its U.S. Marshal could "call on the commander-in-chief to aid them in suppressing such violence and enforcing the laws." *Id.* The President was obligated to respond, though he could decide how many troops were "necessary to suppress the same." *Id.*

Contrary to the stay opinion, therefore, the District's interpretation of Section 49-103 does not "imbue two presidential subordinates with more power to protect the seat of the federal government than the President." Slip Op. 18. Congress expanded the President's already immense power to defend the District with military force by enabling him to use the D.C. Guard for local disturbances less serious than a wholesale assault on governmental authority. But Congress did not allow presidents to exercise that additional power solely on their own initiative, instead requiring participation from officials attuned to local conditions.

The stay panel considered it irrational for Congress to condition presidential action on a request from at-will subordinates. "After all, the President could order

12

either of his two subordinates to make such a request." Slip Op. 18. That comment ignores established legislative practices and political realities.

Congress has long assigned specific decisions to officers other than the President, enabling presidents to control those decisions only through their supervisory authority over these officers, rather than by making them directly. *See Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 610-13 (1838); 1 Op. Att'y Gen. 624, 625-29 (1823). Indeed, Congress routinely structures executive decision-making so that the President's ability to act hinges on decisions by subordinates. *E.g.*, 19 U.S.C. § 1862(c)(1)(A) (authorizing President to restrict imports only after Commerce Secretary determines they threaten national security).

This is not a mere formality. Even if presidents "may consider the decision after its rendition as a reason for removing the officer," *Myers v. United States*, 272 U.S. 52, 135 (1926), those officers are obligated and presumed to obey statutory limits when performing their duties, *Martin v. Mott*, 25 U.S. 19, 33 (1827). Should they resist unlawful demands, a President can incur serious administrative and political costs by trying to replace such officials with compliant ones who will do his bidding. "President Nixon's efforts to remove Archibald Cox as special prosecutor," for instance, "made apparent the political costs of firing an officer that refuses to heed the President's policies." Kevin Stack, *The President's Statutory Powers to Administer the Laws*, 106 Colum. L. Rev. 263, 295 (2006); *see also*

13

Peter Strauss, *Overseer, or "The Decider"? The President in Administrative Law*, 75 Geo. Wash. L. Rev. 696, 706 (2007) (describing "political furor" after President Jackson successively removed two Treasury Secretaries to secure a decision withdrawing Treasury funds from the Bank of the United States).

The stay panel also reasoned that Section 49-103's use of permissive phrasing does not suggest that such requests are mandatory.  But the formulation used in Section 49-103 mimics the phrasing in contemporary state laws that gave independent authority to local officials, including authority governors lacked.  *E.g.*, *Military Code of the State of New York* § 79 (1889) ("In case of any breach of the peace, tumult, riot, or resistance to process of this state, it shall be lawful for any sheriff of any county, or the mayor of any city, to call for aid upon the commandant of the national guard.").

For its part, the Trump administration argues that Section 49-103 cannot be the exclusive authority to activate the Guard because it does not account for a task supposedly "traditionally" performed by such forces: responding to natural disasters.  In 1889, however, *no* state constitution authorized the militia to respond to natural disasters, *see* Stimson, *supra*, § 298, and it appears that state statutes did not do so either.  Over time, states have amended their laws to authorize this function.  *Compare* Mont. Const. art. VII, § 6 (1889) (permitting militia "to aid in the execution of the laws, to suppress insurrection or to repel invasion"), *with*

14

Mont. Const. art. VI, § 13 (1972) (same, but adding "or protect life and property in natural disasters").  While Congress has not updated the D.C. Code, it has provided for natural disasters elsewhere.  *E.g.*, 10 U.S.C. § 12310(c)(1)(D); *id.* § 12301.

### C.    No other D.C. Code provision supports President Trump's deployment.

The Administration chiefly relies on the words "other duties" in Section 49-102 to argue that President Trump can employ the D.C. Guard for any purpose at any time.  *Cf. Learning Res.*, 146 S. Ct. at 637 ("Based on two words … the President asserts the independent power to impose tariffs on imports from any country, of any product, at any rate, for any amount of time.").  "Those words cannot bear such weight."  *Id.*

In Section 49-102, the term "other duties" is part of "a list of specific items separated by commas and followed by a general or collective term."  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008).  And when statutes use "a catchall phrase at the end of an enumeration of specifics, as in *dogs, cats, horses, cattle, and other animals*," it "implies the addition of *similar* after the word *other*," as in "other similar animals."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199-200 (2012).  Or here, "other similar duties."

