ORAL ARGUMENT NOT YET SCHEDULED

**No. 25-5418**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

DISTRICT OF COLUMBIA,

*Plaintiff-Appellee*,

*v.*

DONALD J. TRUMP, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No.1:25-cv-03005
Before the Honorable Jia M. Cobb

**BRIEF OF *AMICI CURIAE* MEMBERS OF CONGRESS
IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

Bruce V. Spiva
R. Brent Ferguson
Sejal Jhaveri
Renata O'Donnell
Kate Hamilton
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI CURIAE* ...............................................1

I.      Introduction...........................................................................................1

II.     Summary of Argument  ........................................................................3

ARGUMENT ......................................................................................................4

I.      The Legislative History of the Home Rule Act Demonstrates Congress's Intent to Give the District Control of its Own Affairs.....................................4

        A.      Congress passed the Home Rule Act to empower the District to govern itself...................................................................................4

        B.      The text of the Home Rule Act reflects Congress's intent to ensure the District could exercise self-government..........................................7

        C.      Through the Home Rule Act, Congress retained oversight authority and granted authority to the Federal Executive in very limited circumstances ...........................................................................8

II.     Allowing Executive Overreach in the District Would Undermine Federalism Interests Across the Country..........................................................15

        A.      The Home Rule Act empowers the District to govern its own affairs, much like any other American city or state........................................15

        B.      By trampling on the District's ability to self-govern, Defendants' actions offend basic principles of federalism...................................16

CONCLUSION ..................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Association of Civilian Technicians v. United States*,
   603 F.3d 989 (D.C. Cir. 2010) ................................................................18

*Bond v. United States*, 564 U.S. 211 (2011)...............................................16

*District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674
   (D.C. Cir. Dec. 17, 2025) ...................................................................8, 19

*Esteras v. United States*, 606 U.S. 185 (2025)...............................................9

*Laird v. Tatum*, 408 U.S. 1 (1972).............................................................17

*Maryland ex rel. Levin v. United States*, 381 U.S. 41 (1965) ...................17

*Printz v. United States*, 521 U.S. 898 (1997).............................................16

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012).............9

*United States ex rel. Gillett v. Dern*, 74 F.2d 485 (D.C. Cir. 1934).........17

*United States v. Morrison*, 529 U.S. 598 (2000).......................................16

*Whitman v. American Trucking Associations*, 531 U.S. 457 (2001).......................19

*Yates v. United States*, 574 U.S. 528 (2015) .............................................13

**Statutes and Constitutional Provisions**

18 U.S.C. § 1385................................................................................18

32 U.S.C. § 502(f).............................................................................18

D.C. Code § 1-201.01 *et seq.* ..........................................................1, 4

D.C. Code § 1-201.02(a)...............................................................7, 8, 9

D.C. Code §§ 1-202.01–1-202.04 ..........................................................7

D.C. Code § 1-202.02 .......................................................................10

D.C. Code §§ 1-203.01–1-203.03 ..........................................................7

D.C. Code §§ 1-204.01–1-204.115 ..........................................................8

D.C. Code § 1-204.22 ...............................................................................10

D.C. Code § 1-204.33 ...............................................................................10

D.C. Code § 1-206.02 .................................................................................9

D.C. Code §§ 1-206.01–1-206.02 ..............................................................9

D.C. Code §§ 1-207.01–1-207.71 ..............................................................8

D.C. Code § 1-207.40(a) ..........................................................................11

D.C. Code § 1-207.40(b) ..........................................................................11

D.C. Code § 49-101 *et seq.* ......................................................................13

D.C. Code § 49-102 ..................................................................................13

D.C. Code § 49-103 .............................................................................13, 14

D.C. Code § 49-404 ..................................................................................14

D.C. Code § 5-101.03 ...............................................................................10

D.C. Code § 5-105.01 ...............................................................................11

D.C. Code § 5-105.05 ...............................................................................11

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 15 ...................................................................17

U.S. Const. art. I, § 8, cl. 16 ...................................................................17

U.S. Const. art. I, § 8, cl. 17 .....................................................................4

## Other Authorities

Act of March 1, 1889, ch. 328, 25 Stat. 772 (1889) ................................13

Campbell Robertson, *A 'Summer Surge' of Law Enforcement Is Planned for D.C., Officials Say*, New York Times (May 15, 2026), https://www.nytimes.com/2026/05/15/us/politics/law-enforcement-agents-washington-dc.html .....................................................................................1

Erwin Chemerinsky, *Federalism Not as Limits, But as Empowerment*, 45 U. Kan. L. Rev. 1219 (1997) ........................................................................16

