**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 25-5418**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

DISTRICT OF COLUMBIA,
*Plaintiff-Appellee*,

v.

DONALD J. TRUMP, in his official capacity as President
of the United States, *et al.*,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia

**APPELLANTS' REPLY BRIEF**

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7539*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................3

I.    The deployments are lawful. ..................................................................3

    A.    The President's Commander-in-Chief Power Authorizes Deployment of the D.C. Guard. .......................................................................3

    B.    Other Provisions of the D.C. Code specifically authorize the D.C. Guard's deployment. ................................................................5

    C.    Section 502(f) also authorizes the deployments. ...............................9

    D.    Plaintiff's alternative arguments concerning the deployment of State Guard members are not a basis for affirming the injunction. ............15

        1.    An injunction against the D.C. Guard's deployment does not require or warrant an injunction against the state Guards' deployment. .............................................................................15

        2.    Plaintiff's Militia Clauses argument is not a basis for affirmance. ............................................................................17

        3.    Plaintiff's statutory authorization argument fails. ....................20

II.    The District did not establish the equitable factors for injunctive relief.......22

CONCLUSION...............................................................................................27

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Constitution**

U.S. Const. art. I, § 8, cl. 16 ................................................................ 12

**Cases**

*Abbott v. Biden*,
　70 F.4th 817 (5th Cir. 2023) ......................................................... 13

*Ali v. Federal Bureau of Prisons*,
　552 U.S. 214 (2008) ....................................................................... 6

*Association of Civilian Technicians, Inc. v. United States*,
　603 F.3d 989 (D.C. Cir. 2010) ..................................................... 13

*Bond v. United States*,
　564 U.S. 211 (2011) ..................................................................... 18

*In re Debs*,
　158 U.S. 564 (1895) ....................................................................... 3

*District of Columbia v. Trump*,
　No. 25-5418, 2025 WL 3673674 (D.C. Cir. Dec. 17, 2025) (per curiam) ......... 1

*Fuld v. Palestinian Liberation Org.*,
　606 U.S. 1 (2025) ......................................................................... 21

*INS v. Chadha*
　462 U.S. 919 (1983) ..................................................................... 18

*Massachusetts v. EPA*,
　549 U.S. 497 (2007) ..................................................................... 21

*Monsanto Co. v. Geertson Seed Farms*,
　561 U.S. 139 (2010) ................................................................ 16, 22

*In re Neagle*,
　135 U.S. 1 (1890) ........................................................................... 3

*Russell Motor Car Co. v. United States*,
　261 U.S. 514 (1923) ....................................................................... 6

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ................................................................... 2, 15, 17

**Federal Statutes**

10 U.S.C. § 246 .................................................................................................... 6

10 U.S.C. § 12406 .......................................................................................... 3-4

16 U.S.C. § 1456 .................................................................................................. 9

22 U.S.C. § 1978 .................................................................................................. 9

32 U.S.C. § 112 ................................................................................................. 12

32 U.S.C. § 502 ................................................... 1, 9, 10, 11, 12, 13, 14, 15, 22

**District Statutes**

D.C. Code § 1-206.02 .................................................................................. 7, 20

D.C. Code § 5-129.03 ....................................................................................... 22

D.C. Code § 49-102 ................................................................................. 1, 5, 6, 7

D.C. Code § 49-103 .......................................................................................... 8, 9

D.C. Code § 49-401 ............................................................................................ 5

D.C. Code § 49-404 ........................................................................................ 1, 5

D.C. Code § 49-405 ..................................................................................... 1, 5, 6

D.C. Code § 49-406 ........................................................................................ 5, 6

D.C. Code § 49-409 ........................................................................................ 1, 3

D.C. Code § 49-901 ............................................................................................ 5

**Other**

Exec. Order No. 11485, § 1, 34 Fed. Reg. 15411, 15411 (Oct. 3, 1969) ................ 7

*Auth. to Use Troops to Prevent Interference With Fed. Emps. by Mayday
Demonstrations & Consequent Impairment of Gov't Functions*,
   1 Op. O.L.C. Supp. 343 (1971) ........................................................................ 3

*Use of the Nat'l Guard to Support Drug Interdiction Efforts in D.C.*,
13 Op. O.L.C. 91 (1989) ……………………………………………………….8

iv

**INTRODUCTION**

As defendants previously explained, a host of authorities provide the President with power to deploy the District of Columbia (D.C. or District) National Guard in the District and to request deployment of state National Guards to aid that mission. Congress made the President the "Commander-in-Chief of the militia of the District of Columbia," D.C. Code § 49-409, which empowers the President to deploy the D.C. Guard—federal troops—to the District, a federal enclave. Congress also specifically authorized the President to call up the D.C. Guard "to aid the civil authorities" or for any "duties" he "may deem proper," D.C. Code §§ 49-102, 49-404, 49-405, and further authorized the President to request deployment of Guard members in "[s]upport of operations or missions undertaken" at his or the Secretary of War's request, 32 U.S.C. § 502(f)(2)(A). Plaintiff contends that all of these provisions, layered over the authority of the President and the cooperating states, do not collectively permit the limited deployments at issue here. These arguments are unavailing, as the stay panel held. *District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *1 (D.C. Cir. Dec. 17, 2025) (per curiam) (*Stay Decision*). Thus, as the stay panel rightly concluded, plaintiff is not likely to prevail in challenging the deployments here, and the district court erred in entering a preliminary injunction.