Ignoring that basic tenet, the Administration portrays "other duties" as completely unlike the preceding words: "drills, inspections, parades, escort."  D.C. Code § 49-102.  Although those terms all refer to training and ceremonial

15

functions, *see* Appellee Br. 26-27, the Administration cites the subsequent catchall term as grounds to indefinitely maintain a supplemental police force, with power to "assist law enforcement," identify perceived crimes, look out for "suspects," and detain people, Decl. of Lawerence Doane ¶¶ 6, 7, 12, JA516-18.  If that is right, troops could presumably be ordered to do much more: search homes, conduct interrogations, make formal arrests—the list goes on.  Regardless of whether the Administration has currently ordered the Guard to perform those functions, it has not disavowed that power.  Just the opposite.  *See* JA548 (stating that Guard duties may "require personnel to be armed" and "sworn in as law enforcement agents").

Additional factors confirm that "other duties" lacks the broad meaning claimed.  Section 49-102 empowers the Guard's Commanding General to prescribe these duties—meaning that this official, by himself, could order the Guard to perpetually fight crime across Washington, D.C.  And he would not be alone.  The commanding officer of *any* regiment, battalion, or company may "assemble his command … for drill, instruction, *or other business*, *as he may deem expedient*."  D.C. Code § 49-102 (emphasis added).  The italicized phrase is just as capacious as "other duties, as he may deem proper" in the previous sentence.  No textual basis exists for treating them differently.  And the only limit imposed on these commanding officers is that "no parade shall be performed … without the

16

permission of the Commanding General," *id.*, underscoring the exclusive focus on training and ceremonial functions.

Yet more surrounding text yields the same inference. The relevant sentence reads in full: "The Commanding General *shall prescribe such stated drills and parades as he may deem necessary for the instruction of the National Guard*, and may order out any portion of the National Guard for *such* drills, inspections, parades, escort, or other duties, as he may deem proper." *Id.* (emphasis added). The word "such" links the statute's "other duties" directly to "drills and parades" used for "instruction."

Bereft of textual arguments, the Administration invokes the Office of Legal Counsel's views, but the memos cited have virtually no analysis. The 1963 memo notes Section 49-102's "broad" language and then pronounces—with no further discussion—that because the President supervises the Guard's officers, "it would certainly not seem inappropriate" for the President to direct the use of the Guard to support police crowd-control activities. Memorandum from Norbert A. Schlei, Assistant Attorney General, OLC, at 3 (July 30, 1963).

Barely a week later, OLC warned against relying on that interpretation, acknowledging the likelihood that it "would not be sustained by the courts." Memorandum from Norbert A. Schlei, Assistant Attorney General, OLC, at 3 (Aug. 9, 1963). As OLC explained, "'other duties' … might be construed by the

17

courts *in pari materia* with the other terms used in that section which relate primarily to drill- and training-type activities as distinguished from the aid-to-civil-authorities-type activities expressly covered by [D.C. Code § 49-103]." *Id.*

As for the 1989 OLC memo, its reasoning is no more extensive, and it offers nothing but the 1963 discussion as support. *See* 13 Op. O.L.C. 91, 93 (1989).

The stay panel, quite notably, did not rely on Section 49-102. But its hodgepodge of citations fares no better. The President's commander-in-chief status and supervisory role do not allow him to choose the purposes for which the D.C. Guard may be activated. *See supra* Part I.A. And Sections 49-404 and 49-405 only confirm that the sole mechanism for presidential deployments is a request under Section 49-103.