H.R. Rep. No. 93-482 (1973)................................................................5, 11, 12, 14

H.R. Rep. No. 109-452 (2006)......................................................................................19

House Committee on the District of Columbia, 93rd Cong., Procedure for Handling H.R. 9056 (Comm. Print 1973)..........................................................15

James W. Moeller, *Congressional Management of the District of Columbia Prior to Home Rule: The Struggle to Underground Power Lines in the Nation's Capital*, 19 U.D.C. L. Rev. 115 (2016)....................................................................5

Joseph Nunn, *Section 502(f) Is Not a Blank Check*, Lawfare (Oct. 17, 2024), https://www.lawfaremedia.org/article/section-502(f)-is-not-a-blank-check ......18

Pub. L. No. 93-198, 87 Stat. 774 (1973)..............................................................1, 5

Richard Briffault, *The Challenge of the New Preemption*, 70 Stan. L. Rev. 1995 (2018) ..................................................................................................................16

Richard Nixon, *Statement on Signing the District of Columbia Self-Government and Governmental Reorganization Act*, The American Presidency Project, UC Santa Barbara (Dec. 24, 1973), https://www.presidency.ucsb.edu/documents/statement-signing-the-district-columbia-self-government-and-governmental-reorganization.........................6, 7

The Federalist No. 51 (James Madison) ...................................................................16

*Washington DC: Our Changing City*, Urban Institute, https://apps.urban.org/features/OurChangingCity/demographics/#history (last visited May 26, 2026) ..........................................................................................6

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici* are 114 Members of the United States House of Representatives. A complete list of *Amici* appears in the appendix of this brief. *See* Ex. A. As Members of Congress, the undersigned offer their perspective on the purpose and breadth of the District of Columbia Home Rule Act and its relationship to the current National Guard deployment in the District of Columbia. In addition, *Amici*, as members of an equal branch of the federal government, seek to ensure that the executive does not unlawfully assert power that it does not inherently possess or that Congress has not appropriately delegated to it. *Amici* have the consent of all parties to file this brief.

## I.    Introduction

In 1973, Congress used its exclusive constitutional authority over the District of Columbia to pass the District of Columbia Home Rule Act (the "Act"). *See* Pub. L. No. 93-198, 87 Stat. 774 (1973); D.C. Code § 1-201.01 *et seq.* In so doing, it empowered the District to govern itself. Today, more than 3,500 National Guard troops from eight states and the District of Columbia rove the District, with an additional 1,500 requested by executive branch officials this month, allegedly to combat crime and promote law and order.[2] They answer not to the District's local

---

[1]   No person other than *Amici* authored this brief in whole or part, or contributed money to fund its preparation or submission.

[2] Campbell Robertson, *A 'Summer Surge' of Law Enforcement Is Planned for D.C., Officials Say*, N.Y. Times (May 15, 2026),

elected leaders, but to the Department of Defense—which mobilized the troops at the President's directive.

This military takeover of the District strikes at the heart of the Act and flouts the careful statutory scheme Congress constructed to govern the District and the National Guard. The legislative text, history, purpose, and structure of the Act demonstrate that Congress granted the District broad authority to govern itself while intentionally limiting the authority of the President to intervene in local policing or deploy the D.C. National Guard ("DCNG"). Though the District does not have the same status as states, the Act places significant limits on the President's power to impose the National Guard on the District.

And even beyond the District, Congress has circumscribed the ability of the National Guard to intrude on civilian affairs. Appellants ride roughshod over the fundamental ideals of self-governance and separation of powers around which Congress has carefully built these statutory schemes. The Court should affirm the decision below and allow the District to return to the self-governance Congress granted it.

---

https://www.nytimes.com/2026/05/15/us/politics/law-enforcement-agents-washington-dc.html.

## II.    Summary of Argument

This Court should affirm the preliminary injunction entered by the district court. The district court correctly found, among other things, that the Appellants' deployment of National Guard troops in the District exceeds Appellants' authority under Title 49 of the D.C. Code. As the district court found, a plain reading of Title 49 prevents Appellants from deploying the DCNG, and Appellants lack the statutory authority to request National Guard troops from outside the District. *See* JA809. The history and purpose of the Act further support the district court's preliminary injunction finding that the President does not have residual executive power under the Act to deploy the DCNG or other National Guard troops in the District. Any finding otherwise, including one adopting the Stay Panel's preliminary analysis, would sanction an unlawful usurpation of Congress's constitutional authority to govern the District. Congress delegated control over the District to local leaders, but retained certain powers, including residual oversight power, for itself, and provided extremely minimal authority to the President. Appellants here, acting at the direction of the President, are violating the Act, as well as unlawfully encroaching on Congress's constitutional power to govern the District.