In addition, as to the state Guards, plaintiff's § 502(f) arguments are irrelevant since, although plaintiff labors mightily to show that this provision only permits state

1

Guards to undertake operations separately authorized under state law, plaintiff again does not attempt to show that any state Guard's operations are unauthorized by the sending state's laws. Plaintiff instead makes a series of alternative arguments the district court did not address. This Court, however, will not "uphold[] a preliminary injunction based upon a legal theory not embraced by the district court." *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011). And the alternative arguments are in any event meritless.

The equitable requirements independently require reversal. The only irreparable harm the district court identified was a supposed "sovereign" injury. But plaintiff has no response to the basic points that the deployment does not interfere with its exercise of its limited delegated authority and that these asserted sovereign injuries—at most sounding in lack of statutory authority—do not give rise to any presumption of irreparable harm. Plaintiff's remaining harm assertions, which the district court did not embrace, do not withstand even minimal scrutiny. And the injunction would unwind agreements negotiated at the highest levels of federal and state government and end a successful effort to address high crime rates in the Nation's capital. This Court should vacate the injunction.

## ARGUMENT

## I.    The deployments are lawful.

### A.    The President's Commander-in-Chief Power Authorizes Deployment of the D.C. Guard.

Congress made the President "Commander-in-Chief of the militia of the District of Columbia." D.C. Code § 49-409.  By virtue of that delegation, the President has authority to deploy the D.C. Guard—a federal entity—within a federal enclave—the District. There is no reason to think Congress must explicitly and separately bless every use of a federal force in a federal enclave for federal purposes. The scope of the President's statutory authority as Commander in Chief should also be construed against the backdrop of the President's Article II authority to "use troops for the protection of federal property and federal functions." *Auth. to Use Troops to Prevent Interference With Fed. Emps. by Mayday Demonstrations & Consequent Impairment of Gov't Functions*, 1 Op. O.L.C. Supp. 343, 343 (1971); *see also id.* at 344 (discussing *In re Neagle*, 135 U.S. 1 (1890); and *In re Debs*, 158 U.S. 564 (1895)). The President's deployment of the D.C. Guard serves that interest, quelling the violent crime problem in D.C. that reaches far beyond local concerns, endangering federal property, officials, and functions.

Plaintiff's attempt to argue otherwise hinges on an inapt analogy to state National Guard members. Plaintiff emphasizes that state Guard members may be called into federal service in specified circumstances, Answering Br. 7 (citing 10

U.S.C. § 12406), but the D.C. Guard is always under the authority of the federal government. Nor is it relevant that state law might restrict a governor's ability to deploy Guard members in state status, Answering Br. 36-39, as that does not bear on whether the President can deploy federal troops to a federal enclave. Instead, the logical inference from the relevant statutory scheme is that the President may broadly deploy the Guard in the District unless a federal statute or the Constitution prohibits it.

Even if plaintiff's analogy to the powers wielded by governors was apt here, plaintiff admits that the governors of all 50 states wield authorities over their state Guards they deny the President has. Answering Br. 39. Plaintiff attempts a survey of powers wielded by state Governors in 1889 specifically. But there is no reason to think Congress intended the D.C. Guard to be limited to a survey of state Guard practice at a particular point in time. And even on plaintiff's reading, the limitations it suggests were far from universal. Answering Br. 37 (asserting that "[m]ore often than not" governors lacked authority to deploy the Guard to "execute the laws"). Rather than specifically enumerating the circumstances in which the President may call out the Guard, Congress opted for a general delegation, which empowers the President to deploy a federal force in a federal enclave to advance federal interests.

And that authority, alone, resolves this case. As explained below, plaintiff's arguments about the state Guards are either contingent on its arguments about the

D.C. Guard or not properly before the Court. *See infra* pp. 15-22. Thus, if the D.C. Guard deployment was lawful, the district court's injunction must be set aside.