Section 49-404 states that, unless federalized, "[t]he enrolled militia shall not be subject to any duty except when called … to aid the civil authorities in the execution of the laws or suppression of riots." *Id.* § 49-404. This reference to aiding the civil authorities refers exclusively to Section 49-103. That is clear from its echo of Section 49-103's terms and, even more unmistakably, from its precise reference to the "enrolled militia." The National Guard is the District's "organized" militia, distinct from the "enrolled" militia that includes every able-bodied adult male under age 45. *See* D.C. Code §§ 49-101, 49-406. And importantly, aid to the civil authorities under Section 49-103 is not limited to the

18

National Guard: the President may call out any portion of the enrolled "militia" he deems necessary. *Id.* § 49-103. Section 49-404's reference to aiding the civil authorities, therefore, indisputably refers *only* to that provision, which is the only provision in the D.C. Code for deploying the larger "militia" and the only provision addressing the execution of the laws and suppression of riots.

Likewise, Section 49-405's passing reference to the President's calling-out power also relates exclusively to requests for aid under Section 49-103. Section 49-405 mentions situations in which "it shall be necessary to call out any portion *of the enrolled militia.*" *Id.* § 49-405 (emphasis added). By discussing the service of "the enrolled militia"—which, again, may be assigned duties *only* under Section 49-103—this passage clearly refers to Section 49-103 alone.

The same is true of Section 49-901, which sets compensation rates when Guard members are "ordered to duty in case of riot, tumult, breach of the peace, or whenever called in aid of the civil authorities." *Id.* § 49-901. Here, too, the textual echo of Section 49-103 is obvious. And conspicuously, no similar provision addresses the compensation of Guard members deployed under Section 49-102 or any other section—yet another confirmation that no such deployments are permitted.

19

**II.    Title 32 Does Not Allow President Trump to Use the National Guard for Crime Reduction.**

    **A.    Section 502(f)(2) allows state National Guards to receive federal pay and benefits only for activities independently authorized by other laws.**

The primary function of 32 U.S.C. § 502 ("Required drills and field exercises") has always been to provide federal funding for the training of National Guard units while they remain under state control. *See* Christopher R. Brown, *Been There, Doing That in a Title 32 Status: The National Guard Now Authorized to Perform Its 400-Year-Old Domestic Mission in Title 32 Status*, 2008 Army Lawyer 23, 29-30 (2008). Congress eventually authorized funding for the performance of "other duty in addition to" such training. 32 U.S.C. § 502(f)(1). And from the late 1980s to the early 2000s, Congress made several types of non-training duties eligible for such funding. *See* Brown, *supra*, at 30-32. But "cumbersome" bureaucratic hurdles made it difficult to take advantage of these provisions, as when New York failed to obtain funding for its Guard to provide security at critical mass transit facilities in 2005. *Id.* at 31. So in a 2006 amendment that garnered virtually no discussion, Congress streamlined things by clarifying that the eligible "training or other duty" could include "support of operations or missions undertaken by [a] unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(2)(A).

20

The Trump administration now argues that this little-noticed provision, tucked at the end of a measure concerning funding and training, quietly revolutionized the chief executive's relationship to the nation's military forces—allowing President Trump to use unfederalized National Guard troops for *anything*, "unless a federal statute or the Constitution specifically prohibits a particular use." Appellant Br. 26. This claim does not withstand scrutiny. And "the fact that no [other] President has ever found such power in [this statute] is strong evidence that it does not exist." *Learning Res.*, 146 S. Ct. at 643.

Section 502 itself does not authorize National Guard members to perform any specific type of "duty." 32 U.S.C. § 502(f)(1). And it does not delegate to presidents the power to create such authorizations. Instead, it relies on state law, which provides the root source of authority for these duties. *See, e.g.*, 32 U.S.C. § 112(h)(1) (allowing Section 502 funding of counter-drug activities that are "authorized by the law of the State"). In other words, Section 502 simply allows certain duties to be carried out in Title 32 status—permitting federal funding and benefits, *see id.* § 112(a)—when those activities are deemed to serve national interests, either by the President, under Section 502(f)(2), or by Congress, in statutes addressing specific activities, *e.g.*, 10 U.S.C. § 12310(c) (activities responding to various types of emergencies).