## ARGUMENT

I. **The Legislative History of the Home Rule Act Demonstrates Congress's Intent to Give the District Control of its Own Affairs.**

As the district court found, Congress delegated its own exclusive constitutional authority over the District through the Act. Any transfer of its power over the District to the President is thus limited by the specific text and purpose of the Act. That delegation of authority cannot be overruled by claims of nonexistent residual federal executive power, because that would frustrate constitutionally mandated separation of powers. JA846-47. And Congress, rather than retaining a large role for itself or creating a larger role for the President, chose to give local leaders the vast majority of local powers, including police powers, setting the District in the same or similar status as states and territories in the context of National Guard deployments. The purpose and structure of the Act, as well as its very specific limited grants of power to the President relating to the Metropolitan Police Department ("MPD") and National Guard, demonstrate that Appellants exceeded their power in deploying DCNG and other National Guard troops to the District for non-military, crime deterrence missions without the request of local authorities.

A. **Congress passed the Home Rule Act to empower the District to govern itself.**

Under Article I, Section 8, Clause 17 of the Constitution, Congress has the power to "exercise exclusive Legislation in all Cases whatsoever," over the District

4

of Columbia. U.S. Const. art. I, § 8, cl. 17. In 1973, Congress used this exclusive power to pass the Act. The Act delegated Congress's constitutional power to govern the District to a popularly elected Mayor and 13-member Council. *See* Pub. L. No. 93-198, 87 Stat. 774 (1973); D.C. Code § 1-201.01 *et seq.*

Prior to the enactment of the Act in 1973, District residents had been denied self-governance for most of the District's history, except for brief periods during the Nineteenth Century. Congress engaged in the quotidian tasks of governing purely local matters in the District, from fixing roads to providing for education of the local population. From 1874-1967, the District was subject to a cumbersome governing process in which Congress legislated and delegated some of its power to the President. Under this system, Congress acted as the legislature for the District, and a three-person board, appointed by the President, acted as the chief executive. James W. Moeller, *Congressional Management of the District of Columbia Prior to Home Rule: The Struggle to Underground Power Lines in the Nation's Capital*, 19 U.D.C. L. Rev. 115, 116 (2016) (citing act providing a permanent form of government for the District of Columbia, ch. 180, 20 Stat. 102 (1878)). Federal control over the District required the federal government to oversee multiple "quasi-Federal agencies" including the Land Redevelopment Agency, the District of Columbia Manpower Administration, the National Capital Housing Authority, and the National Capital Planning Commission. H.R. Rep. No. 93-482, at 1446-47 (1973).

5

Congress exercised its control over the large population of Black District residents in a manner that abused their civil rights, ushering in nearly one hundred years of Jim Crow, including racially segregated schools, and often ignored or gave short shrift to their needs.[3] The growing civil rights movement of the post-World War II era paved the way for the Act by bolstering District residents' push for their right to self-government.

As such, the bipartisan passage of the Act comports with a broader Congressional goal to make real for District residents the promises of democratic participation that had been a central part of the mission of the civil rights movement. President Richard Nixon shared this understanding. In signing the Act on December 24, 1973, Nixon explained that he was "pleased" to do so, since "[o]ne of the major goals of [his] Administration [was] to place responsibility for local functions under local control and to provide local government with the authority and resources they need to serve their communities effectively."[4] The Act substantially furthered this objective by "giv[ing] the people of the District of Columbia the right to elect their

---

[3] *Washington DC: Our Changing City*, Urban Inst., https://apps.urban.org/features/OurChangingCity/demographics/#history (last visited May 26, 2026) (noting that the District became majority Black in the early 1950s).

[4] *See* Richard Nixon, *Statement on Signing the District of Columbia Self-Government and Governmental Reorganization Act*, The Am. Presidency Project, UC Santa Barbara (Dec. 24, 1973), https://www.presidency.ucsb.edu/documents/statement-signing-the-district-columbia-self-government-and-governmental-reorganization.

own city officials and to govern themselves in local affairs" thereby "broaden[ing] and strengthen[ing] the structure of the city government to enable it to deal more effectively with its responsibilities." "I am proud," President Nixon stated, "to join the Congress in pledging the full support of my Administration to make self-government a success in the District of Columbia."[5]

Through the Act, Congress expressly sought to "grant to the inhabitants of the District of Columbia powers of local self-government" and "relieve Congress of the burden of legislating upon essentially local District matters." D.C. Code § 1-201.02(a).