### B. Other Provisions of the D.C. Code specifically authorize the D.C. Guard's deployment.

**1.** The D.C. Code makes clear in numerous other provisions that the D.C. Guard may be deployed in a broad range of circumstances. It provides that the President "shall order out" the D.C. Guard "[w]henever it shall be necessary." D.C. Code § 49-405. It recognizes the D.C. Guard may be used "to aid the civil authorities in the execution of the laws." *Id.* § 49-404; *see also id.* § 49-901 ("Whenever the National Guard of the District of Columbia shall be ordered to duty in case of riot, tumult, breach of the peace, or whenever called in aid of the civil authorities . . . ."). And it allows the Commanding General to "order out any portion of the National Guard for such drills, inspections, parades, escort, or other duties, as he may deem proper." *Id.* § 49-102.

Plaintiff works hard to reduce the scope of these provisions, but its attempts are not persuasive. As to the first three provisions, it dismisses them as pertaining only to the "enrolled militia," consisting of all able-bodied adult males under 45 years old, D.C. Code § 49-401, rather than the National Guard, defined as the organized militia, *id.* § 49-406. But the National Guard (or organized militia) is a subset of the enrolled militia. The statutory structure makes this point clear. The "militia" includes all those "enrolled" under the statute, *id.* § 49-401, and the

5

"organized militia" is a volunteer subset of that group, *see id.* § 49-406. This is also consistent with Congress's definition of "militia of the United States" in a different context, which identifies the "organized militia" as a subset of that militia. 10 U.S.C. § 246(a). Thus, when the D.C. Code contemplates the enrolled militia being called forth to aid the civil authorities and execute the laws, that includes deployment of the D.C. Guard to serve that purpose. Indeed, in authorizing the Commander in Chief "to call out *any portion of* the enrolled militia," D.C Code § 49-405 (emphasis added), Congress expressly authorized deployment of the organized militia.

As to Section 49-102, plaintiff does not dispute that the relevant language— "other duties, as he may deem proper"—is capacious. D.C. Code § 49-102. Plaintiff relies solely on the principle of ejusdem generis to argue that this must be limited to exercises similar to drills, inspections, escorts, and parades. Answering Br. 36. This contention is misplaced. Interpretive canons like *ejusdem generis* are tools for understanding ambiguous terms, not for injecting ambiguity into plain text. *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 224-25 (2008) (rejecting "petitioner's attempt to create ambiguity" through invocation of *ejusdem generic* canon "where the statute's text and structure suggest none"); *see also Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923) ("where words are of obscure or doubtful meaning, and then, but only then"). And in any event, although plaintiff characterizes the Guard as engaged in "law enforcement," Answering Br. 28, the

6

Guard's activities—primarily patrolling areas while not making arrests or charging decisions—are not significantly different than the other listed activities.

Historical practice further supports defendants' position. In 1969, President Nixon issued an Executive Order providing that the Secretary of Defense may order out the D.C. Guard "to aid [the] civil authorities of the District of Columbia." Exec. Order No. 11485, § 1, 34 Fed. Reg. 15411, 15411 (Oct. 3, 1969). Congress was undoubtedly aware of this delegation of authority when it passed the Home Rule Act just four years later, yet "when Congress was given the opportunity just four years later in enacting the Home Rule Act to direct such power going forward to the Mayor or City Council, Congress did the opposite." *Stay Decision*, at *9; *see* D.C. Code § 1-206.02(b).

The Executive Branch, moreover, has so interpreted these provisions since at least 1963. Plaintiff notes that, shortly after the Office of Legal Counsel (OLC) issued its 1963 opinion, it cautioned that courts might read Section 49-102 more narrowly. Answering Br. 32. But OLC has consistently adhered to its view and, after examining the question in more detail in 1989, repeated that "[t]he authorization to order out the Guard for 'other duties, as he may deem proper' has long been viewed as broad enough to include law enforcement activities" and that reading "'other duties'" consistent with its normal meaning "is especially appropriate in light of section [49-404] of the Code, which makes it clear that the National Guard, acting

7

as militia, may be 'called . . . to aid the civil authorities in the execution of the laws.'" *Use of the Nat'l Guard to Support Drug Interdiction Efforts in D.C.*, 13 Op. O.L.C. 91, 93 (1989) (third alteration in original).

**2.** Plaintiff also repeats its argument that Section 49-103 operates as a limitation on the President's use of the Guard, and further limits any authority granted by Sections 49-404 and 49-901. Answering Br. 29. But Section 49-103 is not phrased in terms of a limitation on the President. It states that "it shall be lawful for the Mayor of the District of Columbia, or for the United States Marshal for the District of Columbia, or for the National Capital Service Director, to call on the Commander-in-Chief to aid them in suppressing such violence and enforcing the laws." D.C. Code § 49-103. By its terms, this is just a means for those officials to request the D.C. Guard's assistance, not a restriction on the President's use of the Guard.