"Section 902 [of Title 32], for example, does not provide that the Secretary of Defense can call up the state National Guard units for 'homeland defense activities' directly ordered by the Secretary."  JA854.  Instead, it allows the Secretary to "provide funds to a Governor to employ National Guard units or members to conduct homeland defense activities."  32 U.S.C. § 902.  "The power to deploy the National Guard comes from the governor's authorities under state law; the Secretary can then decide which activities are necessary and appropriate to fund for homeland defense purposes under Title 32."  JA854.  As the stay panel acknowledged, "to accept [a] mission [under Title 32], the state governor must exercise authorities *that already exist* under state law."  Slip Op. 19-20 (citation omitted).

Properly interpreted in this way, Section 502(f)(2) does not authorize either the D.C. Guard's deployment or the importation of state troops.  The D.C. Guard's deployment is unsupported by D.C. law for the reasons explained above.  *See supra* Section I.  And the importation of state troops is unlawful for at least two reasons.  First, these deployments have been structured only as supporting the D.C. Guard's own operation.  Because that operation is illegal, so is the participation of other Guard units in that operation.  Second, the Administration has not shown that any state Guard's deployment is actually authorized by that state's laws.  Because

22

one of Section 502's prerequisites is not satisfied, President Trump cannot rely on that statute to invite state troops to police the District.

To start, the legality of the state deployments hinges on the legality of the operation they are supporting. The out-of-district troops are not performing a freestanding mission requested by President Trump under Section 502. Rather, they have been tasked exclusively with supporting the D.C. Guard's mission. *See* Decl. of Donald Snider ¶ 12, JA530 (the D.C. Guard "is the lead National Guard unit that is augmented by National Guard units from several states"); Doane Decl. ¶ 9, JA517 (the D.C. Guard's Commanding General exercises "coordinating and tasking authority" over the state forces). The states' Guard units have been incorporated into this operation only through agreements with the D.C. Guard. *See* JA547-78 (MOU between D.C. Guard and "supporting" states). Those agreements expressly provide that the D.C. Guard leadership plays "the lead role" in "tasking units from a supporting State," and that the D.C. Guard retains "tactical control" over "operational direction." *Id.* § 3.2, JA547-48.

"If the [D.C. Guard] does not have the authority to conduct general crime deterrence in the District itself, it also cannot invite out-of-state National Guard units to do so." JA855. Because the D.C. Guard's deployment is unlawful, it is not a valid "operation or mission" for which President Trump may request the support of state troops under Section 502(f)(2).

23

Separately, the Administration must show that state law supports the deployment of state troops to police the District, because that is a precondition of utilizing Section 502. As the stay panel acknowledged, Title 32 requires a state-law basis for any presidentially requested operations or missions. The Administration has identified no such basis. And neither have the states whose troops are patrolling the District. *See* Amicus Br. of South Carolina et al. (discussing federal law instead). Because a statutory precondition of Section 502 has not been met, that statute cannot authorize President Trump's operation.

The stay panel also discussed the Emergency Management Assistance Compact ("EMAC"), but that discussion is a red herring. Although congressionally approved compacts like the EMAC may establish legal authority to deploy state National Guards, the District does not need to show that the EMAC is the only means by which state Guard members could be sent into D.C. *Contra* Slip Op. 20. The fact that the EMAC's terms are unsatisfied simply means that it, too, fails to authorize the President's actions, so "no authority exists for the out-of-state National Guard units to operate in the District." JA857.

### B. Section 502(f)(2) cannot plausibly be read as allowing presidents to use the military for domestic law enforcement whenever a governor lends troops.

The stay panel did not even acknowledge one of the most critical flaws in the Administration's position. Federal law has long prevented the military from

24

being turned on the domestic populace unless absolutely necessary. The Administration's boundless reading of Section 502(f)(2) would allow presidents to easily sidestep that safeguard.

Military participation in law enforcement is generally forbidden—a rule so important that its willful violation can lead to imprisonment. *See* 18 U.S.C. § 1385. Congress must "expressly" authorize any departure from that rule. *Id.* Only in "exceptional" circumstances, therefore, may the military execute the laws. *Illinois*, 146 S. Ct. at 434.