### B. The text of the Home Rule Act reflects Congress's intent to ensure the District could exercise self-government.

The Act's structure comports with Congress's stated purpose to grant the District broad authority to govern itself. The Act begins with the stated purpose to "grant to the inhabitants of the District of Columbia powers of local self-government" and "relieve Congress of the burden of legislating upon essentially local District matters" "to the greatest extent possible." *Id.* The Act's second and third titles detail the transfer of federal powers to the District, define the District's legislative power, and describe the process for amending its charter through a referendum of District residents. D.C. Code §§ 1-203.01–1-203.03, 1-202.01–1-

---

[5] *Id.*

202.04. Title IV details the extensive plan of self-government, vesting the legislative power in the District Council and the executive power in the District Mayor, and Title VII describes the District's procedures for succession in office. D.C. Code §§ 1-204.01–1-204.115, 1-207.01–1-207.71. Each of these titles represents a specific enactment of Congress's broader scheme to grant the District control over its affairs. Each provision must be interpreted in light of the statute's overall structure and purpose. Here, that is a comprehensive transfer of governance to District residents subject only to explicit exemptions.[6]

### C. Through the Home Rule Act, Congress retained oversight authority and granted authority to the Federal Executive in very limited circumstances.

The Act is an organized, expansive grant of "local self-government" to residents of the District of Columbia. D.C. Code § 1-201.02(a). In passing the Act, Congress shifted the course it had followed for over a century. Rather than continuing to reserve its exclusive constitutional authority over the District for itself and delegating a portion of that authority only to the President, *see supra*

---

[6] For this reason, the Stay Panel concurring opinion's insinuation that the District lacks Article III standing is incorrect because it ignores the District's sovereign structure. *See District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *13 (D.C. Cir. Dec. 17, 2025) (Rao, J., concurring). As the district court properly held, "the District has a right to govern itself and to determine how to enforce laws in the District[,]" and the District's alleged harm that "Defendants have, without statutory authority, reallocated decisions about preventing and deterring crime from the District's local government authorities to other actors" is sufficient to establish standing. JA822-23.

Section I(A), Congress delegated its authority to the District's elected representatives through Home Rule. This structural contrast is telling: where Congress intended to retain federal oversight—as with legislative matters—it did so explicitly. *See* D.C. Code §§ 1-206.01–1-206.02.  Congress's decision not to grant the President authority over the District—which Congress had granted to the President through statute prior to Home Rule—indicates an intent to transfer executive authority to the Mayor, save for explicit exceptions. Any other reading would render the Act's comprehensive grant of executive power to the Mayor a nullity, contrary to the canon against surplusage and the Act's stated purpose of granting home rule "to the greatest extent possible." D.C. Code § 1-201.02(a). *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Under the Act, the federal government retains minimal powers in local District operations. Congress retains an oversight role in the District's legislative affairs, reserving the power under Title VI to "exercise its constitutional authority as legislature for the District." In that same title, Congress prohibited the District Council from enacting legislation on certain specific matters, such as imposing taxes on the property of the federal government, or enacting regulations over federal courts. D.C. Code § 1-206.02. By enumerating the specific subjects on which the District may not legislate, Congress left the District otherwise free to legislate on local matters without Congressional intervention. *See Esteras v. United States*, 606

9

U.S. 185, 195 (2025) (applying the "well-established canon of statutory interpretation: '*expressio unius est exclusio alterius*'—in plain English, expressing one item of [an] associated group or series excludes another left unmentioned") (internal quotation marks omitted). Thus, Congress gave the District expansive legislative power over its own affairs, with Congressional oversight.

Although Congress could have similarly transferred executive authority over the District to the President, it did not. The Act vested the "executive power of the District" in the "Mayor who shall be the chief executive officer of the District government" to ensure the "proper execution of all laws relating to the District" and the "proper administration of the affairs of the District." D.C. Code § 1-204.22. Likewise, the Act transferred authority for the District's public housing authority granted under the 1934 District of Columbia Alley Dwelling Act from the President to the Mayor. D.C. Code § 1-202.02.[7]

The President's authority over the MPD is strictly limited, following the Act's statutory scheme of strong local control. The Act delegates to the Mayor the duty to "preserve the public peace," "prevent crime and arrest offenders," and otherwise "enforce and obey all laws and ordinances in force in the District." *Id.* § 5-101.03.

---

[7] Congress granted the President explicit authority to appoint local judges from "the list of persons recommended by the District of Columbia Judicial Nomination Commission . . . and[] by and with the advice and consent of the Senate." D.C. Code § 1-204.33.

It also delegates to the Mayor power to appoint "all officers and members of [the] Metropolitan Police force," *id.* § 5-105.01, determine the "[c]omposition of [the] force," *id.* § 5-105.05, and to set the rules governing the MPD, subject to any legislation enacted by the Council or by Congress. In contrast, Congress provided the President a role only in "special conditions of an emergency nature"; when he may request that the Mayor provide the "services of the Metropolitan police force" for "federal purposes," but not "for a period in excess of 48 hours" unless the President has notified Members of Congress. *Id.* § 1-207.40(a). If the President notifies Congress, the services made available expire after 30 days. *Id.* § 1-207.40(b).

During drafting and passage of the Act, Congress carefully considered whether to give the President power over District policing. For example, Chief of Police of the MPD Jerry V. Wilson submitted letters to the Chair of the House Committee on the District of Columbia and the House of Representatives in support of the Act. The Chief wrote that any "apprehension over local control of police power in the District is misplaced" because the District is made up of "responsible citizens who want effective law enforcement just as much as residents do in any other city." H.R. Rep. No. 93-482, at 1492-93 (1973). He noted that "[i]f the city of Washington is to be treated substantially as a local community, albeit a special one, rather than a federal enclave, then there is no reason to deprive local citizens of

control over that fundamental local service, the police force." *Id.* In this same letter, the Chief noted that under the Act, "local control over the police would prevail during urban rioting or during massive demonstrations against the Federal government." *Id.* The Chief further noted that under the Act "there presumably is no power vested in the President to employ the militia or Federal forces within the city without express request of the Mayor." *Id.*

Other legislative history demonstrates specific debate over whether the Act should delegate more power to the President. The "dissenting views" that accompanied the Act argued that "[i]t is entirely appropriate that the acts of a subordinate legislative body to which Congress has delegated power to enact provisions for the government of the District of Columbia should also submit its enactments to the President for his approval," and yet "the President is effectively cut out from such review." H.R. Rep. No. 93-482, at 1562 (1973). These dissenters contrasted the President's authority under Home Rule with the President's authority in territories, noting that "[t]he President, on the other hand, has veto power over enactments of the local legislatures for Guam." *Id.* (citing 48 U.S.C. § 1423i). The Act was not amended to address the opponents' concern.

Just as Congress circumscribed the President's role in local policing, it intentionally limited the President's authority to deploy the National Guard in the District. Well before the passage of the Act, Congress drafted Title 49 of the D.C.

Code, which governs when the President may call out the DCNG. *See* Act of March 1, 1889, ch. 328, § 45, 25 Stat. 772, 778 (1889); D.C. Code § 49-101 *et seq.*; *see also* JA846 ("When the DCNG is in state militia status, the President is exercising delegated authority from Congress's exclusive constitutional power over the District.").

That title provides for only two circumstances in which the President may rely upon the DCNG. First, D.C. Code § 49-102 enables the President to "order out" the National Guard for "drills, inspections, parades, escort, or other duties, as he may deem proper." Applying the *noscitur a sociis* and *ejusdem generis* canons,[8] the district court correctly found that "other duties" in this context refers to "other military duties that are similar in nature to drills, inspections, parades, or escorts" thus "exclud[ing] activities outside of military exercises, such as patrolling a city to deter crime." JA829.

Second, Section 49-103 provides that the President may deploy the National Guard to "aid the civil authorities in the execution of the laws" under a single

---

[8] "[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation modified). "[E]*jusdem generis*, counsels: where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* at 544 (citation modified).

circumstance: where there is "tumult, riot, or mob" and the Mayor, the U.S. Marshal for the District, or the National Capital Service Director "call on the Commander-in-Chief to aid them in suppressing such violence and enforcing the laws." D.C. Code §§ 49-404, 49-103. The district court also correctly concluded that the President may exercise authority under Section 49-103 "when the relevant civilian authorities request aid." JA829.

By design, the Act left in place Title 49's strict limits on the President's power to deploy the National Guard. Indeed, the report of the House Committee on the District of Columbia notes that the Act did not "modify the power of the President to obtain the troops necessary to deal with any emergency which might arise in the District." H.R. Rep. No. 93-482, at 1489 (1973). And outside of emergencies where local authorities seek assistance, Congress decided that local police, under local control, were perfectly capable of policing the District, rendering unnecessary an enhanced role for the President. As Congress explained, "[t]here is no reason to believe that the new government established under the bill will have any less of a stake in maintaining peace, law, and order tempered with justice than it has in the past." *Id.* at 1491. Despite objections to the limited power of the President in the realm of policing, the Act remained unchanged, demonstrating Congress's intent to limit the President's interventions to emergencies.

14

**II.    Allowing Executive Overreach in the District Would Undermine Federalism Interests Across the Country.**

The unlawful presence of National Guard troops in the District is an affront to its sovereignty, just like that of the states that have challenged unlawful deployments of the National Guard. That the District is not a state does not change the fact that this incursion on local control contravenes longstanding principles of federalism.

**A.    The Home Rule Act empowers the District to govern its own affairs, much like any other American city or state.**

When drafting the Act, Congress acted as a state legislature and delegated its constitutional power to the District. H. Comm. on the District of Columbia, 93rd Cong., Procedure for Handling H.R. 9056, at 981 (Comm. Print 1973). Congress observed that the District was already "treated as a State for many purposes by the Federal Government, in terms of grants, in its relationship with other States, and so on." *Id.* For this reason, Congress enacted the Act's Title IV charter, and in so doing "delegate[d]" to the District "the power to run its local government." *Id.* at 980-91.

**B.    By trampling on the District's ability to self-govern, Defendants' actions offend basic principles of federalism.**

Defendants' deployment of troops to police the District over its objection undermines the District's self-government and tramples the federalism principles that protect localities' rights to sovereignty and self-determination.[9]

The federalist system of "dual sovereignty"—along with the parallel separation of powers among the branches of the federal government—suffuses the Constitution. *Printz v. United States*, 521 U.S. 898, 918-19 (1997). This "structure of government is a means to the end of effective government that minimizes the possibility of tyrannical rule."[10] "The federal structure allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive by putting the States in competition for a

---

[9] Although the language of the Tenth Amendment addresses the authority of states, the Supreme Court has regularly extended the same concept to local governments, consistent with the principle that "[t]he Constitution requires a distinction between what is truly national and what is truly local." *United States v. Morrison*, 529 U.S. 598, 617-18 (2000). Indeed, many of the Court's foundational federalism decisions revolve around issues of local, rather than state, control. *See* Richard Briffault, *The Challenge of the New Preemption*, 70 Stan. L. Rev. 1995, 2018 (2018).

[10] Erwin Chemerinsky, *Federalism Not as Limits, But as Empowerment*, 45 U. Kan. L. Rev. 1219, 1220 (1997); *see also* The Federalist No. 51 (James Madison) ("[t]he different governments will control each other, at the same time that each will be controlled by itself.")

mobile citizenry.'" *Bond v. United States*, 564 U.S. 211, 221 (2011) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)).

These federalism principles guide the careful statutory scheme that Congress has developed concerning the National Guard, and they apply to the District. The Constitution "reserv[es] to the States" the principal power over the "Militia[.]" U.S. Const. art. I, § 8, cl. 16; *see United States ex rel. Gillett v. Dern*, 74 F.2d 485, 487 (D.C. Cir. 1934). It also delegates to Congress the authority for "calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. Const. art. I, § 8, cl. 15. As the Supreme Court has explained, the National Guard is "the modern Militia reserved to the [States] by . . . the Constitution." *Maryland ex rel. Levin v. United States*, 381 U.S. 41, 46 (1965), *vacated on other grounds*, 382 U.S. 159 (1965).

Congress has used its authority concerning the National Guard to develop a statutory scheme that carefully incorporates these federalism principles and respects our nation's "traditional and strong resistance . . . to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). That statutory scheme designates three modes in which the National Guard can operate: "state active duty, federal active duty under Title 10 of the U.S. Code, and full-time National Guard duty under Title 32 of the U.S. Code." *See* JA811. It also subjects National Guard troops under Title 10 status to the requirements of the Posse Comitatus Act ("PCA"),

17

18 U.S.C. § 1385, which proscribes the use of federal armed forces for civilian law enforcement, absent an express constitutional or statutory exception.

All National Guard units at issue in this case are operating under "full-time National Guard duty" pursuant to Title 32. *See* JA811; *see* 32 U.S.C. § 502(f). Under Title 32, National Guard units operate in a status in which they are "under the command of the state Governor," *Ass'n of Civilian Technicians v. United States*, 603 F.3d 989, 993 (D.C. Cir. 2010), but may be paid with federal funds, receive federal benefits, and perform limited federal missions.[11] Congress requires National Guard units to complete extensive training regimens, and originally created "Title 32 status" for the limited purpose of enabling the federal government—rather than state coffers—to cover the costs. *Id.*

Congress in 2006 widened the scope of Title 32 to authorize the National Guard to support operations or missions "at the request of the President or Secretary of Defense," but the legislative history of that amendment confirms that Congress intended to keep the reach of Title 32 narrow. Indeed, the caption of Title 32 is "Required drills and field exercises" and the Report of the House Armed Services Committee on the 2006 amendment suggests that Congress remained focused on training, with little mention of the ability of Guard forces to support Presidentially

---

[11] *See* Joseph Nunn, *Section 502(f) Is Not a Blank Check*, Lawfare (Oct. 17, 2024), https://www.lawfaremedia.org/article/section-502(f)-is-not-a-blank-check.

requested operations or missions. *See* H.R. Rep. No. 109-452, at 323 (2006) (discussing at length how the amendment would enable "reserve component personnel performing active guard and reserve duty, as well as military technicians (dual status), to . . . train active duty members of the armed forces"). Title 32 maintains the careful balance of state and federal control that has long governed National Guard deployments, and there is no indication that the 2006 amendment significantly altered that balance to authorize Defendants' actions. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not hide elephants in mouseholes.").

The Stay Decision ignores the overall structure of Title 32 in reading Section 502(f)(2)(A) broadly. *See District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *6 (D.C. Cir. Dec. 17, 2025) ("And the text of Section 502(f)(2)(A) likely leaves room for operational missions such as the type of public-safety-support mission within the Nation's Capital at issue here."). But as the district court correctly explained, that argument fails to grasp that the statutory scheme demonstrates that this provision is focused on training, and specifically titled "required drills and field exercises." *See* JA811-12 ("Duties under Title 32 are defined as 'training or other duty' performed by a member of the National Guard under sections 316, 502, 503, 504, or 505 of Title 32 'for which the member is entitled to pay from the United States.'") (citing 32 U.S.C. § 101(19)).

19

Through Titles 32 and 10 and the limits of the PCA, Congress has constructed a statutory scheme that protects the ability of states and localities to self-govern. That scheme allows for domestic military intervention only in true emergencies. There is no emergency here, and yet Defendants ride roughshod over the careful balance set by the Constitution and Congress, thereby severely constraining the ability of the District to govern its own affairs. These actions not only impinge upon the rights of the District and its residents, but—if allowed to stand—will help chart the course for continued unlawful deployments in localities across the country.

## CONCLUSION

This Court should affirm, because the district court correctly preliminarily enjoined Defendant-Appellants from exceeding their power in sending National Guard troops to the District.

Dated: May 26, 2026

Respectfully submitted,

/s/ Bruce V. Spiva
Bruce V. Spiva (DC Bar No. 443754)
R. Brent Ferguson (DC Bar No. 1782289)
Sejal Jhaveri (DC Bar No. 90043488)
Renata O'Donnell (DC Bar No. 1723929)
Kate Hamilton (DC Bar No. 90006168)
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
bspiva@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org

20

rodonnell@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a) and Fed. R. App. P. 29(a)(5) because it contains 4,657 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this response has been prepared in proportionally spaced typeface using Times New Roman 14-point font.

*/s/ Bruce V. Spiva*
Bruce V. Spiva
*Counsel for Amici Curiae*

22

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2026, I electronically filed this *Amici Curiae* Brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Bruce V. Spiva*
Bruce V. Spiva
*Counsel for Amici Curiae*

# EXHIBIT A

## APPENDIX: LIST OF *AMICI CURIAE*

**Jamie Raskin**
Representative of Maryland

**Robert Garcia**
Representative of California

**Adam Smith**
Representative of Washington

**Hakeem Jeffries**
Representative of New York

**Katherine Clark**
Representative of Massachusetts

**Pete Aguilar**
Representative of California

**Joe Neguse**
Representative of Colorado

**Rosa L. DeLauro**
Representative of Connecticut

**Gabe Amo**
Representative of Rhode Island

**Yassamin Ansari**
Representative of Arizona

**Jake Auchincloss**
Representative of Massachusetts

**Becca Balint**
Representative of Vermont

**Nanette Barragán**
Representative of California

**Joyce Beatty**
Representative of Ohio

**Ami Bera, M.D.**
Representative of California

**Donald S. Beyer Jr.**
Representative of Virginia

**Suzanne Bonamici**
Representative of Oregon

**Shontel Brown**
Representative of Ohio

**Julia Brownley**
Representative of California

**Salud O. Carbajal**
Representative of California

**Ed Case**
Representative of Hawaii

**Sean Casten**
Representative of Illinois

**Judy Chu**
Representative of California

**Gilbert R. Cisneros, Jr.**
Representative of California

**Emanuel Cleaver, II**
Representative of Missouri

**Steve Cohen**
Representative of Tennessee

**J. Luis Correa**
Representative of California

**Joe Courtney**
Representative of Connecticut

**Jasmine Crockett**
Representative of Texas

**Jason Crow**
Representative of Colorado

**Madeleine Dean**
Representative of Pennsylvania

**Diana DeGette**
Representative of Colorado

**Suzan K. DelBene**
Representative of Washington

**Chris Deluzio**
Representative of Pennsylvania

**Mark DeSaulnier**
Representative of California

**Maxine Dexter**
Representative of Oregon

**Debbie Dingell**
Representative of Michigan

**Lloyd Doggett**
Representative of Texas

**Sarah Elfreth**
Representative of Maryland

**Veronica Escobar**
Representative of Texas

**Adriano Espaillat**
Representative of New York

**Lizzie Fletcher**
Representative of Texas

**Bill Foster**
Representative of Illinois

**Lois Frankel**
Representative of Florida

**Laura Friedman**
Representative of California

**John Garamendi**
Representative of California

**Jesús G. "Chuy" García**
Representative of Illinois

**Sylvia Garcia**
Representative of Texas

**Dan Goldman**
Representative of New York

**Maggie Goodlander**
Representative of New Hampshire

**Al Green**
Representative of Texas

**Adelita Grijalva**
Representative of Arizona

**Steny H. Hoyer**
Representative of Maryland

**Jared Huffman**
Representative of California

**Glenn F. Ivey**
Representative of Maryland

**Jonathan L. Jackson**
Representative of Illinois

**Pramila Jayapal**
Representative of Washington

**Henry C. "Hank" Johnson, Jr.**
Representative of Georgia

**Julie Johnson**
Representative of Texas

**Sydney Kamlager-Dove**
Representative of California

**Timothy M. Kennedy**
Representative of New York

**Ro Khanna**
Representative of California

**Raja Krishnamoorthi**
Representative of Illinois

**George Latimer**
Representative of New York

**Teresa Leger Fernández**
Representative of New Mexico

**Mike Levin**
Representative of California

**Sam T. Liccardo**
Representative of California

**Ted W. Lieu**
Representative of California

**Zoe Lofgren**
Representative of California

**Stephen F. Lynch**
Representative of Massachusetts

**Seth Magaziner**
Representative of Rhode Island

**John W. Mannion**
Representative of New York

**Lucy McBath**
Representative of Georgia

**April McClain Delaney**
Representative of Maryland

**Jennifer L. McClellan**
Representative of Virginia

**Betty McCollum**
Representative of Minnesota

**James P. McGovern**
Representative of Massachusetts

**LaMonica McIver**
Representative of New Jersey

**Analilia Mejia**
Representative of New Jersey

**Christian Menefee**
Representative of Texas

**Kweisi Mfume**
Representative of Maryland

**Dave Min**
Representative of California

**Jerrold Nadler**
Representative of New York

**Eleanor Holmes Norton**
Representative of the District of
Columbia

**Alexandria Ocasio-Cortez**
Representative of New York

**Frank Pallone, Jr.**
Representative of New Jersey

**Nancy Pelosi**
Representative of California

**Chellie Pingree**
Representative of Maine

**Mike Quigley**
Representative of Illinois

**Delia C. Ramirez**
Representative of Illinois

**Emily Randall**
Representative of Washington

**Deborah K. Ross**
Representative of North Carolina

**Andrea Salinas**
Representative of Oregon

**Linda T. Sánchez**
Representative of California

**Mary Gay Scanlon**
Representative of Pennsylvania

**Jan Schakowsky**
Representative of Illinois

**Robert C. "Bobby" Scott**
Representative of Virginia

**Terri A. Sewell**
Representative of Alabama

**Brad Sherman**
Representative of California

**Haley Stevens**
Representative of Michigan

**Marilyn Strickland**
Representative of Washington

**Shri Thanedar**
Representative of Michigan

4

**Bennie G. Thompson**
Representative of Mississippi

**Mike Thompson**
Representative of California

**Dina Titus**
Representative of Nevada

**Rashida Tlaib**
Representative of Michigan

**Lori Trahan**
Representative of Massachusetts

**Lauren Underwood**
Representative of Illinois

**Marc Veasey**
Representative of Texas

**Nydia M. Velázquez**
Representative of New York

**James Walkinshaw**
Representative of Virginia

**Maxine Waters**
Representative of California

**Bonnie Watson Coleman**
Representative of New Jersey

**George T. Whitesides**
Representative of California

5