Given that the two officials listed alongside the Mayor in this provision are federal officials, plaintiff's and "the district court's reading would imbue two presidential subordinates with more power to protect the seat of the federal government than the President—a highly untenable reading of statutory text." *Stay Decision*, at *9. Plaintiff cites other statutes they claim "make a request from another executive official a trigger for the President's power." Answering Br. 31. But even assuming those statutes in fact require a request from a subordinate official, they

confirm that when Congress wishes to achieve that unusual result, it does so expressly. 16 U.S.C. § 1456(c)(1)(B) ("the President may, upon written request from the Secretary"); 22 U.S.C. § 1978(a)(5) ("[u]pon receipt of any certification made [by the Secretary of Commerce or Interior], the President may"). Section 49-103, by contrast, sets out when the Mayor and presidential subordinates can make a request; it sets no limits on the President's authority. In addition, these statutes—again, assuming plaintiff is reading them correctly—underscore how untenable plaintiff's interpretation of Section 49-103 is. Every one of them involves the head of a Cabinet-level agency who—although serving at the pleasure of the President—exercises significant policy discretion. That is obviously not comparable to making the President's ability to deploy a component of the armed forces in a federal enclave contingent upon a finding by a United States Marshal or the National Capital Services Director.

### C.    Section 502(f) also authorizes the deployments.

Title 32 authorizes National Guard members to "be ordered to perform training or other duty," which may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(1), (2)(A). That is what these deployments are. Of course, the deploying state's governor (or the President in the case of the D.C. Guard) must authorize the deployment. Answering Br. 41. But there is no dispute

that they did so. Opening Br. 28; JA547-78.

**1.** Initially, plaintiff again contends that defendants forfeited reliance on § 502(f). Answering Br. 39. Plaintiff made this contention at the stay stage, but the stay panel nonetheless analyzed § 502(f) in detail and concluded that defendants "are likely to show that Section 502(f)(2)(A) authorized the President and the Secretary of Defense to request that both the D.C. Guard and the State Guards undertake a federal mission in the District." *Stay Decision*, at *8.[1]

The forfeiture argument is also wrong. The Commanding General ordered the D.C. Guard into duty in accordance with § 502(f), JA671, as the district court acknowledged, JA815. In briefing on the injunction, defendants stressed that § 502(f) "authorizes the President or Secretary to request National Guard units to support a federal mission, which necessarily includes operations in the District, where the President's authority overlaps as both the Commander in Chief of the federal military and the D.C. National Guard." Dkt. No. 34, at 22-23. And defendants' counsel reiterated that point at argument. Dkt. No. 80, at 53-54, 57.

---

[1] Plaintiff's contention that the stay panel never addressed this question, Answering Br. 39, is wrong. The panel analyzed the statute in detail and expressly held that it likely *did* provide independent authorization. *Stay Decision*, at *6, *8. In the portion of the opinion on which plaintiff appears to rely, the panel further held that defendants were likely to prevail *even if* the district court was correct that § 502(f) encompasses only missions and operations authorized under state law. *Id.* at *8.

Even if plaintiff's forfeiture argument were borderline, the Court should exercise its discretion to address § 502(f)'s application to the D.C. Guard—a pure issue of law that would be dispositive. The stay panel already analyzed it in detail, holding that § 502(f) likely authorized the D.C. Guard's deployment. *Stay Decision*, at *2. Moreover, this is an appeal from a preliminary injunction, and the district court has stayed this case on the expectation that this appeal will be highly relevant to—if not dispositive of—further proceedings below. Dkt. No. 105. Indeed, a lynchpin of plaintiff's argument is that § 502(f) must be interpreted identically as to both D.C. and state Guards. *See* Answering Br. 42.

**2.** On the merits, plaintiff contends that § 502(f) provides no independent source of authority for deployments. Of course it does. The statute authorizes Guard members to "*be ordered* to perform training or other duty," which may include "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." 32 U.S.C. § 502(f)(1), (2)(A) (emphasis added). Plaintiff notes that § 502(f)(1) directs that duties are performed "[u]nder regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force," Answering Br. 40, but that procedural requirement has nothing to do with whether the statute independently authorizes deployments. And although plaintiff points to several National Guard Bureau regulations, none of the cited provisions discusses operations requested by the President or Secretary of War under

11

§ 502(f)(2)(A). Certainly, other parts of Title 32 authorize funding, but nothing in § 502 (which does not contain the word "fund" or "funding") is limited to funding. *Contra* Answering Br. 43-44.

Plaintiff's reliance on a drug interdiction statute, 32 U.S.C. § 112, only undermines its argument. Congress itself understood § 502(f) as providing substantive authority to order deployment, referencing the fact that state National Guard members may be "ordered to perform full-time National Guard *duty* under section 502(f)." *Id.* § 112(b)(1) (emphasis added). This language, particularly the reference to "duty," would make no sense if § 502(f) were limited to funding state-authorized missions. And the following subsection, § 112(c), is consistent with that conclusion. A state actor must certify that "use of the National Guard . . . for the *activities proposed*" is "authorized by, and is consistent with, State law." *Id.* § 112(c)(5) (emphasis added). But the activities the Guard members perform while in federal service, and whether they comply with state law, is a question distinct from the authority to call forth those Guard members in the first place. Only the latter question is relevant here.

Plaintiff's reliance on the Militia Clauses is similarly mistaken. Congress may provide for "governing" only "such Part of [the militia] as may be employed in the Service of the United States." U.S. Const. art. I, § 8, cl. 16. The federal government cannot, by contrast, govern National Guard members in state status. But plaintiff

misunderstands what it means to "govern" the militia. As the Fifth Circuit recently explained, "[g]overning in the military context" generally refers to boots-on-the-ground decisions, like "command[ing] and control[ling] the troops" in the field, as well as military discipline. *Abbott v. Biden*, 70 F.4th 817, 831 (5th Cir. 2023). It does not extend to setting the legal framework under which the state Guard members may be deployed or may operate. *Cf. Association of Civilian Technicians, Inc. v. United States*, 603 F.3d 989, 993-94 (D.C. Cir. 2010) (Guard members remain "under the control of the states" even when their actions are "governed largely by substantive federal law." (quotation marks omitted)). Here, the state Guard members remain under the "command and control" of their state governors, and that is all the Militia Clauses require.

**3.** In any event, none of plaintiff's merits arguments about § 502(f) ultimately matter to the outcome of this appeal. As to state Guards, plaintiff makes no attempt to show that their deployments are inconsistent with any deploying state's law. And as the stay panel observed, the remedy for a state-law violation would be a suit against the governor (presumably in state court, Opening Br. 27); *Stay Decision*, at *10. As to the D.C. Guard, plaintiff does not contend that reading § 502(f) to convey substantive authority raises any constitutional concerns.

Plaintiff's argument is thus essentially a double bankshot. It argues that state Guard deployments must be authorized by state law and that a contrary reading

would raise constitutional concerns. Thus, according to plaintiff, § 502(f) cannot be read to authorize deployment of the state *or D.C.* National Guard members. Notwithstanding the fact that its constitutional arguments (admittedly) do not extend to the D.C. Guard, plaintiff attempts to narrow § 502(f) by arguing that "[w]hatever authority Section 502(f) grants, it must apply to the D.C. Guard and state Guards alike." Answering Br. 42.

This argument misses the point. As the stay panel noted, § 502(f) does not apply in the same way to both state and D.C. National Guard deployments. *Stay Decision* at *7. The term "request" in § 502(f) necessarily implies consent to the deployment by the relevant commander. So in effect, § 502(f) authorizes the deployment of the National Guard for a mission requested by the President *if* the relevant commander consents. For a state Guard, the governor must consent—and there is no reason to think that § 502(f) would override any state-law limitations to which the governor is subject. For the District, the Commanding General must consent, *see Stay Decision* at *7, but functionally, the President can unilaterally order out the D.C. Guard given that the D.C. Commanding General is appointed by and subordinate to the President. This is not treating § 502(f) as a "chameleon[]" subject to changed meaning in different contexts. Answering Br. 41 (quotation marks omitted). The meaning of the statute is the same in both contexts: It provides federal authorization for operations the President or Secretary of War requests

subject to consent by the relevant state or, for D.C., federal commander. The point is that, as to the D.C. Guard, an entity that is always under exclusively federal control, federal authorization is *sufficient*—even if, as plaintiff contends, state Guard operations must *also* be authorized by the relevant state's laws.

### D. Plaintiff's alternative arguments concerning the deployment of State Guard members are not a basis for affirming the injunction.

For the reasons previously explained, plaintiff's arguments concerning the D.C. Code and § 502(f) are wrong. But those arguments would not support an injunction against deployment of state Guard members even if plaintiff were right. The D.C. Code does not govern or address the conduct of state Guard members. Opening Br. 39. And as to § 502(f), neither plaintiff nor the district court has identified any conflict between the sending State's laws and these deployments.

Plaintiff insists that the injunction must be affirmed as to state Guards for three additional reasons. Answering Br. 48-53. The district court did not endorse any of these arguments, and this Court has made clear that it will not "uphold[] a preliminary injunction based upon a legal theory not embraced by the district court." *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011). In any event, none is a basis for affirmance.

#### 1. An injunction against the D.C. Guard's deployment does not require or warrant an injunction against the state Guards' deployment.

There is no logical reason why an injunction against the D.C. Guard's

15

deployment should extend to the deployment of state Guards. Plaintiff is wrong to argue that the D.C. Guard deployment requires but lacks express authorization in the D.C. Code. *See supra* pp. 3-9. But even if the Court accepted the argument, it would not call into question the deployment of state Guard members at the President or Secretary's request, with the consent and at the direction of their state governors.

Plaintiff does not contend otherwise. But it insists that the two deployments are inextricably linked because the memoranda of understanding (MOUs) supposedly provide that state Guard members will "support" the D.C. Guard and follow its "operational direction" and that defendants have in turn placed those units under the D.C. Guard's "command and control." Answering Br. 48 (quotation marks omitted). Plaintiff mischaracterizes and takes out of context the sources it cites. *See infra* pp. 18-19. But even if the deployment of the D.C. National Guard were enjoined on legal grounds distinct to the D.C. Guard, it would be up to defendants—in conjunction and with the continued consent and cooperation of the relevant states—to decide whether the deployment of state Guards in support of the federal mission should continue. If a court determines (or finds it likely, as here) that "a particular agency order" is unlawful, what comes next is "for the agency to decide." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159-60 (2010).

### 2.    Plaintiff's Militia Clauses argument is not a basis for affirmance.

Plaintiff next argues that the state Guard deployments violate the Militia Clauses because, on plaintiff's reading of the record, the state Guards are under the command and control of the federal government rather than their respective state executives. Answering Br. 48-50. The district court not only did not embrace this argument, it expressly declined to reach it. JA821 n.10.

This Court should also decline to address it. Initially, plaintiff's contention is fact-bound. Furthermore, the logic underlying *Sherley*—"it is for the district court to determine, in the first instance, whether the plaintiffs' showing on a particular claim warrants preliminary injunctive relief," 644 F.3d at 397-98—applies with particular force here. Plaintiff's argument is not that state Guards could not be deployed at all but instead that state governors have in practice ceded too much of the control over their Guards to the federal government. It would likely be an abuse of discretion for the district court to grant plaintiff an injunction based on this theory, since plaintiff is not irreparably harmed by the particulars of the command-and-control structure. Indeed, it is implausible that plaintiff has standing to vindicate, for example, the Governor of Ohio's interest in exercising command and control over

17

the Ohio National Guard.[2] And even if plaintiff could somehow obtain relief on this theory, any injunction would presumably be limited to, for example, restoring additional control to the States, not enjoining the deployment altogether.

Plaintiff's arguments are meritless, in any event. Plaintiff contends that the MOUs "explicitly provide that state troops must take 'operational direction' from the D.C. Guard." Answering Br. 49 (quoting JA548). But daily briefings, shared tasking orders, and logistical synchronization among participating National Guard units are features of multi-jurisdiction operations grounded in prudent coordination, not an unlawful assumption of command. The relevant point is that "[s]ending units will remain under the command and control of the Adjutants General or Commanding General of the supporting jurisdiction." JA548; *see also* JA523 (memorandum from Secretary of War stating that "[a]t all times, any supporting out-of-district [National Guard] personnel will remain under the administrative command and control of their State Governor"). Each governor can decline particular missions. JA547; *see also* JA517. And of course, "[o]ut of district forces

---

[2] Plaintiff invokes *Bond v. United States*, 564 U.S. 211 (2011). Answering Br. 50. But the injury that supported standing there was the petitioner's prosecution under an assertedly unconstitutional statute. *Bond*, 564 U.S. at 224. Similarly, in *INS v. Chadha*, 462 U.S. 919 (1983), "the challenger sought to protect not the prerogatives of the Presidency as such but rather his own right to avoid deportation under an invalid order." *Bond*, 564 U.S. at 223. By contrast, an injunction returning additional control of state Guards to state governors would not redress plaintiff's asserted injury, which is based on the deployment itself.

may be withdrawn, or their operations further limited by their State Governors at any time." JA517; *see also* JA549 (MOU "may be terminated by either party at any time.").

Plaintiff also contends that "[d]efendants have in turn placed [state Guard] units under the 'command and control' of the D.C. Guard," Answering Br. 48, and that "defendants have repeatedly stated that 'all' Guard units are under the 'command and control' of the D.C. Guard," Answering Br. 49. But none of the record materials that plaintiff cites in making these assertions—JA544 (document showing task organization); JA874 (operational documents setting forth, *inter alia*, the D.C. Guard's mission, the number of Guard members from each jurisdiction, and tasks performed); JA878 (similar); JA884 (similar)—provides any support. These operational and organizational materials at most show that the D.C. Guard operates as a liaison and chief coordinating element for state Guard units that have been deployed in the District in Title 32 status. Although the D.C. Guard has "coordinating and tasking authority over . . . out of district forces," those forces "remain under the administrative command and control of their sending state Adjutants General and ultimately their State Governors," and "[a]ll tasks assigned to out-of-district forces are within parameters set by their State Governors." JA517.

19

### 3.    Plaintiff's statutory authorization argument fails.

Finally, plaintiff asserts that the state Guard deployments are unlawful because they lack federal statutory authorization. Answering Br. 50-53. In the district court, plaintiff contended that the Home Rule Act and Emergency Management Assistance Compact (EMAC) precludes the President from requesting and receiving state Guard units into the District without the Mayor's consent. Dkt. No. 3-1, at 22-24. But the Home Rule Act provides the District's local government with no authority over the D.C. Guard that it previously lacked. D.C. Code § 1-206.02(b). And the statute does not even arguably provide the District's local government with any authority over state Guard members. As to the EMAC, although plaintiff half-heartedly reprises its contention that the Compact forecloses the state Guard deployments here, Answering Br. 52-53, that contention cannot be taken seriously for the many reasons set forth in our opening brief, Opening Br. 39-41, and the stay panel's decision, *Stay Decision*, at *10.

Plaintiff's new argument in this Court is that state Guard members cannot be deployed to the District at the request of the President or Secretary of War absent a federal statute specifically authorizing those deployments. Answering Br. 50-51. That is, according to plaintiff, it is not enough that (1) the President requests the deployment, (2) the relevant state governor approves and directs the deployment, (3) the deployment is authorized by state law, (4) the deployment does not conflict with

any provision of federal law, and (5) the deployment does not violate the Constitution.

There is no basis for this argument. Plaintiff invokes the principle that state sovereign authority is bounded by state borders, Answering Br. 50 (citing *Fuld v. Palestinian Liberation Org.*, 606 U.S. 1, 14 (2025)), and that states cannot invade other states, *id.* (citing *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007)). Putting aside that the cited cases are wildly inapt—*Fuld* is a personal-jurisdiction case, *Massachusetts* is a case about greenhouse-gas emissions—the state sovereignty principles plaintiff invokes are entirely misplaced. "The District of Columbia . . . is a federal district, not a sovereign State." *Stay Decision*, at *11. And in any event, states do not "invade" the District when they send Guard members at the President's request.

This argument is also highly implausible. For one, it would mean the President would have less power to receive state Guard assistance in the District (a federal enclave) than in the 50 states.[3] It would also mean that, at least before 2002 (when the District's council authorized the Mayor to execute the EMAC), *no one* could

---

[3] For example, on plaintiff's view, the federal government could request and have the Ohio National Guard perform a federal mission in Title 32 status in Ohio with the governor's consent and at his direction (or in another state, with the permission of that state's governor), provided that the Ohio Guard's performance of that mission is authorized by state law. But not so in D.C., where separate federal authorization would be required.

21

lawfully request a state Guard's deployment to D.C. for any purpose (such as, for example, presence at inaugurations). The district court cited D.C. Code § 5-129.03 as authority for the D.C. Guard's deployment at inaugurations and suggested that Title 32 orders permit out-of-District Guard members to act under Title 5 of the D.C. Code. JA856. But that provision just authorizes the Mayor to designate special police officers; it does not refer to the D.C. Guard and certainly is not specific statutory authorization for deployment of state Guard members into the District.

Finally, even if the state Guard deployments to the District required federal statutory authorization, § 502(f) is such authorization. It is one thing to contend, as plaintiff also does, that § 502(f) is not sufficient to permit state Guards to conduct operations that their own state laws do not authorize. But even accepting that position, § 502(f) obviously permits the President to request state assistance for operations that *are* authorized by state law and do not conflict with any provision of federal law.

## II.    The District did not establish the equitable factors for injunctive relief.

Plaintiff's unlikelihood of success is dispositive. But the district court's order should also be vacated because the remaining factors do not warrant the "extraordinary relief of an injunction," *Monsanto*, 561 U.S. at 165-66, just as the "balancing of the relevant equitable considerations . . . weigh[ed] heavily in favor of granting a stay," *Stay Decision*, at *11. Even plaintiff's standing is questionable, as

22

Judge Rao explained, *id.* at \*13 (Rao, J., concurring), and plaintiff's arguments on the equitable factors are measurably worse.

**1.a.** The district court found irreparable harm based solely on plaintiff's "exercise of the sovereign powers that Congress has delegated to it." JA865. Plaintiff briefly parrots that conclusion, Answering Br. 53, but has no answer to the basic point that these asserted injuries are at most statutory, arising from the local government's delegated authority, and thus cannot give rise to a presumption of irreparable injury, Opening Br. 44. In fact, plaintiff concedes that it suffers no sovereign injury. Answering Br. 15 ("[T]he District is not claiming injury to any inherent 'sovereignty.'"). Without any sovereign injury, or any concrete evidence that deployment of the National Guard has irreparably harmed plaintiff's statutory authority, plaintiff cannot make out a claim for injunctive relief. Certainly, plaintiff has some delegated authority to police the District. But the mission here is not a law-enforcement mission, and even if the Guards were engaged in policing, plaintiff's delegated authority is far from exclusive in that space. Opening Br. 45-46.

**b.** Plaintiff's other assertions of irreparable harm are not properly before the Court, since the district court did not accept them. Even so, they fail:

**i.** Plaintiff claims that "[t]he deployment has forced the District to divert resources to coordinate with and protect the Guard." Answering Br. 53. Defendants appreciate the coordination and assistance the Metropolitan Police Department

(MPD) has provided (which has helped enhance safety for residents and visitors), but these actions are voluntary and not a basis for an injunction. And although plaintiff provides a string cite to the record, *id.*, none of those materials provides any evidence that any alleged diversion appreciably diminishes MPD resources, which in any event are offset by assistance the Guard's presence at highly trafficked area provides.

**ii.** Plaintiff asserts that the deployment has somehow "threatened public safety." Answering Br. 53. But plaintiff mischaracterizes the materials it cites. Those materials—produced in discovery by defendants—suggest only a risk of targeted violence to *Guard members*, not the public. JA743, JA794, JA799. The Guard presence has enhanced public safety, as even the District's Mayor has acknowledged. *See infra* pp. 26-27.

**iii.** Plaintiff asserts that the deployments have harmed local businesses and reduced tax revenue. The district court correctly suggested that these claimed injuries might be too speculative to even support Article III standing, let alone for irreparable harm, *see* JA821 n.9. Plaintiff cites only a declaration noting that daily hotel occupancy from August 11-30, 2025, declined 3.9% compared to the same period in 2024. JA513. That alleged decline, itself quite modest, is even less significant given the declaration's acknowledgment that 2025 daily hotel occupancy was already down 1.9% year over year. Moreover, this August period was the end

24

of tourist season and, as a Washington Post article plaintiff relied on below noted, even before the Guard showed up, "[b]y several key indicators — marketing forecasts, street-level foot traffic, hotel occupancy — Washington's tourism economy is sliding." *See* Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, Wash. Post (Aug. 29, 2025).[4] Weeks before the deployment, plaintiff's marketing organization partner "had forecast a roughly 5 percent dip in international visitors this year." *Id.*

**iv.** Plaintiff contends that the deployments pull Guard members away from other potential missions. Answering Br. 55. But plaintiff does not demonstrate any concrete adverse impacts to existing state operations. The governors of the cooperating states presumably determined that the deployments would not compromise the ability of their Guards to perform state functions, and if a state needs Guard members currently deployed to D.C., the governor can withdraw them at any time. *See supra* pp. 18-19. And in any event, this would not be an injury *to plaintiff*, let alone irreparable injury warranting an injunction.

**v.** That leaves plaintiff's various claims that District residents fear the Guard. Answering Br. 53, 55. If particular residents feel this way, that is of course regrettable. But defendants have no control over the subjective reactions of third

---

[4] https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

parties. Notably, plaintiff does not point to a single incident where Guard members have even allegedly done anything wrong, let alone anything that could reasonably stoke fear.

**2.** On the other side of the ledger, the injunction "implicates the strong federal interest in the protection of federal functions and property within the Nation's Capital." *Stay Decision*, at \*11. It would also require unwinding memoranda of understanding negotiated between the highest levels of the federal government and the governments of the States who agreed to provide assistance. JA547-78. And it would disrupt the lives of affected service members, who have been deployed "without concrete signs of having caused irreparable harm to the District." *Stay Decision*, at \*11.

The resulting disruptions to the federal government's operations and public safety in the District would be substantial. As the district court acknowledged, the National Guard has taken over patrolling some parks, freeing up the Park Police to assist the MPD in other activities. JA817. This is helpful, since the District has an acknowledged shortage of police officers, and the MPD's current manpower is well below Mayor Bowser's longstanding goal (a point plaintiff does not address). Opening Br. 13.

Indeed, even Mayor Bowser has noted that "violent crime in the District has noticeably decreased" since August, "due to the cooperative efforts between District

26

and federal officials," Mayor's Order No. 2025-090, *Creation of the Safe and Beautiful Emergency Operations Center* § I.E (Sep. 2, 2025). Plaintiff insists that the Mayor "has expressly distinguished Guard members from federal civilian law enforcement and credited only the latter with helping reduce crime." Answering Br. 11-12. But even assuming this litigation gloss on the Mayor's statement is what she meant, this assistance from federal civilian law enforcement is substantially enabled by the Guard's presence, which frees up federal forces to partner with the MPD. The balance of equities strongly favors vacatur.

## CONCLUSION

The Court should vacate the injunction.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7539*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3511*
  *andrew.bernie@usdoj.gov*

June 2026

28

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 6,378 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman font.

/s/ *Andrew M. Bernie*
ANDREW M. BERNIE