Whenever Congress has authorized such exceptions, "it has done so in explicit terms, and subject to strict limits." *Learning Res.*, 146 S. Ct. at 639. For instance, the President may federalize the militia to suppress an insurrection against a state government, but only if that state requests assistance. 10 U.S.C. § 251. The President may also federalize the militia to enforce federal law, but only upon finding that enforcement by ordinary judicial proceedings is impractical. *Id.* § 252. Similarly, the President may use military forces to suppress rebellions within a state, but only if residents are being denied their constitutional rights or if unlawful combinations are impeding the course of justice. *Id.* § 253. The President also may federalize the National Guard to enforce federal law, but only upon finding that he is unable to do so with the regular armed forces, and only if

25

some other law permits him to use the regular armed forces for that purpose. *Id.* § 12406(3); *see Illinois*, 146 S. Ct. at 434 (enforcing this limit).

In addition to requiring specific triggering events, Congress also routinely restricts the scope of military involvement in law enforcement. For instance, although the military may support law enforcement efforts against drug smuggling and transnational crime, 10 U.S.C. § 284(a), the nature of this support is limited, *see id.* § 284(a)(1)(B), (b). And importantly, members of the armed forces—whenever they are allowed to assist civilian law enforcement—are forbidden from directly participating in any "search, seizure, arrest, or other similar activity," unless authorized by law. *Id.* § 275; *see also id.* § 283(c) (limiting such participation even during situations involving bombings of public places and government facilities).

"Th[e] pattern is plain: When Congress grants the power to [employ the military for law enforcement], it does so clearly and with careful constraints." *Learning Res.*, 146 S. Ct. at 644.

The Administration's position would make these vital restrictions "utterly ineffectual." *Abramski v. United States*, 573 U.S. 169, 181 (2014). Indeed, it already has. Armed National Guard troops are physically detaining District residents, *see* Doane Decl. ¶ 7, JA517, even though the active duty military and federalized National Guard members are barred from performing any "seizure,

26

arrest, or other similar activity," 10 U.S.C. § 275.  In the Administration's view, presidents aided by sympathetic governors can use Section 502(f)(2) to dodge this restriction and every other limit on military participation in domestic law enforcement.  Instead of federalizing the Guard, invoking the Insurrection Act, or employing similarly restricted laws, presidents could simply rely on allied governors to deploy military force at will, sending troops anywhere, for any purpose, unless expressly prohibited by law.  *See* Appellant Br. 26.  So could the Secretary of Defense.  *See* 32 U.S.C. § 502(f)(2)(A).  *But see Learning Res.*, 146 S. Ct. at 640 (rejecting interpretation giving President "unbounded" power in light of a "backdrop of clear and limited delegations").

Making this reading even less plausible is the dangerous accountability gap that would follow.  By the Administration's own telling, the troops it has invited to patrol the District are under the "command and control" of their own states.  Doane Decl. ¶ 9, JA517.  Neither the D.C. Guard, nor the District's local government, nor the President himself has any "disciplinary or administrative authority over these forces."  *Id.*  In other words, the President (or Defense Secretary) may send any willing governor's troops into another jurisdiction to police the local population while those troops remain completely beyond the disciplinary authority of the federal government and the jurisdiction in which they are operating—and also unrestrained by the Posse Comitatus Act and similar restrictions.

27

That the President must rely on the acquiescence of a like-minded governor hardly makes this interpretation more credible.  If anything, things only become more fraught when a President solicits troops from allied politicians and sends them to police jurisdictions that he views as less loyal to him.  Strikingly, only Republican governors have lent their troops for President Trump's operation, much like six years ago when the President first exploited Section 502(f)(2) in a similar manner.  *See* Paul Sonne et al., *Pentagon Disarms National Guard Activated in D.C., Sends Active-Duty Forces Home*, Wash. Post (June 5, 2020).  Politicians have thus sent soldiers into another American jurisdiction to conduct armed patrols, under their own exclusively disciplinary control, while openly disparaging that jurisdiction's elected officials.  *See* Amicus Br. of South Carolina et al., at 21.  The notion that Congress sanctioned this disturbing result by adding the "operations or missions" clause to the tail end of Section 502 defies belief.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

Dated: May 26, 2026

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,485 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 26th day of May, 2026.

                              */s/ Brianne J. Gorod*
                              Brianne J. Gorod

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of May, 2026, I electronically filed the

foregoing document using the Court's CM/ECF system, causing a notice of filing

to be served upon all counsel of record.

Dated: May 26, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod